CUAUHTÉMOC ORTEGA (Bar No. 257443)
Federal Public Defender
C. PAMELA GÓMEZ (Bar No. 233848)
(E-Mail: Pamela_Gomez@fd.org)
AJAY V. KUSNOOR (Bar No. 273929)
(E-Mail: Ajay_Kusnoor@fd.org)
LAURA PAUL (Bar No. 329386)
(E-mail: Laura_Paul@fd.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Movant
IOURI MIKHEL

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IOURI MIKHEL, | Case No. 23-cv-08403 |
| Petitioner, | Related Case No, CR 02-00220-MCS |
| v. | **DEATH PENALTY CASE** |
| UNITED STATES OF AMERICA, | **CORRECTED MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY 28 U.S.C § 2255** |
| Respondent. | |

CUAUHTÉMOC ORTEGA (Bar No. 257443)
Federal Public Defender
C. PAMELA GÓMEZ (Bar No. 233848)
(E-Mail:  Pamela_Gomez@fd.org)
AJAY V. KUSNOOR (Bar No. 273929)
(E-Mail:  Ajay_Kusnoor@fd.org)
LAURA PAUL (Bar No. 329386)
(E-mail: Laura_Paul@fd.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone:  (213) 894-2854
Facsimile:  (213) 894-0081

Attorneys for Movant
IOURI MIKHEL

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. CR 02-00220-MCS |
|---|---|
| Plaintiff, | **DEATH PENALTY CASE** |
| v. | **MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY 28 U.S.C § 2255** |
| IOURI MIKHEL, et al, | |
| Defendant. | |

# TABLE OF CONTENTS

Page

I. STATEMENT REGARDING FORM ................................................................................1

II. INTRODUCTION AND PROCEDURAL HISTORY.................................................1

III. FACTUAL BACKGROUND .......................................................................................4

    A.    June 2002 to August 2004: Pre-authorization advocacy without the assistance of a mitigation specialist or penalty-phase experts .........................5

    B.    September 2004: Appointment of mitigation specialist Holly Jackson ...........6

    C.    April 2006: Reassignment to Judge Dickran Tevrizian..................................7

    D.    September 2006 to January 2007: The guilt phase trial...................................8

    E.    January to February 2007: Penalty phase trial .................................................9

IV. ALLEGATIONS APPLICABLE TO EACH AND EVERY CLAIM ......................11

V. LEGAL STANDARDS RELATING TO INEFFECTIVE ASSISTANCE OF COUNSEL...............................................................................................................13

VI. CLAIMS FOR RELIEF...............................................................................................15

CLAIM 1: SPECIAL ADMINISTRATIVE MEASURES VIOLATED MIKHEL'S

FEDERAL CONSTITUTIONAL RIGHTS..................................................................15

    A.    Facts currently known in support of the claim..............................................16

        1.    Background regarding DOJ's use of Special Administrative Measures (SAMs) in the post-9/11 era...............................................16

        2.    The DOJ imposed a SAMs order against Mikhel on June 6, 2003, but waited another two and a half years to provide written notice of the basis for the order..................................................16

        3.    The SAMs order imposed a host of impairments on Mikhel's access to his legal team and defense experts .....................................18

        4.    After the imposition of the SAMs order, Mikhel's mental health dramatically deteriorated ................................................................21

        5.    The government weaponized the SAMs order at the penalty phase...22

        6.    After Mikhel was sentenced to death, the government repudiated the notion that Mikhel had ties to Russian Organized Crime, one of the purported bases for imposing SAMs......................................22

        7.    The SAMs order continued to impact Mikhel and his defense team on direct appeal to the Ninth Circuit...............................................23

        8.    Prolonged solitary confinement is a form of torture........................24

# TABLE OF CONTENTS

Page

B.    Analysis ..................................................................................................24

    1.    Imposition of a SAMs order on a false basis violated Mikhel's right to due process ..............................................................24

    2.    SAMs restrictions interfered with Mikhel's right to counsel and right to present a defense ........................................25

    3.    SAMs impaired Mikhel's competence to stand trial ..........................26

    4.    SAMs confinement violated the prohibition against double jeopardy ............................................................................27

    5.    SAMs confinement is cruel and unusual punishment ......................27

C.    Conclusion .............................................................................................27

CLAIM 2: TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO DECLARE DOUBT AS TO MIKHEL'S COMPETENCY, RESULTING IN MIKHEL BEING TRIED WHILE INCOMPETENT IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION ...........28

A.    Legal basis ..............................................................................................28

B.    Factual Background ................................................................................31

    1.    There were sufficient indicia of incompetence to give objectively reasonable counsel a reason to doubt defendant's competency .........31

    2.    There was a reasonable probability that Mikhel would have been found incompetent .................................................................42

C.    Mikhel was incompetent to stand trial .................................................43

D.    Conclusion .............................................................................................47

CLAIM 3: TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PREPARE AND PRESENT MITIGATING EVIDENCE AT THE AUTHORIZATION STAGE .........................................................48

A.    Standard of Care.....................................................................................48

B.    Background regarding the authorization process ..................................49

C.    Facts in support of claim ........................................................................50

D.    Argument ................................................................................................53

CLAIM 4: INEFFECTIVE ASSISTANCE AT THE GUILT PHASE ...........................54

A.    Trial counsel were ineffective for failing to investigate and challenge the government's forensic science evidence.......................................55

    1.    Legal basis.................................................................................55

ii

# TABLE OF CONTENTS

Page

2.    Forensic science controversies in the decade before Mikhel's trial would have caused reasonable counsel to scrutinize the government's evidence ................................................................................. 56

3.    Counsel failed to investigate and challenge the pathology findings .... 58

    a.    Factual background regarding the evidence at trial and new pathological evidence first developed in post-conviction proceedings .................................................................................. 59

        (1)    The autopsy of Rita Pekler was flawed, resulting in scientifically unreliable testimony regarding cause and time of death ............................................................. 60

        (2)    The prosecution presented scientifically unreliable testimony regarding Alex Umansky's cause and time of death ................................................................. 61

        (3)    The prosecution presented scientifically unreliable testimony regarding the time of Meyer Muscatel's death ........................................................................ 63

        (4)    The autopsy of Nick Kharabadze was not performed competently and was insufficiently documented ........... 63

        (5)    Dr. Lawrence reached an opinion concerning the cause of Safiev's death based on hearsay accounts of crime-scene evidence, rather than his own personal observations of the autopsy ......................................... 64

    b.    Trial counsel provided prejudicially deficient performance by failing to investigate the pathology evidence and challenge it at trial ................................................................. 65

4.    Counsel failed to investigate and challenge the government's toxicology evidence ................................................................... 66

5.    Counsel failed to investigate and challenge the government's trace evidence analysis ................................................................ 68

    a.    Karen Korsberg testified regarding her analysis of rope, cordage, and hair evidence ...................................................... 69

    b.    The jury never heard about serious flaws in the FBI's analysis of the fiber and the rope ........................................... 70

    c.    Counsel opened the door to damaging testimony about hair evidence and mitochondrial DNA (mtDNA) testing .............. 72

    d.    Counsel's examination of Korsberg was inadequate ............... 72

    e.    Prejudice resulted ................................................................. 73

6.    Counsel failed to investigate and challenge the presentation of cell site location information ...................................................... 74

# TABLE OF CONTENTS

Page

7. Counsel failed to object to testimonial hearsay admitted in violation of Mikhel's rights under the Confrontation Clause ............ 77

8. Counsel's inadequate investigation of all other forensic evidence was also deficient performance ........................................................ 79

B. Counsel's deficient performance extended throughout the guilt phase. ....... 79

1. Counsel failed to object when the prosecutor vouched for the government witnesses through their plea agreements........................ 79

2. Counsel elicited "truthful testimony" provisions from government witnesses .................................................................................. 82

3. Counsel elicited irrelevant and prejudicial guilt-phase testimony from the victim's family ................................................................ 84

4. Counsel failed to retain appropriate experts ..................................... 85

5. Counsel failed to investigate and present a mental state defense at the guilt phase .................................................................................. 86

6. Counsel failed to properly cross-examine Altmanis with his prior inconsistent statements ................................................................ 86

7. Counsel failed to adequately cross-examine material witnesses Andrei Liapine and Andrei Agueev .................................................. 88

8. Counsel provided ineffective assistance when he challenged the wiretaps in this case................................................................ 90

9. Counsel failed to object to a partial courtroom closure ..................... 91

   a. The trial court ejected Armen Harutiunian from the courtroom based on unfounded speculation about his alleged gang affiliation................................................... 92

   b. Counsel's failure to investigate Harutiunian and object to his exclusion was deficient performance......................................... 94

   c. Prejudice resulted................................................................... 95

C. Cumulative prejudice ............................................................................ 96

CLAIM 5: TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE AT THE PENALTY PHASE................................................................... 96

A. Legal Basis and Standard of Care............................................................ 96

B. Analysis ................................................................................................ 98

1. Trial counsel provided deficient performance ................................... 98

   a. Counsel had no unified strategy for the guilt and penalty-phase defenses .............................................................. 98

# TABLE OF CONTENTS

Page

b. Counsel failed to establish a relationship of trust and confidence with Mikhel..........................................................100

c. Counsel's inadequate investigation and presentation of Mikhel's social history was deficient performance.................102

    (1) Failure to investigate family background and life history in the former Soviet Union, Mikhel's place of birth ...............................................................................105

    (2) Failure to investigate Mikhel's experiences after he emigrated from Russia..................................................112

    (3) Failure to investigate and present evidence regarding the intergenerational transmission of trauma ..............112

    (4) Improper reliance on videotaped witness interviews, rather than the presentation of live testimony.............114

d. Counsel's investigation and presentation of mental health evidence was inadequate .........................................115

    (1) Inadequate investigation of Mikhel's mental health ....115

    (2) Inadequate presentation of mental-health testimony ..117

    (3) Improper reliance on an expert who lacked credibility 119

e. Counsel failed to rebut the government's case-in-aggravation with readily available evidence ...........................120

    (1) Failure to present evidence that Mikhel could be safely confined within the BOP..................................121

    (2) Failure to present evidence that the MDC escape attempt, which hinged on the bumbling efforts of a cocaine addict, was unlikely to succeed......................124

    (3) Failure to present evidence that the SB-CDC escape "attempt" was also unrealistic....................................128

    (4) Failure to respond to the government's victim impact evidence ...............................................................129

f. Counsel failed to object to an improper aggravating factor...132

g. Counsel failed to object to the prosecutor's improper closing argument.................................................................132

2. Counsel's deficient performance resulted in prejudice.....................135

a. Social history evidence, including evidence of generational trauma in the Mikhel family, would have made a difference at the penalty phase .........................................................136

# TABLE OF CONTENTS

Page

(1) Mikhel's parents and grandparents experienced significant disruption in their lives during and after the Bolshevik revolution...............................136

(2) Mikhel's parents endured significant trauma during World War II.........................................138

(3) Iouri Mikhel's difficult childhood and adolescence.....143

(4) Vladimir Mikhel's alcoholism and suicide...................144

(5) Mikhel's desperate efforts to avoid military conscription led to his arrest and imprisonment, a turning point in his life ................................145

(6) Perestroika and the culture of "conspicuous consumption"...........................................146

(7) Mikhel's struggles in the 1990s: erratic finances and untreated mental health issues .....................148

(8) Mikhel's friendship with David and Linda Morrow....149

(9) Evidence of Mikhel's positive influence on Anton Abramkin, Marina Karagodina's son ...........150

   b. Mitigating mental health evidence justifies a sentence less than death........................................151

   c. New evidence rebutting the government's case-in-aggravation would have caused at least one juror to have reasonable doubt as to a death sentence.............................152

C. Conclusion ...................................................153

CLAIM 6: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO FILE A TIMELY MOTION FOR RECUSAL.......................................153

A. Legal basis for the claim .........................................153

   1. The trial court must recuse so long as there is a potential for bias or an appearance of unfairness........................................153

   2. Trial counsel have an obligation to move for recusal where there are clear indicia of potential bias ...............................154

A. Facts currently known in support of the claim............................154

B. Analysis ......................................................158

   1. Trial counsel provided deficient performance by failing to investigate Judge Tevrizian's disclosure.................................158

   2. Trial counsel provided deficient performance by failing to file a timely motion........................................159

## TABLE OF CONTENTS

Page

3.   Prejudice resulted from counsel's deficient performance..................160

C.   Conclusion ...................................................................161

CLAIM 7: COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO THE ANONYMOUS JURY ..................................................161

A.   Legal basis ...................................................................161

B.   Factual basis ................................................................162

CLAIM 8: THE TRIAL COURT DENIED MIKHEL FUNDING TO MOUNT A TIMELY AND CONSTITUTIONALLY ADEQUATE DEFENSE, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS OF THE UNITED STATES CONSTITUTION..........165

A.   Legal basis ...................................................................165

1.   The Court abdicated its responsibility to provide resources for Mikhel to subject the prosecution's case to meaningful adversarial testing ..................................................................165

B.   The Court abdicated its responsibility to ensure Mikhel could rely on the guiding hand of counsel at critical times during the proceedings ..............170

C.   The Court's failure to provide the required resources in a timely manner precluded the defense from subjecting the prosecution's case to meaningful adversarial testing at critical times during the proceedings.......170

D.   The denial of funding for a mitigation specialist early in the case prejudiced Mikhel at trial .........................................................171

CLAIM 9: MIKHEL WAS DENIED HIS RIGHT TO CONFLICT-FREE REPRESENTATION ............................................................172

A.   Legal basis ...................................................................173

B.   Facts currently known in support of this claim...........................174

1.   Mikhel sought new counsel based on a breakdown in his relationship with Rubin and Callahan...............................174

2.   Mikhel renewed his request for substitution of counsel because trial counsel refused to prepare him for his guilt-phase testimony...175

3.   At the penalty phase, Mikhel requested that the trial court appoint Holly Jackson to take over the representation from Rubin.............177

4.   Other team members' declarations support Mikhel's account of a breakdown in the attorney-client relationship and undercut Rubin's representation that Mikhel was merely attempting to manipulate the Court..................................................................178

C.   Analysis ......................................................................179

# TABLE OF CONTENTS

Page

1.   The trial court conducted an inadequate inquiry ............................... 179

2.   The conflict was extensive ............................................................ 180

3.   Mikhel's request for new counsel was timely ................................. 181

4.   The Court must presume prejudice, but even if a showing of prejudice is required, Mikhel is still entitled to relief ........................ 181

CLAIM 10: GOVERNMENT MISCONDUCT DEPRIVED MIKHEL OF A FAIR TRIAL ................................................................................................. 182

A.   Legal basis ........................................................................................ 182

B.   The government violated Mikhel's rights to due process when it created the false impression that Mikhel had ties to Russian Organized Crime. ..... 185

C.   The government failed to correct other false impressions ......................... 190

D.   The government violated Mikhel's Sixth Amendment rights when it used confidential informants to gather inculpatory evidence from Mikhel while in custody and while represented by counsel ............................................... 190

1.   The government relied on Gitte Lellan, a confidential informant, to obtain information about Mikhel's attempted escape and wire transfers ........................................................................................ 191

a.   Facts currently known in support of the claim ...................... 191

b.   The Government violated *Massiah* and its progeny .............. 194

2.   The government relied on other informants to unconstitutionally obtain information the government used to argue Mikhel presented a future danger ........................................................... 196

E.   The government suppressed information concerning institutional involvement in the attempted escape from MDC. ................................... 197

F.   The government suppressed other *Brady* information ............................. 198

G.   Other instances of prosecutorial misconduct ......................................... 198

H.   Conclusion ....................................................................................... 203

CLAIM 11: MIKHEL IS ENTITLED TO RELIEF ON HIS CLAIM OF JUDICIAL BIAS ................................................................................................. 204

A.   Legal basis ........................................................................................ 204

B.   Facts currently known in support of the claim ....................................... 205

1.   The court responded to trial counsel's brain injury by accusing him of perjury, ordering his medical records, and interrogating his treating physician in court ............................................................. 205

## TABLE OF CONTENTS

Page

2. Judge Tevrizian's *sua sponte* objections on behalf of the government are also evidence of bias ................................................................206

3. While his application to be the U.S. Attorney was pending, the trial judge refused to allow defense counsel to present evidence of misconduct in the U.S. Attorney's office ........................................207

4. Judge Tevrizian made inappropriate comments throughout Mikhel's guilt-phase testimony ....................................................208

5. Judge Tevrizian belatedly disclosed financial ties to a witness..........209

C. Conclusion ................................................................................209

CLAIM 12: MIKHEL WAS DENIED A FAIR AND IMPARTIAL JURY .................210

A. Mikhel's jury was not drawn from a fair cross section of the community ..210

   1. Legal basis ................................................................................211

   2. Methodology and data................................................................212

   3. Hispanic jurors were systematically underrepresented in Mikhel's jury pool................................................................................212

      a. Hispanics are a 'distinctive' group under Duren...................212

      b. The number of Hispanics was disproportionately low ..........213

      c. The underrepresentation of Hispanics in Mikhel's jury pool was systemic ................................................................213

      d. Other disparities suggest a systemic origin...........................214

      e. Exclusive use of voter registration lists created a disparity....215

   4. The disparity is systemic.............................................................216

B. Mikhel's trial counsel were ineffective for failing to challenge the venire based on the Fair Cross-Section violation................................................216

C. Mikhel was denied a fair and impartial jury by the Court's limitations on voir dire................................................................................217

D. Mikhel was denied the effective assistance of counsel during voir dire ......219

   1. Legal basis ................................................................................220

   2. Counsel ineffectively failed to object to the government's discriminatory use of peremptory strikes.........................................220

   3. Analysis of the seated jury...........................................................223

      a. The prosecutor struck a disproportionate number of Black jurors .....................................................................................226

# TABLE OF CONTENTS

Page

b.   The prosecution struck a disproportionate number of Hispanic, Asian, and women jurors.......................................228

c.   Reasonable counsel would have objected to the prosecutor's peremptory strikes of female jurors and jurors of color ........229

E.   Counsel were ineffective for failing to conduct adequate voir dire.............230

F.   Counsel failed to appropriately consult with retained experts ...................230

G.   Prejudice...........................................................................................231

CLAIM 13: JUROR MISCONDUCT....................................................................231

CLAIM 14: MIKHEL WAS PLACED IN VISIBLE RESTRAINTS AT TRIAL, IN VIOLATION OF HIS RIGHT TO DUE PROCESS ...............................233

CLAIM 15: MIKHEL WAS DENIED THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL...........................................................................234

CLAIM 16: MIKHEL IS ENTITLED TO RELIEF BASED ON THE PRESENTATION OF FAULTY FORENSIC EVIDENCE AT TRIAL ..235

A.   Legal basis ......................................................................................235

B.   Facts currently known in support of the claim...........................................235

CLAIM 17: THE FEDERAL DEATH PENALTY ACT AND ITS ADMINISTRATION ARE UNCONSTITUTIONAL...............................239

A.   Legal basis ......................................................................................240

B.   The FDPA fails to narrow the class of death-eligible offenders in violation of Mikhel's Eighth Amendment rights.......................................240

C.   Because the FDPA fails to narrow those who are death eligible, the death penalty is arbitrary and capricious as applied to Mikhel ...........................241

CLAIM 18: CUMULATIVE ERROR .........................................................................244

VII  PRAYER FOR RELIEF .................................................................................245

**TABLE OF AUTHORITIES**

Page(s)

**Federal Cases**

*Abdul-Kabir v. Quarterman,*
550 U.S. 233 (2007)................................................................................ 135

*Ainsworth v. Woodford,*
268 F.3d 868 (9th Cir. 2001) ................................................................. 102

*Ake v. Oklahoma,*
470 U.S. 68 (1985)................................................................... 41, 42, 170

*Batson v. Kentucky,*
476 U.S. 79 (1986)...........................................................................*passim*

*Berger v. United States,*
295 U.S. 78 (1935)................................................................. 4, 124, 182

*Berghuis v. Smith,*
559 U.S. 314 (2010).................................................................... 211, 213

*Bittaker v. Woodford,*
337 F.3d 715 (2003) ............................................................................... 33

*Bobby v. Van Hook,*
558 U.S. 4 (2009).................................................................................... 14

*Bouchillon v. Collins,*
907 F.2d 589 (5th Cir. 1990) ........................................................... 28, 29

*Bracy v. Gramley,*
520 U.S. 899 (1997)............................................................................. 204

*Brady v. Maryland,*
373 U.S. 83 (1963)............................................... 182, 185, 197, 198

*Brecht v. Abrahamson,*
507 U.S. 619 (1993)............................................................................... 12

*Browning v. Baker,*
875 F.3d 444 (9th Cir 2017) ................................................................. 56

*Buck v. Davis,*
580 U.S. 100 (2017)............................................................................... 14

## TABLE OF AUTHORITIES

Page(s)

*Bucklew v. Precythe*,
139 S. Ct. 1112 (2019)..................................................................................... 27

*Burt v. Uchtman*,
422 F.3d 557 (7th Cir. 2005) ..................................................................... 29, 41

*Caro v. Woodford*,
280 F.3d 1247 (9th Cir. 2002) ............................................................... 115, 151

*Chambers v. Mississippi*,
410 U.S. 284 (1973)................................................................................ 12, 244

*Coleman v. Thompson*,
501 U.S. 722 (1991)................................................................................. 12, 13

*Commonwealth v. Mendiola*,
976 F.2d 475 (9th Cir. 1992) ......................................................................... 184

*Cooper v. Fitzharris*,
586 F.2d 1325 (9th Cir. 1978) ......................................................................... 14

*Cooper v. Oklahoma*,
517 U.S. 348 (1996)......................................................................................... 28

*Cox v. Ayers*,
613 F.3d 883 (9th Cir. 2010) ........................................................................... 97

*Crawford v. Washington*,
541 U.S. 36 (2004).................................................................................... 77, 78

*Daniels v. Woodford*,
428 F.3d 1181 (9th Cir. 2005) ........................................................ 173, 180, 181

*Daubert v. Merrell Dow Pharmaceuticals*,
509 U.S. 579 (1993)................................................................................. 54, 55

*Deck v. Missouri*,
544 U.S. 622 (2005)....................................................................................... 233

*Dickey v. Davis*,
69 F.4th 624 (9th Cir. 2023)........................................................... 182, 188, 189

*Doe v. Ayers*,
782 F.3d 425 (9th Cir. 2015) ........................................................................ 220

## TABLE OF AUTHORITIES

Page(s)

*Donnelly v. DeChristoforo*,
416 U.S. 637 (1974)................................................................................. 183

*Drayden v. White*,
232 F.3d 704 (9th Cir. 2000) .................................................................. 183

*Drope v. Missouri*,
420 U.S. 162 (1975)................................................................................... 28

*Dunn v. Neal*,
44 F.4th 696 (7th Cir. 2022) .................................................................... 65

*Duren v. Missouri*,
439 U.S. 357 (1979).............................................................. 211, 212, 213

*Dusky v. United States*,
362 U.S. 402 (1960)...................................................................... 28, 41, 48

*Dyas v. Poole*,
317 F.3d 934 (9th Cir. 2003) .................................................................. 234

*E. & J. Gallo Winery v. Gallo Cattle Co.*,
967 F.2d 1280 (9th Cir. 1992) ................................................................ 159

*Elmore v. Ozmint*,
661 F.3d 783 (4th Cir. 2011) .................................................................... 56

*Estelle v. Williams*,
425 U.S. 501 (1976)................................................................................. 233

*Evitts v. Lucey*,
469 U.S. 387 (1985)........................................................................ 13, 234

*Foster v. California*,
394 U.S.440 (1969)................................................................................. 183

*Franks v. Delaware*,
438 U.S. 154 (1978).................................................................................. 90

*Furman v. Georgia*,
408 U.S. 238 (1972.)............................................................................... 240

*Gannett Co. v. DePasquale*,
443 U.S. 368 (1979)................................................................................ 169

# TABLE OF AUTHORITIES

Page(s)

*Gardner v. Florida*,
430 U.S. 349 (1977)........................................................................217, 219

*Gideon v. Wainwright*,
372 U.S. 335 (1963)................................................................ 14, 165, 166

*Giglio v. United States*,
405 U.S. 150 (1972)................................................................... 183, 185

*Gimenez v. Ochoa*,
821 F.3d 1136 (9th Cir. 2016) .......................................................235, 239

*Globe Newspaper v. Superior Court*,
457 U.S. 596 (1982)........................................................................... 91

*Glossip v. Gross*,
576 U.S. 863 (2015)......................................................................... 244

*Godfrey v. Georgia*,
446 U.S. 420 (1980)......................................................................... 240

*Gonzalez v. Wong*,
667 F.3d 965 (9th Cir. 2011) ........................................................ 88, 199

*Government of Virgin Islands v. Forte*,
865 F.2d 59 (3d Cir. 1989) ............................................................... 230

*Greer v. Miller*,
483 U.S. 756 (1987)........................................................................ 183

*Greer v. Mitchell*,
264 F.3d 663 (6th Cir. 2001) ...................................................... 15, 234

*Gregg v. Georgia*,
428 U.S.153 (1976)................................................................... 240, 243

*Griffin v. California*,
380 U.S. 609 (1965)........................................................................ 232

*Hayes v. Brown*,
399 F.3d 972 (9th Cir. 2005) ........................................................... 185

*Hibbler v. Benedetti*,
693 F.3d 1140 (9th Cir. 2012) ............................................................ 29

**TABLE OF AUTHORITIES**

Page(s)

*Hinton v. Alabama*,
  571 U.S. 263 (2014)............................................................... 30, 55, 217, 230

*Holbrook v. Flynn*,
  475 U.S. 560 (1986)................................................................................ 233

*House v. Bell*,
  547 U.S. 518 (2006)................................................................................. 12

*Hull v. Kyler*,
  190 F.3d 88 (3d Cir. 1999) ....................................................................... 30

*Illinois v. Allen*,
  397 U.S. 337 (1970)................................................................................ 233

*In re Al-Nashiri*,
  921 F.3d 224 (D.C. Cir. 2019)................................................................. 158

*In re Medley*,
  134 U.S. 160 (1890)................................................................................. 27

*In re Murchison*,
  349 U.S. 133 (1955)................................................................................ 153

*Irvin v. Dowd*,
  366 U.S. 717 (1961)................................................................................ 232

*Johnson v. Sublett*,
  63 F.3d 926 (9th Cir. 1995) ..................................................................... 183

*Johnson v. Zerbst*,
  304 U.S. 458 (1938)................................................................................. 14

*Kyles v. Whitley*,
  514 U.S. 419 (1995)................................................................................ 183

*Lambright v. Schriro*,
  490 F.3d 1103 (9th Cir. 2007) .................................................................. 42

*Lockett v. Ohio*,
  438 U.S. 586 (1978)................................................................................ 217

*Lowenfield v. Phelps*,
  484 U.S. 231 (1988)................................................................................ 240

## TABLE OF AUTHORITIES

Page(s)

*Madrid v. Gomez*,
889 F.Supp. 1146 (N.D. Cal. 1995)................................................................. 32, 44

*Massiah v. United States*,
377 U.S. 201 (2009).................................................... 190, 194, 195

*Mattox v. United States*,
146 U.S. 140 (1892).................................................................... 232

*Maxwell v. Roe*,
606 F.3d 561 (9th Cir. 2010) ................................................................ 46

*McCleskey v. Kemp*,
481 U.S. 279 (1987)...................................................................... 183

*McKaskle v. Wiggins*,
465 U.S. 168 (1984)....................................................................... 233

*McKernan v. Superintendent Smithfield SCI*,
849 F.3d 557 (3d Cir. 2017) ................................................................. 154

*McMann v. Richardson*,
397 U.S. 759 (1970)........................................................................ 169

*McWilliams v. Dunn*,
582 U.S. 183 (2017)........................................................................ 169

*Medina v. California*,
505 U.S. 437 (1992)........................................................................ 28

*Miller v. Pate*,
386 U.S. 1 (1967).................................................................... 184, 188

*Miranda v. Arizona*,
384 U.S. 346 (1966)........................................................ 200, 202, 203

*Missouri v. Seibert*,
542 U.S. 600 (2004).................................................................... 202

*Mitchell v. United States*,
526 U.S. 314 (1999).................................................................... 232

*Mooney v. Holohan*,
294 U.S. 103 (1935).................................................................... 185

**TABLE OF AUTHORITIES**

Page(s)

*Morgan v. Illinois*,
504 U.S. 719 (1992)............................................................................*passim*

*Murtishaw v. Woodford*,
255 F.3d 926 (9th Cir. 2001) ............................................................ 135

*Napue v. People of State of Illinois*,
360 U.S. 264 (1959).............................................................. 182, 184, 185

*Neder v. United States*,
527 U.S. 1 (1999)............................................................................... 91

*North Carolina v. Pearce*,
395 U.S. 711 (1969)........................................................................... 27

*Parker v. Dugger*,
498 U.S. 308 (1991)......................................................................... 234

*Parker v. Gladden*,
385 U.S. 363 (1966)......................................................................... 232

*Parle v. Runnels*,
505 F.3d 922 (9th Cir. 2007) ...................................................... 12, 244

*Pate v. Robinson*,
383 U.S. 375 (1966)............................................................... 28, 47, 48

*Pena-Rodriguez v. Colorado*,
580 U.S. 206 (2017)......................................................................... 232

*Perry v. Leeke*,
488 U.S. 272 (1989)......................................................................... 181

*Porter v. McCollum*,
558 U.S. 30 (2009)................................................................. 13, 14, 97

*Press-Enterprise Co. v. Superior Court*,
464 U.S. 501 (1984)........................................................................... 91

*Press-Enterprise Co. v. Superior Court*,
478 U.S. 1 (1986).............................................................................. 91

*Preston v. United States*,
923 F.2d 731 (9th Cir. 1991) ...................................................... 154, 159

<u>**TABLE OF AUTHORITIES**</u>

Page(s)

*Ramseyer v. Wood,*
64 F.3d 1432 (9th Cir. 1995) ..................................................................................... 231

*Rhoden v. Rowland,*
172 F.3d 633 (9th Cir. 1999) ..................................................................................... 233

*Richmond Newspapers, Inc. v. Virginia,*
448 U.S. 555 (1980) ...................................................................................................... 91

*Rippo v. Baker,*
580 U.S. 285 (2017) ..................................................................................................... 204

*Rivas v. Fischer,*
780 F.3d 529 (2d Cir. 2015) ......................................................................................... 65

*Rompilla v. Beard,*
545 U.S. 374 (2005) ................................................................................ 13, 97, 102, 120

*Schell v. Witek,*
218 F.3d 1017 (9th Cir. 2000) .................................................................................... 181

*Sharp v. Puckett,*
930 F.2d 450 (5th Cir. 1991) ....................................................................................... 15

*Silva v. Woodford,*
279 F.3d 825 (9th Cir. 2002) ................................................................................ 97, 102

*Skipper v. South Carolina,*
476 U.S. 1 (1986) .......................................................................................................... 95

*Smith v. Phillips,*
455 U.S. 209 (1982) ..................................................................................................... 183

*Smith v. Robbins,*
528 U.S. 259 (2000) ................................................................................................ 15, 235

*Snyder v. Louisiana,*
552 U.S. 472 (2008) ................................................................................... 223, 228, 229

*Strickland v. Washington,*
466 U.S. 668 (1984) ................................................................................................ *passim*

*Strickler v. Greene,*
527 U.S. 263 (1999) ..................................................................................................... 185

## TABLE OF AUTHORITIES

Page(s)

*Taylor v. Louisiana*,
419 U.S. 522 (1975)...................................................................................... 210

*Tennard v. Dretke*,
542 U.S. 274 (2004)...................................................................................... 134

*Thomas v. Clements*,
789 F.3d 760 (7th Cir. 2015) ........................................................................ 65

*Thomas v. Lumpkin*,
995 F.3d 432 (5th Cir. 2021) ...................................................................... 220

*Thompson v. Calderon*,
120 F.3d 1045 (9th Cir. 1997) .................................................................... 189

*United States. v. Fernandez*,
388 F.3d 1199 (9th Cir. 2004) .................................................................... 161

*United States. v. Peoples*,
250 F.3d 630 (8th Cir. 2001) ...................................................................... 162

*United States ex rel. Thompson v. Dye*,
221 F.2d 763 (3rd Cir. 1955) ...................................................................... 184

*United States v. Agurs*,
427 U.S. 97 (1976)....................................................................................... 185

*United States v. Allsup*,
566 F.2d 68 (9th Cir. 1977) ................................................................ 204, 209

*United States v. Bryan*,
868 F.2d 1032 (9th Cir. 1989) .................................................................... 183

*United States v. Conforte*,
624 F.2d 869 (9th Cir. 1980) ...................................................................... 154

*United States v. Dozier*,
844 F.2d 701 (9th Cir. 1988) ........................................................................ 90

*United States v. Duncan*,
643 F.3d 1242 (9th Cir. 2011) ...................................................................... 29

*United States v. Elliott*,
893 F.2d 220 (9th Cir. 1990) ........................................................................ 90

# TABLE OF AUTHORITIES

Page(s)

*United States v. Feldman*,
  983 F.2d 144 (9th Cir. 1992) .......................................................................... 159

*United States v. Fell*,
  224 F. Supp. 3d 327 (D. Vt. 2016) .......................................................... 242, 243

*United States v. Gomez-Gallardo*,
  915 F.2d 553 (9th Cir. 1990) .......................................................................... 184

*United States v. Hernandez-Estrada*,
  749 F.3d 1154 (9th Cir. 2014) ................................................................. 211, 216

*United States v. Loyola-Dominguez*,
  125 F.3d 1315 (9th Cir. 1997) ........................................................................ 28

*United States v. Martinez-Salazar*,
  528 U.S. 304 (2000) ........................................................................................ 219

*United States v. Mikhel*,
  552 F.3d 961 (9th Cir. 2009) ............................................................................ 24

*United States. v. Mikhel*,
  889 F.3d 1003 (9th Cir. 2018) ................................................................. *passim*

*United States v. Montalvo*,
  331 F.3d 1052 (9th Cir. 2003) .......................................................................... 12

*United States v. Moore*,
  159 F.3d 1154 (9th Cir. 1998) ................................................... 173, 174, 181

*United States v. North*,
  910 F.2d 843 (D.C. Cir. 1990) ...................................................................... 184

*United States v. Pena-Garcia*,
  505 F.2d 964 (9th Cir. 1974) ................................................................. 204, 206

*United States v. Reid*,
  214 F. Supp. 2d. 84 (D. Mass. 2002) ............................................................ 25, 26

*United States v. Reinhart*,
  357 F.3d 521 (5th Cir. 2004) ........................................................................... 15

*United States v. Rivera*,
  682 F.3d 1223 (9th Cir. 2012) ......................................................................... 95

# TABLE OF AUTHORITIES

Page(s)

*United States v. Roberts,*
618 F.2d 530 (9th Cir. 1980) ................................................................ 80, 83

*United States v. Rodriguez-Lara,*
421 F.3d 932 (9th Cir. 2005) ..................................................................... 212

*United States v. Rogers,*
119 F.3d 1377 (9th Cir. 1997) .................................................................... 160

*United States v. Sattar,*
395 F. Supp. 2d 79 (S.D.N.Y. 2005) ........................................................... 19

*United States v. Savage,*
970 F.3d 217 (3d Cir. 2020) ...................................................................... 216

*United States v. Service Deli, Inc.,*
151 F.3d 938 (9th Cir. 1998) ..................................................................... 183

*United States v. Severdija,*
790 F.2d 1556 (11th Cir. 1986) ................................................................. 184

*United States v. Shryock,*
342 F.3d 948 (9th Cir. 2003) ................................................... 161, 162, 164

*United States v. Smith,*
723 F.3d 510 (4th Cir. 2013) ....................................................................... 12

*United States v. Socony-Vacuum Oil Co.,*
310 U.S. 150 (1940) ................................................................................... 184

*United States v. Tham,*
960 F.2d 1391 (9th Cir. 1992) ..................................................................... 90

*United States v. Velazquez,*
855 F.3d 1021 (9th Cir. 2017) ........................................................... 173, 179

*United States v. Williamson,*
183 F.3d 458 (5th Cir. 1999) ....................................................................... 15

*United States v. Young,*
470 U.S. 1 (1985) ......................................................................................... 79

*Vasquez v. Hillery,*
474 U.S. 254 (1986) ................................................................................... 213

# TABLE OF AUTHORITIES

Page(s)

*Virgil v. Dretke,*
446 F.3d 598 (5th Cir. 2006) ................................................................ 220, 231

*Wainwright v. Witt,*
469 U.S. 412 (1985) .............................................................................. 217, 223

*Wallace v. Stewart,*
184 F.3d 1112 (9th Cir. 1999) ...................................................................... 115

*Waller v. Georgia,*
467 U.S. 39 (1984) .......................................................................................... 91

*Weaver v. Massachusetts,*
582 U.S. 286 (2017) ..................................................................... 91, 95, 229

*Westbrook v. Arizona,*
384 U.S. 150 (1966) ..................................................................................... 169

*Wiggins v. Smith,*
539 U.S. 510 (2003) .............................................................................. *passim*

*Williams v. Pennsylvania,*
579 U.S. 1 (2016) ......................................................................................... 153

*Williams v. Taylor,*
529 U.S. 362 (2000) ...................................................................... 13, 102, 167

*Williams v. Woodford,*
384 F.3d 567 (9th Cir. 2004) ....................................................................... 203

*Williamson v. Ward,*
110 F.3d 1508 (10th Cir. 1997) .............................................................. 29, 30

*Witherspoon v. Illinois,*
391 U.S. 510 (1968) .............................................................................. 217, 223

*Withrow v. Larkin,*
421 U.S .35 (1975) ....................................................................................... 204

*Woodson v. North Carolina,*
428 U.S. 280 (1976) ..................................................................................... 166

*Zant v. Stephens,*
462 U.S. 862 (1983) ..................................................................................... 240

# TABLE OF AUTHORITIES

Page(s)

*Zapata v. Vasquez*,
788 F.3d 1106 (9th Cir. 2015) ................................................................. 134

**State Cases**

*In re Earl Lloyd Jackson*,
3 Cal. 4th 578 (1992) ............................................................................. 195

*In re Wilson*,
3 Cal. 4th 945 (1992) ............................................................................. 195

*People v. Dekraai*,
5 Cal. App. 5th 1110 (2016) ............................................................ 195, 196

*State v. Syed*,
463 Md. 60 (2019) .................................................................................... 77

*Syed v. State*,
236 Md. App. 183 (2018) .......................................................................... 76

**Federal Statutes**

18 U.S.C. § 981(a)(1)(C) ............................................................................. 5

18 U.S.C. §1203 ..................................................................................... 132

18 U.S.C. § 201(b)(2)(C) ......................................................................... 197

18 U.S.C. § 371 .......................................................................................... 5

18 U.S.C. § 1203 ................................................................................... 4, 13

18 U.S.C. § 1956(h) .................................................................................... 4

18 U.S.C. § 3432 ..................................................................................... 161

18 U.S.C. § 3592 ..................................................................................... 241

18 U.S.C. § 4241 ................................................................................. 28, 29

21 U.S.C. § 853 .......................................................................................... 5

28 U.S.C. § 455(a) .................................................................................. 154

28 U.S.C. § 144 ...................................................................................... 154

## TABLE OF AUTHORITIES

Page(s)

28 U.S.C. § 2255 ...............................................................................................*passim*

28 U.S.C. § 2461 ...................................................................................................... 5

**Regulations**

28 CFR § 501.3 ...................................................................................................... 16

**Miscellaneous**

Nancy J. King, *Racial Jurymandering: Cancer or Cure? A Contemporary Review of Affirmative Action in Jury Selection*, 68 N.Y.U. L Rev. 707 (1993) .................... 216

Laura Rovner, *Preferring Order to Justice,* 61 Am. U. L. Rev. 1331 (2012).............. 24

John F. Stinneford, *Experimental Punishments*, 95 Notre Dame L. Rev. 39 (2019).... 27

Federal Rule of Evidence 702 ................................................................................. 54

G. Ben Cohen and Robert J. Smith, *The Racial Geography of the Federal Death Penalty*, 85 Wash. L. Rev. 425 (2010.) ................................................................ 241

Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases,* 58 N.Y.U. L. Rev. 299 (1983) ................................................... 167

Judicial Conduct, Canon 2, Rule 2.11 ................................................................. 154

Stuart Grassian, *Psychiatric Effects of Solitary Confinement,* 22 Wash. U. J.L. & Pol'y 325 (2006).......................................................................................................... 32

Comes now defendant Mr. Iouri Mikhel ("Mikhel"), by and through his undersigned counsel, pursuant to 28 U.S.C. § 2255, Rule 2 of the Rules Governing Section 2255 Proceedings, and respectfully requests that this Court grant him a new trial, vacate the judgment entered against him, and/or vacate, set aside or correct the sentence.

## I.  STATEMENT REGARDING FORM

In accordance with Rule 2, this Motion sets forth only the facts and claims entitling Mikhel to relief. Counsel are mindful that this is not the brief on the merits of the claims. As such, this Motion does not contain an exhaustive discussion of relevant case law. Rather, case law is included for the purpose of defining the contours of the claim and to put the government on notice as to the nature of the claim. Mikhel will file separate pleadings regarding discovery, evidentiary development, and legal briefing later in the proceedings.

Through counsel, Mikhel states the following grounds for granting this motion.

## II.  INTRODUCTION AND PROCEDURAL HISTORY

Although the counts charged in the First Superseding Indictment against Mikhel made him vulnerable to the death penalty, from June 16, 2002, until August 3, 2004, the district court refused to provide Mikhel's defense the funding necessary to investigate mitigating evidence. The district court refused to fund penalty-phase experts (including the services of a mitigation specialist) until the case was authorized but promised counsel that they would have sufficient time to complete their investigation if the government sought the death penalty. Once the government notified the Court of its intention to seek death, the government demanded a speedy trial, relying as justification on the harm that its own delay had caused to its case in chief.

By that time, the case had been transferred to a different judge, who had made no promises about time and resources. Thus, Mikhel was rushed to trial represented by counsel whose investigation fell far short of what prevailing norms require in a capital case.

Using the convenient theory that Mikhel was part of some amorphous and dangerous group the government called "Russian Organized Crime," on June 6, 2003, the

government sought and obtained authorization from the Department of Justice (DOJ) to place Mikhel under Special Administrative Measures ("SAMs"), a system of confinement that has been described as "the darkest corner of the U.S. federal prison system, combining the brutality and isolation of maximum-security units with additional restrictions that deny individuals almost any connection to the human world."[1] The government would cage Mikhel under those measures for 13-years, beginning three years prior to his capital trial and lasting until 2017.

Perhaps because of his genetic predisposition to mental illness—a predisposition undiscovered by trial counsel—Mikhel was driven to what some would call madness by his conditions of confinement, conditions that made him vulnerable to attempting to commit suicide *at least three times* before his capital trial began.

With the deck stacked against him by a Judge who refused to fund his defense, a second Judge who failed to honor the prior promise of time and resources—the same Judge who actively tried to become the U.S. Attorney for the same office prosecuting the case he was presiding over—and saddled by counsel whose performance was below the standards at the time of his capital trial, Mikhel was forced to face his capital jury. With unprepared counsel and before a Judge who refused to stop the locomotive rushing towards him, Mikhel faced a jury whose identities had been cloaked under the pretense that they needed protection from "Russian Organized Crime." Given the harshness of SAMs confinement, Mikhel's mental health deteriorated, resulting in his disastrous decision to take the stand during the guilt phase of his trial. Because his counsel had not prepared effectively for trial, they did not cultivate a relationship of trust with him, and could not persuade him not to take the stand.

At the penalty phase of his trial, the government relied upon a misrepresentation of the security measures under which the Bureau of Prison would keep Mikhel in custody to

---

[1] Ex. 30, The Darkest Corner: Special Administrative Measures and Extreme Isolation in the Federal Bureau of Prisons, Center for Constitutional Rights Report, Sept. 2017.

convince the jury that Mikhel was a future danger and therefore deserved to be executed. Trial counsel did not rebut these misrepresentations. After finding no mitigating factors, the jury sentenced Mikhel to death. This was hardly inevitable. A compelling mitigating story went untold because of the ineffectiveness of his capital trial counsel. As the social historian hired by undersigned counsel states, Mikhel's family had suffered a chain of challenges, traumas, and tragedies spanning more than a century, a history that had melted away the resilience his family had in the face of generations of hardships where the constant trauma took its toll over time, impacting Mikhel's own ability to survive amidst the chaos of the society around him.

In an astonishing about-face, the government nonchalantly dismissed the impact of its misrepresentations about "Russian Organized Crime" by stating, in the appeal for a separately tried co-defendant, that "[a]part from [its Motion to Empanel an Anonymous Jury], the government never argued that Mikhel and Kadamovas were part of Russian organized crime or the Russian Mafia." Dkt. 43, Government's Answering Brief, *United States v. Petro Krylov*, Case No. 08-50033, at 37.

On May 9, 2018, the Ninth Circuit denied Mikhel's direct appeal. *United States. v. Mikhel,* 889 F.3d 1003 (9th Cir. 2018). Among its findings, a panel of the Ninth Circuit found that Mikhel's counsel "[n]ever squarely moved for a competency hearing." *Id.* at 1036 n.14. The U.S. Supreme Court denied Mikhel's petition for writ of certiorari on October 7, 2019, thus making his conviction final and triggering the one-year statute of limitations for Mikhel to file a 2255 Motion pursuant to 28 U.S.C. § 2255(f)(1).

In this Motion, Mikhel is unable to show all the prejudicial errors that would entitle him to relief because his investigation has been hampered by impediments beyond his control.

Initially, this Motion was due on October 7, 2020. Just months into the limitations period, the COVID-19 pandemic erupted. Reason and policy demanded an immediate halt to all in-person investigative efforts.

3

Then, in February 2022 the Russian Federation invaded Ukraine. Given the fallout from these hostilities, travel to Russia and its neighboring countries poses ongoing serious safety risks, as recognized by the U.S. State Department, which has issued the strictest travel warning, a "Level 4: Do Not Travel" advisory, for Russia.

As a consequence, the government explicitly waived its statute of limitations defense for any motion filed on or before October 7, 2023. *See* Dkt. nos. 2381, 2406, 2414, 2417, 2427, and 2445 (notices of government's waiver). With these waivers, the government has acknowledged that Mikhel cannot complete his investigation, which requires travel to Russia and Ukraine, in the current climate. Mikhel thus brings this incomplete Motion with the expectation that he will have an opportunity to amend his Motion once the impediments to the investigation are lifted. Without this opportunity, history will repeat itself, and Mikhel will never have a full and fair opportunity to investigate his case. What is more, the government will miss yet another instance to heed the Supreme Court's warning of close to a century ago:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about just one

*Berger v. United States*, 295 U.S. 78, 88 (1935).

Such duty is nowhere more weighty as when the government seeks to inflict the ultimate punishment in the name of justice.

## III.  FACTUAL BACKGROUND

Iouri Mikhel and Jurijus Kadamovas were charged with hostage-taking resulting in death and conspiracy to take hostages resulting in death (18 U.S.C. § 1203); conspiracy to launder monetary instruments (18 U.S.C. § 1956(h)); and conspiracy to escape from

4

custody (18 U.S.C. § 371), with additional criminal forfeiture counts (U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853, and 28 U.S.C. § 2461). (Dkt. 502.)

The government alleged that the defendants conspired to hold five victims hostage: Meyer Muscatel, Rita Pekler, Alex Umansky, Nick Kharabadze, and George Safiev. Each victim was ultimately killed. According to the government, Mikhel and Kadamovas were the ringleaders of a conspiracy involving co-defendants Petro Krylov, Natalya Solovyeva, Aleksejus Markovskis, and Ainar Altmanis. Altmanis, Solovyeva, and Markovskis cooperated with the government and agreed to testify against the remaining co-defendants.

After a 75-day jury trial, Mikhel and Kadamovas were sentenced to death, and at a separate jury trial, Krylov was sentenced to life without parole.

**A.     June 2002 to August 2004: Pre-authorization advocacy without the assistance of a mitigation specialist or penalty-phase experts**

In June 2002, the district court appointed two attorneys to represent Mikhel in this death-eligible case, Rick Callahan and Dale Rubin.[2] (Dkt. 89; Ex. 165, R. Callahan Decl., ¶ 1.) The DOJ had not authorized the case for the death sentence at that time.

In September 2002, Chris Filipiak joined Mikhel's defense team as the sole investigator. (Dkt. 185.) Trial counsel requested that District Judge Nora Manella approve funding for a mitigation specialist. Judge Manella denied the request and refused to fund penalty-phase experts or the services of a mitigation specialist until after the case was authorized. (*See* 07/15/2005 RT 91.)

In October 2002, Rubin and Filipiak traveled to Russia and the United Kingdom to investigate Mikhel's background in preparation for an anticipated DOJ presentation. (Ex. 43, H. Jackson Decl., ¶ 17.) They interviewed no biological relatives during their brief stay in St. Petersburg. After November 2002, billing records reflect that team members took no

---

[2] Mikhel originally retained attorney Victor Sherman to represent him in this matter. Sherman already represented Andrei Agueev, who was first a co-defendant, then a material witness against Mikhel. Sherman was removed as counsel due to a conflict of interest on April 22, 2002. (04/22/2002 RT.)

meaningful action to investigate Mikhel's social history or his mental health until early 2005 after the case was authorized.

In the interim, BOP accused Mikhel, Kadamovas, and Krylov of attempting to escape from the Metropolitan Detention Center in Los Angeles (MDC). The plot was foiled on March 7, 2003. (12/06/2006 RT 72-148.) Mikhel was moved from MDC to the Central Detention Center, a San Bernardino County facility.

On June 6, 2003, DOJ placed Mikhel under a SAMs order, significantly restricting his access to counsel. (*See* Claims 1, 2, 5, and 9.)

Counsel made their authorization presentation to the U.S. Attorney's office on July 21, 2003. Six months later, in January 2004, counsel made their authorization presentation to the DOJ in Washington, DC.

Around three weeks after the presentation in Washington, D.C., Mikhel attempted to take his own life. Still housed at the Central Detention Center in San Bernardino, Mikhel cut open a major blood vessel in his leg and almost bled to death. (Ex. 33, W. Vicary Summary Rpt., 09/05/2006.)

DOJ announced its decision to seek a death sentence against Mikhel on August 3, 2004. (Dkt. 505.)

**B.      September 2004: Appointment of mitigation specialist Holly Jackson**

Holly Jackson, a mitigation specialist, was first appointed to Mikhel's defense team in September 2004, one month after the case was authorized.

On April 14, 2005, Mikhel attempted suicide a second time, deliberately overdosing on psychiatric medication.

Three months later, in July 2005, the district court authorized funding for a psychiatrist to evaluate Mikhel. But no defense forensic psychiatrist evaluated Mikhel until the eve of the guilt-phase trial (in September 2006.)

During the four-year pre-trial period, the bulk of the team's international investigation took place over the course of one month: October 2005. In that window of time, team members: (1) conducted a deposition of a witness, Konstantinos Tezhik, in

Athens, Greece; (2) traveled to Cyprus to investigate the uncharged homicide of Valeriy Papou; (3) traveled to Turkey to investigate the uncharged homicide of Anton Popsuy-Shapko[3]; and (4) traveled to St. Petersburg and Moscow to conduct guilt-and penalty-phase investigation. As with the team's prior trip to Russia, no biological relatives were located or interviewed on this trip.

On January 27, 2006, the defense gave notice of a potential mental-health defense at the guilt phase. Counsel did not specify the nature of the defense. And in the notice, counsel admitted that Mikhel had not undergone an evaluation by any defense mental-health experts. (Dkt. 878.)

**C.    April 2006: Reassignment to Judge Dickran Tevrizian**

In late March 2006, co-defendants Kadamovas, Krylov, and Mikhel jointly requested a 6-month continuance of the trial, which was set for July 11 in Judge Manella's courtroom. (*See* Dkt. 950.) On April 12, 2006, the case was transferred from Judge Manella to Judge Dickran Tevrizian. (Dkt. 948.) The first hearing in front of Judge Tevrizian took place on May 3, 2006. As justification for a continuance, trial counsel explained that the Mikhel team's investigation was delayed because Judge Manella refused to fund penalty-phase experts or a mitigation specialist until the case was authorized. (05/03/2006 RT 31-32.) The government's notice of intent to seek the death penalty included allegations regarding two uncharged homicides that occurred on foreign soil. (05/03/2006 RT 32.) Mikhel's strict conditions of confinement made trial preparation challenging and severely limited the amount of time counsel had to review discovery with him. (05/03/2006 RT 34.) Conducting mitigation investigations in Russia had proven to be challenging. (05/03/2006 RT 35.) Counsel warned the Court that Mikhel shouldn't be forced to start trial while his mitigation investigation was incomplete. "Any seminar that anyone goes to regarding capital defense, every person that lectures tells you your penalty phase must be

---

[3] The trial court later excluded evidence of the uncharged crimes in Turkey and Cyprus from the government's penalty-phase case. The court noted on the record that the government's evidence as to each uncharged homicide "may be speculative to the point that there is just absolutely no reliability." (05/22/06 RT 43-44; *see also* Dkt. 1025.)

7

prepared at the beginning of the trial." (05/03/2006 RT 37). Disregarding these complaints, Judge Tevrizian denied the requested continuance. (05/03/2006 RT 50.)

The defendants renewed their motion for a continuance two weeks later, on May 17. (Dkt. 999.) At a hearing on June 12, 2006, the Court once again denied the request for more time. (06/12/2006 RT 54.) He did so despite being well aware of the scope of his discretion. He once noted, "When I became a federal judge, Manny Real was the Chief Judge. He gave me a pen and he said to me, 'With this pen, you can stop a speeding locomotive.'" (05/22/2006 RT 61.)

On June 16, co-defendant Petro Krylov moved for a continuance of the trial based on his trial counsel's illness. (Dkt. 1052.) On June 26, the Court granted Krylov a continuance and severed his trial from Kadamovas and Mikhel's.

**D.    September 2006 to January 2007: The guilt phase trial**

On September 2, 2006, three days before the jury was sworn in, Mikhel was finally evaluated by a defense psychiatrist, William Vicary. This was the first such defense-initiated forensic psychiatric examination in the case. Vicary diagnosed Mikhel with bipolar disorder. On September 5, he submitted a letter report to Rubin explaining the basis for his diagnosis and opining that medication would enhance Mikhel's competency to stand trial. (Ex. 33, W. Vicary Summary Rpt ., 09/05/2006.)

On the night of September 5, 2006, Mikhel attempted to hang himself in his jail cell. (09/06/2006 RT 3-7 (sealed).) Opening statements were set to take place the next morning. Judge Tevrizian ordered that Mikhel be evaluated within 72 hours for his competency to stand trial. On September 7, a psychiatrist employed by the Bureau of Prisons ("BOP"), Dr. Ralph Ihle, conducted a forensic psychiatric examination of Mikhel. Dr. Ihle ultimately concluded that Mikhel was competent to stand trial, and the court accepted this finding at a hearing on September 14, 2006. Trial counsel did not declare a doubt about Mikhel's competency or request a competency hearing. (09/14/2006 RT 130-33.)

Trial counsel Rick Callahan also suffered a medical emergency during the first week of the guilt phase. On September 10, Callahan fell down a flight of stairs and injured his head. Callahan was hospitalized and treated for a skull fracture, a severe concussion, and a bleed in his brain. (09/15/2006 RT 7.) After conducting an on-the-record examination of Callahan and his treating physician, the trial court granted a short continuance of the trial to allow time for Callahan's recovery. (09/21/2006 RT 47.)

In the midst of the guilt-phase trial, Jackson and Craig Haney, the team's social historian, flew to St. Petersburg for further penalty-phase investigation. (Ex. 43 ¶ 40.) The government's star witness, Ainar Altmanis, testified while Jackson and Haney were out of the country. Over the course of seven court days, Altmanis blamed Mikhel and Kadamovas for planning and carrying out the capital crimes.

Altmanis, who was facing state and federal prosecutions for his role in the crimes, testified pursuant to a plea bargain. Likewise, accomplices Natalya Solovyeva and Aleksejius Markovskis gave evidence against Mikhel and Kadamovas in exchange for consideration in their own pending cases. To bolster their accomplice testimony, the government presented a wide array of forensic scientific evidence, which largely went unchallenged by the defense.

Mikhel and his trial counsel disagreed over whether Mikhel ought to testify at the guilt phase. Against the advice of counsel, Mikhel testified on direct examination over the course of three court days (January 3, 4, 5, 2007). On January 9, he refused to be cross-examined by the government, and his testimony came to an abrupt end. Because Mikhel refused to submit to cross-examination questions, the trial court struck his entire testimony and instructed the jury not to consider it. (01/09/2007 RT 22-29.)

On January 17, 2007, the jury reached a guilty verdict for both Mikhel and Kadamovas on all counts.

**E.    January to February 2007: Penalty phase trial**

Shortly before the penalty phase, Vicary evaluated Mikhel once more. He concluded that Mikhel had decompensated considerably since his initial evaluation less than four

months earlier. In a letter to counsel, he wrote that Mikhel's "paranoia, depression, and agitation has compromised his ability to rationally cooperate with counsel." (Ex. 51, W. Vicary Rpt. at 806.) Counsel did not raise a doubt as to Mikhel's competency or request a competency hearing.

The team engaged in final preparations for the penalty phase. But ultimately, none of Mikhel's family members or friends flew from Russia to Los Angeles to testify on his behalf. Mikhel absented himself from the courtroom throughout the penalty phase.

The government presented extensive victim impact evidence from relatives and loved ones for each of the five victims. The government also called two sheriff's deputies from the SB-CDC to testify that they intercepted a letter Mikhel wrote in which he outlined plans for an escape from custody.

Instead of calling live mitigation witnesses, Mikhel's defense team presented videotaped statements from a handful of Mikhel's friends and only one relative: his cousin, Edward Mikhel. Counsel also presented testimony about the criminal activities of victims Rita Pekler (who had been investigated for fraud), Alex Umansky (who had been investigated for insurance fraud), and George Safiev (who had been investigated for criminal activity and corruption in Russia.)

The defense case rested largely on expert testimony. Dr. Marshall Goldman, an expert on Russian society, testified about the culture of corruption in Russia after the collapse of the Soviet Union. Dr. Craig Haney, a social historian, testified about risk factors in Mikhel's background that damaged his development. Dr. Inderpal Dhillon, Mikhel's treating psychiatrist from West Valley Detention Center, testified that Mikhel suffers from bipolar disorder, and William Vicary, a forensic psychiatrist also testified about Mikhel's mental health struggles while in custody, awaiting trial.

On February 13, the jury returned death verdicts for both Mikhel and Kadamovas. (02/13/2007 RT 92, 103-04.) The jury unanimously found all of the alleged statutory and non-statutory aggravating circumstances to be true. (02/13/2007 RT 84-88.) The jury

unanimously found an absence of mitigating circumstances for Mikhel. (02/13/2007 RT 88-92.)

## IV.  ALLEGATIONS APPLICABLE TO EACH AND EVERY CLAIM

In the interest of brevity and to avoid repetition, Mikhel makes the following allegations for each of the enumerated claims below and incorporates these allegations into each claim:

The facts in support of each claim are based on the allegations in this Motion; the declarations and other documents contained in the exhibits to the Motion; the entire record of all the trial and appellate proceedings involving Mikhel in federal district court and the Ninth Circuit, including the documents, exhibits, and pleadings in *United States v. Mikhel*, C.D. Cal. Case No. 02-cr-220, *United States v. United States District Court*, Ninth Circuit Case No. 06-73376, *United States v. Mikhel*, Ninth Circuit Case No. 06-50114, *In re Mikhel*, Ninth Circuit Case No. 07-70430, *United States v. Mikhel*, Ninth Circuit Case No. 07-99008, *United States v. Kadamovas*, Ninth Circuit Case No. 07-99009, *Iouri Mikhel v. United States*, Supreme Court Case No. 18-7835; judicially noticed facts; and all other documents and facts that Mikhel may develop and present. The allegations set forth in this Motion generally are incorporated by this reference into each claim below as though set forth in full.

Legal authorities in support of each claim are briefly identified within that claim. Each claim is based on a "violation of the Constitution or laws of the United States." 28 U.S.C. § 2255(a). The Court cannot properly deny Mikhel relief without first affording him an opportunity for discovery and an evidentiary hearing to further show his entitlement to relief. Mikhel requests the opportunity to brief his entitlement to Court-sponsored fact development and relief.

Mikhel does not waive any applicable rights or privileges by the filing of this Motion and the supporting exhibits and, in particular, he does not waive the attorney-client or work-product privileges. Mikhel hereby requests that any waiver of a privilege occur only after a hearing with sufficient notice and the right to be heard on whether a waiver has

11

occurred and the scope of any such waiver. Mikhel also requests "use immunity" for each and every disclosure he has made and may make in support of this Motion.

The violation of Mikhel's constitutional rights constitutes structural error and warrants the granting of this Motion without any determination of whether the error was harmless. Even assuming that the harmless error doctrine applies, however, relief is nevertheless required because the error "had substantial and injurious effect or influence" in determining Mikhel's convictions and sentences. *Brecht v. Abrahamson*, 507 U.S. 619, 627, 631, 638 (1993); *United States v. Montalvo*, 331 F.3d 1052 (9th Cir. 2003) (*Brecht* standard applies in § 2255 proceedings).[4] Relief is also required because the error so infected the integrity of the proceeding as to warrant habeas relief even if did not substantially influence the jury's verdict. *Brecht*, 507 U.S. at 638 n.9.

The constitutional violations set forth in each individual claim alone mandate relief from the convictions and sentences. However, even if these violations do not mandate relief standing on their own, relief is required when each claim is considered together with the additional errors alleged in the other claims in the Motion. Cumulatively, these errors mandate relief from Mikhel's convictions and sentences. *Chambers v. Mississippi*, 410 U.S. 284 (1973); *Parle v. Runnels*, 505 F.3d 922, 927 & nn.5, 6 (9th Cir. 2007.)

If this Court finds any claim to be procedurally defaulted, merits review of the claim is nevertheless required because Mikhel can establish cause and prejudice for the default and/or a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991), *abrogated in part on other grounds by Martinez v. Ryan*, 132 S. Ct. 1309, 1315 (2012); *House v. Bell*, 547 U.S. 518, 522 (2006). To the extent that any claim, or part thereof, is deemed to be untimely or procedurally barred, it is a result of the ineffective assistance of prior counsel

---

[4] The United States Supreme Court has not clarified what harmless error standard applies in § 2255 proceedings, *Brecht* or the standard announced in *Chapman v. California*. The Circuits are split on this issue. *See United States v. Smith*, 723 F.3d 510, 517 (4th Cir. 2013) (collecting cases). In *Montalvo*, the Ninth Circuit announced that *Brecht* applies to § 2255 proceedings. While this is the law of the Circuit, Mikhel maintains that it was wrongly decided and that the *Chapman* standard applies. Where harmless error review is required, Mikhel is entitled to relief if the government cannot show that the error was harmless beyond a reasonable doubt.

and/or inadequate funding for all necessary investigation, and accordingly, this Court should adjudicate the claim on the merits. Prior counsel (trial and appellate) were ineffective in not raising the claim earlier. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985); *Coleman*, 501 U.S. at 753-54.

Finally, Mikhel maintains that there was no basis for federal jurisdiction in this case; his conviction and sentence were imposed in violation of the Fifth, Eighth, and Tenth Amendments. Mikhel was prosecuted under the Hostage Taking Act of 1984, 18 U.S.C. § 1203. Charges under this statute made Mikhel eligible for the death penalty. The Hostage Taking Act was addressed to, and intended to protect against international terrorism. But the criminal acts involved in this case have no connection to international terrorism. Mikhel acknowledges that the Ninth Circuit rejected an attack on an application of the Hostage Taking Act and the jurisdiction of the federal courts. *Mikhel*, 889 F.3d at 1021-25. Mikhel maintains that this was wrongly decided and that his convictions and death sentences were invalid.

## V.  LEGAL STANDARDS RELATING TO INEFFECTIVE ASSISTANCE OF COUNSEL

Under *Strickland v. Washington*, 466 U.S. 668 (1984), a habeas Movant seeking to establish the ineffective assistance of trial counsel must demonstrate: (1) that counsel's performance fell below "an objective standard of reasonableness," (*i.e.*, deficient performance); and (2) that but for counsel's deficient performance, there is a reasonable probability that the factfinder would have had a reasonable doubt with respect to the defendant's guilt or the appropriate punishment (*i.e.*, prejudice). *Id.* at 688, 695; *Porter v. McCollum*, 558 U.S. 30, 32 (2009); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *Wiggins v. Smith*, 539 U.S. 510, 538 (2003); *Williams v. Taylor*, 529 U.S. 362, 398 (2000).

The American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (hereinafter "ABA Guidelines") are guides to

13

determining what professional norms are reasonable.[5] *Wiggins*, 539 U.S. at 522, 524. See *Bobby v. Van Hook*, 558 U.S. 4, 6-17 (2009). (Counsel's representation must be evaluated against the ABA Guidelines in effect at the time of trial.) The 2003 ABA Guidelines were in effect at the time of Mikhel's trial. Attorneys should also ensure, pursuant to the ABA Guidelines, that they receive appropriate training through continuing legal education. Strategic decisions made in the absence of a complete investigation are reasonable only to the extent that professional norms support the limitations of the investigation. *Wiggins*, 539 U.S. at 528; *Strickland*, 466 U.S. at 690-91.

Mikhel is not responsible for his counsel's derelictions. The government is required to provide indigent defendants with counsel, *Gideon v. Wainwright*, 372 U.S. 335, 340 (1963); counsel is required to perform adequately, *Strickland*, 466 U.S. at 693, and the government, not the defendant, bears responsibility for ensuring that adequate counsel is provided, *Johnson v. Zerbst*, 304 U.S. 458, 467-68 (1938.)

A Movant need only demonstrate a reasonable probability that, but for counsel's errors, at least one juror would have come to a different result. *Buck v. Davis*, 580 U.S. 100, 137 (2017). For claims related to counsel's ineffectiveness during the sentencing phase of trial, a reasonable probability of a different result is assessed by considering "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding"—and "reweighing it against the evidence in aggravation." *Porter*, 558 U.S. at 41 (quoting *Williams*, 529 U.S. at 397-98.)

Each allegation of ineffective assistance of counsel, standing alone, justifies relief under the standard established in *Strickland*. But *Strickland* also directs courts to consider the errors in totality. 466 U.S. at 688, 694 (describing the prejudice standard as "but for counsel's unprofessional errors, the result of the proceeding would have been different", *see also Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978) (en banc) ("prejudice may result from the cumulative impact of multiple deficiencies.") It is when all of counsel's

---

[5] Unless otherwise stated, references to "ABA Guidelines" or "Guidelines" in this motion refer to the 2003 ABA Guidelines.

14

failings are evaluated cumulatively that their full impact becomes clear. And from that vantage point, it is particularly evident that counsel's performance in this case was objectively unreasonable, and that were it not for counsel's ineffective representation, there is a reasonable probability that Mikhel would not have been convicted or would have received a life sentence. *Strickland*, 466 U.S. at 694.

Ineffective assistance of appellate counsel claims are also judged by the *Strickland* standard. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000). A Movant can establish the deficiency of appellate counsel's performance by showing that counsel "fail[ed] to raise or properly brief or argue certain issues on appeal." *Sharp v. Puckett*, 930 F.2d 450, 451 (5th Cir. 1991.) Particularly in a capital case, there can be no reasonable strategy for failing to raise a meritorious issue on appeal. *Greer v. Mitchell*, 264 F.3d 663, 679 (6th Cir. 2001) ("[I]n a capital case . . . appellate attorneys must err on the side of inclusion particularly where, as here, there appear to exist a significant number of facts to support the claim."). A habeas Movant establishes prejudice where appellate counsel's errors "undermine[] the result on direct appeal, making the sentence unfair or unreliable." *United States v. Williamson*, 183 F.3d 458, 463 (5th Cir. 1999); *see United States v. Reinhart*, 357 F.3d 521 (5th Cir. 2004) (habeas relief granted for failure to raise a sentencing error on appeal.)

## VI.  CLAIMS FOR RELIEF

## CLAIM 1: SPECIAL ADMINISTRATIVE MEASURES VIOLATED MIKHEL'S FEDERAL CONSTITUTIONAL RIGHTS

The government's imposition of SAMs against Mikhel resulted in a fundamentally unfair trial, in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution. Mikhel's convictions and sentences must be vacated based on the constitutional violations detailed below.

15

**A.     Facts currently known in support of the claim**

        **1.     Background regarding DOJ's use of Special Administrative Measures (SAMs) in the post-9/11 era**

Federal law allows for the DOJ to impose strict conditions of confinement on individuals in custody, known as SAMs where they are "reasonably necessary to protect persons against the risk of death or serious bodily injury." 28 CFR § 501.3. DOJ first promulgated the regulations establishing SAMs in 1996, with the goal of targeting specific prisoners who posed extraordinary safety threats to the public. (Ex. 30, CCR SAMS Rpt., 09/2017.) DOJ dramatically expanded its use of SAMs after the terrorist attacks of September 11, 2001. After September 11, DOJ promulgated amended regulations that: (1) tripled the length of time for which SAMs can be imposed without an internal review, from 120 days to one year; (2) relaxed standards for renewing SAMs orders (prior to 2001, DOJ needed to demonstrate that an original reason justifying the measure still existed; after 2001, DOJ was only obligated to demonstrate that some reason existed for the continued imposition of the SAMs, even if that reason differed from the original justification); and (3) allowed for imposition of SAMs on pre-trial detainees. (Ex. 30 at 445.) Pre-trial detainees could be subjected to SAMs "without any meaningful explanation or hearing regarding what they did or *why* the Attorney General thought the restrictions were necessary." (Ex. 30 at 445.) (emphasis in original.)

        **2.     The DOJ imposed a SAMs order against Mikhel on June 6, 2003, but waited another two and a half years to provide written notice of the basis for the order**

The government instituted a SAMs order against Mikhel on June 6, 2003. (Ex. 18, DOJ Ltr. Originating SAM, 06/09/2003.) The government renewed the SAMs order on a yearly basis until June 5, 2017. (Ex. 29, DOJ Memo Vacating SAM, 06/05/2017.) Mikhel thus remained under SAMs restrictions for a total of 14 years.

Under the SAMs order, Mikhel endured a regime of near-total isolation and 24-hour surveillance. At West Valley Detention Center ("WVDC"), he was housed alone in a

16

Special Housing Unit. Two deputy sheriffs surveilled this unit at all times. Mikhel had no contact with any person, other than deputy sheriffs, his attorneys, investigators, and his mitigation specialist.[6] He remained under lockdown for 23 hours a day, with only an hour a day in the day room. He was subjected to strip searches two times a day and frequent "shakedown" searches of his cell. (05/31/2006 RT 8-11.)

As noted above, DOJ's amended regulations allowed the government to impose these conditions on pre-trial detainees without notice of the basis for the SAMs order, much less an adversarial hearing requiring proof of the asserted threat to public safety. Mikhel's case is no exception. Although Mikhel was presumed innocent as a pre-trial detainee, the government imposed SAMs restrictions without even giving him written notice of the basis for this radical curtailment of his rights.

In February 2006, Mikhel filed an application seeking written notification of the basis for the SAMs restrictions, as well as an unredacted copy of the SAMs order itself. The trial court denied Mikhel's request for an unredacted copy of the order. But it ordered the government to provide Mikhel with "written notification of the basis for imposing the SAM's restrictions." (Dkt. 905.)

The government first provided written notice of the basis for its SAMs order in a letter to counsel dated February 28, 2006. The notice states as follows:

> Based on the information provided to the DOJ of your proclivity for violence, and your extensive ties with Russian Organized Crime, the Attorney General, through his designated agent, the Assistant Attorney General, has determined there continues to be a substantial risk that your communications or contacts with persons could result in death or serious bodily injury to persons.

(Ex. 19, DOJ Ltr. Extending SAM, 02/28/2006 (emphasis added).)

The government made this assertion while knowing that as early as March 31, 2004, at least one of the main witnesses against Mikhel, Elena Krivohatchenko, the wife of the government's main cooperating codefendant against Mikhel, refused to continue in the

---

[6] Mikhel's SAMs order restricted non-legal phone calls to members of Mikhel's immediate family. At the time of his arrest, all of Mikhel's immediate family members had passed away. (*See* Ex. 58, J. Hass Decl., ¶¶ 148-49, 165, 190).

17

U.S. Marshall's Witness Protection Program, thus indicating she felt no substantial risk that Mikhel could cause her harm. (Ex. 56, E. Krivohatchenko contract with FBI.) What is more, the government obtained a fairly routine protective order for discovery, with no mention of Mikhel's alleged ties to organized crime as a justification for withholding disclosure of discovery to Mikhel. (Dkt. 450.)

The government continued to cite Mikhel's purported ties to Russian organized crime as a justification for renewing SAMs over the subsequent decade. (*See* Exs. 20-28, SAMs Renewal Orders of 2007, 2008, 2010, 2011, 2012, 2013, 2014, 2015, 2016.)

**3.    The SAMs order imposed a host of impairments on Mikhel's access to his legal team and defense experts**

The SAMs order gave the government unique power over the defense team, in particular during the crucial pre-trial period. It required DOJ "preclearance" of any translators and any other defense expert who might need to communicate with Mikhel. In other words, the government held veto power over potential defense experts, depriving Mikhel of the freedom to choose his own experts and ancillary service providers. SAMs also placed onerous constraints on legal visitation. Under SAMs, precleared paralegals were permitted to meet one-on-one with Mikhel, but investigators and translators were forbidden from meeting with Mikhel unless a precleared attorney supervised the meeting. (05/31/2006 RT 9.)

Government oversight of the defense team's conduct was explicit in the SAMs order's enforcement provisions. Mikhel's counsel was required to sign an affirmation agreeing to be bound by the order's terms. If his counsel refused to sign, his legal team could not communicate with him. All defense experts were likewise required to sign an affirmation agreeing to abide by all SAMs conditions and were required to be cleared by the U.S. Attorney's office before communicating with Mikhel. (*See* Ex. 20, SAMs Renewal

18

Ltr., 06/27/2007.) In the event of any perceived non-compliance with the order, defense team members risked prosecution and prison time.[7]

While under SAMs at West Valley Detention Center, Mikhel's attorneys were not allowed contact visits with him—the team communicated with Mikhel through a screen. (05/31/2006 RT 38-39; *see also* Dkt. 1017 (sealed) at 3.) Mikhel's jailers took extreme measures to disorient him en route to the visiting area. Deputies blindfolded him and put a hood over his head, then pushed him to the visiting area in a wheelchair. On arrival, he was spun around to further disorient him before the hood was removed. (05/31/2006 RT 26.) This was, predictably, nauseating for Mikhel. (Dkt. 876 at 7.)[8]

These measures significantly impaired the defense team's relationship with Mikhel. Defense investigator Chris Filipiak explains as follows:

> The conditions for our meetings were not conducive at all to having proper communications with a client, either to continue developing a trusting relationship or for the client to participate and assist counsel in his defense. Before SAMs, we met Iouri in nice rooms with computers, and Iouri was unshackled for our visits. After SAMs, we had to meet in what can be best described as a hallway with telephones, separated by glass. I could literally touch both sides of the room if I stood upright and extended my arms. Iouri communicated through the phone from either side of the glass. There was a row of cells behind him. There was no privacy. . . I think Iouri had to be handcuffed during those meetings. He was strip-searched even though it was not a contact visit. . . Iouri shut down after SAMs. Whatever rapport and trusting relationship we had managed to build until then went out the window when the Government put Iouri under SAMs restrictions.

(Ex. 42, C. Filipiak Decl., ¶¶ 10, 11.)

---

[7] In another case in which DOJ imposed SAM restrictions, attorney Lynne Stewart was convicted and disbarred for signing the affirmation, then failing to comply with the SAMs order. *United States v. Sattar*, 395 F. Supp. 2d 79 (S.D.N.Y. 2005). She was sentenced to prison. *See* U.S. Attorney for the Southern District of New York Press Release, "Former Attorney Lynne Stewart Re-Sentenced to 10 Years in Prison for Terrorism-Related Crimes," July 15, 2010, https://archives.fbi.gov/archives/newyork/press-releases/2010/nyfo071510a.htm

[8] This practice was ultimately terminated due to Mikhel's ongoing issues with nausea. (Dkt. 876 at 7.)

Trial counsel Rick Callahan likewise recalls that the restrictions "severely impacted Mr. Mikhel's mental health and impeded [the team's] efforts as his legal representatives," and they "impeded [the team's] ability to prepare for trial." (Ex. 165, R. Callahan Decl., ¶¶ 13, 14.)

The SAMs order impeded efforts to arrange for necessary expert services in the preparation of Mikhel's defense. (Dkt. 1017, Defense EPA to Modify the SAM Order (sealed).) The requirement that defense counsel be present during expert examinations threatened the validity of psychological testing.[9] The SAMs provisions requiring preclearance of experts resulted in lengthy delays—it took over 5 weeks for the government to approve one mental health expert's request to examine Mikhel. A requirement that the defense obtain prosecutorial approval for its experts forced the defense to prematurely disclose the identity of its expert witnesses, regardless of whether they would be called to testify and allowed the government an unfair advantage. (Dkt. 1017 at 3.)[10]

Through counsel, Mikhel moved to modify his conditions of confinement, citing the lack of a legitimate penological justification for the SAMs order and the strain on Mikhel's right to counsel. (Dkt. 876 and 877, Motion to Modify Conditions of Confinement and Exhibits.) At a hearing on May 31, 2006, the trial court refused to lift the SAMs restrictions. (05/31/2006 RT 25-26.) However, the trial court agreed to one requested modification of the SAMs order: as of May 31, 2006 (shortly before jury selection and nearly four years into the pre-trial period): defense investigator Filipiak, an

---

[9] National Academy of Neuropsychology, *Presence of Third Party Observers During Neuropsychological Testing*, Archives of Clinical Neuropsychology, 379-80 (2000) https://www.nanonline.org/docs/PAIC/PDFs/NANPositionThirdParty.pdf (noting that presence of untrained third-party observers violates testing norms requiring a "distraction free" environment and may result in invalid results on neuropsychological tests, which "have not been standardized in the presence of an observer.")

[10] Well before trial, Mikhel, Kadamovas, and Krylov applied for an order requiring "screened off" FBI agents and prosecutors to conduct all preclearance of defense experts and consultants. (Dkt. 812.) The government opposed this request, and it was denied. (Dkts. 819, 822.)

20

experienced investigator and a veteran of the U.S. Air Force, was finally permitted to meet with Mikhel without an attorney present. (05/31/2006 RT 38-40; Ex. 42, ¶¶ 2-4.)

### 4. After the imposition of the SAMs order, Mikhel's mental health dramatically deteriorated

As a result of his prolonged isolation under the SAM order, Mikhel's mental health deteriorated.

Holly Jackson recalls that the "[l]ong-term solitary confinement had a devastating effect on Mr. Mikhel. It hastened the deterioration of his mental health." (Ex. 43, H. Jackson Decl., ¶ 13.) The SAM order was already in place when she joined the team, and it was clear that Mikhel was very depressed. Over time, his symptoms worsened, and Jackson observed wild swings in his mood. (Ex. 43 ¶ 12.)

According to Filipiak: "Iouri became so paranoid about talking over the phone in the visiting room when we met that he would not talk at all about the case in any meaningful way." (Ex. 42 ¶ 10.)

Craig Haney, the team's social historian, recalls that "the isolated, solitary confinement conditions to which Mr. Mikhel was subjected contributed to his depression and his sense of hopelessness." (Ex. 48, C. Haney Decl., ¶ 15.)

Likewise, Callahan recalls that Mikhel found SAMs confinement to be humiliating and that he decompensated more as time passed. (Ex. 165 ¶ 15.) "Working with Mr. Mikhel was like preparing a case with a client *in absentia*." (Ex. 165 ¶ 14.)

His treating physician at WVDC, Dr. Inderpal Dhillon, recalls Mikhel experiencing "many troubling behaviors and symptoms, including racing thoughts, sleeplessness, auditory hallucinations, and banging his head against the wall." (Ex. 47, I. Dhillon Decl., ¶ 4.)

While the SAMs order was in place, Mikhel made three serious attempts to end his own life. On January 20, 2004, he cut a blood vessel in his leg and nearly bled to death. On April 14, 2005, he intentionally took an overdose of sleeping pills and psychiatric medication. And on September 6, 2006, he attempted to hang himself.

Dr. Shawn Agharkar, a forensic psychiatrist who was retained during post-conviction proceedings, evaluated Mikhel's records and interviewed him regarding his experiences during SAMs confinement. His 2021 report details the extent of the long-term psychological damage that SAMs inflicted on Mikhel. (Ex. 34, Psych. Rpt., B. Agharkar.) "[H]is conditions of confinement have exacerbated his underlying mood disorder and left him with a profound sense of helplessness and hopelessness regarding his future." (Ex. 34 at 518.) Dr. Agharkar notes that Mikhel continues to experience the following symptoms:

> He does not sleep more than four or five hours a night and has noticed his memory is poor. He was notably tangential in his thought processes with me. Mr. Mikhel reported he does not like to leave his cell even now, that he prefers small spaces, and that he never used to be like that prior to being put in SAMs.

(Ex. 34 at 518-519.)

According to Dr. Agharkar, who has consulted on many capital cases in his career, Mikhel's despondency far exceeds that of other death-row prisoners, and it "cannot simply be attributed to a "normal" reaction to his present circumstance." (Ex. 34 at 519.) Mikhel continues to express suicidal thoughts. "[I]f he thought he could succeed (he said he was too closely monitored at Terre Haute), he would certainly attempt suicide." (Ex. 34 at 519.)

**5.      The government weaponized the SAMs order at the penalty phase**

At the penalty phase, the government cited the SAMs order as justification for a death sentence. (01/24/2007 RT at 60-61)

**6.      After Mikhel was sentenced to death, the government repudiated the notion that Mikhel had ties to Russian Organized Crime, one of the purported bases for imposing SAMs**

As noted above, the government concealed its justification for imposing SAMs for two and a half years (from 2003 to 2006). Then, in 2006, the government sent trial counsel a letter claiming it relied on Mikhel's purported ties to Russian organized crime as one basis for imposing a SAM order.

But after Mikhel and Kadamovas were convicted and sentenced to death, their co-defendant Petro Krylov was tried separately before a different judge in the Central District,

22

Judge Otero. The same prosecution team tried both cases. In the penalty-phase closing arguments on May 21, 2007, just months after the Government had obtained a death sentence against Mikhel, the prosecutor argued:

> there is simply no evidence that [Mikhel and Kadamovas] were a part of the Russian Mafia. Did they have accomplices in Russia? Absolutely. Several of them. Were they organize[d]? Absolutely. Were they sophisticated? Absolutely. But there's not one piece of evidence showing that they answered to or were connected to what they would call, the defense would call, the true, quote, unquote, Russian Mafia back in Moscow.

(Ex. 53, *U.S. v. Petro Krylov*, 05/21/2007 RT 108-09.)

On appeal to the Ninth Circuit, Krylov once again pointed out that the government had previously linked Mikhel and Kadamovas to organized crime, but disavowed this theory when he stood trial. In its answering brief filed in 2010, the government disingenuously asserted that "*apart from the motion* [to empanel an anonymous jury], the government did not take any position on whether or not Mikhel or Kadamovas were part of Russian organized crime or the Russian mafia." (*U.S. v. Petro Krylov*, Ninth Circuit Case 08-50033, Dkt. 43, at 37) (emphasis added.)

Meanwhile, the government continued to renew its SAMs order every year. Even after repudiating the notion that Mikhel had ties to Russian organized crime at Krylov's trial and in his appeal, the government continued to cite Mikhel's ties to Russian organized crime as a basis for renewing the SAMs order *for the next ten years*. (See Exs. 20-28, SAMs Renewal Orders of 2007, 2008, 2010, 2011, 2012, 2013, 2014, 2016.)

**7.      The SAMs order continued to impact Mikhel and his defense team on direct appeal to the Ninth Circuit**

Mikhel remained under a SAMs order through his appellate proceedings. Appellate counsel moved for attorney-client access without SAMs restrictions. These restrictions interfered with their ability to represent Mikhel and his ability to assist them. (*United States v. Mikhel*, 9th Cir. Case No. 07-99008, Dkt. 16, 03/27/2008.)

In a published order, the Ninth Circuit denied Mikhel's motion to lift all SAMs restrictions and granted only a limited modification of the order, permitting: (1) use of

23

precleared translators; (2) investigators' dissemination of certain Mikhel communications to facilitate post-sentencing proceedings; and (3) investigator meetings with Mikhel without an attorney present. *United States v. Mikhel*, 552 F.3d 961 (9th Cir. 2009).

### 8. Prolonged solitary confinement is a form of torture

Prolonged solitary confinement is considered torture under international human rights law. The United Nations Special Rapporteur on Torture has declared that "any imposition of solitary confinement beyond 15 days constitutes torture, or cruel, inhuman or degrading treatment, depending on the circumstances."[11] Likewise, under the United Nations Standard Minimum Rules for the Treatment of Prisoners (the "Mandela Rules"), solitary confinement for more than 15 days may amount to torture or cruel, inhuman or degrading treatment or punishment.[12]

Scientific studies show that prolonged solitary confinement inflicts both physical and psychological wounds on prisoners. (Ex. 30 at 452-54 (summarizing research).) "[S]elf-mutilation and suicide are more prevalent in isolated, punitive housing units such as administrative segregation and security housing or SHU, where prisoners are subjected to solitary-like conditions of confinement." (Ex. 9, Expert Rpt. C. Haney, 03/12/2015.)

### B. Analysis

### 1. Imposition of a SAMs order on a false basis violated Mikhel's right to due process

The SAMs order gave the prosecution significant advantages at trial. Long-term solitary confinement is a coercive measure often used to "break" pretrial detainees like Mikhel. *See* Laura Rovner & Jeanne Theoharis*, Preferring Order to Justice,* 61 Am. U. L. Rev.

---

[11] See Special Rapporteur on Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, *Interim Rep. of the Special Rapporteur of the Human Rights Council on torture and other cruel, inhuman, or degrading treatment or punishment*, 76 U.N. Doc. A/66/268 (Aug 5. 2011), https://digitallibrary.un.org/record/710177?ln=en (accessed October 1, 2023).

[12] *See* The Mandela Rules, Rules 43 and 44, available at https://www.unodc.org/documents/justice-and-prison-reform/Nelson_Mandela_Rules-E-ebook.pdf

1331 (2012) ("The harshness of the conditions . . . are a powerful inducement on the SAMs prisoner to break, cooperate, and plead.") As detailed above, the SAMs order: (1) forced the defense to prematurely reveal the identity of its experts; (2) drove a wedge between Mikhel and his legal team; and (3) impaired Mikhel's ability to assist in his own defense. SAMs also provided the government with further argument of Mikhel's alleged "future dangerousness," as evidenced by the prosecutor's closing argument at the penalty phase.

The government gained these significant advantages using misleading arguments about Mikhel's ties to organized crime. As detailed above, at Mikhel's trial, the government insisted such ties were a pressing danger, justifying extreme conditions of confinement that curtailed his access to counsel. But at Krylov's separate trial before a different judge, the government *denied* the existence of such ties. Contrary to the Government's assertion to the Ninth Circuit, the government used the same false basis that Mikhel was involved in organized crime at every stage of the case against Mikhel, beginning by justifying the wiretaps used to arrest him. (Ex. 54, Wiretap Authorization Order at 844, 877) (justifying wiretap to surveil "various individuals, who are believed to have connections to Russian Organized Crime" and noting "the kidnappings were perpetrated by either the same individual or individuals within the same Russian Organized Crime group.") The government also used the same argument to get an anonymous jury. Securing a conviction and/or death sentence through misleading evidence and argument violates due process. Mikhel is entitled to relief from his convictions and death sentence based on prosecutorial misconduct. (*See* Claim 10.)

**2.    SAMs restrictions interfered with Mikhel's right to counsel and right to present a defense**

Imposition of the SAMs measure also led to violations of Mikhel's Sixth Amendment and due process rights to the assistance of counsel at trial and on direct appeal. *See United States v. Reid*, 214 F. Supp. 2d. 84 (D. Mass. 2002) (denying government request for defense counsel to sign SAMs order on Sixth Amendment grounds; affirmation

25

requirement "fundamentally and impermissibly intrudes on the proper role of defense counsel"; also noting case of Lynne Stewart and the "chilling effect" that the SAMs order inflicts on defense counsel.)

SAMs no doubt interfered with Mikhel's access to counsel; it created an obstacle course of impediments for his legal team. The SAMs order dictated which team members could visit Mikhel—forbidding investigator Filipiak from meeting one-on-one with Mikhel for much of the pre-trial period. Because of SAMs restrictions, Mikhel's counsel was forced to prematurely disclose the identity of their expert witnesses to the government. And Mikhel was forbidden from taking part in any joint defense meetings with Kadamovas and his attorneys.

"[P]re-trial strictures on a detainee cannot unduly burden [a defendant's] fundamental constitutional right to a vigorous defense by an independent attorney under the Sixth Amendment." *Reid*, 214 F. Supp. 2d at 92. Here, as in *Reid*, SAMs restrictions imposed a "chilling effect" on the defense function. At trial and on direct appeal, counsel was threatened with prosecution and prison time in the event of any perceived noncompliance with the SAMs order. SAMs thus incentivized cooperation with the government over vigorous advocacy on Mikhel's behalf.

SAMs also contributed to the deterioration of Mikhel's relationship with his defense counsel, thus diminishing counsel's ability to advocate on his behalf throughout the trial. As explained in Claims 5 and 9, counsel's deteriorating relationship with their client resulted in prejudice at both phases of his capital trial.

### 3.    SAMs impaired Mikhel's competence to stand trial

SAMs restrictions contributed to the decompensation of Mikhel's mental health in the years leading up to trial. To the point that he could no longer rationally assist counsel. Because SAMs confinement led to Mikhel's incompetence to stand trial, Mikhel is entitled to relief from his convictions and sentences. *See* Claim 2; (Ex. 34 at 517-18 (Dr. Agharkar's conclusion that Mikhel was incompetent to stand trial).)

26

**4.**     **SAMs confinement violated the prohibition against double jeopardy**

Mikhel's prolonged confinement under SAMs violated the prohibition against double jeopardy, in that it imposed double punishment for the same crime. *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969) (Double Jeopardy Clause prohibits "multiple punishments for the same offense.")

**5.**     **SAMs confinement is cruel and unusual punishment**

Mikhel's prolonged solitary confinement amounted to cruel and unusual punishment, in violation of the Eighth Amendment.

SAMs restrictions "superadd[s]" "terror, pain, or disgrace" to an existing sentence. It is thus "cruel." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1124 (2019). Indeed, over a hundred years ago, the Supreme Court condemned prolonged solitary confinement as "an additional punishment of such a severe kind that it is spoken of . . . as a further terror and peculiar mark of infamy to be added to the punishment of death." *In re Medley,* 134 U.S. 160, 170 (1890) (citation and quotation marks omitted.)

Long-term solitary confinement was unheard of at the time of the founding. Hence, it is "unusual" under the original understanding of the Eighth Amendment. John F. Stinneford, *Experimental Punishments*, 95 Notre Dame L. Rev, 39, 65-66, 71-72 (2019).

**C.     Conclusion**

Mikhel is entitled to relief from his convictions and sentences based on the unconstitutional imposition of SAMs confinement at trial and on appeal.

**CLAIM 2: TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO DECLARE DOUBT AS TO MIKHEL'S COMPETENCY, RESULTING IN MIKHEL BEING TRIED WHILE INCOMPETENT IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION**

**A.      Legal basis**

The judgment of conviction and sentence of death was rendered in violation of Mikhel's constitutional rights to due process; a fair and reliable determination of guilt and penalty; to be physically and mentally present at trial; to present a defense; the effective assistance of counsel; the assistance of qualified mental health experts; and to a jury trial as guaranteed by the Fifth, Sixth, and Eighth Amendments to the United States Constitution because Mikhel was tried, convicted and sentenced to death when he was mentally incompetent to stand trial.

The federal constitutional due process guarantees a fair trial, at which the accused has a right to be present and rationally participate in the proceedings, prohibits the trial of a defendant who is mentally incompetent. *Medina v. California*, 505 U.S. 437, 453 (1992); *Drope v. Missouri*, 420 U.S. 162, 172-73 (1975); *Pate v. Robinson*, 383 U.S. 375, 386 (1966). It is therefore "well established that a conviction obtained against an incompetent defendant is a clear violation of the constitutional guarantee of due process." *United States v. Loyola-Dominguez*, 125 F.3d 1315, 1318 (9th Cir. 1997); *Medina*, 505 U.S. at 453 (same.)

A defendant is mentally incompetent if, as the result of mental disease or defect, the defendant is unable to comprehend the nature of the proceedings or rationally assist counsel in conducting the defense. *Drope*, 420 U.S. at 172; *see also* 18 U.S.C. § 4241. Where a preponderance of the evidence shows that a defendant lacks the requisite understanding or ability to participate in the proceedings, the defendant may not be tried or punished. *Cooper v. Oklahoma*, 517 U.S. 348 (1996); *Bouchillon v. Collins*, 907 F.2d 589 (5th Cir. 1990). Factors that are relevant to a competency inquiry include "evidence of a defendant's

28

irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial." *Drope*, 420 U.S. at 180.

The trial and sentencing of Mikhel while he was mentally incompetent constitute a deprivation of due process necessitating the granting of relief without a further showing of prejudice. *Pate*, 383 U.S. at 386-87; *Dusky v. United States*, 362 U.S. 402 (1960). The error deprived Mikhel of a fair and reliable determination of guilt and penalty. *Pate*, 383 U.S.at 386.

"[J]udges must depend to some extent on counsel to bring [competence] issues into focus." *Drope v. Missouri*, 420 U.S .162, 172-73 (1975). Whenever information that is made known to the trial court raises a doubt that a defendant is mentally competent to stand trial, due process requires the suspension of criminal proceedings until the defendant's competency can be determined on the basis of an adequate, thorough, and reliable mental health evaluation. *Williamson v. Ward*, 110 F.3d 1508, 1517 (10th Cir. 1997). Defense counsel are therefore constitutionally obligated to vindicate this rudimentary trial right by bringing evidence suggesting incompetence to the attention of the court. *Id.*; *Bouchillon*, 907 F.2d at 595; *Burt v. Uchtman*, 422 F.3d 557 (7th Cir. 2005) (same.)

If counsel had conducted a reasonable investigation of Mikhel's background, monitored the effect of the medication given to Mikhel by prison doctors, had him immediately evaluated following his suicide attempts, and investigated the impact the conditions of confinement were having on his mental state, counsel would have learned that Mikhel could not track, focus or concentrate on the pre-trial and trial proceedings, and was not able to integrate and evaluate new information to the degree minimally necessary to appreciate and exercise his legal rights. Instead, as his counsel described him close to trial, Mikhel "sits and stares blankly ahead, does not respond to our inquiries, and when he does speak makes comments that are inappropriate to the proceedings at hand. He claims that he is not sleeping but is very tired all the time." (Ex. 173, Fax from Rubin to Ihle, at 2689.) Any reasonably diligent counsel aware of such information would have been obligated to request a hearing to determine Mikhel's competency.

Trial counsel must raise doubt and request a competency hearing when there is a "reasonable doubt" about the defendant's competency. *United States v. Duncan,* 643 F.3d 1242, 1250 (9th Cir. 2011). When there is a "reasonable doubt" about defendant's competence, a full competency hearing before the district court is required under 18 U.S.C. § 4241. *Duncan*, 643 F.3d at 1250. In order to determine whether failure to move for a competency hearing constitutes ineffective assistance of counsel "there must be sufficient indicia of incompetence to give objectively reasonable counsel a reason to doubt defendant's competency" and "a reasonable probability that the defendant would have been found incompetent." *Hibbler v. Benedetti*, 693 F.3d 1140, 1149–50 (9th Cir. 2012).

Foremost, here, trial counsel was mistaken in his belief that "Mental health is traditionally a penalty phase issue." (Dkt. 919.) As far back as 1989, the ABA published its Criminal Justice Mental Health Standards to specifically address counsel's obligation related to a defendant's mental health. Standard 7-4.2 imposed on the court, the prosecution as well as defendant's counsel the duty to raise the issue of competence and request a hearing whenever there is "a good faith doubt as to the defendant's competence." The 2003 ABA Guidelines reiterate that mental health issues pervade capital cases, and emphasize that '[e]vidence concerning the defendant's mental status is relevant to numerous issues that arise at various junctions during the proceedings, including competency to stand trial, sanity at the time of the offense, capacity to intent or premeditate death, ability to comprehend Miranda warnings, and competency to waive constitutional rights." Commentary to Guideline 4.1 at 30-31. Mental health issues are so pervasive that the Guidelines recommend that at least one member of the defense team be "qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments." Guideline 4.1.A.2. Thus, to the extent trial counsel believed "mental health is traditionally a penalty phase issue" and otherwise minimized Mikhel's mental status, counsel provided deficient performance. *Hinton v. Alabama*, 571 U.S. 263, 274 (2014) ("An attorney's ignorance of a point of law that is

30

fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*.")

To establish prejudice from counsel's failure to seek a timely competency hearing, Mikhel must show only a reasonable probability that he was incompetent at the time of his trial. *Hull v. Kyler*, 190 F.3d 88, 105 (3d Cir. 1999). Trial counsel's "lack of investigation created a substantial risk that [their] client's due process rights were violated by standing trial while incompetent, and therefore undermines . . . confidence in the reliability of the adversarial testing process." *Williamson,* 110 F.3d, at 1519.

**B.    Factual Background**

The investigation into Mikhel's mental state was hampered by the Court's failure to provide the funding to investigate the capital case in a timely fashion, coupled with trial counsel's misunderstanding of the investigation required in a capital case. Contrary to the 1998 Spencer Report, adopted by the Judicial Conference on September 15, 1998 (Ex. 5, at 49), the court refused to fund a mitigation investigation until the case was authorized as a death penalty case. *See* Claim 8. Counsel's deficient performance in investigating Mikhel's competency and counsel's failure to raise doubt must be seen in light of the court's refusal to fund a timely, adequate investigation pursuant to the requirements of effective representation pursuant to the Spencer report, case law, the then-prevailing professional norms, as well as counsel's own misunderstanding of the law.

**1.    There were sufficient indicia of incompetence to give objectively reasonable counsel a reason to doubt defendant's competency**

On June 6, 2003, following a thwarted escape attempt, the Government imposed SAMs on Mikhel. (Ex. 18.) From MDC, Mikhel was transferred to SB-CDC, in San Bernardino. SAMs restrictions are harsh, meant to totally isolate those who are suspected of terrorism. (*See* Claim 1.) As early as 1993, it was well known that the type of conditions of confinement imposed by SAMs erode mental health:

> Solitary confinement—that is the confinement of a prisoner alone in a cell for all, or nearly all, of the day with minimal environmental stimulation and minimal opportunity for social interaction—can cause severe psychiatric harm.

31

> . . . .
>
> There are substantial differences in the effects of solitary confinement upon different individuals. Those most severely affected are often individuals with evidence of subtle neurological or attention deficit disorder, or with some other vulnerability. These individuals suffer from states of florid psychotic delirium, marked by severe hallucinatory confusion, disorientation, and even incoherence, and by intense agitation and paranoia. These psychotic disturbances often have a dissociative character, and individuals so affected often do not recall events which occurred during the course of the confusional psychosis.
>
> …
>
> Moreover, although many of the acute symptoms suffered by these inmates are likely to subside upon termination of solitary confinement, many—including some who did not become overtly psychiatrically ill during their confinement in solitary—will likely suffer permanent harm as a result of such confinement.

Stuart Grassian, *Psychiatric Effects of Solitary Confinement,* 22 Wash. U. J.L. & Pol'y 325, 332 (2006).[13]

Predictably, the SAMs conditions had a devastating effect on Mikhel and his mental state. (Ex. 42, ¶ 10-11; Ex. 165, ¶¶ 13, 14.) The conditions impeded the communications between Mikhel and his defense team. Mikhel "became so paranoid about talking over the phone in the visiting room when [he and his investigator] met that he would not talk at all about the case in any meaningful way." (Ex. 42 ¶ 10.) Mikhel "shut down after SAMs." (Ex. 42 ¶ 11.)

On January 20, 2004, after about six months under these conditions, Mikhel attempted suicide for the first time while in custody. (Ex. 41 at 671.) On January 30, 2004, Dr. Jose Flores-Lopez, M.D. Psychiatrist at SB-CDC evaluated Mikhel's psychiatric needs and determined Mikhel was a "strong candidate for involuntary medication." (Ex. 41 at 672.) Dr. Flores-Lopez was so concerned about Mikhel's mental state that he wrote a letter, in which he described Mikhel as acutely suicidal and depressed:

---

[13] Dr. Grassian's article is "largely a redacted, non-institution and non-inmate specific, version of his declaration submitted" in September 1993 in *Madrid v. Gomez,* 889 F.Supp. 1146 (N.D. Cal. 1995), a California case involving conditions of confinement at Pelican Bay.

32

> Mr. Mikhel remains acutely suicidal and depressed. He requires 24-hour suicide watch, as well as daily psychiatric consultation. He is uncooperative, unpredictable and exhibits severe mood swings, as well as severe depression.
>
> Mr. Mikhel has been observed to discard his voluntary psychiatric medication. As a result, Mr. Mikhel is a strong candidate for involuntary medication. We cannot accommodate this high level of psychiatric need.

(Ex. 41 at 672.) Twenty years later, Dr. Flores-Lopez stands by that opinion. (Ex. 41.)

Billing records from February through April 2004 reveal minimal contact between the trial team and Mikhel.[14] Such records indicate that no team member visited him between January 2 and June 10, 2004, when one of his counsel, Rick Callahan, visited him. This was five months after Mikhel's suicide attempt and after SAMs had already been extended by the government for one year. Neither his co-counsel, Dale Rubin, nor Chris Filipiak, the one investigator assigned to his case at that time, billed any time to Mikhel's case between the suicide attempt and the June visit. The same records reveal that Richard Callahan billed for communications with co-counsel Dale Rubin concerning Mikhel's mental conditions. The communications seem to have been short, as Callahan billed either 18 or 20 minutes each of the three instances in February and March of 2004 where he talked to Rubin about the matter.

On February 2, 2004, the government was notified that due to Mikhel's suicide attempt, the San Bernardino County jail could not address Mikhel's mental needs and that he was a candidate for involuntary medication, (Ex. 172, Fax from MDC to DeWitt at 2688.) Yet, on August 3, 2004, the government notified the court that the Attorney General had decided to seek death for Mikhel. (Dkt. 505.)

As predicted by Dr. Flores-Lopez, Mikhel continued refusing medication, including lithium through November and December of 2004 and Seroquel doses through April

---

[14] Undersigned counsel will proffer confidential documents at a hearing once the court issues a protective order to effectuate a limited waiver of privileged material pursuant to *Bittaker v. Woodford*, 337 F.3d 715 (2003) (finding it would be an abuse of discretion not to enter a protective order tailored to effectuate a limited waiver when a petitioner raises an IAC claim in post conviction.)

2005. (Ex. 34 at 509-10, Ex. 41 at 667 ¶ 4-5, 472, Ex. 17.) Through the month of April, Mikhel was observed "writing voraciously about incoherent ideas" and exhibited other symptoms of severe mental illness, such as hypomanic behavior, suicidal ideations, and insomnia. (Ex. 34 at 505.)

Yet, on April 10, 2005, Mikhel was taken off suicide watch. Four days later, on April 14, 2005, Mikhel attempted suicide a second time, deliberately overdosing on psychiatric medication. He had hoarded pills for two months. He overdosed around 11 p.m. on April 14 and was not found until 4 or 5 a.m. the next day, at which point he was taken to a medical ICU at an outside hospital for treatment. (Ex. 34 at 504.) Concerned that Mikhel was decompensating, Rubin and Callahan sent a letter to the U.S. Attorney's Office requesting a modification of Mikhel's conditions of confinement under SAMs. (Ex. 32.) The letter, dated May 3, 2005, ended with this dire prediction: "His descent has advanced to such a degree that Dale and I are not only beginning to doubt Mr. Mikhel's future competency to stand trial, but more importantly, we are gravely concerned about just how much longer Mr. Mikhel will survive." (Ex. 32 at 487.)

Yet, despite the clear signs that Mikhel continued to decompensate under SAMs, defense counsel failed to have him evaluated by a defense forensic psychiatrist until after August 2006, on the eve of trial and after other acts of self-harm.

Holly Jackson, the mitigation specialist the Court finally approved to fund after the government was authorized to seek death, traveled to Russia to gather records in October 2005. Upon her return, Jackson observed that Mikhel's mental health symptoms were worsening, and expressed concern that Mikhel was decompensating and that he was losing trust and confidence in his legal team. (Ex. 43 ¶ 14.) She requested that the team redouble its efforts to investigate Mikhel's mental health by tracking down all jail, medical, and mental-health records, and consulting with appropriate mental health experts and treating physicians. (Ex. 43 ¶ 30.) She created a form for team members to use in visits with Mikhel to track his mental health symptoms. No team members ever used the form Jackson

34

created to keep track of fluctuations in Mikhel's symptoms. (Ex. 43 ¶ 14.) " I don't know why they didn't declare doubt." (Ex. 43 ¶ 39)

After the defense's desperate motions to continue the trial were denied, and after Judge Tevrizian chastised the defense for their non-compliance with prior discovery orders on August 14, 2006, counsel's mental health investigation took on new urgency. (08/14/2006 RT 37-38.) Later that month, Rubin reached out to then-doctor William Vicary to evaluate Mikhel. (Dkt. 1186.) Vicary was already infamous at the time for his misconduct in the Menendez trial. (Ex. 171, LA Times article, Note-Altering May Cost Menendez Psychiatrist.) He would later lose his license. (*See* Claim 5.)

Vicary first evaluated Mikhel in person on September 2, 2006, three days before the jury was sworn in. (Ex. 33.) He interviewed Mikhel for three hours, and he diagnosed Mikhel with bipolar disorder. On September 5, he submitted a letter report to Rubin explaining Mikhel's diagnosis with bipolar disorder and opining that medication would enhance Mikhel's competency to stand trial. (Ex. 33.)[15]

On the night of September 5, 2006, the night before the guilt phase was supposed to begin, Mikhel attempted suicide for the third time while pending trial. This time, he hung himself in his jail cell and was unsuccessful only because the fire sprinkler to which he had attached the spreadsheet broke loose. His failed attempt left him with a ligature mark around his neck. (01/31/2007 RT 133-34, 142.)

Two days later, the Court ordered that a psychiatrist employed by the BOP, Dr. Ralph Ihle, conduct a forensic psychiatric examination of Mikhel. After his evaluation, Rubin supplied Dr. Ihle with the test results from Dr. Kyle Boone's neuropsychological evaluation of Mikhel. Rubin enclosed the following message with the test results:

> I am sorry but it took me time to locate this report in my computer. I hope it is some help to you. If important, Iouri was being medicated at WVDC at the time of this testing. [¶] I thought you should be aware that Iouri is now unable to assist us in the preparation/presentation of this trial. He sits and stares blankly ahead, does not respond to our inquiries, and when he does speak makes comments that are inappropriate to the

---

[15] Counsel did not use this report as a basis for declaring a doubt as to competency.

35

proceedings at hand. He claims that he is not sleeping but is very tired all the time.

(Ex. 173.)

As alleged below in Claim 5, trial counsel provided deficient performance by failing to build the type of relationships necessary in a capital case, especially when a defendant manifests signs of mental illness. By the time trial began, the rift between Mikhel and counsel was obvious to other team members. (Ex. 43 ¶ 15; Ex. 48 ¶ 12.) Counsel had failed to visit Mikhel for long stretches of time, including for months after his first suicide attempt, and during trial. Trial counsel perceived Mikhel as "difficult" or "demanding," but they spent little time with him to better understand what was at the root of his actions. Because the defense team had unreasonably delayed their investigation, Jackson was away during several weeks of the guilt phase, conducting the mitigating investigation that should have been done much earlier. (Claim 5.) By the time she returned, Mikhel had decompensated even further. Team dynamics had also deteriorated to the point that Rubin and Callahan "were no longer speaking to" Jackson, their mitigation specialist. (Ex. 43 ¶ 37.) Even after the passage of time, Jackson remembers:

> I sat next to Mr. Mikhel at counsel table, even though Mr. Rubin and Mr. Callahan did not want me there. Mr. Mikhel's mental health was extremely poor at that time. I could tell he was in a fog. He would say things to me along the lines of, "I feel like you are saving my life just by sitting here."

(Ex. 43 ¶ 37.)

In fact, Jackson thought Mikhael was not competent to stand trial:

> It was and is my opinion that Mr. Mikhel was not competent to stand trial. I recall telling Dale Rubin and Rick Callahan that I did not think Mr. Mikhel was competent and that he could not rationally assist counsel. To this day, I cannot explain why the attorneys never formally declared a doubt about Mr. Mikhel's competency or requested a competency hearing.

(Ex. 43 ¶ 39.)

Counsel's failure to conduct a reasonable investigation and keep track of their client's mental health proved to be disastrous at trial. By then, Mikhel refused to listen to the advice of counsel regarding his trial testimony. (Ex. 48 ¶ 38.)

36

After counsel for Mikhel and Kadamovas completed their defense cases, Mikhel personally invoked his right to testify. He spent the next three days detailing—in mostly narrative form—facets from his life, some relating to the events raised at trial, that he wanted to put before the jury. Once done, Mikhel refused to be questioned by either counsel for Kadamovas or the government, and the court granted Kadamovas' motion to strike the testimony.

Mikhel's trial counsel represented to the court they had strenuously opposed his decision to testify and told the court they spent hours attempting to persuade him not to testify. (12/12/2006 RT 17-18.) When Mikhel persisted, the court attempted to dissuade him and had the government preview its cross-examination. The prosecutor informed Mikhel that his testimony would open the door to an entire cart of damning evidence, including his responsibility for the kidnapping and extortion of Armen Gyurdzhiyants; the disappearance, kidnaping for ransom, and murder of Valeriy Popov in Cyprus; and the kidnapping for ransom and murder of Anton Popsuey-Shapko in Turkey. (12/12/2006 RT 70, 73-81.) Mikhel viewed the preview as a "challenge" and rejected the court's warning against testifying. (12/12/2006 RT 128-29) (sealed.)

The next day, Mikhel moved for a continuance, stating it would really take months to adequately prepare his direct examination, but the court denied the request. (12/13/2006 RT 198-200.) (sealed.) Mikhel then declared that because he did not have enough time to prepare his testimony, he would not testify. (12/13/2006 RT 200-01) (sealed.) Then, when trial resumed after the holiday break, Mikhel abruptly changed course again, deciding to testify. Once again, the court warned him that he might be well advised to exercise his right to remain silent, particularly since his voice was "strikingly similar" to that of Raul, whose recorded voice was heard demanding ransom payments from Safiev's family. (01/03/2007 RT 38-39.) Defense counsel relayed Mikhel's intent to open the door to the Turkey and Cyprus murders, walk through it, and then "turn around and take it off the hinges." (01/03/2007 RT 36.)

37

Mikhel followed through with his plan. In a rambling, poorly controlled direct examination, he volunteered his explanation for the disappearance of Popov in Cyprus and Popsuey-Shapko in Turkey. He admitted meeting them to facilitate the transfer of large sums of cash into foreign bank accounts. The transfer in Popov's case involved the use of a yacht that Mikhel's company had purchased for $17 million. Mikhel disclaimed any responsibility for their deaths, and in doing so, provided the ticket for the admission of the government's previously precluded evidence that he had kidnapped and murdered the two men. (01/04/2007 RT 70, 73-75, 84-108, 126-43.)

In his "defense," Mikhel testified that he had led a life of crime. While a teenager, he bribed officials to avoid the draft and was imprisoned for that offense. (01/03/2007 RT 95-96, 101-02.) After his release, he obtained a fake passport, worked illegally, and then learned the smuggling business, making two to three million dollars. (01/03/2007 RT 123-29, 147.) He also earned millions of dollars creating shell companies where Russians could store their foreign currency. (01/03/2007 RT 169-71.)

On the side, he learned of a facility that had been conducting medical research, involving a test for cancer through the use of a protein. The facility had closed due to lack of funding. Convinced of the value of the research, Mikhel met with the head of the institute and offered his group's funding. He financed the institute for about eight months until ex-members of the KGB learned of its value and intimidated the researchers into severing ties with Mikhel's group in favor of them. (01/03/2007 RT 132-36, 138-44.)

Mikhel related that he bought a Russian restaurant in Turkey, after meeting one of its owners while stopped in Turkey during a Mediterranean cruise, and then opened a casino in the Sheraton Hotel in Antalya, Turkey. When the casino closed a few years later, he opened another restaurant so the casino workers would still have jobs. (01/03/2007 RT 180-84; 01/04/2007 RT 22-24.) During this period, he moved to Los Angeles and then to Palm Springs to work on his golf game. Tired of golf, he moved to Los Angeles but traveled extensively. He flew to Jamaica for his 35th birthday and then flew the entire party to Las Vegas for an exclusive concert. He took his girlfriend to Canada for a bear hunt,

38

received a racehorse from her father in Jamaica, and watched as the horse finished second in the Caribbean Derby. (01/04/2007 RT 51-53.) Other extravagances included the purchase of two Ferraris to use when he visited Europe; the purchase of a yacht for $17 million; numerous vacations in Europe; a reception with Princess Caroline Murat in Monaco, where she requested his help in planning a music festival, which involved financing a bribe in order to allow the founder of the Buena Vista Social Club (a renowned Cuban band) to travel out of Cuba; and a Christmas party in Jamaica where he flew in his friends from America, Russia, and Europe. (01/04/2007 RT 55, 67-70, 110-17.)

After Mikhel finished, counsel for Kadamovas described it as "some type of suicide mission" by Mikhel. (01/05/2007 RT 102.) When the court suggested that it would strike some of Mikhel's testimony if he refused to answer specific questions, the government disagreed, observing that "Mikhel's testimony is actually very helpful for the government." Mikhel's lawyer said he would be happy to have the court strike the testimony, a request the court denied. (01/07/2007 RT 102, 107-08.) Mikhel refused to answer any questions, either from lawyers for Kadamovas or the government, and the court struck the entirety of his testimony. (01/09/2007 RT 22-28.)

Following the striking of his testimony at the close of guilt phase, Mikhel appeared in open court only once more: when the guilt phase verdicts were announced. (01/17/2007 RT 16.) The district court, although troubled by Mikhel's absence, took no steps to determine his competence; nor did counsel. (01/24/2007 RT 4-6 [Sealed].) Instead, the court accepted Mikhel's waiver, instructing the jury each remaining day of the sentencing hearing that Mikhel had voluntarily absented himself. (*See, e.g.*, 01/24/2007 RT 45.)

On January 18, 2007, Vicary saw Mikhel for a third time, where he noted Mikhel's already tenuous mental health had deteriorated further:

> His mental condition appears to recently have deteriorated at the MDC. He has not been offered any mood stabilizing or tranquilizing medication. He was prescribed Prozac which he apparently refused. He has stayed up for days at a time without sleep working on his legal case. He has been consumed with excessive detail. When he testified at his trial he apparently

39

demonstrated some grandiosity. Due to lack of sleep, his concentration and memory were impaired as each day went into the afternoon. He believes that he is the victim of an elaborate conspiracy involving the government, the judge, and his own attorneys. His paranoia and frustration led him to refuse to testify further after his attorney ended the direct examination. He subsequently refused to appear in court except for the verdicts. He has indicated that he will not appear during the penalty phase.

On current mental status examination, he reported that he felt humiliated, isolated, and hopeless. He denied experiencing any psychiatric symptoms. His speech had a slightly pressured quality at times. There was often moisture in his eyes. He was most comfortable when discussing the conspiracy against him. He denied any suicidal ideas. He did indicate that he might be willing to take tranquilizing and mood stabilizing medications.

(Ex. 51 at 806.)

Vicary then opined Mikhel was no longer able to rationally cooperate with counsel:

The defendant's paranoia, depression, and agitation has compromised his ability to rationally cooperate with counsel. His self destructive actions such as refusing to stand for cross examination and removing himself from the trial are the product of his illogical thinking. Such actions were taken against the advice of counsel. His behavior antagonized the judge and potentially alienated the jurors.

(Ex. 51 at 806.)

Mikhel absented himself from the entirety of the sentencing trial, refusing to appear again in front of the sentencing jury that would determine whether he would live or die. (01/24/2007 RT 4-6.) As a spectator and outside the presence of the jury, Mikhel would view the rest of his capital trial through audio and video feed from a holding cell in the courthouse.

Although defense counsel openly questioned amongst each other whether Mikhel was competent to stand trial, let alone assist counsel, and told the government as much in writing, at no point did the defense raise doubt with the Court that they had reason to doubt Mikhel's competency. *United States v. Mikhel*, 889 F.3d 1003, 1036 n.14 (9th Cir. 2018) (finding that "the doubts raised [by counsel] were highly tentative, and we are unconvinced Mikhel ever squarely moved for a competency hearing.") Counsel's failure to

40

move for a competency hearing was unreasonable given the plethora of indicia of Mikhel's incompetence at numerous times during the proceedings, chief among them:

- Mikhel had been placed in solitary confinement, where his mental health deteriorated to the point he attempted to commit suicide;

- at least one medical provider had identified Mikhel as requiring involuntary medication after his first suicide attempt;

- they were aware that at multiple times, Mikhel was not getting the proper medical attention for his mental health needs;

- counsel was aware Mikhel was hoarding his medication, if nothing more because Mikhel had attempted to commit suicide a second time through such medication;

- Mikhel was given a Bipolar diagnosis but received improper medication from his jailers;

- Mikhel tried to commit suicide a third time, just as the guilt phase was about to commence. His method this time was so desperate, that he had only failed because the fire sprinkler had snapped, and the sheet he used left a visible ligature mark around his neck;

- the one mental health expert trial counsel had asked to examine Mikhel had seen his mental health deteriorate and concluded the day after Mikhel testified at the conclusion of the guilt phase, that Mikhel's "paranoia, depression, and agitation had compromised his ability to rationally cooperate with counsel."

A reasonable trial counsel in a death penalty case would have seen all red flags as indicia to doubt Mikhel's "sufficient present ability to consult with his lawyers with a reasonable degree of rational understanding." *Dusky*, 362 U.S. at 402. Counsel utterly abandoned their duty to ensure Mikhel was not tried while incompetent. In the face of this information, counsel's conduct was deficient. *Burt*, 422 F.3d at 595 (finding deficient performance where counsel was aware of the defendant's medications, his frequent mood swings, and that the defendant did not appear to comprehend counsel's legal advice.)

41

**2.      There was a reasonable probability that Mikhel would have been found incompetent**

Due process requires the court to "assure the defendant [has] access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985). Similarly, "Counsel may not rely for the development and presentation of mitigating evidence on . . . a court appointed psychologist . . . The responsibility to afford effective representation is not delegable to parties who have no obligation to protect or further the interests of the defendant." *Lambright v. Schriro*, 490 F.3d 1103, 1121 (9th Cir. 2007.)

Here, neither Dr. Ihle nor Dr. Dhillon were "defense experts." Both Dr. Ihle and Dr. Dhillon were state actors, each employed by the government that sought Mikhel's conviction and sentence to death. Neither were entrusted with assisting in the evaluation, preparation, and presentation of the defense. Their reports were not confidential, and neither had the obligation to protect or further the interest of the defendant. *Lambright*, 490 F.3d at 1121.

Thus, the evaluation done by Dr. Ihle did not constitute a competency hearing, as the Ninth Circuit found on direct appeal. *Mikhel*, 889 F.3d at 1036. Neither does his report satisfy the type of evaluation the court envisioned pursuant to *Ake* and its progeny. Similarly, the defense's reliance on Dr. Dhillon was misplaced, as she had no obligation to protect or further the legal interests of the defendant. Thus, trial counsel was ineffective for failing to avail himself of the resources the Constitution made available to his capitally charged client, not reaching out to the experts at hand, and failing to use the expertise his own hired experts had concerning the impact of the conditions of confinement had on Mikhel.

Trial counsel's reliance on Vicary was misplaced from the start. To the extent Vicary's credibility gave counsel qualms about relying on his opinions, it was self-imposed. (*See* Claim 5.) Counsel hired Vicary knowing of his checkered past. Counsel himself tried to take the sting out of his ill-fated decision by front loading Vicary's credibility issue

42

before the jury. (*See* Claim 5.) Counsel's selection of Vicary was the result of his inattention to the case, rather than the result of a strategic decision. *Wiggins*, 539 U.S. at 526 (finding the record shows counsel's failures resulted from inattention, not a reasoned strategic judgment.)

Had counsel performed as the Guidelines required, including understanding and monitoring his capital client's mental health during all the proceedings, hiring and consulting with credible experts, and moving the court to determine whether he was competent, there was a reasonable probability that Mikhel would have been found incompetent.

## C.    Mikhel was incompetent to stand trial

Given their rushed investigation, and that they thought mental health was primarily a penalty phase issue, Mikhel's counsel was unable to reach a sound strategic decision as to whether or not to raise doubt about Mikhel's competence despite the sufficient indicia of incompetence.

Foremost, counsel's rushed investigation precluded them from obtaining vital records and a social history, which would have indicated that Mikhel was indeed among those whom research shows are "most severely affected" by solitary confinement. *See* Claim 5. Unbeknownst to trial counsel, Mikhel has a multi-generational family history of mental illness, giving him genetic predisposition for mental illness. Both his maternal grandmother, as well as his maternal grand-aunt were diagnosed with psychiatric disorders and depression, respectively. Tragically, and tellingly, Mikhel's sole brother, Vladimir Mikhel, fifteen years his senior, died by suicide, asphyxiating himself by hanging, the same act of self-harm as Mikhel was driven to on the eve of trial. These are records that a constitutionally effective investigation in a capital case must collect. Trial counsel failed to obtain them. (Ex. 43, H. Jackson Decl. ¶¶ 33-34.)[16] The medical records in this case reveal

---

[16] This is, no doubt, but the tip of the iceberg of the potentially available evidence concerning Mikhel's background. As the government's waivers make clear, the

43

that Mikhel suffered from states of florid psychotic delirium, disorientation, and intense agitation and paranoia.

Because of trial counsel's delay in investigating and compiling documents concerning Mikhel's mental health, counsel belatedly obtained medical records concerning Mikhel's confinement during crucial times during pre-trial preparation. No member of the defense team was able to review them to further assess them for competency and other mental health issues, let alone provide them to a mental health expert.[17] (Ex. 48 ¶ 43.)

Trial counsel's deficient performance is all the more remarkable because they had access to an expert whom they could have consulted about the impact solitary confinement was having on Mikhel's mental state. Craig Haney, the expert hired as a social historian, had a background in precisely that research. He, after all, was also an expert in the 1993 *Madrid v. Gomez* litigation. 889 F.Supp. at 1158 (describing Dr. Craig Haney, as "a professor of psychology at the University of California at Santa Cruz, who has specialized in the psychological effects of incarceration.") But counsel never asked Dr. Haney to opine as to how those conditions were affecting Mikhel. (Ex. 48 ¶¶ 15-17.)

Had trial counsel consulted with an adequate expert, such as Dr. Agharkar who examined Mikhel at the behest of undersigned counsel, and provided the type of information that a constitutionally adequate investigation would have revealed, counsel would have shown Mikhel was indeed incompetent at the time of his trial. (Ex. 34.)

Dr. Agharkar is a medical doctor. He treats a wide variety of conditions including ADHD, depression, bipolar disorder, anxiety, schizophrenia, posttraumatic stress disorder, panic disorder, and substance-related illnesses. (Ex. 34.) He maintains an active clinical practice involving neuropsychiatric evaluations of persons with neurologic impairments, acquired brain injuries, and neurodevelopmental disorders including intellectual disability.

---

investigation in this case for post-conviction proceedings has been impeded first by the COVID-19 pandemic and by the consequences of the invasion by Russia into Ukrainian territory.

[17] To the extent the records were delayed or suppressed by the government, that constitutes a *Brady/Napue* violation. (*See* Claim 10.)

44

He has testified in criminal and civil cases nationwide and has consulted with various entities, including the Federal Bureau of Investigation (FBI), the United States Armed Forces, and the Department of Defense (DoD). Dr. Agharkar has Top Secret security clearance with the United States government.[18]

Dr. Agharkar reviewed Mikhel's medical treatment notes, the various reports provided by the government, and other documents available at the time of trial. In addition, he reviewed documents compiled by current counsel in post-conviction investigation and interviewed Mikhel twice for the purposes of his evaluation.

Dr. Agharkar concluded that Mikhel was "bent on killing himself" during trial, which affected the evaluations done at the time:

> Mr. Mikhel saw several evaluators prior to and during his capital trial. Clearly, there were clinical indicators of distress as he attempted suicide at least three times leading up to, and during, his trial. In his first suicide attempt, a near-lethal cutting, Mr. Mikhel lost a large amount of blood and required hospitalization. A second suicide attempt, in which Mr. Mikhel overdosed on pills, required that he be placed on a hospital ventilator to survive. His third attempt at suicide, where he hanged himself from a ceiling fixture with a sheet, took place during his capital trial. He survived that attempt because the ceiling fixture ultimately broke under his weight. When a person is bent on killing himself, the relationship between himself and his evaluators/treaters becomes adversarial rather than collaborative. That is, Mr. Mikhel was aware that if he was forthcoming and honest regarding his moods and suicidality, his efforts would be thwarted by doctors examining him.

(Ex. 34 at 517-18.)

Given he was intent on killing himself, Dr. Agharkar opined an examiner needed to be skeptical about relying on Mikhel's self-reporting:

> Thus, it would be perilous and poor technique to rely on his self-report as it was likely not to be accurate in relation to his mood states and suicidal thinking. Suicide attempts are not considered

---

[18] Top Secret security clearance "provides access to critical information for national security information, which must be kept secure. This authorization is valid for 5 years and must be renewed after that." See What are the Various Federal Security Clearances? Available at https://www.ciat.edu/blog/federal-security-clearances/

On information and belief, counsel proffers this is the type of clearance needed in order to evaluate defendants who are considered a national security risk by the government.

45

in our field to be a rational act, rather, likely evidence of an underlying psychiatric illness. Further, given his circumstances, it is not inconceivable that Mr. Mikhel would play up or play down aspects of his life and mental functioning so that he would get the death penalty, also known as suicide by State. If he could not be successful killing himself, he could influence events to get his desired outcome of death. Mr. Mikhel reported to me that he did not care about the outcome of his trial, that he felt depressed and hopeless, and certainly would not have been honest with evaluators as to whether he was still suicidal or not. He has a family history of suicide and given the potential lethality of his attempts, these should have been taken far more seriously than they were.

(Ex. 34 at 518.)

The materials available at the time of trial, along with those undersigned counsel has gathered, are the type of evidence courts consider for retrospective competency evaluations, *Maxwell v. Roe*, 606 F.3d 561, 576 (9th Cir. 2010) (listing cases), Dr. Agharkar concluded:

With that background, I have concerns regarding Mr. Mikhel's competency at the time of his capital trial. While he has always appeared to have a rational and factual understanding of the proceedings against him, he stopped cooperating with his attorneys and was depressed, despondent, and hopeless about his future. He had been diagnosed with Bipolar depression around the time of his trial and based on the history gathered during our interviews, in my opinion, that is an accurate diagnosis. Given his depression and suicidality, it is further my opinion, to a reasonable degree of medical certainty, that Mr. Mikhel was likely not competent to stand trial at the time of his capital trial.

(Ex. 34 at 518.)

Dr. Agharkar also bears witness to the dramatic and lasting effects the SAMs conditions of confinement have had on Mikhel:

Mr. Mikhel was held in the most restrictive solitary confinement available during his trial and for approximately fifteen years in total, an extremely long period of time. In fact, it was shortly after being placed in solitary confinement that he attempted to kill himself. His moods deteriorated and he became more depressed and hopeless about his future. He had no contact with the outside world, no ability to orient himself to current events, and was nearly completely cut off from any human interaction at all, likely creating in him an overall feeling of unreality. He discussed solitary confinement as the "hardest time of my life." Mr. Mikhel told me the mental strain was the worst he had ever endured in order to maintain his sanity. In my opinion, his conditions of confinement have exacerbated his underlying mood disorder and left him with a profound sense of helplessness and hopelessness

46

regarding his future. He experienced crying spells which sometimes still afflict him now. He does not sleep more than four or five hours a night and has noticed his memory is poor. He was notably tangential in his thought processes with me. Mr. Mikhel reported he does not like to leave his cell even now, that he prefers small spaces, and that he never used to be like that prior to being put in SAMs. He believes he has been "thrown away" and his life is "meaningless."

(Ex. 34 at 518-19.)

Given the type of experience Dr. Agharkar has, including the fact that he possesses Top Secret security clearance from the United States Government, his concluding statements concerning how SAMs has impacted Mikhel are sobering:

Having consulted on well over a thousand capital cases over my career, [Mikhel's] despondency far exceeds that of other death row inmates I have evaluated and cannot simply be attributed to a "normal" reaction to his present circumstance. Though he is not imminently suicidal, he has expressed that if he thought he could succeed (he said he was too closely monitored at Terre Haute), he would certainly attempt suicide.

(Ex. 34 at 519.)

**D.    Conclusion**

What was painfully apparent to his co-defendant's counsel—that Mikhel's testimony was, in effect, a fourth suicide attempt—was lost on both trial counsel and the court. (*See* Ex. 34 at 518.)

The court accused him of manipulation and diminished the critical importance of his three suicide attempts in jail. The court told the jury that his testimony was "nonsense," as though he was just lying when it should have been apparent that he did not understand what he was doing.

Counsel's inaction was inexplicable. They had, on more than one occasion, explicitly questioned their client's competence in writing, and yet did not initiate the competency procedures that they were obligated to perform. Counsel knew he had tried to commit suicide three different times, in three different ways. Counsel knew he was not getting the right medication, when he even took it, to treat his bipolar disorder. Counsel knew he was decompensating under the SAMs restrictions. Even described him as "staring blankly

47

ahead," "non-responsive" and "inappropriate." the florid symptoms of mental illness rendered him unable to cope and incompetent to stand trial.

But for his trial counsel's failure to reasonably investigate, raise doubt as to his competency, and demand a competency hearing, there is a reasonable probability Mikhel would have been found incompetent for trial. *Pate*, 383 U.S. at 386-87. The error deprived Mikhel of a fair and reliable determination of guilt and penalty. *Pate*, 383 U.S.at 386. He is therefore entitled to a new trial. *Dusky v. United States*, 362 U.S. 402 (1960).

## CLAIM 3: TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PREPARE AND PRESENT MITIGATING EVIDENCE AT THE AUTHORIZATION STAGE

Trial counsel was ineffective for failing to prepare and present mitigating evidence to the DOJ to aid in its authorization decision. But for counsel's failure to investigate and present this evidence, there is a reasonable probability that DOJ would not have sought the death penalty against Mikhel. Counsel's ineffective assistance at the pre-authorization phase of this case violated Mikhel's rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution.

### A.   Standard of Care

"At every stage of the proceedings," the ABA Guidelines require counsel to make "extraordinary efforts on behalf of the accused." 2003 ABA Guidelines, Commentary to Guideline 1.1 (quoting ABA Standards for Criminal Justice: Defense Function, Standard 4-1.2(c)), *reprinted in* 31 Hofstra L. Rev. 913, 923 (2003). "The mitigation investigation should begin as quickly as possible, because it may affect the investigation of first phase defense (e.g., by suggesting additional areas for questioning police officers or other witnesses), decisions about the need for expert evaluations (including competency, mental retardation, or insanity), motion practice, and plea negotiations." *Id.* at 1023.[19]

---

[19] The 2003 ABA Guidelines took effect in February 2003, shortly after counsel's appointment to this matter. Even under the prior version of the Guidelines, counsel had

48

The Guidelines clearly delineate who is responsible for this investigation. "The defense team should consist of no fewer than two attorneys qualified in accordance with Guideline 5.1, *an investigator, and a mitigation specialist.*" Guideline 4.1(A) (emphasis added).

Mitigation specialists play a critical role in capital defense work. Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have." Commentary to Guideline 4.1 (regarding the defense team and supporting services). Eliciting information from the client about potential penalty-phase defenses "is very personal and may be extremely difficult for the client to discuss." Commentary to Guideline 10.7, *reprinted in* 31 Hofstra L. Rev 913, 1024 (2003). For this reason, "a mitigation specialist who is trained to recognize and overcome these barriers, and who has the skills to help the client cope with the emotional impact of such painful disclosures, is invaluable in conducting this aspect of the investigation." *Id.*

Under the 2003 ABA Guidelines, "[c]ounsel at all stages of the case should make every appropriate effort to establish a relationship of trust with the client, and should maintain close contact with the client." Guideline 10.5(A).

## B.    Background regarding the authorization process

At the time of trial, the DOJ had policies in place regarding the process for authorizing a death sentence in death-eligible cases. *See generally* United States Attorneys' Manual, Chapter 9-10.000.[20] Under these policies, the death penalty may not be sought without prior written authorization of the Attorney General. *Id.* § 9-10.020.

The process begins at the local level, with the U.S. Attorney in each district considering whether to recommend a potential death sentence. Before making the

---

an obligation to conduct a thorough investigation into all reasonably available mitigating evidence from the moment of their appointment to the case. *See* 1989 ABA Guidelines, Guideline 11.4.1(A) ("Counsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial. *Both investigations should begin immediately upon counsel's entry into the case and should be pursued expeditiously.*" (emphasis added).)

[20] An archived version of the U.S. Attorneys' Manual in place at the time of Mikhel's indictment and prosecution is available online. https://www.justice.gov/archive/usao/usam/1997/1997USAM_Title%209%20Criminal_Part2.pdf

authorization decision, the U.S. Attorney must "give counsel for the defendant a reasonable opportunity to present any facts, including any mitigating factors, to the United States Attorney for consideration." *Id.* § 9-10.030.

Thereafter, submissions from the U.S. Attorney and the defense are sent to the Assistant Attorney General and the Criminal Division's Capital Case Unit. *Id.* § 9-10.050. A committee appointed by the Attorney General then reviews this material, and it may permit an oral presentation from defense counsel. *Id.* The committee then makes a recommendation to the Attorney General, who then makes a final decision whether the government should file a Notice of Intention to Seek the Death Penalty. *Id.*

Input from defense counsel is integral to the authorization process. "No decision to seek the death penalty shall be made without affording defense counsel an opportunity to present evidence and argument in mitigation . . ." *Id.* § 9-10.050.

## C.    Facts in support of claim

Richard Callahan was appointed to represent Mikhel on June 3, 2002. (Dkt. 89.) The district court appointed Dale Rubin as co-counsel on June 27, 2002. (06/27/2022 RT 6-7.)

On September 3, 2002, Chris Filipiak joined the defense team as the sole defense investigator. (Dkt. 184 (sealed).) He was a fact investigator, not a mitigation specialist. (Ex. 42, C. Filipiak Decl., ¶ 5.) Filipiak had no background or training in Russian language or culture. (Ex. 42 ¶ 4.)

A month later, in October 2002, Filipiak and Rubin traveled to St. Petersburg, Russia, and London, UK to conduct investigation. In St. Petersburg, they interviewed four witnesses (Natasha Alifanova, Olga Startseva, Svetlana Koginova, and Benjamin Bril), all friends of Mikhel. They also attempted to investigate Mikhel's criminal history in St. Petersburg (meeting with the deputy head of the state police in St. Petersburg, a representative of the prison system, and a representative of Interpol). No interviews were conducted with any of Mikhel's biological relatives. In London, they conducted videotaped interviews with Marina Karagodina, Mikhel's girlfriend, and her son, Anton Abramkin.

50

According to Filipiak, these videos were intended to lift Mikhel's spirits and to get him more involved in the case. (Ex. 42 ¶ 5.)

After this trip concluded, the team failed to conduct any meaningful mitigation investigation until early 2005, after the case was authorized.

In the interim, the BOP accused Mikhel, Kadamovas, and Krylov of attempting to escape from custody. The alleged plot was foiled on March 7, 2003. Mikhel was moved from the MDC in Los Angeles to the SB-CDC. DOJ imposed SAMs on Mikhel starting on June 6, 2003. (Ex. 18; *see also* Claim One (regarding unconstitutionality of SAMs measures).)

Preparation for the authorization presentation occurred with little to no input from the sole defense investigator, Filipiak, who does not recall participating in any planning meetings in advance of the authorization presentations. (Ex. 42 ¶ 6.) Callahan also has no recollection of doing a "moot court or a dry run to prepare for these presentations." (Ex. 165, R. Callahan Decl., ¶ 6.)

On July 14, 2003, over a year after his appointment as Mikhel's counsel, Rubin sent a three-page letter to the local U.S. Attorney's Office, advocating for a sentence less than death. (Ex. 15, D. Rubin Ltr., 07/14/2013.) Rubin pointed to the following as justifying a non-capital sentence:

- The need for intra-district consistency and national uniformity in the administration of the death penalty: Rubin identified other individuals who were accused of more serious crimes but not facing a capital prosecution because the DOJ declined to seek death.

- The enormous expense of capital trials.

- The fact that Mikhel had "no incidents of violence since his incarceration and no criminal record at all." (Ex. 15 at 273.)

- Declining public support for the death penalty.

Counsel's presentation to the local U.S. Attorney's office took place on July 21, 2003. Following this presentation, trial counsel sent a one-page letter to the local U.S.

51

Attorneys' Office, advocating for a life sentence. (Ex. 16, D. Rubin Ltr., 10/15/2003.) The letter advised then-U.S. Attorney Debra Yang that "DOJ has allowed a defendant in *U.S. v. Stephen 'the Rifleman' Flemmi* to plead guilty to racketeering charges for a life without release sentence. Mr. Flemmi, a major player in Boston organized crime was charged with 10 murders."

In the weeks following the presentation to the local authorities, counsel conducted no meaningful investigation into mitigating evidence. Three months later, on January 4, 2004, counsel presented their case to the DOJ in Washington, D.C. To Callahan's recollection, there was no change in strategy between the meeting with the local prosecutors and the second meeting with DOJ lawyers in Washington. (Ex. 165 ¶ 7.)

Around three weeks after the presentation in Washington, D.C., Mikhel attempted to take his own life. Still housed at the SB-CDC, Mikhel cut open a major blood vessel in his leg and almost bled to death. (Ex. 33, W. Vicary Summary Rpt., 09/05/2006.) He was evaluated by a psychiatrist at the SB-CDC, Dr. Flores-Lopez, who determined that Mikhel was a "strong candidate for involuntary medication." In Dr. Flores-Lopez's view, the CDC was not able to accommodate someone with mental health needs as severe as Mikhel's. He requested that Mikhel be immediately "transported to a facility where all of his psychiatric needs can be addressed." (Ex. 17, J. Flores-Lopez Ltr. 01/30/2004.)

Dr. Flores-Lopez recently reviewed this memorandum and provided additional context for his analysis. "Based on what I wrote in my memo and notes, Mr. Mikhel was probably having some sort of manic episode." (Ex. 41, J. Flores-Lopez Decl., ¶ 4.) Although he was not asked to make a formal diagnosis, Flores-Lopez's notes and memorandum make clear that Mikhel was "severely depressed, manic, and maybe even psychotic." (Ex. 41 ¶ 11.) He "should have been placed in a suicide cell or some other place for his safety." (Ex. 41 ¶ 4.) Mikhel "clearly was not capable of making decisions for himself" at that time, and he should have been forcibly medicated. (Ex. 41 ¶ 5.)

Despite Dr. Flores-Lopez's strong opinion that Mikhel needed a higher level of care, his hands were tied because Mikhel was in federal (not county) custody. Dr. Flores-

Lopez "had no real power with federal inmates." (Ex. 41 ¶ 9.) He could not immediately effect a transfer to a facility with a higher level of care—all he could do was "type up a memo and pass it on to the administration." (Ex. 41 ¶ 10.) Dr. Flores-Lopez was never contacted by any member of Mikhel's defense team. (Ex. 41 ¶ 12.) The case was authorized on August 3, 2004.

Holly Jackson, a mitigation specialist, was first appointed to Mikhel's case after the case was authorized. (Dkt. 546, Sealed Order Appointing Jackson, 09/07/2004.)

**D. Argument**

Under prevailing professional norms at the time of trial, counsel had an obligation to investigate mitigating evidence from the moment they were appointed to represent Mikhel. Despite this obligation, counsel did not conduct any meaningful mitigation investigation until *after* the case was authorized—two years after their appointment. Trial counsel's failure to develop mitigating evidence prior to the DOJ's authorization decision constituted deficient performance under *Strickland.*

In the months preceding their presentation to the local U.S. Attorney's Office and the DOJ in Washington, D.C., counsel conducted only a limited investigation into Mikhel's social history and mental health. Counsel knew that Mikhel grew up in Russia and previously resided in the United Kingdom and that he had lived in Southern California for less than a decade before his arrest. Despite this knowledge, counsel made only cursory efforts to interview witnesses and request records for use in their case-in-mitigation. Counsel took only one trip to Russia and to the UK. This trip took place just weeks after counsel was appointed to the case—before any member of the defense team had a strong relationship with Mikhel or a firm grasp on the relevant investigative sources that needed to be developed in each country. In the long window of time after this trip and before DOJ's authorization decision, counsel made no further efforts to uncover evidence about Mikhel's family background and social history.

Counsel likewise conducted little investigation into Mikhel's mental health, despite clear "red flags" indicating the need to do so. Counsel knew that Mikhel had attempted

suicide in custody and nearly bled to death as a result of his injuries. Despite the clear deterioration in Mikhel's mental health, counsel did not retain any mental health experts to evaluate Mikhel until after the case was authorized. Nor did counsel consult with jail mental health staff about the extent of Mikhel's mental health issues. Had they done so, counsel would have learned that Mikhel was likely experiencing a manic episode and that he may have been experiencing psychotic symptoms. They also would have learned that the jail was utterly ill-equipped to deal with someone as ill as Mikhel. Finally, they would have learned that Mikhel was likely incapable of making decisions for himself and in need of involuntary medication to control his symptoms. In short, a reasonable mental health investigation would have yielded important evidence that could have swayed DOJ's authorization decision.

No reasonable strategy supported counsel's decision not to investigate and present this evidence. Consideration of mitigating evidence is of paramount importance in the authorization process, as the U.S. Attorneys' Manual makes clear. Standard 9-10.30 states:

> In determining whether it is appropriate to seek the death penalty, the United States Attorney, the Capital Review Committee, and the Attorney General will determine whether the applicable statutory aggravating factors and any non-statutory aggravating factors sufficiently outweigh the applicable mitigating factors to justify a sentence of death or, in the absence of any mitigating factors, whether the aggravating factors themselves are sufficient to justify a sentence of death. Reviewers are to resolve ambiguity as to the presence or strength of aggravating or mitigating factors in favor of the defendant.

*U*nited States Attorneys' Manual, Chapter 9-10.000

As detailed in Claim 5, a wealth of mitigating evidence was available to counsel, had they conducted a reasonable investigation. But for counsel's failure to investigate and present this evidence to the DOJ, there is a reasonable probability that Mikhel's case would not have been authorized.

## CLAIM 4: INEFFECTIVE ASSISTANCE AT THE GUILT PHASE

Mikhel's rights under the Fifth, Sixth and Eighth Amendments to the Constitution were violated because his counsel were ineffective at the guilt phase of trial.

54

**A.** **Trial counsel were ineffective for failing to investigate and challenge the government's forensic science evidence**

Trial counsel were ineffective for failing to challenge the government's unreliable forensic scientific evidence. Before trial even began, reasonable counsel would have filed motions to exclude improper forensic expert testimony under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and Federal Rule of Evidence 702. Trial counsel failed to do so. They were ill-equipped to file such motions because they failed to investigate the government's evidence: the team consulted only one forensic science expert, a DNA expert, before trial. (Ex. 165, R. Callahan Decl., ¶ 9.)

Forensic science played a critical role in this prosecution because the government claimed that the science corroborated the testimony of its cooperating witnesses, Ainar Altmanis, Natalya Solovyeva, and Aleksejus Markovskis, each of whom had a motive to lie. Throughout the guilt phase, counsel failed to object to improper expert testimony, failed to adequately cross-examine the government's experts, and failed to present appropriate expert testimony rebutting the government's scientific evidence. In particular, counsel failed to challenge misleading and inaccurate testimony concerning: (1) trace evidence (hair and fiber); (2) pathology; (3) toxicology; and (4) cell cite location data.

Because counsel failed to conduct a reasonable investigation into the government's forensic science evidence and testimony, their failure to expose flaws in the government's testimony or present any evidence in rebuttal cannot be deemed strategic. *Wiggins*, 539 U.S. 510 at 521-23.

**1.** **Legal basis**

The Sixth Amendment requires defense counsel to subject forensic evidence to meaningful adversarial testing, an endeavor that often entails the assistance of appropriate consulting and testifying experts. *Hinton v. Alabama*, 571 U.S. 263, 276 (2014) (in a 1985 capital trial in Alabama state court, trial counsel was ineffective for failing to seek supplemental funding to replace an inadequate ballistics expert). Counsel have an obligation to "independently investigate the circumstances of the crime and all evidence—

55

whether testimonial, forensic, or otherwise--purporting to inculpate the client." Commentary to Guideline 1.1, *reprinted in* 31 Hofstra L. Rev. *913,* 926 (2003). Counsel must do thorough background research regarding all of the prosecution's witnesses and must "subject[] all forensic evidence to rigorous independent scrutiny." *Id.*

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. A fear of "learning the truth" about the strength of the prosecution's forensic evidence is an insufficient basis for trial counsel's failure to investigate. *See Browning v. Baker*, 875 F.3d 444, 473 (9th Cir 2017) (1986 trial) (an "uninformed, gut-based intuition about his client's guilt" does not justify counsel's failure to investigate). Counsel's duty to investigate extends beyond the evidence that the prosecution intends to present at trial. Counsel may also be ineffective for unreasonably failing to conduct an independent analysis of the evidence that the government chooses to bypass in the presentation of its case. *Elmore v. Ozmint*, 661 F.3d 783, 859 (4th Cir. 2011) (counsel ineffective at 1984 trial in South Carolina state court for "blind acceptance of the State's forensic evidence.").

### 2. Forensic science controversies in the decade before Mikhel's trial would have caused reasonable counsel to scrutinize the government's evidence

Counsel had every reason to carefully scrutinize the government's scientific evidence. In the decade before Mikhel's trial, the FBI crime lab was widely criticized for its substandard practice in the investigation and presentation of scientific evidence.

In the 1990s, Frederic Whitehurst, an agent and scientist at the FBI crime lab, blew the whistle regarding substandard practices in the lab's evaluation of scientific evidence. In response, the DOJ conducted an independent review of the lab. This resulted in the

publication of an Office of Inspector General (OIG) report in 1997.[21] The 1997 OIG report identified widespread deficiencies in the work of the crime lab's Explosives Unit, Materials Analysis Unit, and Chemistry-Toxicology Unit. In several high-profile cases, such as the Oklahoma City bombing and the assassination of Circuit Judge Robert Vance, the OIG uncovered proof of scientifically flawed testimony, inaccurate testimony, testimony beyond examiner's expertise, improper preparation of lab reports, insufficient documentation of test results, scientifically flawed reports, and inadequate record management.

In June 1998, OIG published a follow-up report regarding the scandal at the FBI crime lab.[22] While progress had been made, OIG urged the FBI to take remedial action in several areas, including report drafting and monitoring of expert testimony. The OIG recommended ongoing external and internal reviews to ensure the FBI made meaningful progress toward rectifying these and other problems.

In January 2006, the OIG published yet another report documenting the FBI's mishandling of forensic science evidence. In the report, titled "A Review of the FBI's Handling of the Brandon Mayfield Case,"[23] the OIG detailed the FBI's wrongful detention of Brandon Mayfield on suspicion of bombing a commuter train in Madrid, Spain. The sole basis of this arrest was a purported fingerprint match between Mayfield and a print retrieved from the crime scene. After Mayfield's arrest, Spanish police informed the FBI

---

[21] Office of the Inspector General, Department of Justice, "The FBI Laboratory: An Investigation into Laboratory Practices and Alleged Misconduct in Explosives-Related and Other Cases," Executive Summary (1997), https://oig.justice.gov/sites/default/files/archive/special/9704a/00exesum.htm (accessed September 11, 2023)

[22] Office of the Inspector General, Department of Justice, "The FBI Laboratory One Year Later: A Follow-Up to the Inspector General's April 1997 Report on FBI Laboratory Practices and Alleged Misconduct in Explosives-Related and Other Cases," Introduction (1998), https://oig.justice.gov/sites/default/files/legacy/special/9806.htm (accessed September 11, 2023)

[23] Office of the Inspector General, Department of Justice, "A Review of The FBI's Handling of the Brandon Mayfield Case," (2006), https://oig.justice.gov/sites/default/files/archive/special/s0601/final.pdf (accessed September 11, 2023)

they had matched the same print to another individual, an Algerian national. The FBI later admitted it had misidentified Mayfield and its purported fingerprint match was made in error. OIG determined that FBI examiners misidentified Mayfield by engaging in "circular reasoning." That is, they reasoned "'backward' from features that were visible in the known prints of Mayfield," to match his known print to the suspect's. As a result, "murky or ambiguous details . . .were erroneously identified as points of similarity with Mayfield's prints."[24] This type of analysis is riddled with "confirmation bias" or "tunnel vision" and is not reliable. Even more troubling, OIG determined that Brandon Mayfield's Muslim faith "likely contributed to the examiners' failure to sufficiently reconsider the identification after legitimate questions about it were raised."[25]

The FBI crime lab was once regarded as a paragon of scientific expertise in the law enforcement community. By the time of Mikhel's trial, that reputation was in serious question, as was the validity of forensic science practiced by law enforcement labs throughout the country. Trial counsel had every reason to suspect that the government's experts relied on suspect methodology and may have been influenced by confirmation bias or tunnel vision. Given the OIG's findings, they also should have expected the government's experts to testify with a greater degree of confidence than what is supported by the scientific evidence.

### 3. Counsel failed to investigate and challenge the pathology findings

The prosecution presented unreliable and misleading pathology evidence at trial. Trial counsel provided ineffective assistance in failing to investigate the pathology findings and failing to rebut this evidence. A reasonable defense investigation would have revealed serious flaws in the conduct of the autopsies and deficiencies in the prosecution's testimony regarding cause and time of death. Counsel provided deficient performance by failing to file appropriate pre-trial motions, failing to conduct an informed cross-

---

[24] *Id.* at 7.
[25] *Id.* at 12.

examination of the prosecution experts, failing to object to improper testimony, and failing to call an independent forensic pathologist to testify as a defense expert. Because there is a reasonable probability of a different outcome at both guilt and penalty had counsel challenged this evidence, Mikhel was denied his right to the effective assistance of counsel.

//

//

//

//

//

### a. Factual background regarding the evidence at trial and new pathological evidence first developed in post-conviction proceedings

Dr. John Cooper performed the autopsy of Meyer Muscatel, prepared a report documenting his findings, and testified at trial concerning those findings. (Trial Exhibit 1259; 10/25/2006 RT 78-122.)

Dr. John Eisele performed the autopsies of Alex Umansky and Rita Pekler and prepared the autopsy reports for each. (*See* Trial Exhibits 1429 and 1430.) He passed away before trial. (12/01/2006 RT 64.) Another forensic pathologist, Dr. Robert Lawrence, testified about the autopsies of Umansky and Pekler.

Dr. Lawrence conducted the autopsies of George Safiev and Nick Kharabadze. (*See* Trial Exhibits 1431 and 1432.) He prepared the autopsy report and testified to his findings at trial. (12/01/2006 RT 45, 55.)

Defense counsel did not retain a forensic pathologist to review the pathology findings in this case and did not call his own expert to testify at trial.

A post-conviction expert, Dr. Stuart Hamilton, recently reviewed the trial experts' findings. Dr. Hamilton is a Home Office Registered Forensic Pathologist in the United Kingdom. He is the Deputy Chief Forensic Pathologist for the East Midlands, an Honorary Associate Professor at the University of Leicester, and Honorary Consultant

Pathologist at Leicester Royal Infirmary. His prior experience as a forensic pathologist includes a 2014 presentation to the Security Council of the United Nations in an investigation into war crimes. Dr. Hamilton's expertise includes forensic pathology of submerged decedents. As set forth in more detail below, Dr. Hamilton concluded that there were major flaws in the conduct of the autopsies and/or the reporting of pathological findings regarding each victim.

> **(1)    The autopsy of Rita Pekler was flawed, resulting in scientifically unreliable testimony regarding cause and time of death**

Dr. John Eisele, who conducted the autopsy of Rita Pekler, concluded that the cause of her death was asphyxia via either suffocation or drowning. Because he passed away before trial, Dr. Lawrence testified in his stead. At trial, Dr. Lawrence acknowledged Dr. Eisele could not conclude whether the cause of death was suffocation or drowning. (12/01/2006 RT 73.) But he testified differently from the report. Dr. Lawrence opined that Pekler had already expired when she entered the New Melones Reservoir, and that suffocation was the most likely cause of death. Drowning was not an issue unless she was drowned elsewhere, then entered the water at the Parrot's Ferry Bridge. (12/01/2006 RT 73-74.) He ruled out a finding of manual strangulation or ligature strangulation based on the absence of marks to support such a conclusion. (12/01/2006 RT 74.)

Trial counsel's brief cross-examination did not explore the basis for Dr. Lawrence's deviation from Dr. Eisele's findings or explore any potential improprieties in the conduct of the autopsy. Such evidence was available to counsel, had they conducted an adequate investigation. In a post-conviction declaration, Dr. Hamilton critiqued the autopsy's methodology, as well as Dr. Lawrence's testimony that suffocation was the cause of death.

Dr. Hamilton has "*significant reservations regarding the way this autopsy was performed*." (Ex. 38, S. Hamilton Decl. at 616 (emphasis added).) Pekler's jaw was removed before the autopsy. Not only was this unnecessary, it "interfered with the interpretation of the autopsy findings." (Ex. 38 at 616.) Removal of the jaw during the autopsy disrupted

Pekler's mouth, and it may have resulted in a tear to her upper lip. (Ex. 38 at 616-17.) "Assessment of any other potential injuries in or around the mouth has been compromised by the disruption caused by removal of the jaw." (Ex. 38 at 617.)

Dr. Hamilton has similar reservations about Dr. Lawrence's testimony ruling out strangulation as a cause of death. The autopsy report notes fractures of the thyroid horns, an injury that might indicate strangulation. (Trial Exhibit 1429 at 6.) But further analysis to explore this as a potential cause of death was impossible because Pekler's jaw was inappropriately removed prior to the autopsy. Fractures of the thyroid horns, which might indicate strangulation, "could not be interpreted adequately as removal of the neck structures was compromised by removal of the jaw." (Ex. 38 at 617.)

Dr. Hamilton opined that the cause of death in this case should have been listed as "unascertained." (Ex. 38 at 618.) The unreliable methods used during the autopsy diminish the reliability of any determination regarding cause of death. "There were no positive signs of either suffocation or drowning in this case and therefore to conclude that death must have resulted from one or the other is an overstatement of the meaning of the physical findings." (Ex. 38 at 617.)

To the extent Dr. Lawrence based his opinion on evidence outside of the physical findings from the autopsy, that is improper:

> In cases such as this I am of the view that while the pathologist is not able to give a cause of death, the autopsy evidence is only part of the case and the jury may hear other evidence that leads them to conclude on the totality of what they hear that person drowned or was suffocated. *To state this from the pathological perspective with no evidence to support the conclusion is not correct.*

(Ex. 38 at 618 (emphasis added).)

### (2) The prosecution presented scientifically unreliable testimony regarding Alex Umansky's cause and time of death

In his autopsy report, Dr. Eisele opined that the cause of Umansky's death was asphyxia via either suffocation or drowning. As with Pekler, Dr. Lawrence relayed these

61

findings to the jury, even though he had not conducted the autopsy himself. (12/01/2006 RT 66.) He opined that asphyxia by suffocation could be accomplished by placing a bag over the victim's head or duct tape over the nose and mouth. (12/01/2006 RT 66.) The court asked Dr. Lawrence about the results of toxicological testing. Dr. Lawrence testified that Umansky's sample had a blood alcohol level of .07. He acknowledged that this alcohol could come from post-mortem decomposition, but he testified that Umansky maybe had "a drink or two" before he expired. (12/01/2006 RT 70.)

As with Pekler's autopsy, Dr. Hamilton took issue with the conduct of Umansky's autopsy. The jaw was removed prior to the autopsy, which in turn interfered with assessment of oral injuries in the context of suffocation. The torso was eviscerated before the head. In the UK, this is a practice that is frowned on because it "creates a risk of artefactual haemorrhage in the neck (Prinsloo-Gordon haemorrhages)." (Ex. 38 at 620-21.)

Dr. Hamilton also found fault with the trial experts' cause-of-death determination. "[T]here were no positive pathological findings that would support the conclusion that Mr. Umansky was suffocated or drowned." The cause of death should have been listed as "unascertained." (Ex. 38 at 622.)

Dr. Hamilton also commented on problems with the toxicology analysis of Umansky. First, Dr. Hamilton noted that the reports fail to state whether appropriate preservatives were added to fluid samples collected from Umansky. If not, this would impact accuracy of alcohol tests on those samples because of post-mortem alcohol generation. (Ex. 38 at 621.) Second, Dr. Hamilton concluded that the fluid sample submitted for alcohol analysis was likely inappropriate. According to the toxicology report for Umansky, no sample described as "blood" was submitted for further analysis. "I infer that the dark red cavity fluid [retrieved during the autopsy] was tested, which would be potentially composed of blood, effusion, and decomposition fluid and therefore I do not consider it safe to equate this with a true blood alcohol level." (Ex. 38 at 622.)

**(3)    The prosecution presented scientifically unreliable testimony regarding the time of Meyer Muscatel's death**

Dr. Cooper estimated that Meyer Muscatel passed away on October 12 or 13, 2001 and that the cause of death was asphyxia by suffocation (smothering with tape). (10/25/2006 RT 90, 105.)

Dr. Hamilton reviewed the autopsy report and toxicological findings on Muscatel, as well as Dr. Cooper's testimony. While Dr. Hamilton found no fault in the methodology of the autopsy, he took issue with several of Dr. Cooper's findings, most notably, his conclusion regarding the time of death. The range Dr. Cooper gave was too narrow. That is because Muscatel's body was in water, which retards decomposition—because of the variability in environmental factors, it is impossible to estimate time of death in a case like this, outside of saying that the degree of decomposition isn't compatible with a post-mortem interval of minutes or hours. "[T]o be much more definitive than this is at best unhelpful and at worst potentially misleading." (Ex. 38 at 613.)

**(4)    The autopsy of Nick Kharabadze was not performed competently and was insufficiently documented**

Dr. Lawrence testified that flex ties were used to bind Kahrabadze's wrists and neck, and a weight or weights was "associated" with the body. (12/01/2006 RT 47.) Dr. Lawrence concluded that the cause of death was asphyxia due to ligature strangulation, as a result of the flex tie around his neck. (12/01/2006 RT 49.) But there was no documentation of any signs of struggle around Kharabadze's neck. (12/01/2006 RT 48.)

Dr. Hamilton agreed with Dr. Lawrence's conclusion that ligature strangulation is the likely cause of death. (Ex. 38 at 628.) However, he criticized Dr. Lawrence's methods. First, as with Umansky, the torso was eviscerated before the head in this case. Second, the autopsy insufficiently documented the ligature around Kharabadze's neck. The report contains no description of any mark associated with the ligature on the neck. And, following removal of the ligature, Kharabadze's body was not clearly photographed—a

significant omission in a case involving purported ligature strangulation. Third, and most notably, Safiev's and Kharabadze's autopsies were conducted in sequence in the same space, which produces a risk of cross-contamination. (Ex. 38 at 627.)

**(5)    Dr. Lawrence reached an opinion concerning the cause of Safiev's death based on hearsay accounts of crime-scene evidence, rather than his own personal observations of the autopsy**

Dr. Lawrence testified that he conducted the autopsies of Kharabadze and Safiev at "the same day, same time." (12/01/06 RT 57.) Dr. Lawrence opined that the cause of Safiev's death was asphyxia via either suffocation or drowning. (12/1/06 RT 58.) Even though the autopsy showed no signs of ligature marks, that does not mean a ligature was not used. "He could have undergone ligature strangulation, but if it was with the zip ties, it probably would have left a mark right after he was dead. But that could have disappeared after the decomposition." (12/1/06 RT 59.) "If there was something between the ligature and the neck . . . then he could have been choked with a ligature or rope or a zip tie and leave no marks at all on the neck." (12/1/06 RT 59.) He reviewed toxicological analysis showing that Safiev's blood alcohol level was .10. He estimated that approximately .04 of that came from post-mortem decomposition. The remaining .06 likely derived from consumption of alcohol—approximately two to three drinks within an hour or two of death. (12/1/06 RT 60.) The body showed signs of minor ante-mortem injuries, but no post-mortem injury. (12/1/06 RT 61.)

Dr. Hamilton opined that, as with Pekler and Umansky, "there is no pathologically identifiable natural, traumatic or toxicological cause of death identifiable from Mr. Safiev's autopsy and the medical cause of death is best considered 'unascertained.'" (Ex. 38 at 634.) Dr. Hamilton took issue with Dr. Lawrence's reporting of autopsy findings that appear to be based on hearsay accounts of the crime-scene evidence, rather than his own observations of Safiev's body:

> Mr. Safiev and Mr. Kharabadze underwent autopsy examinations at the same time and in Mr. Kharabadze's report Dr. Lawrence

records that he "was possibly suffocated in the region of New Melones Lake, possibly choked or having a bag placed over the head with a ligature, with weights then added to the body, and dumped off the bridge into the lake." [¶] *It would appear that the conclusion that Mr. Safiev drowned or was suffocated is most likely based on this hearsay account rather than pathological findings.* In my opinion it would be more appropriate to give the cause of death as 'unascertained,' while accepting that drowning or suffocation cannot be excluded, and allow a jury to consider the robustness of the other evidence regarding an 'asphyxial' mode of death.

(Ex. 38 at 634 (emphasis added).)

### b. Trial counsel provided prejudicially deficient performance by failing to investigate the pathology evidence and challenge it at trial

Trial counsel failed to consult an independent defense expert in pathology. Had they done so, counsel would have discovered the numerous flaws in the methodology and reporting of the autopsies in this case. This was deficient performance. *Dunn v. Neal*, 44 F.4th 696, 707-08 (7th Cir. 2022) (trial counsel's failure to consult a forensic pathologist was objectively unreasonable and fell below the standard of care); *Rivas v. Fischer*, 780 F.3d 529, 546-52 (2d Cir. 2015) (same); *Thomas v. Clements*, 789 F.3d 760, 768-73 (7th Cir. 2015) (same); *United States v. Rodriguez*, No. 04-cr-00055-RRE, Dkt. 1157, at 75-76 (D. N.D. Jan. 3, 2022) (at 2006 trial in federal district court, trial counsel in death-penalty proceeding provided deficient performance by conducting "no meaningful investigation or consultation with a competent expert on the issue of cause of death.")

Trial counsel's failure to challenge the pathology findings was not strategic. At both the guilt and penalty phases of trial, counsel sought to dispute Ainar Altmanis's testimony, which was bolstered by an array of forensic evidence introduced by the government. It follows that any evidence casting doubt on the reliability of the government's forensic evidence would have undercut Altmanis's testimony, and in turn, the government's case against Mikhel.

Counsel's deficient performance resulted in prejudice at both phases of the trial. The government used pathology findings to shore up Altmanis's testimony regarding the

timing and cause of death of each victim in this case. Had counsel challenged the pathology findings through pretrial motions, evidentiary objections, appropriate cross-examination, and the presentation of a defense expert like Dr. Hamilton, this critical piece of corroboration would not have been available to the government.

Indeed, the prosecutor made extensive use of the pathology findings throughout closing argument, frequently tying them to Altmanis's testimony as corroborating evidence. (*See, e.g.*, 01/10/2007 RT 79 (arguing that Dr. Cooper "confirmed that Meyer Muscatel was suffocated. He suffered the exact type of death that Ainar Altmanis described.")) Without challenging the pathology findings, trial counsel allowed the government to use such findings to vouch for the accomplice now turned cooperating witness who had the most motivation to minimize his own role in the events, while casting all blame on the defendants facing trial.[26]

### 4. Counsel failed to investigate and challenge the government's toxicology evidence

Toxicologist Bill Glenn Posey testified at the guilt phase regarding his analysis of fluid and tissue samples. He opined that all five victims had alcohol and/or diphenhydramine (the generic drug that is the equivalent to Benadryl or Demedrol) in their system at the time of death. (12/01/2006 RT 25-35.)

Dr. Gary Lage, a forensic toxicologist, reviewed the toxicology and pathology evidence presented at trial in this case. In his report, he explains that there are several limitations on the probative value of the toxicology evidence presented to the jury, which largely went unchallenged at trial. (Ex. 49, G. Lage Rpt.)

Defense counsel should have challenged the reliability of this evidence based on the selection of tissue and fluid samples that were submitted for testing. At the time of trial, toxicologists understood that the most reliable place to take samples is the peripheral area

---

[26] Because of his cooperation, the government asked the federal court to reduce Altmanis' sentence to 20 years. The Court, the Honorable Judge Otero, disturbed by Altmanis role in the case, sentenced Altmanis to 3 more years than what the government recommended. Altmanis should be released from federal prison by June 20, 2031.

(usually the femoral artery or vein). Vitreous fluid in the eye is also an ideal sample because it "is less susceptible to postmortem decomposition and alcohol and drug level changes." (Ex. 49 at 726.) Here, no such samples (peripheral blood or vitreous fluid) were tested for any of the five victims. Instead, as summarized below, Dr. Posey purported to have tested the following samples:

| Meyer Muscatel | Liver tissue |
| Rita Pekler | Heart and liver tissue |
| Alex Umansky | Blood (chest fluid) and bile |
| Nick Kharabadze | Blood (subclavian) and gastric contents |
| George Safiev | Blood (subclavian), bile, and urine |

As summarized above, toxicology samples for four of the victims derived from the heart and central chest area. In Dr. Lage's opinion, such samples are among the least reliable for toxicological testing. That is because samples from the heart and chest area are "susceptible to postmortem changes, and elevations [in] alcohol and drug levels." (Ex. 49 at 725-26.) Likewise, samples from the liver yield less probative results and are more challenging to interpret. That is because there is limited information available to toxicologists on the relevance of drug levels identified from the liver. (Ex. 49 at 726.)

Like Dr. Hamilton, Dr. Lage expressed concern about Umansky's toxicological testing. "Chest fluid" is frequently referred to as "chest blood, since it looks like blood." This is a misnomer. "Chest fluid" is actually "a mixture of blood and fluid that has leaked from the central area, and *is the least reliable source for toxicological analysis*." (Ex. 49 at 726 (emphasis added).)

Post-mortem redistribution of substances and the post-mortem generation of alcohol also posed major interpretive problems in this case. After death, ethyl alcohol forms in the decedent's body through a microbiological process: "converting blood glucose to ethyl alcohol (i.e., fermentation)." (Ex. 49 at 724.)

67

Testing was available, but not conducted, to discern the impact of post-mortem decomposition on alcohol levels. Dr. Lage reports that "the determination of ethyl glucuronide (ETG) in urine can be used to differentiate between antemortem ingestion and postmortem production of Ethanol since the formation of ETG requires a living person." (Ex. 49 at 726-27.) "Another process that can help differentiate between antemortem Ethanol ingestion and Postmortem Ethanol formation is to analyze for other alcohols (i.e., n-propanol, methanol, etc.), since they would be expected to be formed postmortem and indicate the level of Ethanol [that] is also elevated by postmortem formation." (Ex. 49 at 727.) No such tests were attempted here.

Reasonable counsel would have exposed the limitations of the government's toxicology evidence through cross-examination or the presentation of a defense expert. Had counsel done so, there is a reasonable probability of a different result. As with other forensic evidence presented at trial, the government used toxicology findings to corroborate unreliable accomplice testimony. This is apparent from the government's closing argument, where the prosecutor pointed to toxicology findings as corroboration for Altmanis and Solovyeva's account of what happened to the victims. (*See, e.g.*, 01/10/2007 RT 78-79, 116-117; 01/11/2007 RT 12.) The prosecutor told the jury: "And you know that the victims in this case ingested alcohol. That was confirmed by the toxicology results of the tests that were done following their autopsies. So, again, Mr. Altmanis's testimony is confirmed on this important point." (01/11/2007 RT 12.) Because this misleading scientific evidence lent credence to unreliable accomplice testimony, trial counsel's failure to challenge it resulted in prejudice under *Strickland*.

**5. Counsel failed to investigate and challenge the government's trace evidence analysis**

The government presented evidence that the FBI's analysis of "trace evidence"—specifically hairs and fibers—inculpated Mikhel and his co-defendants in the capital crimes. Trial counsel failed to investigate this evidence, failed to adequately cross-examine

68

the government's expert witness (Karen Korsberg), and failed to call their own expert witness to rebut her testimony. This was deficient performance.

### a. Karen Korsberg testified regarding her analysis of rope, cordage, and hair evidence

Korsberg, an examiner in the FBI's Trace Evidence Unit, testified at the guilt phase. She analyzed carpet samples taken from Kadamovas's Weslin residence (Trial Exhibits 255-257.) (11/30/2006 RT 36, 41-42.) She compared these samples to a fiber retrieved from Nick Kharabdze's clothing. (11/30/2006 RT 42.) Drawing no objection from the defense, she characterized the sample from Kharabadze's clothing as "off-white nylon *carpet-type* fibers." (11/30/2006 RT 42 (emphasis added).) She examined microscopic characteristics and optical properties of this sample and compared it to the known samples from the Weslin house, Mikhel's known residence, ultimately opining that they are "all consistent with coming from the same source." (11/30/2006 RT 42.)

Again drawing no objection from the defense, Korsberg testified that the FBI retrieved a "green nylon *carpet-type* fiber" from Kharabadze's shirt (Trial Exhibit 513-D). (11/30/2006 RT 43 (emphasis added).) She compared this fiber to fibers vacuumed from Altmanis's vehicle and determined they were consistent with coming from the same source. (11/30/2006 RT 43.)

Korsberg compared the rope used to bind Umansky with the rope used to bind Pekler. (11/30/2006 RT 43.) They exhibited the same "color, construction, and composition," and were "consistent with coming from the same source." (11/30/2006 RT 44.)

No testimony concerning hair samples or mitochondrial DNA testing[27] was presented on direct examination. Trial counsel opened the door to this topic through his brief cross-examination of Korsberg. There, counsel elicited testimony that hair samples

---

[27] Mitochondrial DNA (mtDNA) is a separate form of DNA compared to nuclear DNA (nDNA). mtDNA is commonly analyzed when the more discriminatory nDNA is not possible, such as when hair samples do not contain root tissue. (Ex. 50, C. Palenik Rpt. at 766.)

retrieved from the crime were sent out for mitochondrial DNA testing. (11/30/2006 RT 49-50.)

On the government's redirect, Korsberg then had an opportunity to elaborate on the hair evidence. She compared hair samples retrieved from the Parrot's Ferry Bridge with a known sample taken from Meyer Muscatel. She found that these hairs had the same microscopic characteristics as known samples taken from Muscatel. (11/30/2006 RT 56, 57.) On redirect, the government elicited no testimony concerning a mitochondrial DNA match between these samples. That fact came out through counsel's re-cross examination. On trial counsel's re-cross, Korsberg testified that hair evidence from the Parrots' Ferry bridge was submitted for mitochondrial DNA testing. (11/30/2006 RT 58.)

### b.    The jury never heard about serious flaws in the FBI's analysis of the fiber and the rope

Microtrace is a laboratory that specializes in the analysis of trace evidence. Dr. Chris Palenik and Dr. Jack Hietpas, two analysts at Microtrace, reviewed trial discovery related to the fiber and hair evidence presented at trial, along with Korsberg's trial testimony. In their 2023 report, Drs. Palenik and Hietpas explain that they found several flaws in the FBI's analysis of the fiber and cordage evidence.

*First*, the FBI lab's work was inadequately documented. The FBI took no photographs to document any of the fiber or cordage associations presented at trial. (Ex. 50 at 772.) "A hallmark of a scientific study is that it can be peer-reviewed by third parties to assess the validity of the data and its interpretation. Without this documentation, it is not possible to fully review the conclusions in the FBI laboratory reports." (Ex. 50 at 772.)

*Second*, the FBI's scientific analysis was incomplete. Microspectrophotometry (MSP) is a specialized technique used to analyze the color of materials. This technique was not attempted on fibers that the FBI deemed too "lightly colored" (namely, the "carpet-type fibers" found on Kharabadze and samples of the rope retrieved from Umansky and Pekler). In Microtrace's view, this was a mistake. "[M]any lightly colored fibers can provide probative comparative MSP data. The time it takes to collect MSP data (typically less than

70

five minutes per fiber) and the fact that the fibers showed an observable color provides ample reason to attempt MSP data collection." (Ex. 50 at 772.) In addition to MSP, other forensic approaches were available, such as Raman microspectroscopy or chromatography; these techniques, while uncommon, could have been used to identify or compare the fiber dyes. The FBI also failed to assess the subtype of nylon fiber in the samples. (Ex. 50 at 772.)

*Third*, Microtrace found fault with the FBI's failure to conduct replicate analyses. "[T]here is no indication in the discovery data to suggest that replicate analyses, a hallmark of the scientific process, were collected for any of the FTIR or MSP analyses performed in the case." (Ex. 50 at 772-73.) The FBI used FTIR (Fourier transform infrared spectroscopy) to identify the general polymer type used to construct fibers. But it failed to plot FTIR spectra for questioned fibers on the same graph. "[T]his is routinely performed to look for subtle differences in the spectra of two samples being compared." (Ex. 50 at 772.) Microtrace undertook this comparison. "Minor differences were noted in a direct comparison of the FTIR spectra provided in support of" the association between green fibers in Altmanis's car and fibers recovered from Kharabadze's shirt**.** (Ex. 50 at 772.) The resulting graph shows clear distinctions in the spectra between the samples from Kharabadze and Altmanis's vehicle. (Ex. 50 at 777.)

Microtrace's conclusions regarding the FBI's analysis of the fiber and cordage evidence are as follows:

> In summary, the fiber comparisons conducted by the FBI laboratory are cursory in nature. A primary point of comparison, color, was not photographically documented and is thus not reviewable. Points of comparison that were readily accessible at the time of the original work were not evaluated such as MSP data collection (for some fibers), cross section comparison and subpolymer assignments. Minor differences, such as those observed in the FTIR spectra . . . were not pursued. Each of these criticisms represent accessible analyses in practice at the time the work was performed by the FBI with a relatively high potential for providing additional probative information, that were not performed.

(Ex. 50 at 773.)

71

Trial counsel's cross-examination failed to expose any of these deficiencies in the FBI's analysis of the fiber and cordage evidence.

**c.    Counsel opened the door to damaging testimony about hair evidence and mitochondrial DNA (mtDNA) testing**

On direct examination, Korsberg did not testify about her comparison of hairs retrieved from the crime scene and known samples retrieved from victim Meyer Muscatel. The jury only heard that testimony because trial counsel opened the door to it through his cross-examination. This was deficient performance; reasonable counsel would not have invited further inculpatory testimony against his or her own client.

Likewise, trial counsel elicited testimony that hair evidence had been submitted for mtDNA analysis. It was deficient performance to open the door to any further evidence concerning mtDNA, without being prepared to rebut it. Such rebuttal was available to counsel, had they conducted an adequate investigation. This is evident from the FBI lab's processing of hairs recovered from a vacuum at Designed Water World. These hairs were reported to have similar microscopic characteristics to Pekler's head hair. However, the FBI's reports of mtDNA analysis of this evidence are inconsistent, raising serious questions about the reliability of the FBI's testing procedures and reporting practices. On one report, dated August 18, 2004, the FBI reported a mixture of mtDNA—showing more than one individual--which is "not interpretable." A later report, dated June 22, 2005, purports to show a match between these specimens. "[T]here is a change in interpretation that was not acknowledged in the second report." (Ex. 50 at 769.) This unexplained change in interpretation suggests critical failures in the FBI lab's processing and reporting of mtDNA lab results.

**d.    Counsel's examination of Korsberg was inadequate**

In addition to the analytical flaws identified above, Mictorace also took issue with Korsberg's testimony about her analysis of the trace evidence in this case. Because they were unprepared, trial counsel failed to expose flaws in her testimony through appropriate objections or through cross-examination.

72

Korsberg misreported her findings. Throughout her testimony, Korsberg referred to questioned fibers as "carpet-type" fibers. This is presented as a scientific fact, rather than her interpretation of the evidence. "The source of these questioned fibers has not been established. It is misleading to suggest, without further explanation, that . . . these fibers originate from a carpet because they are trilobal nylon fibers." (Ex. 50 at 773.)

This error is consequential. Korsberg implied that *all* trilobal nylon fibers are carpet fibers. That is not the case. "While it is true that many (not all) carpet fibers are trilobal, trilobal fibers are used in many other applications besides carpets." (Ex. 50 at 773.) Trial counsel should have objected to Korsberg's characterization of questioned fibers as "carpet-type" fibers, and he should have cross-examined her to expose the misleading nature of this testimony.

Korsberg's testimony regarding her analysis of green trilobal fibers recovered from Altmanis's car was also misleading. Korsberg testified that she had "found green nylon carpet-type fiber that had the same microscopic characteristics and optical properties in a vacuuming that was identified as coming from a vehicle from Mr. Altmanis. Again, these are consistent with coming from the same source." (11/30/2006 RT 42.) This testimony doesn't address the fact that the fibers from the vehicle vacuum sweepings were not samples of the carpet from the vehicle, but rather questioned fibers found in the vehicle from an unknown source. This difference matters. From this testimony, the jury could infer that fibers on Kharabadze's shirt were associated with fibers originating from the carpet in Altmanis's vehicle. But in Microtrace's experience, "Fibers of unknown origin are particularly challenging to interpret since the universe of possible sources could include contamination by the scene or laboratory personnel who were in contact with multiple locations." (Ex. 50 at 774.)

### e.    Prejudice resulted

There is a reasonable probability of a different outcome in this case, had counsel adequately challenged the trace evidence. As with other items of forensic evidence, the

73

prosecutor used this evidence to shore up the credibility of its cooperating witnesses. This is most evident in the government's closing argument at the guilt phase.

Because trial counsel failed to challenge Korsberg's characterization of fibers located on Kharabadze's body as "carpet type" fibers, the government made maximal use of this evidence in closing. There, the prosecutor repeatedly referred to the fibers found on Kharabadze as carpet fibers, even though that characterization was misleading. The prosecutor argued to the jury:

> When [Kharabadze's] body was pulled up, his clothing was analyzed by the FBI Lab, and *they found carpet fibers on his clothing.* And the FBI Lab was able to match those carpet fibers at the Weslin residence as being consistent with the carpeting -- the carpeting at the Weslin residence was consistent with those carpet fibers that were found on Nick Kharabadze's body, on his clothing; specifically, the *carpet fibers that were found on his shoes, on his boxer shorts, and on his shirt.*

(01/10/2007 RT 194.)

Similarly, because counsel failed to contest the reliability of the match between the rope used to bind Pekler and Umansky, the government overstated the significance of this evidence. "Karen [Korsberg] . . . testified that the rope that was used to bind those two weights to the body of Rita Pekler, they had common characteristics in all respect to the rope that was used as a ligature for Alexander Umansky." (01/10/2007 RT 119.) This too is misleading; it is an overstatement to assert that these samples had common characteristics because the government did not conduct a thorough evaluation of these samples, as Drs. Hietpas and Palenik explained in their report.

**6.      Counsel failed to investigate and challenge the presentation of cell site location information**

The government elicited testimony and introduced exhibits that purported to show Mikhel's whereabouts based on cell phone data. Trial counsel failed to investigate or challenge this evidence. Had they done so, they would have learned that the cell site location testimony in this case was unreliable.

74

Through witness Timothy Tomasello, the government introduced Exhibit 749, a list of call detail records for the phone number (310) 993-6748, a cellular telephone subscribed to by Iouri Mikhel. Exhibit 749 consisted of cell site location information for that phone from the months of January and February 2002.[28] According to Tomasello, Exhibit 744 "accurately reflects the cell sites where Defendant Mikhel's cell phone was used during the time period of January 24th, 2002, starting at 9:37 p.m. and January 25th of 2002, ending at 11:36 a.m." (11/16/2006 RT 147.) Using this data, Tomasello then described where Mikhel's cell phone was used over this time period. (11/16/2007 RT 148-49.) Trial counsel briefly cross-examined Tomasello and asked no questions about the reliability of the data that he used to determine the location of Mikhel's cell phone. (11/16/2006 RT 150.)

The government later called Special Agent James Davidson to synthesize data concerning cell site location information for both Mikhel and Kadamovas in a series of charts. Through his testimony, the government introduced demonstrative exhibits purporting to portray historical cell site location information for the phone number (310) 993-6748 (Mikhel's phone). Davidson affirmed that Trial Exhibit 745 was "a plot of cell-site information from Iouri Mikhel's cell phone for January 24th, 2002, and January 25th, 2002." (12/05/2006 RT 88.) According to Davidson, this map accurately plotted out the locations in the state of California where Mikhel's cell phone was used. (12/05/2006 RT 88.) Exhibit 745 was admitted into evidence without objection.

On a second chart, Trial Exhibit 759, Agent Davidson presented data summarizing cell site location for both Mikhel and Kadamovas's phones on the dates of January 24 and 25, 2002. (12/05/2006 RT 99-100.) This too was admitted with no objection from the defense. (12/05/2006 RT 100.) Callahan cross-examined Davidson briefly and asked no questions about any issues with the reliability of the data used to create these maps. (12/05/2006 RT 105-11.)

---

[28] These were kept by AT&T, Mikhel's cell phone carrier, before AT&T merged with Cingular. (11/16/2006 RT 146.)

75

Counsel failed to consult with an expert concerning cell site location data. Had they done so, they would have learned that the government's analysis suffered from serious flaws.

John Ellis is an attorney and an expert in the interpretation of historical cell site location information. He reviewed the evidence presented at Mikhel's trial, and he concluded that the government used unreliable data to draw conclusions about Mikhel and Kadamovas's whereabouts. (Ex. 164, J. Ellis Decl.) This unreliable data includes but is not limited to,  the government's demonstrative exhibits compiling data pulled from incoming calls, even though AT&T explicitly instructed the government not to make evidentiary use of this data because of its unreliability.

This is clear from the discovery, which includes a document titled "How to read 'Subscriber Activity Reports'" In this document, AT&T instructed that that its cell tower location data for incoming calls lacks reliability. (*See* Ex. 31, AT&T Fax.) As Ellis explains in his declaration, **only outgoing call data** from AT&T is reliable for use in court. (Ex. 164 ¶ 14.)

This error impacts much of the government's presentation of cell site location information.

As noted above, Trial Exhibit 744 was a demonstrative exhibit used to show Mikhel's location and cell phone usage between January 24, 2002, at 9:37 PM and January 25, 2002, at 11:36 AM. This exhibit reflects five incoming calls (8, 10, 11, 12, and 14) to the phone number 310-993-6748. In Ellis's opinion, "the location of cell sites to which calls 8, 10, 11, 12, and 14 connected was not reliable." (Ex. 164 ¶ 14.)

Exhibit 745 is a demonstrative exhibit used to show the location of Mikhel's phone during the same time period as Exhibit 744. This too is unreliable because it is based on incoming call data, which AT&T specifically instructed not to use to locate the position of

76

the receiving cell phone.[29] Reasonable counsel would have investigated the government's cell phone forensics, objected to unreliable evidence, and cross-examined the government's witnesses regarding the basis for their opinions (including the reliability of underlying data and the methodology employed). Trial counsel failed to take these steps, which was deficient performance under *Strickland*.

The cell phone location data in this case was prejudicial to Mikhel's defense. The government used this data to show that Mikhel traveled from the Los Angeles area to the New Melones Reservoir around the time of the five abductions in question, just as Altmanis claimed he did. Yet this testimony was highly misleading. Had trial counsel demonstrated critical flaws in the government's analysis of this data and presentation of that data through misleading charts and maps, there is a reasonable probability of a different outcome at the guilt phase.

### 7. Counsel failed to object to testimonial hearsay admitted in violation of Mikhel's rights under the Confrontation Clause

Trial counsel failed to object to forensic testimony and evidence admitted in violation of Mikhel's right of confrontation, as guaranteed by the Sixth Amendment. *Crawford v. Washington*, 541 U.S. 36 (2004), held that testimonial hearsay is inadmissible unless the proponent of the evidence can establish "unavailability [of the declarant] and a prior opportunity for cross-examination." At the time of trial, many legal scholars identified serious Sixth Amendment confrontation clause problems with typical forensic science testimony in criminal cases. *See, e.g.*, Pamela Metzger, Cheating the *Constitution,* 59 Vand. L. Rev. 475 (2006) (state statutes that permit state prosecutors to use hearsay state

---

[29] In 2016, a new trial was ordered in the Adnan Syed case based on a similar claim of ineffective assistance of counsel for Syed's conviction in a 2000 trial. There, trial counsel failed to effectively cross-examine a government expert regarding the use and misuse of call detail and subscriber activity records. *See Syed v. State*, 236 Md. App. 183, 209 (2018) (summarizing post-conviction evidence). The government expert in that case made the same error as the government expert here—reliance on incoming call data, despite AT&T's explicit warning that this data is not reliable. The Maryland appellate courts reversed this decision, but only on procedural grounds (a finding that Syed had waived this specific claim of ineffective assistance). *State v. Syed*, 463 Md. 60, 98-105 (2019).

crime lab reports, instead of live testimony, are unconstitutional after *Crawford*); John M. Spires, Testimonial or *Nontestimonial?* The Admissibility of Forensic Evidence after *Crawford v. Washington*, 94 Ky. L.J. 187 (2005) (noting that "the admissibility of crucial forensic evidence when the defendant is afforded no opportunity for cross-examination is uncertain.") Following *Crawford*, reasonable counsel would have objected to the use of hearsay forensic reports and forensic findings under the Confrontation Clause. Trial counsel's failure to object was deficient performance under *Strickland*.

As noted above, Dr. Lawrence testified to the findings of another pathologist, Dr. Eisele, who conducted the autopsies of Umansky and Pekler. Dr. Eisele's written reports were admitted into evidence through Dr. Lawrence's testimony. (12/01/2006 RT 64 (admission of Eisele's report as to Umansky, Trial Exhibit 1430); 12/01/2006 RT 70 (admission of Eisele's report as Pekler, Trial Exhibit 1429).) Trial counsel failed to preserve a confrontation clause objection to this testimony and to the reports. Trial counsel made a generic hearsay objection to the admission of the autopsy reports, which was overruled. (12/01/2006 RT 56.) But he failed to preserve the Sixth Amendment basis for his objection and failed to argue these reports were inadmissible under *Crawford*.

Similarly, DNA expert Rhonda Craig testified as to other examiners' serological testing, without drawing any objection from the defense under *Crawford* or the Sixth Amendment. (11/29/2006 RT 124-26.) Craig testified regarding the results of presumptive blood testing conducted on a plank taken from Mikhel's Oak View home (Trial Exhibits 210-A, B, and C). Craig did not conduct this testing herself; it was the work of another analyst. According to Craig, this unnamed examiner concluded that the plank tested positive on presumptive tests for the presence of blood. However, he or she concluded there was not enough sample to conduct confirmatory testing. Craig then testified that there was insufficient DNA for testing, and she speculated that if blood dripped on the floor and was later cleaned, the remaining stain might be so minimal that DNA testing is no longer possible. (11/29/2006 RT 126-27.) This speculation corroborated Altmanis's testimony regarding the Muscatel crime. (10/11/2006 RT 23, 73 (recounting Muscatel's

injury in the foyer of Mikhel's home and subsequent cleaning of that area).) Thus, counsel's failure to object prejudiced Mikhel's defense.

### 8. Counsel's inadequate investigation of all other forensic evidence was also deficient performance

Trial counsel conducted an unreasonable investigation of all other forensic evidence presented at the guilt phase, including but not limited to the following: handwriting analysis in English and Cyrillic, nuclear and mitochondrial DNA analysis, serology, fingerprinting evidence, shoeprint comparisons, chemical analysis, tool mark evidence, blood spatter, and forensic odontology. Because Mikhel does not currently have subpoena power to adequately investigate these issues, he makes these allegations on information and belief. Mikhel intends to seek discovery regarding the government's investigation and presentation of all forensic evidence in this case. Once discovery is complete, he will amend his petition to supplement these allegations with additional evidence of counsel's deficient performance and the resulting prejudice.

**B.    Counsel's deficient performance extended throughout the guilt phase.**

### 1. Counsel failed to object when the prosecutor vouched for the government witnesses through their plea agreements

Trial counsel failed to object when the government improperly vouched for the government's witnesses, in violation of Mikhel's rights to due process and a fair trial. Prosecutorial vouching for a witness's credibility may violate due process. Improper vouching occurs when a prosecutor expresses an opinion about a witness's credibility or expresses an opinion concerning the defendant's guilt. *United States v. Young*, 470 U.S. 1, 18-19 (1985). Vouching is improper for two reasons. First, "such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury." *Id.* at 18. Second, the "prosecutor's opinion carries with it the imprimatur of the government and may induce the jury to trust the government's judgment rather than its own view of the evidence." *Id.*

at 18-19 (citing *Berger v. United States*, 295 U.S. 78, 88-89 (1935).) Truthfulness provisions in plea agreements may lead the jury to believe that evidence outside the record supports the prosecution's case. *United States v. Roberts*, 618 F.2d 530, 534 (9th Cir. 1980) (finding admission of entire plea agreement and the prosecutor's related comments concerning the truthfulness provision in said agreement constituted improper vouching.)

Here, the government elicited the truthfulness provisions in plea agreements with multiple cooperating witnesses, including but not limited to:

As to Ainar Altmanis:

Q: And what is your understanding of the consequences that you face under that plea agreement if you fail to tell the truth when you testify at trial?

A: It will annul this agreement.

Q: And what effect will that have on you?

A: I will get what I was supposed to get.

Q: And what is that?

A: Life imprisonment

. . . .

Q: Could you possibly face new charges as well if you fail to testify truthfully when testifying in court?

A: Yes.

(10/20/2006 RT 75-76.)

As to Natalya Solovyeva,

[DeWitt]: Ms. Solovyeva, did you understand that responding truthfully when you testified and when you spoke in interviews to the FBI and the Government was a requirement of your Plea Agreement?

[Solovyeva]: Yes.

. . . .

Q: And, Ms. Solovyeva, can you please turn to Page 12 of Government's Exhibit 558, specifically Paragraph 22.

A: Yes.

Q: That paragraph says:

"The Defendant understands that any knowingly false or misleading statement by Defendant will subject Defendant to prosecution for false statement, obstruction of justice, and perjury and will constitute a breach by Defendant of this Agreement." Did you see that?

(11/08/2006 RT 44-45.)

As to Aleksejus Markovskis,

[DeWitt]: Did you understand that that was part of your agreement per your plea agreement?

[Markovskis]: Yes, I do.

Q: That you tell the truth?

A: Yes, absolutely.

Q: And, Mr. Markovkis, can you look at Pate 12 and specifically Paragraph 22-A?

A: Yes.

Q: Do you see the provision that says that "any knowingly false or misleading statement by the defendant will subject you to persecution for false statement, obstruction of justice, and perjury, and will constitute a breach of this agreement"?

. . . .

A: Yes. We discussed with my attorney that provision.

(11/14/2006 RT 85-86.)

Given that the credibility of the witnesses against Mikhel was paramount in the guilt phase, trial counsel provided ineffective assistance when they failed to properly and timely

81

object to the government's vouching when the government relied upon the truth provisions in the respective plea agreements.[30]

> ### 2. Counsel elicited "truthful testimony" provisions from government witnesses

Trial counsel provided ineffective assistance when counsel elicited "truthful testimony" provisions during the testimony of key government witnesses, including during the testimony of Solovyeva and Markovskis.

Solovyeva, Kadamovas' girlfriend, testified against Kadamovas and Mikhel. In his cross-examination, trial counsel elicited at least three times from Solovyeva that under her plea agreement with the government, she had agreed to testify truthfully:

> [Callahan]: And what you're hoping is that that one event takes place, which is that the prosecution moves or requests that this Court give you a sentence less that life in prison, correct?
>
> [Solovyeve]: Correct. Based on my truthful testimony.
>
> . . .
>
> Q: All right. Your Plea Agreement in this case has conditions that you must abide by; isn't that right?
>
> A: Correct. To give truthful testimony.
>
> Q: Yes; and give truthful testimony as you assist them in their prosecution of this case.

(11/03/2006 RT 95.)

Finally, trial counsel again elicited testimony from Solovyeva, a government witness, that she was credible:

---

[30] The Court's subsequent erroneous exclusion of the testimony of Clifford Smith, an informant used by the same office that prosecuted Mikhel, also shows an unreasonable risk of actual bias from the Court. (*See* Claim 11.)

Q: So you understand, as you sit there, that it's very important for you and your future to satisfy the prosecution with the job you did in this case.

A: My sentence depends on the judge. It's not the satisfaction of the prosecution. I will tell the truth and then the judge will decide my future and my sentence.

(11/03/2006 RT 96.)

Aleksejus Markovskis was an acquaintance of Kadamovas and later a co-defendant who testified against Mikhel and Kadamovas. During cross examination, trial counsel elicited the "truthful testimony" provision of his plea agreement with the government:

[Rubin]: The law says, according to that plea, that it would be an unlawful sentence for you to get anything less than life without release; isn't that right"

[Markovskis]: That's correct.

Q: And that's what a "mandatory minimum sentence" is; is that right?

A: Yes.

Q: Now, if it's unlawful for a Judge to sentence someone that's plead guilty to those to a sentence of less than life without release, how is it that you hope to get a sentence less than life without release?

A: My attorney explained to me that when I help the Government and I tell the truth and describe the events honestly and to the best of my recollection there's a possibility for me for the sentence reduction.

(11/09/2006 RT 166-67.)

Truthfulness provisions in plea agreements may lead the jury to believe that evidence outside the record supports the prosecution's case. *Roberts*, 618 F.2d at 534. By

83

eliciting the "truthful testimony" provision from these cooperating witnesses, trial counsel deficiently implied that the Judge was monitoring the witnesses' testimony for their truthfulness and thus making reference to evidence not before the jury, which violated due process. Because the witnesses' testimony implicated Mikhel in the charges against him, counsel's deficient performance prejudiced Mikhel when his own counsel elicited information as to their credibility.

### 3.    Counsel elicited irrelevant and prejudicial guilt-phase testimony from the victim's family

Trial counsel provided deficient performance by failing to object when the government elicited irrelevant guilt-phase testimony from Nancy Muscatel, the victim's wife, that she had "touched his beard, and. . . kissed" Muscatel the last evening she saw him. (10/25/2006 RT 30.) Further, trial counsel's performance was deficient when he asked Nancy Muscatel whether her husband had "a temper" and whether she had described him as a "tough guy." (10/25/2006 RT 35-37.) The government capitalized on trial counsel opening the door to victim-impact redirect during the guilt phase of Mikhel's capital trial:

> [Dugdale]: Ma'am, Mr. Callahan asked you some questions about your husband's personality.
> Can you explain to the jury what kind of person your husband was?
> [Ms. Nancy Muscatel]: My husband was the most devoted and loving man, family man, a spiritual man, a man of faith. His children and family came first and foremost. He had passion about life.
> He had tremendous feelings about how people should be treated. And he was just always trying to be better. He was always bettering himself, always.

84

Q: And did you find your husband to be a tough or aggressive guy or anything like that when you knew him?

A: No. Aggressive in business in the sense of, you know, getting the job done. But, you know, working hard.

Q: Thank you. I have no further questions.

The Court: Mr. Callahan?

Mr. Callahan: Nothing your Honor.

(10/25/2006 RT 39.)

Trial counsel's deficient performance prejudiced Mikhel by opening the door to testimony that would allow the jury to feel sympathy for the victim's family at the guilt phase of trial, where that type of evidence is irrelevant and prejudicial.

### 4.    Counsel failed to retain appropriate experts

Trial counsel provided deficient performance by failing to retain and properly proffer experts. At trial, the government introduced the testimony of Aaron Gogley whom the government proffered as an expert in money laundering. (10/31/2006 RT 114-56; 11/01/2006 RT 10-70; 11/28/2006 RT 126-202; 11/29/2006 RT 8-92.) The defense proffered the testimony of Carl Knudson as an expert to show flaws in Gogley's analysis and therefore raise reasonable doubt that the money the government alleged came from the hostage taking originated from other sources not related to the Government's accusations. (12/12/2006 RT 93.) According to the proffer, Knudson's testimony would have also rebutted the government's theory that Mikhel engaged in hostage taking because he was desperate for money. (12/12/2006 RT 93.) The government filed a Motion in Limine to exclude Knudson's testimony. (Dkt. 1370; 12/12/2006 RT 95-98.) In granting the government's in Limine Motion, the Court found that the report was not only not dated, but that it did not include an expert opinion:

> This is not an opinion, an expert opinion. It really doesn't go to what Mr. Callahan has indicated his Offer of Proof will reveal that the money laundered in this case was not laundered in a proper manner. I just think that the report of findings that was submitted in this case do [sic] not comport with an expert opinion

and an expert report. So I'm granting the Government's Motion in its entirety.

(12/12/2006 RT 100.)

Trial counsel performed deficiently by failing to file a timely expert report that gave notice of their expert's findings. Counsel's deficient performance led to the exclusion of such expert testimony. As counsel articulated in his proffer, Knudsen's testimony would have raised doubt as to one of the government's main theories against Mikhel. Thus, counsel's failure clearly prejudiced Mikhel by leaving the government's theory unrebutted. To the extent that the Court erred in granting the motion to dismiss, Mikhel was denied due process by the Court's error.

As explained below, trial counsel also provided ineffective assistance when they failed to hire an expert to show that, contrary to the polished image Altmanis presented in court, his speech pattern in other settings, including during calls with his wife, was thuggish and abusive, thus further casting doubt as to his credibility.

### 5. Counsel failed to investigate and present a mental state defense at the guilt phase

Trial counsel were aware that Mikhel suffered from serious mental illness at the time of trial. (Claims 2 and 5.) But counsel failed to present a mental-state defense at the guilt phase. This was unreasonable under prevailing professional norms. Post-conviction investigation reveals that Mikhel suffered from bipolar disorder prior to his arrest and his confinement under SAMs. (Exs. 34, 47.) Had counsel presented a mental-state defense at the guilt phase, there is a reasonable probability that Mikhel would not have been convicted or sentenced to death.

### 6. Counsel failed to properly cross-examine Altmanis with his prior inconsistent statements

Trial counsel provided deficient performance by failing to cross-examine Altmanis with his prior inconsistent statements, including but not limited to Altmanis' numerous changing descriptions of the facts surrounding the Muscatel murder; on the one hand,

86

asserting Mikhel and Kadamovas always kept secrets from him and tried to edge him out, while on the other, giving him every detail of what they were doing; Altmanis' inconsistent descriptions of Mikhel as a calm, cool killer, but in other interviews describing Mikhel as in "rage like an animal;" describing how Mikhel used ropes against the victims where the coroner's reports showed no ligature marks on the victims' necks. Given the government's reliance on Altmanis' testimony, Mikhel was prejudiced by counsel's failure to fully cross-examine Altmanis with all his prior inconsistent statements, which would have further undermined his credibility.

Counsel further failed to cross-examine Altmanis with his history of mental health issues, including having seen a psychologist, experiencing hallucinations, and hearing voices. (*United States v. Krylov*, 04/13/2007 RT 27-50.) At Krylov's trial, a certified court interpreter hired by Krylov's defense attorney testified that: 1) she had translated numerous recorded telephones calls of various defendants and various parties, including Altmanis, whom she had identified when Krylov's counsel asked her to attend Altmanis' testimony in October of 2006 at Mikhel's trial; 2) the certified court reporter testified that in some of the conversations, Altmanis and his wife had discussed him seeing a psychologist in several occasions, that he was suffering from hallucinations and hearing voices of children and old people; 3) given her educational background, which included a master's degree in psychology, and other degrees, the certified court interpreter testified that she detected a difference between Altmanis' pattern of speech in the recorded phone calls in comparison to the way he testified in court: in his normal speech, he used obscenities, his speech was very rough, giving the impression that he was a very hyper person, whereas in court, he was very calm, very well put together. In the recorded calls, his speech was abusive. (*United States v. Krylov*, 04/13/2007 RT 29-31, 50.)

Counsel's performance was deficient in that they did not verify the accuracy of the translation of Altmanis's testimony. Counsel also failed to present evidence explaining that Altmanis's pattern of speech in court differed markedly from his speech pattern in prior recorded phones calls. (*See* Claim 10.)

87

Because the government depended on Altmanis' testimony both as to guilt and as to Mikhel's moral culpability for the crimes, counsel's failure to impeach Altmanis prejudiced Mikhel.

To the extent the government withheld information,[31] including psychiatric reports casting doubt as to Altmanis' credibility, truthfulness, and competency, including his history of hallucinations and hearing voices, the government suppressed material information within *Brady*'s ambit. *Gonzalez v. Wong*, 667 F.3d 965, 981 (9th Cir. 2011) (in a § 2254 capital case, remanding to the lower court when petitioner made a colorable argument that a testifying informant's psychological reports indicating he had schizophrenia were suppressed, where those reports could have been used to impeach the informant's credibility.)

### 7.   Counsel failed to adequately cross-examine material witnesses Andrei Liapine and Andrei Agueev

The government deposed material witnesses Andrei Liapine and Andrei Agueev less than two months after Rubin and Callahan were appointed to the case. Both witnesses testified about their role in a money laundering operation that was central to the government's case against Mikhel and Kadamovas.

Agueev was deposed on August 1, 2002. At the deposition, Mikhel's counsel conducted a limited cross-examination, spanning just 7 pages of transcripts. (09/13/2006 RT 98-104.)

Liapine was deposed on August 2, 2002. Mikhel's counsel asked no cross-examination questions during this deposition. All cross-examination was handled by counsel for Kadamovas, Richard Lasting. (09/14/2006 RT 62-77, 80-81.) Near the end of Lasting's cross-examination, Liapine revealed that when he was arrested, local authorities in the UAE covered him with a hood and beat him with their fists and other objects during his interrogation. (09/14/2006 RT 76-77.)

---

[31] At Krylov's trial, Krylov's attorney stated the defense had not been given translations of the calls in question. (04/13/2007 RT 47-48.)

The government later moved to admit their deposition testimony at the guilt phase, in lieu of live testimony. Trial counsel filed a written opposition to the government's motion. (Dkt. 1027.) There, counsel argued that they had not been able to conduct a complete cross-examination of either witness because they had had insufficient time to prepare. The opposition notes the following concerning the limited information available to counsel at the time of these depositions:

- At the time Agueev and Liapine were deposed, the government had provided Mikhel's defense only 550 pages of discovery.

- A year later, on July 3, 2003, the government disclosed 1,700 pages of discovery relevant to Liapine and Agueev.

- On August 15, 2003, the government released additional materials relevant to Agueev and Liapine.

(Dkt. 1027 at 7.)

At the hearing on the motion, counsel explained why they were not able to provide effective assistance at these depositions. (06/12/2006 RT 71-72.) There, counsel explained that information about Alexander Afonin, an integral player in the money laundering scheme, was first disclosed long after these depositions. "[B]ecause [Afonin] was working with Agueev and Liapine, [this discovery] was really necessary in order to properly cross-examine Mr. Agueev and Liapine." (06/12/2006 RT 72.) "How were the attorneys supposed to be prepared and ready to take a deposition by a month and a half after their being appointed when really nobody knew anything about the case at that point?" (06/12/2006 RT 72.)

Lasting later explained why there was a prejudice problem. One of these witnesses, Agueev, lied about never previously having visited the United States. (*See* 09/13/2006 RT 91.) Lasting told the court:

> Subsequent to that deposition with discovery that was produced after an FBI interview that took place in November of 2002, it turns out that there is evidence to suggest that at least one of those individuals had been in the United States and, in fact, had

89

been at a location within probably a 1,000 yards of the Umansky [Hard Wired] business prior to his claiming that he was brought back to the United States for the first time.

(6/12/06 RT 76.)

As evidenced by Lasting's argument, impeachment material concerning Agueev and Liapine could and should have been used to cross-examine these witnesses at their pre-trial depositions, but counsel were unable to prepare because of the delayed disclosure of documents. To the extent the government interferes with their availability, such action constitutes prosecutorial misconduct.

**8. Counsel provided ineffective assistance when he challenged the wiretaps in this case**

Trial counsel challenged the wiretaps in this case and moved for the evidence to be suppressed. (Dkts. 307, 311, 318.) However, counsel failed to challenge the justification for the wiretaps: namely, Mikhel's alleged ties to "Russian Organized Crime." Had counsel conducted a constitutionally adequate investigation both as to Mikhel's actions in this case and his social history, counsel would have found that the government knowingly misled the courts that authorized the wiretaps. (*See* Claims 1 and 10.) When a reviewing court determines that an affiant has knowingly or recklessly included false information that is material to the determination of probable cause, evidence seized pursuant to that warrant must be suppressed. *Franks v. Delaware*, 438 U.S. 154 (1978); *United States v. Dozier*, 844 F.2d 701, 705 (9th Cir. 1988); *United States* v. *Elliott,* 893 F.2d 220,222 (9th Cir. 1990) (*de novo* review is appropriate because the probable cause question "turns on the consequences of a fraud on the issuing magistrate which that magistrate was not in a position to evaluate."); *United States v. Tham*, 960 F.2d 1391, 1395 (9th Cir. 1992) (finding that the ultimate question whether a false statement or omission is essential to a finding of probable cause or necessity is a mixed question of law and fact reviewed *de novo*.).

Because Mikhel did not receive a fair adjudication of his Fourth Amendment right to protect against illegal searches and seizures, given counsel's ineffectiveness and the government's misconduct, his claim is cognizable here. Mikhel is entitled to relief based on

his trial counsel's failure to investigate meritorious bases for challenging the wiretap in this case.

### 9.   Counsel failed to object to a partial courtroom closure

Mikhel is entitled to relief from his convictions and sentences based on his trial counsel's failure to object to the wrongful exclusion of Armen Harutiunian from the courtroom, in violation of Mikhel's right to open court proceedings.

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." U.S. Const. amend. VI. The requirement of a public trial "is for the benefit of the accused." *Waller v. Georgia*, 467 U.S. 39, 46 (1984). This is because "the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." *Id.* (internal quotations omitted).

There is also a first-amendment qualified right of access—by the public and the press—to criminal trials. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980). This includes a defendant's right to have witness testimony, voir dire, and preliminary hearings open to the public. *Globe Newspaper v. Superior Court*, 457 U.S. 596, 606-07 (1982) (witness testimony); *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510 (1984) (voir dire); *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 10-13 (1986) ("Press-Enterprise II") (preliminary hearings).

Ordinarily, the denial of a criminal defendant's right to a public trial is structural error. *Waller*, 467 U.S. at 49; *Neder v. United States*, 527 U.S. 1, 8 (1999) (listing "denial of public trial" among the limited class of "structural" errors, because it is a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself.") However, to prevail on a claim of ineffective assistance of counsel for failing to object to a violation of the right to a public trial, a defendant must demonstrate "either a reasonable probability of a different outcome in his or her case or . . . that the particular public-trial violation was so serious as to render his or her trial fundamentally unfair." *Weaver v. Massachusetts*, 582 U.S. 286, 300–01 (2017).

91

### a. The trial court ejected Armen Harutiunian from the courtroom based on unfounded speculation about his alleged gang affiliation

At a proceeding outside the jury's presence on January 10, 2007, Judge Tevrizian *sua sponte* excluded Armen Harutiunian from the courtroom. He did so without seeking input from defense counsel, without conducting an on-the-record colloquy with Harutiunian, and without conducting a hearing regarding the propriety of a partial courtroom closure. Judge Tevrizian made the following brief comments on the record:

> Last Friday there was an incident in the courtroom that was brought to my attention by the Marshals. An individual by the name of . . . Armen Harutiunian . . . came into court.
>
> Mr. Harutiunian had on the back of his neck tattooed Armenian Power with a flag. Armenian power is a gang in the Armenian community. It's called AP. Mr. Harutiunian had just been released from the Metropolitan Detention Center and that morning came into the courtroom. He identified himself as a friend of Mr. Mikhel or a fan of Mr. Mikhel.
>
> I don't know whether or not Mr. Harutiunian was brought here to intimidate the Court. But I can assure you I have not been intimidated by Mr. Harutiunian. And I think that should be placed on the record.
>
> Mr. Harutiunian will not be allowed to come into the courthouse nor any of the buildings in the immediate area. I have a picture of Mr. Harutiunian that was provided to me by the United States Marshals Service.

(01/10/2007 RT 5-6.)

Trial counsel did not ask for a hearing or object to Harutiunian's exclusion. Nor did counsel make a record of Harutiunian's wrongful exclusion from the courtroom on Friday, January 5, 2007 (the date on which Harutiunian apparently attempted to attend the trial). January 5 was the third day of Mikhel's guilt-phase testimony, a pivotal moment in the trial.

On direct appeal to the Ninth Circuit, Mikhel argued that the exclusion of Harutiunian from the courtroom violated his right to a public trial. The claim was reviewed

for plain error because trial counsel failed to object. The Ninth Circuit found no error occurred:

> To determine whether a closure implicates the Sixth Amendment, we look to whether the closure affected the values undergirding the right to a public trial, including ensuring fair proceedings, reminding the prosecutor and judge of their grave responsibilities, discouraging perjury, and encouraging witnesses to come forward. Nothing in the record here suggests Harutiunian's exclusion had any effect on these values, particularly given his lack of any apparent connection to defendants or the case and the absence of any evidence that he later sought readmittance to the courtroom. The exclusion did not implicate defendants' constitutional rights. The district court therefore did not err, let alone plainly err, by excluding Harutiunian.

*United States v. Mikhel*, 889 F.3d 1003, 1033 (9th Cir. 2018) (citation omitted).

Harutiunian was first interviewed for purposes of the instant motion for relief under 28 U.S.C. § 2255; the defense did not attempt to interview him at trial. In his post-conviction declaration, Harutiunian explains that he knew Mikhel prior to his arrest. They met in Encino when Harutiunian was still a teenager. (Ex. 44, A. Harutiunian Decl., ¶ 2.) Harutiunian and his brother Aram ended up in custody at the MDC at the same time as Mikhel. Mikhel went out of his way to help the two of them: "Iouri would put money on my books, help me out at commissary and cook for all of us. A group of us all ate together and shared our food. It did not matter that my brother and I were only half-Russian. Iouri never asked for anything in return." (Ex. 44 ¶ 3.) (Harutiuniun is half Armenian and half Russian; *see* Ex. 44 ¶ 1.)

Once he was released from MDC, Harutiunian went to court to show support for Mikhel, his friend. At the entrance to the courtroom, he presented identification to two Marshals, who asked why he was there. He explained that he was there to show support for Mikhel. He was then allowed into the courtroom. (Ex. 44 ¶ 5.) Within a minute of his sitting down, four Marshals removed him from the courtroom. (Ex. 44 ¶ 6.) He was accused of being in the courtroom to "scope out or pick out the jury." In his declaration, Harutiunian denies that was his purpose. "That is a lie." (Ex. 44 ¶ 7.)

93

Judge Tevrizian's speculation about his gang allegiance was also unfounded. Harutiunian has never affiliated with the "Armenian Power" gang or any other gang. "I have no idea why anyone would say that I am in any gang." (Ex. 44 ¶ 9.) Harutiunian has a tattoo of the Armenian flag on the back of his head. This is not a gang tattoo. The tattoo includes the year 1915, the year of the Armenian Genocide. (Ex. 44 ¶ 8.)

The trial court's rush to expel Harutiunian from the courtroom had significant consequences when Harutiunian later violated the conditions of his release. "[B]ecause of what happened in the courtroom the [BOP] labeled me as Russian Mob. I have never been part of that." The BOP acknowledged as much when Harutiunian was later sent to USP Victorville. On arrival, the BOP removed the Russian Mafia designation from his file. (Ex. 44 ¶ 9.)

> **b.** **Counsel's failure to investigate Harutiunian and object to his exclusion was deficient performance**

Trial counsel provided deficient performance with regard to Harutiunian's exclusion from the courtroom. Counsel had at least two opportunities to object to Harutiunian's exclusion and to seek a hearing regarding the reasons for Harutiunian's attendance at trial. But they failed to object both at the moment that Harutiunian was excluded and again when the trial court made a record regarding the reasons for his exclusion.

Trial counsel had ample opportunity to investigate Harutiunian—he was removed from the courtroom on January 5 and the issue was revisited five days later when Judge Tevrizian explained the basis for his exclusion from the courtroom. At no point did trial counsel attempt to interview Harutiunian.

Had they done so, trial counsel would have learned that Harutiunian did not have any improper motive for attending Mikhel's trial. He was not there to intimidate anyone. He was not acting on behalf of any gang. He was just there to show support for Mikhel.

Trial counsel also would have learned important information about Mikhel's character and record. Mikhel went out of his way to help Harutiunian in jail, and he did so in spite of differences in their ethnic background. This information was potentially

relevant at the penalty phase, where mitigating evidence regarding a defendant's positive adjustment to incarceration is of paramount importance. *See Skipper v. South Carolina*, 476 U.S. 1, 5 (1986) ("evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating.").

### c.   Prejudice resulted

Prejudice ensued from trial counsel's inaction. Harutiunian was excluded at a particularly inopportune moment for Mikhel: in the middle of his testimony. Mikhel had no family in the United States. Because his trial team failed to locate and interview friends in the area, he had no supporters in the courtroom (and no friends or family to testify in person at the penalty phase). (*See* Claim 4) Instead, he faced a public gallery mostly composed of relatives of the victims. (Ex. 165 ¶ 32 (counsel's declaration noting that "presence of the victims' families in the courtroom made this trial difficult" for the defense). Harutiunian's exclusion strikes at the heart of the Sixth Amendment values that undergird the right to a public trial, which "entitles a criminal defendant 'at the very least . . to have his friends, relatives and counsel present, no matter with what offense he may be charged.'" *United States v. Rivera*, 682 F.3d 1223, 1229 (9th Cir. 2012) (quoting *In re Oliver*, 333 U.S. 257, 272 (1948).)

Even if Mikhel cannot show a reasonable probability of a different outcome at either the guilt or penalty phase of his trial, he is still entitled to relief. That is because trial counsel's failure to object infected these proceedings with unfairness. *Weaver*, 582 U.S. at 300-01. Here, Judge Tevrizian assumed that Mikhel sent Harutiunian to the courtroom to intimidate him and to intimidate the jury. He was mistaken. As Harutiunian explains in his declaration, his only purpose was to show support for Mikhel. By failing to investigate this issue, failing to correct the record, and failing to object to Harutiunian's exclusion, trial counsel tacitly endorsed the trial court's erroneous accusations, further biasing Judge Tevrizian against Mikhel. Because trial counsel's deficient performance contributed to Judge Tevrizian's deep-seated bias against Mikhel, relief is required. (*See* Claims 6 and 11.)

## C.   Cumulative prejudice

Taken together or individually, counsel's deficient performance prejudiced Mikhel because there is a reasonable probability that, absent the errors, at least one juror would have had a reasonable doubt respecting guilt. *Strickland*, 466 U.S. at 695.

## CLAIM 5: TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE AT THE PENALTY PHASE

Mikhel is entitled to relief based on the ineffective assistance of counsel ("IAC") at the penalty phase of trial. Because Mikhel's rights under the Fifth, Sixth, and Eighth Amendments to the Constitution were violated as a result of counsel's ineffective assistance, this Court must vacate his death sentence.[32]

## A.   Legal Basis and Standard of Care

To prevail on an ineffective assistance of counsel claim, "[a] petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510 (2003). In preparing for the penalty phase of a capital trial, defense counsel has an "obligation to conduct a thorough investigation of the defendant's background." *Wiggins*, 539 U.S. at 543 (quoting *Williams*, 529 U.S. at 396).

In deciding what evidence to present at penalty, counsel must consider all of the following:

> (1) Witnesses familiar with and evidence relating to the client's life and development, from conception to the time of sentencing, that would be explanatory of the offense(s) for which the client is being sentenced, would rebut or explain evidence presented by the prosecutor, would present positive aspects of the client's life, or would otherwise support a sentence less than death;

---

[32] Iouri Mikhel was raised in St. Petersburg, Russia (then Leningrad), emigrating first to the U.K. and then the United States in the 1990s. In preparation for the penalty phase, trial counsel failed to conduct necessary investigation in Russia and Ukraine. Undersigned counsel have not been able to complete their investigation of this claim due to a combination of extraordinary circumstances, including the COVID pandemic, Russia's invasion of Ukraine, the diplomatic rift between the United States and Russia, Russia's draconian "foreign agent" laws, Executive Orders prohibiting and criminalizing numerous activities within the Russian Federation or related to any person located therein, and the significant safety risks facing American citizens traveling to Russia in the current climate. Mikhel intends to amend his petition and supplement the instant claim with additional evidence once he has had a full opportunity to conduct necessary investigation in Russia.

(2) Expert and lay witnesses along with supporting documentation (e.g. school records, military records) to provide medical, psychological, sociological, cultural, or other insights into the client's mental and/or emotional state and life history that may explain or lessen the client's culpability for the underlying offense(s); to give a favorable opinion as to the client's capacity for rehabilitation, or adaptation to prison; to explain possible treatment programs; or otherwise support a sentence less than death; and/or to rebut or explain evidence presented by the prosecutor;

(3) Witnesses who can testify about the applicable alternative to a death sentence and/or the conditions under which the alternative sentence would be served;

(4) Witnesses who can testify about the adverse impact of the client's execution on the client's family and loved ones.

(5) Demonstrative evidence, such as photos, videos, and physical objects (e.g., trophies, artwork, military medals), and documents that humanize the client or portray him positively, such as certificates of earned awards, favorable press accounts, and letters of praise or reference.

Guideline 10.11

A comprehensive mitigation investigation is incumbent in every capital case, even if the client is uncooperative. *See* Guideline 10.7 ("The investigation regarding penalty should be conducted regardless of any statement by the client that evidence bearing upon penalty is not to be collected or presented."); *Porter*, 558 U.S. 30 (granting relief on IAC claim for failure to investigate and present mitigating evidence, even though client was "fatalistic and uncooperative."); *Rompilla*, 545 U.S. 374, 377 ("We hold that even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial.")

In the context of a penalty-phase IAC claim in a capital case, the *Strickland* prejudice standard is whether there is a "reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537. "The bar for establishing prejudice is set lower in death-penalty sentencing cases than in guilt-phase challenges and noncapital cases." *Cox v. Ayers*, 613 F.3d 883, 898 (9th Cir. 2010); *see also Silva v. Woodford*, 279 F.3d

97

825, 847 (9th Cir. 2002) ("[W]e must be especially cautious in protecting a defendant's right to effective counsel at a capital sentencing hearing.").

**B.      Analysis**

       **1.      Trial counsel provided deficient performance**

             **a.      Counsel had no unified strategy for the guilt and penalty-phase defenses**

The 2003 ABA Guidelines imposed on counsel a duty to "seek a theory that will be effective in connection with both guilt and penalty," and to "seek to minimize any inconsistencies" between the two phases of trial. Guideline 10.10.1. "[I]f counsel takes contradictory positions at guilt/innocence and sentencing, credibility with the sentencer may be damaged and the defendant's chances for a non-death sentence reduced. Accordingly, it is critical that, well before trial, counsel formulate an integrated defense theory that will be reinforced by its presentation at both the guilt and mitigation stages." Commentary to Guideline 10.10.1, *reprinted in* 31 Hofstra L. Rev. 913, 1047-48 (2003).

The defense team failed to formulate a uniform strategy going into trial. (Ex. 48, ¶ 9 (criticizing absence of a unified strategy for guilt-and penalty-phase presentation in this case).). This is evident from counsel's closing arguments at guilt and penalty, which were inconsistent in their characterization of Mikhel's mental state.

The guilt-phase closing argument portrayed Mikhel as a sophisticated money launderer. There, counsel argued that Mikhel was simply too intelligent and sophisticated to involve himself with hands-on violence, as the government alleged: "Mr. Mikhel was a professional criminal, a professional money man." (01/11/2007 RT 68.) His handling of records of money laundering was "organized." (01/11/2007 RT 69.) According to counsel, the government accurately characterized Mikhel as a "master of deception" and as "ingenious, clever, intelligent, sophisticated [and] brazen." (01/11/2007 RT 70, 71.) Likewise, counsel endorsed the government's depiction of Mikhel's attempt to escape from the MDC as a sophisticated plot that had a real chance of success. "We are not challenging the escape attempt." It was "not violent" but "it was remarkably intricately

planned," "meticulous," and carried out in a "remarkably intelligent" way. (01/11/2007 RT 118.)

This strategy fell flat, and Mikhel was convicted on all counts. Later, in the penalty phase, counsel were forced to backpedal, portraying Mikhel as a broken human being whose violent acts were the product of neglectful parenting and mental vulnerabilities. Counsel explained that Mikhel was more prone to violence due to his impoverished childhood, attachment disorder, and bipolar mood disorder. (*See, e.g.*, 02/09/2007 RT 87; 02/09/2007 RT 75.)

The government made maximal use of the glaring inconsistencies between these two theories, as demonstrated by its closing argument. There, the prosecutor argued:

> Remember in the guilt phase, for instance, his story was he's such a wealthy guy who had so many options there's no reason why he would have murdered these people. And now what are they telling you? He was a person who had such limited options, that's why he murdered these people. Think about that inconsistency.

(02/09/2007 RT 143-44.)

The government seized on counsel's earlier depiction of Mikhel as intelligent, sophisticated, and rational, employing the same language to communicate the depth of his cold-blooded behavior toward the victims. The defendants "were intelligent men . . . [t]hey were smart and . . . capable people." (02/09/2007 RT 124.) Just as counsel previously commented on Mikhel's "meticulous" escape planning, the government parroted their language to argue for a death verdict. Regarding the letter Mikhel wrote to solicit assistance in an escape from SB-CDC, the prosecutor commented: "Look how *meticulous* he is. Look at how he notices every little thing. Do you think for one second if he finds any sort of flaw in a system that's run by human beings he's not going to take advantage of that?" (02/09/2007 RT 150) (emphasis added).

The failure to present a unified strategy at guilt and penalty was the natural outgrowth of the team's dysfunction and poor communication. Jackson recalls, "No one on the defense team produced an investigation plan." (Ex. 43, Jackson Decl., ¶ 11.) Formal meetings were a rare event. (Ex. 42 ¶ 6; Ex. 43 ¶ 8; Ex. 48 ¶ 6.) Jackson also recalls that

individual team members "did not work together well," and the attorneys failed to give much direction to other team members. (Ex. 43 ¶ 8.) Haney had so little contact with the attorneys on the case that he does not think he would recognize either one if he encountered them now. (Ex. 48 ¶ 6.)

The relationship between Jackson, the mitigation specialist, and the attorneys unraveled dramatically as the trial approached. "By the time trial started, Mr. Rubin and Mr. Callahan were no longer speaking to me. I sat next to Mr. Mikhel at counsel table, even though Mr. Rubin and Mr. Callahan did not want me there." (Ex. 43 ¶ 37.)

### b.    Counsel failed to establish a relationship of trust and confidence with Mikhel

The standard of care demanded that counsel establish a relationship of trust with the client. "Counsel at all stages of the case should make every appropriate effort to establish a relationship of trust with the client, . . . should maintain close contact with the client." Guideline 10.5(A). "Counsel at all stages of the case should engage in a continuing dialogue with the client concerning all matters that might reasonably be expected to have a material impact on the case." Guideline 10.5(C).

Building rapport is uniquely important in capital litigation because of the stakes involved, the unique vulnerabilities of capital defendants, and the likelihood of linguistic and cultural barriers to effective communication. "[T]he prevalence of mental illness and impaired reasoning is so high in the capital defendant population that '[i]t must be assumed that the client is emotionally and intellectually impaired.'" Commentary to Guideline 10.5, *reprinted in* 31 Hofstra L. Rev. 913, 1007 (2003) (quoting Rick Kammen & Lee Norton, Plea Agreements: Working with Capital Defendants, The Advocate, Mar. 2000, at 31). Where cultural and linguistic barriers exist, the Guidelines advise counsel to work closely with mitigation specialists, social workers, or other mental health experts to overcome these impediments. *Id.* at 1008.

Building this relationship is vital to advising the client and presenting an effective defense at trial.

100

> Establishing a relationship of trust with the client is essential both to overcome the client's natural resistance to disclosing the often personal and painful facts necessary to present an effective penalty phase defense and to ensure that the client will listen to counsel's advice on important matters such as whether to testify and the advisability of a plea.

Commentary to Guideline 10.5, *reprinted in* 31 Hofstra L. Rev. 913, 1008 (2003).

In the case of "uncooperative" clients, counsel have special duties. "Counsel should try to obtain treatment for the client's mental and/or emotional problems, which may become worse over time." *Id.* at 1010. "[M]aintaining an ongoing relationship with the client minimizes the possibility that he will engage in counter-productive behavior . . . Thus, the failure to maintain such a relationship is professionally irresponsible." *Id.* at 1011.

Here, counsel failed to develop a relationship of trust and rapport with Mikhel, and by the time of trial, the attorney-client relationship had completely broken down. (*See* Claim 9.)

Trial counsel Dale Rubin visited Mikhel infrequently during the pre-authorization or pre-trial period. He billed no time for client visits between April 22, 2003, and January 27, 2005. Based on his billing records, his last visit with Mikhel was on January 9, 2007, in the middle of Mikhel's guilt-phase testimony. Thus, he spent little to no time with Mikhel in the weeks leading up to the penalty-phase or during the penalty-phase itself.

Trial counsel Callahan likewise failed to visit Mikhel in the run-up to the penalty phase. Based on billing records, his last visit with Mikhel was on December 31, 2006. Over the course of four and a half years, Callahan billed a total of 104.4 hours for client visits. That works out to just under two hours per month. (By contrast, Jackson billed a total of 260.4 hours for client visits over the span of two and a half years, which averages 8 hours per month.)

Team members showed little interest in Mikhel's well-being at a critical moment in the case: Mikhel's first attempt to take his own life. Mikhel's first suicide attempt occurred on January 20, 2004. Billing records show that no team member visited him until June 10,

2004, five months later, when Callahan visited him at the West Valley Detention Center. And in the three-month period after Mikhel's first suicide attempt, Dale Rubin and Chris Filipiak billed no time to this case whatsoever.

The rift between Mikhel and counsel was obvious to other team members. (Ex. 43 ¶ 15; Ex. 48 ¶ 12.) Counsel perceived Mikhel as "difficult" or "demanding," but they spent little time with him to better understand what was at the root of his actions. This proved to be disastrous at trial when Mikhel refused to listen to the advice of counsel regarding his trial testimony and when Mikhel absented himself from the penalty phase. (Ex. 48 ¶¶ 38, 41.) According to Craig Haney, "every effort should have been made to talk [Mikhel] out of testifying," but he was never asked to "talk[] to Mr. Mikhel about the dangers of testifying." (Ex. 48 ¶ 38.) Haney recalls trying to convince Mikhel not to absent himself from the penalty phase, but by that point, "the breakdown in the relationship between Mr. Mikhel and his lawyers was too great, and he would not reconsider that decision." (Ex. 48 ¶ 41.)

Regular visitation was especially important to the attorney-client relationship in this case. Mikhel had decompensated significantly because of his lengthy time in solitary confinement. (Ex. 48 ¶ 15.) Haney, an expert on long-term solitary confinement, has found that individuals who "are deprived meaningful social contact with others come to see other people as aversive; that is, they become uncomfortable around them." (Ex. 48 ¶ 16.) Given Mikhel's extreme isolation, trial counsel's failure to prioritize in-person visitation was particularly unreasonable.

### c. Counsel's inadequate investigation and presentation of Mikhel's social history was deficient performance

At the time of trial, the standard of care required counsel to conduct a comprehensive investigation of Mikhel's social history. *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005) (for a 1989 trial); *Silva v. Woodford*, 279 F.3d 825 (9th Cir. 2002); *Ainsworth v. Woodford*, 268 F.3d 868 (9th Cir. 2001.)

102

Comprehensive investigation into life history is incumbent on all capital counsel. Counsel must explore all of the following:

> (1) Medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage);
>
> (2) Family and social history (including physical, sexual, or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment, and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one, or a natural disaster; experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (e.g., failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities);
>
> (3) Educational history (including achievement, performance, behavior, and activities), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof, and activities;
>
> (4) Military service, (including length and type of service, conduct, special training, combat exposure, health and mental health services);
>
> (5) Employment and training history (including skills and performance, and barriers to employability);
>
> (6) Prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education or training, and regarding clinical services)

Commentary to Guideline 10.7, *reprinted in* 31 Hofstra L. Rev 913, 1022-23 (2003).

"It is necessary to locate and interview the client's family members (who may suffer from some of the same impairments as the client), and virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors correctional, probation, or parole officers, and others." *Id.* at 1024.

In addition to witness interviews, record-gathering is a critical component of social history investigation. Records "can contain a wealth of mitigating evidence, documenting or providing clues to childhood abuse, retardation, brain damage, and/or mental illness, and corroborating witnesses' recollections." *Id.*

103

Developing a compelling social history requires counsel to conduct a multi-generational investigation. "Records should be requested concerning not only the client, but also his parents, grandparents, siblings, cousins, and children." *Id.* at 1024-25. This investigation should "extend[] as far as possibly vertically and horizontally" in order to reveal "significant patterns of family dysfunction" that "may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment." *Id.* at 1025. To evaluate the potential hereditary component of mental illness, "counsel should 'investigate at least three generations' of the client's family." *Id.* at 1025 n.216. Counsel must engage in multi-faceted efforts to collect records pertaining to the client, his or her siblings and parents, and other family members, including but not limited to school, social service, welfare, juvenile dependency, family court, medical, military, employment, criminal correctional, birth, marriage, death, substance abuse, and immigration records. *Id.* at 1025.

As explained in Claims 3 and 8, the Mikhel defense team operated without a mitigation specialist for years because the district court refused to fund penalty-phase experts until DOJ authorized this matter as a capital case. *See* Guideline 10.4(C) ("as soon as possible after designation, lead counsel should assemble a defense team" that includes "at least one mitigation specialist and one fact investigator."). But, even though counsel was unconstitutionally deprived of this resource by the court for far too long, there was much that counsel failed to do prior to Jackson's appointment. Counsel had a duty to investigate the penalty phase as soon as they were appointed, regardless of whether the court funded them. Counsel should have been collecting as many documents as possible, identifying witnesses, begun strategizing the comprehensive mitigation investigation that would need to be done, and identifying resources that would be needed. But until Jackson was appointed as the Mikhel team's mitigation specialist, the mitigation investigation languished. As a result of this delay, counsel's mitigation investigation was rushed and inadequate.

104

**(1)** **Failure to investigate family background and life history in the former Soviet Union, Mikhel's place of birth**

Counsel failed to conduct a thorough investigation of Mikhel's social history. Readily available mitigating evidence that was not presented at trial is summarized in the declaration of sociologist Jeff Hass, an expert on Soviet and Russian history and society. Professor Hass was retained by Mikhel's post-conviction counsel to prepare a social history examining three generations of Mikhel's family on both the maternal and paternal lines, as the Guidelines for counsel's performance at the time of Mikhel's trial required. (*See* Ex. 58, J. Hass Decl.) Reasonable counsel would have investigated and presented the evidence summarized in Professor Hass's social history.

Unreasonable delays impacted the quality of the team's investigative efforts. Jackson recalls: "I should not have waited so long to travel to Russia. I knew that many important mitigation witnesses were in Russia. The time we spent there was inadequate. I wish we had stayed in Russia for several weeks to exhaust record collection and to build rapport with witnesses." (Ex. 43 ¶ 18.)

Poor communication also hampered the team's efforts. Counsel made haphazard attempts to build relationships with potential mitigation witnesses. Rubin and Filipiak traveled to Russia in 2002 and made contact with a limited number of Mikhel's friends in Russia and with his ex-girlfriend and her son in the UK. In the two years between this trip and Jackson's appointment as a mitigation specialist, "no one maintained contact with Mr. Mikhel's friends and family in Russia or the UK." (Ex. 43 ¶ 18.) Indeed, in the intervening years, no one from the defense team ever succeeded in re-interviewing Mikhel's ex-girlfriend, Marina Karagodina, or her son, Anton Abramkin. (Ex. 48 ¶ 33 (describing Dr. Haney's failed attempt to interview Karagodina in 2005).)

Team members also failed to communicate with one another about the progress of the investigation, to Mikhel's detriment. Jackson's first trip to Russia occurred in October 2005, three years after Rubin and Filipiak's trip. Rubin and Filipiak returned to Russia at

the same time as Jackson. But they conducted their own investigation, and they made little effort to coordinate their efforts with hers. Before she traveled to Russia, Jackson "had almost no communication with Mr. Filipiak or Mr. Rubin about what they did on their prior trip to Russia [in 2002]." No one told her that Rubin and Filipiak conducted videotaped interviews with several important witnesses in 2002, so she did not review these videos until much later after she had conducted her own videotaped interviews. (Ex. 43 ¶ 23.) At trial, the government identified inconsistencies between videotaped witness statements, insinuating that witnesses made false statements to Jackson in order to help Mikhel. (*See*, *e.g.*, 02/02/2007 RT 163-165 (cross-examination of trial expert Dr. Elena Zdravomyslova).)

Jackson returned to Russia with Craig Haney in October 2006, in the middle of the guilt-phase trial. Jackson recalls: "The attorneys were preoccupied with the guilt phase and did not communicate with us while we were in Russia." (Ex. 48 ¶ 18.)

As noted above, capital counsel must make every effort to locate and interview the client's biological relatives. Here, over the course of a four-year pretrial period, counsel only interviewed <u>one</u> biological relative: Mikhel's paternal cousin, Edward. (Ex. 43 ¶ 43-44.) Many other relatives were available to be interviewed, had counsel conducted a diligent search for living relatives. Indeed, post-conviction counsel have identified 16 of Mikhel's relatives in Russia who were not interviewed at the time of trial. (Ex. 170, A. Kusnoor Decl., ¶ 14.)

Counsel failed to follow-up on important leads they uncovered on their trips to Russia. Edward Mikhel was first interviewed in October 2006, on the team's final trip to Russia. Reasonable counsel would have followed up on several leads for further investigation based on this interview:

- Edward Mikhel told Jackson and Haney that the paternal side of Iouri's family suffered immensely after the Bolshevik revolution. He explained that Iouri's paternal grandfather was politically repressed and the family's land was nationalized. (Ex. 77, E. Mikhel Interview, at 1159.)

106

Documentary evidence was available to corroborate this claim; archival records illuminate, expand on, and corroborate Edward's account. (Ex. 58 ¶¶ 14-27 (describing political repression of Mikhel's paternal family based on archival material available at the time of trial).) Yet counsel did not seek these readily available archival records, some of which are reproduced in the exhibits supporting the instant motion. (*See*, *e.g.,* Exs. 106, Boris Mikhel Personal File; Ex. 107, Andrei Mikhel Military Records; Ex. 108, Ivan and Andrei Mikhel Personal Files.)

• Edward also revealed that Mikhel's father, Gherman, was punished during World War II for unlawful possession of a radio. Edward informed counsel that Gherman was sent to fight on the front lines of the Soviet army as punishment. (Ex. 77 at 1161-62.) Counsel failed to seek records concerning the nature of Gherman's discipline for this "crime." In fact, as punishment for possessing a radio, Gherman was sent to a prison camp, Ryblag, a notorious "gulag." (Ex. 58 ¶¶ 31-33.) He was only released when a military tribunal reclassified his crime, at which point he was sent to the frontlines of the Soviet army. (Ex. 58 ¶ 34.)

• Edward told Jackson and Haney that when Mikhel was growing up, his family was in poor shape financially; they struggled to make ends meet. (Ex. 77 at 1167.) Counsel did not obtain readily available records to substantiate Edward's recollection. In fact, available records and historical data reveal that the Mikhel family was on the lower end of the Soviet socioeconomic spectrum throughout Mikhel's childhood. (Ex. 58 ¶ 135 (summarizing evidence).)

• Edward told Jackson that when Mikhel's mother, Margarita, was pregnant with him, she consulted a gynecologist about terminating her pregnancy. (Ex. 76, E. Mikhel Interview Memo at 1155.) The gynecologist, Margarita's friend, told her it was too late to abort her pregnancy. Jackson

107

acknowledges she should have interviewed this friend, but she ran out of time to even locate her. (Ex. 43 ¶ 43.)

- Edward was interviewed alongside his wife, Musa. Despite Haney's and Jackson's efforts, Musa Mikhel never warmed up—she was reluctant to speak in front of her husband. In Haney's view, she was never really interviewed, and if Haney had an opportunity to return to Russia, he would have attempted a one-on-one interview in the hope of getting her to open up. (Ex. 48 ¶ 25.)

The team conducted three interviews with Natasha Alifanova, Mikhel's ex-girlfriend who still lived in St. Petersburg at the time of trial. As they did with Edward Mikhel's interview, the team failed to follow up on important leads from these interviews:

- In 2002, Alifanova told counsel that she suspected Mikhel's brother Vladimir died a few years previously. (Ex. 79, N. Alifanova Interview (2002) at 1184.) She repeated this information in her 2005 interview with Jackson, adding that he was an alcoholic, and when Vladimir showed up at his mother's funeral, he used it as an excuse to get drunk. (Ex. 83, N. Alifanova Interview (2005) at 1217.) Counsel failed to follow up on this important information, which indicates that Vladimir may have suffered from depression Most notably, they failed to investigate his cause of death. Had they done so, they would have learned that he died by suicide in 1996. (Ex. 58 ¶ 165; Ex. 109, Vital Records for V. Mikhel, at 1884, 1890.)

- Alifanova told Jackson that Margarita survived the Siege of Leningrad, and she attributed much of Margarita's odd behavior and mood disturbances to this traumatic experience. Margarita had a habit of buying and storing large quantities of food, and she would hoard food, even when small mice infested her supply. (Ex. 83 at 1221.) She was constantly in a depression. (Ex. 83 at 1225.) Counsel failed to investigate Margarita's experiences during the Siege of Leningrad and the extent of her enduring psychological issues as a result

108

of it. (Ex. 58 ¶¶ 85-121 (summarizing available evidence about conditions during the Siege of Leningrad, including widespread starvation and bomb campaigns in the vicinity of Margarita's apartment)).)

Lack of cultural competency was an impediment to rapport. No team member had any background in Russian language or culture before their work on Mikhel's behalf. Because of differences in the legal system between the United States and Russia, Haney struggled to explain to witnesses why their assistance was necessary. (Ex. 48 ¶ 20.) Witnesses in Russia perceived the defense team to be government officials and were understandably wary as a result. (Ex. 48 ¶ 23.) Class sensitivities were also a barrier to rapport. Witnesses were "sensitive about socioeconomic status, reluctant to complain about what they did not have, and inclined to portray themselves as better-off than they actually were." (Ex. 48 ¶ 24.) Witnesses were also reluctant to complain about the government, which Haney attributes to lives lived under Communist rule. (Ex. 48 ¶ 24.)

Just as the team's efforts to interview witnesses fell short, so too did the team's efforts to gather records regarding Mikhel's social history. The team did not have assistance from a records specialist, "someone on the ground in Russia who had particular expertise with the Russian bureaucracy and how best to gather records and find archived material." (Ex. 48 ¶ 32.) According to Filipiak "[r]ecord collection in Russia was like the Wild West. We would hire a local fixer and then just show up to see what would happen." (Ex. 42 ¶ 16.) Had counsel conducted a diligent search for genealogical and life historical records, they would have uncovered the material summarized in Professor Hass's declaration (Ex. 58; *see also* Exs. 87-127 (genealogical and archival material uncovered by undersigned counsel).)

The team failed to undertake critical steps to facilitate record collection in Russia. For instance, Jackson wanted to obtain Mikhel's prison records from Russian authorities, but she learned that this would require a power of attorney executed by Mikhel, authorizing a third party to gather these records. Jackson failed to obtain this authorization

109

from Mikhel. Nor did she ask Russian authorities to supply Mikhel with valid identity documents to facilitate requests for records. (Ex. 43 ¶ 20.)

Counsel failed to pursue important leads derived from life-history records they obtained in Russia. Trial counsel obtained a document concerning Margarita Mikhel's life history: an autobiography that she prepared after World War II, which was required for job applications. (Exs. 70, 71, Autobiography of M. Mikhel and Translation; 02/02/2007 RT 99-101.) In her autobiography, Margarita explained that her biological father, Genrikh Fot, was a Mennonite colonist. She acknowledges that she was born in a Mennonite colony, but claims to have moved back to her mother's place of birth in 1922. (Ex. 71 at 1142.) Counsel failed to investigate Mikhel's Mennonite heritage and Margarita Mikhel's ties to the Mennonite colonies. Had they conducted a thorough search for records regarding Margarita's early life history, they would have learned that she spent the first ten years of her life on Mennonite land (in what is now Ukraine), where she was raised by her paternal grandparents (the Fots). (Ex. 58 ¶¶ 65-70.) Conditions in the Mennonite colonies in the 1920s were bleak—colonists experienced civil war, famine, religious and linguistic discrimination, forced migration, and the expropriation of their land. (Ex. 58 ¶¶ 60-61, 64; Ex. 129, J. Urry Article; Ex. 130, A. Baerg Diary.) Reasonable counsel would have pursued evidence regarding Margarita Mikhel's traumatic early life experiences.

Additionally, counsel failed to obtain English translations of important records that they uncovered. The trial team obtained a limited set of Mikhel's school records during their time in Russia. However, because these records were in Russian, Jackson was unaware that they contained a long list of classmates who could and should have been interviewed. Ultimately, Jackson made no effort to interview the classmates identified in Mikhel's school records. (Ex. 86, I. Mikhel School Records, with Translation obtained by undersigned counsel appended.) This failure to investigate, in turn, impacted the credibility of Haney's penalty-phase testimony. There, Haney attempted to testify about Mikhel's educational background. But other than report cards from Mikhel's schools and an interview with one of Mikhel's school teachers, he had little to draw from. "There are

110

grades, but there's little else. *And there were no schoolmates of his around or available with whom I could conduct interviews who might have had additional information to suggest.*" (02/02/2007 RT 66) (emphasis added). Likewise, Haney struggled to articulate what "peer-related" risk factors were at issue in this case because the team was unsuccessful in locating or interviewing any of Mikhel's school classmates in Russia. "Well, the peer related issues, again because we were hard pressed to find anybody who was a schoolmate or a friend at the time *and so hard pressed we didn't, we couldn't find— it was impossible to know exactly who Iouri was with, who his friends were, who he was relating with.*" (02/02/2007 RT 68) (emphasis added). Exhibit 86 to the instant motion reveals there were dozens of school classmates listed in the school records that counsel obtained, many of whom could have provided Haney and Jackson with critical information about "peer-related" risk factors had they been interviewed.[33]

While counsel gathered Mikhel's childhood medical records from Russia, Jackson acknowledges that the team failed to have the entire set of records translated into English. (Ex. 43 ¶ 28.) The first full translation (a 314-page document) was prepared in 2021, at the direction of undersigned counsel. (Ex. 85, 2021 I. Mikhel Pediatric Records Translation and M. Michaelian Decl.)

Counsel failed to gather important vital and health records for Mikhel and his family. Had they done so, they would have discovered documented instances of mental illness in Mikhel's family. (Ex. 87, Margarita Mikhel Case File, at 1580; Ex. 109 at 1889; Ex. 115, Kurmanov Disability Cert.)

Mikhel's trial team provided deficient performance by failing to investigate his family background and life history in Russia. This was the result of inattention, unreasonable delay, inadequate staffing, and poor communication, rather than the result of strategic decision-making.

---

[33] Given the impediments mentioned above, counsel have been unable to conduct interviews of some of these peers, who counsel have reasonable grounds to believe were alive prior to Russian's invasion of Ukraine. (Ex. 170, Kusnoor Declaration.)

111

> **(2)     Failure to investigate Mikhel's experiences after he emigrated from Russia**

Counsel also failed to investigate Mikhel's experiences after he left Russia in 1993. Available evidence that was not presented at trial is also summarized in Hass's social history. (Ex. 58 ¶¶ 193-223.)

Counsel failed to interview witnesses in the Southern California area and in the U.K. who could have provided important testimony about Mikhel's background and character. This is, again, due to the team's dysfunction and poor communication. Jackson recalls that she wanted to locate and interview Mikhel's friends who lived in Southern California. But she "assumed that Chris Filipiak would identify witnesses for [her] to interview based on his review of the discovery." (Ex. 43 ¶ 16.) Unlike Jackson, Filipiak had access to investigative databases to locate witnesses. When he failed to provide any of the information she needed to follow up on contacts in the area, Jackson "eventually just gave up on the investigation of mitigation witnesses in the [Southern California] area." (Ex. 43 ¶ 16.)

Such accounts were available, had counsel attempted to interview witnesses who knew Mikhel in the years that he lived in Los Angeles and London. (*See, e.g.*, Ex. 39, A. Abramkin Decl.; Ex. 40, G. Gentile Decl.; Ex. 45, L. Morrow Decl.; Ex. 12, E. Roiz Decl.; Ex. 13, A Shakirov Decl.; Ex. 62, V. Prasol Decl.; Ex. 167, G. Birnbaum Decl.) Likewise, counsel failed to make diligent efforts to interview Mikhel's former romantic partners, including Marina Karagodina, Michelle Lancaster, and Elizabeth Taddy, Mikhel's ex-wife. (Ex. 48 ¶¶ 33, 35-37.) Haney explains that efforts to interview these witnesses were not made until late into the team's trial preparation, and ultimately, none of them testified at trial.

> **(3)     Failure to investigate and present evidence regarding the intergenerational transmission of trauma**

Trial counsel provided deficient performance by failing to investigate and present evidence concerning the intergenerational transmission of trauma. This research explains

112

how the uniquely horrific events that Mikhel's parents and grandparents endured had a continuing impact on their descendants.

At the time of trial, scientific research showed that traumatic life experiences have an intergenerational impact, meaning that the children and grandchildren of trauma survivors are more likely to experience mental health difficulties than their peers. (*See, e.g.*, Ex. 134, Nader Research Article (reporting results of two studies that "strongly suggest that children whose parent[s] are traumatized by violence or disaster may . . . be more likely to be subsequently traumatized and are at risk of experiencing increased symptoms following a traumatic event.") Many such studies have been conducted among the descendants of Holocaust survivors. These studies document that "[p]arental trauma exposure is associated with greater risk for posttraumatic stress disorder (PTSD) and mood and anxiety disorders in offspring." (Ex. 148, Yehuda, et al., Research Article (citing research available at the time of trial regarding psychological assessments of the children of Holocaust survivors).)

Professor Hass's declaration explains that Mikhel's maternal grandfather was a Mennonite, and his mother Margarita spent her childhood on a Mennonite colony in the midst of a civil war. In 1997, a psychologist, Lynda Klassen Reynolds, published a dissertation reporting the results of psychological testing of first- and second-generation descendants of Mennonite colonists who emigrated from Russia to Canada. This study demonstrated that the descendants of diaspora Mennonites are more likely to experience mental health symptoms than the general population. (Ex. 133, Klassen Reynolds Research Study.)

Likewise, there is abundant research demonstrating that the starvation that many experienced during the Siege of Leningrad caused long-term health impacts on survivors. (*See, e.g.*, Ex. 138, Sparén *et al.* Research Study; Ex. 141, Koupil et al. Research Study.)

Counsel also failed to present scientific research regarding epigenetics. Studies show that trauma survivors experience genetic modifications that may ultimately impact the mental health of their descendants. Counsel should have presented this important research

113

to the jury to explain why the trauma that Mikhel's parents and grandparents experienced had a direct impact on him. (*See* Ex. 146, Ramo-Fernández et al. Research Study (literature review summarizing research, with citations to studies available at the time of trial); Exs. 127, 132, 136, 137, 139 (cited in Ex. 146).)

### (4)    Improper reliance on videotaped witness interviews, rather than the presentation of live testimony

Trial counsel provided deficient performance by presenting videotaped statements from Mikhel's friends and his cousin, Edward Mikhel, instead of live witness testimony.

Haney, an expert in capital mitigation, explains that "live testimony from lay witnesses is essential to the mitigation case." In his experience, such testimony is necessary to humanize capital defendants. The jury "never got a feel for all of [Mikhel's] human dimensions and qualities," because no friends or family came to court to testify on his behalf. (Ex. 48 ¶ 39.)

The team decided to present videotaped statements without consulting Haney. (Ex. 48 ¶ 40.) Holly Jackson explains what led to this decision. The team wanted to have three of Mr. Mikhel's friends from Russia travel to Los Angeles to testify at the penalty phase. No efforts were made to help witnesses obtain their visas until mid-January 2007, shortly before the penalty phase. Ultimately, the only witness who traveled from Russia to the U.S. was an expert, Dr. Elena Zdravomyslova, a sociologist who had never met Mikhel. (Ex. 43 ¶ 46.)

Both Jackson and Haney viewed the videotaped statements as an inadequate substitute for live testimony. Haney recounts that videotaping was "awkward" for the witnesses because they were not used to it. As a result, "[t]hey became terse and often suppressed their emotions." (Ex. 48 ¶ 40.) Because he was present when the videotapes were produced, he knows that they only conveyed "a small portion of the information the witnesses had." (Ex. 48 ¶ 40.) In Jackson's view, "You cannot achieve the same emotional connection with jurors using videotaped statements." (Ex. 43 ¶ 47.) Jackson firmly believes

114

that it would have made a difference to the jury if heard directly from friends and family who knew Mikhel and loved him. (Ex. 43, ¶ 47.)

The lack of live testimony gave the prosecutor fertile grounds for rebuttal. In closing statements, the prosecutor argued that Mikhel's mitigating evidence lacked weight and credibility because no one came to court to speak in his defense. (02/09/2007 RT 138-40.)

### d. Counsel's investigation and presentation of mental health evidence was inadequate

Counsel conducted an unreasonable investigation of Mikhel's mental health. (*See* Claim 2.) This, in turn, impacted the quality of their presentation of mental-health testimony at trial. Trial experts Dhillon and Vicary were unprepared to testify and gave opinions that were easily attacked on cross-examination. Counsel's choice of Vicary as a mental-health expert was wholly inappropriate, considering his prior misconduct in a prominent case (the Eric Menendez trial).

### (1) Inadequate investigation of Mikhel's mental health

"Counsel have an affirmative duty to provide mental health experts with information needed to develop an accurate profile of the defendant's mental health." *Caro v. Woodford*, 280 F.3d 1247, 1254 (9th Cir. 2002). In capital cases, defense counsel has a "professional responsibility to investigate and bring to the attention of mental health experts . . . facts that the experts do not request[.]" *Wallace v. Stewart*, 184 F.3d 1112, 1116 (9th Cir. 1999).

Counsel's investigation fell short of these standards in two key ways. First, counsel failed to adequately investigate and document the extent of Mikhel's mental illness. Second, counsel failed to provide their mental health experts with adequate background information to render a reliable opinion and failed to prepare them for their testimony.

Counsel's assessment of Mikhel's mental health required more than regular client visits. Mikhel had a pronounced tendency to under-report his symptoms. (Ex. 60, W. Vicary Decl., ¶ 9 ("Mikhel had a tendency to downplay his symptoms. I got the sense that

115

he did not want other people to view him as sick."); Ex. 48 ¶ 13 (Mikhel "was stoic, and understated the hardships and traumas to which he had been exposed.").) In light of Mikhel's tendency to deflect, it was imperative that counsel identify collateral sources of information—gathering medical and mental health records and interviewing witnesses whose behavioral observations could inform mental health diagnoses. Such accounts were readily available to counsel, had counsel interviewed Mikhel's friends in the Southern California area. (*See, e.g.*, Ex. 40 (documenting Mikhel's hallucinations); Ex. 62 (documenting Mikhel's mood swings).)

Counsel failed to interview mental health professionals who treated Mikhel in jail, many of whom still recall the severity of his illness and his stark conditions of confinement, even after his suicide attempts. (*See, e.g.*, Ex. 10, M. Kortkamp Decl., ¶¶ 4-5 (mental health staff member who confirmed that Mikhel was housed "alone in a wing of four rooms" despite two serious suicide attempts); Ex. 11, J. Wells Decl., ¶ 6 (treating physician at West Valley Detention Center who confirmed that he administered "serious medications for the treatment of depression and psychosis" to Mikhel); Ex. 41, J. Flores-Lopez Decl. (SB-CDC physician suggested involuntary medication may be required, given severity of Mikhel's mental illness).)

The team subpoenaed Mikhel's medical records from MDC. But these were turned over too late for anyone to make any use of them. (Ex. 48 ¶ 43.)

Jackson voiced concerns about the team's failure to investigate. Her attempts to stir counsel to action often fell on deaf ears. For instance, Jackson devised a system for the team to monitor Mikhel's symptoms. She emailed the team a list of recommendations, including a "Client Observation Sheet," with a request that team members keep track of Mikhel's symptoms during each legal visit. These efforts were futile. As Jackson recalls, "No one on the team used the form I created. I gathered that no one else on the team thought it was worthwhile monitoring the client's symptoms." (Ex. 43 ¶ 14.)

Team members understood that Mikhel was decompensating as a result of his long-term confinement under SAMs. The team's social historian, Craig Haney, was and is a

116

renowned expert on the impact of long-term solitary confinement. (See Ex. 9, Ashker Expert Report; Ex. 48; *see also* Claim 1.) Counsel never asked Haney to explore this avenue of mitigating evidence. Nor did the time retain a consulting mental health expert to assist them in developing mental health evidence for the penalty phase. (Ex. 43 ¶ 30.)

Counsel's incomplete investigation of Mikhel's social history had a ripple effect on the team's investigation of mental-health defenses. Because counsel failed to conduct a comprehensive investigation into Mikhel's social history, the penalty-phase experts who testified at trial gave incomplete and unhelpful testimony that was easily impeached on cross-examination. (Ex. 47, I. Dhillon Decl., ¶¶ 8-9; Ex. 48 ¶¶ 56-57.)

Experts were siloed off from each other. (Ex. 48 ¶ 52; Ex. 60 ¶ 14.) Haney, who had many years of capital mitigation experience before this case, explains just how unusual this was: "It is common for the defense team to gather all of the experts to share their information and conclusions. That did not happen here. . . typically, you want your mental health experts to have all of the social history evidence that is available to the defense team." (Ex. 48 ¶ 52.)

### **(2)    Inadequate presentation of mental-health testimony**

Trial counsel provided deficient performance in their presentation of mental health testimony.

The team failed to prepare Dr. Dhillon for her testimony. Dr. Dhillon had never been involved in a case of this magnitude; her prior testimony was in less serious matters, like hearings regarding involuntary medication orders. (Ex. 47 ¶ 7.) As Mikhel's treating physician in the jail, she initially concluded that he suffered from Bipolar Disorder I, the more severe form of this condition. But over the course of her preparation for trial, she came to believe that the more fitting diagnosis was Bipolar Disorder II, the less severe form of bipolar disorder. (Ex. 47 ¶ 5.) No one prepared her to testify regarding a clarification in her diagnosis. Nor did counsel provide her with sufficient background information about Mikhel to testify competently about his genetic predisposition to mental illness or any mental health conditions that preexisted his time in custody. (Ex. 47 ¶¶ 8-9.)

117

The government's cross-examination of Dr. Dhillon exploited the lack of preparation and the inadequate foundation for her opinions. On cross, Dr. Dhillon conceded that she had no evidence that Mikhel suffered from mental illness prior to his first escape attempt; to her knowledge, he had no history of receiving any kind of psychiatric treatment. (01/31/2007 RT 39.) She asserted that Mikhel had an inherited predisposition for mental illness (depression). (01/31/2007 RT 38.) But she had little to back up this opinion. She admitted Mikhel never told her about any family members suffering from mental illness. (01/31/2007 RT 49.) She also admitted that she had made an incorrect diagnosis. After the prosecutor reviewed DSM diagnostic criteria with her, she admitted that Mikhel did not meet criteria for Bipolar Disorder I. The correct diagnosis was Bipolar Disorder II, which is less severe and shorter in duration. (01/31/2007 RT 45-47.) In her declaration, Jackson acknowledges that the team failed to prepare Dhillon for her testimony, and as a result, she looked biased in Mikhel's favor. (Ex. 43 ¶ 48.)

Likewise, Vicary recalls very little preparation for his testimony. (Ex. 60 ¶ 16.) He did not receive much input from counsel "about the specific mental health symptoms [Mikhel] was manifesting," and he got the sense that "the lawyers in this case under-estimated the extent of Mikhel's mental illness." (Ex. 60, W. Vicary Decl., ¶ 8.) He was never given treatment records from the West Valley Detention Center, where Mikhel had previously attempted suicide. (01/31/2007 RT 178-79.) And he was provided very little information about Mikhel's social history, which proved to be a liability in cross-examination. (*See, e.g.*, 01/31/2007 RT 195-97.) As Vicary states in his declaration, "I was unprepared to answer [the prosecutor's] questions because no one provided me with Mikhel's social history." (Ex. 60 ¶ 13.)

Ultimately, Vicary's testimony did more harm than good. On cross-examination, the prosecutor elicited testimony that: (1) Mikhel's crimes had no mental health cause; (2) he considered Mikhel to be manipulative and a pathological liar; and (3) Mikhel reported there was nothing in his childhood or upbringing that cause psychological problems, and that

118

anybody who opined differently would be completely wrong. (01/31/2007 RT 168-69, 198, 203.)

To the extent trial counsel limited the scope of their mental-health presentation at the penalty phase to prevent the admission of rebuttal evidence, that strategy was not reasonable. Two government mental-health experts, Drs. Pitt and Wetzel evaluated Mikhel before the penalty trial. Because they were also operating in an absence of critical information, they concluded that he had a normal, average childhood, that he had never seriously considered suicide, and that he had simply malingered mental illness for personal gain. (Ex. 34, Agharkar Expert Report, at 499.) But a properly prepared mental health expert would have been able to explain why their findings were inaccurate. As Dr. Shawn Agharkar explains in his declaration, both government experts inappropriately relied on Mikhel's self-reporting to reach their conclusions. (Ex. 34 at 499, 517.) "These experts either did not review or inappropriately discredited the records from prior treating mental health professionals, the records from the institutions where Mr. Mikhel was treated and the records of Mr. Mikhel's personal or family history." (Ex. 34 at 499.) Drs. Pitt and Wetzel's conclusions about Mikhel's "malingering" and his "normal" childhood would not hold up to further scrutiny if counsel had properly prepared for their presentation of mental-health evidence at the penalty phase.

**(3)  Improper reliance on an expert who lacked credibility**

Trial counsel provided deficient performance by retaining a mental health expert, William Vicary, who lacked credibility due to a high-profile instance of misconduct in a previous case, the Eric Menendez trial.

Counsel began Vicary's examination by eliciting testimony about his falsification of records in the Menendez case. At the request of defense counsel in that case, Vicary altered treatment notes from his visits with Menendez. He did so knowing that "it was wrong and unethical" to do so. His misconduct only came to light when defense counsel unintentionally disclosed the unedited version of his treatment notes to the prosecutor. He was admonished and placed on probation by the Medical Board of California.

119

(01/31/2007 RT 127-29.) Counsel then introduced exhibits 3133-A and 3133-B, two articles that Vicary wrote regarding his misconduct in the Menendez case. (01/31/2007 RT 128-31.)

On cross-examination, the government asked Vicary to expand on this account. (01/31/2007 RT 170-77.) Vicary admitted he rewrote 10 pages of treatment notes to remove potentially damaging pieces of evidence against Menendez, something that he knew was unethical. (01/31/2007 RT 173.) He deliberately made them appear to be original notes, effectively deceiving the government. (01/31/2007 RT 174-75.) The State Medical Board charged him with "Gross negligence, falsifying medical documentation and acts involving dishonesty" for his misconduct in the Menendez case. (01/31/2007 RT 171.) The official complaint and the board's findings were admitted into evidence (Trial Exhibits 1900 and 1901). (01/31/2007 RT 171, 176-77.)[34]

Reasonable counsel would not have relied on Vicary as a testifying expert in a capital murder trial, considering his misconduct in the Menendez case. Vicary's testimony diminished the credibility of Mikhel's mental health defense at the penalty phase. It signaled to the jury that counsel was desperate for the assistance of a mental health expert, and the only such expert willing to testify on Mikhel's behalf was someone with a checkered past. Counsel's reliance on Vicary was unreasonable under prevailing professional norms.

### e.   Counsel failed to rebut the government's case-in-aggravation with readily available evidence

In *Rompilla v. Beard*, 545 U.S. 374 (2005), the Supreme Court found trial counsel ineffective for failing to investigate evidence rebutting the state's case-in-aggravation (the petitioner's prior conviction). Likewise, the ABA Guidelines state that counsel have a duty to investigate information that "rebuts the prosecution's case in aggravation." Guideline 10.11(A). Counsel must closely examine the government's proposed aggravation to assess

---

[34] In 2019, the Medical Board of California disciplined Dr. Vicary for misconduct unrelated to the Menendez trial. He voluntarily surrendered his medical license.

whether it "may appropriately be challenged as improper, inaccurate, misleading or not legally admissible." Guideline 10.11(I).

In August 2004, the government filed its notice of intent to seek the death penalty. There, the government notified counsel of its intent to present aggravating evidence, including proof of "future dangerousness" as evidenced by "Mikhel's participation in an effort to escape from the Metropolitan Detention Center in 2003, as well as SB-CDC in 2004." (Dkt. 505.)

Counsel failed to investigate evidence rebutting the "future dangerousness" aggravating factor. Had they done so, counsel could have presented evidence that Mikhel was unlikely to pose a danger to anyone should he receive a life without parole sentence.

Counsel also failed to interview witnesses regarding the two alleged escape attempts. Had they investigated the MDC escape allegations, they would have learned that the plan was far from the criminally sophisticated plot that the government made it out to be. Had they investigated, the SB-CDC escape allegations, trial counsel would have learned that this plot was unrealistic and that others alleged to have conspired with Mikhel had no involvement in this plan.

Finally, counsel failed to investigate the government's victim-impact evidence.

### (1)    Failure to present evidence that Mikhel could be safely confined within the BOP

Trial counsel failed to retain an expert witness who could competently testify about Mikhel's risk of future dangerousness in the custody of the BOP should he be sentenced to life without parole instead of the death penalty. This was deficient performance under *Strickland*.

Expert Maureen Baird, Ph.D., previously served as a Warden at BOP facilities across the country (the Federal Correctional Institution (FCI), Danbury; the Metropolitan Correctional Center in New York; and the United States Penitentiary (USP) in Marion, Illinois). She last served as the Senior Executive Service Warden at USP Marion before her retirement in September 2016. In a declaration prepared in support of the instant motion,

121

Retired Warden Baird concludes that Mikhel "can safely be managed by the BOP for the remainder of his life in prison." (Ex. 158, M. Baird Decl., ¶ 11.) Retired Warden Baird would have reached the same conclusion at the time of trial.[35] Had trial counsel retained an expert on BOP's placement and classification procedures, he or she could have explained "how enhanced security measures, like those initiated and applied to Mikhel following the escape attempt from MDC Los Angeles, would remain in place throughout his life in prison." (Ex. 158 ¶ 14.) Baird explains:

- Absent a death sentence, Mikhel would undoubtedly have been incarcerated within the "H Unit" at the United States Penitentiary-Florence's Administrative Maximum Facility (ADX) in Colorado. That is because he was under a SAMs order. (Ex. 158 ¶ 31.) "The ADX is one of the most secure prisons in the world. . . . No inmate has ever escaped from the ADX." (Ex. 158 ¶ 32.)

- The H Unit has been in existence since 2002, at least four years before trial. (Ex. 158 ¶ 17.)

- The H Unit at ADX has extremely strict conditions of confinement, and it is designed to nullify any potential safety threats. (Ex. 158 ¶¶ 33-35 (detailing SAMs conditions and architectural features of the H Unit.)

- SAMs conditions of confinement would continue indefinitely and would only be removed if the BOP and DOJ were absolutely certain that Mikhel no longer posed a threat to institutional safety. (Ex. 158 ¶¶ 36-38.) Baird explains: "As a former senior executive of the BOP, I do not know of any warden who would recommend discontinuing SAMs at the possible risk of serious harm to others resulting or the potential for threats to national security." (Ex. 158 ¶ 36.)

---

[35] Although Retired Warden Baird explains she would not have been available as a defense expert, trial counsel could have subpoenaed BOP officials familiar with SAMs and in particular, the H Unit, as defense counsel did in the case of *United States v. Sayfullo Habibullaevic Saipov*, S.D.N.Y, Case No. 17-722. (*See* Ex. 166, C. Synsvoll Testimony.)

Given these conditions of confinement, and the certainty that BOP and DOJ would not remove SAMs restrictions without proper justification, Baird determined that Mikhel could safely be confined within the BOP should he be sentenced to life without parole.

An expert with Baird's background could have explained how BOP's implementation of SAMs differs from a county-level facility, and how extremely unlikely it would be for a BOP facility to see SAMs violations like those that occurred at the Central Detention Center in San Bernardino in this case. (Ex. 158 ¶ 50.) Unlike the ADX and other BOP facilities, "this contract prison was not equipped or designed to properly manage inmates, like Mikhel, who were under the provisions of SAMs." (Ex. 158 ¶ 16.) Reasonable counsel would have presented similar testimony to rebut the "future dangerousness" aggravator.

Dr. Mark Cunningham was the only defense expert to testify at trial regarding BOP policies, and he was called on behalf of Kadamovas. (02/06/2007 RT 130-31.) Unlike Baird, Dr. Cunningham had no prior employment with the BOP and thus lacked the intimate familiarity with BOP operations that was required in this case. Dr. Cunningham briefly testified about how SAMs were likely to be employed in the future, should Mikhel remain incarcerated for life in the BOP. (02/06/2007 RT 203-207.)

Dr. Cunningham's lack of expertise regarding SAMs confinement was evident from the prosecutor's cross-examination. There, the prosecutor asked: "And you're aware of the fact that even at ADX, the most secure facility in the Bureau of Prisons, there have been instances where people have been able to violate SAMs orders?" Dr. Cunningham responded that he did not have any specific information on that point. The prosecutor then referenced an Office of Inspector General report that, in her telling, supported her point: "You're aware of the fact that the Bureau of Prisons' Inspector General recently issued a report about problems with people at ADX being able to get messages out?" (02/07/2007 RT 52.) In doing so, the prosecutor implied that these messages were sent by inmates under a SAMs order.

123

The prosecutor's questioning misled the jury about inmates under SAMs restrictions at ADX. (*See* Claim 10.) At the time of trial, and to this day, no prisoners at ADX under a SAMs order have been caught violating the terms of those orders, and no SAMs inmates at ADX have sent messages out of the prison. (Ex. 158 ¶ 19.) The OIG report that the prosecutor referenced identified three convicted terrorists who succeeded in mailing out approximately 90 letters. These prisoners were **not** under SAMs orders. *See* DOJ OIG, *The Federal Bureau of Prisons' Monitoring of Mail for High-Risk Inmates*, E&I Report I-2006-009 (Sept. 2006); (Ex. 158 ¶ 21 (explaining that the government misrepresented SAMs violations at ADX.).) Had counsel consulted an expert like Baird, they would have been prepared to rebut this highly misleading line of questioning with evidence to the contrary. *See Berger v. United States*, 295 U.S. 78, 84 (1935) (by misstating the facts, "the United States prosecuting attorney overstepped the bounds of propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense.")

Counsel provided deficient performance by failing to object to the prosecutor's misleading question and Dr. Cunningham's incorrect response. Counsel also provided deficient performance by failing to present an expert who could explain how BOP could safely house Mikhel for the remainder of his natural life, should he be sentenced to life without parole.

### (2) Failure to present evidence that the MDC escape attempt, which hinged on the bumbling efforts of a cocaine addict, was unlikely to succeed

In Haney's view, trial counsel were unnecessarily fearful of the escape evidence and "went out of their way to avoid addressing it in court." (Ex. 48 ¶ 48.) Indeed, trial counsel Callahan has no recollection of ever attempting to interview any of the alleged conspirators in the MDC escape attempt, nor does Callahan have recollection of suspecting that MDC staff were involved. (Ex. 165, R. Callahan Decl., ¶ 12.) Had they investigated Mikhel's alleged attempt to escape from MDC, counsel would have learned that the scheme was far

124

from the elaborate, sophisticated plot that the government portrayed (a narrative that the defense mistakenly and unreasonably adopted).

The governments' main witness regarding the escape attempt, Sabrina Tynan, admitted her role in the scheme. Her husband, Thomas, was incarcerated at MDC, where he was housed with Mikhel. At his request, Sabrina Tynan arranged for Thomas's brother Michael to travel from Chicago to Los Angeles to aid in the delivery of equipment for use in an escape. Sabrina recalled that Michael Tynan made two successful deliveries of equipment to MDC. According to Tynan, Mikhel and others planned to access an internal stairwell in the building, then use the hydraulic pump to open a window, then rappel down the side of the building, where a motorcycle gang awaited to transport them to a safe house. (12/08/2006 RT 78-80.) On direct examination, Sabrina noted that with his second delivery of equipment, Michael Tynan "had become very unreliable. He arrived late at one point; he fell asleep for another delivery. He just plain didn't show up for another one and turned off his cell phone so he couldn't be reached." (12/08/2006 RT 111-12.) She revealed little else about flaws in the planning and execution of this attempt.

Counsel's brief cross-examination revealed that: (1) in Tynan's view, the plot was past the halfway point to completion when it was disrupted; (2) when she initially brought Michael to Los Angeles, she had to bail him out of jail for petty theft, and he was later arrested again for petty theft when he returned to Chicago; (3) Sabrina, Michael and Thomas Tynan were all indicted, and she pleaded guilty without any cooperation agreement; and (4) both she and Thomas Tynan were out of custody. (12/08/2006 RT 122-26.)

Post-conviction investigation has yielded important information that the jury should have heard at the penalty phase.

*First*, both Michael Tynan and Sabrina Cannon (nee Tynan) recall that MDC employees were involved in the escape plot. Michael Tynan recalls: "I know that Iouri had two guards on the payroll as well as others. Thomas told me that Iouri got the tool to unscrew and open the windows from a maintenance guy at MDC." (Ex. 59, M. Tynan

125

Decl., ¶ 12.)[36] Likewise, Sabrina Cannon recalled that MDC correctional officers were involved and had helped prepare maps of the jail for use in the escape. (Ex. 161, A. Villasenor Decl. ¶ 6.) This evidence would have significantly changed the narrative about the escape attempt. Institutional staff bear significant responsibility for the events that unfolded, a fact that casts Mikhel's culpability in a totally different light. (Ex. 48 ¶ 58 (evidence of staff involvement would have been helpful to explain why Mikhel did not pose a "future danger" in prison).)[37]

*Second*, the escape plot was in danger of unraveling from the moment Michel Tynan was enlisted to help. In his declaration, Michael admits he was using cocaine heavily around the time of these events. (Ex. 59, M. Tynan Decl., ¶ 6.) On his first trip to deliver equipment to MDC, Michael hoisted a bag of cell phones, and "as the bag was pulled up it banged against the wall cracking one of the phones." (Ex. 59 ¶ 9.) On his second trip, Michael "had to take the bus to MDC because [his] glasses had broken and [he] could not see." On further reflection, he now realizes "[i]t was probably not smart of me to take the bus to help someone escape from prison." (Ex. 59 ¶ 10.) His third attempt to deliver goods to MDC failed. He now complains that "[i]t took three tries to do and [the] bag weighed 50 pounds." In the midst of his bumbling efforts to hoist a 50-pound bag through a window, Tynan lost the keys to his car. He was drunk, and he parked his car at a gas station while he shopped for a snack. He returned to his car and "passed out." When he woke up, his phone and keys were missing. He later found the phone and keys between his seat and the center console. By that time, it was too late to attempt delivery. (Ex. 59 ¶ 11.)

Sabrina Cannon confirms this account. She told Mikhel's post-conviction investigator that Michael Tynan had been in and out of rehab for years and had a knack

---

[36] This account is corroborated by a memorandum in the trial discovery. (*See* Ex. 52, Memo to S. Wanamaker (memorandum to Captain S. Wanamaker noting that a class "A" bit to a screwdriver had gone missing).)

[37] Records from a confidential informant working for the government indicate that she may have alerted authorities about the planned attempt before it took place, thus indicating the possibility that the government may have waited for an overt act to take place before "uncovering" the conspiracy. (*See* Claim 10.)

for falling into the authorities' hands while committing crimes. (Ex. 161 ¶ 8.) In Sabrina's view, Michael was the worst person to ask to complete this job. (Ex. 161 ¶ 8.) By her telling, Sabrina's role in this plot was to make sure that Michael did not "fall into a crack pipe" while he was in Los Angeles. (Ex. 161 ¶ 9.)

*Third*, had counsel interviewed both witnesses, they would have learned that they perceived the plot to be outlandish and farfetched. (Ex. 161 ¶ 10; Ex. 59 ¶ 4.) Sabrina Cannon did not understand how a motorcycle gang sitting in front of MDC would not attract the attention of the authorities. (Ex. 161 ¶ 10.) These accounts are confirmation of Mikhel's grandiosity, further evidence of untreated mental illness.

*Fourth*, at trial, Sabrina Tynan testified that she was not offered any inducements or incentives in exchange for her cooperation against Mikhel. But that was only half of the story. In an interview with Mikhel's post-conviction investigator, she revealed that she was threatened and mistreated throughout her time in custody. Upon arrest, Tynan's son, then an infant, was taken into foster care even though her sister was available to care for him. Tynan was subjected to "diesel therapy," meaning the FBI transported her around the country to various facilities in an effort to "break" her. (Ex. 161 ¶ 15.) FBI agent Ingerd Sotelo threatened her if she refused to testify. In that event, Sotelo said she would tell her employer that she was still on probation, which would result in her losing her job. (Ex. 161 ¶ 15.) Had counsel elicited testimony about these matters, the jury would have understood that Sabrina had an incentive to curry favor with the government by making Mikhel seem more dangerous than he actually was.

*Fifth*, counsel failed to seek important discovery regarding the MDC escape attempt. Most notably, counsel failed to seek discovery regarding Jose Avila, who may have been acting as a government informant at the time of his involvement in the escape plot and may have misled the jury about the consideration he received in exchange for his testimony against Mikhel. (*See* Claim 10.)

127

### (3)      Failure to present evidence that the SB-CDC escape "attempt" was also unrealistic

At the penalty phase, the government presented testimony from two correctional officers who worked at the SB-CDC, where Mikhel was incarcerated in 2003. Deputies Paul Casas and Joshua Payne testified that officers intercepted two letters (Trial Exhibits 1701 and 1702) that Mikhel left in a trash can. These were plans to escape from custody. They determined that Mikhel had attempted to pass these letters to another prisoner at the SB-CDC, Hector Lopez. (1/24/2007 RT 131-34; 1/24/2007 RT 164.) The intended recipient of the escape plan was Jason Stivers, an inmate who had previously been incarcerated with Mikhel at the SB-CDC in May 2003. (01/24/2007 RT 141-42, 171-73.)

The escape letter (Trial Exhibit 1702) was addressed to Sandra Gruce, Jason Stivers' mother, with instructions that she deliver the letter to Jason. (01/24/2007 RT 169-70, 174.) Deputy Casas explained that in the letter, Mikhel proposed an elaborate escape from the SB-CDC, with Stivers' assistance. Mikhel offered $100 million to anyone who would help him escape. Casas thought Mikhel's plan was "very" feasible. (01/24/2007 RT 178, 183, 206.)

Counsel failed to investigate this alleged escape attempt in two important ways. *First*, critical information in the letter (Trial Exhibit 1702) cried out for further inquiry. Had they read the letter carefully, counsel would have learned important information about the genesis of this plot. Mikhel wrote the following to Stivers: "**<u>Since you have approached me with a simple offer to help</u>**, you gave me the hope which helped me to survive for the last eight months." (*See* Trial Exhibit 1702, page 3 of the letter) (emphasis added). Evidently, Stivers approached Mikhel to propose an escape when they were housed together at the SB-CDC in May 2003 (eight months before Mikhel sent this letter). Mikhel alleges on information and belief that Stivers was already working as an informant for the FBI, the U.S. Marshals Service, and/or the San Bernardino County Sheriff's Department at the time he approached Mikhel regarding the escape plot. (*See* Claim 10, State Misconduct). Counsel should have investigated this theory and sought discovery

128

from the government regarding Stivers' contacts with the FBI, the U.S. Marshal's Service, and the San Bernardino County Sheriff's Department. The letter indicates that Mikhel's purported attempt to escape from the SB-CDC would never have come about but for Stivers' solicitation. Counsel should have investigated evidence supporting this theory and presented it to the jury.

*Second*, counsel failed to interview critical witnesses who could have put these events in context. Counsel never interviewed Hector Lopez or Sandra Gruce, two witnesses who allegedly aided Mikhel's efforts. Both deny any involvement in any attempts to escape. In a post-conviction declaration, Lopez explains that he heard Mikhel saying "some *way out shit* like wanting to escape and blowing things up." (Ex. 14, H. Lopez Decl., ¶ 5) (emphasis added). Lopez told him there was nothing he could do to assist. (Ex. 14 ¶ 6.) Mikhel tried to show him paperwork proving he was rich and could pay him. These boasts struck Lopez as grandiose and false: "if the Russian was so rich why was he in there with a court appointed lawyer?" (Ex. 14 ¶ 7.) Lopez categorically denied any involvement in the escape attempt or knowledge of its details. (Ex. 14 ¶ 9.) Likewise, Gruce denies any involvement in these events. (Ex. 159, S. Gruce Decl., ¶ 3.) Gruce and Lopez's statements demonstrate that Mikhel's letter was more a product of his grandiosity (a well-known symptom of bipolar disorder) than a feasible plan bolstered by a network of supporters. Reasonable counsel would have investigated and presented this important rebuttal evidence at the penalty phase.

### (4) Failure to respond to the government's victim impact evidence

Trial counsel knew they needed to investigate the victims' background in order to challenge the government's introduction of victim-impact information against Mikhel. Trial counsel's decision to cut this type of investigation short was unreasonable. Without subpoena power, undersigned counsel's effort to obtain information concerning the victims has been limited, including following up on the red flags available at the time of trial.

For example, counsel has tried to obtain more information concerning a Criminal Intelligence Report from the U.S. Department of State concerning Ms. Pekler, disclosed to trial counsel apparently on June 21, 2006.[38] According to the Criminal Intelligence Report, Ms. Pekler and the Pekler Group were connected with a named male, "a member of an Organized Crime Group originating from the Vladivostok Consular District." (Ex. 157, U.S. Dep't of State Report, at 2507.) The Report describes "Pekler, Rita, and the Pekler Group" as a previous malafide sponsor and incorporator of over 40 questionable companies across California. (Ex. 157 at 2507.) In the Assessment section, the Report concludes that named male suspect "has been identified as a known OC figure. His association with Pekler fits the current profile of OC activity and lends credence to the argument that Pekler is a known associate of OC figures and malafide sponsor." (Ex. 157 at 2508.) Based upon that information, undersigned counsel filed a FOIA. On March 21, 2022, the US Department stated "[t]he searches have been completed and the case is currently in review", estimating April 1, 2022, as a date of completion. The Department has yet to produce any documents. (Ex. 152, 2022 FOIA email, at 2741.)

According to a Memorandum of Interview from the Internal Revenue Service, Criminal Investigation, in February 2001, Ms. Pekler was the subject of a federal grand jury concerning illegal bank transactions and evading the Currency Transaction Reports required by the Bank Secrecy Act/anti-money laundering program. (Ex. 156, 2001 IRS Memorandum, at 2492.) According to the AUSA involved in that investigation, as of January 24, 2001, there was apparently "nothing happening in the Grand Jury investigation that would have caused Rita any concern." (Ex. 154, N. Factorovich Interview, at 2487-88.) It was a "pre-indictment investigation" that Ms. Pekler was aware of. However, the "investigation did include contacts and informants in the Russian Organized Crime arena." (Ex. 154 at 2488.) Undersigned counsel requested information from the IRS through FOIA. The IRS denied disclosing any documents, erroneously asserting the sought

---

[38] Counsel have been unable to identify a comprehensive discovery log from the government produced at the time of trial.

130

information constitutes "return information of a third party taxpayer" and therefore exempted under FOIA. (Ex. 155, FOIA Appeal Denial, at 2490.)

Trial records indicate Mr. Umansky was being investigated, along with Ms. Pekler, for insurance fraud. (Ex. 154 at 2488.) Undersigned counsel filed a FOIA with the FBI, which resulted in approximately 1500 pages of documents regarding the investigation in this case. However, a similar request for documents from the FBI concerning Mrs. Safiev and Kharabaze were denied by the FBI, stating: "The records responsive to your request are law enforcement records; there is a pending or prospective law enforcement proceeding relevant to these responsive records, and release of the information could reasonably be expected to interfere with enforcement proceedings." (Ex. 150, FBI's Safiev FOIA Denial; Ex. 15, FBI's Kharabadze FOIA Denial.) If the FBI released 1500 pages around this investigation concerning Mr. Umansky, a reasonable inference is that the Safiev and Kharabaze records thus far not disclosed by the FBI are for another law enforcement proceeding or investigation into Safiev or Kharabaze or both, not related to Mr. Mikhel's case. Counsel continues to pursue administrative and judicial remedies from the various improper denials of their FOIA requests.

Counsel has thus far been able to find that Ms. Rita Pekler, under her alias as "Margurita Kaspler" was charged with one count of theft in West Virginia on June 18, 1981. (Ex. 163, FBI's Pekler FOIA, at 2489.) Further, a heavily redacted response to a FOIA request to the Department of Homeland Security reveals that around 1998, Ms. Pekler was a "suspect" known as a Pawn Shop Broker. According to the report, a meeting was held on October 7, 1997, at the California Department of Justice, in Commerce, California. At an unknown date due to redactions, an unknown detective with the Los Angeles Police Department engaged in some unknown action concerning "pawn shop applicants in the Los Angeles area." The Detective explained that:

> Many of these applicants are Russian emigres living on welfare. Yet in spite of this fact these individuals have been found to have large amounts of currency (in the hundreds of thousands) available to them to open up the pawn shops. Rita PECKLER, a known pawn shop broker, represents many of the applicants.

131

(Ex. 153, ICE FOIA, at 2480.)

According to the report, Ms. Pekler "was listed as the owner of three CTR transactions (total transactions $177,000.00.)" (Ex. 153 at 2480.) The CTR mentioned here may refer to the Currency Transaction Reports required by the Bank Secrecy Act/anti-money laundering program, the same type of reports Ms. Pekler was apparently investigated for evading as late as February 2001.

Victim-impact evidence was critical to the government's penalty-phase case. As explained in more detail below, in closing argument, the government used testimony about the victims' good qualities to draw a contrast between "good immigrants" and "bad immigrants" (i.e., Mikhel and his cohorts). (*See, e.g.*, 02/09/2007 RT 18-19.) Accordingly, had counsel presented evidence that challenged the government's depiction of the victims, there is a reasonable probability of a different outcome at penalty.

### f. Counsel failed to object to an improper aggravating factor

Counsel unreasonably failed to object to the use, as an aggravating factor, of "Death During the Commission of Another Crime." Contrary to the title of the aggravating factor, hostage taking is not "another" crime, separate from the death-eligible crime, during which the victims' deaths occurred but is, rather, the only crime Mikhel was charged with that carries a potential death sentence. The aggravating factor alleging that death occurred during hostage taking simply reiterates the capital charge of hostage taking resulting in death. *See* 18 U.S.C. 1203. This is the crime that made Mikhel eligible under the law for the death sentence and should not be considered as an aggravating factor. It should not be used as aggravating the criminal acts and calling for an increased sentence. Double-counting of this aggravating factor prejudiced Mikhel at the penalty phase.

### g. Counsel failed to object to the prosecutor's improper closing argument

Trial counsel also provided deficient performance by failing to object to the prosecutor's improper penalty-phase closing argument.

132

Throughout the prosecutor's closing argument, the government characterized Mikhel and his co-defendants as "bad immigrants," in stark contrast to the victims, who were "good immigrants." These include the following statements:

- Pekler immigrated to the United States, where she started a business. "Unlike the defendants, Rita Pekler did not choose to kidnap and murder people for a living." (02/09/2007 RT 17.)

- Umansky's family immigrated to the United States from the former Soviet Union. "Unlike the defendants, Alex Umansky didn't choose kidnapping; he didn't choose ransoming people; and he certainly didn't choose murder as a way of life." (02/09/2007 RT 18-19.)

- "[L]et us not ignore, ladies and gentlemen, all the hard-working people who grew up in Russia and Lithuania during the period of perestroika and never went on to murder people . . . think about look at the backgrounds of the victims in this case and their families, none of whom chose to become cold-blooded murderers." (02/09/2007 RT 52.)

The prosecutor returned to the theme of ethnicity and nationality in the rebuttal argument, this time drawing a distinction between defense counsel, both white American males, and their clients:

> And Defendant Mikhel and Defendant Kadamovas and the job that these lawyers did, it's an illustration how great this country is that men that vicious who show no pity and no remorse for anybody get men who are as compassionate as these defense attorneys are about their clients' situations. It shows what a great country that they are—that men who show no pity like that get pity from great attorneys like these.

(02/09/2007 RT 118.)

Later, the government commented that the defendants "ended five lives because they wanted to enjoy a higher standard of living than most Americans would ever dream of," and argued that the defendants "took advantage of the hospitality that this country offered and they murdered people in our back yard." (02/09/2007 RT 125, 148.) Yet defense counsel failed to object to the prosecutor's explicitly xenophobic and nativist

133

remarks. This was deficient performance under *Strickland*. *Zapata v. Vasquez*, 788 F.3d 1106 (9th Cir. 2015) (granting relief under *Strickland* where trial counsel failed to object to racially charged and inflammatory statements in closing argument).

Relatedly, trial counsel failed to object to the prosecutor's comparison of the value of the defendants' and victims' lives. On direct appeal, the Ninth Circuit held that the prosecutor's arguments "comparing life in prison to the victims' deaths" were clearly improper. *Mikhel*, 889 F.3d at 1054. It follows that reasonable counsel would have objected to such comments, including the following:

> the government argued that defendants' life in prison must be measured "against the five lives, the five lifetimes of days that have been ripped away;" that defendants will "get three square meals a day," while "[t]he last thing that Meyer Muscatel tasted in his life was that boot cover that was shoved in his mouth;" that defendants' "privileges" of watching cable television or reading books in prison are things the victims "only wished they could do;" and that the jury should show no mercy to defendants because defendants showed none to their victims.

*Id.*

"These statements should never have been made." *Id.* But because trial counsel failed to object, the Ninth Circuit reviewed this claim for plain error and concluded that Mikhel could not show these comments so "affected the jury's ability to consider the totality of the evidence fairly that it tainted the verdict and deprived [defendants] of a fair trial." *Id.* (quoting *United States v. Sanchez*, 659 F.3d 1252, 1257 (9th Cir. 2011)). Reviewing for a reasonable probability of a different outcome, a less onerous burden for Mikhel to meet, this Court should grant relief on Mikhel's related claim of ineffective assistance.

The government repeatedly argued that Mikhel's proffered mitigation should be discounted because it lacked a causal nexus to the capital crimes. (*See, e.g.*, 02/09/2007 RT 50-53.) With these arguments, the government invited the jury to disregard any mitigation that has no direct causal relationship to the capital crime, in violation of Mikhel's Eighth Amendment rights. *Tennard v. Dretke*, 542 U.S. 274, 287 (2004). Counsel failed to object or request that the Court clarify that the Eighth Amendment contains no such "causal nexus

requirement." Similarly, the prosecutor repeatedly misstated the law with respect to mitigating factors when it argued as follows:

> When you consider each of these mitigating factors, I'd like you to ask yourself as to each of them, when you go back to the Jury room to deliberate. Ask yourself, first: Does this factor actually exist? Are there facts that support it? Then ask yourself: If they do exist, is this really something that would justify a lesser sentence?
>
> And then, finally, if you do think that it's something that might justify a lesser sentence, ask yourself: What weight, if any, you should give it in your deliberation process?

*Id.* at 1055.

This argument invited the jury to disregard or give no weight to certain mitigating factors that were objectively true. On direct appeal, the Ninth Circuit held that these arguments were not improper, but it did so by applying plain error review because trial counsel failed to object. *Mikhel*, 889 F.3d at 1054. Mikhel's related claim of ineffective assistance of counsel is nonetheless meritorious. Reasonable counsel would have insisted on clarification so that Mikhel's capital jury could properly give effect to the mitigating evidence they presented. *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 254 (2007) (capital jury must have "meaningful opportunity to give effect to . . . mitigating evidence" presented at penalty.)

### 2.      Counsel's deficient performance resulted in prejudice

Whether considered individually or cumulatively, each instance of deficient performance above resulted in prejudice.

To assess prejudice on a claim of ineffective assistance for failure to investigate and present mitigating evidence at the penalty phase, the federal habeas court compares the evidence that "actually was presented to the jury with the evidence that might have been presented had counsel acted differently." *Murtishaw v. Woodford*, 255 F.3d 926, 940 (9th Cir. 2001). The court "reweigh[s] the evidence in aggravation against the totality of available mitigating evidence," *i.e.*, the mitigation presented at trial and the additional mitigation presented post-conviction. *Wiggins*, 539 U.S. at 534, 536. On reweighing, Mikhel is entitled

to relief if there is a reasonable probability that at least one juror would have had doubt for a death sentence, but for counsel's deficient performance.

### a. Social history evidence, including evidence of generational trauma in the Mikhel family, would have made a difference at the penalty phase

Had the jury been presented with all of the social history evidence summarized in Professor Hass's declaration, there is a reasonable probability of a different outcome at the penalty phase. "In no small sense, the traumas of the Mikhel family history are the traumas of Russian and Soviet history." The "long history of stresses and strains" that this family endured "ultimately affected Mr. Mikhel's family life and life chances." (Ex. 58 ¶ 5.)

Mikhel incorporates Professor Hass's declaration (Exhibit 58) by reference as if fully set forth herein. In his declaration, Professor Hass documents in depth: (1) the chaos and dislocation that Mikhel's parents and grandparents experienced during and after the Bolshevik revolution; (2) his parents' traumatic experiences during World War II; (3) his traumatic childhood and adolescence; (4) his older brother's suicide at the age of 46; (5) his desperate efforts to evade conscription during the invasion of Afghanistan; (6) Perestroika and the culture of "conspicuous consumption" in the 1990s; (7) his financial and mental health struggles in the years before his arrest; (8) his friendship with David and Linda Morrow (rebuttal to the government's insinuations of antisemitism); and (9) his devotion to family, particularly his stepson. The mitigating information contained in the Hass declaration is not cumulative to what was introduced at trial; rather, it fills the vast tranches of evidence left unexplored by counsel's deficient performance.

### (1) Mikhel's parents and grandparents experienced significant disruption in their lives during and after the Bolshevik revolution

Professor Hass's declaration details the chaos and disruption that Mikhel's parents and grandparents endured as a result of the Bolshevik revolution and Stalinism. These events had an enduring effect in the decades to come. "Families and communities that

continuously face oppressive environments over the years can 'learn' powerlessness, despondency, worthlessness, cynicism, and general feelings that playing by the rules (if there are stable, fair rules) only reproduces pain and leaves a void of positive meaning around which one can build a sense of a worthwhile self and hopes for a positive future." (Ex. 58 ¶ 218 (footnote omitted).) "Such is the case for Iouri Mikhel, whose family history is a chain of challenges, traumas, and tragedies spanning more than a century." (Ex. 58 ¶ 219.)

Mikhel's paternal grandparents were landowners at the time of the Bolshevik revolution. After the Revolution, they were politically repressed. Mikhel's grandfather Ivan lost his voting rights; his land was nationalized and taken by the state. (Ex. 58 ¶ 16.) He was deemed "counter-revolutionary" and an "enemy of the revolution" by virtue of his class background. This approach to political repression "was not so distant from racial and ethnic discrimination (guilt by belonging or association) of anti-Semitism in pre-World War II Germany or Jim Crow racism in the American Deep South Before the 1960s." (Ex. 58 ¶ 17.) By 1929, Mikhel's grandfather, his wife, and four out of five of his children (including Gherman, Mikhel's father) had lost their voting rights, simply because of their class background. (Ex. 58 ¶ 21.) Two of Mikhel's paternal uncles, Andrei and Iouri, were sent to concentration camps in the far north of the country. (Ex. 58 ¶ 22.)

Mikhel's maternal grandmother, Anna, grew up in a home with an alcoholic father, who abandoned his family. (Ex. 58 ¶ 44.) Anna met Genrikh Fot (Mikhel's grandfather) when they were both working in a hospital during World War I. (Ex. 58 ¶¶ 47, 50.) Anna was ethnically Russian; Genrikh came from a Mennonite family, with ethnic roots in Germany. (Ex. 58 ¶ 56.) In 1918, Anna moved with Genrikh to his homeland, the Mennonite colonies, then part of southern Russia, but now part of Ukraine. (Ex. 58 ¶ 51.) Although Mennonites observed a total ban on marriage outside of the faith, Anna and Genrikh married, a union that was both "unusual and extraordinary for that time and place." (Ex. 58 ¶ 52.) They divorced soon after Mikhel's mother Margarita was born. (Ex. 58 ¶ 53.)

137

At the age of 2, Margarita was left behind on Mennonite land while Anna pursued educational and career opportunities in Leningrad and Cherepovetz, her place of birth. (Ex. 58 ¶¶ 65-68.) Margarita was left in the care of Genrikh Fot's family. (Ex. 58 ¶ 65.) The Mennonite colonies experienced one disaster after another throughout Margarita's youth: civil war, famine, religious and linguistic discrimination, and the eventual forced migration of the Mennonite population to Siberia and central Asia. (Ex. 58 ¶¶ 61, 64, 65, 69.) Margarita did not reunite with her mother until 1930 when she moved to Leningrad. (Ex. 58 ¶ 70.)

The long history of generational trauma in the Mikhel family would have made a difference to the jury, had counsel presented it. As Hass explains, "Generations can show resilience, but that resilience can melt away if generation after generation faces hardships that do not allow stability, let alone mobility." (Ex. 58 ¶ 219.) "If successive generations of the same family tree face repeated challenges and obstacles, due not only to chance ('bad luck') but also repressive contexts, the cumulative effect over time is real." (Ex. 58 ¶ 218.)

### (2) Mikhel's parents endured significant trauma during World War II

Chief among counsel's omissions was the failure to present evidence regarding Margarita and Gherman Mikhel's wartime trauma. The jury heard only brief testimony concerning their experiences during the Siege of Leningrad and the war. Defense experts Craig Haney and Elena Zdravomyslova briefly testified on this topic (02/02/2007 RT 36-39, 106-111), but neither witness had specific expertise in the history of the siege. By contrast, Professor Hass is an expert on the Siege of Leningrad.[39] His declaration thoroughly documents the uniquely horrific conditions that Margarita Mikhel experienced during the war. (Ex. 58 ¶¶ 88-121.) This evidence is critical because it explains why Margarita no doubt suffered long-term medical and mental health impacts from the

---

[39] Hass has published extensively on this topic. In 2021, he published a book on the Siege of Leningrad: *Wartime Suffering and Survival: The Human Condition under Siege in the Blockade of Leningrad, 1941-1944*.

traumatic experiences she endured during the war—traumatic experiences that she carried with her as a mother and caregiver to Mikhel.

Margarita "lived in Leningrad from the outbreak of the war and then the Blockade, until July 1943, when she was evacuated. She returned to Leningrad in October 1945 . . . . This means that Margarita experienced the worst of the Blockade." (Ex. 58 ¶ 90.) "The deadliest aspect of the Blockade was the lack of sufficient food," which only grew worse "when the German army closed the front lines, isolating more than three million civilians and over 500,000 soldiers inside the Blockade ring." (Ex. 58 ¶ 92.) Rationing went into effect in July 1941. The civilian population was divided into four categories:

> 1) Category I: Skilled workers and engineers necessary for the war effort (e.g. in factories producing munitions and other military output); 2) Category II: White-collar employees and clerical staff; 3) Category III: Dependents (izhdiventsy), i.e. civilians not working (for health, age, or other reasons, including homemakers and senior citizens) or working in low-status jobs; 4) Category IV: Children under the age of 14. . . . Category III was the worst ration category for survival.

(Ex. 58 ¶ 93.)

Based on Margarita's circumstances, Professor Hass concluded that Margarita Fot was likely in Category III, the lowest ration category. (Ex. 58 ¶ 102.) The ration for individuals in this category dipped to 125 grams of bread a day, which is "approximately one quarter of a standard American loaf of bread." (Ex. 58 ¶ 94.) This may explain why she chose to donate blood, despite her malnourishment—doing so would yield supplemental rations. (Ex. 58 ¶ 103.)

In this climate of scarcity, "[c]ulinary innovations" proliferated. (Ex. 58 ¶¶ 94-95.) "Bread factories turned to cellulose and other ersatz ingredients to make up for the reduced supply of flour. In the end, these rations provided from 707 to 1087 calories per day, far below average daily caloric needs." (Ex. 58 ¶ 95.)

By the spring of 1942, starvation was rampant, and the situation grew so bad that "Leningraders sometimes had a hard time telling who was what sex." (Ex. 58 ¶ 95.)

139

Professor Hass's declaration details the extreme measures that ordinary Leningraders took to stay alive:

> The extreme deficit of food led to another Blockade trauma: innovating with food by consuming things that they otherwise would not have consider eating. Leningraders turned to eating dogs, cats, birds, and rats in the first months of the first winter, but the population of those animals decline[d] precipitously as millions of civilians starved. Other innovations included using joiner's glue (and other forms of glue), in particular, to make a form of aspic. Belts and other leather objects were boiled to make them edible. From a distance such behavior might seem rational for survival, but it did lead to trauma, including cases of suicides from eating cats and post-war habits of never wasting food or buying raw meat.

(Ex. 58 ¶ 96.)

The situation grew so dire that some Leningraders consumed human flesh in order to survive. "The most ominous 'culinary innovation' was cannibalism. That cannibalism occurred is not in doubt: many Leningraders wrote in their diaries of seeing frozen corpses on the streets, as yet uncollected by the proper authorities, visibly losing chunks of flesh every day." (Ex. 58 ¶ 97.) These conditions were an inescapable feature of daily life. Margarita "would have seen corpses on the street losing flesh every day (a widespread sign of cannibalism). She might also have heard rumors of some Leningraders kidnapping civilians (especially children) and killing them to sell their flesh (marketed as non-human meat in meat pies or other culinary concoctions)." (Ex. 58 ¶ 97.)

The death rate during the Siege was astronomical.

> In November 1941, approximately 11,000 civilians died. In December 1941, this increased to over 50,000 civilians; over 88,000 civilians died from July to December 1941. Starvation was either the primary cause, or else weakened the body so that other afflictions became even riskier or deadlier (e.g. gastroenteritis, typhus, scarlet fever, tuberculosis, pneumonia). One report listed "nutritional abnormalities" as causing 256,386 deaths in 1942. Perhaps almost 100,000 civilians died in January 1942 and again in February. Approximately 274,000 civilians died from January to March 1942, due to starving to death or from other related effects. The monthly death rate dipped below 10,000 by August 1942.

(Ex. 58 ¶ 98) (footnotes omitted).

140

During the Siege, Margarita lived in an apartment that was 30 minutes by foot from the headquarters of Leningrad authorities, "one of the more important targets of German air raids and artillery." As a result, she likely endured "long evenings in air raid shelters or facing the violence of explosions nearby." (Ex. 58 ¶ 106.)

Because the Soviet Union was at war with Germany, ethnic Germans like Margarita faced harassment and discrimination during the war. "Stalin's regime saw little difference between Soviet citizens of German heritage and the Nazis of Germany proper." Not only were they treated with suspicion, many were forced to work in Siberia and Kazakhstan on collective farms, or in labor camps at industrial sites. (Ex. 58 ¶ 108.)

The suffering that Margarita experienced firsthand is of the type that "could cauterize human beings and burn away senses of social norms." Following the war, Margarita "would try to remake some degree of a normal life and have some success, but the trauma of the Blockade could not be erased entirely." (Ex. 58 ¶ 121.)

Similarly, the jury never heard the full extent of the traumatic experiences that Mikhel's father Gherman endured during the war. The jury heard only that he fought on the front lines of the Soviet army. (Ex. 77 at 1162.) This was an incomplete account. Hass explains that Gherman was punished severely for a minor "offense"—possession of a radio—in 1943. "He served his punishment at the NKVD Ryblag Camp (City of Uglich)." (Ex. 58 ¶ 31.) Conditions at this gulag were "horrendous"; "[i]t is no exaggeration to claim that suffering and mortality in Gulag camps were little different from suffering and mortality in Nazi death camps before and during World War II." (Ex. 58 ¶ 32.)

Professor Hass provides important contextual information about what Gherman endured during his time in the gulag:

> The average Gulag was both a practice of dehumanizing punishment as well as a source of cheap labor. In the average Gulag camp, before and during the war, conditions were harsh and survival always in question. Rations were at a subsistence level, but everyday labor was intense (e.g. felling and hauling trees or mining) and conditions difficult (e.g. cold weather, with an average temperature in January-February of 17° F). Prisoners might work up to fourteen hours per day and receive rations providing too few calories to replenish strength. Starvation, disease, and physical exhaustion were constant threats to inmates

141

> across the Gulag system, including Ryblag. In some camps prisoners might be subjects for medical experiments, as happened in Nazi death camps. Political prisoners also had lower status than common criminals and were subjected to abuses by camp commanders and guards as well as fellow inmates.

(Ex. 58 ¶ 32).

Ryblag's mortality rate was significant: it reached 22% in 1942, with a child mortality of 64%, "higher than in Soviet society at large, even in some of the worst situations. This confirms rampant malnutrition, high physical demands of everyday labor and survival, and little formal care for inmates' health." (Ex. 58 ¶ 33) (footnotes and citations omitted).

In May 1944, a military tribunal reclassified Gherman's crime, changing his punishment to 5 years imprisonment without disenfranchisement, a punishment that allowed Gherman to "atone for his guilt on the front. . . . If he proved himself a steadfast defender of the USSR, then by a petition of the command, he could be completely released from punishment." (Ex. 58 ¶ 34.) Gherman served on the front lines of the Soviet army, advancing all the way to Berlin. (Ex. 58 ¶ 36.) He was wounded with shrapnel in his left leg and later awarded with several military commendations for his bravery in the air. (Ex. 58 ¶ 37-39.) Assuming he suffered post-traumatic stress symptoms from these experiences, he could expect little treatment of any meaningful therapeutic value within the Soviet healthcare establishment. "Psychological trauma was not considered a medical condition, but instead was blamed on weak will or similar problems of one's own lack of discipline." (Ex. 58 ¶ 40.)

Enduring psychological trauma is well-documented among Mikhel's extended family who survived World War II. Mikhel's maternal grandmother, Anna Fot, was certified as "physically limited" with a second-degree disability, "cerebral pre-sclerosis with hysterical reactions," as of July 1945. "Anna underwent psychiatric treatment in the years after the war," and she was certified by the state as a group II invalid. (Ex. 58 ¶ 129.) Sadly, this label would not have afforded her meaningful assistance from the state. "Pensions for Group II invalids were too little to live on even in a socialist system; aid usually consisted

142

of wheelchairs or artificial limbs of low quality, and psychological aid was nonexistent." (Ex. 58 ¶ 125.)

Anna's sister, Evdokia Kurmanov, also suffered from diagnosed mental health issues and was also certified as disabled on account of her psychiatric condition in the post-war years. "In 1947, the Medical Disability Commission designated her as a Group II invalid on account of her mental health diagnosis of 'involutional depression' or 'age-related depression.'" (Ex. 58 ¶ 125.) Because she was the widow of a prominent Soviet official, Kurmanov's personal writings are on file at the Cheropovets Museum and the Cherepovets Archive. "These documents are filled with complaints of her ill health, depression, and premonitions of death. Evdokia lodged complaints in all directions, including to party bigwigs and Stalin himself." (Ex. 58 ¶ 126.)

Iouri's mother displayed symptoms consistent with post-traumatic stress disorder, including hoarding food in her apartment, despite having a rodent infestation. (Ex. 58 ¶ 177.)

### (3) Iouri Mikhel's difficult childhood and adolescence

Mikhel's jury was misinformed about the circumstances of his home life in the post-war years. In her closing argument, the prosecutor reminded the jury that Mikhel's own expert, Dr. Elena Zdravomyslova, said that his family "had a relatively good socioeconomic position compared to other Russians. They were about average." (02/09/2007 RT 141.) This was wholly inaccurate, as Professor Hass explains.

Gherman and Margarita struggled to make ends meet when Mikel was a child. Margarita worked as a teacher, and her salary would have been below the national average because teachers were not well paid for their labor. Likewise, Gherman earned a monthly salary of 50 rubles. "The average wage of 1965 was 97 rubles per person per month, or 194 rubles for two working parents. . . . We can speculate with some confidence that family income left the Mikhel family at the lower end of the Soviet socioeconomic spectrum." (Ex. 58 ¶ 135.)

143

From his birth in 1965 through the age of 9, Mikhel experienced poor health, with repeated hospitalizations for a variety of ailments, facts that counsel presented to the jury. But the jury heard little to nothing regarding the poor quality of health care that Mikhel received in these institutions.

> Soviet health care at this time lagged behind that in the West. While medical care was cheap or free in the Soviet welfare state, this did not always translate into quality of care. Actual provision was labor-intensive, with little upgraded technology to aid diagnoses or care. . . . "Bedside manner" as a rule was more a matter of authority and rudeness than empathetic attempts to understand the patient's needs. Doctors and medical staff were among the lower-paid Soviet professions, suggesting that talented Soviets sought other better-paying jobs (e.g. engineers). Diagnoses were made without in-depth study. Such provision, akin to triage medical care, was sufficient for usual ailments for much of the population, especially in an urban center such as Leningrad. As well, the quality and provision of medical care was stratified—Soviets in higher-status institutional positions (work, Communist Party, etc.) or with the means to provide doctors with additional remuneration generally received better care. Without additional means (money or networks in the medical field), the Mikhel family would have received only basic care at best. It is possible that Iouri's childhood conditions would have received cursory investigations and allowed to develop too long before treatment.

(Ex. 58 ¶ 142.)

Hass concludes "It is a safe assumption that Iouri received substandard care relative not only to medical care in the USA and the West, but also relative to Soviets whose families were better off and had connections to obtain better attention for better-qualified staff in better hospitals and clinics." (Ex. 58 ¶ 142.)

### (4)   Vladimir Mikhel's alcoholism and suicide

Iouri's only sibling, Vladimir, was fifteen years older than him. (Ex. 58 ¶ 155.) When Iouri was approximately 5 years old, Vladimir was drafted into the Soviet army. "After his military service, Vladimir became an alcoholic and had little contact with the family." (Ex. 58 ¶ 156.)

Conscripts like Vladimir "faced harsh conditions in the Soviet army," and alcoholism and physical abuse was "rampant." (Ex. 58 ¶¶ 157, 158.) Vladimir returned from military service a changed man. "His remaining years, leading to an early death in

144

1996, were tumultuous—marked by failed romantic relationships, illegal employment in the black and gray markets, and his ongoing substance abuse." (Ex. 58 ¶ 160.)

After returning home, Vladimir made his living in the shadow economy. (Ex. 58 ¶ 162.) Iouri eventually followed him into these activities, working alongside his older brother in a black-market photoshop. "That Vladimir brought Iouri into such shadow market activity at a formative age meant that Iouri was more likely than others to turn to such action as a survival strategy later in life." (Ex. 58 ¶ 163.)

Iouri and Margarita Mikhel both lost contact with Vladimir; Iouri broke off ties with him in 1982. (Ex. 58 ¶ 164.) Vladimir Mikhel passed away on August 13, 1996, in St. Petersburg. His death certificate notes the cause of death as "asphyxiation by hanging." His death was ruled a suicide. (Ex. 58 ¶ 165; Ex. 109 at 1889.)

Evidence of Vladimir Mikhel's suicide would have cast Iouri Mikhel's own mental health struggles and attempts at self-harm in a completely different light. Throughout the penalty phase, the prosecutor repeatedly attempted to portray Iouri Mikhel's suicide attempts as efforts to manipulate jail authorities and efforts to evade responsibility for the capital crime. (*See*, *e.g.*, 01/31/2007 RT 36-38.)

### (5) Mikhel's desperate efforts to avoid military conscription led to his arrest and imprisonment, a turning point in his life

Vladimir Mikhel's experience in the Soviet army is an important context for a turning point in Mikhel's life history: his efforts to avoid military conscription, which led to his arrest and imprisonment.

The Soviet Union invaded Afghanistan in December 1979, and over the course of the following decade, "more than 15,000 Soviet soldiers died and another 60,000 were wounded," as a result, "[p]undits rightly referred to this quagmire as the 'Soviet Vietnam.'" (Ex. 58 ¶ 169.) Mikhel was required to register for the draft, but he failed to do so. His forgery of documentation to evade the draft led to his arrest in March 1985. (Ex. 58 ¶ 172.)

145

> Given the wartime experiences of his grandmother, mother, father, and older brother, as well as the declining status of army service and general image that time in the army was as bad or worse than time in prison, Iouri was desperate to avoid conscription. He ultimately forged documents to facilitate his evasion of military service. He was arrested in March 1985 and later sentenced to eight years in prison for evading the draft and forging documents.

(Ex. 58 ¶ 172.)

Mikhel spent time in the Kresty prison in St. Petersburg, which is "historically notorious for its brutal social and physical conditions." (Ex. 58 ¶ 173.) Professor Hass explains as follows:

> The architecture itself is glum: tight enclosed spaces, little light, and dark colors contribute to a negative psychological effect. In the late Soviet period and afterward, overcrowding in cells has been constant: at times twenty inmates have been crowded into cells designed for six, and by the 1990s Kresty held ten times more prisoners than allowed in its original design (over 12,000 inmates versus 1150 inmates by plan). Additionally, Soviet and post-Soviet prison life is notorious for its social brutality, as various gangs exploit and brutalize other prisoners for various reasons, including mere whim.

(Ex. 58 ¶ 173.)

Mikhel was imprisoned for three years, and he was released to a labor colony in Luga, where he remained until 1992. With assistance from an attorney, he was granted conditional release and moved to a halfway house. (Ex. 58 ¶ 178.)

### (6) Perestroika and the culture of "conspicuous consumption"

Additional contextual information about the climate of conspicuous consumption following the collapse of the Soviet Union would have made a difference in the penalty phase. In his penalty phase closing, the prosecutor invoked the defendants' purchase of luxury items as proof of their depravity: "And another thing that shocks the conscience about this case is the fact that the Defendants spent their blood money on the things that they did. Some of these were the most needless luxuries you can imagine." (02/09/2007 RT 125-26.) Establishing the cultural context for these purchases was critical to Mikhel's

146

defense. Yet, as Dr. Craig Haney admits, he struggled to testify confidently about this aspect of the case because he was not an expert on Russian society. (Ex. 48, ¶ 51.)

"By 1991 the USSR was coming apart, leading to the failed putsch in August 1991. In essence, perestroika was a period when laws and institutions were unraveling, leaving an increasingly chaotic and lawless economy and society in its wake. This was the world Iouri would be released into." (Ex. 58 ¶ 180.) Mikhel emerged from his experiences in prison and the halfway house into a world of lawless capitalism. (Ex. 58 ¶ 181.) Like many in this new economy, Mikhel struggled to adapt his skills to the new market demand. (Ex. 58 ¶ 182.) "Retail inflation for 1992 alone was approximately 2500%, and wages and pensions did not keep up with the rise in prices." (Ex. 58 ¶ 184.)

In this climate of yawning income inequality and unregulated capitalism, Iouri's embrace of conspicuous consumption was hardly unique, as Hass explains. "With the introduction of underregulated capitalism . . . some Russians made enormous amounts of money quickly and in shadowy circumstances." (Ex. 58 ¶ 185.) "New Russians," who engaged in conspicuous consumption, were a "visible beneficiary of the new economy." While some earned a living legally, many others "made profit speculating against the ruble, speculating on goods imported legally or illegally, or engaging in racketeering." (Ex. 58 ¶ 185.)

Excessive displays of wealth were normalized in this economic climate. "New Russians showed off their wealth by wearing expensive clothes, driving expensive imported cars, and living in expensive apartments." (Ex. 58 ¶ 185.)

> For someone like Iouri, who was underprivileged before 1992 and who had few opportunities, the allure of New Russians would have been difficult to fight off. Further, his earlier experience in the shadow economy would have added to the appeal of New Russians, as he would have some knowledge of the source of their immense incomes. If they could do it, why couldn't he?

(Ex. 58 ¶ 185.)

147

"As he became an adult, Iouri adapted as many Russians did around him, by turning to shadow markets and entrepreneurial opportunities that promised quick pay-offs (but also risks) and by succumbing to the lure of conspicuous consumption." (Ex. 58 ¶ 223.)

### (7)   Mikhel's struggles in the 1990s: erratic finances and untreated mental health issues

The jury heard little of the turmoil in Mikhel's personal life in the years leading up to the capital crime.

Mikhel was "observed to exhibit unsettlingly erratic changes in behavior," which sometimes negatively impacted his relationships with others. (Ex. 58 ¶ 204.) After Mikhel settled in Southern California, he befriended Valeriy Prasol. In a post-conviction declaration, Prasol recalls wild fluctuations in Mikhel's mood and demeanor, with no apparent explanation. (Ex. 62 ¶ 7.) "Their friendship fractured towards the end of the decade when Mikhel's demeanor towards him changed so dramatically that Prasol walked away and did not speak to Mikhel for a long period of time. A rapprochement in early 2000 was brief, with Mikhel initially being friendly but quickly displaying the same harsh demeanor that ended the friendship for good." (Ex. 58 ¶ 205.)

Gary Gentile, Mikhel's friend and former business associate, provided a similar account in his post-conviction declaration. Gentile recalls Mikhel as being gregarious and sociable, possibly to mask deep-seated issues that he held close to the vest. While he put on the appearance of wealth, in reality, Mikhel's finances were precarious, and his financial situation grew to be so difficult that he ended up moving into Gentile's condominium in Rancho Mirage. One night, Mikhel's girlfriend Natasha Alifanova asked Gary to come to the condo because Mikhel's behavior was worrying her. When he arrived, he saw Mikhel "lying on his bed, sweating profusely and apparently hallucinating." (Ex. 58 ¶ 206-07; Ex. 40 ¶ 7.)

As Hass explains, Mikhel's business endeavors were also turbulent in this period of time. In the 1990s, Mikhel was attempting to engage in the trade of "extra pure aluminum." (Ex. 58 ¶ 208.) This was an extremely risky endeavor.

> The late 1990s was the moment of the "aluminum wars," when various Russian economic and political elites were scrambling to gain from consolidating the production and export of aluminum. Key actors included emerging oligarchs Oleg Deripaska and Roman Abramovich, among others. The Western firm TransWorld invested in this field in the 1990s but was forced to sell its holdings and leave the Russian market because of growing risks to those investments and the lives of those involved. Physical harm was a real threat, and killings over investment and control of aluminum assets was a real phenomenon. As in other aspects of Russia's 1990s economy, the stakes and possible profits were great enough that human life became expendable: as one commentator noted, it seemed as if someone was killed every few days.

(Ex. 58 ¶ 208.)

Given witness accounts noting Mikhel's stress and his refusal to identify the source, "[o]ne possibility is that, in trying to enter this field even as a marginal player, he perceived or even received threats from more powerful figures." (Ex. 58 ¶ 208.) It is also possible "that Iouri was financing his lifestyle not entirely from profits or wages, but from debts from sources who would be less forgiving of nonpayment." (Ex. 58 ¶ 209.)

### (8)   Mikhel's friendship with David and Linda Morrow

In her closing argument, the prosecutor dwelled on evidence of Kadamovas's antisemitic comments about Meyer Muscatel. "The cold depravity of the defendants' actions, the complete indifference with which they treated human life, was best described by defendant Kadamovas himself when he later laughed about how the fat Jew had crapped his pants when they had thrown him off the bridge." (02/09/2009 RT 16.)

Lacking any evidence to the contrary, the jury likely drew the inference that Mikhel shared Kadamovas's abhorrent values. The jury never heard testimony from two of Mikhel's friends who could have explained Mikhel's respect for their Jewish faith. Linda Morrow got to know Mikhel through her husband, David Morrow, a physician. (Ex. 45, L. Morrow Decl., ¶ 2.) Morrow recounts that Mikhel (whom she knew as Alex Pavlov) was always kind to her, and he was an interesting and knowledgeable conversationalist. (Ex. 45 ¶¶ 4, 6.) She and her husband often invited Mikhel to their home for observation of the Sabbath:

> As a fully observant Orthodox Jew with the tradition of opening my home to Jews and non-Jews alike for meals and especially for Sabbath meals, I invited Alex to join our family for these special meals where we would say the traditional prayers, sing, and discuss topics such as philosophy, religion, history, art and music.

(Ex. 45 ¶ 4.)

Evidence and argument about antisemitism no doubt prejudiced Mikhel. Yet the jury never heard evidence directly refuting any insinuations that Mikhel harbored such views.

### (9)   Evidence of Mikhel's positive influence on Anton Abramkin, Marina Karagodina's son

At trial, the jury was asked to consider the following factor in mitigation: "Iouri Mikhel is the father of a daughter and the stepfather of a son, both of whom will suffer if he is executed." (02/13/2007 RT 43.) In her closing argument, the prosecutor stressed the absence of any evidence concerning Mikhel's close ties to the children in his life: "What evidence did you hear of any of these mitigators? What evidence did you hear at trial that would suggest that these mitigators are true?" (02/09/2007 RT 58.) No jurors found this factor to be true, likely because no such evidence was presented at trial. It follows that evidence regarding Mikhel's devotion to his family would have made a difference at the penalty phase.

In 2001, Marina Karagodina left her ex-husband, Vitaliy Abramkin, to live with Mikhel in Los Angeles. Anton Abramkin is Marina Karagodina's son from her previous relationship. When she moved from London to California, she brought Anton with her. In his post-conviction declaration, Anton recounts that Mikhel was "the only man in [his] life that played the role of a father." (Ex. 39 ¶ 5.) Mikhel was the exact opposite of Abramkin's biological father, who was largely absent from his childhood. Abramkin lived with Mikhel for several months before Mikhel's arrest. In this time, Mikhel went out of his way to shower Abramkin with love and attention and to make sure that he felt at home in Los Angeles, his new home.

> [E]ven my own father, Vitaly, did not do what Iouri did for me. Iouri taught me how to ride a bike, enrolled me in soccer camp,

150

and taught me how to play basketball. Iouri and I spent a lot to time together—driving around in his car and hanging out at the exotic fish shop where he taught me about Lionfish and fish in general. He dedicated time to me despite being busy with his own business. Iouri was the most suave man I ever met - he taught me what a man should be, how he should dress, and how he should carry himself. These are things that my own father never did - he was always so consumed with work.

(Ex. 39 ¶ 5.)

Had the jury heard Anton's account, there is a reasonable probability of a different outcome at the penalty phase.

### b. Mitigating mental health evidence justifies a sentence less than death

Under the Federal Death Penalty Act, evidence that the defendant "committed the offense under severe mental or emotional disturbance," is a statutory mitigating factor. 18 U.S.C. § 3592(a)(6). "More than any other singular factor, mental defects have been respected as a reason for leniency in our criminal justice system." *Caro v. Woodford*, 280 F.3d 1247, 1258 (9th Cir. 2002). The jury heard much testimony about Mikhel's mental-health struggles while in custody, but this testimony was easily impeached given how little background information counsel provided to their experts. The jury did not hear any evidence concerning Mikhel's genetic predisposition to mental illness or his underlying mood disorder *before* his incarceration. There is a reasonable probability that at least one juror would have had doubt about a death sentence, had this evidence been presented.

Counsel presented no testimony concerning Mikhel's genetic predisposition to mental illness. Undersigned counsel retained a psychiatrist, Dr. Shawn Agharkar, to evaluate Mikhel. Based on the information contained in Professor Hass's declaration, he concluded "there is a strong familial history of mental illness in this case." He also determined that "Mr. Mikhel was genetically predisposed to developing mental illness." (Ex. 34, Agharkar Report at 501.) Dr. Agharkar concluded that Mikhel suffered from an "underlying mood disorder," and he agreed with trial experts' diagnosis of bipolar disorder with depression. At the time of trial, Mikhel's preexisting mood disorder was exacerbated

151

by his extreme conditions of confinement and isolation at trial. These conditions "left him with a profound sense of helplessness and hopelessness regarding his future." (Ex. 34 at 518.)

The jury would have heard similar testimony from Dr. Dhillon, had counsel conducted a diligent investigation. Dr. Dhillon was only recently made aware of Mikhel's family history of mental illness; in her view, this evidence "makes clear that Mikhel was suffering from genuine mental illness, not just a one-time episode brought on by his incarceration." (Ex. 47 ¶ 8.)

Lay witness accounts of Mikhel's mental-health struggles in the years before his arrest also would have made a difference to her analysis. Dr. Dhillon has reviewed Prasol and Gentile's declarations recounting Mikhel's moods and changes in behavior in the years leading up to his arrest. In her view, "This information would have bolstered my diagnosis and subsequent treatment of Mikhel." Prasol's account of changes in Mikhel's mood would have bolstered her diagnosis of bipolar disorder. She firmly believes that Mikhel "should have been treated not with anti-depressants, but with mood stabilizers and anti-psychotics." (Ex. 47 ¶ 9.)

**c.    New evidence rebutting the government's case-in-aggravation would have caused at least one juror to have reasonable doubt as to a death sentence**

As detailed above, a wealth of evidence rebutting the government's case-in-aggravation was available to counsel, had they conducted a diligent investigation. On reweighing the aggravating and mitigating evidence, the Court must consider the significant new evidence in rebuttal developed in post-conviction proceedings. There is a reasonable probability of a different outcome at penalty had the jury heard evidence that: (1) the BOP could safely house Mikhel for the remainder of his natural life, negating any threat of "future danger" in this case; (2) the MDC escape attempt bore little chance of success, and it may have been abetted by correctional staff; and (3) the CDC escape

152

"attempt" was more a product of Mikhel's grandiosity than a legitimate attempt to escape from custody.

## C.    Conclusion

Mikhel is entitled to relief on his claim of ineffective assistance at the penalty phase of his trial.

# CLAIM 6: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO FILE A TIMELY MOTION FOR RECUSAL

Trial counsel were ineffective for failing to investigate Judge Tevrizian's application to serve as the U.S. Attorney for the Central District of California and failing to file a timely motion for his recusal. Had counsel done so, there is a reasonable probability of a more favorable outcome at trial. Because counsel's ineffective assistance resulted in the denial of Mikhel's rights under the Fifth, Sixth, and Eighth Amendments to the Constitution, he is entitled to relief on the instant claim.

## A.    Legal basis for the claim

### 1.    The trial court must recuse so long as there is a potential for bias or an appearance of unfairness

"A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). To satisfy due process, Supreme Court law demands more than an "absence of actual bias." *Id.* "[O]ur system of law has always endeavored to prevent even the probability of unfairness." *Id.* "[T]o perform its high function in the best way 'justice must satisfy the appearance of justice.'" *Murchison*, 349 U.S. at 136 (quoting *Offutt v. United States*, 348 U.S. 11, 14 (1954).) The relevant inquiry is not "whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, 'the average judge in his position is "likely" to be neutral, or whether there is an unconstitutional 'potential for bias.'" *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016) (quoting *Caperton et al. v. A.T. Massey Coal Co., Inc., et al.*, 556 U.S. 868, 881 (2009).)

Under the federal recusal and disqualification statute, "judges 'shall disqualify' themselves in any 'proceeding in which [their] impartiality might reasonably be

153

questioned.'" 28 U.S.C. 455(a). Judicial ethics canons and guidelines apply the same standard. *See* Code of Conduct for United States Judges, Canon 3C(1); American Bar Association, Model Code of Judicial Conduct, Canon 2, Rule 2.11.

Prospective employment with a party before the Court is grounds for recusal. The Judicial Conference's Committee on Codes of Conduct has opined that "[a]fter the initiation of any discussions with a [potential employer], no matter how preliminary or tentative the exploration may be, the judge must recuse . . . any matter in which the [prospective employer] appears." Judicial Conference of the United States Committee on Codes of Conduct, Advisory Opinion No. 84: Pursuit of Post-Judicial Employment (April 2016.)

### 2. Trial counsel have an obligation to move for recusal where there are clear indicia of potential bias

Trial counsel have an obligation to safeguard a defendant's right to a fair trial by an impartial jury, and counsel's failure to seek recusal where there are clear indicia of potential bias constitutes ineffective assistance under the Sixth Amendment. *McKernan v. Superintendent Smithfield SCI*, 849 F.3d 557 (3d Cir. 2017) (granting relief on IAC claim for failure to move to recuse trial judge). To properly raise the issue, federal law requires counsel to file a motion for recusal, supported by an affidavit "stat[ing] the facts and the reasons for the belief that bias or prejudice exists." 28 U.S.C. § 144. While the statute does not set forth a precise deadline for filing, the Ninth Circuit requires that counsel file a recusal motion "with reasonable promptness after the ground for such a motion is ascertained." *Preston v. United States*, 923 F.2d 731, 733 (9th Cir. 1991). *See also United States v. Conforte*, 624 F.2d 869, 879-80 (9th Cir. 1980) (applying timeliness requirement.)

### A. Facts currently known in support of the claim

President George W. Bush was a vocal proponent of the death penalty. In his six years as Governor of the State of Texas, he presided over 152 executions, more than any

154

other governor in the recent history of the state.[40] His administration lobbied Congress to pass the PATRIOT Act, a dramatic expansion of government surveillance powers in response to national security threats arising from the September 11 attacks on the World Trade Center and the Pentagon. In March 2006, Congress reauthorized the PATRIOT Act. The reauthorization included a new provision allowing the Attorney General to indefinitely fill vacant United States Attorneys positions without Congressional authorization, a significant departure from prior law that only allowed a 120-day interim appointment. USA PATRIOT IMPROVEMENT AND REAUTHORIZATION ACT OF 2005, PL 109–177, March 9, 2006, 120 Stat 192.

During the guilt phase of Mikhel's trial, the U.S. Attorney for the Central District of California, Debra Yang, resigned from her position. She submitted her resignation in mid-October 2006. (Ex. 4, Adam Cohen, *The U.S. Attorney, the G.O.P. Congressman and the Timely Job Offer*, N.Y. Times (May 4, 2007).) In the months after her departure, there was widespread speculation in the press that Yang was encouraged to resign and that the White House hoped to replace her with a more loyal, "partisan" prosecutor. (Ex. 3, Susan Crabtree, *Yang Denies Departure is Linked to That of Other U.S. Attorneys*, The Hill (Mar. 5, 2007); Ex. 4.) Indeed, within weeks of Yang's resignation, nine U.S. Attorneys were abruptly fired from their positions. An Inspector General later determined that most of these firings were politically motivated. (Ex. 7, U.S. Department of Justice Report: An Investigation of Allegations of Politicized Hiring by Monica Goodling and Other Staff in the Office of the Attorney General, (Jul. 28, 2008) (Excerpts Ex. 6, U.S. Department of Justice Report: An Investigation into the Removal of Nine U.S. Attorneys in 2006, (September 2008) (Excerpts).)

In December 2006, Judge Dickran Tevrizian submitted an application to be the U.S. Attorney for the Central District of California. On December 28, 2006, he revealed this to counsel in the Mikhel and Kadamovas case. (12/28/2006 RT 5.) He advised that in recent

---

[40] Sister Helen Prejean, *Death In Texas*, N.Y. Rev., Jan. 13, 2005, https://www.nybooks.com/articles/2005/01/13/death-in-texas/

weeks he had been contacted by a search committee "not associated with the Justice Department [or] . . . . the administration," and that he had agreed to submit his name for consideration. He assured the parties that he had not been contacted by "Washington" or the "administration." But he failed to inform counsel that he had already filled out the committee's application and interviewed with the committee.

Judge Tevrizian's application remained pending through the last month of the guilt phase and the first week of the penalty phase. At that time, trial counsel failed to investigate the circumstances of Tevrizian's application and failed to move for his recusal.

The jury reached its guilty verdict on January 17, 2007. (Dkt. 1432.) The next day, the LA Times reported that Tevrizian was a "front runner" for the job of U.S. Attorney: "In a highly unusual development, veteran Judge Dickran M. Tevrizian has emerged as one of the leading candidates for the job of top federal prosecutor in Los Angeles." (Ex. 1, Henry Weinstein and Greg Krikorian, *Judge is in Race for U.S. Attorney Job*, L.A. Times, January 18, 2007.)

That same day, Attorney General Alberto Gonzales testified at a Senate hearing about a number of controversies during his tenure, including the scandal brewing over his firing of U.S. Attorneys who were perceived as insufficiently loyal to the administration. California Senator Diane Feinstein raised concerns over the firings of the U.S. Attorneys for the Northern and Southern District of California:

> I am very concerned. I have had two of them ask to resign in my State from major jurisdictions with major cases ongoing, with substantially good records as prosecutors. I am very concerned because, technically, under the Patriot Act, you can appoint someone without confirmation for the remainder of the President's term. I do not believe you should do that. We are going to try to change the law back.

(Ex. 8, Senate Judiciary Committee Hearing at 148.)

Later in response to questions about his practices with regard to selecting U.S. Attorneys, Gonzales explained,

> [T]he U.S. Attorney positions are very, very important to me personally. They are my representatives in the community. They are the face of the administration, quite frankly. They are often viewed as the leader of the law enforcement effort within a

community, not just by State and locals, but by other Federal components, and so I care very much about who my U.S. Attorney is in a particular district. That is very, very important to me.

(Ex. 8 at 150.)

Mikhel's counsel filed a written motion to recuse Judge Tevrizian on January 29, 2007, 32 days after he first disclosed his application. The Court denied the motion in a hearing the next day. He reminded the parties that when he first announced his application, neither side objected. He claimed his candidacy was in a preliminary phase. "I submitted a form application and was interviewed by the screening committee only. I have never been interviewed by anyone [in] the DOJ or White House counsel's office. In fact, I never directly submitted my application to the DOJ or White House counsel's office. It was submitted only to the local screening committee, who may have passed it on." (01/30/2007 RT 6). He denied applying for the position for financial gain, to enhance his resume, or for political purposes. (01/30/2007 RT 6). He noted that he would not receive financial compensation because he was already on a federal judicial pension for life, and he identified a number of other federal judicial officers who left their positions to serve in another branch of government. (01/30/2007 RT 6-7). He also noted that several district judges in Central District were previously U.S. Attorney or AUSAs before their appointment. Judge Tevrizian asserted that his application was never considered on the merits by DOJ or White House counsel's office. (01/30/2007 RT 9.)

Mikhel and Kadamovas then filed a mandamus petition in the Ninth Circuit, which was denied. The recusal motion was "arguably" filed too late, and the Ninth Circuit thought the record was unclear whether the district court had made a final ruling on the recusal issue. (Dkt. 1501.)

Mikhel and Kadamovas then raised the claim on direct appeal. The Ninth Circuit denied this claim as waived because trial counsel failed to file a timely recusal motion. *Mikhel*, 889 F.3d at 1027.

157

## B. Analysis

"[I]t is beyond question that judges may not adjudicate cases involving their prospective employers." *In re Al-Nashiri*, 921 F.3d 224 (D.C. Cir. 2019) (granting mandamus to Guantanamo detainee, where presiding military judge failed to disclose that he had applied for employment as an immigration judge). Here, trial counsel unreasonably failed to follow up on Judge Tevrizian's disclosure and make a timely motion for recusal. Mikhel was thus deprived of the effective assistance of counsel and a fair trial before an impartial judge.

### 1. Trial counsel provided deficient performance by failing to investigate Judge Tevrizian's disclosure

Trial counsel had a professional obligation to investigate and present potential claims of error, as well as a duty to preserve the record for appeal. *See* 2003 ABA Guidelines, Guideline 10.8. By failing to investigate Judge Tevrizian's disclosure and failing to file a timely written motion for his recusal, trial counsel provided deficient performance.

Judge Tevrizian made an incomplete disclosure of his conflict of interest. Although it was incomplete, his disclosure put counsel on notice of a potential recusal motion.[41] Reasonable counsel would have immediately investigated the status of Judge Tevrizian's application and the application procedures in the Central District of California. This would have led counsel to discover that Judge Tevrizian had misrepresented the status of his application.

Contemporaneous news reports of the politicization of the DOJ during George W. Bush's presidency also should have prompted counsel to move expeditiously for Tevrizian's recusal. Trial counsel were no doubt aware that the Bush administration was a strong proponent of capital punishment, as was the United States DOJ. Counsel were also no doubt aware that at the time that Judge Tevrizian was "invited" to apply, and soon became the frontrunner for consideration, the Bush administration was actively seeking to

---

[41] Mikhel also raises a claim of judicial bias based on the extra-record evidence presented here. *See* Claim 11.

158

appoint U.S. Attorneys who were perceived as "loyal." The resulting scandal led to several high-profile resignations, including that of former Attorney General Alberto Gonzales, who led the DOJ at the time that Judge Tevrizian was under consideration. Tevrizian's status as a frontrunner signals that he was viewed by administration officials within the DOJ and the White House, as loyal to the administration.[42]

Further investigation would have uncovered evidence that Judge Tevrizian had a pattern and practice of failing to recuse himself when it was clearly indicated. Over a decade before the Mikhel trial, Judge Tevrizian failed to recuse himself in *United States v. Feldman*, 983 F.2d 144 (9th Cir. 1992). There, because of a financial interest in Bank of America, Judge Tevrizian was called upon to recuse himself from the litigation. He only partially recused himself from the proceeding. The Ninth Circuit reversed, holding that because of his financial interest, Judge Tevrizian was obligated to recuse himself altogether.

### 2.    Trial counsel provided deficient performance by failing to file a timely motion

Counsel's delay in moving to recuse Judge Tevrizian was unreasonable. As explained in the Ninth Circuit opinion, the burden is on trial counsel to timely move for recusal. *Mikhel*, 889 F.3d at 1027. This was settled law at the time of trial. *See E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1295 (9th Cir. 1992) ("It is well established in this circuit that a recusal motion must be made in a timely fashion.") Ninth Circuit law does not set a "fixed" deadline for such a motion; rather, the motion "should be filed with reasonable promptness after the ground for such a motion is ascertained." *Preston v. United States*, 923 F.2d 731, 733 (9th Cir. 1991). It was also settled law that "a party having information that raises a possible ground for disqualification cannot wait until after an

---

[42] A report by the Office of the Inspector General later uncovered the depth of the politicization of the Department of Justice's selection process for U.S. Attorneys during the Bush years. (Ex. 7.)

unfavorable judgment before bringing the information to the court's attention." *United States v. Rogers*, 119 F.3d 1377, 1380 (9th Cir. 1997).

The ABA Guidelines also warned counsel about the potential danger of waiver if legal objections are not made in a timely fashion.

> [M]ost jurisdictions have strict waiver rules that will forestall post-judgment relief if an issue was not litigated at the first opportunity. An issue may be waived not only by the failure to timely file a pretrial motion, but also because of the lack of a contemporaneous objection at trial, or the failure to request a jury instruction, or counsel's failure to comply with some other procedural requirement established by statute, court rule, or case law. Counsel must therefore know and follow the procedural requirements for issue preservation and act with the understanding that the failure to raise an issue by motion, objection, or other appropriate procedure may well forfeit the ability of the client to obtain relief on that issue in subsequent proceedings.

Commentary to Guideline 10.8, *reprinted in* 31 Hofstra L. Rev. 913, 1031 (2003).

Waiting 32 days to file a motion for recusal was deficient performance under these standards, especially given the fact that the trial was ongoing.

### 3.   Prejudice resulted from counsel's deficient performance

Had counsel filed a timely recusal motion, there is a reasonable probability of a different outcome at both guilt and penalty. Judge Tevrizian's application to serve as the U.S. Attorney for the Central District of California signaled his loyalty to the prosecution and his inherent bias against Mikhel. This was a high-profile prosecution; a death verdict would be the first in the Central District in the modern era of the death penalty. No U.S. Attorney had previously succeeded in securing a death sentence against any defendant in the Central District since the reinstatement of the death penalty in 1988. Judge Tevrizian's application to lead the U.S. Attorney's office while it was actively seeking a death sentence against Mikhel signaled his entrenched bias in favor of a conviction and death judgment. Because trial counsel failed to file a timely motion for recusal, a biased judge adjudicated Mikhel's trial. There is at least a reasonable probability of a different outcome, had counsel timely moved for recusal.

160

## C. Conclusion

Mikhel is entitled to relief based on his trial counsel's deficient performance in failing to file a timely recusal motion.

## CLAIM 7: COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO THE ANONYMOUS JURY

### A. Legal basis

An anonymous jury is not favored by the Constitution but is allowable under certain circumstances. 18 U.S.C. § 3432. A court may only deprive a defendant of a list of the veniremen if it finds by a "preponderance of the evidence that providing the list may jeopardize the life or safety of any person." *Id.*

In determining whether there is a need for an anonymous jury for the protection of jurors, courts have looked to "(1) the defendants' involvement with organized crime; (2) the defendants' participation in a group with the capacity to harm jurors; (3) the defendants' past attempts to interfere with the judicial process or witnesses; (4) the potential that the defendants will suffer lengthy incarceration if convicted; and (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation and harassment." *U.S. v. Fernandez*, 388 F.3d 1199, 1244 (9th Cir. 2004), modified, 425 F.3d 1248 (9th Cir. 2005). If those factors weigh in favor of an anonymous jury, a district court must ensure that "reasonable safeguards are adopted by the trial court to minimize any risk of infringement upon the fundamental rights of the accused." *Id.*

If handled improperly, anonymous juries can lead jurors to believe that anonymity is required due to the dangerousness of the defendants on trial, which, as a result, interferes with the defendant's Fifth Amendment right to a presumption of innocence. *United States v. Shryock*, 342 F.3d 948, 971 (9th Cir. 2003). In Mikhel's' case, counsel had no strategic reason for failing to object to the motion, to request a protective order prohibiting counsel from disclosing the names of jurors to the defendants, and to request a limiting instruction. Adequate safeguards include instructions that the use of anonymous juries is

commonplace in federal court and that anonymity has no correlation to the defendants' guilt. *Id.*at 973; *See U.S. v. Peoples*, 250 F.3d 630, 635 (8th Cir. 2001) (stating that a district court acted properly when it disclosed the names of veniremen to defense counsel and directly explained why an anonymous jury was being employed to the panel members.)

**B.      Factual basis**

On May 17, 2006, the government filed a Motion to Empanel an Anonymous Jury. (Dkt. 1002.) Defense counsel did not file an objection. At a hearing on June 12, 2006, defense counsel, again, did not object or offer any response when the Court asked if any parties would like to be heard on the matter. (01/12/2006 RT 66-67.) On June 16, 2006, the Court granted the motion without explanation. (Dkt. 1064.) The juror questionnaires, filed under seal at Dkt. 1629, said, "[all] information contained in this questionnaire will be kept confidential. Neither your identities nor your answers will be released to the general public or the media without authority or expressed order of the Court." (Juror Questionnaire, Page 1). Trial counsel did not request that the names be released with a protective order enjoining Mikhel and Kadamovas from personally knowing the names of the jurors, so that counsel could properly prepare for voir dire. *See U.S. v. Peoples*, 250 F.3d 630 (8th Cir. 2001). Counsel did not request any remedial instruction on the topic of the anonymous jury and the Court never issued one.

Throughout the trial, the government, on numerous occasions, presented the jury with facts supporting the prosecutor's argument that Mikhel was dangerous and a risk to the public. During the penalty phase opening argument, the government explained that it was not enough to sentence Mikhel to life imprisonment, "both because of the viciousness, callousness, and cold-blooded nature of the crimes" he was accused of, "but also for the risk of escape that they will pose and the danger they will pose should they ever succeed in those efforts." (01/24/2007 RT 56.) This belief was reiterated during penalty closing when the government stated that "There's no doubt that they pose a danger in this case and they'll pose a danger for the rest of their lives." (02/09/2007 RT

162

150.) There was no evidence presented, either in the Motion to Empanel an Anonymous Jury or anywhere else, that Mikhel or his co-defendant had threatened any juror.

Trial counsel failed to object to the government's motion for an anonymous jury or even ensure that the appropriate safeguards were implemented. The government's unopposed motion alleged that because of the defendants' "participation in a group with the potential to harm jurors" (without evidence of any actual threat) and their "lack of respect" for the judicial process (based only on escape attempts), the extensive sentences they faced, and the high chance for extensive media attention, the Court would be justified in empaneling an anonymous jury. (Dkt. 1002 at 1.) Had counsel not tacitly agreed with its silence that an anonymous jury was necessary, and held the government to its burden of proof, the court would have found that there was insufficient supporting evidence or at the very least, would have permitted counsel to know the names and identifying information to properly prepare for voir dire.

In its motion to the Court, the government asserted that there was evidence that the "defendants committed the horrendous crimes at issue within the structure of a violent criminal organization" and that evidence of this "came from the very mouth of one of the defendants—Defendant Kadamovas…" (Dkt. 1002 at 5.) Here, the government misled the Court. As explained in Claim 10 (regarding prosecutorial misconduct), the government later denied that Mikhel and Kadamovas had any ties to Russian organized crime at the separate trial of co-defendant Petro Krylov. Reasonable counsel would have objected to this argument, considering that it had no basis in fact. And, although Mikhel had tried to escape from incarceration, there was no evidence before the court that there had been any threat made to the court, jury, or witnesses. In fact, the wife of the main cooperating witness had refused entry into the witness protection program as early as 2004. (*See* Claim 10.) The escape attempts had no correlation with the safety of the jurors. None of the evidence offered by the prosecution justified the use of the anonymous jury.

While the Ninth Circuit found that the trial court "suggested" to jurors that the purpose of their anonymity was to protect them from the media (*United States v. Mikhel*,

163

889 F.3d 1003, 1031 (9th Cir. 1018)), the trial court took no steps to seal the docket and prevent the public—and the media—from accessing the government's motion and its *real* reasons for seeking anonymity. Even if the trial court did have reason to worry about the jury's privacy and safety, there were less restrictive means of protecting the jury that would not have prejudiced Mikhel. Specifically, the court could have released the names of the jurors to counsel with a protective order limiting the use of the information.[43] This is not a novel procedure and has been used in district courts in various states, including New Mexico, Colorado, and New York. (Ex. 55, K. McNally Decl. ¶ 5.)

It was not enough to insinuate that the jury's anonymity was a benign strategy to protect them from intrusive media scrutiny. The government ensured that the jury feared Mikhel by telling them that it was not enough to impose a life sentence because of the supposed risk that Mikhel would escape and "the danger they will pose should they ever succeed in those efforts." (01/24/2007 RT 56.) The government drove this idea home by noting that Mikhel would be a "danger for the rest of [his life]." (02/09/2007 RT 150.) In combination with their anonymous status, the jury could only have assumed that he was a danger to them personally.

After failing to object or respond to the government's motion or statements in any way, defense counsel then failed to ensure that adequate jury instructions were implemented to insulate his client from further prejudice. As stated above, courts have recognized that the use of anonymity can influence the jury's opinions on the defendants' dangerousness. *Shryock*, 342 F.3d at 971. To protect Mikhel's rights to a presumption of innocence and a fair trial, counsel should have requested an instruction prohibiting the jury from considering their anonymous status.

---

[43] On June 15, 2020 and June 16, 2020 defense counsel moved this Court to publish the names of the jurors to habeas counsel. (Dkt. 2337 and 2338) The motion was denied on July 30, 2020. (Dkt. 2375.) Until such time as those names are provided to counsel for the purpose of investigating the impact of the jury's anonymous status, whether the trial court sufficiently minimized the risk of infringement upon Mikhel's fundamental rights remains undetermined.

Counsel's failure to object to the anonymous jury and to request reasonable safeguards in the form of a protective order and remedial instructions compromised the preparation for voir dire, made the jury fearful of Mikhel, and bolstered the government's argument for the jury to find that Mikhel had a high risk of future dangerousness. Had defense counsel's performance not been deficient, there is a reasonable probability at least one juror would have voted to acquit or voted for a life sentence.

Mikhel hereby also asserts the substantive claim that the amenity of his capital jury deprived him of a fair trial. For these reasons described above, the Ninth Circuit's decision on the propriety of an anonymous jury does not constitute the law of the case. Therefore, nothing precludes this court from reviewing the violation in light of these additional fact. Mikhel

## CLAIM 8: THE TRIAL COURT DENIED MIKHEL FUNDING TO MOUNT A TIMELY AND CONSTITUTIONALLY ADEQUATE DEFENSE, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS OF THE UNITED STATES CONSTITUTION

**A.    Legal basis**

**1.    The Court abdicated its responsibility to provide resources for Mikhel to subject the prosecution's case to meaningful adversarial testing**

The Supreme Court long ago recognized that "[t]he assistance of counsel is one of the safeguards of the Sixth Amendment deemed necessary to ensure fundamental human rights of life and liberty. The Sixth Amendment stands as a constant admonition that if the constitutional safeguards it provides be lost, justice will not 'still be done.'" *Gideon v. Wainwright,* 372 U.S. 335, 343 (1963) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 462 (1938)). The right to counsel is so fundamental because,

> The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. . . . He

165

> requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence.

*Gideon,* 372 U.S. at 344-45 (quoting *Powell v. Alabama,* 287 U.S. 45, 68-69 (1932).)

Because "the penalty of death is qualitatively different." *Woodson v. North Carolina,* 428 U.S. 280, 305 (1976), established standards that have long applied to the uniquely complicated nature of defending a capital case. The American Bar Association ("ABA"), for example, recognized that capital case representation is inherently unlike other types of criminal defense work. The introduction of the 1989 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases states that "[e]xperience has demonstrated that capital trials and appeals are extremely specialized and demanding."

The Federal Judiciary has recognized the same. Beginning in May of 1997, the Committee on Defender Services of the Judicial Conference of the United States appointed a Subcommittee on Federal Death Penalty Cases "to understand better the reasons for the high cost of representation in federal death penalty cases in comparison to non-capital cases." (Ex. 5, Hon. James R. Spencer et al, Fed. Death Penalty Cases: Recommendations Concerning the Cost and Quality of Def. Representation, Before the Subcomm. on Fed. Death Penalty Cases, Comm. on Defender Services Judicial Conf. of the United States, (1998), at 14.) The recommendations of what became to be known as the "Spencer Report," after the Subcommittee's Chair, the Honorable James R. Spencer, were adopted by the Judicial Conference of the United States on September 15, 1998. The Spencer Report warned that "[t]o understand *why* federal death penalty cases cost so much, and how these costs may be controlled consistent with constitutional and statutory mandates, requires first and foremost an understanding of the characteristics of federal death penalty cases and the special responsibilities of defense counsel appointed to such cases." (Ex. 5 at 20.)

According to the Spencer Report, two particular factors affect the cost of capital cases: the prosecutorial decision to prosecute in federal court, and the prosecutorial decision to authorize the death penalty. (Ex. 5 at 20-21.) The third prosecutorial decision affecting the cost is the decision whether to enter into a plea agreement with the defendant or to try the case. (Ex. 5 at 23.) *See also* Guideline 10.2, "Counsel should provide high quality legal representation in accordance with these Guidelines for so long as the jurisdiction is legally entitled to seek the death penalty." "In accordance with Guideline 1.1 (B), once a client is detained under circumstances in which the death penalty is legally possible, counsel should proceed as if it will be sought." Commentary to Guideline 10.2, *reprinted in* 31 Hofstra L. Rev. 913, 994 (2003).

Among the factors affecting the scope and cost of the defense representation is the fact that a death penalty case involves "two trials," a guilt phase and the penalty phase. (Ex. 5 at 23.) The Spencer Report explains that "[l]awyers in a death penalty case must prepare for both trials and must develop an overall strategy that takes the penalty phase into account even in the guilt phase." (Ex. 5 at 23.) Indeed, as early as 1983, legal experts agreed that preparation for the sentencing phase of a capital case should begin early and even inform preparation for a trial's guilt phase:

> Counsel's obligation to discover and appropriately present all potentially beneficial mitigating evidence at the penalty phase should influence everything the attorney does before and during trial . . . .
>
> * * *
>
> The timing of this investigation is critical. If the life investigation awaits the guilt verdict, it will be too late. Although a continuance should be requested and may be granted between the guilt and penalty phases of a trial, it is likely to be too brief to afford defense counsel the opportunity to conduct a substantial investigation.

Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases,* 58 N.Y.U. L. Rev. 299, 320, 324 (1983); *see also Williams v. Taylor*, 529 U.S. 362, 395 (2000) (finding deficient performance under the stringent standard of 28 U.S.C. § 2254(d) for a

167

capital trial in early 1980 where "[t]he record establishes that counsel did not begin to prepare for [the sentencing] phase of the proceeding until a week before the trial.")

Thus, the Spencer Report noted that "[t]his means that the way the defense proceeds differs from a non-capital cases in important ways beginning with jury selection. For example, facts that make no difference in the determination of guilt or innocence may become very important to the jury's assessment of the defendant's culpability in the penalty phase." (Ex. 5 at 23.)

> In addition to defending against the prosecution's case for a death sentence, counsel must also plan and present a case for a lesser sentence. In order to effectuate the defendant's constitutional right to present any information in mitigation of sentence, counsel must conduct a broad investigation of the defendant's life history.

(Ex. 5 at 25.)

The Spencer Report also notes the importance of the authorization process in the funding of death penalty cases:

> [The authorization process] creates another forum in which defense counsel must advocate on behalf of the client facing a possible death sentence. One of defense counsel's most important functions is to present information first to the local United States Attorney and then to the Justice Department that would justify a lesser sentence. Effective advocacy requires counsel to explore all of the issues that are likely to enter into the Attorney General's decision whether to authorize a federal death penalty prosecution, including the nature and strength of the federal interest, the evidence of guilt, and the aggravating and mitigating factors. Although the written and oral presentations made to the Death Penalty Review Committee are not as detailed or comprehensive as a penalty phase presentation to a jury, counsel must conduct a wide-ranging preliminary investigation of facts relevant to sentencing *before* the Justice Department makes the decision whether to file a notice seeking the death penalty, if it is to have an effect on the authorization process. . . .

> Because development of mitigating information early in the case may convince the prosecution that the death penalty should not be authorized, delaying preparation for the penalty phase is likely to increase the number of cases authorized, and therefore increase total costs. In a small number of instances, judges were reluctant to approve expenditures related to the penalty phase until an authorization decision was made. However, if the result of such a decision is that cases are authorized which should not be, this approach may cost more money than it saves, for cases that are never authorized cost much less than cases that are authorized, even if a guilty plea to a sentence less than death

168

eventually is negotiated. . . . (See also Recommendation 5, "The Death Penalty Authorization Process," in Part II of this report.)

. . . .

The defense depends on experts to develop information relevant to sentencing, even before the prosecution makes a final decision about whether to seek the death penalty. "Because the first job of the defense is to convince the Department of Justice not to certify the case as a capital case, mitigation expenses, including the use of increasingly specialized experts, are increasing and are occurring early in the process." Both the prosecution and the defense also typically hire experts to evaluate the defendant's mental condition in order to develop evidence related to culpability and future dangerousness relevant to the penalty phase. . . Two important categories of expert services frequently used in federal death penalty cases but not in noncapital federal criminal cases are mitigation specialists and jury consultants. . . . Without exception, the lawyers interviewed by the Subcommittee stressed the importance of a mitigation specialist to high quality investigation and preparation of the penalty phase.

(Ex. 5 at 28-31, quoting 1989 ABA Guideline 11.8.3 (preparation for the sentencing phase should begin immediately upon counsel's entry into the case).)

Recognizing the fiscal consequences of the authorization process, the Spencer Report recommended that the courts use their supervisory powers to ensure the authorization process proceeds expeditiously. Recommendation 5(b). The Report also notes that courts should "also ensure that the prosecution's timetables allow for meaningful advocacy by counsel for the defendant." (Ex. 5 at 44.)

It is the responsibility of the trial court to safeguard a defendant's constitutional rights. *Gannett Co. v. DePasquale*, 443 U.S. 368, 378 (1979) (finding that "a trial judge has an affirmative constitutional duty to minimize the effects of prejudicial pretrial publicity."); *Westbrook v. Arizona*, 384 U.S. 150, 151 (1966) (recognizing that the Constitutional right to counsel invokes the court's "protecting duty . . of determining whether there is an intelligent and competent waiver" of counsel); *McMann v. Richardson*, 397 U.S. 759, 771 (1970) ("if the right to counsel guaranteed by the Constitution is to serve its purpose, defendants cannot be left to the mercies of incompetent counsel, and that judges should strive to maintain proper standards of performance by attorneys who are representing defendants in criminal cases in their courts."); *McWilliams v. Dunn*, 582 U.S. 183, 186 (2017)

169

("Our decision in *Ake v. Oklahoma,* 470 U.S. 68 . . . (1985), clearly established that, when certain threshold criteria are met, the State must provide an indigent defendant with access to a mental health expert who is sufficiently available to the defense and independent from the prosecution to effectively 'assist in evaluation, preparation, and presentation of the defense.'")

**B. The Court abdicated its responsibility to ensure Mikhel could rely on the guiding hand of counsel at critical times during the proceedings**

Although the Spencer Report as well as both case law and legal scholars warned that counsel need to prepare for a possible penalty phase early in the case, the Court disregarded those warnings and hampered the defense's ability to both advocate before the authorization committee and prepare for a constitutionally adequate defense. Here, the Court repeatedly denied funding for a mitigation specialist prior to the government's authorization. As the Court itself acknowledged, "the defense notes that this Court denied appointment of mitigation experts until the government filed its notice of intent to seek the death penalty. And that was, I believe, in August 2004." (07/15/2005 RT 91.)

The Court finally granted Mikhel's motion to appoint a mitigation specialist on September 7, 2004, two years after the government filed charges under which he could face a possible death sentence. (Dkt. 546 (Sealed). From that day forward, Mikhel's team played catch-up to overcome the time they had lost preparing for a capital trial, while Mikhel's mental health continued to unravel.

**C. The Court's failure to provide the required resources in a timely manner precluded the defense from subjecting the prosecution's case to meaningful adversarial testing at critical times during the proceedings**

Without a mitigation specialist, Mikhel's counsel was unable to conduct the type of investigation the Spencer Report, as well as the ABA Guidelines, find crucial at the critical stage where the prosecution can be persuaded from not seeking death. As the ABA Guidelines recognize,

> The period between an arrest or detention and the prosecutor's declaration of intent to seek the death penalty is often critically

170

> important. In addition to enabling counsel to counsel his or her client and to obtain information regarding guilt that may later become unavailable, effective advocacy by defense counsel during this period may persuade the prosecution not to seek the death penalty. Thus, it is imperative that counsel begin investigating mitigating evidence and assembling the defense team as early as possible – well before the prosecution has actually determined that the death penalty will be sought.
>
> These Guidelines, therefore, apply in any circumstance in which a detainee of the government may face a possible death sentence, regardless of whether formal legal proceedings have been commenced or the prosecution has affirmatively indicated that the death penalty will be sought. The case remains subject to these Guidelines until the imposition of the death penalty is no longer a legal possibility.

History of ABA Guideline 1.1, *reprinted in* 31 Hofstra L. Rev. 913, 921-22 (2003).

Here, by denying the necessary funding to conduct the investigation required during the critical stage of pre-authorization of a capital eligible case, the Court, in essence, denied Mikhel the guiding hand of counsel at a critical stage of the proceedings.

## D.    The denial of funding for a mitigation specialist early in the case prejudiced Mikhel at trial

Once the government formally notified Mikhel of its intention to seek death, the government sought a trial date. (Dkt. 608.) In recognition that it had denied adequate resources before, the Court acknowledged that "this is a [death] penalty case, and certainly the defense should be able to leave no stone unturned in its investigation of any evidence that might lessen the likelihood of convictions or the likelihood of the jury returning verdicts of death." (07/15/2005 RT 93.) The Court then set the trial date of July 11, 2006. (07/15/2005 RT 94.) That recognition, however, fell on deaf ears once a new trial judge was assigned.

On March 10, 2006, Judge Manella was appointed to the California Court of Appeal. (Ex. 2, Jean Guccione, Federal Judge Is Moving to State Appellate Court, Los Angeles Times, March 10, 2006.) Over the defendants' objections, the case was then assigned to Judge D. Tevrizian, with "all scheduled dates to remain on calendar." (Dkts. No. 945, 948.)

171

On the first appearance before a new judge, Mikhel's trial counsel attempted to make the new court understand why defense counsel needed more time to prepare for a capital trial. All defense counsel representing a capital defendant joined the motion to continue trial. As Mikhel's counsel stated:

> Our trial judge at the time had made a decision that no death penalty experts were going to be appointed, including mitigation specialist or any medical individuals, until after the Government had made its decision. And if the Court looks at the sealed requests that were made to Judge Manella, the Court will see that they were all denied. And Judge Manella wrote on the bottom of each one of them that we are not to worry, we will have plenty of time to prepare for the capital case should the Government file a notice of intent.

(05/03/2006 RT 32.)

Unmoved by counsels' plea, the Court denied the defendant's motion to continue. At the next hearing, in describing the Court's discretion, Judge Tevrizian said: "When I became a federal judge, Manny Real was the Chief Judge. He gave me a pen and he said to me, "With this pen, you can stop a speeding locomotive." (05/22/2006 RT 61.)

To Mikhel's dismay, however, Mikhel was rushed to face his capital trial represented by unprepared counsel, without having had time or the resources to conduct an adequate investigation, where the relationship between Mikhel and his counsel deteriorated as Mikhel saw the locomotive the trial court refused to stop racing down the tracks towards him. Thus, Mikhel was prejudiced by the Court's refusal to adequately fund a proper investigation in a timely manner.

## CLAIM 9: MIKHEL WAS DENIED HIS RIGHT TO CONFLICT-FREE REPRESENTATION

Due to a complete breakdown in the attorney-client relationship between Mikhel and his trial counsel, Mikhel was constructively denied his Sixth Amendment right to counsel. Despite Mikhel's repeated requests for substitution of counsel, the trial court refused to appoint new counsel. Mikhel and his attorneys stopped communicating by the end of the guilt phase, and at the penalty phase, Mikhel refused to attend court or participate in the proceedings. The irreconcilable conflict here resulted in the denial of

172

Mikhel's rights under the Fifth, Sixth, and Eighth Amendments to the Constitution. Because Mikhel was constructively denied his right to counsel, this Court must grant relief from his convictions and death sentence.

## A. Legal basis

"A defendant has a Sixth Amendment right to conflict-free representation." *Daniels v. Woodford*, 428 F.3d 1181, 1196 (9th Cir. 2005). A trial court's refusal to grant a motion for substitution of counsel in the face of an irreconcilable conflict of interest constitutes a "constructive denial of counsel." *Id.* at 1197. "The test for determining whether the trial judge should have granted a substitution motion is the same as the test for determining whether an irreconcilable conflict existed." *Id.* Such an irreconcilable conflict may exist where a defendant has "completely lost trust in his attorney." *Id.* at 1181.

"A defendant need not show prejudice when the breakdown of a relationship between attorney and client from irreconcilable differences results in the complete denial of counsel." *United States v. Moore*, 159 F.3d 1154, 1158 (9th Cir. 1998).

The Ninth Circuit considers three factors when assessing whether a district court abused its discretion in denying a motion to substitute counsel: "'(1) the adequacy of the district court's inquiry; (2) the extent of the conflict between the defendant and counsel; and (3) the timeliness of defendant's motion.'" *United States v. Velazquez*, 855 F.3d 1021, 1034 (9th Cir. 2017) (quoting *United States v. Reyes-Bosque*, 596 F.3d 1017, 1033 (9th Cir. 2010).)

Under the first factor, "failure to conduct an inquiry is not necessarily an abuse of discretion if the trial court has sufficient information to resolve the motion." *Velasquez*, 855 F.3d at 1034. "When a trial court is informed of a conflict between trial counsel and a defendant, 'the trial court should question the attorney or defendant privately and in-depth, and examine available witnesses.'" *Daniels*, 428 F.3d at 1200 (quoting *United States v. Nguyen*, 262 F.3d 998, 1004 (9th Cir. 2001)).

Under the second factor, the court considers the extent of the conflict. Courts are more likely to find a denial of the right to counsel if there is a "serious breach of trust and

a significant breakdown in communication that substantially interfered with the attorney-client relationship." *Adelzo-Gonzalez*, 268 F.3d at 779.

Under the third factor, the court considers the timeliness of the motion. A court must "balance the resulting inconvenience and delay against the defendant's important constitutional right to counsel of his choice." *Moore*, 159 F.3d at 1161 (internal citation and quotation marks omitted).

**B.     Facts currently known in support of this claim**

**1.     Mikhel sought new counsel based on a breakdown in his relationship with Rubin and Callahan**

Months before trial, at a hearing on May 31, 2006, Mikhel informed the Court that he was dissatisfied with his attorneys' representation, noting their lack of preparation for the cross-examination of Ainar Altmanis. (05/31/2006 RT 50-51.) Mikhel continued to find himself at odds with his attorneys once the trial began. On November 30, 2006, Mikhel filed a *pro se* request for substitution of counsel. In his filing, he revealed that there was a total breakdown in his relationship with counsel, and he voiced concerns about the effectiveness of their advocacy. (Dkt. 1337 (sealed).)

The Court held a brief hearing on Mikhel's request on November 30. Only Mikhel's counsel and Mikhel were present; the government, Kadamovas and his legal team were excused. (11/30/2006 RT 220-26 (sealed).) No witnesses were called.

The Court concluded that there was no conflict of interest and held that Mikhel's attorneys had been effective. (11/30/2006 RT 221-222, 223-24 (sealed).) The Court also denied Mikhel's motion as untimely. (11/30/2006 RT 220-22 (sealed).)

Trial counsel voiced his disagreement with statements that Mikhel made in his request for substitution of counsel. On the record, Rubin noted that Mikhel had been wearing jail garb to court throughout the trial and that he looked unkempt. (11/30/2006 RT 224-25 (sealed).) The Court accused Mikhel of being manipulative, clever and savvy. (11/30/2006 RT 225 (sealed).)

174

Trial counsel Dale Rubin also stated that he wanted Mikhel to undergo another psychological evaluation by Dr. Ihle. (11/30/2006 RT 225 (sealed).) The Court denied this request. (11/30/2006 RT 226 (sealed).)

Mikhel submitted another declaration to the Court on December 5, 2006. (Dkt. 1359 (sealed).) The contents of the declaration were a response to Rubin's comments on the record—in particular, Mikhel took issue with Rubin's suggestion that he undergo further psychological evaluation and that he looked unkempt. Mikhel denied having any mental health disturbance. His poor grooming was the natural result of the deplorable conditions of confinement at MDC. With this declaration, he conveyed to the Court his profound distrust in trial counsel and indicated that there was a total breakdown in communication with them.

**2. Mikhel renewed his request for substitution of counsel because trial counsel refused to prepare him for his guilt-phase testimony**

A week later, Mikhel submitted a third sealed declaration renewing his request for substitution of counsel. (Dkt. 1372 (sealed).) Once again, Mikhel conveyed that there was a total rupture in the attorney-client relationship. The conflict came to a head over Mikhel's proposed testimony. Mikhel wanted to testify in his own defense, but trial counsel had done almost nothing to prepare him for his possible testimony. Like everything else in his defense, all preparation was happening at the last minute.

The Court held a hearing concerning Mikhel's request on December 12. (12/12/2006 RT 126-33 (sealed).) Mikhel renewed his complaint that the attorneys had failed to prepare him for his testimony, despite having several years in which to do so. (12/12/2006 RT 129 (sealed).)

The Court denied Mikhel's request for new counsel and insisted that counsel had done a "remarkable job" representing him. (12/12/2006 RT 127, 130 (sealed).) The Court also offered unsolicited advice about the wisdom of Mikhel's proposed testimony, suggesting that the jury may be more likely to convict him should he take the stand. (12/12/2006 RT 128 (sealed).) The Court refused to appoint independent counsel to

175

advise Mikhel on whether he ought to testify and instead instructed Mikhel to discuss the issue with Rubin and Callahan. (12/12/2006 RT 130 (sealed).) Mikhel indicated that Rubin and Callahan were ill-prepared for this task because he had had no communication with them. (12/12/2006 RT 131 (sealed).)

Faced with these complaints about their performance, trial counsel openly criticized Mikhel, blaming him for the breakdown in communication and accusing him of an attempt to "invite" the Court to err. (12/12/2006 RT 131-32 (sealed).) Rubin informed the Court:

> over a period of four or more years of my representation of Mr. Mikhel he has been totally uncooperative with any efforts of meeting with him and trying to investigate this case and get his take on the facts and circumstances of the charges against him. He refused to provide us with names of witnesses, he refused to provide us with locations of witnesses. On several occasions he informed me that if I attempted to locate certain witnesses he would have me fired. . . despite what he's wanted, I've gone forward and attempted to investigate the case anyway. . . . He has been one of the most uncooperative clients that I have ever worked for.

(12/12/2006 RT 132-133 (sealed).)

In response to Rubin's and the Court's comments, Mikhel filed a fourth declaration the following day, December 13. (Dkt. 1366 (sealed).) He viewed the Court's denial of his request for assistance in preparing for his testimony as an act depriving him of a bona fide opportunity to testify in his own defense.

The same day, Mikhel's defense requested a continuance until after the holidays to allow Mikhel additional time to prepare his testimony. (12/13/2006 RT (sealed).) At sidebar, the Court expressed his view that Mikhel's proposed testimony was invited error. Rubin agreed with the Court's perspective. (12/13/2006 RT 199 (sealed).) Two days later, on December 15, 2006, Mikhel's defense rested. But the Court gave Mikhel a two-week continuance to prepare his testimony.

On January 3, 4, and 5, 2007 Mikhel testified on direct examination. The government and Kadamovas's counsel were supposed to cross-examine him on January 9, but Mikhel refused to participate in the cross-examination. (01/09/2007 RT 23-27.) As a

176

result, the trial court struck his entire testimony from the record. Starting January 10, 2007, Mikhel refused to come to court for the remainder of the trial, including the penalty phase.

### 3. At the penalty phase, Mikhel requested that the trial court appoint Holly Jackson to take over the representation from Rubin

On February 1, while the penalty phase was underway, Mikhel filed a final *pro se* declaration objecting to his attorneys' continued representation of him. He objected to the content of Vicary's testimony regarding the extent of his mental illness, and he asked the Court to remove Rubin (the lead attorney at the penalty phase) and replace him with Holly Jackson, his mitigation specialist. Mikhel informed the Court that Jackson, not Rubin, had done the bulk of the penalty phase preparation, so she was prepared to step in for Rubin. (Dkt. 1508 (sealed) at 4-5.) The Court conducted a hearing with Mikhel and counsel in the lockup because Mikhel refused to come to court. As with prior colloquies concerning Mikhel's request for new counsel, no other defense team members were questioned during this hearing.

At this brief hearing, Mikhel objected to Vicary's testimony and renewed his request for Jackson to be appointed as substitute counsel for the remainder of the proceeding. He made clear that he continued to lack confidence in his attorneys because of the way Rubin handled his guilt-phase testimony: "[Rubin] simply abandoned testimony, sat down, and make my testimony as grotesque as any abortion, the result of any abortion could be." (02/01/2007 RT 8 (sealed).)

Rubin made an offer of proof regarding the remaining mitigating evidence he intended to present at the penalty phase. (02/01/2007 RT 8-13 (sealed).) He also informed the Court that he had "been working very closely with death penalty resource counsel . . . specifically with Michael Burt in San Francisco and Judy Clark [sic]" who were "aware of everything" that the defense had done to prepare. (02/01/2007 RT 14 (sealed).) The Court again denied Mikhel's request for new counsel. (02/01/2007 RT 15 (sealed).)

177

**4.      Other team members' declarations support Mikhel's account of a breakdown in the attorney-client relationship and undercut Rubin's representation that Mikhel was merely attempting to manipulate the Court**

As discussed in Claim 5, Mikhel explained that his trial counsel failed to develop a relationship of trust and rapport with him in the years leading up to trial. Rubin and Callahan's visits with Mikhel were infrequent. During the pre-trial period, Rubin went nearly two years without visiting Mikhel (he did not bill for visits with Mikhel between April 22, 2003, and January 27, 2005). After Mikhel's first suicide attempt, no one on his legal team visited him for five months. And in the weeks leading up to the penalty phase and throughout the penalty-phase trial, Callahan and Rubin did not bill any time for client visits, further evidence of an absence of communication at this critical juncture.

The strained relationship between Mikhel and his trial counsel was obvious to other team members. "From the beginning of my work on this case, it was clear that there was a rift between the attorneys and Mr. Mikhel." (Ex. 43, H. Jackson Decl., ¶ 15.) In particular, Rubin and Mikhel did not have a good working relationship, and after SAMs restrictions were imposed, the relationship deteriorated significantly. (Ex. 42, C. Filipiak Decl., ¶ 11.)

As justification for opposing Mikhel's requests for new counsel, trial counsel cited their extensive collaboration with resource counsel. Other team members recall little to no collaboration with resource counsel. (Ex. 43 ¶ 10; Ex. 42 ¶ 7.)

Rubin repeatedly complained to the Court that Mikhel was uncooperative and actively obstructing his attempts to investigate mitigating evidence. That was not the case; while Mikhel may have grown to distrust his trial lawyers, that did not equate to an outright hostility to mitigating evidence. Craig Haney recalls that he developed a good relationship with Mikhel. He noted that Mikhel had a tendency to understate the hardship and trauma he endured as a young person, as most defendants do. But overall, he was cooperative. "He never refused a visit with me. Our visits were lengthy. Mr. Mikhel would talk for hours, and he impressed me as honest and forthcoming. I found him to be a

178

reliable reporter about his social history, which was the focus of my interviews with him." (Ex. 48, C. Haney Decl., ¶ 12.) Likewise, Jackson recalls that Mikhel "was always willing to cooperate" with her efforts to gather records in Russia by signing releases. (Ex. 43 ¶ 19.)

Had the Court conducted an appropriate inquiry in response to Mikhel's requests for new counsel, instead of adopting counsel's self-serving antagonism towards Mikhel's complaints, the Court would have learned that Mikhel's grievances were legitimate and were not just an attempt to manipulate the system. The Court also would have learned that Rubin misrepresented Mikhel's willingness to cooperate in the penalty-phase investigation.

## C. Analysis

### 1. The trial court conducted an inadequate inquiry

When faced with evidence of a breakdown in the attorney-client relationship, trial courts must conduct a probing inquiry to assess the extent of the conflict. Uncooperative or obstructive behavior by the client does not absolve the trial court from conducting this inquiry. Rather, a district court must make a "meaningful attempt to probe more deeply into the nature" of the attorney-client relationship, *Adelzo-Gonzalez*, 268 F.3d at 778, even if there are some preliminary indications that "conflicts stemmed from unreasonableness on [the client's] part," *Velaszuez*, 855 F.3d at 1035.

In *Adelzo-Gonzalez*, the Ninth Circuit criticized the district court for failing to fulfill this obligation.

> the district court's inquiries into Adelzo–Gonzalez's first and last motions were inadequate. The district court asked only open-ended questions and put the onus on defendant to articulate why the appointed counsel could not provide competent representation. While open-ended questions are not always inadequate, in most circumstances a court can only ascertain the extent of a breakdown in communication by asking specific and targeted questions.

*Adelzo-Gonzalez*, 268 F.3d at 777–78.

At no point did the trial court conduct the probing inquiry into the nature of the conflict.[44] From the first instant Mikhel raised the issue, still weeks before trial, the Court was dismissive of Mikhel's plight. Subsequently, the Court conducted a series of brief colloquies with Mikhel and his counsel. He did not call any witnesses or seek to question other team members about the breakdown in communication. He failed to ask targeted questions to assess the genesis of the conflict between Mikhel and his lawyers. And he assumed that Mikhel's complaints were an attempt to sow the record with issues for an eventual appeal; in other words, he assumed that Mikhel was attempting to manipulate the process to his advantage. That was not the case. Mikhel had a legitimate grievance with his attorneys, one that the trial court refused to acknowledge. Indeed, counsel antagonized Mikhel openly and stridently in front of the Court. As in *Adelzo-Gonzalez*, signs of counsel's antagonism to Mikhel should have prompted the trial court to conduct a more meaningful inquiry into the conflict.

### 2. The conflict was extensive

The conflict here was no minor disagreement—rather, it was a "serious breach of trust and a significant breakdown in communication that substantially interfered with the attorney-client relationship." *Adelzo-Gonzalez*, 268 F.3d at 779. Because Mikhel's counsel failed to spend sufficient time building a relationship with him in the years leading up to trial, their relationship disintegrated at a critical moment in the case—the end of the guilt phase trial, when Mikhel decided he wanted to testify in his own defense. The total breakdown in communication at such a critical juncture resulted in a denial of Mikhel's right to counsel. *See Daniels*, 428 F.3d at 1197 ("The Supreme Court has repeatedly held that a defendant's Sixth Amendment right to counsel is violated if the defendant is unable to communicate with his or her counsel during key trial preparation times.").

Lacking any rapport with their client, trial counsel were unable to work constructively with Mikhel toward a resolution of their disagreement regarding strategy.

---

[44] Untreated mental illness and the lack of competency proceedings exacerbated this situation.

180

And when Mikhel asked the Court for help because he had lost faith in his counsel, counsel opted to accuse him of manipulating the Court, blaming him for the breakdown in their relationship. Indeed, Rubin told the Court that he thought Mikhel was "one of the most uncooperative clients" he had ever had.

### 3. Mikhel's request for new counsel was timely

In assessing the timeliness of Mikhel's request for new counsel, the Court must weigh "the resulting inconvenience and delay against the defendant's important constitutional right to counsel of his choice." *Moore*, 159 F.3d at 1161. Even if the trial court becomes aware of a conflict on the eve of trial, a motion to substitute counsel is timely if the conflict is serious enough to justify the delay. *Daniels*, 428 F.3d at 1200.

Mikhel's request was timely. He brought the conflict of interest to the Court's attention well before trial, on May 31, 2006. He reasserted the issue on November 30, approximately two months before the penalty phase began. He renewed his request repeatedly, signaling that the relationship continued to deteriorate and that he had lost faith in his attorneys. Ultimately, he presented the Court with a reasonable alternative to proceeding with conflicted counsel—he asked that the Court appoint Holly Jackson to represent him at the penalty phase. Jackson was a licensed attorney, and she had spent two years conducting penalty-phase investigation in this matter. Appointing Jackson as substitute counsel would have necessitated minimal inconvenience or delay for all parties involved.

### 4. The Court must presume prejudice, but even if a showing of prejudice is required, Mikhel is still entitled to relief

Mikhel was constructively denied his right to counsel, an error that gives rise to a presumption of prejudice. In other words, Mikhel need not show a reasonable probability of a different outcome at trial, had the trial court granted his request for new counsel. *Perry v. Leeke*, 488 U.S. 272, 278–79 (1989); *Daniels*, 428 F.3d at 1199; *Schell v. Witek*, 218 F.3d 1017, 1027 (9th Cir. 2000). Even if such a showing were required, Mikhel would still prevail on the instant claim. For the reasons set forth in Claims 2 through 7, Mikhel's

181

counsel provided deficient performance resulting in prejudice at both the guilt and penalty phases of his trial.

## CLAIM 10: GOVERNMENT MISCONDUCT DEPRIVED MIKHEL OF A FAIR TRIAL

### A. Legal basis

Mikhel's convictions and sentence of death were unlawfully and unconstitutionally imposed in violation of his rights to due process of law, equal protection, effective assistance of counsel, a fair trial, and an accurate and reliable penalty determination guaranteed by the Fifth, Sixth and Eighth Amendments to the United States Constitution because the government: (1) knowingly presented perjured testimony; (2) failed to disclose to the defense legally discoverable and material evidence that the defense was entitled to; (3) argued evidence that was struck or inadmissible, along with matters wholly outside the record; (4) asserted that there was other incriminating evidence against Mikhel that was not presented; (5) made inflammatory, disparaging, and argumentative remarks throughout the trial; (6) argued that Mikhel had the burden of proving his innocence by improperly vouching for the credibility of witnesses; (7) engaged in misconduct with law enforcement authorities prior to and during the trial in this matter; (8) improperly influenced witnesses; (9) misrepresented facts to the court and jury; (10) violated Mikhel's rights through the unlawful use of a jailhouse informants; (11) knowingly presented the perjured testimony of informants; and (12) made other impermissible statements during closing argument. *Brady v. Maryland*, 373 U.S. 83 (1963); *Berger v. United States*, 295 U.S. 78 (1935); *Napue v. Illinois*, 360U.S. 264 (1959). "For nearly ninety years, it has been established Supreme Court precedent that a conviction violates due process if it is obtained through knowing presentation of perjured testimony." *Dickey v. Davis*, 69 F.4th 624, 636 (9th Cir. 2023) (citing *Mooney v. Holohan*, 294 U.S. 103, 112-13 (1935) (per curiam)). "In 1957, the Supreme Court held that a prosecutor's failure to correct a material false impression also violates due process." *Dickey*, 69 F.4th at 636 (citing *Alcorta v. Texas*, 355 U.S. 28, 31 (1957)) (per curiam).

In all cases, but most particularly during a capital trial, a prosecutor must not simply pursue a conviction but rather must seek to ensure that justice is done. *Kyles v. Whitley,* 514 U.S. 419 (1995) (citing *Berger,* 295 U.S. at 88). Likewise, the decision to charge the death penalty cannot rest on criteria that offend the Constitution. *McCleskey v. Kemp,* 481 U.S. 279, 293, 107 (1987).

A criminal defendant's due process rights are violated if prosecutorial misconduct renders a trial fundamentally unfair. *Drayden v. White,* 232 F.3d 704, 713 (9th Cir. 2000) (quoting *Darden v. Wainwright,* 477 U.S. 168, 183 (1986)); *see Greer v. Miller,* 483 U.S. 756, 765 (1987) (conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips,* 455 U.S. 209, 219 (1982).

The federal court must distinguish between "ordinary trial error of a prosecutor and that sort of egregious misconduct . . . amount[ing] to a denial of constitutional due process." *Donnelly v. DeChristoforo,* 416 U.S. 637, 647-48 (1974); *see also Johnson v. Sublett,* 63 F.3d 926, 929 (9th Cir. 1995). The prosecutor is deemed to have knowledge of everything in the investigation of the defendant. *United States v. Bryan,* 868 F.2d 1032 (9th Cir. 1989). This includes evidence of another suspect. *Smith v. Secretary of New Mexico Dep 't. of Corrections,* 50 F .3d 801 (10th Cir. 1995). The prosecutor must present reliable evidence and avoid the presentation of false evidence. *Foster v. California,* 394 U.S.440, 442 (1969). Further, the prosecution has an affirmative obligation to reveal to the defense any material exculpatory or impeachment evidence, *Kyles,* 514 U.S. at 419, not to present false evidence, and to notify the court and counsel when it has reason to believe that false evidence has been presented. *Giglio v. United States,* 405 U.S. 150 (1972). Even if the defense impeaches the witness, the prosecution's failure to disclose information is nonetheless material. *United States v. Service Deli, Inc.,* 151 F.3d 938, 943-44 (9th Cir. 1998). And, in determining materiality, if the information could have been used to either undermine the government's case or support the defense, and is reasonably likely to have affected the outcome, a new

trial is warranted. *United States v. Severdija,* 790 F.2d 1556 (11th Cir. 1986) (undisclosed statement would have supported defense theory that he lacked intent); *United States ex rel. Thompson v. Dye,* 221 F.2d 763 (3rd Cir. 1955) (information would have supported mental state defense).

The prosecution "must not knowingly elicit testimony from a witness in order to impeach him with otherwise inadmissible testimony." *See United States v. Gomez-Gallardo,* 915 F.2d 553, 555 (9th Cir. 1990). Impeachment is improper when employed as a guise to present substantive evidence to the jury that would be otherwise inadmissible. *Id.*. A determination must be made as to whether the prosecution examined the witness for the primary purpose of placing before the jury substantive evidence, which was otherwise inadmissible. *Id.*

It is prosecutorial misconduct to present evidence and arguments that are intended to appeal to the emotions of the jury and inflame their passions. *See, e.g., Miller v. Pate,* 386 U.S. 1, 4-7 (1967); *Commonwealth v. Mendiola,* 976 F.2d 475, 486-87 (9th Cir. 1992), *overruled on other grounds, George v. Camacho,* 119 F.3d 1393 (9th Cir. 1997) (repeated references to false evidence). When such conduct is more than an isolated statement in "closing arguments [but] follow[s] on the heels of improper and indecorous prosecutorial conduct during trial," it is "more likely to amount to the type of severe misconduct that justifies reversing a conviction." *United States v. North,* 910 F.2d 843, 897 (D.C. Cir. 1990) (citing *Berger,* 295 U.S. at 84-89); *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 240 (1940).

Mikhel's motion specifically invokes *Napue*, in which the Supreme Court established that a conviction is invalid if the State is aware of a material falsity and fails to correct it, regardless of whether the State intentionally solicited the false evidence or testimony. *See Napue*, 360 U.S. at 269–70. This is so because the State's knowing use of false testimony prevents "a trial that could in any real sense be termed fair." *Id.* at 270. The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction . . . does not cease to apply merely because the false testimony goes only to the credibility of the witness." *Id.* at 269. To prevail on his *Napue* claim, Mikhel bears the

184

burden of showing that: "(1) testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) . . . the false testimony was material." *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc) (alteration in original) (quoting *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003)); *see Napue*, 360 U.S. at 269-71. The Supreme Court has repeatedly acknowledged that the introduction of false testimony is corrosive to the "truth-seeking function" of our adversarial system. *United States v. Agurs*, 427 U.S. 97, 103–04, 103 n.8 (1976) (collecting cases). Under *Napue*, a jury's determination "must be set aside if there is any reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *Id.* at 103–04, (emphasis added); *see also Giglio*, 405 U.S. at 154.

Napue's materiality standard is considerably less demanding than the standard for *Brady* claims, which requires that a petitioner show "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding *would* have been different." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (emphasis added). The Supreme Court has explained that *Napue*'s materiality threshold is lower "not just because [*Napue* cases] involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process." *Agurs*, 427 U.S. at 104. "[A] deliberate deception of court and jury by the presentation of testimony known to be perjured . . . is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation." *Mooney*, 294 U.S. at 113.

**B.** **The government violated Mikhel's rights to due process when it created the false impression that Mikhel had ties to Russian Organized Crime.**

As alleged above and in Claim 1, the prosecution claimed incorrectly that Mikhel's actions were tied to the Russian Mafia, and that his connection to organized crime presented an ongoing danger to witnesses, the jury, and the general public.

*Anonymous Jury*. The government used its unsupported allegation of Russian mafia ties to alarm the court about the safety of jurors, in order to secure an anonymous jury. (Dkt. 1002.) To justify hiding all prospective and seated jurors' identity from the public

185

and from Mikhel's counsel, the government argued that "while this case is not charged as a racketeering case, there is evidence that defendants committed the horrendous crimes at issue within the structure of a violent Russian criminal organization." (Dkt. 1002 at 5.)

*Future Dangerousness*. The government also used Mikhel's SAMs confinement, which was grounded in its misrepresentations about Mikhel's non-existent Russian Mafia connections, to create the false impression that the BOP would be unable to securely confine Mikhel unless the jury sentenced him to death, and elicited misleading testimony to accomplish this.

While cross-examining Dr. Cunningham, a BOP expert called on behalf of Kadamovas, the government asked Dr. Cunningham: "And you're aware of the fact that even at ADX, the most secure facility in the Bureau of Prisons, there have been instances where people have been able to violate SAMs orders?" (02/07/2007 RT 52.) When Dr. Cunningham responded he lacked any specific information on that point, the government continued to question him about it, and misrepresented the content of an Office of Inspector General (OIG) report concerning communications within ADX in general: "You're aware of the fact that the Bureau of Prisons' Inspector General recently issued a report about problems with people at ADX being able to get messages out?" (02/07/2007 RT 52.) The prosecutor thus constructed the false impression that BOP measures, *even under SAMs*, would not be able to restrict Mikhel's communications.

This was not what the report said. Maureen Baird, a retired Warden with twenty seven years of experience working with the BOP and extensive experience working in facilities with inmates under SAMs restrictions, opined that this "**was a blatantly false statement made by the prosecutor regarding multiple violations of SAMs orders by inmates at ADX Florence**." (Ex. 158, M. Baird Decl., ¶ 19.) The OIG report that the prosecutor referenced identifies three convicted terrorists who succeeded in mailing out approximately 90 letters to extremists. These prisoners were **not** under SAMs orders. *See* U.S. DOJ-OIG General Evaluation and Inspections Division, *The Federal Bureau of Prisons' Monitoring of Mail for High-Risk Inmates*, (Sept. 2006); Ex. 158 ¶ 21).

186

Furthermore, the government asked the jury to impose death in its penalty-phase opening argument misleadingly conflated the *inability* of the San Bernardino County Jail to properly secure an inmate under SAMs order with the BOP's *ability* to manage a SAMS inmate. (1/24/2007 RT 60-61.) But the fact of the matter was that the San Bernardino county jail "was not equipped or designed to properly manage inmates, like Mikhel, who were under the provisions of SAMs. Much to the contrary, the BOP is designed to fully comply with SAMs Orders to manage inmates safely and securely with SAMs restrictions" by dedicating an entire unit within ADX, the H Unit, to the management of SAMs prisoners since 2004. (Ex. 158 ¶¶ 16-17.) And in fact, the conditions of confinement in the ADX H Unit are even more stringent than they are in the SCU in Terre Haute, where death-sentenced inmates are held:

> Following trial, absent a death sentence, which usually results in placement in the Special Confinement Unit (SCU) at USP Terre Haute, Indiana, Mikhel would undoubtedly have been incarcerated within H Unit at ADX Florence. This decision is based solely on the SAMs order which was in place at the time of trial and for many years after. . . . The ADX is one of the most secure prisons in the world and is designed to house dangerous and violent offenders, based on their criminal histories, backgrounds, and conduct in prison. No inmate has ever escaped from the ADX. The ADX has several missions and housing units within its institution. The Special Security Unit, otherwise known as H Unit, within the ADX, is one of the most restrictive units and is solely comprised of inmates under a SAMs order. The main purpose of assigning SAMs is to restrict the inmate's communication, not only with the outside world, but also with other inmates.

(Ex. 158 ¶¶ 31-33.)

Thus, contrary to the false impression the prosecution created at trial, Mikhel would not have been able to escape because at the H Unit, "the cells are comprised of solid walls and steel doors, with a small slot in the door which allows food trays to be delivered and restraints to be applied. Some cells at the ADX comprise an additional security enhancement of a sallyport, which provides greater security for corrections officers." (Ex. 158 ¶ 33.) In the H Unit, Mikhel would not have been able to see outside, as only "[s]mall, narrow windows provide limited natural light in the cells." (Ex. 158 ¶ 33.) At the H Unit,

187

"there is no physical contact between inmates" and "[t]he main purpose of assigning SAMs is to restrict the inmate's communication, not only with the outside world, but also with other inmates," and "ADX staff, especially those assigned to H Unit, receive extensive training on SAMs procedures as well as managing inmates under SAMs." (Ex. 158 ¶¶ 17, 32, 33.)

Contrary to the prosecutor's statement, it is extremely unlikely the BOP system would have allowed Mikhel "to manipulate people and exploit flaws in the system" because the BOP's "security procedures have improved not only because of the lessons learned from [Mikhel's escape attempt at MDC], but from other similar incidents which have occurred in all federal prisons. The BOP is now better equipped to effectively manage inmates who pose significant security concerns and risks." It is "[b]ecause of the Agency's ever evolving security processes" that retired Warden Baird is confident the BOP "will continue to safely house and manage Mikhel, for the remainder of his life, as they have already demonstrated over the last more than 20 years since April 2003, when the escape plot was uncovered." (Ex. 158 ¶ 12.) Comparing H Unit at ADX to the San Bernardino County Jail was misleading and inflammatory.

These misrepresentations about the BOP and its ability to safely house Mikhel is a sufficient basis for relief. "[T]he Supreme Court established that a conviction is invalid if the State is aware of a material falsity and fails to correct it, regardless of whether the State intentionally solicited the false evidence or testimony." *Dickey v. Davis*, 69 F.4th 624, 636 (9th Cir. 2023) (citing *Napue*, 360 U.S. at 269-70). As the Supreme Court said in 1967:

> More than 30 years ago this Court held that the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence. There has been no deviation from that established principle. There can be no retreat from that principle here.

*Miller v. Pate*, 386 U.S. 1, 7 (1967) (*citing Mooney v. Holohan*, 294 U.S. 103; *Napue v. People of State of Illinois*, 360 U.S. 264; *Pyle v. State of Kansas*, 317 U.S. 213; *Alcorta v. State of Texas*, 355 U.S. 28.)

188

It is difficult to reconcile how there could there be no prejudice to Mikhel when the government *created* the false impression by eliciting testimony about it, as opposed to simply failing to correct a witness's false statement, as was the case in *Dickey*, 69 F.4th at 636.

*Government misrepresentations in other proceedings.* The government continued to misinform factfinders to defend its actions even after Mikhel's trial. Co-defendant Krylov pointed out to the Ninth Circuit during his appeal that the government had previously linked Mikhel and Kadamovas to organized crime, but disavowed that theory during the Krylov trial. In its answering brief filed in 2010, the government asserted that "*apart from the motion* [to empanel an anonymous jury], the government did not take any position on whether or not Mikhel or Kadamovas were part of Russian organized crime or the Russian mafia." (*U.S. v. Petro Krylov*, Ninth Circuit Case 08-50033, Dkt. 43, at 37) (emphasis added). As shown above, and as the prosecutors who signed that brief should have known, that was yet another misstatement because this allegation was present in news stories based on information from government sources[45] that jurors were aware of even in jury selection (see 08/30/2006 RT 50) and in each request to impose or request SAMs. This continued to harm Mikhel (*see* Claim 1), as he was not removed from SAMs until 2017.

To the extent the government used inconsistent theories in other instances, and elicited false testimony at Mikhel's trial as shown by the testimony of those same witnesses in any other proceeding, the prosecution committed misconduct and deprived Mikhel of a fair trial. *Thompson v. Calderon*, 120 F.3d 1045, 1058 (9th Cir. 1997).

---

[45] *See, e.g.,* Feldman and Wilson, "Five California Bodies Linked to Russian Mafia," CNN.com, available at http://www.cnn.com/2002/US/03/21/kidnap.murder.plot/index.html (last accessed October 2, 2023.); Rosenzweig, "U.S. Seeks Death Penalty in Killing of 5" Aug 4, 2004 L.A. Times, available at "https://www.latimes.com/archives/la-xpm-2004-aug-04-me-death4-story.html (last accessed October 2, 2023.). See also 08/30/2006 RT 58. (government acknowledging that newspaper articles discussed or hinted at Russian mafia.)

189

**C.     The government failed to correct other false impressions**

The government alleged that witnesses were in danger because Mikhel's communications presented a "substantial risk" of harm to them. However, the government knew this was incorrect. As early as March 31, 2004, at least one of the main witnesses against Mikhel, Elena Krivohatchenko (the wife of cooperating co-defendant Altmanis), refused to continue the U.S. Marshall's Witness Protection program, thus indicating she felt no risk at all that Mikhel could cause her harm. (Ex. 56, E. Krivohatchenko contract with FBI.) This was misleading.

The government allowed Altmanis to testify that he feared for his family, when his own wife (who was also a cooperating witness) did not have any fear, while at the same time minimizing the incentive Altmanis had to testify against Mikhel. (10/20/2006 RT 70-71.)

The jury was never told that Altmanis' wife was living openly in the U.S at the time, without availing herself of the government's witness protection program. And the government allowed her to testify that she was part of the program, and that she received money from the FBI, but did not clarify that she had voluntarily ended her participation in it.

**D.     The government violated Mikhel's Sixth Amendment rights when it used confidential informants to gather inculpatory evidence from Mikhel while in custody and while represented by counsel**

Mikhel's Fifth and Sixth Amendment rights were violated when the government gathered evidence against Mikhel through confidential informants, where such evidence was obtained in the absence of counsel without Mikhel's knowledge that those in question were confidential informants. *Massiah v. United States*, 377 U.S. 201 (2009).

**1.      The government relied on Gitte Lellan, a confidential informant, to obtain information about Mikhel's attempted escape and wire transfers**

      **a.      Facts currently known in support of the claim**

The government knew, or should have known, as alleged below, that Mikhel's first escape attempt at MDC was facilitated by a confidential informant who, with the government's knowledge, was misusing her status as Mikhel's legal representative to gain access to Mikhel, extract information from him, and pass it to her handlers in law enforcement.

After his arrest, Mikhel was represented by attorney Victor Sherman and his law firm, which employed a paralegal by the name of Gitte Lellan. Lellan was also a confidential informant acting on behalf of the sheriff's department and the FBI. Law enforcement relied on Lellan to obtain incriminating information from Mikhel, knowing full well she met with him as Sherman's agent, and that her communications with Mikhel were privileged. She used this relationship to direct the movement of funds ultimately used to finance Mikhel's attempted escape from MDC, a key piece of aggravating evidence at the penalty phase.

On February 19, 2002, Mikhel was arrested. (Dkt. 9.) He retained attorney Victor Sherman to represent him in this matter. On the same day that Mikhel hired Sherman, Agueev designated Victor Sherman as his counsel of record. (*United States v. Agueev*, Case No. CR 02-00126-NM, Dkt. 24.) Agueev was at the time suspected of participating in a money laundering operation that was central to the government's case against Mikhel and Kadamovas. Sherman had also agreed to represent Mikhel in various real estate transactions that would be the source of his legal fees.

Beginning on April 1, 2002, the government filed a motion notifying the Court of the apparent conflict of interest between Mikhel and his counsel, Victor Sherman, because of the concurrent representation. (*United States. v. Agueev*, USDC Case No. CR 02-00126-

191

NM; Dkt. 50.) On April 22, 2002, the Court removed Sherman as counsel for Mikhel due to the conflict of interest.

Sherman and Lellan continued to conduct legal visits with Mikhel while in custody and corresponded with Mikhel via mail for many months after Sherman was removed from the criminal case. MDC visiting log records show that on May 7, 2002, Gitte Lellan visited Mikhel at MDC. (Trial Exhibits 1046A, 1046B.)

Unbeknownst to Mikhel, Lellan was not only assisting his attorney in a real estate transaction: she was a confidential informant who had provided information to the Joint Terrorism Task Force for some time before. (Ex. 179.) Two and a half years before September 2004, another informant introduced Lellan to Los Angeles County Sherriff's Department ("LASD"), Detective Alex Gilinets. Lellan was described to Gilinets as someone who "may have knowledge concerning the 'kidnappings.'" (Ex. 179 at 2730.) From then on, Lellan began providing information to LASD, and through LASD, to the FBI about Mikhel.

On May 17, 2002, Lellan sent LASD Detective Gilinets an email confirming their arrangement:

> In reference to our prior meeting and phone calls, I am writing this email to confirm that I today offered my 100% assistance in a pending, federal [international] investigation, including tape-recording all conversations, whether by phone or in person. I will turn over any and all documentation I come into possession off [sic], just as I will follow any and all instructions given to me.
>
> In exchange for my cooperation in the pending investigation, I will greatly appreciate if the federal authorities will release [the INS detainer], which has been place on my 21-year-old son Marcus Lellan, following a conviction for vehicular manslaughter.

(Dkt. 609 at Ex. B.)

The INS detainer placed on Lellan's son, Marcus Lellan, was the result of his pleading guilty in April 2000 to reckless driving and four counts of vehicular manslaughter with gross negligence. (Ex. 180.)

The government explicitly knew she was a legal representative: "Gitte Lellan was a realtor who was working with a defense attorney for Iouri Mikhel." (*United States v. Krylov*, 03/29/2007 RT 70.)  Lellan was "able to get access to Mikhel and Kadamovas after they were arrested" because she was a paralegal.[46]  (*United States v. Krylov*, 03/29/2007 RT 70.) Counsel understands that she held herself out as Victor Sherman's paralegal.[47]

In an email dated June 26, 2002, Lellan relayed to Detective Gilinets information she had extracted from Mikhel during a visit at MDC, including information about transferring funds to Marina Karagodina. Acknowledging her message, Detective Gilinets told Lellan: "thank you gitta . . . this should be very help ful . . . I will let you know . . . if u are available in the afternoon . . . I would like to meet with u . . ." (Ex. 178 at 2728) (spaces in original.)

On July 9, 2002, Lellan again reiterated her willingness to assist law enforcement authorities:

> As for your question "how far I am willing to go", I can only assure you (again) that I am/will be your slave and do whatever you want me to do, as long as my son's INS detainer [. . .] will be removed. Whatever I need to do I will do, without limitation or hesitation.

(Dkt. 609 at Ex. C.)

On January 18, 2003, via email, Gilinets congratulated Lellan for a "good job with this synopsis . ." and letting her know that once he is back in the office, he will "come up with some more ideas. . . .". To this, Lellan replies: I will make your proud, I promise :)." (Dkt. 609 at Ex. F.)

The FBI was also aware of Lellan's cooperation. In an FBI 302 authored on January 24, 2003 by FBI Special Agents Janet J. Palmore and Gary H. Bennett Jr., they stated that

---

[46] It is unknown at this time if this refers to the FBI's Joint Terrorism Task Forces. See https://www.fbi.gov/investigate/terrorism/joint-terrorism-task-forces

[47] In an application to enter MDC to visit Mikhel, dated July 10, 2002 and apparently signed by Lellan, Lellan describes herself as an employee of Victor Sherman and stated she was seeking to enter the institution as the representative of Victor Sherman, a licensed attorney. (Ex. 177.) As undersigned counsel has no discovery power, counsel does not have access to the application actually submitted by Lellan to MDC.

193

"Detective Alex Gilinetz [sic], Los Angeles Sheriff's Department, provided agents with the following information: Gitta (LNU) is a woman who has been visiting Iouri Mikhel in jail. She is not an attorney, but has worked with attorneys in the past to assist clients in real estate transactions." (Dkt. 609 at Ex. D.) According to the memo, the memo relates to "Investigation on 5/13/2002 at Los Angeles, Calif." (*Id.*)

In a fax from Lellan to FBI Special Agent Jennifer Schramm, dated September 25, 2003, Lellan reviews her previous disclosures to the government about Mikhel's escape plan, indicating that Lellan made her law enforcement handlers aware of Mikhel's plan over a year before the plan was foiled. (Ex. 178.)

Trial counsel reached an agreement with the government as to the admissibility of Lellan's statements. (*U.S. v. Lellan*, CR 04-1016-NM, Dkt. 50 ("Regarding the issue of E-Mails, counsel for Mikhel has come to an agreement with the government.)

### b. The Government violated *Massiah* and its progeny

Mikhel's Fifth and Sixth Amendment rights were violated when the government used evidence obtained by Lellan, a confidential informant, against Mikhel, where such evidence was obtained in the absence of counsel, without Mikhel's knowledge that Lellan was a confidential informant. *Massiah v. United States*, 377 U.S. 201 (2009). Lellan was a confidential informant for the government.

The Los Angeles County Sheriff's Department has a long history of using confidential informants unconstitutionally to obtain information against defendants while in custody *See* Report of the 1989-90 Los Angeles County Grand Jury, Investigation of the Involvement of Jail House Informants in the Criminal Justice System in Los Angeles County;[48] *Goldstein v. City of Long Beach*, *et. al.*, USDC, C.D. Cal. Case No. CV 04-9692. The misuse of confidential informants has led to relief in a number of cases, such as: Order Granting Writ of Habeas Corpus, *In re Oscar Lee Morris*, Los Angeles County Superior

---

[48] Available at http://grandjury.co.la.ca.us/gjreports.html

Court Habeas Case No. BH001152, 01/21/2000; *In re Earl Lloyd Jackson*, 3 Cal. 4th 578, 584 (1992); *In re Wilson*, 3 Cal. 4th 945, 949 (1992).

The federal government's use of confidential informants has also been plagued by irregularities and failures to abide by the their own rules of investigation. According to the 2005 report, "The Federal Bureau of Investigation's Compliance with the Attorney General's Investigative Guidelines (Redacted) Special Report September 2005 Office of the Inspector General,"[49] it is difficult for the FBI to track the productivity of the confidential informants "because unlike the case with a cooperating witness who typically testifies at trial, an informant's identity rarely becomes public." (*Id.* at 66.) Indeed, at the same time as Mikhel's trial, the same office that was prosecuting Mikhel was misusing confidential informants. (*See* Claim 11.) In *United States v. Griffin*, CR 02-938-RGK, a case tried just prior to Mikhel's, the U.S. Attorney's Office had allowed an informant witness to lie with impunity in its prosecution of alleged members of the "Aryan Brotherhood." (Dkt. 1362.) In that case, despite knowing that informant Cliff Smith had lied on the stand, the government provided him the full benefit of his plea agreement, never prosecuted him for perjury, and continued relying on Smith as a cooperating witness even after he had admitted to giving false testimony.

Any agreement between the government and trial counsel regarding the use of Lellan's statements did not cure the *Massiah* problem, and counsel provided ineffective assistance of counsel by agreeing to a very narrow stipulation to cure the violation. The proper remedy for such pervasive misconduct was to preclude the prosecution to seek the death penalty against Mikhel. *See, e.g, People v. Dekraai*, 5 Cal. App. 5th 1110 (2016), <u>as modified</u> (Dec. 14, 2016) (disqualifying the entire Orange County District Attorney's office from prosecuting the case given the rampant misuse of Confidential Informants); *People v. Dekraai*, No. 12ZF0128, 2017 WL 4330504, at *15 (striking the death penalty as a potential

[49] Available at https://oig.justice.gov/reports/federal-bureau-investigations-compliance-attorney-generals-investigative-guidelines

punishment for the defendant giving the continuous failure to comply with discovery concerning confidential informants.)

In Mikhel's case, the government used the attempted escape as an additional basis for the death penalty, even though one of their own informants had encouraged and facilitated the attempt in order to benefit financially and materially. In closing argument, the government repeatedly used the escape attempt as evidence of Mikhel's future dangerousness, urging the jury to sentence Mikhel to death. Here, the government encouraged Lellan to visit Mikhel to gather incriminating evidence against him when he believed his communications with her were confidential. The extent of this constitutional violation cannot be known until such time as the full range of Lellan's communications with her handlers at the LASD and the FBI in known. After complete discovery and an opportunity for a fair hearing, the court may want to exercise the same discretion as the *Dekraai* court did or grant relief as the court in this district did in *Barry G. Williams v. Ron Davis*, CV 00-10637 Dkt., 2016/03/29 Order Granting Habeas Relief, Dkt. 26.

To the extent the government's action led to the ultimate breakdown of the attorney-client relationship between Mikhel and his trial counsel, either by fostering Lellan and Sherman's access to Mikhel once trial counsel were appointed, such actions constitute interference with the right to counsel under the Sixth Amendment, as well as prosecutorial misconduct.

**2. The government relied on other informants to unconstitutionally obtain information the government used to argue Mikhel presented a future danger**

The government introduced the testimony of Jose Avila to establish that Mikhel had attempted to escape from MDC. (2006/12/08 RT 139.) Avila had been transferred from another district to MDC to face trial in this district. In addition to criminal charges, Avila was facing deportation at the time he testified against Mikhel. (2006/12/08 RT 166.) Avila was adamant that although he was facing deportation proceedings, and had signed a document stated he would not contest his deportation, he still had the ability to challenge

196

his deportation. (2006/12/08 RT 177-78.) To the extent the government transferred Avila to MDC to obtain information from Mikhel, that was misconduct. (*See* Dkt. 2399.) To the extent Avila was under the impression the government would assist him further in his deportation proceedings beyond what was disclosed at trial, the government violated *Brady* and its progeny.

## E.    The government suppressed information concerning institutional involvement in the attempted escape from MDC.

As alleged in Claim 4, at least two potential witnesses indicated guards at MDC were involved in the attempted escape from MDC.

Sometime in early 2005, the DOJ initiated a clandestine operation to investigate allegations that individuals then employed as correctional officers at the Los Angeles MDC were receiving payments from inmates in return for smuggling contraband into the MDC. (Ex. 175.) The investigation involved at least one individual who was a federal prisoner in custody at MDC then introduced an undercover employee to the targets. Undersigned counsel have determined that the investigation led to the conviction of at least four correctional officers for, among other charges, bribery in violation of 18 U.S.C. § 201(b)(2)(C) and providing contraband in prison in violation of 18 U.S.C. §§ (3) and (4).[50] At least one of these correctional officers with the initials A.R. was at MDC during the time Mikhel was in custody at that facility, and participated in the prison shakedown on March 8, 2003, following Mikhel's escape attempt.[51]

Special Investigative Agent Marvin Battley provided false testimony, saying that the escape attempt did not involved MDC staff members. (12/06/2006 RT 98.)

---

[50] The case numbers are known to undersigned counsel. Because pleadings filed in these cases may still be under sealed at the request of the government, in the abundance of caution, counsel will disclose the cases involved as well as the names of the identified correctional officers upon request by the Court.

[51] Counsel does not include this report as an exhibit, so as not to disclose the identity of correctional officers that may be incarcerated. The information comes from the government's discovery Bates Nos. 38782-38808.

To the extent the government minimized involvement by correctional officers or other institutional actors in the attempted escape, and therefore, underscored Mikhel's future dangerousness, such actions constitute *Napue*/*Brady* violations.

**F.    The government suppressed other *Brady* information**

In discovery during trial, the government redacted the identities of a number of inmates and guards interviewed by the government in relation to the attempted escape from MDC and SB-CDC. (See Dkt. 2399.) To the extent the government failed to disclose that Jason Stivers, Billy Parker, and others yet to be determined were confidential informants or approached Mikhel in order to obtain assistance from the government, the government violated *Brady* by not disclosing such information.

In preparation for the penalty phase, trial counsel subpoenaed Mikhel's medical records. (*See* Claim 5.) Because the records were not promptly delivered to Mikhel's counsel, counsel was precluded from providing such documents to their experts in order to mount a defense in mitigation. To the extent the government delayed the disclosure of such document, such delay constitutes a *Brady* violation.

To the extent the government failed to disclose evidence that contradicted the image the government presented at trial concerning the victims, such failure to disclose constitutes a *Brady* violation.

**G.    Other instances of prosecutorial misconduct**

*Sabrina Tynan.* As asserted in Claim 5, agent Ingerd Sotelo exerted improper pressure on Sabrina Tynan to testify at trial. The exertion of such undisclosed pressure constitutes a *Brady* violation.

*Judicial bias known to government.* The government deprived Mikhel of a fair trial and an unbiased judge by failing to reveal until after Mikhel's conviction and sentence that Judge Tevrizian had financial stakes in a company owned by Rachel and Dan Hoisman, who were related to one of the victims. The government was aware of this information before trial began. (02/15/2007 RT 10-11.)

198

*Altmanis' severe mental health diagnoses.* Altmanis had a history of mental health issues, including having seen a psychologist, experiencing hallucinations and hearing voices. (*United States v. Krylov*, 04/13/2007 RT 27-50.) At Krylov's trial, a certified court interpreter hired by Krylov's defense attorney testified that: 1) she had translated numerous recorded telephones calls of various defendants and various parties, including Altmanis, whom she had identified when Krylov's counsel asked her to attend Altmanis' testimony in October of 2006 at Mikhel's trial; 2) the certified court reporter testified that in some of the conversations, Altmanis and his wife had discussed him seeing a psychologist in several occasions, that he was suffering from hallucinations and hearing voices of children and old people; 3) given her educational background, which included a master's degree in psychology, and other degrees, the certified court interpreter testified that she detected a difference between Altmanis' pattern of speech in the recorded phone calls in comparison to the way he testified in court: in his normal speech, he used obscenities, his speech was very rough, giving the impression that he was a very hyper person, whereas in court, he was very calm, very well put together. In the recorded calls, his speech was abusive. (*United States v. Krylov*, 04/13/2007 RT 29-31, 50.)

To the extent the government withheld information about Altmanis that could have impeached his testimony, including psychiatric reports which documented his history of hallucinations and hearing voice and cast doubt as to his credibility, truthfulness and competency, the government suppressed material information within *Brady's* ambit. *Gonzalez v. Wong*, 667 F.3d 965, 981 (9th Cir. 2011) (in a § 2254 capital case, remanding to the lower court when petitioner made a colorable argument that a testifying informant's psychological reports indicating he had schizophrenia were suppressed, where those reports could have been used to impeach the informant's credibility.)

*Raymond Eidaks.* The government also interfered with trial counsel's efforts to mount a defense. Most tellingly, agents on behalf of the government instructed witnesses, such as Raymond Eidaks, to not cooperate with the defense. When Filipiak, Mikhel's trial

199

investigator, interviewed Eidaks, Eidaks stopped the interview to call Agent Louis Perez to get "permission." (Ex. 42, C. Filipiak Decl., ¶ 15.)

*Intimidation of Marina Karagodina.* Further, the government interfered with Mikhel's case in mitigation by obtaining statements in violation of *Miranda v. Arizona* and due process, intimidating Marina Karagodina, his former girlfriend and the mother of his child.

Prior to the penalty phase, counsel informed the Court: "the government went and through Scotland Yard interviewed her for days. And after that interview by the government Ms. Karagodina won't talk to us anymore. So she's not only not available, but she isn't cooperating with us at all." (01/26/2007 RT 9.) By browbeating and threatening Karagodina, the government interfered with Mikhel's ability to mount a case in mitigation. The government exploited this at trial when in closing argument, the prosecutor emphasized that no one had cared enough about Mikhel to come to testify on his behalf. (02/09/2007 RT 138-40.)

During the interviews of Karagodina, the UK police officers advised she was a suspect in an American criminal investigation, that they were acting on behalf of the U.S. government, and recited to her a warning that fell far short of *Miranda*: "Before the interview commences I must remind you of your legal entitlement for legal advice and that this interview may be delayed for you to obtain it if necessary. Do you require a solicitor to be present this morning?" *Miranda v. Arizona*, 384 U.S. 346 (1966.)

One topic of the interviews concerned statements made by Iain Litchfield, a car broker in London, who had sold cars for Mikhel. The government, also using the Metropolitan Police Service in London as its agents, interviewed him in August 2004 about his interactions with Karagodina and prepared an MG11(T) report to memorialize the statement. (Ex. 168 at 2665-69.) According to the MG11(T), Litchfield was selling one of Mikhel's cars the early 2000s. Karagodina went to Litchfield's property at some point (Litchfield was unsure of the date) to retrieve a suitcase which was in the car, and that Mikhel had advised Litchfield it contained a maintenance logbook for the car it was in, which he wanted for the sale. (Ex. 168 at 2668.) The report claimed that Karagodina

200

opened the case in front of him, and that Litchfield said it contained "heavy duty cable ties and duct tape . . . bottles of what appeared to be drugs, syringes and. . . an item in a bag which could not be anything other than a handgun, because of its shape and weight." (Ex. 168 at 2668.)

According to Mark Ward, who served almost twenty years as a law enforcement officer in the UK, the Metropolitan Police improperly used Form MG11(T) purporting to memorialize Litchfield's statements. (Ex. 162, M. Ward Decl., ¶¶ 6-10.) "The proper use of the MG11 would have been a statement signed by Mr. Litchfield. . . An MG11 statement is essentially a signed document which details the account of an event or events a witness would give should they be called to give evidence in a court of law. The MG11 would properly be a true account given by the witness of an event; they are not usually a statement in which a police officer states the account they were given by a witness." (Ex. 162 ¶ 8.) [52]

When interviewed by David Park, an investigator for undersigned counsel, Litchfield denied he had told the Metropolitan Police that he had seen the contents of the case: "Litchfield asserted that he never saw the contents of the bag he gave to Marina, as it was locked. Mr. Litchfield stated that the statement Det. Richards prepared is incorrect about this exchange. Marina did not open the bag for Mr. Litchfield, and he never saw what was inside it." (Ex. 168, ¶ 7.)

---

[52] Mr. Ward's assessments are further corroborated by additional information. In order for a written statement by a witness to be used in a criminal proceeding without the witness attending court, "a written statement must: be signed by the "maker", that is the person whose evidence it is; include a declaration of truth, such as the one printed on the statement forms." Since Lichfield did not sign the MG11, it is likely inadmissible in the UK. This can be verified at: https://www.hse.gov.uk/enforce/enforcementguide/pretrial/witness-written.htm#fn1

The Metropolitan Police should have handed Lichfield what is known as section 3 of the MG11 form. This can be verified at: https://www.kent.police.uk/foi-ai/kent-police/Policy/crime-and-intelligence/police-response-to-victims-and-witnesses-referring-to-extended-victim-services-in-kent-n15b/

When the Metropolitan Police, still working on behalf of the FBI, interviewed Karagodina on May 16, 2005, they intimidated Karagodina into corroborating the Litchfield MG11(T). The interrogation was recorded in four transcripts, with a break between each interview session. Examination of these transcripts reveals that the interrogation was not fully recorded, and that the detectives continued to question her in the breaks.  In particular, Interview 3 ended at 11:59 a.m., and Interview 4 began more than 20 minutes later, at 12:19. (*See, e.g.*, Ex. 176 at 2718.)

The detective asked Karagodina about the gun several times, the first time apparently off the record, as the first mention of it in the transcript occurs during the third session: "You remember the bag that we discussed in the previous interviews and one that was supposed to have contained a gun, syringes and tape and all that sort of thing"; the detective then said that they were going to re-interview Litchfield, and that her story was not matching his. (Ex. 176 at 2712.) She continued to deny that there was a gun, and the detective suggested that possibly she threw the gun away because she was afraid and that "you must tell us, and then we will stop hounding you." (Ex. 176 at 2714.) She persisted in denying it, and the detective said, "Just tell us, that's all we want to know." (Ex. 176 at 2716.) Finally, the detective said, "I will give you another opportunity, and one last opportunity to tell me if there was a gun in that bag?" (Ex. 176 at 2717.) The recording was stopped, and after a 20-minute unrecorded break, recording resumed, and Karagodina stated that there were stamps, sellotapes and a gun in the bag she retrieved from Litchfield. (Ex. 176 at 2723.)

The FBI violated Karagodina's *Miranda* rights by interrogating her in this way. *Missouri v. Seibert*, 542 U.S. 600, 617 (2004) (holding that a trial court must suppress post-warning confessions obtained during a deliberate two-step interrogation where the

202

midstream *Miranda* warning—in light of the objective facts and circumstances—did not effectively apprise the suspect of his rights.)[53]

This was not the only incident of intimidation that she was subjected to. According to her son Anton Abramkin, Karagodina became "catatonic" when she was first interviewed by the FBI in Los Angeles just after Mikhel's arrest. (Ex. 39, A. Abramkin Decl., ¶ 6.) Abramkin remembers that once they arrived in the UK, the FBI, this time accompanied by the Metropolitan Police, came to interrogate his mother again. As the FBI and the police were leaving, "the Met police told my mom, 'You can thank your husband for this.'" (Ex. 39 ¶ 7.) Karagodina's husband at the time "was an ex-Soviet secret service agent . . . [who] did things like wiretap [Karagodina's] phone and hide her passport" to intimidate her. (Ex. 39 ¶ 2.) There is no question that the FBI was able to exploit her vulnerability in this way to extract a favorable statement.

*Michelle Lancaster.* In addition, trial counsel at the time believe the government unnecessarily seized Michelle Lancaster's bank records as a way to intimidate her. Lancaster had maintained a romantic relationship with Mikhel. By intimidating Lancaster, the government made her unavailable to the defense; otherwise, she too would have testified during the penalty phase.

## H. Conclusion

As alleged above, the government committed numerous instances of prosecutorial misconduct. Each, on its own, and cumulative—in addition to other instances of

---

[53] Relatedly, trial counsel were ineffective for failing to file a motion to exclude Marina Karagodina's statements to Scotland Yard in her March 2005 interview. As indicated above, Karagodina's statements to British law enforcement were coerced. Trial counsel was aware of this fact. (01/26/2007 RT 9.) The government nonetheless threatened to use Karagodina's statements as impeachment evidence if Mikhel attempted to call her as a live witness or present her videotaped statement at the penalty phase. (01/26/2007 RT 5-6.) Reasonable counsel would have moved to exclude Karagodina's statements to law enforcement because they were obtained in violation of due process. Mikhel had standing to file such a motion under Ninth Circuit law. *See Williams v. Woodford*, 384 F.3d 567, 593 (9th Cir. 2004) (admission of third party's involuntary statement may violate defendant's right to due process). Excluding these statements would have allowed the defense to call Marina as a witness at the penalty phase without the threat of improper impeachment. As explained in Claim 5, the lack of live witness testimony prejudiced Mikhel at the penalty phase.

203

misconduct yet unknown—undermine confidence in Mikhel's conviction and sentence of death. This Court should therefore grant relief.

## CLAIM 11: MIKHEL IS ENTITLED TO RELIEF ON HIS CLAIM OF JUDICIAL BIAS

Mikhel's convictions and sentences were obtained in violation of his rights under the Fifth, Sixth, and Eighth Amendments because the trial court was biased against him.

### A.    Legal basis

Judicial bias in favor of the prosecution or against the defendant constitutes a violation of the defendant's due process right to a fair trial. *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997). Due process requires relief and a retrial even if there is insufficient proof of actual bias: "Recusal is required when objectively speaking, 'the *probability* of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.'" *Rippo v. Baker*, 580 U.S. 285, 287 (2017) (per curium) (granting certiorari, vacating and remanding in a state capital case) (emphasis added). For instance, recusal may be required where the "adjudicator has a pecuniary interest in the outcome and in which he has been the target of personal abuse or criticism from the party before him." *Withrow v. Larkin*, 421 U.S .35, 47 (1975) (footnotes omitted).

Due process demands that a trial judge not take on the role of an advocate, particularly in criminal matters. "Where the parties are represented by competent counsel, the judge cannot usurp their role. And most certainly he cannot take on the task of the prosecution." *United States v. Pena-Garcia*, 505 F.2d 964, 967 (9th Cir. 1974). "[T]he court must also be mindful that in the eyes of a jury, the court occupies a position of preeminence and special persuasiveness and, accordingly, the court must avoid the appearance of giving aid to one party or another." *United States v. Allsup*, 566 F.2d 68, 72 (9th Cir. 1977) (cleaned up).

Under the Code of Conduct for United States Judges, a judge should disqualify him- or herself "in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which . . . the judge has a personal

204

bias or prejudice concerning a party . . ." Canon 3(C)(1)(a). Additionally, "[a] judge should be patient, dignified, respectful, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity." Canon 3(A)(3).

**B.      Facts currently known in support of the claim**

The facts in support of Claim 6, (ineffective assistance with regard to recusal) are incorporated here by reference. There, Mikhel explained that Judge Tevrizian applied to be the U.S. Attorney for the Central District of California in the middle of Mikhel's guilt-phase trial, which was proof of his bias against Mikhel and in favor of the prosecution.

Declarations from trial team members recount Judge Tevrizian's overt hostility to the defense. (Ex. 42, Ex. 165, ¶ 23-26.) These accounts provide contextual information concerning Judge Tevrizian's tone, demeanor, and body language that is not available in the trial record. Haney recalls, "Throughout my testimony, I felt that Judge Tevrizian was hostile to the defense, including before the jury. I do not think the transcript does justice to the extent of Judge Tevrizian's hostility, which he largely conveyed through his demeanor and body language." Judge Tevrizian's attitude to the defense prejudiced Mikhel in front of the jury: "The defense was already struggling to connect with the jurors, and Judge Tevrizian just made it worse." (Ex. 48 ¶ 54.)

As summarized below, Judge Tevrizian's antagonism towards the defense pervaded Mikhel's trial, including proceedings before the jury.

**1.      The court responded to trial counsel's brain injury by accusing him of perjury, ordering his medical records, and interrogating his treating physician in court**

At the start of the guilt phase, trial counsel Rick Callahan suffered a serious injury when he fell down a flight of stairs. Callahan was hospitalized and treated for a skull fracture, severe concussion, and bleeding in his brain. He returned home, only to be readmitted to the hospital because of ongoing symptoms related to his brain injury (vertigo, nausea, and extreme headaches). (09/15/2006 RT 5-7; Dkt. 1204.) Rubin moved *ex parte* to continue the trial. (Dkt. 1204.)

205

The trial court's bias is clear from the rancorous tone of the proceedings that followed. Judge Tevrizian responded with outright hostility to Callahan's predicament, embarking on an inquisition to probe the extent of his injuries. The court subpoenaed Callahan's medical records, then convened a hearing at which both Callahan and his physician were interrogated at length. (09/21/2006 RT.) Prior to the hearing, Callahan submitted a sealed declaration describing his injuries. (Dkt. 1218 (sealed).) At the hearing, Judge Tevrizian implied that in this declaration, Callahan made false statements under oath, concealed a substance abuse problem, and exaggerated the extent of his injuries. (09/21/2006 RT 10.) In a lengthy colloquy, the trial court cross-examined Callahan about the exact sequence of events that led to his hospitalization, using treatment records to imply that Callahan misrepresented key events in this sequence. (09/21/2006 RT 10-29.) The trial court then placed Callahan's treating physician under oath and asked for a full accounting of Callahan's medical condition and a prediction of the time it would take for him to recover. (09/21/2006 RT 30-40.)

These extraordinary events left a lasting impression on other team members. Filipiak recalls: "It was outrageous how [the trial court] questioned Rick, his credibility and integrity. There was no reason for Tevrizian to think Rick was a drunk, especially after he questioned Rick's doctor about his very serious head injury. Tevrizian would not have questioned a prosecutor the same way he did Rick." (Ex. 42, C. Filipiak Decl., ¶ 13.)

**2. Judge Tevrizian's *sua sponte* objections on behalf of the government are also evidence of bias**

As noted above, a trial judge must not assume the role of an advocate, especially in criminal cases. *Pena-Garcia*, 505 F.2d at 967. Here, the trial court routinely made *sua sponte* objections on behalf of the government, while making a point of his refusal to do the same for Mikhel. The trial court's treatment of two witnesses exemplifies this disparate treatment.

The government called IRS Special Agent Aaron Gogley to testify about financial transactions and money laundering. Throughout Callahan's cross-examination of Gogley,

206

the trial court repeatedly raised objections on the government's behalf. (*See, e.g.,* 11/01/2006 RT 62, 64, 65.)

The trial court took a markedly different approach to the government's examination of Mikhel's witnesses. As an example, when Dhillon testified at the penalty phase, the prosecutor asked a number of objectionable questions throughout his cross-examination. The trial court did not intervene. When trial counsel ultimately objected, the trial court scolded him: "It's [the prosecution's] cross-examination; he's entitled to ask leading questions. You haven't objected. *I don't stick my nose in until there's an objection. It's not my function to do so.*" (01/31/2007 RT 55) (emphasis added). Judge Tevrizian's inconsistent treatment of the prosecution and the defense is proof of his bias. At the minimum, it showed that Judge Tevrizian's actual bias was too high a risk to be constitutionally tolerable, especially in a death penalty case.

**3.     While his application to be the U.S. Attorney was pending, the trial judge refused to allow defense counsel to present evidence of misconduct in the U.S. Attorney's office**

After Judge Tevrizian applied to become the U.S. Attorney in the Central District. But before he revealed his application to the parties, defense counsel attempted to present evidence of that office's misconduct—proof that the U.S. Attorney's Office had a pattern and practice of misleading juries regarding its plea agreements with informants.

At the guilt phase, the government's informant witnesses admitted that they were testifying pursuant to plea bargains, but the government elicited testimony that their plea agreements required truthful testimony in Mikhel's case. (10/20/2006 RT 75 (Altmanis's testimony); 11/08/2006 RT 43-46 (Solovyeva's testimony); 11/09/06 RT 28-30 (Markovskis's testimony). The jury was told that the informants would not get the benefit of their plea agreements if they were later found to have lied under oath.

But in cases tried just prior to Mikhel's, the U.S. Attorney's Office had allowed an informant witness to lie with impunity. Mikhel filed an application seeking permission to introduce testimony on this point. (Dkt. 1362.) In his application, Mikhel explained that in

207

a recent gang prosecution, the government called cooperating witness Cliff Smith to testify against the defendant, even though he had previously admitted to perjury in previous proceedings (the prosecution of TD Bingham and Barry Mills). The informant received the full benefit of his plea agreement and he was never prosecuted for perjury, despite his admissions. Worse still, the government continued relying on Smith as a cooperating witness *even after* he had admitted to giving false testimony. Smith's testimony was relevant in the Mikhel case, considering how the government used Altmanis's, Solovyeva's, and Markovskis' plea agreements to vouch for their credibility. It was required to rebut a false impression created by the prosecution—namely, that the U.S. Attorney's Office consistently identifies and punishes informants who testify falsely.

At a hearing on December 12, 2006, the trial court denied Mikhel's request. Judge Tevrizian insisted Smith's perjury was irrelevant because different prosecutors tried the Mikhel case. "[T]hat is only relevant to that witness and to that case. It is not relevant to the witnesses in this case. It has nothing to do with this case." (12/12/2006 RT 8.) This ruling cannot be considered in a vacuum. As noted above, Judge Tevrizian was under consideration to be the new U.S. Attorney at the time that he excluded this evidence of that very office's misconduct. This ruling is suspect on its own, but it is all the more so when viewed in light of Judge Tevrizian's personal interest in protecting the reputation of the office he sought to lead.

### 4. Judge Tevrizian made inappropriate comments throughout Mikhel's guilt-phase testimony

Throughout Mikhel's testimony, Judge Tevrizian made snide comments conveying his disbelief in the truth of Mikhel's account. Not only did he do so at sidebar conferences; (*see, e.g.*, 01/04/2007 RT 60 ("this is all total nonsense so far")); he mocked Mikhel's testimony in front of the jury, using the government's objections as an opportunity to convey his opinion that Mikhel was a liar. And it did not matter if the objection was meritless: While overruling a government objection, the Court instructed the defense: "Go ahead, Mr. Mikhel. Continue with your story." (01/05/2007 RT 20.) In response to

208

another objection from the government, which the trial court sustained, the court announced the following, in reference to Mikhel's testimony: "This is total nonsense." (01/05/2007 RT 89.) These improper comments prejudiced the jury against Mikhel. *Allsup*, 566 F.2d at 72 ("in the eyes of a jury, the court occupies a position of preeminence and special persuasiveness").

### 5. Judge Tevrizian belatedly disclosed financial ties to a witness

After the penalty phase concluded, Judge Tevrizian disclosed that he had a connection to an important witness in the case: Rachel Hoisman, the daughter of Meyer Muscatel. At a hearing on February 15, 2007, Judge Tevrizian disclosed he had previously invested money in a business affiliated with Hoisman's husband, Dan Hoisman, and that he had only recently become aware of his connection to the Hoismans. (02/15/2007 RT.) Only when prompted by the court, the prosecutor revealed that at a pre-trial hearing, the Hoismans alerted him to a potential conflict of interest based on their personal ties to the court. The prosecutor admitted that he chose not to share this critical information with the defense or the court. (02/15/2007 RT 10-12.)(*See* Claim 9.)

Five days after Judge Tevrizian revealed his financial ties to the Hoisman's, he concluded that recusal was not warranted. (02/20/2007 RT.) Chris Filipiak recalls that defense inquiries into these financial ties were greeted with hostility in court. (Ex. 42 ¶ 13 ("I think he was really upset when the issue of his potential investment in some property linked to one of the victims was raised.")) Judge Tevrizian acknowledged that the prosecutor had an opportunity to notify opposing counsel and the court, but never admonished the government for its suppression of material information.

### C. Conclusion

The circumstances identified above are extraordinary in any criminal case, let alone a case where the government seeks death. Not only did the trial court apply to be appointed the prosecutor's office mid-trial, he denied defense requests to present evidence of misconduct in that office while concealing his candidacy for the U.S. Attorney position. He responded to defense counsel's medical emergency by ordering counsel's medical

records from the hospital, interrogating counsel's treating physician, and deriding counsel as a liar and an alcoholic in open court. Just as he accused counsel of dishonesty, he characterized Mikhel's testimony as "nonsense" and a "story" *in front of the jury*. When he belatedly disclosed financial ties to a prosecution witness, he allowed the prosecution's suppression of this material information to go unpunished.

Mikhel's trial was infected with unfairness. He is entitled to relief from his convictions and sentences because judicial bias violated his right to due process.

## CLAIM 12: MIKHEL WAS DENIED A FAIR AND IMPARTIAL JURY

Procedures used in the selection of Mikhel's jury violated his rights under the Fifth, Sixth, and Eighth Amendments. First, the composition of the venire for Mikhel's case was the result of systemic, non-random procedures that disproportionately selected Hispanic, Black, and Asian jurors, in violation of the Fair Cross-Section clause of the Sixth Amendment. And, trial counsel was ineffective with regard to jury selection by failing to object to the jury venire based on the Fair Cross-Section requirement.

Counsel was also ineffective during voir dire by failing to object to the government's use of racially motivated and gender-based peremptory challenges, challenge biased potential jurors for cause, and appropriately use retained experts.

## A.    Mikhel's jury was not drawn from a fair cross section of the community

The presence of "a fair cross section of the community on venires, panels, [or] lists from which petit juries are drawn is essential to the fulfillment of the Sixth Amendment's guarantee of an impartial jury trial in criminal prosecutions." *Taylor v. Louisiana*, 419 U.S. 522, 526 (1975). Statistical analysis shows that Hispanic jurors were significantly underrepresented in Mikhel's jury pool and that Black jurors were significantly overrepresented.[54] (*See generally* Ex. 57.) Moreover, those disparities were the result of systemic, non-random procedures that disproportionately excluded jurors from those racial groups.

---

[54] Mikhel uses the terms "Black" and "Hispanic" to reflect the language used on the United States Census and other demographic surveys.

210

These procedures violated Mikhel's right to be tried "by an impartial jury drawn from sources reflecting a fair cross section of the community." *Berghuis v. Smith*, 559 U.S. 314, 319 (2010). Moreover, because defense counsel was on notice that there were problems with the jury pool but failed to pursue this issue, Mikhel was denied his right to effective counsel. Mikhel's Sixth Amendment rights were violated, and Mikhel's conviction and sentence must be vacated.

### 1. Legal basis

Under *Duren v. Missouri*, 439 U.S. 357 (1979), a criminal defendant must make the following three showings to establish a prima facie violation of the Sixth Amendment's fair-cross-section requirement: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Id.* at 364. If the defendant makes a prima facie showing under *Duren*, the burden shifts to the state to justify the infringement by demonstrating that the attainment of a fair cross-section is incompatible with a significant state interest. *Id.* at 367-68. A criminal defendant may challenge the exclusion of a particular group as violating the fair cross-section requirement, "whether or not he is a member of the excluded class." *Duren*, 439 U.S. at 359 n.1.

In *Berghuis*, the Supreme Court expressly declined to adopt a single test for measuring underrepresentation, recognizing that "[e]ach test"—absolute disparity, relative disparity, and statistical significance— "is imperfect." 559 U.S. at 329. Current Ninth Circuit precedent follows this approach, declining to set thresholds and instead requiring courts to "consider the evidence proffered by the defendant, including expert testimony, and employ the most appropriate method, or methods, applicable to the specific challenge in the context of the particular jury pool at issue." *United States v. Hernandez-Estrada*, 749 F.3d 1154, 1165 (9th Cir. 2014.)

211

## 2.    Methodology and data

Dr. John Weeks is a statistician and demographer who has reviewed and analyzed the available data related to the composition of Mikhel's jury pool. (*See* Exs. 37, 57.)

There are three main ways to measure under representation of a distinctive group. "**Absolute disparity** measures the simple absolute difference between the percentage of that group as represented in the jury pool . . . and the percentage of people in the community who are in the cognizable group. . . ." (Ex. 57 ¶ 15.) To measure how "substantive" the absolute disparity is, "**[r]elative or comparative disparity** is measured by relating (comparing) the absolute disparity to the cognizable group's percentage in the entire jury-eligible community." (Ex. 57 ¶ 17.) Finally, "**[s]tatistical significance** answers the question: What is the probability that we could have randomly drawn a sample" of prospective jurors "from the list of qualified potential jurors . . . and have generated" the absolute disparity seen in this case? (Ex. 57 ¶ 19.)

Dr. Weeks compared the composition of Mikhel's jury venire to two sets of population data: the decennial Census (interpolated to reflect the 2006 population based on data from the 2000 Census and 2010 Census; hereinafter "Census") and the 2007 American Community Survey ("ACS"). The difference between the two data points is simple: the Census includes all adults "in the community" (the same data point described in *Duren*, 439 U.S. at 364), and the ACS is filtered for those adults who are also citizens.

## 3.    Hispanic jurors were systematically underrepresented in Mikhel's jury pool

Mikhel can establish a prima facie case that Hispanics were systematically excluded from the jury pool under *Duren* using either set of population data. (*See generally* Ex. 57 ¶¶ 12-22; Table 1 (analyzing Census data); Ex. 37 ¶ 8, Table 1 (analyzing ACS data.))

### a.    Hispanics are a 'distinctive' group under Duren

The first requirement for a Duren analysis is met because "Hispanics are unquestionably 'distinctive' groups for the purposes of a fair-cross-section analysis." *United States v. Rodriguez-Lara*, 421 F.3d 932, 941 (9th Cir. 2005), *overruled on other grounds by United*

212

*States v. Hernandez-Estrada*, 749 F.3d 1154 (9th Cir. 2014); *Duren*, 439 U.S. at 364.

### b.   The number of Hispanics was disproportionately low

Hispanics were underrepresented in Mikhel's jury pool to a degree that is not "fair and reasonable in relation to the number of such persons in the community." *Id.* Courts have typically applied three different methods for measuring underrepresentation. *Berghuis*, 559 U.S. at 316. Both comparative data sets reveal a statistically significant disparity.

With respect to Hispanic prospective jurors as reflected in the Census data, Hispanics made up 40.1% of the adult population of the Western Division at the time of Mikhel's trial, but only 18.9% of the jury pool, an absolute disparity of -21.2 and a relative disparity of -53%. (Ex. 57 ¶ 13, Table 1.) This is statistically significant and indicative of systemic exclusion, as there is zero chance that this was just a random disparity. (Ex. 57 ¶¶ 12-22, Table 1; ¶¶ 18-22.)

The numbers remain statistically significant after comparing Mikhel's jury pool to the narrower ACS data. With respect to Hispanic prospective jurors as reflected in that data, Hispanics made up 28.51% of the adult-citizen population of the Western Division at the time of Mikhel's trial, but only 18.91% of the jury pool, an absolute disparity of -9.60, and a relative disparity of -34%. (Ex. 37 ¶ 8, Table 1.) Even when compared to the ACS data, the probability that this disparity would occur purely by chance is still zero. (Ex. 37 ¶ 8, Table 1.) This disparity is significantly worse than levels that the United States Supreme Court previously found unacceptable in the equal protection context. *See Vasquez v. Hillery*, 474 U.S. 254, 268 n.2 (1986) (4.7% disparity). These discrepancies establish underrepresentation under *Duren*.

### c.   The underrepresentation of Hispanics in Mikhel's jury pool was systemic

This underrepresentation was systemic given the zero likelihood of the low number of Hispanic jurors appearing in the venire. Other disparities that occurred, discussed in detail below, had either zero chance of occurring (in the case of overrepresented Black jurors and underrepresented jurors in the "all others" category) and only a 14.7% chance

of occurring (in the case of underrepresented White jurors.) These add up to a systemic cause, not a random accident.

### d. Other disparities suggest a systemic origin

With respect to Black prospective jurors as compared to Census data, Dr. Weeks found that Blacks in the community made up just 7.9% of the adult community population of the Western Division at the time of Mikhel's trial, but they made up 19.3% of the jury pool, an absolute disparity of 11.4, and a relative disparity of 145%. (Ex. 57 ¶ 13, Table 1.) When compared to the ACS data, Dr. Weeks found that Blacks made up 10.71% of the adult citizen population, and made up 19.27% of the jury venire, which creates an absolute disparity of 8.56, and a relative disparity of 80%. (Ex. 37 ¶ 8, Table 1.) As Dr. Weeks notes, there is zero chance of this disparity occurring purely by chance. (Ex. 37 ¶ 8, Table 1; Ex. 57 ¶ 13, Table 1.)

With respect to White prospective jurors as compared to Census data, Dr. Weeks found that Whites in the community made up 36.5% of the adult community population of the Western Division at the time of Mikhel's trial, but they made up 44.7% of the jury pool, an absolute disparity of 8.2%, and a relative disparity of 23%; there is a .2% chance of this occurring randomly. (Ex. 57 ¶ 13, Table 1.) When compared to the ACS data, Dr. Weeks found that Whites made up 47.90% of the adult citizen population, and made up 44.73% of the jury venire, creating an absolute disparity of -3.17 and a relative disparity of -7%; there is a 14.7% chance of this occurring randomly. (Ex. 37 ¶ 8, Table 1.)

Finally, further disproportionate representation which has zero chance of occurring randomly is found within the "all others" category, regardless of the data set used. As compared to Census data, groups not included in the White, Black, Hispanic, or Asian groups should have come close to the community population of 2.5%; however, this group represented 6.2% of the venire, with an absolute disparity of 3.7 and a relative disparity of 152%. (Ex. 57 ¶ 13, Table 1.) As compared to ACS data, the "all others" group made up 2.21% of the adult citizen population, but represented 6.18% of the venire, with an absolute

214

disparity of 3.97 and a relative disparity of 180%.

The jury wheel in Mikhel's case was composed of voter registration lists from four counties in the district: San Luis Obispo, Santa Barbara County, Ventura County, and Los Angeles County. One juror was also drawn from San Bernardino county.[55] The proportion of jurors called from each of these counties was exactly what was expected for Los Angeles, Ventura, and Santa Barbara counties, based on the overall population of those counties. (Ex. 57 ¶ 24.) The draw from San Luis Obispo was only 1% but should have been 3% based on the overall population of the county.

Dr. Weeks suspects that the disparities discussed above arise from the way jurors were drawn in Los Angeles county, and could be attributed to response rates or the way the master jury wheel was created and drawn from. (Ex. 57 ¶ 25.) Because the jury was anonymous, and undersigned counsel does not have addresses and other data necessary for this calculation, the reason for this unquestionably stark disparity is unknown. (*See* Claim 7; *see also* Dkt. 2469 (pending "Motion to Inspect and Duplicate Court Records.")

> **e.    Exclusive use of voter registration lists created a disparity**

Finally, even if the prospective jurors for Mikhel's jury wheel had been drawn from the voter registration lists using a purely random draw—which, as detailed above, they clearly were not—those voter registration lists themselves were skewed towards excluding minority prospective jurors.

At the time of Mikhel's trial, the Central District used only voter registration lists to compose the jury pool. (*See* Ex. 35, General Order No. 03-12.) In 2004, the Ninth Circuit Jury Trial Improvement Committee found that voter registration lists alone were under-inclusive and recommended that districts supplement voter registration lists with California Department of Motor Vehicle records and that they direct the vendors compiling their jury wheels to run names of prospective jurors through the National Change of Address database to reduce the number of undeliverable questionnaires. Supplementing and refining the

---

[55] The 2003 Jury Plan allows grand jurors, but not petit jurors, to be drawn from the Eastern Division. (Ex. 35, General Order No. 03-12 at 527.)

source list in this way would serve "to increase inclusiveness and to provide better representation of the adult citizen population who are qualified to serve as jurors." (Ex. 160, Ninth Cir. Jury Trial Improvement Comm. at 2552-53.) The Central District did not change its procedures until 2013, when it began to include "registered voters, licensed drivers, and holders of California Identification Cards" in the source lists. (Ex. 36, General Order No. 13-13 at 538.)

As other state and federal jurisdictions have long recognized, pools drawn exclusively from voter rolls systematically underrepresent distinctive groups. Consistent with the disparities seen in Mikhel's jury pool, "[v]oter registration lists . . . consistently underrepresent African-American and Hispanic citizens who would otherwise be eligible to serve as jurors." Nancy J. King, Racial Jurymandering: Cancer or Cure? *A Contemporary Review of Affirmative Action in Jury Selection*, 68 N.Y.U. L. Rev. 707, 712-13 (1993); *see also United States v. Savage*, 970 F.3d 217, 257-58 (3d Cir. 2020) ("[D]rawing on voter registration lists alone might be actionable under some circumstances when use of those lists over time did have the effect of sizably underrepresenting a particular class or group on the jury venire.").

### 4. The disparity is systemic

Although the Ninth Circuit has in the past found insufficient evidence of a fair cross-section violation based only on the use of voter registration lists, *see United States v. Hernandez-Estrada*, 749 F.3d 1154, 1166 (9th Cir. 2014), the expert evidence in this case establishes that Hispanic jurors were significantly underrepresented in Mikhel's jury pool. (*See generally* Ex. 57 ¶¶ 16-22.) Moreover, the disproportionate representation of Black, White, and "all other" jurors in addition to the Hispanic jurors was not only the result of using voter lists: instead, it was the result of a deeply flawed process, and not random bad luck.

### B. Mikhel's trial counsel were ineffective for failing to challenge the venire based on the Fair Cross-Section violation

The fair cross-section claim was a meritorious claim that trial counsel failed to raise. They did not seek to hire an expert to assist them in understanding the demographic problem, nor did they hire a jury consultant who could have assisted them. Counsel did not

216

move to quash the venire or determine what had caused the disparities that were apparent in the courtroom as voir dire was happening. Counsel's performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 668; *Cf. Hinton v. Alabama*, 571 U.S. 263, 275 (2014).

The Guidelines in place at the time of Mikhel's trial specifically provided that "[c]ounsel should consider . . . whether any procedures have been instituted for selection of juries in capital cases that present particular legal bases for challenge," and "particularly those relating to bias on the basis of race or gender." Guideline 10.10.2(A). The Guidelines note that "[s]uch challenges may include challenges to the selection of the grand jury and grand jury forepersons as well as to the selection of the petit jury venire." *Id.* Counsel's failure to act in accordance with the Guidelines by following up on problems with the jury pool—including obviously problems specific to racial composition—constituted deficient performance. *See Wiggins*, 539 U.S. at 522, 524 (2003.)

Mikhel was prejudiced by counsel's failure to challenge the jury wheel. Because trial counsel failed to timely object to the non-random draw in this case, key records related to the jury wheel may have been destroyed. Because Mikhel's Sixth Amendment rights to an impartial jury and his right to the effective assistance of counsel were violated, Mikhel's conviction and death sentence must be vacated.

**C.     Mikhel was denied a fair and impartial jury by the Court's limitations on voir dire**

The capital jury selection process, as informed by *Witt*, *Witherspoon*, and *Morgan*, is insufficient to protect a capital defendant's constitutional rights to a jury which can consider and give effect to mitigation evidence. *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). But while *Lockett* invokes the Eighth Amendment, a capital defendant also has a due process right to a fair sentencing process as well. *Gardner v. Florida*, 430 U.S. 349, 358 (1977). By not allowing a capital defendant to understand what limitations and biases prospective jurors have about mitigation evidence, the defendant's "legitimate interest in the character of the procedure which leads to the imposition of sentence" is violated. *Id.*, *citing Witherspoon*, 391 U.S. at 521-

217

523.

In Mikhel's case, the court firmly disallowed any foray into inquiring about mitigation, whether it was specific to the case or presented as a hypothetical. (*See*, e.g., 08/15/2006 RT 42, 56-59; 204-12; 08/16/2006 RT 56.) As a result, jurors who said they would "consider" mitigation were never given an example of what mitigation might be. Rather, they were only told:

> The word 'mitigate' means to make less severe or to moderate. A mitigating factor, then, is any aspect of the defendant's background, character, or record, any circumstance of the offense, or any other relevant fact or circumstance, which would ten[d] to support the imposition of a sentence of life without the possibility of release.

(08/15/2006 RT 11-12.)

But other than the catch-all "any aspect of the defendant's background, character, or record" the jurors were given no specific examples of mitigation, such as mental health diagnoses, childhood trauma, or the like. On the other hand, because the statutory aggravators were formally plead in the charging papers, the jurors were routinely asked about evidence in aggravation. (*See*, *e.g.*, 08/15/2006 RT 166-68.) While this helped defense counsel understand how jurors felt about that evidence, their picture of the juror's fitness to serve was unbalanced and incomplete, and as a result, they could not exercise their peremptories intelligently.

As a result of this hide-the-ball approach, jurors understood *how* mitigation worked in a legal sense, but they did not understand what constituted mitigation. When the court prevented them from talking about what mitigation and reverted to rehabilitating them by asking if they could follow the court's instructions, the jurors nearly always said yes, and when they did, they were immune from being excused for cause. (*See*, *e.g.*, 08/15/2006 RT 49-50.) But this response was given in a vacuum: jurors were never given information about what mitigation actually was, only that it was "evidence" that might persuade them to vote for life. And, it was apparent that some jurors did not understand mitigation despite the court's definition of it above, and believed mitigation consisted of things that would reduce

218

culpability, like self-defense. (*See*, *e.g.*, 08/16/2006 RT 25-26.) Capital defendants have the right to effective assistance of counsel during voir dire and sentencing. *Gardner* 430 U.S. at 358 (*citing Mempa v. Rhay*, 389 U.S. 128 (1967), and *Specht v. Patterson*, 386 U.S. 605 (1967).)The trial court's refusal to allow inquiry into juror biases regarding mitigation abridged those rights, effectively denying Mikhel a fair trial before the government ever called its first witness.

Because the jurors were not permitted to discuss mitigation during voir dire, many jurors who could have been challenged for cause under *Morgan* were seated, or the defense was forced to speculate about a juror's views based on incomplete information and exercise a peremptory. *See United States v. Martinez-Salazar*, 528 U.S. 304, 316 (2000) ("[T]he seating of any juror who should have been dismissed for cause ... would require reversal"). For example, many jurors admitted having a "burden" impairment at the penalty phase in that they would presume a sentence of death upon conviction of 1st degree murder, or in the case of multiple murders, and told counsel that they would expect the defense to dissuade them from that position. (*See*, 08/17/2006 RT 45.) Had these jurors been allowed to answer questions, for example, about what kind of proof they would require, then the court could apply *Morgan* and determine if they were fit to sit. Instead, defense counsel was repeatedly prevented from making this inquiry, and the jurors who did express a *Morgan*-disqualifying propensity to impose death upon conviction, regardless of mitigation, were rehabilitated with the very questions that *Morgan* disfavored: Can you follow the law. *Morgan v. Illinois*, 504 U.S. 719, 735 (1992). As a result, Mikhel's sentence violates the due process clause and the Sixth and Eighth Amendments of the Constitution, and he is entitled to a new penalty phase trial.

**D.    Mikhel was denied the effective assistance of counsel during voir dire**

Trial counsel failed to ensure that Mikhel's Sixth Amendment rights were protected during voir dire by failing to object to the government's use of racially motivated and gender-based peremptory challenges, challenge biased potential jurors for cause, and appropriately use retained experts.

219

## 1. Legal basis

During voir dire in a capital case, "certain inquiries must be made to effectuate constitutional protections." *Morgan v. Illinois*, 504 U.S. 719, 730 (1992.) Indeed, voir dire "plays a critical function in assuring" that a defendant's Sixth Amendment "right to an impartial jury will be honored." *Id.* (cleaned up.) A defendant has the right to effective counsel during voir dire. *Virgil v. Dretke*, 446 F.3d 598, 610 (5th Cir. 2006). Counsel should raise appropriate *Batson*[56] challenges to prevent the government from excluding jurors based on race and appropriate *J.E.B.* challenges based on gender. *Doe v. Ayers,* 782 F.3d 425, 432 (9th Cir. 2015) (trial counsel's failure to object to prosecutor's peremptory strikes of Black jurors "constituted deficient performance" under *Strickland*). Counsel's duties during voir dire also include objecting to biased jurors. *Virgil*, 446 F.3d at 610; *Thomas v. Lumpkin*, 995 F.3d 432, 445 (5th Cir. 2021) ("a counsel's failure to object to the seating of a juror who expressed an inability to be impartial is ineffective assistance."), Guideline 10.10.2 and Commentary.

## 2. Counsel ineffectively failed to object to the government's discriminatory use of peremptory strikes

After hardship excusals, stipulations to excuse, and challenges for cause, the court randomly drew 167 jurors to participate in the peremptory round and assigned them an order in which to be called to the jury box. (09/01/2006 RT 63-77.) The peremptory round began on September 5, 2006. (09/05/2006 RT 10.) Each side was to have 28 peremptory strikes for the seated jury and 4 strikes for the alternates. (Dkt. 1102 at 2; 09/5/2006 RT 4.) In total, 66 jurors were called to the box during this final round to seat the jury and the alternates. (09/5/2006 RT 1-144.) The jury was seated and sworn after the first 51 jurors were called to the box (09/05/2006 RT 111), and the alternates were selected and sworn after the remaining 15 jurors were called up (09/05/2006 144.)

---

[56] *Batson v. Kentucky*, 476 U.S. 79 (1986.)

Of the 66 total jurors called forward during the peremptory round, the following can be said of their demographic makeup:[57]

| Table A—Government Use of Peremptories by Race, Ethnicity, and Gender | | | | | |
|---|---|---|---|---|---|
| Race, Ethnicity, and Gender | Number of jurors in peremptory round (66 total) | Percent of jurors in peremptory round (66 Total) | Number of jurors struck by government (21 Total) | Percentage of jurors struck (of number present in peremptory round) | Percentage of total strikes (21 Total) |
| Black | 14 | 21% | 6 | 43% | 29% |
| White | 26 | 39% | 3 | 12% | 14% |
| Native Hawaiian/Pacific Islander | 0 | — | — | — | — |
| American Indian/Alaska Native | 0 | — | — | — | — |
| Asian | 7 | 11% | 4 | 57% | 19% |
| Other | 3 | 5% | 2 | 67% | 10% |
| Multi-Race | 4 | 6% | 1 | 25% | 5% |
| Unknown | 12 | 18% | 5 | 42% | 24% |
| Self-ID Hispanic (12 Unk, 1 Other) | 13 | 20% | 5 | 38% | 24% |
| Female | 32 | 48% | 13 | 40% | 62% |
| Male | 33 | 50% | 8 | 24% | 38% |
| No information | 1 | 2% | 0 | — | |

The government used 85% of its strikes (18 of 21) on minorities. Broken down by group, the government struck 42% of the Black jurors (6 of 14); 57% of Asian jurors (4 of 7); and 42% of the combined smaller number of remaining groups (Other, Multi-Race, and Unknown; 8 of 19). There was overlap between the "Other, Multi-Race, and Unknown" group and Hispanic jurors; the government struck 38% of Hispanic jurors (5 of 13). In

---

[57] The peremptory round data can be generally found at (09/05/2006, RT 1-144.) Percentages are rounded to the nearest whole number. Juror numbers are presented in the sequence in which they were called to the jury box during the pertinent part of voir dire being discussed.

221

contrast, the government only struck 12% of the White jurors.

The government struck 40% of the female jurors, and only 24% of the men. Almost two-thirds of those strikes used against minorities (62%) were also of women. Five of the six Black jurors struck were women. Three of the five Hispanic jurors were women, one of the four Asian jurors were women; five of the eight remaining were women. Two of the three White jurors were women.

Following the peremptory round, the entire jury, including the seated jurors and the alternates, was as follows:

| Table B—Final Composition of Jury | | | | |
|---|---|---|---|---|
| **Seat Number** | **Juror Number** | **Race** | **Hispanic Y/N** | **Sex** |
| **1** | **84** | **White** | **N** | **M** |
| **2** | **227** | **Multi** | **N** | **M** |
| **3** | **39** | **White** | **N** | **M** |
| **4** | **197** | **Unknown** | **Y** | **M** |
| **5** | **31** | **White** | **(unreported)** | **F** |
| **6** | **239** | **Black** | **(unreported)** | **F** |
| **7** | **36** | **White** | **N** | **M** |
| **8** | **95** | **Black** | **(unreported)** | **M** |
| **9** | **57** | **Unknown** | **Y** | **M** |
| **10** | **8** | **Asian** | **(unreported)** | **M** |
| **11** | **67** | **Unknown** | **Y** | **M** |
| **12** | **256** | **White** | **N** | **F** |
| Alt 1 | 21 | White | (unreported) | M |
| Alt 2 | 183 | Black | (unreported) | F |
| Alt 3 | 60 | White | N | F |
| Alt 4 | 119 | White | N | F |
| Alt 5 | 23 | White | N | F |
| Alt 6 | 132 | Black | N | M |
| Alt 7 | 45 (alt) | Unknown | Y | F |
| Alt 8 | 131 (alt) | White | N | M |

Following voir dire, the seated jury consisted of 5 White jurors, 2 Black jurors, 3 Hispanic jurors, 1 Asian juror, and 1 juror of multiracial identity, as highlighted in bold type above in Table B. The alternates consisted of 5 White jurors, 2 Black jurors, and 1 Hispanic juror. While the government's heavy-handed use of peremptories to strike minorities and women must have been apparent during the peremptory round, counsel made only one *Batson* challenge, and no challenge to the government's gender-based strikes under *J.E.B.* The *Batson* challenge was denied. (09/05/2006 RT 80.) Because no alternate jurors were needed to reach either verdict, the remainder of the discussion regarding the government's use of peremptories focuses on the strikes used during the selection of the seated jury. However, the government's use of peremptory strikes of alternates continued the pattern discussed here and should have been the subject of continued challenges by the defense. Counsel should have raised a challenge at every available opportunity to ensure that the government was not using racially motivated or gender-based strikes. *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008).

### 3. Analysis of the seated jury

During individual voir dire, the judge sharply limited the attorney's questions to questions about juror views on the death penalty, in accordance with *Witt*, *Witherspoon*, and *Morgan*,[58] as well as limited follow-up on responses on other topics given in the juror questionnaires when specifically requested.

//
//
//
//

---

[58] *Wainwright v. Witt*, 469 U.S. 412 (1985); *Witherspoon v. Illinois*, 391 U.S. 510 (1968); *Morgan v. Illinois*, 504 U.S. 719 (1992).

The seated jurors said the following about their death penalty views during voir dire:

| Table C—Death Views of Seated Jurors | | |
|---|---|---|
| **Juror Number** | **Death Penalty View** | **Demographic Information** |
| 84 | Juror 84 said, "I'm not a hundred percent either way" The juror also agreed that his views on the death penalty were "neutral." | White Male |
| 227 | Juror 227 said, "I could see where you could impose [the death penalty.]" The juror said he was "open to either possible punishment." | Multi-racial Male |
| 39 | Juror 39 said, "Well, I am Catholic. And personally, I am against the death penalty, because I think it's a bad example if somebody—if someone kills something, somebody and then we're going to kill them; we're acting just like they did. However, the law—if the law states it that it's the death penalty I think that we should follow the law. Because we have to follow the law." | White Male |
| 197 | Juror 197 agreed that he did not "have strong feelings about the death penalty" and said that defendants with money "have a better chance of getting off." | Hispanic Male |
| 31 | Juror 31 said she was "neutral" on the death penalty. | White Female |
| 239 | Juror 239 said, "I can't really say if I'm in favor or not. I just know that the laws were created in order to punish individuals if they are found to have broken [the law] in a heinous manner and sometimes it results in the death penalty." | Black Female |
| 36 | Juror 36 said, "I don't have any feelings about the death penalty one way or another. I'm not against it." He also said that she had "an open mind." | White Male |
| 95 | Juror 95 agreed he did not "have any great feelings about [the death penalty]" and that he was "neutral." | Black Male |
| 57 | Juror 57 said, "I have never given it any thought" and agreed that he was "on the fence" about the death penalty." | Hispanic Male |
| 8 | Juror 8 said, "I believe in the death penalty . . . I do believe in capital punishment. I've never had any other view." | Asian Male |
| 67 | Juror 67 said, "Considering the number of murders in this country, the death penalty doesn't seem to deter many" but said he was "fairly neutral on the death penalty." | Hispanic Male |

224

| 256 | Juror 256 said, "I am not for or against the death penalty," that she had "no feelings on it either way" and was "completely neutral." | White Female |

The government exercised 18 of its strikes as the seated jury was selected; those jurors had the following to say about the death penalty:

| Table D—Death Views of Jurors Struck by government | | |
|---|---|---|
| **Juror Number** | **Death Penalty View** | **Available Demographic Information** |
| 30 | Juror 30 said she didn't "want to be the one to say . . . you have to die today" but that she could impose the death penalty. | Hispanic Female |
| 112 | Juror 112 said she had "no feelings one way or the other, either for or against the death penalty" | Black Female |
| 2 | Juror 2, who the government had challenged for cause unsuccessfully during individual voir dire, said it would be "hard to impose" the death penalty, but also that he would automatically vote for the death penalty in the case of multiple murders. | Hispanic Male |
| 164 | "I don't really have any views either way." | Asian Male |
| 10 | "It will be difficult" but could do it. | Hispanic Female |
| 172 | "Neutral" | Asian Male |
| 115 | When asked if she had "leanings one way or the other for the death penalty," Juror 115 replied "No, not one way or the other. I'm kind of middle road" agreed she was "neutral." | Black Female |
| 174 | Juror 174 said, "I do not have any beliefs or value systems that make me sway one way or another" and "I don't think I have any predisposition" and "would not have substantial difficulty" imposing the death penalty. | Asian Female |
| 193 | Juror 193 said she "wasn't a death penalty advocate" and said she was "neutral" on the subject. | Black Female |
| 90 | Juror 90 had no "feelings about the death penalty one way or the other." | White Female |
| 241 | Juror 241 said, "it's not easy to say whether the person deserves it or not" | Hispanic Female |
| 116 | Juror 116 said the death penalty was "sometimes necessary and just" and said that the indictments | White Male |

225

| | | |
|---|---|---|
| | themselves made him think that one or both defendants might be guilty. | |
| 285 | Juror 285 said she was "completely neutral" on the death penalty | Black Female |
| 142 | Juror 142 said that he would have difficulty in overcoming the logic of taking another life by imposing the death penalty, but that he could do it. | Multiracial Male |
| 217 | Juror 217 said she "had problems" with the death penalty but that she could impose it. | "Other" Non-Hispanic Female |
| 100 | Juror 100 said he was in favor of the death penalty "in a case of extreme cruelty caused to the victim" or when there was "malicious intent" or the defendant "set out to kill someone purposely." | Black Male |
| 206 | The government unsuccessfully challenged this juror for cause, who said that he had problems with both the death penalty or life without parole, even though he also said he could impose either sentence. | Asian Male |
| 216 | Juror 216 expressed some fear about being the only one to decide, but also said, I think you have to hear it all out before you can actually say, 'yes, give him the death penalty'" and that she did not lean either way in favor of the death penalty. | Black Female |

### a. The prosecutor struck a disproportionate number of Black jurors

Amongst the five White seated jurors (Juror numbers 31, 256, 84, 36, and 39), four held views which were neutral or equivocal about the death penalty: Juror 31 said she was "neutral" on the death penalty; Juror 256 said, "I am not for or against the death penalty;" Juror 84 said "I'm not a hundred percent either way;" Juror 36 said, "I don't have any feelings about the death penalty one way or another." The fifth of the White jurors, number 39, stated *opposition* to the death penalty (although he said he could impose it if the law required it): "Well, I am Catholic. And personally, I am against the death penalty, because I think it's a bad example if somebody—if someone kills something, somebody and then we're going to kill them; we're acting just like they did." Two Black jurors that avoided the prosecutor's strikes were also neutral: Juror 239 said, "I can't really say if I'm

226

in favor or not," and Juror 95 agreed he did not "have any great feelings about [the death penalty]" and that he was "neutral."

However, the government inexplicably struck six Black jurors who expressed neutral views like those of the five White seated jurors and other unseated jurors that the government chose not to strike. Juror 112 said she had "no feelings one way or the other, either for or against the death penalty;" Juror 115 said she did not have leanings one way or the other, and that she was "middle road;" Juror 193 said she "wasn't a death penalty advocate but there are times it should come into play" and that she was "neutral" on the subject; Juror 285 said she was "completely neutral" on the death penalty; Juror 216 said she did not lean either way in favor of the death penalty; and Juror 100 said he was simply in favor of the death penalty "in a case of extreme cruelty caused to the victim" or when there was "malicious intent" or the defendant "set out to kill someone purposely."

The defense made only one *Batson* objection when the government struck Juror 285, the fourth of its six strikes against Black jurors. (09/05/2006 RT 80-81.) The government claimed she was "lukewarm" on the death penalty (although she had claimed to be "completely neutral") and said that it was concerned over a note on the jury questionnaire that her father was incarcerated on drug charges, even though other White jurors also had family members who had contacts with the criminal justice system, such as Jurors 8, 67, and 39. (Dkt. 1629) Counsel did not object or make an offer of proof regarding these inconsistencies. (09/05/2006 RT 81.)

When the government struck Juror 285, it had already declined to strike nine similarly neutral White jurors at that point in the process: Jurors 84, 110, 256, 53, 16, 242, 120, 36, and 31. As voir dire continued, the government struck two more Black jurors, without a *Batson* challenge from the defense, even though one of those Black jurors, number 100, was not neutral because he was in *favor* of the death penalty for a case like Mikhel's.

### b.     The prosecution struck a disproportionate number of Hispanic, Asian, and women jurors

*Hispanic jurors.* Nine Hispanic jurors (30, 2, 3, 10, 241, 197, 261, 218, and 79) were called to the jury box during the peremptory round. The government struck four of these jurors, Juror numbers 30, 2, 10, and 241. While each of these four jurors expressed that the decision would be difficult to make, because it involved taking a life, none of them said they could not impose the death penalty. In fact, Juror 2 said in her questionnaire that she was inclined to impose death *automatically* in cases of multiple murders.

*Asian jurors.* The government struck three of the four Asian jurors in the peremptory round. Juror number 164 said, "I don't really have views either way." Juror 172 said he was neutral on the death penalty. Juror 206 said he was not in favor of either life without parole or the death penalty. Counsel should have challenged the government's strikes, at least regarding Jurors 164 and 172.

*Other groups.* The government used a peremptory strike against Juror 142, who had marked that he was multi-racial, despite the fact that, like White Juror 39, he was morally against the death penalty: "It's tough to justify killing someone because they killed someone" but could, nonetheless, impose the death penalty.

*Female jurors.* Of the 20 women called to the jury box during the peremptory round, the government struck 11 of them. Of those women, Jurors 30, 112, 115, 174, 193, 90, 285, and 216 said they were neutral in one way or another; the remaining female jurors expressed that the decision would be difficult for them but said they could impose the death penalty.

Counsel should have challenged most, if not all, of these strikes. *Batson*, 476 U.S. 79; *J.E.B.* 114 S.Ct. 1419. Relief is required if even one juror was removed for an improper purpose. *See Snyder v. Louisiana*, 552 U.S. 472, 478 (2008) ("The Constitution forbids striking even a single prospective juror for a discriminatory purpose.").

### c.   Reasonable counsel would have objected to the prosecutor's peremptory strikes of female jurors and jurors of color

These statistics alone create an inference of discrimination. *See, e.g., Miller-El II*, 545 U.S. at 240 (noting that "happenstance" was unlikely to explain prosecutor's use of ten peremptory challenges to remove most of the African-American prospective jurors.) At the very least, the prosecution should have been called on to explain their use of peremptory strikes to exclude most of the Black prospective jurors from the jury, particularly where those strikes appeared to be motivated by race because each of these jurors had expressed their ability to be impartial.

Counsel's failure to challenge the government's peremptory strikes under *Batson* and *J.E.B.* constitutes deficient performance under *Strickland*, 466 U.S. 668. Because there was only one objection late in the selection process, the prosecution was never called upon to justify these strikes, and the court never determined whether the strikes were motivated by racial, ethnic, or gender-based stereotypes.[59] The "rule in *Batson* provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it." *Miller-El,* 545 U.S. at 251-52.

A *Batson* violation renders the proceedings fundamentally unfair. When trial counsel's deficient performance results in a structural error, the prejudice prong of a *Strickland* claim can be presumed. *See Weaver v. Massachusetts*, 582 U.S. 286, 301 (2017) (reaffirming "the Court's precedents determining that certain errors are deemed structural and require reversal" without a showing of prejudice "because they cause fundamental unfairness, either to the defendant in the specific case or by pervasive undermining of the systemic requirements of a fair and open judicial process.") Where, as here, a prima facie case for a *Batson* violation has been made and the record is silent on the trial court's findings, the appropriate remedy is a new trial. *Snyder*, 552 U.S. at 485. At the very least,

---

[59] All of the Hispanic jurors that the government struck were also women, doubling counsel's responsibility to challenge the government's strikes under both *Batson* and *J.E.B.*

229

this Court should "require[] the prosecutor to come forward with a neutral explanation" for these strikes. *Government of Virgin Islands v. Forte*, 865 F.2d 59, 64 (3d Cir. 1989) (explaining that the appropriate remedy for ineffectively failing to raise a *Batson* challenge is "to give [the defendant] what he should have gotten in the first place, an explanation from the prosecutor as to why [he] used [his] peremptory challenges and a ruling by the court on whether [the defendant] has established that there was purposeful discrimination.")

**E.   Counsel were ineffective for failing to conduct adequate voir dire**

Counsel were ineffective for failing to challenge seated Jurors 227, 39, 197, 57, 67, and 256 (Dkt. 1629) for cause or to exercise one of their available peremptories because of their family contacts with law enforcement. Counsel should not have allowed Juror 100 to remain on the jury because he was in favor of the death penalty.

Counsel provided deficient performance in failing to challenge jurors for cause and failing to exercise available peremptory strikes against jurors who were biased against others on the basis of ethnicity, national origin, religious, or political beliefs.

Counsel had 9 strikes left when it accepted the jury. (09/05/2006 RT 110-11). There were plenty of strikes with which to ensure biased jurors did not sit. There was no strategic reason for counsel failing to challenge these jurors for cause or exercise peremptory strikes on them.

**F.   Counsel failed to appropriately consult with retained experts**

Counsel failed to retain an expert to assist in the preparation of the jury questionnaire, to prepare for voir dire, and to conduct voir dire. Had they done so, not only would they have discovered that the jury pool in Mikhel's case did not represent a fair cross-section of the community and that the Central District did not employ the required random selection procedure to compose Mikhel's jury pool (*see* Claim 7), they would have identified the claims discussed here.

Counsel's failure to adequately consult with experts to prepare and conduct voir dire was deficient performance. *Cf. Hinton v. Alabama*, 571 U.S. 263, 275 (2014). Effective use of such an expert would have enabled counsel to better identify biased jurors through

230

written questionnaires and live voir dire, and then challenge those jurors for cause and make effective use of their peremptory strikes.

## G.  Prejudice

To establish prejudice, a petitioner typically must establish that a biased juror was seated. However, prejudice can also be shown if the cumulative prejudice of defense counsel's deficiencies rendered the proceeding fundamentally unfair, even without a specific showing of juror bias. *See, e.g., Ramseyer v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995) Here, Mikhel can establish prejudice because, as detailed above, the government exercised racially motivated and gender-based strikes, and counsel failed to challenge those properly. *Batson*, 476 U.S. 79; *J.E.B.* 114 S.Ct. 1419. Additionally, there were seated jurors who were biased because of their relationships with law enforcement officers. And at least one seated juror was biased in favor of the death penalty. *See Virgil*, 446 F.3d 598 at 609. Taken together, counsel's failures deprived Mikhel of the right to an "adequate voir dire," *Morgan*, 504 U.S. at 729 (1992), and prejudiced Mikhel. Mikhel is entitled to a new trial.

## CLAIM 13: JUROR MISCONDUCT

Mikhel's conviction and death sentence were imposed in violation of the Fifth, Sixth, and Eighth Amendments of the Constitution due to juror misconduct and juror bias during both phases of his trial. Mikhel makes these allegations on information and belief. He has been unable to develop the factual basis of this claim because the jurors' names and contact information remain sealed as of this filing. This Court denied his motion for limited disclosure of juror names in an order dated July 30, 2020. (Dkt. 2375.) As the Court acknowledged in that order, Rule 6(a) permits discovery on a showing of "good cause," after the filing of a motion for collateral relief under § 2255. (Dkt. 2375 at 3 n.2.) After the filing of his motion under § 2255, Mikhel will renew his motion for disclosure of juror identifying information as a request for discovery under Rule 6(a). He will seek leave to amend this motion to incorporate specific allegations of juror misconduct once he has had an opportunity to interview the jurors.

231

Mikhel alleges that jurors committed misconduct by failing to disclose material information on voir dire, engaging in premature jury deliberations, considering extrinsic evidence (including exposure to pretrial publicity), visiting the crime scenes and experimenting with evidence, discussing the case or consulting with third parties, failing to follow court instructions not to prejudge the case or Mikhel, allowing racial prejudice and/or ethnic bias to influence their decision, and allowing considerations of cost to influence their penalty decision. Mikhel is entitled to relief. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 225 (2017); *Mitchell v. United States*, 526 U.S. 314, 328 (1999); *Parker v. Gladden*, 385 U.S. 363, 364-65 (1966); *Griffin v. California*, 380 U.S. 609, 613 (1965); *Mattox v. United States*, 146 U.S. 140, 150 (1892.)

Mikhel also alleges that persons with a bias against him remained on the jury, making the jury abnormally prone to finding him guilty and sentencing him to death. This is evidenced by the extraordinary outcome at the penalty phase, where the jury unanimously found an absence of mitigating circumstances for Mikhel. (02/13/2007 RT 88-92.) Not one juror found that any of the 18 factors in mitigation had been proven by a preponderance of the evidence. Factors that the jury unanimously rejected include the following:

- "Ainar Altmanis was intimately involved in each of the murders for which Iouri Mikhel faces the death penalty, but Altmanis has made deals with both the state and federal authorities to avoid capital punishment. He faces a maximum of 20 years in custody for his state conviction." (02/13/2007 RT 88.)

- "Iouri Mikhel has suffered catastrophic loss of close family members at a young age. His father died when Mr. Mikhel was 11 years old; his grandmother died when Mr. Mikhel was 13; his mother passed away when Mr. Mikhel was 27 years old. In addition, Mr. Mikhel's brother died at the age of 46." (02/13/2007 RT 88-89.)

232

- "Iouri Mikhel was neglected and abandoned for the first 18 years of his life, living in orphanage-like boarding schools along with extended stays in hospitals for physical problems." (02/13/2007 RT 89.)

The jury's unanimous rejection of these factors, which are objectively mitigating, indicates an open defiance of the penalty-phase jury instructions and overt bias in favor of the prosecution. Mikhel is entitled to relief based on juror bias and misconduct.

**CLAIM 14: MIKHEL WAS PLACED IN VISIBLE RESTRAINTS AT TRIAL, IN VIOLATION OF HIS RIGHT TO DUE PROCESS**

The use of visible restraints at trial violated Mikhel's rights under the Fifth, Sixth, and Eighth Amendments.

"[N]o person should be tried while shackled and gagged except as a last resort." *Illinois v. Allen*, 397 U.S. 337, 344 (1970). Shackling a defendant is "an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold." *Id.* Accordingly, a defendant may be shackled only after a showing of "substantial need." *Estelle v. Williams*, 425 U.S. 501, 505 (1976); *see McKaskle v. Wiggins*, 465 U.S. 168, 178-79 (1984) ("[T]he courts have recognized that a defendant has a right to be present at all important stages of trial, . . . that he may not normally be forced to appear in court in shackles or prison garb, . . . and that he has a right to present testimony in his own behalf." (internal citations omitted)). Trial judges are required to make specific findings to justify shackling a particular defendant. *Deck v. Missouri*, 544 U.S. 622, 629, 633 (2005). The showing of substantial need required to justify shackling is only satisfied by "an essential state interest specific to each trial." *Holbrook v. Flynn*, 475 U.S. 560, 568-69 (1986); *see also Rhoden v. Rowland*, 172 F.3d 633, 636 (9th Cir. 1999). "[D]ue process requires the trial court to engage in an analysis of the security risks posed by the defendant and to consider less restrictive alternatives before permitting a defendant to be restrained." *Id.*

Shackling a defendant in front of the jury is inherently prejudicial: "'[T]he consequences of compelling a defendant to wear prison clothing' or of forcing him to stand trial while medicated . . . 'cannot be shown from a trial transcript.'" *Deck*, 544 U.S. at

233

635 (quoting *Riggins v. Nevada*, 504 U.S. 127, 137 (1992).) "[S]hackling during trial carries a high risk of prejudice because it indicates that the court believes there is a 'need to separate the defendant from the community at large, creating an inherent danger that a jury may form the impression that the defendant is dangerous or untrustworthy.'" *Dyas v. Poole*, 317 F.3d 934, 937 (9th Cir. 2003) (per curiam) (quoting *Rhoden*, 172 F.3d at 636).

Mikhel was restrained at trial. (Ex. 165, R. Callahan Decl., ¶ 30 (recounting that Mikhel wore ankle chains throughout all phases of the trial).) On information and belief, Mikhel alleges that these restraints were visible to the jury and that visible shackling prejudiced the jury against him, in violation of his right to due process. Trial counsel were ineffective for failing to object to the improper shackling.

Mikhel is unable to plead this claim with any more specificity until he is granted access to juror identifying information and allowed to interview the jurors in this matter.

## CLAIM 15: MIKHEL WAS DENIED THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

To the extent the government maintains that any claim asserted in this Motion could have been raised on direct appeal, Mikhel's appellate counsel were ineffective for failing to raise that claim.

A criminal appellant is entitled to the effective assistance of counsel in his direct appeal. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). Effective appellate counsel in capital cases is especially important because of "the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally." *Parker v. Dugger*, 498 U.S. 308, 321 (1991). Counsel may narrow the issues to "maximize the likelihood of success on appeal." *Id.* at 288. However, particularly in a capital case, there can be no reasonable strategy for failing to raise a meritorious issue on appeal. *See Greer v. Mitchell*, 264 F.3d 663, 679 (6th Cir. 2001) ("[I]n a capital case . . . appellate attorneys must err on the side of inclusion particularly where, as here, there appear to exist a significant number of facts to support the claim.")

234

Claims of ineffective assistance of appellate counsel are evaluated using the *Strickland* standard. In this context, appellate counsel provides deficient performance where he or she fails to assert "nonfrivolous issues" on appeal. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). Prejudice requires a showing of a "reasonable probability" that the appellant would have prevailed on direct appeal but for counsel's deficient performance. *Id.*

Each claim asserted in this Motion is meritorious. To the extent the claim could have been asserted on direct appeal, prior counsel provided deficient performance in failing to assert all "nonfrivolous issues" on appeal, and Mikhel is entitled to relief based on his related claim of ineffective assistance of appellate counsel.

## CLAIM 16: MIKHEL IS ENTITLED TO RELIEF BASED ON THE PRESENTATION OF FAULTY FORENSIC EVIDENCE AT TRIAL

Mikhel is entitled to relief from his convictions and sentence based on the presentation of faulty forensic evidence at his trial, in violation of his right to due process and his rights under the Fifth, Sixth, and Eighth Amendments.

### A.    Legal basis

"[H]abeas petitioners can allege a constitutional violation from the introduction of flawed expert testimony at trial if they show that the introduction of this evidence 'undermined the fundamental fairness of the entire trial.'" *Gimenez v. Ochoa*, 821 F.3d 1136, 1144 (9th Cir. 2016) (quoting *Albrecht v. Horn*, 485 F.3d 103, 124 n.7 (3d Cir. 2007)). Subsequent scientific developments that undermine confidence in the forensic science evidence presented at trial give rise to a claim for relief under the due process clause. *Id.*

### B.    Facts currently known in support of the claim

Mikhel incorporates by reference the facts in support of Claim 4, alleging that trial counsel failed to challenge the government's presentation of false and misleading forensic science evidence.

In 2009, the National Academy of Science published a report ("NAS Report") finding that "[w]ith the exception of nuclear DNA analysis, . . . no forensic method has

235

been rigorously shown to have the capacity to consistently, and with a high degree of certainty, demonstrate a connection between evidence and a specific individual or source."[60]

In 2016, the President's Council of Advisors on Science and Technology issued a report ("PCAST Report") expanding on the findings of the NAS Report. The report's aims were two-fold: (1) clarifying scientific standards for the validity and reliability of forensic methods; and (2) evaluating the validity and reliability of specific forensic methods, specifically "feature-comparison" methods, which are "methods that attempt to determine whether an evidentiary sample . . . is or is not associated with a potential 'source' sample."[61]

The PCAST Report distinguishes between two types of feature-comparison methods: objective and subjective. Objective methods are "defined with enough standardized and quantifiable detail that they can be performed by either an automated system or human examiners exercising little or no judgment." Subjective methods are those that "involve significant human judgment."[62]

Validation of subjective methods requires "'black-box studies,' in which many examiners render decisions about many independent tests (typically, involving 'questioned' samples and one or more 'known' samples) and the error rates are determined."[63] If error and false-positive rates are not reported, a "match" is not scientifically valid: "Without appropriate estimates of accuracy, an examiner's statement that two samples are similar— or even indistinguishable—is scientifically meaningless: it has no probative value and

---

[60] National Research Council of the National Academies, *Strengthening Forensic Science in the United States: A Path Forward*, 7 (2009) https://www.ojp.gov/pdffiles1/nij/grants/228091.pdf (accessed September 29, 2023).

[61] President's Council of Advisors on Science and Technology, *Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods*. https://obamawhitehouse.archives.gov/sites/default/files/microsites/ostp/PCAST/pcast forensic_science_report_final.pdf (accessed September 29, 2023).

[62] *Id.* at 18 n.3.

[63] *Id.* at 18-19.

236

considerable potential for prejudicial impact."[64] This is because, without such analysis, it is impossible to determine the level of accuracy of each purported finding and whether such findings adhere to replicable determinations that abide by the scientific method. While the PCAST Report focused specifically on bitemark comparisons, latent fingerprint analysis, firearms, and footwear analysis, the approach outlined in the PCAST report "could be applied to assess the foundational validity and validity as applied of any forensic feature-comparison method . . ."[65]

At Mikhel's trial, the prosecution presented the results of forensic feature-comparison analysis for several items of evidence, including (1) a purported match between latent fingerprints found on two items of evidence (an envelope and a wrench) and Mikhel's known exemplar; (2) a purported match between a shoeprint found on the Parrott's Ferry Bridge and a shoe seized from Kadamovas's residence; (3) handwriting analysis purporting to match items of evidence to Mikhel and Kadamovas's known exemplars; and (4) trace evidence comparisons of hairs and fibers retrieved from the victims and the crime scenes. (11/30/2006 RT 77-83 (latent fingerprint on envelope); 12/08/2006 RT 29-36 (latent fingerprint on wrench); 10/24/2006 RT 112-30 (shoe print); 11/30/2006 RT 143-64, 169-200 (handwriting analysis); 11/30/2006 RT 36-59 (trace evidence).)

The government presented no "black box" studies to demonstrate that these "feature comparison" methods were properly validated. The government's testifying experts reported matches between known and questioned items of evidence, but they failed to report their error and false-positive rates. Following the PCAST Report's guidance, in the absence of error and false-positive rates, the reporting of a match is "scientifically meaningless."

[64] *Id.* at 19.
[65] *Id.* at 21.

237

The analysis of latent fingerprint evidence in this case is particularly troubling. Alison Rees, an ATF and FBI fingerprint examiner, testified that she compared a latent lift retrieved from an envelope (Trial Ex. 253) to a known exemplar from Mikhel's left ring finger. (11/30/2006 RT 77.) She concluded that these prints are identical, to the exclusion of all others: "I've concluded that the latent fingerprint that was developed on the envelope was made *to the exclusion of all other fingers* other than the left ring finger of Mr. Mikhel." (11/30/2006 RT 83 (emphasis added).) Rees reported no error or false-positive rates for her analysis of fingerprint evidence.

Later, Ruben Sanchez, an LAPD latent fingerprint expert, testified that he conducted a comparison between Mikhel's known exemplar and a wrench used during the attempt to escape from MDC. He found a match. (12/08/2006 RT 29-36.) Like Rees, he did not report errors or false-positive rates for his findings.

Research since the time of trial casts significant doubt on the accuracy of this testimony. In particular, Rees purported finding of a match "to the exclusion of all other fingers" is improper testimony and has no basis invalid science. The 2009 NAS Report concluded that "no forensic method other than nuclear DNA analysis has been rigorously shown to have the capacity to consistently and with a high degree of certainty support conclusions about 'individualization.'"[66] The National Institute of Standards and Technology ("NIST") reached a similar conclusion in a study published in 2012: "Because empirical evidence and statistical reasoning do not support a source attribution to the exclusion of all other individuals in the world, *latent print examiners should not report or testify, directly or by implication, to a source attribution to the exclusion of all others in the world.*"[67]

---

[66] NAS Report, *supra* note 1, at 8.

[67] National Institute of Standards and Technology, *Latent Print Examination and Human Factors: Improving the Practice through a Systems Approach*, 72 (Feb. 2012), https://nvlpubs.nist.gov/nistpubs/ir/2012/NIST.IR.7842.pdf (accessed September 29, 2023) (emphasis added).

238

In 2016, PCAST concluded that latent fingerprint analysis "is a foundationally valid subjective methodology."[68] However, the PCAST report raised significant concerns with the validity of fingerprint analysis as applied in practice. Latent print examination in practice has an alarmingly high false-positive rate. At the time of its publication, in 2016, only 2 properly designed studies of the accuracy of latent fingerprint analysis have been conducted. These 2 studies found false positive rates that could be as high as 1 in 306 in one study and 1 in 18 in another.[69]

Failure to report false-positive rates to jurors has significant consequences because of the widespread misperception that this evidence is infallible. As the PCAST report explains, "empirically estimated false positive rates are *much higher* than the general public (and, by extension, most jurors) would likely believe based on longstanding claims about the accuracy of fingerprint analysis."[70] The PCAST Report also notes the problem of cognitive bias in fingerprint analysis. At the time of publication, no labs conducted truly blind verification programs.[71]

The prosecution made extensive use of forensic science evidence to convict Mikhel and his co-defendants. Later developments in the field of forensic science, as summarized in the NAS and PCAST Reports, cast significant doubt on the reliability of this evidence. Because introduction of unreliable and inaccurate scientific evidence "undermined the fundamental fairness of the entire trial," Mikhel is entitled to relief from his convictions and sentences. *Gimenez*, 821 F.3d at 1144.

**CLAIM 17: THE FEDERAL DEATH PENALTY ACT AND ITS ADMINISTRATION ARE UNCONSTITUTIONAL**

Mikhel's death sentence was imposed in violation of the Eighth Amendment because the Federal Death Penalty Act ("FDPA") fails to meaningfully narrow the class of

---

[68] PCAST Report, *supra* note 2, at 9.

[69] *Id.* at 96.

[70] *Id.* at 95 (emphasis in original).

[71] *Id.* at 96.

239

death-eligible homicides, and Mikhel's death sentence was imposed in an arbitrary and capricious manner.

## A.      Legal basis

The Eighth Amendment prohibits the imposition of a death sentence unless the governing statute reasonably justifies the imposition of a more severe sentence on the defendant compared to others found guilty of murder. "To pass constitutional muster, a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder,'" and thereby suitably guide the sentencer's discretion. *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988) (quoting *Zant v. Stephens*, 462 U.S. 862, 877 (1983)); *Furman v. Georgia*, 408 U.S. 238 (1972.)

Since *Furman v. Georgia*, the Supreme Court has required any statute governing imposition of the death penalty to "tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980.) The statute "must channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death." *Id.* (quotations and footnotes omitted); *Gregg v. Georgia*, 428 U.S.153, 192 (1976) (opinion of Stewart, Powell & Stevens, JJ.); *Id.* at 222 (opinion of White, J., Burger, C.J., & Rehnquist, J.)

## B.      The FDPA fails to narrow the class of death-eligible offenders in violation of Mikhel's Eighth Amendment rights

Under *Furman*, the Court held that the death penalty could no longer be "wantonly and freakishly impose[d]"; instead, its imposition must "always [be] circumscribed by the legislative guidelines." *Id.* at 206-07. Thus, aggravating factors must be narrowly and precisely defined. *Godfrey*, 446 U.S. at 429; *Zant v. Stephens*, 462 U.S. 862, 877-78 & n.15 (1983.)

Under the FDPA, however, aggravating factors are not narrowly and precisely defined. The FDPA sets forth sixteen statutory aggravating factors that make a wide swath

240

of homicides death-eligible, including felony murder, financial gain from the offense, and prior conviction for two felony drug offenses. In addition to these sixteen statutory aggravators, the FDPA permits consideration of "any other aggravating factor for which notice has been given." 18 U.S.C. § 3592. As a result of the extraordinary breadth of the statute, individual federal prosecutors are afforded virtually unfettered discretion in deciding whether to seek death, creating a substantial risk of arbitrariness. Particularly considering that the FDPA includes a catch-all aggravating factor, virtually any murder could be charged capitally under the FDPA. The FDPA thus unconstitutionally fails to narrow the class of murders for which the death penalty may be imposed.

## C. Because the FDPA fails to narrow those who are death eligible, the death penalty is arbitrary and capricious as applied to Mikhel

While the broadness of the FDPA's aggravating factors means that nearly any federally charged murder could qualify as a capital offense, in practice, federal death sentences are exceedingly rare. Indeed, "[t]he infrequency of the federal death penalty—with 67 federal death sentences in the face of over 150,000 murders—makes death by lightning strike look positively routine." G. Ben Cohen and Robert J. Smith, *The Racial Geography of the Federal Death Penalty*, 85 Wash. L. Rev. 425, 431 (2010.) Mikhel's death sentence was imposed in violation of the Eighth Amendment because it was applied on the basis of arbitrary factors, including the location of Mikhel's crime.

The authorization and imposition of death have consistently been a Southern phenomenon. Since 1927, there have been 63 federal executions. In a study of this issue published in 2010, the authors note:

> Geographic disparities . . . persist. To promote uniformity, United States Attorneys submit all death-eligible federal cases to the United States Attorney General for death authorization. Yet the geography of the federal death penalty is anything but uniform. Six of the ninety-four federal judicial districts account for one-third of death-authorizations. More than half of all death-authorizations come from fourteen federal districts. Seven federal districts are responsible for approximately 40% of the individuals on federal death row. Two-thirds of districts have not sentenced anyone to death.

Cohen & Smith, *The Racial Geography of the Federal Death Penalty*, 85 Wash. L. Rev. at 429–30.

241

Part of this problem stems from certain jurisdictions *seeking* death authorization much more frequently than others, so the centralized review process is unable to effectively counter this source of geographic disparity. As a result, "[n]early one-third of federal districts have not sought a death sentence. Fewer than 20% of federal districts have sentenced more than one person to death." Cohen & Smith, *The Racial Geography of the Federal Death Penalty*, 85 Wash. L. Rev. 425, 429–30 (2010.)

Because charging practices differ widely across districts and some districts never seek death sentences at all, constitutionally relevant factors such as culpability are not determinative.

In addition to geography, the race of both the defendant and the victim factors heavily into whether the death penalty is imposed. Defendants who, like Mikhel, were convicted of killing a white victim "are more likely to be sentenced to death" than those convicted of killing a black victim. Cohen & Smith, *The Racial Geography of the Federal Death Penalty*, 85 Wash. L. Rev. 425, 428 (2010.) Finally, as more fully explained in the claims raised in this motion, additional arbitrary factors unrelated to Mikhel's culpability factored heavily into the sentencing result in this case. For example, the failure of Mikhel's counsel to develop mitigating evidence, to request appropriate jury instructions, and to ensure that the jury was unbiased all influenced the jury's ultimate decision to sentence Mikhel to death.

These kinds of disparities led one federal judge to conclude, "It is undeniable that there is no principled way to distinguish the few cases in which death is the result from the many equally abhorrent cases in which it is not." *United States v. Fell*, 224 F. Supp. 3d 327, 341 (D. Vt. 2016).

In *Fell*, the court found that the most striking evidence of arbitrary application of the death sentence involves cases such as Mikhel's in which there were multiple victims. *Id.* at 340-41. "The death of multiple victims is a statutory aggravating factor for homicide, 18 U.S.C. § 3592(c)(16), and a frequent feature of cases authorized for the federal death penalty." *Id.* 340-41 (D. Vt. 2016). According to the court in *Fell*, "it becomes obvious that there are no identifiable, objective criteria which distinguish one multiple homicides which

resulted in the death penalty from the great majority which did not." *Id.* at 341. The *Fell* court continued:

> Defendants involved in drug and gang-related violence were relatively more likely to receive life sentences than death, but there were instances of death sentences for some gang leaders. Two political terrorists responsible for multiple bombing deaths (McVeigh and Tsarnaev) received the death penalty but the Unabomber (Kaczynski) did not.

*Id.* at 341.

In response, the government in *Fell* argued that the decision whether or not to seek death in individual cases "are based on multiple factors unique to each case":

> [H]ow could you possibly quantify strength of evidence in a given case? How do you mathematically assess the value of cooperator testimony by one cooperator versus cooperator testimony by two or three who corroborate each other? How do you quantify corroborator testimony as compared to independent facts on the ground that can corroborate the color of the car or the type of gun that was used? The point I am asking you to consider is there are enumerable myriad factors that go into the decision making process that are simply unquantifiable?

*United States v. Fell*, 224 F. Supp. 3d at 341.

But as the *Fell* court concluded, "[t]he defense could not have made the point more clearly: the decision to impose death is subjective, multi-factorial, unreproducible, and, for these reasons, irremediably arbitrary. " *Id.* at 341.

None of the factors that the government articulated in *Fell* serve to advance any of the penological interests the Supreme Court has found as justifications for the death penalty. *Gregg v. Georgia,* 428 U.S. 153, 183 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.), identified "retribution and deterrence of capital crimes by prospective offenders" as the social purposes served by the death penalty.)

The pattern of arbitrarily deciding in which case to seek death has not ameliorated since the *Fell* court conducted an evidentiary hearing. To the contrary; as the chart in Ex. 174 indicates, the cases in which the government has sought death do not reflect any discernable principle through which DOJ is advancing the penological interest that justifies the death penalty. The decisions seem so random that DOJ is advancing neither

243

retribution nor deterrence by its decision making process.

Because geography and other factors unrelated to Mikhel's culpability factored so heavily into the determination of his sentence, and because the FDPA fails to meaningfully narrow the class of defendants eligible for the death penalty, the government's administration of the federal death penalty as applied to Mikhel is arbitrary and capricious. *See Glossip v. Gross*, 576 U.S. 863, 908-78 (2015) (Breyer, J. dissenting) (constitutionally impermissible factors, such as race and geography, dictate who receives the death penalty, instead of permissible factors like the aggravation of the crime.) Mikhel's rights under the Eighth Amendment were violated, and his death sentence must be vacated.

## CLAIM 18: CUMULATIVE ERROR

Mikhel's convictions, confinement, and sentence violate the Fifth, Sixth, and Eighth Amendments of the United States Constitution because of the cumulative impact of the errors that occurred throughout his capital trial.

*Chambers v. Mississippi*, 410 U.S. 284 (1973), held that "the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007). The cumulative impact of multiple errors may violate due process, even when no individual error rises to the level of a constitutional violation that would warrant habeas relief. *Id.* "[T]he fundamental question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense 'far less persuasive[.]'" *Id.* at 928 (quoting *Chambers*, 410 U.S. at 294.)

Mikhel has identified numerous errors that occurred during the guilt and penalty phases of his trial, as set forth in Claims 1 through 17 above, which are incorporated here by reference. The cumulative impact of these combined errors violated Mikhel's rights to due process, a fair trial, the right to confront the evidence against him, a fair and impartial jury, and a fair and reliable guilt and penalty determination.

Assuming the harmless error doctrine applies to this claim, the combined weight of the errors at Mikhel's trial resulted in prejudice at both the guilt and penalty phases of

244

Mikhel's trial. Because Mikhel's rights under the Fifth, Sixth, and Eighth Amendments were violated, and the error was not harmless, this Court must vacate his convictions and death sentence.

## VII  PRAYER FOR RELIEF

1.      WHEREFORE, Defendant/movant Iouri Mikhel asks that this Court provide the following relief:

2.      Permit him to file this 2255 Motion and allow him reasonable time to file any appropriate amendments, an appendix with documents supporting his Motion, and a memorandum of law in support of his claims;

3.      Permit Mikhel to Amend this Motion to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery, investigation, and litigation of this Motion, and to allow the amendment to relate back to the date of the filing of his Section 2255 Motion;

4.      Require the government to file an Answer to the Motion in the form prescribed by Rule 5 of the Rules Governing 28 U.S.C. § 2255 Cases in the United States District Court, identifying all proceedings conducted in Mikhel's case, including any which have not been recorded or transcribed, and specifically admitting or denying the factual allegations set forth in this 2255 Motion;

5.      Allow Mikhel reasonable time to file a Reply to the government's answer, to amend the motion, if warranted, and to file such legal memorandum and briefs as may be necessary to respond or reply to any defenses raised and/or motions filed by the government's Answer;

6.      Order such discovery as Mikhel may request by separate motion;

7.      Conduct an evidentiary hearing to resolve any factual disputes raised by the government's Answer to this Motion, or by Mikhel's Response to any Affirmative Defenses raised by the government after the completion of discovery, as Mikhel will request by separate motion. Because Mikhel has alleged facts which, if true, entitle

245

him to relief, he is also entitled to a full evidentiary hearing to establish the facts he alleges;

8.    Permit further amendment to and briefing of this Motion if the fact-development procedures so warrant, and allow reasonable time for briefing the merits of grounds asserted in the motion and any amendments thereto, after discovery is complete and an evidentiary hearing is conducted;

9.    Vacate Mikhel's conviction and death sentences and order that appropriate retrial and/or sentencing hearings be conducted; and

10.    Grant such additional relief as may be necessary and to which Mikhel may be entitled.

Respectfully submitted

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  October 4, 2023          By:  /s/ C. Pamela Gómez
                                      C. PAMELA GÓMEZ

                                 By:  /s/ Ajay V. Kusnoor
                                      AJAY V. KUSNOOR

                                 By   /s/ Laura Paul
                                      LAURA PAUL
                                      Deputy Federal Public Defenders
                                      Attorneys for Movant
                                      IOURI MIKHEL

246

CERTIFICATION PURSUANT TO RULE 2(b)(5) OF THE RULES GOVERNING SECTION 2255 PROCEEDINGS

The undersigned, being authorized to sign for the movant, declares under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

I make this verification on Mr. Mikhel's behalf because these matters are more within my knowledge than his, and because he is incarcerated in a state different from my office.

Executed on: October 4, 2023

By: /s/ C. Pamela Gómez
C. PAMELA GÓMEZ
Deputy Federal Public Defender

Attorney for Movant
IOURI MIKHEL