# EXHIBIT 1



79 of 1716 DOCUMENTS

Copyright 2007 Los Angeles Times
All Rights Reserved
Los Angeles Times

January 18, 2007 Thursday
Home Edition

**SECTION:** CALIFORNIA; Metro; Metro Desk; Part B; Pg. 3

**LENGTH:** 723 words

**HEADLINE:** Judge is in race for U.S. attorney job;
Dickran Tevrizian was asked to apply as L.A.'s top prosecutor, a move many find unusual because he could retire or be a private jurist.

**BYLINE:** Henry Weinstein and Greg Krikorian, Times Staff Writers

**BODY:**

In a highly unusual development, veteran Judge Dickran M. Tevrizian has emerged as one of the leading candidates for the job of top federal prosecutor in Los Angeles.

Tevrizian, who has been a federal judge for 21 years, was considering leaving the bench to go into the lucrative field of private judging. But he was recruited by local lawyers to apply for the position, according to a number of people in the legal community.

Tevrizian, 66, declined to comment. But several lawyers who are conversant with the selection process said he is among half a dozen people, including five former federal prosecutors, seeking to fill the vacancy left by former U.S. Atty. Debra Wong Yang, who resigned to join a private law firm.

Tevrizian's candidacy is "highly unusual," said Loyola Law School professor Laurie Levenson, who worked in the U.S. attorney's office in Los Angeles from 1981 to 1989. She noted that at least nine U.S. attorneys have ascended to the federal bench after serving as the top federal prosecutor in Los Angeles. But there is no precedent here for the reverse: to give up a federal judgeship, which is a lifetime appointment, for the U.S. attorney's position, which has minimal job security.

Levenson said Yang's successor will take the job at a "pivotal moment" in the history of the office, which has been understaffed and beset with other problems in recent years.

"There are significant morale issues," Levenson said. "They have lost a lot of senior people."

Other candidates for the position include Daniel P. Collins, a partner at Munger, Tolles & Olson in Los Angeles

**Exhibit 1 - 1**

Judge is in race for U.S. attorney job; Dickran Tevrizian was asked to apply as L.A.'s top prosecutor, a move many find unusual because he could retire or be a private jurist. Los Angeles Times J

and a former clerk to Supreme Court Justice Antonin Scalia; and Uttam S. Dhillon, a top lawyer in the U.S. Department of Homeland Security, who was a federal prosecutor in Los Angeles and served as chief counsel for the House of Representatives Committee on Homeland Security.

Also applying are Kimberly Ann Dunne, a partner at Sidley Austin; Nathan Hochman, a partner in Hochman, Salkin, Rettig, Toscher & Perez in Beverly Hills; Daniel Levin, a partner at WilmerHale in Washington, D.C., who served as counselor to U.S. Atty. Gen. John Ashcroft, special assistant to FBI Director Robert Mueller, senior associate counsel to Bush and legal advisor under National Security Advisor Stephen Hadley; and Thomas O'Brien, who is chief of the criminal division of the U.S. attorney's office in Los Angeles.

Tevrizian grew up in Southern California and attended Los Angeles High School before graduating from USC and USC Law School.

A long-time Republican, Tevrizian spent six years in private practice before being tapped for a Municipal Court judgeship by Gov. Ronald Reagan in 1972 and elevated to the Superior Court by Gov. Jerry Brown in 1978.

In 1985, Tevrizian was appointed by then-President Reagan to the federal bench.

In that job, Tevrizian presided over a number of high-profile cases, including the corruption case of former Democratic Assemblyman Bruce Young of Norwalk, the multimillion-dollar securities fraud case of onetime carpet-cleaning entrepreneur Barry Minkow and the government's prosecution of Hollywood private investigator Anthony Pellicano on explosives charges.

Although he is considered tough on crime, Tevrizian has taken action on behalf of inmates he concluded had been prosecuted unfairly.

In 2003, he overturned the second-degree murder conviction of Thomas L. Goldstein, who had served 24 years for a Long Beach slaying. That decision was upheld by a federal appeals court and in 2004 Goldstein was released after the Los Angeles County district attorney's office concluded that it had no case against him.

Several attorneys said they were puzzled that Tevrizian, at an age when he could retire or make a lot of money as a private judge, would want to leap into what could be a very tough job. But one veteran Los Angeles lawyer, who has frequently appeared before the judge, said he was not surprised.

"Federal judges have enormous power but can only exercise it in the cases that come before them," said Jan Handzlik, a partner at Howrey Simon, who was a federal prosecutor here in the 1970s. As U.S. attorney, Judge Tevrizian ... would be free to advocate, rather than adjudicate, and would undoubtedly have an impact on a broad range of issues affecting the community as a whole."

henry.weinstein@latimes.com

greg krikorian@latimes.com

**GRAPHIC:** PHOTO: A COURT VETERAN: Dickran Tevrizian has been a federal judge for 21 years. PHOTOGRAPHER: Myung J. Chun Los Angeles Times

**LOAD-DATE:** January 18, 2007

**Exhibit 1 - 2**

# EXHIBIT

# 2

Los Angeles Times

CALIFORNIA

# Federal Judge Is Moving to State Appellate Court

BY JEAN GUCCIONE

MARCH 10, 2006 12 AM PT

TIMES STAFF WRITER

In a highly unusual career move, Nora M. Manella, a well-respected federal trial judge, was appointed Thursday to the state Court of Appeal in Los Angeles, giving up lifetime tenure.

Gov. Arnold Schwarzenegger's appointment of Manella, a Studio City Democrat, comes just two weeks after the state GOP called on the Republican governor to name more members of his own political party to the bench.

Manella, whose father was a founder of the Los Angeles law firm of Irell & Manella, said she applied for a seat on the state appellate bench because she's "always been somewhat of an appellate wonk."

"What I like most about judging is deciding difficult issues."

She will miss the interaction with lawyers at the trial level, she said, but looks forward to "the intellectual heavy lifting of the appellate court."

Manella's nomination must be confirmed by the state Commission on Judicial Appointments. An April 10 hearing has been set in Los Angeles. If approved, she will succeed Justice Gary Hastings, who retired.

**Exhibit 2 - 3**

Despite her political party affiliation, Manella, 55, has received appointments from more Republicans than Democrats throughout her legal career. Republican Gov. George Deukmejian appointed her to Los Angeles Municipal Court in 1990, and Republican Gov. Pete Wilson elevated her to the Los Angeles County Superior Court two years later.

She also was U.S. attorney for the Central District of California from 1994 until 1998, when President Clinton named her to the federal trial bench. She won unanimous approval of the Republican-led U.S. Senate.

"She's perfect for the job," said Laurie Levenson, a professor at Loyola Law School and a friend of Manella. "She's so smart. She's so experienced. She's a virtual judicial powerhouse -- and a class act."

Yet Mike Spence, president of the California Republican Assembly, would have preferred a Republican powerhouse. "The governor has a dismal record when it comes to appointing Republicans to the bench," he said.

But Beverly Hills attorney Eric George, who advises the governor on judicial appointments, said no "political party has a lock on great jurists."

Few federal judges switch to the state courts unless it's for a coveted seat on the state Supreme Court. Lifetime tenure is considered a major benefit of the federal bench, but in recent years more federal judges are retiring earlier because of overwhelming criminal caseloads and little discretion, especially in sentencing.

In her new job, Manella will face election every 12 years. She also will receive a pay raise from $165,200 to $170,694.

**Exhibit 2 -  4**

# EXHIBIT

# 3



# Yang denies departure is linked to that of other U.S. attorneys

BY SUSAN CRABTREE - 03/05/07 08:09 PM EST

SHARE          TWEET

## Just In...

**House GOP leader says State of the Union attendance could be capped: report**
HOUSE — 2M 21S AGO

**Minor League Baseball to launch Black community outreach program 'The Nine'**
BLOG BRIEFING ROOM — 24M 36S AGO

**Jan. 6 panel probing Trump's role in effort to seize voting machines: report**
NATIONAL SECURITY — 57M 48S AGO

**North Carolina fertilizer plant fire forces thousands to evacuate**
STATE WATCH — 1H 23M AGO

**Record enrollment numbers send a clear message about health care affordability, access**
OPINION — 1H 29M AGO

**Luján stroke jolts 50-50 Senate**
SENATE — 1H 37M AGO

**US calls on UN Security**



A former U.S. attorney for Los Angeles, Debra Wong Yang, dismissed questions about the timing of her departure, which occurred about a month before several other U.S. attorneys were fired late last year.

Wong Yang was heading up the investigation into Rep. Jerry Lewis's (R-Calif.) ties to a lobbying firm and the millions of dollars in contracts the firm's clients received from Congress. Wong Yang, the first Asian-American woman to serve as a U.S. attorney, left her post with Justice to become a partner at Gibson, Dunn and Crutcher, the law firm representing Lewis. She will co-chair the firm's crisis-management practice group, along with Washington, D.C., partner Theodore B. Olson, a former Bush administration solicitor general.

Wong Yang said her departure was a personal decision based on financial concerns and the fact that she is a single mother, and had nothing to do with the firings of other U.S. attorneys. She also said her departure would not affect the case against Lewis in any way, noting that the Justice Department said it would have allowed her to stay in the position "as long as I wanted to."

"The investigation [into Lewis] would never be delayed or affected in any way because of my departure," she said. "We had 260 attorneys in that office."

She said that she had been looking for a more lucrative position in the private sector for months and that a longtime friend, Nick Hanna in the Orange County office of Gibson, Dunn and Crutcher — not Olson or anyone else with close ties to the Bush administration — first contacted her about the position. She said she turned down a more lucrative offer from another firm to take the job at Gibson, Dunn and Crutcher.

SHARE          TWEET

THE HILL 1625 K STREET, NW SUITE 900 WASHINGTON DC 20006 | 202-628-8500 TEL | 202-628-8503 FAX
THE CONTENTS OF THIS SITE ARE © 1998 - 2022 NEXSTAR MEDIA INC. | ALL RIGHTS RESERVED.

SUBSCRIBE TO PUSH NOTIFICATIONS

**Exhibit 3 - 5**

# EXHIBIT

# 4

**The New York Times** | https://www.nytimes.com/2007/05/04/opinion/04fri4.html

**EDITORIAL OBSERVER**

# The U.S. Attorney, the G.O.P. Congressman and the Timely Job Offer

**By Adam Cohen**

May 4, 2007

There is yet another United States attorney whose abrupt departure from office is raising questions: Debra Wong Yang of Los Angeles. Ms. Yang was not fired, as eight other prosecutors were, but she resigned under circumstances that raise serious questions, starting with whether she was pushed out to disrupt her investigation of one of the most powerful Republicans in Congress.

If the United States attorney scandal has made one thing clear, it is that the riskiest job in the Bush administration is being a prosecutor investigating a Republican member of Congress. Carol Lam, the United States attorney in San Diego, was fired after she put Randy Cunningham, known as Duke, in prison. Paul Charlton, in Arizona, was dismissed while he was investigating Rick Renzi. Dan Bogden, in Nevada, was fired while he was reportedly investigating Jim Gibbons, a congressman who was elected governor last year.

Ms. Yang was investigating Jerry Lewis, who was chairman of the powerful House Appropriations Committee. Ms. Lam and most of the other purged prosecutors were fired on Dec. 7. Ms. Yang, in a fortuitously timed exit, resigned in mid-October.

Ms. Yang says she left for personal reasons, but there is growing evidence that the White House was intent on removing her. Kyle Sampson, the Justice Department staff member in charge of the firings, told investigators last month in still-secret testimony that Harriet Miers, the White House counsel at the time, had asked him more than once about Ms. Yang. He testified, according to Congressional sources, that as late as mid-September, Ms. Miers wanted to know whether Ms. Yang could be made to resign. Mr. Sampson reportedly recalled that Ms. Miers was focused on just two United States attorneys: Ms. Yang and Bud Cummins, the Arkansas prosecutor who was later fired to make room for Tim Griffin, a Republican political operative and Karl Rove protégé.

**Exhibit 4 -  6**

It is hard to see what put Ms. Yang on the White House list other than her investigation of Mr. Lewis, which threatened to pull in well-connected lobbyists, military contractors and Republican contributors. Ms. Yang, by all accounts, had a strong record. Alberto Gonzales hailed her as "one of the most respected U.S. attorneys in the country."

The new job that Ms. Yang landed raised more red flags. Press reports say she got a $1.5 million signing bonus to become a partner in Gibson, Dunn & Crutcher, a firm with strong Republican ties. She was hired to be co-leader of the Crisis Management Practice Group with Theodore Olson, who was President Bush's solicitor general and his Supreme Court lawyer in Bush v. Gore. Gibson, Dunn was defending Mr. Lewis in Ms. Yang's investigation.

Several issues bear investigating. First, did Ms. Yang know or suspect that she might lose her job, and jump ship to avoid being fired? That is not hard to believe because Ms. Miers and Mr. Sampson were exchanging e-mail about dismissing her in mid-September, and she announced her departure in October. Ms. Yang served on the Attorney General's Advisory Committee, which Mr. Gonzales has called "a small group of U.S. attorneys that I consult on policy matters." That may have put her in a position to be tipped off in advance.

A second possibility is that Gibson, Dunn dangled a rich financial package before Ms. Yang to get her out, and to disrupt the investigation of Mr. Lewis. Ms. Yang, who says she left her job purely for personal reasons, may not have known she was being lured away by people with close ties to Mr. Lewis and the White House, who were hoping to replace her with a more partisan prosecutor.

Another possibility is that the timing of her departure was coincidental. That would make her lucky indeed: after more than 15 years of working for government, she decided to take a private sector job precisely when the White House counsel was apparently trying to fire her.

It is impossible to know how much of a setback Ms. Yang's departure was to the investigation of Mr. Lewis. It could be that it slowed down after she left. It could also be that it is going forward just as it would have had she stayed. If it has not been affected, that could be because the close attention Congress and the press are paying to United States attorneys has prevented the White House from installing a "loyal Bushie," in Mr. Sampson's famous phrase.

United States attorneys serve, as the White House likes to point out, at the pleasure of the president. But if Ms. Yang, or any of the others, was pushed out to prevent justice from being done in a pending criminal matter, it would be a serious misuse of executive

**Exhibit 4 - 7**

authority. It could also be obstruction of justice.

Congress is conducting closed-door interviews with Justice Department officials. That is important, but hardly enough. It is looking more and more as if the United States attorney dismissals were managed out of the White House. The way to put to rest the questions about Ms. Yang's suspicious departure, and the firings of the other prosecutors, is to require that Ms. Miers, Mr. Rove and other White House officials tell what they know, in public and under oath.

**Exhibit 4 -  8**

# EXHIBIT 5

Federal Death Penalty Cases

>> Table of Contents

# FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION

Prepared by

**Subcommittee on Federal Death Penalty Cases
Committee on Defender Services
Judicial Conference of the United States**

**Honorable James R. Spencer, Subcommittee Chair
Honorable Robin J. Cauthron
Honorable Nancy G. Edmunds**

**May 1998**

The recommendations in this report were adopted by the Judicial Conference of the United States on September 15, 1998

>> Table of Contents

http://www.uscourts.gov/dpenalty/1COVER.htm [10/6/2008 2:49:15 PM]

**Exhibit 5 -  9**

# FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION

## TABLE OF CONTENTS

**Executive Summary**

**Introduction**

**I. Analysis & Findings**

    **A. Number and Overall Cost of Federal Death Penalty Cases**

        1. **The Decision to Prosecute in Federal Court**
        2. **The Decision to Authorize the Death Penalty**
        3. **The Decision to Go to Trial**

    **B. Factors Affecting the Scope and Cost of Defense Representation**

        1. **Death Penalty Cases Involve Two Trials**
        2. **Complexity of the Guilt Phase**
        3. **Scope of the Penalty Phase**
        4. **Special Obligations of Counsel in a Death Penalty Case**

            a. **Consultation with the Client**
            b. **Motions Litigation**
            c. **Jury Selection**

        5. **Effect of Prosecution Resources**
        6. **Effect of the Authorization Process**
        7. **Importance of Experts and their Cost**

    **C. Factors Affecting the Availability, Cost and Quality of Counsel**

        1. **Importance of "Learned" Counsel**
        2. **Federal Death Penalty Resource Counsel Project**

Table of Contents

3. **Consultation Prior to Appointment of Counsel**
4. **Availability and Recruitment of Qualified Lawyers**

    a. **Federal Defender Organizations**
    b. **Panel Attorneys**

5. **Adequacy of Compensation to Attract Qualified Counsel**
6. **Number of Counsel**

D. **Efforts to Control the Cost of Representation**

**Conclusion**

II. **Recommendations & Commentary**

1. **Qualifications for Appointment**

    a. **Quality of Counsel**
    b. **Qualifications of Counsel**
    c. **Special Considerations in the Appointment of Counsel on Appeal**
    d. **Special Considerations in the Appointment of Counsel in Post-Conviction Proceedings**
    e. **Hourly Rate of Compensation for Counsel**

2. **Consultation with Federal Defender Organizations or the Administrative Office**

    a. **Notification of Statutory Obligation to Consult**
    b. **Consultation by Courts in Selecting Counsel**
    c. **Consultation by Federal Defender Organizations and the Administrative Office in Recommending Counsel**

3. **Appointment of More Than Two Lawyers**

4. **Appointment of the Federal Defender Organization**

    a. **FDO as Lead Counsel**
    b. **FDO as Second Counsel**

5. **The Death Penalty Authorization Process**

**Exhibit 5 - 11**

Table of Contents

**a.** **Streamlining the Authorization Process**
**b.** **Court Monitoring of the Authorization Process**

6. **Federal Death Penalty Resource Counsel**

    **a.** **Information from Resource Counsel**
    **b.** **Technology and Information Sharing**

7. **Experts**

    **a.** **Salaried Positions for Penalty Phase Investigators**
    **b.** **Negotiating Reduced Rates**
    **c.** **Directory of Experts**

8. **Training**

9. **Case Budgeting**

    **a.** **Consultation with Prosecution**
    **b.** **Prior to Death Penalty Authorization**
    **c.** **After Death Penalty Authorization**
    **d.** **Advice from Administrative Office and Resource Counsel**
    **e.** **Confidentiality of Case Budgets**
    **f.** **Modification of Approved Budget**
    **g.** **Payment of Interim Vouchers**
    **h.** **Budgets in Excess of $250,000**
    **i.** **Death Penalty Not Authorized**
    **j.** **Judicial Conference Guidelines**
    **k.** **Judicial Training for Death Penalty Cases**

10. **Case Management**

    **a.** **Non-lawyer Staff**
    **b.** **Multi-defendant Cases**

        **i.** **Early Decision Regarding Severance**
        **ii.** **Regularly Scheduled Status Hearings**
        **iii.** **"Coordinating Counsel"**
        **iv.** **Shared Resources**
        **v.** **Voucher Review**

http://www.uscourts.gov/dpenalty/2TABLE.htm (3 of 4) [10/6/2008 2:49:16 PM]

**Exhibit 5 - 12**

Table of Contents

11.  **Availability of Cost Data**

**Appendix A: Recommendations**

**Appendix B: Sources & Methodology**

*Appendix C: Supporting Data* (Not Available Online)

**Exhibit 5 -  13**

# EXECUTIVE SUMMARY

This report addresses the cost, availability and quality of defense representation in federal death penalty cases and recommends steps which should be taken in order to keep expenditures in these cases within reasonable limits. It has been prepared by the Subcommittee on Federal Death Penalty Cases of the Judicial Conference Committee on Defender Services. The report was prompted by judicial and congressional concerns about the costs involved in providing defense services in federal death penalty cases and is the product of extensive study and data collection.

Federal death penalty prosecutions are large-scale cases that are costly to defend. They require more lawyers, working more hours, at a higher hourly rate than other federal criminal matters. The number of federal death penalty prosecutions has grown dramatically in the last several years, and their impact on the defender services appropriation cannot responsibly be ignored. The judiciary has a duty to ensure that its funds are spent wisely, and to identify the best ways to provide cost-effective representation in these challenging cases.

To this end, the Subcommittee has thoroughly examined the nature of defense representation in federal death penalty cases. Part I of this report sets forth the Subcommittee's analysis and findings, which are based upon qualitative and quantitative information gathered from many sources. This part of the report describes the number of federal death penalty cases and the cost of defending them, and discusses the characteristics of federal death penalty cases and the special duties they impose on defense counsel. This information is essential to a full understanding of the recommendations set forth in Part II of the report. Also contained in Part I are data on the expense of prosecuting federal death penalty cases, which have been provided by the Department of Justice.

In general, the Subcommittee on Federal Death Penalty Cases has concluded that judges assigned to federal death penalty cases have been appropriately conscious of the need to monitor defense costs and that, for the most part, their efforts to control expenses have been successful. In the vast majority of cases, moreover, judges have been able to appoint well-qualified lawyers with sufficient experience in death penalty litigation to make cost-effective decisions about the resources required to present a defense. Overall, the average cost of representation in each major category of federal death penalty cases is reasonable in relation to the obligations imposed on defense counsel and the costs of prosecuting such cases. Nevertheless, the Subcommittee believes the additional cost-containment measures proposed in its recommendations should be implemented.

Among the most important findings presented in Part I of the report are the following:

1. The number of federal prosecutions in which an offense punishable by death is charged, and to which special statutory requirements for the appointment and compensation of counsel apply, increased sharply after the 1994 Federal Death Penalty Act increased the number of federal crimes punishable by death.

**Exhibit 5 - 14**

Executive Summary

- Number of defendants charged with offenses punishable by death (by year of indictment):
  1991 -- 12
  1992 -- 45
  1993 -- 28
  1994 -- 45
  1995 -- 118
  1996 -- 159
  1997 -- 153

2. The cost of defending cases in which the Attorney General decides to seek the death penalty for commission of an offense potentially punishable by death (authorized cases) is much higher than the cost of defending cases in which the Attorney General declines to authorize the death penalty for an offense punishable by death. The number of authorized cases has increased since 1994.

- Number of cases where the Attorney General has authorized seeking the death penalty, by year in which the authorization decision was made (figures provided by the Department of Justice):

      1990 -- 2
      1991 -- 6
      1992 -- 16
      1993 -- 5
      1994 -- 7
      1995 -- 17
      1996 -- 20
      1997 -- 31

- Average total cost per representation of a sample of cases in which the defendant was charged with an offense punishable by death and the Attorney General did not authorize seeking the death penalty (1990-1997):   **$55,772**
- Average total cost per representation of a sample of cases in which the defendant was charged with an offense punishable by death and the Attorney General authorized seeking the death penalty (includes cases resolved by guilty plea as well as cases resolved by trial) (1990-1997):   **$218,112**

3. The cost of defending a federal death penalty case that is resolved by means of a trial is higher than the cost of defending a case that is resolved through a guilty plea, even though many guilty pleas are entered after most of the preparation for trial has been completed. The number of federal death penalty trials, and the number of individual defendants tried on capital charges, has increased since the federal death penalty was revived by Congress in 1988.

- Number of federal death penalty trials/defendants, by calendar year:

**Exhibit 5 - 15**

Executive Summary

> 1988 -- 0
> 1989 -- 0
> 1990 -- 1 trial, 1 defendant
> 1991 -- 4 trials, 5 defendants
> 1992 -- 1 trial, 1 defendant
> 1993 -- 3 trials, 7 defendants
> 1994 -- 1 trial, 3 defendants
> 1995 -- 4 trials, 7 defendants
> 1996 -- 5 trials, 7 defendants
> 1997 -- 8 trials, 11 defendants

- Average total cost per representation of a sample of authorized federal death penalty cases resolved through a guilty plea (1990-1997): **$192,333**

- Average total cost per representation of a sample of authorized federal death penalty cases resolved through a trial (1990-1997): **$269,139**

4. The costs of *defending* federal death penalty cases appear to be reasonable in relation to the costs of *prosecuting* such cases. The Department of Justice collected data regarding its prosecution costs in a sample of authorized cases, including some that went to trial and some that ended in guilty pleas. These cost data did not include non-attorney investigative costs or the value of services provided to the prosecution by law enforcement agencies.

- Average total cost of prosecuting an authorized federal death penalty case (based on a sample of cases resolved by guilty plea and by trial selected by the Department of Justice; does not include any non-attorney investigative costs or the costs of expert and other assistance provided by law enforcement agencies; figures provided by the Department of Justice): **$365,000**

5. The overall cost of providing representation in federal death penalty cases is due to the growing number of such prosecutions (in particular the growing number of trials), the special duties of counsel in federal death penalty cases, and the higher hourly rate paid to counsel. The number of cases depends upon prosecutorial decisions, over which the judiciary has no control. The special obligations of counsel are due to a combination of those responsibilities inherent in any capital case and the unusual complexity of many federal death penalty prosecutions, particularly drug conspiracy cases. The higher maximum rate for counsel in federal death penalty cases is actually lower than the market rates charged by the lawyers appointed in federal death penalty cases, and is required in order to assure an adequate supply of qualified lawyers. Generally, courts have succeeded in appointing counsel with the experience and judgment needed to make prudent use of resources in defending federal death penalty cases. Federal defender organizations are not at this time ready to assume a major portion of the responsibility for representation in federal death penalty cases, so that courts must continue to appoint panel attorneys and must offer an adequate rate of compensation.

In Part II of this report, the Subcommittee recommends additional steps designed to contain and reduce

**Exhibit 5 -  16**

the cost of capital defense representation. In the death penalty area in particular, cost-effectiveness is inseparable from high quality representation: assuring appropriate resources for the defense at the trial stage minimizes the risk of time-consuming and expensive post-conviction litigation later on. Therefore, in addition to recommendations designed to monitor and limit expenditures, the Subcommittee has proposed a number of measures intended to assure the appointment of well-qualified counsel and to make other improvements in the delivery of defense services. The most significant of the Subcommittee's recommendations can be summarized as follows:

- Courts should assure the appointment of highly qualified counsel whenever the defendant is charged with an offense punishable by death. The hourly rate authorized for compensation of counsel in federal death penalty cases should remain high enough to attract a sufficient number of qualified attorneys. **Recommendation 1.**

- Courts should consult with the local federal public defender, or, in districts not served by a federal public defender, with the Administrative Office of the U.S. Courts to identify counsel. In districts served by a community defender organization, courts should consult with the community defender organization. **Recommendation 2.**

- Courts should not appoint more than two lawyers to represent a defendant in a federal death penalty case except in exceptional circumstances; however, courts should authorize appointed counsel to utilize the services of other lawyers to assist them on a more limited basis when this would contain costs or when additional staff might be required to meet time limits. **Recommendation 3.**

- Courts should appoint federal defender organizations as lead or second counsel in federal death penalty cases only if the federal defender organization has staff with the appropriate qualifications and experience and other resources sufficient to undertake the representation without unduly disrupting the operation of the office. **Recommendation 4.**

- The Department of Justice should streamline the review of federal death penalty cases so that cases in which a request for the death penalty is very unlikely will be reviewed more quickly. An earlier decision not to seek the death penalty will reduce the length of time the case must be treated as a federal death penalty case where the defendant is entitled to two lawyers who may be paid at a higher hourly rate. Expediting review of cases in which a request for the death penalty is unlikely, such as cases in which the local United States Attorney strongly recommends against seeking the death penalty, will significantly reduce defense costs without diminishing the usefulness of centralized review. **Recommendation 5.**

- The Administrative Office of the U.S. Courts should continue to support the Federal Death Penalty Resource Counsel Project, which has become essential to the delivery of high quality,

**Exhibit 5 - 17**

Executive Summary

cost-effective defense representation, and it should consider expanding the availability of model pleadings and other information needed by counsel in federal death penalty cases through the use of technology. **Recommendation 6.**

- Federal defender organizations should consider creating salaried positions for penalty phase investigators who would coordinate preparation for the penalty phase in federal death penalty cases at a lower cost than a mitigation specialist retained as an expert at an hourly rate. Lawyers should be encouraged to negotiate reduced rates with experts. Also, information about qualified experts in fields often involved in federal death penalty cases and about the rates they charge should be made available to counsel. **Recommendation 7.**

- The Administrative Office of the U.S. Courts should continue to support training for counsel in federal death penalty cases. **Recommendation 8.**

- Courts should require lawyers to develop case budgets to ensure the most effective and economical use of resources. Case budgeting should be done both before the prosecution makes a decision whether it will seek the death penalty and after, if the death penalty is authorized. Case budgets should be reviewed if circumstances change. The Judicial Conference should develop guidelines for case budgeting, and judges and lawyers should be trained in the budgeting process. **Recommendation 9.**

- In multi-defendant federal death penalty cases, courts should consider making early decisions about whether to sever non-capital defendants from defendants facing capital charges. Courts should also consider using case management techniques to diminish the cost of document production and distribution and to reduce duplication of effort among defense counsel. **Recommendation 10.**

- The Judiciary should improve its capacity to track costs in federal death penalty cases. **Recommendation 11.**

**Exhibit 5 - 18**

# INTRODUCTION

This report responds to judicial and congressional concerns about the cost of providing representation in federal death penalty cases. Congress revived the death penalty for federal crimes in 1988, authorizing capital punishment for "drug kingpin" murders.[1] In 1994, Congress expanded to fifty the number of federal crimes punishable by death.[2] The portion of the Defender Services appropriation allocated to federal death penalty cases has increased over the past decade, especially since fiscal year (FY) 1995. Federal death penalty cases consumed almost six percent of the Defender Services obligations for payments to panel attorneys for fiscal year 1997, although they comprised approximately 0.3 percent of the caseload.[3]

In order to understand better the reasons for the high cost of representation in federal death penalty cases in comparison to non-capital cases, Judge Emmett Ripley Cox, the Chair of the Judicial Conference Committee on Defender Services, in May 1997 appointed a Subcommittee on Federal Death Penalty Cases to study the judiciary's current approach to the appointment and compensation of counsel in these cases, its success in recruiting qualified attorneys, and the quality and cost of services provided. Judge Cox named three members of the Committee on Defender Services to the Subcommittee: Judge James R. Spencer, of the Eastern District of Virginia, Chair of the Subcommittee; Judge Robin J. Cauthron, of the Western District of Oklahoma; and Judge Nancy G. Edmunds, of the Eastern District of Michigan. Norman Lefstein, Dean of the Indiana University School of Law at Indianapolis, was selected to serve as the Subcommittee's chief consultant.

The Subcommittee gathered both qualitative and quantitative information about federal death penalty cases. Dean Lefstein and his staff [4] conducted extensive interviews with lawyers and judges representing a wide range of perspectives, and covering more than half of the judicial districts in which a federal death penalty prosecution has been authorized. The Subcommittee's staff also reviewed articles and reports concerning representation in death penalty cases, including the recent Report on Costs and Recommendations for the Control of Costs of the Defender Services Program prepared by Coopers & Lybrand Consulting. Additionally, staff compiled a database containing cost information regarding federal death penalty cases from 1990, the year the first post-*Furman* federal death penalty case was authorized, to the end of fiscal year 1997. The Subcommittee's staff analyzed these data by correlating cost information with descriptive information (case demographics), and by comparing costs in federal death penalty cases with costs in non-capital homicide cases. The Subcommittee also obtained information concerning the time spent by attorneys in federal defender organizations (FDOs) on representation in federal death penalty cases and the costs incurred by local United States Attorney's Offices in prosecuting them. Because of the small number of federal death penalty cases that have been reviewed on direct appeal or in post-conviction proceedings, the quantitative analyses in this report focus on representation at the trial stage, and therefore do not reflect the overall cost of representation in a case in which a death sentence is imposed.[5]

**Exhibit 5 - 19**

Federal Death Penalty Cases

The Subcommittee's findings are set out in Part I of this Report. The Subcommittee has proposed eleven recommendations to enhance the judicial administration of federal death penalty cases. These recommendations, supported by commentary, are set out in Part II. The recommendations alone are reproduced in Appendix A. The Subcommittee's methodology and the sources consulted are described in Appendix B. Additional statistical and other supporting data are contained in Appendix C.

## I. ANALYSIS AND FINDINGS

In general, the high cost of providing representation in federal death penalty cases is a result of the heavy demands these cases place on the time and skill of counsel and the growing number of federal criminal cases in which the defendant faces a potential sentence of death. The cost of representation in each federal death penalty case depends upon several elements: the number of hours each attorney must work to discharge his or her ethical obligation to the client; the hourly rate at which the attorney is compensated; and the nature, type, and cost of investigative and expert services reasonably required. To understand *why* federal death penalty cases cost so much, and how these costs may be controlled consistent with constitutional and statutory mandates, requires first and foremost an understanding of the characteristics of federal death penalty cases and the special responsibilities of defense counsel appointed to such cases.

**A. Number and Overall Cost of Federal Death Penalty Cases.**

The total cost of providing representation in federal death penalty cases depends upon the number of such cases, as well as the cost of representation in each case. As described more fully below, special standards affecting the cost of representation apply to all federal criminal cases in which an offense charged is punishable by death, whether or not the prosecution ultimately decides to seek the death penalty.[6] Although many factors affect the cost of representation, two particularly significant ones are the prosecution's decisions whether to seek the death penalty and whether to accept a plea agreement to a sentence less than death.[7]

**1. The Decision to Prosecute in Federal Court.** The total number of federal death penalty cases depends, in the first instance, on the decision to prosecute an offense in federal rather than in state court.[8] The number of federal prosecutions including an offense punishable by death has increased dramatically, particularly since the enactment of the Federal Death Penalty Act as part of the 1994 crime bill. No exact count of federal death penalty cases filed nationwide by United States Attorney's offices since 1988 is available; a reasonable estimate,

**Exhibit 5 -  20**

Federal Death Penalty Cases



Federal Death Penalty Cases By Year of Indictment

however, is 560 cases[9] over the period 1991 to 1997, increasing from 12 cases in 1991, to 118 in 1995, 159 in 1996, and 153 in 1997.[10]

The average total cost per federal death penalty representation in a sample of cases prosecuted from 1990 to 1997 (including cases in which the prosecution ultimately declined to seek the death penalty) was $142,000.[11] However, the prosecution's decision to seek the death penalty -- as would be expected -- makes a substantial difference in the cost of representation, so

that this overall average is not useful in assessing the resources required for a case in which the prosecution does decide to seek the death penalty.

**2. The Decision to Authorize the Death Penalty.** The cost of representation in a federal death penalty case depends heavily upon whether the prosecution does or does not seek the death penalty. (See Charts C-4, C-5, and C-6, comparing the total costs and elements of total cost of cases in which death penalty authorization was granted with those in which it was denied.) While the decision to charge an offense punishable by death is made by a local U.S. Attorney, no federal prosecutor may actually seek the death penalty unless specifically authorized to do so by the Attorney General of the United States.

**Exhibit 5 - 21**

Federal Death Penalty Cases

## Authorized Cases by Calendar Year of Decision



The Attorney General has authorized seeking the death penalty in a total of 111 cases between 1988 and December 1997.[12] The average total cost (for counsel and related services) of authorized cases in the Subcommittee's sample was $218,112, as compared to $55,772 for cases in which the death penalty was never authorized; the average total cost of cases in which the prosecution was authorized to seek the death penalty, but later formally withdrew its request before trial was $145,806. The number of cases in which the Attorney General authorized seeking the death penalty rose from two cases in 1990 to 31 cases in 1997. Twenty-two cases in which the prosecution has been authorized to seek the death penalty were pending as of December 1997.

**Exhibit 5 -  22**





Number of Federal Death Penalty Trials and Defendants Tried by Calendar Year

**3. The Decision to Go to Trial.** The third prosecutorial decision affecting the cost of representation is the decision whether to enter into a guilty plea agreement with the defendant or to try the case. (See Table C-7 and Chart C-8.) Of the 111 defendants against whom the Attorney General has sought the death penalty, the total number of defendants *tried* on capital

charges in federal court was 41 through December 1997. The average total cost for authorized cases ending in capital trials was $269,139,[13] as compared to $192,333 for authorized cases

resolved by a guilty plea. To date, nineteen defendants have been sentenced to death; one death sentence was later overturned on appeal and the case remanded for resentencing.

**B. Factors Affecting the Scope and Cost of Defense Representation.**

**1. Death Penalty Cases Involve Two Trials.** Federal law provides for a two part (bifurcated) trial in a capital case. [14] In the first part, the guilt phase, the jury is asked to determine whether the prosecution has proven, beyond a reasonable doubt, that the defendant has committed a crime punishable by death. If a conviction is returned on a capital count, then in the second part, the penalty phase, the jury must first determine whether the prosecution has proven additional facts (aggravating circumstances) in order to satisfy threshold requirements for imposing the death penalty. If so, the jury considers evidence offered by the prosecution to justify the death penalty, including aggravating circumstances in addition to those required for the threshold finding, and evidence the defense offers as a reason not to sentence the defendant to death (mitigating circumstances).

Lawyers in a death penalty case must prepare for both trials, and must develop an overall strategy that takes the penalty phase into account even in the guilt phase. This means that the way the defense

**Exhibit 5 - 23**

proceeds differs from a non-capital case in important ways beginning with jury selection. For example, facts that make no difference in the determination of guilt or innocence may become very important to the jury's assessment of the defendant's culpability in the penalty phase. Lawyers interviewed by the Subcommittee, for instance, described cases in which both the prosecution and the defense invested substantial resources in obtaining expert opinions concerning the precise manner of the victim's death, even though this would not affect the guilt phase verdict, because of the importance of this information to the determination of the appropriate penalty.

**2. Complexity of the Guilt Phase.** Federal death penalty cases generally are highly complex criminal prosecutions, even without taking the penalty phase into account. As a representative of the Department of Justice remarked at a meeting with Subcommittee staff to discuss compilation of cost data, federal death penalty cases have more in common with complex drug conspiracy cases than with non-capital federal homicide cases,[15] many of which are comparatively simple cases brought in federal court only because they occurred on federal land. (See Table C-7.)

Most cases in which the prosecution has sought a death sentence have invoked the "drug kingpin" provision of the 1988 Anti-Drug Abuse Act, 21 U.S.C. § 848(e). This statute authorizes the death penalty for intentional killings in furtherance of a "continuing criminal enterprise" (CCE), or serious drug offense, and for intentional killings of law enforcement officers to avoid prosecution for a drug offense. CCE cases, together with prosecutions of drug organizations under the RICO death penalty provision added in 1994, comprised approximately 62 percent of the authorized federal death penalty cases through December 1997.[16] CCE and RICO cases typically involve investigations stretching over years, and encompassing numerous acts of violence. They often include several homicide charges, many witnesses, and evidence in the guilt phase derived from wiretaps, video surveillance, informants, and experts. The magnitude of some of these cases is illustrated by a judge's estimate that the prosecution listed 500 potential witnesses in one case, and another judge's estimate that the prosecution disclosed 30,000 pages of documents in discovery.

Another reason drug conspiracy cases are so complex is that they often involve many defendants joined in a single indictment. Multi-defendant cases generally tend to cost more to defend, per defendant, than single defendant cases.[17] This effect may be magnified in a case in which some defendants face the death penalty and other defendants face only non-capital charges, as the difference in the potential penalty may produce significant differences in strategy both before and during trial.

In most cases, judges have severed defendants facing capital charges from those facing only non-capital charges,[18] with the expectation that this will, among other things, reduce the overall cost of representation. Severance practices with regard to defendants facing *capital* charges have varied. Some judges have followed the more common state practice and tried each defendant separately. Others have severed only the penalty phase trials, so that the same jury determined the penalty for each defendant, but in separate hearings. Others have conducted joint penalty phase trials.

Drug conspiracy cases (including both CCE and RICO prosecutions) are the most expensive federal

**Exhibit 5 -  24**

death penalty cases to defend. The total cost of representation in drug conspiracy cases in which the prosecution authorized seeking the death penalty averaged $244,185,[19] or nearly 12 percent more than the average total cost of all authorized cases. (See Table C-7 and Chart C-8.)

**3. Scope of the Penalty Phase.** Evidence in the penalty phase of a federal death penalty trial typically includes a wide range of information about the defendant, the victim, and the nature of the offense that is not admissible in the guilt phase. Defense counsel in a federal death penalty case must investigate and prepare to respond to information offered by the prosecution to justify a death sentence. Federal law allows prosecutors to offer reliable information in the penalty phase, even if it does not satisfy the normal rules of evidence.[20] Although the prosecution must prove certain aggravating circumstances spelled out by statute, it is not limited to proving these factors. Defense counsel must therefore investigate and prepare to meet potential "non-statutory aggravating circumstances," such as an allegation that the defendant will be dangerous in the future. The penalty phase of a federal death penalty case therefore may include yet another "trial" in which the jury is required to determine whether the defendant is responsible for crimes in addition to those charged in the indictment. In one federal death penalty case, for example, the government attempted to prove the defendant committed another murder in the penalty phase, even though charges against him for that crime had been dismissed in a state court proceeding. Mini-trials of other criminal charges can be costly in terms of time and resources to prosecute and defend.

In addition to defending against the prosecution's case for a death sentence, counsel must also plan and present a case for a lesser sentence. In order to effectuate the defendant's constitutional right to present any information in mitigation of sentence, counsel must conduct a broad investigation of the defendant's life history. "Although it makes no express demands on counsel, the [right to offer mitigating evidence] does nothing to fulfill its purpose unless it is understood to presuppose the defense lawyer will unearth, develop, present and insist on consideration of those 'compassionate or mitigating factors stemming from the diverse frailties of humankind.'"[21] Indeed, one of the most frequent grounds for setting aside state death penalty verdicts is counsel's failure to investigate and present available mitigating information.[22] The broad range of information that may be relevant to the penalty phase requires defense counsel to cast a wide net in the investigation of any capital case.[23]

**4. Special Obligations of Counsel in a Death Penalty Case.** The nature of a criminal prosecution in which the defendant's life is at stake transforms counsel's role from start to finish. The quality of defense counsel's work must always remain in accord with the gravity of the proceeding. The special obligations of counsel appointed to a federal death penalty case are reflected in a comparison of hours billed in capital as compared to non-capital homicide cases.[24] The average number of hours billed in non-capital homicide cases from FY 1992 to FY 1997 was 117, as compared to 962 in a sample of federal death penalty cases (including cases never authorized). The average number of hours billed in authorized cases was 1,464. While representation in a federal death penalty case differs from representation in a non-capital federal criminal case in many ways, there are several particularly notable differences.

**Exhibit 5 - 25**

Federal Death Penalty Cases

| Average Number of Attorney Hours Billed in Capital and Non-Capital Homicide Cases | | | | |
|---|---|---|---|---|
| | Case Type | In Court Hours | Out of Court Hours | Avg. Total Attorney Hours Per Representation |
| Non-Capital | Homicides | 18 | 100 | 117 |
| Capital | Auth. Denied | 38 | 391 | 429 |
| | Auth. Granted | 231 | 1,233 | 1,464 |
| | Capital Trial | 409 | 1,480 | 1,889 |
| | Plea | 61 | 1,201 | 1,262 |
| | Drug Cases | 277 | 1,343 | 1,619 |

**a. Consultation with the client.** An important element of death penalty representation is the establishment of a professional relationship with the client.[25] Although it is important in every case, lawyers emphasized that consultation with the client is vastly more time consuming and demanding in a death penalty case for several reasons. First, the nature of the penalty phase inquiry requires a relationship which encourages the client to disclose his or her most closely guarded life history with the lawyer. Experiences of mental illness, substance abuse, emotional and physical abuse, social and academic failure, and other "family secrets" must be revealed, researched and analyzed for the insight they may provide into the underlying causes of the client's alleged conduct. The establishment of trust and confidence is also vitally important if the lawyer is to convince the defendant to consider an offer to plead guilty, especially because what is offered is likely to be life imprisonment without the possibility of parole. Accepting such a "deal" requires tremendous faith in counsel. Another reason the attorney-client relationship is particularly time-consuming stems from the enormous stress that the risk of a death sentence imposes on both the client and the lawyer; special care must be taken in order to avoid a rupture of the professional relationship that would force counsel to withdraw, delaying the trial.

**b. Motions Litigation.** The relative novelty of the federal death penalty laws, particularly those enacted in the 1994 crime bill, means that many legal issues concerning the interpretation and constitutionality of those statutes have not been authoritatively resolved. To date, the circuit courts of appeals have decided only a handful of federal death penalty cases. Lawyers and judges agree that these issues are time-consuming to litigate. Several judges commented that they, or their law clerks, devoted months of preparation to a federal death penalty case. Defense lawyers have an ethical obligation to raise

**Exhibit 5 -  26**

Federal Death Penalty Cases

challenges to the manner in which both the guilt and penalty phases of the trial are conducted, because if an issue is not raised at trial, the defendant generally cannot benefit, even if a ruling by a higher court subsequently favors the defense position.[26] Consequently, newer statutes tend to produce more constitutional and interpretive issues than statutes that have already been the subject of extensive appellate and Supreme Court consideration. Many issues may arise in a single case. In one multi-defendant case, for example, a judge estimated that 2,800 legal pleadings had been filed by the parties.

**c. Jury Selection.** The lawyer in a death penalty case also has additional responsibilities in jury selection. Because the same jury will generally decide the penalty phase as a well as the guilt phase, the court must determine whether jurors should be disqualified because their views about the imposition of the death penalty, for or against, would make them unable to follow the law governing penalty phase deliberations. Typically the "death qualification" inquiry is conducted on an individual basis. The usual voir dire in a federal criminal case is conducted by the judge, with limited participation by counsel. In death penalty cases, however, the lawyers generally participate in drafting questionnaires for prospective jurors, and take part in questioning the venire. Jury selection takes much longer in federal death penalty cases than in non-capital federal criminal cases both because the total number of jurors questioned is larger to allow for those who may be excused due to the death qualification inquiry, pretrial publicity or other factors related to the nature of the case, and because of the more extensive questioning of each individual prospective juror. For example, one judge who ordinarily selects a jury for a criminal case in an afternoon reported that it took three weeks to complete jury selection in a federal death penalty case.

As part of its recent study of the Defender Services program, Coopers & Lybrand reviewed records of federal death penalty cases (including cases that were not authorized and cases resolved by guilty plea) from FY 1995 to FY 1997, and found a similar distribution of attorney hours for each year.[27] In-court hearings, including trials, comprised 14%. The largest components were legal research (20%) and reviewing documents (16%). Legal research and writing is of great importance in federal capital cases because the federal death penalty statutes have not been definitively construed.[28] Judges as well as lawyers reported they had to devote extraordinary amounts of time to the analysis of legal issues in federal death penalty cases. Conferences with the client comprised 9% of attorney hours, reflecting the time required to establish and sustain a professional relationship in a federal death penalty case.[29] Another element, not directly captured in the available payment data, is the additional in- and out-of-court attorney time associated with jury selection in a death penalty case.

**5. Effect of Prosecution Resources.** Coopers & Lybrand found that "[t]he prosecution's resources are a key driver of capital representation costs."[30] Interviews with lawyers and judges confirmed this. Judges generally reported that prosecution resources in death penalty cases seemed unlimited. Typically, at least two and often three lawyers appeared for the prosecution in federal death penalty cases, who were assisted in court by one or more "case agents" assigned by a law enforcement agency. Investigative work and the preparation of prosecution exhibits for trial, including charts, video and audiotapes, is generally performed by law enforcement personnel. Law enforcement agencies also performed scientific examinations and provided expert witnesses at no direct cost to the prosecution. In some cases, which arose from joint state and federal investigations, state law enforcement agencies contributed resources to

**Exhibit 5 -  27**

the prosecution effort.

At the request of the Subcommittee, the Department of Justice gathered cost information concerning 21 of 24 completed federal death penalty prosecutions in which the Attorney General had decided to seek the death penalty after January 1995.[31] Some of these prosecutions involved more than one defendant. The set of cases included some cases that were resolved by guilty pleas and some cases that went to trial. The Department of Justice reported an average total cost per prosecution of $365,296, but this figure does not include the cost of investigation or the cost of scientific testing and expert evaluations performed by law enforcement personnel.[32] The average cost of payments to private retained experts (such as psychiatrists or other experts not employed by a government agency) was $30,269 per prosecution.

**6. Effect of the Authorization Process.** Another obligation unique to federal capital cases is advocacy on behalf of the client in the Justice Department death penalty authorization process. In January 1995 the Department promulgated a formal "protocol" describing the manner in which the Attorney General would review federal death penalty cases to determine whether to file a notice of an intention to seek the death penalty.[33] Initially, the local United States Attorney reviews the case and makes a non-binding recommendation to the Justice Department about whether the death penalty should be sought. Generally, the Attorney General has followed recommendations against seeking the death penalty, but has overriden such recommendations in at least two cases. All cases are reviewed by a committee of senior Department of Justice officials, who submit their views to the Attorney General, who then makes the final decision. The Death Penalty Review Committee offers defense counsel the opportunity to present information in writing and in a face-to-face meeting in Washington, D.C.[34]

The Department of Justice authorization process has two important implications for the cost of defense representation in federal capital cases. First, because any case involving an offense punishable by death remains a potential death penalty case until a final decision is made by the Attorney General, a longer authorization process increases the length of time that the defendant remains statutorily entitled to at least two lawyers who are compensated at a higher hourly rate. (See Section C.5, infra.) A number of judges reported "riding herd" on the authorization process by requiring reports from the prosecution or setting deadlines to expedite a final decision. All other things being equal, including the number of capital prosecutions ultimately approved, a shorter authorization review process would mean lower defense costs.

The second cost implication of the authorization process is that it creates another forum in which defense counsel must advocate on behalf of the client facing a possible death sentence.[35] One of defense counsel's most important functions is to present information first to the local United States Attorney and then to the Justice Department that would justify a lesser sentence. Effective advocacy requires counsel to explore all of the issues that are likely to enter into the Attorney General's decision whether to authorize a federal death penalty prosecution, including the nature and strength of the federal interest, the evidence of guilt, and the aggravating and mitigating factors. Although the written and oral presentations made to the Death Penalty Review Committee are not as detailed or comprehensive as a

Federal Death Penalty Cases

penalty phase presentation to a jury, counsel must conduct a wide-ranging preliminary investigation of facts relevant to sentencing *before* the Justice Department makes the decision whether to file a notice seeking the death penalty, if it is to have an effect on the authorization process.

It was impossible to quantify the effect of defense participation on the death penalty review process in terms of outcome and cost. Department of Justice officials said they view the participation by defense counsel as valuable, and that they encourage oral and written presentations. Defense lawyers offered divergent opinions about the value of participating in the central Department of Justice review, but the majority made presentations and would do so in future cases.

Because development of mitigating information early in the case may convince the prosecution that the death penalty should not be authorized, delaying preparation for the penalty phase is likely to increase the number of cases authorized, and therefore increase total costs. In a small number of instances, judges were reluctant to approve expenditures related to the penalty phase until an authorization decision was made. However, if the result of such a decision is that cases are authorized which should not be, this approach may cost more money than it saves, for cases that are never authorized cost much less than cases that are authorized, even if a guilty plea to a sentence less than death eventually is negotiated. This is illustrated by a comparison of the average total cost of cases in which the prosecution declines to seek the death penalty in the first instance ($55,772), as compared to the average total cost of cases in which the prosecution grants authorization, and then withdraws it ($145,806), and the average total cost of cases ending in guilty pleas ($192,333). (See also Recommendation 5, "The Death Penalty Authorization Process," in Part II of this report.)

**7. Importance of Experts and their Cost.** Another factor affecting the cost and complexity of capital cases is the importance of expert testimony in both the guilt and penalty phases. Payments to experts are a substantial component of defense costs in federal death penalty cases. Coopers & Lybrand found that about 19% of payments for representation in federal capital cases for FY 1997 went to services other than counsel: primarily experts and investigators.[36] This figure may understate the total spending on these services, because some of these costs are included as reimbursable expenses on attorney vouchers, rather than in separate vouchers submitted by the expert or investigator.

As with attorney compensation, there were significant differences between cases in which the Attorney General authorized seeking the death penalty, and those in which the death penalty was not authorized. (See Chart C-10.) The average amount spent on non-attorney compensation in cases in which authorization was *denied* was $10,094, as compared with $51,889 in cases in which authorization to seek the death penalty was *granted*.

Average Amount of Non-Attorney Compensation

in Capital and Non-Capital Homicide Cases

**Exhibit 5 -  29**

Federal Death Penalty Cases

| | Case Type | Avg. Amount of Non-Attorney Comp. | Avg. Total Cost of Representation (Attorney and Non-Attorney) |
|---|---|---|---|
| Non-Capital | Homicides | $ 1,515 | $ 9,159 |
| Capital | Auth. Denied | $10,094 | $ 55,773 |
| | Auth. Granted | $51,889 | $218,113 |
| | Capital Trial | $53,143 | $269,139 |
| | Plea | $51,028 | $192,333 |
| | Drug Cases | $52,218 | $244,186 |

In general, both the prosecution and the defense rely more extensively on experts in death penalty cases than in other federal criminal cases. Although prosecution forensic science experts typically are salaried employees of law enforcement agencies, the defense generally must hire experts who charge an hourly rate for their services. In the guilt phase, the prosecution is likely to call experts to testify about scientific analyses, such as DNA profiling, ballistics comparisons, or hair, fiber, or metallurgical evidence that may connect the defendant to a crime. Other types of experts common in large drug conspiracy cases include experts in the interpretation or authentication of audiotapes, and experts in the structure of drug organizations. To assure the reliability of this evidence and the manner in which it is presented to the jury, defense lawyers must consult with experts in these fields as well.

The defense depends on experts to develop information relevant to sentencing, even before the prosecution makes a final decision about whether to seek the death penalty.

"Because the first job of the defense is to convince the Department of Justice not to certify the case as a capital case, mitigation expenses, including the use of increasingly specialized experts, are increasing and are occurring early in the process."[37] Both the prosecution and the defense also typically hire experts to evaluate the defendant's mental condition in order to develop evidence related to culpability and future dangerousness relevant to the penalty phase. (See Charts C-11 and C-12, comparing expert and investigative costs in federal death penalty cases and non-capital federal homicide cases.)

Two important categories of expert services frequently used in federal death penalty cases but not in non-capital federal criminal cases are mitigation specialists and jury consultants. Mitigation specialists

**Exhibit 5 -  30**

typically have graduate degrees, such as a Ph.D. or masters degree in social work, and have extensive training and experience in the defense of capital cases. They are generally hired to coordinate an investigation of the defendant's life history, identify issues requiring evaluation by psychologists, psychiatrists or other medical professionals, and assist attorneys in locating experts and providing documentary materials for them to review. Although most often they assist counsel in assembling and interpreting the information needed in the penalty phase of a capital case, in some cases mitigation specialists are also called to testify about their findings.

Without exception, the lawyers interviewed by the Subcommittee stressed the importance of a mitigation specialist to high quality investigation and preparation of the penalty phase. Judges generally agreed with the importance of a thorough penalty phase investigation, even when they were unconvinced about the persuasiveness of particular mitigating evidence offered on behalf of an individual defendant. The work performed by mitigation specialists is work which otherwise would have to be done by a lawyer, rather than an investigator or a paralegal. Because the hourly rates approved for mitigation specialists are substantially lower than those authorized for attorneys,[38] the appointment of a mitigation specialist or penalty phase investigator generally produces a substantial reduction in the overall costs of representation.

Jury consultants provide a range of services in federal death penalty cases. They assist in drafting questionnaires for prospective jurors to aid in the jury selection process. The use of questionnaires has become standard in federal capital cases as a way to streamline and expedite the process of jury selection. In addition, in some cases jury consultants are retained to organize and interpret the results of jury questionnaires, advise attorneys about follow-up questions to be asked during the in court voir dire, and to advise the attorneys about whether or not to strike a particular juror. Jury consultants are routinely retained in high stakes civil litigation, and have been engaged by the prosecution in federal death penalty cases. Most of the attorneys interviewed by the Subcommittee were emphatic about the value of jury consultants, and regarded the availability of a jury expert as a top priority. However, some lawyers were willing to forego a jury consultant in order to assure judicial approval of other needed services. Judges generally indicated greater willingness to approve jury consultants when the prosecution retained a jury consultant than when the prosecution did not. (See also Recommendation 7, "Experts," in Part II of this report.)

**C. Factors Affecting the Availability, Cost and Quality of Counsel.**

**1. Importance of "Learned" Counsel.** Since the first Judiciary Act in 1789, federal law has required the appointment of "learned" counsel in a capital case. Currently, 18 U.S.C. § 3005 explicitly requires the appointment of two lawyers, at least one of whom is learned in the law related to capital punishment. An American Bar Association study several years ago summarized the special demands on counsel in a capital case:

> Counsel must not only be able to deal with the most serious crime--homicide-- in the most difficult circumstances, but must also be thoroughly knowledgeable about a complex body

**Exhibit 5 - 31**

Federal Death Penalty Cases

of constitutional law and unusual procedures that do not apply in other criminal cases. Bifurcated capital cases involve two trials with two different sets of issues. Investigation must often be conducted in several states, and, in some cases, in foreign countries. And penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history.[39]

In interviews, judges and lawyers attested to the importance of the statutory "learned counsel" requirement. A number of judges, particularly those with experience reviewing state death penalty trials in federal habeas corpus proceedings underscored the importance of "doing it right the first time," i.e., minimizing time-consuming post-conviction proceedings by assuring high quality representation in federal death penalty cases at the trial level.[40] Similarly, a former Florida Attorney General testified before an American Bar Association Task Force studying representation in state death penalty cases that, "[b]eyond peradventure, better representation at trial and on appeal will benefit all concerned."[41]

Federal death penalty cases require knowledge of the extensive and complex body of law governing capital punishment *and* the intricacies of federal criminal practice and procedure. Neither one alone is sufficient to assure high quality representation. Lawyers and judges recounted cases in which seasoned federal criminal lawyers who lacked death penalty experience missed important issues. For example, one judge described a situation in which experienced and highly esteemed felony trial lawyers who had no capital experience simply did not know how to pursue the mitigation investigation required by the case. After many months had been invested, the court appointed an experienced capital litigator from outside the jurisdiction as "learned counsel." A series of mental health tests arranged by this attorney resulted in a decision by the Justice Department to withdraw the request for the death penalty on the eve of trial. The judge credited the "learned counsel" with obtaining that result, which the judge believed could have been achieved much earlier. On the other hand, differences between state and federal practice place a lawyer who may have prior capital experience but no prior federal criminal trial experience at a disadvantage. The federal sentencing guidelines, speedy trial act, rules of evidence and procedure, and the specifics of the federal death penalty law play an important role in representation. Also, because federal death penalty cases frequently involve complex drug conspiracies, familiarity with this specialized area of practice is often desirable. When lawyers with experience in both the federal trial and death penalty arenas cannot be found, some courts have attempted to combine strengths by appointing a team which includes an experienced federal criminal practitioner and an experienced state court capital litigator.

Judges praised the quality of the representation provided by the lawyers they appointed as higher than the ordinary standard of practice in federal criminal cases. Judges familiar with state death penalty trials found that the quality of representation in federal death penalty cases was superior to the norm in state death penalty cases as well. In a few cases, judges expressed disappointment with the quality of representation, but in these instances they generally had replaced the lawyers whose performance they considered deficient.

After having handled their first federal death penalty case, a number of learned counsel have accepted

**Exhibit 5 -  32**

subsequent appointments to such cases. This is a significant trend and one which the judiciary should seek to perpetuate. Judges and lawyers agreed that counsel with federal death penalty experience were more efficient than lawyers without such experience. The availability of these highly skillful and knowledgeable lawyers has been an important resource, particularly in districts that lack attorneys with death penalty trial experience. (See Section C.4.b, infra.) In contrast, in federal capital habeas corpus cases, very few lawyers have been willing to accept repeat appointments, so that the learning curve remains steep (and therefore time-consuming and costly) in almost every new case. The continued willingness of these learned counsel to accept appointments in federal death penalty cases is an important element of any strategy for managing the costs of representation while maintaining quality.[42] (See also Recommendation 1, "Qualifications for Appointment," in Part II of this report.)

**2. Federal Death Penalty Resource Counsel Project.** The federal defender program has no systemic counterpart to the Criminal Division of the Department of Justice, which centrally supports the work of federal prosecutors nationwide. While a U.S. Attorney's Office bringing a federal death penalty prosecution can obtain training, advice, legal research and brief-writing assistance, sample pleadings and supplemental staffing from the Justice Department,[43] the private panel attorneys defending federal death penalty cases are, for the most part, sole practitioners or partners in small law firms comprised of fewer than half a dozen attorneys. Furthermore, although federal defender organizations are centrally funded, the representation they provide is entirely de-centralized. In order to improve the quality of representation and the cost effectiveness of defense services, in FY 1992 the judiciary established the Federal Death Penalty Resource Counsel Project (RCP). The RCP currently consists of three experienced capital litigators who support the work of appointed counsel and provide advice to the Administrative Office of the U.S. Courts on a part-time basis.[44] The Resource Counsel Project has become essential to the delivery of high quality, cost-effective representation in federal death penalty cases.

Dividing the work regionally, Resource Counsel are available to provide assistance to defense counsel in every federal death penalty case. Judges, defense counsel, Administrative Office staff and Department of Justice death penalty policy makers praised their efforts and effectiveness. Resource Counsel's legal advice and pleadings have prevented lawyers from having to "reinvent the wheel" in every case. They have provided substantial assistance to courts and counsel in developing and implementing case budgeting procedures. They have assisted the Administrative Office and federal public defenders in discharging their statutory responsibilities to recommend qualified counsel for appointment. They have provided training opportunities for counsel. In addition, by monitoring prosecution decisions and following developments in this important area, they have provided critical statistical information and policy advice to the Administrative Office. (See also Recommendations 6, 8 and 9 ("Federal Death Penalty Resource Counsel," "Training," and "Case Budgeting") in Part II of this report.)

**3. Consultation Prior to Appointment of Counsel.** Since 1995, federal law has required the court, before appointing counsel in a federal death penalty case, to consult with the federal public defender for the district, or, if there is no federal public defender (or the defender has a conflict), with the Administrative Office of the United States Courts. This statutory requirement has generally, although

**Exhibit 5 - 33**

not universally, been honored. In a very few cases, judges have appointed counsel without formally consulting either the federal public defender or the Administrative Office. For the most part, judges have taken a case-by-case approach to seeking advice about the appointment of counsel, although in one district the court directed the federal public defender to provide a list of lawyers qualified to handle federal death penalty cases instead of consulting as each case arose. In districts not served by a federal public defender, judges have consulted with the Administrative Office, which generally refers the court to one of the three Federal Death Penalty Resource Counsel, who provide training and support to lawyers handling federal death penalty cases nationwide.[45] The consultation process assists judges in identifying qualified lawyers to appoint to federal death penalty cases. (See also Recommendation 2, "Consultation with Federal Defender Organizations or the Administrative Office," in Part II of this report.)

**4. Availability and Recruitment of Qualified Lawyers.** A defendant charged with an offense punishable by death is entitled to two lawyers by statute. (18 U.S.C. § 3005). A judge assigned a federal death penalty case may appoint private lawyers compensated on an hourly basis ("panel" attorneys) or, in a district served by a federal defender organization,[46] the court may appoint a lawyer employed by the FDO together with a panel attorney.[47] For the reasons discussed below, panel attorneys have been appointed in the vast majority of federal death penalty cases.

**a. Federal Defender Organizations.** Federal defender organizations are not currently able to provide representation in a large proportion of federal death penalty cases.[48] A few federal defender offices employ lawyers with prior death penalty experience gained in state court, but most do not. Indeed, lawyers in federal defender offices may also lack significant experience trying homicide cases, because few such cases are brought in the federal courts. Even federal defenders with extensive federal criminal experience feel themselves unqualified to provide representation without the participation of a "learned" counsel with capital case experience. Trial experience in non-capital cases is no substitute for the training required to prepare for the penalty phase of a capital case and to develop an overall trial strategy that integrates both phases. In almost all instances in which a judge has appointed a federal defender organization as counsel, the FDO has been joined by a panel attorney with death penalty experience.

Another obstacle to relying on federal defender organizations to provide representation in a larger proportion of federal death penalty cases is the effect of an appointment on the defender office as a whole. Death penalty cases consume resources: the time of experienced lawyers and supervisors, investigators, and support staff; and budgetary allocations for experts. Defenders reported to the Subcommittee that the time commitment involved in handling a death penalty case was disruptive, especially in districts in which it was difficult for the federal defender organization to compensate for the appointment in the death penalty case by reducing the number of non-capital cases assigned to the office. Lawyers assigned to federal death penalty cases generally transferred their existing cases to other attorneys and reduced or eliminated their intake of new cases. Especially in smaller offices, where the added caseload had to be divided among fewer lawyers, death penalty cases interfered with the office's ability to fulfill its obligations to other clients.

**Exhibit 5 - 34**

**b. Panel Attorneys.** To date, courts generally have been able to locate and recruit a sufficient number of qualified lawyers to meet the need for representation. In some areas of the country, particularly those with state death penalty statutes, a substantial number of lawyers have developed experience defending capital cases. Not all of these lawyers, however, are fully qualified to provide representation in *federal* death penalty cases, because of unfamiliarity with important aspects of federal criminal practice. In other areas, especially those in which there is not a state death penalty statute, courts have been unable to recruit qualified lawyers from within the district, and have appointed lawyers with death penalty experience from other states. The Subcommittee found that judges who appointed counsel from outside their districts in order to meet qualification standards experienced a very high degree of satisfaction with the representation provided in their cases.[49] Typically, these judges had appointed one of the small (but growing) number of litigators who have provided representation in two or more federal death penalty cases. Both the appointing judges and the local counsel reported a range of resulting benefits, including the on-the job training of the local co-counsel.[50] (See also Recommendation 4, "Appointment of the Federal Defender Organization," in Part II of this report.)

**5. Adequacy of Compensation to Attract Qualified Counsel.** Current federal law authorizes an attorney in a federal death penalty case to be paid up to $125 per hour.[51] At present, this maximum hourly rate appears adequate. Several years ago, the Judicial Conference reported that, "[w]hile many courts find the quality of panel attorneys [in non-capital cases] to be very high, serious funding difficulties and inadequate compensation hamper many courts in their ability to recruit and retain experienced attorneys as members of the CJA panel."[52] If the "real" (inflation-adjusted) hourly rate were to decline substantially, as it has for non-capital federal criminal representation, fulfillment of the judiciary's statutory and constitutional obligations to appoint qualified counsel might be jeopardized.[53]

Panel attorneys who are qualified for appointment to a federal death penalty case are generally among the most experienced and respected criminal practitioners. Consequently, many of them command high fees for retained criminal work and, in some instances, for civil litigation. Without exception, lawyers appointed in federal death penalty cases reported earning hourly rates from private clients that are much higher than (and often double) the maximum rate that may be paid for their representation in a federal capital case. Although the hourly rates of compensation in federal capital cases are higher than those paid in non-capital federal criminal cases,[54] they are quite low in comparison to hourly rates for lawyers generally, and to the imputed hourly cost of office overhead.[55] Most of the lawyers interviewed said they would not be willing to accept appointment to federal death penalty cases at the hourly rates which are authorized for non-capital representation.

One of the reasons it is sometimes difficult to recruit qualified counsel for a federal death penalty case is that lawyers in federal death penalty cases have to decline work they would otherwise accept while the capital case is pending. A single death penalty case can preclude a lawyer from accepting any other clients for a significant period.[56] Especially in the months preceding trial, defending a death penalty case often consumes all of an attorney's time. A lawyer's unavailability can significantly damage the network of referrals and name recognition vital to sustaining a small practice. One judge in a district with a very active criminal defense bar found that several lawyers declined appointment to a capital case

**Exhibit 5 - 35**

because of the anticipated length of the trial and the effect the case would have on their retained practice.

A number of lawyers recounted the detrimental effect of a single capital case on their practices. "You do lose business. People know you're busy and don't call," said one attorney who was interviewed. Another lawyer described the effect of a lengthy death penalty case involving a drug conspiracy on his practice as "devastating." Some lawyers also feel they lose potentially lucrative white-collar business once they become categorized as death-penalty lawyers. Lawyers also believe they lose future clients because of lack of exposure. One lawyer who had been devoting all of his professional time to a large, multi-defendant case recounted running into a journalist who said he had thought the lawyer must have left town because he had not seen him at the state courthouse for so long.

Another factor discouraging lawyers with active practices from accepting appointment to a federal death penalty case is a reluctance to become economically dependent on the timely payment of vouchers. Although generally lawyers did not complain about the timeliness of payments, in more than one case a long delay in the approval of vouchers forced lawyers to borrow money to pay office expenses. (See Recommendation 1(e), "Hourly Rate of Compensation for Counsel," in Part II of this report.)

**6. Number of Counsel.** Since the First Judiciary Act in 1789, federal law has provided for the appointment of a minimum of two lawyers per defendant in a capital case. Judges have generally appointed two lawyers in federal death penalty cases, although there have been rare instances in which the court has not done so until after the prosecution has filed notice of its intention to seek the death penalty, effectively delaying defense preparation. In a few cases, a judge has formally appointed more than two lawyers. This usually has occurred because the judge was dissatisfied with one or more of the lawyers originally appointed, but felt the overall ability of the defense team to meet statutory time limits and to provide an effective defense would be better accomplished by adding a new lawyer with needed skills rather than by replacing the lawyer originally appointed.

The defense team in federal capital cases may include paralegals, investigators and less experienced lawyers, generally billing at an hourly rate substantially below that of lead counsel. The additional lawyers who work on the case generally are not formally appointed, but rather are authorized by the court to work on limited and discrete tasks. When these assistant counsel are used effectively, total costs of attorney compensation are reduced, because the average hourly rate is reduced. For example, one appointed lawyer, who was authorized by the court to receive the statutory maximum of $125 per hour, hired a less experienced lawyer at $45 per hour to listen

to thousands of hours of wiretap tapes and identify the important parts, thus achieving substantial

savings.[57] (See Recommendation 3, "Appointment of More than Two Lawyers," in Part II of this report.)

### D. Efforts to Control the Cost of Representation.

**Exhibit 5 - 36**

Judges presiding over federal capital cases have been mindful of the need to closely monitor and control costs, and have pursued several strategies to this end. Probably the paramount concern has been to appoint responsible, trustworthy and experienced lawyers who will themselves exercise judgment about the reasonableness of costs. After closely reviewing vouchers, the judges interviewed indicated their satisfaction with the integrity of the lawyers they had appointed. In a very few instances, judges removed the lawyers who had first been appointed to the case, sometimes by a different judicial officer. The most common reason for removal was lack of death penalty experience evidenced in the lawyers' failure to identify and focus on the more promising lines of investigation, thus wasting resources.

Judges have used a variety of techniques to control costs. Many judges, particularly those presiding over cases filed in the last two years, have established budgets for the cost of defense representation. In one complex multi-defendant case, a judge directed the clerk of court to develop a computer program to assist in the tracking of expenditures. Other judges recounted denying or reducing requests for experts, and asking counsel to determine whether a qualified expert could be found at a lower rate or to persuade the expert to reduce the requested fee.

Judges also authorized the hiring of paralegals to reduce the costs of coordinating and distributing materials among defense counsel in multi-defendant cases.

Interviews with lawyers also revealed a reassuring degree of restraint. A number of lawyers recounted decisions not to request funds for certain experts or services, and almost all of them negotiated reduced rates or obtained some services from experts on a pro bono basis, recognizing that by reducing costs whenever possible, it would be easier to obtain judicial approval for other needed services. In multi-defendant cases, lawyers, both on their own and with judicial prompting, coordinated discovery and motions practice, thereby reducing the

potential for duplicative work. (See Recommendations 9 and 10 ("Case Budgeting" and "Case Management") in Part II of this report.)

## CONCLUSION

The recommendations set forth in Part II of this report should be adopted by the Judicial Conference of the United States and implemented by the judiciary.

## II. RECOMMENDATIONS AND COMMENTARY

**Exhibit 5 -  37**

## 1. Qualifications for Appointment.

a. <u>Quality of Counsel.</u> Courts should ensure that all attorneys appointed in federal death penalty cases are well qualified, by virtue of their prior defense experience, training and commitment, to serve as counsel in this highly specialized and demanding type of litigation. High quality legal representation is essential to assure fair and final verdicts, as well as cost-effective case management.

b. <u>Qualifications of Counsel.</u> As required by statute, at the outset of every capital case, courts should appoint two counsel, at least one of whom is experienced in and knowledgeable about the defense of death penalty cases. Ordinarily, "learned counsel" should have distinguished prior experience in the trial, appeal, or post-conviction review of federal death penalty cases, or distinguished prior experience in *state* death penalty trials, appeals, or post-conviction review that, in combination with co-counsel, will assure high quality representation.

c. <u>Special Considerations in the Appointment of Counsel on Appeal.</u> Ordinarily, the attorneys appointed to represent a death-sentenced federal appellant should include at least one attorney who did not represent the appellant at trial. In appointing appellate counsel, courts should, among other relevant factors, consider:

> i. the attorney's experience in federal criminal appeals and capital appeals;
> ii. the general qualifications identified in paragraph 1(a), above; and
> iii. the attorney's willingness, unless relieved, to serve as counsel in any post-conviction proceedings that may follow the appeal.

d. <u>Special Considerations in the Appointment of Counsel in Post-Conviction Proceedings.</u> In appointing post-conviction counsel in a case where the defendant is sentenced to death, courts should consider the attorney's experience in federal post-conviction proceedings and in capital post-conviction proceedings, as well as the general qualifications set forth in paragraph 1(a).

e. <u>Hourly Rate of Compensation for Counsel.</u> The rate of compensation for counsel in a capital case should be maintained at a level sufficient to assure the appointment of attorneys who are appropriately qualified to undertake such representation.

### Commentary

As Recommendation 1(a) indicates, the first responsibility of the court in a federal death penalty case is to appoint well-trained, experienced and dedicated defense counsel. Federal law requires the appointment of two counsel to represent a defendant in a federal death penalty case, of whom at least one must be "learned in the law applicable to capital cases." 18 U.S.C. § 3005. Additional requirements relating to counsel's experience are codified at

**Exhibit 5 -  38**

21 U.S.C. § 848(q)(5)-(7). Legislatures, courts, bar associations, and other groups that have considered the qualifications necessary for effective representation in death penalty proceedings have consistently demanded a higher degree of training and experience than that required for other representations. Such heightened standards are required to ensure that representation is both cost-effective and commensurate with the complexity and high stakes of the litigation. The standards listed in Recommendations 1(b) - (d) are designed to assist courts in identifying the specific types of prior experience which have been deemed most valuable in the experience of the federal courts thus far. They emphasize the importance of bringing to bear both death penalty expertise and experience in the practice of criminal defense in the federal courts.

Recommendation 1(b) calls for the appointment of specially qualified counsel "at the outset" of a case, because virtually all aspects of the defense of a federal death penalty case, beginning with decisions made at the earliest stages of the litigation, are affected by the complexities of the penalty phase. Early appointment of "learned counsel" is also necessitated by the formal "authorization process" adopted by the Department of Justice to guide the Attorney General's decision-making regarding whether to seek imposition of a death sentence. (See United States Attorney's Manual § 9-10.000.) Integral to the authorization process is a presentation to Justice Department officials of the factors which would justify not seeking a death sentence against the defendant. A "mitigation investigation" therefore must be undertaken at the commencement of the representation. Since an early decision not to seek death is the least costly way to resolve a potential capital charge, a prompt preliminary mitigation investigation leading to effective advocacy with the Justice Department is critical both to a defendant's interests and to sound fiscal management of public funds.

Trial courts should appoint counsel with "distinguished prior experience" (Recommendation 1(b)) in death penalty trials or appeals, even if meeting this standard requires appointing a lawyer from outside the district in which a matter arises. The preparation of a death penalty case for trial requires knowledge, skills and abilities which are absent in even the most seasoned felony trial lawyers, if they lack capital experience. An attorney knowledgeable about the nature of capital pretrial litigation, the scope of a mitigation investigation and the impact of the sentencing process on the guilt phase is indispensable and generally produces cost efficiencies. The costs of travel and other expenses associated with "importing" counsel from another jurisdiction can be minimized with careful planning by counsel and the court. With appropriate forethought, investigations, client counseling, court appearances and other obligations can be coordinated to maximize the efficient use of counsel's time and ensure cost-effectiveness.

Recommendations 1(c) and (d), with respect to the appointment of appellate and post-conviction counsel, respond to the requirement of 21 U.S.C. § 848(q) that representation in death penalty cases continue through post-conviction proceedings. Because trial counsel ordinarily will be precluded by a conflict of interest from representing the defendant in a post-conviction proceeding under 28 U.S.C. § 2255, continuity of representation and the efficient use of resources generally will best be achieved by appointing, at the appellate stage, at least one new lawyer who may continue to provide representation in any post-conviction proceedings. This should promote continuing representation by a lawyer who is already familiar with the record. In determining which, if any, of a death-sentenced defendant's prior counsel to appoint as post-conviction or appellate counsel, courts should consult with those counsel, the

**Exhibit 5 - 39**

Federal Death Penalty Cases

district's federal defender organization and/or the Administrative Office (See Recommendation 2).

Recommendation 1(e) reflects the fact that appropriate rates of compensation are essential to maintaining the quality of representation required in a federal capital case. The time demands of these cases are such that a single federal death penalty representation is likely to become, for a substantial period of time, counsel's exclusive or nearly exclusive professional commitment. It is therefore necessary that the hourly rate of compensation be fair in relation to the costs associated with maintaining a criminal practice. Federal statute currently provides for an hourly rate of up to $125 (21 U.S.C. § 848 (q)(10)(A)), which the Subcommittee finds to be adequate at the present time. However, this figure should be reviewed at least every three years, to ensure that it remains sufficient in light of inflation and other factors. (See 18 U.S.C. § 3006A(d)(1).)

**2. Consultation with Federal Defender Organizations or the Administrative Office.**

a. Notification of Statutory Obligation to Consult. The Administrative Office of the U.S. Courts (Administrative Office) and federal defender organizations should take appropriate action to ensure that their availability to provide statutorily mandated consultation regarding the appointment of counsel in every federal death penalty case is well known to the courts. (See 18 U.S.C. § 3005.)

b. Consultation by Courts in Selecting Counsel. In each case involving an offense punishable by death, courts should, as required by 18 U.S.C. § 3005, consider the recommendation of the district's Federal Public Defender (FPD) (unless the defender organization has a conflict) about the lawyers to be appointed. In districts not served by a Federal Public Defender Organization, 18 U.S.C. § 3005 requires consultation with the Administrative Office. Although not required to do so by statute, courts served by a Community Defender Organization should seek the advice of that office.

c. Consultation by Federal Defender Organizations and the Administrative Office in Recommending Counsel. In discharging their responsibility to recommend defense counsel, FDOs and the Administrative Office should consult with Federal Death Penalty Resource Counsel in order to identify attorneys who are well qualified, by virtue of their prior defense experience, training and commitment, to serve as lead and second counsel.

### Commentary

Since 1994, courts have been required to consider the recommendation of their federal public defender organization[58] or the Administrative Office regarding the appointment of counsel in each federal death penalty case. The Administrative Office has notified courts of this relatively recent innovation, and it has been largely followed and yielded results satisfying to judges, defense counsel and prosecutors. In a small number of cases, however, the Subcommittee found that courts had ignored or been unaware of the consultation requirement. For that reason, Recommendation 2(a) suggests that the Administrative Office take further steps to ensure that all courts are familiar with their obligations in this area and with the nature of the assistance which will be provided to them upon their request (see Commentary

**Exhibit 5 -  40**

accompanying Recommendation 2(c)).

Recommendation 2(b) reflects the Subcommittee's view that recommendations concerning appointment of counsel are best obtained on an individualized, case-by-case basis. The relative infrequency of federal death penalty appointments, and the typically swift response which any court requesting a recommendation can expect, makes lists or "panels" of attorneys both unnecessary and, in some respects, impractical. Currently, within approximately 24 hours of receipt of a request, the Administrative Office or federal defender provides the court with the names of attorneys who not only are qualified to serve as counsel but who also have been contacted and indicated their willingness to serve in the particular case.[59] These individualized recommendations help to ensure that counsel are well-suited to the demands of a particular case and compatible with one another and the defendant. Case-specific consultation is also required by existing Judicial Conference policy (see paragraph 6.01B of the Guidelines for the Criminal Justice Act (CJA Guidelines), Volume VII, Guide to Judiciary Policies and Procedures, explaining the 18 U.S.C. § 3005 consultation requirement and suggesting that in developing a recommendation, consideration be given to "the facts and circumstances of the case.")

Recommendation 2(b) also suggests that in districts served by a Community Defender Organization (rather than a Federal Public Defender Organization) courts extend the statutory requirement and seek the recommendation of the head of that organization about appointment of counsel in federal death penalty cases. The omission of specific reference to Community Defender Organizations in the statute is not explained in any legislative history, and consultation with a Community Defender Organization is likely to be as valuable as consultation with a Federal Public Defender Organization.

To assist federal defender organizations and the Administrative Office in discharging their responsibility to recommend counsel, the judiciary has contracted with three Federal Death Penalty Resource Counsel, experienced capital litigators whose work is described in Section C.2 of Part I of this report. Recommendation 2(c) recognizes the value of the assistance provided by Resource Counsel and urges federal defenders and the Administrative Office to continue to work closely with them. Resource Counsel are knowledgeable about and maintain effective communication with defense counsel nationwide. Their ability promptly to match attorneys with cases is of great value to the judiciary.

## 3. Appointment of More Than Two Lawyers.

> Number of Counsel. Courts should not appoint more than two lawyers to provide representation to a defendant in a federal death penalty case unless exceptional circumstances and good cause are shown. Appointed counsel may, however, with prior court authorization, use the services of attorneys who work in association with them, provided that the employment of such additional counsel (at a reduced hourly rate) diminishes the total cost of representation or is required to meet time limits.

### Commentary

Exhibit 5 - 41

The norm in federal death penalty cases is the appointment of two counsel per defendant. More than two attorneys should be appointed only in exceptional circumstances. Courts contemplating the appointment of a third counsel might consider contacting the Administrative Office for information and advice about whether circumstances warrant such appointment. Notwithstanding this suggested limit on the number of attorneys charged with responsibility for the defense in its entirety, courts are encouraged to permit appointed counsel to employ additional attorneys to perform more limited services where to do so would be cost-effective or otherwise enhance the effective use of resources. For example, in many federal death penalty cases the prosecution provides to defense counsel an extensive amount of discovery material which must be reviewed for relevance and organized for use by the defense. Providing legal assistance to appointed counsel at a lower hourly rate may prove economical or it may be a necessity in light of court deadlines. This is consistent with existing Judicial Conference policy with respect to all Criminal Justice Act representations (see CJA Guideline 2.11A), and is emphasized here because of its cost containment potential in capital litigation.

**4. Appointment of the Federal Defender Organization (FDO).**

a. <u>FDO as Lead Counsel.</u> Courts should consider appointing the district's FDO as lead counsel in a federal death penalty case only if the following conditions are present:

> i. the FDO has one or more lawyers with experience in the trial and/or appeal of capital cases who are qualified to serve as "learned counsel"; and

> ii. the FDO has sufficient resources so that workload can be adjusted without unduly disrupting the operation of the office, and the lawyer(s) assigned to the death penalty case can devote adequate time to its defense, recognizing that the case may require all of their available time; and

> iii. the FDO has or is likely to obtain sufficient funds to provide for the expert, investigative and other services reasonably believed to be necessary for the defense of the death penalty case.

b. <u>FDO as Second Counsel.</u> Courts should consider appointing the district's FDO as second counsel in a federal death penalty case only if the following conditions are present:

> i. the FDO has sufficient resources so that workload can be adjusted without unduly disrupting the operation of the office, and the lawyer(s) assigned to the death penalty case can devote adequate time to its defense, recognizing that the case may require all of their available time; and

> ii. the FDO has or is likely to obtain sufficient funds to provide for the expert, investigative and other services reasonably believed to be necessary for the defense of the death penalty case.

# Commentary

Federal defender organizations have provided representation in only a small number of the federal death penalty cases filed to date. In many cases, representation by defender organizations has been precluded because of conflicts of interest which arise because the organization has represented either another defendant or a witness in the case. Even where the defender organization is not disqualified by a conflict, however, there are good reasons to proceed with caution in making appointments in this area. A decision to appoint a defender organization either as lead or as second counsel in a capital case should be made only after consideration of the factors identified in this Recommendation and consultation between the court and the federal defender.

Recommendation 4(a) is intended to inform courts, which are accustomed to relying on federal defenders to undertake the most difficult representations, that few federal defender attorneys currently possess appropriate qualifications and experience to act as lead counsel in a federal death penalty case. Because violent felony offenses, particularly homicides, rarely are prosecuted in the federal courts, there is little opportunity for federal court practitioners to learn even the fundamentals relevant to the guilt phase defense of a federal death penalty case. Unless they gained such experience in state court before joining the defender organization, most federal defender attorneys have little to no experience defending a homicide case; of those who did bring with them such state court background, few have capital experience.

Notwithstanding these considerations, however, there is much to be gained from the involvement of a defender organization in the defense of a federal capital case. Recommendation 4(b) suggests pairing a defender organization as co-counsel with an experienced capital litigator, an approach which has successfully been employed in some cases. In these cases, the defender organization has benefitted from the expertise of the "learned counsel" and gained valuable capital litigation experience as well. At the same time, the "learned counsel" has benefitted from the institutional resources and local court expertise of the defender staff. Whether as lead or second counsel[60], a federal defender organization should not be required to undertake more than one federal death penalty representation at a time unless the head of the organization believes such an arrangement is appropriate. Recommendations 4(a) and (b) acknowledge that capital cases inevitably and seriously disrupt the normal functioning of an office. To undertake too much death penalty litigation would seriously threaten the effective performance of a defender organization's overriding responsibility to provide representation to a substantial number of financially eligible criminal defendants in its district each year.

## 5. The Death Penalty Authorization Process.

a. Streamlining the Authorization Process. The Department of Justice should consider adopting a "fast track" review of cases involving death-eligible defendants where there is a high probability that the death penalty will not be sought.

**Exhibit 5 - 43**

b. Court Monitoring of the Authorization Process. Courts should exercise their supervisory powers to ensure that the death penalty authorization process proceeds expeditiously.

## Commentary

A decision not to seek the death penalty against a defendant has large and immediate cost-saving consequences. The sooner that decision is made, the larger the savings. Since the death penalty ultimately is sought against only a small number of the defendants charged with death-punishable offenses, the process for identifying those defendants should be as expeditious as possible in order to preserve funding and minimize the unnecessary expenditure of resources. Recommendation 5(a) calls upon the Department of Justice to increase the speed with which it makes decisions not to authorize seeking the death penalty. Recommendation 5(b) urges judges to oversee the authorization process by monitoring the progress of the decisionmaking and imposing reasonable deadlines on the prosecution in this regard. Courts should also ensure that the prosecution's timetables allow for meaningful advocacy by counsel for the defendant.

## 6. Federal Death Penalty Resource Counsel.

a. Information from Resource Counsel. In all federal death penalty cases, defense counsel should obtain the services of Federal Death Penalty Resource Counsel in order to obtain the benefit of model pleadings and other information that will save time, conserve resources and enhance representation. The judiciary

should allocate resources sufficient to permit the full value of these services to be provided in every case.

b. Technology and Information Sharing. The Administrative Office should explore the use of computer-based technology to facilitate the efficient and cost-effective sharing of information between Resource Counsel and defense counsel in federal death penalty cases.

## Commentary

Recommendation 6(a) urges the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project (described in Section C.2 of Part I of this report), which has become essential to the delivery of high quality, cost-effective representation in federal death penalty cases, and to ensure the Project's continued effectiveness.

Recommendation 6(b) recognizes that recent innovations in computer technology are making it increasingly easy and inexpensive for individuals who are geographically dispersed to share information. The Administrative Office should explore the feasibility and cost-effectiveness of using computer and other technology to enhance the delivery of support to appointed counsel in federal death penalty cases.

**Exhibit 5 -  44**

Federal Death Penalty Cases

## 7. Experts.

a. Salaried Positions for Penalty Phase Investigators. The federal defender program should consider establishing salaried positions within FDOs for persons trained to gather and analyze information relevant to the penalty phase of a capital case. FDOs should explore the possibility that, in addition to providing services in death penalty cases to which their FDO is appointed, it might be feasible for these investigators to render assistance to panel attorneys and to other FDOs.

b. Negotiating Reduced Rates. Counsel should seek to contain costs by negotiating reduced hourly rates and/or total fees with experts and other service providers.

c. Directory of Experts. A directory of experts willing to provide the assistance most frequently needed in federal death penalty cases, and their hourly rates of billing, should be developed and made available to counsel.

### Commentary

Penalty phase investigators, or "mitigation specialists," as they have come to be called, are individuals trained and experienced in the development and presentation of evidence for the penalty phase of a capital case. Their work is part of the existing "standard of care" in a federal death penalty case. (See Section B.7 of Part I of this Report.) Because the hourly rates charged by mitigation specialists are lower than those authorized for appointed counsel, employment of a mitigation specialist is likely to be a cost-effective approach to developing the penalty phase defense.

Mitigation specialists are, however, in short supply. In most of the federal death penalty cases the Subcommittee examined, penalty phase investigators were not available locally. Courts thus were required to pay for the costs of travel and related expenses in addition to paying the mitigation specialist's hourly rates. Recommendation 7(a) suggests ameliorating this problem by employing and training persons for this work in federal defender organizations. Because of the cost containment potential, the feasibility of having these salaried employees work not only on cases to which their federal defender organization is appointed, but on others within their region, should be explored as well.

Recommendation 7(b) encourages counsel to negotiate a reduced hourly rate for expert services whenever possible. Private experts must be employed in death penalty cases, but the cost of their services can and should be contained. When asked to provide services for the defense of an indigent criminal defendant, many experts are willing to accept fees lower than their customary hourly rates for private clients. In addition, courts and counsel should agree in advance to a total amount which may be expended for a particular expert. If it appears that costs will exceed the agreed-upon amount, counsel should return to the court for prior authorization to secure them. If travel costs are to be incurred, government rates should be obtained.

**Exhibit 5 -  45**

## 8. Training.

Federal Death Penalty Training Programs. The Administrative Office should continue to offer and expand training programs designed specifically for defense counsel in federal death penalty cases.

### Commentary

All of the defense counsel interviewed by the Subcommittee stressed the importance of participating in specialized death penalty training programs. Although the individuals appointed as "learned counsel" comprised a highly experienced group of lawyers, they nevertheless continued to attend training programs to update and refine their skills and knowledge, and emphasized that they availed themselves of such opportunities whenever possible. There are, however, very few training programs anywhere in the country specializing in the defense of death penalty cases, and there is only one -- an annual one-day program organized by the Federal Death Penalty Resource Counsel Project and funded by the Administrative Office -- focusing entirely on federal death penalty representation. Almost all of the defense counsel the Subcommittee interviewed had attended this program and identified it as a significant resource. With the case law relatively undeveloped and so many issues being litigated for the first time, the opportunity for counsel to benefit from the research of others and to share information and ideas was considered especially important and cost-effective. The Administrative Office and Federal Death Penalty Resource Counsel should ensure that training opportunities continue to meet the needs of appointed counsel in this area.

## 9. Case Budgeting.

a. Consultation with Prosecution. Upon learning that a defendant is charged with an offense punishable by death, courts should promptly consult with the prosecution to determine the likelihood that the death penalty will be sought in the case and to find out when that decision will be made.

b. Prior to Death Penalty Authorization. Ordinarily, the court should require defense counsel to submit a litigation budget encompassing all services (counsel, expert, investigative and other) likely to be required through the time that the Department of Justice(DOJ) determines whether or not to authorize the death penalty.

c. After Death Penalty Authorization. As soon as practicable after the death penalty has been authorized by DOJ, defense counsel should be required to submit a further budget for services likely to be needed through the trial of the guilt and penalty phases of the case. In its discretion, the court may determine that defense counsel should prepare budgets for shorter intervals of time.

d. Advice from Administrative Office and Resource Counsel. In preparing and reviewing case budgets, defense counsel and the courts should seek advice from

the Administrative Office and Federal Death Penalty Resource Counsel, as may be appropriate.

**Exhibit 5 -  46**

e. <u>Confidentiality of Case Budgets.</u> Case budgets should be submitted <u>ex parte</u> and should be filed and maintained under seal.

f. <u>Modification of Approved Budget.</u> An approved budget should guide counsel's use of time and resources by indicating the services for which compensation is authorized. Case budgets should be re-evaluated when justified by changed or unexpected circumstances, and should be modified by the court where good cause is shown.

g. <u>Payment of Interim Vouchers.</u> Courts should require counsel to submit vouchers on a monthly basis, and should promptly review, certify and process those vouchers for payment.

h. <u>Budgets In Excess of $250,000.</u> If the total amount proposed by defense counsel to be budgeted for a case exceeds $250,000, the court should, prior to approval, submit such budget for review and recommendation to the Administrative Office.

i. <u>Death Penalty Not Authorized.</u> As soon as practicable after DOJ declines to authorize the death penalty, the court should review the number of appointed counsel and the hourly rate of compensation needed for the duration of the proceeding pursuant to CJA Guideline 6.02.B(2).

j. <u>Judicial Conference Guidelines.</u> The Judicial Conference should promulgate guidelines on case budgeting for use by the courts and counsel.

k. <u>Judicial Training for Death Penalty Cases.</u> The Federal Judicial Center should work in cooperation with the Administrative Office to provide training for judges in the management of federal death penalty cases and, in particular, in the review of case budgets.

## Commentary

The Judicial Conference has endorsed the use of case budgets to manage the cost of capital habeas corpus cases. (CJA Guideline 6.02.F.) Case budgets for federal death penalty cases are designed to serve purposes similar to those accomplished by case budgets for capital habeas corpus cases. A complete case budget will require the lawyer to incorporate cost considerations into litigation planning and will encourage the use of less expensive means to achieve the desired end. For example, a budget might request appointment of an expert to perform a task that could be accomplished by a lawyer, justifying the request by showing that the expert's work will produce a corresponding reduction in the attorney hours required.

Submission and review of a budget will also assist the court in monitoring the overall cost of representation in the case, and determining the reasonableness of costs. Case budgets are increasingly being requested by courts or submitted by lawyers in federal death penalty cases. Most judges and lawyers interviewed by the Subcommittee were receptive to the idea of case budgeting, provided that

**Exhibit 5 -  47**

Federal Death Penalty Cases

persons with expertise in the defense of federal death penalty cases were available to assist in the development or the review of a case budget. Recommendation 9(d) encourages courts and counsel to seek such assistance from the Administrative Office and Federal Death Penalty Resource Counsel.

Because of the unpredictability of pretrial litigation, it is impractical to require counsel to budget for an entire case from start to finish. At a minimum, the budgeting process should be in two stages, as suggested in Recommendations 9(b) and (c). The first stage begins when the lawyer is sufficiently familiar with the case to be able to present a budget reasonably related to the anticipated factual and legal issues in the case and continues until the Department of Justice makes its decision as to whether it will seek the death penalty. If a death penalty notice is filed, a further budget should be prepared. The court may require a single budget from authorization to trial, or a series of budgets covering shorter increments of time. If the prosecution will not seek the death penalty, Recommendation 9(i) calls for the court to review the case in accordance with CJA Guideline 6.02.B(2), to determine whether the number or compensation of counsel should be reduced.

Because case budgeting is time consuming, and because federal death penalty cases in which the prosecution decides not to seek the death penalty cost much less than cases in which the death penalty is authorized, it may not be cost-effective for counsel to prepare a case budget if authorization is improbable. For this reason, Recommendation 9(a) encourages courts to inquire of the prosecution whether authorization is unlikely. Furthermore, inquiring into the date by which the authorization decision will be made will provide information about how long a period the initial budget should cover, which will assist courts in reviewing budgets.

If a significant mitigation investigation is to be undertaken, the Subcommittee recommends that a budget be developed for this work.

Recommendation 9(e) calls for case budgets to be submitted ex parte and maintained permanently under seal. A case budget requires defense counsel to spell out the overall litigation plan for the case. Consequently, it is an extremely sensitive document and contains privileged information. This approach is consistent with Judicial Conference policy regarding capital habeas case budgets. (CJA Guideline 6.02F.)

Review of case budgets greater than $250,000 by the Administrative Office should assist courts in determining whether the cost of representation is reasonable in light of experience in other similar cases and in identifying areas in which expenses might be reduced.

## 10. Case Management.

a. Non-Lawyer Staff. Where it will be cost-effective, courts should consider authorizing payment for services to assist counsel in organizing and analyzing documents and other case materials.

b. Multi-defendant Cases.

**Exhibit 5 - 48**

i. <u>Early Decision Regarding Severance.</u> Courts should consider making an early decision on severance of non-capital from capital co-defendants.

ii. <u>Regularly Scheduled Status Hearings.</u> Status hearings should be held frequently, and a schedule for such hearings should be agreed upon in advance by all parties and the court.

iii. "<u>Coordinating Counsel.</u>" In a multi-defendant case (in particular a multi-defendant case in which more than one individual is eligible for the death penalty), and with the consent of co-counsel, courts should consider designating counsel for one defendant as "coordinating counsel."

iv. <u>Shared Resources.</u> Counsel for co-defendants should be encouraged to share resources to the extent that doing so does not impinge on confidentiality protections or pose an unnecessary risk of creating a conflict of interest.

v. <u>Voucher Review</u>. In large multi-defendant cases, after approving a case budget, the court should consider assigning a magistrate judge to review individual vouchers. The court should meet with defense counsel at regular intervals to review spending in light of the case budget and to identify and discuss future needs.

## Commentary

Recommendation 10(a) recognizes that the large volume of discovery materials and pleadings associated with a federal death penalty case may make it cost-effective for courts to authorize (and appointed counsel to employ) the services of law clerks, paralegals, secretaries or others to perform organizational work which would otherwise have to be performed by counsel at a higher hourly rate. (See also Commentary accompanying Recommendation 3, endorsing the practice of authorizing counsel to obtain the services of additional attorneys under appropriate circumstances.) Judicial Conference policy provides that, in general, appointed counsel may not be reimbursed for expenses deemed part of their office overhead (CJA Guideline 2.28); however, unusual expenses of this nature may be compensated (CJA Guideline 3.16). The Guidelines suggest that in determining whether an expense is unusual or extraordinary, "consideration should be given to whether the circumstances from which the need arose would normally result

in an additional charge to a fee paying client over and above that charged for overhead expenses" (CJA Guideline 3.16).

Recommendations 10(b)(i) - (iv) address some of the particular management burdens associated with multi-defendant federal death penalty cases. Special efforts are required to ensure the orderly administration of justice in these matters, which tend to become costly and cumbersome for courts and counsel.

Federal Death Penalty Cases

Recommendation 10(b)(i) suggests that courts make early decisions concerning severance of non-capital from capital co-defendants. In general, capital cases remain pending longer than non-capital cases and involve far greater amounts of pre-trial litigation. Separating the cases of non-capital co-defendants, where appropriate, may lead to swifter and less costly dispositions in those cases. The earlier such a decision is implemented, the greater will be the cost savings.

Recommendation 10(b)(ii) suggests that courts schedule frequent status hearings so that discovery and other matters may proceed efficiently and so that problems may be noted early and swiftly resolved. If the schedule for such status hearings (on a monthly or other basis) is agreed upon in advance, then all parties can plan accordingly and valuable time will not be wasted while counsel and judges try to find a mutually convenient time for their next meeting.

Recommendation 10(b)(iii) suggests that, if all counsel agree, courts consider designating the attorneys for one defendant as "coordinating counsel." Coordinating counsel might be responsible for arranging the efficient filing and service of motions and responses among the co-defendants, scheduling co-counsel meetings and court dates, facilitating discovery, or any other tasks deemed appropriate by counsel and the court. In multi-defendant cases where the federal defender organization represents a defendant eligible for the death penalty, courts should (taking into account the views of the federal defender) consider designating the FDO as coordinating counsel because of its institutional capabilities. In the event that a panel attorney is designated as coordinating counsel, the additional time and resources demanded by this role should be compensated.

## 11. Availability of Cost Data

The Administrative Office should improve its ability to collect and analyze information about case budgets and the cost of capital cases.

### Commentary

Only because there have been a comparatively small number of federal death penalty cases was it possible to assemble -- by painstaking manual collection -- the cost data relied upon by the Subcommittee. This process was necessitated by the limitations of the only available information source, the CJA payment system. The Administrative Office is in the process of replacing that system. Given the heightened significance of capital case costs to the federal defender program, the Administrative Office should give priority to ensuring that its new system will provide capital case data which is accurate, reliable and accessible. In addition, the Administrative Office should continuously track capital case costs so that the impact of appellate and post-conviction litigation can be analyzed, trends in case costs can be readily identified, and appropriate cost-containment mechanisms can be developed.

**Exhibit 5 -  50**

Federal Death Penalty Cases

Footnotes

1. 21 U.S.C. § 848, *codifying* Pub. L. 100-690, 102 Stat. 4382 (1988). The Supreme Court's decision in *Furman v. Georgia*, 408 U.S. 238 (1972), had invalidated the previously existing federal death penalty statutes.

2. Pub. L. 103-322, 108 Stat. 1959 (1994).

3. Coopers & Lybrand Consulting, Report on Costs and Recommendations for the Control of Costs of the Defender Services Program (C&L) at Appendix Table 0.1 (Jan. 28, 1998).

4. Dean Lefstein was assisted by Lisa Greenman, Attorney Advisor in the Defender Services Division of the Administrative Office of the U.S. Courts, and David Reiser, a consultant to the Division. In addition, Kathleen O'Connor, Budget Analyst, and Sylvia Fleming, Systems Support Analyst, assisted in the quantitative analysis.

5. Cost averages reported here do not include estimates of the cost of representation in cases in which a federal defender organization (FDO) served as sole or co-counsel. The available data were inadequate to make reliable estimates of the cost of work performed by FDO attorneys and staff, and using panel attorney payments alone in cases in which FDOs served as co-counsel would have understated the actual cost of representation. Because panel attorneys, rather than FDOs, have provided representation in the vast majority of cases, the actual payments approved for panel attorneys are a better source of information on the cost of representation than estimates of FDO costs. The cost averages in this report also do not include expenditures attributable to the case that arose from the bombing of the federal building in Oklahoma City. Payment information related to the defense of that extraordinary case remains under seal pursuant to court order. However, the data available to the Subcommittee affords an adequate basis for assessing the cost of the typical range of federal death penalty cases.

6. See 18 U.S.C. § 3005 (requiring appointment of two lawyers, including at least one "learned" counsel); 21 U.S.C. § 848(q) (setting higher maximum hourly rate for capital cases, establishing special qualifications for appointment, and setting special threshold for review of services other than counsel). These standards are discussed more fully in Sections B.7 (expert services), C.1 (learned counsel), C.5 (compensation of counsel), and C.6 (number of counsel).

7. Other factors considered by the Subcommittee included regional variations and variations over time. Although there have been too few federal death penalty cases to draw any statistically meaningful conclusions about whether the cost of representation varies regionally, the data which do exist suggest that there are not substantial differences such as those which have been noted in federal capital habeas corpus cases. Also, while annual costs of representation have varied -- probably as a result of the number of new cases for which few vouchers have yet been approved in a given fiscal year -- the average total cost per representation has remained stable and even declined from year to year. (See Appendix C, Chart C-1.) One possible explanation is that the proportion of highly complex drug conspiracy cases has declined, so that the average federal death penalty case is slightly less complex and expensive.

8. There is a small category of offenses over which the federal government has exclusive criminal jurisdiction. See 18 U.S.C. §§ 7, 13. Such cases cannot be prosecuted in a state court. However, most of the offenses charged

Federal Death Penalty Cases

in federal death penalty cases could also be prosecuted in a state court. Of the federal death penalty cases filed to date, it is uncertain precisely how many could have been prosecuted as *capital* cases in state court, because not all state laws provide for the death penalty, and the statutory standards for death penalty prosecutions vary from state to state. Interview data indicate, however, that the vast majority of federal death penalty cases could also have been prosecuted as state capital cases.

9. This estimate is based on cases tracked by the Federal Death Penalty Resource Counsel Project, which is described in Section C.2, *infra*.

10. Since January 1995, the Justice Department has reviewed <u>all</u> federal death penalty cases in order to monitor and centralize decisionmaking as to those cases in which the death penalty will be sought. Prior to that time, there was centralized review only of cases in which the local U.S. Attorney requested permission to seek the death penalty, and there was no requirement that the Attorney General review cases in which the local United States Attorney did not request such authorization. (The Department of Justice reports that 46 such cases were reviewed by the Attorney General from 1990 to 1994, of which 36 were authorized.) Between January 1995 and December 1997, the Attorney General reviewed 162 federal death penalty cases in which she did not seek the death penalty; however, this statistic cannot be extrapolated to determine the likely number of unauthorized cases for the period from 1988 to 1995, because fewer federal offenses were punishable by death before the enactment of the 1994 crime bill.

11. The sample consists of 78 authorized federal death penalty cases, 58 cases in which authorization was denied, and 7 cases in which the authorization decision was still pending. The $142,000 figure reflects the average (mean) total cost of vouchers approved for the representation of a single defendant prior to the end of FY 1997. Because federal death penalty cases typically extend over more than one fiscal year, *total* costs are more helpful in analyzing costs and making recommendations for case budgeting and other controls than *annual* costs. The distribution of costs for a representation on an annual basis may reflect more about how quickly vouchers are submitted and approved in a particular case than about the reasonable cost of the work required in the case in any given year. Average cost statistics reported are based on the total of payments made through the end of FY 1997, and may not be complete for any given case. The Subcommittee's sample over-represents the proportion of federal death penalty cases in which authorization was granted; therefore the average cost of the cases in the sample is greater than the average total cost of <u>all</u> federal death penalty cases.

12. This number was provided by the Department of Justice in a letter to the Honorable William Terrell Hodges, Chair of the Executive Committee of the Judicial Conference of the United States, dated April 14, 1998. The Department provided the Subcommittee with a list identifying <u>113</u> authorized cases through December 12, 1997.

13. The "capital trials" in the Subcommittee's sample include one case in which defendants were acquitted of capital charges, and which therefore did not include a penalty phase, and one case in which the government withdrew its request for the death penalty mid-trial, because these cases were prepared and litigated through the guilt phase as capital cases, even though there was no penalty phase. Two cases resolved by guilty pleas after the commencement of jury selection but before the presentation of evidence have not been classified as capital trials, although in these cases the vast majority of costs associated with the trial of a federal death penalty case had been incurred.

14. See 21 U.S.C. § 848(i) (separate sentencing hearing); 18 U.S.C. § 3593(b) (same). All post-*Furman* state

**Exhibit 5 - 52**

Federal Death Penalty Cases

death penalty laws likewise provide for a bifurcated sentencing proceeding.

15. A report by the General Accounting Office (GAO) prepared shortly after the revival of the federal death penalty examined existing data concerning the additional costs associated with a death penalty prosecution. GAO, Limited Data Available on Costs of Death Sentences (Sept. 1989). Subsequently, the State Justice Institute sponsored a study responding to some of the GAO's methodological critiques of earlier studies. Phillip J. Cook & Donna B. Slawson, The Cost of Processing Murder Cases in North Carolina (1993). Cook and Slawson found that both the prosecution and the defense devoted much more time to a capital murder trial than to a non-capital murder trial, and that the capital trials lasted much longer. Id. at 61.

16. Source: Federal Death Penalty Resource Counsel Project data. In addition, some of the federal death penalty prosecutions not brought under the CCE or RICO provisions also involve drug conspiracies. For example, one prosecution under the civil rights law arose from a federal investigation into a related drug conspiracy. Another case in which the capital charge was based on a kidnapping statute also grew out of a drug conspiracy, as did a robbery case.

17. C&L at IV.81.

18. Source: Federal Death Penalty Resource Counsel Project data.

19. The number of representations in other offense categories was too small to generate meaningful averages; however, the average cost per representation in each category was lower than the average for drug cases.

20. As a result, the scope of the penalty phase in a federal capital case may be even wider than it is in states that adhere to the rules of evidence in the penalty phase.

21. Louis D. Bilionis & Richard A. Rosen, Lawyers, Arbitrariness and the Eighth Amendment, 75 Tex. L. Rev. 1301, 1316-17 (1997) (citing Woodson v. North Carolina, 428 U.S. 280, 304 (1976) (opinion of Stewart, Powell, & Stevens, JJ.).

22. Recent decisions illustrating this point include: Williamson v. Ward, 110 F.3d 1508 (10th Cir. 1997); Hall v. Washington, 106 F.3d 742 (7th Cir. 1997); Emerson v. Gramley, 91 F.3d 898 (7th Cir. 1996), cert. denied, 117 S. Ct. 1260 (1997); Glenn v. Tate, 71 F.3d 1204 (6th Cir. 1995), cert. denied, 117 S.Ct. 273 (1996); Hendricks v. Calderon, 70 F.3d 1032 (9th Cir. 1995), cert. denied, 116 S.Ct. 1335 (1996); Clabourne v. Lewis, 64 F.3d 1373 (9th Cir. 1995); Antwine v. Delo, 54 F.3d 1357 (8th Cir. 1995), cert. denied, 116 S.Ct. 753 (1996); Baxter v. Thomas, 45 F.3d 1501 (11th Cir.), cert. denied, 116 S.Ct. 385 (1995); Jackson v. Herring, 42 F.3d 1350 (11th Cir.), cert. denied, 116 S.Ct. 38 (1995).

23. See ABA Guideline 11.8.3; New York Guideline 10.3.

24. Cook and Slawson found an enormous difference in the amount of time defense counsel devoted to a non-capital murder case as compared to a capital murder case in their study of North Carolina cases. The Costs of Processing Murder Cases in North Carolina at 61. (See note 15, *supra*.)

**Exhibit 5 - 53**

Federal Death Penalty Cases

25. See ABA Guideline 11.4.2.

26. In other words, lawyers have to raise issues that may previously have been decided against them in their district or circuit. If they fail to do so, they will be barred by procedural default from obtaining relief from a death sentence, even if the Supreme Court later finds their positions meritorious. *See* Hitchcock v. Dugger, 481 U.S. 393 (1987) (upholding challenge to application of Florida death penalty statute that had been repeatedly rejected by the circuit and district courts).

27. C&L at IV.50. Prior to 1994, attorneys did not categorize their hours on vouchers, so reliable data concerning the attorney workload do not exist prior to FY 1995.

28. It is too early to tell from the data whether attorney time associated with legal research and writing will decline as unresolved issues are decided by the appellate courts.

29. Comparable data are not available for non-capital homicides, or other non-capital cases, because the voucher form used in non-capital cases does not break down attorney hours into these categories.

30. C&L at IV.22.

31. The Department did not identify cases by name; therefore it was impossible to compare the cost of prosecution and defense in specific cases.

32. In addition, the Department's estimate of its personnel costs for each prosecution was based on the share of attorney and non-attorney staff salary and benefits devoted to each prosecution, and therefore did not include "overhead" costs.

33. Department of Justice, United States Attorney's Manual § 9-10.000.

34. In some districts, U.S. Attorney's offices have also implemented a similar process for obtaining defense counsel's input into the decision regarding whether or not to recommend authorization to the Attorney General.

35. Another, less important, cost factor is the direct cost of participating in the authorization process. This includes the attorney time devoted to drafting a written submission to the Death Penalty Review Committee and the costs of travel to and from Washington to meet with the Committee. The CJA payment system does not separately track these costs.

36. C& L at IV.49. For <u>non-capital</u> homicides, the portion of payments for services other than counsel was approximately 16.2% in FY 1997, and 18% over the period FY 1992-97. The distribution of these costs was different from that in capital cases. Investigators were used much more frequently in federal death penalty cases (88/136) than in non-capital homicides (128/639 from FY 1992-1997). In those cases in which investigators were hired, the average cost was $22,438 for death penalty cases, compared to $3,502 for non-capital homicide cases. Psychologists were also hired much more frequently (50/136 versus 62/639). The average spending for each case in which a psychologist was hired was $8,723 for death penalty cases compared to $1,382 for non-capital homicide. Similarly, "other" experts were hired in 94/136 federal death penalty cases versus 78/639 non-capital

**Exhibit 5 -  54**

homicides, with an average cost in each case in which an "other" expert was hired of $21,928 in death penalty cases versus $3,980 for non-capital homicides.

37. C&L at IV.24. See ABA Guideline 11.8.3 (preparation for the sentencing phase should begin immediately upon counsel's entry into the case).

38. The precise amounts and hourly rates paid to mitigation specialists in all cases could not be determined, because the standard death penalty expert expense form does not include a distinct code for mitigation specialist or the equivalent, who are therefore coded "other." It was possible, however, to tie CJA payment system information to other data concerning the use of mitigation specialists for several cases. Hourly rates paid to mitigation specialists in those cases ranged from $35 to $80 per hour.

39. American Bar Association, Toward a More Just and Effective System of Review in State Death Penalty Cases, 40 Am. U. L. Rev. 1, 63 (1990).

40. Id. at 65, 69, 70.

41. Id. at 70.

42. See Judicial Conference of the United States, Committee on Defender Services, Subcommittee on Death Penalty Representation at 5 (1995) (discussing the problem of constant reinvention of the wheel in capital habeas cases).

43. In fact, the Justice Department is in the process of enhancing the support already available to prosecutors in federal death penalty cases. Although in the past the Criminal Division did not have a designated death penalty unit, approximately eight new attorney positions are to be dedicated exclusively to assisting U.S. Attorney's Offices involved in federal death penalty prosecutions.

44. The Federal Death Penalty Resource Counsel Project is modeled on the CJA Panel Attorney Resource Counsel program, in which, in a limited number of federal districts which are not served by a federal defender organization, a private panel attorney provides, on a part-time, hourly fee basis, training and advice to appointed counsel and serves as a liaison with the court and the Administrative Office when necessary. The Federal Death Penalty Resource Counsel Project should not be confused with the former Post-Conviction Defender Organizations, or Death Penalty Resource Centers, which were fully staffed law offices providing representation and other services in death penalty habeas corpus proceedings arising from state court death sentences, and which no longer receive any federal funding.

45. See Section C.2, supra.

46. There are two types of FDO. A federal public defender (FPD) is a federal agency staffed by federal employees. A community defender organization (CDO) is a non-profit agency funded by a grant from the judiciary. The fifty FPD offices serve 58 of the 94 federal districts. Thirteen CDOs serve an additional 15 districts.

**Exhibit 5 - 55**

47. In a small number of cases, courts have appointed two attorneys from an FDO as counsel and have not appointed a panel attorney. There has been one capital trial in which representation was provided exclusively by the FDO. In all other cases in which the death penalty was authorized, a panel attorney was appointed together with the FDO.

48. In many federal death penalty cases, conflict of interest rules have precluded the FDO from accepting appointment. These conflicts typically arise because the FDO has previously represented a co-defendant or witness in the case, and are particularly common in multi-defendant prosecutions.

49. Although 21 U.S.C. § 848(q)(5) requires appointment of at least one attorney who has been admitted to practice *in the court in which the prosecution is to be tried* for not less than five years, the statute provides an exception, for good cause, which permits the court to appoint instead "an attorney whose background, knowledge, or experience would otherwise enable him or her to properly represent the defendant, with due consideration to the seriousness of the possible penalty and to the unique and complex nature of the litigation. 21 U.S.C. § 848(q)(7).

50. Concerns have been raised, however, about whether lawyers from out-of-district might be less effective than local attorneys in jury trials. Those interviewed disagreed about this point, and it may be more true in some areas than in others. At one extreme, there were those who believed it would be disadvantageous to appoint a lawyer from *a larger city within the same district* to a case in a more rural area. It may also be, as some interviewees suggested, that familiarity with the local jury pool is especially important in a capital case, and that counsel without local trial experience is more likely to need an expert to assist in jury selection. See Section B.7, *supra*.

51. 21 U.S.C. § 848(q)(10)(A). There is no statutory maximum for cases filed prior to April 24, 1996, however Judicial Conference guidelines recommend an hourly rate ranging between $75 and $125 per hour. Courts authorized rates higher than $125 per hour only in a handful of federal death penalty cases filed before the enactment of the statutory maximum. Coopers & Lybrand attributed a substantial portion of the increase in the cost per federal death penalty representation to a "real increase in [hourly] rates." (C&L IV.37). This conclusion, however, is not correct, as it was based on a projection from the *highest* hourly rates paid in a case during a fiscal year, rather than the average rate paid per hour billed over the fiscal year. Using the latter method, the average hourly rate fluctuated from year to year. FY 1991: $115.82; FY 1992: $108.22; FY 1993: $99.44; FY 1994: $79.92; FY 1995: $88.16; FY 1996: $113.84; FY 1997: $108.84. Calculating average hourly rates billed *per representation* showed a similar pattern of fluctuation, rather than a consistent rise in the hourly rate of attorney compensation. Therefore, it cannot be said that the rate of attorney compensation accounted for a significant portion of the overall increase in spending on federal death penalty cases.

52. Report of the Judicial Conference of the United States on the Federal Defender Program at 12 (1993).

53. The national average (mean) billing rate for law firm *associates*, as of January 1, 1997, was $134 per hour. The median billing rate for associates was $125 per hour, which means that half of the country's non-partner lawyers (who typically have less experience than qualified federal death penalty lawyers) bill at a higher rate than the highest rate that may be authorized for a lawyer capable of undertaking the most challenging criminal representation. Altman, Weil, and Pensa, The 1997 Survey of Law Firm Economics at II-3 (1997). For small firms, the mean for associates was $127 per hour, and the median was $125 per hour. For partners in small firms -- the most comparable source for the rate panel attorneys in capital cases would command in the private market,

**Exhibit 5 - 56**

Federal Death Penalty Cases

the mean was $169 per hour, and the median was $160 per hour. Id. at II-6. For lawyers with at least five years of experience, the minimum required by statute, the mean billing rate was $150 per hour, with a median of $145. For lawyers with 15 years of experience -- much more typical of the lawyers considered qualified for federal death penalty cases -- the mean was $179 per hour, and the median was $175 per hour. Id. at II-9. The 1996 national average hourly cost of office overhead, assuming 1800 billable hours yearly, was $64.3 per hour. Id. at VII-5. In some areas, billing rates and overhead costs are much higher than the national average, yet the maximum rate for representation in a federal death penalty case is limited to $125 per hour.

54. The maximum rate which may be paid to appointed counsel in non-capital cases is $75 per hour. Although the Judicial Conference has approved this rate for all districts, funding has been provided by Congress only for 12 districts (or portions of districts) at this rate. The remaining districts are limited to $45 for out-of-court work and $65 for in court work.

55. These factors are relevant to the determination of a reasonable rate of compensation for legal representation under the ABA Model Rules of Professional Conduct and caselaw interpreting federal "fee-shifting" statutes. See Model Rules of Professional Conduct 1.5(a)(1), (3) and (7).

56. See Model Rules of Professional Conduct 1.5(a)(2) (inability to accept other employment is a factor in setting reasonable fee).

57. In the sample of federal death penalty cases assembled for this report, there were two cases in which a total of five lawyers were compensated, however in both cases some of the lawyers were replaced by others, so that no more than three lawyers worked on the case at one time. In eight cases, four lawyers were compensated, however in some of these cases lawyers replaced others who had been removed. In 12 cases three lawyers were compensated. In the remaining 95 cases (81% of the total), only two lawyers were compensated.

58. A district court which chooses to provide representation through a federal defender organization may elect one of two organizational models. A Federal Public Defender Organization (FPDO) is a federal agency, headed by a Federal Public Defender who is selected by the Circuit Court of Appeals. The attorneys and other staff of a federal public defender organization are government employees. A Community Defender Organization (CDO) is a not-for-profit corporation governed by a board of directors and led by an executive director. Both types of organization are funded and administered by the federal judiciary pursuant to the Criminal Justice Act, 18 U.S.C. § 3006A. The term "federal defender organization," or "FDO," as used in this report, includes both organizational models.

59. The distinction between being qualified to serve and willing to do so is significant. Most defense counsel interviewed by the Subcommittee indicated that they would not be willing to accept appointment to more than one federal death penalty case at a time. Furthermore, since accepting a federal death penalty appointment requires a substantial time commitment which may ultimately cause the attorney to become entirely unavailable for any other fee-generating work, appointment to such a case is not lightly undertaken.

60. In a very small number of cases, federal defender organizations have served as both lead and second counsel, without the assistance of a panel attorney; such appointments should not be made unless the federal defender believes it is in the best interests of the client and the organization.

**Exhibit 5 -  57**

Appendix A

# APPENDIX A

# RECOMMENDATIONS

## 1. Qualifications for Appointment.

a. Quality of Counsel. Courts should ensure that all attorneys appointed in federal death penalty cases are well qualified, by virtue of their prior defense experience, training and commitment, to serve as counsel in this highly specialized and demanding type of litigation. High quality legal representation is essential to assure fair and final verdicts, as well as cost-effective case management.

b. Qualifications of Counsel. As required by statute, at the outset of every capital case, courts should appoint two counsel, at least one of whom is experienced in and knowledgeable about the defense of death penalty cases. Ordinarily, "learned counsel" should have distinguished prior experience in the trial, appeal, or post-conviction review of federal death penalty cases, or distinguished prior experience in *state* death penalty trials, appeals, or post-conviction review that, in combination with co-counsel, will assure high quality representation.

c. Special Considerations in the Appointment of Counsel on Appeal. Ordinarily, the attorneys appointed to represent a death-sentenced federal appellant should include at least one attorney who did not represent the appellant at trial. In appointing appellate counsel, courts should, among other relevant factors, consider:

   i. the attorney's experience in federal criminal appeals and capital appeals;

   ii. the general qualifications identified in paragraph 1(a), above; and

   iii. the attorney's willingness, unless relieved, to serve as counsel in any post-conviction proceedings that may follow the appeal.

d. Special Considerations in the Appointment of Counsel in Post-Conviction Proceedings. In appointing post-conviction counsel in a case where the defendant is sentenced to death, courts should consider the attorney's experience in federal post-conviction proceedings and in capital post-conviction proceedings, as well as the general qualifications set forth in paragraph 1(a).

e. Hourly Rate of Compensation for Counsel. The rate of compensation for counsel in a capital case should be maintained at a level sufficient to assure the appointment of attorneys who are appropriately qualified to undertake such representation.

**Exhibit 5 -  58**

Appendix A

**2. Consultation with Federal Defender Organizations or the Administrative Office.**

a. <u>Notification of Statutory Obligation to Consult.</u> The Administrative Office of the U.S. Courts (Administrative Office) and federal defender organizations should take appropriate action to ensure that their availability to provide statutorily mandated consultation regarding the appointment of counsel in every federal death penalty case is well known to the courts. (See 18 U.S.C. § 3005.)

b. <u>Consultation by Courts in Selecting Counsel.</u> In each case involving an offense punishable by death, courts should, as required by 18 U.S.C. § 3005, consider the recommendation of the district's Federal Public Defender (FPD) (unless the defender organization has a conflict) about the lawyers to be appointed. In districts not served by a Federal Public Defender Organization, 18 U.S.C. § 3005 requires consultation with the Administrative Office. Although not required to do so by statute, courts served by a Community Defender Organization should seek the advice of that office.

c. <u>Consultation by Federal Defender Organizations and the Administrative Office in Recommending Counsel.</u> In discharging their responsibility to recommend defense counsel, FDOs and the Administrative Office should consult with Federal Death Penalty Resource Counsel in order to identify attorneys who are well qualified, by virtue of their prior defense experience, training and commitment, to serve as lead and second counsel.

**3. Appointment of More Than Two Lawyers.**

<u>Number of Counsel.</u> Courts should not appoint more than two lawyers to provide representation to a defendant in a federal death penalty case unless exceptional circumstances and good cause are shown. Appointed counsel may, however, with prior court authorization, use the services of attorneys who work in association with them, provided that the employment of such additional counsel (at a reduced hourly rate) diminishes the total cost of representation or is required to meet time limits.

**4. Appointment of the Federal Defender Organization (FDO).**

a. <u>FDO as Lead Counsel.</u> Courts should consider appointing the district's FDO as lead counsel in a federal death penalty case only if the following conditions are present:

    i. the FDO has one or more lawyers with experience in the trial and/or appeal of capital cases who are qualified to serve as "learned counsel"; and

    ii. the FDO has sufficient resources so that workload can be adjusted without unduly disrupting the operation of the office, and the lawyer(s) assigned to the death penalty case can devote adequate time to its defense, recognizing that the case may require all of their available time; and

    iii. the FDO has or is likely to obtain sufficient funds to provide for the expert,

**Exhibit 5 - 59**

Appendix A

investigative and other services reasonably believed to be necessary for the defense of the death penalty case.

b. <u>FDO as Second Counsel.</u> Courts should consider appointing the district's FDO as second counsel in a federal death penalty case only if the following conditions are present:

i. the FDO has sufficient resources so that workload can be adjusted without unduly disrupting the operation of the office, and the lawyer(s) assigned to the death penalty case can devote adequate time to its defense, recognizing that the case may require all of their available time; and

ii. the FDO has or is likely to obtain sufficient funds to provide for the expert, investigative and other services reasonably believed to be necessary for the defense of the death penalty case.

## 5. The Death Penalty Authorization Process.

a. <u>Streamlining the Authorization Process.</u> The Department of Justice should consider adopting a "fast track" review of cases involving death-eligible defendants where there is a high probability that the death penalty will not be sought.

b. <u>Court Monitoring of the Authorization Process.</u> Courts should exercise their supervisory powers to ensure that the death penalty authorization process proceeds expeditiously.

## 6. Federal Death Penalty Resource Counsel.

a. <u>Information from Resource Counsel.</u> In all federal death penalty cases, defense counsel should obtain the services of Federal Death Penalty Resource Counsel in order to obtain the benefit of model pleadings and other information that will save time, conserve resources and enhance representation. The judiciary should allocate resources sufficient to permit the full value of these services to be provided in every case.

b. <u>Technology and Information Sharing.</u> The Administrative Office should explore the use of computer-based technology to facilitate the efficient and cost-effective sharing of information between Resource Counsel and defense counsel in federal death penalty cases.

## 7. Experts.

a. <u>Salaried Positions for Penalty Phase Investigators.</u> The federal defender program should consider establishing salaried positions within FDOs for persons trained to gather and analyze information relevant to the penalty phase of a capital case. FDOs should explore the possibility that, in addition to providing services in death penalty cases to which their FDO is appointed, it might be feasible for these

**Exhibit 5 - 60**

Appendix A

investigators to render assistance to panel attorneys and to other FDOs.

b. Negotiating Reduced Rates. Counsel should seek to contain costs by negotiating reduced hourly rates and/or total fees with experts and other service providers.

c. Directory of Experts. A directory of experts willing to provide the assistance most frequently needed in federal death penalty cases, and their hourly rates of billing, should be developed and made available to counsel.

## 8. Training.

Federal Death Penalty Training Programs. The Administrative Office should continue to offer and expand training programs designed specifically for defense counsel in federal death penalty cases.

## 9. Case Budgeting.

a. Consultation with Prosecution. Upon learning that a defendant is charged with an offense punishable by death, courts should promptly consult with the prosecution to determine the likelihood that the death penalty will be sought in the case and to find out when that decision will be made.

b. Prior to Death Penalty Authorization. Ordinarily, the court should require defense counsel to submit a litigation budget encompassing all services (counsel, expert, investigative and other) likely to be required through the time that the Department of Justice (DOJ) determines whether or not to authorize the death penalty.

c. After Death Penalty Authorization. As soon as practicable after the death penalty has been authorized by DOJ, defense counsel should be required to submit a further budget for services likely to be needed through the trial of the guilt and penalty phases of the case. In its discretion, the court may determine that defense counsel should prepare budgets for shorter intervals of time.

d. Advice from Administrative Office and Resource Counsel. In preparing and reviewing case budgets, defense counsel and the courts should seek advice from the Administrative Office and Federal Death Penalty Resource Counsel, as may be appropriate.

e. Confidentiality of Case Budgets. Case budgets should be submitted ex parte and should be filed and maintained under seal.

f. Modification of Approved Budget. An approved budget should guide counsel's use of time and resources by indicating the services for which compensation is authorized. Case budgets should be re-evaluated when justified by changed or unexpected circumstances, and should be modified by the court where good cause is shown.

Appendix A

g. <u>Payment of Interim Vouchers.</u> Courts should require counsel to submit vouchers on a monthly basis, and should promptly review, certify and process those vouchers for payment.

h. <u>Budgets In Excess of $250,000.</u> If the total amount proposed by defense counsel to be budgeted for a case exceeds $250,000, the court should, prior to approval, submit such budget for review and recommendation to the Administrative Office.

i. <u>Death Penalty Not Authorized.</u> As soon as practicable after DOJ declines to authorize the death penalty, the court should review the number of appointed counsel and the hourly rate of compensation needed for the duration of the proceeding pursuant to CJA Guideline 6.02.B(2).

j. <u>Judicial Conference Guidelines.</u> The Judicial Conference should promulgate guidelines on case budgeting for use by the courts and counsel.

k. <u>Judicial Training for Death Penalty Cases.</u> The Federal Judicial Center should work in cooperation with the Administrative Office to provide training for judges in the management of federal death penalty cases and, in particular, in the review of case budgets.

**10. Case Management.**

a. <u>Non-Lawyer Staff.</u> Where it will be cost-effective, courts should consider authorizing payment for services to assist counsel in organizing and analyzing documents and other case materials.

b. <u>Multi-defendant Cases.</u>

    i. <u>Early Decision Regarding Severance.</u> Courts should consider making an early decision on severance of non-capital from capital co-defendants.

    ii. <u>Regularly Scheduled Status Hearings.</u> Status hearings should be held frequently, and a schedule for such hearings should be agreed upon in advance by all parties and the court.

    iii. "<u>Coordinating Counsel.</u>" In a multi-defendant case (in particular a multi-defendant case in which more than one individual is eligible for the death penalty), and with the consent of co-counsel, courts should consider designating counsel for one defendant as "coordinating counsel."

    iv. <u>Shared Resources.</u> Counsel for co-defendants should be encouraged to share resources to the extent that doing so does not impinge on confidentiality protections or pose an unnecessary risk of creating a conflict of interest.

    v. <u>Voucher Review</u>. In large multi-defendant cases, after approving a case budget, the

**Exhibit 5 -  62**

Appendix A

court should consider assigning a magistrate judge to review individual vouchers. The court should meet with defense counsel at regular intervals to review spending in light of the case budget and to identify and discuss future needs.

## 11. Availability of Cost Data

The Administrative Office should improve its ability to collect and analyze information about case budgets and the cost of capital cases.

**Exhibit 5 -  63**

# APPENDIX B

## SOURCES AND METHODOLOGY

The Subcommittee's conclusions are based on a combination of qualitative judgments about representation in federal capital cases obtained from interviews, pleadings, and training materials, and quantitative data concerning the number, characteristics, and cost of representation in federal death penalty cases.

## QUALITATIVE AND BACKGROUND SOURCES

**Standard of Practice in Death Penalty Cases.** In order to fully understand the unique standards of practice applicable to death penalty cases in general, and to federal death penalty cases in particular, the Subcommittee reviewed works by judges, scholars, and lawyers concerning the duties of counsel in a capital case. Sources included works focusing on federal habeas corpus for state prisoners under sentence of death such as the Report of the Judicial Conference Ad Hoc Committee on Federal Habeas Corpus in Capital Cases (Powell Committee report) (1989), the Report on Death Penalty Representation of the Committee on Defender Services Subcommittee on Death Penalty Representation (1995), and Ira P. Robbins, Towards a More Just and Effective System of Review in State Death Penalty Cases, 40 Am. U. L. Rev. 1 (1990), as well as materials related to the funding and quality of representation provided in state death penalty cases, such as: Louis D. Bilionis and Richard D. Rosen, Lawyers, Arbitrariness and the Eighth Amendment, 75 Tex. L. Rev. 1301 (1997); Michael D. Moore, Analysis of State Indigent Defense Systems and their Application to Death-Eligible Defendants, 37 Wm. & Mary L. Rev. 1617 (1996); Norman Lefstein, Reform of Defense Representation in Capital Cases: the Indiana Experience and its Implications for the Nation, 29 Ind. L. Rev. 495 (1996); Douglas W. Vick, Poorhouse Justice: Underfunded Indigent Defense Services and Arbitrary Death Sentences, 43 Buff. L. Rev. 329 (1995); Ruth E. Friedman & Bryan A. Stevenson, Solving Alabama's Capital Defense Problems: It's a Dollars and Sense Thing, 44 Ala. L. Rev. 1 (1992); Anthony Paduano & Clive Stafford-Smith, The Unconscionability of Sub-Minimum Wages Paid Appointed Counsel in Capital Cases, 43 Rutgers L. Rev. 281 (1991); Albert L. Vreeland, II, The Breath of the Unfee'd Lawyer: Statutory Fee Limitations and Ineffective Assistance of Counsel in Capital Litigation, 90 Mich. L. Rev. 626 (1991).

**Appointment of Counsel Standards.** The Subcommittee also examined standards for the appointment and compensation of counsel in death penalty cases, including the American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989).

**Nature of Federal Death Penalty Cases.** To better grasp the characteristics of federal death penalty practice, the Subcommittee reviewed training materials for defense lawyers prepared by the Federal Death Penalty Resource Counsel Project and materials collected and distributed by the Federal Judicial Center (FJC) to assist judges assigned to preside over federal death penalty cases. The Subcommittee

**Exhibit 5 -  64**

Appendix B

met with the three lawyers hired as Resource Counsel, and with the FJC staff assigned to develop a handbook on federal death penalty cases. The Subcommittee also reviewed an FJC newsletter entitled "Chambers to Chambers," several issues of which were devoted to the management of federal death penalty cases.

**Analyses of Costs of Representation.** In order to focus the Subcommittee's inquiry and to refine the collection of empirical data, the Subcommittee surveyed a number of sources dealing with the costs of representation in general and the costs of representation in death penalty cases in particular. General analyses of defense costs included the Report of the Judicial Conference of the United States on the Federal Defender Program (1993) and the Economy Subcommittee of the Budget Committee of the Judicial Conference, Panel Attorney Total Hours Profiles (1996), and General Accounting Office, Cost of Providing Court-Appointed Attorneys is Rising, but Costs are Unclear (1995). The Subcommittee also reviewed sources dealing directly with death penalty cases, including: General Accounting Office, Limited Data Available on Costs of Death Sentences (1989); Philip J. Cook & Donna B. Slawson, The Costs of Processing Murder Cases in North Carolina (1993); and The Spangenberg Group, A Study of Representation in Capital Cases in Texas (1993). In addition, the Subcommittee reviewed the Report on Costs and Recommendations for the Control of Costs of the Defender Services Program prepared by Coopers & Lybrand Consulting for submission to Congress in February 1998.

**Economic Factors Related to Availability of Counsel.** In order to assess the market forces at work, the Subcommittee obtained information concerning the rates paid to lawyers for work of a complexity similar to federal death penalty cases, including General Accounting Office, Information on the Federal Government's Use of Private Attorneys (1992) and Altman, Weil, Pensa, The 1997 Survey of Law Firm Economics. For a theoretical perspective on the market for legal services, the Subcommittee examined works such as: Pauline Holden & Steven Balkin, Quality and Cost Comparisons of Private Bar Indigent Defense Systems: Contract Versus Ordered Assigned Counsel, 76 J. L. & Criminology 176 (1985) and Herbert M. Kritzer, et al, The Impact of Fee Arrangements on Lawyers' Effort, 19 L. & Soc. Rev. 251 (1985).

**Interviews.** The Subcommittee's primary sources of qualitative information consisted of lengthy, in-depth interviews with lawyers and judges who had participated in federal death penalty cases. The interviews were conducted by Subcommittee staff, who prepared detailed summaries promptly after completion of the interviews. The identity of the individuals interviewed was not revealed even to the judges of the Subcommittee.

**Judges.** The Subcommittee conducted detailed interviews of a total of thirteen federal district judges. The Subcommittee also made use of information related to the management of federal death penalty cases provided at a "focus group" meeting on capital habeas corpus cases in March 1997. In order to encourage candor, the individuals interviewed were promised that their identities would remain confidential, and that remarks would not be attributed to them in the final report. Although follow-up questions varied, the Subcommittee used a standardized structured protocol to guide each interview. The Subcommittee took care to assure that the interviews captured a variety of judicial perspectives. The Subcommittee spoke to judges from all across the country, including one from each federal circuit.

**Exhibit 5 - 65**

Appendix B

Those interviewed included judges who had presided over cases that ended with lengthy capital trials, cases that ended in negotiated guilty pleas, and cases in which the Department of Justice declined to seek the death penalty. The judges included recent appointees to the bench, as well as more experienced judges. Some of the judges came from districts in states with long histories of post-Furman death penalty litigation, while others came from districts in states without the death penalty.

**Department of Justice.** The Subcommittee contacted the Department of Justice to obtain permission to interview prosecutors in federal death penalty cases. Although the Department agreed to provide certain quantitative information, further described below, it declined to authorize the Subcommittee to interview prosecutors or to collect data from prosecutors by a questionnaire.

**Defense Counsel.** The Subcommittee interviewed a total of 21 defense lawyers. In all, these lawyers had participated in 45 federal death penalty cases. As with the judges, interviews were conducted using a standardized interview protocol, and those interviewed were promised that their names would not be directly or indirectly disclosed. The interview subjects included lawyers with extensive death penalty experience, who had participated in several federal death penalty cases, as well as lawyers who until their first federal death penalty appointment had had no prior death penalty experience. The Subcommittee interviewed panel attorneys as well as staff attorneys in federal defender organizations. The Subcommittee also met with a group of federal defenders during a national conference. The lawyers interviewed had participated in a wide range of types of federal death penalty cases. Some of the cases had proceeded through penalty phase trials, while others had been resolved by a plea of guilty. The cases included some in which the Department of Justice did not authorize seeking a death sentence and some in which authorization to seek the death penalty was granted and later withdrawn.

## QUANTITATIVE DATA AND ANALYSIS.

The costs of providing representation in federal death penalty cases include direct payments to individual lawyers appointed by the court (panel attorneys) and to persons providing services other than counsel at the request of a panel attorney, and resources committed to representation in federal death penalty cases by federal public defender and community defender organizations. The Subcommittee attempted to obtain and analyze data from both sources.

**CJA Payment Data.** Payments to panel attorneys must be certified by counsel to be reasonable and necessary, and must be approved by the presiding judicial officer. Additionally, in cases filed after April 24, 1996, payments for services other than counsel exceeding $7500 must also be approved by the chief judge of the circuit court of appeals or the chief judge's designee. Payments are supported by vouchers submitted by the panel attorney (CJA 30) or the non-attorney service provider (CJA 31). Some, but not all of the information recorded on the voucher forms is entered into a computer by the district court clerk and then transmitted to the Administrative Office. The Administrative Office maintains computerized data concerning the nature of the service provided, the hours billed (for attorneys this is divided between in and out of court time), the hourly rate, and, for cases after FY 1994, the type of work the attorney performed, broken down into 8 subcategories.

**Exhibit 5 - 66**

Appendix B

In order to assess the relationship between the raw cost data and the characteristics of federal death penalty cases developed from the interviews and review of documents, the Subcommittee created tables of information concerning the histories of federal death penalty cases. This "case demographics" data came from information developed by the Federal Death Penalty Resource Counsel Project and from the Department of Justice. By relating case demographics to cost information, the Subcommittee hoped to produce a clearer understanding of how the nature of the representation influenced costs. For example, the Subcommittee compared costs in cases in which the Department of Justice authorized a request for the death penalty with cases in which authorization was denied. The Subcommittee also examined the costs of authorized cases terminating in guilty pleas and those resolved at trial.

In addition, for purposes of comparison, the Subcommittee obtained voucher information related to non-capital homicide cases. The Subcommittee compared average expenditures on various items in an effort to better understand how the requirements of representation in death penalty cases influenced costs.

The quantitative data sources utilized by the Subcommittee have certain limitations. As the Economy Subcommittee of the Budget Committee of the Judicial Conference noted in a caveat to its 1996 report on panel attorney hours, the CJA payment system was designed only to process vouchers for payment, and not to serve as a management information system. Thus, this database does not include basic information on the disposition of a case, as a result of which cases that went to trial cannot be distinguished from those resolved by a guilty plea, despite the obvious relevance such differences would have in identifying the "typical" costs of representation. Similarly, the CJA payment system does not reflect factors such as the number of offenses charged or the number of codefendants joined in a case, although both may make a case more complicated and more costly. Also, the CJA payment system does not have an adequate mechanism to regularize the entry of names and other identifying information. As a result, small variations in the spelling of a defendant's name, for example, will lead the computer to treat the vouchers as if they relate to different cases. Average costs per representation computed without correcting this problem will be inaccurate because the case count will be artificially inflated. This creates a particularly serious problem in capital cases, because attorneys typically submit interim vouchers, rather than waiting until a case is entirely over to request payment. Because there are more vouchers submitted per case, there are likely to be more inconsistencies or variations in the way names (and even case numbers) are entered, and therefore more errors in the count.

Moreover, although the CJA 30 form was revised in 1994 to collect additional details about the type of work an attorney performed during the time period covered by the voucher, the forms are not designed to address some of the questions about the costs of representation the Subcommittee wished to answer. It is not possible, for example, to reliably isolate costs associated with the Department of Justice death penalty authorization process from other costs. Nor, unfortunately, do the categories for "services other than counsel" on the CJA 31 form correlate precisely to the service categories of greatest importance in a study of federal capital cases (there is no category, for example, for mitigation specialists; payments to such experts therefore are included within the category of "other"). Finally, the Subcommittee learned that the CJA payment system does not reliably track federal death penalty cases. Although in theory vouchers for each defendant charged in an indictment with an offense that carries a potential punishment

**Exhibit 5 - 67**

Appendix B

of death should be coded "D2" (for a federal death penalty case), in fact some vouchers in death penalty cases are not coded properly. The Subcommittee could not, therefore, identify the universe of federal death penalty cases by selecting "D2" vouchers."

The Subcommittee attempted to address the deficiencies in the CJA payment data in several ways. In order to obtain a sample of federal death penalty cases which included both unauthorized as well as authorized cases, the Subcommittee obtained a case list from the Federal Death Penalty Resource Counsel Project, which tracks federal death penalty cases across the country.[1] This list included all cases in which the Department of Justice authorized a death penalty prosecution, as well as a number of cases in which the Department of Justice declined to authorize seeking the death penalty. Only cases in which CJA payment information had been placed under seal were excluded from this list. The Subcommittee then obtained all CJA payments relating to this list of cases. Administrative Office staff reviewed the payment information data, making revisions as needed to produce consistent name and case number fields, to assure an accurate count of representations for purposes of averaging. The resulting data were imported into a database. A small number of cases which were unrepresentative for various reasons were removed from the sample. For example, vouchers billed for appellate or post-conviction representation were eliminated, because these could not validly be compared to costs at the initial trial stage.[2] Also eliminated were cases in which the costs of representation were primarily borne by a federal defender organization, because in such cases the vouchers submitted by the panel attorney or other service providers would not have reflected the actual cost of representation, but rather would have understated it.

The Subcommittee also reviewed case disposition information from the Administrative Office SARD database, but found too many reliability problems to make these data useful.

**Federal Defender Hours.** Except for a very small number of cases in which representation was provided by retained counsel (the Subcommittee is aware of only one federal death penalty case handled entirely by a retained lawyer; in a small number of other cases a retained lawyer provided limited services), in cases not assigned to panel attorneys representation is provided by Federal Defender Organizations (FDOs), which may be either Federal Public Defender Organizations (FPDs) or Community Defender Organizations (CDOs). Attorneys in FDOs are salaried employees and do not submit bills by the hour, however they do keep a rough account of their hours using a system called "Timekeeper." The Subcommittee obtained records from the Timekeeper system for cases coded as federal death penalty cases, however the number of FDO cases identified in the Timekeeper database was so small, and the reliability of the hours so uncertain, that the Subcommittee limited itself to the analyses of federal defender hours previously performed by Coopers & Lybrand. Coopers & Lybrand also developed a methodology for estimating the imputed hourly costs of FDO attorneys, paralegals and investigators.

**Department of Justice Data.** The Department of Justice provided the Subcommittee with a list of federal death penalty cases by status as of December 12, 1997. The Department also gathered cost information from local U.S. Attorney's Offices concerning 24 completed federal death penalty

**Exhibit 5 -  68**

Appendix B

prosecutions in which the Attorney General had authorized seeking the death penalty. The 24 cases included cases resolved by guilty plea as well as trial. Each case may involve one or more defendants, however the Department did not provide information concerning the number of defendants, case disposition, or the statutory basis for the prosecution.

Footnotes

1. The Subcommittee subsequently obtained a longer list of cases from the Department of Justice. This list included 107 authorized cases, and 162 cases reviewed by the Attorney General but never authorized. Even this list was not complete for the entire period, because it contained only cases reviewed, but not authorized after January 1995.

2. There were too few vouchers associated with appellate or post-conviction representation to allow meaningful analyses of these costs separately from trial.

**Exhibit 5 -  69**

# EXHIBIT

# 6

**U.S. Department of Justice**

# An Investigation into the Removal of Nine U.S. Attorneys in 2006



**U.S. Department of Justice**
**Office of the Inspector General**



**U.S. Department of Justice**
**Office of Professional Responsibility**

September 2008

**Exhibit 6 - 70**

**TABLE OF CONTENTS**

CHAPTER ONE INTRODUCTION ............................................................ 1

I.    Methodology of the Investigation ....................................................... 2

II.   Organization of this Report ............................................................... 4

CHAPTER TWO BACKGROUND........................................................... 7

I.    U.S. Attorneys ................................................................................. 7

II.   Selection of U.S. Attorneys................................................................ 8

III.  Department Evaluation and Interaction with U.S. Attorneys ............ 9

IV.   Backgrounds of Department Officials............................................... 10

      A.   Alberto Gonzales ................................................................... 11

      B.   Kyle Sampson ........................................................................ 11

      C.   Monica Goodling ................................................................... 11

      D.   Paul McNulty ........................................................................ 12

      E.   Michael Elston ...................................................................... 12

      F.   David Margolis ...................................................................... 13

      G.   William Mercer ...................................................................... 13

CHAPTER THREE FACTUAL OVERVIEW............................................. 15

I.    Development of U.S. Attorney Removal Lists ................................... 15

      A.   Genesis of Plan to Remove U.S. Attorneys............................. 16

      B.   Process to Identify U.S. Attorneys for Removal...................... 16

      C.   The First List – March 2, 2005.............................................. 18

           1.   Input from Comey and Margolis ................................... 21
           2.   Reaction to the List from the Office of the
                White House Counsel.................................................... 22
           3.   Fall 2005 – Further Consultations about the Removal
                of U.S. Attorneys......................................................... 23

                a.   Battle .................................................................. 23
                b.   Mercer................................................................. 23
                c.   Comey ................................................................. 24
                d.   Buchanan ........................................................... 24

      D.   The Second List – January 2006........................................... 25

i

**Exhibit 6 - 71**

1.    Sampson's January 1, 2006, Draft List ........................ 25
2.    The January 9, 2006, Memorandum from Sampson
      to the White House ................................................ 27
3.    The First Removal:  Todd Graves ................................ 29

E.   The Third List – April 14, 2006 ............................................. 30

1.    Heffelfinger ................................................................ 31
2.    Ryan ........................................................................... 32
3.    The Plan to Replace Cummins with Griffin .................. 33

      a.    Miers's Request Regarding Griffin ...................... 33
      b.    Battle Tells Cummins to Resign ......................... 34

4.    Sampson Suggests that Patrick Fitzgerald Be Removed  34

F.   The Fourth List – September 13, 2006 ................................... 35

1.    Sampson's "Consensus" Process in Compiling the List . 37
2.    The Removal Plan Takes Shape ................................... 39

G.   Elston's List – November 1, 2006 .......................................... 40

H.   The Fifth List – November 7, 2006 ........................................ 42

1.    Iglesias is Added to the List........................................ 42
2.    The Removal Plan ....................................................... 43
3.    Reaction to the November 7 List and Plan ................... 44

I.   The Sixth List – November 15, 2006 ..................................... 46

1.    The Revised Plan......................................................... 46
2.    Execution of the Plan is Postponed............................. 47
3.    The November 27, 2006, Meeting in the
      Attorney General's Office............................................ 48

      a.    Gonzales's Recollection of the
            November 27 Meeting ........................................ 49
      b.    McNulty Asks to Add Ryan to the List ................ 49
      c.    White House Approval of the Removal Plan ......... 50

J.   The Seventh and Final List – December 4, 2006 ................... 50

1.    The White House Approves the Plan ............................ 50
2.    The Implementation of the Removal Plan..................... 51

II.   The Aftermath of the Removals ................................................... 52

A.   The U.S. Attorneys' Initial Reactions..................................... 53

B.   Concern that the Department Intended to Bypass Senate
     Confirmation for Replacement U.S. Attorneys ...................... 54

C.   The Department Begins to Publicly Respond to Concerns
     About the Removals ............................................................. 55

ii

**Exhibit 6 -  72**

1.    Articles About Cummins's Removal ............................. 55
2.    Senators Express Concern About the Removals ............ 57
3.    Sampson's January 2007 Briefing of Senate Judiciary Committee Staff ........................................................ 58

D.    Elston's Telephone Calls to Charlton and McKay on January 17, 2007 ................................................................ 61

1.    Telephone Call to McKay ............................................. 62
2.    Telephone Call to Charlton .......................................... 63
3.    Elston's Description of the Telephone Calls .................. 63

E.    Attorney General Gonzales's January 18, 2007, Testimony Before the Senate Judiciary Committee ............................... 64

F.    Cummins Seeks Advice from Elston ..................................... 65

G.    McNulty's February 6, 2007, Testimony Before the Senate Judiciary Committee ........................................................... 65

1.    McNulty's Use of the Term "Performance-Related" to Describe the Removals ................................................. 65
2.    Attorney General Gonzales's Reaction to McNulty's Testimony .................................................................. 67
3.    U.S. Attorneys' Reaction to McNulty's Testimony .......... 68

H.    The February 8 Letter from Several Senators ........................ 68

I.    McNulty's February 14 Closed Briefing for the Senate Judiciary Committee ............................................... 69

1.    Preparation for the Briefing ......................................... 69
2.    McNulty's Briefing for the Senate Judiciary Committee  71

J.    Elston's Alleged Threat to Cummins ..................................... 73

1.    Cummins's Quote in The Washington Post ................... 73
2.    Elston's Telephone Call to Cummins .......................... 74

a.    Cummins's Account of the Telephone Call .......... 74
b.    Cummins's E-mail to Bogden, Charlton, Iglesias, Lam, and McKay about the Telephone Call ......... 75
c.    Elston's Account of the Telephone Call .............. 76

K.    The Department's Response to the Senators' Letter .............. 77

L.    Events in March 2007 ......................................................... 78

1.    March 3 Washington Post Article ............................... 78
2.    House and Senate Hearings ....................................... 78
3.    Cummins's February 20 E-mail Surfaces .................... 79
4.    Moschella's Testimony Before the House Judiciary Subcommittee ........................................................... 82

a.    Preparation Sessions ......................................... 82

**Exhibit 6 -  73**

b.     Discussion in Preparation Sessions About White House Involvement ............................................ 82
c.     March 5 Meeting at the White House to Discuss Moschella's Testimony ...................................... 84
d.     Moschella's Testimony ....................................... 85

M.    Attorney General Gonzales's March 7 Op-Ed Article.............. 87

N.    Additional Documents Come to Light.................................... 89

O.    Sampson's Resignation....................................................... 93

P.    The Scudder Memorandum ............................................... 93

Q.    Attorney General Gonzales's March 13 Press Conference ....... 94

R.    Attorney General Gonzales Directs an Investigation ............... 95

S.    Attorney General Gonzales's Conversation with Goodling....... 95

T.    Goodling Resigns from the Department ............................... 97

U.    Subsequent Events ............................................................ 97

CHAPTER FOUR TODD GRAVES ............................................... 99

I.     Introduction ................................................................................ 99

A.    Graves's Background........................................................... 99
1.     The EARS Evaluation of Graves's Office.....................100
2.     Graves's Status on the Removal lists.........................100

B.    Reasons Proffered for Graves's Removal..............................101

II.    Chronology of Events Related to Graves's Removal...................... 102

A.    The Misconduct Allegations...............................................102
1.     Allegations Concerning Graves's Wife ........................102
2.     Anonymous Allegations Regarding Graves...................104

B.    Complaints About Graves...................................................105
1.     Senator Bond's Congressional Staff Complain About Graves to White House Staff.......................................105
2.     The Department Learns About Bond's Staff's Complaints .............................................................106

C.    Graves is Told to Resign ...................................................108

D.    Department Comments About Graves's Resignation .............110

III.   Analysis...................................................................................... 111

CHAPTER FIVE H.E. "BUD" CUMMINS................................................. 115

iv

Exhibit 6 - 74

I.     Introduction .................................................................................. 115

     A.     Cummins's Background .....................................................115

     B.     The EARS Evaluations of Cummins's Office .........................116

     C.     Cummins's Status on the Removal Lists ..............................116

     D.     Reasons Proffered for Cummins's Removal ..........................116

II.     Chronology of Events Related to Cummins's Removal ................... 117

     A.     Cummins's Performance....................................................117

          1.     Sampson's Statements.............................................117
          2.     Department Managers' Statements...........................118

     B.     Cummins's Removal and Griffin's Appointment ...................119

          1.     Griffin's Background................................................119
          2.     Griffin Learns Cummins's Name is on the
                    Removal List ..........................................................120
          3.     Griffin Expresses Interest in the U.S. Attorney
                    Position ..................................................................121
          4.     January 2006 Removal List Identifies Griffin as
                    Cummins's Replacement...........................................124
          5.     Griffin's Nomination Process ....................................125

               a.     Allegation that the Department Intended to
                    Bypass the Senate Confirmation Process ...........126
               b.     The Pre-Nomination Process .............................127
                c.     Indefinite Interim Appointment Proposed for
                    Griffin ...........................................................128
                d.     Griffin Returns to Arkansas as a Special
                    Assistant U.S. Attorney....................................131

     C.     Attorney General Gonzales Appoints Griffin Interim U.S.
          Attorney .........................................................................131

     D.     Public Concerns About Griffin's Appointment ......................132

     E.     The Attorney General's and the Deputy Attorney General's
          Testimony .......................................................................135

     F.     The Department's Written Response to Congressional
          Concerns About Griffin's Appointment................................137

     G.     Griffin Withdraws............................................................140

     H.     Taylor's Comment Concerning Cummins .............................141

III.     Analysis...................................................................................... 142

     A.     Cummins's Removal..........................................................142

     B.     Misleading Statements about Cummins's Removal ...............144

**Exhibit 6 - 75**

C.      Interim Appointment of Griffin....................................145

CHAPTER SIX DAVID IGLESIAS.......................................... 149

I.    Introduction ...................................................... 149

A.      Iglesias's Background.........................................149

B.      The EARS Evaluations of Iglesias's Office............................150

C.      Iglesias's Status on the Removal Lists.................................151

D.      Reasons Proffered for Iglesias's Removal .............................151

E.      Investigative Limitations....................................153

II.    Chronology of Events Related to Iglesias's Removal ...................... 155

A.      Alleged Concerns about Iglesias's Management....................155

B.      Voter Fraud and Public Corruption Matters.........................158

1.      Initial Complaints of Voter Fraud ...............................158
2.      Representative Wilson's Complaint Concerning
        Voter Fraud ..............................................159
3.      Formation of the Election Fraud Task Force................160
4.      Continuing Complaints About Voter Fraud.................161
5.      Election Fraud Task Force Review of Complaints.........163
6.      Iglesias's Meeting with Weh Regarding his Handling
        of Voter Fraud Complaints .....................................164
7.      Complaints to the White House Regarding Iglesias's
        Handling of Voter Fraud Cases..................................165
8.      Complaints Concerning Iglesias's Handling of Public
        Corruption Cases....................................................166

        a.      The Vigil Case..................................................166
        b.      The "Courthouse Case"....................................168

9.      Senator Domenici's Calls to Attorney General
        Gonzales Regarding Iglesias ......................................168
10.     Complaints to the Department Regarding Voter
        Fraud and Corruption Cases.....................................170
11.     Complaints to Senator Domenici................................172
12.     Complaints to Karl Rove about Delays in the
        Courthouse Case .....................................................172
13.     Senator Domenici's Telephone Call to Deputy
        Attorney General McNulty...........................................174
14.     White House Communications with Attorney General
        Gonzales...............................................................175
15.     Iglesias's Meeting with Rogers ....................................176
16.     Representative Wilson's Telephone Call to Iglesias.......177
17.     Senator Domenici's Telephone Call to Iglesias .............179

**Exhibit 6 -  76**

18.  Allegation Concerning Representative Wilson's Telephone Call to Harriet Miers ...................................181

III.  Iglesias's Removal.......................................................... 182

A.  Iglesias is Added to Sampson's List......................................182

B.  White House Knowledge of the Decision to Remove Iglesias...185

C.  Iglesias is Told to Resign ..................................................185

IV.  Analysis........................................................................ 186

A.  Iglesias was not Removed Because of Management Issues ....187

B.  Complaints about Iglesias's Handling of Voter Fraud and Public Corruption Cases.................................................190

C.  Additional Issues............................................................194

D.  Unanswered Questions.....................................................197

CHAPTER SEVEN DANIEL BOGDEN .................................................... 201

I.  Introduction ................................................................. 201

A.  Bogden's Background.......................................................201

B.  The EARS Evaluation of Bogden's Office ............................201

C.  Bogden's Status on the Removal Lists ................................201

D.  Reasons Proffered for Bogden's Removal............................202

II.  Chronology of Events Related to Bogden's Removal ...................... 204

A.  Obscenity Prosecution......................................................205

1.  Obscenity Prosecution Task Force............................205
2.  Task Force Request to Bogden and Complaints About His Response................................................206

B.  Bogden's Alleged Lack of Energy and Leadership .................209

C.  Patriot Act Criticism.......................................................211

D.  McNulty's Qualms About Removing Bogden........................212

E.  Bogden's Removal and Gonzales's Concerns ........................214

III.  Analysis........................................................................ 214

CHAPTER EIGHT PAUL CHARLTON ..................................................... 219

I.  Introduction ................................................................. 219

A.  Charlton's Background.....................................................219

**Exhibit 6 - 77**

B.    The EARS Evaluation of Charlton's Office ............................219

C.    Charlton's Status on the Removal Lists ...............................219

II.    Chronology of Events Related to Charlton's Removal.................... 220

A.    Charlton's Discussions With Senator Kyl............................221

B.    Tape Recording Interrogations .................................................223

1.    Department Considers Tape Recording Policy.............223
2.    Charlton Implements a Taping Policy in His District....224
3.    Pilot Project for Charlton's District .............................225

C.    The Death Penalty Case.............................................................227

1.    The Department's Procedure for Death Penalty Cases..227
2.    The Death Penalty Decision.........................................227
3.    Charlton Seeks Reconsideration of the Decision ..........229
4.    Charlton Asks to Speak to Attorney General Gonzales About the Decision.....................................................231
5.    Attorney General Gonzales Denies Charlton's Request to Reconsider ...........................................................233
6.    Sampson Places Charlton's Name on the September 2006 Removal List ...................................234

D.    Obscenity Prosecutions ......................................................234

1.    The Obscenity Prosecution Task Force Requests Charlton's Assistance...............................................235
2.    Task Force Complaints About Charlton.......................235

E.    Investigation of Congressman Renzi ....................................238

F.    Charlton's Resignation .........................................................240

III.    Analysis................................................................................... 240

A.    Renzi Prosecution..................................................................240

B.    Obscenity Prosecution...........................................................241

C.    Discussion with Senator Kyl About Resources ......................241

D.    Tape Recording Policy............................................................242

E.    The Death Penalty Case.........................................................244

CHAPTER NINE JOHN MCKAY............................................................ 247

I.    Introduction ........................................................................... 247

A.    McKay's Background.............................................................247

1.    The EARS Evaluations of McKay's Office ....................247
2.    McKay's Status on the Removal Lists .........................247

**Exhibit 6 -  78**

B.   Reasons Proffered for McKay's Removal ...............................248

II.   Chronology of Events Related to McKay's Removal ....................... 248

A.   The Wales Murder Investigation............................................248

B.   The Northwest LInX Project ................................................251

C.   The Washington State Gubernatorial Election......................252

1.   McKay's Office Initiates a Preliminary Inquiry .............252
2.   Telephone Call to McKay from Congressman Hastings's Chief of Staff ..............................................253
3.   Complaints About McKay's Handling of Voter Fraud Allegations .................................................................255
4.   Statements of Department Officials ...........................257

D.   2006 LInX Issues .............................................................258

1.   Contentious Meeting with McNulty and Mercer ...........259
2.   McKay's Bid for a Judicial Nomination ......................260
3.   McKay's August 30 Letter to McNulty.........................261
4.   McNulty's Response to McKay's letter.........................262

E.   McKay Appears on the September 2006 Removal List ...........263

F.   McKay is Told to Resign.......................................................264

G.   Allegation that McKay was Removed Because His District's Sentencing Statistics Were Out of Line ................................264

III.   Analysis.................................................................................. 266

A.   Voter Fraud Complaints .....................................................266

B.   Wales Murder Investigation ...............................................267

C.   Sentencing Statistics...........................................................268

D.   LInX.................................................................................269

CHAPTER TEN CAROL LAM ................................................................. 271

I.   Introduction ............................................................................... 271

A.   Lam's Background ..............................................................271

B.   The EARS Evaluation of Lam's Office...................................271

C.   Lam's Status on the Removal Lists ......................................272

D.   Reasons Proffered for Lam's Removal..................................272

II.   Chronology of Events Related to Lam's Removal........................... 273

A.   Firearms Cases .................................................................273

**Exhibit 6 -  79**

B.    Immigration Cases ............................................................277

C.    Lam's Removal ..................................................................283

D.    Public Corruption Investigations.......................................284

III.    Analysis................................................................................. 285

CHAPTER ELEVEN MARGARET CHIARA................................................ 289

I.    Introduction ........................................................................... 289

A.    Background ........................................................................289

B.    The EARS Evaluation of Chiara's Office .............................289

C.    Chiara's Status on the Removal Lists.................................290

D.    Reasons Proffered for Chiara's Removal ............................290

II.    Chronology of Events Related to Chiara's Removal ....................... 292

A.    Chiara's Inclusion on the Removal Lists .............................292

B.    Factual Chronology Relating to Conflict in Western District of Michigan U.S. Attorney's Office.......................................293

     1.    U.S. Attorney's Office ................................................293
     2.    Senior Management Conflicts in Chiara's Office ..........293

         a.    Rumors and Allegations Regarding Relationship with AUSA and Favoritism.............293

         (1)    Chiara's friend is hired .....................................293
         (2)    Rumors about their relationship .......................295

         b.    Meyer Confronts Chiara About her Relationship with the AUSA .............................299

     3.    Chiara Requests Assistance from EOUSA....................301
     4.    Additional Incidents...................................................302
     5.    The Relationship Rumors Spread ...............................303
     6.    Chiara's Request for an OPR Investigation...................306
     7.    Chiara is Given Advance Notice of Her Removal..........308
     8.    Chiara's Removal .....................................................309

III.    Analysis................................................................................. 309

CHAPTER TWELVE KEVIN RYAN ....................................................... 313

I.    Introduction ........................................................................... 313

A.    Background ........................................................................313

B.    The EARS Evaluations of Ryan's Office ...............................313

**Exhibit 6 - 80**

C.  Status on the Removal Lists ...............................................314

D.  Reasons Proffered for Ryan's Removal ................................315

II.  Chronology of Events Related to Ryan's Removal.......................... 315

A.  Concerns About Ryan's Management....................................315

B.  Sampson's Discussions About Ryan in Early 2005 ..............316

C.  Fall 2005 EARS Evaluation is Postponed ............................317

D.  Events in 2006.....................................................................317

1.  Ryan is on Sampson's January 9, 2006, List of U.S. Attorneys Recommended for Removal.........................317

2.  Controversy Concerning the Methodology of the EARS Evaluation .......................................................318

3.  The March 2006 EARS Evaluation ............................318

4.  The Special EARS Evaluation....................................319

E.  The Removal Lists ...............................................................321

III.  Analysis.................................................................................... 323

CHAPTER THIRTEEN CONCLUSIONS ................................................... 325

I.  Removal Process....................................................................... 326

A.  Oversight of the Process ......................................................326

B.  Implementation of the Removal Plan...................................328

C.  Reasons for the Removals of Individual U.S. Attorneys .........331

D.  Notification to the U.S. Attorneys........................................336

II.  White House Involvement in the Removal Process ........................ 337

III.  The Attorney General's Interim Appointment Authority ................. 338

IV.  The Conduct of Senior Department Officials................................ 339

A.  Alberto Gonzales ................................................................339

1.  Gonzales's Statements at the March 13 Press Conference...............................................................341

2.  Gonzales's Conversation with Goodling ......................342

B.  Paul McNulty .....................................................................344

C.  Kyle Sampson .....................................................................346

1.  Misleading Statements to the White House.................347

2.  Misleading Statements to Congress............................348

3.  Misleading Department Officials................................349

**Exhibit 6 - 81**

D.      Monica Goodling ...............................................................351

E.      David Margolis ..................................................................352

F.      Michael Elston ...................................................................354

G.      William Moschella ............................................................356

V.      Conclusion ................................................................................ 356

**Exhibit 6 -  82**

# CHAPTER ONE
# INTRODUCTION

On December 7, 2006, at the direction of senior Department of Justice (Department) officials, seven U.S. Attorneys were told to resign from their positions.[1]  Two other U.S. Attorneys had been told to resign earlier in 2006.[2] When these removals became public in late 2006 and early 2007, members of Congress began to raise questions and concerns about the reasons for the removals, including whether they were intended to influence certain prosecutions.

Beginning in March 2007, the Office of the Inspector General (OIG) and the Office of Professional Responsibility (OPR) conducted this joint investigation into the removals of these U.S. Attorneys.[3]  Our investigation focused on the reasons for the removals of the U.S. Attorneys and whether they were removed for partisan political purposes, or to influence an investigation or prosecution, or to retaliate for their actions in any specific investigation or prosecution.  We also examined the process by which the U.S. Attorneys were selected for removal, and we sought to identify the persons involved in those decisions, whether in the Department, the White House, Congress, or elsewhere.  In addition, we investigated whether the Attorney General or other Department officials made any false or misleading statements to Congress or the public concerning the removals, and whether they attempted to influence the testimony of other witnesses.  Finally, we examined whether the Attorney General or others intended to bypass the Senate confirmation process in the replacement of any removed U.S. Attorney through the use of the Attorney General's appointment power for Interim U.S. Attorneys.

---

[1]  The U.S. Attorneys were Daniel Bogden, Paul Charlton, Margaret Chiara, David Iglesias, Carol Lam, John McKay, and Kevin Ryan.

[2]  On January 24, 2006, Todd Graves was told to resign; on June 14, 2006, H.E. "Bud" Cummins was told to resign.

[3]  In addition, we also conducted joint investigations of three other matters related to the subject matter of this investigation.  We investigated allegations that the Department's former White House Liaison, Monica Goodling, and others in the Office of the Attorney General used political considerations to assess candidates for career positions in the Department, and on July 28, 2008, we issued a report describing our findings.  We also investigated allegations that officials overseeing the Department's Honors Program and Summer Law Intern Program used political considerations in assessing candidates for those programs, and on June 24, 2008, we issued a report describing our findings in that investigation.  In addition, we investigated allegations that former Civil Rights Division Assistant Attorney General (AAG) Bradley Schlozman and others used political considerations in hiring and personnel decisions in the Civil Rights Division.  We will issue a separate report describing the results of that investigation.

1

**Exhibit 6 -  83**

## I.    Methodology of the Investigation

During the course of our investigation, we conducted approximately 90 interviews.[4]  Among the witnesses we interviewed were former Attorney General Alberto Gonzales; former Deputy Attorneys General Paul McNulty, James Comey, and Larry Thompson; and numerous current and former employees of the Office of the Attorney General (OAG), the Office of the Deputy Attorney General (ODAG), and the Executive Office for United States Attorneys (EOUSA). We interviewed eight of the nine U.S. Attorneys who were removed – Daniel Bogden, Paul Charlton, Margaret Chiara, Bud Cummins, Todd Graves, David Iglesias, John McKay, and Carol Lam.  The ninth U.S. Attorney, Kevin Ryan, declined our request for an interview.

We also attempted to interview Monica Goodling, a former counsel to Attorney General Gonzales and the Department's White House Liaison.  She declined to cooperate with our investigation.  However, on May 23, 2007, Goodling testified before the United States House of Representatives Committee on the Judiciary pursuant to a grant of immunity issued by the United States District Court for the District of Columbia, and we reviewed the transcript of that hearing.

We also attempted to interview White House staff who may have played a role in the removals of the U.S. Attorneys.  We discussed our request with the Office of Counsel to the President (White House Counsel's Office), and that office encouraged current and former White House employees to agree to be interviewed by us.  Several former White House staff members agreed to be interviewed, including Deputy White House Counsel David Leitch; Director of Political Affairs Sara Taylor; Deputy Director of Political Affairs Scott Jennings; Associate White House Counsel Dabney Friedrich, Christopher Oprison, and Grant Dixton; and Paralegal Colin Newman.  However, other former White House staff, including White House Counsel Harriet Miers, Assistant to the President and Deputy Chief of Staff and Senior Advisor Karl Rove, Deputy White House Counsel William Kelley, and Associate White House Counsel Richard Klingler, declined our request to interview them.

Miers's attorney told us that although he understood that considerations of executive privilege were not an issue between the Department of Justice and the White House since both are part of the Executive Branch, an interview with us might undermine Miers's ability to rely on the instructions she received from the White House directing her to refuse to appear for Congressional testimony.  Rove's attorney advised us after consultation with Rove that he

---

[4]  Some of the people we interviewed were also interviewed in connection with our other joint investigations described in footnote 3.

2

**Exhibit 6 -  84**

declined our request for an interview.  We were informed by the White House Counsel's Office that both Kelley and Klingler also declined our request.

We also interviewed several members of Congress and congressional staff regarding the removals.  We interviewed Congresswoman Heather Wilson in relation to Iglesias's removal.  We interviewed Congressman "Doc" Hastings and his former Chief of Staff, Ed Cassidy, in relation to the removal of McKay.  We requested an interview with Senator Christopher S. "Kit" Bond in relation to Graves's removal, and he provided us with a written statement.

We also attempted to interview Senator Pete V. Domenici and his Chief of Staff, Steven Bell, about the removal of Iglesias and any conversations they had with the White House or the Department related to the removal.  However, Senator Domenici and Bell declined our requests for an interview.[5]

In our investigation, we also reviewed several thousand electronic and hard copy documents, including documents the Department produced in response to Congressional investigations of the U.S. Attorney removals.[6]  We obtained and searched the e-mail accounts of numerous current and former Department employees in, among other Department components, the Attorney General's Office, the Deputy Attorney General's Office, and EOUSA.

We also requested and received documents from the White House showing communications between the White House and outside persons and entities, including the Department of Justice, related to the removal of the U.S. Attorneys.  However, the White House Counsel's Office declined to provide internal e-mails or internal documents related to the U.S. Attorney removals, stating that these documents were protected from disclosure because, according to the White House Counsel's Office, such material "implicate[s] White House confidentiality interests of a very high order. . . ."  The White House did not formally assert executive privilege as grounds for withholding the material from us, but asserted that its "internal communications . . . are, in our judgment, covered by the deliberative process and/or presidential communications components of executive privilege in the event of a demand for them by Congress."

As we discuss in more detail in Chapter Three, in the course of our investigation we also learned that in early March 2007 Associate White House Counsel Michael Scudder had interviewed Department and White House

---

[5]  Domenici declined to be interviewed, but said he would provide written answers to questions through his attorney.  We declined this offer because we did not believe it would be a reliable or appropriate investigative method under the circumstances.

[6]  Some of these documents were produced to Congress in redacted form.  However, we had access to and reviewed these documents in unredacted form.

3

**Exhibit 6 -  85**

personnel at the request of White House Counsel Fred Fielding in an effort to understand the circumstances surrounding the U.S. Attorney removals and be in a position to respond to this issue.[7]  Based on his interviews, Scudder created a memorandum for Fielding containing a timeline of events, which was provided to the Department of Justice's Office of Legal Counsel (OLC) and to the Attorney General.  Because the Scudder chronology appeared to contain information we had not obtained elsewhere in our investigation, we requested that OLC produce a complete copy of the final Scudder memorandum and all drafts of the memorandum.  OLC declined to produce the document, stating that the White House Counsel's Office directed it not to do so.  The White House Counsel's Office agreed to provide us with one paragraph in the memorandum related to information about Iglesias's removal, and two paragraphs containing information Rove provided to Scudder.  White House Counsel notified us that these paragraphs contained information similar to previous public statements the White House made in the press.  The White House Counsel's Office declined to provide to us a full copy of the memorandum, stating that it has a "very strong confidentiality interest" in not providing documents that were prepared to advise and assist the President and his advisors "in response to a public, ongoing, and significant controversy."[8]

The White House Counsel's Office eventually provided to us a heavily redacted version of the document, but the redactions made the document virtually worthless as an investigative tool.  We disagree with the White House's rationale for withholding this document, particularly since the document was shared with OLC and e-mail records also show that drafts had been provided to former Attorney General Gonzales.  We also disagree with the White House Counsel's Office decision not to provide us White House internal documents related to the U.S. Attorney removals and, as we discuss below, believe it hindered our investigation.

## II.     Organization of this Report

In Chapter Two of this report, we provide background information about the jurisdiction and duties of U.S. Attorneys, how they are selected and evaluated, and their position in the Department's organizational structure.

---

[7]  We learned about this document from the Department's Office of Legal Counsel.  In response to our document request, OLC had provided to us its final chronology, deleting all references to the Scudder chronology and all information derived from that document.  When we obtained earlier drafts of the OLC chronology, we saw references to the Scudder memorandum as support for certain propositions in the chronology, including alleged communications between a member of Congress and the White House regarding Iglesias.

[8]  A copy of a letter from Emmet Flood, Special Counsel to the President, describing the reasons for the White House's decision is included in Appendix A.

**Exhibit 6 -  86**

In Chapter Three, we describe in detail the background leading to the removal of the U.S. Attorneys in 2006, including the genesis of the plan to replace them, the various modifications of the plan in 2005 through 2006, and the involvement of the White House and Department officials in the development of the plan.  We then discuss the removals and events following the removals, including the initial Congressional and public focus on the removals, the Department's efforts to explain the removals, the public statements and testimony of senior Department officials about the reasons for the removals, and the Congressional hearings regarding the removals.

In Chapters Four through Twelve, we discuss in detail the circumstances surrounding the removal of each of the nine U.S. Attorneys.  We examine the reasons the Department offered for each removal, the process by which the U.S. Attorneys were selected for removal, the process by which they were removed, and our conclusions regarding their removal.

In Chapter Thirteen, we provide our conclusions about the process by which the U.S. Attorneys were selected for removal and removed, the reasons proffered for removal, the actions of senior Department leaders in the removal process, and whether any Department employee made false or misleading statements to Congress or the public related to the removals.[9]

---

[9]  With the exception of the nine U.S. Attorneys who were removed in 2006, we do not discuss in detail all of the U.S. Attorneys Kyle Sampson or others at the Department may have considered for removal between 2005 and 2006.  However, in describing the removal selection process, we identify those U.S. Attorneys Sampson specifically mentioned to the White House in removal lists and e-mail correspondence concerning the removals.  We also note what Department officials told us about why these U.S. Attorneys ultimately were not removed.

**Exhibit 6 -  87**

# CHAPTER THIRTEEN
# CONCLUSIONS

Like other Presidential appointees, United States Attorneys can be removed by the President for any reason or for no reason, as long as it is not an illegal or improper reason.  In the past, U.S. Attorneys normally were not replaced except in cases of misconduct or when there was a change in Administrations.  Prior to the events described in this report, the Department of Justice had never removed a group of U.S. Attorneys at one time because of alleged performance issues.  The way the Department handled the removal of nine U.S. Attorneys in 2006, and the after-the-fact reasons proffered for the removals of this group, resulted in significant controversy, concerns that the removals were undertaken for improper political purposes, and allegations that the reasons proffered by the Department for the removals were not accurate.[200]

We therefore investigated in detail how each of the nine U.S. Attorneys was selected for removal and the process used to remove them.  In addition, we examined the accuracy of the public statements and congressional testimony by Department officials justifying the removals.

We concluded that the process the Department used to select the U.S. Attorneys for removal was fundamentally flawed, and the oversight and implementation of the removal process by the Department's most senior leaders was seriously lacking.  In particular, we found that Attorney General Alberto Gonzales and Deputy Attorney General Paul McNulty failed to adequately supervise the U.S. Attorney selection and removal process, and they were remarkably unengaged in the process.  Instead, Chief of Staff to the Attorney General Kyle Sampson, with very little input from other Department officials, designed, selected, and implemented the removal process, with little supervision or oversight.  In addition, after the removals became public the statements provided by the Attorney General and other Department officials about the reasons for the removals were inconsistent, misleading, and inaccurate in many respects.

The most serious allegations that arose were that the U.S. Attorneys were removed based on improper political factors, including to affect the way they handled certain voter fraud or public corruption investigations and prosecutions.  Our investigation found significant evidence that political partisan considerations were an important factor in the removal of several of

---

[200] The nine U.S. Attorneys removed in 2006 were:  Todd Graves, W.D. Missouri; H.E. "Bud" Cummins, E.D. Arkansas; David Iglesias, D. New Mexico; Daniel Bogden, D. Nevada; Paul Charlton, D. Arizona; John McKay, W.D. Washington; Carol Lam, S.D. California; Margaret Chiara, W.D. Michigan; and Kevin Ryan, N.D. California.

**Exhibit 6 -  88**

the U.S. Attorneys.  The most troubling example was David Iglesias, the U.S. Attorney in New Mexico.  We concluded that complaints from New Mexico Republican politicians and party activists about Iglesias's handling of voter fraud and public corruption cases caused his removal, and that the Department removed Iglesias without any inquiry into his handling of the cases.

However, we were unable to fully develop the facts regarding the removal of Iglesias and several other U.S. Attorneys because of the refusal by certain key witnesses to be interviewed by us, as well as by the White House's decision not to provide internal White House documents to us.  Therefore, we recommend that counsel specially appointed by the Attorney General work with us to conduct further investigation and ultimately to determine whether the totality of the evidence demonstrates that any criminal offense was committed.

In this chapter, we first provide our analysis of the process used by the Department to remove the U.S. Attorneys.  We then provide our findings concerning the conduct of each of the senior Department officials most involved in the removals, including an assessment of the accuracy of their statements explaining the removals.

## I.    Removal Process

### A.    Oversight of the Process

Shortly after the 2004 Presidential election, White House Counsel Harriet Miers raised with Sampson the idea of seeking resignations from all 93 U.S. Attorneys.  Sampson, who at the time was Counsel to the Attorney General, told Miers he thought that it was not a good idea to ask for the resignations of all U.S. Attorneys.  Sampson suggested as an alternative that the White House replace a much smaller number of U.S. Attorneys when their 4-year terms expired.

As noted, U.S. Attorneys are appointed for a term of 4 years.  Typically, however, they remain in office beyond the expiration of their terms.  Sampson wrote in a January 2005 e-mail to a White House official that "the vast majority of U.S. Attorneys, 80-85 percent, I would guess, are doing a great job, are loyal Bushies, etc., etc.," and he proposed developing a plan to remove approximately 15 to 20% of "underperforming" U.S. Attorneys.

Sampson discussed this proposal with Gonzales when Gonzales was White House Counsel.  After he became the Attorney General in February 2005, Gonzales authorized Sampson to proceed with a review to identify those "underperforming" U.S. Attorneys who should be removed.  While both Sampson and Gonzales told us and stated in their congressional testimony that the President can remove U.S. Attorneys for any reason or for no reason, it

**Exhibit 6 -  89**

appears that the original plan was to evaluate the performance of each U.S. Attorney and make recommendations to the White House as to who should be removed based upon that assessment.

We found that Gonzales delegated the entire project to Sampson and provided little direction or supervision. According to Gonzales, he told Sampson to consult with the senior leadership of the Department, obtain a consensus recommendation as to which U.S. Attorneys should be removed, and coordinate with the White House on the process. However, Gonzales acknowledged to us that he did not discuss with Sampson how to evaluate the U.S. Attorneys or which factors to consider. We found that Gonzales eventually approved the removals of a group of U.S. Attorneys without inquiring about the process Sampson used to select them for removal, or why each name was on Sampson's removal list. Gonzales also did not know who Sampson had consulted with or what these individuals had said about each of the U.S. Attorneys identified for removal. Instead, Gonzales told us he "assumed" that Sampson engaged in an evaluation process, that the resulting recommendations were based on performance, and that the recommendations reflected the consensus of senior managers in the Department. Each of those assumptions was faulty.

Gonzales also said he had little recollection of being briefed about Sampson's review process as it progressed over a year and a half. He claimed to us and to Congress an extraordinary lack of recollection about the entire removal process. In his most remarkable claim, he testified that he did not remember the meeting in his conference room on November 27, 2006, when the plan was finalized and he approved the removals of the U.S. Attorneys, even though this important meeting occurred only a few months prior to his testimony.

This was not a minor personnel matter that should have been hard to remember. Rather, it related to an unprecedented removal of a group of high-level Presidential appointees, which Sampson and others recognized would result in significant controversy. Nonetheless, Gonzales conceded that he exercised virtually no oversight of the project, and his claim to have very little recollection of his role in the process is extraordinary and difficult to accept.

We also found that Deputy Attorney General McNulty had little involvement in or oversight of the removal process, despite his role as the immediate supervisor of all U.S. Attorneys. McNulty was not even made aware of the removal plan until the fall of 2006. When McNulty learned about the plan, he thought it was a bad idea. However, he deferred to Sampson and did not raise his concerns with regard to the plan itself or, except in a couple of cases, the evaluation of specific U.S. Attorneys to be removed. Rather, he distanced himself from the project, both while it was ongoing and after it was implemented.

327

**Exhibit 6 -  90**

Moreover, we found that there was virtually no communication between Attorney General Gonzales and Deputy Attorney General McNulty about this important matter.  Even when McNulty learned about the plan in the fall of 2006 (more than a year after Gonzales and Sampson initiated the removal process), he did not discuss any of his concerns about the plan with Sampson or Gonzales.

In addition, as discussed in the chapter on Carol Lam, the U.S. Attorney for the Southern District of California, in the summer of 2006 Gonzales and Sampson suggested a plan to address concerns they had with Lam's prosecutive decisions in gun and immigration cases, and asked the Deputy Attorney General's Office to execute the plan.  Yet, McNulty and his staff did not implement the plan, and the Attorney General and his staff never followed up with the Deputy Attorney General about the outcome of the plan before Lam was removed.

After the U.S. Attorney removals, poor communication persisted between Gonzales and McNulty.  For example, Attorney General Gonzales testified before Congress on January 17, 2007, that all the U.S. Attorneys were removed for performance reasons.  However, Deputy Attorney General McNulty testified before another congressional panel less than 3 weeks later that H.E. "Bud" Cummins III, the U.S. Attorney for the Eastern District of Arkansas, was removed to provide a position for Tim Griffin, the Deputy Director of Political Affairs at the White House.  Gonzales was upset by McNulty's testimony because, he told us, up to that point he believed that Cummins had been removed for poor performance.  However, according to both Gonzales and McNulty, they never discussed Cummins's removal or McNulty's testimony.

## B.    Implementation of the Removal Plan

We found no evidence that Gonzales, McNulty, or anyone else in the Department carefully evaluated the basis for each U.S. Attorney's removal or attempted to ensure that there were no improper political reasons for the removals.

Sampson was primarily responsible for creating the plan, selecting the U.S. Attorneys to be removed, and implementing the plan.  He said he consulted with Department officials in informal settings to get their "frank assessments" of U.S. Attorneys, and Sampson described himself as the "aggregator" of their views.  Sampson also testified that he had "no independent basis" for removing any U.S. Attorney and that he relied on other Department officials, such as McNulty, Executive Office for U.S. Attorneys (EOUSA) Directors Mary Beth Buchanan and Michael Battle, and Associate Deputy Attorney General David Margolis to make recommendations about who should be removed.  He said, "[i]n my mind, they were the Department officials who

328

**Exhibit 6 -  91**

would have reason to make informed judgments about who might be added to such a list."

This claim was misleading.  Neither Sampson nor anyone else in the Department ever engaged in a systematic assessment of the performance of U.S. Attorneys to determine who was underperforming and should be replaced.  Instead, Sampson's evaluation process was casual, *ad hoc,* and anecdotal, and he did not develop any consensus from Department officials about which U.S. Attorneys should be removed.

For example, when Sampson asked Margolis for his input in early 2005, Margolis recommended that Kevin Ryan, Margaret Chiara, and Dunn Lampton from the Southern District of Mississippi should be considered for removal because of performance issues.  He also suggested the names of about eight other U.S. Attorneys that deserved a "closer look."  After that, Margolis – the long-term career Department official with the most knowledge about U.S. Attorney matters – had little input into the process, except in November 2006 when Sampson read him a list of names of U.S. Attorneys who would be removed.  EOUSA Director Battle received an initial inquiry from Monica Goodling in the fall of 2005 about whether he had concerns about any U.S. Attorneys, but he was not consulted again about the performance of any U.S. Attorney as part of Sampson's process.  Sampson even acknowledged to us that he did not make it clear to some of the people he consulted about the purpose for asking what they thought about particular U.S. Attorneys.

Sampson's process for documenting the assessments he received of U.S. Attorneys was similarly arbitrary, disorganized, and unsystematic.  He said he kept a chart listing all the names of the U.S. Attorneys on which he made notes based on conversations he had with others.  Sampson said he would keep the annotated chart until it became "dog-eared" and then he would throw it away and start over.  While Sampson said he sometimes made notes during his conversations with other Department officials, a lot of the information he gleaned from others he "just remembered."  Sampson described the discussions he had with Department officials about U.S. Attorneys as "largely an oral exercise" with "some really rough tracking."  Sampson did not keep any of these lists with his notes, and as a result we were forced to rely on Sampson's vague and conflicting memories of the reasons for the removals of the U.S. Attorneys.

Neither Sampson nor anyone else involved in the removal process reviewed the performance evaluations of U.S. Attorneys' Offices conducted by EOUSA's Evaluation and Review Staff (EARS), except for the evaluations of Ryan's office.  Yet, Sampson told Miers and later told congressional staff that the selection of U.S. Attorneys to be removed was based in part on the results of EARS evaluations.

329

**Exhibit 6 -  92**

While Presidential appointees can be removed by the President at will and do not have the notice and due process protections afforded civil service employees, Sampson was supposed to determine which U.S. Attorneys should be removed based on an evaluation of their performance.  Sampson told us that the removal plan was in accord with the management theory that removing a percentage of underperforming employees constitutes good management.  However, if the purpose was to remove U.S. Attorneys who were underperforming, one would have expected Sampson to engage in a more systematic assessment of the U.S. Attorneys' performance, including a review of all EARS evaluations and direct and forthright conversations with senior officials in the best positions to assess the performance of U.S. Attorneys.  None of that occurred.

In addition, neither Sampson nor anyone else in the Department asked several of the removed U.S. Attorneys for an explanation about the complaints that allegedly justified their removal.  As a consequence, the telephone calls from Battle to the U.S. Attorneys telling them to resign were stunning to most of them.  It is not surprising that the removals led to criticism from the U.S. Attorneys when the Department later stated publicly that they were removed for performance-related reasons after they had been told otherwise.

Moreover, as discussed in more detail in the chapters on the individual U.S. Attorneys, we found conflicting testimony about the reasons each U.S. Attorney was recommended for removal.  In some cases, neither Sampson nor any other Department official acknowledged recommending that the U.S. Attorney be placed on the removal list.  In other cases, the Department's senior leaders did not even know why Sampson placed the U.S. Attorney on the list.

Sampson's repeated assertion that "underperformance" was the decisive factor in the removal process was misleading.  In fact, Sampson acknowledged that he considered whether a particular U.S. Attorney identified for removal had strong support from their home-state elected Republican officials.  According to Sampson, a U.S. Attorney was considered for removal not merely if he was "mediocre," but if he was perceived as both mediocre and lacking political support.  Conversely, Sampson acknowledged deleting from his removal list the names of several U.S. Attorneys whom he considered "mediocre" because he believed they had the political support of their home-state Senators and he did not think the Administration would want to risk a fight with the Senators over their removal.

While U.S. Attorneys are Presidential appointees who may be dismissed for any reason or for no reason, Department leaders failed to ensure that the removals were not undertaken for improper reasons.  We believe that removing U.S. Attorneys based on their lack of political support could affect the integrity and independence of the Department's prosecutive decisions and the public's confidence that such decisions are insulated from political considerations.

330

**Exhibit 6 -  93**

U.S. Attorneys should make their prosecutive decisions based on the Department's priorities, the law, and the facts of each case, not on a fear of being removed if they lose political support.

We recognize that U.S. Attorneys are selected in part based on the recommendations of state and federal political officials. But once they assume office, U.S. Attorneys should leave politics behind and make their prosecutive decisions divorced from partisan political considerations. For Department officials to recommend the removal of U.S. Attorneys even in part because they do or do not have political support undermines the public's confidence that Department of Justice prosecutive decisions are based on the facts and the law and not on political considerations.

In short, we believe that senior Department officials – particularly the Attorney General and the Deputy Attorney – abdicated their responsibility to safeguard the integrity and independence of the Department by failing to ensure that the removal of U.S. Attorneys was not based on improper political considerations.

### C.     Reasons for the Removals of Individual U.S. Attorneys

In Chapters Four through Twelve, we analyzed the reasons proffered by Department officials for the removal of each U.S. Attorney. Those chapters demonstrate how flawed the removal process was, and the evidence in those chapters also contradicts the Department's initial claims that U.S. Attorneys were removed for performance reasons.

In January 2006, Missouri U.S. Attorney Todd Graves was the first U.S. Attorney told to resign. As described in detail in Chapter Four, while our investigation into Graves's removal was hindered by the refusal of Goodling and key officials in the White House to be interviewed, the evidence showed that the primary reason for Graves's removal was complaints from the staff of Missouri Senator Christopher S. "Kit" Bond. Bond's staff urged the White House Counsel's Office to remove Graves because he had declined to intervene in a conflict between Senator Bond's staff and the staff of Graves's brother (a Republican Congressman from Missouri). Thus, it appears that Graves was told to resign because of a political dispute among Missouri politicians, not because of an objective assessment of his performance as U.S. Attorney.

Yet, we found that no one in the Department accepted responsibility for the decision to remove Graves. Each senior official we interviewed claimed that others must have made the decision. EOUSA Director Battle, who placed the call telling Graves to resign, said he did so at the direction of Goodling, and that Goodling did not provide him with the reasons for Graves's removal. Goodling stated in her congressional testimony that she would have instructed Battle to make the call to Graves only at Sampson's direction. Sampson said

331

**Exhibit 6 -  94**

that he had no recollection of the matter, that he believed Goodling had handled it, and that he assumed Graves's removal was based on a finding of misconduct by Margolis. Margolis told us there was no misconduct finding against Graves and that he played no role in Graves's removal.

In addition, according to Sampson and Gonzales, it is not clear whether anyone consulted with the Attorney General about Graves's removal. Gonzales told us he did not remember being told why Graves was asked to resign, although he said "can't imagine it didn't happen." He said, "I'm sure I was told and I don't remember."

In June 2006, Arkansas U.S. Attorney Bud Cummins was the second U.S. Attorney told to resign. Contrary to Gonzales's initial statement that the U.S. Attorneys had been removed after an evaluation showed they were underperforming, Cummins was not removed for any performance reasons. While Sampson stated that he thought Cummins was "mediocre," Sampson never assessed Cummins's performance and later agreed with McNulty's testimony to the Senate Judiciary Committee that Cummins was not removed for performance reasons. Rather, the evidence shows that the main reason for Cummins's removal was to provide a position for former White House official Tim Griffin.

The other seven U.S. Attorneys were all told to resign on December 7, 2006. The most controversial case was the removal of New Mexico U.S. Attorney David Iglesias. As discussed in Chapter Six, we were unable to uncover all the facts pertaining to his removal because of the refusal by key witnesses to be interviewed, including Rove, Miers, Goodling, New Mexico Senator Pete Domenici, and Domenici's Chief of Staff. As a result, we believe important gaps remain in the evidence regarding Iglesias's removal as U.S. Attorney.

However, the evidence we uncovered showed that Iglesias was removed because of complaints to the Department and the White House by Senator Domenici and other New Mexico Republican political officials and party activists about Iglesias's handling of voter fraud and public corruption cases in the New Mexico. We concluded that the other reasons proffered by the Department after Iglesias's removal – that he was an "absentee landlord," that he delegated too much authority to his First Assistant, and that he was an underperformer – were after-the-fact rationalizations that did not actually contribute to his removal.

We also found that the Department never investigated the complaints about Iglesias's decisions on voter fraud or public corruption cases, or even asked Iglesias about them. Rather, based upon the complaints about Iglesias and Senator Domenici's "loss of confidence" in him, Sampson placed Iglesias on the removal list. By accepting complaints from New Mexico political officials

332

**Exhibit 6 - 95**

as a basis for Iglesias's removal without investigating their validity, we believe Department leaders abdicated their responsibility to ensure that prosecutorial decisions would be based on the law, the evidence, and Department policy, rather than political pressure related to the handling of specific cases.

With regard to Nevada U.S. Attorney Daniel Bogden, as with Graves, we were unable to identify the person responsible for recommending that he be placed on the removal list. Bogden first appeared on the September 2006 removal list, shortly after Sampson received vociferous complaints from the head of the Department's Obscenity Prosecution Task Force that Bogden would not assign a prosecutor to a Task Force obscenity case. Yet, neither Sampson nor any other senior Department official asked Bogden for his response to this complaint. No one inquired about competing resource needs in Bogden's district, his view of the strength of the obscenity case, or his offer to provide assistance to the Task Force with office space, grand jury time, secretarial support, and prosecution advice.

It also appears that some Department officials believed that voter fraud was an issue in Nevada. However, no one complained about Bogden's handling of any allegations of voter fraud, and we found no evidence to support any speculation that Bogden's removal related to any voter fraud issues.

Department officials testified and told us that Bogden was considered to be a "mediocre" U.S. Attorney and lacked energy and leadership. Yet, we found no evidence that Department managers ever raised concerns about Bogden's performance with him before he was removed, and they also did not ask Department officials who would likely be most knowledgeable about Bogden's performance, such as Battle or Margolis, before placing Bogden on the removal list.

Moreover, except for Goodling, no one involved in the removals said they recommended that Bogden be removed, and Goodling denied that her recommendation was the cause of his removal. While Sampson acknowledged that he must have physically placed Bogden's name on the list, Sampson denied that he made the decision to do so and said that he did not remember who made the recommendation. Attorney General Gonzales stated that he did not know why Bogden was removed.

Sampson also acknowledged to us that there may have been other "mediocre" U.S. Attorneys whose performance was worse than Bogden's, but they were not removed because they had the right political connections. This admission is another example of the consideration of political factors in the removal process by the Department.

The reason for the removal of John McKay, the U.S. Attorney for the Western District of Washington, was difficult to determine. McKay was

333

**Exhibit 6 - 96**

included on Sampson's first removal list in March 2005 during a controversy about his handling of voter fraud allegations in connection with the contested 2004 Washington State gubernatorial election. However, Sampson stated that he did not believe he placed McKay's name on this removal list because of McKay's handling of voter fraud allegations, and none of the other Department officials we interviewed said they recalled hearing any concerns about the way McKay handled voter fraud allegations related to the election.

Sampson took McKay's name off the next removal list in January 2006, after Deputy Attorney General James Comey spoke highly of McKay's performance. Sampson subsequently placed McKay back on the list in September 2006. McKay told us that White House Counsel Miers and Deputy White House Counsel William Kelley told him at a meeting in August 2006 – a few weeks before McKay's name reappeared on the removal list – that Washington State Republicans were displeased with his handling of voter fraud complaints. Because Miers and Kelley, as well as Rove, declined to cooperate with our investigation, and because we were denied access to internal White House documents, we cannot rule out the possibility that McKay's handling of voter fraud complaints played a part in the decision to remove him from office.

Based on the available evidence, however, we believe that the main reason McKay's name was placed back on the list in September 2006 was his clash with Deputy Attorney General McNulty over the LInX information-sharing program, which McKay zealously advocated. Sampson told us that McNulty was irritated by McKay's August 30, 2006, letter urging McNulty to adopt LInX as the Department's sole information-sharing program. McKay's letter was signed by 17 U.S. Attorneys in addition to McKay and was disseminated both inside and outside the Department.

However, McNulty told us that he did not instruct Sampson to put McKay on the removal list and that he was prepared to work with McKay to resolve the information-sharing issue. While McNulty said he did not initiate McKay's removal, he also stated that he did not object when he saw McKay's name on the removal list because he had questions about McKay's judgment in light of the way McKay handled the LInX matter.

With regard to Arizona U.S. Attorney Paul Charlton, we found no evidence, as some speculated, that Charlton was removed because of his office's investigation and prosecution of an Arizona Congressman. Rather, we found that the Department was displeased with Charlton's implementation of a policy in his district that required that interrogations be tape recorded. Charlton's unilateral action in implementing the policy, without consulting Department leaders and in direct opposition to the FBI's policies, was counterproductive and inappropriate. Yet, the Deputy Attorney General's Office and Charlton agreed to address the issue by considering a pilot taping

334

**Exhibit 6 - 97**

program.  Moreover, after the dispute about the taping policy, which occurred in February 2006, Charlton was not included on Sampson's next removal list.

We concluded that the most significant factor in Charlton's removal was his actions in a death penalty case.  Charlton persistently opposed the Department's decision to seek the death penalty in a homicide case, and he irritated Department leaders by seeking a meeting with the Attorney General to urge him to reconsider his decision.  We are troubled that Department officials considered Charlton's actions in the death penalty case, including requesting a meeting with the Attorney General, to be inappropriate.  We do not believe his actions were insubordinate or that they justified his removal.

With regard to Carol Lam, the U.S. Attorney for the Southern District of California, we also found no evidence to support speculation that Lam was removed in retaliation for her prosecution of certain public corruption cases.  Rather, she was placed on the removal lists because of the Department's concerns about the low number of gun and immigration prosecutions undertaken by her office.  These concerns were raised in the EARS evaluation of Lam's office in 2004, and Department officials expressed these concerns to her.  In response, Lam argued to the Department that the low number of gun prosecutions resulted from various factors in her district, including strong state gun laws and effective state and local law enforcement of gun laws. With regard to immigration cases, Lam explained that her office decided to prosecute the more serious offenders with charges bringing longer sentences, and that it took more resources to investigate and prosecute these types of cases.

These explanations did not persuade Department leaders or assuage their concerns about her prosecutorial priorities.  It is the President's and the Department's prerogative to remove a U.S. Attorney who they believe is not adhering to their priorities or not adequately pursuing the types of prosecutions that the Department chooses to emphasize.  This is true for any U.S. Attorney, even one such as Lam who was described by Margolis as otherwise "outstanding," "tough," and "honest," and who was described in the EARS evaluation as "an effective manager . . . respected by the judiciary, law enforcement agencies, and the USAO staff."

However, what we found troubling about Lam's case was that no one examined her response to the concerns about her prosecution of immigration and gun cases, and the Department removed her without implementing the plan outlined by Sampson, at the direction of the Attorney General, to address the Department's concerns about Lam's prosecutorial priorities.  The plan called for the Deputy Attorney General (or his staff) having "a heart-to-heart" talk with Lam about the urgent need to improve immigration enforcement; working with her to develop a plan to address the problem; and removing her if she "balk[ed]" or otherwise did not perform in a measurable way.  Yet, we found no evidence that anyone in the Deputy Attorney General's office took any of the

**Exhibit 6 -  98**

steps outlined in the plan, or that anyone in the Attorney General's Office inquired about the outcome of the plan before Lam was removed.

With regard to the remaining two U.S. Attorneys – Margaret Chiara from the Western District of Michigan and Kevin Ryan from the Northern District of California – we found that the Department had reasonable concerns about their performance and management, and that they were removed for those reasons. We concluded that, contrary to Chiara's claim, she was not removed because of rumors concerning an alleged sexual relationship with a subordinate Assistant U.S. Attorney.

The evidence was clear that Ryan was removed because of concerns about his performance and the two EARS evaluations that severely criticized his management of the office. In contrast to the process the Department used to decide whether to remove the other U.S. Attorneys, the Department sought an objective evaluation of concerns about Ryan's performance, and Ryan was given an opportunity to respond to those concerns. At the end of the process, the Department considered the evaluations and his responses, concluded that Ryan's office needed a change of leadership, and implemented that change. We found nothing inappropriate with that decision.

### D.    Notification to the U.S. Attorneys

We also concluded that the way the U.S. Attorneys were told to resign was poorly handled. EOUSA Director Battle was instructed to inform the U.S. Attorneys to submit their resignations without providing them the reasons for their removals.

According to Sampson, at the November 27, 2006, meeting at which the removal plan was approved, the group discussed whether McNulty should notify the U.S. Attorneys in person while they were in Washington, D.C., for a conference. McNulty said that he did not recall being asked to notify the U.S. Attorneys and said having Battle make the calls was consistent with the notion of keeping the removals "in a lower key."

We believe a better practice would have been for the Attorney General or the Deputy Attorney General, who was the U.S. Attorneys' direct supervisor, to personally inform the U.S. Attorneys of their removal. Several of the U.S. Attorneys said they were stunned by Battle's call and were confused about why they were asked to resign. Moreover, the U.S. Attorneys were told that they were being removed because the Administration wanted to give someone else a chance to serve. That was not true, except in the case of Cummins. Moreover, we found no evidence that the Department had other candidates in mind to replace most of those who were removed. And when some U.S. Attorneys inquired about the reason they were being removed, they received no other response.

336

**Exhibit 6 -  99**

The decision not to disclose to the U.S. Attorneys why they were being removed led to speculation by them, and eventually by others, about the true reasons they were being removed, including speculation in some cases that they were removed for improper political reasons.  Further, no one adequately considered what would happen once it became known that multiple U.S. Attorneys had been asked to resign at the same time without being told why.  McNulty indicated that the working assumption was that the U.S. Attorneys would see it in their best interest to deal with their removals quietly because they would not want to admit they had been fired.  However, that assumption failed to account for speculation about the real reasons for their removal, particularly when it became known, as it inevitably would, that seven U.S. Attorneys were removed on the same day.  In addition, in light of what Battle told them about the Administration wanting to give someone else a chance to serve, the U.S. Attorneys were understandably angry when Gonzales and McNulty later testified that the removals were based on performance.

It is within the President's power to remove U.S. Attorneys for any reason or for no reason as long as the removal is not for improper or illegal purposes.  However, we believe the better practice would be to ask each of the U.S. Attorneys to address the concerns or complaints related to them and, after evaluating their responses and other information, inform them in a straightforward and professional manner why they were being asked to resign.

## II.   White House Involvement in the Removal Process

While our investigation could not fully determine the role of White House officials in the removals of the U.S. Attorneys, for at least three of the removals, the evidence indicates the White House was more involved than merely approving the removal of Presidential appointees, as Department officials initially stated.

First, with regard to Cummins the evidence shows that the White House sought to give former White House official Griffin a chance to serve as U.S. Attorney, and that both Rove and Miers supported Griffin's appointment.

Second, as discussed above, we found evidence that the White House may have directed Graves's removal because of conflicts with Senator Bond's staff that were unrelated to Graves's duties as U.S. Attorney.  However, no one at the Department questioned the basis for Graves's removal or attempted to ensure that it was not undertaken for an improper political purpose.

Third, we found evidence that complaints to Rove and others at the White House and the Department by New Mexico Republican political officials and party activists about how Iglesias was handling voter fraud cases and a public corruption case led to Iglesias's removal.

**Exhibit 6 -  100**

We recognize that some White House involvement in the removals is not remarkable because U.S. Attorneys are Presidential appointees.  However, because Miers, Rove, Deputy White House Counsel Kelley, and Associate White House Counsel Klingler refused to cooperate with our investigation, and because the White House declined to provide internal documents to us, we were unable to determine the role the White House played in these removals.

Nevertheless, the evidence we found shows that Gonzales, McNulty, and other Department officials acquiesced in the replacement of Iglesias and several other U.S. Attorneys without scrutinizing or even questioning the basis for their removals.  Moreover, the Department failed to ensure that the removals were not undertaken for an improper political purpose.  Instead, after the removals, Gonzales, McNulty, and others simply asserted that the removals were performance-based, which the evidence showed was inaccurate and misleading with regard to several of the U.S. Attorneys.

## III.    The Attorney General's Interim Appointment Authority

Another allegation we examined was whether the Department intended to avoid the formal Senate confirmation process by appointing Interim U.S. Attorneys to the vacant positions for an indefinite period of time.  A provision contained in the Patriot Reauthorization Act that took effect in March 2006 authorized the Attorney General to appoint an Interim U.S. Attorney until the vacancy was filled by a confirmed presidential appointee.  Previously, the Attorney General could appoint an Interim U.S. Attorney for only 120 days.

In mid-September 2006, Sampson e-mailed Miers with a list of "U.S. [Attorneys] We Now Should Consider Pushing Out," and recommended that the Administration use the Attorney General's authority to make Interim U.S. Attorney appointments to fill the resulting vacancies in lieu of going through the formal nomination and Senate confirmation process.  Sampson wrote:  "By not going the PAS [Presidentially Appointed, Senate Confirmed] route, we can give far less deference to home-State Senators and thereby get (1) our preferred person appointed and (2) do it far faster and more efficiently, at less political cost to the White House."  We found no record of Miers's response to this e-mail, and she declined our requests for an interview.

Both Sampson and Gonzales told us that Gonzales opposed Sampson's idea to bypass the Senate confirmation process using the interim appointment authority, and the evidence shows that Sampson abandoned the idea as a general matter.  On November 7, 2006, Sampson forwarded to Elston and McNulty a copy of his proposed plan for the U.S. Attorney removals, and Step 4 of that plan stated that the Department and the White House would "obtain recommendations from Senators and other state political leadership," and

338

**Exhibit 6 - 101**

"have [the] President make nominations and work to secure confirmation of U.S. Attorney nominees."

However, when faced with Arkansas Senator Mark Pryor's continued opposition to Griffin's nomination after Cummins resigned in mid-December 2006, Sampson again advocated using the Attorney General's interim appointment authority to place Griffin in the position indefinitely without Senate confirmation.  He wrote in a December 19 e-mail to the White House, "I think we should gum this to death," and suggested in his e-mail that if either of the Democratic senators from Arkansas would not agree to support Griffin's nomination the Department could "run out the clock" to the end of the Bush Administration while appearing to act in good faith by asking the Senators for recommendations, interviewing other candidates, and pledging to "desire" a Senate-confirmed U.S. Attorney.  Sampson's e-mail also stated that "our guy [Griffin] is in there so the status quo is good for us."

When questioned about this e-mail during his congressional testimony, Sampson characterized his discussion of using the interim appointment authority to bypass Senate confirmation as a "bad idea at the staff level." Gonzales told us he could not recall whether he discussed use of the interim appointment authority in Griffin's case with Sampson at that time, but said he thought it was a "dumb idea" as a general matter.  We found no evidence that Gonzales ever supported this idea, and in fact he pledged to Senator Pryor in a telephone conversation that he would not recommend that the President nominate Griffin if Pryor could not support the nomination.  Eventually, Griffin withdrew from consideration for the permanent U.S. Attorney position, and the Department nominated another candidate.

In sum, the evidence shows that Sampson, on his own initiative, advocated using the Attorney General's authority to appoint an Interim U.S. Attorney to bypass the formal Senate confirmation process, an admittedly "bad idea" that was not supported by Gonzales.  However, we believe that Sampson's suggestion was not simply a 'bad idea," it was a bad faith recommendation to keep Griffin in the position without Senate confirmation.

## IV.    The Conduct of Senior Department Officials

In this section, we assess the actions of each of the Department's senior leaders who were most involved in the U.S. Attorney removal process, and we also examine the accuracy of their public statements about the removals.

### A.    Alberto Gonzales

We believe that Attorney General Gonzales bears primary responsibility for the flawed U.S. Attorney removal process and the resulting turmoil that it created.  This was not a simple personnel matter that should be delegated to

**Exhibit 6 -  102**

subordinate officials – it was an unprecedented removal of a group of high-level Department officials that was certain to raise concerns if not handled properly. Such an undertaking warranted close supervision by the Attorney General, as well as the Deputy Attorney General.  Gonzales did not provide such supervision, nor did he ensure that the Deputy Attorney General provided the necessary oversight.

Gonzales described himself as a delegator and said it was not in his nature to micromanage the "good people" to whom he delegated responsibility. According to Gonzales, he told Sampson to consult with the senior leadership of the Department, obtain a consensus  recommendation as to which U.S. Attorneys should be removed, and coordinate with the White House on the removal process.  Yet, Gonzales acknowledged that he did not discuss with Sampson how to evaluate the U.S. Attorneys or what factors to consider. According to Gonzales, while Sampson provided him "periodic" and "very brief updates" about the U.S. Attorney removal plan over time, they had no discussion of "substance" in terms of the reasons underlying the proposed removals, and Gonzales said he did not know who was "going on and off the list."

Gonzales also stated that while it was his decision to approve the removals, he did so based on Sampson's recommendations and what he thought was the consensus of Department leaders.  Yet, he said that he never asked Sampson or anyone else how they arrived at their recommendations or why each particular U.S. Attorney warranted removal.  Instead, he said he "assumed" that Sampson engaged in an "evaluation process," that the recommendations were based on performance issues, and that they reflected a consensus of senior Department managers.

Even after the removals, Gonzales said he still did not know why certain of the U.S. Attorneys had been removed.  For example, Gonzales told us that he had no recollection of being consulted about Graves's removal.  Gonzales also told us he did not recall having any discussions with Sampson about Griffin replacing Cummins, who was the second U.S. Attorney told to resign.

Most remarkably, Gonzales told us he had "no recollection" of the November 27, 2006, meeting in his conference room during which he approved the plan to request the resignations of the U.S. Attorneys on December 7.  At the meeting, the other participants discussed the steps necessary to implement the plan.  Gonzales was present, received a copy of the 3-page implementation plan, and gave his approval to proceed.  Yet, only a few months later Gonzales stated that he did not remember this critical meeting.

While delegation in many matters is understandable given the wide range of matters demanding an Attorney General's attention, we believe that Gonzales failed to exercise appropriate leadership and supervision throughout this entire

**Exhibit 6 -  103**

process.  While he described himself as a delegator who does not micromanage, he allowed a subordinate who had little prosecutorial or managerial experience to design the plan and select for removal Presidentially appointed Department officials with virtually no supervision, oversight, or accountability.

Gonzales failed to take action even in the case of Iglesias where he had notice that partisan politics might be involved in the requests for his removal. Gonzales received three telephone calls from 2005 to 2006 from Senator Domenici raising concerns about Iglesias.  During the fall of 2006, Gonzales also discussed with Rove and with the President allegations of voter fraud in New Mexico.  Gonzales said he asked Sampson to look into Senator Domenici's complaints, but he never inquired about the outcome of any review or ensured that the complaints were fairly assessed.  Gonzales told us that he would have expected that someone would have looked into the complaints.  According to Gonzales, "you can't have, you know, a member of Congress calling and making an allegation and not checking it out and seeing whether or not there's anything there to it."  But that is exactly what happened with Domenici's complaints, and Gonzales failed to ensure that the allegations were examined before Iglesias was removed.

Gonzales also made a series of statements after the removals that we concluded were inaccurate and misleading, as we discuss in the following sections.

### 1.    Gonzales's Statements at the March 13 Press Conference

On March 13, 2007, Gonzales held a brief press conference concerning the U.S. Attorney removals, partly in an attempt to respond to the perception that the Department was withholding information about the removals.  During this press conference, Gonzales made several statements about his own role in the removal process, including that he "was not involved in seeing any memos, was not involved in any discussions about what was going on."  Gonzales also stated, "I never saw documents.  We never had a discussion about where things stood."

As the facts described in Chapter Three demonstrate, these statements were inaccurate and misleading.  Sampson had periodically briefed Gonzales about the status of the removal process as it progressed.  Moreover, at the meeting in his conference room on November 27, 2006, Gonzales received a copy of the 3-page implementation plan and approved the removal plan.  Even if he did not recall the November 27 meeting, it is unclear why Gonzales would claim that he "never had a discussion about where things stood" since he had been briefed by Sampson periodically.

While it is clear that several of Gonzales's statements at the press conference were untrue, it is difficult to determine whether Gonzales

**Exhibit 6 -  104**

deliberately provided false information. Gonzales stated that prior to the press conference he had not gone back to look at his calendars or other documents to prepare, that the press conference was a hurried reaction to the controversy, and that he simply did not remember the November 27 meeting at which he approved the final removal plan. As noted, we found his alleged failure of memory about a key meeting in his office to remove a group of Presidential appointees extraordinary, no matter how hurriedly the press conference was arranged. More importantly, such inaccurate statements from the Attorney General significantly damaged his credibility and the Department's credibility in its response to this controversy.

As a general matter, Gonzales repeatedly testified that the removals were not undertaken for an improper or illegal purpose. However, he could not have known whether that was true because he did not ask Sampson why the U. S. Attorneys were being removed. Although it is understandable that the Attorney General would rely on the representations of others in important matters he had delegated to them, in this situation he was aware that political concerns may have motivated at least one of the removals. Political leaders in New Mexico had expressed concerns to him directly about Iglesias regarding his handling of voter fraud and public corruption matters. Yet, he did not question whether improper political considerations had resulted in Iglesias's or any other U.S. Attorney's removal.

### 2.    Gonzales's Conversation with Goodling

Another serious allegation regarding the Attorney General's statements after the removals concerned a conversation he had with Monica Goodling in his office on March 15, 2007. The conversation took place after Congress had indicated to Gonzales that it proposed to subpoena Goodling and others to testify about the removals, and after Gonzales had directed the Department's Office of Professional Responsibility to investigate the circumstances of the removals. In congressional testimony in April and May 2007, Gonzales repeatedly asserted that out of deference to the ongoing internal investigation he had not discussed the facts of the removals with anyone in the Department.

This turned out to be untrue. When Goodling testified before the House Judiciary Committee on May 23, 2007, pursuant to a grant of immunity, she disclosed her March 15 conversation with Gonzales. Goodling testified that the conversation with Gonzales had made her uncomfortable because she was concerned at the time that she and Gonzales might have to testify about the U.S. Attorney removals at some point. Goodling testified that she was distraught and went to the Attorney General to seek a transfer to another component of the Department. Goodling said that after that part of the conversation, Gonzales was "just trying to chat" and said "'let me tell you what I can remember.'" According to Goodling, Gonzales laid out his general recollection of some of the events concerning the U.S. Attorney removals, and

342

**Exhibit 6 -  105**

then asked her if she had any reaction to what he said.  Goodling said that Gonzales also mentioned that he thought that everybody who was on the removal list was there for performance-related reasons, and Gonzales said he had been upset with McNulty because he thought McNulty wrongly testified that Cummins was removed only to give Griffin a chance to serve.  Goodling said that while there was more to her discussion with Gonzales, she could not recall anything further.  Goodling also said she did not believe that Gonzales was trying to shape her recollection of events.  As noted above, we were not able to interview Goodling about this or other matters.

Gonzales emphatically denied to us that he had tried to influence Goodling's testimony.  He said that Goodling came to his office in an extremely distraught state, saying that she was paralyzed and could not do her work.  Gonzales said he asked her why and she said something about having had the same information that Sampson had (referring to information that the White House was involved with the removal process earlier than had been disclosed by the Department).  Gonzales said he tried to console Goodling and said that no one intentionally had done anything wrong.  He said he wanted to reassure her and began to tell her what he knew about what had happened with regard to the U.S. Attorney removals, although he said he did not remember specifically what he told Goodling about the removals.  Gonzales told us he could not recall discussing McNulty and Cummins with Goodling, but did not deny that he did.

Gonzales said that Goodling asked for a transfer to another component in the Department, and he told her he would consider her request and assured her that they would get through the current situation.  Gonzales said it seemed that Goodling felt better when she left his office.

We do not believe the evidence is sufficient to conclude that Gonzales attempted to influence the recollection of a witness in a pending investigation.  Goodling testified that she did not believe Gonzales was trying to shape her recollection of events.  Moreover, Gonzales did not seek out Goodling to relay his version of events; rather, she came to see him because she was distraught.  In addition, several witnesses confirmed Goodling's distraught state of mind at the time of her conversation with Gonzales.  When we asked Gonzales whether he considered that it might have been inappropriate for him to discuss his recollections with Goodling, he told us that he did not give it any thought at the time because he was just trying to help Goodling.

We believe that Gonzales was, in fact, trying to console Goodling during this meeting.  However, even in his attempt to console her, he should not have recounted his recollection of the substantive facts of the matter to Goodling.  Regardless of his motive, we question Gonzales's judgment in recounting what he believed the facts to be with someone whom he knew to be a prospective witness in both a Congressional investigation and an internal Department

343

**Exhibit 6 -  106**

investigation.  We also question why he stated to Congress that he had never discussed the facts of the removals with anyone in the Department, which was not true.

### B.    Paul McNulty

As noted above, we found that Deputy Attorney General McNulty had little involvement in the removal process despite his role as the immediate supervisor of U.S. Attorneys.  McNulty was not even informed about the removal plan until mid to late October 2006.  McNulty said he was surprised when he learned about the plan, but he did not object to it.  McNulty stated that the removal process was an initiative of the Office of the Attorney General related to a "personnel matter" that was within the province of the Attorney General, and therefore he deferred to the Office of the Attorney General in the matter.

Yet, like Gonzales, McNulty did not ask questions as to how Sampson came up with the names on the removal list.  McNulty told congressional investigators that even though he was aware of concerns about each of the U.S. Attorneys targeted for removal, he was "a softie" when it came to addressing such concerns with the U.S. Attorneys directly, and said the removal plan was contrary to the way he would have addressed such concerns.  However, McNulty said he did not express his reservations about the plan to Sampson or the Attorney General.

We believe the Deputy Attorney General, the second in command of the Department of Justice and the immediate supervisor of the U.S. Attorneys, should have raised his objections forcefully and not been so deferential about such a significant personnel action involving U.S. Attorneys under his supervision.

This is especially true with regard to Iglesias's removal.  As discussed in Chapter Six, Senator Domenici called McNulty in October 2006 to criticize Iglesias's handling of public corruption cases and told McNulty that Iglesias was "in over his head."  McNulty said he had no specific recollection of discussing Senator Domenici's telephone call with Gonzales or Sampson, but told us that it is the type of contact he would have passed along to them.

However, like Gonzales, McNulty never investigated the accuracy of Senator Domenici's complaints, or the possibility that these complaints could be related to partisan political considerations and that Iglesias could have been handling these cases appropriately and in accord with Department policy, the law, and the evidence.  Instead, McNulty distanced himself from the decision to remove Iglesias, labeling it a "personnel" matter which he considered outside his "bailiwick."

**Exhibit 6 -  107**

Moreover, we also believe McNulty should have disclosed Senator Domenici's call during his congressional briefing. McNulty said that he did not want to raise Senator Domenici's involvement because he was "concerned about . . . putting the Senator in a bad light or in a difficult position" and that he wanted to keep the conversation between Domenici and him about Iglesias "confidential . . . [I]t was just a courtesy." McNulty defended his action by noting that he had disclosed in his briefing generic "congressional concerns" about Iglesias. We disagree and do not believe that Senator Domenici's calls should have been kept confidential or that the Department owed the Senator any "courtesy" with regard to his complaints about Iglesias, which had led to Iglesias's removal. Rather, McNulty owed Congress and the public full and accurate testimony regarding the matter, and McNulty failed to provide such testimony as a result of his misguided attempt to shield Senator Domenici from criticism.

We also examined the claim raised by Goodling in her congressional testimony that she believed McNulty had greater knowledge about the history of the White House's involvement in the removal than McNulty had told Congress. Goodling said she had briefed McNulty in the summer of 2006 about the White House's involvement in Griffin's appointment.

McNulty testified to the Senate Judiciary Committee on February 6, 2007, that while he was aware in the summer of 2006 that Griffin was scheduled to replace Cummins, he did not know how Griffin came to the Department's attention.[201] He also stated in his closed briefing of the Senate Judiciary Committee on February 14, 2007, that the removal process began within the Department in September or October 2006. McNulty also said at the briefing that the Department had sent the list to the White House Counsel's Office in October 2006 and asked if they had any objection to the names, and the White House voiced no objections. In fact, as discussed above, this was not an accurate description of the timing of the removal process or the White House's role in the process.

Because Goodling declined our request for an interview, we were unable to question her concerning what she told McNulty regarding Griffin or the White House's involvement in the removal process. However, we concluded that McNulty did not intentionally mislead Congress in his testimony. At the

---

[201] McNulty later clarified this statement in his testimony before the House Subcommittee on the Judiciary on June 21, 2007. He stated that he had known for months that "Cummins was asked to move over so that Mr. Griffin would have a chance." However, he stated that he did not know exactly how Griffin came to the Department's attention, and he noted that Goodling said she was not even particularly aware of how he came to the Department's attention. McNulty said, "I just didn't know the specifics of how he came to be recommended to us. We later learned that Ms. Miers contacted Kyle Sampson, and that's the – the way."

345

**Exhibit 6 - 108**

time he testified in February 2007, he was unaware of the White House's earlier involvement in the removals. He stated what he believed about the process at the time: that the Department came up with the names in the fall of 2006 and the White House did not object. While that was not correct, McNulty did not know that at the time.

We also noted that while Goodling was supposed to accompany McNulty to the closed briefing, McNulty instructed her to remain outside the room because he was concerned that her status as the Department's White House Liaison would raise questions by the Senators. Goodling testified that she believed McNulty had done so in order to discourage the Senators from asking questions about the White House's role in the removals. McNulty said his concern at the time was that Goodling's presence would make the removal process seem "more political" given the fact that Goodling's position at the Department was uniquely associated with the Department's political appointments. We believe the decision to exclude Goodling was troubling and reflected an inappropriate focus on appearances. Besides Sampson, Goodling was the only other person who had in-depth knowledge about the removals and the level of the White House's involvement in the process. Had Goodling been present, it is likely that McNulty would not have provided misleading information to the Senate about the timing and substance of the White House's involvement.

Moreover, although we determined that McNulty did not intentionally mislead Congress, he stated in his testimony to the Senate Judiciary Committee that "we never have and never will" seek to remove a U.S. Attorney to interfere with an ongoing investigation or in retaliation for prosecution. However, McNulty did not question Sampson concerning the basis for the removal recommendations. Especially with respect to Iglesias's removal, McNulty should have inquired about the reasons for the removals to ensure that they were not improper before providing testimony to Congress implying that he had done so.

### C.    Kyle Sampson

As discussed above, Sampson was the person most responsible for creating the removal plan, selecting the U.S. Attorneys to be removed, and implementing the plan. Yet, after the controversy over the removals erupted, Sampson attempted to downplay his role, describing himself as the "aggregator" and denying responsibility for placing several of the U.S. Attorneys on the list.

We concluded that from start to finish Sampson mishandled the removal process. And, as discussed above, he inappropriately advocated bypassing the Senate confirmation process for replacing U.S. Attorneys through a strategy of

**Exhibit 6 -  109**

"gum[ming] this to death" and "run[ning] out the clock" while appearing to act in good faith.

We were also troubled by Sampson's claims that he did not recall the reasons for many of the removals or who had recommended that certain U.S. Attorneys be removed.  For example, while Sampson said he did not place Iglesias on the list at the request of the White House, his recollection on this issue was varying and vague.  We question why Sampson could not recall the precise reason why he placed Iglesias on the removal list, given the relatively short passage of time since the incident, and the fact that Iglesias's name alone was added, for the first time, to the November 2006 list.  Moreover, other misleading after-the-fact explanations for why Iglesias was placed on the list caused us to further doubt the candor of Sampson's explanations.  In the end, we question whether Sampson provided us the full story about Iglesias's placement on the list, as well as the reasons for other U.S. Attorney removals.

As discussed in the sections that follow, we also concluded that Sampson made various misleading statements about the U.S. Attorney removals to the White House, Congress, and other Department officials.

### 1.    Misleading Statements to the White House

Sampson's misleading statements about the U.S. Attorney removals began as the selection process was unfolding.  He misrepresented to the White House how the selections occurred.  In an e-mail to Harriet Miers in January 2006 forwarding a list of names to the White House, Sampson wrote, "I list these folks based on my review" of the EARS evaluations, and "my interviews with officials in the Office of the Attorney General, Office of the Deputy Attorney General, and the Criminal Division."  Sampson thus created the general impression that the EARS evaluations and his "interviews" of senior Department officials, including officials in the Criminal Division, formed the basis of his identification of specific U.S. Attorneys for removal.

However, Sampson admitted to us that he did not remember speaking to anyone in the Criminal Division about the performance of U.S. Attorneys, except "only in the most general terms."  He also acknowledged that he never reviewed any EARS evaluations.  He told us that it would have been better if he had stated in the e-mail to Miers that it was based on his understanding of somebody else's understanding of the reviews of the offices.[202]  We believe that Sampson's misleading statements to Miers gave the impression that the

---

[202]  However, even that would have been inaccurate because, as we noted in each of the U.S. Attorney chapters, with the exception of Ryan's March 2006 EARS evaluation (which had not yet taken place), each of the EARS evaluations of the removed U.S. Attorneys was largely positive.

**Exhibit 6 -  110**

Department had engaged in a far more systematic and structured evaluation process to determine which U.S. Attorneys should be removed.

### 2.   Misleading Statements to Congress

Sampson similarly misled congressional staff in his January 12, 2007, briefing that the removals were based on EARS evaluations. At this meeting, Sampson and Acting Assistant Attorney General for the Office of Legislative Affairs Richard Hertling briefed staff for Senators Patrick Leahy and Dianne Feinstein about the removals. Sampson told the Senators' staffs that the Department had been engaged in a process to identify underperforming U.S. Attorneys and that the process included a review of the EARS evaluations. The two staff members for the Senators told us that Sampson initially explained that the terminations were based on the EARS evaluations, but backtracked when Feinstein's counsel pressed him for copies. According to both staff members, Sampson then explained that some of the removals were based on EARS evaluations, and some on other factors such as caseloads and responsiveness to Department policy initiatives.

According to Hertling, who said he knew little about the controversy at the time, Sampson attempted to impress upon the congressional staff that the removals were the result of a process the Department undertook to identify U.S. Attorneys who were the "weakest performers," and that the process included a review of EARS evaluations. Hertling told us that one of the things that stuck in his mind was Sampson's "specific reference" to EARS evaluations as a basis for identifying these particular U.S. Attorneys for termination.

However, Sampson claimed to us that he mentioned the EARS evaluations only in connection with Ryan's removal. He said that he doubted he would have suggested that the other removals were based on the EARS evaluations because "that wouldn't have been accurate." Yet, based upon the recollection of the other witnesses at the briefing, including Hertling, we believe that Sampson misled the congressional staff that EARS evaluations played a more significant role in the Department's decision-making process than they actually did.

Second, Sampson included misleading statements in the Department's response to a February 8, 2007, letter from several Senators asking for information about the circumstances of Cummins's resignation and Griffin's appointment. Sampson, who drafted the response and circulated it in the Department and the White House for comment, had the final sign-off on the language in the response.

The response, which was sent on February 23, 2007, contained three misleading statements. The first was the statement that "it was well-known, as early as December 2004, that Mr. Cummins intended to leave . . . ." As we

348

**Exhibit 6 - 111**

noted in Chapter Five, we found evidence that in drafting the response Sampson discovered a small news item in a free weekly Arkansas tabloid reporting that Cummins might begin exploring career options before the expiration of President Bush's second term.  However, Cummins told us he did not intend to resign at that time and was not looking for other employment. We also found no evidence that anyone at the Department was aware of the article until February 2007.

The second misleading statement in the Department's response was that "the decision to have Mr. Griffin replace Mr. Cummins was first contemplated in spring or summer of 2006 [and] the final decision to appoint Mr. Griffin . . . was made on or about December 15 . . ."  This statement is directly contradicted by the January 9, 2006, e-mail Sampson sent to Miers in which Griffin is listed as a replacement for Cummins.  The second part of the statement, that the final decision to appoint Griffin was made around December 15, is also misleading.  As noted in Chapter Five, Sampson informed Goodling on August 18, 2006, that the Attorney General would appoint Griffin Interim U.S. Attorney following Griffin's return to the Department.

The third misleading statement in the Department's response was that "The Department is not aware of Karl Rove playing any role in the decision to appoint Mr. Griffin."  This statement is contradicted by Sampson's e-mail on December 19, 2006, to Associate White House Counsel Christopher Oprison in which Sampson wrote, "I'm not 100 percent sure that Tim was the guy on which to test drive this authority, but know that getting him appointed was important to Harriet, Karl, etc."  While Sampson later explained this e-mail by stating that he "assumed" but did not know that Rove was involved in the decision to appoint Griffin, we found this explanation unpersuasive and belied by the evidence.

### 3.    Misleading Department Officials

Sampson also misled Department officials and allowed them to mislead others about several aspects of the U.S. Attorney removals.

First, in mid-December 2006 after media reports began questioning the circumstances of Griffin's appointment, Sampson drafted talking points for the Department's Office of Public Affairs to use to respond to media inquiries.  In these talking points, Sampson wrote that "Griffin was appointed Interim U.S. Attorney because of the timing of Cummins's resignation."

In fact, as Sampson knew, Cummins had been removed so that Griffin could take his place.  The Department's talking points left the misleading impression that Griffin was appointed as Interim U.S. Attorney because of the unexpected timing of Cummins's resignation, when in fact Cummins was told to resign to create a position for Griffin.

**Exhibit 6 -  112**

Second and more important, Sampson's failure to disclose what he knew about the White House's involvement in the removals caused McNulty and Principal Associate Deputy Attorney General William Moschella to provide inaccurate testimony to Congress.  Both McNulty and Moschella testified that based on what they knew at the time, the White House was not involved in the removals until October 2006 and at that point became involved only to sign off on the process.

Sampson was present at staff preparation sessions before both McNulty's and Moschella's congressional testimony where the group discussed what they should say in their testimony.  Several other participants told us that the question about the White House's involvement was raised during at least one of McNulty's preparation sessions, and McNulty indicated that he would tell Congress that the White House was involved to sign off on the process because U.S. Attorneys are Presidential appointments.  This was a misleading statement about the extent and timing of the White House's role, which Sampson knew.  However, Sampson did not correct McNulty's mistaken belief or inform him of the full extent of the White House's involvement.

Consequently, in a closed briefing session on February 14, 2007, McNulty told members of the Senate Judiciary Committee that the U.S. Attorney removal process began within the Department in September or October of 2006, and that the Department sent a list to the White House Counsel's office in October and asked if they objected to the names.  Similarly, Moschella testified incorrectly before a House Judiciary Subcommittee on March 6, 2007, based on what he had learned during the preparation sessions and from McNulty's testimony, that the process to remove the U.S. Attorneys began in early October 2006 and that the White House eventually became involved in the removals, but only to sign off on the proposal because the U.S. Attorneys were Presidential appointees.

When we interviewed Sampson, he rationalized his not correcting the misimpression left at the preparation sessions by arguing that there were two separate phases of the process – the earlier "thinking" phase and the later "action" phase, and he said he was focused on the later action phase during the preparation sessions.  We found Sampson's testimony on this point not credible.  Sampson sent three separate lists of U.S. Attorneys for removal to the White House for consideration before the fall of 2006.  We believe that Sampson should have been more forthcoming at the preparation sessions about the White House's involvement to ensure that McNulty and Moschella were aware of the facts and did not mislead Congress.  Sampson's failure to do so resulted in inaccurate and misleading testimony about a critical aspect of the controversy.

We concluded that Sampson engaged in misconduct by making misleading statements and failing to disclose important information to the

**Exhibit 6 -  113**

White House, members of Congress, congressional staff, and Department officials concerning the reasons for the removals of the U.S. Attorneys and the extent of White House involvement in the removal process.

### D.    Monica Goodling

Because Goodling refused to be interviewed by us, there are potential gaps in our investigation of the reasons for the removal of certain U.S. Attorneys. As the Department's White House Liaison, Goodling had significant contact with White House officials about Department personnel matters, and Goodling was involved to some extent in the selection of the U.S. Attorneys for removal. For example, it appears that Goodling instructed EOUSA Director Battle to call Graves and direct him to resign. As noted above, she said she did so based on Sampson's instruction, a claim Sampson denied. Consequently, we were unable to determine how Goodling came to order Graves's removal, or determine the White House's role in Graves's forced resignation.

Based on our investigation, we also found that, like Sampson, Goodling's failure to fully disclose what she knew about the White House's involvement in the removals contributed to McNulty's and Moschella's inaccurate statements to Congress. Goodling was present for at least part of McNulty's preparation sessions and his Senate testimony, as well as Moschella's preparation session where the issue of the White House's involvement was raised. Both McNulty and Moschella told us that no one at the preparation sessions provided them with all the facts about the White House's involvement with the removal plan. Like Sampson, Goodling never corrected their misimpressions, and consequently McNulty and Moschella both led Congress to believe the White House was involved later in the process and only to sign off on a list of names, which was not true. However, Goodling did not inform them, or anyone else, that their testimony was incorrect until Sampson's e-mails surfaced.

In addition, the evidence shows that Goodling was aware that she had been less than forthcoming in failing to disclose the White House's involvement to other Department officials. For example, when she learned that the Department planned to provide Sampson's documents to Congress that showed earlier and more substantive involvement by the White House in the removals than Moschella and McNulty had testified to, she became distraught and told Margolis that her career was over because she had the same information as Sampson. As noted above, Goodling also met with Gonzales and, according to Gonzales, indicated that she had the same information that Sampson had, referring to the information about the timing of the White House's involvement.

We also concluded that Goodling was partly responsible for creating the false impression that Griffin was chosen to replace Cummins because the USAO's First Assistant was unavailable because she was on maternity leave. This information was provided to Senator Pryor's office and to Brian

351

**Exhibit 6 - 114**

Roehrkasse, a Department of Justice spokesperson.  Sampson told us that Goodling told Gonzales in December 2006 about the First Assistant being on maternity leave.  However, Goodling clearly knew that the First Assistant's maternity leave had nothing to do with Griffin's appointment as Interim U.S. Attorney, but she did not correct this misimpression, which was conveyed by the Department to Senator Pryor.

We concluded that Goodling engaged in misconduct by failing to disclose important information and to correct Department officials who were providing what she knew was misleading information to Congress and the public concerning the extent of the White House's involvement in the U.S. Attorney removal process, and for providing misleading information to Congress and the Department concerning Griffin's appointment as Interim U.S. Attorney.

### E.    David Margolis

We found that Associate Deputy Attorney General Margolis had little involvement in the selection of which U.S. Attorneys to remove, despite his position, experience, and knowledge about many U.S. Attorneys.

In early 2005, Sampson informed Margolis about Miers's suggestion to replace all U.S. Attorneys, an idea that both Margolis and Sampson considered unwise.  Margolis endorsed the idea of replacing weak or mediocre U.S. Attorneys, noting to us that in the past U.S. Attorneys were generally removed only for misconduct or gross incompetence tantamount to misconduct.

At that time, Sampson asked Margolis for his opinion concerning the weakest U.S. Attorneys.  Margolis told us that two U.S. Attorneys should be removed on performance grounds – Ryan and Lampton.  In addition, Margolis said that at that time he also either recommended Chiara for removal or endorsed her removal.  Margolis also gave Sampson the names of approximately eight additional U.S. Attorneys who warranted a closer look, either because of general performance, specific conduct, or both.[203]

After discussions in 2005, Margolis was not consulted again on which U.S. Attorneys should be removed until November 2006, just before the removal plan was finalized and approved.  Margolis was not asked, and did not follow up with Sampson, about what criteria should be considered in determining who should be removed or the evaluation process that should lead to the selections.  In addition, although Sampson later claimed that he understood that Margolis regularly reviewed EARS evaluations, Sampson never discussed with Margolis what the evaluations revealed about any of the U.S. Attorneys, except Ryan.

---

[203]  However, none of these eight was among the ones directed to resign in 2006.

352

**Exhibit 6 -  115**

In November 2006, when Sampson advised Margolis about the impending removals, he either showed Margolis a list or read from a list of six U.S. Attorneys that Sampson indicated were to be removed. Margolis told us that he was struck more by the names Sampson did not mention than the ones he did. Margolis asked Sampson why Ryan and Lampton were not on the removal list, and Sampson responded that he would look into it. Based on Margolis's and McNulty's suggestion, Ryan was subsequently added to the list.

However, Margolis told us that he did not think to question Sampson about the six U.S. Attorneys who were on Sampson's list. Margolis said he was more focused on the names that were omitted and assumed Sampson had valid reasons for the six slated for removal.

Margolis is the senior career attorney in the Department and someone who had significant knowledge about U.S. Attorneys and their performance. He was involved in panel interviews for the selection of most U.S. Attorneys, and as part of his duties handles misconduct allegations involving U.S. Attorneys. He is highly respected within the Department, and his opinion was valued because of his experience and stature.

Yet, prior to the removals, he never questioned Sampson concerning why the specific U.S. Attorneys slated for removal were chosen or what process was used to select them. We believe that under these circumstances – an unprecedented dismissal of a group of U.S. Attorneys at one time allegedly for performance reasons – Margolis should have raised questions about the list and the process used to identify the names to ensure there were no improper reasons and that the Department was following a defensible process for the removals. But Margolis never raised those issues, and instead focused solely on seeking to ensure that Ryan was added to the removal list.

It is noteworthy that while Margolis had endorsed the idea of removing weak U.S. Attorneys, by his own testimony he was struck by the fact that two weak performing U.S. Attorneys he had recommended for removal on performance grounds were not on Sampson's November 2006 list. Moreover, none of the other eight U.S. Attorneys who he had originally suggested warranted a closer look were included on the list. Instead, Sampson's removal list contained the names of six other U.S. Attorneys and Margolis did not know the reasons why as to five of them.

We recognize that the decision to remove the U.S. Attorneys was not Margolis's to make. But given his position, we believe he should have asked Sampson, McNulty, or other senior Department leaders about the removal process. This is particularly true given that this removal of U.S. Attorneys was unprecedented, and it did not appear from the names on Sampson's list that the U.S. Attorneys Margolis thought were weak had been included.

353

**Exhibit 6 - 116**

In his testimony to congressional investigators, Margolis acknowledged that he should have taken additional steps when he learned about the removal plan.  Margolis stated:

> I should say that I am a bit exasperated by my role here because I'm the only one of all the people involved who knows how to fire a United States Attorney or a Marshal based on experience. And I was not aggressive enough or vigilant enough, and I should have done a number of things, I should have inserted myself.  I was too passive, and I'd like to, I think—and I hold myself accountable for this—that if I had stepped in and said something, that maybe this would have been - we would have handled this better . . . .  And I'd like to think that I know how far a career guy should go and when he should defer to the political appointees.  But in this case, ironically, I think my tentativeness and lack of aggressiveness – which I'm not known for lack of aggressiveness.  I think it did my masters a disservice, and I accept that.  That does not mean that I'm excluding everybody else from their own responsibility.  That's a different issue.

Margolis added that he had become side-tracked by ensuring that certain U.S. Attorneys such as Ryan were on the removal list, and that he was not vigilant enough in ensuring that no one was removed for an improper reason. Moreover, Margolis said he should have asked for the reasons why each of the U.S. Attorneys was being removed.

We agree.  We believe that given Margolis's experience, position, and stature he was too deferential to others on this important and unprecedented removal of U.S. Attorneys.  Had he raised questions, as he acknowledged he should have, the damage to the Department by the fundamentally flawed removal process might have been mitigated.[204]

### F.    Michael Elston

One of the most serious allegations stemming from the controversy was that Michael Elston, the Chief of Staff to Deputy Attorney General McNulty, attempted to threaten and intimidate three of the fired U.S. Attorneys in order to keep them from publicly discussing their removals.

As discussed in more detail in Chapter Three, on January 17, 2007, the day preceding Attorney General Gonzales's testimony before the Senate Judiciary Committee, Elston telephoned McKay and Charlton.  According to

---

[204] We also recognize, however, that Margolis could not have done anything about the first two removals – Graves and Cummins – because he was neither asked for his opinion nor informed of the removals at the time.

**Exhibit 6 -  117**

Elston, McNulty asked him to make the call to let McKay and Charlton know that the Attorney General was not going to testify about who had been removed or the basis for the removals.

According to McKay, Elston began the conversation by stating that people in the Department were surprised they had not seen any "incendiary comments" from McKay in the press.  McKay said that Elston then stated that the Attorney General would make only general statements in his Senate testimony about the resignations, would not state that the U.S. Attorneys had been fired, and would not disclose the reasons for their removal.  McKay told us that he believed that Elston was offering him a *quid pro quo*:  "You keep quiet, we won't say anything."  McKay said he replied to Elston that he would stay quiet not because the Attorney General would not disclose why he had been fired, but rather because he believed it was his duty to do so.

Charlton told us that he viewed a similar phone call from Elston as a veiled threat.  Charlton said that Elston told him that the Department's senior management had noticed that he had not been commenting in the media, and he wanted Charlton to know that the Attorney General was not going to comment on why Charlton had been asked to resign.

Elston denied calling McKay and Charlton in an attempt to threaten them to remain silent, and denied offering them any *quid pro quo* in exchange for their silence.

Approximately 1 month later, after a Washington Post article quoted Cummins as criticizing the Department for stating that the removals of the U.S. Attorneys were based on their performance, Elston called Cummins.  According to Cummins, Elston expressed dismay that the U.S. Attorneys might appear before Congress to testify about their removals, which would force the Department to publicly disclose the reasons for the removals.  Cummins subsequently sent an e-mail describing this conversation with Elston to McKay, Charlton, Lam, Bogden, and Iglesias, characterizing it as a threatening call.

Elston disputed Cummins's characterization of the call.  Elston told congressional investigators he believed that Cummins had misinterpreted his remarks, which Elston said were more along the lines of saying that it was a shame that the reasons for the U.S. Attorneys' removals were being discussed in the media because it was tarnishing the Department as well as the reputations of the individual U.S. Attorneys.  Elston said he never intended to send Cummins or anyone else a threatening message.

While we understand why McKay, Charlton, and Cummins may have interpreted Elston's phone calls as a threat, we do not have sufficient evidence to conclude that Elston intended to threaten them.  In an interview with a reporter the day before he testified before Congress, and his congressional

355

**Exhibit 6 -  118**

testimony, Cummins did not characterize Elston's call as a threat. Elston's comments appear close to the line, and we do not believe it unreasonable for McKay, Charlton, and Cummins to have reached the conclusions they did. Nevertheless, we do not believe the evidence is sufficient to show that his intent was to threaten or intimidate the three U.S. Attorneys.

### G.    William Moschella

Moschella testified before the House Judiciary Committee in March 2007 about the reasons for the removal of each U.S. Attorney. He did not become Principal Associate Deputy Attorney General until October 2006, and we found no evidence that he was consulted about the removals prior to the November 27, 2006, meeting at which the Attorney General approved the removal plan.

As we discuss above, Moschella's congressional testimony misstated both the timing and the nature of the White House involvement in the removal process.[205] However, Moschella did not know that his testimony about the timing or the extent of the White House's involvement was inaccurate. Moschella only reiterated publicly what he had been told about these issues and what McNulty had previously told the Senate Judiciary Committee. No one at the Department – in particular Sampson and Goodling – informed Moschella that what McNulty said was incorrect. When Moschella subsequently learned about the inaccuracies in his testimony, after Sampson retrieved his e-mails and showed them to Moschella and other Department officials, Moschella was understandably upset and recognized the need to correct the inaccuracies. Under these circumstances, we concluded that Moschella's inaccurate testimony was not his fault and that he should not be criticized for it.

## V.    Conclusion

In sum, we believe that the process used to remove the nine U.S. Attorneys in 2006 was fundamentally flawed. While Presidential appointees can be removed for any reason or for no reason, as long as it is not an illegal or

---

[205] In his testimony before the House Judiciary Subcommittee, Moschella inaccurately testified that Iglesias's EARS evaluation had criticized him for "delegating to his First Assistant the overall running of the office." However, as previously noted, Moschella obtained this misimpression from the chart prepared by Goodling for McNulty's closed briefing of the Senate Judiciary Committee on February 14, 2006, which contained after-the-fact rationalizations for many of the removals. In Iglesias's case, it contained the notation that Iglesias was "an absentee landlord." However, the EARS evaluation does not criticize Iglesias; rather it states that the "First Assistant appropriately oversees the day to day work of the USAO's senior management team . . . ." We concluded that this was an honest mistake by Moschella, attributing the criticism to the EARS report when it was actually contained on the Goodling chart.

**Exhibit 6 -  119**

improper reason, Department officials publicly justified the removals as the result of an evaluation that sought to replace underperforming U.S. Attorneys. In fact, we determined that the process implemented largely by Kyle Sampson, Chief of Staff to the Attorney General, was unsystematic and arbitrary, with little oversight by the Attorney General, the Deputy Attorney General, or any other senior Department official. In choosing which U.S. Attorneys to remove, Sampson did not adequately consult with the Department officials most knowledgeable about their performance, or even examine formal evaluations of each U.S. Attorney's Office, despite his representations to the contrary.

We also determined that the U.S. Attorneys were not given an opportunity to address concerns about their performance or provided the reasons for their removal, which led to widespread speculation about the true reasons for their removal, including that they were removed for improper partisan political reasons. And to make matters worse, after the removals became public the statements and congressional testimony provided by the Attorney General, the Deputy Attorney General, Sampson, and other Department officials about the reasons for the removals were inconsistent, misleading, and inaccurate in many respects.

We believe the primary responsibility for these serious failures rest with senior Department leaders – Attorney General Alberto Gonzales and Deputy Attorney General Paul McNulty – who abdicated their responsibility to adequately oversee the process and to ensure that the reasons for removal of each U.S. Attorney were supportable and not improper. These removals were not a minor personnel matter – they were an unprecedented removal of a group of high-level Department officials that was certain to raise concerns if not handled properly. Yet, neither the Attorney General nor the Deputy Attorney General provided adequate oversight or supervision of this process. We also concluded that Sampson bears significant responsibility for the flawed and arbitrary removal process. Moreover, they and other Department officials are responsible for failing to provide accurate and truthful statements about the removals and their role in the process.

We believe our investigation was able to uncover most of the facts relating to the reasons for the removal of most of the U.S. Attorneys. However, as described in this report, there are gaps in our investigation because of the refusal of certain key witnesses to be interviewed by us, including former White House officials Karl Rove, Harriet Miers, and William Kelley, former Department of Justice White House Liaison Monica Goodling, Senator Pete Domenici, and his Chief of Staff. In addition, the White House would not provide us internal documents related to the removals of the U.S. Attorneys.

The most serious allegation that we were not able to fully investigate related to the removal of David Iglesias, the U.S. Attorney for New Mexico, and the allegation that he was removed to influence voter fraud and public

357

**Exhibit 6 -  120**

corruption prosecutions. We recommend that a counsel specially appointed by the Attorney General assess the facts we have uncovered, work with us to conduct further investigation, and ultimately determine whether the evidence demonstrates that any criminal offense was committed with regard to the removal of Iglesias or any other U.S. Attorney, or the testimony of any witness related to the U.S. Attorney removals.

The Department's removal of the U.S. Attorneys and the controversy it created severely damaged the credibility of the Department and raised doubts about the integrity of Department prosecutive decisions. We believe that this investigation, and final resolution of the issues raised in this report, can help restore confidence in the Department by fully describing the serious failures in the process used to remove the U.S. Attorneys and by providing lessons for the Department in how to avoid such failures in the future.

**Exhibit 6 - 121**

# EXHIBIT

# 7

**U.S. Department of Justice**

# An Investigation of Allegations of Politicized Hiring by Monica Goodling and Other Staff in the Office of the Attorney General





| **U.S. Department of Justice** | **U.S. Department of Justice** |
|---|---|
| **Office of Professional Responsibility** | **Office of the Inspector General** |

July 28, 2008

Exhibit 7 -  122

# TABLE OF CONTENTS

TABLE OF CONTENTS ..............................................................................................i

CHAPTER ONE INTRODUCTION.................................................................. 1

I.    Scope of the Investigation................................................................... 1

II.   Methodology of the Investigation ...................................................... 2

III.  Organization of this Report ................................................................ 3

CHAPTER TWO BACKGROUND...................................................................... 5

I.    Monica Goodling ................................................................................. 5

II.   Kyle Sampson ...................................................................................... 6

III.  Susan Richmond and Jan Williams.................................................... 7

IV.   Department Components and Personnel ............................................ 7

V.    Hiring Standards ................................................................................ 11
      A.    Department Career and Political Attorney Positions ............... 11
      B.    Legal Standards........................................................................... 12

CHAPTER THREE GOODLING'S ROLE IN DEPARTMENT HIRING............. 17

I.    Interview Questions ........................................................................... 18

II.   Internet Research............................................................................... 20

III.  Employment Forms............................................................................ 22

IV.   Reference Checks................................................................................ 23

CHAPTER FOUR EVIDENCE AND ANALYSIS:  PERMANENT CAREER
      ATTORNEY HIRING DECISIONS.................................................... 25

I.    Interim U.S. Attorney Waiver Requests to Hire Career AUSAs.......... 25
      A.    Screening Waiver Requests ...................................................... 28
            1.    The USAO for the District of Columbia ......................... 29
            2.    The USAO for the Western District of Missouri ............. 30
            3.    The USAO for the Western District of Washington ........ 32

**Exhibit 7 -  123**

B.    Recent Changes in the Waiver Process ................................... 35

C.    Analysis ................................................................................. 35

II.   Other Career Attorney Positions ..................................................... 37

    A.    The USAO for the District of Columbia ................................ 37

    B.    The USAO for the District of Colorado .................................. 39

    C.    EOUSA Deputy Director Position ......................................... 40

        1.    EOUSA Deputy Director Candidate #1 ....................... 40

        2.    EOUSA Deputy Director Candidate #2 ........................ 44

III.  Conclusions Regarding Candidates for Career Positions ................. 45

CHAPTER FIVE EVIDENCE AND ANALYSIS:  CANDIDATES FOR
    TEMPORARY DETAILS ...................................................... 47

I.   Goodling ......................................................................................... 47

    A.    Candidate #1 ......................................................................... 48

    B.    Candidate #2 ......................................................................... 50

    C.    Candidate #3 ......................................................................... 52

    D.    Candidate #4 ......................................................................... 53

    E.    Candidate #5 ......................................................................... 54

    F.    Candidate #6 ......................................................................... 54

    G.    Candidate #7 ......................................................................... 57

    H.    Candidate #8 ......................................................................... 59

    I.    Conclusion ............................................................................ 59

II.   Richmond and Williams .................................................................. 60

    A.    Candidate #9 ......................................................................... 61

    B.    Candidate #10 ....................................................................... 64

III.  Recent Changes in the Detailee Selection Process ........................... 65

IV.  Analysis ........................................................................................... 65

CHAPTER SIX EVIDENCE AND ANALYSIS:  IMMIGRATION JUDGE AND
    BOARD OF IMMIGRATION APPEALS MEMBER HIRING
    DECISIONS ........................................................................... 69

I.   Immigration Judges and Board of Immigration Appeals Members .... 69

    A.    The Executive Office for Immigration Review ......................... 69

ii

**Exhibit 7 -  124**

B.     Immigration Judges ............................................................ 70

C.     The Board of Immigration Appeals ......................................... 70

D.     Department of Justice Policy .............................................. 71

II.     Process for Hiring Immigration Judges ........................................... 71

A.     The Process Prior to Spring 2004 ......................................... 71

B.     The Office of the Attorney General Considers Changes to the
Process .................................................................... 73

C.     Last Occasion in Which EOIR Played a Role in Selecting
Immigration Judges ........................................................ 75

D.     The Office of Legal Counsel ............................................... 77

E.     The Immigration Judge Appointment Process Implemented
by Sampson ................................................................ 81

III.    Sampson's Recommendations to EOIR ........................................... 83

A.     Sources for Immigration Judge Candidates ............................. 83

B.     Candidates Provided to EOIR by Sampson ............................. 85

       1.    Candidate Supported by Karl Rove .............................. 85
       2.    Candidates Provided by the White House ...................... 86
       3.    Recommendations from Republican Members of
           Congress ........................................................ 87
       4.    Candidates Hired Without EOIR Interviews ................. 88
       5.    Other Candidates Selected by Sampson ....................... 90

C.     Problems Created by the New Hiring Process ........................ 91

IV.    Williams's Recommendations to EOIR ........................................... 92

A.     Sources for Immigration Judge Candidates ............................. 93

B.     Candidates Provided to EOIR by Williams ............................. 94

       1.    The White House Seeks to Place "Priority Candidates" .. 94
       2.    Candidates Solicited from a Civil Division Political
           Appointee ...................................................... 95
       3.    EOIR Requested Immigration Judges .......................... 96
       4.    Candidates Selected by Williams who had also Applied
           Through the Vacancy Announcement ......................... 97
       5.    Additional White House Candidates Provided to EOIR ... 98

C.     The Direct Appointment Process Continued to Affect EOIR ..... 99

D.     Search Terms for Screening Candidates ............................... 99

iii

**Exhibit 7 -  125**

V.      Goodling's Recommendations to EOIR...........................................101

    A.      Sources for Immigration Judge Candidates.........................102

    B.      Political Screening by Goodling...........................................103

        1.      Candidates Considered for Career and Political Positions......................................................................103

        2.      Candidates Provided to EOIR by Goodling.................104

    C.      Increasing Vacancies for Immigration Judges......................106

    D.      Screening of Candidates by Immigration Judges in Florida ..108

    E.      Candidates Selected by Goodling for Positions on the Board of Immigration Appeals.....................................................110

    F.      The Hiring Freeze...........................................................112

VI.     The Current Process for Hiring Immigration Judges and Board of Immigration Appeals Members.....................................................114

    A.      Immigration Judges..........................................................114

    B.      Board of Immigration Appeals Members..............................115

VII.    Analysis................................................................................115

    A.      Kyle Sampson...................................................................117

    B.      Jan Williams ...................................................................118

    C.      Monica Goodling...............................................................121

    D.      EOIR Director and Deputy Director....................................122

CHAPTER SEVEN OTHER ISSUES .......................................................125

I.      John Nowacki ........................................................................125

II.     Goodling's Discrimination Against a Detailee on the Basis of Sexual Orientation ..........................................................................128

    A.      EOUSA Detail.................................................................128

    B.      SMART Detail.................................................................130

    C.      Detail to Office of Violence Against Women .........................132

    D.      Analysis..........................................................................132

CHAPTER EIGHT CONCLUSIONS AND RECOMMENDATIONS................135

iv

**Exhibit 7 -  126**

# CHAPTER ONE
# INTRODUCTION

## I.      Scope of the Investigation

In March 2007, the Office of Professional Responsibility (OPR) and the Office of the Inspector General (OIG) began a joint investigation of allegations that in 2006 several United States Attorneys (U.S. Attorneys) were forced to resign for improper reasons, including improper political purposes.  We also received an allegation that Monica Goodling, the Department of Justice's (DOJ or Department) White House Liaison and Senior Counsel to the Attorney General, had discriminated on the basis of political affiliation against a candidate for a career position as an Assistant United States Attorney (AUSA).  We therefore expanded our investigation to include the allegation that Goodling inappropriately used political or ideological affiliations in the hiring process for career Department employees.

On May 23, 2007, Goodling testified before the United States House of Representatives Committee on the Judiciary pursuant to a grant of immunity issued by the United States District Court for the District of Columbia.  In both her written statement and verbal testimony, Goodling acknowledged that she took political considerations into account in assessing candidates for career positions in the Department.  Goodling described three categories of such positions.

First, Goodling stated that "[i]n a very small number of cases [regarding AUSAs], I believe that my decisions may have been influenced in part based on political considerations."[1]

Second, Goodling stated that "[i]n some cases, I learned and considered political information" when assessing career attorneys who applied for temporary detail positions in the Office of the Deputy Attorney General, the Office of Legal Policy, the Office of the Associate Attorney General, the National Security Division, and the Executive Office for United States Attorneys.

Third, Goodling stated that "[i]n reviewing resumes and soliciting applications [for immigration judges and Board of Immigration Appeals members] . . . I sometimes took political considerations into account."

---

[1] Prepared Statement of Monica Goodling, submitted in connection with her May 23, 2007, congressional testimony before the Committee on the Judiciary, United States House of Representatives.

1

Exhibit 7 -  127

Goodling added that Office of the Attorney General (OAG) Chief of Staff Kyle Sampson had told her that the Office of Legal Counsel had "provided guidance . . . indicating that Immigration Judge appointments were not subject to the civil service rules applicable to other career positions." Goodling testified that she "assumed" that Board of Immigration Appeals (BIA) member appointments were also not subject to civil service laws.

As a result of Goodling's testimony and other information developed during the course of this investigation, we included in the scope of our investigation Goodling's role in the selection and hiring of candidates for AUSA and other career attorney positions, career attorney details to Department offices, and immigration judge (IJ) and BIA positions. We also examined whether Goodling's predecessors as the Department's White House Liaison, Susan Richmond and Jan Williams, and Goodling's immediate supervisor, OAG Chief of Staff Kyle Sampson, considered political or ideological affiliations when assessing candidates for career positions within the Department.[2]

In addition, during our investigation we learned of allegations that Goodling had discriminated on the basis of rumored sexual orientation against a career Department attorney who had applied for several temporary details. We investigated those allegations as well.

Finally, we investigated whether several witnesses to or subjects of our investigation provided inaccurate or misleading information to us during our investigation or to other Department officials related to the issues in this investigation.

## II.    Methodology of the Investigation

During the course of our investigation, we interviewed more than 85 individuals, some more than once. Some of these people were also interviewed in connection with the other joint investigations by our offices. We also interviewed former Attorney General Alberto Gonzales, former

---

[2] In addition to this investigation and the investigation of the removal of several U.S. Attorneys mentioned previously, we jointly investigated allegations that officials overseeing the Department's Honors Program and Summer Law Intern Program used political or ideological affiliations in assessing candidates for those programs. We also jointly investigated allegations that former Civil Rights Division Acting Assistant Attorney General (AAG) Bradley Schlozman and others used political or ideological affiliations in hiring and personnel decisions in the Civil Rights Division. On June 24, 2008, we issued a separate report describing our findings regarding allegations of politicized hiring in the Honors Program and the Summer Law Intern Program. We will issue separate reports describing our findings regarding the removal of several U.S. Attorneys and the Civil Rights Division when those investigations are completed.

**Exhibit 7 -  128**

Deputy Attorney General Paul McNulty, and numerous current and former employees of the OAG, the Office of the Deputy Attorney (ODAG), the Executive Office for United States Attorneys (EOUSA), and the Executive Office for Immigration Review (EOIR).  We also interviewed many individuals who were alleged victims or beneficiaries of political discrimination in Department hiring decisions.

Monica Goodling declined our request to be interviewed.  Because she is not currently employed by the Department, we could not compel her to cooperate.

In addition to our interviews, we reviewed thousands of documents, including documents from the OAG, ODAG, EOUSA, EOIR, and numerous U.S. Attorneys' Offices (USAO).  We also reviewed relevant e-mails of numerous current and former Department employees.  We searched the computer hard drives of several former OAG employees, including Sampson and Goodling, for documents relevant to this investigation.  We also reviewed the hard-copy documents in Goodling's and Sampson's offices after they resigned from the Department.

We sent a written survey to every person we could identify who was interviewed by Goodling or others in the OAG for any position from January 1, 2004, to April 2007, seeking information about their interviews.  The survey asked for information about the positions for which the candidates applied, who interviewed them, and the kinds of questions the candidates were asked during the interviews.  Of the 484 people to whom we sent the questionnaire, approximately 300 responded.

## III.    Organization of this Report

This report is divided into eight chapters.  In Chapter Two, we provide a factual overview of Goodling's and Sampson's duties and responsibilities while they worked in the Department.  We also discuss the duties and responsibilities of Goodling's two predecessors as the Department's White House Liaison, Susan Richmond and Jan Williams.  We briefly describe the Department components that are discussed in this report, and we identify the leaders of those components during the relevant time periods.  We then describe applicable legal standards and policies governing the hiring of career employees by the Department.

In Chapter Three, we describe Goodling's role in hiring Department attorneys and the methods she used to evaluate candidates.  In Chapters Four, Five, and Six, we describe our findings and analysis as to whether Goodling inappropriately considered political or ideological affiliations when assessing AUSA or other career attorney candidates; whether Goodling, Richmond, or Williams considered political or ideological affiliations to

**Exhibit 7 -  129**

assess candidates for DOJ details; and whether Sampson, Williams, or Goodling considered political or ideological affiliations to assess candidates for IJ and BIA positions.  In Chapter Six, we also discuss whether Jan Williams provided inaccurate information to our investigators and whether Goodling provided inaccurate information to Civil Division attorneys defending a lawsuit involving the selection of IJs.

In Chapter Seven, we discuss several issues that arose during our investigation, including whether EOUSA Deputy Director John Nowacki provided senior Department officials with inaccurate information about whether Goodling had used political or ideological affiliations to evaluate candidates for EOUSA detail positions, and whether Goodling discriminated against a detailee candidate on the basis of her alleged sexual orientation.

In Chapter Eight, we provide our conclusions and recommendations.

4

**Exhibit 7 -  130**

# CHAPTER EIGHT
# CONCLUSIONS AND RECOMMENDATIONS

This investigation examined allegations that Monica Goodling, who worked in the Office of the Attorney General (OAG) as the Department's White House Liaison, inappropriately considered political and ideological affiliations in the selection and hiring of certain Assistant United States Attorneys (AUSA) and career attorneys in the Department, and in approving details of career attorneys to Department offices.  We also investigated allegations that former Chief of Staff to the Attorney General Kyle Sampson, Goodling, and Goodling's predecessor as the Department's White House Liaison, Jan Williams, inappropriately considered political and ideological affiliations in selecting immigration judges (IJs) and members of the Board of Immigration Appeals (BIA), all of which are career positions.

As the Department's White House Liaison, Goodling regularly screened candidates for political positions at the Department, and most of the persons Goodling screened or interviewed had applied for political positions.  However, Goodling also approved the hiring of career AUSAs by interim U.S. Attorneys.  She also approved the selection of career attorneys applying for details in several Department offices.  In addition, she interviewed many candidates who were interested in obtaining any position in the Department, whether career or political, and she sometimes sought to place these individuals in career positions.

It is not improper to consider political or ideological affiliations in making hiring decisions for political positions.  However, both Department policy and federal law prohibit discrimination in hiring for career positions on the basis of political affiliations.

Our investigation found that Goodling improperly subjected candidates for certain career positions to the same politically based evaluation she used on candidates for political positions, in violation of federal law and Department policy.

With regard to requests from interim U.S. Attorneys to hire AUSAs, we determined that in two instances Goodling considered the candidate's political or ideological affiliations when she assessed the request.  For example, in one instance when the interim U.S. Attorney in the District of Columbia sought approval from Goodling to hire an AUSA for a vacant position, Goodling responded that the candidate gave her pause because judging from his résumé he appeared to be a "liberal Democrat."  Goodling also stated that because Republicans had lost control of Congress after the November 2006 elections, she expected that

135

**Exhibit 7 -  131**

Republican congressional staff might be interested in applying for AUSA positions in Washington.  Eventually, after the interim U.S. Attorney complained to Sampson about Goodling's response to his request, the U.S. Attorney was allowed to hire the AUSA.

The evidence also showed that Goodling considered political or ideological affiliations when recommending and selecting candidates for other permanent career positions, including a career SES position in the Executive Office for U.S. Attorneys (EOUSA) and AUSA positions.  These actions violated federal law and Department policy, and also constituted misconduct.

In addition, we determined that Goodling often used political or ideological affiliations to select or reject career attorney candidates for temporary details to Department offices, including positions in EOUSA that had not been filled by political appointees.  Goodling's use of political considerations in connection with these details was particularly damaging to the Department because it resulted in high-quality candidates for important details being rejected in favor of less-qualified candidates.  For example, an experienced career terrorism prosecutor was rejected by Goodling for a detail to EOUSA to work on counterterrorism issues because of his wife's political affiliations.  Instead, EOUSA had to select a much more junior attorney who lacked any experience in counterterrorism issues and who EOUSA officials believed was not qualified for the position.

We also determined that in several instances Goodling and one of her predecessors as the Department's White House Liaison, Susan Richmond, opposed on the basis of political affiliation the extensions of details for career Department attorneys working in the Office of the Deputy Attorney General, even though these candidates had the full support of the Deputy Attorney General and his staff.

While temporary detail assignments are covered by the civil service restriction on considering political affiliations in hiring, there is an exception for positions which are of a "confidential, policy-determining, policy-making, or policy-advocating character."  We believe that not all of the detailee positions at issue in this report were covered by this exception.  For example, we believe that none of the EOUSA positions for which Goodling considered the detailee's political affiliations were covered by this exemption from the civil service laws.  Therefore we believe it was improper, and violated the law and Department policy, for Goodling to use political or ideological affiliations in selecting or rejecting detailees to these positions.

**Exhibit 7 - 132**

The evidence showed that the most systematic use of political or ideological affiliations in screening candidates for career positions occurred in the selection of IJs, who work in the Department's Executive Office for Immigration Review (EOIR).  In the spring of 2004, Sampson created and implemented a new process for the selection of IJs.  The new process ensured that all candidates for these positions were selected by the Attorney General's staff.  Under this process, staff in the OAG would identify and select candidates for these positions using the Attorney General's direct appointment authority.  Sampson implemented the new process and it followed by the Department's White House Liaisons, Williams and then Goodling.

Sampson told us that he implemented the new process because he believed that IJs were political appointees and therefore not subject to civil service rules.  Sampson said that his understanding of the nature of these positions was based on a conversation with Kevin Ohlson, the Deputy Director of EOIR, as well as advice Sampson said he received from the Department's Office of Legal Counsel (OLC).  However, Ohlson told us he knew IJs were career positions and that he did not state or suggest to Sampson that these positions were exempt from civil service rules.  The evidence also indicated that OLC did not advise Sampson that the Attorney General could appoint IJs without regard to the civil service laws governing the hiring of career Department employees.

We determined that, under the process implemented by Sampson and followed by Williams and Goodling, the OAG solicited candidates for IJ positions and informed EOIR who was to be hired for each position.  The principal source for such candidates was the White House, although other Republican sources provided politically acceptable candidates to Sampson, Williams, and Goodling.  All three of these officials inappropriately considered political or ideological affiliations in evaluating and selecting candidates for IJ positions.  For example, we found that Goodling screened the candidates using a variety of techniques for determining their political affiliations, including researching the candidates' political contributions and voter registration records, using an Internet search string with political terms, and asking the candidates questions regarding their political affiliations during interviews.

In sum, the evidence showed that Sampson, Williams, and Goodling violated federal law and Department policy, and Sampson and Goodling committed misconduct, by considering political and ideological affiliations in soliciting and selecting IJs, which are career positions protected by the civil service laws.

137

**Exhibit 7 -  133**

Not only did this process violate the law and Department policy, it also caused significant delays in appointing IJs.  These delays increased the burden on the immigration courts, which already were experiencing an increased workload and a high vacancy rate.  EOIR Deputy Director Ohlson repeatedly requested candidate names to address the growing number of vacancies, with little success.  As a result of the delay in providing candidates, the Department was unable to timely fill the large numbers of vacant IJ positions.

We also concluded that Goodling committed misconduct when she provided inaccurate information to a Civil Division attorney who was defending a lawsuit brought by an unsuccessful IJ candidate.  Goodling told the attorney that she did not take political factors into consideration in connection with IJ hiring, which was not accurate.

In addition, we concluded that Williams provided inaccurate information to us concerning her Internet research activities.

Because Goodling, Sampson, and Williams have resigned from the Department, they are no longer subject to discipline by the Department for their actions described in this report.  Nevertheless, we recommend that the Department consider the findings in this report should they apply in the future for another position with the Department.

In addition, we concluded that EOUSA Deputy Director John Nowacki committed misconduct by drafting a proposed Department response to a media inquiry which he knew was inaccurate.  Although Nowacki knew that Goodling had used political and ideological affiliations to assess career attorney candidates for EOUSA detail positions, he drafted a media statement in which the Department would have denied the allegations.  Nowacki is still employed by the Department.  Therefore, we recommend that the Department consider appropriate discipline for him based upon the evidence in this report.

Finally, as discussed in this report, after the allegations about politicized hiring arose, the Department changed various policies and practices.  In 2007, in response to the allegations about Goodling's inappropriate consideration of political affiliations on requests by interim U.S. Attorneys to hire AUSAs, former Attorney General Gonzales directed that such waiver requests be reviewed by EOUSA, not political appointees in senior Department offices.  In addition, EOUSA has recently ended the practice of reviewing the résumés of the waiver candidates and instead assesses those requests solely based on the budgetary status of the USAO as well as the status of the new U.S. Attorney's nomination.  We believe these changes are appropriate and

**Exhibit 7 -  134**

can help prevent a recurrence of the improper use of political or ideological affiliations to evaluate waiver requests for career AUSAs.

With regard to immigration judges, as a result of the civil litigation over the unsuccessful candidacy of an immigration judge applicant, in April 2007, former Attorney General Gonzales approved a new process to fill immigration judge positions.  The new process returned the responsibility for evaluating and selecting immigration judges to EOIR.  According to EOIR officials, the process is working more effectively now and political considerations are not being used in the selection of candidates.

However, we believe the Department should consider additional changes.  We recommend that the Department clarify its policies regarding the use of political or ideological affiliations to select career attorney candidates for temporary details within the Department.  As discussed in this report, it is unclear which detailee positions are excluded from the scope of civil service law, and the Department's guidance on this issue is inconsistent.  We recommend that the Department clarify the circumstances under which political considerations may and may not be considered when assessing career candidates for details to various Department positions.

In addition, in our June 24, 2008, report on the Department's Honors Program and Summer Law Intern Program, we made other recommendations to address allegations of politicized hiring in the Department.[92]  Those recommendations included revising the Department of Justice Human Resource Order to emphasize that the process for hiring career attorneys must be merit based and to specify that ideological considerations cannot be used as proxies to discriminate on the basis of political affiliations.  We also recommended that the briefing and training materials for Department political appointees should stress that candidates for career positions must be evaluated based on their merits and that ideological affiliations may not be used as a screening device for discriminating on the basis of political affiliations.

When the prior report on Honors Program hiring was issued, Attorney General Mukasey announced that the Department intended to implement all of these recommendations.  These recommendations also apply to the improper conduct described in this report.

---

[92]  See *An Investigation of Allegations of Politicized Hiring in the Department of Justice Honors Program and Summer Law Intern Program* (June 24, 2008).

**Exhibit 7 -  135**

We believe that implementation of our recommendations can help prevent a recurrence of the violations of federal law and Department policy, and the misconduct, that we describe in this report.

**Exhibit 7 - 136**

# EXHIBIT

# 8



S. Hrg. 110–47

# DEPARTMENT OF JUSTICE OVERSIGHT

# HEARING

BEFORE THE

# COMMITTEE ON THE JUDICIARY
# UNITED STATES SENATE

ONE HUNDRED TENTH CONGRESS

FIRST SESSION

JANUARY 18, 2007

**Serial No. J–110–3**

Printed for the use of the Committee on the Judiciary



U.S. GOVERNMENT PRINTING OFFICE

35–728 PDF          WASHINGTON : 2007

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250   Mail: Stop SSOP, Washington, DC 20402–0001

**Exhibit 8 -  137**

COMMITTEE ON THE JUDICIARY

PATRICK J. LEAHY, Vermont, *Chairman*

EDWARD M. KENNEDY, Massachusetts
JOSEPH R. BIDEN, JR., Delaware
HERB KOHL, Wisconsin
DIANNE FEINSTEIN, California
RUSSELL D. FEINGOLD, Wisconsin
CHARLES E. SCHUMER, New York
RICHARD J. DURBIN, Illinois
BENJAMIN L. CARDIN, Maryland
SHELDON WHITEHOUSE, Rhode Island

ARLEN SPECTER, Pennsylvania
ORRIN G. HATCH, Utah
CHARLES E. GRASSLEY, Iowa
JON KYL, Arizona
JEFF SESSIONS, Alabama
LINDSEY O. GRAHAM, South Carolina
JOHN CORNYN, Texas
SAM BROWNBACK, Kansas
TOM COBURN, Oklahoma

BRUCE A. COHEN, *Chief Counsel and Staff Director*
MICHAEL O'NEILL, *Republican Chief Counsel and Staff Director*

(II)

**Exhibit 8 - 138**

# C O N T E N T S

────────

## STATEMENTS OF COMMITTEE MEMBERS

Page

Grassley, Hon. Charles E., a U.S. Senator from the State of Iowa, prepared statement ........................................................................................................... 233
Leahy, Hon. Patrick J., a U.S. Senator from the State of Vermont ................... 1
    prepared statement and letters ...................................................................... 247
Specter, Hon. Arlen, a U.S. Senator from the State of Pennsylvania ................ 3

## WITNESS

Gonzales, Alberto R., Attorney General of the United States, Department of Justice, Washington, D.C. .............................................................................. 6

## QUESTIONS AND ANSWERS

Responses of Alberto R. Gonzales to questions submitted by Senators Leahy, Specter, Kennedy, Biden, Feinstein, Feingold, Schumer, Durbin, Grassley, and Cornyn ........................................................................................................... 67

## SUBMISSIONS FOR THE RECORD

American Civil Liberties Union, New York, New York, reports .......................... 177
Ehrlich-Steele Democrats, Official Voter Guide, November 7, 2006 ................... 210
Gonzales, Alberto R., Attorney General of the United States, Department of Justice, Washington, D.C., prepared statement ........................................... 212
Law deans and professors, joint statement ......................................................... 246
Wall Street Journal, Jan. 12, 2007, article .......................................................... 255
Washington Post, Jan. 13, 2007, article ............................................................... 257

Exhibit 8 -  139

**Exhibit 8 -  140**

# DEPARTMENT OF JUSTICE OVERSIGHT

### THURSDAY, JANUARY 18, 2007

U.S. SENATE,
COMMITTEE ON THE JUDICIARY,
*Washington, DC*

The Committee met, pursuant to notice, at 9:32 a.m., in room 106, Dirksen Senate Office Building, Hon. Patrick J. Leahy (chairman of the committee) presiding.

Also present: Senators Kennedy, Kohl, Feinstein, Feingold, Schumer, Cardin, Whitehouse, Specter, Hatch, Grassley, Kyl, and Cornyn.

### OPENING STATEMENT OF HON. PATRICK J. LEAHY, A U.S. SENATOR FROM THE STATE OF VERMONT

Chairman LEAHY. Good morning. Thank you, all of you, for coming.

We are in a different hearing room than usual, but Attorney General, there was some interest in your testimony so we expanded the room somewhat.

We are going to hold what I believe is an important hearing to examine the operations of the Department of Justice. This is, after all, the Federal agency entrusted with ensuring the fair and impartial administration of justice for all Americans.

As I have always done, I take our oversight responsibility very seriously. In the 32 years since I first came to the Senate, and that was during the era of Watergate and Vietnam, I have never seen a time when our constitution and fundamental rights as Americans were more threatened, unfortunately, by our own government.

This last weekend, the President and Vice President indicated that they intended to override the will of the American people as expressed in the most recent national elections and ignore actions of Congress in order to escalate the war in Iraq.

For years, the administration has engaged in warrantless wire tapping of Americans, I believe, contrary to the law. I welcomed the President's decision yesterday to not reauthorize this program and to instead seek approval for all wire taps from the Foreign Intelligence Surveillance Court, as the law requires, as many of us have been saying should have been done years ago.

Now, we must engage in all surveillance necessary to prevent acts of terrorism, but we can, and should, do so in ways that protect the basic rights of all Americans, including the right to privacy.

To ensure the balance necessary to achieve both security and liberty for our Nation, the President must also fully inform Congress

(1)

**Exhibit 8 - 141**

2

and the American people about the contours of the Foreign Intelligence Surveillance Court order authorizing the surveillance program, but also the program itself.

Regrettably, the administration has all too often refused to answer the legitimate oversight questions of the duly elected representatives of the American people. Unfortunately, the Justice Department has been complicit in advancing these government policies which threaten our basic liberties and overstep the bounds of our constitution. Some of the criticisms have been made by members of both parties.

The Department has played a pivotal role, in my view, in eroding basic human rights and undercutting America's leading role as an advocate for human rights throughout the world.

Last week, the world marked the fifth anniversary of the arrival of the first prisoners at Guantanamo Bay, and they marked that anniversary with protests. That facility has replaced Abu Ghraib in the eyes of many, including some of our closest allies, our best allies, as a symbol of repression.

For more than 2 years we sought answers from the Department of Justice about reported—and in some instances documented—cases of the abuse of detainess at Guantanamo.

I wrote to the Attorney General regarding press reports that the Central Intelligence Agency has finally acknowledged the existence of additional classified documents detailing the Bush administration's interrogation and detention policy for terrorism suspects.

I am glad that after initially refusing to provide any new information in response to my inquiries, the Attorney General wrote to me last week to say that he would work to develop an accommodation that would provide the Judiciary Committee with a sufficient understanding of the Department's position on legal questions related to that CIA program.

But I remain disappointed that the Department of Justice and the White House have continued to refuse to provide the requests documents to the committee. The administration's secret policies have not only reduced America's standing around the world to one of the lowest points in our history, but these policies also jeopardize the Department's own efforts, ironically, to prosecute terrorism.

Last week, USA Today reported that the Department's terrorism case against José Padilla is imperiled by concerns of Mr. Padilla's treatment during his lengthy detention. The back-and-forth designation as a defendant and as an enemy combatant has eroded his mental capacity to such a great extent, he may not be fairly tried.

After the administration and, I must say, the Republican-led Congress, eviscerated the great Writ of Habeus Corpus in just a matter of hours, eviscerated the great Writ of Habeus Corpus not just for detainees but for millions of permanent residents living in the United States, this Department of Justice filed a legal brief expressly reporting that result, raising the specter that millions living in the United States today can now be subjected to definite government detention. The shudder that sent was felt not only throughout our country, but around the world.

This week, we commemorated the life and contributions of Dr. Martin Luther King, Jr. Sadly, while the Department has defended the constitutionality of the Voting Rights Act, I am concerned it is

**Exhibit 8 - 142**

3

backing away from the vigorous enforcement of the Voting Rights Act that the President promised only a few months ago. I know some of the Senators on this panel will have questions about that.

In nearly 6 years in office, the Bush-Cheney administration has filed only one suit on behalf of African-American voters under Section 2 of the Voting Rights Act, the key section that provides a Cause of Action for discrimination against minority voters.

I am deeply concerned the Department of Justice is retreating from its core mission to hold those who would violate our criminal laws accountable. Now, last week the President told us he plans to spend $1.2 billion more, on top of the billions of dollars sent to Iraq for reconstruction.

But despite mounting evidence of widespread corruption, contracting fraud, billions unaccounted for, the Department of Justice has not brought a single criminal case against a corporate contractor in Iraq, even though we know, just reading the press, about the huge amounts of money in taxpayers' dollars that have been stolen in Iraq.

The Department also has to do better at addressing the dangers that Americans face at home. According to the FBI's preliminary crime statistics for the first half of 2006, violent crimes in the United States rose again.

It troubles me that, while this administration is more than willing to spend more and more American taxpayer funds for police in Iraq, it is cutting back funding for our State and local police at home.

I do not want to get into a debate on the Iraq war, but if we can spend money to buildup police forces in Iraq and we have to pay for it by cutting money for police forces in the United States of America, there are a lot of us across the political spectrum who think that is a Hobson's choice.

This committee has a special stewardship role to protect our most cherished rights and liberties as Americans and to make sure that our fundamental freedoms are preserved for future generations.

So, there is much more to be done. I believe civil liberties and the Constitution of this great country have been damaged during the past 6 years. We will try to repair some of that damage.

Attorney General Gonzales, I do thank you for being here. I want to say that I hope that disagreements we may have do not obscure my desire to work with you to make the Department of Justice a better defender of Americans and their constitutional rights.

We will talk about this later on. I know there are areas that you will be speaking about this morning, about the competence of immigration reform, other areas. Let us find those areas we can work together. Let us repair some of the concerns—justifiable concerns—Americans have.

I will yield the rest of my time.

[The prepared statement of Senator Leahy appears as a submission for the record.]

**STATEMENT OF ARLEN SPECTER, A U.S. SENATOR FROM THE STATE OF PENNSYLVANIA**

Senator SPECTER. Thank you very much, Mr. Chairman.

**Exhibit 8 -  143**

4

We welcome you here, Attorney General Gonzales. The Congress has worked coordinately with the President on the major issues facing the country, the war against terrorism, with the resolution authorizing the use of force, and this committee structured the renewal of the Patriot Act, giving the Department of Justice substantial additional authority to fight terrorism.

As we have authorized executive authority, we have simultaneously expressed our concern about the balance with civil liberties. I was pleased to note yesterday that the Department of Justice has revised the Terrorist Surveillance Program and has brought it within the review of the Foreign Intelligence Surveillance Court.

Your letter to Senator Leahy, the Chairman, and me noted that you had been working on it since the summer of 2005. It is a little hard to see why it took so long. We will want to inquire further into the details as to the process that you used.

I thank you for the extensive briefing which I received yesterday from Steve Bradbury and Ken Wainstein, two very, very able attorneys in your Department. There are questions which remain unanswered.

I talked to them and they said they would get back to me about a review of the affidavits submitted establishing what you have concluded is probable cause, and the orders which have been entered, and the review, which they represented to me, that the Foreign Intelligence Surveillance Court is making.

Without discussing many of the details in an open session, there is a question which was already raised publicly about whether review is programmatic or individual. Your representatives have said that it is individualized on the warrants. In their description to me, I think we need to know more on the oversight process.

With respect to the time delay, the disclosure was made by the New York Times on December 16. It was a Friday. We were wrapping up the Patriot Act. The disclosure of that secret surveillance program was a major complicating factor. I think had that not been noted, that we would have gotten that Act finished before December 31 and I think it would have been stronger in some material respects.

I believe that the United States and the administration have paid a heavy price for not acting sooner to bring the Terrorist Surveillance Program under judicial review. That is the traditional way; before there is a wire tap or a search and seizure, to have probable cause established and to have court approval.

We lost a close election. I would not want to get involved in what was cause and effect, but the heavy criticism which the President took on the program, I think, was very harmful in the political process and for the reputation of the country. So I will be inquiring further as to why it took so long and what could have been done further.

As you know, this committee was hard at work with legislation which I had proposed and others had co-sponsored. We had four hearings, and I think we could have been of assistance to you if we had been consulted.

Turning to the issue of habeus corpus, I note in your statement that the bills which have been introduced "defy common sense". I

**Exhibit 8 - 144**

5

do not think Chairman Leahy and I would object to the characterization of the legislation which we introduced jointly to reinstate habeus corpus.

I do not think we would object to your characterization that our actions have defied common sense. But when you take a look at what the Supreme Court has said on this subject, Justice Stevens wrote in *Rasul* v. *Bush*, habeus corpus has been applied to persons detained within the United States. It has embraced claims of aliens detained within the sovereign territory of this country.

It is a little hard for me to understand how the Writ of Habeus Corpus, which goes back to the Magna Carta, can be modified by any legislation when there is an explicit constitutional provision that the Writ of Habeus Corpus would not be suspended except in time of invasion or rebellion. No one contends that either of those situations is present.

When you come to the issue of common sense, it goes beyond Pat Leahy and Arlen Specter to Justice Stevens and the four justices who joined him. It goes to Justice O'Connor in *Hamdi* v. *Rumsfeld*, when she outlined that the Writ of Habeus Corpus applies to every individual detained within the United States.

When your prepared statement cites the 1950 Supreme Court decision under totally different circumstances in World War II, any vitality of that decision is long gone with the recent pronouncements by the Supreme Court of the United States.

The issue of the signing statements, Mr. Attorney General, continues to be a matter of major concern. They came up in the Patriot Act, which was very carefully negotiated with the Judiciary Committee and the Department of Justice. Then the President issues a signing statement saying that he is at liberty to disregard provisions on oversight. It came up with the McCain legislation on torture.

Now it has come up with the legislation on the postal authority, where the President signed the legislation which prohibited opening mail, and then issues a signing statement that he retains the authority to do that.

If the President is asserting that the Act of Congress is unconstitutional, then he ought to say so and not sign the Act. But if he signs the Act, as provided in the Constitution that the Congress presents him an Act, he has the choice of either approving the Act or of vetoing it. Matters of that sort put a very, very considerable strain on the relations between the legislative and executive branches.

I wrote to you on November 20 requesting two memoranda which relate to the subject of rendition. You were quoted in the Chicago Tribune, saying that the decision on whether there will be rendition depends on the likelihood as to whether there will be torture or no torture, leaving open the possibility of torture.

I discussed this with you personally, and then got, really, a pro forma letter back from one of your assistants. My suggestion to you, Mr. Attorney General, would be that when the Chairman or the Ranking press a matter, write to you, talk to you about it personally, that you ought to give it your personal attention on a response.

**Exhibit 8 - 145**

6

I would suggest to you, further, that when you cite in your letter to me that these are highly classified matters, that you consider informing at least the Chairman and the Ranking Member, as is the practice on the Intelligence Committee, which I know in some detail, having chaired that committee in the 104th Congress.

I have a number of other points to make, but my red light is now going on so I shall thank the Chairman and conclude.

Chairman LEAHY. Thank you. Thank you, Senator Specter.

What we will do, after the Attorney General's opening statement, we will have 7-minute rounds. The Attorney General is going to stay here throughout most of the day. I understand from the floor that the flurry of votes we had late last night will not be repeated, certainly during the morning, so I would urge Senators to stay within that time.

Mr. Attorney General, please stand and raise your right hand.

[Whereupon, the witness was duly sworn.]

Chairman LEAHY. I would also note that this is, of course, an open hearing. We have television. We have 18 Senators, both Republicans and Democrats, who have a constitutional duty to their constituents, to their office to ask questions, and they want to be heard. They want to have the answers heard.

Also, though, it is a public hearing and the public has a right to watch what is going on. I understand that there are people in the audience who wish to demonstrate their feelings about things.

I would point out, however, that in standing, you are blocking the views of people who want to hear this. I think, as matter of politeness, you do want to give those people behind you a chance to watch these hearings. One of the great things about this country, is we have such hearings and people can be heard.

Mr. Attorney General, please proceed.

**STATEMENT OF ALBERTO R. GONZALES, ATTORNEY GENERAL OF THE UNITED STATES, DEPARTMENT OF JUSTICE, WASHINGTON, D.C.**

Attorney General GONZALES. Thank you, Mr. Chairman. I look forward to our conversation this morning about the important work of the Department of Justice.

The Department of Justice's responsibilities are vast, as we all know, but our top priority continues to be the prevention of terrorist attacks. At the Department of Justice, every day is September 12th.

I expect that much of our discussion today will focus on matters related to the war on terror. In particular, I expect that you will want to discuss the letter I sent to Chairman Leahy and Senator Specter yesterday regarding the President's decision not to reauthorize the Terrorist Surveillance Program.

Court orders issued last week by a judge of the Foreign Intelligence Surveillance Court will enable the government to conduct electronic surveillance, very specifically, surveillance into or out of the United States, where there is probable cause to believe that one of the communicants is a member or agent of Al Qaeda or an associated terrorist organization, subject to the approval of the FISA court.

**Exhibit 8 - 146**

22

to be crystal clear about issues like the signing statement we discussed earlier.

As I understand it, the President was preserving other legal authority he already has. He was not asserting any new authority. Is that a fair statement?

Attorney General GONZALES. That is correct. In fact, I would think that the Congress and the American people would want to know his thinking about legislation and his thinking about the implementation of legislation. I mean, again, this is a dialog between the President of the United States, the American people, the Congress, and, of course, the executive branch.

Senator HATCH. Well, thank you, General. My time is up.

Chairman LEAHY. Under our rules of appearance, Senator Kohl of Wisconsin would go next. But Senator Feinstein of California is managing a bill on the floor. Senator Kohl, in his usual gracious manner, has yielded first to her.

Senator Feinstein, you are recognized.

Senator FEINSTEIN. Thank you very much. I want to thank my friend and colleague, Senator Kohl. The bill goes up at 11, so I very much appreciate this.

Good morning.

Attorney General GONZALES. Good morning, Senator. Good to talk to you again.

Senator FEINSTEIN. Thank you. Mr. Gonzales, let me speak as a member of the Intelligence Committee for a minute. I want to commend you for the action—the corrective action—you have taken on the Terrorist Surveillance Program.

I believe bringing it into conformance with the law is the right thing to do. In my briefings on the program, I believe you are doing that. I think there are a couple of things outstanding which we can discuss, but not in this forum. I just want to say, I think it is overdue, but thank you for taking that action.

Attorney General GONZALES. Senator, I just say that we continue to believe that what has happened in the past, the President's actions were, of course, lawful. But I think this is a good step. I think involving all branches of government on such an important program is best for the country.

Senator FEINSTEIN. Thank you.

Now, let me ask you one question. One part of the letter you sent to the Chair and Ranking Member said that the President will not be reauthorizing the Terrorist Surveillance Program following, I guess, the end of this 45-day period. What will happen to it?

Attorney General GONZALES. Well, there will be no "Terrorist Surveillance Program". All electronic surveillance, as defined under FISA, of the kind described in the letter, international communications outside the United States where we have reasonable grounds to believe that a party to the communication is a member or agent of Al Qaeda or an affiliate organization, that that will all be done under an order issued by a judge in the FISA court.

Senator FEINSTEIN. Thank you.

You and I talked on Tuesday about what is happening with U.S. Attorneys. It spurred me to do a little research, and let me begin. Title 28, Section 541 states, "Each U.S. Attorney shall be appointed for a term of 4 years. On the expiration of his term, a U.S. Attor-

**Exhibit 8 -  147**

23

ney shall continue to perform the duties of his office until his successor is appointed and qualified."

Now, I understand that there is a pleasure aspect to it, but I also understand what practice has been in the past. We have 13 vacancies. Yesterday you sent up two nominees for the 13 existing vacancies.

Attorney General GONZALES. There have been 11 vacancies created since the law was changed, 11 vacancies in the U.S. Attorney's offices. The President has now nominated as to six of those. As to the remaining five, we are in discussion with home-State Senators. So let me publicly sort of preempt, perhaps, a question you are going to ask me.

That is, I am fully committed, as the administration is fully committed, to ensure that with respect to every U.S. Attorney position in this country, we will have a Presidentially appointed, Senate-confirmed U.S. Attorney.

I think a U.S. Attorney, who I view as the leader, law enforcement leader, my representative in the community, has greater imprimatur of authority if in fact that person has been confirmed by the Senate.

Senator FEINSTEIN. All right.

Now, let me get at where I am going. How many U.S. Attorneys have been asked to resign in the past year?

Attorney General GONZALES. Senator, you are asking me to get into a public discussion about personnel.

Senator FEINSTEIN. No. I am just asking you to give me a number, that is all.

Attorney General GONZALES. I do not know the answer.

Senator FEINSTEIN. I am just asking you to give me a number.

Attorney General GONZALES. I do not know the answer to that question. But we have been very forthcoming—

Senator FEINSTEIN. You did not know it on Tuesday when I spoke with you. You said you would find out and tell me.

Attorney General GONZALES. I am not sure I said that.

Senator FEINSTEIN. Yes, you did, Mr. Attorney General.

Attorney General GONZALES. Well, if that is what I said, that is what I will do. But we did provide to you a letter where we gave you a lot of information about—

Senator FEINSTEIN. I read the letter.

Attorney General GONZALES. All right.

Senator FEINSTEIN. It does not answer the questions that I have. I know of at least six that have been asked to resign. I know that we amended the law in the Patriot Act and we amended it because if there were a national security problem the Attorney General would have the ability to move into the gap. We did not amend it to prevent the confirmation process from taking place.

I am very concerned. I have had two of them ask to resign in my State from major jurisdictions with major cases ongoing, with substantially good records as prosecutors. I am very concerned because, technically, under the Patriot Act, you can appoint someone without confirmation for the remainder of the President's term. I do not believe you should do that. We are going to try to change the law back.

**Exhibit 8 -  148**

24

Attorney General GONZALES. Senator, may I just say that I do not think there is any evidence that that is what I am trying to do? In fact, to the contrary. The evidence is quite clear that what we are trying to do is ensure that, for the people in each of these respective districts, we have the very best possible representative for the Department of Justice and that we are working to nominate people, and that we are working with home-State Senators to get U.S. Attorneys nominated. So the evidence is just quite contrary to what you are possibly suggesting. Let me just say—

Senator FEINSTEIN. Do you deny that you have asked, your office has asked, U.S. Attorneys to resign in the past year, yes or no?

Attorney General GONZALES. Yes. No, I do not deny that. What I am saying is, that happens during every administration, during different periods for different reasons. So the fact that that has happened, quite frankly, some people should view that as a sign of good management.

What we do, is we make an evaluation about the performance of individuals. I have a responsibility to the people in your district that we have the best possible people in these positions. That is the reason why changes sometimes have to be made, although there are a number of reasons why changes get made and why people leave on their own.

I think I would never, every make a change in a U.S. Attorney position for political reasons or if it would in any way jeopardize an ongoing serious investigation. I just would not do it.

Senator FEINSTEIN. Well, let me just say one thing. I believe very strongly that these positions should come to this committee for confirmation.

Attorney General GONZALES. They are, Senator.

Senator FEINSTEIN. I believe very strongly we should have the opportunity to answer questions about it.

Attorney General GONZALES. I agree with you.

Senator FEINSTEIN. I have been asked by another Senator to ask this question, and I will. Was there any other reason for asking Bud Cummings of Arkansas to resign, other than the desire to put in Tim Griffin?

Attorney General GONZALES. Senator, again, I am not going to get into a public discussion about the merits or not with respect to personnel decisions. I will say that I have had two conversations, one as recently as, I think, yesterday with the Senator from Arkansas about this issue. He and I are in a dialog.

I am consulting with the home-State Senator so he understands what is going on and the reasons why, and working with him to try to get this thing resolved, to make sure for his benefit, for the benefit of the Department of Justice, that we have the best possible person manning that position.

Senator FEINSTEIN. All right. If I could move on quickly.

In 2000, the last year that the Bureau of Alcohol, Tobacco, Firearms, and Explosives issued a report with an analysis, it was revealed that 57 percent of all guns used in crimes in the United States had come from 1.2 percent of licensed gun dealers. In other words, the majority of crimes were not coming from guns from the black market, but from a few licensed dealers.

**Exhibit 8 -  149**

43

Senator SESSIONS. Thank you, Attorney General Gonzales, for your leadership and your hard work to defend this country and to promote the rule of law, and I mean that sincerely.

I am not surprised that when you said yes, they still are not happy. We have just had a professional complaint here. I would just note that I am of the belief that at a time in which this Congress has authorized hostile action against certain groups like al Qaeda, it is perfectly appropriate for the United States President to authorize his agents to intercept their phone calls in foreign lands and intercept international phone calls that may come into our country if one of the parties to that conversation are connected to an entity with which we are at war. I think we have been through this around and around many times.

You have said, OK, now we will go on and in light of the complaints go through this procedure, and maybe that was a good decision. Maybe it is just throwing a little more chum in the water for the sharks. I do not know. But at any rate, I thank you for trying to work with the Congress.

There has been some complaints about replacement of the United States Attorneys. I served as United States Attorney for 12 years. I am sure some people would have liked to have removed me before that. But I am well aware that the United States Attorneys serve as the pleasure of the President.

The United States Attorneys that are being replaced here, as I understand it, all have served 4 years or more, had 4-year terms. And we are now in the second term of this President, and I think to make seven changes that I think are involved here is not that many, and that the office of the United States Attorney is a very important office, and it has tremendous management responsibilities and law enforcement responsibilities that cannot fail to meet standards. And if someone is not producing, I think the President has every right to seek a change for that or other reasons that may come up. I would just—

Attorney General GONZALES. Senator, could I just interrupt you?

Senator SESSIONS. Yes.

Attorney General GONZALES. There are constant changes in the ranks of our U.S. Attorneys.

Senator SESSIONS. Absolutely.

Attorney General GONZALES. They come and go, and they leave for a variety of reasons. And so the fact that someone is leaving— I do not want to—again, I do not want to get into personal details of individual U.S. Attorneys. I do want to say, however—and I have said this publicly a lot recently, it seems—the U.S. Attorney positions are very, very important to me personally.

They are my representatives in the community. They are the face of the administration, quite frankly. They are often viewed as the leader of the law enforcement effort within a community, not just by State and locals, but by other Federal components, and so I care very much about who my U.S. Attorney is in a particular district. That is very, very important to me. And so decisions with respect to U.S. Attorneys are made on what is best for the Department, but also what is best for the people in the respective district.

**Exhibit 8 - 150**

# EXHIBIT

# 9

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

|  |  |
|---|---|
| TODD ASHKER, DANNY TROXELL, GEORGE RUIZ, JEFFREY FRANKLIN, GEORGE FRANCO, GABRIEL REYES, RICHARD JOHNSON, PAUL REDD, LUIS ESQUIVEL, and RONNIE DEWBERRY, on their own behalf, and on behalf of a class of similarly situated prisoners,<br><br>                 Plaintiffs,<br><br>    v.<br><br>EDMUND G. BROWN, JR., Governor of the State of California, MATTHEW CATE, Secretary, California Department of Corrections and Rehabilitation (CDCR); ANTHONY CHAUS, Chief, Office of Correctional Safety, CDCR; and G.D. LEWIS, Warden, Pelican Bay State Prison,<br><br>                 Defendants. | Case No. 4:09 CV 05796 CW<br><br>**EXPERT REPORT OF CRAIG HANEY, Ph.D., J.D.**<br><br>Honorable Claudia Wilken |

**Exhibit 9 -  151**

Table of Contents

I.      Expert Qualifications ...........................................................................................1

II.     Basis of Expert Opinion ...................................................................................... 5

III.    Summary of Expert Opinion ............................................................................ 10

IV.     The Adverse Psychological Effects of Isolation ...........................................12

V.      The Nature of Solitary Confinement at the Pelican Bay SHU ..............................38

VI.     The Psychological Effects of Long-Term Solitary Confinement at the Pelican

        Bay SHU (PBSHU) ....................................................................................... 44

        A.  The Overall Psychological Status of the Current PBSHU Population ............ 45

            1.  Re-Interviews with Prisoners from the Original *Madrid* Sample.............. 46

            2.  Non-Randomly Selected Sample ................................................................ 55

            3.  Randomly Selected Sample........................................................................ 57

                a)  Prevalence of Reported Stress/Trauma-Related Symptoms and

                    Isolation-Related Pathology.................................................. 59

                b)  Isolation-Related Suffering and Syndromes....................................... 63

                    i.   The Ongoing Struggle to Maintain Sanity ............................... 63

                    ii.  Problematic Adaptations to Prolonged Isolation and Long-

                         Term

                         Dysfunction ............................................................................68

        B.  Comparisons to the Pelican Bay General Population ..................................... 79

        C.  Pathological Levels of Loneliness................................................................90

        D.  Absence of Outlets or Viable Sources of Professional Support.......................96

VII.    Conclusion: Long-Term PBSHU Confinement Cruelly Inflicts Extreme

        Psychological Pain and Lasting Damage on Prisoners That Derive In Large

        Part From the Experience of Social Death To Which It Subjects Them ............. 102

**Exhibit 9 -  152**

**I.      Expert Qualifications**

1.      I am a Distinguished Professor of Psychology at the University of California, Santa Cruz, where I also currently serve as the Director of the Legal Studies Program. My area of academic specialization is in what is generally termed "psychology and law," which is the application of psychological data and principles to legal issues. I teach graduate and undergraduate courses in social psychology, psychology and law, and research methods. I received a bachelor's degree in psychology from the University of Pennsylvania, an M.A. and Ph.D. in Psychology and a J.D. degree from Stanford University, and I have been the recipient of a number of scholarship, fellowship, and other academic awards.

2.      I have published numerous scholarly articles and book chapters on topics in law and psychology, including encyclopedia and handbook chapters on the backgrounds and social histories of persons accused of violent crimes, the psychological effects of imprisonment, and the nature and consequences of solitary or "supermax"-type confinement. In addition to these scholarly articles and book chapters, I have published two sole-authored books: *Death by Design: Capital Punishment as a Social Psychological System* (Oxford University Press, 2005), and *Reforming Punishment: Psychological Limits to the Pains of Imprisonment* (American Psychological Association Books, 2006).

3.      In the course of my academic work in psychology and law, I have lectured and given invited addresses throughout the country on the role of social and institutional histories in explaining criminal violence, the psychological effects of living and working in institutional settings (typically maximum security prisons), and the psychological consequences of solitary confinement. I have

1

**Exhibit 9 -  153**

given these lectures and addresses at various law schools, bar associations, university campuses, and numerous professional psychology organizations such as the American Psychological Association.

4.      I also have served as a consultant to numerous governmental, law enforcement, and legal agencies and organizations, including the Palo Alto Police Department, various California Legislative Select Committees, the National Science Foundation, the American Association for the Advancement of Science, and the United States Department of Justice. For example, in the summer of 2000, I was invited to attend and participated in a White House Forum on the uses of science and technology to improve crime and prison policy, and in 2001 I participated in a conference jointly sponsored by the United States Department of Health and Human Services (DHHS) concerning government policies and programs that could better address the needs of formerly incarcerated persons as they were reintegrated into their communities. I continued to work with DHHS on the issue of how best to insure the successful reintegration of prisoners into the communities from which they have come. More recently, I consulted with the Department of Homeland Security on detention-related issues, and I served as both a consultant to and an expert witness before the United States Congress. I was appointed in 2012 as a member of a National Academy of Sciences committee analyzing the causes and consequences of high rates of incarceration in the United States, and I co-authored the NAS committee's report, published in book form as *The Growth of Incarceration in the United States: Exploring the Causes and Consequences*, released in April, 2014.  A copy of my curriculum vitae is attached to this Expert Report as Exhibit 1.

2

**Exhibit 9 -  154**

5.      My academic interest in the psychological effects of various prison conditions is long-standing and dates back to 1971, when I was still a graduate student.  I was one of the principal researchers in what has come to be known as the "Stanford Prison Experiment," in which my colleagues Philip Zimbardo, Curtis Banks, and I randomly assigned normal, psychologically healthy college students to the roles of either "prisoner" or "guard" within a simulated prison environment that we had created in the basement of the Psychology Department at Stanford University. The study has since come to be regarded as a "classic" study in the field of social psychology, demonstrating the power of institutional settings to change and transform the people who enter them.[1]

6.      Since then I have been studying the psychological effects of living and working in real (as opposed to simulated) institutional environments, including juvenile facilities, mainline adult prison and jail settings, and specialized correctional housing units  (such as solitary and "supermax"-type confinement).  In the course of that work, I have toured and inspected numerous maximum security state prisons and related facilities (in Alabama, Arkansas, Arizona, California, Florida, Georgia, Idaho, Louisiana, Massachusetts, Montana, New Jersey, New Mexico, Ohio, Oregon, Pennsylvania, Tennessee, Texas, Utah, and Washington), many maximum security federal prisons (including the Administrative Maximum or "ADX" facility in Florence, Colorado), as well as

---

[1] For example, see Craig Haney, Curtis Banks & Philip Zimbardo, *Interpersonal Dynamics in a Simulated Prison*, 1 International Journal of Criminology and Penology 69 (1973); Craig Haney & Philip Zimbardo, *The Socialization into Criminality: On Becoming a Prisoner and a Guard*, in Law, Justice, and the Individual in Society: Psychological and Legal Issues (J. Tapp and F. Levine, eds., 1977); and Craig Haney & Philip Zimbardo, *Persistent Dispositionalism in Interactionist Clothing: Fundamental Attribution Error in Explaining Prison Abuse*, Personality and Social Psychology Bulletin, 35, 807-814 (2009).

3

**Exhibit 9 -  155**

prisons in Canada, Cuba, England, Hungary, Mexico, and Russia.  I also have conducted numerous interviews with correctional officials, guards, and prisoners to assess the impact of penal confinement, and statistically analyzed aggregate data from numerous correctional documents and official records to examine the effects of specific conditions of confinement on the quality of prison life and the ability of prisoners to adjust to them.[2]

7.     I have been qualified and have testified as an expert in various federal courts, including United States District Courts in Arkansas, California, Georgia, Hawaii, New Mexico, Pennsylvania, South Carolina, Texas, and Washington, and in numerous state courts, including courts in Colorado, Florida, Montana, New Jersey, New Mexico, Ohio, Oregon, Tennessee, Utah, and Wyoming as well as, in California, the Superior Courts of Alameda, Calaveras, Kern, Los Angeles, Marin, Mariposa, Monterey, Orange, Sacramento, San Diego, San Francisco, San Mateo, Santa Clara, Santa Cruz, Shasta, Tulare, Ventura, and Yolo counties. My research, writing, and testimony have been cited by state courts, including the California Supreme Court, and by Federal District Courts,

---

[2] For example, Craig Haney & Philip Zimbardo, *The Socialization into Criminality: On Becoming a Prisoner and a Guard*, in Law, Justice, and the Individual in Society: Psychological and Legal Issues (pp. 198-223) (J. Tapp and F. Levine, eds., 1977); Craig Haney, *Infamous Punishment: The Psychological Effects of Isolation*, 8 National Prison Project Journal 3 (1993); Craig Haney, *Psychology and Prison Pain: Confronting the Coming Crisis in Eighth Amendment Law*, Psychology, Public Policy, and Law, 3, 499-588 (1997); Craig Haney, *The Consequences of Prison Life: Notes on the New Psychology of Prison Effects*, in D. Canter & R. Zukauskiene (Eds.), Psychology and Law: Bridging the Gap (pp. 143-165). Burlington, VT: Ashgate Publishing (2008); Craig Haney, *On Mitigation as Counter-Narrative: A Case Study of the Hidden Context of Prison Violence*, University of Missouri-Kansas City Law Review, 77, 911-946 (2009); Craig Haney, *Counting Casualties in the War on Prisoners*, 43 University of San Francisco Law Review 87-138 (2008); Craig Haney, *The Perversions of Prison: On the Origins of Hypermasculinity and Sexual Violence in Confinement*, American Criminal Law Review, 48, 121-141 (2011) [Reprinted in: S. Ferguson (Ed.), Readings in Race, Ethnicity, Gender and Class. Sage Publications (2012)]; and Craig Haney, *Prison Effects in the Age of Mass Imprisonment*, The Prison Journal, 92, 1-24 (2012).

4

**Exhibit 9 -  156**

Circuit Courts of Appeal, and the United States Supreme Court.[3] A statement of compensation and a list of the cases that I have testified in as an expert at trial or by deposition during the last four years is attached to this Expert Report as Exhibit 2.

## II.    Basis of Expert Opinion

8.    I have been retained by counsel for the Plaintiffs in *Ashker et. al. v. Governor of California* to provide expert opinions on two inter-related topics: a) a summary of what is known about the negative psychological consequences of confinement in isolation or "supermax" prisons; and b) based on the case-specific documents that I have been provided and reviewed, and a series of interviews that I have conducted, the extent to which prisoners housed in the Pelican Bay Security Housing Unit (PBSHU) continue to be subjected to solitary-type confinement that may place them at a serious risk of psychological harm.

9.    My opinions on these topics are based on a number of sources. In addition to my own direct experience interviewing and evaluating prisoners housed in solitary confinement, I reviewed the extensive published literature that addresses the psychological effects of solitary confinement. In addition, I have been provided with a set of documents that pertain to the use of solitary confinement at the Pelican Bay SHU. The documents that I reviewed include: the Class Action Complaint for Injunctive and Declaratory Relief in *Ashker v. Governor of California*; a 2012 Amnesty International report on conditions in California's SHUs entitled "The Edge of Endurance: Prison Conditions in California's Security Housing Units"; and the Declaration of Terry Kupers, M.D.,

---

[3] For example, see *Brown v. Plata*, 131 S.Ct. 1910 (2011).

5

**Exhibit 9 -  157**

M.S.P. in support of class certification.[4] I also reviewed the Central Files of almost all of the prisoners with whom I conducted confidential inteviews in conjunction with this case, including their prison medical and mental health documents.

10.     In addition to the present Expert Report, on April 30, 2013, I filed a declaration in support in support of Plaintiffs' motion for class certification in conjunction with this case. In order to provide the Court with a comprehensive analysis and discussion of my expert opinions, I have incorporated portions of that earlier declaration into the present one.

11.     As I mentioned in my earlier declaration, the PBSHU is a facility that I know well. I first toured and inspected this "supermax" prison in 1990, not long after it had opened. Many of the "pods" at the prison had not yet received their first prisoners and some of those that I toured were still empty. I returned to the prison many times in the early 1990s, as one of the experts who evaluated and testified about the impact of what was then considered "long-term" isolated confinement in *Madrid v. Gomez*.[5] In conjunction with my work on that case, I toured and inspected the facility a number of times and conducted numerous interviews with prisoners who were housed in the PBSHU to determine its psychological effects. In July, September, and December, 1992, I conducted approximately thirty (30) interviews with PBSHU prisoners to better understand

---

[4] I should note that although I reviewed Dr. Kupers' earlier declaration and, as I will point out later in this Expert Report, found his observations to be consistent with my own, his opinions have not influenced or affected my own. I have known of and respected Dr. Kupers' work for some time. However, I am adamant about reaching my own, independent conclusions, and believe that he functions in exactly the same way. I have not reviewed his Expert Report or any of the others filed in conjunction with this case.

[5] 889 F. Supp. 1146 (N.D. Cal. 1995).

6

**Exhibit 9 -  158**

their conditions of confinement and form preliminary opinions about how they were being affected by those conditions. Then, on two separate occasions (August 3-4, and August 30-September 1, 1993), I and a team of researchers that I assembled returned to the facility for several days to complete a systematic study that entailed in-depth assessments of a representative group of one hundred (100) randomly selected PBSHU prisoners. I also have returned to the prison on a number of occasions since *Madrid* was decided, both to tour and inspect conditions and to interview prisoners. In addition, because of my longstanding interest in the psychological effects of solitary confinement, my active participation in assessing the effects of the PBSHU, and my involvement in the *Madrid* lawsuit, I have remained apprised of many of the practices, policies, and conditions at the facility.

12.    Recently, and directly in conjunction with the *Ashker* case, I have conducted additional sets of prisoner interviews and conducted an additional tour and inspection of the facility. Specifically, I traveled to the PBSHU on April 16-17, 2013, and conducted confidential in-person interviews with seven (7) prisoners who were both part of the original sample of randomly selected prisoners from my August-September, 1993 study <u>and</u> who were currently housed in the SHU facility. They were: Prisoner B, Prisoner GG, Prisoner D, Prisoner C, Prisoner E, Prisoner M, and Prisoner A.[6] Several of these men had been transferred to other CDCR prisons in the intervening 20-year period and

---

[6] In order to protect the confidentiality of the prisoners referred to in this Expert Report, I have identified them in the text with alphabetical designations only. The prisoners' names and numbers are contained in Exhibit 3, filed under seal.

7

**Exhibit 9 -  159**

were now back at the PBSHU, and several had *never* left since I interviewed them many years ago (Prisoner A, Prisoner B, Prisoner C, and Prisoner D).

13.     In addition to the above interviews conducted in April, 2013, I traveled to PBSP on four additional occasions in conjunction with the *Ashker* case. Specifically, between January 17 and 21, 2014, I conducted a series of confidential in-person interviews with two different groups of class members (i.e., prisoners who had been housed continuously in the PBSHU for the last 10 years or more). The first group consisted of eight prisoners who were selected on a non-random basis by Plaintiffs' counsel.[7] The second group, which consisted of 16 prisoners, was randomly selected from a roster of prisoners provided by CDCR.[8]  This latter group was part of a larger group of <u>randomly</u> selected prisoners, chosen in this way to ensure that a representative sample was included in my analysis. Thus, on December 8-11, 2014, I conducted a second set of confidential in-person interviews with 25 different randomly selected prisoners who were members of the Plaintiff class still housed at the PBSHU.[9] On December 15-18, 2014, I interviewed a group of 25 general population ("GP")

---

[7] When I conducted these interviews during January 17-21, 2014, I was not aware of which interviewees had been selected non-randomly and which by random selection.

[8] The random selections were accomplished through the use of a computerized random number generator, a roster of names provided by CDCR that listed all of the prisoners who had been gang validated more than ten years previously, the elimination of those who had not been in prison continuously for the ten previous years (based on the CDCR's inmate locator), and a subsequent questionnaire set to some of them to determine the length of time that they had spent in the PBSHU. The initial sample of 17 prisoners was randomly selected from this group who had been housed in the PBSHU continuously for the last 10 years or more. A total of 24 interviews were completed in the January, 2014 round of interviews; one prisoner from the random sample refused to be interviewed.

[9] Computer-generated random numbers were used to select interviewees from a roster of names provided by CDCR that listed all Plaintiff class members still housed at the PBSHU. No prisoner refused, so the entire sample of 25 randomly selected prisoners was interviewed in the December, 2014 round of interviews.

8

**Exhibit 9 -  160**

prisoners whom I selected from a list of prisoners who had been incarcerated in the CDCR continuously for a period of 10 years or more.[10]

14.     Finally, on April 11, 2014, Dr. Terry Kupers and I toured and inspected the SHU housing units where *Ashker* class members are confined and other areas of the Pelican Bay State Prison where they might be taken (e.g., the Psychiatric Services Unit or "PSU" and the prison infirmary).

## III.     Summary of Expert Opinion

15.     By way of summary, it is my expert opinion that being housed in solitary or isolated confinement—especially over a long period of time—can produce a number of negative psychological effects. It places prisoners at grave risk of psychological harm. I believe that these effects are now well understood and described in the scientific literature. There are numerous empirical studies that report "robust" findings—that is, the findings have been obtained in studies that were conducted by researchers and clinicians from diverse backgrounds and perspectives, were completed and published over a period of many decades, and

---

[10] The target sample of general population ("GP") interviewees consisted of prisoners who had been incarcerated in the CDCR for 10 or more years and who were currently housed in GP at the Pelican Bay State Prison. To obtain this sample, a group of 100 prisoners was randomly selected from a roster of 315 prisoners that was provided by CDCR, containing the names of all prisoners whose entrance date into the CDCR was on or before July 31, 2004 (10 years or more ago at the time the list was generated). Each of those prisoners was sent a letter and a form asking if they were willing to be interviewed by me, and also several other questions about their prison histories. A group of 41 prisoners who agreed to be interviewed returned their form in time to be screened and to meet the CDCR deadline to inform them of our list of interviewees. I screened their forms to ensure that 1) the prisoner had, in fact, been in the CDCR continuously for the last 10 years, and 2) they were not currently on the mental health caseload (because their status as either a CCCMS or EOP prisoner would disqualify them from placement in the PBSHU). Several prisoners were eliminated because they were either on the mental health caseload or because they had not been confined continuously in the CDCR for the last 10 years. A final sample of 25 interviewees and 5 "alternates" was randomly selected from the list of "eligible" prisoners (i.e., those who had been in CDCR continuously for 10 or more years <u>and</u> who were not currently on the CDCR mental health caseload). I determined on site, in the course of obtaining their institutional histories, that two interviewees did not meet the criteria (i.e., they had not been housed in the CDCR continuously over the last 10 years and they were replaced by two alternates. No one refused to be interviewed and, in all, 25 GP prisoners were, in fact, interviewed.

9

**Exhibit 9 -  161**

are empirically very consistent.[11] With remarkably few exceptions, virtually every one of these studies has documented the pain and suffering that isolated prisoners endure and the risk of psychological harm to which they are exposed.

16.      In addition, the empirical conclusions are theoretically sound. That is, there are straightforward scientific explanations for the fact that long-term isolation—the absence of meaningful social contact and interaction with others— and the other severe deprivations that typically occur under conditions of isolated or solitary confinement have harmful psychological consequences. Social exclusion and isolation from others is known to produce adverse psychological effects in contexts other than prison; it makes perfect theoretical sense that this experience produces similar negative outcomes in correctional settings, where the isolation is so rigidly enforced, the social opprobrium that attaches to isolated prisoners can be extreme, and the other associated deprivations are so severe.

17.      The scientific literature on isolation, as well as my own research and experience, indicate that "long-term" exposure to precisely the kinds of conditions and practices that—based on the extensive number of documents that I have reviewed and many prisoner interviews I now have conducted—clearly currently exist in the PBSHU and clearly place prisoners at grave risk of psychological harm. This is true whether or not those prisoners suffer from a pre-existing mental illness.

---

[11] Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, Crime & Delinquency, 49, 124-156 (2003); Craig Haney, *The Social Psychology of Isolation: Why Solitary Confinement is Psychologically Harmful*, Prison Service Journal, 12 (January, 2009); and Craig Haney & Mona Lynch, *Regulating Prisons of the Future: The Psychological Consequences of Solitary and Supermax Confinement*, New York University Review of Law and Social Change 23, 477-570 (1997).

10

**Exhibit 9 -  162**

18.     It should be noted that "long-term" or "prolonged" exposure to prison isolation is generally used in the literature to refer to durations of solitary confinement that are *much* briefer than the amounts of time that *Ashker* class members have been subjected to it. For example, the American Psychiatric Association (APA) defined "prolonged segregation" as segregation lasting for *four weeks* or longer (which the APA also said "should be avoided" for the seriously mentally ill).[12] Thus, *Ashker* class members have, as a group, been subjected to durations of isolated confinement that far exceed—by substantial orders of magnitude—the amounts typically reported in the literature, studied by researchers, and considered psychiatrically problematic.

19.     I should note that the opinions I have reached in this case concerning the current use, nature, and effects of long-term isolated confinement in the PBSHU are no longer preliminary, as they were in my April 30, 2013 declaration. They are now based on an extensive amount of data, including the aforementioned interviews of samples of both long-term SHU (class members) and a comparison sample of GP prisoners, a recent tour of the PBSHU, and a substantial number of official, case-related documents. The conclusions that I reach in this Expert Report are now settled and I am confident in them.

## IV.     The Adverse Psychological Effects of Isolation

20.     "Solitary confinement" and "isolated confinement" are terms of art in correctional practice and scholarship. For perhaps obvious reasons, total and absolute solitary confinement—literally *complete* isolation from any form of

---

[12] American Psychiatric Association, *Position Statement on Segregation of Prisoners with Mental Illness* (2012), *available at* http://www.psych.org/File%20Library/Learn/Archives/ps2012 _PrisonerSegregation.pdf.

11

**Exhibit 9 -  163**

human contact—does not exist in prison and never has. Instead, the term is generally used to refer to conditions of extreme (but not total) isolation from others. I have defined it elsewhere, in a way that is entirely consistent with its use in the broader correctional literature, as:

> [S]egregation from the mainstream prisoner population in attached housing units or free-standing facilities where prisoners are involuntarily confined in their cells for upwards of 23 hours a day or more, given only extremely limited or no opportunities for direct and normal social contact with other persons (i.e., contact that is not mediated by bars, restraints, security glass or screens, and the like), and afforded extremely limited if any access to meaningful programming of any kind.[13]

21.　　This definition is similar to the one employed by the National Institute of Corrections (NIC), as cited by Chase Riveland in a standard reference work on solitary-type confinement that was sponsored and disseminated by the United States Department of Justice. Riveland noted that the NIC itself had defined solitary or "supermax" housing as occurring in a "freestanding facility, or a distinct unit within a freestanding facility, that provides for the management and secure control of inmates" under conditions characterized by "separation, restricted movement, and limited access to staff and other inmates."[14] More recently, the Department of Justice employed a similar definition, noting that "the terms 'isolation' or 'solitary confinement' mean the state of being confined to one's cell for approximately 22 hours per day or more, alone or with other

---

[13] Haney, *The Social Psychology of Isolation, supra* note 11, at footnote 1. Obviously, there is little or no difference between 22.5 hours of cell confinement, as practiced at Pelican Bay SHU, and the 23 hours referred to here.

[14] Chase Riveland, *Supermax Prisons: Overview and General Considerations. National Institute of Corrections.* Washington DC: United States Department of Justice (1999), at p. 3, *available at* http://static.nicic.gov/Library/014937.pdf.

12

**Exhibit 9 - 164**

<u>prisoners, that limits contact with others</u>… An isolation unit means a unit where all or most of those housed in the unit are subjected to isolation."[15]

22.     Even prisoners in "isolated confinement" who are "double-celled" (i.e., housed with another prisoner) may nonetheless suffer many of the negative psychological effects that are described in the paragraphs below. In fact, in some ways, prisoners who are double-celled in an isolation unit have the worst of both worlds: they are "crowded" in and confined with another person inside a small cell but—and this is the crux of their "isolation"—simultaneously isolated from the rest of the mainstream prisoner population, deprived of even minimal freedom of movement, prohibited from access to meaningful prison programs, and denied opportunities for any semblance of "normal" social interaction.[16]

23.     As I noted in passing above, researchers and practitioners know that meaningful social interactions and social connectedness can have a positive effect on people's physical and mental health and, conversely, that social isolation in general is potentially very harmful and can undermine health and psychological well-being.[17] Not surprisingly, there is now a reasonably large and

---

[15] United States Department of Justice, Letter to the Honorable Tom Corbett, Re: *Investigation of the State Correctional Institution at Cresson and Notice of Expanded Investigation*, May 31, 2013, at p. 5 (emphasis in original), *available at* http://www.justice.gov/crt/about/spl/documents/cresson_findings_5-31-13.pdf, citing also to Wilkinson v. Austin, 545 U.S. 209, 214, 224 (2005), where the United States Supreme Court described solitary confinement as limiting human contact for 23 hours per day, and; Tillery v. Owens, 907 F.2d 418, 422 (3d Cir. 1990), where the Third Circuit described it as limiting contact for 21 to 22 hours per day.

[16] This is especially problematic if prisoners are involuntarily double-celled, have little or no choice over the identity of the person with whom they are double-celled, and have no practical or feasible means of changing cellmates if they become incompatible. Even under the best of circumstances, however, double-celling under conditions of otherwise isolated confinement may be difficult for prisoners to accommodate to.

[17] For example, see: Brock Bastian & Nick Haslam, *Excluded from Humanity: The Dehumanizing Effects of Social Ostracism*, Journal of Experimental Social Psychology, 46, 107-113 (2010);

13

**Exhibit 9 -  165**

growing literature on the significant risk that solitary or so-called "supermax" confinement poses for the mental health of prisoners. The long-term absence of meaningful human contact and social interaction, the enforced idleness and inactivity, and the oppressive security and surveillance procedures, and the accompanying hardware and other paraphernalia that are brought or built into these units combine to create harsh, dehumanizing, and deprived conditions of confinement. These conditions predictably can impair the psychological functioning of the prisoners who are subjected to them.[18] For some prisoners, these impairments can be permanent and life-threatening.

24.   In the admitted absence of a single "perfect" study of the phenomenon,[19] there is a substantial body of published literature that clearly

---

Stephanie Cacioppo & John Cacioppo, *Decoding the Invisible Forces of Social Connections*, Frontiers in Integrative Neuroscience, 6, 51 (2012); DeWall, et al., *Belongingness as a Core Personality Trait: How Social Exclusion Influences Social Functioning and Personality Expression*, Journal of Personality, 79, 979-1012 (2011); Damiano Fiorillo & Fabio Sabatini, *Quality and Quantity: The Role of Social Interactions in Self-Reported Individual Health*, Social Science & Medicine, 73, 1644-1652 (2011); S. Hafner et al., *Association Between Social Isolation and Inflammatory Markers in Depressed and Non-depressed Individuals: Results from the MONICA/KORA Study*, Brain, Behavior, and Immunity, 25, 1701-1707 (2011); Johan Karremans, et al., *Secure Attachment Partners Attenuate Neural Responses to Social Exclusion: An fMRI Investigation*, International Journal of Psychophysiology, 81, 44-50 (2011); Graham Thornicroft, *Social Deprivation and Rates of Treated Mental Disorder: Developing Statistical Models to Predict Psychiatric Service Utilisation*, British Journal of Psychiatry, 158, 475-484 (1991).

[18] For example, see: Kristin Cloyes, David Lovell, David Allen & Lorna Rhodes, *Assessment of Psychosocial Impairment in a Supermaximum Security Unit Sample*, Criminal Justice and Behavior, 33, 760-781 (2006); Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, *supra* note 11; and Peter Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, in Michael Tonry (Ed.), Crime and Justice (pp. 441-528). Volume 34. Chicago: University of Chicago Press (2006).

[19] No more than basic knowledge of research methodology is required to design the "perfect" study of the effects of solitary confinement: dividing a representative sample of prisoners (who had never been in solitary confinement) into two groups by randomly assigning half to either a treatment condition (say, two or more years in solitary confinement) or a control condition (the same length of time residing in a typical prison housing unit), and conducting longitudinal assessments of both groups (i.e., before, during, and after their experiences), by impartial researchers skilled at gaining the trust of prisoners (including ones perceived by the prisoner-participants as having absolutely no connection to the prison administration). Unfortunately, no more than basic knowledge of the realities of prison life and the practicalities of conducting

14

**Exhibit 9 - 166**

documents the distinctive patterns of psychological harm that can and do occur when persons are placed in solitary confinement. These broad patterns have been consistently identified in personal accounts written by persons confined in isolation, in descriptive studies authored by mental health professionals who worked in many such places, and in systematic research conducted on the nature and effects of solitary or "supermax" confinement. The studies have now spanned a period of over four decades, and were conducted in locations across several continents by researchers with different professional expertise, ranging from psychiatrists to sociologists and architects.[20]

25.    For example, mental health and correctional staff who have worked in disciplinary segregation and isolation units have reported observing a range of problematic symptoms manifested by the prisoners confined in these places.[21]

---

research in prisons is required to understand why such a study would be impossible to ever conduct. Moreover, any prison system that allowed truly independent, experienced researchers to perform even a reasonable approximation of such a study would be, almost by definition, so atypical as to call the generalizability of the results into question. Keep in mind also that the assessment process itself—depending on who carried it out, how often it was done, and in what manner—might well provide the solitary confinement participants with more meaningful social contact than they are currently afforded in a number of such units with which I am familiar, thereby significantly changing (and improving) the conditions of their confinement.

[20] For example, see: Arrigo, B., & Bullock, J., *The Psychological Effects of Solitary Confinement on Prisoners in Supermax Units: Reviewing What We Know and What Should Change*, International Journal of Offender Therapy and Comparative Criminology, 52, 622-640 (2008); Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement,* and Haney & Lynch, *Regulating Prisons of the Future, supra* note 11; and Smith, *The Effects of Solitary Confinement on Prison Inmates, supra* note 17. The latter two citations to my own writing are included here because they contain an extensive number of references citing to the work of numerous other researchers (in lieu of reproducing those long lists of studies separately here). My own work builds on the work of those other researchers and my findings and conclusions are consistent with and corroborative of them.

[21] For detailed reviews of all of these psychological issues, and references to the many empirical studies that support these statements, see, for example: Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, and Haney & Lynch, *Regulating Prisons of the Future, supra* note 11; and Smith, *The Effects of Solitary Confinement on Prison Inmates, supra* note 18.

15

**Exhibit 9 -  167**

The authors of one of the early studies of solitary confinement summarized their findings by concluding that "[e]xcessive deprivation of liberty, here defined as near complete confinement to the cell, results in deep emotional disturbances."[22]

26.     A decade later, Professor Hans Toch's large-scale psychological study of prisoners "in crisis" in New York State correctional facilities included important observations about the effects of isolation.[23] After he and his colleagues had conducted numerous in-depth interviews of prisoners, Toch concluded that "isolation panic" was a serious problem in solitary confinement. The symptoms that Toch reported included rage, panic, loss of control and breakdowns, psychological regression, a build-up of physiological and psychic tension that led to incidents of self-mutilation.[24] Professor Toch noted that although isolation panic could occur under other conditions of confinement it was "most sharply prevalent in segregation." Moreover, it marked an important dichotomy for prisoners: the "distinction between imprisonment, which is tolerable, and isolation, which is not."[25]

27.     More recent studies have identified other symptoms that appear to be produced by these conditions. Those symptoms include: appetite and sleep

---

[22] Bruno M. Cormier & Paul J. Williams, *Excessive Deprivation of Liberty*, Canadian Psychiatric Association Journal, 11, 470-484 (1966), at p. 484. For other early studies of solitary confinement, see: Paul Gendreau, N. Freedman, G. Wilde, & George Scott, *Changes in EEG Alpha Frequency and Evoked Response Latency During Solitary Confinement*, Journal of Abnormal Psychology, 79, 54-59 (1972); George Scott & Paul Gendreau, *Psychiatric Implications of Sensory Deprivation in a Maximum Security Prison*, Canadian Psychiatric Association Journal, 12, 337-341 (1969); Richard H. Walters, John E. Callagan & Albert F. Newman, *Effect of Solitary Confinement on Prisoners*, American Journal of Psychiatry, 119, 771-773 (1963).

[23] Hans Toch, *Men in Crisis: Human Breakdowns in Prisons*. Aldine Publishing Co.: Chicago (1975).

[24] *Id.* at 54.

[25] *Ibid.*

16

**Exhibit 9 - 168**

disturbances, anxiety, panic, rage, loss of control, paranoia, hallucinations, and self-mutilations. Moreover, direct studies of prison isolation have documented an extremely broad range of harmful psychological reactions. These effects include increases in the following potentially damaging symptoms and problematic behaviors: anxiety, withdrawal, hypersensitivity, ruminations, cognitive dysfunction, hallucinations, loss of control, irritability, aggression, rage, paranoia, hopelessness, a sense of impending emotional breakdown, self-mutilation, and suicidal ideation and behavior.[26]

---

[26] In addition to the numerous studies cited in the articles referenced *supra* at notes 11 and 15, there is a significant international literature on the adverse effects of solitary confinement. For example, see: Henri N. Barte, *L'Isolement Carceral*, Perspectives Psychiatriques, 28, 252 (1989). Barte analyzed what he called the "psychopathogenic" effects of solitary confinement in French prisons and concluded that prisoners placed there for extended periods of time could become schizophrenic instead of receptive to social rehabilitation. He argued that the practice was unjustifiable, counterproductive, and "a denial of the bonds that unite humankind." In addition, see: Reto Volkart, *Einzelhaft: Eine Literaturubersicht* (Solitary confinement: A literature survey), Psychologie -Schweizerische Zeitschrift fur Psychologie und ihre Anwendungen, 42, 1-24 (1983) (reviewing the empirical and theoretical literature on the negative effects of solitary confinement); Reto Volkart, Adolf Dittrich, Thomas Rothenfluh, & Paul Werner, *Eine Kontrollierte Untersuchung uber Psychopathologische Effekte der Einzelhaft* (A controlled investigation on psychopathological effects of solitary confinement), Psychologie - Schweizerische Zeitschrift fur Psychologie und ihre Anwendungen, 42, 25-46 (1983) (when prisoners in "normal" conditions of confinement were compared to those in solitary confinement, the latter were found to display considerably more psychopathological symptoms that included heightened feelings of anxiety, emotional hypersensitivity, ideas of persecution, and thought disorders); Reto Volkart, et al., *Einzelhaft als Risikofaktor fur Psychiatrische Hospitalisierung* (Solitary confinement as a risk for psychiatric hospitalization), Psychiatria Clinica, 16, 365-377 (1983) (finding that prisoners who were hospitalized in a psychiatric clinic included a disproportionate number who had been kept in solitary confinement); Boguslaw Waligora, *Funkcjonowanie Czlowieka W Warunkach Izolacji Wieziennej* (How men function in conditions of penitentiary isolation), Seria Psychologia I Pedagogika NR 34, Poland (1974) (concluding that so-called "pejorative isolation" of the sort that occurs in prison strengthens "the asocial features in the criminal's personality thus becoming an essential cause of difficulties and failures in the process of his resocialization"). See, also, Ida Koch, *Mental and Social Sequelae of Isolation: The Evidence of Deprivation Experiments and of Pretrial Detention in Denmark, in The Expansion of European Prison Systems*, Working Papers in European Criminology, No. 7, 119 (Bill Rolston & Mike Tomlinson eds. 1986) who found evidence of "acute isolation syndrome" among detainees that occurred after only a few days in isolation and included "problems of concentration, restlessness, failure of memory, sleeping problems and impaired sense of time an ability to follow the rhythm of day and night" (at p. 124). If the isolated confinement persisted—"a few weeks" or more—there was the possibility that detainees would develop "chronic isolation syndrome," including intensified difficulties with memory and concentration, "inexplicable fatigue," a "distinct emotional lability" that can include "fits of rage," hallucinations, and the "extremely common" belief among isolated prisoners that "they have gone or are going mad" (at p. 125). See, also: Michael Bauer, Stefan Priebe, Bettina

17

**Exhibit 9 - 169**

28.    In addition, a number of correlational studies have been done examining the relationship between housing type and various kinds of incident reports in prison. They show that self-mutilation and suicide are more prevalent in isolated, punitive housing units such as administrative segregation and security housing or SHU, where prisoners are subjected to solitary-like conditions of confinement. For example, clinical researchers Ray Patterson and Kerry Hughes attributed higher suicide rates in solitary confinement-type units to the heightened levels of "environmental stress" that are generated by the "isolation, punitive sanctions, [and] severely restricted living conditions" that exist there.[27] These authors reported that "the conditions of deprivation in locked units and higher-security housing were a common stressor shared by many of the prisoners who committed suicide."[28] Similarly, a team of researchers in New York recently reported that "[i]nmates punished by solitary confinement were approximately 6.9 times as likely to commit acts of self-harm after we controlled for the length of jail stay, SMI [whether the inmate was seriously mentally ill],

---

Haring & Kerstin Adamczak, *Long-Term Mental Sequelae of Political Imprisonment in East Germany*, Journal of Nervous & Mental Disease, 181, 257-262 (1993), who reported on the serious and persistent psychiatric symptoms suffered by a group of former East German political prisoners who sought mental health treatment upon release and whose adverse conditions of confinement had included punitive isolation.

[27] Raymond Patterson & Kerry Hughes, *Review of Completed Suicides in the California Department of Corrections and Rehabilitation, 1999-2004,* Psychiatric Services, 59, 676-682 (2008), at p. 678.

[28] Ibid. See also: Lindsay M. Hayes, *National Study of Jail Suicides: Seven Years Later.* Special Issue: Jail Suicide: A Comprehensive Approach to a Continuing National Problem, Psychiatric Quarterly, 60, 7 (1989); Alison Liebling, *Vulnerability and Prison Suicide,* British Journal of Criminology, 36, 173-187 (1995); and Alison Liebling, *Prison Suicide and Prisoner Coping,* Crime and Justice, 26, 283-359 (1999).

18

**Exhibit 9 -  170**

age, and race/ethnicity."[29] In addition, signs of deteriorating mental and physical health (beyond self-injury), other-directed violence, such as stabbings, attacks on staff, and property destruction, and collective violence are also more prevalent in these units.[30]

29.     The empirical consensus on the harmfulness of isolated or solitary-type confinement is very broad. I say that despite the fact that there is one study that has been cited for a different conclusion. The so-called "Colorado Study" of *one year* in "administrative segregation," is sometimes referenced as evidence that isolated confinement does not pose a significant risk to the psychological well-being of inmates. In addition to the fact that the Colorado Study focused on one year in administrative segregation, as opposed to the core issue in the present case—the effects of severe isolation for ten (10) years or more—there are several other reasons why the Colorado Study is a singularly inappropriate study on which to rely. They establish the fact that this study should not serve as the basis for minimizing or ignoring the grave risk of "psychological damage to inmates" that occurs in isolation units like those at issue in the *Ashker* case.

---

[29] Fatos Kaba, et al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, American Journal of Public Health, *104*, 442-447 (2014), at p. 445.

[30] For example, see: Howard Bidna, *Effects of Increased Security on Prison Violence*, Journal of Criminal Justice, 3, 33-46 (1975); K. Anthony Edwards, *Some Characteristics of Prisoners Transferred from Prison to a State Mental Hospital*, Behavioral Sciences and the Law, 6, 131-137 (1988); Elmer H. Johnson, *Felon Self-Mutilation: Correlate of Stress in Prison*, in Bruce L. Danto (Ed.) Jail House Blues. Michigan: Epic Publications (1973); Anne Jones, *Self-Mutilation in Prison: A Comparison of Mutilators and Nonmutilators*, Criminal Justice and Behavior, 13, 286-296 (1986); Peter Kratcoski, *The Implications of Research Explaining Prison Violence and Disruption*, Federal Probation, 52, 27-32 (1988); Ernest Otto Moore, *A Prison Environment: Its Effect on Health Care Utilization*, Dissertation Abstracts, Ann Arbor, Michigan (1980); Frank Porporino, *Managing Violent Individuals in Correctional Settings*, Journal of Interpersonal Violence, 1, 213-237 (1986); and Pamela Steinke, *Using Situational Factors to Predict Types of Prison Violence*, 17 Journal of Offender Rehabilitation, 17, 119-132 (1991).

19

**Exhibit 9 -  171**

30.      For one, the Colorado Study has been roundly criticized by a number of researchers from a variety of disciplines (psychology, psychiatry, anthropology, history, and law) as deeply flawed in its methodology. Many of these experts have published critiques of the study in which they conclude that its methodological problems are so severe as to render the results uninterpretable.[31]

31.      These and other kinds of methodological problems led well-known prison researchers David Lovell and Hans Toch to note in their critique of the study that "[d]espite the volume of the data, no systematic interpretation of the findings is possible."[32] Many other published criticisms of the study's methodology reached similar conclusions.[33]

---

[31] The serious methodological problems include: the inappropriate exposure of all groups to the key treatment variable (isolation); the continued cross-contamination of the general population and administrative segregation groups throughout the study (confounding the interpretation of any differences or similarities between them); the use of a convenience and patchwork sample rather than a representative group of participants; the failure to record (and, therefore, the inability to quantify or code) the exact nature of the conditions of confinement (especially, the amount or degree of isolation) to which each participant or group of participants was exposed; employing a single, inexperienced research assistant with only a bachelor's degree (who wore a badge identifying her to the prisoners as a department of corrections employee) to collect *all* of the study data; problematic instances in which the research assistant questioned the truthfulness of the prisoners' responses and required them to "redo" the tests being administered; the total reliance on self-reported rating scales that were created through the disaggregation and reconstruction/recombination of subscales taken from other test batteries that had not been validated with prisoner populations; and the failure to utilize even a basic interview with the study participants or to make use of the behavioral observational data that were collected (that appeared at odds with the prisoner self reports).

[32] David Lovell & Hans Toch, *Some Observations about the Colorado Segregation Study*, Correctional Mental Health Report, May/June 2011, 3-4, 14.

[33] For example, see: Stuart Grassian & Terry Kupers, *The Colorado Study Versus the Reality of Supermax Confinement*, Correctional Mental Health Report, May/June 2011, 1-4; Lorna A. Rhodes & David Lovell, *Is Adaptation the Right Question? Addressing the Larger Context of Administrative Segregation: Commentary on One Year Longitudinal Study of the Psychological Effects of Administrative Segregation*, Corrections & Mental Health, June 21, 2011, 1-9, *available at* http://community.nicic.gov/cfs-file.ashx/__key/CommunityServer.Components.PostAttachments/00.00.05.95.19/Supermax-_2D00_-T-_2D00_-Rhodes-and-Lovell.pdf; Sharon Shalev & Monica Lloyd, *If This Be Method, Yet There Is Madness in It: Commentary on One Year Longitudinal Study of the Psychological Effects of Administrative Segregation*, Corrections & Mental Health, June 21, 2011, 1-7, *available at* http://community.nicic.gov/cfs-

20

**Exhibit 9 - 172**

32. The study's numerous and serious methodological flaws notwithstanding, the authors of the Colorado Study have themselves repeatedly taken public positions that explicitly acknowledge the potentially harmful effects of prolonged prison isolation; most of them have published articles, forwarded recommendations, and drafted position papers in favor of *limiting* the use of isolation altogether and, among other things, *against* housing mentally ill prisoners inside these kinds of units. For example, Maureen O'Keefe, a researcher for the Colorado Department of Corrections and the primary author of the study, is on record as favoring significant reductions in the use of prison isolation (or "administrative segregation" as it is known in Colorado). She is also very clear about what she termed a misuse or misinterpretation of the study's results: "[W]e do not believe in any way and we do not promote the study as something to argue for the case of segregation... My interpretation is that people believe that this study sanctions administrative segregation for mentally ill and nonmentally ill alike... I do not believe that the conclusions lend to that and that is not the intended use of our study.[34]

33. In addition, two of the study's other authors, Jeffrey Metzner and Jamie Fellner, have published an article concluding that "[i]solation can be harmful to any prisoner," that the potentially adverse effects of isolation include

file.ashx/__key/CommunityServer.Components.PostAttachments/00.00.05.95.21/Supermax-_2D00_-T-_2D00_-Shalev-and-Lloyd.pdf; and Peter Scharff Smith, *The Effects of Solitary Confinement: Commentary on One Year Longitudinal Study of the Psychological Effects of Administrative Segregation*, Corrections & Mental Health, June 21, 2011, 1-11, *available at* http://community.nicic.gov/cfs-file.ashx/__key/CommunityServer.Components.PostAttachments/00.00.05.95.22/Supermax-_2D00_-T-_2D00_-Smith.pdf.

[34] Deposition of Maureen O'Keefe at 96, 101 (Oct. 25, 2013), Sardakowski v. Clements, No. 1:2012cv01326 (D. Colo. filed May 21, 2012) (Civil Action No. 12-CV-01326-RBJ-KLM).

21

**Exhibit 9 - 173**

"anxiety, depression, anger, cognitive disturbances, perceptual distortions, obsessive thoughts, paranoia, and psychosis."[35] In fact, their deep concerns over the harmfulness of isolated conditions of confinement led them to recommend that professional organizations "should actively support practitioners who work for changed segregation policies and they should use their institutional authority to press for a nationwide rethinking of the use of isolation" in the name of their "commitment to ethics and human rights."[36]

34.     Indeed, the painfulness and damaging potential of solitary confinement is underscored by the fact that it is commonly used in so-called "brainwashing" and certain forms of torture. In fact, many of the negative effects of solitary confinement are analogous to the acute reactions suffered by torture and trauma victims, including post-traumatic stress disorder ("PTSD") and the kind of psychiatric sequelae that plague victims of what are called "deprivation and constraint" torture techniques.[37]

---

[35] Jeffrey Metzner & Jamie Fellner, *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics,* Journal of the Academy of Psychiatry and Law, 38, 104-108 (2010), at p. 104, *available at* http://www.hrw.org/sites/default/files/related_material/Solitary%20Confinement%20and%20 Mental%20Illness%20in%20US%20Prisons.pdf.

[36] Id. at p. 107. In addition to the serious methodological flaws that have been identified in the Colorado Study, and the positions that virtually all of its authors have taken acknowledging the harmful effects of isolation and opposing its use with mentally ill prisoners in particular, the Colorado Department of Corrections itself has moved over the last several years to both very significantly reduce the overall number of prisoners who are housed in isolation units (again, termed "administrative segregation" there). Memo to Wardens from Lou Archuleta, Interim Director of Prisons, Colorado DOC, December 10, 2013. See, also: Jennifer Brown, *Colorado Stops Putting Mentally Ill Prisoners in Solitary Confinement*, Denver Post, Dec. 12, 2013, *available at* http://www.denverpost.com/news/ci_24712664/colorado-wont-put-mentally-ill-prisoners-solitary-confinement.

[37] Solitary confinement is among the most frequently used psychological torture techniques. In D. Foster, *Detention & Torture in South Africa: Psychological, Legal & Historical Studies*, Cape Town: David Philip (1987), Psychologist Foster listed solitary confinement among the most common "psychological procedures" used to torture South African detainees (at p. 69), and concluded that "[g]iven the full context of dependency, helplessness and social isolation common

22

**Exhibit 9 -  174**

35.     The *prevalence* of psychological symptoms (that is, the percentage of prisoners who are placed in these units who suffer from these and related signs of psychological distress) is often very high. For example, in the study that I alluded to in passing earlier in this Expert Report, I conducted systematic assessments of a randomly selected sample of 100 prisoners housed at the same facility that is the focus of the present litigation—the PBSHU. The sample was randomly selected to ensure that it consisted of a representative group of SHU prisoners. The representativeness of the sample allowed me to estimate the prevalence of psychological trauma and isolation-related pathology among the population of PBSHU prisoners. In fact, I found that every symptom of psychological distress that I measured but one (fainting spells) was suffered by more than half of the prisoners who were interviewed.[38] Many of the symptoms were reported by two-thirds or more of the prisoners assessed in this isolated housing unit, and some were suffered by nearly everyone. Well over half of the prisoners who were isolated in the PBSHU reported a constellation of symptoms—headaches, trembling, sweaty palms, and heart palpitations—that are commonly regarded as stress-related.

---

to conditions of South African security law detention, there can be little doubt that solitary confinement under these circumstances should in itself be regarded as a form of torture" (at p. 136). See also: Matthew Lippman, The *Development and Drafting of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, 27 Boston College International & Comparative Law Review, 27, 275 (1994); Tim Shallice, *Solitary Confinement—A Torture Revived?* New Scientist, November 28, 1974; F.E. Somnier & I.K. Genefke, *Psychotherapy for Victims of Torture*, British Journal of Psychiatry, 149, 323-329 (1986); and Shaun R. Whittaker, *Counseling Torture Victims*, The Counseling Psychologist, 16, 272-278 (1988).

[38] See Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement supra* note 11.

23

**Exhibit 9 -  175**

36.     I also found that almost all of the prisoners whom I evaluated in the PBSHU reported ruminations or intrusive thoughts, an oversensitivity to external stimuli, irrational anger and irritability, difficulties with attention and often with memory, and a tendency to socially withdraw. Almost as many prisoners reported a constellation of symptoms indicative of mood or emotional disorders—concerns over emotional flatness or losing the ability to feel, swings in emotional responding, and feelings of depression or sadness that did not go away. Finally, sizable minorities of the prisoners reported symptoms that are typically only associated with more extreme forms of psychopathology—hallucinations, perceptual distortions, and thoughts of suicide.

37.     It is important to note—especially in the context of the current case—that these reported symptoms of psychological trauma and the psychopathological effects of isolation came from prisoners who, by definition, were housed at the PBSHU for a maximum of no more than three (3) or four (4) years. The facility opened in 1989, and the interviews that I conducted took place just a few years later (although it is certainly true that some of the prisoners I interviewed for the study I completed in 1993 had been in isolation units at other prisons). In contrast, the prisoners in the *Ashker* Plaintiff class have been housed in the PBSHU for much longer periods of time—ten (10) years or more (in addition to, in some cases, being housed in isolation units prior to coming to the PBSHU). And, as I also noted, the Plaintiff class includes some prisoners who were interviewed by me in the PBSHU in 1992 and 1993, who reported many of the symptoms of psychological distress described above, and who are *still* at the facility.

24

**Exhibit 9 -  176**

38.     Although these specific symptoms of psychological stress and the psychopathological reactions to isolation are numerous and well-documented, and provide important indices of the risk of harm to which isolated prisoners are subjected, there are other significant aspects to the psychological pain and dysfunction that solitary confinement can produce, ones that extend beyond these specific and more easily measured symptoms and reactions. Depriving people of normal social contact and meaningful social interaction over long periods of time can damage or distort their social identities, destabilize their sense of self and, for some, destroy their ability to function normally in free society.

39.     Psychological science has long recognized the critical role of social contact in establishing and maintaining emotional health and well-being. As one researcher put it: "Since its inception, the field of psychology emphasized the importance of social connections."[39] For example, the importance of "affiliation"—the opportunity to have meaningful contact with others—in reducing anxiety in the face of uncertain or fear-arousing stimuli is long established in social psychological literature.[40] In addition, one of the ways that people determine the appropriateness of their feelings—indeed, how we establish

---

[39] DeWall, C., *Looking Back and Forward: Lessons Learned and Moving Forward*, in C. DeWall (Ed.), The Oxford Handbook of Social Exclusion (pp. 301-303). New York: Oxford University Press (2013), at p. 301.

[40] For example, see: Stanley Schachter, *The Psychology of Affiliation: Experimental Studies of the Sources of Gregariousness*. Stanford, CA: Stanford University Press (1959); Irving Sarnoff & Philip Zimbardo, *Anxiety, Fear, and Social Affiliation*, Journal of Abnormal Social Psychology, 62, 356-363 (1961); Philip Zimbardo & Robert Formica, *Emotional Comparison and Self-Esteem as Determinants of Affiliation*, Journal of Personality, 31, 141-162 (1963).

25

**Exhibit 9 -  177**

the very nature and tenor of our emotions—is through contact with others.[41]

Prolonged social deprivation is painful and destabilizing in part because it deprives persons of the opportunity to ground their thoughts and emotions in a meaningful social context—to know what they feel and whether those feelings are appropriate.

40.     Since this early research was conducted on the importance of affiliation, numerous scientific studies have established the psychological significance of social contact, connectedness and belongingness. They have concluded, among other things, that the human brain is literally "wired to connect" to others.[42] Thwarting this "need to connect" not only undermines psychological well-being but increases physical morbidity and mortality.

41.     Indeed, in part out of recognition of the importance of the human need for social contact, connection, and belongingness, social psychologists and others have written extensively about the harmful effects of its deprivation—what happens when people are subjected to social exclusion and isolation. Years ago, Herbert Kelman argued that denying persons of contact with others was a form of dehumanization.[43]  More recently, others have documented the ways in which

---

[41] For example, see: A. Fischer, A. Manstead, & R. Zaalberg, *Social Influences on the Emotion Process*, in M. Hewstone & W. Stroebe (Eds.), European Review of Social Psychology (pp. 171-202). Volume 14. Wiley Press (2004); C. Saarni, *The Development of Emotional Competence*. New York: Guilford Press (1999); Stanley Schachter & Jerome Singer, *Cognitive, Social, and Physiological Determinants of Emotional State*, Psychological Review, 69, 379-399 (1962); L. Tiedens & C. Leach (Eds.), *The Social Life of Emotions*. New York: Cambridge University Press (2004); and S. Truax, *Determinants of Emotion Attributions: A Unifying View*, Motivation and Emotion, 8, 33-54 (1984).

[42] Lieberman, M., Social: Why Our Brains Are Wired to Connect. New York: Random House (2013).

[43] Kelman, H., *Violence Without Restraint: Reflections on the Dehumanization of Victims and Victimizers*. In G. Kren & L. Rappaport (Eds.), Varieties of Psychohistory (pp. 282-314). New York: Springer (1976).

26

**Exhibit 9 -  178**

social exclusion is not only "painful in itself," but also "undermines people's sense of belonging, control, self-esteem, and meaningfulness, reduces pro-social behavior, and impairs self-regulation."[44] Indeed, the subjective experience of social exclusion results in what have been called "cognitive deconstructive states" in which there is emotional numbing, reduced empathy, cognitive inflexibility, lethargy, and an absence of meaningful thought.[45]

42.    In fact, the editor of an authoritative *Oxford Handbook of Social Exclusion* concluded the volume by summarizing the "serious threat" that social exclusion represents to psychological health and well-being, including "increased salivary cortisol levels... and blood flow to brain regions associated with physical pain," "sweeping changes" in attention, memory, thinking, and self-regulation, as well as changes in aggression and prosocial behavior. As he put it: "This dizzying array of responses to social exclusion supports the premise that it strikes at the core of well-being."[46]

43.    In a broader sense, the social deprivation and social exclusion imposed by solitary confinement engenders *social pathology*—necessary adaptations that prisoners must make to live in an environment that is devoid of normal social contact—that is, to exist and function in the absence of meaningful interaction and closeness with others. In this socially pathological environment, prisoners have no choice but to adapt in socially pathological ways. Over time,

---

[44] Bastian & Haslam, *supra* note 17, at p. 107, internal references omitted.

[45] Twenge, J., Catanese, K., & Baumeister, R. (2003). *Social Exclusion and the Deconstructed State: Time Perception, Meaninglessness, Lethargy, Lack of Emotion, and Self Awareness.* Journal of Personality and Social Psychology, 85, 409-423 (2003).

[46] DeWall, *supra* note 38, at p. 302.

27

**Exhibit 9 -  179**

they gradually change their patterns of thinking, acting and feeling to cope with the profoundly asocial world in which they are forced to live, accommodating to the absence of social support and the routine feedback that comes from normal, meaningful social contact.

44.     There are several problematic features to the social pathologies that isolated prisoners are forced to adopt. The first is that, although these adaptations are functional—even *necessary*—under the isolated conditions in which they live, the fact that prisoners eventually "adjust" to the absence of others does not mean that the experience ceases to be painful. Some prisoners have told me that the absence of meaningful contact and the loss of closeness with others are akin to a dull ache or pain that never goes away. Others remain acutely aware of the relationships that have ended and the feelings that can never be rekindled.

45.     Second, some prisoners cope with the painful, asocial nature of their isolated existence by paradoxically creating even more distance between themselves and others. For some, the absence of others becomes so painful that they convince themselves that they do not need social contact of any kind—that people are a "nuisance," after all, and the less contact they have the better. As a result, they socially withdraw further from the world around them, receding even more deeply into themselves than the sheer physical isolation of solitary confinement and its attendant procedures require. Others move from initially being starved for social contact to eventually being disoriented and even frightened by it. As they become increasingly unfamiliar and uncomfortable with

28

**Exhibit 9 -  180**

social interaction, they are further alienated from others and made anxious in their presence.[47]

46.     Third, and finally, while these social pathological adaptations are functional and even necessary in the short-term, over time they tend to be internalized and persist long after the prisoner's time in isolation has ended. Thus, the adaptations move from being consciously employed survival strategies or noticeable reactions to immediate conditions of confinement to becoming more deeply ingrained ways of being. Prisoners may develop extreme habits, tendencies, perspectives, and beliefs that are difficult or impossible to relinquish once they are released. Although their adaptations may have been functional in isolation (or appeared to be so), they are typically acutely dysfunctional in the social world most prisoners are expected to re-enter. In extreme cases, these ways of being are not only dysfunctional but have been internalized so deeply that they become disabling, interfering with the capacity to live a remotely normal or fulfilling social life.

47.     It is also important to note that, although social deprivation is the source of the greatest psychological pain that prisoners experience in solitary confinement, and places them at the greatest risk of harm, prison isolation units deprive prisoners of many other things as well. Solitary confinement typically includes high levels of repressive control, enforced idleness, reduced environmental stimulation, and physical or material deprivations that also

---

[47] For evidence that solitary confinement may lead to a withdrawal from social contact or an increased tendency to find the presence of people increasingly aversive or anxiety arousing, see: Cormier, B., & Williams, supra note 22; Haney, *supra* note 11; H. Miller & G. Young, *Prison Segregation: Administrative Detention Remedy or Mental Health Problem?*, Criminal Behaviour and Mental Health, 7, 85-94 (1997); Scott & Gendreau, *supra* note 21; Toch, *supra* note 22; and Waligora, *supra* note 25.

29

Exhibit 9 -  181

produce psychological distress and can exacerbate the negative consequences of social deprivation. Indeed, most of the things that we know are beneficial to prisoners—such as increased participation in institutional programming, contact visits with persons from outside the prison, opportunities for meaningful physical exercise or recreation, and so on[48]—are either functionally denied or greatly restricted for prisoners who are housed in isolation units. Thus, in addition to the social pathology that is created by the experience of solitary confinement, these other stressors also can produce additional negative psychological effects.

48.     For example, we know that people in general require a certain level of mental and physical activity in order to remain mentally and physically healthy. Simply put, human beings need movement and exercise to maintain normal functioning. The severe restrictions that are imposed in isolation units— typically no more than an hour or so a day out of their cells—can negatively impact prisoners' well-being. Denying prisoners access to normal and necessary human activity places them at risk of psychological harm.

49.     Similarly, apart from the profound social, mental and physical deprivations that solitary confinement can produce, prisoners housed in these units experience prolonged periods of monotony and idleness. Many of them experience a form of sensory deprivation or "reduced environmental stimulation" —there is an unvarying sameness to the physical stimuli that surround them. These prisoners exist within the same limited spaces and are subjected to the same repetitive routines, day in and day out. There is little or no external

---

[48] J. Wooldredge, *Inmate Experiences and Psychological Well-Being*, Criminal Justice and Behavior, 26, 235-250 (1999).

30

**Exhibit 9 -  182**

variation to the experiences they are permitted to have or can create for themselves. They not only see and experience the same extremely limited physical environment, but also have minimal, routinized, and superficial contacts with the same very small group of people, again and again, for years on end. This loss of perceptual and cognitive or mental stimulation may result in the atrophy of important skills and capacities.[49]

50.     In addition, conditions of solitary confinement in most prison isolation units deprive prisoners of the opportunity to give and receive caring human touch. This is certainly true of the PBSHU, where contact visits are absolutely prohibited. In the case of Plaintiff class members, this means that they have gone for a decade or more without ever touching another person with affection. Yet, psychologists have long known that: "Touch is central to human social life. It is the most developed sensory modality at birth, and it contributes to cognitive, brain, and socioemotional development and childhood."[50] The need for caring human touch is so fundamental that early deprivation is a risk factor for neurodevelopmental disorders, depression, suicidality, and other self destructive behavior.[51] Later deprivation is associated with violent behavior in adolescents.[52]

---

[49] For examples of this range of symptoms, see: Brodsky & Scogin, *Inmates in Protective Custody: First Data on Emotional Effects*, Forensic Reports, 1, 267-280 (1988); Grassian, S., *Psychopathological Effects of Solitary Confinement*, American Journal of Psychiatry, 140, 1450-54 (1983); Haney, *supra* note 11; Miller & Young, *supra* note 47; and Volkart, et al., *supra* note 26.

[50] Hertenstein, M., Keltner, D., App, B., Bulleit, B, & Jaskolka, A., *Touch Communicates Distinct Emotions.* Emotion, 6, 528-533 (2006), at p. 528. See, also: Hertenstein, M., & Weiss, S. (Eds.), The Handbook of Touch: Neuroscience, Behavioral, and Health Perspectives. New York: Springer (2011).

[51] For example, see: Cascio, C., *Somatosensory Processes in Neurodevelopmental Disorders.* Journal of Neurodevelopmental Disorders, 2, 62-69 (2010); Field, S., *Touch Deprivation and Aggression Against Self Among Adolescents*, in Stoff, D. & Susman, E. (Ed.), Developmental psychobiology of aggression (117-140). New York: Cambridge (2005).

31

**Exhibit 9 -  183**

Recent theory and research now indicate that "touch is a primary platform for the development of secure attachments and cooperative relationships," is "intimately involved in patterns of caregiving," is a "powerful means by which individuals reduce the suffering of others," and also "promotes cooperation and reciprocal altruism."[53]

51.     The uniquely prosocial emotion of compassion "is universally signaled through touch," so that persons who live in a world without touch are denied the experience of receiving or expressing compassion in this way.[54] Researchers have found that caring human touch mediates a sense of security and place, a sense of shared companionship, of being and nurturing, feelings of worth and competence, access to reliable alliance and assistance, and guidance and support in stressful situations.[55] A number of experts have argued that caring human touch is so integral to our well being that it is actually therapeutic; it has been recommended to treat a host of maladies including depression, suicidality, and learning disabilities.[56]

---

[52] Field, T., *Violence and Touch Deprivation in Adolescents*, <u>Adolescence</u>, <u>37</u>, 735-749 (2002)

[53] Goetz, J., Keltner, D., & Simon-Thomas, E., *Compassion: An Evolutionary Analysis and Empirical Review*, <u>Psychological Bulletin</u>, <u>136</u>, 351-374 (2010), at p. 360.

[54] Stellar, J., & Keltner, D., Compassion, in Tugade, M., Shiota, M., & Kirby, L. (Eds.), <u>Handbook of Positive Emotions</u> (pp. 329-341). New York: Guilford (2014)

[55] Weiss, R., *The Attachment Bond in Childhood and Adulthood*, in C. Parkes, J. Stevenson-Hinde, & P. Marris (Eds.), <u>Attachment Across the Life Cycle</u> (66-76). London: Routledge (1995).

[56] For example, see: Dobson, S., Upadhyaya, S., Conyers, I., & Raghavan, R., *Touch in the Care of People with Profound and Complex Needs*, <u>Journal of Learning Disabilities</u>, <u>6</u>, 351-362 (2002); Field, T., *Deprivation and Aggression Against Self Among Adolescents*. In D. Stoff & E. Susman(Eds.), <u>Developmental Psychobiology of Aggression</u> (pp. 117-140). New York: Cambridge (2005)

32

**Exhibit 9 -  184**

52.    Not every isolated prisoner will suffer all of the previously described adverse psychological reactions to their severe conditions of confinement. But the overall nature and magnitude of the negative psychological reactions that I have documented in my own research and that have been reported by others in the literature underscore the stressfulness and painfulness of this kind of confinement, the lengths to which prisoners must go to adapt and adjust to it, and the risk of harm that it creates. The potentially devastating effects of these conditions are reflected in the characteristically high numbers of suicide deaths, incidents of self-harm and self-mutilation that occur in many of these units.

53.    The years of sustained research on solitary confinement, the negative outcomes that have been documented across time and locality, and the theoretical consistency of these findings with what is known more generally in the psychological literature about the harmful effects of isolation leave little doubt about its negative effects. These effects are not only painful but can do real harm and inflict real damage that is sometimes severe and can be irreversible. Indeed, for some prisoners, the attempt to cope with isolated confinement sets in motion a set of cognitive, emotional, and behavioral changes that are long-lasting. They can persist beyond the time that prisoners are housed in isolation and lead to long-term disability and dysfunction.

54.    Thus, the accumulated weight of the scientific evidence that I have cited and summarized above documents and confirms that isolated confinement can produce a range of adverse psychological effects. We clearly do know what happens to people in prison and elsewhere in society when they are deprived of normal social contact for extended periods of time. The evidence I have

33

**Exhibit 9 -  185**

summarized above describes and details the risk of psychological harm that long-term isolation creates, including mental pain and suffering and the increased incidence of self-harm and suicide.

55. The psychological literature underscores the importance of meaningful social contact and interaction, in essence establishing these things as identifiable human needs. Over the long-term, they may be as essential to a person's psychological or mental health as adequate food, clothing, and shelter are to his or her physical well-being.

56. In large part in response to the scientific evidence that I have summarized above, and out of the recognition that meaningful social contact and interaction is central to psychological health and well-being, virtually every major human rights and mental health organization in the United States as well as internationally have taken public stands in favor of significantly limiting solitary or isolated confinement use (if not abandoning it altogether). These organizations include major legal, medical, and health organizations, as well as faith communities and international monitoring bodies.[57]

---

[57] See, e.g., Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *Interim Report of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, U.N. Doc A/66/268, ¶¶ 76-78 (Aug. 5, 2011) (asserting that solitary confinement for longer than 15 days constitutes torture, and that juveniles and people with mental illness should never be held in solitary confinement); American Academy of Child and Adolescent Psychiatry, *Solitary Confinement of Juvenile Offenders* (2012), *available at* http://www.aacap.org/AACAP/Policy_Statements/2012/Solitary_Confinement_of_Juvenile_Offenders.aspx (opposing "the use of solitary confinement in correctional facilities for juveniles," stating that "any youth that is confined for more than 24 hours must be evaluated by a mental health professional," and aligning AACAP with the United Nations Rules for the Protection of Juveniles Deprived of their Liberty, which includes among "disciplinary measures constituting cruel, inhuman or degrading treatment" "closed or solitary confinement or any other punishment that may compromise the physical or mental health of the juvenile concerned"); American Psychiatric Association, *Position Statement on Segregation of Prisoners with Mental Illness* (2012), *available at* http://www.psych.org/File%20Library/Learn/Archives/ps2012_PrisonerSegregation.pdf ("Prolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates.");

34

**Exhibit 9 - 186**

57.    In fact, in recognition of the adverse mental health effects of segregated, solitary, or isolated confinement, the American Bar Association's *Standards for Criminal Justice on the Treatment of Prisoners* mandate that "[s]egregated housing should be for the briefest term and under the least

---

American Public Health Association, *Solitary Confinement as a Public Health Issue*, Policy No. 201310 (2013), *available at* http://www.apha.org/advocacy/policy/policysearch/default.htm?id=1462 (detailing the public-health harms of solitary confinement; urging correctional authorities to "eliminate solitary confinement for security purposes unless no other less restrictive option is available to manage a current, serious, and ongoing threat to the safety of others"; and asserting that "[p]unitive segregation should be eliminated"); Mental Health America, *Seclusion and Restraints, Policy Position Statement 24* (2011), *available at* http://www.nmha.org/positions/seclusion-restraints ("urg[ing] abolition of the use of seclusion . . . to control symptoms of mental illnesses"); National Alliance on Mental Illness, *Public Policy Platform Section 9.8*, *available at* http://www.nami.org/Template.cfm?Section=NAMI_Policy_Platform&Template=/ContentManagement/ContentDisplay.cfm&ContentID=38253 ("oppos[ing] the use of solitary confinement and equivalent forms of extended administrative segregation for persons with mental illnesses"); Society of Correctional Physicians, *Position Statement, Restricted Housing of Mentally Ill Inmates* (2013), *available at* http://societyofcorrectionalphysicians.org/resources/position-statements/restricted-housing-of-mentally-ill-inmates ("acknowledg[ing] that prolonged segregation of inmates with serious mental illness, with rare exceptions, violates basic tenets of mental health treatment," and recommending against holding these prisoners in segregated housing for more than four weeks); New York State Council of Churches, *Resolution Opposing the Use of Prolonged Solitary Confinement in the Correctional Facilities of New York State and New York City* (2012), *available at* https://sites.google.com/site/nyscouncilofchurches /priorities/on-solitary-confinement; Presbyterian Church (USA), *Commissioners' Resolution 11-2, On Prolonged Solitary Confinement in U.S. Prisons* (2012), *available at* https://pc-biz.org/MeetingPapers/(S(em2ohnl5h5sdehz2rjteqxtn))/Explorer.aspx?id=4389  (urging all members of the faith to participate in work to "significantly limit the use of solitary confinement"); Rabbinical Assembly, *Resolution on Prison Conditions and Prisoner Isolation* (2012), *available at* http://www.rabbinicalassembly.org/story/resolution-prison-conditions-and-prisoner-isolation?tp=377 (calling on prison authorities to end prolonged solitary confinement, and the solitary confinement of juveniles and of people with mental illness); American Bar Association, *ABA Criminal Justice Standards on the Treatment of Prisoners, Standards* 23-2.6-2.9, 23-3.8, 23-5.5 (2010), *available at* http://www.americanbar.org /publications/criminal_justice_section_archive/crimjust_standards_treatmentprisoners.html (limiting acceptable rationales for segregated housing and long-term segregated housing, stating that no prisoners with serious mental illness should be placed in segregation, requiring monitoring of mental-health issues in segregation, and requiring certain procedures for placement in long-term segregation, generally characterizing segregated housing as a practice of last resort, and requiring social interaction and programming for those placed in segregation for their own protection); New York Bar Association, *Committee on Civil Rights Report to the House of Delegates: Solitary Confinement in New York State 1-2 Resolution* (2013), *available at* http://www.nysba.org/WorkArea/DownloadAsset.aspx?id=26699 (calling on state officials to significantly limit the use of solitary confinement, and recommending that solitary confinement for longer than 15 days be proscribed).

35

**Exhibit 9 -  187**

restrictive conditions practicable."[58] Moreover, the ABA requires that the mental health of *all* prisoners in segregated housing "should be monitored" through a process that should include daily correctional staff logs "documenting prisoners' behavior," the presence of a "qualified mental health professional" inside each segregated housing unit "[s]everal times a week," weekly observations and conversations between isolated prisoners and qualified mental health professionals, and "[a]t least every [90 days], a qualified mental health professional should perform a comprehensive mental health assessment of each prisoner in segregated housing" (unless such assessment is specifically deemed unnecessary in light of prior individualized observations).[59] In addition, at intervals "not to exceed [30 days], correctional authorities should meet and document an evaluation of each prisoner's progress" in an evaluation that explicitly "should also consider the nature of the prisoner's mental health," and at intervals "not to exceed [90 days], a full classification review" should be conducted that addresses the prisoner's "individualized plan" in segregation with "a presumption in favor of removing the prisoner from segregated housing."[60]

58.     Finally, in addition to prominent human rights, mental health, and legal organizations, distinguished expert panels that have investigated and analyzed these issues have reached similar conclusions. For example, in a 2006 published report based in part on a series of fact-finding hearings conducted in

---

[58] American Bar Association, *ABA Criminal Justice Standards on the Treatment of Prisoners, Standard 23-2.6(a)* (2010), *available at* http://www.americanbar.org /publications/criminal_justice_section_archive/crimjust_standards_treatmentprisoners.html [hereinafter *"ABA Standards"*].

[59] *ABA Standards*, 23-2.8(b).

[60] *ABA Standards*, 23-2.9.

36

**Exhibit 9 -  188**

the United States, in which diverse groups of nationally recognized experts testified about a wide range of prison issues, the bipartisan Commission on Safety and Abuse in America's Prisons concluded that solitary and "supermax"-type units were "expensive and soul destroying"[61] and recommended that prison systems "end conditions of isolation."[62]

59.     Later that same year, an international group of prominent mental health and correctional experts meeting on psychological trauma in Istanbul, Tukey issued a joint statement on "the use and effects of solitary confinement." In what has come to be known as the "Istanbul Statement," they acknowledged that the "central harmful feature" of solitary confinement is its reduction of meaningful social contact to a level "insufficient to sustain health and well being."[63] Citing various statements, comments, and principles that had been previously issued by the United Nations—all recommending that the use of solitary confinement be carefully restricted or abolished altogether—the Istanbul group concluded that "[a]s a general principle solitary confinement should only be used in very exceptional cases, for as short a time as possible and only as a last resort." Notably, the specific recommendations they made about how such a regime should be structured and operated would, if adopted, end most forms of long-term isolated confinement.

---

[61] Gibbons, John, and Katzenbach, Nicholas. *Confronting Confinement: A Report of the Commission on Safety and Abuse in America's Prisons*. New York: Vera Institute of Justice (2006), at p. 59, *available at* http://www.vera.org/sites/default/files/resources/downloads/Confronting_Confinement.pdf.

[62] Id. at p. 57.
[63] International Psychological Trauma Symposium, *Istanbul Statement on the Use and Effects of Solitary Confinement*. Istanbul, Turkey (December 9, 2007), *available at* http://www.univie.ac.at/bimtor/dateien/topic8_istanbul_statement_effects_solconfinment.pdf

37

**Exhibit 9 -  189**

60.    In summary, the conclusion that long-term solitary or isolated confinement subjects prisoners to significant risk of grave psychological harm is theoretically sound, has widespread empirical support, and reflects the overwhelming consensus view of human rights, mental health, and legal organizations as well as expert groups that have carefully considered the issue.

## V.    The Nature of Solitary Confinement at the Pelican Bay SHU

61.    As I noted above, the adverse psychological effects of solitary confinement are thought to vary as a function of the specific nature and duration of the isolated conditions to which prisoners are exposed. In this regard, there are better and worse isolation or supermax units, including some that have implemented practices and procedures intended to ameliorate the harsh conditions otherwise imposed and minimize the harm that they inflict on prisoners. It is also important to note that there are more and less resilient prisoners, including some who seem able to withstand the painfulness of these environments and to recover from the experience with few if any lasting effects, as well as others whose pre-existing vulnerabilities render them especially susceptible to isolation-related harm. None of these facts undermines the overall consensus that has emerged about the harmful effects of long-term isolation and the serious risk of harm that this form of confinement poses for all prisoners who are subjected to it.

62.    As I noted in passing above, although my evaluation of the effects of long-term confinement in the Pelican Bay SHU was in a preliminary stage when I wrote in support of the Plaintiffs' class certification in April, 2013, the opinions that are contained in the present Expert Report are based on a very substantial

38

**Exhibit 9 -  190**

amount of additional data that I have collected and analyses I have conducted since then. These include an onsite inspection of current conditions of confinement at the facility, in-person confidential interviews with an additional group of eight (8) class members selected by the attorneys, a more sizable, representative sample of forty-one (41) class members (prisoners housed in the PBSHU for 10 years or more), a sample of twenty-five (25) long-term (10 years or more) current Pelican Bay GP prisoners with whom the SHU prisoners could be compared, and the review of an extensive amount of additional discovery material.

63.    To reiterate something that I previously asserted, the PBSHU is very clearly built and operated as a solitary confinement or "supermax" prison. Indeed, in correctional circles it is regarded as one of the "prototypes" of the "supermax" prison form. Based on my tour of the facility in April, 2014 and the numerous interviews I conducted with prisoners, as well as the numerous passing conversations I have had with correctional staff and observations made onsite, it is clear that the PBSHU's essential features—its form and function—are largely unchanged from the facility that I came to know very well from the time of the *Madrid* litigation.

64.    Of course, the extensive court order issued in *Madrid* and the subsequent monitoring of the implementation of the order changed the make-up of the prisoner population (by excluding mentally ill prisoners) and reduced the amount of excessive force used by staff. However, architecturally and procedurally, the PBSHU is remains physically structured and operated on a day-to-day basis in ways that are designed to minimize all forms of meaningful

39

**Exhibit 9 -  191**

human social contact for prisoners. To my knowledge, and in my experience, the facility continues to isolate prisoners in a manner and to a degree that rivals or exceeds any supermax prison in the world. Indeed, the level of isolation imposed at the PBSHU not only "may press the outer bounds of what most humans can psychologically tolerate,"[64] as Judge Henderson concluded in *Madrid*, but also appears to press against the outer bounds of what it is practically possible for correctional officials to achieve in terms of isolated conditions of confinement. That is, it is difficult to imagine how prisoners could be isolated much more.

65.     PBSHU prisoners live under severe conditions of confinement inside cells that they almost never leave. The cells are uniform in dimension, affording prisoners approximately 80 square feet of space. They must eat, sleep, and defecate within that same space. The prisoners' regular opportunities for out-of-cell time are restricted to approximately an hour and a half a day, when they are permitted to enter a concrete enclosed "yard" (where they have access to recently installed "pull up" bars but nothing else). In addition, three days a week, they are given 10 minutes out-of-cell time to shower, which includes the time walking to and from their cells to the shower in the housing pod. They have little or no access to meaningful programs (except what can be accomplished while they are confined to their cells) and are prohibited from group activity of any kind. Aside from the very limited number of them who are double-celled, they have no regular, meaningful contact with one another. Correctional officers instruct them not to talk from pod to pod, or between the walls of their outside

---

[64] *Madrid* v. Gomez, 889 F. Supp. 1146 (N.D. Cal. 1995), at 1267.

40

**Exhibit 9 -  192**

exercise pens. Their brief contacts with correctional staff are entirely routinized and superficial, consisting of perfunctory bureaucratic exchanges (paperwork, feeding, being placed in restraints whenever they are moved elsewhere in the prison). The physical design of the prison and the housing units ensures that even these routinized and superficial contacts are minimized. For example, the pods are overseen and prisoner movement is controlled mostly through the use of electronic locking mechanisms, operated by staff who stay primarily in a central "control booth" inside the units, physically separate and apart from the pods and the prisoners.

66.     The remote geographical location of the facility means that prisoners—the overwhelming majority of whom are from Southern California—have very few visitors.[65] Because all of their visits (social and legal) are held on a non-contact basis—through glass and over phones—prisoners are denied the opportunity to <u>ever</u> physically touch another human being with affection. Until recently, all PBSHU prisoners were prohibited from ever making or receiving a phone call (except when they received bereavement calls notifying them that an immediate family member had died). This meant that they never heard the voices of those loved ones who were unable to visit them.[66] As I say, it is hard to imagine

---

[65] The one-way driving distance between the Los Angeles area (the area from which the largest group of PBSHU prisoners resided) and Crescent City is well over 700 miles and takes nearly 13 hours to drive.

[66] It is my understanding that prisoners placed in Steps 1 or 2 of the Step Down Program at PBSHU are allowed one 15 minute phone call after completing a step. Steps 1 and 2 are designed as one year each but can be accomplished in a minimum of 6 months. A prisoner who is placed in the Step Down Program but who is not participating satisfactorily can "plateau" or "freeze" in Step 1 or 2 and therefore not "earn" any phone calls.

41

**Exhibit 9 -  193**

a level of prison isolation—the extent to which the prisoners are isolated from each other and from the outside world—that is more total and complete.

67.    In addition, the duration of the isolation to which Plaintiff class members are subjected is largely out of step with sound correctional practices with which I am familiar, and with current national trends (not only reducing the numbers of prisoners housed in isolation but also placing limits on the lengths of time they stay there). It is worth noting that the United Nations Special Rapporteur concluded that solitary confinement lasting for longer than *15 days* can constitute torture[67] and, as I mentioned earlier, the American Psychiatric Association defined "prolonged segregation" as segregation lasting for *four weeks* or longer (which the APA said "should be avoided" for the seriously mentally ill).[68] At the time that the *Ashker* litigation commenced, the press reported that, based on information obtained from CDCR, there were an estimated 500 prisoners who had been continuously housed under these draconian conditions for 10 years or more.[69] Approximately 78 had been at the PBSHU for 20 years or more, some since the very day the facility opened in December, 1989.

68.    It is my opinion that the conditions of extreme social isolation and enforced idleness that were described in the documents that I have reviewed and the interviews that I have conducted are equivalent to (or much harsher than) the

---

[67] United Nations Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *Interim Report of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, supra* note 57.

[68] American Psychiatric Association, *Position Statement on Segregation of Prisoners with Mental Illness, supra* note 57.

[69] http://www.scpr.org/news/2011/08/23/28382/pelican-bay-prison-officials-say-they-lock-gang-bo/

42

**Exhibit 9 -  194**

types of isolation conditions that I have seen and studied in other correctional institutions and about which the literature I have summarized in the preceding section of this Expert Report refers. The PBSHU is what *is* meant by the term "supermax" prison and, if the prisoners there are not being subjected to "solitary confinement," then solitary confinement has never existed in modern corrections history.

69.     In fact, as I say, the only way in which the conditions and practices at PBSHU differ is that, as noted above, they are more extreme (i.e., more isolating) than most, and the lengths of time to which Plaintiff class members have been exposed to them are truly extraordinary. Such conditions and durations are truly harsh and severe by any measure and are precisely the kind that create a risk of substantial harm for all the prisoners who are subjected to them.

70.     It is important to note also that all of the prisoners housed in the PBSHU are subjected to essentially the same harsh conditions of isolated confinement. The fact that some small number of these prisoners may be housed with cellmates (i.e., are "double-celled") does not necessarily mitigate and may even exacerbate the psychological impact of their SHU confinement. The kind of forced and strained "interactions" that take place between prisoners who are confined nearly around-the-clock in a small cell hardly constitute meaningful social contact. In fact, under these harsh and deprived conditions, the forced presence of another person may become an additional stressor and source of tension (even conflict) that exacerbates some of the negative reactions brought about by this kind of segregated confinement.

43

**Exhibit 9 -  195**

## VI. The Psychological Effects of Long-Term Solitary Confinement at the Pelican Bay SHU (PBSHU)

71. In this section of my Expert Report I discuss the extensive *Ashker*-related empirical data that I have been able to collect over the last several years. These data document many of the ways that long-term isolation adversely affects prisoners housed in the PBSHU. I have collected and analyzed several distinct kinds of evidence that I discuss separately below, before reaching overall conclusions about their combined significance.

### A. The Overall Psychological Status of the Current PBSHU Population

72. The data acquired directly from PBSHU prisoners are based primarily on a series of confidential, structured interviews that I conducted with them. The interviews consisted of several different kinds of questions to elicit the following information: demographic data (e.g., age, race/ethnicity, marital status), estimated prison sentence and time in prison (including time spent in Ad Seg and/or SHU, at Pelican Bay or elsewhere), a brief account of each prisoner's social and institutional history, and whether or not the prisoner had recently (over the last three month period) been bothered by any of a number of very specific symptoms or reactions. The specific questions consisted of a 27-item symptom checklist that addressed indices of psychological stress or trauma as well as adverse isolation-related pathological reactions that have been reported in the literature. Those prisoners who reported suffering from a symptom were asked whether they experienced it rarely, sometimes, often, or constantly (with a corresponding range in scores from 1 to 4 for purposes of data analysis).

44

**Exhibit 9 - 196**

### 1) Re-Interviews with Prisoners from the Original *Madrid* Sample

73.    The small group of seven (7) prisoners whom I interviewed in April, 2013, represent an important starting point for understanding the effects of long-term PBSHU isolation. As I noted in my earlier declaration, each of them was a member of the original sample of a hundred (100) prisoners whom I interviewed in 1993, in conjunction with then pending *Madrid* litigation. At that time, I selected them randomly from the PBSHU roster and, along with the others I interviewed, they were representative of the larger group of prisoners who were then housed at the PBSHU. The results of the interviews from this original sample formed part of the basis for my testimony in *Madrid*.

74.    In April, 2013, in conjunction with this case, I re-interviewed the seven (7) prisoners from that original sample who were currently housed at the PBSHU. I frankly did not know what to expect from this group of prisoners, some of whom had been kept in PBSHU isolation continuously, virtually since the day the facility opened, some 24 years earlier. I thought it was very possible that these men had become accustomed to their isolation. Since, by definition, they had survived the experience, it was entirely possible that they might no longer be as acutely aware of the deprivations to which they had been subjected for so long a period of time, or as sensitive to the painfulness of conditions of confinement that they had now endured for more than two decades.

75.    I once wrote that "the human psyche abhors the sensation of constant pain" and, like all people, "prisoners can tolerate only so much suffering

45

**Exhibit 9 - 197**

before attempting to transform the experience to reduce its painfulness."[70] Most of us go to great lengths to avoid pain when we can, or to numb or desensitize ourselves to it when we cannot. Although the original group of PBSHU prisoners of which these men were members were clearly in pain at the time I interviewed them in 1993, I thought it was entirely possible that by 2013 they had become numbed or desensitized to the things that originally had caused them so much distress.

76.     Remarkably, instead, the interviews I conducted in April, 2013 indicated that, twenty years later, these prisoners were *still* suffering. The passage of time had not significantly ameliorated their pain or dulled the men's senses to experience it.

77.     Most of the prisoners told me that relatively little had changed at the institution over the years since *Madrid* was decided, except for several obvious and not unimportant court-ordered remedies to the unconstitutional conditions of confinement that existed there. Specifically, as I mentioned earlier and they confirmed, pursuant to the court's order, mentally ill prisoners had been removed from the facility, and the amount of excessive force used by staff had been reduced. Some of the prisoners felt that some of the most abusive staff members now no longer worked at the facility. In short, "things calmed down for a while" (Prisoner A). But the day-to-day level of isolation and deprivation remained more or less the same.

---

[70] Haney, C., Reforming Punishment: Psychological Limits to the Pains of Imprisonment. Washington, DC: American Psychological Association Books (2006), at p. 164

46

**Exhibit 9 -  198**

78. A number of the men I interviewed from this original sample told me that they felt they had, in a sense, "gotten used to" the isolation over the many years they were confined in the PBSHU. However, it was very apparent that what they meant was that they had come to regard their conditions of deprivation and isolated confinement as "normal"; indeed, it was the only life they now knew. At the same time, most acknowledged still suffering from a large number of specific adverse symptoms and reactions. Although they had come to regard their painful condition of social deprivations as "normal," they still suffered—felt—its effects, often very acutely.

79. Thus, as Table 1 illustrates, all or nearly all of these men described suffering from many stress- and isolation-related symptoms, including: anxiety (100%), depression (71%), ruminations (71%), irrational anger and irritability (86%), feelings of overall deterioration (71%), sleep disturbances (100%), the sense of an impending breakdown (71%), and social withdrawal (100%).[71] The psychological symptoms and reactions that they acknowledged to me in 2013 were very similar to the ones that they and others had reported experiencing in my 1993 study, when I posed these questions to them and to the much larger group of PBSHU prisoners I interviewed. The symptoms they reported to me also were similar to the psychiatric observations made by Dr. Kupers in his April 10, 2013 Declaration, and they are entirely consistent with the types of symptoms and the degree of suffering that the psychological literature warns are likely to occur in prisoners housed in these extreme conditions of isolated confinement.

---

[71] These percentages are based on a very small sample—only 7 prisoners—and are provided for purposes of illustration only.

47

**Exhibit 9 - 199**

**Table 1:  PSYCHOLOGICAL SYMPTOMS OF <u>RE-INTERVIEWED</u> PBSHU PRISONERS, 2013 vs. 1993 ORIGINAL SAMPLE**

**Symptoms of Psychological
Stress and Trauma**

| | <u>2013</u> | <u>1993</u> |
|---|---|---|
| Anxiety, Nervousness | 100% | [91%] |
| Headaches | 100% | [88%] |
| Lethargy, Chronic Tiredness | 100% | [84%] |
| Trouble Sleeping | 100% | [84%] |
| Impending Breakdown | 71% | [70%] |
| Perspiring Hands | 71% | [68%] |
| Heart Palpitations | 71% | [68%] |
| Loss of Appetite | 29% | [63%] |
| Dizziness | 100% | [56%] |
| Nightmares | 71% | [55%] |
| Hands Trembling | 43% | [51%] |
| Tingling Sensation* | 14% | [19%] |
| Fainting | 0% | [17%] |

2014: N=7    1993: N=100

**Psychopathological Effects
of Prolonged Isolation**

| | <u>2014</u> | <u>1993</u> |
|---|---|---|
| Ruminations | 71% | [88%] |
| Irrational Anger | 86% | [88%] |
| Oversensitivity to Stimuli | 100% | [86%] |
| Confused Thinking | 100% | [84%] |
| Social Withdrawal | 100% | [83%] |
| Chronic Depression | 71% | [77%] |
| Emotional Flatness | 86% | [73%] |
| Mood Swings | 86% | [71%] |
| Overall Deterioration | 71% | [67%] |
| Talking to Self** | 86% | [63%] |
| Violent Fantasies | 71% | [61%] |
| Perceptual Distortions | 29% | [44%] |
| Hallucinations | 0% | [41%] |
| Suicidal Thoughts | 29% | [27%] |

2014: N=7    1993: N=100

*Not necessarily a symptom of psychological stress or trauma. Included as a "control question" to provide a baseline against which to measure the significance of the trauma-related responses.

** An adaptation to isolation but not necessarily a pathological isolation-related symptom.

48

**Exhibit 9 –  200**

80.     As these data make clear, the re-interviewed prisoners from the original 1993 study remain a highly traumatized and distressed population. With only few exceptions, the prevalence of symptoms is comparable or even somewhat higher now than it was for the overall group in 1993. The exceptions involve symptoms for which, if they persisted, prisoners would likely be provided with medical or psychiatric treatment until they subsided (e.g., fainting, hallucinations), or symptoms that are unlikely to become chronic and last for two decades (e.g., a depressed appetite).

81.     It is striking to me that, some twenty years later, after what was, for many of these prisoners, a period of uninterrupted isolation, they continue to experience the acute pains of their isolated confinement. They have not reached a psychological "accommodation" with their surroundings, at least not in the sense that they are no longer able to recognize and articulate the specific dimensions of their painful existence. They still feel many symptoms associated with stress and trauma, experience the pathological reactions that isolation brings about and, after all these years, are still quite capable of describing them.

82.     As significant as these continued very high levels of specific stress- and trauma-related reactions and isolation-related symptoms are, I also found evidence of much deeper and in many ways more significant adverse changes in this group of long-term PBSHU prisoners. The deeper psychological changes stem from the fact that these men have been forced to live without any meaningful social contact or interaction for such long periods of time—for some, as I noted, several decades—and this, in turn, has stripped most of them of any

49

**Exhibit 9 -  201**

meaningful social relationships of any kind. Some have lost the sense of what a meaningful social relationship, in fact, is. Although they are surrounded by other people, they are profoundly alone.

83.     Because the Pelican Bay State Prison is so far from any population center where all but a tiny percent of the prisoners once lived, the geographical location of the SHU contributes to the level of isolation the prisoners experience. The infrequent visits (that must be conducted on a non-contact basis), combined with the absence of meaningful social contact in prison means that the overwhelming majority of prisoners will have essentially no one with whom to socially interact or relate to on a remotely regular or consistent basis. PBSHU prisoners have been forced to try to adjust to this way of being—being alone—in order to survive their prison terms. In by far the greatest number of cases, they have been forced to do so entirely on the basis of their status as reputed prison gang members or associates, rather than because of any other violent or even serious disciplinary infractions.

84.     For example, one prisoner (Prisoner A) who had been housed continuously in the PBSHU since 1989 (except for a brief one month period) told me that he had only one visit (in 2004) during that entire 24 year period. He said that although he had not received any CDCR Rules Violation Reports (commonly referred to as "115s") since 1997, he nonetheless remained housed on the "short corridor" with other prisoners whom the CDCR has judged to be gang members. As he put it, "Anything we do as validated gang members is interpreted as continuing evidence of gang activity." When I asked him one of the specific symptom questions having to do with "irrational anger" (i.e., getting any over

50

**Exhibit 9 -  202**

insignificant things or for no reason) he answered emphatically "no," and then explained, "I am angry a lot but I know why." He described being depressed all the time, telling me "this is it—it gets to you. [There are] very few signs of hope or things to look forward to." He also told me that he has become withdrawn, discourages people from coming to see him, rarely initiates conversation or contact and "I just don't feel comfortable around people." He also told me that "everyday I struggle with mental survival."

85.     Another prisoner (Prisoner B), who had been housed in the PBSHU continuously since June, 1990, told me that he has not had any violent 115s since being housed at the facility and that all of his write-ups have been for relatively minor things like talking in the law library or participating in the recent hunger strike. He said his last social visit from anyone from the outside world occurred about 15 years ago, when his wife came to see him sometime around 1998. He told me that he struggles against "isolation psychosis" and that "I fight against what is happening to me." He analogized the gradual but nonetheless damaging changes that have taken place in him this way: "If they put me in Chernobyl and gave me food and a TV and left me alone it wouldn't mean that the radioactive environment wasn't making me sick."

86.     One of the adaptations that he told me he uses to survive in what he regards as the "toxic" SHU environment in which he lives—in addition taking refuge in his writing (which he said he does often)—is to isolate himself even further, despite the conditions of near total isolation to which he is subjected: "I don't even take phone calls from outside. I don't let myself get distracted by outside events. I have to control myself. You can't worry about not hearing from

51

Exhibit 9 - 203

family or friends. You have to stay distant from them, and not let them distract you with feelings."

87.     Another one of the prisoners from this original group (Prisoner C) said: "I keep from getting too close to people because it can lead to depression. I have no intimacy in my life. I don't have a chance to relate to people with closeness. You are only allowed to deal roughly with people. You turn off your feelings. You see things and have to shut off." He also told me: "When I first got here, I trusted people. That's how I was raised. [But] you see how the officers mistreat us—it changes the way you live and look at life. You distrust everyone. The anger also builds up in you. I don't feel comfortable around people anymore."

88.     Another prisoner (Prisoner D) who had been in the PBSHU continuously since 1990, and had been in isolated confinement for several years before that, spoke at length about the asociality that had come about as a result of so many years of social deprivation. He described himself as once having been "a people person," but now finds that there are "many times I don't want any part of people. 'Keep quiet and leave me alone'—that's my motto. Don't bother me and I will do the same." He elaborated: "Just leave me alone. I have no wife, no children... leave me to do my time. That's all we <u>can</u> do in here." He was acutely aware of how profoundly he had been changed by the long-term social isolation to which he had been subjected. He told me: "I have not been around people for 28 years. I only knew my family for 18 [before he came to prison]. I don't feel close to them or [to my] homeboys, as messed up as that sounds. Even if they died..." and then his voice trailed off.

52

**Exhibit 9 - 204**

89.    Some of the prisoners from this original 1993 sample told me in 2013 that they were reluctant to talk about how asocial they had become over the years they had spent in the PBSHU. One prisoner (Prisoner E) said, "I have become anti-social in here. I get irritated when people talk to me or call my name." Then he added, "I was afraid to tell you this because it makes me sound crazy, but I decided just to tell the truth." Another (Prisoner C) said, "it is not easy to come out here and talk about this. There are a lot of guys who are going through these things, but they are embarrassed to say or admit it. There are a lot of guys who feel the stigma, the label of being weak, and it is too much to risk."

90.    In summary, this group of men who were members of the original 1993 group of PBSHU prisoners and whom I re-interviewed in 2013 reported that they were still suffering the kind of acute pain and distress that they and members of the larger sample were experiencing some twenty years earlier.  That pain and distress was manifested in the many specific symptoms that they reported suffering as well as the socially pathological adaptations to isolation that they had been forced to adopt over the last several decades.

91.    Perhaps because of the high levels of tension that pervade this environment, and the corresponding hypervigilance that prisoners in isolation continue to maintain, and perhaps because the level of deprivation is so severe, these prisoners had really not "gotten used to" the stress of this kind of confinement, despite the long period of time they had spent in the SHU. And, perhaps because they had so few if any meaningful activities to serve as distractions from their pain, and so few if any meaningful social contacts from which to derive nurturing support, they remained acutely aware of the deep

53

**Exhibit 9 -  205**

losses they continued to suffer along the way—their withering connections to family, friends, and others, and their increasing inability to function as social beings. They understood the "social death" to which they were being subjected and it pained them.[72]

### 2) Non-Randomly Selected Sample

92.    Included among the group of Plaintiff class members whom I interviewed in January, 2014, was a group of eight (8) prisoners who had been selected in advance by the attorneys (in contrast to the rest of the interviewees who were randomly selected). I did not know the status of these prisoners in advance, but interviewed them along with the others, who were part of the randomly selected group.

93.    When I subsequently received the information that allowed me to distinguish the non-randomized from the randomly selected interviewees, I disaggregated the groups and calculated the results from their interviews separately. Thus, the quantitative data from the non-randomized class members have been kept <u>separate</u> from those of the randomly selected group; they are <u>not</u> included in the comparisons between the randomly selected 2014 and 1993 SHU

---

[72] The term "social death" is used here to denote the extreme nature, magnitude, and duration of the isolation to which the Plaintiff class members have been subjected. Isolation from others this total and complete, and this punitively enforced, does not exist anywhere else in modern society. [For example, see the discussion by Harvard sociologist, Orlando Patterson, in Slavery and Social Death: A Comparative Study. Cambridge: Harvard University Press (1982).] For this reason, the long-term isolation at PBSHU is much more extreme than what researchers typically mean when they refer to "social exclusion" and "loneliness" (for example, in the research cited at footnotes 17, 39, 40-43, 45 *supra*, as well as footnote 77 *infra*) and, for this reason as well, its effects are more severe than those studied in these other, less extreme contexts.

54

**Exhibit 9 - 206**

samples nor the comparisons between the 2014 SHU and GP samples that I will report on and discuss later.

94.     The eight (8) prisoners non-randomly selected for interviews were not significantly different in terms of their levels of distress as compared to the larger randomly selected group. They reported somewhat higher prevalence rates for some symptoms and somewhat lower ones for others.[73] The results for this group of interviewees are shown in Table 2 below.

**Table 2:**          **PSYCHOLOGICAL SYMPTOMS AMONG <u>NON-RANDOMLY SELECTED</u> SAMPLE OF 2014 PBSHU PRISONERS**

**Symptoms of Psychological
Stress and Trauma**

| | |
|---|---|
| Anxiety, Nervousness | 88% |
| Headaches | 75% |
| Lethargy, Chronic Tiredness | 88% |
| Trouble Sleeping | 88% |
| Impending Breakdown | 75% |
| Perspiring Hands | 50% |
| Heart Palpitations | 75% |
| Loss of Appetite | 25% |
| Dizziness | 75% |
| Nightmares | 62% |
| Hands Trembling | 63% |
| Tingling Sensation* | 25% |
| Fainting | 0% |

---

[73] The sample did include two prisoners whose situations were somewhat different from others I interviewed, including one who had made several trips to the Psychiatric Services Unit (PSU) over the preceding several years, and another who was scheduled to be released from CDCR custody within several months of my interview. They are discussed separately and in passing below.

55

**Exhibit 9 -  207**

**Psychopathological Effects
of Prolonged Isolation**

| | |
|---|---|
| Ruminations | 63% |
| Irrational Anger | 75% |
| Oversensitivity to Stimuli | 75% |
| Confused Thinking | 75% |
| Social Withdrawal | 88% |
| Chronic Depression | 63% |
| Emotional Flatness | 63% |
| Mood Swings | 88% |
| Overall Deterioration | 88% |
| Talking to Self** | 50% |
| Violent Fantasies | 13% |
| Perceptual Distortions | 25% |
| Hallucinations | 0% |
| Suicidal Thoughts | 0% |

N=8

*Not necessarily a symptom of psychological stress or trauma. Included as a "control question" to provide a baseline against which to measure the significance of the trauma-related responses.

** An adaptation to isolation but not necessarily a pathological isolation-related symptom.

95.  I also noted that, in comparing this sample of prisoners to the randomly selected group (discussed below), that the non-randomly selected prisoners seemed to have slightly more stress- and trauma-related symptoms, and slightly fewer isolation-related symptoms (although neither difference was statistically significant). This may have stemmed from the fact that although the non-randomly selected prisoners were reacting slightly more to the immediate stressors in their environment, they were still capable of reaching out and making contact with the attorneys to voice some of their concerns. On the other hand, the randomly-selected prisoners, discussed below, were suffering somewhat more seriously from the isolation-related pathologies. Their suffering became apparent

56

**Exhibit 9 -  208**

only after they were randomly selected and questioned during my interviews.

These prisoners were more likely to be suffering silently, and in ways that would

not necessarily have been obvious to anyone who did not proactively inquire.

### 3) Randomly Selected Sample

96.     As was the case with the sample of seven (7) prisoners from the

original 1993 sample (discussed in paragraphs 73-91 above), and the group of

eight (8) prisoners I interviewed who had been selected by Plaintiffs' attorneys

(discussed in paragraphs 92-95 above), I found that the larger group of forty-one

(41) randomly selected PBSHU prisoners whom I interviewed were also suffering

greatly. They were suffering at levels comparable to those found in prisoners who

were confined in the same institution more than 20 years ago, when I first

studied it. Again, I believe that this fact in itself is remarkable. It indicates that,

even after 10 years or more in isolation, they had not acclimated fully to it but

rather continued to suffer a host of painful, problematic, and potentially

damaging psychological symptoms.

97.     In addition, as I will discuss in some detail below, the experience

had done something else to them that was not readily apparent in the case of the

1993 prisoners who, by definition had been in the PBSHU for "only" a few years.

The *Ashker* class members had been subjected to a form of "social death" as a

result of their long-term isolation. It consists of the near total the loss of

meaningful contact, connections, and relationships with other human beings. The

depth and dimensions of this loss were apparent to them and they were suffering

as a result of it. They had also been transformed by it. They were, in a very real

sense, different people because of it, people who had lost something not just in

57

**Exhibit 9 -  209**

the world but in themselves. Although they seemed resigned to never getting it back, they were deeply pained by this realization.

98.    The suffering of these prisoners takes several forms, including the high prevalence of indices of psychological stress and trauma as well as a range of isolation-related symptoms. In addition, the suffering and adverse effects are manifested in descriptions of the prisoners' subjective states of mind, brought about in response to their extraordinarily long periods of isolated confinement. The inevitable adaptations that they have been forced to make to this socially pathological environment have produced their own problematic consequences without alleviating much if any of these prisoners' ongoing psychological pain.

99.    As I noted, these latter conclusions are based on the interviews that I conducted with a representative sample of 41 *Ashker* class members, selected at random (to ensure representativeness) from a roster of PBSHU prisoners whom CDCR indicated had been confined in the facility for 10 or more years. The interviews took place in two different locations—some in one of the D Facility SHU boardrooms and some in the SHU visiting area, in January and December, 2014. As I noted earlier, I conducted a structured interview with each randomly selected PBSHU prisoner, collecting demographic information, estimated prison sentence and time in prison (including time spent in Ad Seg and/or SHU, at Pelican Bay or elsewhere), a brief account of the prisoner's social and institutional history, and whether or not the prisoner had been bothered in the last three months by any of a number of very specific psychological symptoms or reactions (and, if so, how often). The specific questions consisted of a 27-items that yielded 25 indices of psychological stress or trauma as well as adverse

58

**Exhibit 9 -  210**

isolation-related pathological reactions that have been reported in the
literature.[74]

### a) Prevalence of Reported Stress/Trauma-Related Symptoms and Isolation-Related Pathology

100.    The representative sample of members of the *Ashker* Plaintiffs—
prisoners who had served 10 years or more in the PBSHU—reported suffering
very high rates of symptoms and indices of pathological reactions, both those
associated with the experience of severe stress and trauma as well as those that
have been described in the literature as having been caused by the experience of
extreme isolation. The present sample suffered these symptoms at prevalence
rates that were very similar to the overall rates reported by the 100 PBSHU
prisoners who were interviewed in 1993 in conjunction with *Madrid*.

101.    Not only are the actual prevalence levels of reported symptoms very
similar overall, but the patterns of specific prevalence levels (i.e., ones reported
by a very high percentage of prisoners versus ones very infrequently reported) are
also very consistent between the two samples.

102.    As these data make clear, the re-interviewed prisoners from the
original 1993 study remain a highly traumatized and distressed population. With
only few exceptions, the prevalence of symptoms is comparable or even
somewhat higher now than it was for the overall group in 1993. The exceptions
involve symptoms for which, if they persisted for years, prisoners would likely
have been provided medical treatment (e.g., headaches, fainting), or ones that

---

[74] Note that, as I have indicated, two items from the full 27 item list do not necessarily indicate a stress-related reaction (in the case of the "tingling sensation" symptom) or a pathological adjustment to isolation (in the case of "talking to self"). These items have *not* been included in any of the calculations or comparisons involving overall levels of suffering and distress.

59

**Exhibit 9 -  211**

would be unlikely to endure for a decade or more (e.g., depressed appetite,

fantasizing violent revenge, or suicidality).

**Table 3:**          **PSYCHOLOGICAL SYMPTOMS AMONG PBSHU PRISONERS, 2014 vs. 1993 REPRESENTATIVE SAMPLES**

**Symptoms of Psychological
Stress and Trauma**

|  | 2014 | 1993 |
|---|---|---|
| Anxiety, Nervousness | 83% | [91%] |
| Headaches | 71% | [88%] |
| Lethargy, Chronic Tiredness | 90% | [84%] |
| Trouble Sleeping | 81% | [84%] |
| Impending Breakdown | 63% | [70%] |
| Perspiring Hands | 51% | [68%] |
| Heart Palpitations | 68% | [68%] |
| Loss of Appetite | 30% | [63%] |
| Dizziness | 76% | [56%] |
| Nightmares | 30% | [55%] |
| Hands Trembling | 42% | [51%] |
| Tingling Sensation* | 20% | [19%] |
| Fainting | 2% | [17%] |

2014: N=41     1993: N=100

**Psychopathological Effects
of Prolonged Isolation**

|  | 2014 | 1993 |
|---|---|---|
| Ruminations | 83% | [88%] |
| Irrational Anger | 88% | [88%] |
| Oversensitivity to Stimuli | 90% | [86%] |
| Confused Thinking | 98% | [84%] |
| Social Withdrawal | 88% | [83%] |
| Chronic Depression | 73% | [77%] |
| Emotional Flatness | 78% | [73%] |
| Mood Swings | 68% | [71%] |
| Overall Deterioration | 83% | [67%] |
| Talking to Self** | 66% | [63%] |
| Violent Fantasies | 37% | [61%] |
| Perceptual Distortions | 20% | [44%] |
| Hallucinations | 37% | [41%] |
| Suicidal Thoughts | 2% | [27%] |

2014: N=41     1993: N=100

*Not necessarily a symptom of psychological stress or trauma. Included as a "control question" to provide a baseline against which to gauge the trauma-related responses.

** An adaptation to isolation but not necessarily a pathological isolation-related symptom.

60

**Exhibit 9 -  212**

103.    To put these findings in context, it is important to recall the nature of the PBSHU at the time of the *Madrid* litigation and, as I alluded to earlier, at the time the data were collected in my 1993 study. I believe it is fair to say that the PBSHU in 1993 was still very much in turmoil. There was still a significant number of mentally ill prisoners housed in the SHU, and their presence in the housing pods was highly disruptive to other prisoners. Some number of those mentally ill prisoners were undoubtedly represented in my randomly drawn sample and, if so, their responses would have at least modestly elevated some of the results (at least in comparison to the 2014 sample, from which mentally ill prisoners presumably had been excluded). Finally, the PBSHU was still, in many respects, a contentious "battleground" between prisoners and correctional staff. The staff's ongoing use of excessive force became a matter of record in the course of the *Madrid* trial and Judge Henderson's opinion in the case addressed it at length. Many of the participants in the 1993 study were very focused on these conflicts and the correspondingly frequent "cell extractions" that were occurring throughout the PBSHU. The prisoners I interviewed then voiced quite a bit anger and fear that they felt as a result of these contentious, physically violent encounters which, in turn, had put the prisoners under a great deal of immediate or acute stress.

104.    Yet, remarkably in my opinion, the current long-term PBSHU prisoners are similarly traumatized, and in pain and distress. They have not reached an accommodation or equilibrium over the many years that they have been kept in isolation. Although they are "long-term" SHU prisoners, they look very much like the acutely traumatized group of prisoners whom I studied in

61

**Exhibit 9 -  213**

1993, when the prisoners at the facility were in shock over the way they were being treated, and very much in open, daily conflict with the correctional staff. On virtually every specifically measurable dimension, they are suffering nearly as much, the same, or worse, than the earlier group. Moreover, unlike this original group, who were housed under these conditions for no more than 3 or so years at the time they were assessed, the Plaintiff class members have endured this extreme form of isolated confinement for a decade or more—in many instances, much more. At the time I interviewed them, many of them held little or no hope that they would ever be free of it. Their suffering and symptomatology had changed from being "acute" to "chronic." The prisoners' painful existence had become a way of being, and their extreme adaptations to it had become part of them.

### b) Isolation-Related Suffering and Syndromes

105.    Just as with the smaller sample of prisoners whom I re-interviewed from the original 1993 sample, the larger group of PBSHU interviewees described attempts to survive their socially pathological conditions of confinement in ways that were both painful and problematic. The challenges they faced in order to survive the experience and the psychological changes that they acknowledged taking place in themselves were in many ways broader and deeper than the specific indices of trauma and other symptoms that they reported to me.

### i) The Ongoing Struggle to Maintain Sanity

106.    Although mentally ill prisoners are prohibited by the *Madrid* exclusion order from being housed at the PBSHU, many prisoners reported that

62

**Exhibit 9 -  214**

they were nonetheless engaged in a constant, ongoing struggle to maintain their sanity. For example, ████████████████ prisoner (Prisoner F) who had been in the prison system continuously since he was a teenager and had been housed in the Pelican Bay SHU for nearly 24 years told me, "You struggle to hold on to your sanity, you feel it slipping away." He told me that his coping mechanism involves rigidly maintaining a daily program or regimen from which you "never deviate." Similarly, another prisoner (Prisoner G) told me that "every day is social, mental, physical pain and you are always on the verge of succumbing to it." He said he believed people in the SHU were "losing their sanity" and that "we have so little input, variation, it wears you down…"

107.    ████████████████████████ (Prisoner E) who had been at the PBSHU for approximately 12 years told me that, "from the start, [it was] very, very difficult" to live in isolation because "you don't know what's happening to you." He also said that the feeling never really left him: "To this day, it's a struggle to fight and reverse the damage." ████████████████ (Prisoner I), ████████████████ who had been in the PBSHU for about 14 years, said: "It is not easy. Frustration, anger, resentment. You are harassed 24/7. [You] survive by trying hard to be human, as much as you can. It's rough, and the longer you are here the harder it is. It festers in your mind."

108.    ████████████████████ (Prisoner J) who had been in the PBSHU continuously for nearly 14 years, told me that "in here, the 'good' things are all material—a package or canteen—nothing psychological or spiritual." He also said that he had fought to get a visit but, "when I finally got it and they came, I didn't want to go." He told me that: "Isolation never stops fighting with your

63

**Exhibit 9 -  215**

mind, in an everyday struggle or battle [that] you have to fight through. I draw and I read, escaping in any way I can. Watch TV sometimes, work out in the morning to relieve anger and stress. But it's 'Groundhog Day'—start over the next day, which is the same over again. You fight every day not to lose your sanity." He said that one of the worst things "is not being able to have opportunities or to get help. For example, with education. We have no release in here, nothing to get involved in. We are surrounded by a wall in here. That bottles us up inside, a constant struggle spiritually and mentally."

109.    ██████████████████████ (Prisoner K) told me he had come into the prison system while still in his teens, and had spent most of his 19 years in prison in isolated confinement, including the last approximately 16 years housed continuously in the PBSHU. He said, "I grew up in here. It's all I know. I have nothing to compare it to. It's like time broke… I watch people lose it. I say, 'I don't want to be like that.' [It's] a constant struggle to stay sane… The hardest thing about this place is maintaining control of yourself against the pressure… You are trying to control chaos in a controlled space."

110.    But he had spent so much time spent in isolation that the experience had taken a toll, one that he clearly recognized: "I'm barely able to associate. I don't relate to my family. I don't understand the world. I don't remember what my house looked like, what my sister looks like. I am completely uncomfortable in the social world." And he has learned to keep his feelings hidden deep inside: "I feel I'm doing good when nobody knows what I'm thinking."

64

**Exhibit 9 -  216**

111.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Prisoner L) told me ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ that he has been in prison from the age of 20 until now, serving time on his first and only adult conviction. He told me that the last 14 of his 23 years in prison have been spent in the PBSHU, and that during that time he has had very few visits from the outside world. He told me he has had very few write ups, none of them for violent offenses. He has tried hard to adjust but constantly struggles. He said: "The more time I'm here, the angrier I get. It isn't good for the brain… I feel like a caged animal… I worry about losing my mind, ask, 'am I losing it?' It bothers me—every day I am waiting to hear from somebody and it never comes."

112.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Prisoner M) said "I think all the guys back here are going crazy and don't want to admit it. We don't talk about it because we are isolated in little boxes, and can't hold a real conversation without other people hearing it."

113.   I did interview one prisoner (Prisoner N) who initially reported to me that he had suffered very few other stress- and isolation-related symptoms— in fact, among the fewest of any of the prisoners whom I interviewed. However, his few reported symptoms did not mean that he was not struggling in a very serious way to maintain his mental health throughout his long period of isolation. He very earnestly told me that he believed that he was the victim of a diabolical plot by correctional officers, something he said he first heard them talking about—in a code that he could not quite understand—several years ago. He said that he finally determined what they were referring to—the fact that prison officials were directing some kind of an electrical "energy force" at him and other

65

**Exhibit 9 -  217**

prisoners. The energy force or wave had very powerful effect on his mind—"it made me confused and disrupted me."

114.    He told me that there were times when he felt he might not be able to tolerate this torment, and he eventually informed his family about what was happening to him. (In fact, his mother has been in contact with me and sent me information both about a civil rights case that her son filed over this and other issues and also included some information that he was able to acquire about some kind of military weapon that used some form of electronic or radio waves similar to the ones he believed the PBSHU staff was using against him.) He told me that other prisoners also had experienced some of these same effects but that he was the only one to have "figured it out." In addition, he said that a prison mental health staff member ████████ knew what the COs were doing to the prisoners with these electronic waves or forces and that he knowingly acquiesced in it.

115.    At one point, apparently because he voiced his concerns about this openly to staff, or made a paranoid-sounding reference to them in a CDCR grievance form (commonly known as a "602") that he filed, he was forcibly removed from his cell and taken involuntarily to the PSU for a mental health evaluation. After a brief stay there, he said, he was given a clean bill of mental health and returned to SHU, where he continued to be housed.[75] He explicitly

---

[75] I reviewed documents that Prisoner N's mother sent me at his request. They indicated that he had been admitted to the PSU on three separate occasions, including once several months after I saw him in April, 2014. ███████████████████████████████
███████████████

███████████████████████████████
███████████████████████████████

66

**Exhibit 9 -  218**

told me that he did not want to be labeled "crazy" because these waves were "real," but he also explicitly said that wanted to make sure that I included a description of these events and his concerns in my report. He re-iterated this when I saw him cell-front in April, 2014, during my tour of the institution.

116.    In short, in addition to the high prevalence of specific symptoms from which this representative sample of prisoners who were subjected to prolonged isolation in the PBSHU reported suffering, many prisoners acknowledged an ongoing, constant struggle to remain mentally stable, a struggle in which many felt their very sanity was at stake. These prisoners certainly have not accommodated to the extraordinary level of social and other forms of deprivation that they have suffered for a decade or more, nor have they ceased to feel the mental pain that comes from being confined in this way.

### ii) Problematic Adaptations to Prolonged Isolation and Long-Term Dysfunction

117.    Just as with the initial sample of seven prisoners whom I had interviewed in 1993 and re-interviewed in 2013, many of the prisoners in the randomly selected group reported that they had struggled to "get used to" the long-term isolation to which they were being subjected. They, too, realized that



This document indicated that Prisoner N was to be retained on the mental health caseload at the CCCMS level of care, and therefore (as of July, 2014) was excluded from the PBSHU.

67

Exhibit 9 -  219

their tenuous "adjustment" had come at high psychological price. Many prisoners regretfully acknowledged that had lost their ability to interact with or be comfortable around people; they were acutely aware of this loss. As one prisoner (Prisoner O) put it, "I was taught to endure. So I do. But coping is not the same as not being affected or changed." Another (Prisoner P) told me that "the worst part is being surrounded by people but you are alone. The last time I touched a loved one was in 1983. The purpose of this place is to break us. It is like quicksand. You try to climb out and sink further down."

118.    The isolation to which prisoners in the PBSHU are subjected is created by the rules, regulations, and architecture of the prison—a regime that prohibits and precludes them from having any meaningful social contact with each other. But the degree of isolation is not limited to that. Earlier I alluded to the geographical location of the prison and the way that its remoteness adds to the overall level of isolation to which PBSHU prisoners are subjected. The prison is located in Crescent City, California, over 700 miles from Los Angeles, the state's largest population center and the geographical area from which the largest number of prisoners come. Family members from the Los Angeles area or farther south must travel a minimum of nearly 13 hours by car (one-way) in order to visit at Pelican Bay. A number of prisoners indicated that the combination of the distance and the cost of such a trip make it prohibitive for many of their families.

119.    In addition to the time and expense involved, all visits are conducted on a non-contact basis, which requires visitors to speak through a thick glass barrier or partition and over a telephone. Of course, SHU prisoners are not permitted to touch their visitors during these non-contact visits (and the

68

**Exhibit 9 -  220**

glass partition that separates them prevents them from doing so). In addition, except for prisoners in the newly implemented stepdown program, prisoners are prohibited even from making phone calls.[76] This prohibition has been in operation since the time the PBSHU first opened. It means that *Ashker* class members who do not receive visits have not heard the voices of loved ones or friends for a decade or more.

120.    One prisoner (Prisoner Q) said that he has been prevented from even writing to his family, and so has lost all contact with them. He said: "CDCR won't let me write to my daughter because I am a gang member. I haven't been allowed to write her. In the beginning of 2012, they stopped my mail. I've lost all communication with everybody. Whenever people would write me, they [CDCR] would say it was 'coded'—even though they couldn't tell you what it means. 'You are under investigation' supersedes everything. The last time I had a visit was in 2002. My daughter was 6 or 7 years old… She reached out to me, to write me, but the prison put a stop to [it]. I have no relationship with people on the outside, nobody to write."

121.    ▬▬▬▬▬▬▬▬▬ (Prisoner R) told me he entered prison approximately 22 years ago on his first and only adult conviction. He has spent most of his time since then in isolation, including about 20 years continuously in the PBSHU. Over that two-decade period, he said that he has had only one visit, which occurred in 2010, when his now-grown children came to see him. He told me that he tries to write to them as much as possible, to stay close,

---

[76] It is my understanding that prisoners in Step 1 of this program may receive a short, non-emergency phone call after six months and receive a second short phone call upon transition to Step 2.

69

**Exhibit 9 - 221**

but that it is hard: "What do you say? You live the same life over and over." He also told me: "I put my kids' pictures facing the TV and I talk to them, as if we were watching the game together. 'Hey, did you see that?' Maybe I'm crazy, but it makes me feel like I'm with them. Maybe someday I'll get to hug them." He told me that the last time he touched them—or anybody (other than when being put in mechanical restraints)—was 1993.

122.    I interviewed a number of PBSHU prisoners with children whom they rarely if ever see, and grandchildren whom they have never seen. ███

████████████ told me, "My son is almost an adult. I haven't seen him for years or heard his voice or him mine." Another (Prisoner T) had a 7 year old daughter when he entered prison 20 years ago.  She has since grown up, gotten married, and had children but he has not seen her or had a visit from anyone else over that period of time.

123.    This near total isolation these men have from one another, and from the outside world, means that they have had to adjust to living in a state of being profoundly alone, a state that has lasted for them for a decade or more. The experience has changed them in number of fundamental ways. Among other things, their social skills have atrophied in the absence of any meaningful opportunity to use them, and they have lost the capacity for deep positive emotions or to feel human connections.

124.    Indeed, there is a profound sadness to most of the men I interviewed in the PBSHU, a somberness and joylessness about them. It is almost as though they are grieving. Many of them seem to be grieving the relationships to family members and loved ones that they once had and now have lost, ones

70

**Exhibit 9 -  222**

that they sense will never be recaptured or recreated. In other instances, the grief seems more generalized, as if they are grieving for a social self, a sense of who they once were, that they know is unlikely ever to be regained. In either case, they have experienced a form of "social death," and they are grief-stricken over what has been lost or taken from them.

125.    In addition, the PBSHU prisoners describe their lives in ways that indicate that they are not just "alienated" but alien, not of this social world. Many of them are resigned to it. They say, "I've gotten used to it, I can tolerate it," but not with a sense of bravado or triumph, rather more a sense of resignation or defeat.

126.    ███████████████████ (Prisoner U) who had been in PBSHU continuously for over 20 years told me that he had grown old there and that a lot of the feelings he once had he no longer felt. He said he mostly just stays by himself, not even bothering to go to the yard most of the time in part because, as he said, "There is nothing in the yard. I can't use the pull up bar. I'm too old and infirm." He told me he was scheduled to get out in the coming summer and was uncertain about how he would do. "If you put a parakeet in a cage for years and you take it out it will die. So I stay in my cage." Many other prisoners told me that they too self-isolated as a way of coping with their otherwise infrequent contact with others and deteriorating social skills. One (Prisoner Q) said "sometimes I go for days without speaking with anybody. [It's] less trouble."

127.    ███████████████████ (Prisoner V) who had come to prison nearly 40 years ago, as a teenager, and had spent most of that time in isolation (including about 24 years in the PBSHU—"I am one of about 70 who came when

71

**Exhibit 9 - 223**

it opened and who are still here"), said that he has very few write-ups (115s) of any kind at PBSHU. He told me he had received an infraction for "talking in the library" (which he said was dismissed), one for the hunger strike that he participated in, and another for possession of reading material that included writing by George Jackson. He has had no visits from the outside—"you are my first visitor," he said—and talked about the isolation: "This place affects you socially. You don't know how to relate to people...."

128.      ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ who had only one visit in his nearly 20 consecutive years in the PBSHU told me, "You get really anxious going anywhere—even coming here [to be interviewed]. You don't leave the section much, so it's scary when you do." It the end of his interview with me he told me our one hour or so conversation was "the most I've talked in years."

129.      ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Prisoner X) who had been in the PBSHU for nearly half his life—20 continuous years—said that during that time he had no more than a handful of visits, and none from his family. He told me, "I think about how scary it would be to be around people, be close to them." He acknowledged that although "the anger and resentment is still there, it is not as intense as it once was." He said, "you are so used to being back here, you adjust to it. This is your life." But then he said, "I wouldn't even know how to program on the mainline. I'm so used to it here."

130.     The social death that the PBSHU prisoners have undergone has created a sense in many of them of what might be called "ontological insecurity"—profound concerns about whether or not they really "exist" and have "being" in the world. This may seem like an extreme assertion, but realize that

72

**Exhibit 9 -  224**

these are men whose families and friends—the persons who helped shape their identities and to whom those identities were most closely tied before coming to prison—not only may have not interacted with them for years (or decades) but not even seen them, and not even heard their voices over the same time period. If the people "closest" to you throughout your life have not seen you, and have not heard your voice, nor you theirs, do you really exist?

131.    Indeed, some PBSHU prisoners described the unsettling experience of being escorted out of their housing pod by a counselor to get a painful bereavement call—for years, these were only kind of phone calls they were allowed to make or receive—only to discover that they did not know who they were talking to, or that no one at the other end of the line could recognize their voice or believe it was really them, it had been so many years since they had heard each other's voices. For those who had gone into prison and into SHU as teenagers or very young men, their voices had changed over the course of the decade or more that had passed since anyone in the outside world had spoken to them. They had grown up and grown old, isolated from the world and from their family, and they now had an older man's voice that no one in their family could recognize or associate with them.

132.    For example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Prisoner V) I referred to earlier told me: "I got a 15 minute phone call when my father died. I realized I have family I don't really know anymore, or even their voices. You haven't talked to your mother, she is like a stranger, you don't recognize each other on [the] phone." He felt bad that he had not been able to grant one of his father's last wishes: "My dad wrote asking for a picture when he was dying. I couldn't send

73

**Exhibit 9 -  225**

one." He added: "All relationships are based on reciprocity and you can't reciprocate in here." He said, "This is an artificial life, it is not real in here," and likened the SHU to "a laboratory, like a weapons lab or a place for human experiments."

133.    I believe that the eroding sense of existence and the fear of complete social death among PBSHU prisoners is one of the reasons that the issue of not only access to telephone calls but also being able to take and send photographs is so significant to them. Photographs are a way of establishing existence, fixing ourselves in time and space. At the same time, however, many of these men knew that the photographs they could now share would establish them, in a sense, as someone else. One prisoner (Prisoner O) explained that the hunger strike-related concession of being able to take photographs was important, but that a number of prisoners were anxious about it as well. "Guys haven't had photos [of themselves] for 24 years. Their families haven't seen them in that time. But some people don't want to take a picture—it would shock the family members and they are embarrassed at how they look. Your family notices changes in you—you don't notice. You are just trying to survive, it is what you have to do."

134.    ▮▮▮▮▮▮▮▮▮ (Prisoner Y) was very articulate about the depersonalization that occurs when people are isolated from others for so long a time. He told me: "I walk into visits—I see my mother, and I know she's my mother, but I haven't touched her for years, and the feeling isn't the same. I haven't hugged her, I feel distant. You feel things but they don't last or feel as deep or full. My grandmother died and I felt bad, but I didn't shed a tear." He told

74

**Exhibit 9 -  226**

me later in the interview: "I have brothers I haven't seen for 22 years. I know I have them but the feeling I have is different now. I have no real relationship to or with them."

135.    One prisoner (Prisoner Z) observed that "just because people don't act broken in here doesn't mean they aren't." He became emotional when I asked him how he had managed to survive. He answered by saying: "I don't know how I survived. Faith, maybe. As long as you have faith there might be a chance..." and then he began to cry. He said he had not cried for decades and that my asking him about himself had "touched a nerve." He told me he had not had a visit in 19 years and, of course, had been denied phone calls for the entire time he was in PBSHU (nearly 20 years). Referring to his family he said, "As the years have gone by, you are out of sight, out of mind." He said his letters to loved ones had dwindled, so that he was down to letters from his father and daughter, about once a month. Otherwise, he has no current contact with the outside world and has not since 1995.

136.    ▮▮▮▮▮▮▮▮▮▮ (Prisoner AA) who told me that he was placed in PBSHU over 20 years ago, said that he had been kept there on the basis of an erroneous classification as a gang member. He complained about how he had been badly deteriorating mentally and physically over years. He said that he "came in a strong young dude and now I am a sick old guy." He also told me that he was a lot more bitter than he used to be and became emotional when he told me "I don't trust people anymore." He, too, acknowledged being "afraid when people are physically close."

75

**Exhibit 9 - 227**

137.    ████████████████████████ (Prisoner BB) told me that he had spent approximately 27 years in prison, including two separate terms in the PBSHU (the last one of which has lasted for 12 continuous years). He could remember only a single 115 that he has had—when his name appeared in what was supposedly a gang-related letter in 2005—but he nonetheless has been retained in SHU for more than a decade, and not yet been seen by the DRB for a stepdown review. He acknowledged having a very difficult time in SHU: "It is traumatic to do this much isolation. On the outside we can smile, on the inside we hurt. Deep inside, we are in pain."

138.    This prisoner told me about a specific event that he said continues to bother him. About two years ago, when the prisoners at the PBSHU were given a chance to take their first photos to send home, he took one to send to his father, who was dying. But he believes that the COs at the prison failed to mail the photo, because his father never received it before he passed away. He said, "It would have been the only picture he ever saw of me before he died, but he never got it. Imagine that, my family didn't even know what I looked like." He said the worst thing about being at the PBSHU is the "lack of contact with outside world... not being able to call, lack of family affection, not being able to hug or touch people."

139.    Another prisoner (Prisoner CC) told me that he had become "desensitized" and was losing the ability to feel. He said that when his grandparents passed away "I had no feelings or emotions" and that "I have a hard time telling my kids and my mother that I love them—it is so at odds with how I live." When I asked him to describe life in the PBSHU, he said: "Isolation, frustration, separated from family, can't communicate with anyone freely, even to

76

**Exhibit 9 -  228**

your parents—you say the wrong thing and you get a 115—getting harassed by staff, have your cell torn up, property destroyed." He said that when he was arrested, his children were about a year and a half old and "I've seen them through glass, growing up."

140.    One older ███████████ (Prisoner DD) who had been housed in PBSHU off and on since it opened, and continuously since 1997, told me about being taken out of the prison only once, to go to the hospital, and being overwhelmed by the stimulation. He said that he could not handle the sights, sounds and smells of the outside world, and was unable to stand on his own. He actually became sick and vomited. He said this happened to him several times until he got accustomed to the sensory overload. He also told me that he had not gotten any visits for 15 or more years. He said "I get letters and pictures but no visits for 15 years. Phone calls only when people die. I haven't heard anyone's voice for years and years—since '97. I haven't touched them of course."

141.    An older ████████████████ (Prisoner EE) who had been at PBSHU continuously for nearly 20 years told me that on the rare occasions when he accidentally touches someone, "it freaks me out—touch."

142.    One of the few prisoners with an actual release date (Prisoner FF) ████████████████████████████. He had been in isolation in various prisons for over 25 years, including two separate stints in PBSHU that amounted to 20 years in total there. As he put it: "This place makes you anti-social. You get used to being by yourself. You beat yourself up if you can't get used to it. But you draw away from people. You become content being alone, thinking about being around people. What will it be like." Another prisoner (Prisoner T), who had not

77

**Exhibit 9 -  229**

had a visit or a cellmate in the 20 years he had been in prison, told me that he avoids social interaction because "that way I won't bring my troubles to other people." Shunning social contact he said "is a daily thing." He also said, "It is hard to connect even with the outside world. They don't understand the world you are living in in here."

143.   One (Prisoner E) said: "they say the mind is a terrible thing to waste. I think a mind is a terrible thing to have alone. You just have your thoughts in your head, to go over and over, and the repetition is deadening. The things we read in books, the ideas we learn, we can't use them."

144.   Remarkably, several prisoners reported that they experienced stronger emotional connections to their televisions—responding with unexpectedly strong feelings and even tears to television dramas—than to the plight of people around them or to tragedies that befell their own families. This, too, underscores the social death to which they have been subjected. In fact, because of the extraordinary conditions under which they have been kept for the last decade or more, these prisoners *do* actually have more meaningful "interaction" and "social engagement" with their television sets and the fictional characters displayed on them—however vicarious and virtual and "unreal"—than with other actual human beings (with whom their contact is sporadic, superficial, and constrained, under the very limited circumstances when it can take place at all).

78

**Exhibit 9 -  230**

**B. Comparisons to the Pelican Bay General Population**

145.    During the week of December 15, 2014, I was able to conduct a series of confidential, structured interviews with a random sample of twenty five (25) mainline prisoners who had been incarcerated for at least ten (10) continuous years and who were presently housed in the Pelican Bay general population (PBGP") Level IV housing facility. They were selected on that basis to be as comparable as possible to the PBSHU prisoners whom I interviewed except that, instead of being housed now and for the last ten years in the PBSHU, they spent at least the last ten years in prison in CDCR and are currently housed in PBGP.

146.    It is important to note that are several ways in which a comparison of these prisoners with the Plaintiff class members represents a very stringent test of the effects of long-term PBSHU confinement. For one, the conditions of confinement in the PBGP are themselves truly severe, roughly equivalent to the kind of harsh conditions that exist in some isolation units in other prison systems. For example, all PBGP prisoners are "cell fed" (i.e., they eat all of their meals in their cells rather than in the dining hall), and total amount of "out-of-cell time" afforded the typical PBGP prisoner (virtually all of whom are double-celled) consists of between no more than about 6 hours of yard, an hour of "dayroom" every third day, and possibly a "job" (for those rare prisoners who have one). The jobs that were described to me ranged from working in the kitchen (which requires prisoners to be on the job most days from 4 AM to 9 AM), being a tier tender (which can mean as little as a half hour a day out-of-cell

79

**Exhibit 9 - 231**

time), and working as a barber (which consists a few hours one day a week). A very few PBGP prisoners also described having had the opportunity to take a computer class, which apparently met as a group, in a classroom, for several hours a week. But everyone said this was limited to a very small number of prisoners and that there was a long waiting list to get in.

147.    Thus, PBGP prisoners are confined to their cells in their "general population" housing units almost as much as prisoners in the PBSHU, and far more than in most maximum security prisons. The main differences between them and SHU prisoners pertain to several limited but not necessarily unimportant social dimensions. That is, virtually all of the GP prisoners are double celled, they exercise in a group setting in an actual outside prison yard, have access to an evening "day room" time when they can congregate with others outside their cells for an hour several evenings a week, are eligible for some of the scarce jobs available at the facility and for some classes taught in an actual classroom setting, and they are permitted to have contact visits in the prison visiting room. Of course, the GP facility is as geographically remote a location as the SHU, so these prisoners too tend to have relatively few visits.

148.    In fact, for PBGP prisoners who do not have a job and are not enrolled in a class—by far the great majority of GP prisoners at Pelican Bay (including the substantial majority of prisoners in my sample)—the main differences in terms of social interaction between them and PBSHU prisoners are relatively modest in number—essentially having cellmates, face-to-face contact with others on the yard and in evening dayroom, access to the telephone, and contact visits. It turns out, however, that these things are quite important

80

**Exhibit 9 - 232**

(especially in comparison to the long-term plight of prisoners who have none of them).

149.    An additional factor that adds to the stringency of this comparison is that many PBGP prisoners have spent long periods (some, years) confined in one or another CDCR isolation unit, before coming to the mainline prison at Pelican Bay. For some of them, this included having spent time in the PBSHU. Many of PBGP prisoners I interviewed acknowledged the lasting aftereffects of their time in isolation, attributing at least some of their current problems and symptoms to the time they spent in SHU. Although they talked about struggling to overcome these effects once released from isolation, they acknowledged varying degrees of success in doing so. The effects of isolation certainly do not immediately disappear; even GP prisoners were in SHU for "only" a year or two, the discomfort they feel around others is something that can interfere with their current social relations and leave them "lonely" in ways that can approximate the feelings of those still in SHU.

150.    Indeed, the PBGP prisoners overall were not at all reticent about voicing their displeasure about their current conditions of confinement. Some complained vehemently. A number of them volunteered that the PBGP was by far "the worst" Level IV prison they had ever been in (and some emphasized that they had been in a number of other Level IV prisons in the CDCR).

151.    In short, these prisoners were suffering and in distress. Yet there was absolutely no comparison to the level of suffering and distress reported by the PBSHU prisoners. On nearly every single specific dimension I measured, the

81

**Exhibit 9 -  233**

PBSHU sample was in significantly more pain, were more traumatized and stressed, and manifested more isolation-related pathological reactions.

152.    There are several ways in which these differences can be described and illustrated. The first is a direct comparison between the two groups in terms of whether or not they were experiencing a particular symptom (irrespective of the symptom's frequency or intensity). Here, of the 25 specific symptoms, the currently isolated PBSHU prisoners were significantly more likely to report experiencing 18 of them, including 11 of the 13 symptoms of isolation-related pathology. These differences are depicted in Table 4 below.

**Table 4:       PREVALENCE OF PSYCHOLOGICAL SYMPTOMS AMONG REPRESENTATIVE SAMPLES OF <u>PBSHU vs. PBGP</u> PRISONERS**

**Symptoms of Psychological and Emotional Trauma**

|  | SHU | GP | Chi Square | *p* value |
|---|---|---|---|---|
| Anxiety, Nervousness | 83% | [48%] | 8.97 | .003 |
| Headaches | 71% | [64%] | .324 | ns |
| Lethargy, Chronic Tiredness | 90% | [60%] | 8,5 | .004 |
| Trouble Sleeping | 81% | [60%] | 3.29 | .07 |
| Impending Breakdown | 63% | [ 4%] | 22.7 | <.001 |
| Perspiring Hands | 51% | [32%] | 2.3 | ns |
| Heart Palpitations | 68% | [32%] | 8.25 | .004 |
| Loss of Appetite | 30% | [12%] | 2.8 | .09 |
| Dizziness | 76% | [32%] | 12.2 | <.001 |
| Nightmares | 30% | [17%] | 1.42 | ns |
| Hands Trembling | 42% | [12%] | 6.83 | .01 |
| Tingling Sensation* | 20% | [12%] | .63 | ns |
| Fainting | 2% | [ 4%] | .13 | ns |

PBSHU: N=41,     PBGP: N=25

82

**Exhibit 9 -  234**

**Psychopathological Effects
of Prolonged Isolation**

|  | SHU | GP | Chi Square | p value |
|---|---|---|---|---|
| Ruminations | 83% | [56%] | 5.7 | .017 |
| Irrational Anger | 88% | [48%] | 12.4 | <.001 |
| Oversensitivity to Stimuli | 90% | [44%] | 16.7 | <.001 |
| Confused Thinking | 98% | [40%] | 28.0 | <.001 |
| Social Withdrawal | 88% | [44%] | 14.5 | <.001 |
| Chronic Depression | 73% | [48%] | 4.6 | .04 |
| Emotional Flatness | 78% | [36%] | 11.7 | .001 |
| Mood Swings | 68% | [32%] | 8.3 | .004 |
| Overall Deterioration | 83% | [44%] | 10.9 | .001 |
| Talking to Self** | 66% | [20%] | 13.1 | <.001 |
| Violent Fantasies | 37% | [20%] | 2.0 | ns |
| Perceptual Distortions | 20% | [0%] | 5.6 | .018 |
| Hallucinations | 37% | [12%] | 4.7 | .03 |
| Suicidal Thoughts | 2% | [0%] | .62 | ns |

PBSHU: N=41      PBGP: N=25

*Not necessarily a symptom of psychological stress or trauma. Included as a "control question" to provide a baseline against which to measure the significance of the trauma-related responses.

** An adaptation to isolation but not necessarily a pathological isolation-related symptom.

153.    These differences are striking, in part because they so clearly distinguish the psychological state of prisoners housed on a long-term basis in the PBSHU versus those housed in an otherwise harsh PBGP mainline prison environment (but one that nonetheless provides a modicum of social interaction and contact). As I noted, Table 4 indicates that, overall, on 25 specific indices of stress and trauma, and isolation-related psychopathology, the PBSHU group suffered significantly higher prevalence on eighteen (18) of them. As might be expected—given the immediately stressful nature of the mainline PBGP prison environment—the symptoms on which there were no differences between the groups pertained primarily to those that were stress- and trauma-related. However, the SHU prisoners were significantly more likely to suffer fully 11 of the

83

**Exhibit 9 -  235**

isolation-related symptoms. In fact, the only two specific isolation-related symptoms on which there were no significant differences between the groups were those with very low prevalence rates overall (violent fantasies and reported suicidality).

154.    In addition to the comparisons between the two groups on each specific symptom, I calculated the overall mean number of symptoms reported by the PBSHU prisoners versus those in the PBGP—an omnibus number of symptoms each group reported experiencing—as well as calculating the differences between the groups by breaking out the stress and trauma-related symptoms and then, separately, the symptoms specifically associated with the experience of isolation.

155.    The PBSHU prisoners reported significantly more symptoms *overall* ($M$=15.30 vs. 7.75, $t$=6.44, df=62, p<.001, Cohen's $D$ = 1.65), including significantly more stress and trauma related symptoms ($M$=6.88 vs. 3.58, $t$=5.36, , df=62, p<.001, Cohen's $D$ = 1.36), and significantly more isolation-related indices of pathology ($M$=8.44 vs. 4.24, $t$=6.63, , df=64, p<.001, Cohen's $D$ = 1.66). In addition to the highly statistically significant nature of these differences, the orders of magnitude are quite large—nearly twice as many symptoms overall as well as for the two separate categories of symptoms suffered by PBSHU prisoners as opposed to those in GP.

156.    A visual illustration of the differences between the two groups in terms of the mean number of symptoms reported (separating stress-related from those specifically associated with isolation) is shown in Figure 1 below.

84

**Exhibit 9 -  236**

**Mean Number of Pathological Symptoms**

**Figure 1: Differences in Mean Number of Symptoms Reported\***

\*Error bars show the standard deviation of each group's scores.

157.    In addition to a determination of the presence or absence of a symptom, I asked prisoners to estimate the frequency with which they were bothered by these symptoms over approximately the last three month period (as a way of gauging intensity or the degree to which they suffered from the particular symptom or underlying problem). Recall that prisoners who reported suffering from a symptom were asked whether they experienced it rarely, sometimes, often, or constantly (with a corresponding range in scores from 1 to 4).

85

**Exhibit 9 -  237**

158.    As Table 5 depicts, the PBSHU prisoners not only experienced more symptoms but also experienced them on average with much greater intensely.

**Table 5:    INTENSITY OF PSYCHOLOGICAL SYMPTOMS AMONG REPRESENTATIVE SAMPLES OF <u>PBSHU vs. PBGP</u> PRISONERS**

**Symptoms of Psychological and Emotional Trauma**

|  | SHU | GP | $t$ test | df^ | $p$ value |
|---|---|---|---|---|---|
| Anxiety, Nervousness | 2.49 | 1.24 | 3.61 | 64 | .001 |
| Headaches | 1.88 | 1.32 | 1.59 | 64 | ns |
| Lethargy, Chronic Tiredness | 2.59 | 1.44 | 3.68 | 64 | <.001 |
| Trouble Sleeping | 2.46 | 1.52 | 2.46 | 64 | .017 |
| Impending Breakdown | 1.49 | .04 | 7.17 | 43.21^ | <.001 |
| Perspiring Hands | 1.32 | .68 | 2.04 | 59.69^ | .045 |
| Heart Palpitations | 1.71 | .72 | 3.06 | 64 | .003 |
| Loss of Appetite | .54 | .20 | 1.85 | 63.76^ | .068 |
| Dizziness | 1.61 | .44 | 5.08 | 63.99^ | <.001 |
| Nightmares | .54 | .21 | 1.88 | 62.97^ | .064 |
| Hands Trembling | .95 | .20 | 3.4 | 61.34^ | .001 |
| Tingling Sensation* | .27 | .24 | .167 | 64 | ns |
| Fainting | .05 | .04 | .126 | 64 | ns |

PBSHU: N=41,    PBGP: N=25

**Psychopathological Effects of Prolonged Isolation**

|  | SHU | GP | $t$ test | df^ | $p$ value |
|---|---|---|---|---|---|
| Ruminations | 2.39 | 1.04 | 4.37 | 64 | <.001 |
| Irrational Anger | 2.37 | 1.08 | 4.24 | 64 | <.001 |
| Oversensitivity to Stimuli | 2.61 | 1.16 | 4.37 | 40.26^ | <.001 |
| Confused Thinking | 2.73 | 1.04 | 5.69 | 32.75^ | <.001 |
| Social Withdrawal | 2.24 | 1.08 | 3.59 | 42.04^ | .001 |
| Chronic Depression | 1.80 | .84 | 3.36 | 64 | .001 |
| Emotional Flatness | 1.93 | .64 | 4.52 | 64 | <.001 |
| Mood Swings | 1.66 | .56 | 3.96 | 62.99^ | <.001 |
| Overall Deterioration | 2.12 | 1.00 | 3.89 | 64 | <.001 |
| Talking to Self** | 1.34 | .40 | 3.81 | 60.59^ | <.001 |
| Violent Fantasies | .90 | .32 | 2.29 | 63.76^ | .026 |
| Perceptual Distortions | .27 | .00 | 2.90 | 40.00^ | .006 |
| Hallucinations | .61 | .24 | 1.84 | 58.77^ | .071 |
| Suicidal Thoughts | .02 | .00 | .778 | 64 | ns |

PBSHU: N=41    PBGP: N=25

86

**Exhibit 9 -  238**

*Not necessarily a symptom of psychological trauma. Included as a "control question" to provide a baseline against which to measure the significance of the trauma-related responses.

** An adaptation to isolation but not necessarily a pathological isolation-related symptom.

^ For symptom questions where there were unequal variances between the SHU and GP groups, unequal variances $t$-tests were performed, and adjusted degrees of freedom were used for these comparisons.

159.    With the exception of headaches (which were reported at reasonably high levels of intensity for both groups), the only symptoms on which there were not significant difference between the SHU and GP prisoners pertained almost exclusively to symptoms that were reported very infrequently by both groups (e.g., fainting, suicidality).

160.    The representative sample of prisoners confined in isolation in the PBSHU for 10 years or more reported suffering much greater stress- and trauma-related symptom intensity ($M$=17.7 vs. 7.79, $t$=5.7, df=62, $p$<.001, Cohen's $D$ = 1.53), and much greater intensity of isolation-related pathology ($M$=21.66 vs. 9.00, $t$=7.46, df=64, $p$<.001, Cohen's $D$ = 1.91).  For these measures, the mean intensities of the reported symptoms were not only significantly different between the groups but were nearly or more than double for the PBSHU prisoners compared to those prisoners housed in GP.

161.    These overall differences are illustrated in Figure 2 below.

87

**Exhibit 9 -  239**



**Figure 2: Differences in Mean Intensity of Symptoms Reported***

***Error bars show the standard deviation of each group's scores.**

162.    Finally, a sequential multiple linear regression was used to determine whether SHU status explained the difference in the intensity of these isolation-related pathological symptoms beyond that explained by demographic and sentence-related variables. Using the total intensity of isolation symptoms as the dependent variable, several independent variables (age, marital status, total estimated prison time to date, and whether the interviewee was serving a life sentence) were tested as predictors. The multiple regression was conducted in three blocks, first adding in age and marital status as demographic control variables, then adding in whether the participant had a life sentence and the

88

**Exhibit 9 - 240**

estimated total amount of prison time served so far, and finally adding in the interviewee's SHU status (SHU or GP) variable. This allows for a determination of the proportion of variance in the dependent measure that is explained by each stage, with a final determination of the additional explanatory power that SHU status provides above and beyond the demographics and other variables.

163.    Stage 1 of the regression (using age and dummy-coded marital status as predictors) explained 13% of the variance in intensity of isolation symptoms. Here, age was positively correlated with isolation symptom intensity, but marital status did not add additional power to the model. Next, at stage 2, whether the interviewee was serving a life sentence was added along with the estimated total prison time variable. Here, the model was significantly improved, with an additional 6% of the variance in isolation symptom intensity explained, (adj. $R^2$ = .186, $F$-change[2,64] = 3.272, $p$ = .044). After adding these two variables, age was no longer a significant predictor of isolation symptom intensity. Total prison time did not matter either. The only significant predictor of isolation symptom intensity after stage 2 was whether the interviewee had a life sentence, such that participants with a life sentence reported suffering more isolation symptom intensity than those without ($t$ = 2.42, $p$ = .018).

164.    Lastly, in stage 3, the interviewees' SHU status was taken into account. It had an extremely large effect, increasing the percentage of variance explained by the model from 18% to 40% (adj. $R^2$ = .403, $F$-change[1,63] = 24.287, $p$ < .001). In the final model, SHU status was by far the largest contributor to the intensity of isolation-related symptoms suffered, even when controlling for age, marital status, and estimated total time in prison.

89

**Exhibit 9 -  241**

165.    In summary, beyond the very significant differences in prevalence rates between these two groups (i.e., the rates at which they report experiencing the individual symptoms or not), the differences between them in symptom intensity are even more striking. Not only do the long-term SHU prisoners experience many more symptoms of psychological stress and trauma and indices of isolation-related pathology than the GP prisoners, but the level or degree of their suffering on these dimensions of psychological pain is far greater.

**C. Pathological Levels of Loneliness**

166.    As I pointed out above, in my discussion of the April, 2013 interviews that I conducted with the seven prisoners whom I originally had interviewed in 1993, "adapting" to long-term PBSHU isolation required prisoners to live for years in the absence of any meaningful social contact. In many instances, the psychological accommodations they were forced to make to the harsh and painful reality of the social deprivation in SHU left prisoners with the feeling that they were losing (or had lost) the capacity to interact with others. Like all skills, this one, too, can atrophy from a lack of use.

167.    The same was true for the larger group of long-term isolated PBSHU prisoners whom I interviewed in January and December, 2014. They also reported becoming uncomfortable and anxiety-ridden in the presence of others, especially in circumstances where they were expected to genuinely "interact." For some prisoners, the absence of others, and their increasing discomfort in even minimally social situations, meant that they sought to avoid it, engaging in a form of "self isolation" in response to the already pathological levels of social isolation to which they were subjected.

90

**Exhibit 9 -  242**

168.    However, even those prisoners who "self isolated" appeared to still acutely feel—and be pained by—the absence of others in their lives. They seemed, in short, to be profoundly lonely, and to continue to be distressed by their loneliness. Over the last several decades, a great deal of psychological research has been devoted to measuring the effects of social isolation and the subjective experience of "loneliness" in a wide range of settings and for people from many different walks of life. We now know that social isolation and loneliness are significantly related to a host of negative psychological and physical outcomes, including a decline in cognitive functioning, poor executive functioning, increased negativity and depression, a heightened sensitivity to social threats, and even increased morbidity and mortality.[77]  It is also a subjectively painful experience.

169.    To measure and compare the level of loneliness within the samples of PBSHU and PBGP prisoners that I interviewed in January and December, 2014, I administered the Revised UCLA Loneliness Scale,[78] a 20 item measure that is generally regarded as "the standard measure of loneliness" used by social

---

[77] For example, in addition to the references cited *supra* at note 17, see also: John Cacioppo & Louise Hawkley, *Perceived Social Isolation and Cognition*, Trends in Cognitive Science, 13, 447-454 (2009); John Cacioppo, Louise Hawkley, & Gary Bernston, *The Anatomy of Loneliness*, Current Directions in Psychological Science, 12, 71-74 (2003); Louise Hawkley & John Cacioppo, *Loneliness matters: A Theoretical and Empirical Review of Consequences and Mechanisms*, Annals of Behavioral Medicine, 40, 218-240 (2010); Mary Hughes, Linda Waite, Louise Hawkley, & John Cacioppo, *Measuring Loneliness in Large Surveys: Results From Two Population-Based Studies*, Research on Aging, 26, 655-672 (2004); Greg Norman, Louise Hawkley, Aaron Ball, Gary Berntson, & John Cacioppo, *Perceived Social Isolation Moderates the Relationship Between Early Childhood Trauma and Pulse Pressure in Older Adults*, International Journal of Psychophysiology, 88, 334-338 (2012).

[78] Dan Russell, Letitia Peplau, & Carolyn Cutrona, *The Revised UCLA Loneliness Scale: Concurrent and Discriminant Validity Evidence*, Journal of Personality and Social Psychology, 39, 472-480 (1980).

91

**Exhibit 9 -  243**

scientists.[79] Respondents select one of four possible responses (always, often, rarely, never) to each of twenty (20) separate items that ask about different but related aspects of their perceived loneliness. A respondent's loneliness score is represented by the appropriately weighted sum of their answers to the entire set of twenty questions.[80]

170.    The mean UCLA Loneliness Scale score for the representative sample of long-term PBSHU prisoners I interviewed was 54.9, more than 10 points above the cutoff point that scale developers consider indicative of "high loneliness." In contrast, the PBGP prisoners averaged 41.6 overall on the scale, clearly at the higher end of the distribution of scores reported in the literature, but not reaching the "high loneliness" cutoff score (of 44) and not remotely as lonely as the long-term PBSHU prisoners.

171.    The differences between the two groups—the sample of PBSHU prisoners versus the PBGP group—on their UCLA Loneliness scores is highly statistically significant, $t= 4.64$, df=64 , $p<.001$, Cohen's $D = 1.15$. That difference is graphically depicted below in Figure 3.

---

[79] Hughes, et al., *supra* note 77, at p. 657.

[80] Items are appropriately counterbalanced so that, for some, "always" indicates frequent loneliness and for others it indicates the opposite, and so on.

92

**Exhibit 9 -  244**



**Figure 3: UCLA Loneliness Scale Scores, PBSHU vs. PBGP\***

**\*Error bars show the standard deviation of each group's scores.**

172.    The highly significant difference between these groups seems remarkable, given the relatively limited differences in the amount of social contact available to the PBGP prisoners who are, as I have noted, living in an extremely harsh, "locked down" mainline prison. Indeed, as I also have pointed out, many of the PBGP prisoners complained about their objectively limited out-of-cell time and sparse contact with others—not nearly as extreme as in the SHU but nonetheless very limited. However, the explanation for the stark difference in the levels of measured loneliness between them appears to lie in the fact that—because they were afforded the opportunity to enjoy at least *some* meaningful

93

**Exhibit 9 -  245**

social contact and to participate in *some* semblance of normal social interaction (that includes phone calls and contact visiting)—the PBGP prisoners have *not* been forced to adopt the extreme survival strategies that the more profoundly isolated long-term PBSHU prisoners had. That is, despite their limited opportunities for interaction, they were virtually unanimous in expressing their desire to participate in the admittedly limited social contacts they were afforded in GP. If anything, they told me that they sought *more* of them. Thus, they all said they took yard, even though it was often cold and rainy outside, all went to dayroom, even though there was not much to do there, said they used the phone as much as permitted (and their family's finances would allow), and told me they wished they could have even more contact visits.

173.    In contrast, as I have noted, the PBSHU prisoners have been afforded none of these opportunities, however limited they may be. Instead, they have had to devise a set of psychologically very problematic survival strategies to exist for a decade or more within conditions of virtually complete isolation. As it turns out, attempting to survive for this long, under conditions of isolation this extreme, produces pathological levels of loneliness.

174.    The degree of loneliness experienced by the PBSHU prisoners is clearly extraordinary. In fact, a literature search of the extensive number of published studies on measured levels of loneliness suggests that the SHU prisoners are among the loneliest groups ever assessed. Their mean scores are comparable to, and in most instances even more extreme than, those of groups of

94

**Exhibit 9 -  246**

elderly nursing home patients and elderly persons institutionalized for chronic, life-threatening illness.[81]

175.    As I pointed out earlier, such extremely high levels of loneliness place persons at risk of a host of serious negative psychological and physical outcomes. In addition to these heightened loneliness-related risks to physical and psychological well-being, the subjective experience of loneliness is itself extremely painful. Indeed, two prominent researchers in this area have described loneliness as "a strong sense of social pain, emptiness, isolation, sadness for lack confidants, unimportance and worthlessness."[82]

176.    This brief quote provides an excellent short summary of much of what my qualitative interview data and the more structured symptom assessments clearly and consistently indicate. The decade or more of PBSHU isolation has imposed a painful form of social death on these men, manifested in part in the pathological levels of loneliness from which they now suffer, as well as the concomitant deep sense of social pain, emptiness, and worthlessness that they experience and report.

---

[81] For example, see: Fessman, N., & Lester, D. (2000). *Loneliness and Depression Among Elderly Nursing Home Patients*. The International Journal of Aging & Human Development, *51*, 137-141 (2000); Grov, C., Golub, S., Parsons, J., Brennan, M., & Karpiak, S., *Loneliness and HIV-Related Stigma Explain Depression Among Older HIV-Positive Adult*s, AIDS Care: Psychological and Socio-medical Aspects of AIDS/HIV, 22, 630-639 (2010); Şahin, Z., & Tan, M., *Loneliness, Depression, and Social Support of Patients with Cancer and Their Caregiver*. Clinical Journal of Oncology Nursing *16*, 145-149 (2012); Sun, Y., Sun, L., Wu, H., Zhang, Z., Wang, B., YU, C., & Cao, H. (2009). *Loneliness, Social Support and Family Function of People Living With HIV/AIDS in Anhui Rural Area, China*. International Journal of STD & AIDS, *20*, 255-258 (2009);  Theeke, L., Goins, R., Moore, J., & Campbell, H. (2012). *Loneliness, Depression, Social Support, and Quality of Life in Older Chronically Ill Appalachians*. The Journal of Psychology: Interdisciplinary and Applied, *146*, 155-171 (2012).

[82] John Cacioppo & Stephanie Cacioppo, *The Phenotype of Loneliness*, European Journal of Developmental Psychology, 9, 446-452 (2012), at p. 2 [citing R. Weiss, *Loneliness: The Experience of Emotional and Social Isolation*. Cambridge, MA: MIT Press (1973).

95

**Exhibit 9 -  247**

**D. Absence of Outlets or Viable Sources of Professional Support**

177.    As I have observed at length above, the extreme social isolation and social exclusion to which the PBSHU prisoners have been subjected, the very high levels of suffering and pathology that they continue to experience, and the almost unprecedented degrees of loneliness they now suffer are based on the extraordinary social deprivation that characterizes the SHU environment. The prisoners have been effectively prevented from having any meaningful social contact with others and, as a result, effectively precluded from developing or maintaining truly meaningful social relationships or social connections, either inside or outside the prison. In the case of the Plaintiff class members, they have been kept in this painful and damaging state for a decade or more. With those harsh facts as a backdrop, I was struck by the fact that the overwhelming majority of these men had literally *no* outlets through which to express or discuss their feelings, and literally no one with whom they could acknowledge or share their pain and suffering.

178.    Of course, this included the correctional staff, who were uniformly regarded by the SHU prisoners as entirely "off limits" in terms of sharing feelings or admitting weakness. That was not surprising and, in itself, did not distinguish the PBSHU from virtually all of the other maximum security prison that I have studied. After more than four decades studying the dynamics of prison life, including countless conversations with correctional officers and observations made in correctional facilities throughout the country, I can unequivocally say that the dividing line between staff and inmates is nearly universally unbridgeable, in both directions. The reprisals prisoners face for crossing it rival

96

**Exhibit 9 -  248**

or exceed the repercussions that are brought to bear on correctional officers if they are perceived by their peers as becoming too close, friendly, or caring toward prisoners. The dividing line at the PBSHU may be more inviolate than at most places, given the hardened views that both groups there have of each other, but it is in place elsewhere as well.

179.    However, this unbridgeable barrier also nearly universally exists between the prisoners and the mental health staff at the PBSHU. In fact, I made a point of asking prisoners about whether they would approach mental health staff, who are supposed to come into the units on a regular basis to conduct "rounds" and monitor the mental health condition of the prisoners.[83] When I asked the interviewees whether they would talk to "the psychs," especially if they had a serious psychological problem or concern, prisoner after prisoner rejected this option out of hand. Many could not have been more vehement in expressing their disdain and mistrust, stating as well that few if any of the prisoners on their tier would *ever* talk in a meaningful or heartfelt way with the psychology staff.

180.    Prisoners gave several kinds of reasons as the basis for their unwillingness to reach out to the mental health staff for help with their emotional problems. Many expressed doubts about whether there was any genuine caring and commitment on the part of the mental health staff members themselves, whom they described as typically engaging in no more than very brief, pro-forma walk-throughs in the units, doing no more than asking "how are you" as they quickly passed by, but really not expecting (and virtually never getting) a

---

[83] Prisoners said that the rounds are supposed to occur on a weekly basis but that they were typically more infrequent. They all acknowledged that they do, in fact, occur.

97

**Exhibit 9 -  249**

meaningful reply. As one of the prisoners (Prisoner S) told me: "I would not talk to the psych staff. They are not here to help you. They are here to move the process along, [to] look like they are trying. They don't even say your name. Everybody I know shines them on." Another prisoner (Prisoner O) said, "nobody talks to them. We know they won't do anything for you. It's not in their interest to tell the truth. They go through and ask 'are you feeling OK?' How am I supposed to know?... I've seen people lose it in here [and] they still don't talk to the psychs."

181.    ███████████████████ (Prisoner HH) concurred, saying "if I was having psychological problems, the psych who just walk by your cell, how would I even know to tell someone? I can't connect to them, I wouldn't go to them. They just say 'psych services' and that's it. They never call us out, like this [a confidential, one-on-one interview], where they really engage."

182.    ████████████████ (Prisoner II) ████████ told me he had spent approximately 17 years continuously in the PBSHU. His prior experience with isolation was extremely problematic. He said: "I got paroled out of solitary ██████ directly out of solitary. It was impossible to describe how hard it was. I was suffering the consequences of being tortured. I had a nervous breakdown." He said that he continued to be affected by isolation and that he had developed an "anxiety disorder," for which he actually sought psychiatric help in the PBSHU. He said that he was formally diagnosed with an anxiety disorder, but that he had a letter from Dr. Sayer at the prison "saying he can't help, to breath into a paper bag when I have anxiety." This prisoner went on

98

**Exhibit 9 -  250**

to say, "the psychs are a joke. They spend a few minutes in each unit. They just walk through fast, just superficially."

183. A number of other prisoners said that they feared that anything they said to the mental health staff—even the mere fact that they had talked to the psychs, something that is inevitable given the physical arrangements and procedural practices in the PBSHU units—would be used against them. Of course, they were reluctant to have other prisoners know that they were having mental health problems; this, too, is a widespread concern in prisons everywhere, where strong disincentives exist for prisoners to admit weakness of any kind. One prisoner (Prisoner JJ) summed this up when he told me that although people do "lose it back here," he would never consult the mental health staff. They "change all the time" and, also, he said "you don't want people listening to what your problems are—so nobody talks to [the MH staff] or even acknowledges them."

184. However, a number of the PBSHU interviewees expressed additional concerns over sharing information about their mental health with the staff. One prisoner (Prisoner KK) who was adamant about the distrust of the mental health staff explained it this way. He said: "I would never go to the psychs. They are the same as COs. I've seen it happen—prisoner goes to psych, psych tells COs, and they [the COs] hassle him."

185. ███████████████████ (Prisoner LL), who had spent approximately 13 continuous years in the PBSHU, said much the same thing. He told me that although he has done a lot of programs "to improve myself," on his own, people in the PBSHU are "withering away" there. And, he said, "there is nobody to seek out here for help," and that included the mental health staff. He

99

**Exhibit 9 - 251**

said, "it goes without saying that we have trust issues with them, and its not really confidential, plus we get stigmatized and shamed" by talking to the mental health staff. Similarly, another prisoner (Prisoner MM) told me, "I doctor myself. The mental health staff here will use what you say against you rather than help you."

186.   One prisoner (Prisoner D) noted that those few prisoners who do see the mental health staff risk being subjected to ridicule, even by correctional officers. He said, "For guys who are on the [mental health] list, the guard says, 'hey, you want to go see the looney doctor?" Another prisoner (Prisoner NN) added a somewhat different but related concern: "the psychs aren't really interested. [They] go through the motions. I've seen how they treat people who are having issues, they don't do anything for them." On the other hand, he said, contact with them comes at a price: "If a CO makes a referral—often to hassle the prisoner—then the psychs take it seriously. [The COs] are making it look like you are losing it [as] a way of punishing you. [It] makes you look crazy and it will lead to your being ostracized."

187.   In addition to the generalized distrust and concerns over appearing weak to COs as well as to other prisoners, a number of prisoners I interviewed had stories about actually seeking help at an earlier time during their stay in the PBSHU, only to be ignored, manipulated, or mistreated in the process. For example, ██████████████████████ (Prisoner OO) said that he had seen a mental health staff member when he first came to PBSHU about 14 years ago and was told that if he was not going to debrief he should not bother coming back. So he never returned. But he said he learned that: "the psychs who go through the

100

**Exhibit 9 -   252**

units each week just breeze through. Nobody trusts the psychs in here. They don't want to help you. They work for and help the prison."

188.    One prisoner (Prisoner P) who had been in the PBSHU for more than two decades also said that he actually did go see the mental health staff in the 1990s but "they just wrote it down, didn't help—they brush you off, that's what I learned." He also said, in terms that I heard voiced again and again, that "there are guys who lose it back here. The psychs come by, just pass by, every couple weeks they come in, [say] 'psych'—they look in, don't seem to care. I wouldn't trust them if I had a problem."

189.    Of course, I have no way of knowing how dedicated and caring the mental health staff actually is at the PBSHU, and am not directly or indirectly commenting on the quality of care they are capable of offering prisoners. Given the level of distrust that seems to permeate these units, however, those things seem irrelevant. I do think that these comments, the fact that they are so widely held and vehemently expressed, help to explain why many of the underlying psychological problems that I have documented are so infrequently observed by and reported on by the prison's mental health staff. Not only do they see prisoners under conditions that simply do not lend themselves to meaningful psychological assessments or allow for meaningful judgments to be made about levels of (or changes in) psychological functioning, but there is such nearly universal distrust of the staff members that it is inconceivable that any significant number of prisoners would come forward to candidly discuss what they were feeling. The staff simply does not meaningfully and proactively seek out the information and the prisoners are not going to volunteer it.

101

Exhibit 9 - 253

190.    And that fact leads to a conclusion that is perhaps even more striking and problematic. It is that the Plaintiff class members are left with absolutely no one with whom they can regularly turn for help with their emotional problems, suffering, or psychological pain. They are, for virtually all intents and purposes, living completely alone, and they have been living this way for a decade or more.

## VII.    Conclusion: Long-Term PBSHU Confinement Cruelly Inflicts Extreme Psychological Pain and Lasting Damage on Prisoners That Derive In Large Part From the Experience of Social Death To Which It Subjects Them.

As I have described in detail above, there is a robust scientific literature that establishes the adverse psychological effects of solitary or isolated confinement and the severe risk of harm to which prisoners in such units are exposed. The risk of harm exists whether or not isolated prisoners are "double celled" and it applies even to those prisoners who enter solitary confinement units without any pre-existing psychiatric disorders. Isolated prisoners are placed at risk of extremely serious and sometimes irreversible harm, including loss of psychological stability, impaired mental functioning, self mutilation, and even death. These empirical findings are theoretically coherent and sound, and are directly related to a much larger literature on the extremely harmful effects of social isolation and social exclusion, which we now know are inimical to psychological well-being and physical health.

191.    Based on the documents that I have reviewed and the interviews I have conducted, as well as my prior knowledge of conditions, practices, and procedures at the PBSHU, I believe that prisoners in this facility continue to be

102

**Exhibit 9 -  254**

subjected to precisely the kind of treatment that the scientific literature indicates places them at serious risk of harm.

192. However, in this case, the harm is neither speculative nor a calculable "risk." It is instead very palpable and real. The kind of near-total, long-term isolated confinement to which these prisoners have been subjected has produced changes in them that are in many ways qualitatively different from and more dangerous than the ones that take place during shorter-term solitary confinement. It has forced these prisoners to truly become—not just to more briefly endure being—asocial and alone. Prisoners in the PBSHU have been subjected to a form of "social death" that has undermined and even destroyed their relationships with others, and damaged their ability to function as social beings. Their identities have been transformed, and their personalities changed. These transformations and changes have occurred over a long period of time, and they have incurred significant amounts of pain and suffering along the way.

193. What is of special concern is not only that these prisoners have not "gotten used to it," and are still suffering. It is that they are suffering in a way that is different from and much worse than the acutely traumatized prisoners who were housed in the PBSHU in the pre-*Madrid* days. The difference is that they have endured these harsh and painful conditions for *more than a decade*—in some instances for several decades—and they are still not only in pain but also transformed and profoundly lessened by the experience. The passage of time has not ameliorated or desensitized them to the pain they are experiencing but, if anything, has deepened the sense of loss and the realization that can never fully recover much of what has been taken from them. In a very real and fundamental

103

Exhibit 9 -  255

way, they have undergone a transformation in their personalities as a result of the conditions of isolated confinement and social exclusion to which they have been subjected. At a basic level, they are no longer people who can comfortably and normally interact with, relate to, or care about other human beings. As I stated earlier, these experiences have adversely and fundamentally changed these men's relationships to others and to themselves. It is hard to imagine a more basic transformation in "who" someone truly "is" than that. And it is the terrible combination of the sheer totality of the isolation and the sheer duration of the experience that has produced it.

194.    Based on my knowledge and study of the human condition, I believe that meaningful social contact represents a basic human need. Its deprivation is not only painful but, depending on the length of the deprivation and the reasons for its imposition, is needlessly cruel and so harmful as to irreparably damage many of the persons who are subjected to it. Prolonged isolation changes people in negative ways that many persons are unlikely to be able to remedy or correct. It literally transforms who they are, how they function in the world, and the way relate to themselves and to others. It undermines who they are and what they are able to become.

195.    The combination of the totality of the data that I have collected and discussed in the preceding paragraphs, and the related review of the literature on the consequences of the extreme form of isolated confinement that has been imposed on Plaintiff class members at the PBSHU indicate that the CDCR has pursued a policy of prolonged cruelty, one imposed with little or no evidence to suggest that it was likely to be effective in producing positive changes in

104

**Exhibit 9 -  256**

individual prisoners or in prison operations anywhere in the state. Indeed, the policy and practice were doggedly pursued—for decades—in the absence of any evidence that it was in fact succeeding, and a great deal of evidence that it was placing prisoners at significant risk of grave psychological harm.

196.    Many of the most onerous and harmful conditions of confinement and the regimen of harsh practices and procedures that I encountered in the PBSHU some twenty (20) years ago are still in existence. There are numerous prisoners who have been subjected to those conditions for extremely long periods of time (some from as long ago as 1989, when the facility opened). The very substantial harm that has been done to the Plaintiff class continues. Swift, decisive, and very significant intervention is necessary to alleviate it in a meaningful and lasting way.

_Craig Haney Ph.D., J.D._
Craig Haney, Ph.D, J.D.

Date: March 12, 2015

105

**Exhibit 9 -  257**

# EXHIBIT 2

Exhibit 9 -  258

Exhibit 2: A Statement of Compensation and Cases Testified in as an Expert at Trial or by Deposition in the Last Four Years.

I am charging $175 per hour plus all expenses for my work on this expert report, and $200 per hour plus all expenses for testimony at trial."

Trial/Hearing Testimony:

United States v. Lujan (2011)

State v. Topete (2011)

United States v. Richardson (2012)

State v. Gatica (2012)

United States v. Northington (2013)

United States v. McCluskey (2013)

Coleman v. Brown (2013)

United States v. Williams (2014)

Deposition Testimony:

Coleman v. Brown (2013)

Mitchell v. Cate (2013)

Conley v. City and County of San Francisco (2013)

Sardakowski v. Clements (2013)

Parsons v. Ryan (2014)

State v. Carreon (2014)

**Exhibit 9 -  259**

# EXHIBIT 3

**Exhibit 9 -  260**

**Exhibit 9 -  261**

# EXHIBIT 10

## DECLARATION OF MARGARETE KORTKAMP

I, MARGARETE KORTKAMP, declare as follows:

1.      I am a retired registered nurse who was licensed to work in the State of California.

2.      On August 9, 2021, I was interviewed at my home by an investigator named David Park with the Federal Public Defender's Office. I was shown medical notes from 2004 and 2005 that had my name or signature on them. They were in reference to treatment for his office's client, Iouri Mikhel, at West Valley Detention Center where I was working. I may have been a charge nurse or supervisor at the time. As such, my name may have appeared on orders merely to verify that other nurses had completed the tasks.

3.      My recollections of Mr. Mikhel were from when he was housed in Unit 16, which we referred to as a med unit. This unit contained isolation cells where the staff would keep elderly patients and others who needed special equipment that could not be moved to the floor. It was not necessarily a suicide watch unit.

4.      I believe Mr. Mikhel at one point took up the whole tank, which means that he was alone in his wing of four rooms. The Marshals may have paid to keep him alone in Unit 16 under suicide watch.

5.      Mr. Mikhel had tried to committed suicide twice, with pills and by slashing. I believe the attempt with pills occurred at San Bernardino County, before he arrived at West Valley Detention Center. Hoarding pills was common: palming, in the cheek, under the tongue, up the nose. Mr. Mikhel did a pretty good job on the slashing attempt as he needed surgery to get fixed up.

_[handwritten annotation: slashing @ CDC qw]_

6.      I don't remember a lot about Mr. Mikhel, but I do recall that he claimed to be very rich, which seemed possible to me. I also heard that he was a contract killer. This

1

_Initials_

**Exhibit 10 - 262**

information might have come from another inmate, but I am not really sure about the source. I didn't spend much time listening to rumors or gossip.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: 3-7-23

_Margarete Kortkamp_
MARGARETE KORTKAMP

2

Initials

**Exhibit 10 -  263**

# EXHIBIT

# 11

## DECLARATION OF JOHN S. WELLS

I, JOHN S. WELLS, declare as follows:

1. I am a retired physician, licensed in psychiatry in the State of California.

2. I was a longtime employee of public mental health departments throughout Southern California, including in Los Angeles County, Riverside County, and San Bernardino County. I have also treated inmates at West Valley Detention Center in San Bernardino County.

3. On August 16, 2021, I was interviewed at my home by an investigator named David Park with the Federal Public Defender's Office. He showed me medication visit notes that I had written in 2004 and 2005 with regard to his office's client, Iouri Mikhel. I would have treated Mr. Mikhel at West Valley Detention Center, but I do not recall him at all.

4. In my notes I had written that I conducted interviews with Mr. Mikhel through the food port in the door to his cell. This would have been awkward, and any examination of the prisoner would have been limited to observing whether or not he was engaged in obviously troubling behavior, such as banging his head against the wall.

5. Regarding my orders to discontinue suicide watch for Mr. Mikhel and return him to his regular cell, my process was to act on the responses I received from the prisoners to my questions. If Mr. Mikhel stated that he was not suicidal, that was the end of the story. I would have taken his answer at face value.

//

//

//

//

1

Initials

**Exhibit 11 - 264**

6.     When I inquired about the medications Mr. Mikhel had been prescribed, I was told that they included Effexor, Lithium, and Seroquel. These are serious medications for the treatment of depression and psychosis.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: _March 7, 2023_     _John Wells, MD_____
                                              JOHN S. WELLS

2

Initials

**Exhibit 11 -  265**

# EXHIBIT

# 12

<u>DECLARATION OF ERNA ROIZ</u>

I, ERNA ROIZ, declare as follows:

1.       I am a resident of Sherman Oaks, California. I am retired after having worked as a travel agent.

2.       On June 23, 2021, I was interviewed at my home by an investigator named David Park with the Federal Public Defender's Office. He asked me about my recollections of his office's client, Iouri Mikhel.

3.       I was working at a travel agency office when a co-worker told me that someone wanted to see me, although there was no appointment scheduled for that time. This was Mikhel. When he walked in he caused a stir among the other women in the office. They thought he was handsome and wondered what he was doing with me. We spoke out on a balcony, where he told me that his previous travel agent, who was also Russian, had closed her business and sent him to me as a referral. I did not believe this story as I knew all of the other Russian-speaking agents around town. I agreed to help him and then forgot about him.

4.       Some days later I received a call from Mikhel asking to purchase a plane ticket to Moscow for him. It was not expensive, maybe a coach ticket.

5.       After that, the next time I heard from Mikhel was when he requested a trip to Jamaica to celebrate his 35th birthday. He wanted me to book several days at the nicest resort there. He told me that he had met a wonderful woman whose family was prominent and one of the handful of families that controlled Jamaica. They lived in compounds, and at night the guards closed the gates around the properties and let loose packs of dogs. This seemed to have made an impression on him. When he returned he gave me a rum cake that he said was a gift from the woman. He seemed to like this woman very much.

1


Initials

**Exhibit 12 - 266**

6.      Sometime later Mikhel asked me to book a week-long Alaskan cruise for him and the Jamaican woman. He again gave me a gift from the woman when he returned, a set of silver spoons from Jamaica.

7.      I remember finding it distasteful when I learned that Mikhel was dating Marina Karagodina, because she was married with a young son. He said they met in Monaco or Monte Carlo, and that she was as beautiful as a model.

8.      At some point before Christmas 2001, Mikhel invited me and my husband to a dinner party. The house was like a mansion, beautifully crafted in a European style. When we entered it was barely furnished. He told me that he had hired people in England or Europe to build furniture fit for the house, but I did not believe this.

9.      There were maybe five or six couples at the dinner. The food was fine but the table was not the type one would find in a Russian home, certainly not such a nice home.

10.     The last time I spoke with Mikhel was after he was arrested and everything came out in the newspapers. He called me from a federal prison and pleaded with me to help Marina leave the country. I bought a business class flight for her and her son.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: 03/27/23

ERNA ROIZ

2

Initials

**Exhibit 12 - 267**

# EXHIBIT 13

<u>DECLARATION OF ALEXEY SHAKIROV</u>

I, ALEXEY SHAKIROV, declare as follows:

1. I am a resident of Burbank, California.

2. On June 28, 2021, I was interviewed at my home by an investigator named David Park with the Federal Public Defender's Office. He asked me about my recollections of his office's client, Iouri Mikhel.

3. I met Mikhel through Jurijus Kadamovas, whom I first encountered at Beyond The Stars, which is an entertainment venue in Glendale, CA. Kadamovas began inviting a small group of expatriate Russians to his place to catch up on news and be around other Russians. I ended up working at Designed Water World for a few months, where I met Mikhel. The two men seemed close, spending a lot time together, eating meals, hanging out. Through Kadamovas I also met Ainar Altmanis.

4. My impression of the three men was that they spoke a certain way to make it seem as though they had a connection to criminal groups. In my experience, this is not unusual in the Russian community. After the collapse of the Soviet Union, I saw firsthand how our society descended into a free-for-all. Crime was glamorized and criminals seemed to be the only people making money. It was not possible to verify claims of criminal connections, so the posturing was not something I gave much thought. I was only concerned with making my money and getting home to my family. I was not interested in joining their circle.

5. Mikhel struck me as trying to put on a more refined image, like a tech investor. Altmanis was verbally aggressive and seemed to want to be seen as muscle. I did not believe any of them were wealthy as there was no evidence of it in their homes or cars. I considered their implied claims to be almost completely bullshit.

1


Initials

**Exhibit 13 - 268**

6.    I learned about their arrests from a Russian newspaper. I find it still hard to believe that they were involved in these crimes, that the people I knew could do something like this. It seemed like a part of the story was missing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED:  3.21. 2023

ALEXEY SHAKIROV

2



Initials

**Exhibit 13 -  269**

# EXHIBIT

# 14

<u>DECLARATION OF HECTOR RUBEN LOPEZ</u>

I, HECTOR R. LOPEZ, declare as follows:

1.    I am 59 years old and am a former federal inmate with a register number of 23064-112. I was incarcerated as a federal inmate at CDC San Bernardino until January 27, 2004.

2.    I am originally from Ontario, California and a former member of the Black Angels.

3.    While incarcerated at CDC San Bernardino, I remember meeting a Russian named Iouri, but we were only there at the same time for about four weeks.

4.    At some point, the Russian Iouri was placed in the Captain's Hole. I think it was for a suicide attempt. I asked a corrections officer (C/O) what was going on. He told me that the Russian was not all there. While the C/O said this, he held his index finger to his head and made a circular motion, implying that Iouri was crazy.

5.    I do remember hearing Iouri say some way out shit like wanting to escape and blowing things up. I do not remember what he wanted to blow up.

6.    Iouri did ask if I wanted to escape, but since I was looking at a long sentence, I told him there was nothing I could do for him. Plus he was saying all those way out things.

7.    Iouri tried to show me bank accounts to prove he was rich but that meant nothing to me. If the Russian was so rich why was he in there with a court appointed lawyer?

8.    San Bernardino County Sheriff's interviewed me about some kite and asked what I knew. I told them that I did not know shit. I did not know shit then and I do not know shit now.

9.    I have no idea why anyone would say I knew about this escape attempt because I did not know anything.

1

Initials

**Exhibit 14 - 270**

10.    No one ever asked me to testify. Not the government. Not the Russian's attorneys.

If I had been contacted, I would have told them what I know and would have testified truthfully.

I declare under penalty of perjury that the foregoing is true and correct.

Executed On:

4/21/23

HECTOR R. LOPEZ

2

Initials

**Exhibit 14 -  271**

# EXHIBIT 15

LAW OFFICES

DALE MICHAEL RUBIN

STATE BAR NO. 68595

2275 HUNTINGTON DRIVE, SUITE 902

SAN MARINO, CALIFORNIA 91108

(800) 695-3717

FAX (413) 228-0521

July 14, 2003

U.S. Department of Justice
Debra W. Yang, United States Attorney
Central District of California
312 North Spring Street
Los Angeles, CA 90012

      RE:    *United States v. Iouri Mikhel*
              Case No. CR 02-220(A) NM

Dear Ms. Yang:

This letter is submitted to assist the United States Attorney and the Attorney General in deciding whether the death penalty should be sought for Mr. Mikhel. This information is submitted pursuant to the death penalty protocols of the United States Attorneys Manual, with the understanding, pursuant to Federal Rule of Criminal Procedure 11(e)(6) and Federal Rule of Evidence 410 that any statement made herein cannot be used against the defendant in any way. This would include the use of this submission in any fashion in any pleading filed with the Court.

The Death Penalty Protocols of the Department of Justice contemplate that the death penalty will be authorized by the Attorney General of the United States in only the most aggravated potential capital cases and against only the most dangerous potential capital defendants. Still, this process is not an easy one. Justice requires not only intra-district consistency but also some degree of national uniformity. To that we will discuss not only this prosecution, but also the actions of federal prosecutors, judges and juries in this and other jurisdictions. As such, the selection of this defendant for a capital prosecution would not, on balance, further legitimate law enforcement goals.

We have been able to conduct substantial investigation into Mr. Mikhel's background, enough to suggest with confidence that our client should not be one of the handful of murder defendants selected by the Attorney General to face an expensive capital trial.[1]

---

[1] Capital trials are enormously expensive. See *Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation*, prepared by the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States (commonly referred to as the *Spenser Report*). See e.g., "*Killers Attorney Costs Hit $725,000*," New

**Exhibit 15 - 272**

2

Without minimizing the seriousness of the government's allegations herein, we respectfully submit that this case falls outside the typical "death authorized" capital prosecution litigated within this district. In recent racketeering prison gang prosecutions entertained in this district, the government has refrained from authorizing the death penalty against defendants charged with a dozen or so murders (see the *Mexican Mafia, 18th Street, NLR* etc.). In these cases individuals were prosecuted for racketeering, for committing intentional murders and contract hits, bringing drugs into jails, drug trafficking, racism and intimidation of witnesses. The government either did not seek the death penalty or failed to obtain a death conviction (i.e. Chuy Martinez).

In any event, there have been other equally or more culpable defendants in this district who have not faced the death penalty. In fact, in *United States v. Frank Fernandez, et al.,* the United States Attorney for the Central District entered into plea bargains with two of the most heinous, deadly and dangerous of individuals, Max Torvisco (Mono) and Jesus Rochin (Gizmo). Both individuals testified in various trials on behalf of the government and have each admitted to personally committing dozens of murders and ordering hundreds of others.[2]

The United States Attorney for the Central District has declined capital prosecutions in many death eligible prosecutions involving more serious crimes and more dangerous defendants. Indeed, the government has not sought the death penalty against ruthless killers, who have slaughtered dozens of victims to further narcotics trafficking or gang related interests. In these cases, the defendants had also proven a continuing danger in custodial settings to other inmates and/or guards. Mr. Mikhel poses no such danger.

Mr. Mikhel has had no incidents of violence since his incarceration and no criminal record at all. There is no evidence that housing Mr. Mikhel in a Security Housing Unit at ADX or elsewhere for the remainder of his natural life will not be sufficient punishment for the crimes alleged against him.

Of interest, this prosecution comes at a time when public approval of the death penalty is at a record low. There have been numerous and constant stories in the news about innocent death row inmates, wrongly convicted. Also, recent federal death penalty prosecutions across the country have been unsuccessful in obtaining death convictions. We believe that this must be taken into consideration in making this determination.

---

Orleans Times-Picayune at 1 (08/11/97). In this case there is insufficient likelihood that expenditure of hundreds of thousands of tax dollars would produce anything different than the result of a non-capital prosecution. See also Philip J. Cook & Donna B. Slawson, *The Costs of Processing Murder Cases in North Carolina* (1993); Richard C. Dieter, *Death Penalty Info. Ctr. Millions Misspent: What Politicians Don't Say About the High Costs of the Death Penalty* (rev. ed. 1994). See generally, Ronald J. Tabak & J. Mark Lane, *The Execution of Injustice: A Cost and Lack-of-Benefit Analysis of the Death Penalty*, 23 Loy.L.A. L. Rev. 69, 116-117 (1989) (comparing murder rates of several states with an active death penalty to the rate in New York, which at the time did not have the death penalty).

[2] Recently, Judge Tevrizian sentenced Mr. Torvisco pursuant to his plea bargain to 10 years in prison; Mr. Rochin received 11 years pursuant to his plea bargain.

Exhibit 15 - 273

3

We hope these comments will be of some assistance in your evaluation of whether to seek the death penalty in this case. Obviously, we are limited by the absence of full discovery and may not be aware of facts that are known to the government at this stage. We would be more than willing, however, to address any concerns that your office might have if that would be helpful. As discussed above, we believe that this case is removed from the type of cases that typically become death penalty cases at the federal level.

We thank you for your courtesy and cooperation in this matter.

Very truly yours,


DALE MICHAEL RUBIN

DMR/ng

Cc: Richard Callahan

**Exhibit 15 - 274**

# EXHIBIT 16

LAW OFFICES

## DALE MICHAEL RUBIN
STATE BAR NO. 68595

2275 HUNTINGTON DRIVE, SUITE 902
SAN MARINO, CALIFORNIA 91108
(800) 695-3717
FAX (413) 228-0521

October 15, 2003

U.S. Department of Justice
Debra W. Yang, United States Attorney
Central District of California
312 North Spring Street
Los Angeles, CA 90012

> RE:   *United States v. Iouri Mikhel*
> Case No. CR 02-220(A) NM

Dear Ms. Yang:

To follow up on our formal death penalty presentation to your office, I have been informed that the DOJ has allowed a defendant in *U.S. v. Stephen 'the Rifleman' Flemmi* to plead guilty to racketeering charges for a life without release sentence. Mr. Flemmi, a major player in Boston organized crime was charged with 10 murders. The victims were shot or strangled and buried in shallow graves. One victim, Debra Davis, who was Flemmi's girlfriend, was killed because it was feared she knew too much.

As part of this plea deal, state authorities in Oklahoma and Florida agreed to end prosecutions to seek the death penalty against Flemmi for other murders committed in their respective states.

In its application of the federal death penalty, the DOJ is to apply the same standards to all prosecutions equally across the country. If the same standards were to apply, Mr. Mikhel certainly would not qualify for the death penalty.

If you wish to meet with Mr. Callahan and I to discuss this matter further, please feel free to contact us at any time. Thank you for your courtesy and cooperation.

Very truly yours,


Dale Michael Rubin
DMR/ng

**Exhibit 16 -  275**

# EXHIBIT 17

# Jose Flores-Lopez, M.D.
(909) 386-0912

January 30, 2004

Re: MEKHEL, Iouri Gherman DOB: ███/65
Med # 0304301156
Book #: 0304301156

To **Whom It May Concern:**

Mr. Mikhel, presently housed in a single cell at CDC in San Bernardino, requires a higher level of psychiatric care than is currently being provided at the aforementioned location.

Mr. Mikhel remains acutely suicidal and depressed. He requires 24-hour suicide watch, as well as daily psychiatric consultations. He is uncooperative, unpredictable and exhibits severe mood swings, as well as severe depression.

Mr. Mikhel has been observed to discard his voluntary psychiatric medications. As a result, Mr. Mikhel is a strong candidate for involuntary medication.

At CDC. San Bernardino, we are unable to accommodate patients requiring involuntary psychiatric medication. We cannot accommodate this high level of psychiatric need.

It is crucial that Mr. Mikhel be transported to a facility where all of his psychiatric needs can be addressed.

Should you have any questions, or require further clarification, please do not hesitate to contact the undersigned.

Respectfully **Submitted,**

Jose Flores-Lopez, M.D. Psychiatrist

JFL:nf

003IM

**Exhibit 17 - 276**

# EXHIBIT

# 18



**U. S. Department of Justice**

*United States Attorney*
*Central District of California*

Susan J. De Witt
Assistant United States Attorney
Terrorism & Organized Crime Strike Force
(213) 894-4496

1500 U.S. Courthouse
312 North Spring Street
Los Angeles, California 90012

June 9, 2003

VIA FACSIMILE

Richard Callahan, Esq.
260 South Lake Avenue, Suite 130
Pasadena, CA 91101
(626) 202-4060
fax: 626-794-4676

Dale Rubin, Esq. (capital counsel)
2555 Huntington Drive, Suite A
San Marino, CA 91108
(800) 695-3717
fax: 413-228-0521

Re:    United States v. Iouri Mikhel, et al., No. CR 02-220(A)-NM

Dear Counsel:

Enclosed is a copy of the memorandum regarding the Origination of Special Administrative Measures (SAM) concerning your client Iouri Mikhel, which was received by our office today. Also enclosed is an affirmation form for your signatures. Please return them at your earliest convenience so that we can forward them to the appropriate authorities. In addition, please provide our office with a list of any and all individuals that you wish to have precleared for access to your client pursuant to the enclosed SAM, as well as signed affirmation forms for each individual.

Very truly yours,

DEBRA W. YANG
United States Attorney

SUSAN J. DE WITT
Assistant United States Attorney
Terrorism & Organized Crime Section

**Exhibit 18 - 277**

## Affirmation

By signing below, I acknowledge receipt of the SAM restrictions document for Iouri Mikhel, dated _____. By signing the affirmation, I acknowledge my awareness and understanding of the SAM provisions and my agreement to abide by these provisions, particularly those that relate to contact between the inmate and his attorney and the attorney's staff. The signing of the affirmation does not serve as an endorsement of the SAM or the conditions of confinement, and does not serve to attest to any of the factors set forth in the conclusions supporting the SAM. However, in signing the affirmation, I acknowledge the restriction that neither I or my staff will forward third-party messages to or from the inmate.

Signature: _____

Name:        _____
             (Please Print)

**Exhibit 18 - 278**

## Affirmation

By signing below, I acknowledge receipt of the SAM restrictions document for Iouri Mikhel, dated _____. By signing the affirmation, I acknowledge my awareness and understanding of the SAM provisions and my agreement to abide by these provisions, particularly those that relate to contact between the inmate and his attorney and the attorney's staff. The signing of the affirmation does not serve as an endorsement of the SAM or the conditions of confinement, and does not serve to attest to any of the factors set forth in the conclusions supporting the SAM. However, in signing the affirmation, I acknowledge the restriction that neither I or my staff will forward third-party messages to or from the inmate.

Signature: _____

Name:      _____
          (Please Print)

**Exhibit 18 - 279**



# Office of the Attorney General
## Washington. B. C. 20530

June 6, 2003

<u>LIMITED OFFICIAL USE</u>

MEMORANDUM FOR HARLEY G. LAPPIN
                               Director
                               Federal Bureau of Prisons

FROM:                  THE ATTORNEY GENERAL

SUBJECT:           Origination of Special Administrative Measures (SAM) Pursuant to <u>28 C.F.R. §501.3 for Federal Pre-trial Detainee Iouri Mikhel</u>

REDACTED

1.    <u>**General Provisions:**</u>

    a.    **Adherence to Usual Detention Facility (DF) Policy Requirements** - In addition to the below-listed SAM, the inmate must comply with all usual United States Marshals Service (USMS), Bureau of Prisons (BOP) and non-BOP detention facilities' policies regarding restrictions, activities, privileges, communications, etc. If there is a conflict between USMS/BOP/DF policies and the SAM, as set forth herein, where the SAM is more restrictive than usual USMS/BOP/DF

<u>LIMITED OFFICIAL USE</u>

**Exhibit 18 - 280**

SPECIAL ADMINISTRATIVE MEASURES (SAM)                    Page 2
Pursuant to 28 C.F.R. § 501.3
Inmate -Iouri Mikhel

LIMITED OFFICIAL USE

policies, then the SAM shall control. If usual USMS BOP DF policies are more restrictive than the SAM, then USMS BOP DF policies shall control.

b.    **Interim SAM Modification Authority** - During the term of this directive, the Director, Office of Enforcement Operations (OEO), Criminal Division, may modify the inmate's SAM as long as any SAM modification authorized by OEO:

i.   Does not create a more restrictive SAM;

ii.  Is not in conflict with the request of the U.S. Attorney for the Central District of California (USA/CDCA), Federal Bureau of Investigation (FBI), or USMS/BOP/DF, or applicable regulations; and

iii. Is not objected to by the USA/CDCA, FBI, or USMS/BOP/DF.

c.    **Inmate Communications Prohibitions** - The inmate is limited, within USMS/BOP/DF's reasonable efforts and existing confinement conditions, from having contact with other inmates and others that could reasonably foreseeably result in the inmate communicating information (sending or receiving) that could circumvent the SAM's intent of significantly limiting the inmate's ability to communicate (send or receive) information relating to acts of violence or other crimes.

i.   The inmate may be prohibited from passing or receiving any oral, written or recorded communications to or from any other inmate, visitor, attorney, or anyone else except as outlined and allowed by this document.

ii.  The inmate may be permitted to communicate with others orally only during certain predesignated times, the place and duration to be set by the USMS/BOP/DF. The inmate shall not have any physical contact with other inmates during this predesignated time and all such occurrences will be monitored and/or recorded. Each recorded occurrence will be provided by USMS/BOP/DF to the FBI to be analyzed for indications that the inmate is attempting to pass messages soliciting or encouraging acts of violence or other crimes.

d.    **Use of Interpreters/Translators** - Translator approval requirement:

i.   USMS/BOP/DF may use Department of Justice (DOJ) approved translators as necessary for the purpose of facilitating communication with the inmate.

LIMITED OFFICIAL USE

**Exhibit 18 - 281**

SPECIAL ADMINISTRATIVE MEASURES (SAM)                                    Page 3
Pursuant to 28 C.F.R. § 501.3
Inmate -Iouri Mikhel

<u>LIMITED OFFICIAL USE</u>

ii. No person shall act as a translator without prior written clearance approval from USMS BOP DF, which shall only be granted after consultation with the FBI and USA/CDCA.

iii. Translators shall not be allowed to engage in, or overhear, unmonitored conversations with the inmate. Translators shall not be alone with the inmate, either in a room or on a telephone or other communications medium.

2.    **Attorney/Client Provisions:**

a.    **Attorney[1] Affirmation of Receipt of the SAM Restrictions Document** - The inmate's attorney (or counsel) – individually by each if more than one – must sign an affirmation acknowledging receipt of the SAM restrictions document. By signing the affirmation, the attorney acknowledges his awareness and understanding of the SAM provisions and his agreement to abide by these provisions, particularly those that relate to contact between the inmate and his attorney and the attorney's staff. The signing of the affirmation does not serve as an endorsement of the SAM or the conditions of confinement, and does not serve to attest to any of the factors that may have served as the basis for the imposition of the SAM.   However, in signing the affirmation, the inmate's attorney, and precleared staff, acknowledge the restriction that they will not forward third-party messages to or from the inmate.

i. The USA/CDCA shall present, or forward, the attorney affirmation of receipt of the SAM restrictions document to the inmate's attorney.

ii. After initiation of SAM and prior to the inmate's attorney being permitted to have attorney/client-privileged communication with the inmate, the inmate's attorney shall execute a document affirming receipt of the SAM restrictions document and return the original to the USA/CDCA.

---

[1]    The term "attorney" refers to the inmate's attorney of record, who has been verified and documented by the USA/CDCA, and who has received and acknowledged receipt of the SAM restrictions document. As used in this document, "attorney" also refers to more than one attorney where the inmate is represented by two or more attorneys, and the provisions of this document shall be fully applicable to each such attorney in his/her individual capacity.

<u>LIMITED OFFICIAL USE</u>

**Exhibit 18 -  282**

SPECIAL ADMINISTRATIVE MEASURES (SAM)                          Page 4
Pursuant to 28 C.F.R. § 501.3
Inmate -Iouri Mikhel

LIMITED OFFICIAL USE

    iii. The USA/CDCA shall maintain the original of the SAM acknowledgment document and forward a copy of the signed document to OEO in Washington, DC and the USMS/BOP/DF.

b.    **Attorney Use of Interpreters/Translators -**

    i. Necessity Requirement - No interpreter/translator (translator) shall be utilized unless absolutely necessary where the inmate does not speak a common language with the attorney. Any translator shall be precleared.[2]

    ii. Attorney Immediate Presence Requirement - Any use of a translator by the attorney shall be in the physical and immediate presence of the attorney - in the same room. The attorney shall not patch through telephone calls, or any other communications, to or from the inmate.

    iii. Translation of Inmate's Correspondence - An attorney of record may only allow a federally-approved translator to translate the inmate's correspondence as necessary for attorney/client privileged communication.

c.    **Attorney/Client Privileged Visits** - May be contact or non-contact, in the discretion of the USMS/BOP/DF.

d.    **Defense Counsel May Disseminate Inmate Conversations** - The inmate's attorney may disseminate the contents of the inmate's communication to third parties for the sole purpose of preparing the inmate's criminal defense – and not for any other reason – on the understanding that any such dissemination shall be made solely by the inmate's counsel, and not by the counsel's staff.

---

[2]    "Precleared" refers to a translator, who is actively assisting the inmate's attorney with the inmate's criminal defense, who has submitted to a background check by the FBI and USA/CDCA, who has successfully been cleared by the FBI and USA/CDCA, and who has received a copy of the inmate's SAM and has agreed – as evidenced by his/her signature – to adhere to the SAM restrictions and requirements.

LIMITED OFFICIAL USE

**Exhibit 18 -  283**

SPECIAL ADMINISTRATIVE MEASURES (SAM)                               Page 5
Pursuant to 28 C.F.R. § 501.3
Inmate -Iouri Mikhel

e.    Unaccompanied Attorney's Precleared Paralegal(s)[3] May Meet With Client - The inmate's attorney's precleared paralegal(s) may meet with the inmate without the necessity of the inmate's attorney being present. An investigator or translator may not meet with the inmate unless they are accompanied by a precleared attorney or paralegal. These meetings may be contact or non-contact, in the discretion of the USMS/BOP/DF.

f.    **Simultaneous Multiple Legal Visitors** - The inmate may have multiple legal visitors provided that at least one of the multiple legal visitors consists of the inmate's attorney or precleared staff member. The inmate may not have joint defense meetings with his co-defendants and their attorneys. These meetings may be contact or non-contact, in the discretion of the USMS/BOP/DF.

g.    **Legally Privileged Telephone Calls** - The following rules refer to all legally-privileged telephone calls or communications:

i. Inmate's Attorney's Precleared Staff May Participate in Inmate Telephone Calls- The inmate's attorney's precleared staff are permitted to communicate directly with the inmate by telephone, provided that the inmate's attorney is physically present and participating in the legal call as well.

ii. Inmate's Initiation of Legally-Privileged Telephone Calls - Inmate initiated telephone communications with his attorney are to be placed by a USMS/BOP/DF staff member and the telephone handed over to the inmate only after the USMS/BOP/DF staff member confirms that the person on the other end of the line is the inmate's attorney. This privilege is contingent upon the following additional restrictions:

---

[3]    "Precleared" when used with regard to an attorney's staff, or "precleared staff member," refers to a co-counsel, paralegal, or an investigator, who is actively assisting the inmate's attorney with the inmate's criminal defense, who has submitted to a background check by the FBI and USA/CDCA, who has successfully been cleared by the FBI and USA/CDCA, and who has received a copy of the inmate's SAM and has agreed – as evidence by his/her signature – to adhere to the SAM restrictions and requirements. As used in this document, "staff member" also refers to more than one staff member, and the provisions of this document shall be fully applicable to each such staff member in his/her individual capacity.

**Exhibit 18 - 284**

SPECIAL ADMINISTRATIVE MEASURES (SAM)                              Page 6
Pursuant to 28 C.F.R. § 501.3
Inmate -Icuri Mikhel

### LIMITED OFFICIAL USE

(1) The inmate's attorney will not allow any non-precleared person to communicate with the inmate, or to take part in and or listen to or overhear any communications with the inmate.

(2) The inmate's attorney must instruct his/her staff that:

a. The inmate's attorney and precleared staff are the only persons allowed to engage in communications with the inmate.

b. The attorney's staff (including the attorney) are not to patch through, forward, transmit, or send the inmate's communications through third parties.

(3) No telephone call/communication, or portion thereof, except as specifically authorized by this document:

a. Is to be overheard by a third party.[4]

b. Will be patched through, or in any manner forwarded or transmitted to a third party.

c. Shall be divulged in any manner to a third party.

d. Shall be in any manner recorded or preserved.[5] The inmate's attorney may make written notes of attorney/client -privileged communications.

(4) If USMS/BOP/DF, FBI or USA/CDCA determines that any call or portion of a call involving the inmate contains any indication of a discussion of illegal activity or actual or attempted circumvention of the SAM, the inmate's telephone privileges may be negatively impacted and the instant call may be immediately terminated.

---

[4]    For purposes of the SAM, "third party" does not include officials of the USMS/BOP/DF, FBI, DOJ, or other duly authorized federal authorities when monitored in connection with their official duties. This section does not allow monitoring of attorney/client privileged communications.

[5]    Except by USMS/BOP/DF, FBI, DOJ or other duly authorized federal authorities. This section does not allow monitoring of attorney/client privileged communications.

### LIMITED OFFICIAL USE

**Exhibit 18 -  285**

SPECIAL ADMINISTRATIVE MEASURES (SAM)                                   Page 7
Pursuant to 28 C.F.R. § 501.3
Inmate - Iouri Mikhel

<u>LIMITED OFFICIAL USE</u>

h.   Inmate's Attorney May Provide Documents to the Inmate - The inmate's
     attorney may provide his her client with the following items: discovery materials,
     court papers (including indictments, court orders, motions, etc.) and or material
     prepared by inmate's counsel, so long as any of the foregoing documents are
     translated, if translation is necessary, by a precleared translator.

     i.  None of the materials provided may include inflammatory materials, materials
     inciting to violence, or materials that may be used to pass messages from inmate
     to inmate, unless such materials have been precleared by the USA/CDCA and the
     FBI.

     ii. The USA/CDCA may authorize additional documents to be presented to the
     inmate.  If any document not listed or described above needs to be transmitted to
     the inmate, consent for the transmission of the document can be obtained from the
     USA/CDCA without the need to formally seek approval for an amendment to the
     SAM.

i.   Legal Mail - The inmate's attorney may not send, communicate, distribute, or
     divulge the inmate's mail, or any portion of its contents (legal or otherwise), to
     third parties.[6]

     i.  In signing the SAM acknowledgment document, the inmate's attorney and
     precleared staff will acknowledge the restriction that only inmate case-related
     documents will be presented to the inmate, and that neither the attorney nor his
     staff will forward third- party mail to or from the inmate.

---

[6]     Legal mail is defined as properly marked correspondence addressed to or from the
inmate's attorney of record.  All other mail, including that otherwise defined by the
USMS/BOP/DF as Special Mail, shall be processed as "non-legal mail."

<u>LIMITED OFFICIAL USE</u>

**Exhibit 18 -  286**

SPECIAL ADMINISTRATIVE MEASURES (SAM)                                    Page 2
Pursuant to 28 C.F.R. § 501.3
Inmate -Iouri Mikhel

<u>LIMITED OFFICIAL USE</u>

3.      <u>Inmate's Non-legal Contacts</u>:

   a.      <u>Non-legal Telephone Contacts</u> -

      i.  The inmate is limited to non-legal telephone calls only to his immediate family members.

      ii.  The quantity and duration of the inmate's non-legal telephone calls with his immediate family members shall be set by the USMS/BOP/DF.

      iii.  All telephone calls or other communications shall be in English unless a fluent FBI, USMS/BOP/DF approved translator is available to contemporaneously monitor the telephone call.  Arranging for a translator may require at least fourteen days advance notice.

   b.      **Family Call Monitoring** - A call with the inmate's immediate family member(s) may be:

      i.  Contemporaneously monitored by the FBI.

      ii.  Contemporaneously recorded (as directed by the FBI) in a manner that allows such telephone calls to be analyzed for indications the call is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

      iii.  Any such recording may be provided by USMS/BOP/DF on a single, individual cassette tape (per call) for forwarding to the FBI on a call-by-call basis as soon as practicable after each call.

   c.      **Telephone SAM Restriction Notifications** - For all nonlegal telephone calls to the inmate's immediate family member(s):

      i.  USMS/BOP/DF shall inform the inmate of the telephone SAM restrictions prior to each telephone call.

---

   [7]     The inmate's "immediate family members" are defined as the inmate's (USMS/BOP/DF/FBI-verifiable) spouse, natural children, parents, and siblings.

<u>LIMITED OFFICIAL USE</u>

**Exhibit 18 -  287**

SPECIAL ADMINISTRATIVE MEASURES (SAM)                    Page 9
Pursuant to 28 C.F.R. § 501.3
Inmate - Iouri Mikhel

<u>LIMITED OFFICIAL USE</u>

ii. USMS/BOP/DF shall verbally inform the inmate's immediate family member(s) on the opposite end of the inmate's telephone communication of the telephone SAM. USMS/BOP/DF is only required to notify the inmate's communication recipient in English.

iii. USMS/BOP/DF shall document each such telephone notification.

d.   **Improper Communications** - If telephone call monitoring or analysis reveals that any call or portion of a non-legal call involving the inmate contains any indication of a discussion of illegal activity, the soliciting or encouraging of acts of violence or terrorism, or actual or attempted circumvention of the SAM, the inmate shall not be permitted any further calls to his immediate family members for a period of time to be determined by USMS/BOP/DF. If contemporaneous monitoring reveals such inappropriate activity, the telephone call may be immediately terminated.

e.   **Non-legal Visits -**

i.  **Limited Visitors** - The inmate shall be permitted to visit only with his immediate family members. The visitor's identity and family member relationship to the inmate will be confirmed by the USMS/BOP/DF and FBI in advance.

ii. **English Requirement** - All (other than attorney/client-privileged) communications during inmate visits will be in English unless a fluent FBI, USMS/BOP/DF- approved translator is readily available to contemporaneously monitor the communication/visit.

iii. **Visit Criteria** - All nonlegal visits may be:

(1) Contemporaneously monitored by USMS/BOP/DF and/or FBI, in a manner that allows such visits to be analyzed for indications the visit is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

(2) Permitted only with a minimum of 14 calendar days advance written notice to the USMS/BOP/DF facility where the inmate is housed.

<u>LIMITED OFFICIAL USE</u>

**Exhibit 18 - 288**

SPECIAL ADMINISTRATIVE MEASURES (SAM)                           Page 10
Pursuant to 28 C.F.R. § 501.3
Inmate -Iouri Mikhel

<u>LIMITED OFFICIAL USE</u>

(3) Without any physical contact. All such meetings shall be non-contact to protect against harm to visitors or staff, should the inmate attempt to take hostages.

(4) Limited to one adult visitor at a time. However, FBI- verified children of the inmate may visit with a pre-approved adult visitor.

f.    Non-legal Mail - Any mail not clearly and properly addressed to/from the inmate's attorney and marked "Legal Mail" (incoming or outgoing):

i. **Copied** - Shall be copied (including the surface of the envelope) by the warden, or his/her designee, of the facility in which the inmate is housed.

ii. **Forwarded** - Shall be forwarded, in copy form, to the location designated by the FBI.

iii. **Analyzed** - After government analysis and approval, if appropriate, the inmate's incoming/outgoing non-legal mail will be forwarded: 1) to the USMS/BOP/DF for delivery to the inmate (incoming); or 2) directly to the addressee (outgoing).

(1) The Federal Government will forward the inmate's non-legal mail to the USMS/BOP/DF for delivery to the inmate or directly to the addressee after a review and analysis period not to exceed:

(a) Five (5) business days for mail which is written entirely in the English language.

(b) Ten (10) business days for any mail which includes writing in any language other than English, to allow for translation.

(c) Thirty (30) business days for any mail where the Federal Government has reasonable suspicion to believe that a code was used, to allow for decoding.

iv. **Mail Seizure** - If outgoing/incoming mail is determined by USMS/BOP/DF or FBI to contain overt or covert discussions of or requests for illegal activities, the soliciting or encouraging of acts of violence or terrorism, or actual or attempted

<u>LIMITED OFFICIAL USE</u>

**Exhibit 18 - 289**

SPECIAL ADMINISTRATIVE MEASURES (SAM)                    Page 11
Pursuant to 28 C.F.R. § 501.3
Inmate -Iouri Mikhel

<u>LIMITED OFFICIAL USE</u>

circumvention of the SAM, the mail shall not be delivered forwarded to the intended recipient but referred to the FBI for appropriate action. The inmate shall be notified in writing of the seizure of any mail.

4.    <u>Communication With News Media:</u>

    a.    The inmate will not be permitted to talk with, meet with, correspond with, or otherwise communicate with any member, or representative, of the news media, in person, by telephone, by furnishing a recorded message, through the mail, through his attorney, through a third party, or otherwise.

5.    <u>No Communal Cells and No Communication Between Cells:</u>

    a.    The inmate shall not be allowed to share a cell with another inmate.

    b.    Except as otherwise provided herein, the inmate shall be limited within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate by making statements audible to other inmates or by sending notes to other inmates.

6.    <u>Recording Conversations Between Cells:</u>

    a.    USMS/BOP/DF/FBI are hereby authorized to place microphones in the hallways and elsewhere outside the inmate's cell to record any statements made by the inmate to other inmates or staff.

    b.    In conducting any such recordings, care shall be taken so as not to overhear any legally- or consular-privileged meetings between the inmate and his counsel/consular officer.

    c.    The Notice of SAM given to the inmate shall notify the inmate that he is subject to such recording.

7.    <u>Cellblock Procedures:</u>

    a.    The inmate shall be kept separated from other inmates as much as possible while in the cellblock area.

<u>LIMITED OFFICIAL USE</u>

**Exhibit 18 - 290**

SPECIAL ADMINISTRATIVE MEASURES (SAM)                                    Page 12
Pursuant to 28 C.F.R. § 501.3
Inmate -Iouri Mikhel
                              LIMITED OFFICIAL USE

b.      The inmate shall be limited, within USMS BOP DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate while in the cellblock area.

8.    **Commissary Privileges:**

a       The USMS/BOP/DF shall restrict access to commissary items or any other objects determined by USMS/BOP/DF to be capable of being converted into dangerous instruments.

9.    **Frequent Cell Searches:**

a.      USMS/BOP/DF is hereby directed to search the inmate's cell frequently and to take appropriate disciplinary action for any infractions.

10.    **Access to Mass Communications** - To prevent the inmate from receiving and acting upon critically-timed information or information coded in a potentially undetectable manner, the inmate's access to materials of mass communication is restricted as follows:

a.      Periodicals/Newspapers -

i. The inmate may have access to publications determined not to facilitate criminal activity or be detrimental to national security; the security, good order or discipline of the institution; or the protection of the public. This determination is to be made by the FBI, in consultation with the USMS/BOP/DF and USAO.

ii. Sections of the periodical/newspaper which offer a forum for information to be passed by unknown and/or unverified individuals, including but not limited to classified advertisements and letters to the editor, should be removed from the periodicals/newspapers prior to distribution to the inmate.

iii. The inmate shall then have access to the remaining portions of the periodicals/newspapers in accordance with USMS/BOP/DF policy, after a delay of at least thirty (30) days. In accordance with subparagraph 3(g), above, the FBI will review the remaining portions of the publications prior to distribution to the inmate and be responsible for any translations required.

iv. In order to avoid passing messages/information from inmate to inmate, the inmate shall not be allowed to share the publication(s) with any other inmates.

                              LIMITED OFFICIAL USE

                                                              **Exhibit 18 - 291**

SPECIAL ADMINISTRATIVE MEASURES (SAM)
Pursuant to 28 C.F.R. § 501.3
Inmate -Iouri Mikhel, Page 13

LIMITED OFFICIAL USE

    b.    Television and Radio -

        i. The inmate is restricted from access to major news channels stations but is permitted access to all other radio and television channels/stations (without news broadcasts), in accordance with USMS/BOP/DF policies.

**CONCLUSION**

REDACTED

LIMITED OFFICIAL USE

**Exhibit 18 - 292**

JUN. 9.2003   1:41PM

SPECIAL ADMINISTRATIVE MEASURES (SAM)
Pursuant to 28 C.F.R. § 501.3
Inmate -Iouri Mikhel, Page 14

LIMITED OFFICIAL USE

REDACTED

## SAM CONTACT INFORMATION

Any questions that you or your staff may have about this memorandum or the SAM directed herein should be directed to Jack Geise, Principal Associate Director of Policy, or Jennifer Underriner, Office of Enforcement Operations. They can be contacted at: U.S. Department of Justice, Criminal Division, Office of Enforcement Operations, 10th and Constitution Avenues, N.W., JCK Building, Room 1200, Washington, DC, 20530-0001; telephone (202) 514-6809; and facsimile (202) 616-8256.

LIMITED OFFICIAL USE

**Exhibit 18 - 293**

# EXHIBIT

# 19



**U. S. Department of Justice**

*United States Attorney*
*Central District of California*

---

*Susan J. De Witt*
*Assistant United States Attorney*
*(213) 894-4496*

*1500 U.S. Courthouse*
*312 North Spring Street*
*Los Angeles, California 90012*

February 28, 2006

VIA FACSIMILE and U.S. MAIL

Dale Rubin, Esq. (capital counsel)
2275 Huntington Drive, Suite 902
San Marino, CA 91108
(800) 695-3717
fax: 413-228-0521

Richard Callahan, Esq.
230 E. Colorado Blvd., Suite 1200
Pasadena, CA 91101
(626) 202-4060
fax: 626-794-4676

Re:    United States v. Iouri Mikhel, et al., No. CR 02-220(B)-NM

Dear Counsel:

I am writing to provide you with written notice of the basis for implementing the SAM order that governs the conditions of confinement for your client Iouri Mikhel. I am requesting that Iouri Mikhel be provided with the following written notification.

**Pursuant to 28 C.F.R. § 501.3, Special Administrative Measures (SAM) were implemented regarding your conditions of confinement. The San Bernardino County Sheriff's Office has adopted these special administrative measures based on information provided to them. These special administrative measures are reasonably necessary to protect persons against the risk of death or serious bodily injury. There is a substantial risk that your communications or contacts with other persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons. Therefore, you are restricted in access to the mail, the media, the telephone, and visitors. These measures will remain in effect for one year subject to further notification by the Office of the Attorney General or his/her designee. The Attorney General originally placed you under Special Administrative Measures effective June 24, 2003.**

**Exhibit 19 - 294**

Notice of Implementation of SAM and
Extensions of the SAM Order
p. 2

**The SAM was modified in August 2003 and renewed in July of 2004 and again in July of 2005. Based on the information provided to the United States Department of Justice (DOJ) of your proclivity for violence, and your extensive ties with Russian Organized Crime, the Attorney General, through his designated agent, the Assistant Attorney General, has determined there continues to be a substantial risk that your communications or contacts with persons could result in death or serious bodily injury to persons. Therefore, pursuant to 28 C.F.R. § 501.3, the San Bernardino County Sheriff's Office will continue to implement the SAM in order to restrict your access to the mail, the media, the telephone, and visitors. The SAM commences immediately upon expiration of the prior SAM authorization period and will be in effect for a period of one year, subject to any further direction.**

By letter dated today, I am sending a copy of this letter to West Valley Detention Center with instructions to provide a copy of either this letter or the bolded notice portion set forth above to inmate Iouri Mikhel.

Very truly yours,

DEBRA WONG YANG
United States Attorney

SUSAN J. DE WITT
Assistant United States Attorney
Organized Crime & Terrorism Section

2

Exhibit 19 - 295

# EXHIBIT

# 20



**U.S. Department of Justice**

Federal Bureau of Prisons

_United States Penitentiary_
_Terre Haute, Indiana_

Date: June 27, 2007

Reply To
Attn Of:   R. V. Veach, Warden

Subject:   Notice of Renewed Special Administrative Measures

To:   Mikhel, Iouri
       Reg. No.: 23675-112

Pursuant to 28 C.F.R. § 501.3, Special Administrative Measures have been implemented regarding your confinement. The Attorney General authorized implementation of the procedures on June 6, 2003, and delegated the implementation of the procedure to the Director of the Bureau of Prisons. These Special Administrative Measures have been implemented based on information concerning your extensive ties with Russian Organized Crime, previous escape attempts, and threats to witnesses. There is a substantial risk that your communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons. Therefore, you are being restricted in access to the mail, the media, the telephone, and visitors. The Special Administrative Measures were most recently extended in June 2007, and will be in effect for one year subject to further direction from the Attorney General.

You may seek review of any special restrictions imposed through the Administrative Remedy Procedure which is set forth in 28 C.F. R. part 542.

**Exhibit 20 - 296**

-2-

1.    **General Provisions:**

    a.    **Adherence to Usual United States Marshals Service (USMS), Bureau of Prisons (BOP) and Detention Facility (DF) Policy Requirements** - In addition to the below-listed SAM, the inmate must comply with all usual USMS, BOP, and non-BOP DF policies regarding restrictions, activities, privileges, communications, etc. If there is a conflict between USMS/BOP/DF policies and the SAM, as set forth herein, where the SAM is more restrictive than usual USMS/BOP/DF policies, then the SAM shall control. If usual USMS/BOP/DF policies are more restrictive than the SAM, then USMS/BOP/DF policies shall control.

    b.    **Interim SAM Modification Authority** - During the term of this directive, the Director, Office of Enforcement Operations (OEO), Criminal Division, may modify the inmate's SAM as long as any SAM modification authorized by OEO:

        i.    Does not create a more restrictive SAM.

        ii.    Is not in conflict with the request of the U.S. Attorney for the Central District of California (USA/CDCA), Federal Bureau of Investigation (FBI), or USMS/BOP/DF, or applicable regulations.

        iii.    Is not objected to by the USA/CDCA, FBI, or USMS/BOP/DF.

    c.    **Inmate Communications Prohibitions** - The inmate is limited, within USMS/BOP/DF's reasonable efforts and existing confinement conditions, from having contact (including passing or receiving any oral, written or recorded communications) with any other inmate, visitor, attorney, or anyone else except as outlined and allowed by this document that could reasonably foreseeably result in the inmate communicating information (sending or receiving) that could circumvent the SAM's intent of significantly limiting the inmate's ability to communicate (send or receive) information relating to acts of violence or other crimes.

        i.    The USMS/BOP/DF may permit the inmate to communicate with other SAM inmates (except co-defendants) orally only during certain pre-designated times, the place and duration to be set by the USMS/BOP/DF. The inmate shall not have any physical contact with other inmates during this pre-designated time and all such pre-designated sessions will be

LIMITED OFFICIAL USE

-3-

monitored and/or recorded. Upon request of the FBI, a copy of the recordings will be provided by the USMS/BOP/DF to the FBI to be analyzed for indications that the inmates are attempting to pass messages soliciting or encouraging acts of violence or other crimes.

d.  Use of Interpreters/Translators by USMS/BOP/DF - Translator approval requirement:

i.  USMS/BOP/DF may use Department of Justice (DOJ)-approved translators as necessary for the purpose of facilitating communication with the inmate.

ii.  No person shall act as a translator without prior written clearance/approval from USMS/BOP/DF, which shall only be granted after consultation with the FBI and USA/CDCA.

iii.  Translators utilized by USMS/BOP/DF shall not be allowed to engage in, or overhear, unmonitored conversations with the inmate. Translators shall not be alone with the inmate, either in a room or on a telephone or other communications medium.

2.  **Attorney/Client Provisions:**

a.  **Attorney[1] Affirmation of Receipt of the SAM Restrictions Document** - The inmate's attorney (or counsel) – individually by each if more than one (1) – must sign an affirmation acknowledging receipt of the SAM restrictions document. By signing the affirmation, the attorney acknowledges his/her awareness and understanding of the SAM provisions and his/her agreement to abide by these provisions, particularly those that relate to contact between the inmate and his attorney and the attorney's staff. The signing of the affirmation does not serve as an endorsement of the SAM or the conditions of confinement, and does not serve to attest to any of the factors set forth in the conclusions supporting the SAM. However, in signing the affirmation, the inmate's attorney, and pre-cleared staff, acknowledge the restriction that they will not forward third-party messages to or from the inmate.

---

[1] The term "attorney" refers to the inmate's attorney of record, who has been verified and documented by the USA/CDCA, and who has received and acknowledged receipt of the SAM restrictions document. As used in this document, "attorney" also refers to more than one (1) attorney where the inmate is represented by two (2) or more attorneys, and the provisions of this document shall be fully applicable to each such attorney in his/her individual capacity.

<u>LIMITED OFFICIAL USE</u>

Exhibit 20 - 298

-4-

    i.    The USA/CDCA shall present, or forward, the attorney affirmation of receipt of the SAM restrictions document to the inmate's attorney.

    ii.    After initiation of SAM and prior to the inmate's attorney being permitted to have attorney/client-privileged contact with the inmate, the inmate's attorney shall execute a document affirming receipt of the SAM restrictions document and return the original to the USA/CDCA.

    iii.    The USA/CDCA shall maintain the original of the SAM acknowledgment document and forward a copy of the signed document to OEO in Washington, D.C. and the USMS/BOP/DF.

b.    **Attorney Use of Interpreters/Translators -**

    i.    Necessity Requirement - No interpreter/translator (translator) shall be utilized unless absolutely necessary where the inmate does not speak a common language with the attorney. Any translator shall be precleared.[2]

    ii.    Attorney Immediate Presence Requirement - Any use of a translator by the attorney shall be in the physical and immediate presence of the attorney - in the same room. The attorney shall not patch through telephone calls, or any other communications, to or from the inmate.

    iii.    Translation of Inmate's Correspondence - An attorney of record may only allow a federally approved translator to translate the inmate's correspondence as necessary for attorney/client-privileged communication.

c.    **Attorney/Client-Privileged Visits** - May be contact or non-contact, at the discretion of the USMS/BOP/DF.

d.    **Attorney May Disseminate Inmate Conversations** - The inmate's attorney may disseminate the contents of the inmate's communication to third parties for the sole purpose of preparing the inmate's post-sentencing proceedings — and not for any other reason — on the understanding that any such dissemination shall be made

---

[2] "Precleared" refers to a translator, who is actively assisting the inmate's attorney with the inmate's defense, who has submitted to a background check by the FBI and USA/CDCA, who has successfully been cleared by the FBI and USA/CDCA, and who has received a copy of the inmate's SAM and has agreed — as evidenced by his/her signature — to adhere to the SAM restrictions and requirements.

<u>LIMITED OFFICIAL USE</u>

Exhibit 20 - 299

-5-

solely by the inmate's attorney, and not by the attorney's staff.

e.  **Unaccompanied Attorney's Pre-cleared Paralegal(s)³ May Meet With Client** - The inmate's attorney's pre-cleared paralegal(s) may meet with the inmate without the necessity of the inmate's attorney being present. An investigator or translator may not meet alone with the inmate. These meetings may be contact or non-contact, at the discretion of the USMS/BOP/DF.

f.  **Simultaneous Multiple Legal Visitors** - The inmate may have multiple legal visitors provided that at least one (1) of the multiple legal visitors consists of the inmate's attorney or pre-cleared paralegal. These meetings may be contact or non-contact, at the discretion of the USMS/BOP/DF.

g.  **Legally Privileged Telephone Calls** - The following rules refer to all legally-privileged telephone calls or communications:

    i.  Inmate's Attorney's Pre-cleared Staff May Participate in Inmate Telephone Calls - The inmate's attorney's pre-cleared staff are permitted to communicate directly with the inmate by telephone, provided that the inmate's attorney is physically present and participating in the legal call as well.

    ii. Inmate's Initiation of Legally-Privileged Telephone Calls - Inmate-initiated telephone communications with his attorney or pre-cleared staff are to be placed by a USMS/BOP/DF staff member and the telephone handed over to the inmate only after the USMS/BOP/DF staff member confirms that the person on the other end of the line is the inmate's attorney. This privilege is contingent upon the following additional restrictions:

---

³ "Precleared" when used with regard to an attorney's staff, or "pre-cleared staff member," refers to a co-counsel, paralegal, or an investigator who is actively assisting the inmate's attorney with the inmate's post-sentencing proceedings, who has submitted a to a background check by the FBI and USA/CDCA, who has successfully been cleared by the FBI and USA/CDCA, and who has received a copy of the inmate's SAM and has agreed – as evidenced by his/her signature – to adhere to the SAM restrictions and requirements. As used in this document, "staff member" also refers to more than one (1) staff member, and the provisions of this document shall be fully applicable to each such staff member in his/her individual capacity. A "paralegal" will also be governed by any additional DF rules and regulations concerning paralegals.

<u>LIMITED OFFICIAL USE</u>

**Exhibit 20 - 300**

-6-

(1)  The inmate's attorney will not allow any non-pre-cleared person to communicate with the inmate, or to take part in and/or listen to or overhear any communications with the inmate.

(2)  The inmate's attorney must instruct his/her staff that:

   (a)  The inmate's attorney and pre-cleared staff are the only persons allowed to engage in communications with the inmate.

   (b)  The attorney's staff (including the attorney) are not to patch through, forward, transmit, or send the inmate's communications to third parties.

(3)  No telephone call/communication, or portion thereof, except as specifically authorized by this document:

   (a)  Is to be overheard by a third party.[4]

   (b)  Will be patched through, or in any manner forwarded or transmitted to a third party.

   (c)  Shall be divulged in any manner to a third party, except as otherwise provided in Section 2d.

   (d)  Shall be in any manner recorded or preserved.[5] The inmate's attorney may make written notes of attorney/client-privileged communications.

(4)  If USMS/BOP/DF, FBI or USA/CDCA determines that the inmate has used or is using the opportunity to make a legal call to speak with another inmate or for any other non-legal reason that would circumvent the intent of the SAM, the inmate's ability to contact

---

[4] For purposes of the SAM, "third party" does not include officials of the USMS/BOP/DF/FBI/DOJ, or other duly authorized federal authorities when acting in connection with their official duties. This section does not allow monitoring of attorney/client-privileged communications.

[5] Except by USMS/BOP/DF/FBI/DOJ or other duly authorized federal authorities. This section does not allow monitoring of attorney/client-privileged communications.

<u>LIMITED OFFICIAL USE</u>

TD:                                                    PAGE:008   R=4%

**Exhibit 20 - 301**

-7-

his attorney by telephone may be suspended or eliminated.

h.  **Documents Provided by Attorney to Inmate** - The inmate's attorney may provide his/her client with or review with the inmate, documents related to his post-sentencing proceedings, including discovery materials, court papers (including indictments, court orders, motions, etc.), and/or material prepared by the inmate's attorney, so long as any of the foregoing documents are translated, if translation is necessary, by a pre-cleared translator. Any document not related to the inmate's post-sentencing proceedings must be sent to the inmate via general correspondence and will be subject to the mail provisions of subparagraphs 2ii and 3g. Documents previously reviewed and cleared for receipt by the inmate, and already in the inmate's possession at the outset of the visit, may be discussed or reviewed by the inmate and the inmate's attorney during the visit.

    i.  None of the materials provided may include inflammatory materials, materials inciting to violence, or materials that may be used to pass messages from inmate to inmate, unless such materials have been precleared by the USA/CDCA and the FBI.

    ii. The USA/CDCA may authorize additional documents to be presented to the inmate. If any document not listed or described above needs to be transmitted to the inmate, consent for the transmission of the document can be obtained from the USA/CDCA without the need to formally seek approval for an amendment to the SAM.

i.  **Legal Mail** - The inmate's attorney may not send, communicate, distribute, or divulge the inmate's mail, or any portion of its contents (legal or otherwise), to third parties.[6]

    In signing the SAM acknowledgment document, the inmate's attorney and pre-cleared staff will acknowledge the restriction that only inmate case-related documents will be presented to the inmate, and that neither the attorney nor his/her staff will forward third-party mail to or from the inmate.

---

[6] Legal mail is defined as properly marked correspondence (marked "Legal Mail") addressed to or from the inmate's attorney of record. All other mail, including that otherwise defined by the USMS/BOP/DF as Special Mail, shall be processed as "non-legal mail."

LIMITED OFFICIAL USE

Exhibit 20 - 302

-8-

3.   **Inmate's Non-legal Contacts:**

   a.   **Non-legal Telephone Contacts -**

      i.   The inmate is limited to non-legal telephone calls with his immediate family members.[7]

      ii.   The quantity and duration of the inmate's non-legal telephone calls with his immediate family members shall be set by the USMS/BOP/DF, with a minimum of one (1) call per month, unless otherwise agreed upon by USMS/BOP/DF, FBI and USA/CDCA to allow more calls.

   b.   **Rules for Telephone Calls -** For all non-legally privileged telephone calls or communications, no telephone call/communication, or portion thereof:

      i.   Is to be overheard by a third party.[8]

      ii.   Is to be patched through, or in any manner forwarded or transmitted, to a third party.

      iii.   Shall be divulged in any manner to a third party.

      iv.   Shall be in any manner recorded or preserved.[9]

   All telephone calls shall be in English unless a fluent FBI/USMS/BOP/DF-approved translator is available to contemporaneously monitor the telephone call. Arranging for a translator may require at least fourteen (14) days advance notice.

   c.   **Telephone SAM Restriction Notifications -** For all non-legal telephone calls to the inmate's immediate family member(s):

   ---

   [7] The inmate's "immediate family members" are defined as the inmate's (USMS/BOP/DF/FBI-verifiable) spouse, natural children, parents, and siblings.

   [8] For purposes of the SAM, "third party" does not include officials of the USMS/BOP/DF/FBI/DOJ, or other duly authorized federal authorities when monitoring in connection with their official duties. This section does not allow monitoring of attorney/client communications.

   [9] Except by USMS/BOP/DF/FBI/DOJ, or other duly authorized federal authorities.

LIMITED OFFICIAL USE

**Exhibit 20 - 303**

-9-

i.      USMS/BOP/DF shall inform the inmate of the telephone SAM restrictions prior to each telephone call.

ii.     USMS/BOP/DF shall verbally inform the inmate's immediate family member(s) on the opposite end of the inmate's telephone communication of the telephone SAM. USMS/BOP/DF is only required to notify the inmate's communication recipient in English.

iii.    USMS/BOP/DF shall document each such telephone notification.

d.   Family Call Monitoring - All calls with the inmate's immediate family member(s) shall be:

i.      Contemporaneously monitored by the FBI.

ii.     Contemporaneously recorded (as directed by the FBI) in a manner that allows such telephone calls to be analyzed for indications the call is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

iii.    A copy of each inmate/immediate family member telephone call recording shall be provided by USMS/BOP/DF on a single, individual cassette tape (per call) for forwarding to the FBI. These recordings shall be forwarded on a call-by-call basis as soon as practicable.

e.   Improper Communications - If telephone call monitoring or analysis reveals that any call or portion of a call involving the inmate contains any indication of a discussion of illegal activity, the soliciting of or encouraging of acts of violence, or actual or attempted circumvention of the SAM, the inmate shall not be permitted any further calls to his immediate family members for a period of time to be determined by USMS/BOP/DF. If contemporaneous monitoring reveals such inappropriate activity, the telephone call may be immediately terminated.

f.   Non-legal Visits -

i.      Limited Visitors - The inmate shall be permitted to visit only with his immediate family members. The visitor's identity and family member relationship to the inmate will be confirmed by the USMS/BOP/DF and FBI in advance.

LIMITED OFFICIAL USE

**Exhibit 20 - 304**

-10-

ii. **English Requirement** - All communications during non-legal inmate visits will be in English unless a fluent FBI/USMS/BOP/DF-approved translator is readily available to contemporaneously monitor the communication/visit.

iii. **Visit Criteria** - All non-legal visits shall be:

    (1) Contemporaneously monitored by USMS/BOP/DF and/or FBI, in a manner that allows such visits to be analyzed for indications the visit is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

    (2) Permitted only with a minimum of fourteen (14) calendar days advance written notice to the USMS/BOP/DF facility where the inmate is housed.

    (3) Without any physical contact. All such meetings shall be non-contact to protect against harm to visitors or staff should the inmate attempt to take hostages.

    (4) Limited to one (1) adult visitor at a time. However, FBI-verified children of the inmate may visit with a pre-approved adult visitor.

g. **Non-legal Mail** - Any mail not clearly and properly addressed to/from the inmate's attorney and marked "Privileged" (incoming or outgoing). Non-legal mail is limited to only the inmate's immediate family, U.S. courts, federal judges, U.S. Attorney's Offices, members of U.S. Congress, BOP, other federal law enforcement entities, and, if the inmate is a citizen of a foreign country, a verified consular representative of that country.

i. **General correspondence with limitations:** correspondence is restricted to immediate family members and the individuals listed below. Volume and frequency of outgoing general correspondence with immediate family members and listed individuals only may be limited to three pieces of paper (not larger than 8 1/2 x 11), double-sided, once per calendar week to a single recipient, at the discretion of the USMS/BOP/DF. The identity and family member or other prior relationship to the inmate will be confirmed by USMS/BOP/DF and FBI.

<u>LIMITED OFFICIAL USE</u>

ID:

PAGE·012   P=072

Exhibit 20 - 305

-11-

ii.    General correspondence without limitations: correspondence to U.S. courts, federal judges, U.S. Attorney's Offices, members of U.S. Congress, BOP, and other federal law enforcement entities. There is no volume nor frequency limitation on mail to/from these parties unless there is evidence of abuse of these privileges, threatening correspondence is detected, circumvention of the SAM is detected, or the quantity to be processed becomes unreasonable to the extent that efficient processing to protect the security, good order or discipline of the institution, the public or national security may be jeopardized.

iii.   All non-legal mail will be:

(1)    **Copied** - Shall be copied (including the surface of the envelope) by the warden, or his/her designee, of the facility in which the inmate is housed.

(2)    **Forwarded** - Shall be forwarded, in copy form, to the location designated by the FBI.

(3).   **Analyzed** - After government analysis and approval, if appropriate, the inmate's incoming/outgoing non-legal mail will be forwarded to the USMS/BOP/DF for delivery to the inmate (incoming); or directly to the addressee (outgoing).

The Federal Government will forward the inmate's non-legal mail to the USMS/BOP/DF for delivery to the inmate or directly to the addressee after a review and analysis period of:

(a)    A reasonable time not to exceed fourteen (14) business days for mail which is written entirely in the English language.

(b)    A reasonable time not to exceed sixty (60) business days for any mail which includes writing in any language other than English, to allow for translation.

(c)    A reasonable time not to exceed sixty (60) business days for any mail where the Federal Government has reasonable suspicion to believe that a code was used, to allow for decoding.

<u>LIMITED OFFICIAL USE</u>

Exhibit 20 - 306

-12-

iv.    Mail Seizure - If outgoing/incoming mail is determined by USMS/BOP/DF or FBI to contain overt or covert discussions of or requests for illegal activities, the soliciting or encouraging of acts of violence, or actual or attempted circumvention of the SAM, the mail shall not be delivered/forwarded to the intended recipient but referred to the FBI for appropriate action. The inmate shall be notified in writing of the seizure of any mail.

4.    **Communication With News Media:**

The inmate will not be permitted to talk with, meet with, correspond with, or otherwise communicate with any member, or representative, of the news media, in person, by telephone, by furnishing a recorded message, through the mail, through his attorney, through a third party, or otherwise.

5.    **No Group Prayer:**

a.    The inmate shall not be allowed to engage in group prayer with other inmates.

b.    If an FBI and/or USMS/BOP/DF approved religious representative is to be present for prayer with the inmate, the prayer shall be conducted as part of a contact or non-contact visit, at the discretion of the USMS/BOP/DF.

6.    **No Communal Cells and No Communication Between Cells:**

a.    The inmate shall not be allowed to share a cell with another inmate.

b.    The inmate shall be limited within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate by making statements audible to other inmates or by sending notes to other inmates, except as permitted in Section 1c above.

7.    **Recording Conversations Between Cells:**

a.    USMS/BOP/DF/FBI are hereby authorized to place microphones in the hallways and elsewhere outside the inmate's cell to record any statements made by the inmate to other inmates or staff.

b.    The Notice of SAM given to the inmate shall notify the inmate that he is subject to such recording.

**LIMITED OFFICIAL USE**

ID:

Exhibit 20 - 307

-13-

8.  **Cellblock Procedures:**

   a.  The inmate shall be kept separated from other inmates as much as possible while in the cellblock area.

   b.  The inmate shall be limited, within USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate while in the cellblock area.

9.  **Commissary Privileges:**

   The USMS/BOP/DF shall restrict access to commissary items or any other objects determined by USMS/BOP/DF to be capable of being converted into dangerous instruments.

10.  **Access to Mass Communications:**

   To prevent the inmate from receiving and acting upon critically-timed information or information coded in a potentially undetectable manner, the inmate's access to materials of mass communication is restricted as follows:

   a.  Periodicals/Newspapers -

      i.  The inmate may have access to publications determined not to facilitate criminal activity or be detrimental to national security; the security, good order or discipline of the institution; or the protection of the public. This determination is to be made by the FBI, in consultation with the USMS/BOP/DF and USA/CDCA.

      ii.  Sections of the periodical/newspaper which offer a forum for information to be passed by unknown and/or unverified individuals, including but not limited to classified advertisements and letters to the editor, should be removed from the periodicals/newspapers prior to distribution to the inmate.

      iii.  The inmate shall then have access to the remaining portions of the periodicals/newspapers in accordance with USMS/BOP/DF policy, after a delay of at least thirty (30) days. In accordance with subparagraph 3g, above, the FBI will review the remaining portions of the publications prior to distribution to the inmate and be responsible for any translations required.

LIMITED OFFICIAL USE

Exhibit 20 - 308

-14-

iv.    In order to avoid passing messages/information from inmate to inmate, the inmate shall not be allowed to share the publication(s) with any other inmates.

b.    Television and Radio - The inmate is authorized to have television and radio viewing and listening privileges, in accordance with standard and applicable USMS/BOP/DF policies and procedures.

c.    Termination or Limitation - If the USMS/BOP/DF determines that the mass communications are being used to send messages to the inmate relating to the furtherance of violent and/or criminal activities, the inmate's access may be limited or terminated for a period of time to be determined by the USMS/BOP/DF.

11.    **Frequent Cell Searches:**

USMS/BOP/DF is hereby directed to search the inmate's cell frequently and to take appropriate disciplinary action for any infractions.

12.    **Transfer of Custody:**

In the event that the inmate is transferred to or from the custody of the USMS, BOP or any other DF, the SAM provisions authorized for this inmate will continue in effect, without need for any additional DOJ authorization.

ID:

Exhibit 20 - 309



**U.S. Department of Justice**

Federal Bureau of Prisons

_United States Penitentiary_
_Terre Haute, Indiana_

Inmate Mikhel #23675-112 was notified and provided a copy of the Special Administrative Measures that were recently extended in June 2007.

_____
MIKHEL, Iouri #23675-112

_____         _____
STAFF WITNESS                                          DATE

                                                                      7-11-07

**Exhibit 20 - 310**

# EXHIBIT

# 21



**U.S. Department of Justice**

Criminal Division

_Office of the Assistant Attorney General_        _Washington, D.C. 20530_

MAY 2 0 2008

LIMITED OFFICIAL USE

**MEMORANDUM**

TO:                Harley G. Lappin
                        Director
                        Federal Bureau of Prisons

FROM:        _ASF_    Alice S. Fisher
                    _by_     Assistant Attorney General

SUBJECT:      Extension of Special Administrative Measures (SAM) Pursuant to 28 C.F.R. § 501.3 for Federal Bureau of Prisons Inmate Iouri Mikhel

       Federal inmate Iouri Mikhel was recently convicted of Conspiring to Take Hostages Resulting in Death, as well as substantive counts of Hostage Taking Resulting in Death, in violation of 18 U.S.C. §1203, in connection with the abduction and murder of five people between October 2001 and January 2002. Mikhel has been sentenced to death and is currently being incarcerated at the U.S.P. in Terre Haute, Indiana. Because of Mikhel's extensive ties with Russian Organized Crime, the Attorney General placed Mikhel under SAM originally effective June 6, 2003. The SAM were most recently extended in June 2007.

       Based upon information provided to me concerning Iouri Mikhel's extensive ties with Russian Organized Crime, previous escape attempts, and threats to witnesses, I find that there is substantial risk that Iouri Mikhel's communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of serious bodily injury to persons. Therefore, I am requesting that you, pursuant to 28 C.F.R. § 501.3, continue to implement SAM in order to restrict Iouri Mikhel's access to the mail, the media, the telephone, and visitors. This SAM will commence immediately upon expiration of the prior SAM authorization period and will be in effect for a period of one (1) year, subject to my further direction.

LIMITED OFFICIAL USE

**Exhibit 21 - 311**

-2-

1.     **General Provisions:**

a.     **Adherence to Usual United States Marshals Service (USMS), Bureau of Prisons (BOP) and Detention Facility (DF) Policy Requirements** - In addition to the below-listed SAM, the inmate must comply with all usual USMS, BOP, and non-BOP DF policies regarding restrictions, activities, privileges, communications, etc. If there is a conflict between USMS/BOP/DF policies and the SAM, as set forth herein, where the SAM is more restrictive than usual USMS/BOP/DF policies, then the SAM shall control. If usual USMS/BOP/DF policies are more restrictive than the SAM, then USMS/BOP/DF policies shall control.

b.     **Interim SAM Modification Authority** - During the term of this directive, the Director, Office of Enforcement Operations (OEO), Criminal Division, may modify the inmate's SAM as long as any SAM modification authorized by OEO:

      i.     Does not create a more restrictive SAM.

      ii.     Is not in conflict with the request of the U.S. Attorney for the Central District of California (USA/CDCA), Federal Bureau of Investigation (FBI), or USMS/BOP/DF, or applicable regulations.

      iii.     Is not objected to by the USA/CDCA, FBI, or USMS/BOP/DF.

c.     **Inmate Communications Prohibitions** - The inmate is limited, within USMS/BOP/DF's reasonable efforts and existing confinement conditions, from having contact (including passing or receiving any oral, written or recorded communications) with any other inmate, visitor, attorney, or anyone else except as outlined and allowed by this document that could reasonably foreseeably result in the inmate communicating information (sending or receiving) that could circumvent the SAM's intent of significantly limiting the inmate's ability to communicate (send or receive) information relating to acts of violence or other crimes.

      i.     The USMS/BOP/DF may permit the inmate to communicate with other SAM inmates (except co-defendants) orally only during certain pre-designated times, the place and duration to be set by the USMS/BOP/DF. The inmate shall not have any physical contact with other inmates during this pre-designated time and all such pre-designated sessions will be

LIMITED OFFICIAL USE

Exhibit 21 - 312

-3-

monitored and/or recorded. Upon request of the FBI, a copy of the recordings will be provided by the USMS/BOP/DF to the FBI to be analyzed for indications that the inmates are attempting to pass messages soliciting or encouraging acts of violence or other crimes.

d.　**Use of Interpreters/Translators by USMS/BOP/DF** - Translator approval requirement:

　　i.　USMS/BOP/DF may use Department of Justice (DOJ)-approved translators as necessary for the purpose of facilitating communication with the inmate.

　　ii.　No person shall act as a translator without prior written clearance/approval from USMS/BOP/DF, which shall only be granted after consultation with the FBI and USA/CDCA.

　　iii.　Translators utilized by USMS/BOP/DF shall not be allowed to engage in, or overhear, unmonitored conversations with the inmate. Translators shall not be alone with the inmate, either in a room or on a telephone or other communications medium.

2.　**Attorney/Client Provisions:**

a.　**Attorney[1] Affirmation of Receipt of the SAM Restrictions Document** - The inmate's attorney (or counsel) – individually by each if more than one (1) – must sign an affirmation acknowledging receipt of the SAM restrictions document. By signing the affirmation, the attorney acknowledges his/her awareness and understanding of the SAM provisions and his/her agreement to abide by these provisions, particularly those that relate to contact between the inmate and his attorney and the attorney's staff. The signing of the affirmation does not serve as an endorsement of the SAM or the conditions of confinement, and does not serve to attest to any of the factors set forth in the conclusions supporting the SAM. However, in signing the affirmation, the inmate's attorney, and pre-cleared staff, acknowledge the restriction that they will not forward third-party messages to or from the inmate.

---

[1] The term "attorney" refers to the inmate's attorney of record, who has been verified and documented by the USA/CDCA, and who has received and acknowledged receipt of the SAM restrictions document. As used in this document, "attorney" also refers to more than one (1) attorney where the inmate is represented by two (2) or more attorneys, and the provisions of this document shall be fully applicable to each such attorney in his/her individual capacity.

LIMITED OFFICIAL USE

Exhibit 21 - 313

-4-

i.   The USA/CDCA shall present, or forward, the attorney affirmation of receipt of the SAM restrictions document to the inmate's attorney.

ii.  After initiation of SAM and prior to the inmate's attorney being permitted to have attorney/client-privileged contact with the inmate, the inmate's attorney shall execute a document affirming receipt of the SAM restrictions document and return the original to the USA/CDCA.

iii. The USA/CDCA shall maintain the original of the SAM acknowledgment document and forward a copy of the signed document to OEO in Washington, D.C. and the USMS/BOP/DF.

b.   **Attorney Use of Interpreters/Translators -**

i.   Necessity Requirement - No interpreter/translator (translator) shall be utilized unless absolutely necessary where the inmate does not speak a common language with the attorney. Any translator shall be precleared.[2]

ii.  Attorney Immediate Presence Requirement - Any use of a translator by the attorney shall be in the physical and immediate presence of the attorney - in the same room. The attorney shall not patch through telephone calls, or any other communications, to or from the inmate.

iii. Translation of Inmate's Correspondence - An attorney of record may only allow a federally approved translator to translate the inmate's correspondence as necessary for attorney/client-privileged communication.

c.   **Attorney/Client-Privileged Visits** - May be contact or non-contact, at the discretion of the USMS/BOP/DF.

d.   **Attorney May Disseminate Inmate Conversations** - The inmate's attorney may disseminate the contents of the inmate's communication to third parties for the sole purpose of preparing the inmate's post-sentencing proceedings – and not for any other reason – on the understanding that any such dissemination shall be made solely by the inmate's attorney, and not by the attorney's staff.

---

[2] "Precleared" refers to a translator, who is actively assisting the inmate's attorney with the inmate's defense, who has submitted to a background check by the FBI and USA/CDCA, who has successfully been cleared by the FBI and USA/CDCA, and who has received a copy of the inmate's SAM and has agreed – as evidenced by his/her signature – to adhere to the SAM restrictions and requirements.

LIMITED OFFICIAL USE

**Exhibit 21 - 314**

-5-

e.  **Unaccompanied Attorney's Pre-cleared Paralegal(s)[3] May Meet With Client -** The inmate's attorney's pre-cleared paralegal(s) may meet with the inmate without the necessity of the inmate's attorney being present. An investigator or translator may not meet alone with the inmate. These meetings may be contact or non-contact, at the discretion of the USMS/BOP/DF.

f.  **Simultaneous Multiple Legal Visitors -** The inmate may have multiple legal visitors provided that at least one (1) of the multiple legal visitors consists of the inmate's attorney or pre-cleared paralegal. These meetings may be contact or non-contact, at the discretion of the USMS/BOP/DF.

g.  **Legally Privileged Telephone Calls -** The following rules refer to all legally-privileged telephone calls or communications:

  i.  Inmate's Attorney's Pre-cleared Staff May Participate in Inmate Telephone Calls - The inmate's attorney's pre-cleared staff are permitted to communicate directly with the inmate by telephone, provided that the inmate's attorney is physically present and participating in the legal call as well.

  ii.  Inmate's Initiation of Legally-Privileged Telephone Calls - Inmate-initiated telephone communications with his attorney or pre-cleared staff are to be placed by a USMS/BOP/DF staff member and the telephone handed over to the inmate only after the USMS/BOP/DF staff member confirms that the person on the other end of the line is the inmate's attorney. This privilege is contingent upon the following additional restrictions:

    (1)  The inmate's attorney will not allow any non-pre-cleared person to communicate with the inmate, or to take part in and/or listen to or

---

[3] "Precleared" when used with regard to an attorney's staff, or "pre-cleared staff member," refers to a co-counsel, paralegal, or an investigator who is actively assisting the inmate's attorney with the inmate's post-sentencing proceedings, who has submitted a to a background check by the FBI and USA/CDCA, who has successfully been cleared by the FBI and USA/CDCA, and who has received a copy of the inmate's SAM and has agreed – as evidenced by his/her signature – to adhere to the SAM restrictions and requirements. As used in this document, "staff member" also refers to more than one (1) staff member, and the provisions of this document shall be fully applicable to each such staff member in his/her individual capacity. A "paralegal" will also be governed by any additional DF rules and regulations concerning paralegals.

LIMITED OFFICIAL USE

**Exhibit 21 - 315**

-6-

overhear any communications with the inmate.

(2)     The inmate's attorney must instruct his/her staff that:

    (a)     The inmate's attorney and pre-cleared staff are the only persons allowed to engage in communications with the inmate.

    (b)     The attorney's staff (including the attorney) are not to patch through, forward, transmit, or send the inmate's communications to third parties.

(3)     No telephone call/communication, or portion thereof, except as specifically authorized by this document:

    (a)     Is to be overheard by a third party.[4]

    (b)     Will be patched through, or in any manner forwarded or transmitted to a third party.

    (c)     Shall be divulged in any manner to a third party, except as otherwise provided in Section 2d.

    (d)     Shall be in any manner recorded or preserved.[5]  The inmate's attorney may make written notes of attorney/ client-privileged communications.

(4)     If USMS/BOP/DF, FBI or USA/CDCA determines that the inmate has used or is using the opportunity to make a legal call to speak with another inmate or for any other non-legal reason that would circumvent the intent of the SAM, the inmate's ability to contact his attorney by telephone may be suspended or eliminated.

---

[4] For purposes of the SAM, "third party" does not include officials of the USMS/BOP/DF/FBI/DOJ, or other duly authorized federal authorities when acting in connection with their official duties.  This section does not allow monitoring of attorney/client-privileged communications.

[5] Except by USMS/BOP/DF/FBI/DOJ or other duly authorized federal authorities.  This section does not allow monitoring of attorney/client-privileged communications.

LIMITED OFFICIAL USE

Exhibit 21 - 316

-7-

h.   **Documents Provided by Attorney to Inmate** - The inmate's attorney may provide his/her client with or review with the inmate, documents related to his post-sentencing proceedings, including discovery materials, court papers (including indictments, court orders, motions, etc.), and/or material prepared by the inmate's attorney, so long as any of the foregoing documents are translated, if translation is necessary, by a pre-cleared translator. Any document not related to the inmate's post-sentencing proceedings must be sent to the inmate via general correspondence and will be subject to the mail provisions of subparagraphs 2ii and 3g. Documents previously reviewed and cleared for receipt by the inmate, and already in the inmate's possession at the outset of the visit, may be discussed or reviewed by the inmate and the inmate's attorney during the visit.

   i.   None of the materials provided may include inflammatory materials, materials inciting to violence, or materials that may be used to pass messages from inmate to inmate, unless such materials have been precleared by the USA/CDCA and the FBI.

   ii.   The USA/CDCA may authorize additional documents to be presented to the inmate. If any document not listed or described above needs to be transmitted to the inmate, consent for the transmission of the document can be obtained from the USA/CDCA without the need to formally seek approval for an amendment to the SAM.

i.   **Legal Mail** - The inmate's attorney may not send, communicate, distribute, or divulge the inmate's mail, or any portion of its contents (legal or otherwise), to third parties.[6]

In signing the SAM acknowledgment document, the inmate's attorney and pre-cleared staff will acknowledge the restriction that only inmate case-related documents will be presented to the inmate, and that neither the attorney nor his/her staff will forward third-party mail to or from the inmate.

3.   **Inmate's Non-legal Contacts:**

a.   **Non-legal Telephone Contacts -**

---

[6] Legal mail is defined as properly marked correspondence (marked "Legal Mail") addressed to or from the inmate's attorney of record. All other mail, including that otherwise defined by the USMS/BOP/DF as Special Mail, shall be processed as "non-legal mail."

LIMITED OFFICIAL USE

**Exhibit 21 - 317**

-8-

    i.     The inmate is limited to non-legal telephone calls with his immediate family members.[7]

    ii.    The quantity and duration of the inmate's non-legal telephone calls with his immediate family members shall be set by the USMS/BOP/DF, with a minimum of one (1) call per month, unless otherwise agreed upon by USMS/BOP/DF, FBI and USA/CDCA to allow more calls.

b.    **Rules for Telephone Calls** - For all non-legally privileged telephone calls or communications, no telephone call/communication, or portion thereof:

    i.     Is to be overheard by a third party.[8]

    ii.    Is to be patched through, or in any manner forwarded or transmitted, to a third party.

    iii.   Shall be divulged in any manner to a third party.

    iv.   Shall be in any manner recorded or preserved.[9]

All telephone calls shall be in English unless a fluent FBI/USMS/BOP/DF-approved translator is available to contemporaneously monitor the telephone call. Arranging for a translator may require at least fourteen (14) days advance notice.

c.    **Telephone SAM Restriction Notifications** - For all non-legal telephone calls to the inmate's immediate family member(s):

    i.     USMS/BOP/DF shall inform the inmate of the telephone SAM restrictions prior to each telephone call.

    ii.    USMS/BOP/DF shall verbally inform the inmate's immediate family

---

[7] The inmate's "immediate family members" are defined as the inmate's (USMS/BOP/DF/FBI-verifiable) spouse, natural children, parents, and siblings.

[8] For purposes of the SAM, "third party" does not include officials of the USMS/BOP/DF/FBI/DOJ, or other duly authorized federal authorities when monitoring in connection with their official duties. This section does not allow monitoring of attorney/client communications.

[9] Except by USMS/BOP/DF/FBI/DOJ, or other duly authorized federal authorities.

LIMITED OFFICIAL USE

**Exhibit 21 - 318**

-9-

member(s) on the opposite end of the inmate's telephone communication of the telephone SAM. USMS/BOP/DF is only required to notify the inmate's communication recipient in English.

iii.    USMS/BOP/DF shall document each such telephone notification.

d.    **Family Call Monitoring** - All calls with the inmate's immediate family member(s) shall be:

    i.    Contemporaneously monitored by the FBI.

    ii.    Contemporaneously recorded (as directed by the FBI) in a manner that allows such telephone calls to be analyzed for indications the call is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

    iii.    A copy of each inmate/immediate family member telephone call recording shall be provided by USMS/BOP/DF on a single, individual cassette tape (per call) for forwarding to the FBI. These recordings shall be forwarded on a call-by-call basis as soon as practicable.

e.    **Improper Communications** - If telephone call monitoring or analysis reveals that any call or portion of a call involving the inmate contains any indication of a discussion of illegal activity, the soliciting of or encouraging of acts of violence, or actual or attempted circumvention of the SAM, the inmate shall not be permitted any further calls to his immediate family members for a period of time to be determined by USMS/BOP/DF. If contemporaneous monitoring reveals such inappropriate activity, the telephone call may be immediately terminated.

f.    **Non-legal Visits -**

    i.    **Limited Visitors** - The inmate shall be permitted to visit only with his immediate family members. The visitor's identity and family member relationship to the inmate will be confirmed by the USMS/BOP/DF and FBI in advance.

    ii.    **English Requirement** - All communications during non-legal inmate visits will be in English unless a fluent FBI/USMS/BOP/DF-approved translator is readily available to contemporaneously monitor the communication/visit.

<u>LIMITED OFFICIAL USE</u>

**Exhibit 21 - 319**

-10-

iii.    **Visit Criteria** - All non-legal visits shall be:

(1)    Contemporaneously monitored by USMS/BOP/DF and/or FBI, in a manner that allows such visits to be analyzed for indications the visit is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

(2)    Permitted only with a minimum of fourteen (14) calendar days advance written notice to the USMS/BOP/DF facility where the inmate is housed.

(3)    Without any physical contact. All such meetings shall be non-contact to protect against harm to visitors or staff should the inmate attempt to take hostages.

(4)    Limited to one (1) adult visitor at a time. However, FBI-verified children of the inmate may visit with a pre-approved adult visitor.

g.    **Non-legal Mail** - Any mail not clearly and properly addressed to/from the inmate's attorney and marked "Privileged" (incoming or outgoing). Non-legal mail is limited to only the inmate's immediate family, U.S. courts, federal judges, U.S. Attorney's Offices, members of U.S. Congress, BOP, other federal law enforcement entities, and, if the inmate is a citizen of a foreign country, a verified consular representative of that country.

i.    **General correspondence with limitations:** correspondence is restricted to immediate family members and the individuals listed below. Volume and frequency of outgoing general correspondence with immediate family members and listed individuals only may be limited to three pieces of paper (not larger than 8 1/2 x 11), double-sided, once per calendar week to a single recipient, at the discretion of the USMS/BOP/DF. The identity and family member or other prior relationship to the inmate will be confirmed by USMS/BOP/DF and FBI.

ii.    **General correspondence without limitations:** correspondence to U.S. courts, federal judges, U.S. Attorney's Offices, members of U.S. Congress, BOP, and other federal law enforcement entities. There is no volume nor frequency limitation on mail to/from these parties unless there is evidence of abuse of these privileges, threatening correspondence is detected, circumvention of the SAM is detected, or the quantity to be processed

LIMITED OFFICIAL USE

**Exhibit 21 - 320**

-11-

becomes unreasonable to the extent that efficient processing to protect the security, good order or discipline of the institution, the public or national security may be jeopardized .

iii.   All non-legal mail will be:

    (1)   **Copied** - Shall be copied (including the surface of the envelope) by the warden, or his/her designee, of the facility in which the inmate is housed.

    (2)   **Forwarded** - Shall be forwarded, in copy form, to the location designated by the FBI.

    (3).   **Analyzed** - After government analysis and approval, if appropriate, the inmate's incoming/outgoing non-legal mail will be forwarded to the USMS/BOP/DF for delivery to the inmate (incoming); or directly to the addressee (outgoing).

The Federal Government will forward the inmate's non-legal mail to the USMS/BOP/DF for delivery to the inmate or directly to the addressee after a review and analysis period of:

    (a)   A reasonable time not to exceed fourteen (14) business days for mail which is written entirely in the English language.

    (b)   A reasonable time not to exceed sixty (60) business days for any mail which includes writing in any language other than English, to allow for translation.

    (c)   A reasonable time not to exceed sixty (60) business days for any mail where the Federal Government has reasonable suspicion to believe that a code was used, to allow for decoding.

iv.   **Mail Seizure** - If outgoing/incoming mail is determined by USMS/BOP/DF or FBI to contain overt or covert discussions of or requests for illegal activities, the soliciting or encouraging of acts of violence, or actual or attempted circumvention of the SAM, the mail shall not be delivered/forwarded to the intended recipient but referred to the FBI for appropriate action.  The inmate shall be notified in writing of the

LIMITED OFFICIAL USE

**Exhibit 21 - 321**

-12-

seizure of any mail.

4. **Communication With News Media:**

The inmate will not be permitted to talk with, meet with, correspond with, or otherwise communicate with any member, or representative, of the news media, in person, by telephone, by furnishing a recorded message, through the mail, through his attorney, through a third party, or otherwise.

5. **No Group Prayer:**

a.    The inmate shall not be allowed to engage in group prayer with other inmates.

b.    If an FBI and/or USMS/BOP/DF approved religious representative is to be present for prayer with the inmate, the prayer shall be conducted as part of a contact or non-contact visit, at the discretion of the USMS/BOP/DF.

6. **No Communal Cells and No Communication Between Cells:**

a.    The inmate shall not be allowed to share a cell with another inmate.

b.    The inmate shall be limited within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate by making statements audible to other inmates or by sending notes to other inmates, except as permitted in Section 1c above.

7. **Recording Conversations Between Cells:**

a.    USMS/BOP/DF/FBI are hereby authorized to place microphones in the hallways and elsewhere outside the inmate's cell to record any statements made by the inmate to other inmates or staff.

b.    The Notice of SAM given to the inmate shall notify the inmate that he is subject to such recording.

8. **Cellblock Procedures:**

a.    The inmate shall be kept separated from other inmates as much as possible while in the cellblock area.

b.    The inmate shall be limited, within USMS/BOP/DF's reasonable efforts and

LIMITED OFFICIAL USE

**Exhibit 21 - 322**

-13-

existing confinement conditions, from communicating with any other inmate while in the cellblock area.

9.    **Commissary Privileges:**

The USMS/BOP/DF shall restrict access to commissary items or any other objects determined by USMS/BOP/DF to be capable of being converted into dangerous instruments.

10.    **Access to Mass Communications:**

To prevent the inmate from receiving and acting upon critically-timed information or information coded in a potentially undetectable manner, the inmate's access to materials of mass communication is restricted as follows:

a.    **Periodicals/Newspapers -**

    i.    The inmate may have access to publications determined not to facilitate criminal activity or be detrimental to: national security; the security, good order or discipline of the institution; or the protection of the public. This determination is to be made by the FBI, in consultation with the USMS/BOP/DF and USA/.

    ii.    Sections of the periodical/newspaper which offer a forum for information to be passed by unknown and/or unverified individuals, including but not limited to classified advertisements and letters to the editor, should be removed from the periodicals/newspapers prior to distribution to the inmate.

    iii.    Non-news type of publication - the FBI will advise the BOP if the publication is acceptable. If restricted, the publication will be denied. If acceptable, upon delivery, the BOP will review the publication for institutional security concerns and forward the publication to the FBI for review if there is a national security concern or if the FBI's intelligence expertise is otherwise needed. The BOP will also forward the publication to the FBI if translations are needed to make that determination. (In these cases, the FBI shall respond to the BOP within fourteen (14) business days.) The inmate shall then have access to the remaining portions of the periodicals/newspapers deemed acceptable, in accordance with USMS/BOP/DF policy.

    News type of publication - the FBI will advise the BOP if the publication is acceptable. If restricted, the publication will be denied. If acceptable, the FBI will process the publication in accordance with the non-legal mail time provisions in subsection 3(g)(iii), as well as the provisions of this

LIMITED OFFICIAL USE

**Exhibit 21 - 323**

-14-

        section (Section 10). The FBI will be responsible for any translations required and may, in its discretion, review the remaining portions of the publication prior to distribution to the inmate.

iv.     In order to avoid passing messages/information from inmate to inmate, the inmate shall not be allowed to share the publication(s) with any other inmates.

b.     **Television and Radio** - The inmate is restricted from access to channels/stations which primarily broadcast news, but is permitted access to all other radio and television channels/stations, including, but not limited to, ABC, NBC, CBS and FOX, in accordance with USMS/BOP/DF policies.

c.     **Termination or Limitation** - If the USMS/BOP/DF determines that the mass communications are being used as a vehicle to send messages to the inmate relating to the furtherance of terrorist activities, the inmate's access may be limited or terminated for a period of time to be determined by the USMS/BOP/DF.

11.     **Frequent Cell Searches:**

USMS/BOP/DF is hereby directed to search the inmate's cell frequently and to take appropriate disciplinary action for any infractions.

12.     **Transfer of Custody:**

In the event that the inmate is transferred to or from the custody of the USMS, BOP or any other DF, the SAM provisions authorized for this inmate will continue in effect, without need for any additional DOJ authorization.

13.     **Inmate's Consular Contacts:**

The inmate, who is a citizen of Russia, shall be allowed Consular communications and visits, consistent with USMS/BOP/DF policy. The Consular contacts shall comply with the U.S. Department of State (DOS) Consular notification and access requirements.[10] Prior to permitting any Consular contact, the FBI will verify the Consular representative's credentials with the DOS.

---

[10] See, Consular Notification and Access, Instructions for Federal, State, and Local Law Enforcement and Other Officials Regarding Foreign Nationals in the United States and the Rights of Consular Officials to Assist Them, DOS. DOS contact: Consular Notification and Outreach Division, Office of Policy Coordination and Public Affairs, DOS, telephone (202) 736-7261 or  http://travel.state.gov/consul_notify.html.

LIMITED OFFICIAL USE

**Exhibit 21 - 324**

-15-

## CONCLUSION

The SAM set forth herein, especially as they relate to attorney/client-privileged communications and family contact, are reasonably necessary to prevent the inmate from committing, soliciting, or conspiring to commit additional criminal activity. Moreover, these measures are the least restrictive that can be tolerated in light of the ability of this inmate to aid knowingly or inadvertently, in plans that create a substantial risk that the inmate's communications or contacts with persons could result in death or serious bodily injury to persons.

With respect to telephone privileges, the SAM is reasonably necessary because of the high probability of calls to co-conspirators to arrange violent activities.

The SAM, with respect to mail privileges, is reasonably necessary to prevent the inmate from receiving or passing along critically-timed messages. While I recognize that eliminating the inmate's mail privileges entirely may be an excessive measure except in the most egregious of circumstances, I believe that delaying mail delivery and allowing authorized personnel to examine a copy of the mail, is sufficient at this time to adequately ensure that the mail is not used to deliver requests for, or assist in, criminal and/or violent activities. Under this procedure, the inmate can relate personal news to family members, even if delayed, but he may find it difficult or unwise to pass along restricted information in light of these procedures.

To the extent that the use of a translator is necessary, the government has the right to make sure that the translator given access to the inmate is worthy of trust.

The SAM's prohibition of contact with the media is reasonably necessary. Communication with the media could pose a substantial risk to public safety if the inmate advocates criminal and/or violent offenses, or if he makes statements designed to incite such acts. Based upon the inmate's past behavior, I believe that it would be unwise to wait until after the inmate solicits or attempts to arrange another violent act to justify such media restrictions.

The SAM's limitations on access to newspapers, publications, television and radio are reasonably necessary to prevent the inmate from receiving and acting upon critically-timed messages. Such messages may be placed in advertisements or communicated through other means, such as the television and/or radio. While I recognize that eliminating the inmate's access to such media may be an excessive measure except in the most egregious of circumstances, I believe that limiting and/or delaying such access may interrupt communication patterns the inmate may develop with the outside world, and ensure that the media is not used to communicate information which furthers violent and/or criminal activities.

LIMITED OFFICIAL USE

**Exhibit 21 - 325**

-16-

**SAM CONTACT INFORMATION**

Any questions that you or your staff may have about this memorandum or the SAM directed herein should be directed to the Office of Enforcement Operations, Criminal Division, U.S. Department of Justice, 10th and Constitution Avenues, N.W., JCK Building, Room 1200, Washington, DC, 20530-0001; telephone (202) 514-6809; and facsimile (202) 616-8256.

LIMITED OFFICIAL USE

**Exhibit 21 -  326**

# EXHIBIT

# 22



**U. S. Department of Justice**

*United States Attorney*
*Central District of California*

| | |
|---|---|
| *Robert E. Dugdale*<br>*Assistant United States*<br>*Chief, Violent and Organized Crime Section*<br>*213-894-4685* | *United States Courthouse*<br>*312 North Spring Street, 12ᵗʰ Floor*<br>*Los Angeles, CA 90012* |

May 28, 2010

VIA INTRAOFFICE MAIL
JAMES LOCKLIN
Deputy Federal Public Defender
Federal Public Defender's Office
321 East 2nd Street
Los Angeles, California 90012
Counsel for defendant Iouri Mikhel

     Re:  United States v. Iouri Mikhel

Dear Counsel:

Please find enclosed a copy of the Extension of Special
Administrative Measures ("SAM") Pursuant to 28 C.F.R. Section
501.3 for Federal Bureau of Prisons Inmate Iouri Mikhel, dated
May 21, 2010.

Very truly yours,

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Violent and Organized Crime Section

Enclosure

**Exhibit 22 - 327**



**U.S. Department of Justice**

Criminal Division

_Office of the Assistant Attorney General_                                    _Washington, D.C. 20530_

---

<u>LIMITED OFFICIAL USE</u>                    MAY 2 1 2010

## MEMORANDUM

TO:                    Harley G. Lappin
                       Director
                       Federal Bureau of Prisons

FROM:        ⸛A.B        Lanny A. Breuer
                       Assistant Attorney General

SUBJECT:               Extension of Special Administrative Measures (SAM) Pursuant to
                       <u>28 C.F.R. § 501.3 for Federal Bureau of Prisons Inmate Iouri Mikhel</u>

Federal inmate Iouri Mikhel (Mikhel) was recently convicted of Conspiring to Take Hostages Resulting in Death, as well as substantive counts of Hostage Taking Resulting in Death, in violation of 18 U.S.C. § 1203, in connection with the abduction and murder of five people between October 2001 and January 2002. Mikhel has been sentenced to death and is currently being incarcerated at the U.S.P. in Terre Haute, Indiana. Because of Mikhel's extensive ties with Russian Organized Crime, the Attorney General placed Mikhel under SAM originally effective June 6, 2003. The SAM were most recently extended in June 2009.

Based upon information provided to me concerning Iouri Mikhel's extensive ties with Russian Organized Crime, previous escape attempts, and threats to witnesses, I find that there is substantial risk that Iouri Mikhel's communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of serious bodily injury to persons. Therefore, I am requesting that you, pursuant to 28 C.F.R. § 501.3, continue to implement SAM in order to restrict Iouri Mikhel's access to the mail, the media, the telephone, and visitors. This SAM will commence immediately upon expiration of the prior SAM authorization period and will be in effect for a period of one (1) year, subject to my further direction.

<u>LIMITED OFFICIAL USE</u>

**Exhibit 22 - 328**

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel, Page 2

1.    **General Provisions:**

    a.    **Adherence to Usual United States Marshals Service (USMS), Bureau of Prisons (BOP) and Detention Facility (DF) Policy Requirements** - In addition to the below-listed SAM, the inmate must comply with all usual USMS, BOP, and non-BOP DF policies regarding restrictions, activities, privileges, communications, etc. If there is a conflict between USMS/BOP/DF policies and the SAM, as set forth herein, where the SAM is more restrictive than usual USMS/BOP/DF policies, then the SAM shall control. If usual USMS/BOP/DF policies are more restrictive than the SAM, then USMS/BOP/DF policies shall control.

    b.    **Interim SAM Modification Authority** - During the term of this directive, the Director, Office of Enforcement Operations (OEO), Criminal Division, may modify the inmate's SAM as long as any SAM modification authorized by OEO:

        i.    Does not create a more restrictive SAM.

        ii.    Is not in conflict with the request of the U.S. Attorney for the Central District of California (USA/CDCA), Federal Bureau of Investigation (FBI), or USMS/BOP/DF, or applicable regulations.

        iii.    Is not objected to by the USA/CDCA, FBI, or USMS/BOP/DF.

    c.    **Inmate Communications Prohibitions** - The inmate is limited, within USMS/BOP/DF's reasonable efforts and existing confinement conditions, from having contact (including passing or receiving any oral, written or recorded communications) with any other inmate, visitor, attorney, or anyone else except as outlined and allowed by this document that could reasonably foreseeably result in the inmate communicating information (sending or receiving) that could circumvent the SAM's intent of significantly limiting the inmate's ability to communicate (send or receive) information relating to acts of violence or other crimes.

        i.    The USMS/BOP/DF may permit the inmate to communicate with other SAM inmates (except co-defendants) orally only during certain pre-designated times, the place and duration to be set by the USMS/BOP/DF. The inmate shall not have any physical contact with other inmates during

LIMITED OFFICIAL USE

Exhibit 22 - 329

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel, Page 3

this pre-designated time and all such pre-designated sessions will be monitored and/or recorded. Upon request of the FBI, a copy of the recordings will be provided by the USMS/BOP/DF to the FBI to be analyzed for indications that the inmates are attempting to pass messages soliciting or encouraging acts of violence or other crimes.

d.    **Use of Interpreters/Translators by USMS/BOP/DF** - Interpreter/translator (interpreter) approval requirement:

    i.    USMS/BOP/DF may use Department of Justice (DOJ)-approved interpreters as necessary for the purpose of facilitating communication with the inmate.

    ii.    No person shall act as an interpreter without prior written clearance/approval from USMS/BOP/DF, which shall only be granted after consultation with the FBI and USA/CDCA.

    iii.    Interpreters utilized by USMS/BOP/DF shall not be allowed to engage in, or overhear, unmonitored conversations with the inmate. Interpreters shall not be alone with the inmate, either in a room or on a telephone or other communications medium.

2.    **Attorney/Client Provisions:**

a.    **Attorney[1] Affirmation of Receipt of the SAM Restrictions Document** - The inmate's attorney (or counsel) – individually by each if more than one (1) – must sign an affirmation acknowledging receipt of the SAM restrictions document. By signing the affirmation, the attorney acknowledges his/her awareness and understanding of the SAM provisions and his/her agreement to abide by these provisions, particularly those that relate to contact between the inmate and his attorney and the attorney's staff. The signing of the affirmation does not serve as an endorsement of the SAM or the conditions of confinement, and does not serve

---

[1] The term "attorney" refers to the inmate's attorney of record, who has been verified and documented by the USA/CDCA, and who has received and acknowledged receipt of the SAM restrictions document. As used in this document, "attorney" also refers to more than one (1) attorney where the inmate is represented by two (2) or more attorneys, and the provisions of this document shall be fully applicable to each such attorney in his/her individual capacity.

<u>LIMITED OFFICIAL USE</u>

**Exhibit 22 - 330**

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel, Page 4

to attest to any of the factors set forth in the conclusions supporting the SAM.
However, in signing the affirmation, the inmate's attorney, and pre-cleared staff,
acknowledge the restriction that they will not forward third-party messages to or
from the inmate.

    i.     The USA/CDCA shall present, or forward, the attorney affirmation of
receipt of the SAM restrictions document to the inmate's attorney.

    ii.     After initiation of SAM and prior to the inmate's attorney being permitted
to have attorney/client-privileged contact with the inmate, the inmate's
attorney shall execute a document affirming receipt of the SAM
restrictions document and return the original to the USA/CDCA.

    iii.     The USA/CDCA shall maintain the original of the SAM acknowledgment
document and forward a copy of the signed document to OEO in
Washington, D.C. and the USMS/BOP/DF.

b.    **Attorney Use of Interpreters/Translators -**

    i.     The Attorney may use Department of Justice (DOJ) and/or USA/CDCA-
approved interpreters as necessary for the purpose of facilitating
communication with the inmate. Any interpreter shall be precleared.[2]

    ii.     No person shall act as an interpreter without prior written
clearance/approval from USMS/BOP/DF/FBI, which shall only be granted
after consultation with the FBI and USA/CDCA.

    iii.     Attorney Immediate Presence Requirement - Any use of an interpreter by
the attorney shall be in the physical and immediate presence of the
attorney in the same room. The attorney shall not patch through telephone
calls, or any other communications, to or from the inmate.

---

[2] "Precleared" refers to an interpreter/translator, who is actively assisting the inmate's
attorney with the inmate's appeal or post-conviction legal proceedings, who has submitted to a
background check by the FBI and USA/CDCA, who has successfully been cleared by the FBI
and USA/CDCA, and who has received a copy of the inmate's SAM and has agreed – as
evidenced by his/her signature – to adhere to the SAM restrictions and requirements.

LIMITED OFFICIAL USE

Exhibit 22 - 331

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel, Page 5

c.   **Attorney May Disseminate Inmate Conversations** - The inmate's attorney and/or investigators working on behalf of the inmate's attorney may disseminate the contents of the inmate's communication to third parties for the sole purpose of preparing the inmate's post-sentencing proceedings – and not for any other reason – on the understanding that any such dissemination shall be made solely by the attorney and/or investigators working on behalf of the inmate's attorney, and not by any other members of the attorney's staff.

d.   **Unaccompanied Attorney's Pre-cleared Paralegal(s)[3] and Investigator(s) May Meet With Client** - The inmate's attorney's pre-cleared paralegal(s) and investigator(s) may meet with the inmate without the necessity of the inmate's attorney being present.  These meetings may be contact or non-contact, at the discretion of the USMS/BOP/DF.

e.   **Attorney/Client-Privileged Visits** - May be contact or non-contact, at the discretion of the USMS/BOP/DF.

f.   **Simultaneous Multiple Legal Visitors** - The inmate may have multiple legal visitors provided that at least one (1) of the multiple legal visitors consists of the inmate's attorney or pre-cleared paralegal.  These meetings may be contact or non-contact, at the discretion of the USMS/BOP/DF.

g.   **Legally Privileged Telephone Calls** - The following rules refer to all legally-privileged telephone calls or communications:

   i.   Inmate's Attorney's Pre-cleared Staff May Participate in Inmate Telephone Calls – The inmate's attorney's pre-cleared staff are permitted to

---

[3] "Precleared" when used with regard to an attorney's staff, or "pre-cleared staff member," refers to a co-counsel, paralegal, or an investigator who is actively assisting the inmate's attorney with the inmate's post-sentencing proceedings, who has submitted a to a background check by the FBI and USA/CDCA, who has successfully been cleared by the FBI and USA/CDCA, and who has received a copy of the inmate's SAM and has agreed – as evidenced by his/her signature – to adhere to the SAM restrictions and requirements.  As used in this document, "staff member" also refers to more than one (1) staff member, and the provisions of this document shall be fully applicable to each such staff member in his/her individual capacity.  A "paralegal" or "investigator" will also be governed by any additional DF rules and regulations governing their conduct.

LIMITED OFFICIAL USE

Exhibit 22 - 332

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel, Page 6

communicate directly with the inmate by telephone, provided that the inmate's attorney is physically present and participating in the legal call as well.

ii.    Inmate's Initiation of Legally-Privileged Telephone Calls – Inmate-initiated telephone communications with his attorney or pre-cleared staff are to be placed by a USMS/BOP/DF staff member and the telephone handed over to the inmate only after the USMS/BOP/DF staff member confirms that the person on the other end of the line is the inmate's attorney. This privilege is contingent upon the following additional restrictions:

(1)    The inmate's attorney will not allow any non-pre-cleared person to communicate with the inmate, or to take part in and/or listen to or overhear any communications with the inmate.

(2)    The inmate's attorney must instruct his/her staff that:

(a)    The inmate's attorney and pre-cleared staff are the only persons allowed to engage in communications with the inmate.

(b)    The attorney's staff (including the attorney) are not to patch through, forward, transmit, or send the inmate's communications to third parties.

(3)    No telephone call/communication, or portion thereof, except as specifically authorized by this document:

(a)    Is to be overheard by a third party.[4]

(b)    Will be patched through, or in any manner forwarded or transmitted to a third party.

---

[4] For purposes of the SAM, "third party" does not include officials of the USMS/BOP/DF/FBI/DOJ, or other duly authorized federal authorities when acting in connection with their official duties. This section does not allow monitoring of attorney/client-privileged communications.

<u>LIMITED OFFICIAL USE</u>

**Exhibit 22 - 333**

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel, Page 7

> (c)     Shall be divulged in any manner to a third party, except as otherwise provided in Section 2d.
>
> (d)     Shall be in any manner recorded or preserved.[5] The inmate's attorney may make written notes of attorney/client-privileged communications.

> (4)     If USMS/BOP/DF, FBI or USA/CDCA determines that the inmate has used or is using the opportunity to make a legal call to speak with another inmate or for any other non-legal reason that would circumvent the intent of the SAM, the inmate's ability to contact his attorney by telephone may be suspended or eliminated.

h.     **Documents Provided by Attorney to Inmate** - The inmate's attorney may provide his/her client with or review with the inmate, documents related to his post-sentencing proceedings, including discovery materials, court papers (including indictments, court orders, motions, etc.), and/or material prepared by the inmate's attorney, so long as any of the foregoing documents are translated, if translation is necessary, by a pre-cleared interpreter. Any document not related to the inmate's post-sentencing proceedings must be sent to the inmate via general correspondence and will be subject to the mail provisions of subparagraphs 2ii and 3g. Documents previously reviewed and cleared for receipt by the inmate, and already in the inmate's possession at the outset of the visit, may be discussed or reviewed by the inmate and the inmate's attorney during the visit.

> i.     None of the materials provided may include inflammatory materials, materials inciting to violence, or materials that may be used to pass messages from inmate to inmate, unless such materials have been precleared by the USA/CDCA and the FBI.
>
> ii.     The USA/CDCA may authorize additional documents to be presented to the inmate. If any document not listed or described above needs to be transmitted to the inmate, consent for the transmission of the document can be obtained from the

---

[5] Except by USMS/BOP/DF/FBI/DOJ or other duly authorized federal authorities. This section does not allow monitoring of attorney/client-privileged communications.

LIMITED OFFICIAL USE

Exhibit 22 - 334

SPECIAL ADMINISTRATIVE MEASURES (SAM)
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel, Page 8

USA/CDCA without the need to formally seek approval for an amendment to the SAM.

i.    **Legal Mail** - The inmate's attorney may not send, communicate, distribute, or divulge the inmate's mail, or any portion of its contents (legal or otherwise), to third parties.[6]

In signing the SAM acknowledgment document, the inmate's attorney and pre-cleared staff will acknowledge the restriction that only inmate case-related documents will be presented to the inmate, and that neither the attorney nor his/her staff will forward third-party mail to or from the inmate.

3.    **Inmate's Non-legal Contacts:**

a.    **Non-legal Telephone Contacts -**

i.    The inmate is limited to non-legal telephone calls with his immediate family members.[7]

ii.   The quantity and duration of the inmate's non-legal telephone calls with his immediate family members shall be set by the USMS/BOP/DF, with a minimum of one (1) call per month.

b.    **Rules for Telephone Calls** - For all non-legally privileged telephone calls or communications, no telephone call/communication, or portion thereof:

i.    Is to be overheard by a third party.[8]

---

[6] Legal mail is defined as properly marked correspondence (marked "Legal Mail") addressed to or from the inmate's attorney.  All other mail, including that otherwise defined by the USMS/BOP/DF as Special Mail, shall be processed as "non-legal mail."

[7] The inmate's "immediate family members" are defined as the inmate's (USMS/BOP/DF/FBI-verifiable) spouse, natural children, parents, and siblings.  Requests for additional non-legal contacts may be submitted and will be considered on a case-by-case basis.

[8] For purposes of the SAM, "third party" does not include officials of the

(continued...)

LIMITED OFFICIAL USE

Exhibit 22 - 335

SPECIAL ADMINISTRATIVE MEASURES (SAM)
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel, Page 9

ii.   Is to be patched through, or in any manner forwarded or transmitted, to a third party.

iii.  Shall be divulged in any manner to a third party.

iv.   Shall be in any manner recorded or preserved.[9]

All telephone calls shall be in English unless a fluent FBI or USMS/BOP/DF approved interpreter is available to contemporaneously monitor the telephone call. Arranging for an interpreter may require at least fourteen (14) days advance notice.

c.  **Telephone SAM Restriction Notifications** - For all non-legal telephone calls to the inmate's immediate family member(s):

   i.    USMS/BOP/DF shall inform the inmate of the telephone SAM restrictions prior to each telephone call.

   ii.   USMS/BOP/DF shall verbally inform the inmate's immediate family member(s) on the opposite end of the inmate's telephone communication of the SAM restrictions. USMS/BOP/DF is only required to notify the inmate's communication recipient in English.

   iii.  USMS/BOP/DF shall document each such telephone notification.

d.  **Family Call Monitoring** - All calls with the inmate's immediate family member(s) shall be:

   i.    Contemporaneously monitored by the FBI.

   ii.   Contemporaneously recorded (as directed by the FBI) in a manner that allows such telephone calls to be analyzed for indications the call is being

---

[8](...continued)
USMS/BOP/DF/FBI/DOJ, or other duly authorized federal authorities when monitoring in connection with their official duties.

[9] Except by USMS/BOP/DF/FBI/DOJ, or other duly authorized federal authorities.

LIMITED OFFICIAL USE

Exhibit 22 - 336

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel, Page 10

> used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

iii. A copy of each inmate/immediate family member telephone call recording shall be provided by USMS/BOP/DF on a single, individual cassette tape or compact disk (per call) for forwarding to the FBI. These recordings shall be forwarded on a call-by-call basis as soon as practicable.

e. **Improper Communications** - If telephone call monitoring or analysis reveals that any call or portion of a call involving the inmate contains any indication of a discussion of illegal activity, the soliciting of or encouraging of acts of violence, or actual or attempted circumvention of the SAM, the inmate shall not be permitted any further calls to his immediate family members for a period of time to be determined by USMS/BOP/DF. If contemporaneous monitoring reveals such inappropriate activity, the telephone call may be immediately terminated.

f. **Non-legal Visits -**

   i. **Limited Visitors** - The inmate shall be permitted to visit only with his immediate family members. The visitor's identity and family member relationship to the inmate will be confirmed by the USMS/BOP/DF and FBI in advance.

   ii. **English Requirement** - All communications during non-legal inmate visits will be in English unless a fluent FBI or USMS/BOP/DF approved interpreter is readily available to contemporaneously monitor the communication/visit.

   iii. **Visit Criteria** - All non-legal visits shall be:

      (1) Contemporaneously monitored by USMS/BOP/DF and/or FBI, in a manner that allows such visits to be analyzed for indications the visit is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

<u>LIMITED OFFICIAL USE</u>

**Exhibit 22 - 337**

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel, Page 11

      (2)    Permitted only with a minimum of fourteen (14) calendar days advance written notice to the USMS/BOP/DF facility where the inmate is housed.

      (3)    Without any physical contact. All such meetings shall be non-contact to protect against harm to visitors or staff should the inmate attempt to take hostages.

      (4)    Limited to one (1) adult visitor at a time. However, FBI-verified children of the inmate may visit with a pre-approved adult visitor.

g.    **Non-legal Mail** - Non-legal mail is any mail not clearly and properly addressed to/from the inmate's attorney and marked "Privileged" (incoming or outgoing). Non-legal mail is limited to only the inmate's immediate family, U.S. courts, federal judges, U.S. Attorney's Offices, members of U.S. Congress, BOP, and other federal law enforcement entities.

    i.    **General correspondence with limitations:** Correspondence is restricted to immediate family members and the individuals listed below. Volume and frequency of outgoing general correspondence with immediate family members and listed individuals may be limited to three pieces of paper (not larger than 8½" x 11"), double-sided, once per calendar week to a single recipient, at the discretion of the USMS/BOP/DF. The identity and family member or other prior relationship to the inmate will be confirmed by USMS/BOP/DF and FBI.

    ii.    **General correspondence without limitations:** There is no volume or frequency limitation on correspondence to/from U.S. courts, federal judges, U.S. Attorney's Offices, members of U.S. Congress, BOP, and other federal law enforcement entities, unless there is evidence of abuse of these privileges, threatening correspondence is detected, circumvention of the SAM is detected, or the quantity to be processed becomes unreasonable to the extent that efficient processing to protect the security, good order or discipline of the institution, the public or national security may be jeopardized.

    iii.    All non-legal mail will be:

LIMITED OFFICIAL USE

Exhibit 22 - 338

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel, Page 12

(1)  **Copied** - Shall be copied (including the surface of the envelope) by the warden, or his/her designee, of the facility in which the inmate is housed.

(2)  **Forwarded** - Shall be forwarded, in copy form, to the location designated by the FBI.

(3).  **Analyzed** - After government analysis and approval, if appropriate, the inmate's incoming/outgoing non-legal mail will be forwarded to the USMS/BOP/DF for delivery to the inmate (incoming); or directly to the addressee (outgoing).

The Federal Government will forward the inmate's non-legal mail to the USMS/BOP/DF for delivery to the inmate or directly to the addressee after a review and analysis period of:

(a)  A reasonable time not to exceed fourteen (14) business days for mail which is written entirely in the English language.

(b)  A reasonable time not to exceed sixty (60) business days for any mail which includes writing in any language other than English, to allow for translation.

(c)  A reasonable time not to exceed sixty (60) business days for any mail where the Federal Government has reasonable suspicion to believe that a code was used, to allow for decoding.

iv.  **Mail Seizure** - If outgoing/incoming mail is determined by USMS/BOP/DF or FBI to contain overt or covert discussions of or requests for illegal activities, the soliciting or encouraging of acts of violence, or actual or attempted circumvention of the SAM, the mail shall not be delivered/forwarded to the intended recipient but referred to the FBI for appropriate action. The inmate shall be notified in writing of the seizure of any mail.

LIMITED OFFICIAL USE

Exhibit 22 - 339

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel, Page 13

4.    **Communication With News Media:**

The inmate will not be permitted to talk with, meet with, correspond with, or otherwise communicate with any member, or representative, of the news media, in person, by telephone, by furnishing a recorded message, through the mail, through his attorney, through a third party, or otherwise.

5.    **Religious Visitation:**

a.    The inmate shall not be allowed to engage in group prayer with other inmates.

b.    If an FBI and/or USMS/BOP/DF approved religious representative is to be present for prayer with the inmate, the prayer shall be conducted as part of a contact or non-contact visit, at the discretion of the USMS/BOP/DF.

6.    **No Communal Cells and No Communication Between Cells:**

a.    The inmate shall not be allowed to share a cell with another inmate.

b.    The inmate shall be limited within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate by making statements audible to other inmates or by sending notes to other inmates, except as permitted in Section 1c above.

7.    **Cellblock Procedures:**

a.    The inmate shall be kept separated from other inmates as much as possible while in the cellblock area.

b.    The inmate shall be limited, within USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate while in the cellblock area.

8.    **Commissary Privileges:**

The USMS/BOP/DF shall restrict access to commissary items or any other objects determined by USMS/BOP/DF to be capable of being converted into dangerous instruments.

LIMITED OFFICIAL USE

**Exhibit 22 - 340**

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel, Page 14

9.    **Access to Mass Communications:**

To prevent the inmate from receiving and acting upon critically-timed information or information coded in a potentially undetectable manner, the inmate's access to materials of mass communication is restricted as follows:

a.    **Publications/Newspapers -**

i.    The inmate may have access to publications determined not to facilitate criminal activity or be detrimental to: national security; the security, good order or discipline of the institution; or the protection of the public. This determination is to be made by the BOP, in consultation with the USA/SDNY.

ii.    Sections of the publication/newspaper which offer a forum for information to be passed by unknown and/or unverified individuals, including but not limited to classified advertisements and letters to the editor, should be removed from the publications/newspapers prior to distribution to the inmate.

iii.    If restricted by BOP rules, a publication will be denied. If acceptable, upon delivery, the BOP will review the publication and make the initial determination. If the FBI's expertise on national security or intelligence matters is required, the publication will be forwarded to the FBI for review. The BOP will also forward the publication to the FBI if translations are needed to make that determination. (In these cases, the FBI shall respond to the BOP within fourteen (14) business days.) The inmate shall then have access to the remaining portions of the publications/newspapers deemed acceptable, in accordance with USMS/BOP/DF policy.

iv.    In order to avoid passing messages/information from inmate to inmate, the inmate shall not be allowed to share the publication(s) with any other inmates.

b.    **Television and Radio** - The inmate is restricted from access to channels/stations which primarily broadcast news, but is permitted access to all other radio and

<u>LIMITED OFFICIAL USE</u>

**Exhibit 22 - 341**

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel, Page 15

television channels/stations, including, but not limited to, ABC, NBC, CBS and FOX, in accordance with USMS/BOP/DF policies.

c.   **Termination or Limitation** - If the USMS/BOP/DF determines that the mass communications are being used as a vehicle to send messages to the inmate relating to the furtherance of terrorist activities, the inmate's access may be limited or terminated for a period of time to be determined by the USMS/BOP/DF.

10.   **Access to Books:**

The inmate may have access to all books which do not facilitate criminal activity or present a substantial threat to national security or the security, discipline, or good order of the institution. This initial determination is to be made by the BOP and, if the BOP determines that the FBI's expertise on national security or intelligence matters is required, the book(s) will be forwarded to the FBI for review. In conducting its analysis, the FBI will determine whether the book advocates or promotes acts of terrorism or violence and/or whether access to the book by this particular inmate would pose a substantial threat to national security.

In order to avoid passing messages/information from inmate to inmate, the inmate shall not be allowed to share books with any other inmates.

11.   **Transfer of Custody:**

In the event that the inmate is transferred to or from the custody of the USMS, BOP or any other DF, the SAM provisions authorized for this inmate will continue in effect, without need for any additional DOJ authorization.

LIMITED OFFICIAL USE

Exhibit 22 - 342

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel, Page 16

12.   **Inmate's Consular Contacts:**

The inmate, who is a citizen of Russia, shall be allowed Consular communications and visits, consistent with USMS/BOP/DF policy. The Consular contacts shall comply with the U.S. Department of State (DOS) Consular notification and access requirements.[10] Prior to permitting any Consular contact, the FBI will verify the Consular representative's credentials with the DOS.

**CONCLUSION**

The SAM set forth herein, especially as they relate to attorney/client-privileged communications and family contact, are reasonably necessary to prevent the inmate from committing, soliciting, or conspiring to commit additional criminal activity. Moreover, these measures are the least restrictive that can be tolerated in light of the ability of this inmate to aid knowingly or inadvertently, in plans that create a substantial risk that the inmate's communications or contacts with persons could result in death or serious bodily injury to persons.

With respect to telephone privileges, the SAM is reasonably necessary because of the high probability of calls to co-conspirators to arrange violent activities.

The SAM, with respect to mail privileges, is reasonably necessary to prevent the inmate from receiving or passing along critically-timed messages. While I recognize that eliminating the inmate's mail privileges entirely may be an excessive measure except in the most egregious of circumstances, I believe that delaying mail delivery and allowing authorized personnel to examine a copy of the mail, is sufficient at this time to adequately ensure that the mail is not used to deliver requests for, or assist in, criminal and/or violent activities. Under this procedure, the inmate can relate personal news to family members, even if delayed, but he may find it difficult or unwise to pass along restricted information in light of these procedures.

To the extent that the use of an interpreter/translator is necessary, the government has the right to make sure that the interpreter/translator given access to the inmate is worthy of trust.

---

[10] See Consular Notification and Access, Instructions for Federal, State, and Local Law Enforcement and Other Officials Regarding Foreign Nationals in the United States and the Rights of Consular Officials to Assist Them, DOS. DOS contact: Consular Notification and Outreach Division, Office of Policy Coordination and Public Affairs, DOS, telephone (202) 736-7261 or http://travel.state.gov/consul_notify.html.

LIMITED OFFICIAL USE

Exhibit 22 - 343

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel, Page 17


The SAM's prohibition of contact with the media is reasonably necessary. Communication with the media could pose a substantial risk to public safety if the inmate advocates criminal and/or violent offenses, or if he makes statements designed to incite such acts. Based upon the inmate's past behavior, I believe that it would be unwise to wait until after the inmate solicits or attempts to arrange another violent act to justify such media restrictions.

The SAM's limitations on access to newspapers, publications, television and radio are reasonably necessary to prevent the inmate from receiving and acting upon critically-timed messages. Such messages may be placed in advertisements or communicated through other means, such as the television and/or radio. While I recognize that eliminating the inmate's access to such media may be an excessive measure except in the most egregious of circumstances, I believe that limiting and/or delaying such access may interrupt communication patterns the inmate may develop with the outside world, and ensure that the media is not used to communicate information which furthers violent and/or criminal activities.

**SAM CONTACT INFORMATION**

Any questions that you or your staff may have about this memorandum or the SAM directed herein should be directed to the Office of Enforcement Operations, Criminal Division, U.S. Department of Justice, 10th and Constitution Avenues, N.W., JCK Building, Room 1200, Washington, DC, 20530-0001; telephone (202) 514-6809; and facsimile (202) 616-8256.


LIMITED OFFICIAL USE


**Exhibit 22 -  344**

# EXHIBIT

# 23



**U.S. Department of Justice**
Federal Bureau of Prisons

*Federal Correctional Complex*
*Terre Haute, Indiana*

June 6, 2011

MEMORANDUM FOR INMATE MIKHEL, IOURI #23675-112

From:      CHARLES L. LOCKETT, COMPLEX WARDEN

Subject:      Notice of Renewed Special Administrative Measures

Pursuant to 28 C.F.R. § 501.3, Special Administrative Measures have been implemented regarding your confinement. The Attorney General authorized implementation of the procedures on June 6, 2003, and delegated the implementation of the procedure to the Director of the Bureau of Prisons. These Special Administrative Measures (SAM) have been implemented based on information concerning your extensive ties with Russian Organized Crime, previous escape attempts, and threats to witnesses. There is a substantial risk your communications or contacts with persons could result in death or serious bodily injury to persons or substantial damage to property that would entail the risk of death or serious bodily injury to persons. The Bureau of Prisons has implemented these measures in the past and is extending them at this time for an additional year period, at the request of the Attorney General's designee. The SAM will commence immediately upon expiration of the prior SAM authorization period and will be in effect for a period of one (1) year, subject to any further direction.

In reaching the conclusion that there is a substantial risk that your communications or contacts could result in death or serious bodily injury to others, the government reports that during a search conducted of your cell in 2009, the BOP discovered a hand-drawn floor plan of the prison tier on which you were being housed. You had previously attempted to escape from custody on two prior occasions, including one attempt that occurred after you had been placed under SAM restrictions. In that instance, in January 2003, you prepared detailed drawings of the facility in which you were incarcerated outlining your escape plan. You then attempted to forward these plans, in violation of the SAM, to a high-ranking member of the Mexican Mafia to whom you were offering one million dollars in return for assistance in facilitating your escape. Your efforts to plot escape from custody and past behavior suggest that you will continue to exploit opportunities to communicate with others outside of the prison system in order to advance your efforts to escape from custody.

**Exhibit 23 - 345**

MIKHEL, Iouri
23675-112
Page 2

Based upon information provided to me concerning your extensive ties with Russian Organized Crime, your escape attempts, and history of violent behavior, including threats to witnesses, I find that there is substantial risk that your communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of serious bodily injury to persons. Therefore, pursuant to 28 C.F.R. § 501.3, the government will continue to implement SAM in order to restrict your access to the mail, the media, the telephone, and visitors. The SAM will commence immediately upon expiration of the prior SAM authorization period and will be in effect for a period of one year, subject to further direction.

1.    **General Provisions:**

    a. **Adherence to Usual United States Marshals Services (USMS), Bureau of Prisons (BOP) and Detention Facility (DF) Policy Requirements** - In addition to the below-listed SAM, you must comply with all usual USMS, BOP, and non-BOP DF policies regarding restrictions, activities, privileges, communications, etc. If there is a conflict between USMS/BOP/DF policies and SAM, as set forth herein, where the SAM is more restrictive than usual USMS/BOP/DF policies, then the SAM shall control. If usual USMS/BOP/DF policies are more restrictive than the SAM, then USMS/BOP/DF policies shall control.

    b. **Interim SAM Modification Authority** - During the term of this directive, the Director, Office of Enforcement Operations (OEO), Criminal Division, may modify your SAM as long as any SAM modification authorized by OEO:

        i.   Does not create a more restrictive SAM.

        ii.  Is not in conflict with the request of the U. S. Attorney for the Central District of California (USA/CDCA), Federal Bureau of Investigation (FBI), or USMS/BOP/DF, or applicable regulations.

        iii. Is not objected to by the USA/CDCA, FBI, or USMS/BOP/DF.

    c. **Inmates Communications Prohibitions** – You are limited, within USMS/BOP/DF's reasonable efforts and existing confinement conditions, from having contact (including passing or receiving any oral, written or recorded communications) with any other inmate, visitor, attorney, or anyone else except as outlined and allowed by this document that could reasonably foreseeably result in you communicating information (sending or receiving) that could circumvent the SAM's intent of significantly limiting your ability to communicate (send or receive) information relating to acts of violence or other crimes.

**Exhibit 23 -  346**

MIKHEL, Iouri
23675-112
Page 3

    i.   The USMS/BOP/DF may permit you to communicate with other SAM inmates orally only during certain predesignated times, the place and duration to be set by the USMS/BOP/DF.  You shall not have any physical contact with the other inmates during this predesignated time and all such predesignated sessions will be monitored and/or recorded.  Upon request to the FBI, a copy of the recordings will be provided by the USMS/BOP/DF to the FBI to be analyzed for indications that the inmates are attempting to pass messages soliciting or encouraging acts of violence or other crimes.

**d.  Use of Interpreters/Translators by USMS/BOP/DF** – Interpreter/translator (interpreter) approval requirement:

    i.   USMS/BOP/DF may use Department of Justice (DO)- approved interpreters as necessary for the purpose of facilitating communication with you.

    ii.   No person shall act as a translator without prior written clearance/approval from USMS/BOP/DF, which shall only be granted after consultation with the FBI and USA/CDCA.

    iii.   Interpreters utilized by USMS/BOP/DF shall not be allowed to engage in, or overhear, unmonitored conversations with you.  Interpreters shall not be alone with you, either in a room or on a telephone or other communications medium.

**2.    Attorney/Client Provisions:**

**a.  Attorney[1] Affirmation of Receipt of the SAM Restrictions Document** –The inmate's attorney (or counsel) - individually by each if more than one - must sign an affirmation acknowledging receipt of the SAM restrictions document.  By signing the affirmation, the attorney acknowledges his/her awareness and understanding of the SAM provisions and his/her agreement to abide by these provisions, particularly those that relate to contact between you and your attorney and the attorney's staff.  The signing of the affirmation does not serve as an endorsement of the SAM or the conditions of confinement, and does not serve to attest any of the factors in the conclusions supporting the SAM.  However, in signing the affirmation, your attorney, and precleared staff acknowledge the restriction that they will not forward third-party messages to or from you.

---

[1]The term "attorney" refers to the inmate's attorney of record, who has been verified and documented by the USA/CDCA, and who has received and acknowledged receipt of the SAM restrictions document.  As used in this document, "attorney" also refers to more than one attorney where the inmate is represented by two or more attorneys, and the provisions of this document shall be fully applicable to each such attorney in his/her individual capacity.

**Exhibit 23 -  347**

MIKHEL, Iouri
23675-112
Page 4

    i.   The USA/CDCA shall present, or forward, the attorney affirmation of receipt of the SAM restrictions document to your attorney.

    ii.  After initiations of SAM and prior to your attorney being permitted to have attorney/client privileged contact with you, your attorney shall execute a document affirming receipt of the SAM restrictions document and return the original to the USA/CDCA.

    iii.  The USA/CDCA shall maintain the original of the SAM acknowledgment document and forward a copy of the signed document to OEO in Washington, D.C., and the USMS/BOP/DF.

**b.  Attorney Use of Interpreters/Translators -**

    i.   Your attorney may use Department of Justice (DOJ) and/or USA/CDCA approved interpreters as necessary for the purpose of facilitating communication with you.  Any interpreter shall be precleared.[2]

    ii.  No person shall act as an interpreter without prior written clearance/approval from USMS/BOP/DF/FBI, which shall only be granted after consultation with the FBI and USA/CDCA.

    iii.  Attorney Immediate Presence Requirement - Any use of a translator by the attorney shall be in the physical and immediate presence of the attorney in the same room.  The attorney shall not patch through telephone calls, or any other communications, to or from you.

**c.  Attorney May Disseminate Inmate Conversations** – Your attorney and/or investigators working on behalf of your attorney may disseminate the contents of the your communication to third parties for the sole purpose of preparing the your post-sentencing proceedings - and not for any other reason - on the understanding that any such dissemination shall be made solely by the attorney and/or investigators working on behalf of your attorney, and not by any other members of the attorney's staff.

---

[2]"Precleared" refers to a interpreter/translator, who is actively assisting the inmate's attorney with the inmate's appeal or post-conviction legal proceedings, who has submitted to a background check by the FBI and USA/CDCA, who has successfully been cleared by the FBI and USA/CDCA, and who has received a copy of the inmate's SAM and has agreed - as evidenced by his/her signature - to adhere to the SAM restrictions and requirements.

**Exhibit 23 - 348**

MIKHEL, Iouri
23675-112
Page 5

d. **Unaccompanied Attorney's Pre-cleared Paralegal(s)[3] and Investigators May Meet With Client** –Your attorney's precleared paralegal(s) and investigator(s) may meet with you without the necessity of your attorney being present.  These meeting may be contact or non-contact, at the discretion of the USM/BOP/DF.

e. **Attorney/Client Privileged Visits** - May be contact or non-contact, at the discretion of the USMS/BOP/DF.

f. **Simultaneous Multiple Legal Visitors** – You may have multiple legal visitors provided that at least one of the multiple legal visitors consists of the your attorney or precleared paralegal.  These meetings may be contact or non-contact, at the discretion of the USMS/BOP/DF.

g. **Legally Privileged Telephone Calls** - The following rules refer to all legally privileged telephone calls or communications:

   i. Your Attorney's Precleared Staff May Participate in Inmate Telephone Calls – Your attorney's precleared staff are permitted to communicate directly with you by telephone, provided that your attorney is physically present and participating in the legal call as well.

   ii. Inmate's initiation of Legally Privileged Telephone Calls – Inmate-initiated telephone communications with your attorney or precleared staff are to be placed by a USMS/BOP/DF staff member and the telephone handed over to you only after the USMS/BOP/DF staff member confirms that the person on the other end of the line is your attorney.  This privilege is contingent upon the following additional restrictions:

---

[3]"Precleared" when used with regard to an attorney's staff, or "precleared staff member," refers to a co-counsel, paralegal, or an investigator, who is actively assisting the inmate's attorney with the inmate's post-sentencing proceedings, who has submitted to a background check by the FBI and USA/CDCA, who has successfully been cleared by the FBI and USA/CDCA, and who has received a copy of the inmate's SAM and has agreed - as evidence by his/her signature - to adhere to the SAM restrictions and requirements.  As used in this document, "staff member" also refers to more than one staff member, and the provisions of this document shall by fully applicable to each such staff member in his/her individual capacity.  A "paralegal" or "investigator" will also be governed by any additional DF rules and regulations governing their conduct.

**Exhibit 23 -  349**

MIKHEL, Iouri
23675-112
Page 6

    (1)    Your attorney will not allow any non-precleared person to communicate with the inmate, or to take part in and/or listen to or overhear any communications with you.

    (2)    Your attorney must instruct his/her staff that:

        (a)    Your attorney and precleared staff are the only persons allowed to engage in communications with you.

        (b)    The attorney's staff (including the attorney) are not to patch through, forward, transmit, or send your communications to third parties.

    (3)    No telephone call/communication, or portion thereof, except as specifically authorized by this document:

        (a)    Is to be overheard by a third party.[4]

        (b)    Will be patched through, or in any manner forwarded or transmitted to a third party.

        (c)    Shall be divulged in any manner to a third party, except as otherwise provided in Section 2c.

        (d)    Shall be in any manner recorded or preserved.[5] The inmate's attorney may make written notes of attorney/client-privileged communications.

    (4)    If USMS/BOP/DF, FBI or USA/CDCA determines that you have used or are using the opportunity to make a legal call to speak with another inmate or for any other non-legal reason which would circumvent the intent of the SAM, your ability to contact your attorney by telephone may be suspended or eliminated.

    **h. Documents Provided by Attorney to Inmate** – Your attorney may provide you with or review with you, documents related to your post-sentencing proceedings, including discovery materials, court papers (including indictments, court orders, motions, etc.), and/or material prepared by your attorney, so long as any of the foregoing documents

---

[4]For purposes of the SAM, "third party" does not include officials of the USMS/BOP/DF/FBI/DO, or other duly authorized federal authorities when acting in connection with their official duties. This section does not allow monitoring of attorney/client privileged communications.

[5]Except by USMS/BOP/DF/FBI/DO or other duly authorized federal authorities. This section does not allow this monitoring of attorney/client privileged communications.

**Exhibit 23 -  350**

MIKHEL, Iouri
23675-112
Page 7

are translated, if translation is necessary, by a pre-cleared translator.  Any document not related to your post-sentencing proceedings must be sent to you via general correspondence and will be subject to the mail provisions of subparagraphs 2i and 3g.  Documents previously reviewed and cleared for receipt by you, and already in your possession at the outset of the visit, may be discussed or reviewed by you and your attorney during the visit.

    i.    None of the materials provided may include inflammatory materials, materials inciting to violence, or materials that may be used to pass messages from inmate to inmate, unless such materials have been precleared by the USA/CDCA and the FBI.

    ii.    The USA/CDCA may authorize additional documents to be presented to you.  If any document not listed or described above needs to be transmitted to you, consent for the transmission of the document can be obtained from the USA/CDCA without the need to formally seek approval for an amendment to the SAM.

i.    **Legal Mail**[6] - Your attorney may not send, communicate, distribute or divulge your mail, or any portion of it's contents (legal or otherwise) to third parties.

    i.    In signing the SAM acknowledgment document, your attorney and precleared staff will acknowledge the restriction that only the inmate case-related documents will be presented to you, and neither your attorney nor his/her staff will forward third-party mail to or from you.

3.    **Inmate's Non-Legal Contacts:**

a.  **Non-legal Telephone Contacts -**

    i.    You are limited to non-legal telephone calls only to your immediate family members.[7]

---

[6]Legal mail is defined as properly marked correspondence (marked "Legal Mail") addressed to or from the inmate's attorney of record.  All other mail, including that otherwise defined by the USMS/BOP/DF as Special Mail, shall be processed as "non-legal mail."

[7]The inmate's "immediate family members" are defined as the inmate's (USMS/BOP/DF/FBI-verifiable) spouse, children, parents, and siblings. Requests for additional non-legal contacts may be submitted and will be consider on a case-by-case basis.

**Exhibit 23 -  351**

MIKHEL, Iouri
23675-112
Page 8

    ii.  The quantity and duration of your non-legal telephone calls with your immediate family members shall be set by the SMS/BOP/DF/FBI/DO, with a minimum of one call per month.

  b. **Rules for Telephone Calls** - For all non-legally privileged telephone calls or communications, no telephone call/communication, or portion thereof:

    i.  Is to be overheard by a third party. [8]

    ii.  Is to be patched through, or in any manner forwarded or transmitted, to a third party.

    iii.  Shall be divulged in any manner to a third party.

    iv.  Shall be in any manner recorded or preserved.[9]

All telephone calls shall be in English unless a fluent FBI, USMS/BOP/DG - approved translator is available to contemporaneously monitor the telephone call. Arranging for a translator may require at least fourteen (14) days advance notice.

  c. **Telephone SAM Restriction Notifications** - For all non-legal telephone calls to the inmate's immediate family member (s):

    i.  USMS/BOP/DF shall verbally inform you of the telephone SAM restrictions prior to each telephone call.

    ii.  USMS/BOP/DF shall verbally inform your immediate family member(s) on the opposite end of your telephone communication of the SAM restrictions. USMS/BOP/DF is only required to notify your communication recipient in English.

    iii  USMS/BOP/DF shall document each such telephone notification.

---

[8]For purposes of the SAM, "third party" does not include officials of the USMS/BOP/DF/FBI/DOJ, or other duly authorized federal authorities when monitoring in connection with their official duties.

[9]Except by USMS/BOP/DF/FBI/DO, or other duly authorized federal authorities.

**Exhibit 23 - 352**

MIKHEL, Iouri
23675-112
Page 9

    d. **Family Call Monitoring** - All calls with your immediate family member(s) shall be:

        i.   Contemporaneously monitored by the FBI.

        ii.  Contemporaneously recorded (as directed by the FBI) in a manner which allows such telephone calls to be analyzed for indications the call is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

        iii. A copy of each of your immediate family member telephone call recording shall be provided by USMS/BOP/DF on a single, individual cassette tape or compact disc (per call) for forwarding to the FBI.  These recordings shall be forwarded on a call-by-call basis as soon as practicable.

    e. **Improper Communications** - If telephone call monitoring or analysis reveals that any call or portion of a call involving the inmate contains any indication of a discussion of illegal activity, the soliciting or encouraging of acts of violence, or actual or attempted circumvention of the SAM, you shall not be permitted any further calls to your immediate family members for a period of time to be determined by USMS/BOP/DF.  If contemporaneous monitoring reveals such inappropriate activity, the telephone call may be immediately terminated.

    f. **Non-legal Visits** -

        i.   **Limited Visitors** - You shall be permitted to visit only with his immediate family members.  The visitor's identity and family member relationship to you will be confirmed by the USMS/BOP/DF and FBI in advance.

        ii.  **English Requirement** - All communications during non-legal inmate visits will be in English unless a fluent FBI, USMS/BOP/DF approved interpreter is readily available to contemporaneously monitor the communication/visit.

        iii. **Visit Criteria** - All non-legal visits shall be:

            (1)   Contemporaneously monitored by USMS/BOP/DF and/or /FBI, in a manner that allows such visits to be analyzed for indications the visit is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

            (2)   Permitted only with a minimum of fourteen calendar days' advance written notice to the USMS/BOP/DF facility where you are housed.

**Exhibit 23 -  353**

MIKHEL, Iouri
23675-112
Page 10

    (3)   Without any physical contact.  All such meetings shall be non-contact to protect against harm to visitors or staff.

    (4)   Limited to one adult visitor at a time.  However, FBI-verified children of the inmate may visit with a pre-approved adult visitor.

g.  **Non-legal Mail** – Non-legal mail is any mail not clearly and properly addressed to/from your attorney and marked "Privileged" (incoming or outgoing).  Non-legal mail is limited to only your immediate family, U.S. courts, federal judges, U.S. Attorney's Offices, members of U.S. Congress, BOP, other federal law enforcement entitles.

   i.  **General correspondence with limitations:** Correspondence is restricted to immediate family members and the individuals listed below.  Volume and frequency of outgoing general correspondence with immediate family members and listed individuals only may be limited to three pieces of paper (not larger than 8 ½" x 11"), double-sided, once per calendar week to a single recipient, at the discretion of the USMS/BOP/DF.  The identity and family member or other prior relationship to you will be confirmed by USMS/BOP/DF and FBI.

   ii.  **General correspondence without limitations:** There is no volume or frequency limitation on correspondence to/from U.S. courts, federal judges, U.S. Attorney's Offices, members of U.S. Congress, BOP, and other federal law enforcement entities, unless there is evidence of abuse of these privileges, threatening correspondence is detected, circumvention of the SAM is detected, or the quantity to be processed becomes unreasonable to the extent that efficient processing to protect the security, good order or discipline of the institution, the public or national security may be jeopardized.

   iii.  All non-legal mail will be:

       (1)   **Copied** - Shall be copied (including the surface of the envelope) by the warden, or his/her designee, of the facility in which the inmate are housed.

       (2)   **Forwarded** - Shall be forwarded, in copy form, to the location designated by the FBI.

       (3)   **Analyzed** - After government analysis and approval, if appropriate, your incoming/outgoing non-legal mail will be forwarded to the USMS/BOP/DF for delivery to you (incoming); or directly to the addresses (outgoing).

**Exhibit 23 - 354**

MIKHEL, Iouri
23675-112
Page 11

The Federal Government will forward your non-legal mail to the USMS/BOP/DF for delivery to you or directly to the addressee after a review and analysis period of:

(a)    A reasonable time not to exceed fourteen (14) business days for mail which is written entirely in the English language.

(b)    A reasonable time not to exceed sixty (60) business days for any mail which includes writing in any language other than English, to allow for translation.

(c)    A reasonable time not to exceed sixty (60) business days for any mail where the Federal Government has reasonable suspicion to believe that a code was used, to allow for decoding.

iv. **Mail Seizure** - If outgoing/incoming mail is determined by USMS/BOP/DF or FBI to contain overt or covert discussions of or requests for illegal activities, the soliciting or encouraging of acts of violence, or actual or attempted circumvention of the SAM, the mail shall not be delivered/forwarded to the intended recipient but referred to the FBI for appropriate action. You shall be notified in writing of the seizure of any mail.

**4.    Communication With News Media:**

You will not be permitted to talk with, meet with, correspond with, or otherwise communicate with any member, or representative, of the news media, in person, by telephone, by furnishing a recorded message, through the mail, through his attorney, through a third party, or otherwise.

**5.    Religious Visitation:**

a. You shall not be allowed to engage in group prayer with other inmates.

b. If an FBI and/or USMS/BOP/DF approved religious representative is to be present for prayer with you, the prayer shall be conducted as part of a contact or non-contact visit, at the discretion of the USMS/BOP/DF.

**Exhibit 23 -  355**

MIKHEL, Iouri
23675-112
Page 12

6. **No Communal Cells and No Communication Between Cells:**

   a. You shall not be allowed to share a cell with another inmate.

   b. You shall be limited within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate by making statements audible to other inmates or by sending notes to other inmates, except as permitted in section 1c above.

7. **Cellblock Procedures:**

   a. You shall be kept separated from other inmates as much as possible while in the cellblock area.

   b. You shall be limited, within USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmates while in the cellblock area.

8. **Commissary Privileges:**

   The USMS/BOP/DF shall restrict access to commissary items or any other objects determined by USMS/BOP/DF to be capable of being converted into dangerous instruments.

9. **Access to Mass Communications:**
   To prevent you from receiving and acting upon critically-timed information or information coded in a potentially undetectable manner, your access to materials of mass communication is restricted as follows:

   a. **Publications/Newspapers -**

      i. You may have access to publications determined not to facilitate criminal activity or be detrimental to: national security; the security, good order or discipline of the institution; or the protection of the public. This determination is to be made by the BOP, in consultation with the USA/CDCA.

      ii. Sections of the publication/newspaper that offer a forum for information to be passed by unknown and/or unverified individuals, including but not limited to classified advertisements and letters to the editor, should be removed from the periodicals/newspapers prior to distribution to you.

**Exhibit 23 - 356**

MIKHEL, Iouri
23675-112
Page 13

    iii. If restricted by BOP rules, a publication will be denied. If acceptable, upon delivery, the BOP will review the publication and make the initial determination. If the FBI's expertise on national security or intelligence matters is required, the publication will be forwarded to the FBI for review. The BOP will also forward the publication to the FBI if translations are needed to make a determination. (In these cases, the FBI shall respond to the BOP within fourteen business days.) You shall then have access to the remaining portions of the publications/newspapers deemed acceptable, in accordance with USMS/BOP/DF policy.

    iv. In order to avoid passing messages/information from inmate to inmate, you will not be allowed to share the publication(s) with any other inmates.

**b. Television and Radio -** The inmate is authorized to have television and radio viewing and listening privileges, in accordance with standard and applicable USMS/BOP/DF policies and procedures.

**c. Termination or Limitation -** If the USMS/BOP/DF determines that the mass communications are being used as a vehicle to send messages to you relating to the furtherance of terrorist activities, your access may be limited or terminated for a period of time to be determined by the USMS/BOP/DF.

## 10. Access to Books :

You may have access to all books which do not facilitate criminal activity or present a substantial threat to national security or the security, discipline, or good order of the institution. This initial determination is to be made by the BOP and, if the BOP determines the FBI's expertise on national security or intelligence matters is required, the book(s) will be forwarded to the FBI for review. In conducting its analysis, the FBI will determine whether the book advocates or promotes acts of terrorism or violence and/or whether access to the book by this particular inmate would pose a substantial threat to national security.

In order to avoid passing messages/information from inmate to inmate, you shall not be allowed to share books with any other inmates.

## 11. Transfer of Custody :

In the event you are transferred to or from the custody of the USMS, BOP or any other DF, the SAM provisions authorized for you will continue in effect, without need for any additional DOJ authorization.

**Exhibit 23 - 357**

MIKHEL, Iouri
23675-112
Page 14

**13.    Inmate's Consular Contacts:**

Since you are a citizen of Russia, you shall be allowed Consular communications and visits, consistent with USMS/BOP/DF policy.  The Consular contacts shall comply with the U.S. Department of State (DOS) Consular notification and access requirements.[10] Prior to permitting any Consular contact, the FBI will verify the Consular representative's credentials with the DOS.

---

[10]See, Consular notification and Access, Instructions for Federal, State, and Local Law Enforcement and Other Officials Regarding Foreign National in the United States and the Rights of Consular Officials to assist them, DOS. DOS contact: Consular Notification and Outreach Division, Office of Policy Coordination and Public Affairs, DOS, telephone (202) 647-4110 or http://www.travel.state.gov/law/consular_753.html.

**Exhibit 23 -  358**

I, Iouri Mikhel, Register No. 26375-112, acknowledge this notification of Renewed Special Administrative Measures which have been extended for an additional year.

Received: June 10, 2011

MIKHEL, IOURI
Register No. 23675-112

T. Royer, Case Manager

Date

**Exhibit 23 - 359**

# EXHIBIT

# 24



**U.S. Department of Justice**

Criminal Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

June 4, 2012

LIMITED OFFICIAL USE

**MEMORANDUM**

TO:                    Charles E. Samuels, Jr.
                       Director
                       Federal Bureau of Prisons

FROM:                  Lanny A. Breuer
                       Assistant Attorney General

SUBJECT:               Extension of Special Administrative Measures Pursuant
                       to 28 C.F.R. § 501.3 for Federal Bureau of Prisons
                       Inmate Iouri Mikhel

Federal Bureau of Prisons (BOP) inmate Iouri Mikhel was convicted in March 2007 of conspiring to take hostages resulting in death, as well as substantive counts of hostage taking resulting in death, in violation of 18 U.S.C. § 1203, in connection with the abduction and murder of five people between October 2001 and January 2002. Mikhel has been sentenced to death and is currently being housed at the U.S.P. in Terre Haute, Indiana. Because of Mikhel's extensive ties with Russian Organized Crime, his multiple escape attempts, and his threats to witnesses, the Attorney General placed Mikhel under Special Administrative Measures (SAM) on June 6, 2003. The SAM were most recently extended in June 2011 and expire on June 6, 2012.

The U.S. Attorney for the Central District of California (USA/CDCA), in his letter dated May 3, 2012, has requested the renewal of the SAM. In reaching the conclusion that there is a substantial risk that Mikhel's communications or contacts could result in death or serious bodily injury to others, the USA/CDCA reports that during a search conducted of Mikhel's cell in 2009, the BOP discovered a hand-drawn floor plan of the prison tier on which Mikhel was being housed. Mikhel had attempted to escape from custody on two prior occasions, including one attempt that occurred after he had been placed under SAM restrictions. In that instance, in January 2004, Mikhel prepared detailed drawings of the facility where he was incarcerated outlining his escape plan. He then attempted to forward these plans, in violation of the SAM, to a high-ranking member of the Mexican Mafia to whom Mikhel was offering one million dollars in return for assistance in facilitating his escape. Mikhel's repeated efforts to plot his escape

**Exhibit 24 -  360**

SPECIAL ADMINISTRATIVE MEASURES (SAM)                          Page 2
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel

from custody and his past behavior suggest that he will continue to exploit opportunities to communicate with others outside of the prison system in order to further his efforts to escape from custody.

Based upon information provided to me concerning Mikhel's extensive ties with Russian organized crime, his escape attempts, and his history of violent behavior, including threats to witnesses, I find that there is substantial risk that his communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of serious bodily injury to persons. Therefore, I am requesting that, pursuant to 28 C.F.R. § 501.3, you continue to implement the SAM in order to restrict Mikhel's access to the mail, the media, the telephone, and visitors. The SAM will commence immediately upon expiration of the prior SAM authorization period and will be in effect for a period of one year, subject to my further direction.

1.  **General Provisions**

    a.  **Adherence to Usual United States Marshals Service (USMS), Bureau of Prisons (BOP) and Detention Facility (DF) Policy Requirements** - In addition to the below-listed SAM, the inmate must comply with all usual USMS, BOP, and non-BOP DF policies regarding restrictions, activities, privileges, communications, etc. If there is a conflict between USMS/BOP/DF policies and the SAM, as set forth herein, where the SAM is more restrictive than usual USMS/BOP/DF policies, then the SAM shall control. If usual USMS/BOP/DF policies are more restrictive than the SAM, then USMS/BOP/DF policies shall control.

    b.  **Interim SAM Modification Authority** - During the term of this directive, the Director, Office of Enforcement Operations (OEO), Criminal Division, may modify the inmate's SAM as long as any SAM modification authorized by OEO:

        i.   Does not create a more restrictive SAM.

        ii.  Is not in conflict with the request of the USA/CDCA, Federal Bureau of Investigation (FBI), or USMS/BOP/DF, or applicable regulations.

        iii. Is not objected to by the USA/CDCA, FBI, or USMS/BOP/DF.

    c.  **Inmate Communications Prohibitions** - The inmate is limited, within the

LIMITED OFFICIAL USE

**Exhibit 24 -  361**

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                              Page 3
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel

USMS/BOP/DF's reasonable efforts and existing confinement conditions, from having contact (including passing or receiving any oral, written, or recorded communications) with any other inmate, visitor, attorney, or anyone else, except as outlined and allowed by this document, that could reasonably foreseeably result in the inmate communicating (sending or receiving) information that could circumvent the SAM's intent of significantly limiting the inmate's ability to communicate (send or receive) information with intent to harm others.

The USMS/BOP/DF may permit the inmate to communicate with other SAM inmates orally only during certain predesignated times, the place and duration to be set by the USMS/BOP/DF. The inmate shall not have any physical contact with other inmates during this predesignated time and all such predesignated sessions may be monitored and/or recorded. Upon request of the FBI, a copy of the recordings will be provided by the USMS/BOP/DF to the FBI to be analyzed for indications that the inmates are attempting to pass messages soliciting or encouraging acts of violence or other crimes.

d.   **Use of Interpreters/Translators by the USMS/BOP/DF -** Interpreter/translator approval requirement:

   i.   The USMS/BOP/DF may use Department of Justice (DOJ) approved interpreters/translators as necessary for the purpose of facilitating communication with the inmate.

   ii.  No person shall act as an interpreter/translator without prior written clearance/approval from the USMS/BOP/DF, which shall only be granted after consultation with the FBI and USA/CDCA.

   iii. Interpreters/translators utilized by the USMS/BOP/DF shall not be allowed to engage in, or overhear, unmonitored conversations with the inmate. Interpreters/translators shall not be alone with the inmate, either in a room or on a telephone or other communications medium.

LIMITED OFFICIAL USE

**Exhibit 24 - 362**

SPECIAL ADMINISTRATIVE MEASURES (SAM)                          Page 4
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel

2.      **Attorney-Client Provisions**

      a.      **Attorney[1] Affirmation of Receipt of the SAM Restrictions Document** - The inmate's attorney (or counsel) – individually by each if more than one – must sign an affirmation acknowledging receipt of the SAM restrictions document. By signing the affirmation, the attorney acknowledges his or her awareness and understanding of the SAM provisions and his or her agreement to abide by these provisions, particularly those that relate to contact between the inmate and his attorney and the attorney's staff. The signing of the affirmation does not serve as an endorsement of the SAM or the conditions of confinement, and does not serve to attest to any of the factors set forth in the conclusions supporting the SAM. However, in signing the affirmation, the inmate's attorney and precleared staff[2] acknowledge the restriction that they will not forward third-party messages to or from the inmate.

            i.      The USA/CDCA shall present, or forward, the attorney affirmation of receipt of the SAM restrictions document to the inmate's attorney.

            ii.     After initiation of the SAM and prior to the inmate's attorney being permitted to have attorney-client privileged contact with the inmate, the

---

[1] The term "attorney" refers to the inmate's attorney of record, who has been verified and documented by the USA/CDCA, and who has received and acknowledged receipt of the SAM restrictions document. As used in this document, "attorney" also refers to more than one attorney where the inmate is represented by two or more attorneys, and the provisions of this document shall be fully applicable to each such attorney in his or her individual capacity.

[2] "Precleared," when used with regard to an attorney's staff, or "precleared staff member," refers to a co-counsel, paralegal, or investigator who is actively assisting the inmate's attorney with the inmate's post-sentencing proceedings, who has submitted to a background check by the FBI and USA/CDCA, who has successfully been cleared by the FBI and USA/CDCA, and who has received a copy of the inmate's SAM and has agreed – as evidenced by his or her signature – to adhere to the SAM restrictions and requirements. As used in this document, "staff member" also refers to more than one staff member, and the provisions of this document shall be fully applicable to each such staff member in his or her individual capacity. A "paralegal" or "investigator" will also be governed by any additional DF rules and regulations governing their conduct.

LIMITED OFFICIAL USE

Exhibit 24 - 363

SPECIAL ADMINISTRATIVE MEASURES (SAM)                          Page 5
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel

        inmate's attorney shall execute a document affirming receipt of the SAM restrictions document and return the original to the USA/CDCA.

    iii.    The USA/CDCA shall maintain the original of the SAM acknowledgment document and forward a copy of the signed document to OEO in Washington, D.C., and the USMS/BOP/DF.

  b.    **Attorney Use of Interpreters/Translators -**

    i.    The inmate's attorney may use DOJ - and/or USA/CDCA - approved interpreters/translators as necessary for the purpose of facilitating communication with the inmate. Any interpreter/translator shall be precleared.[3]

    ii.    No person shall act as an interpreter/translator without prior written clearance/approval from the USMS/BOP/DF/FBI, which shall only be granted after consultation with the FBI and USA/CDCA.

    iii.    Attorney Immediate Presence Requirement - Any use of an interpreter/translator by the attorney shall be in the physical and immediate presence of the attorney — i.e., in the same room. The attorney shall not patch through telephone calls, or any other communications, to or from the inmate.

  c.    **Attorney-Client Privileged Visits -** May be contact or non-contact, at the discretion of the USMS/BOP/DF.

  d.    **Attorney May Disseminate Inmate Conversations -** The inmate's attorney and/or investigators working on behalf of the inmate's attorney may disseminate the contents of the inmate's communication to third parties for the sole purpose of

---

[3] "Precleared," when used with regard to an interpreter/translator, refers to an interpreter/translator who is actively assisting the inmate's attorney with the inmate's appeal or post-conviction legal proceedings, who has submitted to a background check by the FBI and USA/CDCA, who has successfully been cleared by the FBI and USA/CDCA, and who has received a copy of the inmate's SAM and has agreed – as evidenced by his or her signature – to adhere to the SAM restrictions and requirements.

LIMITED OFFICIAL USE

**Exhibit 24 - 364**

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                                              Page 6
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel

preparing the inmate's post-sentencing proceedings – and not for any other reason – on the understanding that any such dissemination shall be made solely by the attorney and/or investigators working on behalf of the inmate's attorney, and not by any other members of the attorney's staff.

e.  **Unaccompanied Attorney's Precleared Paralegal(s) and Investigator(s) May Meet With Client** - The inmate's attorney's precleared paralegal(s) and investigator(s) may meet with the inmate without the need for the inmate's attorney to be present.  These meetings may be contact or non-contact, at the discretion of the USMS/BOP/DF.

f.  **Simultaneous Multiple Legal Visitors** - The inmate may have multiple legal visitors provided that at least one of the multiple legal visitors is the inmate's attorney or precleared paralegal.  These meetings may be contact or non-contact, at the discretion of the USMS/BOP/DF.

g.  **Legally Privileged Telephone Calls** - The following rules refer to all legally privileged telephone calls or communications:

   i.  Inmate's Attorney's Precleared Staff May Participate in Inmate Telephone Calls - The inmate's attorney's precleared staff are permitted to communicate directly with the inmate by telephone, provided that the inmate's attorney is physically present and participating in the legal call, as well.

   ii.  Inmate's Initiation of Legally Privileged Telephone Calls - Inmate-initiated telephone communications with his attorney or precleared staff are to be placed by a USMS/BOP/DF staff member and the telephone handed over to the inmate only after the USMS/BOP/DF staff member confirms that the person on the other end of the line is the inmate's attorney.  This privilege is contingent upon the following additional restrictions:

   (1)  The inmate's attorney will not allow any non-precleared person to communicate with the inmate, or to take part in and/or listen to or overhear any communications with the inmate.

   (2)  The inmate's attorney must instruct his or her staff that:

LIMITED OFFICIAL USE

**Exhibit 24 -  365**

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                    Page 7
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel

(a)   The inmate's attorney and precleared staff are the only persons allowed to engage in communications with the inmate.

(b)   The attorney's staff (including the attorney) are not to patch through, forward, transmit, or send the inmate's calls or any other communications to third parties.

(3)   No telephone call/communication, or portion thereof, except as specifically authorized by this document:

(a)   Is to be overheard by a third party.[4]

(b)   Will be patched through, or in any manner forwarded or transmitted, to a third party.

(c)   Shall be divulged in any manner to a third party, except as otherwise provided in Section 2.d. above.

(d)   Shall be in any manner recorded or preserved.[5]  The inmate's attorney may make written notes of attorney-client privileged communications.

(4)   If the USMS/BOP/DF, FBI or USA/CDCA determines that the inmate has used or is using the opportunity to make a legal call to speak with another inmate or for any other non-legal reason that would circumvent the intent of the SAM, the inmate's ability to contact his attorney by telephone may be suspended or eliminated.

---

[4] For purposes of the SAM, "third party" does not include officials of the USMS/BOP/DF, FBI, or DOJ, or other duly authorized federal authorities when acting in connection with their official duties.  This section does not allow monitoring of attorney-client privileged communications.

[5] Except by the USMS/BOP/DF, FBI, DOJ, or other duly authorized federal authorities.  This section does not allow monitoring of attorney-client privileged communications.

LIMITED OFFICIAL USE

**Exhibit 24 - 366**

SPECIAL ADMINISTRATIVE MEASURES (SAM)                                     Page 8
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel

    h.    **Documents Provided by Attorney to Inmate -** The inmate's attorney may provide the inmate with, or review with the inmate, documents related to his post-sentencing proceedings and/or material prepared by the inmate's attorney, so long as any of the foregoing documents are translated, if translation is necessary, by a precleared interpreter/translator. Any document not related to the inmate's post-sentencing proceedings must be sent to the inmate via general correspondence and will be subject to the mail provisions of subparagraphs 2.i. and 3.g. Documents previously reviewed and cleared for receipt by the inmate, and already in the inmate's possession at the outset of the visit, may be discussed or reviewed by the inmate and the inmate's attorney during the visit.

        i.    None of the materials provided may include inflammatory materials, materials inciting violence, military training materials, or materials that may be used to pass messages from inmate to inmate, unless such materials have been precleared by the USA/CDCA and FBI.

        ii.    The USA/CDCA may authorize additional documents to be presented to the inmate. If any document not listed or described above needs to be transmitted to the inmate, consent for the transmission of the document may be obtained from the USA/CDCA without the need to formally seek approval for an amendment to the SAM.

    i.    **Legal Mail**[6] - The inmate's attorney may not send, communicate, distribute, or divulge the inmate's mail, or any portion of its contents (legal or otherwise), to third parties.

        In signing the SAM acknowledgment document, the inmate's attorney and precleared staff will acknowledge the restriction that only inmate case-related documents will be presented to the inmate, and that neither the attorney nor his/her staff will forward third-party mail to or from the inmate.

---

[6] "Legal mail" is defined as properly marked correspondence (marked "Legal Mail") addressed to or from the inmate's attorney. All other mail, including that otherwise defined by the USMS/BOP/DF as Special Mail, shall be processed as "non-legal mail."

LIMITED OFFICIAL USE

**Exhibit 24 -  367**

SPECIAL ADMINISTRATIVE MEASURES (SAM)                         Page 9
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel

3.    **Inmate's Non-legal Contacts**

    a.    **Non-legally Privileged Telephone Contacts -**

        i.    The inmate is limited to non-legally privileged telephone calls with his immediate family members.[7]

        ii.    The quantity and duration of the inmate's non-legally privileged telephone calls with his immediate family members shall be set by the USMS/BOP/DF, with a minimum of one call per month.

    b.    **Rules for Telephone Calls -** For all non-legally privileged telephone calls or communications, no telephone call/communication, or portion thereof:

        i.    Is to be overheard by a third party.

        ii.    Is to be patched through, or in any manner forwarded or transmitted, to a third party.

        iii.    Shall be divulged in any manner to a third party.

        iv.    Shall be in any manner recorded or preserved.[8]

    All telephone calls shall be in English unless a fluent USMS/BOP/DF- or FBI-approved interpreter/translator is available to contemporaneously monitor the telephone call. Arranging for an interpreter/translator may require at least fourteen (14) days' advance notice.

    c.    **Telephone SAM Restriction Notifications -** For all non-legally privileged telephone calls to the inmate's immediate family member(s):

---

[7] The inmate's "immediate family members" are defined as the inmate's (USMS/BOP/DF- or FBI-verifiable) spouse, children, parents, and siblings. Requests for additional non-legal contacts may be submitted and will be considered on a case-by-case basis.

[8] Except by the USMS/BOP/DF, FBI, DOJ, or other duly authorized federal authorities.

LIMITED OFFICIAL USE

**Exhibit 24 - 368**

SPECIAL ADMINISTRATIVE MEASURES (SAM)                      Page 10
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel

    i.    The USMS/BOP/DF shall inform the inmate of the telephone SAM restrictions prior to each telephone call.

    ii.    The USMS/BOP/DF shall verbally inform the inmate's immediate family member(s) on the opposite end of the inmate's telephone communication of the SAM restrictions. The USMS/BOP/DF is only required to notify the inmate's communication recipient in English.

    iii.    The USMS/BOP/DF shall document each such telephone notification.

d.    **Family Call Monitoring** - All calls with the inmate's immediate family member(s) shall be:

    i.    Contemporaneously monitored by the FBI.

    ii.    Contemporaneously recorded (as directed by the FBI) in a manner that allows such telephone calls to be analyzed for indications the call is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

    iii.    A copy of each inmate/immediate family member telephone call recording shall be provided by the USMS/BOP/DF on a single, individual cassette tape or compact disk (per call) for forwarding to the FBI. These recordings shall be forwarded on a call-by-call basis as soon as practicable.

e.    **Improper Communications** - If telephone call monitoring or analysis reveals that any call or portion of a call involving the inmate contains any indication of a discussion of illegal activity, the soliciting of or encouraging of acts of violence, or actual or attempted circumvention of the SAM, the inmate shall not be permitted any further calls to his immediate family members for a period of time to be determined by the USMS/BOP/DF. If contemporaneous monitoring reveals such inappropriate activity, the telephone call may be immediately terminated.

f.    **Non-legal Visits -**

    i.    **Limited Visitors** - The inmate shall be permitted to visit only with his immediate family members. The visitor's identity and family member relationship to the inmate will be confirmed by the USMS/BOP/DF and

LIMITED OFFICIAL USE

**Exhibit 24 - 369**

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                           Page 11
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel

FBI in advance.

ii.    **English Requirement** - All communications during non-legal inmate
visits will be in English unless a fluent USMS/BOP/DF- or FBI-approved
interpreter/translator is readily available to contemporaneously monitor the
communication/visit. Arranging for an interpreter/translator may require
at least fourteen (14) days' advance notice.

iii.    **Visit Criteria** - All non-legal visits shall be:

(1)    Contemporaneously monitored by the USMS/BOP/DF and/or FBI,
in a manner that allows such visits to be analyzed for indications
the visit is being used to pass messages soliciting or encouraging
acts of violence or other crimes, or to otherwise attempt to
circumvent the SAM.

(2)    Permitted only with a minimum of fourteen (14) calendar days'
advance written notice to the USMS/BOP/DF facility where the
inmate is housed.

(3)    Without any physical contact. All such meetings shall be non-
contact to protect against harm to visitors or staff.

(4)    Limited to one adult visitor at a time. However, the FBI-verified
children of the inmate may visit with a pre-approved adult visitor.

g.    **Non-legal Mail** - Non-legal mail is any mail not clearly and properly addressed
to/from the inmate's attorney and marked "Legal Mail" (incoming or outgoing).
Non-legal mail is limited to only the inmate's immediate family, U.S. courts,
federal judges, U.S. Attorneys' Offices, members of U.S. Congress, the BOP, or
other federal law enforcement entities.

i.    **General correspondence with limitations** - Correspondence is restricted
to immediate family members. The volume and frequency of outgoing
general correspondence with immediate family members may be limited to
three pieces of paper (not larger than 8½" x 11"), double-sided, once per
calendar week to a single recipient, at the discretion of the
USMS/BOP/DF. The identity and family member relationship to the

<u>LIMITED OFFICIAL USE</u>

**Exhibit 24 -  370**

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                                  Page 12
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel

inmate will be confirmed by the USMS/BOP/DF and FBI.

ii.    **General correspondence without limitations** - There is no volume or frequency limitation on correspondence to/from U.S. courts, federal judges, U.S. Attorneys' Offices, members of U.S. Congress, the BOP, and other federal law enforcement entities, unless there is evidence of abuse of these privileges, threatening correspondence is detected, circumvention of the SAM is detected, or the quantity to be processed becomes unreasonable to the extent that efficient processing to protect the security, good order, or discipline of the institution, the public, or national security may be jeopardized.

iii.   All non-legal mail shall be -

(1)    **Copied** - Shall be copied (including the surface of the envelope) by the warden, or his or her designee, of the facility in which the inmate is housed.

(2)    **Forwarded** - Shall be forwarded, in copy form, to the location designated by the FBI.

(3)    **Analyzed** - After government analysis and approval, if appropriate, the inmate's incoming/outgoing non-legal mail shall be forwarded to the USMS/BOP/DF for delivery to the inmate (incoming); or directly to the addressee (outgoing).

iv.    The federal government shall forward the inmate's non-legal mail to the USMS/BOP/DF for delivery to the inmate or directly to the addressee after a review and analysis period of:

(1)    A reasonable time not to exceed fourteen (14) business days for mail that is written entirely in the English language.

(2)    A reasonable time not to exceed sixty (60) business days for any mail that includes writing in any language other than English, to allow for translation.

LIMITED OFFICIAL USE

**Exhibit 24 - 371**

SPECIAL ADMINISTRATIVE MEASURES (SAM)                          Page 13
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel

        (3)    A reasonable time not to exceed sixty (60) business days for any mail where the federal government has reasonable suspicion to believe that a code was used, to allow for decoding.

    v.    **Mail Seizure** - If outgoing/incoming mail is determined by the USMS/BOP/DF or FBI to contain overt or covert discussions of or requests for illegal activities, the soliciting or encouraging of acts of violence, or actual or attempted circumvention of the SAM, the mail shall not be delivered/forwarded to the intended recipient but referred to the FBI for appropriate action. The inmate shall be notified in writing of the seizure of any mail.

4.    **Communication With News Media**

The inmate shall not be permitted to speak, meet, correspond, or otherwise communicate with any member or representative of the news media in person; by telephone; by furnishing a recorded message; through the mail, his attorney, or a third party; or otherwise.

5.    **Religious Visitation**

    a.    The inmate shall not be allowed to engage in group prayer with other inmates.

    b.    If a USMS/BOP/DF- or FBI-approved religious representative is to be present for prayer with the inmate, the prayer shall be conducted as part of a contact or non-contact visit, at the discretion of the USMS/BOP/DF.

6.    **No Communal Cells and No Communication Between Cells**

    a.    The inmate shall not be allowed to share a cell with another inmate.

    b.    The inmate shall be limited within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate by making statements audible to other inmates or by sending notes to other inmates, except as permitted in Section 1.c. above.

LIMITED OFFICIAL USE

**Exhibit 24 - 372**

SPECIAL ADMINISTRATIVE MEASURES (SAM)                          Page 14
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel


7.    **Cellblock Procedures**

   a.    The inmate shall be kept separated from other inmates as much as possible while in the cellblock area.

   b.    The inmate shall be limited, within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate while in the cellblock area.


8.    **Commissary Privileges**

   The USMS/BOP/DF shall restrict access to commissary items or any other objects determined by the USMS/BOP/DF to be capable of being converted into dangerous instruments.


9.    **Access to Mass Communications**

   To prevent the inmate from receiving and acting upon critically timed information or information coded in a potentially undetectable manner, the inmate's access to materials of mass communication is restricted as follows:

   a.    **Publications/Newspapers -**

      i.    The inmate may have access to publications determined not to facilitate criminal activity or be detrimental to national security; the security, good order, or discipline of the institution; or the protection of the public. This determination is to be made by the USMS/BOP/DF, in consultation with the USA/CDCA.

      ii.    Sections of any publication/newspaper that offer a forum for information to be passed by unknown and/or unverified individuals, including but not limited to, classified advertisements and letters to the editor, should be removed from the publications/newspapers prior to distribution to the inmate.

      iii.    If restricted by the USMS/BOP/DF rules, access to a publication will be denied. If acceptable, upon delivery, the USMS/BOP/DF will review the publication and make the initial determination. If the FBI's expertise is


LIMITED OFFICIAL USE


**Exhibit 24 -  373**

SPECIAL ADMINISTRATIVE MEASURES (SAM)                                    Page 15
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel

required, the publication will be forwarded to the FBI for review. The USMS/BOP/DF will also forward the publication to the FBI if translations are needed to make that determination. (In these cases, the FBI shall respond to the USMS/BOP/DF within fourteen (14) business days.) The inmate shall then have access to the remaining portions of the publications/newspapers deemed acceptable, in accordance with USMS/BOP/DF policy.

    iv.    In order to avoid passing messages/information from inmate to inmate, the inmate shall not be allowed to share the publication(s) with any other inmates.

    b.    **Television and Radio -** The inmate is authorized to have television and radio viewing and listening privileges, in accordance with standard and applicable USMS/BOP/DF policies and procedures.

    c.    **Termination or Limitation -** If the USMS/BOP/DF determines that the mass communications are being used as a vehicle to send messages to the inmate relating to the furtherance of criminal activities, the inmate's access may be limited or terminated for a period of time to be determined by the USMS/BOP/DF.

10.    **Access to Books**

The inmate may have access to all books that do not facilitate criminal activity or present a substantial threat to national security or the security, discipline, or good order of the institution. This initial determination is to be made by the USMS/BOP/DF and, if the USMS/BOP/DF determines that the FBI's expertise is required, the book(s) will be forwarded to the FBI for review. In conducting its analysis, the FBI will determine whether the book advocates or promotes acts of terrorism or violence and/or whether access to the book by this particular inmate would pose a substantial threat to national security.

In order to avoid passing messages/information from inmate to inmate, the inmate shall not be allowed to share books with any other inmates.

LIMITED OFFICIAL USE

**Exhibit 24 -  374**

SPECIAL ADMINISTRATIVE MEASURES (SAM)                                     Page 16
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel

11.    **Transfer of Custody**

In the event that the inmate is transferred to or from the custody of the USMS, BOP or any other DF, the SAM provisions authorized for this inmate will continue in effect, without need for any additional DOJ authorization.

12.    **Inmate's Consular Contacts**

The inmate, who is a citizen of Russia, shall be allowed Consular communications and visits, consistent with USMS/BOP/DF policy. The Consular contacts shall comply with the U.S. Department of State (DOS) Consular notification and access requirements.[9] Prior to permitting any Consular contact, the FBI will verify the Consular representative's credentials with the DOS.

**CONCLUSION**

The SAM set forth herein, especially as they relate to attorney-client privileged communications and family contact, are reasonably necessary to prevent the inmate from committing, soliciting, or conspiring to commit additional criminal activity. Moreover, these measures are the least restrictive that can be tolerated in light of the ability of this inmate to aid, knowingly or inadvertently, in plans that create a substantial risk that the inmate's communications or contacts with persons could result in death or serious bodily injury to persons.

With respect to telephone privileges, the SAM are reasonably necessary because of the high probability of calls to co-conspirators to arrange criminal or violent activities.

With respect to mail privileges, the SAM are reasonably necessary to prevent the inmate from receiving or passing along critically timed messages. Although I recognize that eliminating

---

[9] *See* Consular Notification and Access, Instructions for Federal, State, and Local Law Enforcement and Other Officials Regarding Foreign Nationals in the United States and the Rights of Consular Officials to Assist Them, DOS. The DOS contact is the Consular Notification and Outreach Division, Office of Policy Coordination and Public Affairs, DOS, telephone (202) 647-4110 or http://www.travel.state.gov/law/consular/consular_753.html.

LIMITED OFFICIAL USE

**Exhibit 24 -  375**

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                    Page 17
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel

the inmate's mail privileges entirely may be an excessive measure except in the most egregious of circumstances, I believe that delaying mail delivery and allowing authorized personnel to examine a copy of the mail is sufficient at this time to adequately ensure that the mail is not used to deliver requests for, or to assist in, criminal and/or violent activities. Under these procedures, the inmate can relate personal news to family members, even if delayed, but he may find it difficult or unwise to pass along restricted information.

To the extent that the use of an interpreter/translator is necessary, the government has the right to ensure that the interpreter/translator given access to the inmate is worthy of trust.

The SAM's prohibition of contact with the media is reasonably necessary. Communication with the media could pose a substantial risk to public safety if the inmate advocates criminal and/or violent offenses, or if he makes statements designed to incite such acts. Based upon the inmate's past behavior, I believe that it would be unwise to wait until after the inmate solicits or attempts to arrange a violent or criminal act to justify such media restrictions.

The SAM's limitations on access to newspapers, publications, television, and radio are reasonably necessary to prevent the inmate from receiving and acting upon critically timed messages. Such messages may be placed in advertisements or communicated through other means, such as the television and/or radio. Although I recognize that eliminating the inmate's access to such media may be an excessive measure except in the most egregious of circumstances, I believe that limiting and/or delaying such access may interrupt communication patterns the inmate may develop with the outside world, and ensure that the media is not used to communicate information that furthers violent and/or criminal activities.

## SAM CONTACT INFORMATION

Any questions that you or your staff may have about this memorandum or the SAM directed herein should be directed to the Office of Enforcement Operations, Criminal Division, U.S. Department of Justice, 1301 New York Avenue, N.W., JCK Building, Room 1200, Washington, D..C, 20530-0001; telephone (202) 514-6809; and facsimile (202) 616-8256.

LIMITED OFFICIAL USE

**Exhibit 24 - 376**

# EXHIBIT

# 25



**U.S. Department of Justice**
Federal Bureau of Prisons

*Federal Correctional Complex*
*Terre Haute, Indiana*

June 14, 2013

MEMORANDUM FOR INMATE MIKHEL, IOURI #23675-112

From:    J. F. CARAWAY, COMPLEX WARDEN

Subject:    Notice of Renewed Special Administrative Measures

Pursuant to 28 C.F.R. § 501.3, Special Administrative Measures have been implemented regarding your confinement. The Attorney General authorized implementation of the procedures on June 6, 2003, and delegated the implementation of the procedure to the Director of the Bureau of Prisons. These Special Administrative Measures (SAM) have been implemented based on information concerning your extensive ties with Russian Organized Crime, previous escape attempts, and threats to witnesses. There is a substantial risk your communications or contacts with persons could result in death or serious bodily injury to persons or substantial damage to property that would entail the risk of death or serious bodily injury to persons. The Bureau of Prisons has implemented these measures in the past and is extending them at this time for an additional year period, at the request of the Attorney General's designee. The SAM will commence immediately upon expiration of the prior SAM authorization period and will be in effect for a period of one (1) year, subject to any further direction.

In reaching the conclusion that there is a substantial risk that your communications or contacts could result in death or serious bodily injury to others, the government reports that during a search conducted of your cell in 2009, the BOP discovered a hand-drawn floor plan of the prison tier on which you were being housed. You had previously attempted to escape from custody on two prior occasions, including one attempt that occurred after you had been placed under SAM restrictions. In that instance, in January 2003, you prepared detailed drawings of the facility in which you were incarcerated outlining your escape plan. You then attempted to forward these plans, in violation of the SAM, to a high-ranking member of the Mexican Mafia to whom you were offering one million dollars in return for assistance in facilitating your escape. Your efforts to plot escape from custody and past behavior suggest that you will continue to exploit opportunities to communicate with others outside of the prison system in order to advance your efforts to escape from custody.

**Exhibit 25 -  377**

MIKHEL, Iouri
23675-112
Page 2

Based upon information provided to me concerning your extensive ties with Russian Organized Crime, your escape attempts, and history of violent behavior, including threats to witnesses, I find that there is substantial risk that your communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of serious bodily injury to persons. Therefore, pursuant to 28 C.F.R. § 501.3, the government will continue to implement SAM in order to restrict your access to the mail, the media, the telephone, and visitors. The SAM will commence immediately upon expiration of the prior SAM authorization period and will be in effect for a period of one year, subject to further direction.

1.   **General Provisions**

   a. **Adherence to Usual United States Marshals Services (USMS), Bureau of Prisons (BOP) and Detention Facility (DF) Policy Requirements** - In addition to the below-listed SAM, you must comply with all usual USMS, BOP, and non-BOP DF policies regarding restrictions, activities, privileges, communications, etc.  If there is a conflict between USMS/BOP/DF policies and the SAM, as set forth herein, where the SAM is more restrictive than usual USMS/BOP/DF policies, then the SAM shall control.  If usual USMS/BOP/DF policies are more restrictive than the SAM, then USMS/BOP/DF policies shall control.

   b. **Interim SAM Modification Authority** - During the term of this directive, the Director, Office of Enforcement Operations (OEO), Criminal Division, may modify your SAM as long as any SAM modification authorized by OEO:

      i.   Does not create a more restrictive SAM.

      ii.  Is not in conflict with the request of the USA/CDCA, Federal Bureau of Investigation (FBI), or USMS/BOP/DF, or applicable regulations.

      iii. Is not objected to by the USA/CDCA, FBI, or USMS/BOP/DF.

   c. **Inmates Communications Prohibitions** – You are limited, within USMS/BOP/DF's reasonable efforts and existing confinement conditions, from having contact (including passing or receiving any oral, written or recorded communications) with any other inmate, visitor, attorney, or anyone else except as outlined and allowed by this document that could reasonably foreseeably result in you communicating information (sending or receiving) that could circumvent the SAM's intent of significantly limiting your ability to communicate (send or receive) information with intent to harm others.

**Exhibit 25 -  378**

MIKHEL, Iouri
23675-112
Page 3

The USMS/BOP/DF may permit you to communicate with other SAM inmates orally only during certain predesignated times, the place and duration to be set by the USMS/BOP/DF. You shall not have any physical contact with the other inmates during this predesignated time and all such predesignated sessions will be monitored and/or recorded. Upon request to the FBI, a copy of the recordings will be provided by the USMS/BOP/DF to the FBI to be analyzed for indications that you are attempting to pass messages soliciting or encouraging acts of violence or other crimes.

d. **Use of Interpreters/Translators by USMS/BOP/DF** – Interpreter/translator approval requirement:

i. The USMS/BOP/DF may use Department of Justice (DOJ) approved interpreters/translators as necessary for the purpose of facilitating communication with you.

ii. No person shall act as an interpreter/translator without prior written clearance/approval from the USMS/BOP/DF, which shall only be granted after consultation with the FBI and USA/CDCA.

iii. Interpreters/translators utilized by USMS/BOP/DF shall not be allowed to engage in, or overhear, unmonitored conversations with you. Interpreters/translators shall not be alone with you, either in a room or on a telephone or other communications medium.

**Exhibit 25 -  379**

MIKHEL, Iouri
23675-112
Page 4

2.    **Attorney/Client Provisions**

a. **Attorney[1] Affirmation of Receipt of the SAM Restrictions Document –** Your attorney (or counsel) - individually by each if more than one - must sign an affirmation acknowledging receipt of the SAM restrictions document. By signing the affirmation, the attorney acknowledges his or her awareness and understanding of the SAM provisions and his or her agreement to abide by these provisions, particularly those that relate to contact between you and your attorney and the attorney's staff. The signing of the affirmation does not serve as an endorsement of the SAM or the conditions of confinement, and does not serve to attest any of the factors in the conclusions supporting the SAM. However, in signing the affirmation, your attorney, and precleared staff[2] acknowledge the restriction that they will not forward third-party messages to or from you.

    i. The USA/CDCA shall present, or forward, the attorney affirmation of receipt of the SAM restrictions document to your attorney.

    ii. After initiation of the SAM and prior to your attorney being permitted to have attorney-client privileged contact with you, your attorney shall execute a document affirming receipt of the SAM restrictions document and return the original to the USA/CDCA.

    iii. The USA/CDCA shall maintain the original of the SAM acknowledgment document and forward a copy of the signed document to OEO in Washington, D.C., and the USMS/BOP/DF.

---

[1]The term "attorney" refers to your attorney of record, who has been verified and documented by the USA/CDCA, and who has received and acknowledged receipt of the SAM restrictions document. As used in this document, "attorney" also refers to more than one attorney where you is represented by two or more attorneys, and the provisions of this document shall be fully applicable to each such attorney in his/her individual capacity.

[2]"Precleared," when used with regard to an attorney's staff, or "precleared staff member," refers to a co-counsel, paralegal, or investigator who is actively assisting your attorney with your post-sentencing proceedings, who has submitted to a background check by the FBI and USA/CDCA, who has successfully been cleared by the FBI and USA/CDCA, and who has received a copy of your SAM and has agreed – as evidenced by his or her signature – to adhere to the SAM restrictions and requirements. As used in this document, "staff member" also refers to more than one staff member, and the provisions of this document shall be fully applicable to each such staff member in his or her individual capacity. A "paralegal" or "investigator" will also be governed by any additional DF rules and regulations governing their conduct.

**Exhibit 25 -  380**

MIKHEL, Iouri
23675-112
Page 5

    b. **Attorney Use of Interpreters/Translators -**

       i.  Your attorney may use DOJ - and/or USA/CDCA - approved
interpreters/translators as necessary for the purpose of facilitating
communication with you.  Any interpreter/translator shall be precleared.[3]

       ii.  No person shall act as an interpreter/translator without prior written
clearance/approval from USMS/BOP/DF/FBI, which shall only be granted
after consultation with the FBI and USA/CDCA.

       iii.  Attorney Immediate Presence Requirement - Any use of an
interpreter/translator by the attorney shall be in the physical and
immediate presence of the attorney – i.e., in the same room.  The
attorney shall not patch through telephone calls, or any other
communications, to or from you.

    c. **Attorney-Client Privileged Visits** - May be contact or non-contact, at the
discretion of the USMS/BOP/DF.

    d. **Attorney May Disseminate Inmate Conversations** – Your attorney and/or
investigators working on behalf of your attorney may disseminate the
contents of your communication to third parties for the sole purpose of
preparing your post-sentencing proceedings - and not for any other reason -
on the understanding that any such dissemination shall be made solely by the
attorney and/or investigators working on behalf of your attorney, and not by
any other members of the attorney's staff.

    e. **Unaccompanied Attorney's Precleared Paralegal(s) and Investigator(s)
May Meet With Client** –Your attorney precleared paralegal(s) and
investigator(s) may meet with you without the need of your attorney to be
present.  These meeting may be contact or non-contact, at the discretion of
the USM/BOP/DF.

    f. **Simultaneous Multiple Legal Visitors** – You have multiple legal visitors
provided that at least one of the multiple legal visitors is your attorney or
precleared paralegal.  These meetings may be contact or non-contact, at the
discretion of the USMS/BOP/DF.

---

    [3]"Precleared," when used with regard to an interpreter/translator, refers to an
interpreter/translator who is actively assisting your attorney with your appeal or post-
conviction legal proceedings, who has submitted to a background check by the FBI and
USA/CDCA, who has successfully been cleared by the FBI and USA/CDCA, and who
has received a copy of your SAM and has agreed – as evidenced by his or her
signature – to adhere to the SAM restrictions and requirements.

**Exhibit 25 -  381**

MIKHEL, Iouri
23675-112
Page 6

g. **Legally Privileged Telephone Calls** - The following rules refer to all legally privileged telephone calls or communications:

    i. Inmate's Attorney's Precleared Staff May Participate in Inmate Telephone Calls – Your attorney's precleared staff are permitted to communicate directly with you by telephone, provided that your attorney is physically present and participating in the legal call, as well.

    ii. Inmate's initiation of Legally Privileged Telephone Calls – Inmate-initiated telephone communications with his attorney or precleared staff are to be placed by a USMS/BOP/DF staff member and the telephone handed over to you only after the USMS/BOP/DF staff member confirms that the person on the other end of the line is your attorney.  This privilege is contingent upon the following additional restrictions:

        (1) Your attorney will not allow any non-precleared person to communicate with you, or to take part in and/or listen to or overhear any communications with you.

        (2) Your attorney must instruct his/her staff that:

            (a) Your attorney and precleared staff are the only persons allowed to engage in communications with you.

            (b) The attorney's staff (including the attorney) are not to patch through, forward, transmit, or send your calls or other communications to third parties.

        (3) No telephone call/communication, or portion thereof, except as specifically authorized by this document:

            (a) Is to be overheard by a third party.[4]

            (b) Will be patched through, or in any manner forwarded or transmitted to a third party.

            (c) Shall be divulged in any manner to a third party, except as otherwise provided in Section 2.d. above.

---

[4] For purposes of the SAM, "third party" does not include officials of the USMS/BOP/DF/FBI or DOJ, or other duly authorized federal authorities when acting in connection with their official duties.  This section does not allow monitoring of attorney-client privileged communications.

**Exhibit 25 -  382**

MIKHEL, Iouri
23675-112
Page 7

    (d)    Shall be in any manner recorded or preserved.[5] Your attorney may make written notes of attorney-client privileged communications.

    (4)    If USMS/BOP/DF, FBI or USA/CDCA determines that you has used or are using the opportunity to make a legal call to speak with another inmate or for any other non-legal reason that would circumvent the intent of the SAM, your ability to contact his attorney by telephone may be suspended or eliminated.

h. **Documents Provided by Attorney to Inmate** – Your attorney may provide you with, or review with you, documents related to his post-sentencing proceedings and/or material prepared by your attorney, so long as any of the foregoing documents are translated, if translation is necessary, by a precleared interpreter/translator. Any documents not related to your post-sentencing proceedings must be sent to you via general correspondence and will be subject to the mail provisions of subparagraph 2.i. and 3.g. Documents previously reviewed and cleared for receipt by you, and already in your possession at the outset of the visit, may be discussed or reviewed by you and your attorney during the visit.

    i.    None of the materials provided may include inflammatory materials, materials inciting to violence, or materials that may be used to pass messages from inmate to inmate, unless such materials have been precleared by the USA/CDCA and FBI.

    ii.    The USA/CDCA may authorize additional documents to be presented to you. If any document not listed or described above needs to be transmitted to you, consent for the transmission of the document may be obtained from the USA/CDCA without the need to formally seek approval for an amendment to the SAM.

i. **Legal Mail**[6] - Your attorney may not send, communicate, distribute or divulge your mail, or any portion of its contents (legal or otherwise) to third parties.

---

    [5]Except by USMS/BOP/DF, FBI, DOJ, or other duly authorized federal authorities. This section does not allow this monitoring of attorney-client privileged communications.

    [6]Legal mail is defined as properly marked correspondence (marked "Legal Mail") addressed to or from your attorney. All other mail, including that otherwise defined by the USMS/BOP/DF as Special Mail, shall be processed as "non-legal mail."

**Exhibit 25 -  383**

MIKHEL, Iouri
23675-112
Page 8

In signing the SAM acknowledgment document, your attorney and precleared staff will acknowledge the restriction that only you case-related documents will be presented to you, and that neither your attorney nor his/her staff will forward third-party mail to or from you.

3.   **Inmate's Non-Legal Contacts**

   a. **Non-legally Privileged Telephone Contacts -**

   i.   You is limited to non-legally privileged telephone calls with his immediate family members.[7]

   ii.  The quantity and duration of your non-legally privileged telephone calls with his immediate family members shall be set by the USMS/BOP /DF, with a minimum of one call per month.

   b. **Rules for Telephone Calls** - For all non-legally privileged telephone calls or communications, no telephone call/communication, or portion thereof:

   i.   Is to be overheard by a third party.

   ii.  Is to be patched through, or in any manner forwarded or transmitted, to a third party.

   iii. Shall be divulged in any manner to a third party.

   iv.  Shall be in any manner recorded or preserved.[8]

   All telephone calls shall be in English unless a fluent FBI, USMS/BOP/DF- or FBI- approved interpreter/translator is available to contemporaneously monitor the telephone call.  Arranging for an interpreter/translator may require at least fourteen (14) days advance notice.

---

[7]Your "immediate family members" are defined as your (USMS/BOP/DF- or FBI-verifiable) spouse, children, parents, and siblings. Requests for additional non-legal contacts may be submitted and will be consider on a case-by-case basis.

[8]Except by USMS/BOP/DF, FBI, DOJ, or other duly authorized federal authorities.

**Exhibit 25 -  384**

MIKHEL, Iouri
23675-112
Page 9

   c. **Telephone SAM Restriction Notifications** - For all non-legally privileged telephone calls to your immediate family member(s):

      i. USMS/BOP/DF shall inform you of the telephone SAM restrictions prior to each telephone call.

      ii. USMS/BOP/DF shall verbally inform your immediate family member(s) on the opposite end of your telephone communication of the SAM restrictions. USMS/BOP/DF is only required to notify your communication recipient in English.

      iii USMS/BOP/DF shall document each such telephone notification.

   d. **Family Call Monitoring** - All calls with your immediate family member(s) shall be:

      i. Contemporaneously monitored by the FBI.

      ii. Contemporaneously recorded (as directed by the FBI) in a manner which allows such telephone calls to be analyzed for indications the call is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

      iii. A copy of each of your immediate family member telephone call recording shall be provided by the USMS/BOP/DF on a single, individual cassette tape or compact disc (per call) for forwarding to the FBI. These recordings shall be forwarded on a call-by-call basis as soon as practicable.

   e. **Improper Communications** - If telephone call monitoring or analysis reveals that any call or portion of a call involving you contains any indication of a discussion of illegal activity, the soliciting or encouraging of acts of violence, or actual or attempted circumvention of the SAM, you shall not be permitted any further calls to his immediate family members for a period of time to be determined by USMS/BOP/DF. If contemporaneous monitoring reveals such inappropriate activity, the telephone call may be immediately terminated.

   f. **Non-legal Visits -**

      i. **Limited Visitors** - You shall be permitted to visit only with his immediate family members. The visitor's identity and family member relationship to you will be confirmed by the USMS/BOP/DF and FBI in advance.

**Exhibit 25 -  385**

MIKHEL, Iouri
23675-112
Page 10

  ii. **English Requirement** - All communications during non-legal inmate visits will be in English unless a fluent USMS/BOP/DF- or FBI- approved interpreter/translator is readily available to contemporaneously monitor the communication/visit. Arranging for an interpreter/translator may require at least fourteen (14) days advance notice.

  iii. **Visit Criteria** - All non-legal visits shall be:

   (1) Contemporaneously monitored by USMS/BOP/DF and/or FBI, in a manner that allows such visits to be analyzed for indications the visit is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

   (2) Permitted only with a minimum of fourteen calendar days' advance written notice to the USMS/BOP/DF facility where you is housed.

   (3) Without any physical contact. All such meetings shall be non-contact to protect against harm to visitors or staff.

   (4) Limited to one adult visitor at a time. However, FBI-verified children of you may visit with a pre-approved adult visitor.

g. **Non-legal Mail** – Non-legal mail is any mail not clearly and properly addressed to/from your attorney and marked "Legal Mail" (incoming or outgoing). Non-legal mail is limited to only your immediate family, U.S. courts, federal judges, U.S. Attorneys' Offices, members of U.S. Congress, the BOP, other federal law enforcement entitles.

  i. **General correspondence with limitations** - Correspondence is restricted to immediate family members. The volume and frequency of outgoing general correspondence with immediate family members may be limited to three pieces of paper (not larger than 8 ½" x 11"), double-sided, once per calendar week to a single recipient, at the discretion of the USMS/BOP/DF. The identity and family member relationship to you will be confirmed by USMS/BOP/DF and FBI.

  iii. **General correspondence without limitations** - There is no volume or frequency limitation on correspondence to/from U.S. courts, federal judges, U.S. Attorneys' Offices, members of U.S. Congress, the BOP, and other federal law enforcement entities, unless there is evidence of abuse of these privileges, threatening correspondence is detected, circumvention of the SAM is detected, or the quantity to be processed becomes unreasonable to the extent that efficient processing to protect the security, good order, or discipline of the institution, the public or national security may be jeopardized.

**Exhibit 25 -  386**

MIKHEL, Iouri
23675-112
Page 11

iii. All non-legal mail will be -

(1) **Copied** - Shall be copied (including the surface of the envelope) by the warden, or his or her designee, of the facility in which you is housed.

(2) **Forwarded** - Shall be forwarded, in copy form, to the location designated by the FBI.

(3) **Analyzed** - After government analysis and approval, if appropriate, your incoming/outgoing non-legal mail will be forwarded to the USMS/BOP/DF for delivery to you (incoming); or directly to the addresses (outgoing).

iv. The Federal Government shall forward your non-legal mail to the USMS/BOP/DF for delivery to you or directly to the addressee after a review and analysis period of:

(1) A reasonable time not to exceed fourteen (14) business days for mail which is written entirely in the English language.

(2) A reasonable time not to exceed sixty (60) business days for any mail which includes writing in any language other than English, to allow for translation.

(3) A reasonable time not to exceed sixty (60) business days for any mail where the federal government has reasonable suspicion to believe that a code was used, to allow for decoding.

v. **Mail Seizure** - If outgoing/incoming mail is determined by the USMS/BOP/DF or FBI to contain overt or covert discussions of or requests for illegal activities, the soliciting or encouraging of acts of violence, or actual or attempted circumvention of the SAM, the mail shall not be delivered/forwarded to the intended recipient but referred to the FBI for appropriate action. You shall be notified in writing of the seizure of any mail.

4. **Communication With News Media**

You shall not be permitted to speak, meet, correspond, or otherwise communicate with any member or representative of the news media in person; by telephone; by furnishing a recorded message; through the mail, his attorney, or a third party; or otherwise.

**Exhibit 25 -  387**

MIKHEL, Iouri
23675-112
Page 12

5. **Religious Visitation**

    a. You shall not be allowed to engage in group prayer with other inmates.

    b. If a USMS/BOP/DF- or FBI- approved religious representative is to be present for prayer with you, the prayer shall be conducted as part of a contact or non-contact visit, at the discretion of the USMS/BOP/DF.

6. **No Communal Cells and No Communication Between Cells**

    a. You shall not be allowed to share a cell with another inmate.

    b. You shall be limited within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate by making statements audible to other inmates or by sending notes to other inmates, except as permitted in section 1.c. above.

7. **Cellblock Procedures**

    a. You shall be kept separated from other inmates as much as possible while in the cellblock area.

    b. You shall be limited, within USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmates while in the cellblock area.

8. **Commissary Privileges**

The USMS/BOP/DF shall restrict access to commissary items or any other objects determined by USMS/BOP/DF to be capable of being converted into dangerous instruments.

9. **Access to Mass Communications**

To prevent you from receiving and acting upon critically timed information or information coded in a potentially undetectable manner, your access to materials of mass communication is restricted as follows:

    a. **Publications/Newspapers -**

        i. You may have access to publications determined not to facilitate criminal activity or be detrimental to national security; the security, good order or discipline of the institution; or the protection of the public. This determination is to be made by the USMS/BOP/DF, in consultation with the USA/CDCA.

**Exhibit 25 -  388**

MIKHEL, Iouri
23675-112
Page 13

  ii. Sections of the publication/newspaper that offer a forum for information to be passed by unknown and/or unverified individuals, including but not limited to classified advertisements and letters to the editor, should be removed from the publications/newspapers prior to distribution to you.

  iii. If restricted by USMS/BOP/DF rules, access to a publication will be denied. If acceptable, upon delivery, the USMS/BOP/DF will review the publication and make the initial determination. If the FBI's expertise is required, the publication will be forwarded to the FBI for review. The USMS/BOP/DF will also forward the publication to the FBI if translations are needed to make that determination. (In these cases, the FBI shall respond to the USMS/BOP/DF within fourteen (14) business days.) You shall then have access to the remaining portions of the publications/newspapers deemed acceptable, in accordance with USMS/BOP/DF policy.

  iv. In order to avoid passing messages/information from inmate to inmate, you will not be allowed to share the publication(s) with any other inmates.

 **b. Television and Radio** - You is authorized to have television and radio viewing and listening privileges, in accordance with standard and applicable USMS/BOP/DF policies and procedures.

 **c. Termination or Limitation** - If the USMS/BOP/DF determines that the mass communications are being used as a vehicle to send messages to you relating to the furtherance of criminal activities, your access may be limited or terminated for a period of time to be determined by the USMS/BOP/DF.

10. **Access to Books**

You may have access to all books that do not facilitate criminal activity or present a substantial threat to national security or the security, discipline, or good order of the institution. This initial determination is to be made by the USMS/BOP/DF and, if the USMS/BOP/DF determines that the FBI's expertise is required, the book(s) will be forwarded to the FBI for review. In conducting its analysis, the FBI will determine whether the book advocates or promotes acts of terrorism or violence and/or whether access to the book by this particular inmate would pose a substantial threat to national security.

In order to avoid passing messages/information from inmate to inmate, you shall not be allowed to share books with any other inmates.

**Exhibit 25 - 389**

MIKHEL, Iouri
23675-112
Page 14

11.    **Transfer of Custody**

In the event you is transferred to or from the custody of the USMS, BOP or any other DF, the SAM provisions authorized for this inmate will continue in effect, without need for any additional DOJ authorization.

12.    **Inmate's Consular Contacts**

You, who is a citizen of Russia, shall be allowed Consular communications and visits, consistent with USMS/BOP/DF policy. The Consular contacts shall comply with the U.S. Department of State (DOS) Consular notification and access requirements.[9] Prior to permitting any Consular contact, the FBI will verify the Consular representative's credentials with the DOS.

**CONCLUSION**

The SAM set forth herein, especially as they relate to attorney-client privileged communications and family contact, are reasonably necessary to prevent you from committing, soliciting, or conspiring to commit additional criminal activity. Moreover, these measures are the least restrictive that can be tolerated in light of the ability or this inmate to aid, knowingly or inadvertently, in plans that create a substantial risk you're your communications or contacts with persons could result in death or serious bodily injury to persons.

With respect to telephone privileges, the SAM are reasonably necessary because of the high probability of call to co-conspirators to arrange criminal or violent activities.

With respect to mail privileges, the SAM are reasonably necessary to prevent you from receiving or passing along critically timed messages. Although I recognize that eliminating your mail privileges entirely may be an excessive measure except in the most egregious of circumstances, I believe that delaying mail delivery and allowing authorized personnel to examine a copy of the mail is sufficient at this time adequately ensure that the mail is not used to deliver requests for, or to assist in, criminal and/or violent activities. Under these procedures, you can relate personal news to family members, even if delayed, but he may find it difficult or unwise to pass along restricted information.

---

[9]*See* Consular notification and Access, Instructions for Federal, State, and Local Law Enforcement and Other Officials Regarding Foreign National in the United States and the Rights of Consular Officials to Assist Them, DOS. The DOS contact is the Consular Notification and Outreach Division, Office of Policy Coordination and Public Affairs, DOS, telephone (202) 647-4110 or http://www.travel.state.gov/law/consular_753.html.

**Exhibit 25 -  390**

I, Iouri Mikhel, Register No. 26375-112, acknowledge this notification of Renewed Special Administrative Measures which have been extended for an additional year.

Received: June 14, 2013

_____
MIKHEL, IOURI
Register No. 23675-112

_____
C. Shepherd, Case Manager

6/14/13
_____
Date

**Exhibit 25 - 391**

# EXHIBIT

# 26



**U.S. Departm ..t of Justice**
Federal Bureau of Prisons

*Federal Correctional Complex*
*Terre Haute, Indiana*

August 8, 2014

MEMORANDUM FOR INMATE MIKHEL, IOURI #23675-112

From:      J. F. CARAWAY, COMPLEX WARDEN

Subject:      Notice of Renewed Special Administrative Measures

Pursuant to 28 C.F.R. § 501.3, Special Administrative Measures have been implemented regarding your confinement. The Attorney General authorized implementation of the procedures on June 6, 2003, and delegated the implementation of the procedure to the Director of the Bureau of Prisons. These Special Administrative Measures (SAM) have been implemented based on information concerning your extensive ties with Russian Organized Crime, previous escape attempts, and threats to witnesses. There is a substantial risk your communications or contacts with persons could result in death or serious bodily injury to persons or substantial damage to property that would entail the risk of death or serious bodily injury to persons. The Bureau of Prisons has implemented these measures in the past and is extending them at this time for an additional year period, at the request of the Attorney General's designee. The SAM will commence immediately upon expiration of the prior SAM authorization period and will be in effect for a period of one (1) year, subject to any further direction.

In reaching the conclusion that there is a substantial risk that your communications or contacts could result in death or serious bodily injury to others, the government reports that during a search conducted of your cell in 2009, the BOP discovered a hand-drawn floor plan of the prison tier on which you were being housed. You had previously attempted to escape from custody on two prior occasions, including one attempt that occurred after you had been placed under SAM restrictions. In that instance, in January 2003, you prepared detailed drawings of the facility in which you were incarcerated outlining your escape plan. You then attempted to forward these plans, in violation of the SAM, to a high-ranking member of the Mexican Mafia to whom you were offering one million dollars in return for assistance in facilitating your escape. Your efforts to plot escape from custody and past behavior suggest that you will continue to exploit opportunities to communicate with others outside of the prison system in order to advance your efforts to escape from custody.

Based upon information provided to me concerning your extensive ties with Russian Organized Crime, your escape attempts, and history of violent behavior, including threats to witnesses, I find that there is substantial risk that your communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of serious bodily injury to persons. Therefore, pursuant to 28 C.F.R. § 501.3, the government will continue to implement SAM in order to restrict your access to the mail, the media, the telephone, and visitors. The SAM will commence immediately upon expiration of the

**Exhibit 26- 392**

MIKHEL, Iouri
23675-112
Page 2

prior SAM authorization period and will be in effect for a period of one year, subject to further direction.

1.   **General Provisions**

    a.   **Adherence to Usual United States Marshals Services (USMS), Bureau of Prisons (BOP) and Detention Facility (DF) Policy Requirements** - In addition to the below-listed SAM, you must comply with all usual USMS, BOP, and non-BOP DF policies regarding restrictions, activities, privileges, communications, etc. If there is a conflict between USMS/BOP/DF policies and the SAM, as set forth herein, where the SAM is more restrictive than usual USMS/BOP/DF policies, then the SAM shall control. If usual USMS/BOP/DF policies are more restrictive than the SAM, then USMS/BOP/DF policies shall control.

    b.   **Interim SAM Modification Authority** - During the term of this directive, the Director, Office of Enforcement Operations (OEO), Criminal Division, may modify your SAM as long as any SAM modification authorized by OEO:

       i.   Does not create a more restrictive SAM.

       ii.   Is not in conflict with the request of the USA/CDCA, Federal Bureau of Investigation (FBI), or USMS/BOP/DF, or applicable regulations.

       iii.   Is not objected to by the USA/CDCA, FBI, or USMS/BOP/DF.

    c.   **Inmates Communications Prohibitions** – You are limited, within USMS/BOP/DF's reasonable efforts and existing confinement conditions, from having contact (including passing or receiving any oral, written or recorded communications) with any other inmate, visitor, attorney, or anyone else except as outlined and allowed by this document that could reasonably foreseeably result in you communicating information (sending or receiving) that could circumvent the SAM's intent of significantly limiting your ability to communicate (send or receive) information with intent to harm others.

       The USMS/BOP/DF may permit you to communicate with other SAM inmates orally only during certain predesignated times, the place and duration to be set by the USMS/BOP/DF. You shall not have any physical contact with the other inmates during this predesignated time and all such predesignated sessions will be monitored and/or recorded. Upon request to the FBI, a copy of the recordings will be provided by the USMS/BOP/DF to the FBI to be analyzed for indications that you are attempting to pass messages soliciting or encouraging acts of violence or other crimes.

    d.   **Use of Interpreters/Translators by USMS/BOP/DF** – Interpreter/translator approval requirement:

       i.   The USMS/BOP/DF may use Department of Justice (DOJ) approved interpreters/translators as necessary for the purpose of facilitating communication

**Exhibit 26- 393**

MIKHEL, Iouri
23675-112
Page 3

with you.

    ii.  No person shall act as an interpreter/translator without prior written clearance/approval from the USMS/BOP/DF, which shall only be granted after consultation with the FBI and USA/CDCA.

    iii.  Interpreters/translators utilized by USMS/BOP/DF shall not be allowed to engage in, or overhear, unmonitored conversations with you. Interpreters/translators shall not be alone with you, either in a room or on a telephone or other communications medium.

2.    **Attorney/Client Provisions**

    a.  **Attorney[1] Affirmation of Receipt of the SAM Restrictions Document** – Your attorney (or counsel) - individually by each if more than one - must sign an affirmation acknowledging receipt of the SAM restrictions document. By signing the affirmation, the attorney acknowledges his or her awareness and understanding of the SAM provisions and his or her agreement to abide by these provisions, particularly those that relate to contact between you and your attorney and the attorney's staff. The signing of the affirmation does not serve as an endorsement of the SAM or the conditions of confinement, and does not serve to attest any of the factors in the conclusions supporting the SAM. However, in signing the affirmation, your attorney, and precleared staff[2] acknowledge the restriction that they will not forward third-party messages to or from you.

    i.  The USA/CDCA shall present, or forward, the attorney affirmation of receipt of the SAM restrictions document to your attorney.

    ii.  After initiation of the SAM and prior to your attorney being permitted to have attorney-client privileged contact with you, your attorney shall execute a document affirming receipt of the SAM restrictions document and return the

---

[1]The term "attorney" refers to your attorney of record, who has been verified and documented by the USA/CDCA, and who has received and acknowledged receipt of the SAM restrictions document. As used in this document, "attorney" also refers to more than one attorney where you is represented by two or more attorneys, and the provisions of this document shall be fully applicable to each such attorney in his/her individual capacity.

[2]"Precleared," when used with regard to an attorney's staff, or "precleared staff member," refers to a co-counsel, paralegal, or investigator who is actively assisting your attorney with your post-sentencing proceedings, who has submitted to a background check by the FBI and USA/CDCA, who has successfully been cleared by the FBI and USA/CDCA, and who has received a copy of your SAM and has agreed – as evidenced by his or her signature – to adhere to the SAM restrictions and requirements. As used in this document, "staff member" also refers to more than one staff member, and the provisions of this document shall be fully applicable to each such staff member in his or her individual capacity. A "paralegal" or "investigator" will also be governed by any additional DF rules and regulations governing their conduct.

**Exhibit 26- 394**

MIKHEL, Iouri
23675-112
Page 4

original to the USA/CDCA.

iii. The USA/CDCA shall maintain the original of the SAM acknowledgment document and forward a copy of the signed document to OEO in Washington, D.C., and the USMS/BOP/DF.

b. **Attorney Use of Interpreters/Translators -**

i. Your attorney may use DOJ - and/or USA/CDCA - approved interpreters/translators as necessary for the purpose of facilitating communication with you. Any interpreter/translator shall be precleared.[3]

ii. No person shall act as an interpreter/translator without prior written clearance/approval from USMS/BOP/DF/FBI, which shall only be granted after consultation with the FBI and USA/CDCA.

iii. Attorney Immediate Presence Requirement - Any use of an interpreter/translator by the attorney shall be in the physical and immediate presence of the attorney – i.e., in the same room. The attorney shall not patch through telephone calls, or any other communications, to or from you.

c. **Attorney-Client Privileged Visits** - May be contact or non-contact, at the discretion of the USMS/BOP/DF.

d. **Attorney May Disseminate Inmate Conversations** – Your attorney and/or investigators working on behalf of your attorney may disseminate the contents of your communication to third parties for the sole purpose of preparing your post-sentencing proceedings - and not for any other reason - on the understanding that any such dissemination shall be made solely by the attorney and/or investigators working on behalf of your attorney, and not by any other members of the attorney's staff.

e. **Unaccompanied Attorney's Precleared Paralegal(s) and Investigator(s) May Meet With Client** –Your attorney precleared paralegal(s) and investigator(s) may meet with you without the need of your attorney to be present. These meeting may be contact or non-contact, at the discretion of the USM/BOP/DF.

f. **Simultaneous Multiple Legal Visitors** – You have multiple legal visitors provided that at least one of the multiple legal visitors is your attorney or precleared paralegal. These meetings may be contact or non-contact, at the discretion of the USMS/BOP/DF.

---

[3]"Precleared," when used with regard to an interpreter/translator, refers to an interpreter/translator who is actively assisting your attorney with your appeal or post-conviction legal proceedings, who has submitted to a background check by the FBI and USA/CDCA, who has successfully been cleared by the FBI and USA/CDCA, and who has received a copy of your SAM and has agreed – as evidenced by his or her signature – to adhere to the SAM restrictions and requirements.

**Exhibit 26- 395**

MIKHEL, Iouri
23675-112
Page 5

g. **Legally Privileged Telephone Calls** - The following rules refer to all legally privileged telephone calls or communications:

   i. Inmate's Attorney's Precleared Staff May Participate in Inmate Telephone Calls – Your attorney's precleared staff are permitted to communicate directly with you by telephone, provided that your attorney is physically present and participating in the legal call, as well.

   ii. Inmate's initiation of Legally Privileged Telephone Calls – Inmate-initiated telephone communications with his attorney or precleared staff are to be placed by a USMS/BOP/DF staff member and the telephone handed over to you only after the USMS/BOP/DF staff member confirms that the person on the other end of the line is your attorney. This privilege is contingent upon the following additional restrictions:

     (1) Your attorney will not allow any non-precleared person to communicate with you, or to take part in and/or listen to or overhear any communications with you.

     (2) Your attorney must instruct his/her staff that:

       (a) Your attorney and precleared staff are the only persons allowed to engage in communications with you.

       (b) The attorney's staff (including the attorney) are not to patch through, forward, transmit, or send your calls or other communications to third parties.

     (3) No telephone call/communication, or portion thereof, except as specifically authorized by this document:

       (a) Is to be overheard by a third party.[4]

       (b) Will be patched through, or in any manner forwarded or transmitted to a third party.

       (c) Shall be divulged in any manner to a third party, except as otherwise provided in Section 2.d. above.

       (d) Shall be in any manner recorded or preserved.[5] Your attorney may

---

[4]For purposes of the SAM, "third party" does not include officials of the USMS/BOP/DF/FBI or DOJ, or other duly authorized federal authorities when acting in connection with their official duties. This section does not allow monitoring of attorney-client privileged communications.

**Exhibit 26- 396**

MIKHEL, Iouri
23675-112
Page 6

make written notes of attorney-client privileged communications.

(4)     If USMS/BOP/DF, FBI or USA/CDCA determines that you has used or are using the opportunity to make a legal call to speak with another inmate or for any other non-legal reason that would circumvent the intent of the SAM, your ability to contact his attorney by telephone may be suspended or eliminated.

h. **Documents Provided by Attorney to Inmate** – Your attorney may provide you with, or review with you, documents related to his post-sentencing proceedings and/or material prepared by your attorney, so long as any of the foregoing documents are translated, if translation is necessary, by a precleared interpreter/translator. Any documents not related to your post-sentencing proceedings must be sent to you via general correspondence and will be subject to the mail provisions of subparagraph 2.i. and 3.g. Documents previously reviewed and cleared for receipt by you, and already in your possession at the outset of the visit, may be discussed or reviewed by you and your attorney during the visit.

i.   None of the materials provided may include inflammatory materials, materials inciting to violence, or materials that may be used to pass messages from inmate to inmate, unless such materials have been precleared by the USA/CDCA and FBI.

ii.  The USA/CDCA may authorize additional documents to be presented to you. If any document not listed or described above needs to be transmitted to you, consent for the transmission of the document may be obtained from the USA/CDCA without the need to formally seek approval for an amendment to the SAM.

i. **Legal Mail**[6] - Your attorney may not send, communicate, distribute or divulge your mail, or any portion of its contents (legal or otherwise) to third parties. In signing the SAM acknowledgment document, your attorney and precleared staff will acknowledge the restriction that only you case-related documents will be presented to you, and that neither your attorney nor his/her staff will forward third-party mail to or from you.

3.     **Inmate's Non-Legal Contacts**

a. **Non-legally Privileged Telephone Contacts -**

i.   You are limited to non-legally privileged telephone calls with your immediate

---

[5]Except by USMS/BOP/DF, FBI, DOJ, or other duly authorized federal authorities. This section does not allow this monitoring of attorney-client privileged communications.

[6]Legal mail is defined as properly marked correspondence (marked "Legal Mail") addressed to or from your attorney. All other mail, including that otherwise defined by the USMS/BOP/DF as Special Mail, shall be processed as "non-legal mail."

**Exhibit 26- 397**

MIKHEL, Iouri
23675-112
Page 7

family members.[7]

    ii. The quantity and duration of your non-legally privileged telephone calls with your immediate family members shall be set by the USMS/BOP/DF, with a minimum of one call per month.

  b. **Rules for Telephone Calls** - For all non-legally privileged telephone calls or communications, no telephone call/communication, or portion thereof:

    i. Is to be overheard by a third party.

    ii. Is to be patched through, or in any manner forwarded or transmitted, to a third party.

    iii. Shall be divulged in any manner to a third party.

    iv. Shall be in any manner recorded or preserved.[8]

All telephone calls shall be in English unless a fluent FBI, USMS/BOP/DF- or FBI-approved interpreter/translator is available to contemporaneously monitor the telephone call. Arranging for an interpreter/translator may require at least fourteen (14) days advance notice.

  c. **Telephone SAM Restriction Notifications** - For all non-legally privileged telephone calls to your immediate family member(s):

    i. USMS/BOP/DF shall inform you of the telephone SAM restrictions prior to each telephone call.

    ii. USMS/BOP/DF shall verbally inform your immediate family member(s) on the opposite end of your telephone communication of the SAM restrictions. USMS/BOP/DF is only required to notify your communication recipient in English.

    iii USMS/BOP/DF shall document each such telephone notification.

  d. **Family Call Monitoring** - All calls with your immediate family member(s) shall be:

    i. Contemporaneously monitored by the FBI.

_____

[7]Your "immediate family members" are defined as your (USMS/BOP/DF- or FBI-verifiable) spouse, children, parents, and siblings. Requests for additional non-legal contacts may be submitted and will be consider on a case-by-case basis.

[8]Except by USMS/BOP/DF, FBI, DOJ, or other duly authorized federal authorities.

**Exhibit 26- 398**

MIKHEL, Iouri
23675-112
Page 8

    ii. Contemporaneously recorded (as directed by the FBI) in a manner which allows such telephone calls to be analyzed for indications the call is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

    iii. A copy of each of your immediate family member telephone call recording shall be provided by the USMS/BOP/DF on a single, individual cassette tape or compact disc (per call) for forwarding to the FBI. These recordings shall be forwarded on a call-by-call basis as soon as practicable.

  e. **Improper Communications** - If telephone call monitoring or analysis reveals that any call or portion of a call involving you contains any indication of a discussion of illegal activity, the soliciting or encouraging of acts of violence, or actual or attempted circumvention of the SAM, you shall not be permitted any further calls to his immediate family members for a period of time to be determined by USMS/BOP/DF. If contemporaneous monitoring reveals such inappropriate activity, the telephone call may be immediately terminated.

  f. **Non-legal Visits -**

    i. **Limited Visitors** - You shall be permitted to visit only with his immediate family members. The visitor's identity and family member relationship to you will be confirmed by the USMS/BOP/DF and FBI in advance.

    ii. **English Requirement** - All communications during non-legal inmate visits will be in English unless a fluent USMS/BOP/DF- or FBI- approved interpreter/translator is readily available to contemporaneously monitor the communication/visit. Arranging for an interpreter/translator may require at least fourteen (14) days advance notice.

    iii. **Visit Criteria** - All non-legal visits shall be:

      (1) Contemporaneously monitored by USMS/BOP/DF and/or FBI, in a manner that allows such visits to be analyzed for indications the visit is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

      (2) Permitted only with a minimum of fourteen calendar days' advance written notice to the USMS/BOP/DF facility where you is housed.

      (3) Without any physical contact. All such meetings shall be non-contact to protect against harm to visitors or staff.

      (4) Limited to one adult visitor at a time. However, FBI-verified children of you may visit with a pre-approved adult visitor.

  g. **Non-legal Mail** – Non-legal mail is any mail not clearly and properly addressed to/from your attorney and marked "Legal Mail" (incoming or outgoing). Non-legal

**Exhibit 26-  399**

MIKHEL, Iouri
23675-112
Page 9

mail is limited to only your immediate family, U.S. courts, federal judges, U.S. Attorneys' Offices, members of U.S. Congress, the BOP, other federal law enforcement entitles.

i. **General correspondence with limitations** - Correspondence is restricted to immediate family members. The volume and frequency of outgoing general correspondence with immediate family members may be limited to three pieces of paper (not larger than 8 ½" x 11"), double-sided, once per calendar week to a single recipient, at the discretion of the USMS/BOP/DF. The identity and family member relationship to you will be confirmed by USMS/BOP/DF and FBI.

iii. **General correspondence without limitations** - There is no volume or frequency limitation on correspondence to/from U.S. courts, federal judges, U.S. Attorneys' Offices, members of U.S. Congress, the BOP, and other federal law enforcement entities, unless there is evidence of abuse of these privileges, threatening correspondence is detected, circumvention of the SAM is detected, or the quantity to be processed becomes unreasonable to the extent that efficient processing to protect the security, good order, or discipline of the institution, the public or national security may be jeopardized.

iii. All non-legal mail shall be -

   (1)  **Copied** - Shall be copied (including the surface of the envelope) by the warden, or his or her designee, of the facility in which you is housed.

   (2)  **Forwarded** - Shall be forwarded, in copy form, to the location designated by the FBI.

   (3)  **Analyzed** - After government analysis and approval, if appropriate, your incoming/outgoing non-legal mail will be forwarded to the USMS/BOP/DF for delivery to you (incoming); or directly to the addresses (outgoing).

iv. The Federal Government shall forward your non-legal mail to the USMS/BOP/DF for delivery to you or directly to the addressee after a review and analysis period of:

   (1)  A reasonable time not to exceed fourteen (14) business days for mail which is written entirely in the English language.

   (2)  A reasonable time not to exceed sixty (60) business days for any mail which includes writing in any language other than English, to allow for translation.

   (3)  A reasonable time not to exceed sixty (60) business days for any mail where the federal government has reasonable suspicion to believe that a code was used, to allow for decoding.

**Exhibit 26- 400**

MIKHEL, Iouri
23675-112
Page 10

 v. **Mail Seizure** - If outgoing/incoming mail is determined by the USMS/BOP/DF or FBI to contain overt or covert discussions of or requests for illegal activities, the soliciting or encouraging of acts of violence, or actual or attempted circumvention of the SAM, the mail shall not be delivered/forwarded to the intended recipient but referred to the FBI for appropriate action. You shall be notified in writing of the seizure of any mail.

4. **Communication With News Media**

 You shall not be permitted to speak, meet, correspond, or otherwise communicate with any member or representative of the news media in person; by telephone; by furnishing a recorded message; through the mail, his attorney, or a third party; or otherwise.

5. **Religious Visitation**

 a. You shall not be allowed to engage in group prayer with other inmates.

 b. If a USMS/BOP/DF- or FBI- approved religious representative is to be present for prayer with you, the prayer shall be conducted as part of a contact or non-contact visit, at the discretion of the USMS/BOP/DF.

6. **No Communal Cells and No Communication Between Cells**

 a. You shall not be allowed to share a cell with another inmate.

 b. You shall be limited within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate by making statements audible to other inmates or by sending notes to other inmates, except as permitted in section 1.c. above.

7. **Cellblock Procedures**

 a. You shall be kept separated from other inmates as much as possible while in the cellblock area.

 b. You shall be limited, within USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmates while in the cellblock area.

8. **Commissary Privileges**

 The USMS/BOP/DF shall restrict access to commissary items or any other objects determined by USMS/BOP/DF to be capable of being converted into dangerous instruments.

9. **Access to Mass Communications**

**Exhibit 26-  401**

MIKHEL, Iouri
23675-112
Page 11

To prevent you from receiving and acting upon critically timed information or information coded in a potentially undetectable manner, your access to materials of mass communication is restricted as follows:

a. **Publications/Newspapers** -

  i. You may have access to publications determined not to facilitate criminal activity or be detrimental to national security; the security, good order or discipline of the institution; or the protection of the public. This determination is to be made by the USMS/BOP/DF, in consultation with the USA/CDCA.

  ii. Sections of the publication/newspaper that offer a forum for information to be passed by unknown and/or unverified individuals, including but not limited to classified advertisements and letters to the editor, should be removed from the publications/newspapers prior to distribution to you.

  iii. If restricted by USMS/BOP/DF rules, access to a publication will be denied. If acceptable, upon delivery, the USMS/BOP/DF will review the publication and make the initial determination. If the FBI's expertise is required, the publication will be forwarded to the FBI for review. The USMS/BOP/DF will also forward the publication to the FBI if translations are needed to make that determination. (In these cases, the FBI shall respond to the USMS/BOP/DF within fourteen (14) business days.) You shall then have access to the remaining portions of the publications/newspapers deemed acceptable, in accordance with USMS/BOP/DF policy.

  iv. In order to avoid passing messages/information from inmate to inmate, you will not be allowed to share the publication(s) with any other inmates.

b. **Television and Radio** - You are authorized to have television and radio viewing and listening privileges, in accordance with standard and applicable USMS/BOP/DF policies and procedures.

c. **Termination or Limitation** - If the USMS/BOP/DF determines that the mass communications are being used as a vehicle to send messages to you relating to the furtherance of criminal activities, your access may be limited or terminated for a period of time to be determined by the USMS/BOP/DF.

10.   **Access to Books**

You may have access to all books that do not facilitate criminal activity or present a substantial threat to national security or the security, discipline, or good order of the institution. This initial determination is to be made by the USMS/BOP/DF and, if the USMS/BOP/DF determines that the FBI's expertise is required, the book(s) will be forwarded to the FBI for review. In conducting its analysis, the FBI will determine whether the book advocates or promotes acts of terrorism or violence and/or whether access to the book by this particular inmate would pose a substantial threat to national security.

**Exhibit 26-  402**

MIKHEL, Iouri
23675-112
Page 12

In order to avoid passing messages/information from inmate to inmate, you shall not be allowed to share books with any other inmates.

11.    **Transfer of Custody**

In the event you are transferred to or from the custody of the USMS, BOP or any other DF, the SAM provisions authorized for this inmate will continue in effect, without need for any additional DOJ authorization.

12.    **Inmate's Consular Contacts**

As a citizen of Russia, you shall be allowed Consular communications and visits, consistent with USMS/BOP/DF policy. The Consular contacts shall comply with the U.S. Department of State (DOS) Consular notification and access requirements.[9] Prior to permitting any Consular contact, the FBI will verify the Consular representative's credentials with the DOS.

**CONCLUSION**

The SAM set forth herein, especially as they relate to attorney-client privileged communications and family contact, are reasonably necessary to prevent you from committing, soliciting, or conspiring to commit additional criminal activity. Moreover, these measures are the least restrictive that can be tolerated in light of the ability or this inmate to aid, knowingly or

---

[9]*See* Consular notification and Access, Instructions for Federal, State, and Local Law Enforcement and Other Officials Regarding Foreign National in the United States and the Rights of Consular Officials to Assist Them, DOS. The DOS contact is the Consular Notification and Outreach Division, Office of Policy Coordination and Public Affairs, DOS, telephone (202) 647-4110 or http://www.travel.state.gov/law/consular_753.html.

**Exhibit 26- 403**

MIKHEL, Iouri
23675-112
Page 13

inadvertently, in plans that create a substantial risk you're your communications or contacts with persons could result in death or serious bodily injury to persons.

With respect to telephone privileges, the SAM are reasonably necessary because of the high probability of call to co-conspirators to arrange criminal or violent activities.

With respect to mail privileges, the SAM are reasonably necessary to prevent you from receiving or passing along critically timed messages. Although I recognize that eliminating your mail privileges entirely may be an excessive measure except in the most egregious of circumstances, I believe that delaying mail delivery and allowing authorized personnel to examine a copy of the mail is sufficient at this time adequately ensure that the mail is not used to deliver requests for, or to assist in, criminal and/or violent activities. Under these procedures, you can relate personal news to family members, even if delayed, but may find it difficult or unwise to pass along restricted information.

I, Iouri Mikhel, Register No. 26375-112, acknowledge this notification of Renewed Special Administrative Measures which have been extended for an additional year.

Received:  August 8, 2014

X _____
MIKHEL, IOURI
Register No. 23675-112

_____
C. Shepherd, Case Manager

8/11/2014
Date

**Exhibit 26-  404**

# EXHIBIT

# 27



**U.S. Department of Justice**

**Federal Bureau of Prisons**

*Federal Correctional Complex*

*Terre Haute, Indiana*

June 10, 2015

MEMORANDUM FOR INMATE MIKHEL, IOURI #23675-112

From:        Charles A. Daniels, Complex Warden

Subject:        Notice of Renewed Special Administrative Measures

Pursuant to 28 C.F.R. § 501.3, Special Administrative Measures have been implemented regarding your confinement. The Attorney General authorized implementation of the procedures on June 6, 2003, and delegated the implementation of the procedure to the Director of the Bureau of Prisons. These Special Administrative Measures (SAM) have been implemented based on information concerning your extensive ties with Russian Organized Crime, previous escape attempts, and threats to witnesses. There is a substantial risk your communications or contacts with persons could result in death or serious bodily injury to persons or substantial damage to property that would entail the risk of death or serious bodily injury to persons. The Bureau of Prisons has implemented these measures in the past and is extending them at this time for an additional year period, at the request of the Attorney General's designee. The SAM will commence immediately upon expiration of the prior SAM authorization period and will be in effect for a period of one (1) year, subject to any further direction.

In reaching the conclusion that there is a substantial risk that your communications or contacts could result in death or serious bodily injury to others, the government reports that during a search conducted of your cell in 2009, the BOP discovered a hand-drawn floor plan of the prison tier on which you were being housed. You had previously attempted to escape from custody on two prior occasions, including one attempt that occurred after you had been placed under SAM restrictions. In that instance, in January 2003, you prepared detailed drawings of the facility in which you were incarcerated outlining your escape plan. You then attempted to forward these plans, in violation of the SAM, to a high-ranking member of the Mexican Mafia to whom you were offering one million dollars in return for assistance in facilitating your escape. Your efforts to plot escape from custody and past behavior suggest that you will continue to exploit opportunities to communicate with others outside of the prison system in order to advance your efforts to escape from custody.

Based upon information provided concerning your extensive ties with Russian Organized Crime, your escape attempts, and history of violent behavior, including threats to witnesses, it was found that there is substantial risk that your communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of serious bodily injury to persons. Therefore, pursuant to 28 C.F.R. § 501.3, the government will continue to implement SAM in order to restrict your access to the mail, the media, the

**Exhibit 27 -  405**

MIKHEL, Iouri
23675-112
Page 2

telephone, and visitors. The SAM will commence immediately upon expiration of the prior SAM
authorization period and will be in effect for a period of one year, subject to further direction.

1.    **General Provisions**

a.  **Adherence to Usual United States Marshals Services (USMS), Bureau of Prisons
(BOP) and Detention Facility (DF) Policy Requirements** - In addition to the below-
listed SAM, you must comply with all usual USMS, BOP, and non-BOP DF policies
regarding restrictions, activities, privileges, communications, etc.  If there is a conflict
between USMS/BOP/DF policies and the SAM, as set forth herein, where the SAM is
more restrictive than usual USMS/BOP/DF policies, then the SAM shall control.  If
usual USMS/BOP/DF policies are more restrictive than the SAM, then
USMS/BOP/DF policies shall control.

b.  **Interim SAM Modification Authority** - During the term of this directive, the
Director, Office of Enforcement Operations (OEO), Criminal Division, may modify
your SAM as long as any SAM modification authorized by OEO:

i.   Does not create a more restrictive SAM.

ii.  Is not in conflict with the request of the USA/CDCA, Federal Bureau of
Investigation (FBI), or USMS/BOP/DF, or applicable regulations.

iii. Is not objected to by the USA/CDCA, FBI, or USMS/BOP/DF.

c.  **Inmate's Communications Prohibitions** – You are limited, within
USMS/BOP/DF's reasonable efforts and existing confinement conditions, from
having contact (including passing or receiving any oral, written or recorded
communications) with any other inmate, visitor, attorney, or anyone else except as
outlined and allowed by this document that could reasonably foreseeably result in you
communicating information (sending or receiving) that could circumvent the SAM's
intent of significantly limiting your ability to communicate (send or receive)
information with intent to harm others.

The USMS/BOP/DF may permit you to communicate with other SAM inmates orally
only during certain predesignated times, the place and duration to be set by the
USMS/BOP/DF.  You shall not have any physical contact with the other inmates
during this predesignated time and all such predesignated sessions will be monitored
and/or recorded.  Upon request to the FBI, a copy of the recordings will be provided
by the USMS/BOP/DF to the FBI to be analyzed for indications that you are
attempting to pass messages soliciting or encouraging acts of violence or other
crimes.

d.  **Use of Interpreters/Translators by USMS/BOP/DF** – Interpreter/translator
approval requirement:

i.   The USMS/BOP/DF may use Department of Justice (DOJ) approved
interpreters/translators as necessary for the purpose of facilitating communication

**Exhibit 27 -  406**

MIKHEL, Iouri
23675-112
Page 3

with you.

    ii. No person shall act as an interpreter/translator without prior written clearance/approval from the USMS/BOP/DF, which shall only be granted after consultation with the FBI and USA/CDCA.

    iii. Interpreters/translators utilized by USMS/BOP/DF shall not be allowed to engage in, or overhear, unmonitored conversations with you. Interpreters/translators shall not be alone with you, either in a room or on a telephone or other communications medium.

2. **Attorney/Client Provisions**

    a. **Attorney[1] Affirmation of Receipt of the SAM Restrictions Document** –Your attorney (or counsel) - individually by each if more than one - must sign an affirmation acknowledging receipt of the SAM restrictions document. By signing the affirmation, the attorney acknowledges his or her awareness and understanding of the SAM provisions and his or her agreement to abide by these provisions, particularly those that relate to contact between you and your attorney and the attorney's staff. The signing of the affirmation does not serve as an endorsement of the SAM or the conditions of confinement, and does not serve to attest any of the factors in the conclusions supporting the SAM. However, in signing the affirmation, your attorney, and precleared staff[2] acknowledge the restriction that they will not forward third-party messages to or from you.

    i. The USA/CDCA shall present, or forward, the attorney affirmation of receipt of the SAM restrictions document to your attorney.

    ii. After initiation of the SAM and prior to your attorney being permitted to have attorney-client privileged contact with you, your attorney shall execute a

---

[1]The term "attorney" refers to your attorney of record, who has been verified and documented by the USA/CDCA, and who has received and acknowledged receipt of the SAM restrictions document. As used in this document, "attorney" also refers to more than one attorney where you is represented by two or more attorneys, and the provisions of this document shall be fully applicable to each such attorney in his/her individual capacity.

[2]"Precleared," when used with regard to an attorney's staff, or "precleared staff member," refers to a co-counsel, paralegal, or investigator who is actively assisting your attorney with your post-sentencing proceedings, who has submitted to a background check by the FBI and USA/CDCA, who has successfully been cleared by the FBI and USA/CDCA, and who has received a copy of your SAM and has agreed – as evidenced by his or her signature – to adhere to the SAM restrictions and requirements. As used in this document, "staff member" also refers to more than one staff member, and the provisions of this document shall be fully applicable to each such staff member in his or her individual capacity. A "paralegal" or "investigator" will also be governed by any additional DF rules and regulations governing their conduct.

**Exhibit 27 -  407**

MIKHEL, Iouri
23675-112
Page 4

    document affirming receipt of the SAM restrictions document and return the
    original to the USA/CDCA.

    iii. The USA/CDCA shall maintain the original of the SAM acknowledgment
    document and forward a copy of the signed document to OEO in Washington,
    D.C., and the USMS/BOP/DF.

**b. Attorney Use of Interpreters/Translators -**

    i. Your attorney may use DOJ - and/or USA/CDCA - approved
    interpreters/translators as necessary for the purpose of facilitating communication
    with you.  Any interpreter/translator shall be precleared.[3]

    ii. No person shall act as an interpreter/translator without prior written
    clearance/approval from USMS/BOP/DF/FBI, which shall only be granted after
    consultation with the FBI and USA/CDCA.

    iii. Attorney Immediate Presence Requirement - Any use of an interpreter/translator
    by the attorney shall be in the physical and immediate presence of the attorney –
    i.e., in the same room.  The attorney shall not patch through telephone calls, or
    any other communications, to or from you.

**c. Attorney-Client Privileged Visits** - May be contact or non-contact, at the discretion
    of the USMS/BOP/DF.

**d. Attorney May Disseminate Inmate Conversations** – Your attorney and/or
    investigators working on behalf of your attorney may disseminate the contents of your
    communication to third parties for the sole purpose of preparing your post-sentencing
    proceedings - and not for any other reason - on the understanding that any such
    dissemination shall be made solely by the attorney and/or investigators working on
    behalf of your attorney, and not by any other members of the attorney's staff.

**e. Unaccompanied Attorney's Precleared Paralegal(s) and Investigator(s) May
    Meet With Client** –Your attorney precleared paralegal(s) and investigator(s) may
    meet with you without the need of your attorney to be present.  These meeting may be
    contact or non-contact, at the discretion of the USM/BOP/DF.

**f. Simultaneous Multiple Legal Visitors** – You have multiple legal visitors provided
    that at least one of the multiple legal visitors is your attorney or precleared paralegal.

---

[3]"Precleared," when used with regard to an interpreter/translator, refers to an
interpreter/translator who is actively assisting your attorney with your appeal or post-conviction
legal proceedings, who has submitted to a background check by the FBI and USA/CDCA, who
has successfully been cleared by the FBI and USA/CDCA, and who has received a copy of your
SAM and has agreed – as evidenced by his or her signature – to adhere to the SAM restrictions
and requirements.

**Exhibit 27 - 408**

MIKHEL, Iouri
23675-112
Page 5

These meetings may be contact or non-contact, at the discretion of the USMS/BOP/DF.

g. **Legally Privileged Telephone Calls** - The following rules refer to all legally privileged telephone calls or communications:

i. Inmate's Attorney's Precleared Staff May Participate in Inmate Telephone Calls – Your attorney's precleared staff are permitted to communicate directly with you by telephone, provided that your attorney is physically present and participating in the legal call, as well.

ii. Inmate's initiation of Legally Privileged Telephone Calls – Inmate-initiated telephone communications with your attorney or precleared staff are to be placed by a USMS/BOP/DF staff member and the telephone handed over to you only after the USMS/BOP/DF staff member confirms that the person on the other end of the line is your attorney. This privilege is contingent upon the following additional restrictions:

(1) Your attorney will not allow any non-precleared person to communicate with you, or to take part in and/or listen to or overhear any communications with you.

(2) Your attorney must instruct his/her staff that:

(a) Your attorney and precleared staff are the only persons allowed to engage in communications with you.

(b) The attorney's staff (including the attorney) are not to patch through, forward, transmit, or send your calls or other communications to third parties.

(3) No telephone call/communication, or portion thereof, except as specifically authorized by this document:

(a) Is to be overheard by a third party.[4]

(b) Will be patched through, or in any manner forwarded or transmitted to a third party.

(c) Shall be divulged in any manner to a third party, except as otherwise provided in Section 2.d. above.

---

[4]For purposes of the SAM, "third party" does not include officials of the USMS/BOP/DF/FBI or DOJ, or other duly authorized federal authorities when acting in connection with their official duties. This section does not allow monitoring of attorney-client privileged communications.

**Exhibit 27 - 409**

MIKHEL, Iouri
23675-112
Page 6

      (d)     Shall be in any manner recorded or preserved.[5] Your attorney may make written notes of attorney-client privileged communications.

    (4)    If USMS/BOP/DF, FBI or USA/CDCA determines that you has used or are using the opportunity to make a legal call to speak with another inmate or for any other non-legal reason that would circumvent the intent of the SAM, your ability to contact his attorney by telephone may be suspended or eliminated.

  **h.**  **Documents Provided by Attorney to Inmate** – Your attorney may provide you with, or review with you, documents related to his post-sentencing proceedings and/or material prepared by your attorney, so long as any of the foregoing documents are translated, if translation is necessary, by a precleared interpreter/translator. Any documents not related to your post-sentencing proceedings must be sent to you via general correspondence and will be subject to the mail provisions of subparagraph 2.i. and 3.g. Documents previously reviewed and cleared for receipt by you, and already in your possession at the outset of the visit, may be discussed or reviewed by you and your attorney during the visit.

    i.  None of the materials provided may include inflammatory materials, materials inciting to violence, or materials that may be used to pass messages from inmate to inmate, unless such materials have been precleared by the USA/CDCA and FBI.

    ii.  The USA/CDCA may authorize additional documents to be presented to you. If any document not listed or described above needs to be transmitted to you, consent for the transmission of the document may be obtained from the USA/CDCA without the need to formally seek approval for an amendment to the SAM.

  **i.**  **Legal Mail**[6] - Your attorney may not send, communicate, distribute or divulge your mail, or any portion of its contents (legal or otherwise) to third parties. In signing the SAM acknowledgment document, your attorney and precleared staff will acknowledge the restriction that only you case-related documents will be presented to you, and that neither your attorney nor his/her staff will forward third-party mail to or from you.

**3.**    **Inmate's Non-Legal Contacts**

---

[5]Except by USMS/BOP/DF, FBI, DOJ, or other duly authorized federal authorities. This section does not allow this monitoring of attorney-client privileged communications.

[6]Legal mail is defined as properly marked correspondence (marked "Legal Mail") addressed to or from your attorney. All other mail, including that otherwise defined by the USMS/BOP/DF as Special Mail, shall be processed as "non-legal mail."

**Exhibit 27 -  410**

MIKHEL, Iouri
23675-112
Page 7

a. **Non-legally Privileged Telephone Contacts -**

    i.  You are limited to non-legally privileged telephone calls with your immediate family members.[7]

    ii.  The quantity and duration of your non-legally privileged telephone calls with your immediate family members shall be set by the USMS/BOP/DF, with a minimum of one call per month.

b. **Rules for Telephone Calls** - For all non-legally privileged telephone calls or communications, no telephone call/communication, or portion thereof:

    i.  Is to be overheard by a third party.

    ii.  Is to be patched through, or in any manner forwarded or transmitted, to a third party.

    iii.  Shall be divulged in any manner to a third party.

    iv.  Shall be in any manner recorded or preserved.[8]

All telephone calls shall be in English unless a fluent FBI, USMS/BOP/DF- or FBI-approved interpreter/translator is available to contemporaneously monitor the telephone call. Arranging for an interpreter/translator may require at least fourteen (14) days advance notice.

c. **Telephone SAM Restriction Notifications** - For all non-legally privileged telephone calls to your immediate family member(s):

    i.  USMS/BOP/DF shall inform you of the telephone SAM restrictions prior to each telephone call.

    ii.  USMS/BOP/DF shall verbally inform your immediate family member(s) on the opposite end of your telephone communication of the SAM restrictions. USMS/BOP/DF is only required to notify your communication recipient in English.

    iii  USMS/BOP/DF shall document each such telephone notification.

---

[7]Your "immediate family members" are defined as your (USMS/BOP/DF- or FBI-verifiable) spouse, children, parents, and siblings. Requests for additional non-legal contacts may be submitted and will be consider on a case-by-case basis.

[8]Except by USMS/BOP/DF, FBI, DOJ, or other duly authorized federal authorities.

**Exhibit 27 -  411**

MIKHEL, Iouri
23675-112
Page 8

    d. **Family Call Monitoring** - All calls with your immediate family member(s) shall be:

        i.  Contemporaneously monitored by the FBI.

        ii.  Contemporaneously recorded (as directed by the FBI) in a manner which allows such telephone calls to be analyzed for indications the call is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

        iii.  A copy of each of your immediate family member telephone call recording shall be provided by the USMS/BOP/DF on a single, individual cassette tape or compact disc (per call) for forwarding to the FBI. These recordings shall be forwarded on a call-by-call basis as soon as practicable.

    e. **Improper Communications** - If telephone call monitoring or analysis reveals that any call or portion of a call involving you contains any indication of a discussion of illegal activity, the soliciting or encouraging of acts of violence, or actual or attempted circumvention of the SAM, you shall not be permitted any further calls to his immediate family members for a period of time to be determined by USMS/BOP/DF. If contemporaneous monitoring reveals such inappropriate activity, the telephone call may be immediately terminated.

    f. **Non-legal Visits -**

        i.  **Limited Visitors** - You shall be permitted to visit only with his immediate family members. The visitor's identity and family member relationship to you will be confirmed by the USMS/BOP/DF and FBI in advance.

        ii.  **English Requirement** - All communications during non-legal inmate visits will be in English unless a fluent USMS/BOP/DF- or FBI- approved interpreter/translator is readily available to contemporaneously monitor the communication/visit. Arranging for an interpreter/translator may require at least fourteen (14) days advance notice.

        iii. **Visit Criteria** - All non-legal visits shall be:

            (1)  Contemporaneously monitored by USMS/BOP/DF and/or FBI, in a manner that allows such visits to be analyzed for indications the visit is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

            (2)  Permitted only with a minimum of fourteen calendar days' advance written notice to the USMS/BOP/DF facility where you is housed.

            (3)  Without any physical contact. All such meetings shall be non-contact to protect against harm to visitors or staff.

            (4)  Limited to one adult visitor at a time. However, FBI-verified children of

**Exhibit 27 -  412**

MIKHEL, Iouri
23675-112
Page 9

you may visit with a pre-approved adult visitor.

g. **Non-legal Mail** – Non-legal mail is any mail not clearly and properly addressed to/from your attorney and marked "Legal Mail" (incoming or outgoing). Non-legal mail is limited to only your immediate family, U.S. courts, federal judges, U.S. Attorneys' Offices, members of U.S. Congress, the BOP, other federal law enforcement entitles.

   i. **General correspondence with limitations** - Correspondence is restricted to immediate family members. The volume and frequency of outgoing general correspondence with immediate family members may be limited to three pieces of paper (not larger than 8 ½" x 11"), double-sided, once per calendar week to a single recipient, at the discretion of the USMS/BOP/DF. The identity and family member relationship to you will be confirmed by USMS/BOP/DF and FBI.

   iii. **General correspondence without limitations** - There is no volume or frequency limitation on correspondence to/from U.S. courts, federal judges, U.S. Attorneys' Offices, members of U.S. Congress, the BOP, and other federal law enforcement entities, unless there is evidence of abuse of these privileges, threatening correspondence is detected, circumvention of the SAM is detected, or the quantity to be processed becomes unreasonable to the extent that efficient processing to protect the security, good order, or discipline of the institution, the public or national security may be jeopardized.

   iii. All non-legal mail shall be -

      (1) **Copied** - Shall be copied (including the surface of the envelope) by the warden, or his or her designee, of the facility in which you are housed.

      (2) **Forwarded** - Shall be forwarded, in copy form, to the location designated by the FBI.

      (3) **Analyzed** - After government analysis and approval, if appropriate, your incoming/outgoing non-legal mail will be forwarded to the USMS/BOP/DF for delivery to you (incoming); or directly to the addresses (outgoing).

   iv. The Federal Government shall forward your non-legal mail to the USMS/BOP/DF for delivery to you or directly to the addressee after a review and analysis period of:

      (1) A reasonable time not to exceed fourteen (14) business days for mail which is written entirely in the English language.

      (2) A reasonable time not to exceed sixty (60) business days for any mail which includes writing in any language other than English, to allow for translation.

      (3) A reasonable time not to exceed sixty (60) business days for any mail

**Exhibit 27 -  413**

MIKHEL, Iouri
23675-112
Page 10

where the federal government has reasonable suspicion to believe that a code was used, to allow for decoding.

v. **Mail Seizure** - If outgoing/incoming mail is determined by the USMS/BOP/DF or FBI to contain overt or covert discussions of or requests for illegal activities, the soliciting or encouraging of acts of violence, or actual or attempted circumvention of the SAM, the mail shall not be delivered/forwarded to the intended recipient but referred to the FBI for appropriate action. You shall be notified in writing of the seizure of any mail.

4. **Communication With News Media**

You shall not be permitted to speak, meet, correspond, or otherwise communicate with any member or representative of the news media in person; by telephone; by furnishing a recorded message; through the mail, his attorney, or a third party; or otherwise.

5. **Religious Visitation**

a. You shall not be allowed to engage in group prayer with other inmates.

b. If a USMS/BOP/DF- or FBI- approved religious representative is to be present for prayer with you, the prayer shall be conducted as part of a contact or non-contact visit, at the discretion of the USMS/BOP/DF.

6. **No Communal Cells and No Communication Between Cells**

a. You shall not be allowed to share a cell with another inmate.

b. You shall be limited within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate by making statements audible to other inmates or by sending notes to other inmates, except as permitted in section 1.c. above.

7. **Cellblock Procedures**

a. You shall be kept separated from other inmates as much as possible while in the cellblock area.

b. You shall be limited, within USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmates while in the cellblock area.

8. **Commissary Privileges**

The USMS/BOP/DF shall restrict access to commissary items or any other objects determined by USMS/BOP/DF to be capable of being converted into dangerous instruments.

**Exhibit 27 -  414**

MIKHEL, Iouri
23675-112
Page 11

9.    **Access to Mass Communications**

To prevent you from receiving and acting upon critically timed information or information coded in a potentially undetectable manner, your access to materials of mass communication is restricted as follows:

a.  **Publications/Newspapers** -

   i.   You may have access to publications determined not to facilitate criminal activity or be detrimental to national security; the security, good order or discipline of the institution; or the protection of the public. This determination is to be made by the USMS/BOP/DF, in consultation with the USA/CDCA.

   ii.  Sections of the publication/newspaper that offer a forum for information to be passed by unknown and/or unverified individuals, including but not limited to classified advertisements and letters to the editor, should be removed from the publications/newspapers prior to distribution to you.

   iii. If restricted by USMS/BOP/DF rules, access to a publication will be denied. If acceptable, upon delivery, the USMS/BOP/DF will review the publication and make the initial determination. If the FBI's expertise is required, the publication will be forwarded to the FBI for review. The USMS/BOP/DF will also forward the publication to the FBI if translations are needed to make that determination. (In these cases, the FBI shall respond to the USMS/BOP/DF within fourteen (14) business days.) You shall then have access to the remaining portions of the publications/newspapers deemed acceptable, in accordance with USMS/BOP/DF policy.

   iv.  In order to avoid passing messages/information from inmate to inmate, you will not be allowed to share the publication(s) with any other inmates.

b.  **Television and Radio** - You are authorized to have television and radio viewing and listening privileges, in accordance with standard and applicable USMS/BOP/DF policies and procedures.

c.  **Termination or Limitation** - If the USMS/BOP/DF determines that the mass communications are being used as a vehicle to send messages to you relating to the furtherance of criminal activities, your access may be limited or terminated for a period of time to be determined by the USMS/BOP/DF.

10.   **Access to Books**

You may have access to all books that do not facilitate criminal activity or present a substantial threat to national security or the security, discipline, or good order of the institution. This initial determination is to be made by the USMS/BOP/DF and, if the USMS/BOP/DF determines that the FBI's expertise is required, the book(s) will be forwarded to the FBI for review. In conducting its analysis, the FBI will determine

**Exhibit 27 -  415**

MIKHEL, Iouri
23675-112
Page 12

whether the book advocates or promotes acts of terrorism or violence and/or whether your access to the book would pose a substantial threat to national security.

In order to avoid passing messages/information from inmate to inmate, you shall not be allowed to share books with any other inmates.

11.    **Transfer of Custody**

In the event you are transferred to or from the custody of the USMS, BOP or any other DF, the SAM provisions authorized for you will continue in effect, without need for any additional DOJ authorization.

12.    **Inmate's Consular Contacts**

As a citizen of Russia, you shall be allowed Consular communications and visits, consistent with USMS/BOP/DF policy. The Consular contacts shall comply with the U.S. Department of State (DOS) Consular notification and access requirements.[9] Prior to permitting any Consular contact, the FBI will verify the Consular representative's credentials with the DOS.

**CONCLUSION**

The SAM set forth herein, especially as they relate to attorney-client privileged communications and family contact, are reasonably necessary to prevent you from committing, soliciting, or conspiring to commit additional criminal activity. Moreover, these measures are the least restrictive that can be tolerated in light of your ability to aid, knowingly or inadvertently, in plans that create a substantial risk you're your communications or contacts with persons could result in death or serious bodily injury to persons.

With respect to telephone privileges, the SAM are reasonably necessary because of the high probability of call to co-conspirators to arrange criminal or violent activities.

With respect to mail privileges, the SAM are reasonably necessary to prevent you from receiving or passing along critically timed messages. Although I recognize that eliminating your mail privileges entirely may be an excessive measure except in the most egregious of circumstances, I believe that delaying mail delivery and allowing authorized personnel to examine a copy of the mail is sufficient at this time adequately ensure that the mail is not used to deliver requests for, or to assist in, criminal and/or violent activities. Under these procedures, you can relate personal news to family members, even if delayed, but may find it difficult or unwise to pass along restricted information.

---

[9]*See* Consular notification and Access, Instructions for Federal, State, and Local Law Enforcement and Other Officials Regarding Foreign National in the United States and the Rights of Consular Officials to Assist Them, DOS. The DOS contact is the Consular Notification and Outreach Division, Office of Policy Coordination and Public Affairs, DOS, telephone (202) 647-4110 or http://www.travel.state.gov/law/consular_753.html.

**Exhibit 27 -  416**

MIKHEL, Iouri
23675-112
Page 13

I, Iouri Mikhel, Register No. 26375-112, acknowledge this notification of Renewed Special Administrative Measures which have been extended for an additional year.

Received:  June 10, 2015

MIKHEL, IOURI
Register No. 23675-112

C. Shepherd, Case Manager

6/12/2015
Date

**Exhibit 27 -  417**

# EXHIBIT

# 28



**U.S. Department of Justice**

Criminal Division

---

*Office of the Assistant Attorney General*          *Washington, D.C. 20530*

<u>LIMITED OFFICIAL USE</u>  **MAY 3 1 2016**

## **MEMORANDUM**

TO:             Thomas R. Kane
                     Acting Director
                     Federal Bureau of Prisons

FROM:         Paul M. O'Brien
                     Deputy Assistant Attorney General

SUBJECT:     Extension of Special Administrative Measures Pursuant to 28 C.F.R.
                     § 501.3 for Federal Bureau of Prisons Inmate Iouri Mikhel

### **SUMMARY**

The current Special Administrative Measures (SAM) for Federal Bureau of Prisons (BOP) inmate Iouri Mikhel expire on June 6, 2016. The United States Attorney for the Central District of California (USA/CDCA) and the Federal Bureau of Investigation (FBI) request that the SAM be renewed. Based upon the information provided by the USA/ CDCA and the FBI, pursuant to 28 C.F.R. § 501.3, there continues to be a substantial risk that Mikhel's communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of serious bodily injury to persons. Therefore, I am requesting that you continue to implement the SAM to restrict Mikhel's access to the mail, the telephone, visitors, other inmates, and the media. The SAM will commence immediately upon expiration of the prior SAM authorization period and will be in effect for a period of one year, subject to my further direction.

### **PROCEDURAL HISTORY**

Mikhel was convicted in March 2007 of conspiring to take hostages resulting in death, as well as substantive counts of hostage taking resulting in death, in connection with the abductions and murders of several individuals between October 2001 and January 2002. Mikhel has been sentenced to death and is currently being housed at USP Terre Haute, Indiana. Because of Mikhel's extensive ties with Russian Organized Crime, his multiple escape attempts, and his threats to witnesses, the Attorney General placed Mikhel under Special Administrative Measures (SAM) on June 6, 2003. The current SAM expire on June 6, 2016.

**Exhibit 28 - 418**

SPECIAL ADMINISTRATIVE MEASURES (SAM)                                          Page 2
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel

## FACTUAL BACKGROUND

### A.    Mikhel's Criminal Conduct

Mikhel was convicted for the abductions and deaths of Meyer Muscatel, Rita Pekler, Alexander Umansky, Nick Kharabadze and George Safiev. Muscatel, a U.S. citizen, was kidnapped and killed once a ransom was attempted and failed. Umansky, a U.S. citizen, and Kharabadze and Safiev, who were Russian nationals, all were kidnapped purely for ransom money and killed once the money was paid. Pekler was a U.S. citizen who was kidnapped because she knew Safiev, a wealthy Russian businessman, and could be used to help lure Safiev to a place where he could be abducted. When Safiev was unable to attend a meeting with Pekler because of a previously scheduled trip to Moscow, the defendants killed her. The evidence at trial established that Mikhel, together with his co-defendant Jurius Kadamovas, were the ring-leaders of the group responsible for these kidnappings and resulting deaths.

While the defendants killed their victims in California, they sent ransom proceeds from the abductions to banks and individuals all over the world. Once the ransom was received, or when they determined no ransom would be forthcoming, the defendants killed their victims. The USA/CDCA believes that other known and unknown individuals, who remain at large, assisted the defendants, particularly with money laundering and conveying ransom demands. The USA/CDCA also believes that, absent SAM, Mikhel might still be able to access sums of money in hidden accounts throughout the world through contacts who are not in custody and direct them to harm the witnesses who cooperated against him.

Although he was not charged, evidence obtained during the investigation also established that Mikhel was responsible for the abductions and deaths of an individual in Cypress and an individual in Turkey. In addition to the murders of the victims identified above, the government also obtained evidence that Mikhel was involved in the kidnapping of Arman Gyurdzhiaynts for ransom in November 2001, and conspiracy to commit the murder-for-hire of an undercover police officer in November 2001.

Evidence obtained during the investigation suggested that Mikhel and his co-defendants had extensive ties to Russian Organized Crime and could still contact associates both inside and outside the United States. As noted above, between December 2001 and February 2002, Mikhel directed the abduction and murder of Meyer Muscatel, Rita Pekler, Alexander Umansky, Nick Kharabadze and George Safiev. The defendants, including Mikhel, demonstrated their ruthlessness by the manner in which they committed the murders, as detailed below.

LIMITED OFFICIAL USE

**Exhibit 28 - 419**

SPECIAL ADMINISTRATIVE MEASURES (SAM)                    Page 3
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel

### B.   Continued Need for SAM

During the course of their judicial proceedings, Mikhel and Kadamovas actively sought contact with the lead cooperator's family.  According to a second cooperating co-conspirator, Kadamovas, while in the courthouse lock-up before a court appearance, told the cooperator that the FBI would not always be with the lead cooperator's wife and that "life is long."  In another reported incident, Mikhel and Kadamovas, prior to a court hearing, angrily accused one co-conspirator of cooperating with authorities, threatened his life, but told him they would pay him off instead if he refused to cooperate.

Mikhel has attempted to escape from custody on two occasions in 2003 and 2004, including one attempt that occurred after he had been placed under SAM restrictions. Mikhel's 2003 escape plan demonstrated a singular focus and commitment.  He was able to obtain and use smuggled cell phones to direct wire transfers totaling approximately $20,000 to support those plans.  He also stockpiled a large number of instruments and tools to facilitate his escape, including a video camera, which he claimed he intended to use to videotape his escape. According to Mikhel, he then intended to share the video with the "60 Minutes" news show. Among the items found hidden in his cell were the names and addresses of family members of government witnesses.  In January 2004, while under SAM, Mikhel prepared detailed drawings of the facility where he was incarcerated outlining his escape plan.  He then attempted to forward these plans, in violation of the SAM, to a high-ranking member of the Mexican Mafia to whom Mikhel was offering one million dollars in return for assistance in facilitating his escape.

More recently, during a search conducted of Mikhel's cell in 2009, the BOP discovered a hand-drawn floor plan of the prison tier on which Mikhel was being housed at USP Terre Haute, Indiana.

Mikhel's repeated efforts to plot his escape from custody and his past behavior suggest that he will continue to exploit opportunities to communicate with others outside of the prison system in order to further his efforts to escape from custody and to harm cooperating witnesses and their families.

### CONCLUSION

Based upon information provided to me concerning Mikhel's extensive ties with Russian organized crime, his escape attempts, and his history of violent behavior, including threats to witnesses, I find that there is substantial risk that his communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of serious bodily injury to persons.  Therefore, I am requesting that you,

LIMITED OFFICIAL USE

**Exhibit 28 -  420**

**SPECIAL ADMINISTRATIVE MEASURES (SAM)** Page 4
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel

pursuant to 28 C.F.R. § 501.3, continue to implement SAM to restrict Mikhel's access to the mail, the media, the telephone, and visitors.

1. **General Provisions**

    a. **Adherence to Usual United States Marshals Service (USMS), BOP, and Detention Facility (DF) Policy Requirements -** In addition to the below-listed SAM, the inmate must comply with all usual USMS, BOP, and non-BOP DF policies regarding restrictions, activities, privileges, communications, etc. If there is a conflict between USMS/BOP/DF policies and the SAM, as set forth herein, where the SAM are more restrictive than usual USMS/BOP/DF policies, then the SAM shall control. If usual USMS/BOP/DF policies are more restrictive than the SAM, then USMS/BOP/DF policies shall control.

    b. **Interim SAM Modification Authority -** During the term of this directive, the Director, Office of Enforcement Operations (OEO), Criminal Division, may modify the inmate's SAM as long as any SAM modification authorized by OEO:

        i. Does not create a more restrictive SAM;

        ii. Is not in conflict with the request of the USA/CDCA, Federal Bureau of Investigation (FBI), or USMS/BOP/DF, or applicable regulations; and

        iii. Is not objected to by the USA/CDCA, FBI, or USMS/BOP/DF.

    c. **Inmate Communications Prohibitions -** The inmate is limited, within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from having contact (including passing or receiving any oral, written, or recorded communications) with any other inmate, visitor, attorney, or anyone else, except as outlined and allowed by this document, that could reasonably foreseeably result in the inmate communicating (sending or receiving) information that could circumvent the SAM's intent of significantly limiting the inmate's ability to communicate (send or receive) information with intent to harm others.

        The USMS/BOP/DF may permit the inmate to communicate with other SAM inmates orally only during certain predesignated times, the place and duration to be set by the USMS/BOP/DF. The inmate shall not have any physical contact with other inmates during this predesignated time and all such predesignated sessions may be monitored and/or recorded. Upon request of the FBI, a copy of the recordings will be provided by the USMS/BOP/DF to the FBI to be analyzed

LIMITED OFFICIAL USE

**Exhibit 28 - 421**

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                    Page 5
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel

for indications that the inmate is attempting to pass messages soliciting or encouraging acts of violence or other crimes.

d. **Use of Interpreters/Translators by the USMS/BOP/DF** - Interpreter/Translator approval requirement:

  i. The USMS/BOP/DF may use Department of Justice (DOJ) approved interpreters/translators as necessary for the purpose of facilitating communication with the inmate.

  ii. No person shall act as an interpreter/translator without prior written clearance/approval from the USMS/BOP/DF, which shall only be granted after consultation with the FBI and USA/CDCA.

  iii. Interpreters/translators utilized by the USMS/BOP/DF shall not be allowed to engage in, or overhear, unmonitored conversations with the inmate.  Interpreters/translators shall not be alone with the inmate, either in a room or on a telephone or other communications medium.

2. **Attorney-Client Provisions**

  a. **Attorney[1] Affirmation of Receipt of the SAM Restrictions Document -** The inmate's attorney (or counsel) individually by each if more than one must sign an affirmation acknowledging receipt of the SAM restrictions document.  By signing the affirmation, the attorney acknowledges his or her awareness and understanding of the SAM provisions and his or her agreement to abide by these provisions, particularly those that relate to contact between the inmate and his attorney and the attorney's staff.  The signing of the affirmation does not serve as an endorsement of the SAM or the conditions of confinement, and does not serve to attest to any of the factors set forth in the conclusions supporting the SAM.  However, in signing the affirmation, the inmate's attorney and precleared staff[2]

---

[1] The term "attorney" refers to the inmate's attorney of record, who has been verified and documented by the USA/CDCA, and who has received and acknowledged receipt of the SAM restrictions document.  As used in this document, "attorney" also refers to more than one attorney where the inmate is represented by two or more attorneys, and the provisions of this document shall be fully applicable to each such attorney in his or her individual capacity.

[2] "Precleared," when used with regard to an attorney's staff, or "precleared staff member," refers to a co-counsel, paralegal, or investigator who is actively assisting the inmate's

LIMITED OFFICIAL USE

**Exhibit 28 -  422**

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                    Page 6
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel

acknowledge the restriction that they will not forward third-party messages to or from the inmate.

    i.      The USA/CDCA shall present, or forward, the attorney affirmation of receipt of the SAM restrictions document to the inmate's attorney.

    ii.     After initiation of the SAM and prior to the inmate's attorney being permitted to have attorney-client privileged contact with the inmate, the inmate's attorney shall execute a document affirming receipt of the SAM restrictions document and return the original to the USA/CDCA.

    iii.    The USA/CDCA shall maintain the original of the SAM acknowledgment document and forward a copy of the signed document to OEO in Washington, D.C., and the USMS/BOP/DF.

b.    **Attorney Use of Interpreters/Translators -**

    i.      The inmate's attorney may use DOJ- and/or USA/CDCA-approved interpreters/translators as necessary for the purpose of facilitating communication with the inmate.  Any interpreter/translator shall be precleared.[3]

---

attorney with the inmate's post-sentencing proceedings, who has submitted to a background check by the FBI and USA/CDCA, who has successfully been cleared by the FBI and USA/CDCA, and who has received a copy of the inmate's SAM and has agreed as evidenced by his or her signature to adhere to the SAM restrictions and requirements.  As used in this document, "staff member" also refers to more than one staff member, and the provisions of this document shall be fully applicable to each such staff member in his or her individual capacity.  A "paralegal" or "investigator" will also be governed by any additional DF rules and regulations governing their conduct.

    [3] "Precleared," when used with regard to an interpreter/translator, refers to an interpreter/translator who is actively assisting the inmate's attorney with the inmate's post-sentencing proceedings, who has submitted to a background check by the FBI and USA/CDCA, who has successfully been cleared by the FBI and USA/CDCA, and who has received a copy of the inmate's SAM and has agreed as evidenced by his or her signature B to adhere to the SAM restrictions and requirements.

<u>LIMITED OFFICIAL USE</u>

**Exhibit 28 -  423**

SPECIAL ADMINISTRATIVE MEASURES (SAM)                                  Page 7
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel

   ii.  No person shall act as an interpreter/translator without prior written clearance/approval from the USMS/BOP/DF/FBI, which shall only be granted after consultation with the FBI and USA/CDCA.

   iii.  Attorney Immediate Presence Requirement - Any use of an interpreter/translator by the attorney shall be in the physical and immediate presence of the attorney -- i.e., in the same room.  The attorney shall not patch through telephone calls, or any other communications, to or from the inmate.

 c. **Attorney-Client Privileged Visits -** Attorney-client privileged visits may be contact or non-contact, at the discretion of the USMS/BOP/DF.

 d. **Attorney May Disseminate Inmate Conversations -** The inmate's attorney and/or investigators working on behalf of the inmate's attorney may disseminate the contents of the inmate's communication to third parties for the sole purpose of providing necessary legal services related to the inmate's post-sentencing proceedings -- and not for any other reason -- on the understanding that any such dissemination shall be made solely by the attorney and/or investigators working on behalf of the inmate's attorney, and not by any other members of the attorney's staff.

 e. **Unaccompanied Attorney's Precleared Paralegal(s) and Investigator(s) May Meet With Client -** The inmate's attorney's precleared paralegal(s) and investigator(s) may meet with the inmate without the need for the inmate's attorney to be present.  These meetings may be contact or non-contact, at the discretion of the USMS/BOP/DF.

 f. **Simultaneous Multiple Legal Visitors -** The inmate may have multiple legal visitors provided that at least one of the multiple legal visitors is the inmate's attorney or precleared paralegal.  These meetings may be contact or non-contact, at the discretion of the USMS/BOP/DF.

 g. **Legally Privileged Telephone Calls -** The following rules refer to all legally privileged telephone calls or communications:

   i.  **Inmate's Attorney's Precleared Staff May Participate in Inmate Telephone Calls -** The inmate's attorney's precleared staff are permitted to communicate directly with the inmate by telephone, provided that the

LIMITED OFFICIAL USE

**Exhibit 28 -  424**

SPECIAL ADMINISTRATIVE MEASURES (SAM)                          Page 8
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel

inmate's attorney is physically present and participating in the legal call as well.

ii.      **Inmate's Initiation of Legally Privileged Telephone Calls** - Inmate-initiated telephone communications with his attorney or precleared staff are to be placed by a USMS/BOP/DF staff member and the telephone handed over to the inmate only after the USMS/BOP/DF staff member confirms that the person on the other end of the line is the inmate's attorney.  This privilege is contingent upon the following additional restrictions:

(1)      The inmate's attorney will not allow any non-precleared person to communicate with the inmate, or to take part in and/or listen to or overhear any communications with the inmate.

(2)      The inmate's attorney must instruct his or her staff that:

(a)      The inmate's attorney and precleared staff are the only persons allowed to engage in communications with the inmate.

(b)      The attorney's staff (including the attorney) are not to patch through, forward, transmit, or send the inmate's calls, or any other communications to third parties.

(3)      No telephone call/communication, or portion thereof, except as specifically authorized by this document:

(a)      Is to be overheard by a third party.[4]

(b)      Will be patched through, or in any manner forwarded or transmitted, to a third party.

_____

[4] For purposes of the SAM, "third party" does not include officials of the USMS/BOP/DF, FBI, DOJ, or other duly authorized federal authorities when acting in connection with their official duties.  This section does not allow monitoring of attorney-client privileged communications.

LIMITED OFFICIAL USE

**Exhibit 28 -  425**

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                    Page 9
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel

> (c)  Shall be divulged in any manner to a third party, except as otherwise provided in Section 2.d. above.
>
> (d)  Shall be in any manner recorded or preserved.[5]  The inmate's attorney may make written notes of attorney-client privileged communications.

> (4)  If the USMS/BOP/DF, FBI or USA/CDCA determines that the inmate has used or is using the opportunity to make a legal call to speak with another inmate or for any other non-legal reason that would circumvent the intent of the SAM, the inmate's ability to contact his attorney by telephone may be suspended or eliminated.

h.  **Documents Provided by Attorney to Inmate -** During a visit, the inmate's attorney may provide the inmate with, or review with the inmate, documents related to his post-sentencing proceedings, and/or material prepared by the inmate's attorney related to such proceedings, so long as any of the foregoing documents are translated, if translation is necessary, by a precleared interpreter/translator.  Any documents not related to the inmate's post-sentencing proceedings must be sent to the inmate via general correspondence and will be subject to the mail provisions of subparagraphs 2.i. and 3.g.  Documents previously reviewed and cleared for receipt by the inmate, and already in the inmate's possession at the outset of the visit, may be discussed or reviewed by the inmate and the inmate's attorney during the visit.

> i.  None of the materials provided may include inflammatory materials, materials inciting violence, military training materials, or materials that may be used to pass messages from inmate to inmate, unless such materials have been precleared by the USA/CDCA and FBI.

> ii.  The USA/CDCA may authorize additional documents to be presented to the inmate.  If any document not listed or described above needs to be transmitted to the inmate, consent for the transmission of the document may be obtained from the USA/CDCA without the need to formally seek approval for an amendment to the SAM.

---

[5] Except by the USMS/BOP/DF, FBI, DOJ, or other duly authorized federal authorities. This section does not allow monitoring of attorney-client privileged communications.

LIMITED OFFICIAL USE

**Exhibit 28 -  426**

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                          Page 10
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel

       i.       **Legal Mail**[6] - The inmate's attorney may not send, communicate, distribute, or divulge the inmate's mail (legal or otherwise), or any portion of its contents, to third parties, except when disclosure of the contents is necessary for the sole purpose of providing necessary legal services related to the inmate's post-sentencing proceedings - - and not for any other reason.

              In signing the SAM acknowledgment document, the inmate's attorney and precleared staff will acknowledge the restriction that only inmate case-related documents will be presented to the inmate, and that the attorney and his or her staff are strictly prohibited from forwarding third-party mail to or from the inmate.

3.     **Inmate's Non-legal Contacts**

    a.     **Non-legally Privileged Telephone Contacts -**

        i.      The inmate is only authorized to have non-legally privileged telephone calls with his immediate family members.[7]

        ii.     The quantity and duration of the inmate's non-legally privileged telephone calls with his immediate family members shall be set by the USMS/BOP/DF, with a minimum of one call per month.

    b.     **Rules for Telephone Calls -** For all non-legally privileged telephone calls or communications, no telephone call/communication, or portion thereof:

        i.      Is to be overheard by a third party.

        ii.     Is to be patched through, or in any manner forwarded or transmitted, to a third party.

---

[6] "Legal mail" is defined as properly marked correspondence (marked "Legal Mail") addressed to or from the inmate's attorney. All other mail, including that otherwise defined by the USMS/BOP/DF as Special Mail, shall be processed as "non-legal mail."

[7] The inmate's "immediate family members" are defined as the inmate's (USMS/BOP/DF- or FBI-verifiable) spouse, children, parents, and siblings. Requests for additional non-legal contacts may be submitted and will be considered on a case-by-case basis.

LIMITED OFFICIAL USE

**Exhibit 28 -  427**

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                    Page 11
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel

      iii.     Shall be divulged in any manner to a third party.

      iv.     Shall be in any manner recorded or preserved.[8]

All telephone calls shall be in English unless a fluent USMS/BOP/DF- or FBI-approved interpreter/translator is available to contemporaneously monitor the telephone call. Arranging for an interpreter/translator may require at least fourteen (14) days' advance notice.

c.    **Telephone SAM Restriction Notifications -** For all non-legally privileged telephone calls to the inmate's immediate family member(s):

      i.     The USMS/BOP/DF shall inform the inmate of the telephone SAM restrictions prior to each telephone call.

      ii.     The USMS/BOP/DF shall verbally inform the inmate's immediate family member(s) on the opposite end of the inmate's telephone communication of the SAM restrictions. The USMS/BOP/DF is only required to notify the inmate's communication recipient in English.

      iii.     The USMS/BOP/DF shall document each such telephone notification.

d.    **Family Call Monitoring -** All calls with the inmate's immediate family member(s) shall be:

      i.     Contemporaneously monitored by the FBI.

      ii.     Contemporaneously recorded (as directed by the FBI) in a manner that allows such telephone calls to be analyzed for indications the call is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

      iii.     A copy of each telephone call recording involving an inmate/immediate family member shall be provided to the FBI by the USMS/BOP/DF. These recordings shall be forwarded on a call-by-call basis as soon as practicable.

---

[8] Except by the USMS/BOP/DF, FBI, DOJ, or other duly authorized federal authorities.

LIMITED OFFICIAL USE

**Exhibit 28 - 428**

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                         Page 12
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel

> e.      **Improper Communications -** If telephone call monitoring or analysis reveals that any call or portion of a call involving the inmate contains any indication of a discussion of illegal activity, the soliciting of or encouraging of acts of violence, or actual or attempted circumvention of the SAM, the inmate shall not be permitted any further calls to his immediate family members for a period of time to be determined by the USMS/BOP/DF. If contemporaneous monitoring reveals such inappropriate activity, the telephone call may be immediately terminated.

> f.      **Non-legal Visits -**

>> i.      **Limited Visitors -** The inmate shall be permitted to visit only with his immediate family members. The visitor's identity and family member relationship to the inmate will be confirmed by the USMS/BOP/DF and FBI in advance.

>> ii.     **English Requirement -** All communications during non-legal inmate visits will be in English unless a fluent USMS/BOP/DF- or FBI-approved interpreter/translator is readily available to contemporaneously monitor the communication/visit. Arranging for an interpreter/translator may require at least fourteen (14) days' advance notice.

>> iii.    **Visit Criteria -** All non-legal visits shall be:

>>> (1)     Contemporaneously monitored by the USMS/BOP/DF and/or FBI, in a manner that allows such visits to be analyzed for indications the visit is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

>>> (2)     Permitted only with a minimum of fourteen (14) calendar days' advance written notice to the USMS/BOP/DF facility where the inmate is housed.

>>> (3)     Without any physical contact. All such meetings shall be non-contact to protect against harm to visitors or staff.

>>> (4)     Limited to one adult visitor at a time. However, the FBI-verified children of the inmate may visit with a pre-approved adult visitor.

LIMITED OFFICIAL USE

**Exhibit 28 -  429**

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                    Page 13
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel

g. **Non-legal Mail** - Non-legal mail is any mail not clearly and properly addressed to/from the inmate's attorney and marked "Legal Mail" (incoming or outgoing). Non-legal mail is only authorized with the inmate's immediate family, U.S. courts, federal judges, U.S. Attorneys' Offices, members of U.S. Congress, the BOP, or other federal law enforcement entities.

i. **General correspondence with limitations** - Correspondence is only authorized with immediate family members. The volume and frequency of outgoing general correspondence with immediate family members may be limited to three pieces of paper (not larger than 8 ½" x 11"), double-sided, once per calendar week to a single recipient, at the discretion of the USMS/BOP/DF. The identity and family member relationship to the inmate will be confirmed by the USMS/BOP/DF and FBI.

ii. **General correspondence without limitations** - There is no volume or frequency limitation on correspondence to/from U.S. courts, federal judges, U.S. Attorneys' Offices, members of U.S. Congress, the BOP, and other federal law enforcement entities, unless there is evidence of abuse of these privileges, threatening correspondence is detected, circumvention of the SAM is detected, or the quantity to be processed becomes unreasonable to the extent that efficient processing to protect the security, good order, or discipline of the institution, the public, or national security may be jeopardized.

iii. All non-legal mail shall be -

(1) **Copied** - Shall be copied (including the surface of the envelope) by the warden, or his or her designee, of the facility in which the inmate is housed.

(2) **Forwarded** - Shall be forwarded, in copy form, to the location designated by the FBI.

(3) **Analyzed** - After government analysis and approval, if appropriate, the inmate's incoming/outgoing non-legal mail shall be forwarded to the USMS/BOP/DF for delivery to the inmate (incoming), or directly to the addressee (outgoing).

LIMITED OFFICIAL USE

**Exhibit 28 -  430**

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                    Page 14
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel

    iv.    The federal government shall forward the inmate's non-legal mail to the USMS/BOP/DF for delivery to the inmate or directly to the addressee after a review and analysis period of:

        (1)    A reasonable time not to exceed fourteen (14) business days for mail that is written entirely in the English language.

        (2)    A reasonable time not to exceed sixty (60) business days for any mail that includes writing in any language other than English, to allow for translation.

        (3)    A reasonable time not to exceed sixty (60) business days for any mail where the federal government has reasonable suspicion to believe that a code was used, to allow for decoding.

    v.    **Mail Seizure -** If outgoing/incoming mail is determined by the USMS/BOP/DF or FBI to contain overt or covert discussions of or requests for illegal activities, the soliciting or encouraging of acts of violence, or actual or attempted circumvention of the SAM, the mail shall not be delivered/forwarded to the intended recipient but referred to the FBI for appropriate action. The inmate shall be notified in writing of the seizure of any mail.

4.    **Communication With News Media**

The inmate shall not be permitted to speak, meet, correspond, or otherwise communicate with any member or representative of the news media in person; by telephone; by furnishing a recorded message; through the mail, his attorney, or a third party; or otherwise.

5.    **Religious Visitation**

    a.    The inmate shall not be allowed to engage in group prayer with other inmates.

    b.    If a USMS/BOP/DF- and/or FBI-approved religious representative is to be present for prayer with the inmate, the prayer shall be conducted as part of a contact or non-contact visit, at the discretion of the USMS/BOP/DF.

LIMITED OFFICIAL USE

**Exhibit 28 -  431**

SPECIAL ADMINISTRATIVE MEASURES (SAM)                           Page 15
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel

6.    **No Communal Cells and No Communication Between Cells**

   a.    The inmate shall not be allowed to share a cell with another inmate.

   b.    The inmate shall be limited within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate by making statements audible to other inmates or by sending notes to other inmates, except as permitted in Section 1.c., above.

7.    **Cellblock Procedures**

   a.    The inmate shall be kept separated from other inmates as much as possible while in the cellblock area.

   b.    The inmate shall be limited, within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate while in the cellblock area.

8.    **Access to Mass Communications**

   To prevent the inmate from receiving and acting upon critically timed information or information coded in a potentially undetectable manner, the inmate's access to materials of mass communication is restricted as follows:

   a.    **Publications/Newspapers -**

      i.    The inmate may have access to publications determined not to facilitate criminal activity or be detrimental to national security; the security, good order, or discipline of the institution; or the protection of the public. This determination is to be made by the USMS/BOP/DF, in consultation with the USA/CDCA. The inmate may correspond with the publishing company regarding technical aspects of the publication, i.e., availability of particular volumes, billing questions, etc. The review of this correspondence will be in accordance with section 8(a)(iii), below.

      ii.    Sections of any publication/newspaper that offer a forum for information to be passed by unknown and/or unverified individuals, including but not limited to, classified advertisements and letters to the editor, should be removed from the publications/newspapers prior to distribution to the inmate.

LIMITED OFFICIAL USE

**Exhibit 28 - 432**

SPECIAL ADMINISTRATIVE MEASURES (SAM)                          Page 16
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel

iii.    If restricted by the USMS/BOP/DF rules, access to a publication will be denied. If acceptable, upon delivery, the USMS/BOP/DF will review the publication and make the initial determination. If the FBI's expertise is required, the publication will be forwarded to the FBI for review. The USMS/BOP/DF will also forward the publication to the FBI if translations are needed to make that determination. (In these cases, the FBI shall respond to the USMS/BOP/DF within fourteen (14) business days.) The inmate shall then have access to the remaining portions of the publications/newspapers deemed acceptable, in accordance with USMS/BOP/DF policy.

iv.    In order to avoid passing messages/information from inmate to inmate, the inmate shall not be allowed to share the publication(s) with any other inmates.

b.    **Television and Radio -** The inmate is authorized to have television and radio viewing and listening privileges, in accordance with standard and applicable USMS/BOP/DF policies and procedures.

c.    **Termination or Limitation -** If the USMS/BOP/DF determines that mass communications are being used as a vehicle to send messages to the inmate relating to the furtherance of terrorist or criminal activities, the inmate's access may be limited or terminated for a period of time to be determined by the USMS/BOP/DF.

9.    **Access to Books**

The inmate may have access to all books that do not facilitate criminal activity or present a substantial threat to national security or the security, discipline, or good order of the institution. This initial determination is to be made by the USMS/BOP/DF and, if the USMS/BOP/DF determines that the FBI's expertise is required, the book(s) will be forwarded to the FBI for review. In conducting its analysis, the FBI will determine whether the book advocates or promotes acts of terrorism or violence and/or whether access to the book by this particular inmate would pose a substantial threat to national security.

In order to avoid passing messages/information from inmate to inmate, the inmate shall not be allowed to share books with any other inmates.

LIMITED OFFICIAL USE

**Exhibit 28 - 433**

SPECIAL ADMINISTRATIVE MEASURES (SAM)                Page 17
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel

10.    **Transfer of Custody**

In the event that the inmate is transferred to or from the custody of the USMS, BOP, or any other DF, the SAM provisions authorized for this inmate shall continue in effect, without need for any additional DOJ authorization.

11.    **Inmate's Consular Contacts**

The inmate, who is a citizen of Russia, shall be allowed Consular communications and visits, consistent with USMS/BOP/DF policy. The Consular contacts shall comply with the U.S. Department of State (DOS) Consular notification and access requirements.[9] Prior to permitting any Consular contact, the FBI will verify the Consular representative's credentials with the DOS.

**CONCLUSION**

The SAM set forth herein, especially as they relate to attorney-client privileged communications and family contact, are reasonably necessary to prevent the inmate from committing, soliciting, or conspiring to commit additional criminal activity. Moreover, these measures are the least restrictive that can be tolerated in light of the ability of this inmate to aid, knowingly or inadvertently, in plans that create a substantial risk that the inmate's communications or contacts with persons could result in death or serious bodily injury to persons.

With respect to telephone privileges, the SAM are reasonably necessary because of the high probability of calls to co-conspirators to arrange criminal or violent activities.

With respect to mail privileges, the SAM are necessary to prevent the inmate from receiving or passing along critically timed messages. Accordingly, I have weighed the inmate's interest in the timely receipt and/or submission of mail, with the possible danger the contents of the mail may pose to others. I have determined that delaying mail delivery to allow authorized personnel to examine a copy of the mail is the least restrictive means available to ensure that the

---

[9] *See* Consular Notification and Access, Instructions for Federal, State, and Local Law Enforcement and Other Officials Regarding Foreign Nationals in the United States and the Rights of Consular Officials to Assist Them, DOS. The DOS contact is the Consular Notification and Outreach Division, Office of Policy Coordination and Public Affairs, DOS, telephone (202) 485-7703 or http://www.travel.state.gov/law/consular/consular_753.html.

LIMITED OFFICIAL USE

**Exhibit 28 - 434**

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                         Page 18
Pursuant to 28 C.F.R. § 501.3
Inmate - Mikhel

mail is not being used to deliver requests for, or to assist in, violent threats, and/or criminal acts against government witnesses or others.

To the extent that the use of an interpreter/translator is necessary, the government has the right to ensure that the interpreter/translator given access to the inmate is worthy of trust.

The SAM's prohibition of contact with the media is reasonably necessary. Communication with the media could pose a substantial risk to public safety if the inmate advocates criminal and/or violent offenses, or if he makes statements designed to incite such acts. Based upon the inmate's past behavior, I believe that it would be unwise to wait until after the inmate solicits or attempts to arrange a violent or criminal act to justify such media restrictions.

The SAM's limitations on access to mass communications are reasonably necessary to prevent the inmate from receiving and acting upon critically timed messages. Such messages may be placed in advertisements or communicated through other means, such as the television and/or radio. I believe that limiting and/or delaying media access may interrupt communication patterns the inmate may develop with the outside world, and ensure that the media is not used to communicate information that furthers violent and/or criminal activities.

**SAM CONTACT INFORMATION**

Any questions that you or your staff may have about this memorandum or the SAM directed herein should be directed to the Office of Enforcement Operations, Criminal Division, U.S. Department of Justice, 1301 New York Avenue, N.W., JCK Building, Room 1200, Washington, D.C. 20530-0001; telephone (202) 514-6809; and facsimile (202) 616-8256.

LIMITED OFFICIAL USE

**Exhibit 28 -  435**

# EXHIBIT

# 29



**U.S. Department of Justice**
Federal Bureau of Prisons

*Federal Correctional Complex*

_____

*Office of the Complex Warden*                                   *Terre Haute, Indiana 47802*

June 5, 2017

MEMORANDUM FOR  LOURI MIKHEL, REGISTER NUMBER 23675-112

FROM:        J. E. Krueger, Complex Warden

SUBJECT:             Vacation of Special Administrative Measures

The purpose of this memorandum is to notify you the Federal Bureau of Prisons received notification the Special Administrative Measures (SAM) imposed on you have been vacated.   The restrictions of the SAM are no longer in effect.

Received June 7 , 2017 _____
                                    MIKHEL, Louri (Reg. No. 23675-112)

**Exhibit 29 -  436**

# EXHIBIT

# 30



# THE DARKEST CORNER

Special Administrative Measures and
Extreme Isolation in the Federal Bureau of Prisons

center for constitutional rights

Allard K. Lowenstein International Human Rights Clinic
Yale Law School

**Exhibit 30 - 437**

*I believe that very few men are capable*

*of estimating the immense amount of torture*

*and agony which this dreadful punishment,*

*prolonged for years, inflicts upon the sufferers;*

*and in guessing at it myself, and in reasoning*

*from what I have seen written upon their faces,*

*and what to my certain knowledge they feel within,*

*I am only the more convinced that there is*

*a depth of terrible endurance in which none*

*but the sufferers themselves can fathom,*

*and which no man has a right to inflict upon*

*his fellow creature . . . .*

*— Charles Dickens (1842)*

**Exhibit 30 -  438**

# The Darkest Corner:
# Special Administrative Measures and Extreme Isolation in the Federal Bureau of Prisons

Allard K. Lowenstein International Human Rights Clinic
The Center for Constitutional Rights

September 2017

Cover illustration and design by Annelisa Leinbach and Meryl Natow

**Exhibit 30 -  439**

## Acknowledgements

This report is a product of the Allard K. Lowenstein International Human Rights Clinic at Yale Law School ("Lowenstein Clinic") and the Center for Constitutional Rights ("CCR"). The report was written by Allison Frankel, Andy Udelsman, and Andrew Walchuk, all members of the Lowenstein Clinic at Yale. Lowenstein Clinic members Allison Frankel, Tasnim Motala, Alexander Resar, Andy Udelsman, and Andrew Walchuk researched and conducted interviews for this report. Hope Metcalf, Clinical Lecturer at Yale Law School, supervised the research and edited the report. At CCR, current and former staff members Pardiss Kebriaei, Omar Shakir, and Noor Zafar were central to conceiving, planning, and/or editing the report. Baher Azmy, Nahal Zamani, and Alexis Agathocleous provided essential edits and feedback.

The Lowenstein Clinic and CCR thank all of the attorneys, journalists, advocates, and experts who agreed to speak with us for this report. We thank Human Rights Watch and Columbia Law School's Human Rights Institute for submitting FOIA requests related to SAMs in 2012, and we thank Yale Law School's Media Freedom and Information Access Clinic for litigating for three years to force the government to answer those requests with relevant information. We especially thank and remember Scharlette Holdman, a pioneering mitigation expert interviewed for this report, who passed away in July 2017, as well as Lynne Stewart, who was interviewed for this report and who passed away in February 2017. We extend our deepest gratitude to the family members of people under SAMs who shared their stories with us. And we acknowledge all the individuals whose voices we could not hear or share because SAMs prohibit them from communicating with us.

**Exhibit 30 -  440**

# The Darkest Corner: Special Administrative Measures and Extreme Isolation in the Federal Bureau of Prisons

I.   Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   Methodology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.   The Development of SAMs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.   SAMs Impose Sensory Deprivation and Social Isolation . . . . . . . . . . . . . . . . . . . . . 6

   A. Physical Isolation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

   B. Social Isolation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

   C. Spiritual Isolation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

   D. Information Isolation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

V.   SAMs Constitute Inhumane Treatment and May Amount to Torture . . . . . . . . . . . . 11

VI.   SAMs Coerce Pre-Trial Detainees into Pleading Guilty . . . . . . . . . . . . . . . . . . . . . 14

VII.   SAMs Prevent Prisoners and Their Attorneys from Effectively Advocating in Court . . . . . . . . . 16

VIII.  SAMs Erode Democratic Accountability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

IX.   SAMs Invite Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

X.   SAMs Violate U.S. and International Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

   A. SAMs Constitute Impermissible Treatment and Punishment . . . . . . . . . . . . . . . . . . . 23

   B. SAMs Violate the Right to a Fair Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

      I. Pre-Trial Punishment and Coercion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

      2. Right To Participate in Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

      3. Effective Assistance of Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

   C. SAMs Violate Fundamental Civil Liberties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

      I. Right to Free Speech . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

      2. Right to Association . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

      3. Right to Due Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

      4. Right to Equal Treatment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

XI.   Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Endnotes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**Exhibit 30 –  441**

## I. Summary

Prisoners, psychologists, and human rights advocates have long attested to the horrors of solitary confinement: cramped concrete cells, sensory deprivation, and overwhelming social isolation.[1] Scientific consensus that such conditions cause permanent harm led the former United Nations ("U.N.") Special Rapporteur on Torture to declare that "any imposition of solitary confinement beyond 15 days constitutes torture or cruel, inhuman or degrading treatment."[2] The practice has prompted hearings before the U.S. Senate, and at the state level, many corrections leaders have recognized that long-term isolation is unnecessary and even counterproductive.[3]

Yet amid growing recognition of these harms, the federal government has been expanding its use of a lesser known and more extreme form of isolation: Special Administrative Measures ("SAMs"). SAMs are the darkest corner of the U.S. federal prison system, combining the brutality and isolation of maximum-security units with additional restrictions that deny individuals almost any connection to the human world. Those restrictions include gag orders on prisoners, their family members, and their attorneys, effectively shielding this extreme use of government power from public view.

SAMs deny prisoners the narrow avenues of indirect communication – through sink drains or air vents – available to prisoners in solitary confinement. They prohibit social contact with anyone except for a few immediate family members, and heavily regulate even those contacts. And they further prohibit prisoners from connecting to the social world via current media and news, limiting prisoners' access to information to outdated, government-approved materials. Even a prisoner's communications with his lawyer – which are supposed to be protected by attorney-client privilege – can be subject to monitoring by the FBI.

The U.S. Attorney General has sole discretion to impose SAMs, and a prisoner lacks the most basic procedural protections to allow him to contest the SAMs designation. Indeed, prisoners may be left in the dark as to *why* they have been subjected to SAMs, because the Attorney General's justification often cites little more than the prisoner's charges or conviction. Many prisoners remain under these conditions indefinitely, for years or in some cases even decades.[4] And court challenges are difficult. For convicted prisoners in particular, the regulations operate to obstruct their access to counsel, impeding the act of filing a challenge. And even when prisoners can bring challenges, courts routinely rule against them, accepting the government's vague national security justifications.[5]

The imposition of SAMs extends beyond convicted prisoners. Federal prosecutors regularly request that the Attorney General place defendants under these punishing conditions while they await trial, before they have been convicted of any crime. In numerous cases, the Attorney General recommends lifting SAMs after the defendant pleads guilty. This practice erodes defendants' presumption of innocence and serves as a tool to coerce them into cooperating with the government and pleading guilty. Indeed, the Central Intelligence Agency ("CIA") for years relied on the torture of isolation and sensory deprivation as a tool to elicit what it termed "learned helplessness" in detainees suspected of terrorism. For those defendants who do fight their charges at trial, SAMs infect the entire proceeding, limiting prisoners' capacity to participate in their defense and hindering their attorneys' abilities to investigate and zealously advocate.

---

1      CENTER FOR CONSTITUTIONAL RIGHTS | LOWENSTEIN INTERNATIONAL HUMAN RIGHTS CLINIC

**Exhibit 30 –  442**

In addition to shrinking the entirety of the prisoner's world to the four corners of his prison cell, SAMs prevent anyone else from understanding what happens within. Prisoners under SAMs are prohibited from communicating with anyone except a few pre-approved individuals – their attorneys and immediate family members – and SAMs prohibit those individuals from repeating the prisoner's words to anyone else. There is also an explicit prohibition on all forms of communication with the media. In effect, the regulations silence those most qualified to attest to the harms of SAMs. The Department of Justice ("DOJ") further shrouds SAMs under a veil of secrecy by concealing *who* is subject to these conditions and *why*. Indeed, the DOJ and Federal Bureau of Prisons ("BOP") consistently ignore or deny Freedom of Information Act ("FOIA") requests seeking basic information about prisoners under SAMs. The psychological and physiological harms are thus hidden from public oversight and democratic accountability.

The lack of transparency surrounding SAMs makes these measures ripe for discriminatory use against "disfavored" populations. Interviews, publicly available information, and FOIA documents obtained through litigation reveal that the federal government has leveraged SAMs predominantly against Muslims. While the government refuses to reveal the religious identities of people under SAMs,[6] publicly available evidence makes two facts clear: the use of SAMs has increased dramatically since September 11, 2001, and a disproportionately high number of SAMs prisoners are Muslim. In November 2001, there were only sixteen individuals under SAMs;[7] by 2009 there were thirty,[8] and, as of June 8, 2017 there were fifty-one.[9]  SAMs represent the extreme end of a spectrum of discriminatory "counterterrorism" measures targeting Muslims since 9/11, including abusive conditions of confinement and lack of due process at Communication Management Units ("CMUs"),[10] indefinite detention and the military commissions system at Guantánamo Bay,[11] suspicionless surveillance,[12] sweeping immigration roundups,[13] coerced informancy and entrapment,[14] placement on various administrative watch lists,[15] and criminal convictions based on overbroad interpretations of material support and conspiracy statutes.[16] The widespread use of these tools is particularly troubling now, under an administration that has openly discriminated against Muslims and a President who has specifically advocated for the use of torture.[17] Particularly in light of the Trump Administration's open animosity towards other groups, including immigrants and protestors, there is a risk that these tools will be used to target other marginalized groups in the future.

The imposition of SAMs raises serious concerns under U.S. and international law. SAMs eviscerate fair trial protections and the presumption of innocence. They infringe on the rights to free speech and association, religious freedom, family unity, due process, and equal protection under the Constitution and international law. And, not least, they constitute inhumane treatment that may rise to the level of torture. So, while many on both sides of the aisle have criticized President Trump for vowing to "bring back" torture,[18] the torture of SAMs and its underlying conditions of solitary confinement never went away.

This report aims to shed light onto this darkest corner of the U.S. federal prison system. The report necessarily fails to represent the views of the people who are most intimately familiar with SAMs – those who have been subjected to them. Nonetheless, the available information reveals that the severity of SAMs, their increasing use, their lack of procedural protections, and their potential discriminatory application pose urgent concerns for our democracy.

**Exhibit 30 –  443**

## II. Methodology

This report relies on interviews, legal research, and analysis of public documents conducted by the Allard K. Lowenstein International Human Rights Clinic at Yale Law School in collaboration with the Center for Constitutional Rights.

The authors interviewed eleven attorneys who have represented clients under SAMs. The authors also discussed the barriers SAMs pose to investigation with two mitigation specialists, members of defense teams responsible for compiling and telling a defendant's full life history to advocate for a lesser sentence. The authors found these individuals through recommendations and Westlaw searches of attorneys who have litigated issues related to SAMs. Although most attorneys contacted were open to being interviewed, almost all noted that the protective order they signed when agreeing to represent a client under SAMs severely curtailed their ability to speak freely. Three attorneys declined interviews for fear that such an interview might violate SAMs.

In addition, the authors interviewed one reporter who has covered SAMs, two siblings of individuals held under SAMs, and two people who were convicted and sentenced for violating SAMs.

The authors utilized publicly available information from journalists, human rights reporters, and academics, as well as information available in the SAMs regulations themselves and litigation challenging SAMs conditions. Whenever possible, the authors relied on public findings, though the widespread practice of sealing filings containing information related to SAMs complicated those efforts. The authors contacted officials in the DOJ and the BOP for comments in April 2016 and April 2017, but the agencies did not respond to requests for interviews.

Finally, this report relies on documents obtained through FOIA requests sent by Human Rights Watch and Columbia Law School's Human Rights Institute.[19] These documents have not previously been made public, and are published as an annex to this report.[20] The original FOIA requests were submitted in 2012 and sought detailed information about SAMs conditions and individuals subjected to them.[21] For fourteen months, the BOP neglected its legal duty to respond to those FOIA requests, prompting Human Rights Watch to sue.[22] Eventually, litigation forced the BOP to release over a thousand pages of information about SAMs that the BOP had initially refused to release to the public.[23] However, asserting a concern for prisoners' privacy, the BOP succeeded in withholding the prisoners' names, crimes, sentences, religions, nationalities, and associates, as well as the reasons SAMs were imposed and some information detailing the conditions of confinement.[24]

**Exhibit 30 – 444**

## III. The Development of SAMs

SAMs are a regime of prison restrictions that control a prisoner's access to all forms of human contact and information. They are typically imposed on prisoners already held in solitary confinement – that is, prisoners who are confined alone in a cell for over twenty-two hours per day.[25] SAMs intensify that experience and restrict the few remaining rights afforded to prisoners in solitary: the right to communicate with individuals outside of prison, the right to have privileged discussions with an attorney, and the right to acquire information.

The BOP first promulgated the regulations establishing SAMs in 1996 to target prisoners who alleged-ly posed extraordinary safety threats to the public from within prison, for example, by directing acts of violence against witnesses or others.[26] The rules permitted the Attorney General to restrict prisoners' communications that she determined might pose a threat to national security or lead to "acts of violence or terrorism."[27]

Since 2001, the DOJ has been expanding its use of SAMs while altering the SAMs regulations to allow for longer and more severe restrictions.[28] Shortly after the terrorist attacks on September 11, 2001, the BOP placed all prisoners in its custody who were "in any way linked to terrorist activities" into administrative detention as part of an "immediate national security endeavor."[29] An October 2001 BOP memorandum noted that "some or all" of the "inmates with identified links to international terrorist organizations possibly involved in recent events" would likely be placed under SAMs.[30] It appears that a major criterion for deciding whom to place under SAMs was not the prisoner's demonstrated capacity to communicate dangerous information, but rather the prisoner's religion.[31]

> Since 2001, the DOJ has been expanding its use of SAMs while altering the SAMs regula-tions to allow for longer and more severe restrictions.

At the same time, the DOJ amended the SAMs regulations to allow for harsher restrictions and less over-sight. First, the new regulations tripled the length of time for which SAMs can be imposed without inter-nal review, from 120 days to one year.[32] Second, they relaxed the standards for renewing SAMs. Before 2001, to renew SAMs the DOJ had to demonstrate that the original reason justifying the measures still existed.[33] In the post-9/11 era, the DOJ must only demonstrate that *some* reason exists for the continued imposition of SAMs – even if that reason has nothing to do with the original reason for their imposition.[34] Third, the amended regulations clarified that SAMs could be imposed on pre-trial detainees.[35] Finally, the post-9/11 SAMs regulations authorize prison officials to monitor communications between a prisoner and his attorney.[36]

The effect of the amended regulations is to give the Attorney General broad discretionary authority to impose SAMs on prisoners any time allegations of "terrorism" or "national security" arise.[37] Prisoners may be subjected to SAMs without any meaningful explanation or hearing regarding what they did or *why* the Attorney General thought the restrictions were necessary.[38] They cannot challenge the SAMs designation until *after* they are placed under SAMs. Even then, like all federal prisoners, they risk having their cases dismissed for failure to exhaust the effectively meaningless Administrative Remedy Program.[39] Because the very measures they wish to challenge also forbid communication with outside parties, prisoners whose requests to contact attorneys are denied must proceed without the assistance of counsel.[40] That would be a challenging feat for any layperson, and nearly impossible for someone operating under the debilitating circumstances of solitary confinement.

**Exhibit 30 – 445**

While SAMs conditions vary slightly from prisoner to prisoner, the standard regulations severely restrict or altogether prohibit contact with other human beings, including other prisoners and visitors.[41] Calls can only be made to approved "immediate family members" and may be limited to one fifteen-minute call per month.[42] These calls are monitored and recorded by the FBI,[43] and they must be in English unless a government-approved translator is available to contemporaneously monitor the call.[44] In-person visits for SAMs prisoners are similarly monitored and recorded by the FBI, and generally restricted to one approved immediate family member at a time, with fourteen days written notice to the BOP.[45]  Mail is likewise restricted to those family members, with the frequency limited to three 8.5 x 11 pieces of paper "once per week to a single recipient, at the discretion" of the BOP.[46] This mail must also be copied and analyzed by the FBI before it is delivered.[47] SAMs prisoners are generally prohibited from communicating with other prisoners within the cellblock,[48] praying together,[49] communicating with media organizations in any manner,[50] and reading or seeing any publication that has not been approved by the BOP.[51] Finally, the government imposes what amounts to a "gag order" on the few people who *can* contact the prisoner – that is, the prisoner's attorney and authorized immediate family members – prohibiting them from conveying any message from the prisoner to a third person.[52] The net result is that SAMs seal off the prisoner from the outside world and shield his treatment from public scrutiny.

> The net result is that SAMs seal off the prisoner from the outside world and shield his treatment from public scrutiny.

**Exhibit 30 –  446**

## IV. SAMs Impose Sensory Deprivation and Social Isolation

SAMs inflict the most severe form of isolation found in United States federal prisons.[53] Imposed on top of solitary confinement, they operate to seal off prisoners' narrow avenues for human contact and communication. Government control pervades every aspect of the prisoner's life, including what others may say about him.

### A. Physical Isolation

Prisoners under SAMs are subject to the same baseline of extreme restrictions as federal prisoners held under solitary confinement. Many prisoners currently under SAMs are incarcerated in the Administrative Maximum ("ADX") prison in Florence, Colorado,[54] where prisoners in the "general population" are held in small cells for twenty-two to twenty-four hours a day. SAMs prisoners at ADX are held in a separate section of the prison called the Special Security Unit ("SSU") or H-Unit.[55] These prisoners are confined to cells that measure less than eight by ten feet, requiring them to eat their meals within an arm's length of their toilet.[56] They are typically allowed only ten hours total outside of their cell per week, like general population prisoners.[57] But this time is also spent alone, either in a small indoor room or in a cage hardly bigger than their cell.[58] For many prisoners, the cage is too small to run or do anything but walk a few steps in each direction.[59] For one prisoner, "recreation" meant dribbling a basketball alone in his cage and without a hoop.[60]

> For one prisoner, "recreation" meant dribbling a basketball alone in his cage and without a hoop.

That "recreation" can be cancelled or curtailed at the discretion of BOP officers.[61] When first placed under SAMs at ADX Florence, Nidal Ayyad was limited to five hours of exercise per week, and recreation, as well as showers, were cancelled any time a lieutenant and two officers were not present.[62] Also at ADX, SAMs prisoner Mahmud Abouhalima was only permitted to go to inside or outside recreation if he submitted to a strip-search by three staff and a Lieutenant, both on the way out to recreation and on the way back to his cell. He refused recreation under such degrading circumstances.[63] As a result, SAMS prisoners in the H-Unit at ADX often go days without leaving their cells.[64]

Physical conditions are similarly inhumane at pre-trial facilities where SAMs detainees are held – that is, facilities designed to hold individuals who have been charged, but not convicted, of a crime. Conditions at the Metropolitan Correctional Center ("MCC") in Manhattan, where defendants charged with terrorism-related offenses are often held pre-trial, are particularly harsh. Detainees in the MCC's "10 South," where "high-level" defendants – including those under SAMs – are held, have little natural light and no possibility for outdoor recreation.[65] "Recreational time" is provided in a closed room identical to the detainee's cell.[66] Unable to open windows or spend time outdoors, detainees in 10 South have no access to fresh air.[67]

### B. Social Isolation

SAMs add to the already draconian conditions of solitary confinement by limiting the prisoner's few means of communicating with other living beings. Whereas people under other forms of solitary confinement may try to maintain some minimal human contact by yelling through the walls or talking while outside their cells, prisoners under SAMs are forbidden from communicating with other prisoners when they are in their cells.[68] SAMs also cut prisoners off from communication with their loved ones outside of

**Exhibit 30 – 447**

prison. Federal prisoners in standard solitary confinement may face limits on the number of letters or calls they may make, but they generally retain the ability to correspond with approved contacts outside prison.[69] Under SAMs, communications with people outside of prison walls are usually restricted to prisoners' attorneys and a few immediate family members, all of whom must be cleared by the U.S. government as a condition of access.[70]

While ADX does not generally restrict the number of letters prisoners in the general population can send,[71] SAMs typically restrict prisoners to writing one letter per week to a single cleared family member.[72] The letter may not exceed three double-sided sheets of paper.[73] Moreover, whereas prison officials check the correspondence of general population prisoners, prison officials forward all SAMs prisoners' mail to FBI agents for analysis and approval.[74] If foreign translation is required, or there is "reasonable suspicion that a code was used" in the mail, it may take up to sixty days to pass letters along.[75] These delays have significant implications for prisoners; when one prisoner's father received a terminal cancer diagnosis, his father's goodbye letter took two months to reach him.[76] Over time, the limitations and delays of mail can degrade the quality of communication between a prisoner and his family to the point where it can feel worthless.

> When one prisoner's father received a terminal cancer diagnosis, his father's goodbye letter took two months to reach him.

SAMs include severe restrictions on prisoners' phone use. ADX limits all prisoners to two fifteen-minute non-legal phone calls per month.[77] Under SAMs, prisoners may be restricted to just one such call.[78] And, whereas other prisoners may generally call approved contacts, SAMs prisoners are limited to authorized, immediate family members.[79]  In practice, prisoners face numerous obstacles to actually speaking with even these family members because they may call only phone numbers that have been cleared and approved by the FBI.[80] If a family member gets a new number, they may not be able to communicate for months while the clearance process is ongoing.[81] Further, call times are often limited to hours when loved ones are at work or school and unavailable to talk.[82] Finally, if a government interpreter is not available, calls must be in English, making communication impossible for family members who do not speak the language.[83] For Fahad Hashmi, who was held under SAMs at the MCC for three years pre-trial, and whose SAMs were continued at ADX post-conviction, this restriction prevented his mother, who does not speak English, from speaking with him.[84]

Even when SAMs prisoners manage to reach someone on the phone, they are unable to speak freely. Whereas BOP routinely records prisoner phone calls,[85] SAMs prisoners' calls are subjected to heightened scrutiny: an FBI agent must contemporaneously monitor calls.[86] Further, should that agent decide that the conversation is veering into prohibited topics, he may terminate the call immediately, without warning.[87] Prohibited topics have included questions like "what's going on in politics" or, even, "what's the weather."[88] This overwhelming surveillance causes both prisoners and family members to avoid any topic that could be construed as remotely political or controversial.[89] Family conversations become limited to "small talk."

As with phone calls, SAMs prisoners' non-legal in-person visits are sharply curtailed. All prisoners at ADX are denied physical contact during such visits and must speak through a telephone receiver.[90] Prisoners may be shackled and chained at their wrists, ankles, and to the ground, even though the conversation takes place through a thick glass barrier.[91] But while prisoners in the general population may have three visitors at the same time,[92] SAMs prisoners are generally restricted to one adult person at a time.[93] So, for example, if a prisoner's parents are visiting, one parent must wait outside the visiting booth while the

**Exhibit 30 –  448**

other is inside. And as with phone calls, if an FBI interpreter is not available, all conversations must be in English, which can be a barrier to communication for prisoners and family members for whom English is a second language or not spoken at all.[94]

During visits with SAMs prisoners, an FBI officer monitors and, at his discretion, censors the conversation.[95] For example, when one SAMs prisoner attempted to ask his mother and son about whether his cousin and children survived the war in Gaza in 2009, the monitoring staff ordered him and his family to stop talking "politics about Gaza."[96] If an FBI officer is not able to monitor the visit – for example, for operational reasons – visits can be cancelled, even at a moment's notice, after families have traveled across the country to see their relatives.[97]

The visits themselves are almost impossible for most families to undertake. Given ADX Florence's remote location, relatives may struggle to pay expenses including airfare and lodging.[98] Although visiting hours ostensibly last from 8 AM to 3 PM, prison staff often delay the families, holding them for hours before finally permitting the visit.[99] They are also difficult to schedule. SAMs require fourteen-day advance notice for visits, but in reality visits can take months to coordinate because SAMs prisoners cannot use a visiting room when any other prisoner is present.[100] Further, while visiting hours for those in general population at ADX include Saturdays and Sundays, family members may only visit SAMs prisoners on Mondays, Tuesdays, and Wednesdays, excluding holidays.[101] This forces family members to miss work and children to miss school, and entails considerable financial sacrifices in order to see their incarcerated loved one.[102] Given all these barriers, Nidal Ayyad considers himself lucky when he is able to see his mother and son once a year.[103]

> Given all these barriers, Nidal Ayyad considers himself lucky when he is able to see his mother and son once a year.

For Mahmud Abouhalima, SAMs have severed his relationships with family members. Three of his uncles, his grandfather, his aunt, and his uncle's daughter passed away since his incarceration. Since his SAMs prohibited him from contacting anyone outside of his immediate family, Abouhalima could not send condolence letters to his extended family following their deaths.[104] And because the family members he could contact were sworn to secrecy under the SAMs conditions, he was prohibited from even passing on his verbal condolences through them.[105]

Phone calls are also exceedingly difficult to schedule. The prison gives Abouhalima the date and time when he can make a call without any prior arrangement with his immediate family. If no one answers at the assigned time, he loses his single phone call for the month.

The FBI never approved Abouhalima's brother's work phone number after he got a new job in a bakery. After a number of unsuccessful challenges to the rejection of his brother's work phone, Abouhalima was only able to speak with that brother once in the three years that followed.[106] Abouhalima's daughter's phone number was denied approval for nearly six months, effectively prohibiting father-daughter communication for that time period.[107]

Since his family lives thousands of miles away from ADX, in-person visits are burdensome and rare. Abouhalima's family could only visit him three times in his first eight years at ADX.[108] Shackled and separated from his family by thick glass barriers during the precious few visits, Abouhalima reflected, "It feels like we are still living in a medieval period, where the human aspect of contact is not there at all."[109]

**Exhibit 30 –  449**

SAMs limits on family communication directly harm a prisoner's loved ones. Mariam Abu-Ali's brother Ahmed has been under SAMs continuously since 2005, mostly at ADX. She described her family's experience with SAMs:

*Since the beginning of Ahmed's detention by U.S authorities in 2005, he was immediately put under SAMs and held in solitary confinement. He has been in these conditions continuously since then. His SAMs seal him off as much as a person could be isolated within a prison, and severely limit our communication with him. The measures have devastated our family in every way. Ahmed's short, unscheduled phone calls have had my mother sitting by the phone every day for years, and only recently, every Tuesday and Thursday, awaiting his call. Due to SAMs, he is permitted only between two and four 15-minute phone calls a month, so he calls my parents. Effectively, that means that my older brother and I can no longer talk to him, unless we are lucky enough to be visiting home on the right Tuesday or Thursday.*

*In life events, the happy and the sad, we feel the heavy weight of Ahmed's absence. My brother and I have gotten married, and while it was painful enough that Ahmed could not partake in these milestones, it remains especially painful that Ahmed cannot congratulate or even say hello to his in-laws because they are not considered immediate family, because the SAMs only allow Ahmed to communicate with his parents and siblings. He has also not been able to talk to his grandfather, aunts, or uncles, four of whom passed away without the chance to say goodbye. When my grandfather became terminally ill in 2006, his dying wish was to talk to Ahmed, which we could not fulfill, due to SAMs.*

*Since Ahmed's detention in 2005, he has not been permitted a single contact visit with us. I was fourteen years old when Ahmed was detained. Now 28 years old, I have been denied the chance to ever hug my brother in all of those years. My family and I rarely get to have even our noncontact visits because he is so far away from home, at ADX in Florence, Colorado.[110]*

## C. Spiritual Isolation

Religious practice – one of prisoners' few methods of coping – is sharply restricted under SAMs.[111] SAMs regulations explicitly prohibit group prayer.[112] That ban is especially damaging to Muslims, as Islam requires that all able-bodied men attend a congregational Friday prayer, which includes a religious sermon.[113] This is in addition to other religious harassment Muslim prisoners under SAMs have reported experiencing. Uzair Paracha, who was held under SAMs pre-trial at MCC's 10 South, alleged that guards purposefully targeted Muslims there by blasting the radio or delivering food while Muslim prisoners were praying, knowing they could not say anything during prayer.[114]

ADX restricts access to chaplains for all prisoners incarcerated there. A 2008 court agreement calls for an imam to visit ADX four times a month to speak with prisoners, but prison attorneys report that visits occur much less frequently in practice.[115] When the visits do take place, the prisoner and imam must speak through a steel door, requiring them to speak so loudly that private consultations become impossible.[116] Advocates have reported that, while Christian priests or chaplains are generally allowed beyond the solid steel door to pray next to the prisoner in the cell, Muslim chaplains are typically denied this possibility.[117]

> Religious practice – one of prisoners' few methods of coping – is sharply restricted under SAMs.

**Exhibit 30 - 450**

Under SAMs, religious visitations at ADX are even more heavily restricted. The chaplain and SAMs inmate can never meet in private, as SAMs require an FBI agent or BOP official to monitor all conversations.[118] And they are prohibited from communicating in a language other than English unless a government-approved translator is "readily available."[119] Under such restrictions, Nidal Ayyad only received two imam visits a month, and found discussion of personal matters altogether impossible with so many onlookers present.[120] Muhanad al-Farekh, currently held at MCC, has only had one fifteen-minute conversation with an imam – at the insistence of counsel – despite his almost two-year detention.[121]

## D. Information Isolation

SAMs aggravate prisoners' social isolation by restricting their access to information about current events and the world around them.[122] The BOP and FBI censor all magazines and newspapers before a SAMs prisoner may receive them.[123] Officers have broad discretion to redact information that they deem "detrimental to national security," "good order," or "discipline of the institution."[124] For Fahad Hashmi, this censorship regime allowed him to receive newspapers only after a thirty-day delay, with any news covering Muslim majority countries redacted.[125] Books are censored under similar guidelines.[126] For instance, the BOP initially denied Ahmed Omar Abu Ali's request for President Obama's two memoirs.[127] As the case of Abouhalima demonstrates, censors tend to interpret these guidelines broadly.

> SAMs aggravate prisoners' social isolation by restricting their access to information about current events and the world around them.

For several years at ADX, Abouhalima was denied access to any periodicals, magazines, Arabic newspapers, books, or any other form of news other than the *Denver Post* and *USA Today*.[128] It was not until 2008, after nearly three years under SAMs, that Abouhalima was able to receive "daily newspapers with just a few days' delay."[129] However, the FBI continued to remove all articles relating to politics, and issues of *The Nation, Atlantic Monthly,* and *Time* were reduced to fifteen pages; even the world almanac was prohibited by the FBI for containing information that could be used for terrorism.[130]

Prisoners under SAMs are wholly prohibited from communicating with "any member or representative of the news media."[131] Further, the few individuals granted access to SAMs prisoners are "gagged" from repeating the prisoner's words to any third party.[132] Thus, while some Guantánamo prisoners and their lawyers have managed to publish censored versions of their experiences in Guantánamo Bay,[133] SAMs prisoners and their advocates would face criminal charges for doing the same.[134] So while prisoners under SAMs may receive *some* information about the outside world – albeit censored and outdated – they may not impart *any* information, no matter how innocuous, in response.

The DOJ recognizes that this level of censorship is difficult to justify. When the DOJ imposes SAMs on a prisoner, an Assistant Attorney General sends a letter to the BOP explaining the conditions and reasons for that particular prisoner's SAMs. In every letter that the BOP has released, the DOJ has conceded that "eliminating the inmate's access to media may be an excessive measure except in the most egregious of circumstances."[135] But in those letters, the DOJ never explains why an individual case constitutes "the most egregious of circumstances." Instead, the DOJ provides a boilerplate explanation that restricting prisoners' access to media may help to "interrupt communication patterns the inmate may develop with the outside world."[136] The DOJ does not explain how reading an uncensored version of *Time* magazine might allow prisoners to develop such "communication patterns."

**Exhibit 30 -  451**

## V. SAMs Constitute Inhumane Treatment and May Amount to Torture

There is broad – and growing – consensus that the standard conditions of prolonged solitary confinement cause serious and often indelible harm after just weeks.[137] The United Nations Standard Minimum Rules for the Treatment of Prisoners or "Mandela Rules," named for Nelson Mandela, define "prolonged" as beyond fifteen days, after which continued isolation constitutes cruel, inhuman and degrading treatment and, under some conditions, torture.[138] For prisoners under SAMs, isolation lasts at least a year and typically far longer. A 2013 count showed that eighty-two percent of prisoners placed under SAMs were under these restrictions for more than a year.[139] Of those prisoners, thirteen had lived under SAMs for more than a decade.[140]

> A 2013 count showed that eighty-two percent of prisoners placed under SAMs were under these restrictions for more than a year.

Scientific studies have concluded that prolonged isolation causes severe physical disease, including chronic headaches, digestive problems, dizziness, and even heart palpitations.[141] One study of prisoners in solitary confinement at ADX found that all prisoners interviewed exhibited physical symptoms "that are well known in the literature to be caused by isolative confinement."[142] In particular, the study found that every prisoner exhibited memory problems and extreme lethargy, and most prisoners suffered from chronic insomnia and headaches.[143] Other studies demonstrate that the complete absence of stimuli experienced in solitary confinement causes structural changes to the brain.[144]

> Uzair Paracha was held in isolation for two-and-a-half years pending trial. He reported that, during that time, he and other prisoners suffered a severe weakening of their eyesight, brought about by "having [their] entire world just a few feet away."[145] Paracha's physical coordination also deteriorated, making it difficult to walk on stairs, and he developed breathing problems, particularly when he slept.[146]

Additional studies demonstrate that solitary confinement also causes severe psychological damage. Symptoms of that damage include anxiety, panic, rage, loss of control, paranoia, and hallucinations.[147] Solitary can also drive prisoners to self-mutilation. A 2014 study found that prisoners in solitary confinement in New York City jails were nearly seven times more likely to harm themselves than those in general population.[148] Rates of suicide among prisoners in solitary are up to three times higher that within the general population.[149]

These symptoms are widespread among prisoners under solitary confinement. In one study of pathology among solitary prisoners, every symptom of psychological distress measured was present in more than half of the prisoners interviewed, and some symptoms were present in nearly all.[150] There is "not a single published study of solitary or supermax-like confinement in which nonvoluntary confinement lasting for longer than 10 days . . . failed to result in negative psychological effects."[151]

> There is "not a single published study of solitary or supermax-like confinement in which nonvoluntary confinement lasting for longer than 10 days . . . failed to result in negative psychological effects."

These findings have prompted a nationwide movement to end solitary confinement,[152] and they moved U.S. Supreme Court Justice Anthony Kennedy to declare in 2015 that "research still confirms what [the Supreme] Court suggested over a century ago: Years on end of near-total isolation exact a terrible price."[153]

**Exhibit 30 –  452**

Indeed, the price of long-term isolation includes prisoners' basic ability to relate to other humans.[154] A leading scholar on solitary confinement has used the term "social death" to describe the phenomenon wherein prisoners under prolonged solitary confinement lose the "ability to function as social beings."[155]

Senior corrections officials have recognized the harmful effects of solitary confinement and called for reform:

■ After spending just twenty hours in solitary confinement, the head of Colorado's Department of Corrections observed that maintaining his sanity "would be a battle [he] would lose."[156]

■ New York's correction commissioner found that solitary confinement at Rikers Island led to increased violence, and that the program in general "seem[ed] to defy logic."[157]

■ Mississippi's former commissioner of corrections publicly criticized that state's widespread use of solitary: "If you treat people like animals, that's exactly the way they'll behave."[158]

■ A former warden at ADX described the prison he ran: "This place is not designed for humanity. . . . It's not designed for rehabilitation."[159]

Solitary confinement also exacerbates pre-existing forms of mental illness.[160] For this reason, the American Psychiatric Association has recommended against the use of solitary confinement for prisoners with mental illness.[161] Even the BOP has recognized the precarious situation of mentally ill prisoners in solitary confinement: in a class-action lawsuit on behalf of prisoners with mental illness at ADX that the BOP settled in 2016, the BOP admitted "the need for new policies and practices that will better humanize the lives of those confined at ADX with mental illness."[162] Yet people suffering from mental illness continue to languish in solitary confinement and under SAMs.[163]

> Even the BOP has recognized the precarious situation of mentally ill prisoners in solitary confinement.

Jeremy Pinson was sent to ADX Florence and held under SAMs following convictions for making false statements, threatening a juror, and threatening the president.[164] Pinson's threat to the president consisted of a letter to then-President Bush stating, "YOU WILL DIE SOON! DIE BUSH DIE!"[165]

Pinson has been diagnosed with bipolar disorder, schizophrenia, and other psychiatric disorders, as well as severe and chronic PTSD resulting from a childhood of abuse and neglect.[166] While detained pending trial, Pinson attempted suicide several times.[167]

Despite a documented history of severe mental illness, Pinson was sent to ADX and subjected to SAMs.[168] Shortly thereafter, Pinson "began to unravel . . . with increasing symptoms of psychiatric distress."[169]

The effects of long-term solitary confinement mirror the effects of other forms of torture: anxiety, panic, paranoia, hallucinations, self-mutilation, and suicide.[170] When those symptoms develop, and when the purpose of solitary confinement is to coerce, punish, or discriminate, solitary confinement *is* torture.[170]

In fact, prolonged isolation was a primary technique that the CIA employed in its "enhanced interrogation program" after 9/11 under the Bush administration.[172] In addition to the more infamous techniques

**Exhibit 30 – 453**

such as waterboarding, CIA officers used isolation to "break" detainees by inducing a state of "learned helplessness,"[173] a condition in which "a subject is so broken he will not even attempt escape if the opportunity presents itself."[174] CIA psychologists theorized that "inducing such a state could encourage a detainee to cooperate and provide information."[175]

> The effects of long-term solitary confinement mirror the effects of other forms of torture: anxiety, panic, paranoia, hallucinations, self-mutilation, and suicide.

If "breaking" detainees was the goal, the tactics were effective. CIA officers noted that isolation had rendered one detainee "clearly a broken man" and "on the verge of complete breakdown."[176] After assessing a prisoner who had been held in "social isolation" for two and a half years, a CIA psychologist concluded that isolation was having a "clear and escalating effect on [his] psychological functioning."[177]

Other psychologists "identified the lack of human contact experienced by detainees as a cause of psychiatric problems."[178] Thus, while waterboarding and cramped confinement are frequently touted as the most extreme forms of CIA torture, prolonged isolation may have been just as damaging.

> CIA officers noted that isolation had rendered one detainee "clearly a broken man" and "on the verge of complete breakdown."

Jose Padilla first experienced total sensory and social deprivation while in the custody of the Department of Defense at the naval brig in South Carolina. For nearly three years, Padilla lived under SAMs-like conditions and had no human contact, apart from his interrogators. In a declaration responding to a habeas challenge brought by Padilla's lawyers, Vice Admiral Lowell Jacoby, director of the Defense Intelligence Agency ("DIA"), publicly declared that isolation was necessary to establish a detainee's "dependency" upon his interrogators.[179] Jacoby argued that providing Padilla the basic constitutional right of access to counsel would "create expectations by Padilla that his ultimate release may be obtained through an adversarial civil litigation process" – a process guaranteed to him by the Constitution – and thus "break" the dependency that interrogators sought to create.[180]

By the time the government ultimately transferred Padilla to civilian custody for prosecution in 2006, psychiatric experts found that he suffered from post-traumatic stress disorder as a result of prolonged isolation.[181] One military interrogator described Padilla as "a piece of furniture."[182]

Padilla was transferred to ADX upon conviction in civilian court and placed under SAMs. His treatment as a prisoner in the SAMs unit largely mirrors his conditions in military custody as an alleged enemy combatant.[183]

In sum, robust scientific and anecdotal evidence confirms that long-term solitary confinement causes severe physical and psychological damage. Given that SAMs create isolation even *more* extreme than that of standard solitary confinement, the substantial risks of permanent harm are only heightened.

## VI. SAMs Coerce Pre-Trial Detainees into Pleading Guilty

The DOJ inflicts these draconian SAMs restrictions on individuals before they are ever convicted of a crime. According to the former U.N. Special Rapporteur on Torture, "the practice of solitary confinement during pretrial detention creates a de facto situation of psychological pressure which can influence detainees to make confessions or statements against others and undermines the integrity of the investigation."[184] Research has shown that people detained prior to trial are more likely to plead guilty than those who are released pending trial.[185] SAMs exacerbate the already coercive effects of pre-trial detention by depriving prisoners of virtually all contact with other living beings. And they may remain under these restrictive conditions for months or even years pending trial.

The coercive nature of these harsh conditions is no accident: experience shows that the DOJ uses total isolation as a tool to break people, just as the CIA did during its foray into detention.[186] SAMs, says an attorney who has represented numerous clients under these restrictive measures, are "meant to bludgeon people into cooperating with the government, accepting a plea, or breaking their spirit."[187] Another attorney concurred, noting that "everyone knows" that solitary confinement is disorienting and dehumanizing; "this is no surprise and this is calculated."[188] The sister of a prisoner under SAMs opined that these measures appear to be "intentionally used on certain people to break them; to make the prisoner and his family's lives as difficult as possible."[189]

> SAMs, says an attorney who has represented numerous clients under these restrictive measures, are "meant to bludgeon people into cooperating with the government, accepting a plea, or breaking their spirit."

This coercion undermines the most basic principle of the U.S. criminal justice system: defendants are presumed innocent until proven guilty.[190] As the cases of Fahad Hashmi, Uzair Paracha, and Mohamed Warsame illustrate, the government sends a clear message to prisoners accused of crimes related to terrorism: Waive your Fifth Amendment right not to incriminate yourself, or face the consequences of SAMs.

Fahad Hashmi was placed under SAMs five months after he was extradited to the U.S. to face charges, around the time he rejected an offer from the Bush administration to cooperate. While the DOJ cited Hashmi's "proclivity for violence" as the reason for imposing SAMs, Hashmi had no criminal record, had never been charged with committing or assisting any act of violence, and had no direct links to terrorist groups.[191] His pre-SAMs detention, both in the U.S. and in the U.K. before his extradition, had also been without incident.

Hashmi spent three years under solitary confinement and SAMs at the MCC before finally pleading guilty in the face of decades in prison, in exchange for a fifteen-year sentence. The government, which had insisted throughout Hashmi's pre-trial detention that he must be kept under these extreme measures, removed the SAMs the year after he pleaded guilty. U.N. Special Rapporteur on Torture Juan Méndez found that Hashmi's SAMs were "no more than a punitive measure that is unworthy of the United States as a civilized democracy."[192]

**Exhibit 30 – 455**

Uzair Paracha was placed under SAMs nine months after his arrest, when he refused to accept a plea deal.[193] Under the terms of his pre-trial SAMs, Paracha was prohibited from speaking with anyone inside the prison but his guards. After he was convicted, the government permitted him to communicate with other prisoners.[194] "I faced the harshest part of the SAMs while I was innocent in the eyes of American law," Paracha wrote.[195]

Mohammed Warsame spent five and a half years under SAMs pending trial.[196] In 2003, Warsame was picked up by federal agents and interrogated about terrorism-related activities.[197] After Warsame refused to cooperate, he was arrested, denied bail, and placed under SAMs.[198] The government vigorously fought Warsame's five motions to lift his harsh conditions of confinement, claiming "[t]here is every reason to believe that if the defendant were moved to 'a more normal pretrial detention facility,' the Marshals Service would not be able to adequately limit the defendant's ability to communicate with and contact known and suspected terrorists."[199] Then in 2009, the government offered to drop four of Warsame's five charges if he pleaded guilty to the remaining count of material support and agreed to immediate deportation following two more years in prison.[200] The government's newfound willingness to end Warsame's confinement – and allow open communication – suggests that it used SAMs to coerce Warsame into accepting a plea offer.[201] Indeed, after Warsame accepted the plea deal, the judge stated that "the Court has seen nothing in the record or the last five years of proceedings demonstrating that Warsame posed an immediate danger."[202]

**Exhibit 30 -  456**

## VII. SAMs Prevent Prisoners and Their Attorneys from Effectively Advocating in Court

Defendants who decide to fight their charges in court face barriers created by SAMs every step of the way. The deleterious psychological effects of SAMs prevent defendants from participating in their own defense. Defendants and attorneys face difficulties forming productive relationships under the severe restrictions and monitoring of SAMs. And the gag orders that accompany SAMs have a chilling effect on lawyers, inhibiting both investigation and public advocacy. The gag orders also prevent the defendant from speaking publicly and the press from directly investigating, creating a system where the government effectively controls the narrative surrounding the case. These obstacles undermine basic constitutional protections owed to criminal defendants.

> One attorney described how SAMs "eliminate [defendants] as participants in their defense."

SAMs deprive defendants of the ability to participate in their own defense. One attorney described how these measures "dehumanize defendants and create a situation where they cannot exist in a defiant posture [to] fight the case," and ultimately "eliminate them as participants in their defense."[203] This is particularly problematic, the attorney said, with respect to a defendant's right to testify: "The first time [a defendant] talk[s] to anyone besides me after two and a half years in solitary confinement is the jury. There is no way to prepare [him] for it. It really discourages the client from testifying."[204]

> Years of isolation and sensory deprivation rendered Jose Padilla effectively unable to communicate with his attorneys, let alone strategize about his case. A psychological evaluation revealed that Padilla could not "assist his attorneys in reviewing the evidence provided by the government," and was unable to even "consider watching the tapes [of his interrogation] or reviewing the evidence against him."[205] When reminded of the importance of reviewing the evidence in order to fight the case, Padilla "plead[ed] with his attorneys not to 'make him' look at or listen to the material."[206] Moreover, his trauma has resulted in memory gaps, rendering him unable to provide vital information.[207]
>
> The psychologist concluded that Padilla suffered from "post traumatic stress disorder, complicated by the neuropsychiatric effects of prolonged isolation" and as such lacks the capacity to assist in his own defense.[208]

Further, SAMs "can destroy or even inhibit the birth of a trusting relationship" between a defendant and his attorney.[209] The SAMs regime creates a climate of fear and suspicion. Particularly when attorneys are appointed instead of sought out and hired, they face challenges gaining a client's trust. Many defendants understandably fear that their appointed attorneys are part of the system that has harmed them since their arrest: An unknown person who may look and dress like the government lawyers approaches the client and says that everything they say will be monitored; the lawyer cannot reveal anything the defendant tells him, even if it will help his case; and the client cannot talk to anyone but his immediate family.[210] As a result, SAMs "suggest to the client that [defense attorneys] are under the government's control and are therefore untrustworthy."[211]

> Defendants and their attorneys must operate in an environment where everything they say, write, or signal may be monitored by the government.

Even when attorneys successfully establish a relationship with the client, SAMs chill candid conversations about trial strategy. Under certain circumstances, SAMs regulations permit monitoring of attorney-client communications.[212] Accordingly, defendants and their attorneys must operate in an environment where everything they say, write, or signal may be monitored by the government. While SAMs regulations purportedly create a firewall whereby no official involved in prosecuting a case can listen to these privileged conversations,[213] attorneys' conversations are chilled nonetheless.[214]

Many defense attorneys interviewed for this report operated under the assumption that all of their conversations were seen and heard.[215] Some lawyers avoid speaking with clients on the phone because they worry that listeners will hear confidential information.[216] Even in-person visits are not necessarily secure. In MCC, cameras mounted to the walls in attorney-client visiting rooms stare down throughout the visit, creating the appearance – if not the reality – that interactions are constantly watched.[217] This monitoring, whether perceived or actual, leads to self-censorship. Lawyers avoid certain questions, fearing they will tip off the government about their trial strategy, and defendants withhold information that could help with their defense.

Further, conditions in facilities housing SAMs prisoners impede meaningful access to counsel. For instance, in MCC's 10 South attorneys and clients are placed in separate cells during visits, divided by a mesh grate that makes sharing documents difficult and making eye contact impossible.[218] As a result of all of these circumstances, "[p]otential witnesses will not be identified, documents will not be located, and the entire defense investigation of the case will be limited to those discovery materials produced by the government."[219]

Outside of attorney-client communications, SAMs prevent lawyers from effectively investigating their cases. As an initial matter, because of the huge toll SAMs exact on defendants, attorneys often need to expend much of their limited resources fighting their client's conditions of confinement.[220] As a result, they have less time to spend preparing a substantive defense to the charges.[221] When they do investigate, attorneys face high barriers in building trust with witnesses.[222] Many people – not unfairly – assume that the lawyer is "in cahoots with the FBI" because the attorney cannot reveal any information about her client, and all of the attorney's conversations regarding the client are monitored.[223] One mitigation specialist described speaking with witnesses close to the defendant: The "first thing they ask is 'How's he doing? What did he say?'"[224] But SAMs prohibit her from answering that basic question. This inability to speak freely "kills the relationship."[225]

> The consequences of [violating SAMs] are so significant and frightening that most lawyers err on the side of caution even with things that would be beneficial to their clients.

Additionally, SAMs create an uneven playing field, eroding the right to a fair trial. SAMs prevent the defendant and his advocates from educating the public about the defendant's side of the case, because in doing so the attorney risks violating the SAMs prohibition against relaying information from the prisoner to third parties and the media.[226] The government, however, is able to selectively leak information about the defendant's purported dangerousness or supposed lack of remorse. As a result, media coverage about SAMs defendants is one-sided. A mitigation specialist described one situation in which a client had expressed remorse in two written statements, but the prosecution invoked SAMs regulations to refuse the attorney's requests to release those statements. This decision "had a huge impact on the case."[227]

**Exhibit 30 –  458**

The risk of prosecution for violating SAMs leads attorneys to self-censor. As one attorney stated:

> The lines are not clearly drawn, so it ends up sort of amplifying the fear because it's hard to know whether you're going to say something that is going to sort of trip someone's wire. The consequences of [violating SAMs] are so significant and frightening that most lawyers err on the side of caution even with things that would be beneficial to their clients.[228]

Those consequences include criminal prosecution. Defense attorney Lynne Stewart was sentenced to a decade in prison for revealing her client's statements to the press, in violation of his SAMs.[229] Multiple attorneys interviewed for this report described feeling wary of representing people under SAMs in the wake of Stewart's conviction.[230] Stewart's prosecution "has had a chilling effect on lawyers throughout the country; many will not take these terror cases, and those who do operate with excessive caution about what they can say in public and about whom they consult for legal strategy."[231]

Beyond attorneys, other members of a legal team also face the threat of prosecution. Mohamed Yousry, the government-appointed interpreter who translated communications between Lynne Stewart and her client, was also convicted of violating SAMs – not for any public disclosure, but rather for translating the client's letters and statements.[232] As a translator, Yousry was not even asked to sign the SAMs order: from his understanding, the lawyers would tell him what communications violated the law. Yet he was prosecuted along with Stewart and sentenced to sixteen months in prison.[233] Once an adjunct lecturer at the City University of New York completing his doctoral dissertation, Yousry has been unable to find a job since his release from prison.[234]

Finally, SAMs can prevent prisoners from bringing legal challenges after conviction. Because convicted prisoners are not guaranteed the Sixth Amendment right to counsel beyond the first appeal,[235] an unrepresented convicted prisoner's only two options are to represent himself or reach out to an attorney. But as described above, SAMs often so psychologically damage defendants that they cannot represent themselves. And because SAMs prohibit prisoners from writing to anyone who is not on their list of approved contacts, it can be nearly impossible to find a lawyer.[236] Left to fend for themselves from the confines of their cell, prisoners often lack any meaningful administrative remedy and face significant obstacles to judicial review.

> Left to fend for themselves from the confines of their cell, prisoners often lack any meaningful administrative remedy and face significant obstacles to judicial review.

Abouhalima filed an administrative remedy request concerning his access to lawyers, asking "how I could find a lawyer willing to accept my case without first contacting that lawyer and letting him or her know about me and that case."[237] The BOP refused to modify its approach, claiming the Attorney General imposed the restrictions and BOP "merely implemented them."[238] Abouhalima was ultimately allowed to submit names of potential advocates, but he was only permitted to contact up to ten lawyers through mail that would be copied and analyzed by the FBI.[239]

An attorney described this situation from her perspective: "You're putting me as a lawyer in a position of either not being able to respond to this person in the way he deserves because the condition is that the communication is monitored, or just not respond at all," isolating the prisoner even more.[240]

**Exhibit 30 -  459**

Even those prisoners who secure a lawyer risk having their cases dismissed in court if the prisoner has not "exhausted" the BOP's Administrative Remedy Program ("ARP").[241] Exhausting the ARP requires prisoners to (1) raise the issue of concern informally with BOP staff,[242] (2) wait for the staff's response,[243] (3) obtain and file a Remedy Form,[244] (4) wait for the prison's response to the request,[245] (5) obtain and file a Regional Appeal Form,[246] (6) wait for the BOP Regional Office's response,[247] and (7) obtain and submit a Central Office Appeal Form.[248] BOP officials may return without response any filing that fails to adhere to extensive regulations concerning form and timing.[249] Attorneys may not submit these complicated requests or appeals on the prisoner's behalf.[250]

As the case of Mostafa Kamel Mostafa demonstrates, it is nearly impossible for some SAMs prisoners to follow this process. Thus, while the ARP ostensibly affords prisoners an opportunity to redress issues related to their confinement,[251] in practice it can prevent courts from conducting any substantive review of SAMs conditions. Fortunately, U.S. district courts are increasingly holding that the exhaustion requirement does not apply to SAMs challenges, at least when the challenge relates to conditions that impede the prisoner's ability to prepare his defense.[252]

> Mostafa Kamel Mostafa is a prisoner with a physical disability – the amputation of both arms – who has been living under SAMs since early 2013.[253] For years he has been requesting ARP review of his conditions, with little success.[254] For instance, on at least one occasion, a BOP official returned his request for administrative review on the grounds that the carbon copy of Mostafa's request was insufficiently clear.[255] The writing on the carbon copy was faint because Mostafa could not press hard while writing the request, due to the inadequacy of his BOP-issued prosthetic device – the very subject of Mostafa's previous ARP requests.[256]
>
> When Mostafa's defense counsel wrote to the Warden concerning his conditions, she was instructed that Mostafa should seek review through the ARP.[257]

**Exhibit 30 – 460**

## VIII. SAMs Erode Democratic Accountability

SAMs undermine the fundamental principle of democratic accountability by silencing those who have experienced the harms of SAMs. Prisoners themselves are categorically prohibited from speaking to reporters,[258] and the SAMs gag order allows the government to criminally prosecute other individuals for repeating anything a SAMs prisoner has said.[259] Consequently, family members of SAMs prisoners often adopt a policy of declining interviews with journalists altogether.[260] The same is true for lawyers, particularly following the prosecution of Lynne Stewart and her interpreter.[261] The public must, then, rely on the government for any information concerning SAMs and those subjected to them. That information is sparse – it took three years of litigation for Human Rights Watch to get basic information about SAMs conditions.[262]

> The SAMs gag order allows the government to criminally prosecute other individuals for repeating anything a SAMs prisoner has said.

Since only one side has the power to speak, citizens are denied the full picture of what their government is doing in their name.[263] Claims of psychological damage, abuse, and discrimination cannot be effectively investigated, and the Attorney General's justifications for SAMs cannot be tested. This situation allows the government to selectively release information to exaggerate the effectiveness of particular policies while suppressing evidence of those policies' failures.[264] It allows prosecutors to vilify SAMs detainees in public but it prevents defense attorneys from revealing the defendant's perspective. As was the case with the CIA's foray into secret detention,[265] it is a situation ripe for abuse.

In September 2013 the U.K.-based organization Cage Prisoners reported that Mahdi Hashi, a former British citizen of Somali origin who was detained under SAMs for three years pending trial at MCC, went on a hunger strike to protest his conditions of confinement.[266] Hashi was reportedly hospitalized with jaundice and near-liver failure.[267]

Journalists could not verify this claim because the people with access to this information – Hashi, his family, and his U.S. lawyer – were prohibited from talking under the SAMs. And prosecutors and prison administrators declined to comment.[268] Reporters have not been able to establish whether the hunger strike occurred, how long it lasted, or whether Hashi, like many detainees at Guantánamo Bay, was being force-fed.[269] Even his former lawyers in the U.K. could not know his condition. Thus, whereas hunger strikes and brutal force-feeding at Guantánamo Bay sparked a national debate,[270] similar protests by SAMs prisoners and the treatment they may suffer as a result cannot be reported and have been largely invisible.

**Exhibit 30 – 461**

## IX. SAMs Invite Discrimination

The lack of process and transparency surrounding SAMs allows for their discriminatory application against disfavored minorities. Indeed, the limited information available suggests that such discrimination is already occurring. Due to the extreme secrecy surrounding SAMs, the official list of individuals held under these measures remains a carefully guarded BOP secret. Moreover, the BOP refuses to divulge SAMs prisoners' religion on the dubious grounds that such information would interfere with the prisoners' privacy rights.[271] However, the available evidence suggests that the government currently uses SAMs disproportionately against Muslims.

> Out of the thirty-nine current or former SAMs prisoners the authors identified, at least twenty-eight are Muslim.

Specifically, the authors have compiled through public sources a list of all individuals known to have been incarcerated under SAMs. Out of the thirty-nine current or former SAMs prisoners the authors identified,[272] at least twenty-eight are Muslim.[273] Virtually every attorney the authors interviewed confirmed this high rate of Muslims under SAMs.

In addition, FOIA documents reveal that a disproportionately high percentage of prisoners in Communication Management Units ("CMUs") are Muslim.[274] CMUs are federal prison units that share some key elements of SAMs – constant monitoring and heavy restrictions on prisoners' communications with the outside world – but they differ in that prisoners are not subjected to solitary confinement.[275] While Muslim prisoners constitute only six percent of the total federal prison population,[276] 2013 data suggests that they comprised 50% of the CMU population in that year,[277] and 2014 data indicates that the percentage rose to 60% the following year.[278]

> Concerns about the discriminatory application of federal laws have escalated in the early months of the Trump administration.

Both SAMs and CMUs are part of a larger "counterterrorism" political framework that has targeted Muslims since 9/11. For example, shortly after the 9/11 attacks, the Attorney General authorized the arrest of "any Muslim or Arab man encountered during the investigation of a tip received in the 9/11 terrorism investigation" who had violated the terms of his visa, and instructed officials to hold all such individuals until the FBI "affirmatively cleared them of terrorist ties."[279] Pursuant to these directives, government officials rounded up more than 750 Muslim men and detained them for months while subjecting them to solitary confinement and physical abuse.[280] In early 2002, the Bush administration began labeling certain Muslims "enemy combatants," denying them legal protections, and detaining them at Guantánamo Bay, a prison reserved for Muslim men and boys.[281] While public outrage began to build over Guantánamo Bay, however, the government developed what is often referred to as "Guantánamo North"– special units and regimes within domestic prisons that are subject to a separate system of justice, such as CMUs and SAMs.[282]

Concerns about the discriminatory application of federal laws have escalated in the early months of the Trump administration. President Trump has openly supported discrimination against Muslims,[283] and senior advisors in the administration have publically stated they do not consider Islam a religion.[284] After only eight months in office, the Trump Administration has signed two executive orders barring Muslim immigrants and refugees from particular countries from entering the United States that have been rejected by federal courts as a likely violation of the Establishment Clause,[285] and taken steps to

**Exhibit 30 –  462**

change the government's "Countering Violent Extremism" program to focus only on "Islamic Extremism," removing right-wing extremist groups from its mandate.[286] Attorney General Jeff Sessions, who is in charge of placing people under SAMs, was one of the first policymakers to publically defend Trump's Muslim ban, and has repeatedly spoken out against immigration from Muslim countries.[287]

President Trump has also deemed "criminal" or "dangerous" other groups including Mexican immigrants,[288] undocumented people,[289] and political protestors.[290] And President Trump has been unabashed in his rejection of transparency – he regularly accuses and punishes news organizations that are critical of him.[291] Given the Trump administration's blatantly discriminatory statements and policies, and penchant for opacity, there is a high risk that the Executive will target disfavored individuals and groups with its discretionary power to impose SAMs.

> Given the Trump administration's blatantly discriminatory statements and policies, and penchant for opacity, there is a high risk that the Executive will target disfavored individuals and groups with its discretionary power to impose SAMs.

**Exhibit 30 – 463**

## X. SAMs Violate U.S. and International Law

The harsh conditions imposed on SAMs prisoners violate fundamental rights guaranteed by the U.S. Constitution and international law. The prolonged isolation and sensory deprivation experienced by SAMs prisoners constitutes cruel and unusual punishment, and can rise to the level of torture under the Eighth Amendment and international human rights law. The use of SAMs infringes on the right to a fair trial, particularly when SAMs are imposed before trial, while the prisoner is presumed innocent. And SAMs restrict fundamental human rights and civil liberties, such as the rights to free speech and association, due process, and equal treatment.

### A. SAMs Constitute Impermissible Treatment and Punishment

SAMs constitute impermissible punishment under U.S. and international law. The Eighth Amendment and international law prohibit torture, which encompasses both physical and psychological harms.[292] Increasingly, U.S. courts are recognizing that harms such as those inflicted by prolonged isolation can rise to the level of cruel and unusual punishment, in violation of the Eighth Amendment.[293] This growing recognition of prisoners' social needs reflects "evolving standards of decency that mark the progress of a maturing society."[294] Justice Kennedy recently emphasized the constitutional dangers of solitary confinement, noting the "human toll wrought by extended terms of isolation."[295] Picking up on Justice Kennedy's opinion, in March 2017 Justice Breyer affirmed that prolonged solitary confinement "raises serious constitutional questions."[296]

Prolonged solitary confinement also violates international legal prohibitions on torture and other forms of cruel, inhuman, or degrading treatment. International law defines torture as the intentional infliction of severe mental or physical suffering as punishment, for the purpose of obtaining a confession, or for any reason based on discrimination.[297] Under the newly revised U.N. Standard Minimum Rules for the Treatment of Prisoners, or "Mandela Rules," prolonged solitary confinement – defined as lasting longer than fifteen days – constitutes torture or other cruel, inhuman, or degrading treatment.[298] The monitoring body of the U.N. Convention Against Torture has called on the United States to substantially limit its use of prolonged isolation,[299] and the Inter-American Court of Human Rights has described solitary confinement as "cruel and inhuman treatment[], damaging to the person's psychic and moral integrity and the right to respect of the dignity inherent to the human person."[300] The former U.N. Special Rapporteur on Torture has recognized the "adverse acute and latent psychological and physiological effects" of prolonged isolation,[301] and in 2013, he specifically determined that solitary conditions in ADX prison "violate[] the obligations of the United States under international law."[302]

> Under the newly revised U.N. Standard Minimum Rules for the Treatment of Prisoners, or "Mandela Rules," prolonged solitary confinement—defined as lasting longer than fifteen days— constitutes torture or other cruel, inhuman, or degrading treatment.

If prolonged solitary confinement constitutes inhumane treatment or torture, confinement under SAMs is even more extreme. SAMs are imposed *in addition to* solitary confinement, are inherently prolonged, and their pre-trial application can coerce people into pleading guilty.[303] In 2011, the then-Special Rapporteur on Torture opposed the extradition to the United States of certain individuals facing terrorism-related charges on the ground that it may violate international law.[304] He specifically cited the danger that the

**Exhibit 30 – 464**

accused would be placed under solitary confinement and SAMs, and could therefore face torture or other cruel, inhuman, or degrading treatment or punishment.[305]

## B. SAMs Violate The Right to a Fair Trial

### 1. Pre-Trial Punishment and Coercion

The presumption of innocence is a fundamental precept of the U.S. criminal justice system and international law.[306] By imposing extreme restrictions on people based on the crime for which they have been charged, SAMs eviscerate that presumption. The extreme and debilitating conditions imposed pursuant to SAMs constitute impermissible pre-trial punishment, prohibited under both U.S. and international law.[307]

Furthermore, leveraging SAMs to induce defendants to plead guilty violates the prohibitions against coercion in the Fifth and Fourteenth Amendments of the U.S. Constitution and international law.[308]

The Supreme Court has recognized that holding someone in seclusion – particularly away from lawyers, friends, and family – creates an environment that is ripe for coercion.[309] The likelihood of these coercive effects, in part, prompted the U.N. Committee on Torture to recommend the prohibition of solitary confinement, particularly for pre-trial detainees.[310]

> The extreme and debilitating conditions imposed pursuant to SAMs constitute impermissible pre-trial punishment, prohibited under both U.S. and international law.

### 2. Right to Participate in Defense

Defendants have a right under U.S. and international law to participate meaningfully in their own defense.[311] The Supreme Court "has long recognized that when a State brings its judicial power to bear on [a] defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense."[312] This right encompasses an "opportunity to participate meaningfully" in the proceeding.[313] If a defendant's mental state is so compromised that he cannot understand the charges against him, consult with his attorney, or assist in preparing his defense, he cannot be subjected to trial.[314] The documented severe psychological impact of SAMs can render defendants unable to discuss strategy with their attorneys or participate meaningfully in their case, depriving them of their rights under U.S. and international law.

### 3. Effective Assistance of Counsel

The right to counsel is "indispensable to the fair administration of our adversarial system of criminal justice."[315] The U.S. Supreme Court has repeatedly emphasized the necessity of lawyers to protect defendants from state power and impermissible coercion.[316] These concerns are particularly acute when defendants are detained prior to trial, isolated from their loved ones, and facing discrimination and public hostility.[317] International legal bodies have reiterated that attorneys serve as an essential safeguard against government coercion and other human rights violations.[318]

In restricting SAMs defendants' access to counsel,[319] SAMs infringe upon this right. SAMs burden the right to counsel from the outset by prohibiting prisoners' access to counsel until an attorney agrees to be subject to the SAMs and the government approves the attorney. This approval process may constitute "[r]egulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts."[320]

SAMs further prevent attorneys from effectively meeting with their clients to prepare their case. A fundamental component of the right to counsel is attorney-client privilege: Defendants and their attorneys

must be able to speak freely to each other, without fear that their conversations will be monitored.[321] As the Supreme Court has acknowledged, government interception of attorney-client communications inhibits "free exchanges between defendant and counsel because of the fear of being overheard."[322] International law similarly protects an attorney's right to meet with clients in private, free from government intrusion.[323] Provisions of SAMs allowing the government to monitor attorney-client communications violate this right.[324] Further, international and regional human rights bodies emphasize that the right to counsel includes the ability to meet in facilities where trial preparation is practicable.[325] Challenging physical conditions in facilities like ADX Florence and the MCC may unlawfully inhibit the attorneys' abilities to effectively meet with their clients.

> As the Supreme Court has acknowledged, government interception of attorney-client communications inhibits "free exchanges between defendant and counsel because of the fear of being overheard."

SAMs also prohibit attorneys from advocating for their clients in public. This becomes particularly important when the government selectively discloses negative information about a defendant, potentially prejudicing the jury pool.[326] The U.S. Supreme Court has recognized that defense lawyers have a right – and sometimes even a duty – to defend their client's reputation in the public arena.[327] International legal principles likewise protect attorneys' rights to speak to the public free from interference.[328] The SAMs gag order prohibits lawyers from fulfilling this obligation of zealous advocacy.

## C. SAMs Violate Fundamental Civil Liberties

### 1. Right to Free Speech
A number of SAMs provisions burden free speech rights guaranteed under the First Amendment and international law.[329] While prisoners' First Amendment rights are limited, restrictions on prisoners' rights cannot be arbitrary or irrational.[330] SAMs restrictions on prisoners' communications are impermissibly overbroad because they restrict far more speech than is necessary to achieve their stated purpose of protecting national security.[331] The censorship regime that restricts prisoners' access to materials also unjustifiably restricts their First Amendment "right to receive information and ideas."[332] The gag order accompanying SAMs restrictions further violates prisoners' family members' First Amendment rights, functioning as content-based restrictions on their right to speak.[333] Further, by forbidding journalists from any form of communication with SAMs prisoners, SAMs regulations may violate newsgatherers' First Amendment rights to access information and the public's concomitant right to receive information.[334]

### 2. Right to Association
SAMs violate prisoners' rights to associate with forms of community. By severely curtailing their ability to maintain relationships with family members, SAMs violate the right to family integrity, which is recognized in the U.S. Constitution and protected under international human rights law.[335] Restrictions on group prayer, along with limited access to chaplains and religious texts, further burden their right to exercise their religion under U.S. and international law.[336] Together, these restrictions deprive prisoners under the debilitating conditions of SAMs of their ability to access lifelines of support and community.

### 3. Right to Due Process
SAMs violate prisoners' rights to protection against deprivations of life, liberty, or property without the due process of law – particularly, the requirements of adequate notice and a fair hearing. The government's failure to sufficiently explain why SAMs are authorized for certain prisoners means

**Exhibit 30 –  466**

that people lack notice of what behavior leads to their imposition. The boilerplate language used to justify individual SAMs inhibits people from effectively challenging their conditions. Deficiencies in the Administrative Remedy Program and barriers to accessing federal courts make challenging the conditions after they are imposed extremely difficult.[337] Further, courts' consistent deference to the Executive's arguments that SAMs are necessary based on broad and vague allegations of "national security interests" has limited meaningful judicial review of the purported justifications for SAMs.

> The boilerplate language used to justify individual SAMs inhibits people from effectively challenging their conditions.

Prison conditions trigger these due process protections when a prisoner suffers from an "atypical and significant hardship" in relation to the "ordinary incidents of prison life,"[338] and particularly when those conditions last for a long time.[339] The Supreme Court determined that the conditions of extreme isolation and infrequent review at a state supermax prison were both atypical and significant compared to ordinary prison life.[340] Numerous appellate courts have held that prolonged isolation implicates prisoners' due process rights under this standard.[341] SAMs bear many of the same features condemned in these cases: they impose more isolation than other solitary conditions and deprive prisoners of almost all human contact; they can last for an entire year without review, and can be renewed indefinitely; and they bar prisoners from participating in programs that would ease their conditions as a reward for good behavior.

### 4. Right to Equal Treatment

To the extent that SAMs are being applied arbitrarily and selectively against Muslims, they violate the rights to equal protection under the Fifth Amendment[342] and international law.[343] Even if a law or policy does not explicitly discriminate on the basis of religion, the First and Fifth Amendments are violated by "[o]fficial action that targets religious conduct for distinctive treatment."[344] SAMs restrictions, such as restrictions on group prayer and access to imams, disproportionately impact Muslims. Further, given the disproportionate number of Muslims that have been subjected to SAMs, these measures raise serious constitutional concerns about the targeting of Muslims.

**Exhibit 30 –  467**

## Recommendations

**End the Use of SAMs**. Given abundant evidence that prolonged total isolation causes irreparable damage to prisoners, SAMs constitute cruel and unusual punishment under all circumstances, and, when used pre-trial or for any reason based on discrimination, they are tantamount to torture. The U.S. government should immediately cease subjecting prisoners to SAMs. Regardless of any real or purported dangers a prisoner might pose, the government cannot impose a policy that amounts to systematic cruelty or torture. The government must find another way to protect the public while upholding basic human rights.

**Increase Transparency**. The DOJ and the BOP should immediately release basic information about prisoners under SAMs, including the identities of all prisoners who have been subjected to SAMs, their conditions of confinement, and the justifications for imposing SAMs on those individuals. Moreover, the government should allow prisoners, family members, and attorneys to respond to the government's allegations in public, and permit those who have witnessed first-hand the effects of SAMs to participate in public debate.

**Allow Independent Monitoring**. The BOP should grant full and unfettered access to ADX, MCC, and other federal prisons where SAMs prisoners are held pre-trial and post-conviction to the U.N. Special Rapporteur on Torture, whose office has made repeated requests for such access to no avail. There is no justification for denying the Special Rapporteur and other independent human rights monitors access to SAMs prisoners.

**Exhibit 30 –  468**

# Endnotes

1 *See, e.g.*, Hell is a Very Small Place: Voices from Solitary Confinement (Jean Casella et al. eds., 2016); Reginald Dwayne Betts, *Only Once I Thought About Suicide*, 125 Yale L.J. F. 22 (2016), http://www.yalelawjournal.org/forum/only-once-i-thought-about-suicide; Shane Bauer, *Solitary in Iran Nearly Broke Me. Then I Went Inside America's Prisons,* Mother Jones (2012), http://www.motherjones.com/politics/2012/10/solitary-confinement-shane-bauer.

2 Special Rapporteur on Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, *Interim Rep. of the Special Rapporteur of the Human Rights Council on torture and other cruel, inhuman, or degrading treatment or punishment*, 76, U.N. Doc. A/66/268 (Aug. 5, 2011) (by Juan Méndez) [hereinafter *Special Rapporteur on Torture 2011 Report*].

3 For an overview of the national debate about solitary confinement, see The Liman Program, Time in Cell: The ASCA-Liman 2014 National Survey of Administrative Segregation in Prison 1-2 (2014), https://law.yale.edu/system/files/area/center/liman/document/asca-liman_administrativesegregationreport.pdf. For statements from corrections officials, see *infra* Part V.

4 Dep't of Justice, Federal Bureau of Prisons, Special Administrative Measures, at BOP000089-95 (2013) [hereinafter BOP FOIA Documents] (appended to this Report) (listing dates when SAMs were first imposed on prisoners currently confined under SAMs, the earliest of which date back to 1996). As described further in Section II, *infra*, the authors acquired these documents as a result of FOIA litigation in Human Rights Watch v. Dep't of Justice Federal Bureau of Prisons, No. 13-CV-7360, 2015 WL 5459713 (S.D.N.Y. Sept. 16, 2015).

5 *See, e.g.*, United States v. Mohamed, 103 F. Supp. 3d 281, 287-88 (E.D.N.Y. 2015); United States v. El-Hage, 213 F.3d 74, 81 (2d Cir. 2000).

6 *See* Declaration of Jonathan Manes in Support of Cross Motion for Summary Judgment, Ex. O 2, Human Rights Watch v. Dep't of Justice Federal Bureau of Prisons, No. 13-CV-7360, 2015 WL 5459713 [hereinafter Manes Decl.] (Plaintiff in a FOIA suit agreeing not to challenge the government's withholding of information that would reveal the religion of prisoners under SAMs).

7 *Preserving Our Freedoms While Defending Against Terrorism*: *Hearing Before the S. Comm. on the Judiciary*, 107th Cong. 14 (2001) (statement of Hon. Michael Chertoff, Ass't Att'y Gen., Criminal Div., Dep't of Justice).

8 Human Rights Watch & Columbia Law School Human Rights Institute, Illusion of Justice: Human Rights Abuses in US Terrorism Prosecutions 143 (2014), https://www.hrw.org/report/2014/07/21/illusion-justice/human-rights-abuses-us-terrorism-prosecutions [hereinafter Illusion of Justice].

9 *See* Letter from Jennifer A.H. Hodge, Director, Office of Enforcement Operations, D.O.J. Criminal Division, to Hope Metcalf, (June 8, 2017) [on file with authors].

10 *See* Center for Constitutional Rights, Communication Management Units 2 (2014), https://ccrjustice.org/sites/default/files/assets/CCR_CMU_2014Documents-20140709.pdf.

11 *See, e.g.*, Inter-Am. Comm'n Hum. Rts., *Towards the Closure of Guantanamo*, Report No. 20/15, OAS/Ser.L/V/II (2015), http://www.oas.org/en/iachr/reports/pdfs/Towards-Closure-Guantanamo.pdf.

12 *See* Hassan v. City of New York, 804 F.3d 277, 306-07 (3d Cir. 2015) (finding that New Jersey Muslims subject to NYPD suspicionless surveillance program stated valid claim of religious discrimination); Stipulation of Settlement and Order, Raza v. City of New York, No. 1:13-cv-03448 (E.D.N.Y. Mar. 20, 2017) (proposed settlement agreement in response to challenge to NYPD suspicionless surveillance program targeting Muslim communities in New York City).

13 *See, e.g.*, Turkmen v. Ashcroft, 589 F.3d 542 (2d. Cir. 2009) (challenge to sweeping round ups and abusive detention of Muslim, Arab, and South Asian non-citizens with no individualized suspicion of terrorism-related activity).

14 *See* Eric Lichtblau, *F.B.I. Steps Up Use of Stings in ISIS Cases*, N.Y. Times (June 7, 2016), https://www.nytimes.com/2016/06/08/us/fbi-isis-terrorism-stings.html?_r=0; Paul Harris, *Fake terror plots, paid informants: the tactics of FBI 'entrapment' questioned*, The Guardian (Nov. 16, 2011), https://www.theguardian.com/world/2011/nov/16/fbi-entrapment-fake-terror-plots.

15 *See, e.g.*, Tanvir v. Lynch, 128 F. Supp. 3d 756 (S.D.N.Y. 2015) (challenge to plaintiffs' placement on No-Fly List after refusing to serve as FBI informants due to their seriously held religious beliefs); Latif v. Holder, 28 F. Supp. 3d 1134 (D. Or. 2014) (finding that Department of Homeland Security's process for redressing erroneous placement of airline passengers on the "No-Fly List" carried a high risk of erroneous deprivation of constitutionally-protected liberty interests).

16 *See* Amna Akbar, *How Tarek Mehanna Went to Prison for a Thought Crime*, The Nation (Dec. 31, 2013), https://www.thenation.com/article/how-tarek-mehanna-went-prison-thought-crime.

17 *See, e.g.*, Jeremy Diamond, *Trump on torture: 'We have to beat the savages,'* CNN (Mar. 6, 2016), http://www.cnn.com/2016/03/06/politics/donald-trump-torture; Mark Hensch, *Trump won't rule out database, special ID for Muslims in US*, The Hill (Nov. 19, 2015), http://thehill.com/blogs/ballot-box/presidential-races/260727-trump-wont-rule-out-database-special-id-for-muslims; Jenna Johnson & Abigail Hauslohner, *'I think Islam hates us': A timeline of Trump's comments about Islam and Muslims*, Washington Post (May 20, 2017), https://www.washingtonpost.com/news/post-politics/wp/2017/05/20/i-think-islam-hates-us-a-timeline-of-trumps-comments-about-islam-and-muslims; Adam Serwer, *Jeff Sessions's Fear of Muslim Immigrants*, The Atlantic (Feb. 8, 2017), https://www.theatlantic.com/politics/archive/2017/02/jeff-sessions-has-long-feared-muslim-immigrants/516069.

18 *See* Vincent Charles Keating, *Will Donald Trump Bring Back Torture?*, The Wire (Jan. 21, 2017), https://thewire.in/101638/will-donald-trump-bring-back-torture.

19 For details about those requests, see Manes Decl., *supra* note 6, at 5.

20 For citation purposes, this report cites to the numbers in the lower right-hand corner of the released documents. These are the documents' "Bates" numbers, which the government assigned to the documents during processing of the FOIA requests.

21 Manes Decl., *supra* note 6.

22 *Id.* 11-25. In this litigation, Human Rights Watch was represented by Yale Law School's Media Freedom and Information Access Clinic.

23 *Id.* 27-45.

24 *Human Rights Watch*, No. 13-CV-7360, 2015 WL 5459713 at **9-11.

25 *See* Juan E. Méndez, *Preface* to Sharon Salev, Sourcebook on Solitary Confinement (2014), http://solitaryconfinement.org/uploads/JuanMendezPrefaceSourcebookOnSolitaryConfinementTranslation2014.pdf.

26 Most authors date the origination of SAMs to May 1996, when the Bureau of Prisons codified as an interim rule a regulation allowing for the implementation of "special administrative procedures that are reasonably necessary to protect persons against the risk of death or serious bodily injury." Prevention of acts of violence and terrorism, 61 Fed. Reg. 25,120 (May 17, 1996). The Bureau of Prisons had initially published an interim rule on preventing the disclosure of classified information in the Federal Register on October 13, 1995, without public comment. National security cases, 60 Fed. Reg. 53,490 (Oct. 13, 1995). The 1996 regulations were nearly identical to the 1995 rule regarding classified information, but added the violence and terrorism grounds. Both rules became final in 1997. National Security; Prevention of Acts of Violence and Terrorism, 62 Fed. Reg. 33,730 (June 20, 1997) (codified at 28 C.F.R. §§ 501.2, 501.3).

Just months after the BOP promulgated SAMs regulations, a federal judge in New York sentenced a gang member to serve his term in solitary confinement under similarly restrictive conditions. The individual had been convicted of ordering murders from prison. *See* United States v. Felipe, 148 F.3d 101, 106-107 (2d Cir. 1998). Although his restrictions were not imposed pursuant to SAMs, his case is often cited as the origin of SAMs. *See, e.g.*, Wadie E. Said, Crimes of Terror: The Legal and Political Implications of Federal Terrorism Prosecutions 136 (2015).

27 28 C.F.R. § 501.3 (2016).

28 *See* National Security; Prevention of Acts of Violence and Terrorism, 66 Fed. Reg. 55,062 (Oct. 31, 2001).

29 Memorandum issued by Michael B. Cooksey, Assistant Director, Correctional Programs Division, Federal Bureau of Prisons, on Guidance for Handling of Terrorist Inmates and Recent Detainees (Oct. 1, 2001) (on file with authors).

30 *Id.*

31 *See* Laura Rovner & Jeanne Theoharis, *Preferring Order to Justice*, 61 Am. U. L. Rev. 1331, 1406-08 (2012) (showing that Muslim prisoners were disproportionately selected for SAMs and providing examples of Christian terrorists who were not selected, despite their demonstrated capacity to disseminate dangerous information from prison).

32 28 C.F.R. §§ 501.2(c), 501.3(c) (2016).

33 28 C.F.R. §§ 501.2(c), 501.3(c) (2000) (stating SAMs can be extended upon notice "that the circumstances identified in the original notification continue to exist.").

34 28 C.F.R. §§ 501.2(c), 501.3(c) (2016); National Security; Prevention of Acts of Violence and Terrorism, 66 Fed. Reg. at 55,062-63 ("[T]his rule modifies the standard for approving extensions of the special administrative measures. The existing regulation requires that the head of the intelligence agency certify that 'the circumstances identified in the original certification continue to exist.' This standard, however, is unnecessarily static, as it might be read to suggest that the subsequent certifications are limited to a reevaluation of the original grounds. Instead, this rule provides that the subsequent certifications by the head of an intelligence agency may be based on any information available to the intelligence agency."); *see also* Rovner & Theoharis, *supra* note 31, at 1368.

35 28 C.F.R. § 500.1(c) (2016) (defining "inmates" covered by the rule to include pretrial detainees and material witnesses).

36 28 C.F.R. § 501.3(d) (2016). Under the SAMs regulations, the government must provide notice before monitoring attorney-client communications. However, the government may monitor those communications without providing notice to the attorney or defendant if it has authorization under FISA or the Title III wiretapping statute. *See* Memorandum from James Brown, Acting Ass't Att'y Gen. to James Sensenbrenner, Chairman, Comm. On the Jud. 51-53 (May 13, 2003), http://permanent.access.gpo.gov/websites/www.judiciary.house.gov/media/pdfs/patriotlet051303.pdf ("DOJ May 2013 Rep.").

37 *See* Rovner & Theoharis, *supra* note 31, at 1368.

38 28 C.F.R. §§ 501.2 (b), 501.3(b) (2016) (providing that notice "may be limited" at the discretion of prison staff).

39 *See* Geraldine Doetzer, *Hard Labor: The Legal Implications of Shackling Female Inmates During Pregnancy and Childbirth*, 14 Wm. & Mary J. Women & L. 363, 380 (2008) (noting "courts, prison officials, and inmates all recognize that so-called administrative 'remedies' are all but meaningless," requiring prisoners to "jump through time-consuming and ultimately futile hoops in order to justify a court action when the administrative process inevitably fails."). *But see* United States v. Hashmi, 621 F. Supp. 2d 76, 84 (S.D.N.Y. 2008) (considering the merits of a SAMs prisoner's claim despite the prisoner's failure to exhaust the BOP's Administrative Remedy Program).

40 *See infra* Part VII.

41 *See, e.g.*, Memorandum from Att'y Gen. to Charles E. Samuels, Jr., Director, Federal Bureau of Prisons re Origination of Special Administrative Measures for Pretrial Inmate Dzhokhar Tsarnaev (Aug. 27, 2013), United States v. Tsarnaev, No. 13-CR-10200 (D. Mass. Jun 27, 2013), ECF No. 100-1 ("The inmate shall be limited within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate by making statements audible to other inmates or by sending notes to other inmates"). Analysis of similar memoranda released through the Human Rights Watch FOIA litigation reveals that Tsarnaev's conditions are similar to those of other

**Exhibit 30 – 470**

SAMs prisoners. Indeed, those memoranda, appended to this Report, reveal that the DOJ does not recommend tailored conditions for each individual prisoner so much as it applies a boilerplate set of extremely isolative conditions.

42 *See, e.g.*, Memorandum from Lanny A. Breuer, Assistant Attorney General, to Charles E. Samuels, Jr., Director, Bureau of Prisons, "Extension of Special Administrative Measures Pursuant to 28 C.F.R. § 501.3 for Federal Bureau of Prisons Inmate [redacted]" at CRM000386 (Nov. 14, 2012) (appended to this Report) ("Religious Visitation").

43 *See, e.g., id.* at CRM000387 ("Family Call Monitoring").

44 *See, e.g., id.* at CRM000386 ("Rules for Telephone Calls").

45 *See, e.g., id.* at CRM000388 ("Visit Criteria"). Exceptions to the one-visitor-at-a-time rule may be made for "FBI-verified children of the inmate." *Id.*

46 *See, e.g., id.* at CRM000388 ("General correspondence with limitations"). Correspondence with U.S. courts, U.S. Attorney's Offices, and other federal law enforcement agencies is exempted from these limitations, "unless there is evidence of abuse of these privileges." *Id.* ("General correspondence without limitations").

47 *See, e.g., id.* at CRM000389.

48 *See, e.g., id.* ("No Communal Cells and No Communication Between Cells").

49 *See, e.g., id.* ("The inmate shall not be allowed to engage in group prayer with other inmates.").

50 *See, e.g., id.* ("The inmate shall not be permitted to speak, meet, correspond, or otherwise communicate with any member or representative of the news media in person; by telephone; by furnishing a recorded message; through the mail, his attorney, or a third party; or otherwise.").

51 *See, e.g., id.* at CRM000391 ("Access to Mass Communications").

52 *See, e.g., id.* at CRM000384 ("No telephone call/communication, or portion thereof, except as specifically authorized by this document: (a) Is to be overheard by a third party. (b) Will be patched through, or in any manner forwarded or transmitted, to a third party. (c) Shall be divulged in any manner to a third party . . . ."); *see also* Interview with Arun Kundnani, Author, in New York, N.Y. (Feb. 4, 2016).

53 In fact, SAMs are far more restrictive than even the most severe conditions found in most established legal systems. *See, e.g.*, U.K. Ministry of Justice, *Government response to the review of Islamist extremism in prisons, probation and youth justice* (Aug. 22, 2016), https://www.gov.uk/government/publications/islamist-extremism-in-prisons-probation-and-youth-justice/government-response-to-the-review-of-islamist-extremism-in-prisons-probation-and-youth-justice; Alison Hind, *France prepares to tackle jihadi recruitment in prisons*, RFI (July 2, 2015), http://en.rfi.fr/france/20150207-france-prepares-tackle-jihadi-recruitment-prisons; Chris Vallance, *The Prison Wing Housing Only Terrorists*, BBC (May 20, 2016), http://www.bbc.com/news/uk-36336011.

54 BOP FOIA Documents, *supra* note 4, at BOP000237 (revealing that 36 out of 52 SAMs prisoners were held at ADX Florence as of November 25, 2013).

55 U.S. Dep't of Justice, Report and Recommendations Concerning the Use of Restricted Housing 43-44 (2016), https://www.justice.gov/dag/file/815551/download [hereinafter DOJ Solitary Report].

56 Declaration of Nidal Ayyad at 24, Ayyad v. Holder, No. 05-cv-02342 (D. Colo. Aug. 12, 2013) [hereinafter Ayyad Decl.]; Illusion of Justice, *supra* note 8, at 146.

57 DOJ Solitary Report, *supra* note 55, at 44.

58 *See id.*; Yousef v. United States, No. 12-CV-2585-RPM, 2014 WL 1908711, at *3 (D. Colo. May 13, 2014); Eli Hager, *My Life in the SuperMax*, The Marshall Project (Jan. 8, 2016), https://www.themarshallproject.org/2016/01/08/my-life-in-the-supermax#.JsEm3o4ev.

59 Ayyad Decl., *supra* note 56, at 27.

60 Telephone interview with Michael Caruso, Federal Public Defender, Southern District of Florida (Oct. 24, 2016).

61 Rovner & Theoharis, *supra* note 31, at 1405

62 Ayyad Decl., *supra* note 56, at 26-27.

63 Declaration of Mahmud Abouhalima at 34, Ayyad v. Holder, No. 05-cv-02342 (D. Colo. Aug. 12, 2013) [hereinafter Abouhalima Decl.].

64 Rovner & Theoharis, *supra* note 31, at 1405.

65 Amnesty International, Entombed: Isolation in the Federal Prison System 7 (2014), https://www.amnestyusa.org/files/amr510402014en.pdf [hereinafter Entombed]; Arun Kundnani, *The Guantanamo in New York You're Not Allowed to Know About*, The Intercept (Feb. 5, 2016), https://theintercept.com/2016/02/05/mahdi-hashi-metropolitan-correctional-center-manhattan-guantanamo-pretrial-solitary-confinement.

66 Illusion of Justice, *supra* note 8, at 119.

67 Entombed, *supra* note 65, at 7.

68 *See, e.g.*, Memorandum from Lanny A. Breuer, Assistant Attorney General, *supra* note 42, at CRM000390 ("No Communal Cells and No Communication Between Cells"); *see also* Illusion of Justice, *supra* note 8, at 144.

69 28 C.F.R. § 540.16 (2016); U.S. Dep't of Justice, Admission and Orientation Handbook, United States Penitentiary Administrative Maximum Facility Florence, Colorado 5 (2008), https://www.bop.gov/locations/institutions/flm/FLM_aohandbook.pdf [hereinafter ADX Handbook]. Based on allegations of certain forms of misconduct, prisoners may be placed on "restricted correspondence status," which limits their list of approved contacts and subjects communications to monitoring. The prisoner must receive notice and an opportunity to respond to the allegations. Additionally, the prisoner can contest the designation under the Administrative Remedy Program. 28 C.F.R. § 540.15 (2016).

70  *See, e.g.*, Memorandum from Lanny A. Breuer, Assistant Attorney General, *supra* note 42, at CRM000386-88 ("Inmate's Non-legal Contacts").

71  ADX Handbook, *supra* note 69, at 5; Entombed, *supra* note 65, at 16.

72  *See, e.g.*, Memorandum from Lanny A. Breuer, Assistant Attorney General, *supra* note 42, at CRM000388 ("Non-legal Mail").

73  *See id.* ("General Correspondence with limitations"). Prisoners may write to U.S. courts, members of Congress, attorneys' offices, and other federal law enforcement agencies without limitation, "unless there is evidence of abuse of these privileges." *Id.* (emphasis added).

74  U.S. Dep't of Justice, Office of the Inspector General, The Federal Bureau of Prisons' Monitoring of Mail for High-Risk Inmates, at 13 (2006), https://www.oig.justice.gov/reports/BOP/e0609/final.pdf [hereinafter 2006 OIG Report].

75  *Id.*

76  Ayyad decl., *supra* note 56, at 32.

77  Entombed, *supra* note 65, at 16.

78  2006 OIG Report, *supra* note 74, at 75; Illusion of Justice, *supra* note 8, at 149.

79  *See, e.g.*, Memorandum from Lanny A. Breuer, Assistant Attorney General, *supra* note 42, at CRM000386 ("The inmate is limited to non-legally privileged telephone calls with his immediate family members.").

80  *See* Abouhalima Decl., *supra* note 63, at 44.

81  *See id.* at 44-48.

82  *See* Ayyad Decl., *supra* note 56, at 33.

83  *See, e.g.*, Memorandum from Lanny A. Breuer, Assistant Attorney General, *supra* note 42, at CRM000386 ("All telephone calls shall be in English unless a fluent USMS/BOP/DF- or FBI- approved interpreter/translator is available to contemporaneously monitor the telephone call."); 2006 OIG Rep., *supra* note 74, at 13, 75.

84  Interview with Pardiss Kebriaei, Attorney, in New York, N.Y. (Apr. 14, 2017).

85  28 C.F.R. § 540.102 (2016).

86  *See, e.g.*, Memorandum from Lanny A. Breuer, Assistant Attorney General, *supra* note 42, at CRM000387 ("Family Call Monitoring"); 2006 OIG Rep., *supra* note 74, at 13, 75.

87  Telephone interview with Laura Rovner, Professor, University of Denver, Sturm College of Law (Feb. 24, 2016); *see, e.g.*, Memorandum from Lanny A. Breuer, Assistant Attorney General, *supra* note 42, at CRM000387 ("Improper Communications").

88  Interview with Laura Rovner, *supra* note 87.

89  Interview with Faisal Hashmi (Apr. 21, 2016).

90  Illusion of Justice, *supra* note 8, at 148-49.

91  *Id.* at 148-49; Entombed, *supra* note 65, at 16; *see also* Abouhalima Decl., *supra* note 63, at 62-63.

92  U.S. Dep't of Justice, Administrative Maximum Facility Florence, Colorado, Visiting Procedures 2 (May 7, 2014), https://www.bop.gov/locations/institutions/flm/FLM_visit_hours.pdf [hereinafter ADX Florence Visiting Procedures].

93  *See, e.g.*, Memorandum from Lanny A. Breuer, Assistant Attorney General, *supra* note 42, at CRM000388 ("Visit Criteria"). Exceptions to the one-visitor-at-a-time rule may be made for "FBI-verified children of the inmate." *Id.*

94  *See, e.g., id.* at CRM000387-88 ("All communications during non-legal inmate visits will be in English unless a fluent USMS/BOP/DF- or FBI-approved interpreter/translator is readily available to contemporaneously monitor the communication/visit.").

95  *See, e.g., id.* at CRM000388 ("Visit Criteria"); 2006 OIG Rep, *supra* note 74 at 13, 75.

96  Ayyad Decl., *supra* note 56, at 35.

97  Interview with Pardiss Kebriaei, *supra* note 84.

98  Entombed, *supra* note 65, at 16; Abouhalima Decl., *supra* note 63, at 62-63.

99  *Id.*

100 ADX Florence Visiting Procedures, *supra* note 92, at 3; *see also* Abouhalima Decl., *supra* note 63, at 62.

101 ADX Florence Visiting Procedures, *supra* note 92, at 2.

102 *See* Ayyad Decl., *supra* note 56, at 36.

103 *Id.*

104 Abouhalima Decl., *supra* note 63, at 42.

105 *Id.*

106 *Id.* at 44-45.

107 *Id.* at 46-47.

108 *Id.* at 62.

109 *Id.* at 63.

110 Letter from Mariam Abu Ali to President Barack Obama (Dec. 7, 2016) (on file with authors).

111 *See, e.g.*, Memorandum from Lanny A. Breuer, Assistant Attorney General, *supra* note 42 at CRM000390 ("Religious Visitation").

112 *Id.* ("The inmate shall not be allowed to engage in group prayer with other inmates.").

**Exhibit 30 – 472**

113  The Qur'an, *Al-Jumuah* 62:9; *see also* Salahuddin v. Coughlin, 993 F.2d 306, 307 (2d Cir. 1993) (Friday congregated prayer " is commanded by the Qur'an" and "is the central observance of Islam.").

114  ILLUSION OF JUSTICE, *supra* note 8, at 117.

115  ENTOMBED, *supra* note 65, at 14.

116  *Id.*

117  *Id.* at 14-15.

118  *See, e.g.*, Memorandum from Lanny A. Breuer, Assistant Attorney General, *supra* note 42, at CRM000388 ("All non-legal visits shall be . . . [c]ontemporaneously monitored by the USMS/BOP/DF and/or FBI.").

119  *See, e.g., id.* at CRM000387-88.

120  *See* Ayyad Decl., *supra* note 56, at 29-30.

121  Telephone interview with Sean Maher, Attorney (Feb. 17, 2016).

122  *See, e.g.*, Memorandum from Lanny A. Breuer, Assistant Attorney General, *supra* note 42, at CRM000391-92 ("Access to Mass Communications").

123  *See, e.g., id.*

124  *Id.* at CRM000391.

125  Rovner & Theoharis, *supra* note 31, at 1362.

126  *See, e.g.*, Memorandum from Lanny A. Breuer, Assistant Attorney General, *supra* note 42, at CRM000392 ("Access to Books").

127  ILLUSION OF JUSTICE, *supra* note 8, at 145.

128  Abouhalima Decl., *supra* note 63, at 40.

129  *Id.*

130  *Id.* at 40-41.

131  *See, e.g.*, Memorandum from Lanny A. Breuer, Assistant Attorney General, *supra* note 42, at CRM000390 ("The inmate shall not be permitted to speak, meet, correspond, or otherwise communicate with any member or representative of the news media in person; by telephone; by furnishing a recorded message; through the mail, his attorney, or a third party; or otherwise.").

132  *See, e.g., id.* at CRM000384 ("No telephone call/communication, or portion thereof, except as specifically authorized by this document: (a) Is to be overheard by a third party. (b) Will be patched through, or in any manner forwarded or transmitted, to a third party. (c) Shall be divulged in any manner to a third party . . . ."); *see also* Interview with Arun Kundnani, *supra* note 52.

133  *See, e.g.*, MAHVISH KHAN, MY GUANTANAMO DIARY: THE DETAINEES AND THE STORIES THEY TOLD ME (2009); MOHAMEDOU OULD SLAHI, GUANTÁNAMO DIARY (2015).

134  *See* United States v. Stewart, 590 F.3d 93 (2d Cir. 2009) (defense attorney sentenced to a decade in prison for revealing to the press statements from her client under SAMs).

135  *See, e.g.*, Memorandum from Lanny A. Breuer, Assistant Attorney General, *supra* note 42, at CRM000394.

136  *See, e.g., id.*

137  *See, e.g.*, Expert Report of Craig Haney, Ph.D., J.D. 29 *et seq.*, Ashker v. Brown, No. C 09-5796, 2013 WL 1435148 (N.D. Cal. Apr. 9, 2013) (describing the "very broad" "empirical consensus on the harmfulness of isolated solitary confinement"). Dr. Haney's report, along with others submitted into evidence in *Ashker v. Brown*, is available at https://ccrjustice.org/home/what-we-do/our-cases/ashker-v-brown.

138  Economic and Social Council Res. 2015/20, annex, U.N. Standard Minimum Rules for the Treatment of Prisoners, U.N. Doc. A/C.3/70/L.3, r. 44 (Sept. 29, 2015) [hereinafter Mandela Rules]. The Mandela Rules reflect "the general consensus of contemporary thought and the essential elements of the most adequate systems of today [and] set out what is generally accepted as being good principles and practice in the treatment of prisoners and prison management." *Id.* at 7.

139  BOP FOIA DOCUMENTS, *supra* note 4, at BOP000089-95 (manual count revealing that as of October 21, 2013, SAMs were extended beyond one year in 56 out of 68 cases in which SAMs were applied, excluding the 10 cases in which SAMs were authorized less than one year prior to October 21, 2013).

140  *Id.* at BOP000089-90.

141  Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 CRIME & DELINQUENCY 124, 130 *et seq.* (2003) (surveying studies on the effects of isolation).

142  Expert Report of Terry A. Kupers, M.D., M.S.P., at 62, Ashker v. Brown, No. C 09-5796, 2013 WL 1435148 (N.D. Cal. Apr. 9, 2013) ("[A]ll of the prisoners I interviewed told me a list of symptoms and emotional problems that fit exactly the list of symptoms reported in the literature about the damaging effects of long-term isolative confinement.").

143  *Id.* at 23.

144  Maclyn Willigan, *What Solitary Confinement Does to the Human Brain*, SOLITARY WATCH (Aug. 4, 2014), http://solitarywatch.com/2014/08/04/what-solitary-confinement-does-to-the-human-brain (detailing those studies).

145  Uzair Paracha, *Innocent in the Eyes of the Law*, *in* HELL IS A VERY SMALL PLACE: VOICES FROM SOLITARY CONFINEMENT 48-49 (2016).

146  *Id.*

147  For a comprehensive list of these studies, see Expert Report of Dr. Craig Haney, *supra* note 137, at 16-18.

148  Fatos Kaba et al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, 104 AM. J. PUB. HEALTH 442, 44 (2014).

149 AMERICAN CIVIL LIBERTIES UNION, THE DANGEROUS OVERUSE OF SOLITARY CONFINEMENT IN THE UNITED STATES 5 (2014), https://www.aclu.org/sites/default/files/assets/stop_solitary_briefing_paper_updated_august_2014.pdf (citing a study of suicides at the Indiana Department of Corrections).

150 Expert Report of Dr. Craig Haney, *supra* note 137, at 35.

151 Haney, *supra* note 141, at 132.

152 *See, e.g.*, SOLITARY WATCH, https://solitarywatch.com (last visited May 29, 2017); American Civil Liberties Union, *Stop Solitary – Advocacy Campaign Tools*, https://www.aclu.org/other/stop-solitary-advocacy-campaign-tools (last visited May 29, 2017).

153 Davis v. Ayala, 135 S. Ct. 2187, 2210 (2015) (Kennedy, J., concurring). The question before the Court in *Ayala* did not involve the constitutionality of solitary confinement under the Eighth Amendment, but Justice Kennedy wrote separately to raise the issue of solitary confinement.

154 Expert Report of Dr. Craig Haney, *supra* note 137, at 192.

155 *Id.*

156 Rick Raemisch, *My Night in Solitary*, N.Y. TIMES (Feb. 20, 2014), https://www.nytimes.com/2014/02/21/opinion/my-night-in-solitary.html.

157 Michael Winerip & Michael Schwirtz, *Rikers to Ban Isolation for Inmates 21 and Younger*, N.Y. TIMES (Jan. 13, 2015), https://www.nytimes.com/2015/01/14/nyregion/new-york-city-to-end-solitary-confinement-for-inmates21-and-under-at-rikers.html.

158 Erica Goode, *Prisons Rethink Isolation, Saving Money, Lives and Sanity*, N.Y. TIMES (Mar. 10, 2012), http://www.nytimes.com/2012/03/11/us/rethinking-solitary-confinement.html.

159 Mark Binelli, *Inside America's Toughest Federal Prison*, N.Y. TIMES MAGAZINE (Mar. 26, 2015), https://www.nytimes.com/2015/03/29/magazine/inside-americas-toughest-federal-prison.html.

160 Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 WASH. U. J.L. & POL'Y 325, 329 (2006) ("[S]olitary confinement often resulted in severe exacerbation of a previously existing mental condition.").

161 AMERICAN PSYCHIATRIC ASSOCIATION, POSITION STATEMENT ON SEGREGATION OF PRISONERS WITH MENTAL ILLNESS 1 (2012), http://www.dhcs.ca.gov/services/MH/Documents/2013_04_AC_06c_APA_ps2012_PrizSeg.pdf ("Prolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates.").

162 Order Approving Settlement at 6, Bacote v. Federal Bureau of Prisons, No. 12-cv-01570 (D. Colo., Dec 29, 2016), ECF No. 391.

163 *Id.* at 1 (challenging placement of mentally ill prisoners, including at least one person under SAMs, in solitary confinement).

164 United States v. Pinson, 542 F.3d 822, 826 (10th Cir. 2008).

165 *Id.* at 827.

166 *Id.* at 828-29.

167 *Id.* at 828.

168 Pinson v. Berkebile, 553 F. App'x 852, 853 (10th Cir. 2014), *cert. denied*, 134 S. Ct. 1771 (2014).

169 Pinson v. Santana, No. 13-CV-2098, 2015 WL 10550962 at *1 (N.D. Tex. Nov. 23, 2015).

170 Rovner & Theoharis, *supra* note 31, at 1364.

171 Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *Interim Rep. of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment in Accordance with General Assembly resolution 67/161*, ¶ 60, U.N. Doc. A/68/295 (Aug. 2, 2013) (by Juan E. Méndez) [hereinafter *Special Rapporteur on Torture 2013 Report*].

172 SENATE SELECT COMM. ON INTELLIGENCE, COMMITTEE STUDY OF THE CENTRAL INTELLIGENCE AGENCY'S DETENTION AND INTERROGATION PROGRAM, EXECUTIVE SUMMARY 40, (declassified and released Dec. 3, 2004) [hereinafter SENATE TORTURE REPORT] ("After Abu Zubaydah had been in complete isolation for 47 days, the most aggressive interrogation phase began . . . ."); *see id.* at 51 (listing "extended isolation" as a frequent technique used at a CIA detention facility, along with "required standing, loud music," nudity, and "rough treatment," among others).

173 *Id.* at Findings and Conclusions 11.

174 Terrence McCoy, *'Learned Helplessness': The Chilling Psychological Concept Behind the CIA's Interrogation Methods*, Wash. Post (Dec. 11, 2014), https://www.washingtonpost.com/news/morning-mix/wp/2014/12/11/the-chilling-psychological-principle-behind-the-cias-interrogation-methods; *see also* SENATE TORTURE REPORT, *supra* note 172, at Findings and Conclusions, 19 fn. 32.

175 SENATE TORTURE REPORT, *supra* note 172, at 21.

176 *Id.* at 53.

177 *Id.* at 80; *see also id.* at 114 ("CIA psychologists linked bin al-Shibh's deteriorating mental state to his isolation and inability to cope with his long-term detention.").

178 SENATE TORTURE REPORT, *supra* note 172, at Findings and Conclusions, 4.

179 Declaration of Vice Admiral Lowell E. Jacoby (USN), Director of the Defense Intelligence Agency at 4, Padilla v. Rumsfeld, 243 F. Supp. 2d 42 (S.D.N.Y. 2003) [hereinafter Jacoby Decl.]; *see also* Owen Fiss, *The War Against Terrorism and the Rule of Law*, 26 OXFORD J.L. STUDIES 235, 237 (2006) (arguing that Jacoby's declaration showed that interrogators aimed to inspire a "complete sense of dependency on [Padilla's] interrogators and to convince him of the hopelessness of his situation").

180  Jacoby Decl., *supra* note 179, at 8.

181  Aff. of Angela Hegarty, MD ¶ 19, United States v. Hassoun, 477 F. Supp. 2d 1210 (S.D. Fla. 2007), ECF No. 695-3.

182  Deborah Sontag, *Video Is a Window Into a Terror Suspect's Isolation*, N.Y. Times (Dec. 4, 2006), http://www.nytimes.com/2006/12/04/us/04detain.html.

183  Sentencing Memorandum of Jose Padilla at 24-25, United States v. Padilla, No. 04-CV-60001 (S.D. Fla. Sept. 5, 2014), ECF No. 1454.

184  *Special Rapporteur on Torture 2011 Report*, *supra* note 2, 73.

185  *See, e.g.*, Emily Leslie & Nolan G. Pope, *The Unintended Impact of Pretrial Detention on Case Outcomes: Evidence from NYC Arraignments* 3 (Working Paper, Nov. 9, 2016), http://home.uchicago.edu/~npope/pretrial_paper.pdf ("[P]retrial detention increases the probability that a felony defendant will be convicted by at least 13 percentage points. The increase in conviction rates is driven by detainees accepting plea deals more frequently."); Will Dobbie et al., *The Effects of Pre-Trial Detention on Conviction, Future Crime, and Employment: Evidence from Randomly Assigned Judges* 25 (NBER Working Paper No. 22511), https://scholar.princeton.edu/sites/default/files/wdobbie/files/dgy_bail_0.pdf ("[P]re-trial release significantly decreases the probability of conviction, primarily through a decrease in guilty pleas.").

186  *See* Rovner & Theoharis, *supra* note 31, at 1369-70 ("The harshness of the conditions . . . are a powerful inducement on the SAMs prisoner to break, cooperate, and plead."); *supra* Part V (describing the CIA's use of isolation as a technique to induce "learned helplessness" in detainees); *see also* Interview with Sean Maher, *supra* note 121; Telephone interview with Jeanne Theoharis, Professor, Brooklyn College of CUNY (Feb. 17, 2016).

187  Interview with Sean Maher, *supra* note 121.

188  Telephone interview with Joshua Dratel, Attorney (Apr. 22, 2016).

189  Telephone interview with Mariam Abu Ali (Mar. 17, 2016).

190  The Supreme Court's recognition of the "compulsion inherent in custodial surroundings" led it to create the *Miranda* procedural safeguards. Miranda v. Arizona, 384 U.S. 436, 458 (1966) ("Unless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice.").

191  Rovner & Theoharis, *supra* note 31, at 1369.

192  Sally Eberhardt & Jeanne Theoharis, *Five Years Ago, Obama Pledged to End Torture. He Still Hasn't*, The Nation (Jan. 22, 2014), http://www.thenation.com/article/five-years-ago-obama-pledged-end-torture-he-still-hasnt.

193  Illusion of Justice, *supra* note 8 at 121.

194  *Id.*

195  *Id.*

196  Rovner & Theoharis, *supra* note 31, at 1385.

197  David Thomas, *How Mohammed Warsame Became an Accidental "Terrorist,"* The Nation (Nov. 27, 2013), http://www.thenation.com/article/how-mohammed-warsame-became-accidental-terrorist.

198  *Id.*

199  Motion to Vacate Order Directing the Marshals Service to Change Defendant's Conditions of Detention, United States v. Warsame, 537 F. Supp. 2d 1005 (D. Minn. 2008), ECF No. 122.

200  Rovner & Theoharis, *supra* note 31, at 1384.

201  *Id.* at 1385.

202  United States v. Warsame, 651 F. Supp. 2d 978, 981 (D. Minn. 2009). The Court further noted "it simply finds nothing that adequately demonstrates that Warsame was a part of a specific plot against the United States, and very little suggests that he was especially useful to Al Qaeda." *Id.*

203  Interview with Joshua Dratel, *supra* note 188; *see also* Rovner & Theoharis, *supra* note 31, at 1366 (SAMs "psychologically break down the accused, making it difficult for them to participate effectively in their own defense.").

204  Interview with Joshua Dratel, *supra* note 188.

205  Aff. of Angela Hegarty, MD, *supra* note 181, ¶ 16.

206  *Id.* ¶ 8.

207  *Id.* ¶ 13.

208  *Id.* ¶ 19.

209  Interview with Denny LeBeouf and Scharlette Holdman, in New Haven, Conn. (Feb. 5, 2016).

210  Joshua Dratel, *Ethical Issues in Defending a Terrorism Case: Stuck in the Middle*, 2 Cardozo Pub. L. Pol'y & Ethics J. 65, 68-69 (2003).

210  Interview with Denny LeBeouf and Scharlette Holdman, *supra* note 209.

212  28 C.F.R. § 501.3(d) (2016) (permitting monitoring of attorney-client communications after giving notice to the attorney and if "reasonable suspicion exists to believe that a particular inmate may use communications with attorneys or their agents to further or facilitate acts of terrorism"); *see also* Joshua Dratel, *Ethical Issues in Defending a Terrorism Case: How Secrecy and Security Impair the Defense of a Terrorism Case*, 2 Cardozo Pub. L. Pol'y & Ethics. J. 81, 89 (2003).

213  28 C.F.R. § 501.3(d)(3) (2016).

214  *See, e.g.,* Interview with Sean Maher, *supra* note 121.

215  *Id.*

**Exhibit 30 –  475**

216  *Id.*

217  *Id.*

218  Kundnani, *supra* note 65.

219  Dratel, *supra* note 212, at 90.

220  *Id.* at 86.

221  *Id.* ("Instead of concentrating on defending against the charges in the indictment . . . the defendant is preoccupied with ameliorating the conditions of confinement. The client is consumed with the petty and capricious aspects of the S.A.M.s, which can reinforce his negative preconceptions about the United States government and justice system.").

222  Telephone interview with Indrani Balaratnam, Mitigation Investigator (Mar. 2, 2016) ("[T]rust with witnesses is just as important as with your client.").

223  Interview with Denny LeBeouf and Scharlette Holdman, *supra* note 209.

224  *Id.*

225  *Id.*

226  *See, e.g.*, Memorandum from Lanny A. Breuer, Assistant Attorney General, *supra* note 42, at CRM000390 ("The inmate shall not be permitted to speak, meet, correspond, or otherwise communicate with any member or representative of the news media in person; by telephone; by furnishing a recorded message; through the mail, his attorney, or a third party; or otherwise.").

227  Interview with Indrani Balaratnam, *supra* note 222.

228  Interview with Laura Rovner, *supra* note 87.

229  *See* United States v. Stewart, 590 F.3d 93 (2d Cir. 2009).

230  *See* Interview with Joshua Dratel, *supra* note 188 ("Particularly after Lynne Stewart, attorneys became more cautious"); Interview with Fiona Doherty, Clinical Associate Professor, Yale Law School, in New Haven, Conn. (Feb. 19, 2016) (In New York, representing clients under SAMs "comes with the baggage of knowing what happened to Lynne Stewart.").

231  Rovner & Theoharis, *supra* note 31, at 1374.

232  Telephone Interview with Mohamed Yousry (Apr. 27, 2016); Michael Powell and Michelle Garcia, *Translator's Conviction Raises Legal Concerns*, Wash. Post, Jan. 16, 2006, http://www.washingtonpost.com/wp-dyn/content/article/2006/01/15/AR2006011500940.html.

233  The government argued that, while Yousry did not know about the particular legal violations at issue, or support Islamic extremism in any way, by translating the communications he supported a conspiracy. Murtaza Hussain, *Extraordinary Measures: How an Arabic Translator Got Caught in a Net Designed for Terror and Gang Leaders*, The Intercept (June 6, 2016), https://theintercept.com/2016/06/06/how-arabic-translator-got-caught-net-terror-gang-leaders.

234  Interview with Mohamed Yousry, *supra* note 232.

235  *See* Pennsylvania v. Finley, 481 U.S. 551, 555 (1987).

236  Interview with Laura Rovner, *supra* note 87.

237  Abouhalima Decl., *supra* note 63, at 39.

238  *Id.*

239  *Id.*

240  Interview with Laura Rovner, *supra* note 87.

241  Prison Litigation Reform Act of 1995, 110 Stat. 1321-73, as amended, 42 U.S.C. § 1997e(a) (2012) ("No action shall be brought with respect to prison conditions . . . until such administrative remedies as are available are exhausted."). While judges retain the ability to review conditions of confinement to ensure a defendant receives a fair trial, they rarely exercise that power. Porter v. Nussle, 534 U.S. 516, 520 (2002) ("§ 1997e(a)'s exhaustion requirement applies to all prisoners seeking redress for prison circumstances or occurrences.").

242  U.S. Dep't of Justice, Federal Bureau of Prisons, Program Statement No. 1330.17: Administrative Remedy Program, at § 542.13(a) (2012), http://www.lb7.uscourts.gov/documents/13-946.pdf.

243  *Id.*

244  *Id.* at § 542.14(c).

245  *Id.* at § 542.15(a).

246  *Id.* at § 542.14(c).

247  *Id.* at § 542.15(a).

248  *Id.* at § 542.14(c).

249  *Id.* at § 542.17(a).

250  *Id.* at § 542.16(a).

251  *See* 28 C.F.R. § 501.3(e) ("The affected inmate may seek review of any special restrictions imposed in accordance with paragraph (a) of this section through the Administrative Remedy Program.").

252  See, e.g., United States v. Savage, No. 07-550-03, 2010 WL 4236867, at *7 (E.D. Pa. Oct. 21, 2010); United States v. Hashmi, 621 F. Supp. 2d 76, 84 (S.D.N.Y. 2008).

253  Prior to 2013, Mostafa lived among other prisoners in general population in a U.K. prison. Telephone interview with Lindsay Lewis, Attorney (May 31, 2017).

254  *Id.*

255  *Id.*

256  *Id.*

257  *Id.*

**Exhibit 30 –  476**

258  See, e.g., Memorandum from Lanny A. Breuer, Assistant Attorney General, supra note 42 at CRM000390 ("The inmate shall not be permitted to speak, meet, correspond, or otherwise communicate with any member or representative of the news media in person; by telephone; by furnishing a recorded message; through the mail, his attorney, or a third party; or otherwise.").

259  See, e.g., id. at CRM000384 (prohibiting individuals from divulging communications from the SAMs prisoner "in any manner to a third party."); see also Interview with Arun Kundnani, supra note 52.

260  Interview with Arun Kundnani, supra note 52.

261  Interview with Joshua Dratel, supra note 188; Interview with Sean Maher, supra note 121 (stating that advocates' speech is chilled beyond what is required in the gag order because individuals allowed contact with SAMs prisoners err on the side of caution in not violating the gag order and risking prosecution).

262  Manes Decl, supra note 19, at 11-25 (describing Human Rights Watch's litigation with the BOP).

263  See Globe Newspaper Co. v. Superior Court for Norfolk City, 457 U.S. 596, 604 (1982) (The "free discussion of governmental affairs" is necessary "to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government.").

264  The paradigmatic example of this phenomenon is the CIA's manipulation of classified data to improve the public's perception of its torture program. See SENATE TORTURE REPORT, supra note 172, at Findings and Conclusions, 8 ("The CIA coordinated the release of classified information to the media, including inaccurate information concerning the effectiveness of the CIA's enhanced interrogation techniques.").

265  See id.

266  Falguni A. Sheth, This Is Counterterrorism? The Shocking Story of Mahdi Hashi, SALON (Sept. 25, 2013), http://www.salon.com/2013/09/25/this_is_counterterrorism_the_shocking_story_of_mahdi_hashi.

267  Kundnani, supra note 65.

268  Id.

269  Id.

270  Devin Dwyer, "Force-Feeding at Gitmo: Obama's 'Torture' Debate," ABC NEWS (Dec. 11, 2014), abcnews.go.com/Politics/force-feeding-gitmo-obamas-torture-debate/story?id=27531783.

271  Human Rights Watch v. Dep't of Justice Federal Bureau of Prisons, No. 13-cv-7360, 2015 WL 5459713 at *2, *9 (S.D.N.Y. Sept. 16, 2015).

272  The authors created a list of prisoners known to be held at one time under SAMs by using Google, Factiva, and Alt Press Watch engines to search for all news articles containing the terms "SAMs" and Bureau of Prisons, as well as Westlaw to search for people who had challenged SAMs.

273  The authors determined individuals to be Muslim based on descriptions of them as Islamic fundamentalists, or allegations that they were affiliated with Islamic fundamentalist groups. Those prisoners are: Omar Abdel-Rahman, Mahmoud Abouhalima, Ahmed Omar Abu Ali, Ahmed Abu Khattala, Ali Yasin Ahmed, Mohamed Rashed Al-Owhali, Mohaned Al-Farekh, Khalid Al Fawwaz, Ahmed Ghailani, Nidal A. Ayyad, Wadih El-Hage, Mahdi Hashi, Syed Fahad Hashmi, John Walker Lindh, Mohammed M. Jabarah, Alhassane Ould Mohamed, Khalfan Khamis Mohammed, Oussama Abdullah Kassir, Terek Mehanna, Zacarias Moussaoui, Mohamed Odeh, Uzair Paracha, Richard Reid, Tarik Shah, Dzhokhar Tsarnaev, Mohammed Warsame, Ramzi Yousef, Mohamed Yusuf.
    Based on publicly available information, the authors concluded that the following individuals under SAMs are not Muslim: Frank Calabrese, Joseph Lombardo, Steven Mandell, Iouri Mikhel, Ana Baylin Montez, Harold James Nicholson, Ricardo Palmera, Jeremy Pinson, and Peter Rollock.
    Authors have not been able to ascertain the religious identities of the following individuals under SAMs: Ossama Hilder and Abduwali Muse.

274  Those units are colloquially known as "Muslim Management Units," due to their high proportion of Muslim inmates. See Interview with Laura Rovner, supra note 87; Interview with Arun Kundnani, supra note 52.

275  See 28 C.F.R. §§ 540.203, 540.204, 540.205 (2016) (setting forth limitations on visits, written correspondence limitations, and telephone communication for prisoners in CMUs).

276  Besheer Mohamed, A new estimate of the U.S. Muslim Population, PEW RESEARCH CENTER (Jan. 6, 2016), http://www.pewresearch.org/fact-tank/2016/01/06/a-new-estimate-of-the-u-s-muslim-population.

277  BOP FOIA DOCUMENTS, supra note 4, at BOP000097 (showing that 23 out of 47 inmates at Marion's CMU were Muslim, as of November 25, 2013); id. at BOP000124 (24 out of 47 at Terre Haute).

278  CENTER FOR CONSTITUTIONAL RIGHTS, supra note 10, at 2 ("60 percent of CMU prisoners are Muslim, though Muslims comprise only six percent of the federal prisoner population").

279  Turkmen v. Hasty, 789 F.3d 218, 227 (2d Cir. 2015).

280  U.S. DEP'T OF JUSTICE, OFFICE OF THE INSPECTOR GENERAL, THE SEPTEMBER 11 DETAINEES: A REVIEW OF THE TREATMENT OF ALIENS HELD ON IMMIGRATION CHARGES IN CONNECTION WITH THE INVESTIGATION OF THE SEPTEMBER 11 ATTACKS 2 (Apr. 2003), http://www.justice.gov/oig/special/0306/full.pdf.

281  See Inter-Am. Comm'n Hum. Rts., supra note 10, ¶ 221.

**Exhibit 30 –  477**

282 Carrie Johnson, *'Guantanamo North': Inside Secretive U.S. Prisons*, NPR (Mar. 3, 2011), http://www.npr.org/2011/03/03/134168714/guantanamo-north-inside-u-s-secretive-prisons.

283 *See* Scott Shane, Matthew Rosenberg & Eric Lipton, *Trump Pushes Dark View of Islam to Center of U.S. Policy-Making*, N.Y. TIMES (Feb. 1, 2017), https://www.nytimes.com/2017/02/01/us/politics/donald-trump-islam.html.

284 Sarah Posner, *Does Trump think Islam is a religion? A top advisor won't say. That's alarming.*, WASHINGTON POST (Mar. 1, 2017), https://www.washingtonpost.com/blogs/plum-line/wp/2017/03/01/does-trump-think-islam-is-a-religion-a-top-adviser-wont-say-thats-alarming.

285 International Refugee Assistance Project v. Trump, No. 17-1351, 2017 WL 2273306 (4th Cir. May 25, 2017); Hawai'i v. Trump, No. CV 17-00050, 2017 WL 1167383 (D. Haw. Mar. 29, 2017); *see also* Washington v. Trump, 847 F.3d 1151 (9th Cir. Feb. 9, 2017).

286 Julia Edwards Ainsley, Dustin Volz & Kristina Cooke, *Trump to focus counter-extremism program solely on Islam – sources*, REUTERS (Feb. 2, 2017), http://www.reuters.com/article/us-usa-trump-extremists-program-exclusiv-idUSKBN15G5VO.

287 *See* Serwer, *supra* note 17.

288 *Full Text: Donald Trump Announces a Presidential Bid*, WASHINGTON POST (June 16, 2015), https://www.washingtonpost.com/news/post-politics/wp/2015/06/16/full-text-donald-trump-announces-a-presidential-bid; s*ee also* David Agren, *'Bad hombres': reports claim Trump spoke of sending troops to Mexico*, THE GUARDIAN (Feb. 1, 2017), https://www.theguardian.com/us-news/2017/feb/02/bad-hombres-reports-claim-trump-threatened-to-send-troops-to-mexico; Hunter Walker, *Donald Trump just released an epic statement raging against Mexican immigrants and 'disease'*, BUSINESS INSIDER (Jul. 6, 2015), http://www.businessinsider.com/donald-trumps-epic-statement-on-mexico-2015-7.

289 *See, e.g.*, Sophia Tesfaye, *Trump plans to shame sanctuary cities by publishing a weekly list of crimes committed by undocumented immigrants*, SALON (Jan. 25, 2017), http://www.salon.com/2017/01/26/trump-plans-to-shame-sanctuary-cities-by-publishing-a-weekly-list-of-crimes-committed-by-undocumented-immigrants.

290 Josh Sanburn, *President Trump Just Signaled Some Dramatic Changes for Police and Criminal Justice*, FORTUNE (Jan. 21, 2017), http://fortune.com/2017/01/21/president-trump-criminal-justice.

291 *See, e.g.*, Rebecca Savransky, *Trump berates CNN Reporter: 'You are fake news'*, THE HILL (Jan. 11, 2017), http://thehill.com/homenews/administration/313777-trump-berates-cnn-reporter-for-fake-news; Harriet Sinclair, *Trump Suggested Imprisoning Journalists Over Leaks, Comey Memo Alleges*, NEWSWEEK (May 16, 2017), http://www.newsweek.com/trump-comey-prison-journalists-over-intel-leaks-memo-alleges-fbi-russia-610499.

292 U.S. CONST. amend. VIII; International Covenant on Civil and Political Rights art. 7, *adopted* Dec. 16, 1966, 999 U.N.T.S. 171 [hereinafter ICCPR] ("No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment."); Convention on the Elimination of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 16, *adopted* Dec. 10, 1984, 1465 U.N.T.S. 85 [hereinafter CAT] ("Each State Party shall undertake to prevent in any territory under its jurisdiction other acts of cruel, inhuman or degrading treatment or punishment"); *see also* Hudson v. McMillan, 503 U.S. 1, 16 (1992) (Blackmun, J. concurring) ("It is not hard to imagine inflictions of psychological harm—without corresponding physical harm—that might prove to be cruel and unusual punishment.").

293 *See, e.g.*, Thomas v. Farley, 31 F.3d 557, 559 (7th Cir. 1994) ("Mental torture is not an oxymoron, and has been held or assumed in a number of prisoner cases . . . to be actionable as cruel and unusual punishment.") United States v. Corozzo, 256 F.R.D. 398, 401–02 (E.D.N.Y. 2009) (recognizing that social interaction is a human need but not passing on the constitutionality of depriving a prisoner of it); Wilkerson v. Stalder, 639 F. Supp. 2d 654, 679 (M.D. La. 2007) (recognizing "social contact" as a "basic human need").

294 Rhodes v. Chapman, 452 U.S. 337, 346 (1981).

295 Davis v. Ayala, 135 S. Ct. 2187, 2210 (2015) (Kennedy, J., concurring).

296 Ruiz v. Texas, 137 S. Ct. 1246, 1247 (Mar. 7, 2017) (Breyer, J., dissenting from denial of certiorari).

297 CAT, *supra* note 292, art. 1.

298 Mandela Rules, *supra* note 138, r. 43-45.

299 U.N. Comm. Against Torture, Concluding Observations on the Third to Fifth Periodic Reports of the United States of America, 20, U.N. Doc. CAT/C/USA/CO/3-5 (Dec. 19, 2014); U.N. Comm. Against Torture, Conclusions and Recommendations of the Committee Against Torture: United States of America, 36, U.N. Doc. CAT/C/USA/CO/2 (July 25, 2006).

300 Miguel Castro Castro Prison v. Peru, Merits, Reparations, and Costs, Judgment, Inter-Am. Ct. H.R. (ser. C) No. 160, 323 (Nov. 25, 2006). The European Court of Human Rights has held that solitary confinement for three years constitutes inhumane and degrading treatment, and even shorter periods may amount to torture or ill-treatment. Iorgov v. Bulgaria, 40 Eur. H.R. Rep. 7, 83-86 (March 11, 2004).

301 *Special Rapporteur on Torture 2013 Report*, *supra* note 171, at 41, 76.

302 Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *Observations on Communications Transmitted to Governments and Replies Received*, 168, U.N. Doc. A/HRC/25/60/Add.2 (Mar. 11, 2013).

303 *Special Rapporteur on Torture 2011 Report*, *supra* note 2, 72-76 (finding that discrimination and coercion raise the risk that conduct will constitute torture).

**Exhibit 30 –  478**

304 Letter from Juan Méndez, Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, to T.L. Early, Section Registrar European Court of Human Rights (Nov. 25, 2011), http://www.ohchr.org/Documents/Issues/SRTorture/SRTECHRNov2011.pdf. Despite Méndez's opposition, the European Court of Human Rights ultimately permitted the extradition, relying on U.S. government assurances that there were adequate procedural protections in place. For example, the court rejected Mostafa Kamel Mostafa's challenge to his extradition, based on the U.S. government's description of BOP procedures which the court assumed would "make detention at ADX impossible." Babar Ahmad v. United Kingdom, Eur. Ct. H.R. App. Nos. 24027/07 et al., 217, 2013 WL 5785362 (Apr. 10, 2012). The court's assumption proved incorrect when Mustafa was sent to ADX shortly after his conviction in U.S. courts. He has remained there since 2015.

305 Letter from Juan Méndez, *supra* note 304.

306 *See, e.g.*, ICCPR, *supra* note 292, art. 14(2); Powell v. Alabama, 287 U.S. 45, 52 (1932) ("However guilty defendants, upon due inquiry, might prove to have been, they were, until convicted, presumed to be innocent. It was the duty of the court having their cases in charge to see that they were denied no necessary incident of a fair trial."); Mandela Rules, *supra* note 138, r. 111 ("Unconvicted prisoners are presumed innocent and shall be treated as such.").

307 ICCPR, *supra* note 292, art. 9(3) ("It shall not be the general rule that persons awaiting trial shall be detained in custody, but release may be subject to guarantees to appear for trial, at any other stage of the judicial proceedings should occasion arise, for execution of the judgement."); Bell v. Wolfish, 441 U.S. 520, 535 (1979) ("[A] detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."); Mandela Rules, *supra* note 138, r. 111-20 (providing enhanced protections for pre-trial detainees).

308 ICCPR, *supra* note 294, art. 14(3)(g); Schneckloth v. Bustamonte, 412 U.S. 218, 228 (1973) ("[T]he Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force."); Brown v. Mississippi, 297 U.S. 278 (1936) (overturning a conviction that relied solely on evidence obtained through coercion).

309 *See* Miranda v. Arizona, 384 U.S. 436, 455 (1966) ("[T]o be alone with the subject is essential to prevent distraction and to deprive him of any outside support. . . . [T]he very fact of custodial interrogation exacts a heavy toll on individual liberty, and trades on the weakness of individuals.").

310 Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *Interim Rep. of Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment in Accordance with General Assembly resolution 62/148*, 80, U.N. Doc. A/63/175 (July 28, 2008) (by Manfred Nowak) ("Except in exceptional circumstances, such as when the safety of persons or property is involved, the Committee has recommended that the use of solitary confinement be abolished, particularly during pre-trial detention, or at least that it should be strictly and specifically regulated by law (maxim duration, etc.) and exercised under judicial supervision.").

311 ICCPR, *supra* note 292 art. 14(3); Medina v. California, 505 U.S. 437, 448 (1992).

312 Ake v. Oklahoma, 470 U.S. 68, 76 (1985).

313 *Id.*

314 Godinez v. Moran, 509 U.S. 389, 396 (1992) (citing Drope v. Missouri, 420 U.S. 162, 171 (1975)); *see also* Medina v. California, 505 U.S. at 448 ("If a defendant is incompetent, due process considerations require suspension of the criminal trial until such time, if any, that the defendant regains the capacity to participate in his defense and understand the proceedings against him.").

315 Maine v. Moulton, 474 U.S. 159, 168 (1985); *see also id.* at 169 ("Embodying 'a realistic recognition of the obvious truth that the average defendant does not have the professional legal skill to protect himself,' the right to counsel safeguards the other rights deemed essential for the fair prosecution of a criminal proceeding." (quoting Jonathan v. Zerbst, 304 U.S. 458, 462-63 (1938)).

316 *See, e.g.*, Miranda v. Arizona, 384 U.S. 436, 455 (1966); Gideon v. Wainwright, 372 U.S. 335, 345 (1963) (noting the importance to a criminal defendant of "the guiding hand of counsel at every step in the proceedings against him." (quoting Powell v. Alabama, 287 U.S. 45, 68-69 (1932))).

317 Powell, 287 U.S. at 71 (holding that impoverished black defendants facing the death penalty needed lawyers given "the circumstances of public hostility, the imprisonment and the close surveillance of the defendants by the military forces, [and] the fact that their friends and families were all in other states and communication with them necessarily difficult.").

318 U.N. Human Rights Comm., *General Comment No. 20*, 11, U.N. Doc. A/47/40 (1994) ("The protection of the detainee also requires that prompt and regular access be given to doctors and lawyers . . . ."); Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *Report of the Special Rapporteur, pursuant to Commission on Human Rights resolution 1991/38*, 284, UN Doc. E/CN.4/1992/17 (1991) ("Torture most often takes place during incommunicado detention, when the detainee is refused access to legal counsel.").

319 *See supra* Parts VI, VII.

320 Procunier v. Martinez, 416 U.S. 396, 419 (1974) (citing Ex Parte Hull, 312 U.S. 546 (1941)), *overruled in part on other grounds*, Thornburgh v. Abbott, 490 U.S. 401, 419 (1989).

321 *See* Mohawk Industries, Inc. v. Carpenter, 558 U.S. 100, 106, 108 (2009) (citing Swindler & Berlin v. United States, 524 U.S. 399, 403 (1998)) ("[Attorney-client privilege] is one of the oldest recognized privileges for confidential communications . . . . By assuring confidentiality, the privilege encourages clients to make full and frank disclosures to their attorneys, who are then better able to provide candid advice and effective representation").

**Exhibit 30 – 479**

322 Weatherford v. Bursey, 429 U.S. 545, 555 n.4 (1977). While the Court in *Weatherford* upheld a defendant's conviction after an undercover government agent had met with the defendant and his attorney, that case did not involve "discussions concerning respondent's trial strategy or the pending criminal action." *Id.* at 545.

323 *See, e.g.*, U.N. Human Rights Comm., *General Comment 32*, 34, U.N. Doc. CCPR/C/GC/32 (2007) (Lawyers "should be able to meet their clients in private and to communicate with the accused in conditions that fully respect the confidentiality of their communications."); Special Rapporteur on the Independence of Judges and Lawyers, *Report on Independence of Judges and Lawyers*, 110, U.N. Doc. A/64/181 (2009) (noting lawyers' files and documents should be protected from seizure or inspection and that no communications, including telephone calls and other electronic communications, should be intercepted); *see also* Human Rights Comm., *Concluding Observations of the Human Rights Comm.: Spain*, 14, UN Doc. CCPR/C/ESP/CO/5 (2008) ("[T]he right to freely choose a lawyer who can be consulted in complete confidentiality by detainees and who can be present at interrogations should be guaranteed to all detainees").

324 In *United States v. DiDomenico*, Judge Posner of the Seventh Circuit Court of Appeals raised a hypothetical almost identical to SAMs, stating that a government policy of taping all conversations between defendants and their attorneys, and storing them even without disclosing them to prosecutors would still "greatly undermine the freedom of communication between defendants and their lawyers and with it the efficacy of the right to counsel, because knowledge that a permanent record was being made of the conversations between the defendants and their lawyers would make the defendants reluctant to make candid disclosures." 78 F.3d 294, 299-300 (7th Cir. 1996).

325 *See* U.N. Human Rights Comm., *Onoufriou v. Cyprus (Communication No. 1636/2007)*, 6.11, UN Doc. CCPR/C/100/D/1636/2007 (2010) ("'[A]dequate facilities' for the preparation of one's defence, within the meaning of article 14(3) (b) of the Covenant, include access to all evidentiary materials, which the prosecution plans to offer in court against the accused, or which are exculpatory."); *see also* Modarca v. Moldova, App. No. 14437/05, 84-99 (Eur. Ct. of H.R. 2007) (holding that a defendant's rights were violated in a case where the facilities in a detention center required detainees to speak to their lawyers through two panes of glass with holes covered with mesh, which also did not permit documents to be passed back and forth because they prevented effective confidential communication about the case).

326 Chandler v. Florida, 449 U.S. 560, 574 (1981) ("Any criminal case that generates a great deal of publicity presents some risks that the publicity may compromise the right of the defendant to a fair trial.").

327 Gentile v. State Bar of Nevada, 501 U.S. 1030, 1043 (1991). Similarly, while the ABA Model Rules of Professional Conduct prohibit out-of-court statements that have a "substantial likelihood of materially prejudicing" the proceeding, the Rules allow attorneys to "make a statement that a reasonable lawyer would believe is required to protect a client from the substantial undue prejudicial effect of recent publicity not initiated by the lawyer or the lawyer's client." MODEL RULES OF PROF'L CONDUCT r. 3.6(a), (c) (AM. BAR ASS'N 2011).

328 *See* U.N. Human Rights Comm., *General Comment 32, supra* note 323, 38 (stating lawyers should be able to advise and represent people without restrictions, influence, pressure or improper interference from any quarter); Special Rapporteur on the Independence of Judges and Lawyers, *supra* note 323, 64-67 (raising concern that lawyers are often identified with their clients' causes, particularly when lawyers defend individuals in politically sensitive cases).

329 U.S. Const. amend. I; ICCPR, *supra* note 292, art. 19.

330 *See* Turner v. Safley, 482 U.S. 78, 89 (1987).

331 *See* United States v. Stevens, 559 U.S. 460, 481-82 (2010).

332 *See* Board of Education, Island Trees Union Free School District No. 26 v. Pico, 457 U.S. 853, 867 (1982); *see id.* at 872 (enjoining a local school board from removing books from library shelves "simply because they dislike the ideas contained in those books").

333 *See* Reed v. Town of Gilbert, 135 S. Ct. 2218, 2227 (2015) ("Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed.").

334 *See* Branzburg v. Hayes, 408 U.S. 665, 681 (1972) ("[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated."); Thornburgh v. Abbott, 490 U.S. 401, 407 (1989) (citing Procunier v. Martinez, 416 U.S. 396 (1974)) (newsgatherers have a legitimate interest in investigating and publishing information about prison conditions). While the Supreme Court has upheld restrictions on the media's access to prisoners, in each case the prisoner had some alternative means of communicating with the press. *See, e.g.*, Pell v. Procunier, 417 U.S. 817 (1974) (upholding restrictions on face-to-face interviews between prisoners and members of the press in light of alternative means of communicating with the media, such as through writing letters to members of the press and by communicating with the press through their prison visitors); Saxbe v. Washington Post Co., 417 U.S. 843 (1974) (upholding restrictions on interviews between members of the media and certain prisoners because prisoners had alternative means of communicating with the press); Houchins v. KQED Inc., 438 U.S. 1 (1978) (upholding restrictions on media visits to prison because prisoners have other ways to describe jail conditions to the media).

335 *See, e.g.*, Moore v. City of East Cleveland, 431 U.S. 494 (1977) (zoning ordinance that prohibited extended family members from living together violated the due process clause based on the importance of extended family in American society); *see also* ICCPR, *supra* note 294, art. 23(1); American Convention on Human Rights art. 17(1), *opened for signature* Nov. 22, 1969, 36 O.A.S.T.S. ("The family is the natural and fundamental group unit of society and is entitled to protection by society and the State.").

336 *See* U.S. Const. amend. I (forbidding any "law respecting an establishment of religion, or prohibiting the free exercise thereof"); ICCPR, *supra* note 294.

337 Letter from Juan Méndez, *supra* note 304.

338 Wilkinson v. Austin, 545 U.S. 209, 210-11 (2005); Sandin v. Conner, 515 U.S. 472, 484 (1995). The *Wilkinson* court ultimately found that the review procedures implemented by Ohio prison officials sufficed as process to protect the prisoners' liberty interests. The Court emphasized that the prison officials provided each prisoner with a factual basis for their solitary confinement, both protecting against arbitrary decision-making and giving the prisoner a basis for objection in future reviews. In addition, the Court cited the various levels of review required before assignment to solitary and that review was required after thirty days.

339 The Second Circuit has found that solitary confinement lasting more than 305 days is generally always "atypical and significant," any confinement for more that 101 days is subject to close examination, and that confinement less than 101 days can still be "atypical and significant" if restrictions are worse than general SHU conditions. Colon v. Howard, 215 F.3d 227, 231-32 (2d Cir. 1999).

340 Wilkinson, 545 U.S. at 214-15.

341 *See, e.g.*, Williams v. Pennsylvania Dep't of Corrections, 848 F.3d 549 (3rd Cir. Feb. 9, 2017); Incumaa v. Stirling, 791 F.3d 517 (4th Cir. 2015); Wilkerson v. Goodwin, 774 F.3d 845 (5th Cir. 2014).

342 The Supreme Court has held on numerous occasions that the Fifth Amendment due process clause prohibits the federal government from denying equal protection of the laws. *See, e.g.*, Hampton v. Mow Sun Wong, 426 U. S. 88, 100 (1976); Buckley v. Valeo, 424 U. S. 1, 93 (1976); Weinberger v. Wiesenfeld, 420 U. S. 636, 638 n. 2 (1975); Bolling v. Sharpe, 347 U. S. 497, 500 (1954).

343 International Convention on the Elimination of All Forms of Racial Discrimination art. 5, *adopted* Dec. 21, 1965, 660 U.N.T.S. 195; ICCPR, *supra* note 292, art. 18.

344 *See, e.g.*, Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 534 (1993).

**Exhibit 30 – 481**

## About the Center for Constitutional Rights

CCR is a non-profit legal and educational organization dedicated to advancing and protecting the rights guaranteed by the U.S. Constitution and international human rights law. Founded in 1966 by attorneys who represented civil rights movements in the South, CCR employs litigation, education, and advocacy to advance the law in a positive direction, to empower poor communities and communities of color, to guarantee the rights of those with the fewest protections and least access to legal resources, to train the next generation of constitutional and human rights attorneys, and to strengthen the broader movement for social justice. For more information about CCR's mission, history and current work, including our challenges to abusive prison policies, please visit *www.ccrjustice.org.*

## About the Allard K. Lowenstein International Human Rights Clinic at Yale Law School

The Allard K. Lowenstein International Human Rights Clinic is a legal clinic at Yale Law School that undertakes projects on behalf of human rights organizations and individual victims of human rights abuses. The goals of the Clinic are to provide students with practical experience that reflects the range of activities in which lawyers engage to promote respect for human rights, to help students build the basic knowledge and skills necessary to be effective human rights lawyers and advocates, and to contribute to efforts to protect human rights through valuable, high-quality assistance to appropriate organizations and individual clients. To that end, the Clinic undertakes a wide variety of projects every year, including fact-finding, drafting reports, amicus briefs, legal manuals, submissions to various international human rights bodies, and other kinds of human rights advocacy. For more information about the Clinic and to access past projects and publications, please visit its website at *law.yale.edu/schell/lowenstein-clinic.*

**Exhibit 30 –  482**

# EXHIBIT 31

02/11/2002 17:01 FAX 18889384715        AT&T WIRELESS                    ☑001



AT&T Wireless

| Security Department | AT&T Wireless Services<br>PO Box 24679<br>West Palm Beach, FL 33416 |
| --- | --- |

# FAX COVER SHEET

TO:___Wendy Woskoff  File # 17877_____

FAX NUMBER:____310-996-3851_____

FROM: _____AT&T Wireless/NSCC/Rami_____

PHONE NUMBER: _____800-635-6840 option 2_____

FAX NUMBER: _____888-938-4715_____

TOTAL PAGES (INCLUDING COVER): ____36_____

MESSAGE:_____

_____

_____

_____

_____

---

### How to read "Subscriber Activity" Reports

Please note: All call times are recorded in Eastern Standard time.

Type codes are defined as the following:

| | |
| --- | --- |
| Int = Outgoing long distance call | Lcl = Outgoing local call |
| CFO = Call forwarding | Sp = Special Feature |
| Inc = Incoming Call | |

When "Sp" is noted in the "Type" column and then the "Dialed #" column shows "# and the target phone number" for instance "#7182225555" , this is an incoming call that was not answered and then forwarded to voice mail. The preceding row (which is an incoming call) will also indicate "CFO" in the "feature" column.

Outgoing calls only are reliable for location status. Any incoming calls will NOT be considered reliable information for location.

Blacked out areas on this report (if any) are cell site locations which need a court order signed by a judge in order for us to provide.

---

### CONFIDENTIALITY NOTICE

The information contains in this transmission is intended only for the use of the individual or entity to which is addressed and may contain information that is confidential and/or privileged. If you are not the intended recipient or the person responsible for delivering to the intended recipient, you are hereby notified that you have received this transmission in error, and that any review, dissemination, retention or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone to arrange for the return of the original communication to us. Thank you.

17928

**Exhibit 31 -  483**

# EXHIBIT

# 32

LAW OFFICES
OF
**RICHARD M. CALLAHAN, JR.**
230 EAST COLORADO BOULEVARD
SUITE 1200
PASADENA, CA 91101
TELEPHONE (626) 202-4060
TELECOPIER (626) 794-4676

May 3, 2005

**_VIA EMAIL AND_**
**_FIRST CLASS MAIL_**

Robert Dugdale, Esq.
Susan DeWitt, Esq.
Kim Meyer, Esq.
Assistant United States Attorneys
1500 United States Courthouse
312 N. Spring Street
Los Angeles, CA 90012

      Re: *Mikhel Prison Conditions*

Dear Counsel:

      Dale Rubin and I are becoming increasingly concerned regarding the conditions of confinement that Mr. Mikhel must endure while being housed at West Valley Detention Center. Although some of these items deal with certain specific provisions of the Security Administrative Measures ("SAMS"), Mr. Mikhel is being forced to endure conditions that far exceed the purpose of the SAMs, and which have crossed the line impacting the Eighth Amendment's prohibition against cruel and unusual punishment. For example:

      1)      Mr. Mikhel is locked in his cell, twenty-four hours a day, seven days a week. He is not allowed out into the "day room," and cannot communicate with any other inmate. He is not afforded what is termed "yard time," which is intended to provide the inmate at least a brief respite from the confines of his small cell. Instead, Mr. Mikhel is offered the "opportunity" to be placed in a 3' x 4' chain-linked cage outside which is completely covered. He is not afforded a sense of being outside, cannot move around, and cannot get any sun;

**Exhibit 32 - 484**

LAW OFFICES OF
**RICHARD M. CALLAHAN, JR.**

May 3, 2005
Page 2

2)      Because of his special security classification, he is often denied his commissary since the staff fails to pick up his orders, or forgets to deliver the items sought. In addition to basic food items which he can purchase that would allow a modest increase in the quality of his incarceration, it must be remembered that commissary is Mr. Mikhel's only source of paper, pencils and other materials essential to his trial preparation. West Valley will not allow counsel to provide paper or writing instruments to Mr. Mikhel, who is forced to purchase his own accoutrements necessary to write correspondence or make notes relating to his case. As a result, Mr. Mikhel is forced to defend a capital case, involving more than 60,000 pages of discovery, with nothing more than a 3" golf pencil writing on wide-lined paper that resembles that used by children in kindergarten;

3)      Any movement of Mr. Mikhel for any purpose required him to be shackled in leg irons and waist chains. These constant restraints are causing Mr. Mikhel great pain. He is then blindfolded, then hooded on top of that, and placed in a wheelchair where he is moved by prison staff. Although we are aware of your concerns regarding security, using both a blindfold and a hood to prevent him from seeing his surroundings causes him to become nauseous. During a recent trip to the hospital to examine his dislocated shoulder, he apparently vomited on several occasions;

4)      Mr. Mikhel is not allowed to receive any mail except legal mail. He has no contact with anyone else who is important to him, particularly family members. A byproduct of this restriction is that Mr. Mikhel's counsel has lost contact with those who care for him since these people are no longer writing. Notwithstanding the SAMs, I fail to see how such a blanket prohibition on all outside mail furthers any purpose other than to exacerbate Mr. Mikhel's already fragile mental state;

5)      As a condition of the SAMs, Mr. Mikhel is denied all access to the outside world, which means he cannot watch any television, or read any newspapers. Such blanket restrictions

**Exhibit 32 - 485**

LAW OFFICES OF
RICHARD M. CALLAHAN, JR.

May 3, 2005
Page 3

cannot be justified by the SAMs in this case, as they are not "reasonably related" to any legitimate efforts to avoid terrorism or harm to a third party. At this point, these restrictions can only be seen as unduly punitive.

As a separate point, not directly related to the SAMs, it appears Mr. Mikhel's hospital stay after his recent suicide attempt was far too short, and he has not had the opportunity to adequately recover his health. As I understand the process, Mr. Mikhel's stomach was packed with a chalk-like substance in order to absorb the poison he ingested. Apparently, this substance stays in the stomach for an extended period, and is extremely difficult for the body to eliminate on its own. It appears that his hurried hospital stay prevented the medical staff from utilizing the appropriate treatments and medication which would have allowed Mr. Mikhel's system to be properly cleansed. As a result, he continues to have great difficulty eating, which is only compounding his already weakened condition.

We are therefore requesting the following modifications to Mr. Mikhel's conditions of confinement:

1) Allow Mr. Mikhel an appropriate period of time out-of-doors without having to be enclosed in a cage;

2) Assure that Mr. Mikhel will receive his weekly commissary privileges;

3) Allow Mr. Mikhel's counsel to provide appropriate legal pads and reasonable writing instruments for Mr. Mikhel to assist in preparing for his trial defense;

4) Allow Mr. Mikhel to be transported without the necessity of a blindfold;

5) Allow Mr. Mikhel to send and receive mail in a manner similar to that which applies to other inmates, taking into account reasonable and well-defined security precautions;

6) Allow Mr. Mikhel to have unrestricted access to books, radio, television and newspapers to the same extent afforded any other inmate.

Exhibit 32 - 486

LAW OFFICES OF
**RICHARD M. CALLAHAN, JR.**

May 3, 2005
Page 4

We fully understand the government's desire for heightened security measures in light of the very unique history of this case. However, since you don't deal personally with Mr. Mikhel, you understandably cannot appreciate just how serious this situation has become. When all of these added security measures are imposed collectively, the resulting total isolation has caused a palpable and dangerous deterioration in Mr. Mikhel's mental and physical state. His descent has advanced to such a degree that Dale and I are not only beginning to doubt Mr. Mikhel's future competency to stand trial, but more importantly, we are gravely concerned about just how much longer Mr. Mikhel will survive.

We would appreciate your thoughts. Obviously, time is of the essence.

Sincerely,

Richard M. Callahan, Jr.

RMC/vo

Exhibit 32 - 487

# EXHIBIT

# 33

09/05/2006  04:42   3238764716                    WILLIAM VICARY MD                    PAGE  02

**WILLIAM VICARY, J.D., M.D.**

FORENSIC PSYCHIATRY
3575 CAHUENGA BOULEVARD WEST
SUITE 300
LOS ANGELES, CA 90068
Tel: (323) 876-9133

fax (323) 876-4716
w.vicary@att.net



September 5, 2006

Dale Rubin
2275 Huntington Dr. Suite 902
San Marino, CA 91108

Re: Iouri Mikhel
Case No: 02-220(B) DT

Mr. Rubin:

Pursuant to your request and the court order, the above named defendant was interviewed at the Metropolitan Detention Center on September 2, 2006 for three hours. In preparing this summary report the following were reviewed:

(1) Translated Childhood Medical Records
(2) Neuropsychological Testing Results
(3) Institutional Medical and Psychiatric Records

The patient appears to suffer from Bipolar Disorder. This has been his diagnosis while in custody and he has been treated with a variety of mood stabilizing and antidepressant medications. He has made two serious suicide attempts. In the first he slashed his right lower leg and lost a significant amount of blood. He required hospitalization and the wound had to be sutured. On the second attempt he took a massive overdose of psychiatric medication. He collapsed and was found to be unresponsive. He had to be hospitalized and placed on a ventilator. The second suicide attempt was almost successful.

He continues to suffer from depressive and hypomanic symptoms. These include dysphoria, suicidal ideation, mood intensity, irritability, and a profound difficulty in sleeping. He has not been receiving any psychiatric treatment or medication since his transfer to the MDC. He would be agreeable to accepting some antidepressant and mood stabilizing medications. Agents helpful to him in the past have been the antidepressant Remeron and the tranquilizing/mood stabilizing medication Seroquel. These agents could be crushed, mixed with juice, and administered in an oral form under observation.

He has been a demanding, unrealistic, irritable, and intense client. This behavior is largely due to his untreated Bipolar Disorder. If he were to receive adequate psychiatric treatment and medication his competency to stand on trial would be enhanced. He would

1187



Exhibit 33 - 488

be better able to appreciate the reality of his legal circumstances and he would be more capable of cooperating in a rational matter with counsel.

He also suffers from chronic persistent abdominal pain. He has been diagnosed as suffering from Gastric Reflex Disorder and was successfully treated in custody in the past with Nexium. He should have appropriate medical attention, evaluation and treatment for this serious medical problem. He is at risk for gastric hemorrhage. Such an event would require hospitalization and force a delay in his trial. The Nexium could also be pulverized, mixed with juice and administered in an oral form under observation. The patient would agree to this.

He suffers from high blood pressure. This was documented while he was in custody. His blood pressure has been as high as 180/100. He was prescribed antihypertensive medications in the past but his compliance with taking them was problematic. He preferred to try and control his blood pressure with a low salt diet, exercise, and weight loss. At the MDC, he has been gaining weight. His legal situation and trial are highly stressful circumstances. His blood pressure should be monitored at least three times a week at the MDC by the medical staff in order to ascertain his risk for stroke.

If you wish I will continue to periodically monitor his psychiatric and medical status at the MDC. Supplemental written reports could be then prepared and sent to you.

If you have any questions in regard to his matter, please contact me.

Very Truly Yours,

William Vicary J.D., M.D.
Diplomate, American Board of
Psychiatry and Neurology
Diplomate, American Board of
Forensic Psychiatry

WV: L

**Exhibit 33 - 489**

# EXHIBIT

# 34



404.939.6636 (T)
866.824.5215 (F)
4062 Peachtree Rd NE, Suite A-203
Atlanta, Georgia 30319
agharkarmd@gmail.com

September 21, 2023

C. Pamela Gomez, Esq.
321 E 2nd Street
Los Angeles, CA 90012

Re:  Mr. Iouri Mikhel
DOB:  ▮/65

Dear Ms. Gomez:

Enclosed is my report concerning the psychiatric evaluation of Mr. Iouri Mikhel, performed on August 27, 2021, and February 14, 2023. This evaluation was performed pursuant to your request, in order to assess the existence and extent of Mr. Mikhel's psychiatric difficulties. The opinions expressed in my report represent my professional opinion to a reasonable degree of psychiatric certainty, based upon my clinical interviews with Mr. Mikhel and review of relevant records provided by you.

**Qualifications**

I am a medical doctor, who is licensed to practice medicine in Georgia since 2002. I have maintained an active clinical private practice since 2005. I treat a wide variety of conditions including ADHD, Depression, Bipolar Disorder, Anxiety, Schizophrenia, Post-traumatic Stress Disorder, Panic Disorder, and Substance-related illnesses. On a weekly basis, I conduct neuropsychiatric evaluations of persons with neurologic impairments, acquired brain injuries, and neurodevelopmental disorders including Intellectual Disability.

I earned my Doctor of Medicine degree from the State University of New York Health Science Center at Syracuse and completed my residency at Emory University School of Medicine Department of Psychiatry and Behavioral Sciences, where I was Chief Resident.

**Exhibit 34 -  490**

Re: Iouri Mikhel

I also completed a Forensic Psychiatry Fellowship at Emory University School of Medicine. I hold dual board certification as a Diplomate of Adult Psychiatry (AP) and Forensic Psychiatry (FP) of the American Board of Psychiatry and Neurology (ABPN).

In addition to my private practice, I am an Adjunct Assistant Professor of Psychiatry at Morehouse School of Medicine and a Clinical Assistant Professor with the Emory University School of Medicine.

I am a Distinguished Fellow of the American Psychiatric Association. I have served as a consultant to various school systems in the Atlanta area, Emory University Hospitals, Georgia Tech Athletic Department, Georgia Composite State Board of Medical Examiners, Arizona Medical Board, the Federal Bureau of Investigation (FBI), the United States Armed Forces, and the Department of Defense (DoD). I hold Top Secret security clearance with the United States government. My curriculum vitae is attached.

I have experience testifying in criminal and civil cases nationwide and have consulted internationally on forensic matters. I perform independent medical examinations and medical record reviews for psychiatric malpractice and disability cases. I am able to provide professional opinions on an array of legal questions, including criminal and civil competencies, criminal responsibility (insanity defense), personal injury, medical malpractice, and fitness for duty.

**Referral questions:**

1) Was Mr. Mikhel competent to stand trial at the time of his capital trial proceedings?

2) What effect, if any, has extreme solitary confinement had on Mr. Mikhel's psychological functioning?

**Sources of Information**

I was retained by counsel for Iouri Mikhel to conduct a psychiatric evaluation of him. I conducted a clinical interview on August 27, 2021, and February 14, 2023, for approximately 2 and 2.2 hours, respectively.

I have also received and reviewed the following documentary information regarding Mr. Mikhel:

Birth Certificate of Iouri Mikhel

Medical Record Book, 1972-1984 (In Russian)

2

**Exhibit 34 -  491**

Re: Iouri Mikhel

Medical Record Book, 1972-1984 (Translation, Author Unknown)

School Records and Class Photo for Iouri Mikhel, 1975-1978

School Certificate for Iouri Mikhel, 1991

Driving Exam Certificate for Iouri Mikhel, 1992

Death Certificate of Anna Nikolaevna Fot

Death Certificate of Margarita Mikhel

Lab Analysis Reports for Iouri Mikhel, 1999-2000

Prison Medical Records of Iouri Mikhel: - San Bernardino CDC
- West Valley Medical Center
- Arrowhead Regional Medical Center

- Arrowhead Regional Medical Center Notes re First Suicide Attempt on 01/20/2004
- San Bernardino County Sheriff's Detention Facility Notes re First Suicide Attempt on 01/20/2004
- San Bernardino County Sheriff's Department Reports re Second Suicide Attempt on 04/15/2005

Prison Records of Iouri Mikhel From the Metropolitan Detention Center:
- Revised Competency Assessment, 09/10/2006
- Excerpts of West Valley Detention Center Records
- Federal Bureau of Prisons Psychological Data System Notes

Kern County Medical Center Record for Iouri Mikhel, 02/19/2002 Through 03/08/2002
Records re Iouri Mikhel, With Pages Stamped 000001-000559,
From San Bernardino County Sheriff's Department, Health Services Division, County of San Bernardino Department of Behavioral Health, and Arrowhead Regional Medical Center, 04/21/2003 Through 04/23/2006

Trial Exhibit 3112: Progress Notes

Trial Exhibit 3113: Medication Visit re Iouri Mikhel,
San Bernardino County Department of Behavioral Health, 01/22/2004

3

**Exhibit 34 - 492**

Re: Iouri Mikhel

Trial Exhibit 3114: Medication Visit re Iouri Mikhel,
San Bernardino County Department of Behavioral Health, 01/23/2004

Trial Exhibit 3115: Medication Visit re Iouri Mikhel,
San Bernardino County Department of Behavioral Health, 02/01/2004

Trial Exhibit 3116: Medication Visit re Iouri Mikhel,
San Bernardino County Department of Behavioral Health, 02/06/2004

Trial Exhibit 3117: Medication Visit re Iouri Mikhel,
San Bernardino County Department of Behavioral Health, 03/05/2004

Trial Exhibit 3118: Interdisciplinary Notes re Iouri Mikhel,
San Bernardino County Department of Behavioral Health, 03/10/2004

Trial Exhibit 3119: Interdisciplinary Notes re Iouri Mikhel,
San Bernardino County Department of Behavioral Health, 03/17/2004

Trial Exhibit 3120: Interdisciplinary Notes re Iouri Mikhel,
San Bernardino County Department of Behavioral Health, 04/14/2004

Trial Exhibit 3121: Interdisciplinary Notes re Iouri Mikhel,
San Bernardino County Department of Behavioral Health, 04/21/2004; 04/27/2004;
04/29/2004

Trial Exhibit 3122: Medication Visit re Iouri Mikhel,
San Bernardino County Department of Behavioral Health, 05/23/2004

Trial Exhibit 3123: Medication Visit re Iouri Mikhel,
San Bernardino County Department of Behavioral Health, 06/26/2004

Trial Exhibit 3124: Interdisciplinary Notes re Iouri Mikhel,
San Bernardino County Department of Behavioral Health, 04/13/2005

Trial Exhibit 3125: Medication Visit re Iouri Mikhel,
San Bernardino County Department of Behavioral Health, 04/15/2005

Trial Exhibit 3126: Medication Visit re Iouri Mikhel,
San Bernardino County Department of Behavioral Health, 04/18/2005

Trial Exhibit 3127: Medication Visit re Iouri Mikhel,
San Bernardino County Department of Behavioral Health, 04/29/2005

4

**Exhibit 34 -  493**

Re: Iouri Mikhel

Trial Exhibit 3128: Medication Visit re Mikhel,
San Bernardino County Department of Behavioral Health, 05/29/2005

Trial Exhibit 3129: Medical Visit re Iouri Mikhel,
San Bernardino County Department of Behavioral Health, 06/03/2005

Trial Exhibit 3130: Interdisciplinary Notes re Iouri Mikhel,
San Bernardino County Department of Behavioral Health, 06/15/2005

Trial Exhibit 3131: Interdisciplinary Notes re Iouri Mikhel,
San Bernardino County Department of Behavioral Health, 06/22/2005

Trial Exhibit 3131A: Letter by Jose Flores-Lopez, M.D. re Iouri Mikhel, 01/30/2004

Trial Exhibit 3132A: SHU Review re Iouri Mikhel, Metropolitan Detention Center of Los Angeles, 07/06/2006

Trial Exhibit 3132B: SHU Review re Iouri Mikhel, Metropolitan Detention Center of Los Angeles, 07/28/2006

Trial Exhibit 3132C: SHU Review re Iouri Mikhel, Metropolitan Detention Center of Los Angeles, 08/25/2006

Trial Exhibit 3132D: SHU Review re Iouri Mikhel, Metropolitan Detention Center of Los Angeles, 09/21/2006

Trial Exhibit 3132E: Suicide Risk Assessment re Iouri Mikhel, Metropolitan Detention Center of Los Angeles, 09/06/2006

Trial Exhibit 3134: Letter from William Vicary to Dale Rubin, 01/25/2007

Trial Exhibit 3135: Autobiography of Margarita Fot (Russian)

Trial Exhibit 3136: Autobiography of Margarita Fot (English)

Trial Exhibit 3138: Photograph with Writing in Russian and English Translation

Trial Exhibit 3139: Photograph with Writing in Russian and English Translation

Trial Exhibit 3153: Iouri Mikhel Family Tree

Trial Exhibit 3154: U.S. Department of Justice Memorandum re SAM Order, 06/07/2004

**Exhibit 34 – 494**

Re: Iouri Mikhel

Neuropsychological Testing Scores re Iouri Mikhel, 03/21/2006

Declaration of Inderpal Dhillon, 09/12/2006

Report of Ralph Ihle's Forensic Evaluation of Iouri Mikhel for the Department of Justice, 09/14/2006

Transcript of Psychiatric Evaluation Interview of Iouri Mikhel by Steven Pitt, 11/21/2006

Report of Steven Pitt's Evaluation of Iouri Mikhel Addressed to AUSA Carole Peterson, 12/21/2006

Report of Richard Wetzel's Evaluation of Iouri Mikhel, Addressed to AUSA Carole Peterson, 01/20/2007

Summary of Medical History of Iouri Mikhel by Richard Wetzel

Transcript of Trial Testimony of Iouri Mikhel on 01/03/2007

Transcript of Trial Testimony of Iouri Mikhel on 01/04/2007

Transcript of Trial Testimony of Iouri Mikhel on 01/05/2007

Transcript of Trial Testimony of Inderpal Dhillon on 01/30/2007

Transcript of Trial Testimony of Inderpal Dhillon on 01/31/2007

Transcript of Trial Testimony of William Vicary on 01/31/2007

Transcript of Trial Testimony of Craig Haney on 02/01/2007

Transcript of Trial Testimony of Craig Haney on 02/02/2007

Transcript of Trial Testimony of Craig Haney on 02/06/2007

Second Superseding Indictment, 07/29/2004

Opinion United States v. Iouri Mikhel, Court Of Appeals for the Ninth Circuit, Case No. 07-99008, 05/09/2018

MMPI-2 Correctional Interpretive Report for Iouri Mikhel, 11/27/2006

**Exhibit 34 –  495**

Re: Iouri Mikhel

MMPI-2 Criminal Justice and Correctional Report for Iouri Mikhel, 11/27/2006

MMPI-2 Pre-Trial Criminal Interpretative Report for Iouri Mikhel, 11/27/2006

Transcript of MMPI-2 Evaluation of Iouri Mikhel by Richard Wetzel, Ph.D. (Disc 1), 11/27/2006 (Draft Copy)

Transcript of MMPI-2 Evaluation of Iouri Mikhel by Richard Wetzel, Ph.D. (Disc 2), 11/27/2006 (Draft Copy)

Transcript of MMPI-2 Evaluation of Iouri Mikhel by Richard Wetzel, Ph.D. (Disc 3), 11/27/2006

Video of MMPI-2 Evaluation of Iouri Mikhel by Richard Wetzel, Ph.D. (Disc 1), 11/27/2006

Video of MMPI-2 Evaluation of Iouri Mikhel by Richard Wetzel, Ph.D. (Disc 2), 11/27/2006

Video of MMPI-2 Evaluation of Iouri Mikhel by Richard Wetzel, Ph.D. (Disc 3), 11/27/2006

Video of Psychiatric Evaluation of Iouri Mikhel by Steven Pitt, M.D. (Disc 1), 11/21/2006

Video of Psychiatric Evaluation of Iouri Mikhel by Steven Pitt, M.D. (Disc 2), 11/21/2006

Video of Psychiatric Evaluation of Iouri Mikhel by Steven Pitt, M.D. (Disc 3), 11/21/2006

Transcript of Trial Testimony of Marshall Goldman, Ph.D., 01/30/2007

Transcript of Trial Testimony of Elena Zdravomyslova, Ph.D., 02/02/2007

Medical Record Book, 1972-1984 - Translated into English by Dr. Margaret Michaelian

Declaration of Dr. Jeffrey Hass, Ph.D., 09/12/2023

Declaration of Gary Gentile, 02/21/2023

Declaration of Anton Abramkin, 02/16/2023.

7

**Exhibit 34 -  496**

Re: Iouri Mikhel

**Psychiatric Interviews**

At the outset of the evaluation, I informed Mr. Mikhel that I was conducting a psychiatric evaluation, that it was not confidential, and that anything he told me I might be asked to testify about in a hearing. Mr. Mikhel stated that he understood these conditions and agreed to proceed.

Mr. Mikhel presented as despondent and depressed. He acknowledged a great sense of helplessness and hopelessness about his present circumstances. He thinks he has "lost the ability to express myself" after being held in SAM (extreme solitary confinement) for approximately fifteen years. He described his time in SAM as "complete isolation and sensory deprivation." He had virtually no human contact during those years and no communication with the outside world. He is particularly angry that his attorneys could not get an explanation from the government as to why he was held in solitary confinement when his co-defendant was released from such isolation.

Mr. Mikhel has noticed his concentration has become very poor and his mind "wanders" excessively. He expressed continued depressive symptoms and feelings of hopelessness and helplessness. On more than one occasion he related that if he thought he would be successful, he would kill himself. He made several serious attempts in the past and is angry that he did not succeed. He believes his life is meaningless and that he has been "thrown away." He sleeps about four to five hours a night and in addition to sleep difficulties endorsed anhedonia, low energy, poor concentration and appetite, feelings of hopelessness/helplessness, and passive suicidal ideation. These are well known symptoms of Major Depression. He also has had periods of time in the past where he has had elevated/irritable moods, an increase in energy, racing thoughts, and has been diagnosed with Bipolar Depression during his trial.

**Social History**

Iouri Mikhel was born Yuri Germanovich Michel (Michel is a German spelling) on ▮▮▮, 1965, in St. Petersburg, Russia (Leningrad, USSR). His father, then 53, was German Ivanovich Michel. His mother, 46, was Margarita Genrichovna Michel. On Iouri Mikhel's birth certificate, both parents are listed as Russian, although his mother was also of German descent. As a result of her German ancestry, Mr. Mikhel's mother was never fully accepted as Russian. In Russian society, her status would always remain lower than that of those of full Russian ancestry.

When he was arrested in this case, Mr. Mikhel was 37. He had lived in California for approximately seven years. Prior to that time, Mr. Mikhel lived in Belgium and England. He emigrated from the Soviet Union to Belgium and later, England about three years after his release from a Soviet prison where he was sent around age 18 for committing fraud. At the time that he left Russia, Mr. Mikhel was facing additional criminal charges in an N.K.V.D. tribunal for extortion.

8

**Exhibit 34 - 497**

Re: Iouri Mikhel

Mr. Mikhel came to the United States in 1995 and was married to an American woman in Nevada in 1996. In 1999, Mr. Mikhel was given the status of "permanent lawful resident." He separated from his wife shortly after and moved to Palm Springs with another woman.

On a 2004 jail form, Mr. Mikhel indicated that he was divorced. In 2006, Mr. Mikhel reported to jail staff that he had a four-year-old daughter who lived with her mother in London. He said that he was not in a relationship with the mother of his daughter. They had separated because of "cultural differences." He had never met his daughter.

Mr. Mikhel's parents survived WWII. His mother Margarita was in Leningrad during the German siege of that city, which lasted nearly two and a half years. During the siege, 800,000 residents of Leningrad died of cold and hunger. There was no electricity and food was scarce. Margarita nearly starved to death. There were also continuous artillery bombardments and air raids. Throughout the siege, both women worked in support of the Russian government and for their fellow citizens in Leningrad. Anna Fot was trained as a feldsher, or informal medical practitioner. She later earned a degree as a doctor/bacteriologist, and she served as the director of a medical facility on the frontline during the war. Ana received multiple honors for her military service.

Mr. Mikhel's father served in the Russian army in WWII, but only after first serving time in prison. At the beginning of WWII, German Mikhel violated a law requiring all radio transmitters be given to the Russian government. German kept his transmitter and was sentenced to serve 8 years at a correctional work camp called NKVD Ryblag. He wrote to Joseph Stalin during his prison term, requesting release so that he could serve in the Russian army. In 1944, the Military Tribunal of the Supreme Court of the USSR reclassified German Mikhel's crime and sentenced him to atone for his guilt on the front. German died in 1978, at age 67. Mr. Mikhel was then 12 or 13. He reported that he knew little about his father and described their relationship as "brief." His father was "ill for many years," Mr. Mikhel had "not seen much of him," and his father "spent much of his time in hospital." Medical records indicate that German Mikhel was an alcoholic, who died of pancreatic cancer.

Mr. Mikhel's mother, Margarita, died in 1992, at the age of 73. At the time of his mother's death, Mr. Mikhel was 26 years old. He had been released from a halfway house about a year before her death. Margarita Mikhel's cause of death was listed as stomach cancer.

With regard to his relationship with his mother, Mr. Mikhel disclosed that he was "never close" with her. He mentioned her "advanced" age when he was born. Mr. Mikhel also noted that while he was growing up, his mother "left him alone."

9

**Exhibit 34 -  498**

Re: Iouri Mikhel

When asked about who raised him, Mr. Mikhel appeared to have responded with "self." He has also stated that he lived with his mother and had never left her house until age 19. Records do not support this. Rather, they show that as a young child, until age 10-12, Mr. Mikhel was consistently sent to infant and children's boarding schools, summer homes and camps, and hospitals, for months at a time. He was chronically ill from age 1 to age 12. It is unlikely that his mother was able to visit him, as she was also the caretaker for her mother and her husband and worked to support her family financially. The Soviet government only allowed workers a single day off a week.

When Mr. Mikhel was imprisoned for fraud, he reported that he had not had contact with his brother for years. He explained that the two had "different opinions about how to behave." He [the brother] was an alcoholic." Mr. Mikhel had no family in the US.

Mr. Mikhel's counsel have advised me that they have been unable to complete necessary investigation with regard to his social history as a result of several factors beyond their control, including the outbreak of the Covid-19 pandemic, the Russian invasion of Ukraine, and the diplomatic rift between the US and Russia. I intend to supplement my findings should Mr. Mikhel's legal team have the opportunity to conduct additional investigation in Russia that is relevant to my report.

**Family History of Mental Illness**

Although it is known that Mr. Mikhel suffered a concussion as a child, he was reared from ages 1 to 12 primarily in Soviet institutions, and served time in a prison notorious for its deplorable conditions, little else is known about his life experiences and his mental health prior to his arrest in this case in 2002. A friend of Mr. Mikhel's in California observed in a declaration that he once saw Mr. Mikhel appear to hallucinate. (Gentile Declaration) Subsequent to his arrest, Mr. Mikhel made three serious suicide attempts while in pretrial custody for his capital trial, the last at the commencement of his capital trial. He was diagnosed with depression, bipolar disorder and psychosis by treating physicians in the various jails he was housed in prior to trial.

Two government mental health experts who evaluated Mr. Mikhel (Drs. Pitt and Wetzel) relied exclusively on Mr. Mikhel's self-reports that he had never seriously considered suicide, had a very normal, average childhood and malingered mental illness for personal gain. Mikhel's self-reporting is clearly contradicted by records available at the time of trial; it was inappropriate for the government's experts to credit these statements. Those experts either did not review or inappropriately discredited the records from prior treating mental health professionals, the records from the institutions where Mr. Mikhel was treated and the records of Mr. Mikhel's personal or family history.

Mr. Mikhel believed that his grandmother Anna Fot, and his parents German and Margarita, were "traumatized" by their experiences in WWII. Little is known of what German Mikhel experienced as a Russian soldier during WWII, but he was deeply

10

**Exhibit 34 - 499**

Re: Iouri Mikhel

affected by his service. He was not formally diagnosed with "shell shock," as this would have been a rare diagnosis in Russia at that time. After the war, German began drinking heavily, became an alcoholic, and was disabled and unable to work. Mr. Mikhel's mother cared for her husband until he died of pancreatic cancer when Mr. Mikhel was an adolescent. "The Soviet regime paid little attention to veterans' post-war health, such as PTSD. Psychological trauma was not considered a medical condition but instead was blamed on weak will or similar problems of one's own lack of discipline." (Dr. Jeffrey Hass Declaration)

The horrible conditions that Margarita Michel endured while living in Leningrad during the German blockade of that city affected her psychological and physical health. Likewise, Anna Fot suffered long-term mental health issues following the war. She was found to be disabled in 1946. Much later, Margarita was also declared disabled, and unable to work, in 1992. She died the same year from stomach cancer.

On July 20, 1945, Anna Fot was certified by the Russian Military Medical Commission as "physically limited." The reason for her physical limitation: Cerebral pre-sclerosis with hysterical reactions. (BSA 4147)

Today, Anna's diagnosis would be pre-multiple sclerosis and would include either: a) disturbances of memory and concentration and/or; b) nervousness - inward restlessness - increased irritability and/or; c) fatigue - decrease of performance (diminution of cerebral performance). Anna's diagnosis could also have been the degenerative process of Alzheimer's disease.

After 1945, the Leningrad Municipal Council of Workers' Deputies Medical Disability Commission conducted an investigation to determine whether Anna Fot had a disability, its extent and its character. On March 22, 1946, Anna Fot was placed in Disability Group II for a six-month pension issue. The disability commission found that Anna needed treatment. On September 22, 1946, a full list of diagnoses of the medical disability commission was produced. Anna was diagnosed with Sclerosis of Brain Vessels with Psychiatric Disorders; Subacid gastritis; Myocardial dystrophy; and Emphysema. She was 54 years old. (Tab 90, BSA 4148) According to Margarita's personal files, Anna underwent psychiatric treatment in the years after the war. (Declaration of Dr. Jeffrey Hass)

On September 5, 1973, Margarita Mikhel was given a teacher's pension of 130 rubles per month for 15 to 25 years. On April 28, 1992, she was declared an "invalid" as a result of an unspecified disability. The Medical Disability Expert Commission found that Margarita was unable to work. She was placed in disability Group I, with the reason being "general illness." (Tab 94, BSA-4204; Tab 126, BSA-4728) There was insufficient evidence as to whether Margarita suffered from mental illness or not.

11

**Exhibit 34 -  500**

Re: Iouri Mikhel

As noted above, Mr. Mikhel's brother, Vladimir Mikhel, was 15 years older than he was. They had not been in contact since 1982. Mr. Mikhel has stated that Vladimir was an alcoholic. Vladimir Mikhel died in 1996. It appears that he suffered not only from alcoholism but also from mental illness, likely including some form of depression. Vladimir took his own life. He hanged himself. (Declaration of Dr. Jeffrey Hass)

In summary, there is a strong familial history of mental illness in this case. Based on the foregoing, it is my opinion that Mr. Mikhel was genetically predisposed to developing mental illness.

**Expert Trial Testimony - Sociological**

*Elena Zdavaromyslova, Ph.D. ("Dr. Elena") - Background*
Dr. Elena Zdaravomyslova, a sociologist at St. Petersburg University, testified that Mr. Mikhel's mother, Margarita, wrote an autobiography in which she described her mother, Anna Fot, as a heroine of WWII, who received high honors from the Soviet government for her service as a doctor during the German Siege of Leningrad, in which "over a million people died from bombings and starvation combined."

Margarita Mikhel detailed her mother's wartime efforts on behalf of Russia in a 1945 job/university application to demonstrate that she herself was a patriotic Soviet citizen. Margarita's father was of German ethnicity, and she sought to distance herself from her paternal German heritage. Dr. Elena testified that in 1945, "all Germans were equivalent to Nazis to the Russian people."

In the application, Mr. Mikhel's mother disguised her German surname and disguised her father's ethnicity by stating that he was Mennonite. Margarita Mikhel emphasized that she spent only one and a half years of her life living with her (German) biological father before her parents divorced, that her mother later married a Russian man, and that she was raised by Russian parents with no German ethnicity. She further indicated that she was known to be ethnic Russian: "I consider myself ethnic Russian and the word German in my passport does not reflect reality and was written in my passport on my mother's request, without my knowledge and consent."

Dr. Elena testified that although Margarita Mikhel wrote her application in 1945 and Mr. Mikhel was not born until 1965, "the fact remains that after the Second World War and particularly in the Soviet Union, those with German ethnicity were stigmatized and persecuted." Mr. Mikhel's grandmother, Anna Fot, wrote that Margarita herself was a courageous fighter during WWII and received a medal for the defense of Leningrad in 1942.

Dr. Elena stated that surviving the German siege "was incredibly difficult and traumatized survivors for life." Because of her paternal German ancestry, Mr. Mikhel's

12

**Exhibit 34 -  501**

Re: Iouri Mikhel

mother's ability to move up socially was "significantly impaired." "The Soviet government had in place, even prior to the Second World War, a special anti-German policy. Germans were forcibly resettled in Siberia, where they were placed in labor camps. Those of German origin in Russia felt vulnerable and frequently tried to conceal their ethnic origin."

According to Dr. Elena, Mr. Mikhel's family were lower middle class. They were described as middle class because they were educated professionals, not because of their earnings or assets. The family lived in a communal apartment that they shared with unrelated neighbors. The housing belonged to the Soviet state. When Mr. Mikhel's mother became pregnant with him, the family lived in a shared three-room apartment. One room was occupied by a KGB officer and another was occupied by Mr. Mikhel's uncle, son, and wife. The third room was occupied by Mr. Mikhel's father, his older son Vladimir, and Mr. Mikhel's mother. A German woman, who appeared to be a grandparent, also shared one of the two rooms. "It was an uncomfortable housing situation, with several generations and two brothers living in one household."

When Mr. Mikhel's mother became pregnant, it was necessary for her to move into a separate room with Anna Fot, Mr. Mikhel's grandmother. "Margarita's pregnancy was shocking for the family." They were not happy. Margarita was 46 years old, German was 53. Margarita already had a 15 year old son.

Dr. Elena testified that the average age of a mother at that time in the Soviet Union was 22. Women older than 23 were considered "old mothers." The family was upset because Margarita's pregnancy would affect their housing situation. Mr. Mikhel's family, including his extended family, "broke up" in part because of his birth. The family members "stopped communicating and supporting each other." Mr. Mikhel's mother was considered to be too old and his father was sick and getting sicker. Margarita Mikhel only had the support of her own mother, who was nearly 80 years old.

Dr. Elena stated that medical records beginning with Mr. Mikhel's birth show that he was fed incorrectly and was often ill. His mother refused to bring him for regular medical examinations. Beginning at one year, Mr. Mikhel was chronically ill with ear infections, tonsillitis, and double pneumonia. It was suggested that he be placed in a children's hospital, but his mother initially refused. Dr. Elena testified that it was odd that a month later, Mr. Mikhel's mother placed him in a boarding nursery, after which he returned home sick again. Mr. Mikhel "repeated this pattern of a week or two in a hospital and a week or two in a boarding nursery."

In Dr. Elena's opinion this pattern "suggested that Mr. Mikhel was seriously emotionally deprived." His placement in institutions "did not afford him any privacy and would have had a huge psychological impact on him." She testified that "Margarita Mikhel's failure

13

**Exhibit 34 - 502**

Re: Iouri Mikhel

to care for Mr. Mikhel and her abandonment of him to institutions demonstrated that she was a poor mother."

Mr. Mikhel was primarily socialized in Soviet institutions, from early infancy until school. He was in nursery boarding facilities, which housed children from nine months old until three years old. He was also placed in sanatoriums, which were considered boarding health rehabilitation centers. Lastly, he was boarded in hospitals. In all three forms of boarding facilities, Dr. Elena again emphasized that "visitation by parents was rare."

From the age of one until the age of seven, Mr. Mikhel suffered from pneumonia seven times. In the summers, Mr. Mikhel "was sent to boarding kindergartens in the country, where he would live for 90 days away from his home with visitation only possible twice a month." In Dr. Elena's opinion, Mr. Mikhel was "severely neglected as a child." He lived like an orphan and later, after being released from prison, he lived like a homeless person. He lost all his residency rights in St. Petersburg after being imprisoned. This was a part of Soviet culture and law.

When Mr. Mikhel was 12, his father died, and when he was 13, his maternal grandmother died. Mr. Mikhel's father was sick throughout his childhood. Medical records suggest that he was an alcoholic. His maternal grandmother was approximately 79 years old when Mr. Mikhel was born and she suffered from dementia. Mr. Mikhel's older brother, Vladmir, was also reportedly an alcoholic. Vladimir introduced Mr. Mikhel to illegal work. He showed Mr. Mikhel how to use state-owned photography equipment for private purposes and personal profit. Vladimir appeared at his mother Margarita's funeral drunk.

Dr. Elena testified Mr. Mikhel made several attempts to avoid Soviet military service, which was a routine practice in the former Soviet Union. Soviet troops had invaded Afghanistan [in 1979] and young Soviet men did not want to fight. In her opinion, Mr. Mikhel could have escaped military service at age 18 by demonstrating that he was the sole source of support for his mother. Instead, he forged documents to exempt himself and was sent to prison after his forgeries were discovered.

The Soviet correctional system failed to provide even the most basic provisions for inmates, who were forced to rely on family members and friends. Dr. Elena explained that any person imprisoned in Russia loses all rights to state housing and cannot resume residency without an application from family members. She described Mr. Mikhel as "homeless," but during cross examination at trial clarified that she used that word "homeless" as a metaphor.

In order to improve his economic situation, Dr. Elena testified that Mr. Mikhel became involved in a shadow economy, economic activities not registered by the government. The activities themselves were not necessarily illegal, but the government received no

14

**Exhibit 34 - 503**

Re: Iouri Mikhel

taxes from them. She provided examples of teachers tutoring outside of school or people using their cars and charging others for driving them places. Dr. Elena stated that "other than working in the shadow economy, the only way to improve your economic situation in Russia was to become a communist party member." Mr. Mikhel worked for his brother Vladimir and was not a communist party member.

**Mental Health Evaluations and Treatment**

*Dr. Inderpal Dhillon - Treatment 2004; Declaration 2006*
On September 12, 2006, Dr. Inderpal Dhillon, a psychiatrist employed as a contractor by the County of San Bernardino, supervised the psychiatric treatment of Mr. Mikhel while he was incarcerated at the West Valley Detention Center. Dr. Dhillon treated Mr. Mikhel from January 2004 through June 2006.

In her declaration, Dr. Dhillon stated that she began treating Mr. Mikhel in 2004, after Mr. Mikhel made his first suicide attempt after being arrested. She detailed how Mr. Mikhel "made a serious suicide attempt by cutting a deep laceration in his left ankle area. Based on the amount of blood lost, I considered it a serious attempt on his part to bleed to death." Mr. Mikhel was "diagnosed with major depression and treated with antidepressants - Effexor, Remeron and [the benzodiazepine medication] Restoril."

According to Dr. Dhillon, Effexor was discontinued as it was not beneficial to Mr. Mikhel. It caused him "to have racing thoughts and impaired his concentration," particularly with regard to reading and retaining information. Mr. Mikhel also "reported hearing noises and things" while taking Effexor.

Dr. Dhillon next prescribed Zyprexa and later, Seroquel. Mr. Mikhel's diagnosis was changed to bipolar depression. Mr. Mikhel seemed to "do well on Seroquel," but he requested to stop the medication "because of leg movements."

"On April 15, 2005, Mr. Mikhel made his second suicide attempt after arrest by overdosing on Seroquel which he had hoarded over a couple of months prior January 2005." Mr. Mikhel "was found passed out." He "was stabilized in the medical ICU at Arrowhead Regional Medical Center."

When Mr. Mikhel was returned to West Valley Detention Center, Dr. Dhillon determined that "his risk of committing suicide, and succeeding, was considered very high." Mr. Mikhel was monitored hourly and received all medications in liquid form. "He was seen as hopelessly depressed, unable to sleep, and ashamed at not having succeeded in his attempts." Insomnia was a chronic problem for Mr. Mikhel.

Mr. Mikhel allowed Dr. Dhillon to treat him with new medications. Dr. Dhillon believed that Mr. Mikhel's insomnia "definitely required he be stabilized for his mood to start

15

**Exhibit 34 -  504**

Re: Iouri Mikhel

improving." Lithium caused Mr. Mikhel ``gastrointestinal upset." When he took Lamictal, Mr. Mikhel became "hypomanic, reporting 2-3 lines of thought at the same time, not needing sleep, and writing voraciously about incoherent ideas." Depakote was "well tolerated" by Mr. Mikhel. Seroquel produced "good results," and Restoril, 60 mg daily, "also had good results." Dr. Dhillon concluded that a "combination of Depakote, Restoril and Seroquel seemed to be a good" for Mr. Mikhel.

At the end of her declaration, Dr. Dhillon opined that Mr. Mikhel "should be treated as Bipolar Disorder I, Most Recent Episode, Severe." She emphasized that Mr. Mikhel "is at a very high risk for suicide." At trial, she later clarified that the correct diagnosis was Bipolar Disorder II.

*Dr. Ralph Ihle, Ph.D. - September 7, and 10, 2006 Forensic Interviews*
During a September 7, 2006 forensic interview, Mr. Mikhel, then 41, shared with state psychologist Dr. Ihle, that he had a four-year-old daughter who lived with her mother in London, but that he was no longer in a relationship with the woman. Neither of his parents was alive. His brother was also deceased. Mr. Mikhel disclosed that he had been arrested at his home in Encino, on February 19, 2002.

Asked to describe himself, Mr. Mikhel said he was a "normal person." Growing up, he described himself as "out of place." Mr. Mikhel said that he was "self-employed all his life." He might have listed "caring for parents" as a job. Mr. Mikhel explained that in Russia he was always doing something. It was "illegal not to work in Russia."
Mr. Mikhel told Dr. Ihle that he began drinking alcohol around age 27. He denied using "illicit drugs." He reported that his appendix was removed when he was ten and that he fell off a bike around 13. With regard to the latter injury, Mr. Mikhel stated that he was diagnosed with a concussion and spent two weeks in the hospital.

During the interview with Dr. Ihle, Mr. Mikhel said that he had received mental health treatment "over the last couple of years" at the San Bernardino Jail and the West Valley Detention Center. He seemed to indicate that he made suicide attempts "every other week" during the last two years. (It does not appear that Dr. Ihle understood that Mr. Mikhel was joking and downplaying the seriousness of his actions.)

In response to questions on the Competency Assessment Form, administered by Dr. Ihle on September 10, 2006, Mr. Mikhel indicated that he had been charged with several felonies, including hostage taking that resulted in death and money laundering. He was aware of the possible sentences he might receive if found guilty and stated that he would ask for the death penalty. If found not guilty in federal court, Mr. Mikhel believed that he would be charged again by the State of California. If found not guilty by reason of insanity, Mr. Mikhel said that he would be sent to a private institution and would "kill himself out of embarrassment."

16

**Exhibit 34 - 505**

Re: Iouri Mikhel

Among other things, Mr. Mikhel's responses to Dr. Ihle's questions demonstrate that he was of at least average intelligence, spoke English competently, was well-informed about his case and trial and had a dark, sarcastic sense of humor. Mr. Mikhel reported to Dr. Ihle that he did not have confidence in his attorney. When asked if he disagreed with his lawyer's handling of specific parts of the case, Mr. Mikhel responded that there were "too many things to list." He wanted the outcome of his trial to be a death sentence. He said "not guilty is not possible."

In an evaluation section titled "Suicidality," Dr. Ihle documented that for the last three years, Mr. Mikhel had thought he would "be better off dead or wished he was dead." He had "fleeting" thoughts of harming himself. Mr. Mikhel claimed that he had "not really" attempted suicide. He laughed and said he was embarrassed. He did acknowledge that he had "attempted to OD two years ago," but failed to share his attempt to kill himself via a deep cut to his ankle. He mentioned that he believed in nihilism and was a fan of Friedrich Nietzsche.

When asked, Mr. Mikhel reported no mania or manic symptoms. With regard to questions used to determine if he had antisocial personality disorder, Mr. Mikhel admitted that he did repeatedly skip school, that he had done things that were illegal even though he didn't get caught, and that he had been in physical fights repeatedly.

*Dr. William Vicary, J.D., M.D., Forensic Psychologist*
Dr. Vicary interviewed Mr. Mikhel for defense counsel on September 2, 2006. He produced a Summary Report by letter on September 5, 2006. In the report, Dr. Vicary opined that Mr. Mikhel had "Bipolar Disorder, the same diagnosis he had been given in custody and for which he was treated with mood stabilizing and antidepressant medications." He stated that Mr. Mikhel had made "two prior 'serious suicide attempts.'" In the first, "he slashed his right lower leg and lost a significant amount of blood," requiring hospitalization and sutures. On the second attempt, "he took a massive dose of psychiatric medication. He collapsed and was found unresponsive. He had to be hospitalized and put on a ventilator. The second attempt was almost successful."

Dr. Vicary advised defense counsel that Mr. Mikhel continued "to suffer from depressive and hypomanic symptoms. These include dysphoria, suicidal ideation, mood intensity, irritability, and a profound difficulty in sleeping." In Dr. Vicary's opinion, Mr. Mikhel needed psychiatric treatment and medication, something he had not received since being transferred from the West Valley Detention Center to the Metropolitan Detention Center (MDC), in Los Angeles. Dr. Vicary stated that Mr. Mikhel had "been a demanding, unrealistic, irritable, and intense client. He qualified his statement by adding that "[t]his behavior is largely due to his untreated Bipolar Disorder."

Lastly, Dr. Vicary reported that Mr. Mikhel suffered from Gastric Reflux Disorder, had chronic persistent abdominal pain and was at risk for a gastric hemorrhage. Mr. Mikhel's

17

**Exhibit 34 -  506**

Re: Iouri Mikhel

blood pressure, recently registered at 180/100, was high. He was not compliant with antihypertensive medications. Records demonstrate that Mr. Mikhel consistently refused to acknowledge his blood pressure was high and declined medication.

In a September 12, 2006 letter to Dr. Ihle, Chief Psychologist at the MDC, Dr. Vicary wrote that he had reinterviewed Mr. Mikhel on September 12, 2006, for 45 minutes. Dr. Vicary advised that he had reviewed Dr. Ihle's initial evaluation as well as the declaration of Dr. Inderpal Dhillon. Mr. Mikhel was in trial at the time Dr. Vicary wrote his letter.

In the letter, Dr. Vicary described how Mr. Mikhel had "made a nearly successful suicide attempt last Tuesday evening." This was Mr. Mikhel's third suicide attempt after being arrested. Mr. Mikhel had "formed a rope from a sheet and tried to hang himself from a sprinkler fixture. The attempt failed when the fixture broke." Mr. Mikhel "was left with a ligature mark around his neck."

Dr. Vicary made reference to Dr. Ihle spending three and a half hours interviewing Mr. Mikhel on a Friday, three days after the suicide attempt. Another MDC staff psychiatrist saw Mr. Mikhel on Saturday, four days after the suicide attempt, and prescribed Prozac, for Mr. Mikhel, to begin on Sunday. Dr. Vicary pointed out that five days had passed and Mr. Mikhel had still not received any medication.

Dr. Vicary further stated that Dr. Dhillon had previously reviewed Mr. Mikhel's history of "mood symptoms and near lethal suicide attempts." After diagnosing Mr. Mikhel with Bipolar Disorder, Dr. Dhillon had treated Mr. Mikhel with antidepressants and mood stabilizers. Mr. Mikhel was considered "a very high risk for suicide."

Dr. Vicary found that Mr. Mikhel continued to exhibit symptoms of mania and depression and had also experienced psychotic symptoms. In his opinion, Mr. Mikhel's "bipolar symptoms compromise the rationality of his thinking." "He is suspicious of authority figures and is reluctant to disclose his psychiatric symptoms to a layperson or even a trained professional. He can appear to be a merely frustrated, unhappy, manipulative individual." Dr. Vicary explained that prescribing Prozac to a patient with Mr. Mikhel's bipolar symptoms, however, "carries the risk of destabilizing his mood and increasing his risk for suicide." He concluded by advising the MDC that Mr. Mikhel was "under tremendous stress," "is in trial" and "[h]is mental stability is crucial to the successful completion of the trial."

*Dr. Craig Haney, J.D., Ph.D. - Testimony During the Penalty Phase of Trial*
Dr. Haney, a social psychologist, testified to numerous "risk factors" that were present in Mr. Mikhel's life from his birth forward. Risk factors that applied to Mr. Mikhel would be considered mitigation, reasons to decline the death penalty.

The applicable factors that Dr. Haney found are summarized below:

18

**Exhibit 34 -  507**

Re: Iouri Mikhel

- Family-based risk factors: Attachment disorder; child trauma and stress, indirect and direct; family illness and death; loss; abandonment and institutionalization
- Potential school-related risk factors: Low levels of bonding; attendance problems; health-related problems; academic performance apparently below potential
- Peer-related factors: difficulty in locating a schoolmate or a friend of Mr. Mihkel; Older brother (15 years older), returned to the family after serving in the Russian military. He involved Mr. Mikhel in "illegal activities," i.e., processing photographs for money, a private, for-profit activity illegal in the Soviet Union.
- Economic risk factors: Scarcity and rationing of goods/housing; deprivation
- Community risk factors: Mr. Mikhel lived in a community where poverty was severe enough that it affected the way people around him were behaving: inadequate housing; growth of the shadow economy
- Institution/prison risk factors: Incarcerated pre-trial in Kresty Prison for approximately 2 years; Four years in a prison; then release to a halfway house

Dr. Haney toured Kresty Prison and described it as being "in extraordinarily dilapidated condition, having a rancorous odor, and extremely crowded." He personally observed small cells with many people crammed together in them. He testified that Russian prisons in general have been plagued by health problems. Kresty had a tuberculosis epidemic when he visited. Mr. Mikhel contracted tuberculosis while incarcerated there. Dr. Haney believed Mr. Mikhel's entering prison had a retraumatizing effect.

At Kresty, there was no prison classification based on types of crimes committed. Dr. Haney testified that Mr. Mikhel would have seen a profound level of violence. "There was severe, even brutal treatment by staff and brutal treatment and mistreatment taking place from inmate to inmate. Mr. Mikhel acknowledges that he had been exposed to that kind of violence."

Post-institution risk factors: There were no programs to address any damage that might have been done to Mr. Mikhel while in prison. There were significant obstacles for his reintegration into Russian society. He learned no skills in prison which would have been marketable. As a result of his time in prison, Mr. Mikhel lost his claim on state housing and employment. When Mr. Mikhel was released from prison, Russian society was rapidly transitioning and transforming.

In total, Dr. Haney found 32 risk factors that Mr. Mikhel had been exposed to. He testified that many of these factors were important "because Mr. Mikhel was exposed to them from the ages of 0 to 6 years." Mr. Mikhel "was significantly affected and adversely affected by many of the things that happened to him. These set up lasting issues and problems, both psychological and emotional. Mr. Mikhel did not have access to services such as counseling or therapy. In general, in the Soviet Union, there was a cultural norm not to complain about problems and not to recognize trauma or treat it." On cross examination, Dr. Haney testified that Mr. Mikhel had become more violent as he aged.

19

**Exhibit 34 -  508**

Re: Iouri Mikhel

**Jail and Prison Mental Health Treatment — Notes, Diagnoses, Medications**

*Metropolitan Detention Center, Los Angeles (MDC)*
March 26, 2003: A "Special Housing (SHU) Review" was performed by Laurie Schoellkopf, Psy.D., Drug Abuse Psychologist. She noted that Mr. Mikhel had been placed in the SHU on March 7, 2003. Her "psychological review" of Mr. Mikhel resulted in her determining that Mr. Mikhel had no significant mental health problems, that his adjustment to the SHU was satisfactory and that his risk of self-harm was judged to be low as was his risk of harm to others. Mr. Mikhel was referenced in MDC records as a Russian citizen, 37 years old, Caucasian, who spoke fluent Russian. He "denied any significant past history of mental health treatment or use of psychotropic medications." He showed no signs of psychological distress or need for medication consultation. He claimed to be coping and "appeared to be in good spirits." Mr. Mikhel "denied that he had ever made a suicide attempt, and was not currently experiencing suicidal ideations."
June 7, 2006: Bureau of Prisons (BOP) Psychology Data System. Dr. James L. Bernhardt, Psy.D, Forensics Unit Psychologist, screened Mr. Mikhel upon his arrival at MDC. Mr. Mikhel was seen "due to a reported history of mental health treatment and self-harm gestures." An observation was made that Mr. Mikhel presented as "irritable/mildly hostile in mood with a congruent affect." He "self-reported difficulties with sleep and mild depression." Mr. Mikhel shared only that he had cut himself on the leg previously, and dismissed it "as a self-harm gesture."
September 6, 2006: Mr. Mikhel made a third suicide attempt while at MDC. He hanged himself. He nearly succeeded in the attempt and was placed on suicide watch.
January 2007: Mr. Mikhel remained on suicide watch.
January 20, 2007: Mr. Mikel was observed by staff to have been pacing his cell and to be "more anxious."
January 21, 2007: Dr. Bernhardt saw Mr. Mikhel for daily suicide watch contact. "No immediate behavioral concerns were noted or reported."

*San Bernardino County Detention Center (CDC)*
January 30, 2004: Letter from Psychiatrist Jose Flores-Lopez. Dr. Flores-Lopez wrote a letter (to CDC administration) requesting that Mr. Mikhel, then housed in a single cell at San Bernardino, be given a higher level of psychiatric care than that provided at San Bernardino. "Mr. Mikhel remains acutely suicidal and depressed. He requires 24-hour suicide watch, as well as daily psychiatric consultations. He is uncooperative, unpredictable and exhibits severe mood swings, as well as severe depression."

According to Dr. Flores-Lopez, Mr. Mikhel was "discarding his psychiatric medications." As a result, Dr. Flores-Lopez believed he was "a strong candidate for involuntary medication." CDC was unable to accommodate patients requiring involuntary psychiatric medication or with such a high level of psychiatric need. Thus, Dr. Flores-Lopez concluded: "It is crucial that Mr. Mikhel be transported to a facility where all of his

20

**Exhibit 34 –  509**

Re: Iouri Mikhel

psychiatric needs can be addressed." Also on this date, Mr. Mikhel was placed on modified suicide watch, with checks every 15 minutes.

*West Valley Medical Center*
January 21, 2004: First suicide attempt post arrest. Mr. Mikhel was referred to medical after he intentionally cut his left ankle and lost a lot of blood. Mr. Mikhel looked tired, but his thinking was reported as clear, coherent and oriented. He reported that he wished he had cut deeper and that he was "unsure" about suicidal ideation. He was also "unsure" how sad he was. His mental health was to be monitored. He had anemia from loss of blood. He required seven sutures.
January 22, 2004: During a medication visit, Mr. Mikhel appeared "very depressed and tense." He was also tearful. Mr. Mikhel felt that his situation was hopeless and wanted to go home. He was diagnosed with Major Depression and having made a "severe, serious suicide attempt." Trazodone was prescribed. Mr. Mikhel reported no history of mental health issues and denied any substance use. On a "DSM-IV DX sheet," Mr. Mikhel was given an Axis I Diagnosis of 309.9, Adjustment Disorder, unspecified. He was also assigned a billable medical code of V71.09, indicating that he required observation for other suspected mental conditions. Mr. Mikhel's GAF score was 68. It was noted that Mr. Mikhel had a history of high blood pressure. The DSM-IV form was signed by Ms. H. Monica Hsieh, LMFT.
January 23, 2004: Mr. Mikhel was removed from his cell and moved to a "safety cell" after he was observed repeatedly banging his head against the wall. Initially, he refused to respond when spoken to. Later, he told staff that he was not depressed and had no mental health problems. Mr. Mikel began crying at some point and said, "I promise I won't do it again." He appeared to be referring to banging his head. Mr. Mikhel also said that previously he had "cut [his] leg to go to a better place after death." Mr. Mikhel denied having delusions. He was prescribed Trazodone and Remeron.
January 24, 2004: Mr. Mikhel's chart was reviewed. He responded to staff questions by stating only that he was cold and tired.
January 25, 2004: During a medication visit, Mr. Mikhel was described as "guarded and vague regarding his recent suicide attempt." He denied feeling depressed or having any mental illness. He responded to all questions regarding "SA and SI" with "I was going to a place."
January 26, 2004: Mr. Mikhel had another medication visit during which he "talked a great deal about his prescriptions on file." He stated that he still needed his own cell, possibly to improve his mental health. Mr. Mikhel also stated that "he would not kill himself now." He was to be taken off suicide watch and returned to the CDC. In another interview on this date, Mr. Mikhel discussed the death penalty. He told mental health staff that his attorney of choice had been fired and that he now had an appointed attorney. He continued to discuss "the place where he would be better off." It appears that the interviewer believed Mr. Mikhel was psychotic. Mr. Mikhel was also judged to be at very high risk of suicide.

21

**Exhibit 34 -  510**

Re: Iouri Mikhel

January 30, 2004: A "Psy. Med. Eval" was conducted. Mr. Mikhel was found to "remain a danger to self." "He is highly depressed. He has been seen throwing his 4 meds away. Remains a suicide risk." Mr. Mikhel was further described as needing a transfer to obtain a higher level of psychiatric care. Progress notes on this date show that Mr. Mikhel was in his cell on suicide watch, wearing a paper gown. He was "pacing [his] cell from one corner to another corner." Custody officers reported that Mr. Mikhel "has been pacing the entire shift." His affect was flat. He did not appear to be in any distress.

February 2, 2004: U.S. Marshals' correspondence stated that on this date Mr. Mikhel was not at CDC San Bernardino. He was at West Valley "SBSO". The SBSO had communicated that it could not meet Mr. Mikhel's needs and that "[h]e must leave." Also on this date, during a medication visit, Mr. Mikhel discussed not wanting to live. He had been prescribed Effexor 75 mg. His emotion was "mildly blunted."

February 4, 2004: After a second post-arrest suicide attempt, Mr. Mikhel refused a blood transfusion. He was not cooperative during a physical examination. A "psych consult" was ordered. Mr. Mikhel was described as depressed and suicidal. The officer who found Mr. Mikhel after he attempted suicide observed him in his cell, sitting slumped over on his bed. A Fritos bag filled with pills was on the bunk near Mr. Mikhel. He was unresponsive. Medical staff were notified. An IV was started and an oxygen mask was used. Mr. Mikhel was taken to Kaiser Hospital in Fontana. More than two hundred "assorted pills" were found in Mr. Mikhel's cell. Mr. Mikhel's personal notes, which are largely illegible, appear to contain a suicide note/declaration, statements regarding his loneliness, betrayal by love, and efforts to retain memories of Russia. Mr. Mikhel wrote that if he were to write about his life, he doubted he could do it in Russian. He stated that "I started having even my dreams in English." This was to him, "the sign of almost total transformation." Mr. Mikhel also wrote that his mind and body were deteriorating and degrading and that he was disgusted with himself. One of his last legible statements was: "All silly and undignified and ultimately meaningless futility that I call my life now." Within these papers, a letter from Mr. Mikhel to his attorney was discovered and read. In the letter, Mr. Mikhel wrote that "In the event of my sudden departure - i.e., death - all legal material to be forwarded to my attorney . . ." Mr. Mikhel left his personal property - books - to his attorney as well. An inmate property release had been signed and dated by Mr. Mikhel.

Overall, Mr. Mikhel was described as a "high risk inmate." He had been placed on suicide watch "several times" prior to his April 15, 2005 attempt. Mr. Mikhel was last removed from suicide watch on April 10, 2005. Mr. Mikhel was also considered an escape risk and had been disciplined in January 2004 for creating escape plans.

*San Bernardino County Sheriff's Detention Facility — Notes on First Known Suicide Attempt After Arrest*

January 20, 2004: Mr. Mikhel was found in his cell. He was unresponsive and had a laceration to his left ankle. An injury report showed that a guard had been performing hourly checks of Mr. Mikhel. When the guard attempted to retrieve Mr. Mikhel's food

22

**Exhibit 34 -  511**

Re: Iouri Mikhel

tray, he saw that Mr. Mikhel had a razor blade and blood on his hands and a foot. He observed Mr. Mikhel cut himself two more times.

*Arrowhead Regional Medical Center — Notes on First Suicide Attempt*
January 21, 2004: Mr. Mikhel was housed in Unit 16. He was given Motrin four times daily for pain and Benadryl 50 mg for 30 days. His sutures were set to be removed in ten days.
January 23, 2004: Mr. Mikhel's suicide watch was continued. He was prescribed 50 mg of Trazodone, 30 mg of Remeron and 1 mg of Ativan, for one month. He was also prescribed (illegible) 2 mg "for now."
January 26, 2004: Mr. Mikhel's prescription for Ativan was discontinued. He was prescribed Restoril and Remeron, 30 mg each. A note was made that he "[m]ay return to CDC." It was reported that it was "[t]ime for a higher level of care where he can see a psychiatrist daily and involuntary meds can be administered."

*Kern County Medical Center Records (Bakersfield)*
February 21, 2002: Mr. Mikhel had a positive PPD skin test on this date. Blood drawn for Mr. Mikhel's ALT test was also positive for TB. A chest x-ray showed no active pulmonary tuberculosis. Mr. Mikhel had tuberculosis as a child and while he was in prison in Russia.
March 5, 2002: Mr. Mikhel was prescribed six months of INH 300 mg therapy.

**Medications**

Records show that Mr. Mikhel was prescribed the following medications: Trazodone, Lithium, Remeron, Restoril, Risperdal, Effexor, Benadryl, Ativan, INH, Prozac, Seroquel, Tenormin and Abilify.

**Psychiatric Evaluations and Testing by Government Experts for Trial**

*Dr. Steven Pitt's Psychiatric Evaluation of Mr. Mikhel - November 1, 2006*
Dr. Pitt conducted a psychiatric evaluation of Mr. Mikhel on behalf of the United States Attorney's Office, Central District of California, on November 1, 2006. He provided a summary of his evaluation, during which he answered six questions specifically requested by AUSA Carole C. Peterson, on December 21, 2006. Additionally, Dr. Pitt performed a semi-structured interview that covered Mr. Mikhel's psychiatric, medical, legal, relationship and employment history. The evaluation was video recorded and audiotaped.

Dr. Pitt opined that:
1) Mr. Mikhel's capacity at the time of commission of the offenses for which he had been charged was not impaired. Rather, his behavior was goal directed, designed to conceal his involvement and avoid arrest. He was able to appreciate the wrongfulness of his conduct and conform his behavior to the requirements of the law.

23

**Exhibit 34 -  512**

Re: Iouri Mikhel

2) Mr. Mikhel was not under any unusual and substantial duress at the time of the offenses.

3) Mr. Mikhel did not commit the offenses under a severe mental or emotional disturbance.

4) With regard to whether there was anything in Mr. Mikhel's background, record or character that would mitigate against imposition of the death penalty, Dr. Pitt listed a series of psychosocial events "that could, in theory, mitigate against the death penalty." Among these were Mr. Mikhel's "home life, poverty, childhood illness, the culture of Perestroika in the Soviet Union" and Mr. Mikhel's "alleged hatred of the Afghan war and his attempts to evade military service." Ultimately, Dr. Pitt found these psychosocial events insufficient as mitigation.

5) There was nothing in Mr. Mikhel's history to suggest that prior to his arrest he suffered from any mental disease, defect or impairment. Dr. Pitt did observe that "subsequent to his arrest, the defendant has made at least two suicide attempts and has been diagnosed with a mood disorder." He continued by stating that "it is conceivable that Mr. Mikhel developed a mood disorder following his arrest that is part and parcel of his circumstance." Dr. Pitt noted that since his incarceration, "Mr. Mikhel has been diagnosed with a Major Depressive disorder." In Dr. Pitt's opinion, Mr. Mikhel did not have that condition, but rather a mild form of depression best described by the DSM-IV-TR as an Adjustment Disorder with Depressed Mood, Chronic.

6) Nothing in Mr. Mikhel's past or present mental condition explained his commission of the offenses. "Iouri Mikhel is an intelligent, narcissistic, opportunistic, sociopath who, time and again acted in a calculating and cunning manner to perpetrate the alleged offenses."

*Dr. Richard Wetzel's Evaluation of Mr. Mikhel, November 27, 2006*
Dr. Wetzel evaluated Mr. Mikhel on November 27, 2006, at the MDC. He attempted to interview Mr. Mikhel again on January 15, 2007, but Mr. Mikhel declined to allow a second evaluation. Based on his six and one half hour evaluation of Mr. Mikhel on November 27, Dr. Wetzel diagnosed Mr. Mikhel with an Axis I Adjustment Disorder with depressive symptoms, and an Axis II Personality Disorder - NOS with narcissistic and passive-aggressive features.

The purpose of Dr. Wetzel's evaluation was to prepare opinions for the penalty phase of Mr. Mikhel's capital trial.

It appears that Dr. Wetzel relied on Mr. Mikhel's self-report on family history. In describing Mr. Mikhel's family of origin, Dr. Wetzel began by referencing family living in Switzerland. He included information that suggested that when Mr. Mikhel's great-grandfather died in 1852, his family moved to Moscow and requested citizenship. Mr. Mikhel's family apparently owned an "estate" in Russia in the mid-1800s. In 1917, when the Bolshevik Revolution took place, the "family estate" was seized. Mr. Mikhel's paternal

**Exhibit 34 -  513**

Re: Iouri Mikhel

grandfather and four of his sons were sent to labor camps. Mr. Mikhel's father, German, was the youngest son and "because of his youth, was allowed to stay with his mother." Dr. Wetzel noted that "according to Mr. Mikhel, his mother was in Leningrad during the German Siege of Leningrad." Mr. Mikhel "believed" that his mother never got over the experience of living through the siege. His father was on the battlefield for most of World War II. Mr. Mikhel described his mother as a Mennonite with German ancestry. Although Mr. Mikhel said that she had the opportunity to emigrate to Germany, she chose to stay in Russia as it was very important to her to prove that she was a true Russian citizen. With regard to Mr. Mikhel's family of origin, Dr. Wetzel found no causal connection to one or more of the charged crimes.

Dr. Wetzel found no connection between Mr. Mikhel's parents' ages at his birth and his commission of one or more of the crimes. Similarly, Mr. Mikhel's parents' health, the lack of evidence that "he was ever in foster care" [In fact, Mr. Mikhel was repeatedly institutionalized, placed for weeks or months in Soviet boarding nurseries, schools, camps or hospitals], and poverty had no causal connection to the commission of one or more crimes of which he was convicted.

Mr. Mikhel told Dr. Wetzel that he came from "an ordinary socio-economic background for Russians, similar to living in a rent-controlled apartment costing $300 a month." Dr. Wetzel does not appear to have understood the significant differences between occupying a rent-controlled apartment in the United States and the reality of obtaining, living in and paying for Soviet state-owned housing.

Mr. Mikhel claimed he had a "very average childhood." Dr. Wetzel mentioned that Mr. Mikhel's first cousin, Edward, testified that the Mikhel family lived in one room of a three room flat for many years. Edward Mikhel described his cousin's family as "always economically strained." Dr. Wetzel found the information regarding Mr. Mikhel's parents' economic and work status "inconsistent." According to Dr. Wetzel, "If testimony were offered that [Mr. Mikhel's] poverty as a child was the main contributing factor to his choice of extralegal income as his main means of support, I would not agree but would allow that others in good faith could espouse that opinion." It was Dr. Wetzel's opinion that Mr. Mikhel's poverty as a child had no causal connection to any of the crimes charged.

Mr. Mikhel's reaction to childhood poverty was observed by Dr. Wetzel only "to have motivated his illegal involvement in non-permitted jobs and financial activities in Russia." It was Dr. Wetzel's opinion that Mr. Mikhel made decisions "primarily because he believed that some of these activities were very lucrative and made his choices accordingly." Mr. Mikhel's "main motivation was a rational evaluation of his opportunities, not his past poverty."

25

**Exhibit 34 -  514**

Re: Iouri Mikhel

Dr. Wetzel opined that medical records showed no illness during Mr. Mikhel's first year of life, but this is not accurate. Dr. Wetzel did acknowledge that, as a child, beginning at age one, Mr. Mikhel was sent to a hospital on 13 occasions. Dr. Wetzel listed diagnoses given to Mr. Mikhel as a child, including asthma, bronchitis, influenza, ear inflammation, furuncle, multiple middle ear inflammations, fungal infection of the mouth, pneumonia, Scarlet Fever, skin rash, tonsillitis, multiple upper respiratory illnesses, and a concussion, with headache.

Dr. Wetzel's calculations show that at age one, Mr. Mikhel was hospitalized twice for a total of 57 days. At age two, he was hospitalized twice for a total of 130 days. At age three, Mr. Mikhel was hospitalized twice for a total of 18 days. At age four, he had a single hospitalization of 59 days. At age five, he was in the hospital once, for 169 days total. At age six, Mr. Mikhel was hospitalized once for 10 days. At ages nine and ten, Mr. Mikhel spent 10 days in the hospital, respectively. Dr. Wetzel noted that no other records of hospitalization were included. He then concluded that "there was no evidence that Mr. Mikhel spent most of his life outside of his home in medical facilities." (His list of 13 hospitalizations up to age 10 did not include Mr. Mikhel's frequent stays at boarding nurseries, camps, or summer homes for children.)

With regard to an incident wherein Mr. Mikhel was observed repeatedly banging his head against a cell wall after a suicide attempt, Dr. Wetzel stated, "It is my opinion that [Mr. Mikhel] considered 'faking crazy' briefly. He then gave it up." Dr. Wetzel determined that Mr. Mikhel "has lied to physicians or used physicians to lie to others when it is to his personal advantage." He saw no causal connections between any of Mr. Mikhel's purported medical illnesses and the charged offenses.

Similarly, with regard to Mr. Mikhel's emotional health, Dr. Wetzel indicated that Mr. Mikhel had "repeatedly denied that he has any psychiatric disorders to me and to Dr. Pitt." He told both Dr. Pitt and Dr. Wetzel that he had "no negative memories" of childhood or adolescence. Dr. Wetzel clarified that he believed Mr. Mikhel was narcissistic and not bipolar as was alleged in a declaration by Dr. Dhillon. Dr. Wetzel opined that Mr. Mikhel had an Adjustment Reaction with some symptoms of depression after his arrest and confinement.

As to Mr. Mikhel's arrest and imprisonment in the Soviet Union, Dr. Wetzel stated that Mr. Mikhel was irritated with the persons he attempted to bribe to evade the draft and avoid imprisonment. He continued that Mr. Mikhel was treated equally in prison and that everyone in Russian prisons works. Mr. Mikhel's reaction to imprisonment in Russia was that prison and a labor camp were not desired. But, "they presented opportunities for Mr. Mikhel to learn additional skills in bribery and economic opportunism."

Dr. Wetzel contrasted Mr. Mikhel's report of prison life with the testimony of Dr. Craig Haney. In Dr. Wetzel's opinion, Mr. Mikhel engaged in a symbiotic system in Russian

26

**Exhibit 34 - 515**

Re: Iouri Mikhel

prisons, bribing guards to obtain necessities of life and necessities for his private enterprises. Other than by Mr. Mikhel's personal report, it is not known where Dr. Wetzel obtained this information. Additionally, Dr. Wetzel stated "Mr. Mikhel explicitly denied to Dr. Pitt that he was ever brutalized physically or sexually." Dr. Wetzel found that, "by Mr. Mikhel's own report, he developed new friendships with people evading the law and learned new skills in doing so." Regarding Mr. Mikhel's opportunities for economic endeavor in Russia, Dr. Wetzel was of the opinion "that he freely chose how to make his money, in and out of labor camp, in and out of Russia."

In assessing Mr. Mikhel's reaction to imprisonment in the United States, Dr. Wetzel noted that Mr. Mikhel was "charged with one escape attempt in which he brought a large amount of tools and other equipment into the jail." Mr. Mikhel admitted that he intended to escape. Mr. Mikhel attempted suicide at least three times while in jail awaiting and during trial. Dr. Wetzel described Mr. Mikhel's first attempt at suicide, where he cut his ankle, as one of "low lethality, medically and psychologically." He opined that it could've been "a poorly planned attempt to get out of jail into the hospital in order to facilitate escape."

With regard to Mr. Mikhel's second suicide attempt, Dr. Wetzel believed Mr. Mikhel's report that he had planned to commit suicide on his wife's birthday as a gift to her. A treating doctor (unnamed) reported that "Mr. Mikhel's second attempt was a calculated decision ... unrelated to depression." Dr. Wetzel found that Mr. Mikhel's third suicide attempt, where he hanged himself, did not, in fact, occur. Mr. Mikhel denied an attempt to commit suicide and provided inconsistent and inaccurate facts. He stated that, "Because Mr. Mikhel's case was a high profile case, the psychology people were called." This contradicts MDC records and the statements of MDC medical staff.

In assessing Mr. Mikhel's depression and suicide attempts, Dr. Wetzel determined that "neither suicide nor suicide attempt proved psychiatric disorder is present." He elaborated by stating that Mr. Mikhel had evaluated his situation rationally and chose to die. "There is no convincing evidence" that Mr. Mikhel experienced hypomania "except as a short-lived side effect of a medication." Dr. Wetzel further found that there was no reasonable basis for a diagnosis of bipolar disorder and that, "Mr. Mikhel has never been psychotic at any time. He may have considered faking [psychosis] and done it poorly."

As to Mr. Mikhel's special conditions of confinement, Dr. Wetzel asserted that potential suicide methods have been removed. Mr. Mikhel's personal reaction to conditions of confinement did not result in clinical depression. Rather, Dr. Wetzel stated that, if asked, "I would say that he is upset and demoralized by his special conditions of confinement, which are caused by his two escape attempts and his three suicide attempts." In Dr. Wetzel's opinion, "Mr. Mikhel is a person who expects and deserves respect. He is upset that he is not being treated with respect."

27

**Exhibit 34 -  516**

Re: Iouri Mikhel

According to Dr. Wetzel, Mr. Mikhel's attitude toward the death penalty shows that he made a rational assessment of what the verdict was likely to be, and he was right. "He is hopeless about the future, but he is not clinically depressed." Mr. Mikhel's future dangerousness "will be higher than the average for federal prisoners in [Dr. Wetzel's] opinion, primarily because of his ability and willingness to enlist other inmates, prison guards, and people on the outside to assist him in criminal activity." As to remorse, Dr. Wetzel stated "Mr. Mikhel told me 'I have done nothing to be ashamed of.'" Mr. Mikhel denied involvement, acceptance of responsibility, or remorse for any crime of violence. After Dr. Wetzel conducted a mental status examination, he found Mr. Mikhel fully oriented, with at least above average intelligence, experiencing no hallucinations or delusions, and no homicidal ideation or inclination to violence. Dr. Wetzel opined that Mr. Mikhel had no mental disease or defect prior to his arrest. Rather, it was Dr. Wetzel's opinion that Mr. Mikhel "was experiencing legal difficulties [and] demoralization."

Dr. Wetzel administered the MMPI-II to Mr. Mikhel. Mr. Mikhel's answers were consistent with mild neurosis and mild problems. He remarked that Mr. Mikhel had failed to answer over 13 questions on the MMPI.

**Present Examination- Behavioral Observations and Mental Status**

Mr. Mikhel was a 57-year-old Caucasian man of average height and build, dressed in prison attire. His grooming appeared adequate. He was cooperative during the evaluation and had reasonable eye contact with his examiner. His speech was within normal limits though sometimes of low volume. He demonstrated a good command of the English language. He was fully oriented to person, place, time and situation. He endorsed an "ok" mood overall. His affect was restricted. He denied current auditory and visual hallucinations. He denied any active homicidal or suicidal thoughts or attempts in the recent past. His thought processes were linear. There was no evidence of current delusional thinking. His insight and judgment were fair to poor.

**Opinions**

*1. Was Mr. Mikhel competent to stand trial at the time of his capital trial proceedings?*

Mr. Mikhel saw several evaluators prior to and during his capital trial. Clearly there were clinical indicators of distress as he attempted suicide at least three times leading up to, and during, his trial. In his first suicide attempt, a near-lethal cutting, Mr. Mikhel lost a large amount of blood and required hospitalization. A second suicide attempt, in which Mr. Mikhel overdosed on pills, required that he be placed on a hospital ventilator to survive. His third attempt at suicide, where he hanged himself from a ceiling fixture with a sheet, took place during his capital trial. He survived that attempt because the ceiling fixture ultimately broke under his weight. When a person is bent on killing himself, the relationship between himself and his evaluators/treaters becomes adversarial rather than

28

**Exhibit 34 -  517**

Re: Iouri Mikhel

collaborative. That is, Mr. Mikhel was aware that if he was forthcoming and honest regarding his moods and suicidality, his efforts would be thwarted by doctors examining him. Thus, it would be perilous and poor technique to rely on his self-report as it was likely not to be accurate in relation to his mood states and suicidal thinking. Suicide attempts are not considered in our field to be a rational act, rather, likely evidence of an underlying psychiatric illness. Further, given his circumstances, it is not inconceivable that Mr. Mikhel would play up or play down aspects of his life and mental functioning so that he would get the death penalty, also known as suicide by State. If he could not be successful killing himself, he could influence events to get his desired outcome of death. Mr. Mikhel reported to me that he did not care about the outcome of his trial, that he felt depressed and hopeless, and certainly would not have been honest with evaluators as to whether he was still suicidal or not. He has a family history of suicide and given the potential lethality of his attempts, these should have been taken far more seriously than they were.

With that background, I have concerns regarding Mr. Mikhel's competency at the time of his capital trial. While he has always appeared to have a rational and factual understanding of the proceedings against him, he stopped cooperating with his attorneys and was depressed, despondent, and hopeless about this future. He had been diagnosed with Bipolar depression around the time of his trial and based on the history gathered during our interviews, in my opinion, that is an accurate diagnosis. Given his depression and suicidality, it is further my opinion, to a reasonable degree of medical certainty, that Mr. Mikhel was likely not competent to stand trial at the time of his capital trial.

2. *What effect, if any, has extreme solitary confinement had on Mr. Michel's psychological functioning?*

Solitary confinement, particularly over time, has a devastating and deleterious impact on mental health functioning. Enforced isolation and social deprivation can produce severe psychological distress and trauma. Solitary confinement that lasts more than fifteen consecutive days has been recognized by the United Nations and various human rights organizations as torture. Mr. Mikhel was held in the most restrictive solitary confinement available during his trial and for approximately fifteen years in total, an extremely long period of time. In fact, it was shortly after being placed in solitary confinement that he attempted to kill himself. His moods deteriorated and he became more depressed and hopeless about his future. He had no contact with the outside world, no ability to orient himself to current events, and was nearly completely cut off from any human interaction at all, likely creating in him an overall feeling of unreality. He discussed solitary confinement as the "hardest time of my life." Mr. Mikhel told me the mental strain was the worst he had ever endured in order to maintain his sanity. In my opinion, his conditions of confinement have exacerbated his underlying mood disorder and left him with a profound sense of helplessness and hopelessness regarding his future. He experienced crying spells which sometimes still afflict him now. He does not sleep more

29

**Exhibit 34 - 518**

Re: Iouri Mikhel

than four or five hours a night and has noticed his memory is poor. He was notably tangential in his thought processes with me. Mr. Mikhel reported he does not like to leave his cell even now, that he prefers small spaces, and that he never used to be like that prior to being put in SAM. He believes he has been "thrown away" and his life is "meaningless." Having consulted on well over a thousand capital cases over my career, his despondency far exceeds that of other death row inmates I have evaluated and cannot simply be attributed to a "normal" reaction to his present circumstance. Though he is not imminently suicidal, he has expressed that if he thought he could succeed (he said he was too closely monitored at Terre Haute), he would certainly attempt suicide.

I hold the opinions expressed throughout this report to a reasonable degree of medical certainty.

Sincerely,

Bhushan S. Agharkar, M.D., D.F.A.P.A.
Distinguished Fellow, American Psychiatric Association
Diplomate, American Board of Psychiatry and Neurology, with Added Qualifications in Forensic Psychiatry

**Exhibit 34 - 519**

# Appendix A

**Exhibit 34 -  520**

# Bhushan S. Agharkar, M.D.

Mailing Address
4062 Peachtree Road NE, Suite A-203
Atlanta, Georgia 30319
404.939.6636
agharkarmd@gmail.com

Professional Experience:

Agharkar and Associates, July 2005-present
Atlanta, GA 30319
Private Practice

Emory University School of Medicine, July 2005-present
Atlanta, GA 30322
Adjunct Assistant Professor

Morehouse School of Medicine, August 2005-present
Atlanta, GA 30310
Assistant Professor
Associate Residency Training Director, 2005-2011
Course Director, *Patient Evaluation and Treatment I and II*, 2005-2013
Course Director, *Business of Medicine*, 2005-2013
Course Director, *Forensic Psychiatry*, 2005-present
Course Director, *Applied Clinical Psychopharmacology*, 2014-present
Faculty Advisor, *Resident Journal Club*, 2005-2011
Member, *Residency Training and Admissions Committee*, 2005-2011

University of California, Berkeley, School of Law, Berkeley, CA
Guest Lecturer, 2022-present

Columbia Law School, New York, NY
Guest Lecturer, 2021-present

Mercer School of Law, Macon, GA
Guest Lecturer, 2020-present

University of Denver School of Law, Denver, CO
Guest Lecturer, 2019-present

University of Texas at Austin School of Law, Austin, TX
Guest Lecturer, 2016-present

Emory University School of Law, Atlanta, GA
Guest Lecturer, 2015-present

**Exhibit 34 - 521**

Forefront Behavioral Telecare, 2009-2022
Founder and Director of Physician Network Development

Georgia Tech Student Health Services, March-May 2007, September
2008- February 2009
Atlanta, GA 30313
Staff Psychiatrist

Georgia State University Student Health Services, August 2007-June 2008
Atlanta, GA 30303
Staff Psychiatrist

Skyland Trail, July 2006-January 2007
Atlanta, GA 30319
Interim Medical Director

DeKalb Community Service Board, July 2005-February 2007
Decatur, GA 30031
Staff Psychiatrist

Education:
Emory University School of Medicine, 2004-2005
Department of Psychiatry and Behavioral Sciences
Atlanta, GA 30322
Forensic Psychiatry Fellowship

Emory University School of Medicine, 2000-2004
Department of Psychiatry and Behavioral Sciences
Atlanta, GA 30322
Adult Psychiatry Residency
Chief Resident at Emory University Hospitals, 2003-2004

State University of New York Health Science Center at Syracuse,
1996-2000
Syracuse, NY 13210
Doctor of Medicine degree, May 2000

Case Western Reserve University (CWRU), 1993-1997
Cleveland, OH 44106
Grade Point Average 3.83 (A= 4.00)
BA in Psychology, senior *in absentia* privilege
Magna Cum Laude

Certification and Licensure:
Diplomate in Forensic Psychiatry, American Board of Psychiatry and
Neurology, 2007, Re-certified 2017

2

**Exhibit 34 -  522**

Diplomate in Adult Psychiatry, American Board of Psychiatry and Neurology, 2005, Re-certified 2015
Georgia Medical License, 2002
United States Department of Defense TS/SCI Security Clearance, active
Certified Mediator, California State University, Sacramento, 2008

Research Experience and Publications:

·   "Developmental Impairments in Moral Competence as Mitigation in Capital Cases" Walker, R., Clark, J., Monahan, E.C., Shechet, A., Agharkar, B., Kheibari, A., & Victor, G. [Journal of Behavioral Sciences and the Law 2018; 36:437–456]

·   "Traumatic Brain Injury in Criminal Litigation" Stacey Wood, JD, and Bhushan S. Agharkar, MD [84 UMKC L. Rev. 411, Winter 2015]

·   "Delusions and False Memories:  Roadblocks to Competency to Stand Trial" Lloyd Warford, JD, and Bhushan S. Agharkar, MD [82 UMKC L. Rev. 389, Winter 2014]

·   "Advantages of DSM-5 in the Diagnosis of Intellectual Disability:  Reduced Reliance in IQ Ceilings in *Atkins* (Death Penalty) Cases"  Nancy Haydt, JD, Stephen Greenspan, PhD, and Bhushan S. Agharkar, MD [82 UMKC L. Rev. 359, Winter 2014]

·   "Ethnic and Cultural Factors in Identifying Fetal Alcohol Spectrum Disorders" George W. Woods, MD, Stephen Greenspan, PhD, and Bhushan S. Agharkar, MD, Journal of Psychiatry and Law, Spring 2011

·   "Improving Cognition and Treatment Outcomes in Schizophrenia"  Bhushan S. Agharkar, MD [The Psychiatry Report 2004; 2(1): 24-34]

·   "Violence While on SSRIs – a Litigation Perspective" poster presentation at American Academy of Psychiatry and the Law conference, October 22, 2004

·   "Prescribing Conventional Antipsychotics at Two Veterans Administration Hospitals: Are There Geographical Differences?"  Prakash S. Masand, MD, Monica Arora, MD, Thomas L. Schwartz, MD, Anil Sharma, MD, Xiaohong Wang, MD, Subhash Bhatia, MD, Jacob Manjooran, MD, William Hardoby, MD, Subhdeep Virk, MD, Daniel J. Kuhles, MPH, Bhushan Agharkar, BA, and Sanjay Gupta, MD [CNS Spectrums 2001; 6(11): 894-896]

·   "Prescribing Conventional Antipsychotics in the Era of Novel Antipsychotics: Informed Consent Issues"  Prakash S. Masand, Thomas L. Schwartz, Xiaohong Wang, Daniel J. Kuhles, Sanjay Gupta, Bhushan Agharkar, Jacob Manjooran, M. Ahmad Hameed, William Hardoby, Subhdeep Virk, and Bradford Frank. [Am J Ther 2002 Nov-Dec; 9(6):484-7]

3

**Exhibit 34 –  523**

- Research Assistant working on the solubilization of the 5-HT2A receptor under Brian Roth, M.D., Ph.D., at Case Western Reserve University (20 hrs/wk, fall 1995)

- Summer Research Fellow in Retrovirology lab under Bernard Poiesz, M.D., SUNY HSC at Syracuse (40 hrs/wk, 5/1995-8/1995)

- Research Assistant at CWRU, Department of Neurology, Division of Clinical Research (3-5 hrs/wk,1993-1994)

Presentations:
- *Trauma and Anxiety in the Primary Care Setting*, Continuing Medical Education lecture, Baptist Health South Florida, Miami, FL, November 15, 2022
- *Stress in the time of COVID-19*, Continuing Medical Education lecture, Baptist Health South Florida, Miami, FL, April 30, 2020
- *Telehealth Modalities to Facilitate Evaluations Globally as well as in Use by Legal Teams for Case Coordination*, International Academy of Mental Health and the Law, Vienna, Austria, July16, 2015
- *Update on Post-Traumatic Stress Disorder*, Continuing Medical Education lecture, Sixth Annual Mental and Behavioral Health Symposium, Baptist Health South Florida, Miami, FL, March 8, 2014
- *Dealing with the Difficult Patient*, Continuing Medical Education lecture, Primary Care Medicine and Neurology Update for the Primary Care Provider, Chattanooga, TN, June 26, 2010
- *Conflict Prevention and Dispute Avoidance through Teambuilding: Can it be transferred to legal/medical teams?*, International Academy of Mental Health and the Law, New York, NY, July 2, 2009
- *Understanding and Treating Bipolar Disorder*, Continuing Education lecture, Pine River Psychotherapy Associates, Atlanta, GA, October 27, 2008
- *Risk Management Issues in Psychiatry*, Grand Rounds, Morehouse School of Medicine, Department of Psychiatry and Behavioral Sciences, Atlanta, GA, February 27, 2008
- *Suicide and Violence Risk Assessment*, Grand Rounds, Morehouse School of Medicine, Department of Psychiatry and Behavioral Sciences, Atlanta, GA, January 23, 2008
- *Suicide Risk Assessment*, Nepalese Association in Southeast America Convention, Atlanta, GA, September 1, 2007
- *Schizophrenia*, Continuing Education lecture, United Behavioral Healthcare, Atlanta, GA, September 28, 2006

Consultations:
- Office of Military Commissions, Guantanamo Bay (GTMO)
- United States Department of Defense
- United States Armed Forces

4

**Exhibit 34 -  524**

- National Law University, Delhi, India
- 392nd District Court of Henderson County, Texas
- The Clemency Project 2014
- City of Little Rock
- Atlanta Journal Constitution
- VICE news
- Georgia State University
- Federal Bureau of Investigation
- Fulton County Sheriff's Department
- Cobb County School District
- Emory University Hospitals
- Georgia Composite State Board of Medical Examiners
- Georgia Tech Athletic Department
- Arizona Medical Board
- Maricopa County Office of the Attorney General
- Middle District of Alabama, Northern Division

Professional Society Memberships:
- American Neuropsychiatric Association
- American Association on Intellectual and Developmental Disabilities
- American Psychiatric Association
- American Academy of Psychiatry and the Law
- Georgia Psychiatric Physicians Association
- American Association of Directors of Psychiatric Residency Training, 2005-2011
- International Academy of Mental Health and the Law
- American Psychological Association, Division 33

Awards and Honors:
- Distinguished Fellow, American Psychiatric Association, 2015
- Fellow, American Psychiatric Association, 2011
- Phi Beta Kappa
- Honorable Mention, The Joe and Hope Skobba Memorial Award Resident Research Competition, 2005
- Emory University Department of Psychiatry Resident Teaching Award, 2004
- State Farm Foundation Scholarship Recipient (through National Merit Scholarship
  Corporation), 1993-1997
- Presidential Scholarship Recipient at Case Western Reserve University, 1993-1996
- Psi Chi, National Honor Society in Psychology
- Dean's High Honors List at CWRU, 1993-1996
- Who's Who in American Colleges and Universities, 1996
- USAA All-American Scholar-Athlete, 1995
- 

**Exhibit 34 -  525**

<u>Leadership, Teaching, and Volunteer Activities</u>:
- Georgia Psychiatric Physicians Association (GPPA) Trustee 2006-2007, 2008-2011
- GPPA Ethics Committee, Member 2007-present
- GPPA Distinguished Fellow Nominating Committee, Member 2016-present
- Review Editor, *Frontiers in Forensic Psychiatry*, 2011-present
- Georgia Composite State Board of Medical Examiners, Peer Reviewer, November 2008-present
- Arizona Medical Board, Outside Medical Consultant, 2019-present
- National Institute of Trial Advocacy Training, Golden Gate University School of Law, San Francisco, California, 2008
- The Center for African Peace and Conflict Resolution, College of Health and Human Services, California State University, Sacramento, CA, Member 2008-present
- National Institute of Trial Advocacy Training, Georgia State Law School, Atlanta, Georgia, 2007
- American Academy of Psychiatry and the Law *Private Practice* Committee, Member 2007-2010
- American Academy of Psychiatry and the Law *Forensic Training of Psychiatry Residents* Committee, Member 2007-2010
- American Academy of Psychiatry and the Law *Early Career Development* Committee, Member 2007-2010
- Skyland Trail, Professional Advisory Board, Member 2006-2009
- GPPA Board of Trustees Public Affairs Committee, Chair 2005-2011
- GPPA Board of Trustees Early Career Psychiatrists Committee, Chair 2004-2011
- GPPA co-representative to the Medicare Carrier Advisory Committee, 2003-2004
- Developed, organized and taught weekly seminar series in psychodynamic psychotherapy for medical students in Emory Psychiatry rotations, 2003-2004
- APA ECP Advocacy/Leadership Fellow, 2004
- Emory MIT Trustee to the GPPA Board of Trustees, 2003-2004
- Emory Psychiatry Residents Political Action Committee, Chair 2002-2003
- Blackwell Science Publications, Reviewer 2001-present
- Judo, Brown belt
- GASP and Better Bodies brand ambassador

**Exhibit 34 – 526**

# EXHIBIT

# 35

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


IN RE:                                       )
PLAN OF THE                                  )
UNITED STATES DISTRICT COURT,                )
CENTRAL DISTRICT OF CALIFORNIA               )
FOR THE RANDOM SELECTION                     )
OF GRAND AND PETIT JURORS        )           GENERAL ORDER NO.   03-12


General Order No. 99-8 is hereby rescinded and replaced by this General Order.

1.      Declaration of Policy

It is the policy of the United States District Court for the Central District of California (the "Court") that all litigants in this Court entitled to trial by jury shall have the right to petit juries selected at random from a fair cross section of the community in the Division wherein the court convenes.  Grand juries shall be selected by Division for the Western and Southern Divisions.  Because the Eastern Division lacks suitable facilities for utilization by a grand jury, qualified residents of the Eastern Division shall be proportionally included in the grand jury draw for the Western Division.

It is further the policy of the Court that all citizens shall have the opportunity to be considered for service on grand and petit juries of the Court and shall have an obligation to serve as jurors when summoned for that purpose.

No citizen shall be excluded from service as a grand or petit juror on account of race, color, religion, sex, national origin, or economic status.

Pursuant to the Jury Selection and Service Act of 1968, as amended, 28 U.S.C. § 1861, et seq., (the "Act"), the following Jury Selection Plan (this "Plan") is hereby adopted by this Court.

**Exhibit 35 -  527**

2      GENERAL ORDER NO. __03-12__

2.      Applicability of Plan

This Plan applies to the Central District of California (the "District"), which consists of three Divisions:  (l) The Western Division is comprised of the Counties of Los Angeles, San Luis Obispo, Santa Barbara and Ventura; (2) The Southern Division is comprised of Orange County; and (3) The Eastern Division is comprised of the Counties of Riverside and San Bernardino.

3.      Management and Supervision of Jury Selection Process

The Clerk of the Court, any authorized deputy clerk, or any other person authorized by the Court to assist the Clerk, shall manage the jury selection process under the supervision and control of the Chief Judge of the Court, or such other judge as the Chief Judge may designate.

4.      Random Selection from Voter Lists

Registration of citizens eligible to vote is uniformly conducted throughout the District.  A random selection of a fair cross section of the citizens residing in the counties of the Divisions of the District can be made from the lists of registered voters in the various counties of the Divisions which comprise the District.  To foster the policy and protect the rights secured by sections 1861 and 1862 of the  Act, it is not necessary to resort to sources other than the voter registration lists.  Accordingly, names of petit jurors shall be selected at random from the voter registration lists of the Counties of Los Angeles, San Luis Obispo, Santa Barbara and Ventura for the Western Division; the County of Orange, for the Southern Division; and the Counties of Riverside and San Bernardino for the Eastern Division.  Grand jurors shall be selected from the counties comprising each division or a combination of the divisions within the district, except that persons who reside in the Eastern Division shall be included in the Western Division pool.

5.      Random Selection

The selection of names from the master jury wheel will be accomplished by a purely randomized process. This "pure random" definition is applicable throughout this plan.  Similarly, at the option of the Clerk and after consultation with the Court, a properly programmed electronic data processing system for pure randomized selection may be used to select names from the master wheel for the purpose of determining qualification for jury service, and from the qualified wheel for summoning persons to serve as grand or petit jurors.  Such random selections of names from the source list for inclusion in the master wheel by automation personnel must ensure that each county within each Division is substantially proportionally represented in the master wheel in accordance with Title 28, United States Code, section 1863 (b)(3).  The selections of the names from the source list,

**Exhibit 35 -  528**

3    GENERAL ORDER NO.   03-12   

the master wheel,  and the qualified wheel must also ensure that the mathematical odds of any single name being picked are substantially equal.  All names selected shall then be placed in the master jury wheel.

6.    Master Jury Wheel

6.1    Establishment

The Clerk shall establish and maintain three Master Jury Wheels for the District.  The names of petit jurors shall be selected, after reasonable public notice, at random from the voter registration lists of Los Angeles, San Luis Obispo, Santa Barbara and Ventura for the Western Division; Orange, for the Southern Division; and, Riverside and San Bernardino for the Eastern Division. "Reasonable public notice" means the posting of a written announcement of the scheduled drawing on a bulletin board to which the public has access in a Courthouse of the Court located in the Division for which jurors are being selected.  The notice shall be posted for ten (10) consecutive days prior to the date of selection.  A random selection of names of registered voters from each of the counties comprising the Divisions mentioned above shall be placed in the appropriate Master Jury Wheel in such numbers as to insure that each county in the Division is proportionally represented in the appropriate Master Jury Wheel.

6.2    Maintenance

The Court finds it advantageous to use an electronic data processing system ("the Master Jury Wheel") to perform all clerical duties related to the jury selection system. The Court authorizes the Clerk to take such steps as are necessary to establish the Master Jury Wheel for each Division, provided that the operator shall comply with such written instructions as may be provided by the Clerk. Upon the completion of the required data processing work, the Clerk shall require the execution of a declaration by the agency providing the computer service.  Such declaration shall state under penalty of perjury that the procedures of this Plan have been fully met in the automated phase of the selection

process.  The Clerk shall then receive into the permanent records of the Court the selection instructions to the computer facility and the declaration of the computer facility certifying compliance with same. The instructions provided to the operator of the computer facilities shall be available for inspection by the public.  The computer facilities and electronic data processing systems shall perform in a manner that complies with the following:

-        Selection of names from voter registration tape, disc, or other files for inclusion in the Master Jury Wheels;

**Exhibit 35 -  529**

4   GENERAL ORDER NO.  03-12

- Selection of names from the Master Jury Wheels for automatic addressing of jury questionnaires;

- Selection of names from the Qualified Jury Wheels for issuance to jurors of letters, summonses, or other notices to appear;

- Storing of names and addresses in the Master Jury Wheels, or names and addresses in the Qualified Jury Wheels, in such physical forms as may be required;

- Preparation of lists of juror names, index cards, summonses, and other records as are needed or required by law.

7. Formula for Name Selection Procedure

Described below is a selection procedure for the Master Jury Wheels which the Court finds will result in the drawing of names representing a fair cross section of all parts of the District.  According to this procedure, applicable to the initial drawing as well as such additional drawings as may from time to time be necessary, the names selected shall be from the voters' files as maintained by the Registrar of Voters in each county, according to a pure random process.  Thus selected,  the names from each county comprising the Division for which the Master Jury Wheel is being established shall be merged into a single, combined file, referred to as a "Master Wheel".  All of the persons whose names appear on the Master Wheel shall be mailed juror qualification questionnaires, as described in Section 9.  The names of persons found qualified to serve as jurors, based upon their response to the juror qualification questionnaire, shall be transferred to a "Qualified Wheel", as described in Section 10.  As jurors are required, to meet the need of the Court, they shall be summoned to appear, on a pure random basis from the Qualified Wheel for the Division concerned.

8. General Requirements

State, local and federal officials having custody, possession or control of voter registration lists shall make such lists available to the Clerk for inspection, reproduction and copying at all reasonable times as the Clerk may deem necessary and proper for the performance of duties under 28 U.S.C. § 1863(d).

The minimum number of names to  be placed in the Master Jury Wheels shall be at least one-half of 1% of the total number of persons on the lists used as a source of names.  A smaller number of names may be fixed if the Clerk believes that the number of names required above is unduly burdensome and unnecessary, but in no event shall the number of names to be placed in any Master Jury Wheel be less than 1,000.

**Exhibit 35 -  530**

5    GENERAL ORDER NO.   03-12

The Chief Judge of the Court, or such other Judge as the Chief Judge may designate, may order additional names to be placed in any Master Jury Wheel as may be necessary from time to time. Each Master Jury Wheel shall be emptied and refilled at least annually and may be supplemented with additional names selected on a random basis to assure an adequate supply of qualified jurors.

9.    Drawing Names from the Master Jury Wheel

From time to time as required, the Clerk, after reasonable public notice, shall publicly draw at random from the Master Jury Wheel by electronic data processing procedures, the names and addresses of persons to whom questionnaires will be sent, for the purpose of examining their qualifications for jury service.

The Clerk shall then prepare a list of the names drawn, which list shall not be disclosed to any person except on order of court or pursuant to 28 U.S.C. §§ 1867 and 1868.  The Clerk shall mail to every person whose name is drawn from the Master Jury Wheels a juror qualification questionnaire accompanied by instructions to complete and return it to the Clerk by mail within 10 days.

The juror qualification questionnaire required by 28 U.S.C. §§ 1864(a) and 1869(h) shall be in the form prescribed by the Administrative Office of the United States Courts and approved by the Judicial Conference of the United States.

Persons who fail to reply to the questionnaire within the required 10 days, or who submit replies indicating that further investigation is needed, may be summoned for personal interviews before the Clerk, should other means of communication fail to elicit a satisfactory response.  Except for extraordinary cause shown, such appearance shall be without payment of attendance fees or travel allowance.

10.    Qualification of Jurors

Upon receipt of completed juror qualification questionnaires, they shall be reviewed by the Clerk and all persons found to be disqualified, or exempted or excused from service as jurors shall be excluded from the qualified jury wheels.

The Chief Judge of the Court, or such other Judge as the Chief Judge may designate, shall determine on the basis of the completed juror qualification questionnaire and other competent evidence, whether a person is disqualified or exempt, or to be excused from jury service.  Any person shall presumptively be deemed qualified, unless such person is shown to be ineligible for one of the reasons enumerated in this Plan.  The Clerk shall enter such determination in the space provided on that person's juror qualification questionnaire and on the list of names drawn from the Master Jury Wheels.

**Exhibit 35 -  531**

6    GENERAL ORDER NO.   03-12

In accordance with the provisions of 28 U.S.C. § 1865(b), any citizen of the United States who has reached the age of 18 years and has resided for a period of one year within the District shall be deemed qualified to serve on grand or petit juries unless he or she:

a.    is unable to read, write or understand the English Language with a degree of proficiency sufficient to satisfactorily complete the juror qualification questionnaire;

b.    is unable to speak the English language;

c.    is incapable, by reason of mental or physical infirmity, to render satisfactory jury service; or

d.    has a charge pending against him or her for the commission of, or has been convicted in a state or federal court of record of a crime punishable by imprisonment for more than one year and his or her civil rights have not been restored.

11.    Exemption from Jury Service

As required by the Act, 28 U.S.C. § 1863(b)(6), the following persons are exempted from jury service:

a.    members in active service in the armed forces of the United States;

b.    members of the fire or police departments of the state, or subdivision thereof;

c.    public officers in the executive, legislative, or judicial branches of the government of the United States, or the state, or subdivision thereof, who are actively engaged in the performance of official duties. ("Public Officer" shall mean a person who is either elected to public office or who is directly appointed by a person elected to public office.)

**Exhibit 35 -  532**

7    GENERAL ORDER NO.    03-12

12.    Individual Requests For Excuse or Deferment

Pursuant to 28 U.S.C. § 1863 (b)(1), this Plan authorizes the Clerk of the Court, and designated deputies, to manage the jury selection process.  In so doing, the Clerk and the Clerk's deputies shall act under the supervision and control of the Chief Judge of the District Court.

Pursuant to 28 U.S.C. § 1863(5)(A) this Plan specifies, in Section 12, those groups of persons or occupational classes whose members shall, on individual request therefor, be excused from jury service.

The Court takes notice, pursuant to 28 U.S.C. § 1866 (c), that any person summoned for jury service may be excused by the Clerk, upon a showing of undue or extreme inconvenience, if the court's jury selection plan so authorizes.

Based upon the above sections, this Plan provides that the Clerk of the Court, and designated deputies, are authorized to excuse persons summoned for jury service for undue hardship or extreme inconvenience, or any other factor which the Court has specified in Section 12 of this Plan.  The Court finds that this delegation of authority to the Clerk, and designated deputies, is consistent with the intent of 28 U.S.C. § 1869 (j), which defines undue hardship or extreme inconvenience as factors which the Court has determined warrant excuse.

The Court hereby finds that jury service by members of the following occupational classes or groups of persons may entail undue hardship or extreme inconvenience to members thereof, that excuse or deferment of such members is not inconsistent with the Act, and such persons shall be granted an excuse or deferment of service upon individual request:

a.    Persons over 70 years of age;

b.    Persons actively engaged in professional occupations, such as doctors, lawyers, active members of the clergy and full-time teachers;

c .    Persons having active care and custody of a child or children under 14 years of age whose health and/or safety would be jeopardized by their absence for jury service; or a person who is essential to the care of an aged or infirm person;

**Exhibit 35 -  533**

8     GENERAL ORDER NO.   03-12

d.      Any person who has served as a grand or petit juror in a United States Federal Court within the past two years, or any person who has been selected and seated as a trial juror or an alternate juror in a state court trial, within the past two years;

e.      Any person whose services are so essential to the operation of a business, commercial or agricultural enterprise that the enterprise would suffer a severe economic hardship from the absence of the person;

f.      Any person making a showing of "undue hardship or extreme inconvenience," as defined in 28 U.S.C. § l869(j), for such period as is deemed necessary;

g.      Students enrolled full time in a public, parochial or private school;

h.      Persons who serve without compensation as firefighters, members of a rescue squad or ambulance crew for the United States or the state, or subdivision thereof, or any unit of local government.

13.   Qualified Jury Wheels

The names of those persons deemed qualified shall be placed in the appropriate Qualified Jury Wheel.  Names of prospective jurors shall be drawn on a pure random basis from the appropriate Qualified Jury Wheel.  The prospective jurors whose names have been drawn shall be summoned to appear for a time certain as may be designated by the Chief Judge or such other Judge of the Court as the Chief Judge may designate.  The names thus drawn shall be in sufficient number to assure that there are at all times not less than 1000 names in each of the Qualified Jury Wheels. The prospective jurors will be given instructions and the Court will review requests for excuses or exemptions from service and rule thereon.

13.1  Selection of Petit Jurors

Juror selection through summons or notice from a Qualified Jury Wheel shall be continuous, as needed by the Court, through the term of the Master Jury Wheels.

The instruction of jurors in groups drawn from the Qualified Jury

**Exhibit 35 -  534**

9      GENERAL ORDER NO.   03-12

Wheels will continue as necessary until an adequate number of names of qualified jurors are available for active jury service.  Jurors from previous Qualified Jury Wheels may serve at the same time with jurors selected from later Qualified Jury Wheels.

Additional names shall be drawn and jurors shall be instructed from time to time as required, in order to keep an adequate number of names in the Qualified Jury Wheels to meet the need of the Court.

The Clerk shall administer the appropriate oath to those chosen for petit jury service. When the jurors are in the Jury Assembly Room, the Clerk shall forthwith draw the requisite number of petit jurors for immediate service on a pure random basis, utilizing a computer process which selects a panel from among all prospective jurors then present. The Court may then seat prospective jurors in the random order established by the computer process.  After all panels have been selected, jurors not selected for service shall be dismissed until called for jury duty by the Clerk.

The names placed in the Qualified Jury Wheels shall not be made public except upon order of court for good cause shown.

Whenever required, the Clerk shall draw names from the Qualified Jury Wheel for service as petit jurors.

Names of petit jurors called but not chosen for actual service shall be held until the next call for petit jurors has been issued.  The names then shall be placed back into the appropriate Qualified Jury Wheel until the termination of the jurors service term.

A petit juror who has served repeatedly or in a protracted case may request to be excused.  When it appears to the Chief Judge, or such other Judge of the Court as the Chief Judge may designate, that further jury service by such juror would constitute an undue hardship, the juror may be excused from further service until such time as the Master Jury Wheel for that Division is emptied and again refilled.

13.2   Selection of Grand Jurors

The Clerk shall also draw from the appropriate Qualified Jury Wheel sufficient names to constitute a grand jury or juries as to insure that the District's needs will be met.  The Clerk shall administer the appropriate oath to those chosen for grand jury service.  The Court shall then give the grand jurors chosen such instruction as may be required.

The names of grand jurors chosen and sworn shall not be made public unless the interests of justice require otherwise.  No name of a grand juror shall be made public unless authorized by a written order of the Court.

At such times as may be appropriate to the needs of the Court, the Chief Judge, or such other Judge as the Chief Judge may designate, may order that

**Exhibit 35 -  535**

10    GENERAL ORDER NO.  03-12

additional names for grand jury service shall be drawn from the Qualified Jury Wheels and the persons so drawn and summoned to serve as grand jurors shall be instructed and sworn.

Upon the discharge of a grand jury, the persons called to serve thereon shall not again be called for jury duty until the Master Jury Wheel for that Division is emptied and again refilled.

14.    Designation of Judge to Act in Place of the Chief Judge

In the event that the Chief Judge is unable to perform his or her duties under this Plan, including his or her temporary absence from the District, and has not designated another Judge to do so, the Judge of the Court who is authorized to perform the duties of the Chief Judge in case of his or her temporary inability to do so, as provided in 28 U.S.C. § l36(e), shall perform the duties of the Chief Judge under this Plan during the latter's inability or unavailability.

15.    Effective Date

This Plan shall become effective after approval by the Ninth Circuit Judicial Council Reviewing Panel (the "Panel") upon such date as the Panel shall designate, or if no such designation is made, this Plan shall become effective upon the date of its approval by the Panel.

**IT IS SO ORDERED**.

**Exhibit 35 -  536**

# EXHIBIT

# 36



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF | GENERAL ORDER NO. 13-13 |
| THE PLAN OF THE UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA, FOR THE RANDOM SELECTION OF GRAND AND PETIT JURORS | (Supersedes General Order No. 11-08) |

Pursuant to the Jury Selection and Service Act of 1968, as amended, 28 U.S.C. § 1861 *et seq.* ("Act"), the following amended Jury Selection Plan ("Plan") is hereby adopted by the United States District Court for the Central District of California ("Court"), subject to approval by the Ninth Circuit Judicial Council and to such rules and regulations as may be adopted from time to time by the Judicial Conference of the United States.

1.    **Applicability of Plan**

This Plan applies to the Central District of California ("District"), including all three of its divisions: (1) the Western Division, which includes the counties of Los Angeles, San Luis Obispo, Santa Barbara, and Ventura; (2) the Southern Division, which includes the county of Orange; and (3) the Eastern Division, which includes the counties of Riverside and San Bernardino. 28 U.S.C. § 84(c). These three statutory divisions

**Exhibit 36 - 537**

shall constitute the divisions contemplated by the Act, as provided in 28 U.S.C. § 1869(e)(1).

## 2.    Declaration of Policy

It is the policy of the Court that all litigants in this Court entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the division wherein the Court convenes.

It is further the policy of the Court that all citizens shall have the opportunity to be considered for service on grand and petit juries of the Court and shall have an obligation to serve as jurors when summoned for that purpose.  No citizen shall be excluded from service as a grand or petit juror on the basis of race, color, religion, gender, sexual orientation, national origin, or economic status.

## 3.    Management and Supervision of Jury Selection Process

The Clerk of the Court, any authorized deputy clerk, or any other person designated to assist the clerk (collectively "Clerk"), shall manage the jury selection process under the supervision and control of the chief judge of the Court, a judge acting pursuant to 28 U.S.C. § 136(e), or such other judge of the district court as the chief judge may designate ("Chief Judge").  The Clerk is authorized to use non-Court personnel to assist in the performance of functions under this Plan.  Non-Court personnel shall be given detailed instructions regarding any work they are asked to perform, and shall be required to certify that all work performed has been completed pursuant to those instructions.  The instructions provided, and the certifications returned upon completion, will be considered "Juror Selection Records," and will be retained and made available to the public pursuant to Section 12 of this Plan.

## 4.    Sources of Prospective Jurors' Names

The names of prospective jurors shall be drawn from the names of registered voters, licensed drivers, and holders of California Identification Cards (issued by the California Department of Motor Vehicles) who reside within one of the seven counties in the District.  The Clerk shall obtain the names of all registered voters residing in the

**Exhibit 36 -  538**

District by requesting voter registration lists, as defined in 28 U.S.C. § 1869(c) ("Voter Lists"), from the Registrar of Voters or equivalent office in each of the seven counties in the District.  The Clerk shall obtain the names of all licensed drivers and holders of California Identification Cards residing within the District by requesting from the California Department of Motor Vehicles ("DMV") information regarding individuals who hold a California driver's license or identification card and who reside in one of the seven counties in the District ("DMV Records").

The Clerk shall obtain updated Voter Lists and DMV Records (collectively, "Source Data") for the District every year, in advance of the annual emptying and re-filling of the Master Jury Wheels described in Section 5, below.  The Clerk shall obtain the Source Data by requesting, in writing, that each agency provide a list of the required names, together with addresses and any other information necessary to achieve the goals of the Act.  The Clerk shall also require that each agency, when providing the list, provide a declaration certifying that the requested information was forwarded to the Court in accordance with the Clerk's written request.  The Source Data, the Clerk's written requests for the Source Data, and the declarations from each agency providing Source Data will be considered "Juror Selection Records," and will be retained and made available to the public pursuant to Section 12 of this Plan.

**5.    Creation and Maintenance of Master Jury Wheels**

Having obtained the Source Data for each county in the District, the Clerk shall use that information to establish and maintain one "Master Jury Wheel," in electronic form, for each of the three divisions within the District.  First, using a properly programmed electronic data processing system, the Source Data for each county shall be merged into a single list, and duplicate records of the same person and the records of persons under the age of 18 years eliminated.  The resulting list will be referred to as the county's "Merged Source List."

Next, in accordance with 28 U.S.C. § 1863(b)(3), the Clerk shall randomly select names from the Merged Source List for each county in the District, using a purely

**Exhibit 36 -  539**

randomized process through a properly programmed electronic data processing system designed to ensure that the mathematical odds of any single name being picked from a Merged Source List are substantially equal. The selected names shall be placed in the Master Jury Wheel for the division in which the county is located, in such numbers as to ensure that each county is substantially proportionally represented in that division's Master Jury Wheel.

For purposes of determining proportional representation in the Master Jury Wheel, the number of registered voters in each county shall be compared to the total number of registered voters in the division, and a percentage calculated; the number of names drawn from a county's Merged Source List for inclusion in the division's Master Jury Wheel shall be in an amount equal to the same percentage of that division's Master Jury Wheel. For example, if, in a division with two counties, County A has 20% of the registered voters for the division, and County B has 80% of the registered voters, then 20% of the names in the division's Master Jury Wheel should be drawn from County A's Merged Source List, and 80% of the names in the division's Master Jury Wheel should be drawn from County B's Merged Source List.

The minimum number of names to be placed in each Master Jury Wheel shall be at least one-half of 1% of the total number of persons on the Merged Source Lists for the counties in that division. The Court finds that placing names selected from the Merged Source Lists for the counties in a division using a purely randomized process into the Master Jury Wheel for that division in such amounts, with each county in the division substantially proportionally represented, will result in a Master Jury Wheel for each division that includes a fair cross section of the persons residing in that division.

Each Master Jury Wheel shall be emptied and refilled annually prior to January 1. If necessary to assure an adequate supply of qualified jurors, the Chief Judge may order that any Master Jury Wheel be supplemented from time to time with additional names selected from the Merged Source Lists on a random basis, in substantially proportional amounts from each county in the relevant division. Jurors selected from previous Master

4

**Exhibit 36 -  540**

Jury Wheels may serve at the same time as jurors selected from later Master Jury Wheels.

The Merged Source Lists, the list of names placed in the Master Jury Wheels, and any Orders of the Chief Judge directing that a Master Jury Wheel be supplemented with additional names shall be considered "Juror Selection Records," and will be retained and made available to the public pursuant to Section 12 of this Plan.

**6.      Random Selection of Names from the Master Jury Wheels:  One-Step Summoning and Qualification of Prospective Jurors**

Pursuant to 28 U.S.C. § 1878, the Court adopts a one-step process to summon and qualify prospective petit and grand jurors.  The Clerk shall use this one-step approach in lieu of the two separate procedures (a qualification process, followed by a separately issued summons) otherwise provided for by the Act.

Accordingly, throughout the term of the Master Jury Wheels, the Clerk shall regularly select names at random from the Master Jury Wheel for each division as required for assignment to grand and petit juries in that division, in such numbers as are estimated to meet the Court's projected needs.  Names of prospective jurors shall be selected from the Master Jury Wheels using a purely randomized process through a properly programmed electronic data processing system designed to ensure that the mathematical odds of any single name being picked from a Master Jury Wheel are substantially equal.  Once a name has been selected from a Master Jury Wheel, that name shall not be eligible to be drawn again until after the Master Jury Wheel has been emptied and re-filled.  The Clerk shall post a general notice in the Clerk's Office and on the Court's website that explains the process by which names are randomly and periodically drawn from the Master Jury Wheels.

Every person whose name is so drawn shall be mailed a summons for jury service ("Summons").  Pursuant to 28 U.S.C. § 1864(a), each person summoned for jury service shall be instructed to complete and return a juror qualification form ("Questionnaire") within ten days.  Questionnaires may be completed and submitted online through the

**Exhibit 36 -  541**

Court's website, or completed and returned to the Clerk by mail, e-mail, or fax. The Questionnaire shall be in a form prescribed by the Administrative Office of the United States Courts and approved by the Judicial Conference of the United States. Any person who mails Summonses to prospective jurors shall make the affidavit of service required by 28 U.S.C. § 1866(b).

Each Questionnaire submitted by a prospective juror shall be reviewed upon receipt to determine: (1) whether the Questionnaire has been completed; and (2) whether, based on the information provided in or with the Questionnaire, the prospective juror should be disqualified from jury service (see Section 9 of this Plan), exempted from jury service (see Section 10 of this Plan), or excused from jury service for some period of time (see Section 11 of this Plan). A prospective juror may ask to be temporarily excused from jury service by requesting a postponement of jury service to a later date; prospective jurors whose service is postponed will be re-summoned in advance of the new reporting date.

A person shall be deemed qualified and available to serve as summoned unless postponed, disqualified, exempted, or excused by the Court, or by the Clerk, acting under supervision of the Court. For any juror postponed, disqualified, exempted, or excused on the basis of information provided in or with the Questionnaire, the Clerk shall note this determination in the records of the Court, and make the results regarding each potential juror available to that juror in advance of the juror's Summons date.

The Clerk shall record the names of prospective jurors who fail to return the Questionnaire. If any Questionnaires are returned as undeliverable, the Clerk shall note that fact. Prospective jurors who fail to return the Questionnaire or who submit Questionnaires requiring further investigation may be summoned for a personal interview before the Clerk should other means of communication fail to elicit a satisfactory response. Except for extraordinary cause shown, such appearance shall be without attendance fees or travel allowance.

**Exhibit 36 -  542**

Each Summons shall include the date on which the prospective juror's two-week on-call period begins.  All prospective jurors must call in as directed in the Summons, and report if directed to do so.  Prospective jurors not directed to report on the first call-in date must continue to call in as directed throughout the on-call period.

Each week, the Clerk shall determine the number of prospective jurors estimated to be necessary to meet the Court's projected needs for petit jurors, and direct that number of prospective jurors to report for service.  Prospective jurors will be directed to report in the order in which their names were randomly drawn from the Master Jury Wheel prior to the mailing of the Summons.

The Clerk shall maintain a record of the following:  the names of persons sent a Summons; whether the Summons was returned as undeliverable; whether each prospective juror submitted or returned a Questionnaire; whether each Questionnaire submitted was completed; whether any Questionnaires were returned to prospective jurors for additional information; whether each prospective juror was postponed, disqualified, exempted, or excused; whether each prospective juror was directed to report during the on-call period; and whether each prospective juror reported as directed.  This record, and the following documents, will be considered Juror Selection Records:  the affidavits of service completed pursuant to 28 U.S.C. § 1866(b); any Summons returned as undeliverable, with its original envelope; and all submitted or returned Questionnaires.  All Juror Selection Records will be retained and made available to the public pursuant to Section 12 of this Plan.

**7.    Selection of Petit Jurors**

Prospective jurors summoned for petit jury service and not postponed, disqualified, exempted, or excused in advance of the call-in date shall report as directed to the appropriate divisional Jury Assembly Room.  The Clerk shall record the names of any prospective jurors who fail to appear as directed.

Prospective jurors who report as directed may raise at that time additional grounds for postponement, disqualification, exemption, or excuse.  All prospective jurors who

7

**Exhibit 36 -  543**

report as directed will be deemed qualified and available to serve as summoned unless determined not to be for one of these reasons (as defined in Sections 9-11 of this Plan), by the Clerk, acting under supervision of the Court, or by a district or magistrate judge of the Court.  Except for extraordinary cause shown, any appearance by a prospective juror reporting for service and then postponed, disqualified, exempted, or excused shall be without attendance fees or travel allowance.  Prospective jurors who report as directed, and who are not postponed, disqualified, exempted, or excused shall be considered "Present and Available" for jury service.  The Clerk shall maintain records, which will be considered Juror Selection Records, noting whether each person directed to appear on a particular day is Present and Available to serve as directed, and if not, why:  non-deliverable Summons, failure to respond to the Summons, postponement, disqualification, exemption, or excuse.  Any orders to show cause issued to persons who fail to respond to a Summons will also be considered Juror Selection Records.  All Juror Selection Records will be retained and made available to the public pursuant to Section 12 of this Plan.

When those persons who are Present and Available to begin petit jury service on a particular day are gathered in the Jury Assembly Room, the Clerk shall administer to them the appropriate oath.  The Clerk shall then draw from such persons the number required for immediate assignment to petit jury panels, using a purely randomized process through a properly programmed electronic data processing system designed to ensure that the mathematical odds of any single name being picked from among all prospective jurors then present are substantially equal.  Jurors selected for petit jury panels shall then be sent to the appropriate courtroom.

Pursuant to 28 U.S.C. § 1863(b)(7), the list of juror names for a particular petit jury panel may be released to the parties and the public at any time with the approval of the judge presiding at trial, or by the Chief Judge if the judge presiding at trial is unavailable.  The names of such jurors and associated juror information may be kept confidential in any case where the interests of justice so require.  Unless the Court orders

**Exhibit 36 -  544**

that the list be kept confidential, the petit jury panel list shall also be considered a Juror Selection Record, to be maintained and disclosed pursuant to Section 12 of this Plan.

The judge (whether a district, magistrate, or bankruptcy judge) presiding over the trial for which the petit jury panel is called ("Presiding Judge") may excuse jurors upon a showing of undue hardship or extreme inconvenience, for such period as the Presiding Judge deems necessary. The Presiding Judge may also find that a juror is exempt from, or not qualified for, jury service. Jurors postponed by the Presiding Judge to a future date shall be re-summoned in advance of that date. Jurors excused but not postponed to a future date, and jurors found to be exempt or disqualified, shall be released from jury service.

The Presiding Judge may exclude a juror:

(a)    on the ground that such person may be unable to render impartial jury service or that his service as a juror would be likely to disrupt the proceedings;

(b)    upon peremptory challenge as provided by law;

(c)    pursuant to the procedure specified by law upon a challenge by any party for good cause shown; or

(d)    upon determination by the court that his service as a juror would be likely to threaten the secrecy of the proceedings, or otherwise adversely affect the integrity of jury deliberations.

Any person excluded from a particular jury under (a), (b), or (c) shall be eligible to sit on another jury if the basis for the initial exclusion would not be relevant to the juror's ability to serve on a different jury. The Presiding Judge may therefore direct that jurors excluded from a jury under (a), (b), or (c) return to the Jury Assembly Room for possible random selection to another petit jury panel. No person shall be excluded under (d) unless the Presiding Judge, in open court, determines that such is warranted and that exclusion of the person will not be inconsistent with 28 U.S.C. §§1861-1862. The number of persons excluded under (d) shall not exceed 1% of the number of persons who

9

**Exhibit 36 -  545**

return executed Questionnaires during the year between two consecutive fillings of the Master Jury Wheel.  The names of persons excluded under (d), together with detailed explanations for the exclusions, shall be forwarded immediately to the Ninth Circuit Judicial Council.  Jurors excluded under this paragraph and not directed by the presiding judge to return to the Jury Assembly Room for possible random selection to another petit jury panel shall be released from jury service.

The Clerk shall maintain a record of whether each juror selected for a petit jury panel was excused, disqualified, exempted, excluded, or selected to serve as a juror or alternate juror.  This record, as well as any findings made in excluding jurors under subsection (d), above, will be considered Juror Selection Records.

At the end of each day, all prospective jurors who were present and available to serve that day who have not been assigned to a petit jury panel shall be dismissed, and shall be deemed to have completed jury service.  Prospective jurors summoned for jury service and not postponed, disqualified, exempted, or excused, and who have not been assigned to a petit jury panel by the end of the on-call period or initial appearance, will be deemed to have completed jury service.  The Clerk will maintain records, which will be considered Juror Selection Records, of all prospective jurors who are deemed to have completed service pursuant to this paragraph.  All Juror Selection Records will be retained and made available to the public pursuant to Section 12 of this Plan.

**8.     Selection of Grand Jurors**

Prospective jurors summoned for grand jury service and who are not, in advance of the call-in date, postponed, disqualified, exempted, excused, or directed to report instead for potential service as a petit juror shall report as directed to the location where grand jury impanelment is to be held.  The Clerk shall record the names of any prospective jurors who fail to report as directed.

Prospective jurors who report as directed may raise at that time additional grounds for postponement, disqualification, exemption, or excuse.  All prospective jurors who report as directed will be deemed qualified and available to serve as summoned unless

10

**Exhibit 36 -  546**

determined to be otherwise for one of these reasons (as defined in Sections 9-11 of this Plan), by the Clerk, acting under supervision of the Court, or by a district or magistrate judge of the Court.

Except for extraordinary cause shown, any appearance by a prospective juror reporting for service and then postponed, disqualified, exempted, or excused shall be without attendance fees or travel allowance.  Prospective jurors who report as directed, and who are not then postponed, disqualified, exempted, or excused shall be considered "Present and Available" for jury service.  For each person directed to appear on a particular day, the Clerk shall record whether the person is Present and Available to serve as directed, and if not, shall record the reason why:  non-deliverable Summons, failure to respond to the Summons, postponement, disqualification, exemption, or excuse.

When those persons who are Present and Available to begin grand jury service on a particular day are gathered, the Clerk shall then draw from such persons the number required for immediate assignment to a grand jury, using a purely randomized process through a properly programmed electronic data processing system designed to ensure that the mathematical odds of any single name being picked from among all prospective jurors then present are substantially equal.  The Clerk shall administer the appropriate oath to those chosen for grand jury service, and the Chief Judge shall give them necessary instructions.

The names of grand jurors chosen and sworn shall not be disclosed except on order of the Court.  At the end of each day, all prospective jurors who were Present and Available to serve that day who have not been assigned to a grand jury panel shall be dismissed, and shall be deemed to have completed jury service.

**9.    Qualifications for Jury Service**

In accordance with the provisions of 28 U.S.C. § 1865(b), any person whose name is drawn from a Master Source List shall be deemed qualified to serve on grand or petit juries in this Court unless it is determined that the person:

11

**Exhibit 36 -  547**

a. is not a citizen of the United States who has reached the age of 18 years and has resided for a period of one year within the District;

b. is unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form;

c. is unable to speak the English language;

d. is incapable, by reason of mental or physical infirmity, to render satisfactory jury service; or

e. has a charge pending against him or her for the commission of, or has been convicted in a state or federal court of record of, a crime punishable by imprisonment for more than one year and his or her civil rights have not been restored.

Persons summoned for jury duty who are determined to be disqualified from jury service shall be released from jury service.

**10.    Exemption from Jury Service**

The following persons are barred from jury service on the ground that they are exempt:

a. members in active service in the Armed Forces of the United States;

b. members of the fire or police departments of any State, the District of Columbia, any territory or possession of the United States, or any subdivision of a State, the District of Columbia, or such territory or possession; and

c. public officers in the executive, legislative, or judicial branches of the Government of the United States, or of any State, the District of Columbia, any territory or possession of the United States, or any subdivision of a State, the District of Columbia, or such territory or possession, who are actively engaged in the performance of official duties.

Persons summoned for jury duty who are determined to be exempt from jury service shall be released from jury service.

12

**Exhibit 36 -  548**

**11.    Individual Requests for Postponement or Excuse**

   **(a)    Postponement**

   Persons summoned for jury duty may request that service be postponed to a future date. If a request for postponement is granted, a juror will be re-summoned in advance of the requested date.

   **(b)    Groups Whose Members May Request Excuse**

   Persons summoned for jury duty may request that service be excused on the following grounds:

   (i)    Volunteer Safety Personnel.

   Upon individual request, individuals serving a public agency in an official capacity, without compensation, as firefighters or members of a rescue squad or ambulance crew, shall be excused from jury service.

   (ii)    Prior Jury Service.

   The Court finds that jury service by persons who have been selected and seated as a grand or petit juror or an alternate juror in the past year in either a United States District Court or a state trial court would entail undue hardship or extreme inconvenience to them and that excusing such persons would not be inconsistent with the Act. Accordingly, such persons shall be excused from jury service upon individual request.

   (iii)    Care Givers.

   The Court finds that jury service by a person who has the obligation to care for children, the elderly, or other dependants, when the obligation of such care prevents the person from engaging in employment outside the home, would entail undue hardship or extreme inconvenience to that person, and that excusing such a person would not be inconsistent with the Act. Accordingly, such persons shall be excused from jury service upon individual request.

   (iv)    Permanent Excuse.

   The Court finds that any person who provides documentation from a state or federal court showing that he or she has received a permanent excuse from serving as a

13

Exhibit 36 -  549

juror should be excused from jury service in this Court.

**(c)      Individual Showing of Undue Hardship or Extreme Inconvenience**

A prospective juror may make an individual request to be excused from jury service on the grounds that the following would create undue harm or extreme inconvenience:

(i)      great distance, either in miles or travel time, from the place of holding court;

(ii)      grave illness of the prospective juror or a family member for whom the prospective juror must care that prevents the juror from serving now or in the foreseeable future;

(iii)      any other emergency which outweighs in immediacy and urgency the obligation to serve as a juror when summoned;

(iv)      business, employment, or financial hardship to the juror;

(v)      any other factor that the court determines to constitute an undue hardship or to create an extreme inconvenience to the juror;

(vi)      in situations where it is anticipated that a trial or grand jury proceeding may require more than thirty days of service, severe economic hardship to an employer which would result from the absence of a key employee during the period of such service.

Persons summoned for jury duty who are excused from jury service but not postponed to a future date certain shall be released from jury service.

**12.      Juror Statistics and Records**

A Report on Operation of the Jury Selection Plan ("Form AO-12") shall be completed each time a Master Jury Wheel is refilled and any time there is a change in this Plan.  All completed AO-12s will be considered "Juror Selection Records."

All records identified in this Plan as "Juror Selection Records" and that are created during the life of a Master Jury Wheel shall be retained by the Clerk until four years after the later of the following two events (the "Release Date"):  (1) the date that that Master

14

**Exhibit 36 -  550**

Jury Wheel is emptied and refilled; or (2) the date the last of the jurors selected to serve on a jury during the life of that Wheel completes his or her service.  Prior to the Release Date, Juror Selection Records shall not be disclosed, except as necessary in the preparation or presentation of a motion under 28 U.S.C. § 1867(a), (b), or (c); a party preparing such a motion, or any party in a case in which such a motion has been filed, may inspect, reproduce, and copy Juror Selection Records regarding the Master Jury Wheel from which either the grand or petit jury in the case was selected, at all reasonable times, and at the party's expense, during the preparation or pendency of such a motion. During the four years after the Release Date, all Juror Selection Records shall be available for public inspection for the purpose of determining the validity of the selection of any jury; these records will not be available for reproduction or copying without an order of the Court.  Except as otherwise provided in this Plan, the contents of records or papers not identified in this Plan as Juror Selection Records shall be disclosed only upon an order of the Court.  Parties seeking the disclosure of anything not identified as Juror Selection Records must apply to the Court for an order of disclosure; if such an application is made, it shall be referred to the Chief Judge.

**13.    Sanctions for Late Settlement in Civil Cases**

In any civil case in which a settlement is reached and the Court is notified of settlement later than the close of business on the last business day before jurors are scheduled to appear for jury selection, the Court may assess reasonable charges reflecting the costs to the government of compensating said jurors for their unnecessary appearance.  Said charges may be assessed against one or more of the parties, or against one or more counsel, as the Court deems proper, and the amount collected shall be deposited by the Clerk into the Treasury of the United States.

**14.    Effective Date**

This Plan shall become effective upon filing by the Clerk of this Court after approval by the Judicial Council of the Ninth Circuit.  Copies of the approved Plan will

**Exhibit 36 -  551**

General Order No. 13-13

be sent to the Administrative Office of the United States Courts and the United States Attorney General.

IT IS SO ORDERED.

_____
GEORGE H. KING
CHIEF UNITED STATES DISTRICT JUDGE

*Date of Approval by the Court:*              July 30, 2013

*Date of Approval by the Judicial Council:*  October 23, 2013

*Date of Filing by the Clerk*                October 25, 2013

**Exhibit 36 -  552**