# EXHIBIT

# 37

## DECLARATION OF JOHN R. WEEKS, Ph.D.

I, John R. Weeks, Ph.D., declare as follows:

1.      I am Distinguished Professor Emeritus of Geography and Director of the International Population Center at San Diego State University.

2.      My qualifications are detailed in the accompanying Curriculum Vitae (Appendix A to this declaration). In brief, I received my A.B. in Sociology from the University of California, Berkeley, in 1966; my M.A. in Demography from the University of California, Berkeley, in 1969; and my Ph.D. in Demography from the University of California, Berkeley, in 1972. I taught at Michigan State University for three years (1971-1974) prior to accepting an appointment at San Diego State University, where I have been since 1974, initially in the Department of Sociology. I was granted tenure, promoted to Associate Professor, and elected Chair of the Department of Sociology in 1978; and was promoted to Full Professor in 1981. I served as Chair until 1985, when I was appointed Director of the International Population Center (a position I still hold). In 1992, I requested and was granted a move to the Department of Geography, where I am now Distinguished Professor Emeritus of Geography. I am also a Senior Fellow of the California Council on Science and Technology, and a Research Associate of the Broom Center for Demography at the University of California, Santa Barbara. In 2011, I was awarded the Albert W. Johnson Research Award and Distinguished Professorship by San Diego State University.

3.      I have taught undergraduate and graduate-level courses in demography and statistics since 1971, and I have published numerous professional articles, chapters, and books in the field of population studies. In addition, I have presented papers at professional meetings and published reports of professional research. My textbook *Population: An Introduction to Concepts*

1

Initials

Exhibit 37 - 553

*and Issues* is now in its thirteenth edition and is the best-selling text in the field of population studies. Over the past 25 years, I have received several million dollars in research grants from the National Institutes of Health, the National Aeronautics and Space Administration, the National Science Foundation, and the Andrew Mellon Foundation to fund research focused on incorporating remotely sensed images and geographic information system technology into statistically oriented demographic research. Much of this work is summarized in my book, *Spatial Inequalities: Health, Poverty, and Place in Accra, Ghana* (Dordrecht: Springer Publishing Company, 2013). I have also authored papers more closely related to criminal justice issues, such as "Does Night-Time Lighting Deter Crime? An Analysis of Remotely-Sensed Imagery and Crime Data," in Victor Mesev (ed.), *Remotely-Sensed Cities* (London: Taylor & Francis, 2003), and "Remote Sensing and Spatial Statistics as Tools in Crime Analysis," in Fahui Wang (ed.), *Geographic Information Systems and Crime Analysis* (Hershey, PA: Idea Group Publishers, 2005). Another of my relevant publications is "Jury Representativeness: Challenging the Array," Chapter 7 in Walter F. Abbott and John Batt (eds.), *Handbook of Jury Research*, Revision 5 (Philadelphia, PA: American Law Institute - American Bar Association 1999). My most recent publication (co-authored) is "The Relative Timing of Population Growth and Land Use Change—A Case Study of North Taiwan from 1990 to 2015," *Land*, 2022.

4.      I have been involved in work regarding the demographic composition of juries and other population-based/statistical legal issues since 1980, and I have served as a consultant and/or expert witness in nearly 250 legal cases (criminal and civil) as of this date (a complete list is provided in my CV in Appendix A), not including post-sentencing habeas cases such as this (a separate list of which is available upon request). The vast majority of state-level criminal cases have been capital punishment cases and most of them have involved challenges to the

2

Initials

Exhibit 37 - 554

composition of petit and/or grand juries. I have also served as an expert witness on the demographics of federal juries in several United States District Courts (the Central, Eastern, Northern, and Southern Districts of California; the District of New Mexico; the Western District of Pennsylvania; the District of Vermont; and Eastern District of Washington). All of the cases (both criminal and civil) in which I have been involved required the utilization of my expertise in sampling and statistical analysis.

## JURY DEMOGRAPHICS

5.      I have been asked by counsel to review the jury demographics, including the construction and implementation of the Master Jury Wheel and Qualified Jury Wheel that were used in 2006 to select Grand Jurors and Trial Jurors in *U.S. v. Mikhel and Kadamovas*. I have reviewed the demographic data currently available about each member of the 287-person jury pool. The information includes the race, gender, and city (but not zip code) of those who responded to the Juror Qualification Questionnaire and were summoned to appear as petit jurors. I then compared the demographics of the jury pool with the demographics of the Western Division of the Central District of California, which includes the counties of Los Angeles, Ventura, Santa Barbara, and San Luis Obispo.

6.      Data on race were self-reported for 275 of the 287 prospective jurors. There were 123 persons who indicated they were non-Hispanic White (44.7%), 53 who were non-Hispanic Black (19.3%), 52 who were Hispanic (18.9%), 30 who were non-Hispanic Asian (10.9%), and 17 who were non-Hispanic "other" race (6.2%). Data on gender were available for 272 of the 287 persons, and 130 (47.8%) reported that they were female.

7.      It is my understanding that the jury pool at that time was assembled solely from lists of registered voters. Thus, the basic qualifications to be eligible for jury service would have

3

Initials

Exhibit 37 - 555

been age 18 or older and a U.S. citizen. I have used the U.S. Census Bureau's American Community Survey (ACS) data (which replaced the decennial census long form as of the 2000 census) for the three years centered on 2007 as the source of demographic data for the Western Division of the Central District. Unlike the short form on the decennial census, the ACS data include information about citizenship. My analysis of these data shows that among citizens 18 or older, 47.9% were non-Hispanic White, 28.5% were Hispanic, 10.7% were non-Hispanic Black, 10.6% were non-Hispanic Asian, and 2.2% were non-Hispanic "some other race".

8.      Table 1 compares the jury pool demographics with the jury-eligible population in the Western Division of the Central District. If the jury pool is representative, its distribution by race-ethnicity and gender should be very similar to the demographics of the Western Division. However, Table 1 shows this is not the case. In particular, it can be seen that there are large absolute and relative disparities with respect to Hispanics and non-Hispanic Blacks. In particular, there are 34% fewer Hispanics than expected, while there are 80% more non-Hispanic Blacks than expected. In both instances, the large size of the absolute disparities is very notable, and in both cases the difference is highly statistically significant. The jury pool also has a statistically significant higher-than-expected percentage of the residual race-ethnic category of non-Hispanic other race individuals, but the relatively small number of such persons means that the absolute disparity is smaller than most courts demand (which is typically at least 6 percentage points).

4

Initials

Exhibit 37 - 556

**Table 1. Comparison of Jury Pool Demographics with Western Division Demographics Based on 2007 Population of Citizens Aged 18 or Older**

| | Non-Hispanic White | Hispanic | Non-Hispanic Black | Non-Hispanic Asian | All Others | Female |
|---|---|---|---|---|---|---|
| Jurors in Pool in 2006 | 275 | 275 | 275 | 275 | 275 | 272 |
| Jurors of this Group | 123 | 52 | 53 | 30 | 17 | 130 |
| Percent of Group in the Jury Pool | 44.73% | 18.91% | 19.27% | 10.91% | 6.18% | 47.79% |
| Percent of Jury-Eligible (Citizens 18+) Population in the Western District of the Central Division of California of this Group (*Source=ACS 2007 3-Yr data*) | 47.90% | 28.51% | 10.71% | 10.63% | 2.21% | 51.20% |
| Absolute Disparity | -3.17 | -9.60 | 8.56 | 0.28 | 3.97 | -3.41 |
| Relative Disparity | -7% | -34% | 80% | 3% | 180% | -7% |
| Z-score Associated with Disparity | -1.05 | -3.52 | 4.58 | 0.15 | 4.47 | -1.12 |
| Probability of the Disparity Occurring by Chance | 0.147 | 0.000 | 0.000 | 0.440 | 0.000 | 0.131 |
| Statistically Significant? | NO | YES | YES | NO | YES | NO |

9.      Counsel has asked me also to compare the jury pool demographics with data from the 2000 and 2010 decennial censuses, interpolated to 2006. These data have the advantage of being based on the 100 percent count census, but the disadvantage that data are not available on citizenship. Table 2 shows the disparities between the jury pool and the 2006 population 18 and older in the Western Division.

5


Initials

Exhibit 37 -  557

**Table 2. Comparison of Jury Pool Demographics with Western Division Demographics Based on the 2006 Interpolation of the 2000 and 2010 Decennial Censuses for People Aged 18 or Older**

| | Non-Hispanic White | Hispanic | Non-Hispanic Black | Non-Hispanic Asian | All Others | Female |
|---|---|---|---|---|---|---|
| Jurors in Pool in 2006 | 275 | 275 | 275 | 275 | 275 | 272 |
| Jurors of this Group | 123 | 52 | 53 | 30 | 17 | 130 |
| Percent of Group in the Jury Pool | 44.73% | 18.91% | 19.27% | 10.91% | 6.18% | 47.79% |
| Percent of 18+ population in the Western District of the Central Division of California of this Group in 2006 (*source=interpolation between 2000 and 2010 decennial censuses*) | 36.51% | 40.11% | 7.86% | 13.06% | 2.45% | 50.90% |
| Absolute Disparity | 8.22 | -21.20 | 11.41 | -2.15 | 3.73 | -3.11 |
| Relative Disparity | 23% | -53% | 145% | -16% | 152% | -6% |
| Z-score Associated with Disparity | 2.83 | -7.16 | 7.02 | -1.06 | 4.00 | -1.02 |
| Probability of the Disparity Occurring by Chance | 0.002 | 0.000 | 0.000 | 0.144 | 0.000 | 0.154 |
| Statistically Significant? | YES | YES | YES | NO | YES | NO |

10.     Table 2 shows that if we do not take citizenship into account, the disparities between the jury pool and the Western Division are even larger than those shown in Table 1. Non-Hispanic whites are 23% overrepresented in the jury pool, Hispanics are 53% underrepresented, non-Hispanic Blacks are 145% overrepresented and the residual race-ethnic category is 152% overrepresented, although its absolute disparity is fairly small.

11.     The data in both Tables 1 and 2 reveal that the jury pool had large and statistically significant disproportionate representation of Hispanic and Black jurors. This suggests that the sample drawn from the population was not random and not representative of the general

6

Initials

**Exhibit 37 - 558**

population. To complete this review, I need to examine the documents listed below. The listed data are common to other reviews of Federal jury wheels that I have been asked to perform. The listed data have been provided to me in connection with my work as an expert in similar challenges brought on behalf of federal criminal defendants in other federal jurisdictions.

12.     In order to verify that the information used to create the master jury wheel is representative of the jury-eligible population in the district, that the Jury Plan was properly followed, and that the sampling procedures used to draw grand and petit jurors were correct, I must review demographic information from the voter registration list for that time period, and compare that information to the demographic data in the Jury Wheels. It is critical to know that there were no issues regarding undeliverable summonses, out-of-area addresses, or other mailing issues that might contribute to differential response rates. I also need to know the racial-ethnic composition of qualified jurors by zip code so that I can determine if there are differences from one neighborhood to another that are contributing to a skewed jury pool. This list of required data is designed to be complete enough to understand the jury system process used in the Central District of California at the time of trial, and to cross-verify the different data items supplied. These are the data required to reach an opinion with a reasonable degree of certainty in this field.

## GRAND JURY RECORDS

1.     Any AO-12 form or JS-12 form created which relates to any and all Jury Wheels which were used to summon the grand jurors in this case, as required by 28 U.S.C. § 1863(a) and the Jury Plan.

2.     Any other statistical or demographic analyses produced to ensure the quality and compliance of the Master Jury Wheels and Qualified Jury Wheels that were used to summon

<div align="center">7</div>

Initials

<div align="right"><strong>Exhibit 37 - 559</strong></div>

grand jurors in this case consistent with the Jury Plan, the Jury Selection and Service Act, and constitutional requirements.

3. The dates when each Master Jury Wheel used to summon grand jurors in this case was created, refilled, or drawn, as described in the Jury Plan.

4. The calculation that ensures each county within each division is substantially proportionately represented as described in the Jury Plan.

5. The procedures implemented related to prospective jurors who do not respond to a juror qualification form or have their juror qualification form returned from the Postal Service as undeliverable.

6. The dates when grand jurors were summoned in this case.

7. The number of persons summoned from each Qualified Jury Wheel to be considered as grand jurors in this case.

8. The orders requesting the drawing of grand jurors in this case.

9. The procedures for persons deferred to a different service date. If there is such a procedure, please describe the procedure used once the deferred juror attends on the deferral date including their order of consideration.

10. The requests for source data (voter registration lists) as described in the Jury Plan and the response including the name, agency, and contact information.

11. The name, contact information, and description of work for any vendors who participated in creating the Master Jury Wheel or Qualified Jury Wheel.

12. The selection instructions and declaration maintained by the Court for each Master Jury Wheel and each Qualified Jury Wheel.

8

Initials

**Exhibit 37 - 560**

13. Any correspondence, specifications, or descriptions, whether internal or with parties outside the court such as vendors, regarding the creation of the Master Jury Wheel or Qualified Jury Wheel.

14. The District and all Divisional Jury Wheel data for each division as described in the Jury Plan in electronic and accessible form that includes Juror Identification Number, Last Name and First Initial, Zip Code, Race, Gender, Hispanic Ethnicity, Year of Birth, County, and Jury Division. These data should include and identify any special or supplemental District or Division Master Jury Wheels.

15. The District and all Divisional Qualified Jury Wheel data for each division as described in the Jury Plan in electronic and accessible form that includes Juror Identification Number, Last Name and First Initial, Zip Code, Race, Gender, Hispanic Ethnicity, Year of Birth, County, and Jury Division. These data should include and identify any special or supplemental District or Division Qualified Jury Wheels.

16. Data for potential jurors who were selected from the Master Jury Wheel for qualification who either had their qualification form returned by the postal service, did not respond, or were disqualified or exempted or excused from jury service, or qualified for jury service as described in the Jury Plan. The data should be in electronic and accessible form that includes Juror Identification Number; whether the form was returned Undeliverable, or whether the form was not returned; the Reason for Disqualification, Exemption, or Excuse; Qualification; Race; Gender; Hispanic Ethnicity; Year of Birth; Zip Code; City; County; and Jury Division.

17. To the extent it is not supplied otherwise, the information in items #14, #15, and #16 above for the relevant Jury Wheels, including any special or supplemental wheels.

9

Initials

**Exhibit 37 - 561**

18.     Any number or code assigned to individuals for persons selected as potential grand jurors in this case.

19.     Any number or code assigned to individuals for persons summoned as potential jurors for all purposes from the Master Jury Wheel.

20.     The source of data (Master Source List) in electronic form for the Master Jury Wheel used to summon all of the grand jurors in this case. The data should include, as available, Juror Identification Number, Last Name and First Initial, Zip Code, Race, Gender, Hispanic Ethnicity, Year of Birth, County, and Jury Division.

21.     The juror qualification and summons forms for persons summoned to potentially become grand jurors in this case.

22.     The disposition of each summoned potential grand juror in this case as to excusal, deferment, disqualification, or selection as described in the Jury Plan.

## PETIT JURY RECORDS

1.     Any AO-12 form or JS-12 form created which relates to the Source Lists, Master Jury Wheels, and Qualified Jury Wheels that were used to summon the trial jurors in this case, as required by 28 U.S.C. § 1863(a).

2.     Any other statistical or demographic analyses produced to ensure the quality and compliance of the Master Jury Wheels and Qualified Jury Wheels that were used to summon trial jurors in this case with the Jury Plan, Jury Selection and Service Act, and constitutional requirements.

3.     The date when the Master Jury Wheel that was used to summon trial jurors in this case was created, refilled, or drawn, as described in the Jury Plan.

10


Initials

**Exhibit 37 - 562**

4. The calculation that ensures each county within each division is substantially proportionately represented as described in the Jury Plan.

5. The procedures implemented related to prospective jurors who do not respond to a juror qualification form or have their juror qualification form returned from the Postal Service as undeliverable.

6. The date when trial jurors were summoned in this case.

7. The number of persons summoned from the Qualified Jury Wheel to be considered as trial jurors in this case.

8. The order requesting the drawing of trial jurors in this case.

9. The procedures for persons deferred to a different service date. If so, please describe the procedure used once the deferred juror attends on the deferral date including their order of consideration.

10. The request for the source data (voter registration lists) as described in the Jury Plan and the response, including the name, agency, and contact information.

11. The name, contact information, and description of work for any vendors who participated in creating the Master Jury Wheel or Qualified Jury Wheel.

12. The selection instructions and declaration maintained by the Court for each Master Jury Wheel and each Qualified Jury Wheel.

13. Any correspondence, specifications, or descriptions, whether internal or with parties outside the court such as vendors, regarding the creation of the Master Jury Wheel or Qualified Jury Wheel.

14. The District and all Divisional Master Jury Wheel data for each division as described in the Jury Plan in electronic and accessible form that includes Juror Identification

11

Initials

**Exhibit 37 - 563**

Number, Last Name and First Initial, Zip Code, Race, Gender, Hispanic Ethnicity, Year of Birth, County, and Jury Division. These data should include and identify any special or supplemental District or Division Master Jury Wheels.

15.  The District and all Divisional Qualified Jury Wheel data for each division as described in the Jury Plan Section 8 in electronic and accessible form that includes Juror Identification Number, Last Name and First Initial, Zip Code, Race, Gender, Hispanic Ethnicity, Year of Birth, County and Jury Division. These data should include and identify any special or supplemental District or Division Qualified Jury Wheels.

16.  Data for potential jurors who were selected from the Master Jury Wheel for qualification who had their qualification form returned by the postal service, did not respond, or were disqualified or exempted or excused from jury service, or qualified for jury service as described in the Jury Plan. The data should be in electronic and accessible form that includes Juror Identification Number, whether the form was returned Undeliverable, whether the form was not returned, Reason for Disqualification /Exemption /Excuse Qualification, Race, Gender, Hispanic Ethnicity, Year of Birth, Zip Code, City, County, and Jury Division.

17.  To the extent it is not supplied otherwise, the information in items #14, #15, and #16 above for the petit Jury Wheel in this case, including any special or supplemental wheels.

18.  Any number or code assigned to individuals for persons selected as potential petit jurors in this case.

19.  Any number or code assigned to individuals for persons summoned as potential jurors for all purposes from the Master Jury Wheel.

20.  The source of data (Master Source List) in electronic form for the Master Jury Wheel used to summon all of the petit jurors in this case. The data should include, as available,

12

Initials

Exhibit 37 - 564

Voter Identification Number, Last Name and First Initial, Zip Code, Race, Gender, Hispanic Ethnicity, Year of Birth, County, and Jury Division.

21.    The juror qualification and summons forms for persons summoned to potentially become petit jurors in this case.

22.    The disposition of each summoned potential petit juror in this case as to excusal, deferment, disqualification, or selection as described in the Jury Plan.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: <u>27 July 2023</u>

JOHN R. WEEKS, Ph.D.

13

Initials

Exhibit 37 - 565

*APPENDIX A*

**CURRICULUM VITAE OF DR. JOHN R. WEEKS**

14

Initials

Exhibit 37 -  566

<div style="border:1px solid">

**JOHN R. WEEKS, Ph.D.**
Distinguished Professor Emeritus of Geography
Director, International Population Center
San Diego State University
San Diego, CA 92182-4493 USA

*email:* john.weeks@sdsu.edu

</div>

***CURRICULUM VITAE***
**2023**

## EDUCATION

Ph.D. (Demography) University of California, Berkeley, 1972
M.A. (Demography) University of California, Berkeley, 1969
A.B. (Sociology) University of California, Berkeley, 1966

## ACADEMIC POSITIONS

| | |
|---|---|
| 2013 - present | Distinguished Professor Emeritus of Geography, and Director, International Population Center, San Diego State University: https://ipc.sdsu.edu |
| 2012 - present | Research Associate, Broom Center for Demography, University of California, Santa Barbara |
| 2008 - present | Senior Fellow, California Council on Science and Technology |
| 1998 - 2019 | Clinical Professor of Global Public Health, School of Medicine, University of California, San Diego |
| 2010 - 2013 | Distinguished Professor of Geography and Director, International Population Center, San Diego State University |
| 1992 – 2010 | Professor of Geography and Director, International Population Center, San Diego State University |
| 1985 - 1992 | Professor of Sociology and Director, International Population Center, San Diego State University |
| 1981 - 1985 | Professor and Chair, Department of Sociology, San Diego State University |
| 1978 - 1981 | Associate Professor and Chair, Department of Sociology, San Diego State University |
| 1974 - 1978 | Assistant Professor, Department of Sociology, San Diego State University |
| 1971 - 1974 | Assistant Professor of Sociology and Director of Social Science Methods Laboratory, James Madison College, and Assistant Professor of Anthropology (joint appointment), Michigan State University, East Lansing, Michigan |
| 1970 - 1971 | Teaching Assistant, Department of Demography, University of California, Berkeley |

## OTHER PERTINENT PROFESSIONAL EXPERIENCE

Visiting Assistant Research Demographer, International Population and Urban Research, University of California, Berkeley, Summer, 1972
Public Health Statistician, California Department of Public Health, Berkeley, California, 1971
Undergraduate Research Assistant, International Population and Urban Research, University of California, Berkeley, 1964-1966

## RELEVANT HONORS

Recipient of *Lifetime Achievement Award*, American Association of Geographers Population Specialty Group, March 2016
*Commencement Speaker*, College of Arts and Letters, San Diego State University, May 2013.
Recipient of the *Albert W. Johnson Research Award and Distinguished Professorship*, San Diego State University, 2010
Recipient of *Most Influential Professor* Award, Department of Geography (named by Outstanding Graduating Student in Geography), San Diego State University, 2003, 2007
Recipient of San Diego State University Alumni Association *Distinguished Faculty Award in the College of Arts and Letters*, 2003

**Exhibit 37 - 567**

*Phi Beta Kappa Lecturer*, Nu of California Chapter of Phi Beta Kappa, San Diego State University, 2000

Recipient of *Most Influential Professor* Award, Undergraduate Studies (named by Outstanding Graduating Student in Liberal Studies), San Diego State University, 1996

*Ford Foundation Fellowship in Demography*, Department of Demography, University of California, Berkeley, 1970-1971

*NIH Traineeship in Demography*, Department of Demography, University of California, Berkeley, 1967-1970

*NIMH Traineeship in the Demography of Social Disorganization*, Department of Sociology, University of Southern California, Los Angeles, California, 1966-1967

*California State Scholarship*, University of California, Berkeley, 1962-1966

## PUBLICATIONS

### Books

John R. Weeks, ***Population: Introduction to Concepts and Issues, Thirteenth Edition*** (Boston, MA: Cengage Learning, 2020. [Best-selling textbook in the field of population studies; used in Departments of Demography, Sociology, Geography, Ecology, and related Social and Behavioral Sciences in the United States, Canada, Mexico, the United Kingdom, and elsewhere; earlier editions have been translated into Spanish and Arabic.] The 8th, 9th, and 10th editions are available on audio through http://www.learningally.org. The iPhone app for the 13th edition can be downloaded from the App Store.

John R. Weeks, ***Population: Introduction to Concepts and Issues, Twelfth Edition*** (Boston, MA: Cengage Learning), 2016,

John R. Weeks, Allan G. Hill, and Justin Stoler, Editors, ***Spatial Inequalities: Health, Poverty and Place in Accra, Ghana*** (Dordrecht, The Netherlands: Springer), 2013.

John R. Weeks and Debbie L. Fugate, Editors, ***The Youth Bulge: Challenge or Opportunity?*** (New York: IDEBATE Press), 2012.

John R. Weeks, ***Population: Introduction to Concepts and Issues, Eleventh Edition*** (Belmont, CA: Wadsworth Cengage Learning), 2012.

Gregory B. Weeks and John R. Weeks, ***Irresistible Forces: Explaining Latin American Migration to the United States and Its Effects on the South*** (Albuquerque, NM: The University of New Mexico Press), 2010. (see reviews in *Contemporary Sociology: A Journal of Reviews*, 41:1(110-111), 2012; and *Choice*, September 2011).

John R. Weeks, ***Population: Introduction to Concepts and Issues, Tenth Edition*** (Belmont, CA: Wadsworth Publishing Co.), 2008.

Susan L. Cutter, Margaret Arnold, Deborah Balk, Bela Hovy, Mei-Po Kwan, Jonathan D. Mayer, David R. Rain, Havidan Rodriguez, Barbara Boyle Torrey, Billie L. Turner II, John R. Weeks, and Tukufu Zuberi, ***Tools and Methods for Estimating Populations at Risk From Natural Disasters and Complex Humanitarian Crises*** (Washington, DC: The National Academies Press), 2007.

John R. Weeks, ***Population: Introduction to Concepts and Issues, Ninth Edition*** (Belmont, CA: Wadsworth Publishing Co.), 2005.

John R. Weeks, ***Population: Introduction to Concepts and Issues, Eighth Edition*** (Belmont, CA: Wadsworth Publishing Co.), 2002.

John R. Weeks, ***Population: An Introduction to Concepts and Issues, Seventh Edition*** (Belmont, CA: Wadsworth Publishing Co.), 1999.

John R. Weeks, ***Population: An Introduction to Concepts and Issues, Sixth Edition*** (Belmont, CA: Wadsworth), 1996.

John R. Weeks, ***Population: An Introduction to Concepts and Issues, Updated Fifth Edition*** (Belmont, CA: Wadsworth), 1994.

John R. Weeks, ***Population: An Introduction to Concepts and Issues, Fifth Edition*** (Belmont, CA: Wadsworth), 1992.

John R. Weeks and Roberto Ham-Chande (eds.), ***Demographic Dynamics of the U.S.-Mexico Border*** (University of Texas at El Paso: Texas Western Press), 1992. [Reviewed in *Contemporary Sociology* 22(4) July, 1993; *Foreign Affairs* 73(2) March/April, 1994]

John R. Weeks, ***Population: An Introduction to Concepts and Issues, Fourth Edition*** (Belmont, CA: Wadsworth Publishing Co.), 1989.

John R. Weeks, ***Population: An Introduction to Concepts and Issues, Third Edition*** (Belmont, CA: Wadsworth Publishing Co.), 1986.

John R. Weeks, ***Sociología de la Población*** (Madrid: Alianza Universidad Textos), 1984.

John R. Weeks, ***Aging: Concepts and Social Issues*** (Belmont, CA: Wadsworth Publishing Co.), 1984.

**Exhibit 37 - 568**

John R. Weeks, *Population: An Introduction to Concepts and Issues, Second Edition* (Belmont, CA: Wadsworth Publishing Co.), 1981.

John R. Weeks, *Population: An Introduction to Concepts and Issues* (Belmont, CA: Wadsworth Publishing Co.), 1978. [Reviewed in *Contemporary Sociology* 8(1):86, 1979].

John R. Weeks, *Teenage Marriages: A Demographic Analysis*, Studies in Population and Urban Demography, Number 2 (Westport, CT: Greenwood Press), 1976. [Also made available on tape by Recording for the Blind, Inc., 1979]; [Reviewed in *Population (French Edition)*, Vol. 32, No. 6 (Nov. - Dec., 1977), p. 1316]

John R. Weeks, *Social Statistics: A Competency-Based Workbook* (San Diego: San Diego State University Press), 1975.

## Journal Articles

Shih, H.-C.; Stow, D.A.; Weeks, J.R.; Goulias, K.G.; Carvalho, L.M.V. "The Relative Timing of Population Growth and Land Use Change—A Case Study of North Taiwan from 1990 to 2015." *Land,* 11:2204., 2022.

Holly Shakya, John R. Weeks, Sneha Challa, Paul Fleming, Beniamino Cislaghi, Lotus McDougal, Sabrina Boyce, Anita Raj, and Jay Silverman, "Spatial analysis of individual and village level sociodemographic characteristics associated with age at first marriage among married adolescents in rural Niger," *BMC Public Health*, 20:279, 2020.

Sory I. Touré, John R. Weeks, David Lopez-Carr, and Douglas Stow, "Evaluating links between dynamic urban landscapes and under-five child mortality in Accra, Ghana." *Demographic Research*, Volume 42, Article 20, Pages 589-614, 2020.

Holly Shakya, G. L. Darmstadt, K.M. Barker, John R. Weeks, and Nicholas Christakis, "Social normative and social network factors associated with adolescent pregnancy: a cross-sectional study of 176 villages in rural Honduras." *Journal of Global Health*, 10(1), 2020.

Holly Shakya, John R. Weeks, and Nicholas Christakis, " Do Village-Level Normative and Network Factors Help Explain Spatial Variability in Adolescent Childbearing in Rural Honduras?" *SSM - Population Health* 9 (100371), 2019.

Yu Hsin Tsai, Douglas A. Stow, David Lopez-Carr, John R. Weeks, Keith C. Clarke, and Foster Mensah, "Monitoring Forest Cover Change Within Different Reserve Types in Southern Ghana," *Environmental Monitoring and Assessment*, https://doi.org/10.1007/s10661-019-7450-z, May 2019.

Sory I. Touré, Douglas A. Stow, Keith C. Clarke, and John R. Weeks, "Patterns of Land Cover and Land Use Change within the Two Major Metropolitan Areas of Ghana," *Geocarto International*, https://doi.org/10.1080/10106049.2018.1516244, 2018.

Sory I. Touré, Douglas A. Stow, Hsiao-chien Shih, John R. Weeks, and David Lopez-Carr, "Land Cover and Land Use Change Analysis Using Multi-Spectral Resolution Data and Object-Based Image Analysis," *Remote Sensing of Environment*, 210:259-268, 2018.

Magdalena Benza, John R. Weeks, Douglas A. Stow, David López-Carr, and Keith C. Clarke, "Fertility and Urban Context: A Case Study from Ghana, West Africa, Using Remotely Sensed Imagery and GIS," *Population, Space and Place*, 23(8), 2017.

Lloyd Coulter, Douglas A Stow, Yu-Hsin Tsai, Nicholas Ibanez, Hsiao-chien Shih, Andrew Kerr, Magdalena Benza, John R. Weeks, and Foster Mensah, "Classification and assessment of land cover and land use change in southern Ghana using dense stacks of Landsat 7 ETM+ imagery," *Remote Sensing of Environment*, 184:396-409, 2016.

Magdalena Benza, John R. Weeks, Douglas A. Stow, David López-Carr, and Keith C. Clarke, "A Pattern-Based Definition of Urban Context Using Remote Sensing and GIS," *Remote Sensing of Environment*, 183(15):250-264, 2016.

David López-Carr, Kevin M. Mwenda, Narcisa G. Pricope, Phaedon C. Kyriakidis, Marta M. Jankowska, John Weeks, Chris Funk, Gregory Husak, and Joel Michaelsen, "Climate-Related Child Undernutrition: An Integrated Spatial Analysis Of Health Surveys, NDVI, And Precipitation Data In The Lake Victoria Basin," *IEEE Journal of Selected Topics in Applied Earth Observations and Remote Sensing*, 9(6):2830-2835, 2016.

Steven Crook, Li An, John R. Weeks, and Douglas A. Stow, "Latent Trajectory Modeling of Spatiotemporal Relationships between Land Cover and Land Use, Socioeconomics, and Obesity in Ghana", *Spatial Demography*, 4(3):221-244, 2016.

Douglas Stow, John R. Weeks, Hsiao-chien Shih, Lloyd Coulter, Yu-Hsin Tsai, Andrew Kerr, and Foster Mensah, "Inter-regional pattern of urbanization in southern Ghana in the first decade of the new millennium," *Journal of Applied Geography*, 71:32-43, 2016.

Sory Touré, Douglas Stow, Hsiang-chien Shih, Lloyd Coulter, John Weeks, Ryan Engstrom and Avery Sandborn, " An object-based temporal inversion approach to urban land use change analysis," *Remote Sensing Letters* 7(5): 503-512, 2016.

**Exhibit 37 - 569**

Erin E. Conners, Joseph M. Vinetz, John R. Weeks, and Kimberly C. Brouwer, "A global systematic review of Chagas disease prevalence among migrants," *Acta Tropica* 156:68-78, 2016.

Hsiao-chien Shih, Douglas A. Stow, John R. Weeks, and Lloyd Coulter, "Determining the Type and Starting Time of Land Cover and Land Use Change in Ghana Based on Discrete Analysis of Dense Landsat Image Time Series," *IEEE Journal of Selected Topics in Applied Earth Observations and Remote Sensing (JSTARS)*, 9(5):2064-2073, 2015.

Ryan Engstrom, Avery Sandborn, Yu Qin, Jason Burgdorfer, Douglas Stow, John Weeks, and Jordan Graesser, "Mapping slums using spatial features in Accra, Ghana," *Joint Urban Remote Sensing Event (JURSE)*, https://doi.org/10.1109/JURSE.2015.7120494, 2015.

Gregory B. Weeks and John R. Weeks, "Immigration and Transnationalism: Rethinking the Role of the State in Latin America," *International Migration*, 53(5):122-134, 2015.

Anna Carla Lopez-Carr, Marta M. Jankowska, Justin Stoler, Caetlin Ofiesh, David Rain, and John R. Weeks, "Agency, Access, and Anopheles: Neighborhood health perceptions and the implications for community health interventions in Accra, Ghana," *Global Health Action*, 8(http://dx.doi.org/10.3402/gha.v8.26492), 2015.

Justin Stoler, John R. Weeks, and Richard Appiah Otoo, "Drinking Water in Transition: A Multilevel Cross-sectional Analysis of Sachet Water Consumption in Accra," *PLOS ONE*, 8(6): e67257. doi:10.1371/journal.pone.0067257, 2013.

Sory Touré, Douglas Stow, John R. Weeks, and Sanil Kumar, "Histogram Curve Matching Approaches for Object-Based Image Classification of Land Cover and Land Use," *Photogrammetric Engineering and Remote Sensing*, 79(5): 433-440, 2013.

Ryan Engstrom, David Rain, Caetlin Ofiesh, Henry Jewell, and John R. Weeks, "Defining Neighborhood Boundaries for Urban Health Research in Developing Countries: A Case Study of Accra, Ghana," *Journal of Maps* (9)1:36-42. 2013.

Stow, Douglas A., John R. Weeks, S. Toure, Christopher Lippitt, Lloyd Coulter, and Eric Ashcroft, "Urban vegetation cover and vegetation change in Accra, Ghana: Connection to housing quality," *Professional Geographer*, Vol. 65 Issue 3, p451-465, 2013.

Marta Jankowska, Magdalena Benza-Fiocco, and John R. Weeks, "Estimating Spatial Inequalities of Urban Child Mortality," *Demographic Research*, 28(2):33-62, 2013.

Günther Fink, John R. Weeks, and Allan G. Hill, "Income and Health in Accra, Ghana: Results from the Time Use and Health Study, *American Journal of Tropical Medicine and Hygiene*, 87(4):608-615, 2012.

Stoler, Justin, John R. Weeks, and Günther Fink, "Sachet drinking water in Ghana's Accra-Tema Metropolitan Area: Past, present, and future," *Journal of Water, Sanitation and Hygiene for Development*, 2(4): 223-240, 2012.

Gregg Verutes, Magdalena Benza-Fiocco, John R. Weeks, and Lloyd L. Coulter, "Health, Poverty, and Place in Accra, Ghana: Mapping Neighborhoods," *Journal of Maps*, Special Issue on Innovative Mapping in Spatial Demography, 8(4):369-373, 2012.

Kimberly C. Brouwer, Melanie L. Rusch, John R. Weeks, Remedios Lozada, Alicia Vera, Carlos Magis-Rodríguez, and Steffanie A. Strathdee, "Spatial Epidemiology of HIV. Among Injection Drug Users in Tijuana, Mexico," *Annals of the Association of American Geographers*, 102(5):1190-1199, 2012.

John R. Weeks, Arthur Getis, Douglas A. Stow, Allan G. Hill, David Rain, Ryan Engstrom, Justin Stoler, Christopher Lippitt, Marta Jankowska, Anna Carla Lopez, Lloyd Coulter, and Caetlin Ofiesh, "Connecting the Dots Between Health, Poverty and Place in Accra, Ghana," *Annals of the Association of American Geographers*, 102(5):932-941, 2012.

Kimberly C. Brouwer, Remedios Lozada, John R. Weeks, Carlos Magis-Rodríguez, Michelle Firestone-Cruz, and Steffanie A. Strathdee, "Intra-Urban Mobility and its Potential Impact on the Spread of Blood-Borne Infections among Drug Injectors in Tijuana, Mexico," *Substance Use and Misuse*, 47(3):244-253, 2012.

Justin Stoler, Dean Daniels, John R. Weeks, Douglas A. Stow, Lloyd L. Coulter, and Brian K. Finch, "Assessing the Utility of Satellite Imagery with Differing Spatial Resolutions for Deriving Proxy Measures of Slum Presence in Accra, Ghana," *GIScience & Remote Sensing*, 49(1):31-52, 2012.

Justin Stoler, Günther Fink, John R. Weeks, Richard Appiah Otoo, Joseph Ampofo, and Allan G. Hill, "When Urban Taps Run Dry: Sachet Water Consumption and Health Effects in Low Income Neighborhoods of Accra, Ghana," *Health & Place*, 18:250-262, 2012.

Marta M. Jankowska, John R. Weeks, and Ryan Engstrom, "Do the Most Vulnerable People Live in the Worst Slums? A Spatial Analysis of Accra, Ghana," *Annals of GIS*, 17(4):221-235, 2011.

Gregory B. Weeks and John R. Weeks, "Latin American Migration to the United States: A Multidisciplinary View," *The Latin Americanist*, 55(4):5-8, 2011.

Tsai, Yu Hsin, Douglas Stow, and John R. Weeks, "Comparison of Object-Based Image Analysis Approaches to Mapping New Buildings in Accra, Ghana Using Multi-Temporal QuickBird Satellite Imagery," *Remote Sensing*, 3:2707-2726, 2011.

Exhibit 37 - 570

Justin Stoler, Stephanie K. Brodine, Simeon Bromfield, John R. Weeks, and Henry P. Scarlett, "Exploring the relationships between dengue fever knowledge and Aedes aegypti breeding in St. Catherine Parish, Jamaica: A pilot of enhanced low-cost surveillance, *Research Reports in Tropical Medicine*, 2011(2):1-11, 2011.

John R. Weeks, Justin Stoler, and Piotr Jankowski, "Who's Crossing the Border: New Data on Undocumented Immigrants to the United States," *Population, Space and Place*, 17(1):1-26, 2011.

Joni A. Mayer, Susan I. Woodruff, Donald J. Slymen, James F. Sallis, Jean L. Forster, Elizabeth J. Clapp, Katherine D. Hoerster, Latrice C. Pichon, John R. Weeks, George E. Belch, Martin A. Weinstock, and Todd Gilmer, "Why do teens use indoor tanning? A large-scale evaluation of psychosocial, environmental, and policy level correlates," *American Journal of Public Health*, 101:930-938, 2011. PMID: 21421947

Lola Duque and John R. Weeks, "Towards a Model and Methodology for Assessing Student Learning Outcomes and Satisfaction," *Quality Assurance in Education*, 18(2):84-105, 2010.

Douglas Stow, Chris Lippitt, and John R. Weeks, "Delineation of Neighborhoods of Accra, Ghana Based on QuickBird Satellite Data," *Photogrammetric Engineering and Remote Sensing*, 76(8):907-914, August 2010. PMID: 20689664.

John R. Weeks, Arthur Getis, Allan G. Hill, Samuel Agyei-Mensah, and David Rain, "Neighborhoods and Fertility in Accra, Ghana: An AMOEBA-based Approach," *Annals of the Association of American Geographers*, 100(3):558-578, July 2010. PMCID: PMC3093308.

Justin Stoler, John R. Weeks, Arthur Getis, and Allan G. Hill, "Distance Threshold for the Effect of Urban Agriculture on Elevated Self-reported Malaria Prevalence in Accra, Ghana," *American Journal of Tropical Medicine and Hygiene* 80(4): 547-554, 2009. PMID: 19346373.

Hoerster, K.D., R. L. Garrow, J. A. Mayer, E. J. Clapp, J. R. Weeks, S. I. Woodruff, J. F. Sallis, D. J. Slymen, M. R. Patel, and S. A. Sybert, "Density of indoor tanning facilities in 116 large U.S. cities," *American Journal of Preventive Medicine*, 36(3):243-246, 2009. PMID: 19215849.

Marta Jankowska, Jared Aldstadt, Arthur Getis, John R. Weeks, and Grant Fraley, "An amoeba procedure for visualizing clusters," *Proceedings of GIScience*, 2008.

Douglas A. Stow, Anna Carla Lopez, Christopher Lippitt, Sarah Hinton, and John R. Weeks, "Object-based classification of residential land use within Accra, Ghana based on QuickBird satellite data," *International Journal of Remote Sensing*, 28(22):5167-5173, 2007. PMID: 19424445.

Chris D. Elvidge, P. Cinzano, D. R. Pettit, J. Arvesen, Paul Sutton, Christopher Small, R. Nemani, T. Longcore, C. Rich, J. Safran, John R. Weeks, and S. Ebener, "The Nightsat Mission Concept," *International Journal of Remote Sensing* 28(12):2645-70, 2007.

John R. Weeks, Allan G. Hill, Douglas A. Stow, Arthur Getis, and Debbie Fugate, "Can You Spot a Neighborhood From the Air? Defining Neighborhood Structure in Accra, Ghana," *GeoJournal* 69:9-22, 2007. PMID: 19478993.

Minal R. Patel, Joni A. Mayer, Donald J. Slymen, John R. Weeks, and Ami L. Hurd, "Correlates of Tanning Facility Prevalence within San Diego County, California Census Tracts," *Journal of Community Health* 32:391-400, 2007. PMID: 17940870.

Gregory B. Weeks, John R. Weeks, and Amy J. Weeks, "Latino Immigration to the U.S. South: 'Carolatinos' and Public Policy in Charlotte, North Carolina," *Latino(a) Research Review*, 6:1-2:50-72, 2007.

John R. Weeks, Allan G. Hill, Arthur Getis, and Douglas Stow, 2006, "Ethnic Residential Patterns as Predictors of Intra-Urban Child Mortality Inequality in Accra, Ghana," *Urban Geography* 27(6):526-548. PMCID: PMC2758568.

Tarek Rashed, John R. Weeks, Douglas A. Stow, and Debbie Fugate, "Measuring Temporal Compositions of Urban Morphology through Spectral Mixture Analysis: Toward a Soft Approach to Change Analysis in Crowded Cities," *International Journal of Remote Sensing*, 26(4):699-718, 2005.

John R. Weeks, "What Did He Know, and When Did He Know It?  Putting Glenn Trewartha's Call for Population Geography into Historical Perspective." *Population, Space and Place* 10:279-283, 2004.

John R. Weeks, Arthur Getis, Allan G. Hill, Tarek Rashed, and M. Saad Gadalla, "The Fertility Transition in Egypt: Intra-Urban Patterns in Cairo," *Annals of the Association of American Geographers*, 94 (1):74-93, 2004.

Tarek Rashed, John R. Weeks, Dar Roberts, John Rogan, and Rebecca Powell, "Measuring the Physical Composition of Urban Morphology Using Multiple Endmember Spectral Mixture Models," *Photogrammetric Engineering and Remote Sensing* 69(9): 1111-1120, 2003.

Tarek Rashed and John R. Weeks, "Assessing Vulnerability to Earthquake Hazards Through Spatial Multicriteria Analysis of Urban Areas," International Journal of Geographical Information Science, 17(6):549-578, 2003.

John R. Weeks, "Estimating the Muslim Population in the United States Using Census 2000 Data," *Espaces-Populations-Sociétés*, 2003-1:89-101, 2003.

David L. McIntyre and John R. Weeks, "Environmental Impacts of Illegal Immigration on the Cleveland National Forest in California," *Professional Geographer*, 54(3):392-405, 2002.

**Exhibit 37 - 571**

Christopher Peak and John R. Weeks, "Does Community Context Influence Reproductive Outcomes of Mexican Origin Women in San Diego, California?", *The Journal of Immigrant Health*, 4(3):125-136, 2002. PMID: 16228756.

Tarek Rashed, John R. Weeks, M. Saad Gadalla, and Allan G. Hill, "Revealing the Anatomy of Cities through Spectral Mixture Analysis of Multispectral Imagery: A Case Study of the Greater Cairo Region, Egypt," *Geocarto International*, 16(4):5-16, 2001.

John R. Weeks, M. Saad Gadalla, Tarek Rashed, James Stanforth, and Allan G. Hill, "Spatial Variability in Fertility in Menoufia, Egypt, Assessed Through the Application of Remote Sensing and GIS Technologies," *Environment and Planning A*, (32):695-714, 2000.

John R. Weeks, Rubén G. Rumbaut, and Norma Ojeda, "Reproductive Outcomes Among Mexico-Born Women in San Diego and Tijuana: Testing the Migration Selectivity Hypothesis, " *The Journal of Immigrant Health* 1(2):77-90, 1999. PMID: 16228706.

John R. Weeks, "The Early Years of the PAA," a compilation of Weeks (1996) and Weeks (1997): The Population Association of America--https://www.populationassociation.org/about/our-history

John R. Weeks, "Vignettes of PAA History - Demographics of the Early PAA Board Members," *PAA Affairs* 30(2 - Summer):4, 1997.

John R. Weeks, "Vignettes of PAA History - The Beginnings," *PAA Affairs* 29 (4 - Winter): 3-5, 1996.

Rubén G. Rumbaut and John R. Weeks, "Unraveling a Public Health Enigma: Why do Immigrants Experience Superior Perinatal Health Outcomes?" *Research in the Sociology of Health Care*, 13(B): 337-391, 1996.

Paul Ganster, John R. Weeks, and Roberto Ham-Chande, "Demographic Dynamics of the U.S.-Mexico Border," *International Journal of the Sociology of Language* 114:124-129, 1995

John R. Weeks and Rubén G. Rumbaut, "Infant Mortality Among Ethnic Immigrant Groups," *Social Science and Medicine*, 33(3): 327-334, 1991. PMID: 1925697.

John R. Weeks, "The Binational Survey in San Diego and Tijuana," *Frontera Norte* 2(4): 234-236, 1990.

Rubén G. Rumbaut and John R. Weeks, "Infant Health Among Indochinese Refugees: Patterns of Infant Mortality, Birthweight and Prenatal Care in Comparative Perspective," *Research in the Sociology of Health Care*, Volume 8: 137-196, 1989.

John R. Weeks, Rubén G. Rumbaut, Claire Brindis, Carol Korenbrot, and Donald Minkler, "An Analysis of High Fertility Among Indochinese Refugees," *Public Health Reports*, 104(2): 143-150, 1989. [Abstracted in The Atlantic Monthly, April 1994, pp. 89-90] PMID: 2495548.

John R. Weeks, "The Demography of Islamic Nations," *Population Bulletin* (Population Reference Bureau), 43(4), December, 1988. [Abstracted in International Family Planning Perspectives, 15(2):108-109, 1989; and American Demographics (September, 1989):66; Executive Summary prepared by the Population Reference Bureau in April, 1989, and distributed by the Population Resource Center, Washington, D.C.] PMID: 12281990.

Rubén G. Rumbaut and John R. Weeks, "Fertility and Adaptation Among Indochinese Refugees in the United States," *International Migration Review* 20(2): 428-465, 1986. PMID: 12267858.

John R. Weeks, "Teaching International Demography," *Teaching Sociology* 14: (2):92-101, 1986. PMID: 12268304.

John R. Weeks, "Introduction to Three Papers on Teaching Demography,", *Teaching Sociology* 14(2), 1986.

Sally Koblinsky, John R. Weeks, and Gwen C. Cooke, "Preparation and Practice of Secondary Family Life Education Teachers in Home Economics and Other Disciplines," *Home Economics Research Journal* 13(3):334-344, 1985.

Helen M. Wallace, John R. Weeks, and Earl D. Hollander, "Effects of Proposition 13 on Health Care Services for Mothers and Children in California." *Journal of Public Health Policy* 5(4):458-470, 1984. PMID: 6526934.

Sally A. Koblinsky and John R. Weeks, "Family Life Education in California Secondary Schools," *Journal of School Health* 54(4): 181-184, 1984. PMID: 6564301.

John R. Weeks and Jose B. Cuellar, "Isolation of Older Persons: The Influence of Immigration and Length of Residence," *Research on Aging* 5(4):369- 388, 1983.

Helen M. Wallace, John R. Weeks, and Antonio Medina, "Services for and Needs of Pregnant Teenagers in Large Cities of the United States, 1979-1980," *Public Health Reports* 97(6): 583-588, 1982. PMID: 6890697.

Helen M. Wallace, John R. Weeks, and Antonio Medina, "Changes in the Services and the Needs of Pregnant Teenagers in the Large Cities of the United States: A Follow-up Analysis," *Journal of the American Medical Association* 248(18): 2270-2273, 1982. PMID: 7188595.

John R. Weeks, "An Evaluation of the Use-Effectiveness of Fertility Awareness Methods of Family Planning," *Journal of Biosocial Science* 14(1):32-38, 1982. PMID: 7061541.

John R. Weeks and José B. Cuellar, "The Role of Family Members in the Helping Networks of Older People," *The Gerontologist* 21(4): 388-394, 1981. PMID: 7262568.

José B. Cuellar and John R. Weeks, "Hispanic Elders' Needs, Problems, and Access to Public Benefits and Services," *La Red/the Net* no. 28, University of Michigan, Institute for Social Research, November, 1980.

**Exhibit 37 - 572**

John R. Weeks, "Record Linkage in Demography:  History and Application," *Preliminary Papers, Results of Current Research in Demography,* No. 9, Vol.  I, International Population and Urban Research, University of California, Berkeley, February, 1977.

John R. Weeks, "Infant Mortality and Premarital Pregnancy," *Social Science and Medicine* 10(2):165-169, 1976. PMID: 968502.

John R. Weeks, "Urban and Rural Natural Increase in Chile," *Milbank Memorial Fund Quarterly* 48(1):71-89, 1970.

## Chapters in Books

John R. Weeks, "The Future is a Foreign Country: We'll Do Things Differently There," Chapter 5 in Alex Aleinikoff and Alexandra Delano (editors), *New Narratives on the Peopling of America* (Baltimore: Johns Hopkins University Press), *in press.*

John R. Weeks, Douglas A. Stow, and Li An, "Demographics, Health Drivers and Impacts on Land-Cover and Land-Use Change in Ghana," in Steven J. Walsh, editor, *Comprehensive Remote Sensing, Volume 9,* pp. 76-89 (Oxford: Elsevier), 2018.

John R. Weeks, "Demographic Transition Theory" in Bryan S. Turner, ed., *The Wiley Blackwell Encyclopedia of Social Theory* (Oxford, UK: Wiley Blackwell Publishing Co.), 2017.

John R. Weeks, "Demography is an Inherently Spatial Science," in Frank M. Howell, Jeremy R. Porter, and Stephen A. Matthews, Editors, *Recapturing Space: New Middle-Range Theory in Spatial Demography* (Dordrecht, The Netherlands: Springer), 2015.

John R. Weeks, "Demographic Transition Theory," and "Malthus, Thomas," in George Ritzer, ed., *The Wiley Blackwell Encyclopedia of Sociology (Updated)* (Oxford, UK: Wiley Blackwell Publishing Co.), 2015.

Gregory B. Weeks and John R. Weeks, "The Train Has Left the Station: Latino Aging in the New South," Chapter 4 in W.A. Vega, K.S. Markides, J.L. Angel, and F.M. Torres-Gil, editors, *Challenges of Latino Aging in the Americas* (Dordrecht: Springer), 2015.

John R. Weeks, "Population Theories and Dynamics," Chapter 5 in Deborah McFarlane, Editor, *Global Population and Reproductive Health* (Burlington, MA: Jones & Bartlett Learning), 2015.

John R. Weeks, "History and Future of World Population," Chapter 2 in Deborah McFarlane, Editor, *Global Population and Reproductive Health* (Burlington, MA: Jones & Bartlett Learning), 2015.

John R. Weeks, "The World Can't Support Its Current Population Without Inequality and Poverty." In *World Geography: Understanding a Changing World* (http://worldgeography2.abc-clio.com/), 2014.

John R. Weeks, Justin Stoler, Allan G. Hill, Alex Zvoleff, "Fertility in Context: Exploring Egocentric Neighborhoods in Accra," Chapter 11 in John R. Weeks, Allan G. Hill, and Justin Stoler, Editors, *Spatial Inequalities: Health Poverty and Place in Accra, Ghana* (Dordrecht, The Netherlands: Springer), 2013.

Alex Zvoleff, Li An, Justin Stoler, John R. Weeks, "What if Neighbors' Neighborhoods Differ: The Influence of Neighborhood Definitions on Health Outcomes in Accra, Chapter 9 in John R. Weeks, Allan G. Hill, and Justin Stoler, Editors, *Spatial Inequalities: Health Poverty and Place in Accra, Ghana* (Dordrecht, The Netherlands: Springer), 2013.

Ryan Engstrom, Caetlin Ofiesh, David Rain, Henry Jewell, and John Weeks, "Defining Neighborhood Boundaries for Urban Health Research: A Case Study of Accra, Ghana," Chapter 4 in John R. Weeks, Allan G. Hill, and Justin Stoler, Editors, *Spatial Inequalities: Health Poverty and Place in Accra, Ghana* (Dordrecht, The Netherlands: Springer), 2013.

John R. Weeks, Allan G. Hill, and Justin Stoler,  "Introduction to the Accra School: An Overview of Health, Poverty, and Place in Accra,"  Chapter 1 in John R. Weeks, Allan G. Hill, and Justin Stoler, Editors, *Spatial Inequalities: Health Poverty and Place in Accra, Ghana* (Dordrecht, The Netherlands: Springer), 2013.

Gregory B. Weeks and John R. Weeks, "The Demographic Fit Between the US and Latin America" Chapter 11 in John R. Weeks and Debbie L. Fugate, Editors, *The Youth Bulge: Challenge or Opportunity?* (New York: IDEBATE Press), 2012.

John R. Weeks, "Why Do Some Countries Have a Demographic Dividend and Others Do Not?" Chapter 10 in John R. Weeks and Debbie L. Fugate, Editors, *The Youth Bulge: Challenge or Opportunity?* (New York: IDEBATE Press), 2012.

John R. Weeks and Debbie L. Fugate, "Introduction: What is the youth bulge and why does it matter?," Chapter 1 in John R. Weeks and Debbie L. Fugate, Editors, *The Youth Bulge: Challenge or Opportunity?* (New York: IDEBATE Press), 2012.

John R. Weeks, "Demographic Transition Theory," and "Malthus, Thomas," in George Ritzer and J. Michael Ryan, eds., *The Concise Encyclopedia of Sociology* (Oxford, UK: Blackwell Publishing Co.), 2011.

John R. Weeks, "Fertility Rate," in Barney Warf, editor, *Encyclopedia of Geography* (Thousand Oaks, CA: Sage Publications), 2010.

**Exhibit 37 -  573**

John R. Weeks, "Spatial Patterns of Fertility Change in Rural Egypt," Chapter 17 in Luc Anselin and Serge Rey, editors, *Perspectives on Spatial Data Analysis* (New York: Springer Publishing Co.), 2010.

John R. Weeks, "Defining Urban Areas," Chapter 3 in Tarek Rashed and Carsten Juergens (eds.), *Remote Sensing of Urban and Suburban Areas* (New York: Kluwer Press), 2010.

Kimberly Brouwer, John R. Weeks, Remedios Lozada and Steffanie A. Strathdee, "Integrating GIS into the Study of Contextual Factors Affecting Injection Drug Use Along the Mexico/US Border." Chapter 3 (pp. 27-42) in Yonette F. Thomas, Douglas Richardson, and Ivan Cheung, editors, *Geography and Drug Addiction* (New York: Springer Publishing Co.), 2008.

Tarek Rashed, John R. Weeks, Helen Couclelis, and Martin Herold, "An Integrative GIS and Remote Sensing Model for Place-Based Urban Vulnerability Analysis," Chapter 9 in Victor Mesev, editor, *The Integration of RS and GIS* (New York: John Wiley & Son), 2007.

John Anarfi, George Botchie, Samuel Agyei-Mensah, Nii Ayite Coleman, Raymond Atuguba, Julius Najah Fobil, Allan G. Hill, John R. Weeks, and Jacob Songsore, "Population, Development and Environment in Metropolitan Accra: A Two-Phase Study," in *CICRED Programme International de Rescherche sur les Interactions entre la Population, le Developpement et l'Environnement (PRIPODE)* (Paris: UNESCO), 2007.

John R. Weeks, "Demographic Transition Theory," and "Malthus, Thomas," in George Ritzer, ed., *The Blackwell Encyclopedia of Sociology* (Oxford, UK: Blackwell Publishing Co.), 2006.

John R. Weeks, Dennis Larson, and Debbie Fugate, "Patterns of Urban Land Use as Assessed by Satellite Imagery: An Application to Cairo, Egypt," Chapter 11 in Barbara Entwisle and Paul Stern, editors, *Population, Land Use, and Environment: Research Directions* (Washington, DC: National Academies Press), 2005.

DongMei Chen, John R. Weeks, and John V. Kaiser, "Remote Sensing and Spatial Statistics as Tools in Crime Analysis," Chapter XVI in Fahui Wang, ed., *Geographic Information Systems and Crime Analysis* (Hershey, PA: Idea Group Publishers), 2005.

Ernst C. Griffin and John R. Weeks, "Peopling the Region: San Diego's Population Patterns," in Philip R. Pryde, Editor, *San Diego: An Introduction to the Region, Fourth Edition* (Boston: Pearson Custom Publishing), 2004.

Yuying Li and John R. Weeks, "Marital Status," in Sana Loue and Martha Sajatovic, Editors, *Encyclopedia of Women's Health* (New York: Kluwer Academic/Plenum Publishers), 2004.

Elizabeth Christensen and John R. Weeks, "Maternal Mortality," in Sana Loue and Martha Sajatovic, Editors, *Encyclopedia of Women's Health* (New York: Kluwer Academic/Plenum Publishers), 2004.

James Craine and John R. Weeks, "Life Expectancy," in Sana Loue and Martha Sajatovic, Editors, *Encyclopedia of Women's Health* (New York: Kluwer Academic/Plenum Publishers), 2004.

John R. Weeks and Manuel Miranda, "Mortality," in Sana Loue and Martha Sajatovic, Editors, *Encyclopedia of Women's Health* (New York: Kluwer Academic/Plenum Publishers), 2004.

John R. Weeks, "Morbidity," in Sana Loue and Martha Sajatovic, Editors, *Encyclopedia of Women's Health* (New York: Kluwer Academic/Plenum Publishers), 2004.

John R. Weeks, "Demography" in Kimberly Kempf-Leonard, Editor-in-Chief, *Encyclopedia of Social Measurement* (San Diego: Academic Press), 2004.

John R. Weeks, "The Role of Spatial Analysis in Demographic Research," in Michael F. Goodchild and Donald G. Janelle (eds.), *Spatially Integrated Social Science: Examples in Best Practice* (New York: Oxford University Press), 2004.

John R. Weeks, "Using Remote Sensing and Geographic Information Systems to Identify the Underlying Properties of Urban Environments," Chapter 17 in Tony Champion and Graeme Hugo, eds., *New Forms of Urbanization: Conceptualizing and Measuring Human Settlement in the Twenty-first Century* (London: Ashgate Publishing Limited), 2004, eBook issued in 2017: https://doi.org/10.4324/9781315248073.

John R. Weeks, "Does Night-Time Lighting Deter Crime? An Analysis of Remotely-Sensed Imagery and Crime Data," in Victor Mesev. (ed.), *Remotely-Sensed Cities* (London: Taylor & Francis), 2003.

Tarek Rashed and John R. Weeks, "Exploring the Spatial Association Between Measures from Satellite Imagery and Patterns of Urban Vulnerability to Earthquake Hazards," in *International Archives of the Photogrammetry Remote Sensing and Spatial Information Sciences* (CD-ROM), Regensburg, Germany, June 27-29, 2003, Vol. XXXIV-7/W9:114-152.

John R. Weeks, "Remote Sensing," in Paul Demeny and Geoffrey McNicoll, eds., *Encyclopedia of Population, Revised Edition* (New York: Macmillan Reference USA), 2003.

John R. Weeks, "Population Aging," in David J. Ekerdt, Robert A. Applebaum, Karen C. Holden, Stephen G. Post, Kenneth Rockwood, Richard Schulz, Richard L. Sprott, and Peter Uhlenberg, editors, *Encyclopedia of Aging* (New York: Macmillan Reference USA), 2003.

Rashed, T., J. Weeks, D. Stow, and D. Fugate, "Measuring Temporal Compositions of Urban Morphology through Spectral Mixture Analysis: Toward a Soft Approach to Change Analysis in Crowded Cities," *Proceedings of*

**Exhibit 37 -  574**

*the Third International Symposium on Remote Sensing of Urban Areas,* Istanbul, Turkey, June 11-13, 2002.

John R. Weeks and Imre E. Quastler, "Population Geographies of Canada and the United States Since 1950," Chapter 4 in Arthur Getis, Judith Getis, and I.E. Quastler, *The United States and Canada: The Land and the People, Second Edition* (New York: McGraw-Hill), 2001.

John R. Weeks, "Jury Representativeness: Challenging the Array," Chapter 7 in Walter F. Abbott and John Batt, eds., *Handbook of Jury Research, Revision 5* (Philadelphia, PA: American Law Institute - American Bar Association), 1999.

Rubén G. Rumbaut and John R. Weeks, "Children of Immigrants: Is Americanization Hazardous to Infant Health?" in Hiram E. Fitzgerald, Barry M. Lester, and Barry Zuckerman, editors, *Children of Color: Research, Health, and Policy Issues* (New York: Garland Publishing), 1999.

John R. Weeks, "Demographic Dynamics of the San Diego-Tijuana Region," Chapter 2 (pp 17-34) in Mark Spalding, editor, *Sustainable Development in San Diego-Tijuana: Environmental, Social and Economic Implications of Interdependence* (La Jolla: Center for US-Mexican Studies, University of California, San Diego), 1999.

John R. Weeks and Karyl Fuller, "Population Distribution and Migration: Components of Housing Demand and Supply," pp. 60-79 in D. Wozniak, T. Shuman, A. Roet, and M. Garrett, editors, *Human Settlements Habitat: Proceedings and Recommendations of the International Symposium on Human Settlements* (San Diego State University: International Institute for Human Resources Development), 1996.

John R. Weeks, "Population Trends Since 1950," Chapter 5 in Arthur Getis and Judith Getis, Editors, *North America: The Land and the People* (Dubuque, IA: W.C. Brown Publishers), 1995.

John R. Weeks, "The Six Pillars of Global Population and Social Change," *Population Research Group Research Paper 95-01* (East Lansing, MI: Michigan State University, Institute for Public Policy and Social Research), 1995.

John R. Weeks, "Population," Chapter 3 in Anthony DeSouza and Frederick Stutz, *A Geography of World Economy* (New York: Macmillan), 1994.

John R. Weeks, "The Changing Demographic Structure of the San Diego Region," in Norris Clement, editor, *San Diego and Tijuana in Transition* (San Diego State University: Institute for Regional Studies of the Californias), 1993.

John R. Weeks, "The Economic and Social Implications of Population Aging in the Context of Internal and International Migration," pp. 143-162 in T. Shuman et al., *Population Aging: International Perspectives: Proceedings and Recommendations of the International Conference of Population Aging* (San Diego State University: University Center on Aging), 1993

John R. Weeks, "Service Provider Attitudes Toward Natural Family Planning," Chapter 6 in L.A. Severy (Editor), *Advances in Population: Psychosocial Perspectives, Volume 1* (London, England: Jessica Kingsley Publishers, Ltd), 1993. PMID: 12159241.

John R. Weeks and Roberto Ham-Chande, "Demographic Dynamics in the Context of the U.S.-Mexico Border," Chapter 15 in John R. Weeks and Roberto Ham-Chande (eds.), *Demographic Dynamics of the U.S.-Mexico Border* (University of Texas at El Paso: Texas Western Press), 1992.

Roberto Ham-Chande and John R. Weeks, "A Demographic Perspective of the U.S.-Mexico Border," Chapter 1 in John R. Weeks and Roberto Ham-Chande (eds.), *Demographic Dynamics of the U.S.-Mexico Border* (University of Texas at El Paso: Texas Western Press), 1992.

John R. Weeks, "Introduction," in Fareed H. Nu'man, *The Muslim Population in the United States: A Brief Statement* (Washington, D.C.: American Muslim Council), 1992.

Manual García y Griego, John R. Weeks, and Roberto Ham-Chande, "Migration to Mexico," in C. Nam, R. Weller, and W. Serow (eds.), *Comparative Handbook of International Migration* (Westport, CT: Greenwood Press), 1990.

John R. Weeks, "Factors Affecting the Choice of Natural Family Planning," pp. 77-84 in *Proceedings of the Fifth National and International Symposium on NFP* (Los Angeles: Los Angeles Regional Family Planning Council), 1990.

John R. Weeks, "How to Influence Fertility: The Experience So Far." Chapter 15 in Lindsey Grant (ed.), *Elephants in the Volkswagen: Facing the Tough Questions about Our Overcrowded Country* (New York: W.H. Freeman Company), 1992. PMID: 12178971.

John R. Weeks, "Asian-American Aged," pp. 49-50 in G. Maddox (ed.), *Encyclopedia of Aging* (New York: Springer Publishing Co.), 1986.

John R. Weeks and Joseph Spielberg Benitez, "The Cultural Demography of Midwestern Chicano Communities," in S.A. West and J. Macklin (eds.), *The Chicano Experience* (Boulder, CO: Westview Press), pp. 229-251, 1979, reissued as an eBook in 2019: https://doi.org/10.4324/9780429051197.

**Exhibit 37 -  575**

John R. Weeks, "Retirement Homes: Economic Realities and Implications for Ethnic Minority Elders," in E.P. Stanford (ed.), *Retirement: Concepts and Realities* (San Diego State University: University Center on Aging) pp. 151-159, 1978.

## Reviews and Other Publications

John R. Weeks, "Review of 'The Great Demographic Illusion: Majority, Minority, and the Expanding American Mainstream' by Richard Alba," *Contemporary Sociology*, in press.

Gregory Weeks and John R. Weeks, "The political demography of U.S.-Cuba relations," http://www.washingtonpost.com/blogs/monkey-cage/wp/2014/12/18/the-political-demography-of-u-s-cuba-relations/, 2014.

John R. Weeks, "Review of Mark Baldassare, 'California in the New Millennium: The Changing Social and Political Landscape,' Berkeley, CA: University of California Press, 2000." *Professional Geographer*, 53, 2001.

John R. Weeks, "Review of Charles Hirschman, Philip Kasinitz, and Josh DeWind, editors, 'Handbook of International Aging: The American Experience.' *Journal of Immigrant Health*, 3(3):165-167, 2001.

John R. Weeks, "Review of Donald J. Hernandez and Evan Charney, editors, 'From Generation to Generation: The Health and Well-Being of Children in Immigrant Families,' Washington, DC, National Academy of Sciences Press, 1998," *Contemporary Sociology* 29(2): 399-400, 2000.

John R. Weeks, "Review of 'Fertility in the United States: New Patterns, New Theories,' by Casterline, Lee, and Foote," *Population and Environment* 19(6): 577-580, 1998.

John R. Weeks, "Review of 'Aging and Ethnicity: Knowledge and Services' by Donald Gelfand," *Ageing and Society*, 15(2): 138-139, 1995.

John R. Weeks, "Review of 'Immigration and Ethnicity: The Integration of America's Newest Arrivals' by Barry Edmonston and Jeffrey S. Passel," *Population Research and Policy Review*, 14(2):274-276,1995.

John R. Weeks, "Review of 'Painful Inheritance: Health and the New Generation of Fatherless Families' by Ronald J. Angel and Jacqueline L. Angel," *American Journal of Sociology*, (November): 841-843, 1994.

John R. Weeks, "Review of 'The Fourth Wave' and 'Opening and Closing the Doors'," *Population and Environment*, 15(1): 71-72, 1993.

John R. Weeks, "Review of 'The Fear of Population Decline' by Michael Teitelbaum and Jay M. Winter.'" *Canadian Studies in Population* 15(2): 234-236, 1988.

John R. Weeks, "Review of 'Population and Technological Change: A Study of Long-Term Trends' by Ester Boserup," *The Journal of Developing Areas* 17(4):544-546, 1983.

John R. Weeks, "Review of 'Age and Sex Population Projections of Utah Counties', by Therel Black and James Tarver," *Sociology and Social Research* 51(2):386-388, 1967.

## SELECTED OTHER RESEARCH REPORTS

John R. Weeks, "The Use and Abuse of Sampling and Statistical Methods in Construction Defect Lawsuits," last revised 2023.

John R. Weeks and David M. Eisenberg, "Estimating the Cost to the County of San Diego, California, of Services Delivered to Undocumented Immigrants During FY 2006-07," Final Report to the County of San Diego, 2007.

Tanis Salant, John R. Weeks, Efrat Feferman, Jenna Berman, and David Eisenberg, "Undocumented Immigrants in U.S.-Mexico Border Counties: The Costs of Law Enforcement and Criminal Justice Services," Final Report to the United States/Mexico Border Counties Coalition, 2008, https://www.ncjrs.gov/pdffiles1/nij/grants/223285.pdf

Tanis Salant, Christine Brenner, Nadia Rubaii-Barrett, and John R. Weeks, "Illegal Immigrants in U.S./Mexico Border Counties: The Costs of Law Enforcement, Criminal Justice, and Emergency Medical Services." Final Report to the United States/Mexico Border Counties Coalition, 2001, earthops.org/immigration/bordercounties/frontdocs.pdf

John R. Weeks, John V. Kaiser, Dongmei Chen, and Michael T. Dolan, "Identification of Urban Areas at High Risk for Criminal Activity Through Image Analysis: What are the Possibilities?" Final Report to NASA Earth Science Enterprise Commercial Remote Sensing Program, Affiliated Research Center, San Diego State University, 2000.

John R. Weeks, "An Analysis of the Sampling and Extrapolation Methods Utilized by Curtis Guy Odom of The Diehl Group Architects, Inc.," prepared in the case of Canyon Rim Townhomes Association v. The Baldwin Company et al., Orange County Superior Court, 1997.

John R. Weeks, "An Analysis of the Sampling and Extrapolation Methods Utilized by Bruck Allen Architects, Inc.," prepared in the case of The Lakes at Carmel Del Mar Condominium Association v. The Baldwin Company et al., San Diego Superior Court, 1996.

**Exhibit 37 - 576**

John R. Weeks, "The Muslim Population of San Diego County: An Assessment of Pilot Project Methods and Results," Final Report Submitted to the American Muslim Council and Dar al Islam, July 1996.

John R. Weeks, "The Economic Adjustment of Small to Medium Sized Defense Related Firms in San Diego County: With Comparisons of the East, Central, North and South Regions of the County," Prepared for the East County Economic Development Council under contract with the City of San Diego, Economic Development Services, as part of Grant No. CR 9223-94-02 from the Office of Economic Adjustment of the U.S. Department of Defense, December 1995.

John R. Weeks, "The Economic Adjustment of Small to Medium Sized Defense Related Firms in the City of San Diego," Prepared for the East County Economic Development Council under contract with the City of San Diego, Economic Development Services, as part of Grant No. CR 9223-94-02 from the Office of Economic Adjustment of the U.S. Department of Defense, November 1995.

John R. Weeks, "An Evaluation of The Termination of San Diego County's Family Planning Program: Final Report," Prepared for the California Family Planning Council, January, 1995.

John R. Weeks, "The Economic Adjustment of Small Defense Related Firms in the East County Region of San Diego County: Analysis and a Prototype," Prepared for the East County Economic Development Council under contract with the City of San Diego, Economic Development Services, as part of Grant No. CR 9223-94-02 from the Office of Economic Adjustment of the U.S. Department of Defense, December 1994.

John R. Weeks, "Perceptions of Health Care in the East County." La Mesa, CA: East County Economic Development Council, 1994.

John R. Weeks, "Health Status of American Muslims: A Report of Findings from a Set of Preliminary Questionnaires Administered by the American Muslim Council," Prepared for the American Muslim Council, Washington, D.C., 1994.

John R. Weeks, Editor, "The Demographics of East County" (La Mesa, CA: East County Economic Development Council), 1993.

John R. Weeks, "The Nascent Awareness of Muslims in America," Prepared at the request of the American Muslim Council, Washington, D.C., 1993.

Rubén G. Rumbaut and John R. Weeks, "Perinatal Risks & Outcomes Among Low-Income Immigrants," Final Report for Grant MCJ-060595-01 from the U.S. Bureau of Maternal and Child Health and Resources Development, 1992.

David Feldman and John R. Weeks, "Perceptions of East County: The View from Outside," Report for the East County Economic Development Council, 1991.

John R. Weeks, "The Impact of Jobs on Business: Results of a Study Conducted by the East County Economic Development Council." Final Report submitted to the East County Economic Development Council, La Mesa, California, 1991.

John R. Weeks, "The Demographics of the East County Judicial District of the San Diego Superior Court," prepared for the case of People v. Vera, San Diego Superior Court, 1989.

John R. Weeks and Roberto Ham-Chande, with Norma Ojeda, "Demographic Interrelatedness of the U.S.-Mexico Border," Final Report submitted to the U.S. Bureau of the Census, Joint Statistical Agreement Project No. 01-70-20-5900-00-258, May 1989.

John R. Weeks, "Factors Affecting the Choice of Natural Family Planning," Final Report submitted to the U.S. Office of Population Affairs, Research Grant No. FPR 000052-01-0, January 1989.

John R. Weeks, "Population Projection Analysis for the Wastewater Program Management Project", prepared for James M. Montgomery, Consulting Engineers, Inc., San Francisco, California, on behalf of the County of San Diego, September 1988.

John R. Weeks and Rubén G. Rumbaut, "Infant Health and Mortality Among Indochinese Refugees in San Diego County: Final Report," Final Report submitted to the Division of Maternal and Child Health, Bureau of Health Care Delivery and Assistance, Research Grant No. MCJ-060551, August 1988.

John R. Weeks, "Report on an Analysis of the Procedures Used to Develop the Master Juror Qualification List in Los Angeles County," prepared for the case of People v. Richard Ramirez, Los Angeles Superior Court, May 1988.

John R. Weeks, "A Comparison of the Demographics of the Pool of Eligible Jurors in the Community with the Demographics of a Sample of Jurors in the Courthouse: Los Angeles Superior Court, Central Judicial District: August-December 1987," prepared for the case of People v. Richard Ramirez, Los Angeles Superior Court, March 1988.

John R. Weeks, "A Comparison of the Demographics of the Pool of Eligible Jurors in the Community with the Demographics of a Sample of Jurors in the Jury Lounge, San Diego Courthouse, January-February 1988," prepared for the case of People v. Mayer, San Diego Superior Court, 1988.

John R. Weeks, "A Comparison of the Demographics of the Pool of Eligible Jurors in the Community with the Demographics of a Sample of Jurors in the Courthouse: Los Angeles Superior Court, Western (Santa Monica)

**Exhibit 37 - 577**

Judicial District: August 1987-February 1988," prepared for the case of People v. Ware, Los Angeles Superior Court, 1988.

John R. Weeks, "An Analysis of the Demographics of Jury Composition in the Riverside Superior Court, March-April 1987," prepared for the case of People v. Neidiffer and Cruz, Riverside Superior Court, 1987.

John R. Weeks and Roberto Ham-Chande, "Binational Symposium on Population Issues Along the U.S.-Mexico Border," Summary Report of Conference held in Tijuana, Mexico, June 1987.

John R. Weeks, "A Comparison of the Demographics of the Pool of Eligible Jurors with the Demographics of a Sample of Jurors in the Jury Lounge, San Diego Courthouse, March-April 1987," prepared for the case of People v. Lucas, San Diego Superior Court, 1987

John R. Weeks, "The Development of Information Related to U.S. and Mexican Populations," Report to the William and Flora Hewlett Foundation, 1987.

John R. Weeks, "The Disparity Between the Proportion of Blacks in the Population and Proportion of Blacks Surveyed in the Jury Lounges: Vista and San Diego," prepared for the case of People v. Troiani, San Diego Superior Court, 1986.

John R. Weeks, "Teenage Male Attitudes Toward Adolescent Pregnancy," Final Report to the San Diego Community Foundation, 1984.

Helen M. Wallace and John R. Weeks, "Effects of Proposition 13 on Health Care Services for Mothers and Children in California: Reports of Periodic Monitoring, 1978-1984," Final Report to the Division of Maternal and Child Health, U.S. Department of Health and Human Services, 1984.

John R. Weeks, "The Availability of Members of Potentially Cognizable Groups in the Pool of Prospective Jurors," prepared for the case of People v. Ivory, San Diego Superior Court, 1984.

John R. Weeks, "SDSU Demographics in the Year 2000," Report prepared for the Directions 2000 Committee of the California State University Board of Trustees, 1982

John R. Weeks and Sally A. Koblinsky, "An Assessment of Family Life Education in the 9th and 10th Grades in California," Final Report to the Office of Family Planning, California Department of Human Services, 1982.

José B. Cuellar and John R. Weeks, "Minority Elderly Americans: A Prototype for Area Agencies on Aging," Final Report for Grant No. 90-A-1667 (01) from the Administration on Aging to the San Diego Area Agency on Aging and Allied Home Health Association, 1980.

John R. Weeks, "The Need for In-Home Services in San Diego, Part II, "Final Report for Contract No. 00290l from the San Diego Regional Employment and Training Consortium to Allied Community Services, 1978.

John R. Weeks, "The Need for In-Home Services in San Diego, Part I," Final Report for Contract No. 002401 from the San Diego Regional Employment and Training Consortium to Allied Community Services, 1978.

## RESEARCH SUPPORT

John R. Weeks, Mentor to Holly Shakya, "Adolescent pregnancy and social networks in rural Honduras," K01HD087551 Grant from the National Institute of Child Health and Human Development, 2016-2023.

John R. Weeks, Co-Principal Investigator, "The Urban Transition in Ghana and Its Relation to Land Cover and Land Use Change Through Analysis of Multi-Scale and Multi-Temporal Satellite Image Data," National Aeronautics and Space Administration (Douglas Stow, PI), 2012-2016 ($900,000).

John R. Weeks, Mentor to Peter Davidson, "A Mixed-Method Study of Injection Drug Use Settings among FSWs in Tijuana", K01DA032443 grant from the National Institute of Drug Abuse, 2012-2017.

John R. Weeks, Mentor to Abby Randolph, "HIV and Substance Abuse Epidemiology among IDUs: Structural and Network Risk Factors", K01DA033879 grant from the National Institute of Drug Abuse, 2012-2017.

John R. Weeks, Principal Investigator, "Doctoral Dissertation Research: Integrating Space and Place into Children's Perceptions of Environmental Health Hazards," Marta Jankowska, Doctoral Student. Grant from the National Science Foundation, 2011-2013 ($11,585).

John R. Weeks, Principal Investigator/Project Director (Allan G. Hill, Arthur Getis, Douglas Stow, David Rain, and Ryan Engstrom, Co-Investigators), "Health, Poverty, and Place: Modeling Inequalities in Accra Using RS and GIS," R01 Grant from the National Institute of Child Health and Human Development, 2007-2012 ($3,000,000); Diversity Post-Doctoral Supplement, 2009-2011 ($167,000); ARRA Administrative Supplement, 2009 ($72,000).

John R. Weeks, Principal Investigator, "Determining the Costs of Emergency Medical Services Provided to Undocumented Immigrants in San Diego County," Contract with the County of San Diego, 2007 ($40,000).

John R. Weeks, Principal Investigator, "Determining the Costs of Illegal Immigrant Criminal Activity in San Diego Imperial, and Yuma Counties in 2006," Grant from the U.S. Department of Justice, through the United States/Mexico Border Counties Coalition, 2007 ($17,500).

John R. Weeks, Arthur Getis, and Douglas Stow, "Summer Award for External Funding Proposal Development," Grant from the SDSU College of Arts and Letters, 2005 ($5,000).

*John R. Weeks, Ph.D.*

*- 12 -*

**Exhibit 37 - 578**

John R. Weeks, Principal Investigator (Allan G. Hill, Arthur Getis, and Douglas Stow, Co-Investigators), "Intraurban Health Assessed by Remote Sensing and GIS," R21 Grant from the National Institute of Child Health and Human Development, 2004-2007 ($320,000).

John R. Weeks, Co-Principal Investigator (with Arthur Getis), "SPACE Workshop," Grant from the University Consortium on Geographic Information Science, 2004 ($26,000).

John R. Weeks, Co-Investigator (Douglas Stow, PI), "Spatial Decision Support for Border Security," Grant from the National Aeronautics and Space Administration (NASA), 2003-2007 ($900,000).

John R. Weeks, Co-Investigator (Joni Mayer, PI), "Multi-Level Assessment of Indoor Tanning Practices," Grant from the National Cancer Institute, 2003-2007 ($1.2 million).

John R. Weeks, Principal Investigator, "Doctoral Dissertation Research: Measuring the Environmental Context of Social Vulnerability to Urban Earthquake Hazards: An Integrative Remote Sensing and GIS Approach," Tarek Rashed, Doctoral Student. Grant from the National Science Foundation, 2001-2003 ($6,400).

John R. Weeks, Principal Investigator (Allan G. Hill, Arthur Getis, Douglas Stow, and Saad Gadalla, Co-Investigators), "Applying Remote Sensing and Geographic Information System Techniques to the Arab Fertility Transition," Grant from the National Science Foundation, 2001-2004 ($360,000).

John R. Weeks, Principal Investigator, "Determining the Costs of Illegal Immigrant Criminal Activity and Use of Emergency Medical Services in San Diego and Imperial Counties," Grant from the U.S. Department of Justice, through the United States/Mexico Border Counties Coalition, 2000-2001 ($45,000).

John R. Weeks, Co-Principal Investigator, "Identification of Urban Areas at High Risk for Criminal Activity Through Image Analysis: What are the Possibilities?" Grant from the National Aeronautics and Space Administration, Commercial Remote Sensing Program to the San Diego State University Department of Geography Affiliated Research Center (Douglas A Stow, Principal Investigator), 1999 ($50,000).

John R. Weeks, Project Director, "Urban Growth and Socio-Spatial Change in Latin America," San Diego State University Faculty Grant-in-Aid, 1998-99 ($7,500).

John R. Weeks, Principal Investigator (with Allan G. Hill, Harvard University, and M. Saad Gadalla, San Diego State University), "Applications of GIS/Remote Sensing to an Analysis of the Arab Fertility Transition," Grant from the Andrew Mellon Foundation, 1998-2000 ($100,000).

John R. Weeks, Project Director, "Enumerating the Muslim Population of Los Angeles," Grant from the American Muslim Council, 1997($50,000).

John R. Weeks, Project Director, "A Census of the Muslim Population in the United States: Pilot Project in San Diego County," Grant from Dar al Islam (private foundation in New Mexico), 1995 ($40,000).

John R. Weeks, Project Director, "A Study of the Needs of Small Defense-Related Firms in San Diego County," Grant from the U.S. Department of Defense, Office of Economic Adjustment to the City of San Diego Economic Development Services and the East County Economic Development Council, 1994-95.

John R. Weeks, Project Director, "Evaluation of the Closing of San Diego County's Family Planning Program," California Family Planning Council, 1994.

John R. Weeks, Project Director, "Outcomes Measures of Perinatal Risks Among Low Income Immigrant Women," San Diego State University Faculty Grant-in-Aid. 1993.

John R. Weeks, Project Director, "Expert Group Meeting on the Enumeration and Sociodemographic Characterization of the American Muslim Population," American Muslim Council, 1992.

John R. Weeks, Project Director, "Coding of Data on Perinatal Risks and Outcomes," SDSU College of Arts and Letters Mini-Grant, 1992.

John R. Weeks, Co-Principal Investigator (with Rubén G. Rumbaut), "Perinatal Risks and Outcomes Among Low-Income Immigrants," grant from the U.S. Public Health Service, Bureau of Maternal and Child Health and Resource Development, 1990-91.

John R. Weeks, Project Director, "Publication of Proceedings of Population Issues Along the U.S.-Mexico Border," grants from the S.H. Cowell Foundation, and the William and Flora Hewlett Foundation, 1990.

John R. Weeks, Project Director, Research, Scholarship, and Creative Activity mini-grant from San Diego State University, Spring, 1990.

John R. Weeks, Project Director, Research, Scholarship, and Creative Activity mini-grant from San Diego State University, Spring, 1989.

John R. Weeks, Principal Investigator, "Demographic Interrelatedness of the U.S. Mexico Border Region," Grant from the S.H. Cowell Foundation, and a Joint Statistical Agreement (JSA) with the U.S. Bureau of the Census, 1988-1989.

John R. Weeks, Principal Investigator, "Factors Affecting the Choice of Natural Family Planning," Grant from the U.S. Office of Population Affairs to the San Diego State University Foundation, 1987-1988.

John R. Weeks, Co-Principal Investigator (with Rubén G. Rumbaut), "An Analysis of Infant Mortality Among Indochinese Refugees," Grant from the U. S. Office of Maternal and Child Health to the San Diego State University Foundation, 1987-1988.

**Exhibit 37 -  579**

John R. Weeks, Project Director, "Border Issues in Population/Family Planning," Grants from the William and Flora Hewlett Foundation, the Bergstrom Foundation, the S. H. Cowell Foundation, and the Rockefeller Foundation to the San Diego State University Foundation, 1986-1987.

John R. Weeks, Principal Investigator, "Further Analysis of Live Birth Data for San Diego County," Grant for Support of Faculty Research for the Summer of 1985, San Diego State University, 1985.

John R. Weeks, Principal Investigator, "Analysis of Live Birth Data for San Diego County, 1983-1984," Grant from San Diego Urban League to San Diego State University Foundation, 1985.

John R. Weeks, Principal Investigator, Analysis of Survey Data on Male Attitudes Toward Teenage Pregnancy," Grant from San Diego Community Foundation to San Diego State University Foundation, 1984.

John R. Weeks, Co-Principal Investigator (with Helen M. Wallace), "Effects of Proposition 13 on Health Services in California," Grant from the U.S. Office of Maternal and Child Health Services in California," Grant from the U.S. Office of Maternal and Child Health to the San Diego State University Foundation, 1983-1984.

John R. Weeks, Co-Investigator (with Helen M. Wallace), "Maternal and Child Health Project," Grant from the U.S. Office of Maternal and Child Health to the San Diego State University Foundation, 1982-1983.

John R. Weeks, Co-Principal Investigator (with Helen M. Wallace, Gwen C. Cooke, and Sally A. Koblinsky), "The Family Health Education and Training Project," Contract No. 49800365 from the California Office of Family Planning to the San Diego State University Foundation, 1981-1982.

John R. Weeks, Co-Principal Investigator (with José B. Cuellar), "Minority Elderly Americans: Development of a Prototype for Area Agencies on Aging in the Assessment of Equitability of Receipt of Public Benefits in Housing, Employment, Retirement, Income, Health, and Services," Grant No. 90-A-1667 (01) from the U. S. Administration on Aging to the San Diego Area Agency on Aging and Allied Home Health Association, 1979-1980.

John R. Weeks, Principal Investigator, "Client and Population Based Information System for Managing and Evaluating In-Home Services," Contract No. 002901 from the San Diego Regional Employment and Training Consortium to Allied Community Services, 1978.

John R. Weeks, Principal Investigator, "Management Information System for In-Home Service," Contract No. 002401 from the San Diego Regional Employment and Training Consortium to Allied Community Services, 1978.

## PAPERS PRESENTED AT PROFESSIONAL MEETINGS

John R. Weeks, "How Has Teaching Demography Evolved Over Time," presented at the (virtual) annual meeting of the Population Association of America," May 2021.

John R. Weeks, "Educational Level as a Key Predictor of Human Wellbeing," presented at the Wittgenstein Centre Conference, Demographic Aspects of Human Wellbeing, Vienna, Austria, November 2019.

Holly Shakya, John R. Weeks, and Nicholas Christakis, "Individual Social Network Factors Across Disparate Relationships: Social Norms and Their Association with Adolescent Pregnancy in Rural Honduras," presented at the annual meeting of the Population Association of America, Austin, TX, April 2019.

Holly Shakya, John R. Weeks, and Nicholas Christakis, "Village Level Normative: Spatial and Social Network Predictors of Adolescent Pregnancy in Rural Honduras," presented at the annual meeting of the Population Association of America, Denver, April 2018.

Holly Shakya, John R. Weeks, Paul J. Fleming, Lotus McDougal, Anne Scobel, Benjamin Cislaghi, Sabrina Boyce, Anita Raj, and Jay Silverman, "The Association Between Individual and Village-Level Demographic Characteristics and Age at First Marriage Among Married Adolescents in Rural Niger: A Spatial Analysis," presented at the annual meeting of the Population Association of America, Denver, April 2018.

Holly Shakya, John R. Weeks, and Nicholas A. Christakis, "Distribution of adolescent fertility in the Copán region of rural Honduras: Results from a complete census of 176 villages," presented at the annual meeting of the Population Association of America, Chicago, April 2017.

John R. Weeks, "Child mortality along the urban gradient in Ghana," presented at the annual meeting of the American Association of Geographers, Boston, April, 2017.

John R. Weeks and Gregory B. Weeks, "Too Big to Succeed? Demography and Socialist Experiments in Chile and Venezuela," presented at the annual meeting of the Southeastern Council of Latin American Studies (SECOLAS), Charleston, SC, March 2015.

John R. Weeks and Allan G. Hill, "Inequalities in health, morbidity and mortality in Accra, Ghana," presented at the European Health, Morbidity and Mortality Working Group, and British Society for Population Studies Workshop on "The continuing Importance of Inequality in Health and Mortality Analyses," London School of Economics, London, England, September 2014.

**Exhibit 37 -  580**

John R. Weeks, Douglas A. Stow, David Lopez-Carr, Ryan Engstrom, Lloyd Coulter, Sory Toure, Nicholas Ibanez, Foster Mensah, and Sean Taugher, "Environmental Drivers of Internal Migration in Ghana," presented at the Annual Meeting of the Association of American Geographers, Miami, April, 2014.

Douglas Stow, Lloyd Coulter, John R. Weeks, Magdalena Benza-Fiocco, Sory Toure, and Nicholas Ibanez, "The Urban Transition in Ghana and Its Relation to Land Cover and Land Use Change Through Analysis of Multi-scale and Multi-temporal Satellite Image Data," presented at the Annual Meeting of the American Society of Photogrammery and Remote Sensing, Louisville, March, 2014.

Anna Carla Lopéz, David Lopéz-Carr, Laura Grant, and John R. Weeks, "The Spaces and Places of Food Security: Learning from Spatial, Hierarchical, and Econometric Models in Urban Data-poor Areas," presented at the General Meeting of the International Union for the Scientific Study of Population (IUSSP), Busan, Korea, August, 2013.

Allan G. Hill, John R. Weeks, and Magdalena Benza Fiocco, "Towards The Demography Of Ill-Health: Comparing the Geographical Distributions Of Mortality and Health in Ghana," presented at the Annual Meeting of the British Society for Population Studies, Nottingham, UK, September, 2012.

John R. Weeks, Justin Stoler, Allan G. Hill, and Alex Zvoleff, "Fertility in Context: Exploring Egocentric Neighborhoods in Accra, Ghana," Presented at the Annual Meeting of the Association of American Geographers, New York, NY, February 2012; and at the Annual Meeting of the Population Association of America, San Francisco, May, 2012.

John R. Weeks, "Connecting the Dots Between Health, Poverty and Place in Accra, Ghana," Presented at the Annual Meeting of the Association of American Geographers, Seattle, WA, April, 2011.

John R. Weeks, Samuel Agyei-Mensah, George Owusu, Allan G. Hill, and Magdalena Benza-Fiocca, "Ethnic Assimilation in Accra, Ghana," Presented at the Annual Meeting of the Population Association of America, Washington, DC, April, 2011.

Charles F. Westoff and John R. Weeks, "Religiousness and Reproduction in Muslim Countries," Presented at the Annual Meeting of the Population Association of America, Dallas, April, 2010.

John R. Weeks, Allan G. Hill, Arthur Getis, David Rain, Ryan Engstrom, Douglas A. Stow, Livia Montana, Kenneth Hill, and Mark Montgomery, "Modeling Spatial Inequalities in Health in Cities of Developing Countries: The Case of Accra, Ghana," Presented at the Annual Meeting of the Association of American Geographers, Las Vegas, March 2009; and revised versions presented at the Annual Meeting of the Population Association of America, Detroit, May 2009, and the General Meeting of the International Union for the Scientific Study of Population (IUSSP), Marrakech, Morocco, October, 2009.

Gregory B. Weeks and John R. Weeks, "Immigration and Transnationalism: Rethinking the Role of the State in Latin America," Presented at the Annual Meeting of the Southeastern Council of Latin American Studies, New Orleans, LA, April, 2009.

John R. Weeks, Allan G. Hill, Arthur Getis, and Sarah Hinton, "Do Slums Promote High Urban Fertility? Neighborhood Differences in Fertility in Accra, Ghana," Presented at the Annual Meeting of the Population Association of America, New York, March, 2007, and at the Annual Meeting of the Association of American Geographers, San Francisco, April, 2007.

John R. Weeks, Allan G. Hill, Arthur Getis, Douglas Stow, and Debbie Fugate, "The Impact of Neighborhood Structure on Health Inequalities in Accra, Ghana," Presented at the Annual Meeting of the Population Association of America, Los Angeles, March, 2006.

John R. Weeks, Allan G. Hill, Douglas Stow, and Arthur Getis, "Can We Spot a Neighborhood From the Air?," Presented at the Annual Meeting of the Association of American Geographers, Chicago, March, 2006.

Gregory B. Weeks and John R. Weeks, "The Political Demography of Latin American Migration," Presented at the LASA2006 Congress, San Juan, Puerto Rico, March 2006.

John R. Weeks, Allan G. Hill, Arthur Getis, Douglas Stow, Sam Agyei-Mensah, and John K. Anarfi, "Intra-urban Differentials in Poverty and Health in Accra, Ghana," Presented at the General Meeting of the International Union for the Scientific Study of Population, Tours, France, July 2005.

John R. Weeks, Allan G. Hill, Arthur Getis, and Douglas Stow, "Residential Segregation as a Predictor of Intra-Urban Health Inequality in Accra, Ghana." Presented at the Annual Meeting of the Association of American Geographers, Denver, April 2005.

John R. Weeks, "Family Demographic Histories," Presented at the Workshop on Teaching Undergraduate Demography, Annual Meeting of the American Sociological Association, San Francisco, August 2004.

Stow, D., D. Fugate, T., Rashed, J., Weeks, and A. Getis, "Validation of Satellite Derived End-Member Fraction Maps of Cairo, Egypt Using Quickbird Imagery," presented at the Annual Meeting of the Association of American Geographers, Philadelphia, March 2004.

John R. Weeks, Arthur Getis, Douglas Stow, Debbie Fugate, and Anna Carla Lopez, "Neighborhood Predictors of Fertility Levels in Amman, Jordan, Combining RS and Census Data into a GIS," presented at the Annual Meeting of the Association of American Geographers, Philadelphia, March 2004.

*John R. Weeks, Ph.D.*

*- 15 -*

**Exhibit 37 - 581**

John R. Weeks, "Pace and Space: The Geography of Fertility Change in Egypt," Harvard Center for Population and Development Studies Working Group on Health Healing and Ritual Practice, Cambridge, MA, March 2004.

Christopher Chase-Dunn and John R. Weeks, "Global Cities and Suburban Sprawl: An Analysis using GIS and Remote Sensing," Specialist Meeting on Globalization in the World System: Mapping Change over Time, University of California, Riverside, February 2004.

John R. Weeks, "Patterns of Urban Land Use as Assessed by Satellite Imagery: Applications in Egypt and Jordan," presented at the Workshop on Research on Population, Land Use, and Environment, Panel on New Research in Population and Environment, Committee on the Human Dimensions of Global Change, National Research Council, Irvine, California, January 2004.

John R. Weeks and Debbie Fugate, "Neighborhood Context as a Determinant of Child Health in Cairo, Egypt: The Application of GIS and Remote Sensing to a Study of Intra-Urban Variability in Health," presented at Second International Conference on Urban Health, New York City, October 2003 (abstract published in *Journal of Urban Health* 80: Supplement 2, p. 13, 2003).

John R. Weeks, "The Creation and Application of an Urban Gradient Index," presented at the Conference on Migration, Urbanization and Health, Princeton University, September 2003.

Tarek Rashed and John R. Weeks, "Exploring the Spatial Association Between Measures from Satellite Imagery and Patterns of Urban Vulnerability to Earthquake Hazards," presented at the 4th International Symposium on Remote Sensing of Urban Areas, Regensburg, Germany, 2003.

John R. Weeks, Dennis Larson, and Tarek Rashed, "Contrast or Continuum? The Creation and Application of an Urban Gradient Index," presented at the Annual Meeting of the Association of American Geographers, New Orleans, March 2003; also presented at the Annual Meeting of the Population Association of America, Minneapolis, May 2003.

John R. Weeks, "What did he know, and when did he know it?  Putting Glenn Trewartha's call for population geography into historical perspective," presented at the Plenary Session of the Population Specialty Group, Annual Meeting of the Association of American Geographers, New Orleans, March 2003.

John R. Weeks, "Is Americanization Bad for Your Health? Lessons Learned From Studying Reproductive Outcomes of Immigrant Women," Opening Plenary Address at the U.S. Centers for Disease Control Eighth Annual Maternal and Child Health Epidemiology Conference, Clearwater Beach, Florida, December 2002.

John R. Weeks, Dennis Larson, Douglas A. Stow, and Tarek Rashed, "Conceptualizing the Urban-Rural Continuum: The Potential Contribution of Remotely-Sensed Imagery," presented at the International Conference on Population Geographies, University of St. Andrews, St. Andrews, Scotland, July 2002.

Tarek Rashed, John R. Weeks, Douglas Stow, and Debbie Fugate, "Measuring Temporal Compositions of Urban Morphology Through Spectral Mixture Analysis: Toward a Soft Approach to Change Analysis in Crowded Cities," presented at the Third International Symposium on Remote Sensing of Urban Areas, Istanbul, Turkey, June 2002.

John R. Weeks, Arthur Getis, Douglas Stow, Tarek Rashed, Xiaoling Yang, and M. Saad Gadalla, "Spatial Patterns as Predictors of Fertility in Cairo, Egypt," presented at the Annual Meeting of the Population Association of America, Atlanta, GA, May 2002

John R. Weeks, Xiaoling Yang, Arthur Getis, M. Saad Gadalla, and Allan G. Hill, "Spatial Patterns as Predictors of Fertility Change in Rural Egypt," presented at the Annual Meeting of the Population Association of America, Atlanta, GA, May 2002

John R. Weeks, "Using Remote Sensing and Geographic Information Systems to Identify the Underlying Properties of Urban Environments," presented at the conference on "New Forms of Urbanization: Conceptualizing and Measuring Human Settlement in the Twenty-first Century," organized by the IUSSP Working Group on Urbanization and held at the Rockefeller Foundation's Study and Conference Center, Bellagio, Italy, March 2002.

John R. Weeks, Arthur Getis, Douglas Stow, Tarek Rashed, Xiaoling Yang, Saad Gadalla, and Allan Hill, "Spatial Patterns as Predictors of Fertility in Cairo, Egypt," presented at the Annual Meetings of the Association of American Geographers, Los Angeles, March 2002.

Mark McGinnis, Richard Wright, and John R. Weeks, "Predicting the Spatial Pattern of Urban Growth in San Diego County: An Application of the Clarke Urban Growth Model," presented at the Annual Meetings of the Association of American Geographers, Los Angeles, March 2002.

Christine Thurlow Brenner, Nadia Rubaii-Barrett, Tanis Salant, and John R. Weeks, "Criminal Undocumented Immigrants: The Cost to U.S. Counties on the Mexican Border for Law Enforcement, Criminal Justice and Emergency Health Care Services," presented at the Annual Meeting of the Association for Borderlands Studies, Reno, NV, April 2001.

Christopher Peak and John R. Weeks, "Does Community Context Influence Reproductive Outcomes of Mexican Origin Women in San Diego, California?  Presented at the Annual Meeting of the Population Association of America, Washington, DC, March 2001.

John R. Weeks, M. Saad Gadalla, and Allan G. Hill, "The Environmental Context of Fertility in Egypt: Evidence from Demographic and Health Surveys," presented at the Annual Meeting of the Association of American Geographers, New York City, March 2001 (also presented at the Annual Meeting of the Population Association of America, Washington, DC, March 2001).

John R. Weeks, John V. Kaiser, Dongmei Chen, Milan Mueller, and Michael T. Dolan, "Exploring the Role of Remote Sensing and Crime," Presented at Wheredunit? Investigating the Role of Crime and Criminality: The Fourth Annual International Crime Mapping Research Conference, San Diego, CA, December 2000.

John R. Weeks, John V. Kaiser, Dongmei Chen, Milan Mueller, and Michael T. Dolan, "Identification of Urban Areas at High Risk for Criminal Activity Through Image Analysis: What are the Possibilities?" Presented at the ESRI Users Conference, San Diego, CA, June 2000.

John R. Weeks, Tarek Rashed, M. Saad Gadalla, and Allan G. Hill, "The Environmental Context of Reproduction in Rural Menoufia, Egypt," presented at the Annual Meeting of the Association of American Geographers, Pittsburgh, April 2000.

John R. Weeks, Tarek Rashed, M. Saad Gadalla, and Allan G. Hill, "Measuring the Environmental Context of Urban Fertility in Arab Countries: A 'Top-Down' Approach to Fertility in Cairo, Egypt," presented at the Annual Meeting of the Population Association of America, Los Angeles, March 2000.

John R. Weeks, "GIS for the Demography of the Border," presented at the Taller Demográfica de la Frontera México - Estados Unidos, El Colegio de la Frontera Norte, Tijuana, Mexico, October, 1999.

John R. Weeks, M. Saad Gadalla, Tarek Rashed, James Stanforth, and Allan G. Hill, "Spatial Variability in Fertility in Menoufia, Egypt, Assessed Through the Application of Remote-Sensing and GIS Technologies," presented at the Annual Meeting of the Population Association of America, New York, March 1999.

John R. Weeks, Allan G. Hill, and M. Saad Gadalla, "Applications of Remote-Sensing and GIS to the Fertility Transition in Rural Egypt," presented at the 1998 Annual North American Meeting of the Regional Science Association International, Santa Fe, New Mexico, November 1998.

John R. Weeks, "Demographic Dynamics of the San Diego-Tijuana Region," presented at the Conference on "Sustainable Development in San Diego-Tijuana: Environmental and Social Consequences of Economic Integration," UCSD Center for US-Mexican Studies, San Diego, May, 1997.

John R. Weeks and Laura M. Makey, "Fertility Along and Across the US-Mexico Border," presented at the 1997 Annual Meeting of the Population Association of American (Washington, DC, March 1997); and at the 1997 Annual Meeting of the Association of American Geographers (Forth Worth, Texas, April 1997).

John R. Weeks, "New Methods of Estimating the Muslim Population in the United States," presented at the annual meeting of the Population Association of America, New Orleans, 1996.

John R. Weeks, "The Census of Muslims in the United States," presented at the annual meeting of the Association of American Geographers, Charlotte, NC, 1996.

John R. Weeks and Karyl Fuller, "Population Distribution and Migration: Components of Housing Demand and Supply," presented at the International Symposium on Human Settlements, Habitat II, "From Cairo to Istanbul," San Diego, CA 1996.

John R. Weeks, Rubén G. Rumbaut, and Norma Ojeda, "Are Mexico-Born Women Giving Birth in San Diego Healthier Than Women Giving Birth in Tijuana?" presented at the 123rd Annual Meeting of the American Public Health Association, San Diego, CA, 1995.

Rubén G. Rumbaut and John R. Weeks, "Unraveling a Public Health Enigma: Why do Immigrants Experience Superior Perinatal Health Outcomes?" presented at the 122nd Annual Meeting of the American Public Health Association, Washington, DC, 1994. [Abstracted in the *Journal of the American Medical Association*, the *New York Times*, and the *Wall Street Journal*].

John R. Weeks and Rubén G. Rumbaut, "How Important is Migration Selectivity as a Factor in the Perinatal Health of Hispanics?" presented at the annual meeting of the Population Association of America, Miami, FL, 1994.

I. Douglas Sheres and John R. Weeks, "The Geodemographics of Major League Baseball," presented at the annual meeting of the Association of American Geographers, San Francisco, 1994. [Abstracted in *American Demographics*, October 1994, pp 9-11].

John R. Weeks and Robert Schlesinger, "Fertility Along the Two Sides of the U.S.-Mexico Border," presented at the annual meeting of the Association of American Geographers, San Francisco, 1994.

Rubén G. Rumbaut and John R. Weeks, "Ethnicity, Nativity, and the Paradox of Perinatal Health and Morbidity: An Analysis of Sociocultural and Biomedical Causal Factors," presented at the annual meeting of the American Sociological Association, Miami, FL, 1993.

John R. Weeks and Rubén G. Rumbaut, "Why do Immigrant Asian and Hispanic Women Experience Superior Perinatal Health Outcomes?," presented at the annual meeting of the Population Association of American, Cincinnati, OH, 1993. [also presented at the Eighth Annual San Diego Biostatistics and Epidemiology Applications Conference, University of California, San Diego, April, 1993].

Exhibit 37 - 583

John R. Weeks, "The Demographic Dynamics of the U.S.-Mexico Border and the Implications for NAFTA," presented to the Congressional Sunbelt Caucus, the Congressional Border Caucus, and the National Governor's Association, Washington, D.C., sponsored by the Population Resource Center, 1993. [Repeated for members of the Texas State Legislature, Austin, Texas, 1993].

John R. Weeks, "The Economic and Social Implications of Population Aging in the Context of Internal and International Migration," Presented at the International Conference of Population Aging, San Diego, CA, 1992.

John R. Weeks, "The Role of Incentives and Disincentives in Stabilizing Population Growth," presented at the National Carrying Capacity Issues Conference, Washington, D.C., 1992.

John R. Weeks, "Demographic Trends in the Middle East," presented at a Congressional Briefing and a private U.S. State Department Briefing, sponsored by the Population Resource Center and the Population Association of America, Washington, D.C., 1991.

John R. Weeks and Rubén G. Rumbaut, "Ethnicity, Maternal Risk Factors, and Pregnancy Outcomes," presented at the annual meeting of the Population Association of America, Washington, D.C., 1991.

John R. Weeks, "The Demographic Distinctiveness of the U.S.-Mexico Border Region," presented at the IV. Reunión Nacional de la Sociedad Mexicana de Demografía (SOMEDE), El Colegio de México, México, D.F., April, 1990.

John R. Weeks, "Household Structure and Fertility at the U.S.-Mexico Border," presented at the Annual Meeting of the Association of Borderland Scholars, Tijuana, Mexico, 1990.

John R. Weeks and Rubén G. Rumbaut, "Infant Mortality Among Indochinese Refugees," presented at the Second Annual Regional Conference on Maternal and Child Health Research, Rockville, Maryland, 1989.

Rubén G. Rumbaut and John R. Weeks, "Infant Health Among Indochinese Refugees: Patterns of Infant Mortality, Birthweight and Prenatal Care in Comparative Perspective," presented at the annual meeting of the American Sociological Association, San Francisco, 1989.

John R. Weeks and Rubén G. Rumbaut, "Infant Mortality Among Indochinese Refugees in San Diego County," presented at the annual meeting of the Population Association of America, Baltimore, 1989.

John R. Weeks and Tam Trinh, "Factors Affecting the Choice of Natural Family Planning: A Research Progress Report," Fifth National and International Symposium on Natural Family Planning, Los Angeles, 1988.

John R. Weeks, "Factors Affecting the Choice of Natural Family Planning," 16th Annual Psychosocial Workshop, New Orleans, 1988.

Rubén G. Rumbaut and John R. Weeks, "Indochinese Refugees: Infant Health and Cultural Adaptation," National Association of Social Workers, San Diego Health Council, 1988.

John R. Weeks, "Business Demography: Sociological Approaches," Expert Panel on Business Demography, Midwest Sociological Society, Minneapolis, 1988.

John R. Weeks, "Population and Contemporary Issues," Teaching Workshop at the Annual Meeting of the American Sociological Association, Chicago, 1987.

John R. Weeks, "Un Resumen Sobre Niveles de Fecundidad y Planificación Familiar a lo Largo de la Frontera Norte de México," presented at the Third Meeting of Sociedad Mexicana de Demografía, Mexico City, 1986.

John R. Weeks, Rubén G. Rumbaut, Claire Brindis, Carol Korenbrot, and Donald Minkler, "An Analysis of High Fertility Among Indochinese Refugees," presented at the Annual Meetings of the Population Association of America, San Francisco, California, 1986.

John R. Weeks, "Life Satisfaction and Support Networks Among Elder Immigrants," presented at the National Institute of Mental Health Workshop on Immigration and Mental Health, San Diego State University, 1985.

Rubén G. Rumbaut and John R. Weeks, "Fertility and Adaptation Among Indochinese Refugees," presented at the Psychosocial Workshop of the Annual Meetings of the Population Association of America, Boston, Massachusetts, 1985.

John R. Weeks, and Mohamed El-Assal, "Implications of Current Fertility Trends for the Future Development of Egypt," presented at the Egypt in the Year 2000 Conference, Cairo, Egypt, 1982.

Helen M. Wallace, John R. Weeks, Charlotte S. Jones, and Nelaufa Perera-Merrill, "Effects of Proposition 13 on Health Care of Mothers in California," presented at the Annual Meetings of the American Public Health Association, Los Angeles, California, 1982.

José B. Cuellar, John R. Weeks, Solomon Jacobson, Jesse McClure, Rudy Arrieta, and David Guttman, "Distribution of Public Benefits Among the Minority Elderly," presented at the Annual Meetings of the Gerontological Society of America, San Diego, California, 1980.

John R. Weeks and José B. Cuellar, "The Role of Family Members in the Helping Networks of Older People," presented at the Annual Meetings of the California Council on Family Relations, Santa Barbara, California, 1980.

John R. Weeks and José B. Cuellar, "The Influence of Immigration and Length of Residence on the Isolation of Older Persons," presented at the Annual Meetings of the Population Association of America, Denver, 1980.

José B. Cuellar and John R. Weeks, "A Strategy and Tool for the Assessment of Needs and Barriers to Benefits for Minority Elderly," presented at the Annual Meetings of the Western Gerontological Society, Anaheim, California, 1980.

*John R. Weeks, Ph.D.*

*- 18 -*

**Exhibit 37 - 584**

John R. Weeks, "Critique of Research on Psychosocial Aspects of Natural Family Planning," presented at the Research Workshop on NFP: Reality and Potential, sponsored by the National Institute of Child Health and Human Development, Bethesda, Maryland, 1979.

John R. Weeks, "Income Distribution as a Factor in Coale's Preconditions for a Fertility Decline: Evidence from Mexico," presented at the Annual Meetings of the Population Association of America, Atlanta, Georgia, 1978.

John R. Weeks, "Retirement Homes: Economic Realities and Implications for Ethnic Minority Elders, presented at the Annual Institute on Minority Aging, San Diego, California, 1978.

John R. Weeks, "Social Psychological Correlates of Fertility Expectations," Presented at the Annual Meetings of the Pacific Sociological Association, Victoria, British Columbia, 1975.

John R. Weeks and Joseph Spielberg Benitez, "The Ethnodemography of Midwestern Chicano Communities," presented at the Annual Meetings of the Population Association of America, New Orleans, 1973.

John R. Weeks, "Fertility and Family Structure in Chile," presented at the Annual Meetings of the Pacific Sociological Association, Long Beach, California, 1967.


## OTHER RELATED PROFESSIONAL ACTIVITIES

Organizer and Chair, "PAA Presidential Address Topics: Where are they Now? Volume III" Webinar of the Population Association of America, January 2022; available at: https://www.youtube.com/watch?v=oGzTE5OWBkE&list=PLNFXEhCaegwYi6Uz36cYy_Vc5d7hX3Nl9&index=14

Invited Presenter, "Global and Regional Demographic Trends," Webinar of the GEOINT Tradecraft Speaker Series, National Geospatial-Intelligence Agency, November 2021.

Organizer and Chair, "PAA Presidential Address Topics: Where are they Now? Volume II" Webinar of the Population Association of America, April 2021; available at: https://www.youtube.com/watch?v=7k9Y-LJwkWU&t=204s

Organizer and Chair, "PAA Presidential Address Topics: Where are they Now?" Webinar of the Population Association of America, December 2020; available at: https://www.youtube.com/watch?v=JZ9s1OfMMug&t=208s

Invited Speaker, "The Future is a Foreign Country: We'll Do Things Differently There," New Narratives on the Peopling of America, University of California, Berkeley, December 2019.

Discussant, Session on "Spatial Effects on Reproductive Health and Fertility," Annual Meeting of the Population Association of America, Austin, April, 2019.

Organizer and Chair, Sessions on "Health, Poverty, and Place in Ghana," Annual Meeting of the American Association of Geographers, Boston, April, 2017.

Panelist, Session on "Population Geography and the Environment: Special Session in Honor of Clark Gray and David López-Carr," Annual Meeting of the American Association of Geographers, Boston, April, 2017.

Participant, Session on "Population Specialty Group: Lifetime Achievement Award for John Weeks," Annual Meeting of the Association of American Geographers, San Francisco, CA, March 2016.

Panelist, Session on "Mapping Secondary Cities for Resiliency and Emergency Preparedness," Annual Meeting of the Association of American Geographers, San Francisco, CA, March 2016.

Chair, Session on "International Migration," Annual Meeting of the Association of American Geographers, San Francisco, CA, March 2016.

Panelist, Session on "Global health and the environment I: Research," Annual Meeting of the Association of American Geographers, San Francisco, CA, March 2016.

Invited Presenter, "The Power of Pixels: Using Imagery to Understand Spatial Inequalities in Health," University of North Carolina, Charlotte Departments of Geography and Political Science, March 2016.

Organizer and Chair, Session on "Spatial Analysis of Population and the Environment," Annual Meeting of Population Association of America, San Diego, CA, May 2015.

Invited Presenter, "The Power of Pixels: Using Imagery to Understand Spatial Inequalities in Health," University of Miami Departments of Geography, Sociology, and the Center for Latin American Studies, Miami, FL, February 2015.

Invited Presenter, "Too Big to Succeed? Demography and Socialist Experiments in Chile and Venezuela," University of Miami Departments of Geography, Sociology, and the Center for Latin American Studies, Miami, FL, February 2015.

Keynote Speaker, "North of the Border: The Changing Demographics of San Diego," Annual Meeting of the Western Regional Science Association, San Diego, CA, February 2014.

Panelist, Session on "The Use and Abuse of Sampling and Extrapolation in Construction Defect Lawsuits," West Coast Casualty's Construction Defect Seminar, Anaheim, CA, May 2013.

**Exhibit 37 - 585**

Organizer and Chair, Sessions on "Economic Change and Migration," Annual Meeting of the Population Association of America, San Francisco, May 2012.

Organizer and Chair, Sessions on "Health, Poverty, and Place in Ghana I, II, and III," Annual Meeting of the Association of American Geographers, New York, NY, February 2012.

Keynote Address, "Why Should You Care About the Census, and How Will it Affect Education Planning?" 35th Annual Conference of the California Association for Institutional Research, San Diego, November 2010.

Organizer and Instructor, "Advanced Spatial Analysis," GIS in Population Science Workshop, Center for Spatially Integrated Social Science, University of California, Santa Barbara, July 2010.

Invited Presenter, "Why Should You Care About the Census?," Distinguished Lecture Series, Osher Lifelong Learning Institute, University of California, San Diego, June 2010.

Organizer and Instructor, "Advanced Spatial Analysis," GIS in Population Science Workshop, Center for Spatially Integrated Social Science, University of California, Santa Barbara, July 2008.

Organizer and Chair, "Panel Discussion: PAA: How Did We Get Here and Where Are We Going?" and Discussant, Session on "Spatial Demography," Annual Meeting of the Population Association of America, New Orleans, April 2008.

Invited Presenter, "Do Slums Promote High Urban Fertility: Neighborhood Differences in Accra, Ghana," Social Science in Place (SSIP): GIS and Spatial Concepts Seminar Series, Survey Research Center, University of California, Berkeley, November 2007; and in the Winter 2008 Seminar Series of the Initiative in Population Research at The Ohio State University, February, 2008; and at the Graduate Student Seminar Series, Office of Population Research, Princeton University, March, 2008.

Invited Keynote Speaker, "Putting Place and Space into Demographic Analysis," GIS and Population Science Workshop, Center for Spatially Integrated Social Science, University of California, Santa Barbara, July 2006.

Panelist, "Democracy in the Middle East: Prospects, Problems and Promises," Annual Meeting of the Association of American Geographers, Chicago, March 2006.

Invited presenter, "It Takes Money to Make Money: Educating South County," presented to the South County 15th Annual Economic Summit, San Diego, October 2005.

Invited Keynote Speaker, "Putting Place and Space into Demographic Analysis," GIS and Population Science Workshop, Center for Spatially Integrated Social Science, University of California, Santa Barbara, June 2005.

Invited Keynote Speaker, "The Silent Storm: Or, How Population Growth Impacts Everything We Do," Colloquium on Populations Growing: Public Health Responses to Global Impacts, SDSU Graduate School of Public Health, April 2005.

Invited Presenter, "Patterns of Intra-Urban Fertility in Cairo, Egypt and Amman, Jordan," presented to the Department of Geography, University of Ghana, Accra, Ghana, January 2005.

Invited Presenter, "Patterns of Intra-Urban Fertility in Cairo, Egypt and Amman, Jordan," presented to the Rostock Demographic Colloquium, Max Planck Institute for Demographic Research, Rostock, Germany, November 2004.

Invited Presenter, "Changing Hispanic Demographics," presented to the Council of State Governments-West, San Diego, October 2004.

Participant, "Workshop on Systematic Population Estimation," Sponsored by the Office of External Research, Bureau of Intelligence and Research, U.S. Department of State, Arlington, Virginia, May 2004.

Panelist, PSG Session in Honor of the AAG Centennial: Overlaying GIS and Population Geography, Annual Meeting of the Association of American Geographers, Philadelphia, March 2004.

Organizer and Chair, Session on "Spatial Models," Annual Meeting of the Population Association of America, Boston, March 2004.

Presenter, "Demographics of East County," Board of Directors of the East County Economic Development Council, September 2003.

Chair and Discussant, "Population Processes," Regular Session of the Annual Meeting of the American Sociological Association, Atlanta, August 2003.

Instructor, "An Introduction to Spatial Pattern Analysis in a GIS Environment," Center for Spatially Integrated Social Science Summer Workshop Series, University of California, Santa Barbara, July 2003.

Presenter, "Can You Spot a City From the Air? Using Remote Sensing and GIS to Improve our Understanding of Urban Places," Program on Global Studies, 2003 Colloquium Series, Institute for Research on World-Systems, University of California, Riverside, April 2003.

Presenter, "Measuring the Ecological Context of Urban Vulnerability to Earthquake Hazards Through an Integrative Remote Sensing and GIS Approach," Congressional Briefing organized by the University Consortium for Geographic Information Science (UCGIS), Washington, DC, February 2003.

Panelist, "Is Population Growth Good or Bad for San Diego's Economy?" presented at the 2003 San Diego Economic Roundtable (County of San Diego), San Diego, January 2003 (available on video).

**Exhibit 37 - 586**

Organizer and Chair, "Fertility: Individual Level Concepts" and Organizer and Discussant, "Fertility: Policy Level Contexts," Regular Sessions of the Annual Meeting of the American Sociological Association, Chicago, August 2002.

Instructor, "An Introduction to Spatial Pattern Analysis in a GIS Environment," Center for Spatially Integrated Social Science Summer Workshop Series, University of California, Santa Barbara, July 2002.

Presenter, "2010 Roundtable," City of San Diego Year 2000 Redistricting Commission, San Diego, CA, December 2001.

Presenter, "Workshop on Finding Statistically Significant Crime Hot Spots," US Department of Justice, Fifth Annual International Crime Mapping Research Conference, Dallas, TX, December 2001.

Instructor, "An Introduction to Spatial Pattern Analysis in a GIS Environment," Center for Spatially Integrated Social Science Summer Workshop Series, University of California, Santa Barbara, August 2001.

Invited Lecturer, "Population Growth as a Ponzi Scheme," Thirty-Sixth Phi Beta Kappa Lecture, San Diego State University, November, 2000.

Instructor, "An Introduction to Spatial Pattern Analysis in a GIS Environment," Center for Spatially Integrated Social Science Summer Workshop Series, University of California, Santa Barbara, August 2000.

Invited Discussant, "Census 2000 Users' Conference on Public Use Microdata Sample (PUMS) Files," U.S. Bureau of the Census, Washington, DC, May 2000.

Organizer and Chair, Session on "Demographic Applications of GIS and Remote Sensing," Annual Meeting of the Association of American Geographers, Pittsburgh, April 2000.

Presenter, "External Demographics," Districtwide Strategic Planning Committee of the Grossmont-Cuyamaca Community College District, El Cajon, CA, October 1999.

Co-Organizer, Taller Demográfica de la Frontera México-Estados Unidos, El Colegio de la Frontera Norte, Tijuana, Mexico, October, 1999.

Speaker, "The Changing Demographics of San Diego County," Turning Point 2000 Summit of the Grossmont Union High School District, San Diego, March 1999.

Panelist, "Changing Demographics," 1999 San Diego Economic Roundtable (County of San Diego), San Diego, January 1999 (available on video).

Presenter, Seminario de Temas Selectos sobre Salud Reproductiva, "Reproductive Outcomes Among Mexico-Born Women in San Diego and Tijuana: Testing the Migration Selectivity Hypothesis," El Colegio de la Frontera Norte, Tijuana, Mexico, June 1998.

Panelist, Session on "Making Census Data Accessible for College Classes: the SSDAN Network," Annual Meeting of the Association of American Geographers, Fort Worth, April, 1997.

Chair, AAG Presidential Special Topic Session on "The Demography of Texas and the Southwest," Annual Meeting of the Association of American Geographers, Fort Worth, April, 1997.

Discussant, Session on "Major Directions in Population Geography," Annual Meeting of the Association of American Geographers, Fort Worth, April, 1997.

Presenter, "Demo-Facts for the US-Mexico Border Region," Summit Foundation, Washington, DC, March, 1997.

Contributor/Interviewee, "Populations and Communities," Part 24 of Biology Telecourse, "Cycles of Life," Produced by KOCE-TV, Huntington Beach, CA, 1996.

Invited Presenter, "Major Trends in Population Growth in San Diego County," Presented to the Board of Trustees of the Grossmont-Cuyamaca Community College District, 21 November 1995.

Consultant to the East County Economic Development Council on its subcontract from the San Diego Economic Development Corporation to provide data on defense related firms in San Diego County, 1995.

Invited Presenter, "San Diego Town Meeting on Defense Conversion," Co-sponsored by the San Diego Economic Development Corporation, the East County Economic Development Council, and the San Diego Economic Conversion Council; San Diego County Administration Center, November 1995.

Keynote Speaker, "The Six Pillars of Global Population and Social Change." Conference on Global Population and Social Change, Michigan State University, April 1995.

Invited Presenter, "The Defense Conversion and Adjustment Needs of East County Firms," Semi-Annual Meeting of the East County Economic Development Council, Santee, CA, January, 1995.

Consultant, "The Impact of Medicaid Managed Care on STD/HIV. Clinical and Preventive Services in San Diego County," San Diego State University Graduate School of Public Health (Rob Seidman, Project Director), November 1994-October 1995.

Invited Presenter, "Up, Down, and Sideways: Fertility Along the US-Mexico Border." Graduate Colloquium Series of the Department of Geography, University of California at Santa Barbara, November, 1994.

Consultant, "Maquiladora Family Planning and Child Care Survey," San Diego State University Institute for Regional Studies of the Californias (Paul Ganster, Project Director), September-December, 1993.

Keynote Speaker, "East County in Transition," Annual Meeting of the East County Economic Development Council, El Cajon, CA, June 1993.

**Exhibit 37 - 587**

Invited Presenter, "The Changing Demographic Structure of the San Diego Region," SDSU-COLEF Binational Symposium of San Diego and Tijuana in Transition, Tijuana, Mexico, April 1993.

Invited Participant, "California Population Studies," Meeting convened by the California Policy Seminar (a Joint Program of the University of California and State Government), Sacramento, California, January, 1992.

Moderator, Session on "Dollars and Pesos: Funding Joint Ventures," Joint Ventures in Family Planning: A U.S./Mexico Perspective, Binational Conference on Family Planning Along the Border, Co-sponsored by Planned Parenthood of San Diego and Riverside Counties and MexFam, Tijuana, Mexico, September 1991.

Chair, "Demografía Historica: Siglo XVIII-XIX," VIII Conference of Mexican and North American Historians, San Diego, October 1990.

Invited Guest Lecturer, "The Demography of Paradise," I & R Network Conference, Harbor Island, San Diego, January, 1990.

Invited Participant, "II Simposio Binacional Sobre la Población de la Frontera México-Estados Unidos," El Paso, Texas, November, 1989.

Invited Guest Lecturer, "The Demography of the U.S.-Mexico Border," Population Research Laboratory, University of Southern California, Los Angeles, November, 1989.

Invited Guest Lecturer, "The Demographic Interrelatedness of the U.S.-Mexico Border," Population Research Center, University of Texas, Austin, November, 1989.

Invited Guest Lecturer, "The Demographics of San Diego," International Studies Education Project of San Diego Retreat, Mission San Luis Rey, Oceanside, CA, November 1989

Member of Review Panel for "America in the 21st Century: A Global Perspective," Population Reference Bureau, Washington, D.C., August, 1989.

Invited Lecturer, "Demography and Destiny: The Case of Islamic Nations," presented to the Northern California World Affairs Council, San Francisco, April, 1989.

Organizer, Session on "The United States and Mexico: Demographic and Economic Relationships at the Border," Annual Meetings of the Population Association of America, New Orleans, 1988.

Invited Witness, California Legislature's Joint Committee on Refugee Resettlement, International Migration and Cooperative Development, Hearing on the Impact of the Immigration Reform and Control Act of 1986 on the border region of California, San Diego, December, 1987.

Invited Participant, "Southwest Symposium on U.S. Population Policy,"The Woodlands Center for Growth Studies, Houston, Texas, October 1987.

Invited Participant, "Simposio Binacional Sobre la Politica de Poblacion," Universidad Autonoma de Chihuahua, Ciudad Juarez, Mexico, September, 1987.

Member, General Planning Committee, "Bridging the Pacific." Conference sponsored by the United Nations Association of Southern California, University of San Diego, April, 1987.

Director, "Intensive Training Program for Family Planning and Related Health Professionals," International Population Center, San Diego State University, April-May, 1987.

Invited Participant, "Seminar on Southeast Asian Issues," University of California, Irvine, March, 1987.

Discussant, Session on "Later Phases of the Family Life Cycle," Annual Meetings of the Population Association of America, San Francisco, April, 1986.

Consultant re computerizing data for Zimbabwe National Family Planning Council, Harare, Zimbabwe, September, 1984.

Invited Speaker, "Who Lit the Fuse on the Population Bomb?" Earth Day Celebration [the inaugural one], Fresno State College, Fresno, CA, April 1970.

## COURSES TAUGHT AT SAN DIEGO STATE UNIVERSITY

Population and the Environment
Seminar in GeoDemographics
Seminar in Spatial Demography
Spatial Data Analysis
Advanced Quantitative Analysis in Geography
Seminar in Geographic Research Design
People, Places & Environment
Population and Contemporary Issues
Seminar in Demographic Analysis
Seminar in Population Geography
Seminar in Population and Demography
Demography of Latin America
Elementary Social Statistics

Exhibit 37 - 588

Principles of Cultural Geography
Seminar in Human Geography
Sociology of Aging
Social Psychology
Contemporary Social Problems
Introductory Sociology

**GRADUATE ADVISEES**

PhD Committees: Chair (10); Second member (8); Outside member (4)
MA/MS Committees: Chair (32); Second member (17); Outside member (8)
MPH Committees: Outside member (11)

**CONSULTING EXPERIENCE**

***Demographic and Statistical Expert Witnessing and Research in the following legal cases:***

Smart Efficient Solutions, LLC v. Heritage Property & Casualty Insurance Company (2023): Circuit Court of the 20th Judicial District in and for Collier County, Florida (*)
Mayes v. La Sierra University, et al. (2023): Riverside County Superior Court
Ernesto Herrera v. General Atomics et al. (2022): U.S. District Court, Southern District of California (+)
American/BCEGZV v. Shores LLC (2021): Los Angeles County Superior Court (*)
United States v. Robert Bowers (2020): U.S. District Court, Western District of Pennsylvania
De Navarro et al. v. City of South Pasadena et al. (2020): Los Angeles County Superior Court
Tsang v. Candlewood Country Club, et al. (2020): Los Angeles County Superior Court
Zimmerer v. Capistrano Unified School District; YMCA of Orange County (2020): Orange County Superior Court
Aboukhalil v. U.S. Home (2020): Clark County, Nevada Superior Court
People v. E.M. Alfaro (2019): Marin County Superior Court (*)
Victoria Brown v. Parking Concepts, etc., et al. (2019): Orange County Superior Court
Solair v. Starline Windows (2019): Los Angeles County Superior Court
People v. Vincent Martinez et al. (2018): Maricopa County Superior Court, Arizona
The Vue re Starline Windows (2018): Los Angeles County Superior Court
Pepper Lane Owners Association v. Pulte Home Company, LLC (2018): San Francisco Superior Court
Grande South Owners v. Starline Windows Inc. (2018); San Diego County Superior Court
United States v. Alfonzo Williams et al. (2018); U.S. District Court, Northern District of California
Bayside v. Bosa (2017); San Diego County Superior Court
Sapphire Tower Owners Association v. Swinerton (2017); San Diego County Superior Court
People v. Dmitry Shubov. (2017); Stanislaus County Superior Court
United States v. Donald Fell (2017); U.S. District Court, District of Vermont (*)
People v. Anthony Lemar Jones (2016); Solano County Superior Court (*)
2999 California St. HOA v. Axis Services, Inc. (2016); San Francisco County Superior Court
Antelope v. Greystone and US Home (2015); Las Vegas, Nevada
Town Green Village Association v. Orrin Thiessen, Terri Thiessen & Town Green Village LP (2015); Sonoma County Superior Court
People v. Kiyon Twyman (2015); San Diego County Superior Court
Gerald Atkins, et al. v. Del Webb Communities (2015); Las Vegas, Nevada
Campaña v. D.R. Horton (2015); San Diego County Superior Court (+)
The Mark Condominiums Owners Association v. The Mark Condominiums LLC (2014); San Diego County Superior Court (*)
La Posada Homeowners Association v. Brussel Consulting & Construction Mgmt (2014); Las Vegas, Nevada
Solana Del Mar v. Centex Homes (2014); Las Vegas, Nevada
Tomlinson v. U.S. Home (2014); Las Vegas, Nevada
350 W. Ash Association v. 350 W. Ash Urban Homes et al. (2014); San Diego County Superior Court (*)
Mills at Cortez Hill HOA v. Cortez Hill (2014); San Diego County Superior Court
Newport Bluffs v. Western National Construction (2014); Orange County Superior Court
Miller v. Embassy Suites Management, LLC et al. (2014); Orange County Superior Court
Montefaro Owners Associations v. Centex Homes (2014); San Diego County Superior Court
Grand Canyon Village HOA v. Grand Canyon Condominiums, LLC (2014); Las Vegas, Nevada (*)
The Verandas at Escala Assoc. v. Shea Homes (2013); San Diego County Superior Court (*)

*John R. Weeks, Ph.D.*
- 23 -

**Exhibit 37 - 589**

Aragon Townhomes v. Hill Contracting (2013); San Diego County Superior Court
Ochoa (Desert Canyon) v. US Home Corporation (2013); Las Vegas, Nevada
Courts at Aliante v. D.R. Horton (2013); Las Vegas, Nevada (*)
Dorrell Square v. D.R. Horton (2013); Las Vegas, Nevada (*)
Slaughter et al. v. Uponor (2013); Las Vegas, Nevada
Serene v. Desert Plastering (2013); Las Vegas, Nevada
Borges v. McMillin et al. (2013); County of Imperial—El Centro Superior Court (*)
1100 Wilshire Property Owners Association v. 1100 Wilshire Associates LLC et al. (2013); Los Angeles County Superior Court
Hass et al. v. Bivins Construction (Eagle View) (2012); Las Vegas, Nevada (*)
Acqua Vista HOA v. K Hovnanian at Acqua Vista LLC (2012); San Diego County Superior Court (*)
Horsley v. Skyhawk (2012); Las Vegas, Nevada (*)
People v. Charfarous, Luangrath, and Ortiz (2012); San Diego County Superior Court (*)
People v. Padilla (2012); San Diego County Superior Court (*)
Desert Plastering v. Copper Creek LLC (2012); Las Vegas, Nevada
People v. Scott Evans (2012); Orange County Superior Court
United States v. McCluskey (2012); U.S. District Court, District of New Mexico
Cosio et al. v. McMillin et al. (2012); County of Imperial—El Centro Superior Court (*)
Desert Princess HOA v. Kennedy-Wilson, Inc., et al. (2012); Riverside County Superior Court
Shelton et al. v. Banning 144 LLC et al. (2011); Riverside County Superior Court
Aztech Plastering, Inc. adv. Environment for Living (Serenity HOA) (2010); Las Vegas, Nevada
People v. Marc Jernigan (2010); San Diego County Superior Court (*)
People v. Eddie Montañez (2010); San Diego County Superior Court
Rancho Lake (re Desert Plastering) (2010); Las Vegas, Nevada
Rock Springs Vista III v. Zuraff Construction (2009); Las Vegas, Nevada (*)
People v. Johannes Mehserle (2009); Alameda County Superior Court
Bahhur et al. v. Pardee Homes et al. (2009); Ventura County Superior Court
People v. Derlyn Ray Threats (2009); San Diego County Superior Court
Pacific Windows v. ADCO (2008); Riverside County Superior Court (*)
First Light HOA v. D.R. Horton (2008); Las Vegas, Nevada (*)
IPEX Fitting Litigation (2008); Las Vegas, Nevada
Bobier v. McMillin (2008); San Diego County Superior Court
John Allen et al. v. Pacific Coast Communities, Inc. et al. (2008); San Diego County Superior Court
People v. Jean Pierre Rices (2008); San Diego County Superior Court
Del Webb v. IPEX USA LLC (2008); Las Vegas, Nevada (*)
People v. Columbus Allen (2007); Stanislaus County Superior Court
People v. Randolph Kling (2007); Ventura County Superior Court (*)
Adapon v. McMillin (2007); San Diego County Superior Court
Allstate Insurance Company et al. v. IPEX (2007); Las Vegas, Nevada
Simpson v. Wexford et al. v. Atrium Door & Window et al. (2007); Las Vegas, Nevada
People v. Richard Garcia (2007); San Diego County Superior Court
Serena, David et al. v. Yolo County Grand Jury et al. (2006); U.S. District Court, Eastern District of California (*)
People v. Paris and Alberran (2006); San Diego County Superior Court (*)
People v. Edward Thomas (2006); San Diego County Superior Court
Kendall Creek HOA v. Saxton, Inc. (2006); Las Vegas, Nevada
People v. Reggie Cole (2006); Imperial County Superior Court
People v. Mark Jeffrey Brown (2006); San Diego County Superior Court (*)
Dakota Condominium v. Covington Crossing (2006); Las Vegas, Nevada
Galleria Villas COA v. Gray Castle Land, Inc. (2006); Las Vegas, Nevada (*)
People v. DeShawn Campbell (2006); Santa Clara County Superior Court
Centex Rodgers v. Catholic Healthcare West (2005); Arbitration, Los Angeles County Superior Court
Wayne R. & Leah J. Carlson et al. v. Syncon Homes et al. (2005); Ninth Judicial District Court of State of Nevada
People v. Frank Daniels (2004); Santa Barbara County Superior Court
People v. Michael Jackson (2004); Santa Barbara County Superior Court
Onyegbule v. Shapell (2004); San Diego County Superior Court
United States v. Raimundo (2004); United States District Court for the Southern District of California
People v. Noriega (2003); Santa Barbara County Superior Court
United States v. Soewin Chan (2003); United States District Court for the Northern District of California
Erickson et al. v. Brehm Homes et al. (2003); San Diego County Superior Court

*John R. Weeks, Ph.D.*
- 24 -

**Exhibit 37 - 590**

People v. Ballesteros et al. (2003); Santa Barbara County Superior Court (*)

Spectrum Community Association v. Bristol House Partnership, Ltd et al. (2003); Orange County Superior Court

People v. Stuart Alexander (2002); Alameda County Superior Court (*)

17161 Alva Road , etc., v. Zanderson, Inc. et al. (2002); San Diego County Superior Court

United States v. John That Luong (2002); United States District Court for the Eastern District of California

United States v. Rubalcaba et al (re Cervantes) (2002); United States District Court for the Northern District of California

People v. David Ziesmer (2002); Ventura County Superior Court (*)

Allen et al. v. Bramalea California, Inc. et al. (2002); Orange County Superior Court

People v. Michael Schultz (2001); Ventura County Superior Court (*)

Duncan v. Vasquez (2001); United States District Court for the Central District of California

Farshchian v. Ahmanson Development (2001); Los Angeles County Superior Court

People v. Ranjel (2001); San Francisco County Superior Court (*)

Altman v. Cayman Developers (2000); Orange County Superior Court

People v. Wayne Adam Ford (2000); San Bernardino County Superior Court (*)

Monarch Hills v. Bowers Construction, Inc. (2000); San Diego County Superior Court

Sheila A. Delancy et al. v. Ranchland Portola Development et al. (2000); Orange County Superior Court

People v. John Ter Zakarian et al. (2000); Los Angeles County Superior Court

PGA West II Residential Association v. Sunrise Desert Partners et al. (2000); Riverside County Superior Court

Marshall et al. v. Baldwin Builders et al. (2000); San Diego County Superior Court (*)

Abraham et al v. Baldwin Builders et al. (2000); Orange County Superior Court

Village at Majorca HOA v. Leisure Technology, Inc. (2000); San Diego County Superior Court

Bateman el al. v. The William Lyon Company et al. (2000); Orange County Superior Court (*)

People v. Mares (2000); Los Angeles County Superior Court

Lomas de Oro HOA v. Robin Hood Homes, Inc. et al. (1999); San Diego County Superior Court

Corte Melina Maintenance Corporation v. Corte Melina Partners et al (1999); Orange County Superior Court

Costa Brava HOA v. Domain Developers (1999); Orange County Superior Court

Deborah Jo Berg et al. v. The Baldwin Company et al. (1999); San Diego County Superior Court (*)

People v. Iman Kennedy et al. (1999); Marin County Superior Court

People v. James Ary (1999); Contra Costa County Superior Court (*)

Reece et al. v. Premier Group (1999); Riverside County Superior Court

Summit Renaissance HOA v. Anaheim Summit et al. (1999); Orange County Superior Court

Spitz et al v. Brighton et al (1999); Orange County Superior Court (*)

People v. Mark Chin (1999); U.S. District Court, Northern District of California (San Francisco)

Casafina v. William Lyon Company et al. (1999); Orange County Superior Court

Fisher et al., v. Glendale Federal Bank et al. (1999); Orange County Superior Court (*)

People v. Boswell (1999); Monterey County Superior Court

Renaissance Capri HOA v. California Pacific Homes et al. (1999); San Diego County Superior Court

Bishop et al. v. Marblehead and the Lusk Company (1999); Orange County Superior Court (+)

The Masters Series of Seacliff on the Greens Homeowners Association et al. v. Cayman Development Company et al. (1998); Orange County Superior Court

Sausalito Maintenance v. Barratt American Incorporated et al. (1998); Orange County Superior Court (*)

Summit Court Homeowners Association v. Baldwin Building Contractors et al. (1998); Orange County Superior Court (*)

Barkdull v. Fargo Industries et al. (1998); San Diego County Superior Court

Oxford Court HOA v. J.M. Peters Company (1998); Orange County Superior Court

Mission Greens I Maintenance Assoc v. The William Lyon Company (1998); Orange County Superior Court (+)

Spinazolla v. Tierrasanta ("Bella Vista") (1998); San Diego County Superior Court

Kate v. Osborne Development ("Vista Estrella") (1998); Los Angeles County Superior Court

State Farm, etc., v. Newhall Land and Farming et al. ("The Stratford Collection") (1998); Los Angeles County Superior Court

The Glen at Hillsborough Assoc v. The William Lyon Company (1998); Orange County Superior Court

Belflora v. William Lyon Company et al. (1998); Orange County Superior Court

Seacove Place  Homeowners Association v. Laguna Audubon II et al. (1998); Orange County Superior Court (*)(+)

Kerner v. Rancho Cielo Association (1998); Orange County Superior Court (*)

Rancho Villas v. Showcase Homes et al. (1998); San Diego County Superior Court

Monarch Villas v. Shapell Industries et al. (1998); San Diego County Superior Court

Villa Point Homeowners Association v. The Irvine Company (1998); Orange County Superior Court

PGA West v. Sunrise Development (1998); Riverside Superior Court (*)

**Exhibit 37 - 591**

Provence d'Aliso Community Association v. Jess L. Frost et al. (1998); Orange County Superior Court (+)
Cabo Vista Maintenance Corporation v. Fieldstone Trabuco Partners et al. (1998); Orange County Superior Court
Windsong Community Association v. Windsong Partners (1998); Orange County Superior Court
Montecido at Portola Hills Association v. Baldwin Building Contractors (1998); Orange County Superior Court
Mission Del Oro v. Robinhood Homes et al. (1998); San Diego County Superior Court
Schmidt v. Skandia Scene, Inc et al. (1998): San Diego County Superior Court
Angulo et al v. Broadmoor et al. (1998); San Diego County Superior Court
Jacqueline Ames et al. v. Rancon Development Fund VI et al. (Promenade) (1998); San Diego County
        Superior Court (+)
Cueto v. Pardee Construction (1998); San Diego County Superior Court
Palm Valley v. Sunrise Development (1997); Riverside County Superior Court
Sharpe v. Carmel Mountain (1997); San Diego County Superior Court
Gillis v. Fonelo Construction (1997); Los Angeles County Superior Court
Scripps Townhomes COA v. California Pacific Homes (1997); San Diego County Superior Court
Canyon Rim Townhomes Assn v. The Baldwin Company et al. (1997); Orange County Superior Court (*)
Desert Horizons Owners Assn v. Desert Horizons et al. (1997); San Diego County Superior Court (*)
Edward and Helen Law et al. v. Signal Landmark et al. (Port Royale) (1997); San Diego County Superior Court (+)
Corarito v. Donald F. Sammis (1997); San Diego County Superior Court
United States v. Sigifredo Robles et al. (1996); U.S. District Court, Northern District of California
Elysian Community Association v. RGC-M Associates (1996); San Diego County Superior Court
Brown et al., v. F & M Associates (1996); San Diego County Superior Court
Fairway Villas at Eastlake Green Assoc v. Century American Corporation et al. (1996); San Diego County Superior
        Court
Belsera v. Tierrasanta (1996); San Diego County Superior Court
Alexander v. J.M. Peters (1996); San Diego County Superior Court
Cimarron HOA v. Home Capital Corp (1996); San Diego County Superior Court
People v. Mendes Stanley Brown (1996); San Francisco County Superior Court (*)
Ocean Hills Country Club HOA v. Leisure Technology Inc. (1996); San Diego County Superior Court
Scripps Nob Hill v. The Presley Companies (1996); San Diego County Superior Court
Arborlake v. Baldwin et al. (1996); San Diego County Superior Court (*)
Kennedy v. Santa Fe Ridge (1996); San Diego County Superior Court (*)
Mesquite Country Club Condominium HOA v. Mesquite Country Club (1996); Riverside County Superior Court
United States v. Reese (1996 retrial); U.S. District Court, Southern District of California
The Lakes at Carmel Del Mar v. Baldwin Company et al. (1995); San Diego County Superior Court
United States v. Rubio (1995); U.S. District Court, Southern District of California
Cape la Jolla OA v. Brehm Communities et al. (1995); San Diego County Superior Court
Zaslow v. The Baldwin Company (1995); San Diego County Superior Court
Fisher et al., Pacific Sun/West (1995); San Diego County Superior Court
Halcyon Community Assoc. v. Del Mar Associates et al. (1995); San Diego County Superior Court
Arnold v. Baldwin et al. (1995); San Diego County Superior Court (*)
United States v. Elizarra (1995); U.S. District Court, Southern District of California
People v. Cunningham (1995); San Bernardino County Superior Court (*)
Pardee Construction v. Astra Flooring (1995); San Diego County Superior Court (*)
La Costa Alta v. Newport Pacific (1994); San Diego County Superior Court (*)
People v. Ramirez (1994); San Francisco County Superior Court
Vintage Townhomes HOA v. Northwoods-Rancho Cucamonga, Ltd et al. (1994); Riverside County Superior Court
Terraces at Scripps West v. Foote Development (1994); San Diego County Superior Court
City Scene v. Brehm Communities (1994); San Diego County Superior Court (*)
People v. Chan et al. (1993); Orange County Superior Court (*)
People v. Burney (1993); Orange County Superior Court (*)
United States v. Reese et al. (1993); U.S. District Court, Southern District of California
United States v. Roaches (1993); U.S. District Court, Central District of California
Casa de Las Companas v. The Law Company et al. (1993); San Diego County Superior Court
United States v. Valera-Calderon (1993); U.S. District Court, Southern District of California
Ranchwood Park Property Owners Assoc v. Ranchwood Community (1993); San Diego County Superior Court
People v. Strother (1993); Los Angeles County Superior Court (*)
People v. Weaver (1993); San Diego County Superior Court
Courtyards v. Shapell (1992); San Diego County Superior Court
Creekwood Condominium Association v. Douglas Allred Co. (1992); San Diego County Superior Court

Exhibit 37 - 592

North Rim Homeowners Association v. Douglas Allred Co. et al. (1992); San Diego County Superior Court
People v. Hines (1992); San Diego County Superior Court
People v. Chaidez (1992); Santa Barbara County Superior Court (*)
People v. Cabrera et al. (1991); San Diego County Superior Court (*)
United States v. Sainz (1991); U.S. District Court, Southern District of California (*)
People v. Bell (1991); San Diego County Superior Court
County of San Diego, et al., v. Jesse M. Unruh, et al. (1990); San Diego County Superior Court (*)(+)
People v. Isaquirre (1990); San Diego County Superior court
People v. Roberts (1990); San Diego County Superior Court
People v. Butler (1990); San Diego County Superior Court
People v. Pearce (1990); San Diego County Superior Court
People v. Sixto (1989); Kern County Superior Court
People v. Moffett (1989); San Diego County Superior Court
People v. Vera (1989); San Diego County Superior Court (*)
People v. Agrio (1989); San Diego County Superior Court
People v. Bustamonte (1988); Imperial County Superior Court
United States v. Valencia-Garcia (1988); U.S. District Court, Southern District of California
United States v. Martinez-Gonzalez (1988); U.S. District Court, Southern District of California
Ramos v. Ragu Foods (1988); San Francisco County Superior Court
People v. Miller (1988); Riverside County Superior Court
People v. Maier (1988); San Diego County Superior Court
People v. Ware (1987); Los Angeles County Superior Court [Crim Case No. A-739-760 (1988)] (*)
People v. Ramirez (1987); Los Angeles County Superior Court (*)
People v. Samayoa (1987); San Diego County Superior Court (*)
People v. Cosby (1987); San Diego County Superior Court
People v. Carpenter (1987); San Diego County Superior Court
People v. Ayala (1987); San Diego County Superior Court
People v. Moreno (1987); San Diego County Superior Court
People v. Neidiffer and Cruz (1986); Riverside County Superior Court (*)
People v. Lucas (1986); San Diego County Superior Court (*)
People v. Troiani (1986); San Diego County Superior Court (*)
People v. Herrera (1985); San Diego County Superior Court (*)
People v. Dier (1985); San Diego County Superior Court
People v. Dumas (1985); San Diego County Superior Court (*)
People v. O'Hare (1985); San Diego County Superior Court
People v. Ivory (1984); San Diego County Superior Court (*)
People v. Washington (1984); San Diego County Superior Court (*)
People v. Alexander (1983); San Diego County Superior Court (*)
People v. Silva (1982); San Diego County Superior Court (*)
People v. Marshall (1980); San Diego County Superior Court (*)

(*) *Includes Court Testimony and/or Deposition*
(+) *Indicates work for Plaintiff*

### Other Professional Consulting:

Federal Public Defender, Central District of California, Los Angeles, CA (2013 - present)
Habeas Corpus Resource Center, San Francisco, CA (2007-present)
Capital Post-Conviction Project of Louisiana (2021-2022)
East County Economic Development Council (1986-2010)
United Nations Food and Agriculture Organization (FAO-CGIAR Centers) (2002-2005)
Center for Behavioral Epidemiology and Child Health, San Diego State University (2000-2005)
Center for Research on Child and Adolescent Mental Health Services, Children's Hospital, San Diego (1998-2000)
Pacific Biometrics, Inc. (1998 - 1999)
Dick & Patel Associates, Inc. (1998)
Quidel Corporation (1997)
Federal Defenders of San Diego, Inc. (1997)
Sullivan/Luallin Healthcare Consulting (1996-98)
Grossmont-Cuyamaca Community College District (1996)

**Exhibit 37 - 593**

City of San Diego Economic Development Services (1996)
San Diego Economic Development Corporation (1995)
Calgaro Insurance Services, Inc. (1993)
Cuyamaca Bank (1992)
Los Angeles Regional Family Planning Council (1985-1990)
James M. Montgomery, Consulting Engineers, Inc. (1988)
Encyclopedia Britannica Educational Corporation (1982)
Council on Pilipino-American Organizations (1978-81)
Allied Community Services/Allied Community Health (1978-80)


## PROFESSIONAL MEMBERSHIPS AND RELATED RECOGNITION

Population Association of America (PAA)
    PAA Historian and Chair, PAA History Committee, 1994-present
        (https://www.populationassociation.org/about/our-history)
    Member, Memorial Service Committee, 2009-2011 (Chair in 2011)
    Chair of Local Arrangements Committee, 1982
Member, ***World Commission on Forced Displacement Project Steering Committee***, Chumir Foundation
    for Ethics in Leadership, 2016 to 2019.
American Association of Geographers (AAG)
    Member of Board of Directors of Population Geography Specialty Group (1996-2000), President (2000-2001),
        Immediate Past President (2001-2002)
    Reviewer for *The Annals of the Association of American Geographers,* and the *Professional Geographer*
    Editorial Board, ***Annals of the Association of American Geographers*** (2010-2014).
American Sociological Association (ASA)
    Member of Section on Population;
    Member of Section on International Migration;
    Guest Editor of Special Issue of *Teaching Sociology,* 1986
    Reviewer for the *American Sociological Review*
International Union for the Scientific Study of Population (IUSSP)
Southern Demographic Association
Association of Borderland Scholars
Sociedad Mexicana de Demografía
The Society for the Study of Social Biology
Editorial Board, ***Journal of Immigrant Health*** (1996-present).
Editorial Board, ***GeoJournal*** (2007-2017).
External reviewer for the European Research Council, 2014-2015.
Permanent Member, Social Sciences and Population B (SSPB) Study Section, Center for Scientific Review, National
    Institutes of Health, 2012-2013.
Member, SaniPath International Advisory Board, Rollins School of Public Health, Emory University (2012-2014)
Member, Advisory Committee, "GIS Training in Population Sciences," Awarded to Stephen Matthews (PI) by the
    National Institute of Child Health and Human Development, 2004-2013.
External Member, Study Section for Social Science and Population Studies, *Eunice Kennedy Shriver* National
    Institute of Child Health and Human Development, 2005-2011.
International Institute for Applied Systems Analysis (IIASA), Population and Society Site Evaluation Team
    Member, Vienna, Austria, January 2007.
National Research Council, Committee on the Effective Use of Data, Methodologies and Technologies to Estimate
    Sub-National Populations at Risk, Member 2005-2007
Panelist, National Science Foundation Review Panel for Biocomplexity in the Environment: Dynamics of Coupled
    Natural and Human Systems, Washington, DC, March 2004.
*Ad hoc* reviewer for the National Science Foundation
Member, Educators Who Care Executive Committee, Population Institute (Washington, DC), 1999-2008)


## UNIVERSITY SERVICE

Member, Review Panel for Gerontology Program, SDSU, 2013
Chair, Student Outcomes Assessment Committee, Department of Geography, 2000-2013

**Exhibit 37 - 594**

Member, University Student Learning Outcomes Assessment Committee, 2011-2013
Member, University Research Council, 2010-2013
Academic Advisor, Certificate in Environmental Studies, 1997-2013
Faculty Advisor, SDSU Over 60 Program, 1994 - 2013
Member, Personnel Committee, Department of Geography, 1996-2013 (chair 1993-94, 2001-02)
Member, Ph.D. Advising Committee, Department of Geography, 1998-2005, 2007-2010
Member, Research Committee of the College of Arts and Letters, 2008-2009.
Member, Policy Advisory Committee, Department of Geography, 1993-1995, 1997-98 (Chair), 1999-2001, 2008-2009 (Chair).
Member, Global Health Joint Doctoral Program (SDSU-UCSD) Steering Committee, 2007
Member, Curriculum Committee, Department of Geography, 2005-2006
Member, Search Committee for the Dean of the College of Health and Human Services, 2004-2005
Member, Hiring Committee, Department of Geography, 2000-2005
Member, College of Arts and Letters Budget and Resource Planning Committee, 2003-2004
Member, University Faculty Honors and Awards Committee, 2003
Member, Building Advisory Committee, College of Arts and Letter, 2002-03
Member, Search Committee for the Director of the University Center on Aging, SDSU, 2002-2003
Member, Search Committee for the Harold Simon Endowed Chair in International Health and Cross-Cultural Medicine, UCSD School of Medicine, 2000-2003
Member, University Center on Aging, Steering Committee for BA Program, 1995-2003
Member, Search Committee for Tenure-Track Assistant Professor in Gerontology, SDSU, 2000-2001
Member, M.A. Advising Committee, Department of Geography, 1993-99
Member, Search Committee for Dean of the College of Health and Human Services, 1993-94
Member, College of Arts and Letters Research and Professional Leaves Committee, 1989-1990; 1992-1994.
Founding Member of San Diego State University Chapter of Phi Beta Delta Honor Society for International Scholars, 1989.
Member, Department of Sociology Graduate Committee, 1986-1987, 1990-1992.
Member, Department of Sociology Personnel/Recruitment Committee, 1990-1992 (Chair, 1990-1991).
External Member, College of Business Administration Peer Review Committee, 1990-1991.
Member, Advisory Committee of the Program in Cross-Cultural Nursing, College of Health and Human Services, 1987-91.
Member, Planning Committee of the University Center on Aging, 1978 to 1990 (Chair of Committee from 1980-1985).
Member, Ad Hoc Committee on Development of a Joint Doctorate in Applied Social Science Research, 1986-89.
Member, College of Arts and Letters Personnel Committee, 1987-1988.
Member, Department of Sociology Curriculum Committee, 1986-1987.
Chair, Department of Sociology Promotion, Tenure, and Retention Committee, 1986-1987
Member, San Diego State University Senate (Senator from the College of Arts and Letters), 1980-1986.


## RELEVANT COMMUNITY SERVICE

San Diego Association of Governments (SANDAG) - Member of Regional Growth Forecast Expert Review Panel, 1990 - 2012, 2017 – 2018, 2022.
Southern California Association of Governments (SCAG) - Member of Forecast Expert Panel, 2021.
Member, UCSD Center for US-Mexican Studies Fellowship Selection Committee, 1997.
Member, East County Regional Prosperity Strategy Task Force, 1994.
Member, Economic Advisory Board Task Force, County of San Diego, 1993-94.
Planned Parenthood of San Diego and Riverside Counties - Member of Binational Affairs Committee, 1988 to 1992; Member of Board of Directors, 1991-92.


## MEDIA INTERVIEWS:

05/28/2023, "Homeownership in San Diego loses ground in last decade, especially for minorities and younger, middle-aged households." San Diego Union-Tribune:
https://www.sandiegouniontribune.com/business/story/2023-05-28/homeownership-in-san-diego-loses-ground-in-last-decade-especially-for-minorities-and-younger-middle-aged-households?utm_id=99221&sfmc_id=2407999

**Exhibit 37 -  595**

01/20/2019, "Declining birth rates in the U.S." KUSI-TV: https://www.kusi.com/san-diego-people-us-cancer-rate-drops-for-25th-straight-year/

07/23/2018, "Pushed out by high prices, these San Diegans left for greener pastures," San Diego Union-Tribune: http://www.sandiegouniontribune.com/business/real-estate/sd-fi-leaving-san-diego-20180723-story.html.

01/15/2018, "By the Numbers: San Diego County's Most Diverse Neighborhoods," KPBS Midday Edition: http://www.kpbs.org/news/2018/jan/15/numbers-san-diego-countys-most-diverse-neighborhoo/

09/18/2015, "Median Income Climbs; Poverty Persists," San Diego Union-Tribune (Page A1): http://sandiegouniontribune.ca.newsmemory.com/?token=df352adb229611da5c5a1c3e1a268f54_55fc468f_4eb59fe&selDate=20150918

05/01/2015, "San Diego growing at healthy pace," San Diego Union-Tribune: http://www.utsandiego.com/news/2015/may/01/san-diego-population-growths-healthy-pace/

01/08/2015, live interview re low fertility in Japan on KPCC (Southern California Public Radio) on AirTalk with Larry Mantle: http://www.scpr.org/programs/airtalk/2015/01/07/41011/japan-s-shrinking-population-highlights-greater-gl/

12/17/2014, live interview re California demographics on KOGO radio (San Diego, CA) on "News with Cliff Albert."

12/15/2014, live interview re California demographics on KABC radio (Los Angeles, CA) on "McIntyre in the Morning."

12/12/2014, "Improving Economy Boosts Calif. Population," San Diego Union-Tribune (Page A1): http://www.utsandiego.com/news/2014/dec/11/california-demographics-population-state-births/

10/16/2014, "By the Numbers: How diverse is your neighborhood?" Inewsource.org: https://inewsource.org/2014/10/16/diversity-in-san-diego/

6/15/2014, "Ethnic Mosaic a Stroll in Normal Heights," San Diego Union-Tribune (Page SD1): http://www.utsandiego.com/news/2014/Jun/15/tp-ethnic-mosaic-a-stroll-in-normal-heights/?#article-copy

12/13/2013, "Immigrants Drive CA's Higher Growth Rate," San Diego Union-Tribune (Page A2): http://www.utsandiego.com/news/2013/dec/12/california-population-growth-immigrant-immigration/

12/01/2013, "Hardships Still Keep Young Adults at Home," San Diego Union-Tribune: (Page A2) http://www.utsandiego.com/news/2013/Dec/01/tp-hardships-still-keep-young-adults-at-home/?#article-copy

11/7/2013, "Including Cost of Living, State Tops Poverty List," San Diego Union-Tribune (Page A1): http://www.utsandiego.com/news/2013/nov/06/california-census-supplemental-poverty-measure/

9/24/2013, "Report: Migration Numbers Set to Rise Again," San Diego Union-Tribune (Page A1): http://www.utsandiego.com/news/2013/sep/24/tp-report-migration-numbers-set-to-rise-again/

9/1//2013, "No Big Changes for Region's Poverty, Income Rates," San Diego Union-Tribune: http://www.utsandiego.com/news/2013/sep/19/poverty-sandiego-income-census-food/

5/01/2013, "Little Baghdad, California," The Progressive (May 2013 issue): http://progressive.org/little-baghdad-california

1/31/2013, "State Becoming Equal Parts Hispanic and White," San Diego Union-Tribune (Page A1): http://www.utsandiego.com/news/2013/jan/31/california-population-hispanic-white/

1/05/2013, "Population expected to slow to rate unseen since depression," San Diego Union-Tribune (Page A1): http://www.utsandiego.com/news/2013/jan/05/population-expected-to-slow-to-rate-unseen-since/

9/29/2012, "Census may change race, ethnicity terms," San Diego Union-Tribune: http://www.utsandiego.com/news/2012/sep/29/census-looking-to-the-future/?page=1#article

6/25/2012, "Interstate 8 Divide May Lead To San Diego Political Gridlock," KPBS (and played on NPR): http://www.kpbs.org/news/2012/jun/25/interstate-8-divide-may-lead-san-diego-political-g/

5/17/2012, "State, county long ahead of national non-white birth trend, San Diego Union-Tribune: http://www.utsandiego.com/news/2012/may/17/a-first-births-of-babies-of-color-tops-50-percent/?page=1#article

12/08/2011, "Snapshot of How We Live," San Diego Union-Tribune (page A3)

11/30/2011, "Senior Population Grows," San Diego Union-Tribune (page A1): http://www.signonsandiego.com/news/2011/nov/30/number-of-seniors-65-at-record-high-in-2010/?page=1#article

11/15/2011, "Census: Fewer on the Move in America," San Diego Union-Tribune (page A1): http://www.signonsandiego.com/news/2011/nov/15/record-number-americans-staying-put/

10/28/2011, "Are we facing a crisis of overpopulation?" Aljazeera: http://english.aljazeera.net/indepth/features/2011/10/2011107161744294439.html

9/13/2011, "U.S. Census - More Americans Living In Poverty," Midday Edition, KPBS Radio: http://www.kpbs.org/news/2011/sep/13/us-census-more-americans-living-poverty/

*John R. Weeks, Ph.D.*
*- 30 -*

**Exhibit 37 -  596**

8/09/2011, "Envision San Diego: Changing Face of America," KPBS-TV:
http://www.kpbs.org/news/2011/aug/09/envision-san-diego-changing-face-america/

7/29/2011, "Young and Restless can be a Volatile Mix," Science, Vol. 333:552-554,
http://www.sciencemag.org/content/333/6042/552

7/15/2011, "Births Fuel Hispanic Growth," Wall Street Journal (page A3),
http://online.wsj.com/article/SB10001424052702304521304576446232406979972.html?mod=WSJ_hps_sections_news

6/27/2011, "Hispanic Population Growth Has Big Effect," San Diego Union-Tribune (page A1),
http://www.signonsandiego.com/news/2011/jun/27/hispanic-population-growth-has-big-effect/

6/23/2011, "Census Chronicles Housing's Downturn," San Diego Union-Tribune (Page A1),
http://www.signonsandiego.com/news/2011/jun/22/homeownership-fell-in-fast-growing-suburbs-census/

4/20/2011, "Cutting Services to Illegal Immigrants Isn't Easy," San Diego Union-Tribune,
http://www.signonsandiego.com/news/2011/apr/19/cutting-services-to-illegal-immigrants-isnt-easy/

3/25/2011, KUSI-TV, "2010 Census: San Diego population now a minority-majority,"
http://www.kusi.com/story/14324842/lenderman-pkg

3/25/2011, "Census shows dynamic populations in San Diego, U.S," San Diego Union-Tribune,
http://www.signonsandiego.com/news/2011/mar/25/census-shows-dynamic-populations-in-san-diego-us/

3/18/2011, Guest on "San Diego Week," KPBS-TV, http://www.kpbs.org/news/san-diego-week/

3/09/2011, "Region's Growth Eases," San Diego Union-Tribune.

3/08/2011, "U.S. Census: More Minorities Than Whites In San Diego County," KPBS,
http://www.kpbs.org/news/2011/mar/08/census-more-minorities-whites-san-diego-county/

2/18/2011, "Census decennial roll-out ongoing, not yet California," San Diego Union-Tribune

2/16/2011, "Connecting the Dots: What Happens Halfway Around the World Affects Americans, Too," SDSU 360 Magazine, http://newscenter.sdsu.edu/360/news.aspx?s=72772

12/21/2010, Guest interview on CNN International "Connect the World,"
http://www.cnn.com/CNNI/Programs/connect.the.world/

12/21/2010, "As U.S. becomes more diverse, Hispanics flourish," Reuters News Agency,
http://www.reuters.com/article/idUSTRE6BK2UC20101221?pageNumber=1

12/15/2010, "Census Confirms Growth of Minority Groups," San Diego Union-Tribune.

6/13/2010, "Iraqi Refugees, Desperately Seeking English," Chronicle of Higher Education.

4/12/2010, "English classes can't meet demand," San Diego Union-Tribune.

9/20/2009, "Immigrant population declines in California," San Diego Union-Tribune.

7/01/2009, "New federal population estimates differ sharply from state's," North County Times.

5/14/2009, "County not go-to spot for Latinos in region," San Diego Union-Tribune.

12/19/2008, "County bucks trend with 1.5% population gain," San Diego Union-Tribune.

6/25/2008, "Who are the Lucky Few?," USA Today.

3/24/2008, "D.A. says jury pool falls short of Latinos;  Office offers plan to boost numbers," San Diego Union-Tribune.

3/20/2008, "County residents are staying put: Housing slump puts brakes on migration," San Diego Union-Tribune.

2/12/2008, "Immigration projected to drive America's population growth," San Diego Union-Tribune.

1/28/2008, "Analysis: Downtown Juries Lack Hispanics," San Diego Union-Tribune.

9/17/2007, KPBS-Radio, These Days with Tom Fudge, "Birth Rates Shape the Future of San Diego County,"
http://www.kpbs.org/radio/these_days:id=9638.

9/08/2007, "Official Defends Study on Immigrants," San Diego Union-Tribune.

9/08/2007, "Report estimates county's illegal immigrant cost at $256 million in 2006," North County Times.

6/28/2007, "Growth robust in outlying suburbs," San Diego Union-Tribune.

9/14/2006, "Ruling Lets Lawyers Study Jury Recruitment," San Diego Union-Tribune.

8/17/2006, Panel on Voice of America, Talk to America,  "China, Inc."

8/15/2006, "Kids' English Fluency Flourishes," San Diego Union-Tribune.

8/04/2006,  "County's diversity up; Growth levels off," San Diego Union-Tribune.

7/11/2006, Panelist on Voice of America, Talk to America,  "World Population Day."

3/25/2006, "Numbers Down at Schools," San Diego Union-Tribune.

1/08/2006, "Santa Barbara changes a system one judge said was flawed," Ventura County Star.

1/23/2005, "Where Latinos live," San Diego Union-Tribune.

5/20/2004, "County's whites to lose their majority," San Diego Union-Tribune.

4/09/2004, "Thousands in S.D. get a move on," San Diego Union-Tribune.

**Exhibit 37 -  597**

11/13/2003, "County jury pools ruled unconstitutional," Santa Barbara News-Press.

9/27/2003, "Latino jury controversy may delay second trial," Santa Barbara News-Press.

9/22/2003, "Report says county short on Latinos in jury pools," Santa Barbara News-Press.

5/15/2002, "County's immigration surge outstrips region," San Diego Union-Tribune.

4/29/2002, "Babies and immigrants fuel growth of county," San Diego Union-Tribune.

4/7/2002, "Slow progress: More Latinos joining the ranks of homeowners," San Diego Union-Tribune.

5/23/2001, "North County aging, growing more diverse," North County Times.

4/8/2001, "Region grows slower than nation, state for first time in 100 years," North County Times.

3/30/2001, "Despite gains, county slips to No. 3 in state," San Diego Union.

2/14/2001, "Repayment sought for processing of migrants," San Diego Union,
http://www.signonsandiego.com/news/metro/20010214-9999_6m14illegal.html.

2/9/2001, "Study tallies cost of illegal immigration," Los Angeles Times/

2/6/2001, "County spent $50 million on immigrants in '99, study finds," San Diego Union.

2/3/2001, "Imperial County Spent $5.4 million in 1999 to provide services to illegal immigrants," Imperial Valley Press.

10/2000, Victor Sherman and Janet Sherman, "Institutional Racism in the Los Angeles County Grand Jury System," Verdict, Vol. 6, No. 4, pp.3-10.

6/12/2000, San Diego Union-Tribune, "Changing Demographics Challenge Public Schools to Give More Tutoring and Bilingual Support; Hispanic Student Population Soared in the Past 10 Years"

4/25/2000, National Public Radio, Morning Edition, "L.A. Grand Jury"

4/25/2000, Los Angeles Times, "Choices for County Grand Jury Again Include Few Latinos"

4/17/2000, Los Angeles Times, "Gap in Census Leaves Need for Religious Data"

3/26/2000, Los Angeles Times, "Special Report: They're Gaining Clout Everywhere in the Region, But a Legal Challenge Contends That Because of a Flawed Selection Process Latinos are Underrepresented on County Grand Jury"

2/27/2000, San Diego Union-Tribute, "Brake Lights Ahead: Housing Prices Driving Force Behind Slowing Growth and Slowing Traffic"

1/2/2000, San Diego Union-Tribune, "Future of Growth"

9/15/1999, San Diego Union-Tribune, "'90s growth is attributed to minorities"

1/18/1999, San Diego Business Journal, "Economists: 1999 looks healthy for San Diego"

1/9/1999, San Diego Union-Tribune, "Experts foresee San Diego's growth moderating a bit"

9/27/1998, San Diego Union-Tribune, "County's growth measured in millions"

8/31/1998, KGTV. Channel 10 News, interview re U.S. illegitimacy rates

1/30/1998, San Diego Union-Tribune, "S.D. County population growth amazes experts"

5/18/1997, San Diego Union-Tribune, "Experts warn of a leveling-off in decline in Mexico's birth rate"

5/15/1997, KNSD Channel 7/39 News. interview re Nutrition, population growth, and size of humans

4/20/1997, San Diego Union-Tribune, "S.D. County grows, but not by much"

8/11/1996, San Diego Union-Tribune, "Who we are: migration is putting new face on San Diego County"

5/4/1996, San Diego Union-Tribune, "San Diego is No. 1 in growth in the state"

4/14/1996, San Diego Union-Tribune, "Growth up smallest amount in two decades"

2/9/1996, San Diego Union-Tribune, "Fear may keep exact Muslim population a mystery"

11/21/1995, KUSI Channel 9/51 News, interview re defense conversion study

4/20/1995, The Daily Californian, "Military downsizing a bane to small businesses"

2/9/1995, Houston Chronicle, "Infant mortality linked more to morality than to socio-economic status"

2/1/1995, Wall Street Journal, "Infant mortality, mother's morality"

1/31/1995, The Daily Californian, "Pundit: all not lost with peso fall"

11/21/1994, American Medical News, "Poor immigrants have healthier infants than U.S.-born"

11/9/1994, New York Times, "Health Watch: Study finds healthier pregnancy for refugees"

9/4/1994, The Daily California, "East County spins its wheels when it comes to mass transit"

8/30/1994, San Diego Union-Tribune, "Millions in motion: driven by population growth, volume of migration is unprecedented"

6/6/1994, San Diego Union-Tribune, "Not all show decline in bacterial disease passed during sex"

5/29/1994, San Diego Union-Tribune, "San Diego leads state in growth"

2/27/1994, San Diego Union-Tribune, "Economy's slowdown means more people leave than move here in '93"

9/23/1993, San Diego Union-Tribune, "Study shows strengths of immigrants"

9/21/1993, The Daily Californian, "Development council pitches itself"

6/27/1993, San Diego Union-Tribune, "Linked Destiny: border cities in transition as old engines of growth stall"

6/27/1993, San Diego Union-Tribune, "Demographics take West out of East County"

6/25/1993, The Daily Californian, "Data reveals upward trend"

**Exhibit 37 -  598**

5/6/1993, San Diego Union-Tribune, "Population increase at 22-year low"

5/1/1993, San Diego Union-Tribune, "Analysts paint bleak picture for S.D., Tijuana"

4/28/1993, The Daily Californian, "NAFTA would aid San Diego economy"

4/22/1993, The Daily Californian, "Days of plenty fading for many local residents"

9/1/1992, Los Angeles Times, San Diego Edition, "Glee and gloom as University classes begin"

7/18/1992, The Daily Californian, "Lifestyle trends mean change in lunch program"

5/25/1992, Los Angeles Time, San Diego Edition, "SDSU: Narrow, deep cuts cause anguish at University"

5/19/1992, San Diego Union, "San Diego Census: 1990, National City hit hardest by poverty"

5/12/1992, The Daily Californian, "Figures show growing gap between rich, poor"

5/11/1992, San Diego Union, "County census portrait alarming"

11/21/1991, San Diego Evening Tribune, "In courts here, death deals a dark hand:  Capital punishment shows distinct racial patterns"

11/18/1991, San Diego Evening Tribune, "Shadow of segregation haunts city"

8/27/1991, New York Times, "Hmong refugees resist adopting birth control"

3/15/1991, Boston Globe, "Population explosion heightens pressures"

2/23/1991, San Diego Union, "Kuwaiti waits anxiously for chance to return home"

5/28/1990, San Diego Union, "Punishment for women who kill said more severe"

2/11/1990, San Diego Union, "Hidden San Diego: Experts focus on special groups to study how society is changing"

5/2/1989, San Diego Daily Transcript, "ECEDC study indicates new East County employees continue living elsewhere"

3/1/1989, San Diego Tribune, "Does Islam "bomb' have sizzling fuse"

2/17/1989, San Diego Tribune, "San Diego population experts say Islam is the world's fastest growing religion"

11/20/1988, Los Angeles Times, "Lack of young jurors spurs legal tussle"

9/3/1988, The Daily Californian, "Staying ahead of the trends is his job: Weeks' services are sought all over the world"

7/7/1987, Riverside Press-Enterprise, "Riverside judge rules jury pool an uneven mix"

6/15/1987, Excelsior (Mexico City), "Frontera Norte: Estudios de Población"

1/29/1987, The Reader, "Borderline figures: just how many people live in Tijuana today?"

12/8/1986, San Diego Union, "Divorces outnumbered marriages in county last year"

10/14/1986, Los Angeles Times, "Defense Challenges D.A.'s Standard for Seeking Death Penalty"

9/4/1986, San Diego Union, "Statistics don't match the charge against Troiani"

8/28/1986, San Diego Union, "Study says race not a factor in seeking death penalty"

10/24/1985, USA Today, "Elder boom: strange mix of problems"

11/9/1979, San Diego Tribune, "Motivation called natural birth control key"

10/25/1973, Michigan State News, "Two professors give new theory of population, social relationships"

*Rev: 07/08/2023*

**Exhibit 37 -  599**

# APPENDIX B

Exhibit 37 -  600

## APPENDIX B - Iouri Mikhel

| DESCRIPTION | BATES NO. |
|---|---|
| First Report on Goals and Recommendations of the Ninth Circuit Jury Trial Improvement Committee, Adopted by the Judicial Council of the Ninth Circuit (May 2004) | JW-001 - 015 |
| General Order No. 03-12, Plan for the Random Selection of Grand and Petit Jurors, U.S. District Court for the Central District of California, 12/16/2003 | JW-016 - 025 |
| General Order No. 07-10, Plan for the Random Selection of Grand and Petit Jurors, U.S. District Court for the Central District of California, 11/28/2007 | JW-026 - 034 |
| Excerpts from Appellant's Sealed Joint Excerpt of Record, pp. 222-227, *U.S. v. Iouri Mikhel*, U.S. Court of Appeals for the Ninth Circuit, Case No. 07-99008 (05/06/2013) (UNDER SEAL PURSUANT TO COURT ORDER) | JW-035 - 041 |
| Juror questionnaires 1 through 50 (UNDER SEAL PURSUANT TO COURT ORDER) | JW-042 - 641 |
| Juror questionnaires 51 through 99 (UNDER SEAL PURSUANT TO COURT ORDER) | JW-642 - 1229 |
| Juror questionnaires 100 through 150 (UNDER SEAL PURSUANT TO COURT ORDER) | JW-1230 - 1853 |
| Juror questionnaires 151 through 200 (UNDER SEAL PURSUANT TO COURT ORDER) | JW-1854 - 2453 |
| Juror questionnaires 201 through 229 (UNDER SEAL PURSUANT TO COURT ORDER) | JW-2454 - 2801 |
| Juror questionnaires 230 through 287 (UNDER SEAL PURSUANT TO COURT ORDER) | JW-2802 - 3497 |
| Chart by FPD re demographic data of jurors (01/19/2023) | JW-3498 - 3507 |

Appendix B - 1

**Exhibit 37 - 601**

# EXHIBIT

# 38

**Confidential Communication Protected by Attorney-Client and Work-Product Privileges re: *United States of America v. Iouri Mikhel, et al*, CR 02-00220-SJO**

*Note:  While I am aware the expert declarations below are not applicable in California, they are included to assist the reader with the standards to which this report has been produced.*

### REPORT AND STATEMENT OF STATEMENT OF WITNESS
**(Criminal Procedure Rules, r. 16.2; Criminal Justice Act 1967, s. 9; Criminal Justice Act 1988, s. 30)**

**I Dr Stuart John Hamilton DECLARE THAT:**
**Age: Over 18**
**I am an expert in the field of forensic pathology**
**My qualifications and experience are detailed below**
**Relevant declarations are contained in Annex [1] to this report.**
**I confirm that the contents of this report (consisting of 37 pages each signed by me) are true to the best of my knowledge and belief and that I make this report knowing that, if it is tendered in evidence, I would be liable to prosecution if I have wilfully stated anything which I know to be false or that I do not believe to be true.**

**Name Dr Stuart John Hamilton**

**Signed**

**Dated 16th September 2021.**

**Occupation Home Office Registered Forensic Pathologist**

**Ref. No.: Mikhel1**

  **Report for: The Office of the Federal Public Defender, Central District of California**

I am Dr. Stuart John Hamilton, Bachelor of Medicine, Bachelor of Surgery (M.B., ChB.),

Signed:

**Exhibit 38 -  602**

Bachelor of Medical Science with Honours (B.M.Sc. [Hons.]), Fellow of the Royal College of Pathologists (F.R.C.Path) and Member of the Faculty of Forensic and Legal Medicine of the Royal College of Physicians (M.F.F.L.M.).  I am a registered Medical Practitioner with Subspecialty Registration in Forensic Pathology and I have been a Home Office Registered Forensic Pathologist since 2008.  I am Deputy Chief Forensic Pathologist for the East Midlands, an Honorary Associate Professor at the University of Leicester and Honorary Consultant Pathologist at Leicester Royal Infirmary.  I provide expert opinion to both prosecution and defence in cases of suspicious death, homicide and injuries in the living.  In 2014 I presented my findings in an investigation into war crimes to the Security Council of the United Nations.  I have presented at national and international meetings and act as a reviewer for the American Journal of Forensic Medicine and Pathology.

## CONTENTS

| Introduction and general issues | Page 3 |
| Meyer Muscatel | Page 7 |
| Rita Pekler | Page 13 |
| Alex Umansky | Page 18 |
| Nick Kharabadze | Page 22 |
| George Safiev | Page 29 |
| Other material | Page 34 |
| Summary and declarations | Page 35 |

Signed:

**Exhibit 38 -  603**

## **INTRODUCTION**

I have been asked by the Office of the Federal Public Defender, Central District of California to provide an expert forensic pathology report regarding the case of Iouri Mikhel.  Mr Mikhel is said to have been involved in the deaths of five people.  I have been provided with a letter of instruction that invites me to consider the following points:

1.  *In 2002, what was the standard of care for conducting an autopsy on a body immersed in cold water for an extended period of time?*

2.  *Regarding the autopsy procedures in this case:*

    a.  *Did each of the five autopsies conform to the standard of care?  If not, how did they fall short.*

    b.  *Did the examiners collect, preserve and test appropriate bodily fluid and tissue samples?*

3.  *Were there any flaws in the reporting of autopsy results in this case?*

    a.  *Did any of the examiners overstate confidence in their findings?*

    b.  *Do you agree with the examiners' findings regarding the cause and time of death?*

I shall deal with the individual cases in turn, but firstly I will deal with some general concepts to assist with the points raised below.  I shall also deal with point 1 above as an overview.

## **Asphyxia**

"Asphyxia" is a very broad concept, literally meaning "lack of pulsation" but generally used in forensic pathology as meaning "lack of oxygen".  This can come in many forms, from being in an atmosphere with no oxygen through blockage of the airways, even extending to cyanide poisoning where individual cells cannot utilise oxygen.  As such, it covers such a wide range of possibilities that the term itself is

Signed:

**Exhibit 38 -  604**

somewhat unhelpful and it is more useful to consider the precise mechanism by which oxygen is not available. Suffocation is usually used for blockage of the external airways, while strangulation is used for pressure on the neck either from hands (manual strangulation) or some form of ligature (ligature strangulation). It is apparent from these observations that the mechanisms by which different asphyxia modes lead to death differ. This is particularly relevant when considering cases that may involve pressure on the neck. It requires considerably less force to compress the veins and arteries in the neck than to compress the airway. Therefore, pressure on the neck in strangulation prevents blood flow through the brain. Research has shown that this leads to unconsciousness in the order of ten seconds with increasing brain damage and ultimately death in the order of 4 -15 minutes. In contrast, with suffocation, the adverse effect is to reduce the oxygen supply to the body via the lungs. As there is still oxygen in the body, it will take longer for the reduction in oxygen supply to the brain to cause unconsciousness and death.

### Drowning and bodies from water

The diagnosis of drowning at autopsy is challenging as there are no specific features for the autopsy pathologist to identify. The lungs may be waterlogged and oedematous (seen in heart failure or opioid overdose among many other conditions) or they may be overinflated (also seen in asthma). One of the most helpful features is a plume of froth at the mouth, referred to as a *champignon de mousse*, although this is usually transient and will not be seen if the body is submerged for a prolonged period. When a body enters water, it will tend to float initially (unless weighted down) before sinking. In cold water, the temperature will act to refrigerate the body slowing decomposition. At this stage, decomposition may mask injuries such as bruises and

Signed:

**Exhibit 38 - 605**

any aquatic life may feed on the body producing artefacts that resemble injuries.  The body will then naturally float as decomposition gas develops making it buoyant (once again, if the body is not trapped or weighed down).  All of these factors make interpretation of the findings at autopsy challenging to interpret.


**Post mortem toxicology**

It is standard practice to take toxicological samples in a forensic autopsy as was done in all of these cases.  The ideal substrate for toxicology is blood, as this best reflects what was circulating in a person's bloodstream at the time of their death.  Again ideally, this is taken from the femoral or iliac vessels in the groin as it is understood that after death substances may leak out of organs such as the stomach and liver, and blood samples obtained from close to these organs may show artefactually high levels.  It is also the case that levels from organs such as the liver are not directly comparable with blood.  In some circumstances a femoral blood sample may not be available, particularly if a body is decomposed and alternatives must be found.  Blood or fluid from body cavities may be used but the results must be treated with caution.  For the vast majority of substances, it is safe to conclude that if they are detected then this indicates that they had entered the body in life, although the concentrations of such fluids are unlikely to reflect what was in the blood in life.  A final caveat is required in that as bacteria break down bodily tissue, they will produce ethanol (ethyl alcohol, most commonly referred to as "alcohol" in general conversation).  Therefore, a positive result for alcohol does not necessarily indicate someone had been drinking alcoholic beverages prior to their death.

Signed:

**Exhibit 38 -  606**

## Standards for an autopsy

As a starting point, the standards required vary by jurisdiction and with time. It would seem reasonable to suggest that the pathologist performing the examination should be suitably qualified and accredited. The examination should be thorough and detailed with significant findings, both positive and negative recorded and the necessary additional tests should be undertaken to determine, if possible, the medical cause of death and in criminal cases to provide expert information to a jury to aid their understanding of concepts outside the normal experience of a person not trained in pathology.

Signed:

**Exhibit 38 -  607**

### Meyer Muscatel

*Autopsy report.*

Mr Muscatel's body was discovered on 18th October 2001 and the autopsy was performed on 19th October 2001 by Dr John T Cooper.  He lists the pathologic diagnoses as:

- "*Asphyxia by smothering.*

- *Severe crush injury to the thoracic cavity and lower facial skeleton.*

  - *Multiple rib fractures (all ribs fractured, posterior and anterior).*

  - *Sternal fracture.*

  - *Spinal fracture dislocations at C4-C5 and T12-L1*

  - *Mandibular fracture.*

  - *Multiple fractured teeth, maxillary and mandibular.*

- *Superficial stab wound to the left arm.*

- *Postmortem decomposition pattern consistent with body disposal in water*".

It is recorded that the body was found floating in a river.  X-rays were performed and it is commented that the long bones were intact.  Dr Cooper notes that the wrists were bound with a "trash bag tie" and the face was wrapped in yellow tape.  The face was completely covered other than the lower lip and there were remnants of a trash bag over the tape.  A gag was present.

There was evidence of decomposition with no clear pattern of hypostasis.

Signed:

**Exhibit 38 -  608**

The following injuries were recorded:

- "*A 4.5 cm superficial laceration to the back of the head with no associated injury (most likely post mortem).*

- *A 1.5 cm skin avulsion to the left upper chest (most likely post mortem).*

- *Two possible venepuncture marks on the right forearm.*

- *The upper front teeth were knocked loose.*

- *A fracture of the mandible with three overlying skin tears each 1 cm long.*

- *A 3.2 cm stab wound to the lateral margin of the left upper arm penetrating to a depth of 1 inch.*

- *Rib and sternal fractures as described above.*

- *Avulsion of the liver central diaphragmatic attachment*"".

There was no bruising of the neck muscles.  The right lung weighed 510 g and the left 430 g.  They were oedematous.  There was mild coronary and aortic atheroma.

Histological examination was not undertaken.  Dr Cooper concludes that death resulted from smothering that would have caused death in minutes. Given the small gap in the tape Dr Cooper does not exclude the possibility (although considers it unlikely) that he survived long enough to be alive when crushed and considers the injuries present to be in keeping with crushing by a large vehicle.  He estimates that the time of death was between 4 and 10 days with a best estimate of 5 or 6 days prior to discovery.

Signed:

**Exhibit 38 - 609**

*Autopsy Photographs.*

The photographs taken at the autopsy examination show injuries and features as described by Dr Cooper.  I have been provided with a number of images of Mr Muscatel's skeleton after the soft tissues were removed.  The following additional features are present:

- A proximal fracture of the left humerus.

- Two comminuted fractures of the left ulna, dividing it into three roughly equal parts.

- A fracture of the left scapula.

*Body diagrams.*

There are diagrams showing the skeletal injuries.  The humeral and ulnar fractures are marked on these.

*Toxicology.*

A toxicology report for a liver sample received on 26th October 2001 is described as one vial of liver tissue.  This contained ethyl alcohol at 0.20 grams/100 grams and diphenhydramine at 6.54 mg / kg.

There is a letter from John Crawford dated 7th February 2002 in which it is noted that a tissue sample from the right arm showed diphenhydramine at 0.59 mg/kg in muscle.  A single dose of 100 mg should produce a level of 0.11 mg/kg.  Mr Muscatel's name is not included in this document, but as it is dated before the other bodies were discovered, I conclude that it refers to Mr Muscatel.

Signed:

**Exhibit 38 -  610**

*Testimony.*

Dr Cooper gave evidence at the trial of Mr Mikhel and his co-defendant on 25th October 2006.  He states that the smothering would cause loss of consciousness in a few seconds with death in a "*couple of minutes*".  Mr Muscatel would not have survived five to ten minutes.  He states that the blunt force injuries were suggestive of crushing but could be explained by a fall from a height.  He repeats his estimate of the time of death and opines that Mr Muscatel was murdered on 12th or 13th October 2001.

*Specific questions.*

2. *Regarding the autopsy procedures in this case:*

a. *Did the autopsy conform to the standard of care?  If not, how did it fall short.*

   In my opinion, this was a thorough autopsy examination. The major findings are documented.  Radiology was undertaken.

b. *Did the examiner collect, preserve and test appropriate bodily fluid and tissue samples?*

   Toxicology (within the limits imposed by the condition of the body) was performed.  In England and Wales, it is expected that histology of the major organs is undertaken as a matter of routine in an autopsy such as this, but I am of the view that the absence of histology in this case has not had any adverse effect in this case.

3. *Were there any flaws in the reporting of autopsy results in this case?*

Signed:

**Exhibit 38 -  611**

a.  *Did the examiner overstate confidence in his findings?*

I do not agree with Dr Cooper's initial interpretation of the skeletal injuries. Had Mr Muscatel's torso been crushed between the wheels of a heavy vehicle and the ground it would be expected that there would be severe crushing injuries to the heart, lungs, aorta, liver and spleen. I would agree that if the body had been dropped into water from an appreciable height, this would be a reasonable explanation for the skeletal injuries.

I disagree that death would necessarily have occurred in less than 5 to 10 minutes (as with occlusion of the airways by tape there would still be some oxygen in the system to support the brain and it is understood that even with complete occlusion of the blood supply to the brain survival can be up to 14 minutes (albeit by this stage severe and irreversible brain damage would be highly likely)).

b.  *Do you agree with the examiner's findings regarding the cause and time of death?*

In this case, given the presence of tape wrapped around the head which is completely occluding the nose and effectively occluding the mouth, and in the absence of any other plausible cause of death, I would agree that the most reasonable conclusion is that Mr Muscatel has died of suffocation.

With respect to the time of death, it is not possible to state

Signed:

**Exhibit 38 -  612**

how long Mr Muscatel's body was in the water, which as noted above retards decomposition.  It is not possible to indicate how long the interval was between death and his body entering the water, nor is it possible to identify how warm or otherwise the environment the body was in before entering the water.  Given these unknown factors, along with the variability inherent in the rate of decomposition, I am of the view that the estimates given by Dr Cooper are too narrow.  With developments in understanding of the variability of post mortem changes, in 2021 many pathologists (myself included) would state that the only safe estimate would be that someone died at a point between when they were last known to be alive and when they were legally declared dead.  While this may seem facetious, I am of the view that to be much more definitive than this is at best unhelpful and at worst potentially misleading.  However, I do consider the degree of decomposition present would not be compatible with a post-mortem interval of mere minutes or hours.

Signed:

**Exhibit 38 -  613**

13                                                                                  Mikhel1

## Rita Pekler

*Autopsy report.*

Rita Pekler's body was recovered from New Melones Reservoir on 19th March 2002 and an autopsy was performed on by Dr John W Eisele on 24th March 2002.  It is recorded that she was discovered beneath a bridge at a reported depth of 200 – 300 feet.  There was a rope tied around her waist attached to a weightlifting weight and this rope continued to form a ligature on the wrists.  There was also a weight tied around the legs.  There were further ligatures on the wrists and ankles. Intimate swabs were obtained.   Decomposition was present and hypostasis was not apparent.  There was a skin fold on the neck that Dr Eisele did not consider to be a ligature mark.  There was a tear to the upper lip, but it would appear that the jaw had been removed prior to the examination and this may have caused the tear.  The only external injury recorded is a ½ inch laceration on the right patella.  The right femur was fractured.

Internally there was 400 ml of dark red fluid in the right pleural cavity and 200 ml on the left. The right lung weighed 700 g and the left 640 g. The cut surfaces were wet.  The greater horns of the thyroid were fractured but this was interpreted as an artefact from removal of the neck structures during the autopsy.  The left first, second, fourth, fifth and sixth ribs were fractured anterolaterally without associated haemorrhage.  There were similar fractures of the right first and second ribs.  Chest cavity blood, blood from the heart along with samples of the liver, kidney and brain were retained for toxicology.  Histology was not

Signed:

**Exhibit 38 -  614**

performed but x-rays were obtained.

The cause of death is given as "*Asphyxia (suffocation vs drowning)*".  It is noted that there were no significant physical injuries.

### *Toxicology.*

The report refers to "*175 ml of chest fluid, 8 ml of heart blood, granular substance from stomach lining, kidney, liver and brain*".  It was received in the laboratory on 27th March 2002.   The blood ethyl alcohol is recorded as 0.03 grams% with blood diphenhydramine at 0.91 mg/L and a liver diphenhydramine level of 5.39 mg/kg.  A potentially toxic blood level is quoted as 2 – 10 mg/L with the effective level as 0.025 – 0.11 mg/l. It is recorded that in 11 fatalities the liver diphenhydramine was 23 – 47 mg/ kg.

### *Photographs.*

I have been provided with photographs taken at the autopsy.  They are consistent with the description in the autopsy report.  The mandible has clearly been removed prior to the autopsy examination.   There are images of the skull being opened with the torso already eviscerated. There are also images of the body immediately after it was recovered.

### *Testimony.*

Testimony in relation to Ms Pekler was given on 1st December 2006 by Dr Lawrence.  I understand that Dr Eisele had died before the case came to trial.  In his evidence Dr Lawrence offers the view that Ms Pekler was

Signed:

**Exhibit 38 -  615**

15                                                                              Mikhel1

dead when she entered the water and is of the view that death most likely resulted from suffocation. Drowning was not an issue unless she was drowned elsewhere and then entered the water at the bridge. He took the view that the fractures and laceration to the knee were post-mortem phenomena. He discusses the blood alcohol level and indicates this could be the result of decomposition. He also discusses a Benadryl (diphenhydramine) level of .91 and describes this as "high" and may have caused sedation.

*Specific questions.*

2.    *Regarding the autopsy procedures in this case:*

a.   *Did the autopsy conform to the standard of care? If not, how did it fall short.*

While I appreciate that Dr Eisele is sadly deceased and not in a position to address the following comments, I have significant reservations regarding the way this autopsy was performed. Specifically, I am of the view that the removal of the jaw prior to the autopsy was both unnecessary and has interfered with the interpretation of the autopsy findings. Dr Eisele has opined that the cause of death was suffocation or drowning (discussed further in point 3). Suffocation may occur with no physical findings even in the absence of decomposition, but injuries may occur around the nose and mouth if pressure is applied. The mouth was disrupted by removal of the jaw and there was a "tear" to the upper lip

Signed:

**Exhibit 38 -  616**

that may have occurred at that time. Assessment of any other potential injuries in or around the mouth has been compromised by the disruption caused by removal of the jaw. Similarly, there were fractures of the thyroid horns, which may be seen in strangulation, but these could not be interpreted adequately as removal of the neck structures was compromised by removal of the jaw. It is therefore my opinion that this approach has appreciably interfered with the pathological evidence that  may have supported a conclusion that Ms Pekler had been strangled or suffocated.

b. *Did the examiner collect, preserve and test appropriate bodily fluid and tissue samples?*

Within the limits imposed by decomposition the samples taken were appropriate and the interpretation suitably cautious.

3. *Were there any flaws in the reporting of autopsy results in this case?*

a. *Did the examiner overstate confidence in his findings?*

As noted above, the pathological evidence that may have supported the conclusions of suffocation or strangulation was compromised. There were no positive signs of either suffocation or drowning in this case and therefore to conclude that death must have resulted from one or other is an overstatement of the meaning of the physical findings. I do agree that the femoral fracture is most likely a post-

Signed:

**Exhibit 38 -  617**

17                                                                                        Mikhel1

mortem artefact which may have occurred if the body was dropped from a height into water or potentially may have occurred during the recovery process.

b. *Do you agree with the examiner's findings regarding the cause and time of death?*

As indicated in the previous section, the autopsy revealed no positive physical findings to support a conclusion of drowning or suffocation. Given the condition of the body when it was recovered it is possible that signs of drowning or suffocation had been effaced by post-mortem changes. In my opinion, in the absence of positive evidence of a natural, traumatic or toxicological cause of death, the correct conclusion is that the cause of death is "unascertained". In cases such as this I am of the view that while the pathologist is not able to give a cause of death, the autopsy evidence is only part of the case and the jury may hear other evidence that leads them to conclude on the totality of what they hear that a person drowned or was suffocated. To state this from the pathological perspective with no evidence to support the conclusion is not correct.

Signed:

**Exhibit 38 - 618**

18                                                                 Mikhel1

**Alex Umansky**

*Autopsy Report.*

Mr Umansky's body was discovered on 18th March 2002 and the autopsy was undertaken on 24th March 2002 by Dr Eisele. He records that Mr Umansky's body was found beneath a bridge at New Melones Reservoir at a depth of 200 – 300 feet. The hands were bound and there was a broken zip-tie beneath the legs. The maxilla and mandible had been removed but were present with the body. Decomposition was present with no evident hypostasis. There were changes from animal predation to the head and limbs. There were no external antemortem injuries. There was a "*displaced fracture of the distal left lower leg*" and a fracture of the proximal left fibula.

Internally there was 100 ml of "*foul smelling, dark red fluid in each pleural cavity*". The right lung weighed 690 g and the left 660 g. The cut surfaces were wet and exuded "*bloody, minimally foamy fluid*".

Toxicology samples were retained but no histological samples were taken.

Dr Eisele gives the cause of death as "*asphyxia (suffocation vs drowning)*" and notes no significant injuries to the body. The left lower limbs fractures are considered to be post mortem in nature.


*Photographs.*

The autopsy photographs are consistent with Dr Eisele's observations. The chest can be seen to have been eviscerated before the cranium. There are also images of the body recovery.

Signed:

**Exhibit 38 -  619**

19                                                                                    Mikhel1

*Toxicology.*

Samples from this case were recorded as "130 ml chest fluid, 3 ml bile, kidney, liver and brain".  The results state:

"*Blood [sic] ethyl alcohol 0.07 grams%*

*Bile ethyl alcohol 0.03 grams%*".

Diphenhydramine was not detected.

*Testimony.*

The testimony relating to Mr Umansky was again given by Dr Lawrence.  In this evidence he discusses methods of suffocation including a bag over the head or duct tape over the nose and mouth. With respect to the toxicology Dr Lawrence indicates that while decomposition could produce some of the alcohol identified, his opinion was that Mr Umansky had "*a drink or maybe a drink or two*".

*Specific questions.*

2.      *Regarding the autopsy procedures in this case:*

    a. *Did the autopsy conform to the standard of care?  If not, how did it fall short.*

        The jaw was also removed prior to the autopsy in this case and the comments made regarding how this interferes with assessment of oral injuries in the context of suffocation made in reference to Ms Pekler are equally applicable here. I also note from the autopsy photographs that the torso was eviscerated before the head.  In autopsy practice in the

Signed:

**Exhibit 38 -  620**

United Kingdom it is standard in a forensic autopsy to remove the brain before opening the chest as it is said that the process of eviscerating the torso first creates a risk of artefactual haemorrhage in the neck (Prinsloo-Gordon haemorrhages). While I do not take the view that this is a significant factor in this case, it is a practice that would provoke criticism in the UK.

b. *Did the examiners collect, preserve and test appropriate bodily fluid and tissue samples?*

Samples would appear to have been taken appropriately given the condition of the body although it is not stated whether preservative was added to the blood to prevent further artefactual generation of alcohol between the autopsy and the sample being analysed. If the sample was not in appropriate preservative, there is the potential for further post-mortem alcohol generation in the eight days between the autopsy (19th March) and receipt at the laboratory (27th March).

3. *Were there any flaws in the reporting of autopsy results in this case?*

a. *Did the examiner overstate confidence in his findings?*

As with Ms Pekler, I am of the view that there were no positive pathological findings that would support the conclusion that Mr Umansky was suffocated or drowned. I would also express concern over the interpretation of the

Signed:

**Exhibit 38 - 621**

21                                                                                      Mikhel1

toxicological findings.  As I understand from the material provided to me, the samples submitted for toxicology were "130 ml chest fluid, 3 ml bile, kidney, liver and brain".  The chest fluid is described as "*foul smelling, dark red fluid in each pleural cavity*" rather than blood.  The toxicology report gives a blood ethyl alcohol level although there was no sample described as blood submitted.  I infer that the dark red cavity fluid was tested, which would be potentially composed of blood, effusion and decomposition fluid and therefore I do not consider it safe to equate this with a true blood alcohol level.  Given these uncertainties I think it is possible, but by no means certain, that Mr Umansky had drunk alcoholic beverages shortly before his death.

b.  *Do you agree with the examiner's findings regarding the cause and time of death?*

I consider the cause of death from the pathological findings to be unascertained.  As with Ms Pekler there was no identifiable natural, traumatic or toxicological cause of death.

Signed:

**Exhibit 38 - 622**

## **Nick Kharabadze**

*Autopsy report.*

Mr Kharabadze's date of death was estimated by the FBI as being 24th January 2002.  An autopsy was performed by Dr Robert D Lawrence on 19th March 2002 at 14.00, at the same time as the autopsy of Mr Safiev (discussed below).  Under the heading "*circumstances*" Dr Lawrence notes that Mr Kharabadze "*was possibly suffocated in the region of New Melones Lake, possibly choked or having a bag placed over the head with a ligature, with weights then added to the body, and dumped off the bridge into the lake*".

On examination there was evidence of decomposition with skin slippage.  He was wearing a turtle-neck jumper.  There were "*large-style flex band ligatures on the body, firmly present around the neck at the level just above the thyroid prominence, very tight*".  The wrists were bound and bands around the waist attached to weights.  The following injuries are recorded:

- "*Present on the left lower posterolateral ribcage, region of twelfth rib, there is a mottled, 2-1/2 inch, pink bruise.*

- *Present the left lateral malleolus, there is an ill-defined, 1-1/2 inch area of similar bruising.*

- *Present on the left angle of the jaw and extending upward to a point just beneath the left ear, is a 3-1/2 inch area of ill-defined mottled, pink bruising.*

- *Present on the midline lower anterior neck, just above the manubrium, is an ill-defined, 2 inch area of pink-brown*

Signed:

**Exhibit 38 -  623**

*bruising.*

- *On the dorsal and dorsomedial aspect of the right distal forearm, just above the wrist, is an ill-defined, 3-1/2 x 1-1/2 inch area of pink-brown bruising.*

- *There is a mottled, pink brown left orbital ecchymosis with minimal swelling.*

- *On the left side of the bridge of the nose, there is a ½ inch area of full thickness discontinuity of the skin, either a laceration or postmortem artifact.  There is no haemorrhage about the edges of this wound*".

X-rays were performed.  These showed "*extensive decomposition gas*".
The right lung weighed 980 g and the left 920 g and showed marked
pulmonary oedema.  There were bilateral haemothoraces, 900 ml on the
left and 1100 ml on the right.  The strap muscles of the neck were not
injured and the laryngeal structures were intact.  The following is listed
under "diagnoses":

- "*Minor blunt force injuries*
    - *Contusions of left posterolateral torso, left lateral malleolus, and distal right forearm.*

- *Tight ligature encircling neck.*

- *Nonspecific hypoxic changes*
    - *Marked pulmonary congestion and edema*
    - *Visceral congestion*

- *Additional ligatures about abdomen, with weight present when body was found.*

Signed:

**Exhibit 38 -  624**

- *Hemothoraces, left 900 ml, right 1100 ml.*

- *No penetrating trauma.*

- *No significant natural disease*".

The certification is given as:

- "*A. Asphyxia, minutes*

- *B. Ligature strangulation – minutes*

- *Other. Acute ethanol intoxication*"


*Photographs.*

These show a cable-tie like ligature indenting the neck. There is no detailed photography of this area with the ligature removed. The torso has been eviscerated prior to the skull being opened. There is an image showing two bodies on adjacent autopsy tables.


*Toxicology.*

The specimen comprised "*27 ml subclavian blood, 15 ml gastric, kidney & liver*". It was received at the laboratory on 27th March. The blood ethyl alcohol was reported as 0.22 grams% and the gastric ethyl alcohol was 0.49 grams%. Diphenhydramine was not detected.


*Testimony.*

Dr Lawrence gave testimony on this case on 1st December 2006. He describes the ligature as "*very, very tight*" but states that there was some swelling from decomposition so it may not previously have been as tight. He describes "asphyxia" as "*not enough oxygen to the brain*" and

Signed:

**Exhibit 38 - 625**

goes on to say that when the ligature was applied consciousness would be lost in 2 – 3 minutes with irreversible brain damage in the order of 6 to 8 or 9 minutes.  He describes the blood alcohol level as around three times the legal limit for driving (0.08 grams%) and does not consider this to be explained in entirety by decomposition.  In discussion of the bloody fluid in the chest he explains these as being due to the body sinking rapidly to a depth of 200 - 300 feet with a closed airway.

*Specific questions.*

2.        *Regarding the autopsy procedures in this case:*

a.  *Did the autopsy conform to the standard of care?   If not, how did it fall short.*

The torso was eviscerated before the head in this case.  Although the ligature on the neck is described, there is no description of what mark, if any, was present on the body associated with the ligature. This area of the body after removal of the ligature is not clearly photographed.  In my opinion this is a significant omission in a case where ligature strangulation is given as the cause of death, particularly as the absence of a ligature mark leads Dr Lawrence to conclude in the case of Mr Safiev that the furrow on the neck is "*probably an artifact*".  As Dr Lawrence notes, decomposition causes swelling and it is entirely possible that the ligature appeared tighter at the time of autopsy than it was in life (if indeed it was applied in life).

Signed:

**Exhibit 38 -  626**

I also note that the date and time for the autopsies of Mr Safiev and Mr Kharabadze are the same and there is an image of two bodies in the morgue at the same time. This produces a risk of cross-contamination of any trace evidence that may have been recovered.

b. *Did the examiners collect, preserve and test appropriate bodily fluid and tissue samples?*

As with Ms Pekler, the sampling was appropriate given the condition of the body, although it is not stated whether preservative was added to the blood to prevent further artefactual generation of alcohol between the autopsy and the sample being analysed. If the sample was not in appropriate preservative, there is the potential for further post-mortem alcohol generation in the eight days between the autopsy (19th March) and receipt at the laboratory (27th March).

3. *Were there any flaws in the reporting of autopsy results in this case?*

a. *Did the examiner overstate confidence in his findings?*

In Dr Lawrence's testimony regarding Mr Safiev, he stated that death "*was asphyxia but I'm not sure of the mechanism, whether it was smothering, bag over the head, suffocation, gag or drowning or any one of those mechanisms*", having recorded in his report regarding Mr Safiev that there was no ligature mark on the neck. In this context, the absence of any comment regarding a ligature mark in Mr Kharabadze's

Signed:

**Exhibit 38 -  627**

27                                                                          Mikhel1

case somewhat undermines the definitive conclusion he drew in his report.  However, I am of the view that ligature strangulation would be the most plausible cause of death in this case based on the pathological findings.

If it is accepted that death has resulted from ligature strangulation, I am of the view that unconsciousness would have occurred much more quickly than Dr Lawrence stated in his testimony but I agree with his comment regarding the time to irreversible brain damage as a reasonable "ballpark" figure.

Dr Lawrence describes non-specific hypoxic changes specified as dilation of the right heart, pulmonary congestion and oedema and visceral congestion.  In my opinion all of these findings are non-specific and consistent with agonal or post-mortem change associated with the process of death rather than specifically being associated with hypoxia or asphyxia.

I would agree that even allowing for the effects of decomposition and the uncertainty about preservation of the blood sample, the toxicology results are most consistent with Mr Kharabadze having drunk alcoholic beverages shortly before his death.  I am unable to offer an opinion on how much he may have drunk or what subjective effects the alcohol may have had on him.

Dr Lawrence notes a large accumulation of fluid in the

Signed:

**Exhibit 38 - 628**

28                                                                    Mikhel1

pleural cavities and ascribes this to the body sinking rapidly with a closed airway.  I am of the opinion that this fluid accumulation is purely a post-mortem change and neither supports nor refutes the contention that Mr Kharabadze died of ligature strangulation.

b.  *Do you agree with the examiner's findings regarding the cause and time of death?*

I consider ligature strangulation the most likely cause of death allowing for the reservations expressed above.

Signed:

**Exhibit 38 -  629**

### George Safiev

Mr Safiev was estimated by the FBI to have died on 24th January 2002. Dr Lawrence performed an autopsy on 19th March 2002 at 1400. Decomposition was present and there was some adipocere. X-rays were performed. There was a "*groove-like furrow encircling the anterior portion of the neck at a level just above the thyroid prominence. When the neck is extended, no ligature mark is evident*". He notes that "*there is no blunt trauma to the nose, lips or neck*". Bruising to the right orbit and cheek and bruising to the right antihelix are noted. There was a ligature on the ankles and a rope was draped around the right upper limb.

Internally the left lung weighed 805 g and the right 660 g. They were congested and oedematous. There were bilateral haemothoraces measuring 1.9 l on the left, 2.8 l on the right. Dr Lawrence notes they may be partly due to decomposition but appeared mostly composed of blood. The neck structures were normal and "*there are no hemorrhages about the neck musculature. Thus, the mark is probably an artifact due to normal wrinkling of the skin and decomposition*". There was deep bruising behind the right ear.

Dr Lawrence summarises his findings thus:

- "*Blunt force trauma*

    o *Right orbital ecchymosis*

    o *Contusion of right preauricular area*

    o *Contusion of right postauricular area on occipital scalp*

    o *Contusion of lower anterior base of neck*

Signed:

**Exhibit 38 -  630**

- o   *Ligature binding ankles*

- *Nonspecific hypoxic changes*

  - o   *Dilation of the right heart*

  - o   *Pulmonary congestion and edema*

  - o   *Visceral congestion*

- *No significant natural disease present*

- *No penetrating trauma*

- *Bilateral pleural effusions, left 1.9 liters, right 2.8 liters*".

His certification states

- "*A.  Asphyxia – minutes*

- *B.  Type undetermined (suffocation vs drowning)*

- *Other: Acute ethanol exposure*"

## Photographs.

The autopsy photographs are in keeping with Dr Lawrence's report.

## *Toxicology.*

The toxicological samples are recorded as "*32 ml subclavian blood, 3 ml bile, 38 ml gastric, 22 ml urine, liver and kidney*".  It was received in the laboratory on 26th March 2002.  The blood ethyl alcohol is recorded as 0.10 grams%, bile ethyl alcohol as 0.07 grams% and urine ethyl alcohol as 0.11 grams%.  Diphenhydramine was not detected.

## *Testimony.*

Signed:

**Exhibit 38 -  631**

In his testimony Dr Lawrence states that death "*was asphyxia but I'm not sure of the mechanism, whether it was smothering, bag over the head, suffocation, gag or drowning or any one of those mechanisms*". He goes on to state that ligature strangulation could have occurred but the mark could have disappeared with decomposition.  With respect to toxicology, he was of the view that Mr Safiev had taken "*two or three drinks*".  He explains the pleural effusions as an artefact from being "*deep under water for a long period of time with no route for the water pressure to equilibrate*" and that "*somehow the access through the nose and mouth to the chest area was cut off*".

*Specific questions.*

2.      *Regarding the autopsy procedures in this case:*

a.  *Did the autopsy conform to the standard of care?  If not, how did it fall short.*

The autopsy appears to have been performed adequately, other than the torso being eviscerated prior to the cranium. There appears to be one discrepancy in the report, in that the external examination records "*there is no blunt trauma to the nose, lips or neck*" and internally "*there are no hemorrhages about the neck musculature*" while the summary states "*contusion of lower anterior base of neck*".  I can see no reference to this bruising elsewhere in the report.

b.  *Did the examiners collect, preserve and test appropriate bodily fluid and tissue samples?*

Signed:

**Exhibit 38 -  632**

32                                                                      Mikhel1

Appropriate samples were obtained, but as with the cases of Mr Kharabadze and Ms Pekler there is no indication of the use of preservatives on the blood sample and so further post-mortem generation of alcohol cannot be excluded in the seven days between sampling and arrival at the laboratory.

3.  *Were there any flaws in the reporting of autopsy results in this case?*

    a.  *Did the examiner overstate confidence in his findings?*

    The comments I have made regarding the non-specific hypoxic changes in Mr Kharabadze's report also apply here. I am of the opinion that it is likely, but not certain, that Mr Safiev had been drinking alcoholic beverages shortly before his death.

    Dr Lawrence appears to give slightly different explanations for the accumulation of fluid in the chest for Mr Kharabadze and Mr Safiev, with it resulting from rapid sinking with a closed airway in Mr Kharabadze's case and prolonged immersion with a blocked airway in Mr Safiev's case, although there was no pathological evidence of airway occlusion in Mr Safiev's case. I am of the view that this fluid is a post-mortem artefact and does not assist in determining the cause of death in either case and is not indicative of airway occlusion while the body was sinking or submerged.

    b.  *Do you agree with the examiner's findings regarding the cause and time of death?*

Signed:

**Exhibit 38 -  633**

33                                                                                          Mikhel1

As with Ms Pekler and Mr Umansky, it is my opinion that there is no pathologically identifiable natural, traumatic or toxicological cause of death identifiable from Mr Safiev's autopsy and the medical cause of death is best considered "unascertained".  Mr Safiev and Mr Kharabadze underwent autopsy examinations at the same time and in Mr Kharabadze's report  Dr Lawrence records that he "*was possibly suffocated in the region of New Melones Lake, possibly choked or having a bag placed over the head with a ligature, with weights then added to the body, and dumped off the bridge into the lake*".

It would appear that the conclusion that Mr Safiev drowned or was suffocated is most likely based on this hearsay account rather than pathological findings.  In my opinion it would be more appropriate to give the cause of death as "unascertained", while accepting that drowning or suffocation cannot be excluded, and allow a jury to consider the robustness of the other evidence regarding an "asphyxial" mode of death.

Signed:

**Exhibit 38 -  634**

34                                                                          Mikhel1

### Other material

I have also been provided with the following material:

- Curriculum vitae for Dr Cooper, Dr Eisele, Dr Lawrence and Dr Barbour.

- Testimony of Mr Posey (relating to toxicology).

- Toxicology report for an ampoule of clear liquid.

  This was shown to contain diphenhydramine.

- Testimony of Special Agent Tindall.

  Special Agent Tindall refers to a device used to recover a body failing and breaking, causing the body to be "*cast back down to the floor of the reservoir*".

- Testimony of Agent Crews.

- Testimony of Special Agent Fong.

I have reviewed these documents and other than the comments above I do not consider them immediately relevant to this report.

Signed:

**Exhibit 38 -  635**

35                                                                  Mikhel1

## SUMMARY

In summary, I am of the opinion that Mr Muscatel has died of suffocation and it is likely, but not certain, that Mr Kharabadze has died of ligature strangulation. In my opinion the appropriate pathological conclusion for Ms Pekler, Mr Umansky and Mr Safiev is that the cause of death is unascertained at autopsy. I do not exclude suffocation or drowning as the reason for their death but in my opinion to state to a jury that the pathological findings show that death has arisen as a result of an "asphyxial" mode is to overstate the autopsy findings and it should be made clear that these conclusions are more based on the information provided to the pathologist rather than the pathologist's own observations.

## EXPERT WITNESS SELF CERTIFICATION

I confirm that I have read the booklet known as *Disclosure: Experts' Evidence and Unused Material* and that I am aware of my responsibilities as an expert witness to reveal to the defence team any information that might undermine my evidence.

I hereby declare that:

1. I have never been convicted of, cautioned for, or received a penalty notice for any criminal offence other than minor traffic offences.
2. There is no proceedings pending against me in any criminal or civil court.
3. I am not aware of any adverse finding by a judge, magistrate or coroner about my professional competence or credibility as a witness.
4. I have never been the subject of any adverse findings by a professional or regulatory body.
5. There are no proceedings, referrals or investigations pending against me that have been brought by a professional or regulatory body.
6. I am not aware of any other information that I think may adversely affect my professional competence and credulity as an expert witness.

This statement consisting of     37     pages each signed by me is true to the best of my knowledge and belief and I make it knowing that if it is tendered in evidence I shall be liable to prosecution if I have wilfully stated in it anything which I know to be false or do not believe to be true.

*INTERNAL CRITICAL FINDINGS CHECK*

Although it is not a requirement for this report to be subjected to a Critical Conclusions Check as required by the Code of Practice for Forensic Pathologists held by the Forensic Science Regulator, this report has been peer reviewed in a manner analogous to that process. On the information available to me (paperwork) the conclusions reached in this report are reasonable based on the information adduced – Dr F Hollingbury, 15th

Signed:

**Exhibit 38 -  636**

September 2021



Signed:

Dr Stuart J Hamilton MB, ChB, BMSc(Hons), FRCPath, MFFLM

Home Office Registered Forensic Pathologist,

Deputy Chief Forensic Pathologist for the East Midlands,

Honorary Associate Professor at the University of Leicester,

Honorary Consultant Pathologist at Leicester Royal Infirmary.

GMC number: 4540368


Dated:   16th September 2021.


| ANNEX 1 - DECLARATIONS |
| --- |
| 1. I carried out all examinations, measurements, test or experiments which I have referred to in the report. |
| 2. I understand that my duty is to help the court to achieve the overriding objective by giving independent assistance by way of objective, unbiased opinion on matters within my expertise, both in preparing reports and giving oral evidence. I understand that this duty overrides any obligation to the party by whom I am engaged or the person who has paid or is liable to pay me. I confirm that I have complied with and will continue to comply with that duty. |
| 3. I confirm that I have not entered into any arrangement where the amount or payment of my fees is in any way dependent on the outcome of the case. |
| 4. I am not aware of any conflict of interested created by my role as an expert witness in this matter. |
| 5. I do not consider that any interest which I have disclosed affects my suitability as an expert witness on any issues on which I have given evidence. |
| 6. I will advise the party by whom I am instructed if, between the date of my report and the trial, there is any change in circumstances which affect my answers to points 6 and 7 above. |
| 7. I have shown the sources of all information specific to this matter (including literature) I have used. |
| 8. I have exercised reasonable care and skill in order to be accurate and complete in preparing this report. |
| 9. I have endeavoured to include in my report those matters, of which I have knowledge or of which I have been made aware, that might adversely affect the validity of my opinion. I have clearly stated any qualifications to my opinion. |
| 10. I have not, without forming an independent view, included or excluded anything which has been suggested to me by others including my instructing lawyers. |
| 11. I will notify those instructing me immediately and confirm in writing if for any reason my existing report requires any correction or qualification or if my opinion, set out in the report, changes in a material way. |
| 12. I understand that:<br>(a) my report will form the evidence to be given under oath or affirmation;<br>(b) the court may at any stage direct a discussion to take place between experts;<br>(c) the court may direct that, following a discussion between the experts, a statement should be prepared showing those issues which are agreed and those issues which are not agreed, together with the reasons;<br>(d) I may be required to attend court to be cross-examined on my report by a cross-examiner assisted by an |

Signed:

**Exhibit 38 -  637**

| |
|---|
| expert.<br>(e) I am likely to be the subject of public adverse criticism by the judge if the Court concludes that I have not taken reasonable care in trying to meet the standards set out above. |
| 13. I have read Part 19 of the Criminal Procedure Rules 2015 and I have complied with its requirements. |
| 14. I understand that a number of provisions of Part 19 of the Criminal Procedure Rules (in particular the provisions of 19.4 sections (c), (d), and (f)) have to be addressed in the body of the report. |
| 15. I confirm that, to the best of my knowledge and belief, I have acted in accordance with the Code of Practice and Performance Standards for Forensic Pathology published by the Forensic Science Regulator in all aspects that relate to my personal conduct. |

Signed:

**Exhibit 38 -  638**

# Annex 2

**Exhibit 38 -  639**

# *Curriculum Vitae*

## Dr Stuart John Hamilton

## MB ChB BMSc (Hons)

## FRCPath MFFLM

## Home Office Registered Forensic Pathologist

### Deputy Chief Forensic Pathologist for the East Midlands

**Exhibit 38 -  640**

# *Curriculum Vitae*

*Dr Stuart John HAMILTON MB, ChB, BMSc (Hons) FRCPath MFFLM*

**Address:**  East Midlands Forensic Pathology Unit

    Level 3, Robert Kilpatrick Building

    Leicester Royal Infirmary

    Leicester

    LE2 7LX

**Tel:**    07855 799995

**Date of Birth:**  6th November 1973

**Nationality:**  British

**GMC registration number:**  4540368

**Education and Qualifications**

*1985-1992*  Park View Comprehensive School

    10 GCSEs, 3 A levels

*1992-1998 MB ChB*  University of Dundee Medicine

*1994-1995 BMSc(Hons)*  Intercalated Batchelor of Medical Science (Cellular and Molecular Basis of Disease), First Class Honours

*2007*  Fellow of the Royal College of Pathologists (Forensic Pathology)

*2008*  Appointed to the Home Office List of accredited forensic pathologists.

**Exhibit 38 - 641**

**Employment**

*Aug 1998- Feb 1999*: Pre-registration House Officer in general medicine and geriatrics, Stracathro Hospital, Angus.

*Feb - Aug 1999:* Pre-registration House Officer in Orthopaedic/Lower GI surgery, Royal Victoria Infirmary, Newcastle.

*Aug 1999-Apr 2000*: Senior House Officer rotation in general medicine, covering cardiology and nephrology.

*17th Apr 2000 – 31 July 2001*: Senior House Officer in Histopathology, Manchester Royal Infirmary.

*1 Aug 2001- 3 Aug 2003:* Specialist Registrar in Histopathology, North West Deanery.

*4 August 2004 – 31 July 2008:* Specialist Registrar in Forensic Pathology, Royal Victoria Infirmary, Newcastle-upon-Tyne.

*1 August 2008 – 31st July 2011* Home Office Registered Forensic Pathologist for the North-East of England.

*November 2010:* Appointed as associate forensic pathologist to the East Midlands Forensic Pathology Unit.

*17th May 2011 – present:* Deputy Chief Forensic Pathologist and Home Office Registered Forensic Pathologist for the East Midlands.

**Exhibit 38 -  642**

## *Current Duties and Experience*

**Autopsy**

Over 3000 autopsies performed in routine Coronial work, cases requiring and independent pathologist, suspicious deaths and defence autopsies in many jurisdictions.

**Inquest and Court Attendance**

Given evidence in court over 300 times including Crown Court and inquests.

**Other Forensic and Academic Work**

Provision of expert opinion regarding causation of injuries for solicitors and police based on statements, digital images and medical records with evidence given in Crown Court, Magistrates Court and Inquests.

I have provided reports throughout the United Kingdom but also to the Falkland Islands, New Zealand, The Cayman Islands, St Lucia and Singapore.

Represented the North East forensic group practice at the local mass disaster committee until May 2011.

I am a manuscript reviewer for the peer-reviewed journals *Medicine, Science and the Law* and the *American Journal of Forensic Medicine and Pathology.*

Along with Sir Desmond de Silva, Sir Geoffrey Nice, Professor David Crane, and Professor Sue Black, I was one of the authors of a report for Carter Ruck Solicitors regarding torture and starvation of detainees in Syria.

As a result of this work I presented the findings of this report with Professor Crane to the United Nations Security Council in New York on 15th April 2014.

I am a trained appraiser.

**Teaching**

Supervising and training postgraduate general and forensic pathology trainees.

Undergraduate lectures for forensic science, law and medical students.

Autopsy demonstrations for police officers, medical and nursing staff.

Teaching on the Senior Investigating Officers Training Course run by the College of Policing.

I am educational supervisor to forensic pathology trainees in Leicester.

**Exhibit 38 -  643**

I spoke at the Technical Assistance and Information Exchange Instrument of the European Commission (TAIEX) event JHA55690 "workshop on forensic medical examination of gunshot wounds" for the Academy of the Ministry of Internal Affairs of Belarus in Minsk, Belarus 4-5th June 2015.

I regularly teach detectives and first response officers in Leicestershire Police on the value of forensic pathology.

**Other Appointments**

Honorary consultant pathologist at Leicester Royal Infirmary.

Honorary Associate Professor at the University of Leicester.

**Memberships of Societies**

Honorary Secretary of the British Association in Forensic Medicine from June 2014 to July 2018.

Member of the British Association in Forensic Medicine.

Member of the Faculty of Forensic and Legal Medicine.

I became an Associate Member of the American Academy of Forensic Sciences in 2011 and was elevated to full membership in 2013.

**Awards**

In October 2013 I received a Director's Commendation from North Yorkshire Police for my work on Operation Nardoo.

**Exhibit 38 -  644**

**Publications**

1) "Atlas of Autopsy Pathology" Burton, Saunders and Hamilton.  CRC Press publication date 12th August 2015.  ISBN 9781444137521.

2) "Expression of the DEAD Box RNA Helicase p68 is developmentally and growth regulated and correlates with organ differentiation/maturation in the fetus."  Journal of Pathology, vol 184: pp 351-359 (1998) (BMSc project with Dr Frances Fuller-Pace, Department of Pathology, Ninewells Hospital Dundee).

3) "TNF $\beta$ production is reduced in PHA stimulated Lymphocytes from HIV+ Individuals".

Presented at Society for Leukocyte Biology Meeting in Baltimore, December 1998. (Elective Project with Dr Janet L Lathey, University of California San Diego).

4) "Sudden Death and Suicide: Comparison Of Brain Weight".  British Journal of Psychiatry 2002 181

5) "Commotio cordis – a report of 3 cases" International Journal of Legal Medicine 2005 119(2) 88-90.

6) "Death in the South Atlantic: A tale of two pathologists". Hamilton SJ and Saunders SL.  ACP News Autumn 2011 p 15-18

7) "Guidelines on autopsy practice: Autopsy for bodies recovered from water". Taylor M, Whibley M, Lawler W, Grieve J, Hamilton S.  URN G157 Royal College of Pathologists publication December 2018.

8) "Gross Post-Mortem Changes in the Human Body".  Hamilton SJ, Green MA.  In "Taphonomy of Human Remains".  Wiley, 2017.  ISBN 9781118953327

**Presentations at Scientific Meetings**

*"The Dryburn Strangler"* Presented at the British Association of Forensic Medicine Winter Meeting, Cambridge, November 2010

*"Quincy vs Ducky: Scalpels at dawn.  An American Forensic Pathologist and a British Home Office Pathologist Square Off"*.  Breakfast Seminar at the American Academy of Forensic Sciences Annual Meeting, Chicago, February 2011 (Abstract B5 in Proceedings).

*"Soccer scams, search engines, scientists and slaughter.  Investigating a complex double homicide in North-East England"*.  Presented at the American Academy of Forensic Sciences Annual Meeting, Chicago, February 2011 (Abstract G66 in Proceedings).

**Exhibit 38 -  645**

"*Pressure sores in England: Comparing the investigation of two cases*".  Presented at the American Academy of Forensic Sciences Annual Meeting, Atlanta, February 2012 (Abstract G122 in Proceedings).

"*Quincy vs. Ducky II: The Rematch – An American Forensic Pathologist and a British Home Office Pathologist Face Off Again*".  Presented at the American Academy of Forensic Sciences Annual Meeting, Washington DC, February 2013 (Abstract BS2 in Proceedings).

"*When is a murder not a murder?  When it's a non-suspicious death!*".  Presented at the American Academy of Forensic Sciences Annual Meeting, Washington DC, February 2013 (Abstract G114 in Proceedings).


**Media**

"*Forensic Casebook with Matthew Kelly*" 2008.  Commenting on the "brides in the bath" murders.

"*Crimewatch Solved*" 2009. Commenting on a double homicide in which I was the pathologist.

"*Operation Mincemeat*" 2010.  Offering a forensic pathologist's opinion on a World War 2 covert operation involving a corpse.

"*Rigor mortis*" 2010.  Offering a "real" view of the topics of a BBC comedy programme set in a pathology department, broadcast in association with the show on Radio 4.

"*My week*" 2010.  A Guardian article on the work of a forensic pathologist.

"*Another view on Silent Witness*" 2011.  A Guardian piece highlighting the differences between the TV pathologist and the reality of the work.

"*The Generation Gap*" 2011.  A comparison of modern and older approaches to forensic pathology on Radio 4.

"*Fred Dinenage Murder Casebook*" First shown 22nd May 2011 on the Crime and Investigation Network.  Once again, offering an expert opinion on historical homicide cases.

"*History Cold Case*".  First shown 14th July 2011 on BBC 2.  Commenting on the forensic aspects of a medieval mass grave.

"*Tony Robinson's Gods and Monsters*".  Commenting on scientific aspects of superstitions surrounding death.

"*The Secrets of Everything*".  First shown 4th March 2012 on BBC3.  Discussing the effects of a fall from a height into water.

<div align="right">**Exhibit 38 -  646**</div>

"*Bloody Tales of the Tower: Traitors*". First shown 16th April 2012 on National Geographic.  Advising on injuries and discussing on camera the component parts of hanging, drawing and quartering.

I have also advised for *Midsomer Murders*, *Casualty* and *New Tricks* for BBC television.

I advised the author Paul Sussman on forensic aspects of his novel "The Labyrinth of Osiris" (see acknowledgements section of the book).

I advised Jane Robins in her true crime book "The Curious Habits of Dr Adams: A 1950s Murder Mystery (see acknowledgements section of the book).

I am the series advisor on forensic pathology for the 2013, 2014, 2015, 2016, 2017 and 2018 seasons of *Silent Witness*.

I have advised *Emmerdale* on a plot involving a forensic pathologist at the scene of a murder and giving evidence in court.

I was in a panel discussion with the authors Kathy Reichs and Ian Rankin on the portrayal of forensic pathology in literature at the Cheltenham Literature Festival on 13th October 2012 and wrote a piece on the subject for their publication *The Litmus Paper.*

Interviews with BBC Radio 4, BBC TV news, World Service radio and TV regarding exhumations in relation to the Yasser Arafat case.

 "*Bloody Tales - Murder*" Interview discussing theories about the death of Attila the Hun  (first broadcast 1st April 2013, National Geographic Channel).

"*Killers Behind Bars*" Interview regarding homicidal asphyxia (first broadcast 4th April 2013, Channel 5).

"*The King in the Car Park*" Interview discussing injuries on the skeleton of Richard III (first aired Channel 4, 4th February 2013).

Interview for Silent Witness website discussing the role of the expert advisor http://www.bbc.co.uk/programmes/p012yd2c

*Confessions of a torture investigator: 'a stabbing or mass murder is the same to me'* Opinion piece for The Conversation regarding the role of experts in international Human Rights Abuse cases https://theconversation.com/confessions-of-a-torture-investigator-a-stabbing-or-mass-murder-is-the-same-to-me-37816

I appeared at the Radio Times Festival as part of a panel discussion on the programme (25th September 2015)

I advised on forensic aspects of the feature films "High Rise" and "The Autopsy of Jane Doe".

**Exhibit 38 -  647**

"*Britain's Most Evil Killers*" Discussing the forensic pathology aspects of famous murders.  Pick TV, 2017 – 2019.

Panel Discussion at the Scarborough Literature Festival 2017 around the differences between real and fictional forensic pathology.

"*What the Killer Did Next*".  A documentary covering the actions of murderers after the crime.

"*Murder, Mystery and My Family*".  Commenting on forensic pathology aspects of a BBC programme investigating historical murder convictions.

**Exhibit 38 -  648**

**Referees**

1.      Dr PN Cooper

        Forensic Medicine Unit

        Department of Cellular Pathology

        Royal Victoria Infirmary

        Queen Victoria Road

        Newcastle-upon-Tyne

        NE1 4LP


2.      Mr S Nicholls

        Belmores Solicitors

        40 Crown Road

        Norwich

        NR1 3DX


3.      Mr T Carney,

        HM Senior Coroner for Gateshead and South Tyneside,

        31 - 35 Station Road,

        Hebburn,

        Tyne & Wear.

        NE31 1LA


.

**Exhibit 38 -  649**

# Annex 3

Exhibit 38 -  650

**Annex 3 - Iouri Mikhel**

| Tab | Description | Bates No. |
|-----|-------------|-----------|
| 1. | Exhibit 11 to Government's Notice of Expert Witnesses: Curriculum Vitae of John T. Cooper, M.D., 05/31/2005 | SJH-001 - 004 |
| 2. | Trial Testimony of John T. Cooper, M.D., 10/25/2006 | SJH-005 - 052 |
| 3. | Trial Exhibit 1259: Autopsy Report of "John Doe" (Meyer Muscatel), 10/19/2001 | SJH-053 - 059 |
| 4. | Trial Exhibit 1260: Skeletal Diagrams Showing the Injuries Suffered by "John Doe" (Meyer Muscatel) | SJH-060 - 061 |
| 5. | Exhibit 10 to Government's Notice of Expert Witnesses: Curriculum Vitae of John W. Eisele, M.D., 05/17/2005 | SJH-062 - 066 |
| 6. | Trial Exhibit 1429: Autopsy Report for Rita Pekler (Jane Doe #1), 04/24/2002 | SJH-067 - 074 |
| 7. | Trial Exhibit 1430: Autopsy Report for Alexander Umansky (John Doe #3), 04/24/2002 | SJH-075 - 081 |
| 8. | Exhibit 9 to Government's Notice of Expert Witnesses: Curriculum Vitae of Robert D. Lawrence, M.D., 05/31/2005 | SJH-082 - 086 |
| 9. | Trial Testimony of Robert Lawrence, M.D., 12/01/2006 | SJH-087 - 147 |
| 10. | Trial Exhibit 1431: Autopsy Report for Nick Kharabadze (John Doe #1) | SJH-148 - 153 |
| 11. | Trial Exhibit 1432: Autopsy Report of Georgy Safiev (John Doe #2), 04/18/2002 | SJH-154 - 159 |
| 12. | Handwritten Notes by Dr. Robert Lawrence Dated 03/19/2002, Faxed to Kim Myer, 05/23/2005 | SJH-160 - 162 |

**Exhibit 38 - 651**

**Annex 3 -  Iouri Mikhel**

| Tab | Description | Bates No. |
|---|---|---|
| 13. | Exhibit 13 to Government's Notice of Expert Witnesses: Curricula Vitae of Alan D. Barbour, Ph.D., C.L.B, DABFE and Bill L. Posey | SJH-163 - 167 |
| 14. | Trial Testimony of Bill L. Posey, 12/01/2006 | SJH-168 - 195 |
| 15. | Trial Exhibit 1434: Toxicology Report No. CVT 01-7299 for "John Doe," 11/11/2001 | SJH-196 |
| 16. | Trial Exhibit 1435: Toxicology Report No. CVT 02-2750 for "John Doe #1," 04/07/2002 | SJH-197 |
| 17. | Trial Exhibit 1436: Toxicology Report No. CVT 02-2749 for "John Doe #2," 04/07/2002 | SJH-198 |
| 18. | Trial Exhibit 1437: Toxicology Report No. CVT 02-2785 for Alexander Umansky, 04/07/2002 | SJH-199 |
| 19. | Trial Exhibit 1438 Toxicology Report No. CVT 02-2786 for Rita Pekler, 04/07/2002 | SJH-200 |
| 20. | Trial Exhibit 1439: Toxicology Report No. CVT 02-3031 for "Dimedrol," 04/09/2002 | SJH-201 |
| 21. | Follow-up Report by John Crawford, Sr. Investigator, Calaveras Co. District Attorney's Office, re Toxicology Testing, 02/07/2002 | SJH-202 |
| 22. | Autopsy photos of UNSUB #1 (Roll 3), 03/19/2002 *(Envelope labeled: 1A179 Autopsy)* | SJH-203 - 214 |

**Exhibit 38 -  652**

**Annex 3 - Iouri Mikhel**

| Tab | Description | Bates No. |
|---|---|---|
| 23. | Autopsy photos of UNSUB #1 (Roll 2), 03/19/2002 *(Envelope labeled: 1A180 Autopsy)* | SJH-215 - 235 |
| 24. | Autopsy photos of 1st subject recovered from New Melones Lake, (Roll 1), 03/16/2002 *(Envelope labeled: 1A219 Autopsy)* | SJH-236 - 245 |
| 25. | Trial Exhibit 507 E: Photo Showing Recovery of John Doe number One (Nick Kharabadze), per testimony of Anthony Tindall. *(45 pound weight attached to his torso with the zip ties)* | SJH-246 - 247 |
| 26. | Trial Exhibit 507 F: Photo Showing Recovery of John Number One (Nick Kharabadze), per testimony of Anthony Tindall. *(45pound weight attached to his torso with the zip ties from different angle)* | SJH-248 - 249 |
| 27. | Trial Exhibit 507 H:  Photo Showing Recovery of John Doe Number One (Nick Kharabadze), per testimony of Anthony Tindall. *(Close up of 45 pound weight attached to torso with the zip ties)* | SJH-250 - 251 |
| 28. | Trial Exhibit 508 A: Photo of John Doe Number One (Nick Kharabadze), taken on 03/17/2002, at a funeral home in Sonora, CA, by FBI Agent Brian Crews. *(Lying on stomach, flex cuffs around waist)* | SJH-252 - 253 |
| 29. | Trial Exhibit 508 B: Photo Showing Recovery of John Doe Number One (Nick Kharabadze), on 03/17/2002, per testimony of Anthony Tindall. *(Flex cuffs around wrists and waist)* | SJH-254 - 255 |
| 30. | Trial Exhibit 508 C: Photo of John Doe Number One (Nick Kharabadze), taken at the San Joaquin Sheriff's Office Morgue on 03/19/2002, per testimony of Agent Brian Crews. *(Flex cuffs, wrists and waist)* | SJH-256 - 257 |

**Exhibit 38 -  653**

**Annex 3 - Iouri Mikhel**

| Tab | Description | Bates No. |
|---|---|---|
| 31. | Trial Exhibits 508 C, D, G: Photo of John Doe Number One (Nick Kharabadze), taken at the San Joaquin Sheriff's Office Morgue, on 03/19/2002. (*Closeups-see previous descriptions*) | SJH-258 - 260 |
| 32. | Trial Exhibit 508 D: Photo of John Doe Number One (Nick Kharabadze), taken at the San Joaquin Sheriff's Office Morgue on 03/19/2002, per testimony of Agent Brian Crews. (*Upper body showing flex ties around wrists and waist*) | SJH-261 - 262 |
| 33. | Trial Exhibit 508 E: Photo of John Doe Number One (Nick Kharabadze) taken on 03/17/2002, at a funeral home in Sonora, CA, by FBI Agent Brian Crews. (*Flex cuffs around waist*) | SJH-263 - 264 |
| 34. | Trial Exhibit 508 F: Photo of John Doe Number One (Nick Kharabadze) taken on 03/17/2002, at a funeral home in Sonora, CA, by FBI Agent Brian Crews. (*Close-up of flex cuffs around waist*) | SJH-265 - 266 |
| 35. | Trial Exhibit 508 G: Photo of John Doe Number One (Nick Kharabadze), taken at the San Joaquin Sheriff's Office Morgue, on 03/19/2002, per testimony of Agent Brian Crews. (*Close-up of neck area showing flex tie as well as a necklace with a cross*) | SJH-267 - 268 |
| 36. | Trial Notebook containing Meyer Muscatel Autopsy Photos (272612) | SJH-269 - 293 |
| 37. | Trial Notebook containing Meyer Muscatel Autopsy Photos (272613) | SJH-294 - 322 |
| 38. | Trial Notebook containing Meyer Muscatel Autopsy Photos | SJH-323 - 388 |
| 39. | Trial Notebook containing Meyer Muscatel Autopsy Photos (*Internal autopsy shots*) | SJH-389 - 404 |
| 40. | Trial Notebook containing Meyer Muscatel Autopsy Photos (*Dental*) | SJH-405 - 410 |

**Exhibit 38 -  654**

**Annex 3 -  Iouri Mikhel**

| Tab | Description | Bates No. |
|---|---|---|
| 41. | Trial Exhibit 1246: Photo of Meyer Muscatel's recovered body *(Plastic bag over head)* | SJH-411 - 412 |
| 42. | Trial Exhibit 1247: Photo of Meyer Muscatel's recovered body *(Plastic bag over head)* | SJH-413 - 414 |
| 43. | Trial Exhibit 1248: Photo of Meyer Muscatel's recovered body *(Plastic bag over head, partially removed)* | SJH-415 - 416 |
| 44. | Trial Exhibit 1249: Photo of Meyer Muscatel's recovered body *(Plastic bag over head, partially removed)* | SJH-417 - 418 |
| 45. | Trial Exhibit 1250: Photo of Meyer Muscatel's recovered body *(Closeup of flex ties binding hands)* | SJH-419 - 420 |
| 46. | Trial Exhibit 1251: Photo of Meyer Muscatel's recovered body *(Plastic bag fully removed from head)* | SJH-421 - 422 |
| 47. | Trial Exhibit 1252: Photo of Meyer Muscatel's recovered body *(Plastic bag fully removed from head)* | SJH-423 - 424 |
| 48. | Trial Exhibit 1253: Photo of Meyer Muscatel's recovered body *(Demonstrating wound to the head)* | SJH-425 |
| 49. | Trial Exhibit 1260: Diagrams Showing The Injuries Suffered By "John Doe" (Meyer Muscatel) | SJH-426 - 428 |
| 50. | Trial Exhibit 1998: Photo of Meyer Muscatel's recovered body (Left ront with the tape intact) | SJH-429 |
| 51. | Autopsy Photos of Jane Doe (un-numbered) (Roll 5), 03/24/2002 *(Envelope labeled: 1A187 Peckler Autopsy)* | SJH-430 - 448 |

**Exhibit 38 -  655**

**Annex 3 -  Iouri Mikhel**

| Tab | Description | Bates No. |
|-----|-------------|-----------|
| 52. | Photographs of body recovered at Parrots Ferry Bridge, New Melones Lake, 03/19/2002. *(Envelope labeled: 1A190, Autopsy)* | SJH-449 - 457 |
| 53. | Autopsy photos of Jane Doe #1, (Roll 4), 03/24/2002 (Envelope labeled: 1A183, Autopsy) | SJH-458 - 475 |
| 54. | Autopsy photos of John Doe #3 (Roll 7), 03/24/2002 (Envelope labeled: 1A195, Autopsy photos) | SJH-476 - 491 |
| 55. | Autopsy photos of Jane Doe #1 (Roll 6), 03/24/2002 (Envelope labeled: 1A188, Autopsy) | SJH-492 - 509 |
| 56. | Trial Exhibit 521 E: Photo Showing the Recovery of Jane Doe Number One (Rita Pekler), on 03/19/2002, per testimony of Anthony Tindall. *(Weights attached to legs with ligatures)* | SJH-510 - 511 |
| 57. | Trial Exhibit 521 F: Photo Showing the Recovery of Jane Doe Number One (Rita Pekler), on 03/19/2002, per testimony of Anthony Tindall. *(Weights attached to legs with ligatures)* | SJH-512 - 513 |
| 58. | Trial Exhibit 521 G: Photo Showing the Recovery of Jane Doe Number One (Rita Pekler), on 03/19/2002, per testimony of Anthony Tindall. *(Ligatures binding ankles)* | SJH-514 - 515 |
| 59. | Trial Exhibit 521 H: Photo Showing the Recovery of Jane Doe Number One (Rita Pekler), on 03/19/2002, per testimony of Anthony Tindall. *(Arms and hands bound by ligatures)* | SJH-516 - 517 |
| 60. | Trial Exhibit 522 A: Photo of Rita Pekler's Body at San Joaquin County Coroner's Office per testimony of FBI Agent Anthony Tindall. *(Accurately depicts of victim at the time she was raised from the surface of the New Melones Reservoir)* | SJH-518 - 519 |

**Exhibit 38 -  656**

**Annex 3 -  Iouri Mikhel**

| Tab | Description | Bates No. |
|-----|-------------|-----------|
| 61. | Trial Exhibit 522 C: Photo of Rita Pekler's Body at San Joaquin County Coroner's Office per testimony of FBI Agent Anthony Tindall. *(Close up view of a 6 kilogram weight secured around the waist)* | SJH-520 - 521 |
| 62. | Trial Exhibit 522 D: Photo of Rita Pekler's Body at San Joaquin County Coroner's Office per testimony of FBI Agent Anthony Tindall. *(Close up view of a 6 kilogram weight secured around the waist)* | SJH-522 - 523 |
| 63. | Trial Exhibit 522 E: Photo of Rita Pekler's Body at San Joaquin County Coroner's Office per testimony of FBI Agent Anthony Tindall. *(Close up view of a 25 pound weight secured around lower legs, and ankles bound)* | SJH-524 - 525 |
| 64. | Trial Exhibit 522 F: Photo of Rita Pekler's Body at San Joaquin County Coroner's Office per testimony of FBI Agent Anthony Tindall. *(Close up view of a 25 pound weight secured around lower legs)* | SJH-526 - 527 |
| 65. | Autopsy photos of UNSUB #2, (Roll 1), 03/17/2002 *(Envelope labeled: 1A182 Autopsy)* | SJH-528 - 539 |
| 66. | Autopsy photos of UNSUB #2 (Roll 5), 03/19/2002 *(Envelope labeled: 1A191, Autopsy)* | SJH-540 - 558 |
| 67. | Trial Exhibit 515 G: Photo of John Doe Number Two (Gregory Safiev), taken at the funeral home by FBI Agent Brian Crews, on 03/17/2002 | SJH-559 - 560 |
| 68. | Trial Exhibit 515 H: Photo of John Doe Number Two (Gregory Safiev), taken at the funeral home by FBI Agent Brian Crews, on 03/17/2002. *(Close up of flex tie around his ankles)* | SJH-561 - 562 |

**Exhibit 38 -  657**

**Annex 3 - Iouri Mikhel**

| Tab | Description | Bates No. |
|---|---|---|
| 69. | Trial Exhibit 515 I: Photo of John Doe Number Two (Gregory Safiev), taken at the San Joaquin Sheriff's Office Morgue, on 03/19/2002. (*White rope around arm and flex cuff around ankles*) | SJH-563 - 564 |
| 70. | Trial Exhibit 515 J: Photo of John Doe Number Two (Gregory Safiev), taken at the San Joaquin Sheriff's Office Morgue, on 03/19/2002. *(Close up of flex cuff around ankles)* | SJH-565 |
| 71. | Autopsy photos of John Doe (Meyer Muscatel) (Roll 2), 03/24/2002 (Envelope labeled: 1A178 Autopsy Photos 10/09/2002) | SJH-567 - 585 |
| 72. | Autopsy photos of 3rd subject recovered from New Melones Lake, (Roll 3), 03/18/2002 (Envelope labeled: 1A218 Autopsy) | SJH-586 - 593 |
| 73. | Autopsy photos of John Doe #3, (Roll 1), 03/24/2002 (Envelope labeled: 1A196, Autopsy photos) | SJH-594 - 611 |
| 74. | Autopsy photos of John Doe #3 (Roll 3), 03/24/2002*(Envelope labeled: 1A194, Autopsy photos)* | SJH-612 - 628 |
| 75. | Trial Exhibit 518 C: Photo of John Doe Number Three (Alexander Umansky), taken at the New Melones Reservoir, Parrot's Ferry Bridge, on 03/18/2002, per testimony of FBI Agent Anthony Tindall. *(At pontoon boat)* | SJH-629 - 630 |
| 76. | Trial Exhibit 518 D: Photo of John Doe Number Three (Alexander Umansky), taken at the New Melones Reservoir, Parrot's Ferry Bridge, on 03/18/2002, per testimony of FBI Agent Anthony Tindall. *(At pontoon boat)* | SJH-631 - 632 |
| 77. | Trial Exhibit 518 E: Photo of John Doe Number Three (Alexander Umansky), taken at the New Melones Reservoir, Parrot's Ferry Bridge, on 03/18/2002, per testimony of FBI Agent Anthony Tindall. *(At pontoon boat)* | SJH-633 - 634 |

**Exhibit 38 - 658**

**Annex 3 -  Iouri Mikhel**

| Tab | Description | Bates No. |
|---|---|---|
| 78. | Trial Exhibit 518 F: Photo of John Doe Number Three (Alexander Umansky), taken at the New Melones Reservoir, Parrot's Ferry Bridge, on 03/18/2002, per testimony of FBI Agent Anthony Tindall *(At pontoon boat)* | SJH-635 - 636 |
| 79. | Trial Exhibit 518 H: taken at the New Melones Reservoir, Parrot's Ferry Bridge, on 03/18/2002, per testimony of FBI Agent Anthony Tindall. *(Zip tie at back of legs)* | SJH-637 - 638 |
| 80. | Trial Exhibit 518 J: Photo of John Doe Number Three (Alexander Umansky), per testimony of FBI Agent Anthony Tindall. *(Ligatures binding hands)* | SJH-639 - 640 |
| 81. | Trial Exhibit 518 K: Photo of John Doe Number Three (Alexander Umansky), taken at the funeral home on 03/18/2002, per FBI Agent George Fong. *(Close up of wrists)* | SJH-641 - 642 |
| 82. | Trial Exhibit 518 L: Photo of John Doe Number Three (Alexander Umansky), taken at the funeral home, per FBI Agent George Fong, on 03/18/2002. *(Showing tie wrap secured around back of legs)* | SJH-643 - 644 |
| 83. | Trial Exhibit 518 M: Photo of John Doe Number Three (Alexander Umansky), taken at the funeral home, by FBI Agent George Fong, on 03/18/2002. *(Close-up shot of his left shoulder and tattoo)* | SJH-645 - 646 |
| 84. | Autopsy photos of UNSUB #1 and #2, (Roll 1), 03/19/2002 *(Envelope labeled: 1A181 Autopsy)* | SJH-647 - 666 |
| 85. | Autopsy photos of UNSUB #1 and #2, John Doe #1, (Roll 4), 3/19/2002 *(Envelope labeled: 1A192, Autopsy)* | SJH-667 - 689 |
| 86. | Testimony of Anthony Tindall (09/06/2006) | SJH-690 - 759 |
| 87. | Testimony of Brian Crews; Testimony of George Fong (09/08/2006) | SJH-760 - 828 |

**Exhibit 38 -  659**

# EXHIBIT

# 39

DECLARATION OF ANTON ABRAMKIN

I, ANTON ABRMKIN, declare as follows:

1.      I am the son of Marina Karagodina and Vitaly Abramkin. My parents were married for approximately eight years. When I was about eight years old, my mom took me to the U.S. to live with Iouri Mikhel, who was her boyfriend at the time. I am now 28 years old.

2.      When I was growing up, my father was abusive – mostly towards my mother, Marina. The marriage was bad – my father was an ex-Soviet secret service agent, so he was controlling of my mother. He did things like wiretap her phone and hide her passport.  She told me that my father threw her onto a glass table once. She still has a scar on the side of her abdomen from that incident.

3.      I think my mom was introduced to Iouri by her friend, Karine Salloway. I am not clear, but I think she was on the verge of separating from my father. I think the final straw for my mom was finding out that my father had met someone else in Ukraine and had promised that woman to marry her while still married to my mother. I remember my mother was leaving my father, we tried to take my Hot Wheels toy set with us, but my father grabbed it and stomped on it. When we left England, my father obviously did not like it.

4.      My mom did not really warn me we were moving to the US, but I did not mind it. I was already used to moving and have moved around quite a bit even after our time with Iouri. I think I lived in the US for approximately 8 months, when I was eight years old. I would describe Iouri as a good man. When my mom and I arrived in the US, I remember Iouri picked us up in a limousine. Iouri then took us to the Hollywood sign, and I remember I was just taking it all in. When we arrived in the US, I wasn't able to fall asleep right away because of how long the journey had been. My mom wanted to force me to go bed, but Iouri

1

*AA*
Initials

**Exhibit 39 -  660**

let me play with my toys until I tired out. I spent most of the night playing with Iouri's cat and with all the toys that Iouri had already bought for me, including a Jurassic Park 3 play set.

5.        My life with Iouri was a fairytale. Iouri paid for me to go to a good private school and we lived in a big house. Iouri bought my mom a 4x4 (Range Rover) that she used to drop me off at Pinecrest Elementary. Iouri has been the only man in my life that played the role of a father. I have no problem saying that about Iouri because even my own father, Vitaly, did not do what Iouri did for me. Iouri taught me how to ride a bike, enrolled me in soccer camp, and taught me how to play basketball. Iouri and I spent a lot of time together – driving around in his car and hanging out at the exotic fish shop where he taught me about Lionfish and fishes in general. He dedicated time to me despite being busy with his own business. Iouri was the most suave man I have ever met - he taught me what a man should be, how he should dress, and how he should carry himself. These are things that that my own father never did – he was always so consumed with work. My father has only been there for one of my birthdays – my 18th birthday. When my father showed up, the only thing he gave me was a handful of change he grabbed from his car, which amounted to 6 pounds. I have not been in contact with my father in 3 years.

6.        When Iouri was arrested, I remember the FBI storming the house and pulling me out of my bed. The agent that pulled me out of bed carried me over his shoulder and sat me away from my mother. The FBI tried to question both of us. I remember crying and screaming for my mother and my mother crying loudly and uncontrollably – she could not be calmed down. My mom was pregnant at the time.  All the FBI agents were harsh on my mom and me. They wanted to question her and kept switching out the agents until they

<div align="center">2</div>



Initials

<div align="right">**Exhibit 39 -  661**</div>

finally had an agent that was nice. After repeatedly crying for my mom, we were sat together. When the FBI was trying to question my mom, she kept crying and asking for a lawyer, but the FBI just kept questioning her. At some point, my mom became what I would now describe as very catatonic and shell-shocked. She looked frightened, shocked, had shallow eyes, and had difficulty responding.

7.    After Iouri was arrested, I know my father cooperated heavily with the FBI. When the FBI spoke to my mom when we were back in the UK, I was in the other room. The Met Police and the FBI were there. I remember thinking the Met police were on my mom's side and fielded what questions the FBI could ask her. At the end of the interview, as the FBI and the police were leaving, the Met police told my mom, "You can thank your husband for this." I am not surprised that my father would contact the FBI given his relationship with my mother and his dislike for Iouri.

8.    Returning to the UK was horrible for me. I went from living in a mansion to living in a small and crowded flat, going from a good private school to one of the worst schools in Reading. As a kid, my mom discouraged me from sharing this with other kids because she did not want me to get made fun of or just have other kids not believe that this had happened in my life. As a result, I just internalized it. Living in the flat was hard: it was crowded and to top it off, our grandma came to live with us from Ukraine. She had her own problems. She had just lost her husband of a few decades – he had a heart attack while fishing and drowned.

9.    My half-sister, Alisa, is eight years younger than me. When Alisa was born, I felt really happy. Alisa and I are close, and I've always loved her. My family (Marina, Alisa and I) are really close. I don't visit my mother often, but I speak with her on the phone

3

AA
Initials

**Exhibit 39 -  662**

almost every other day. My mom has been my strength and the strength of the family. Through it all, she has not broken and even when she's going through a difficult situation, she has a hard time displaying it. I don't consider Brian, my mother's current husband, as a father figure.  My mom and Brian have spoken about divorcing. I think they've been married for 14 or 15 years. They met online and the times that my mom tried to break it off, Brian called her threatening to hurt himself. We, Alisa and I, are the source of the tension between Brian and my mom. He's controlling, nasty, and is not accountable for his actions. When we lived in Dubai, when I was about 15 years old, Brian attacked me in front of my mom, Alisa, and our grandmother. To this day, Brian denies he attacked me. As soon as I was old enough to leave and had a job ~~financially able~~, I left. Brian has done the same thing to Alisa, had an alteration and then denied it. One time, my mom came to spend Christmas with me and when she returned home, Brian had locked her out of the house and let her know that she no longer lived there.

10.    Through the years, I have kind of pieced together what happened. I still have a box of photographs from my time in the US with Iouri. I don't know why I've saved them, but I figured one of these days I would use them. For a long time, I also kept a letter that Iouri had sent me. It was a drawing of the Jurassic Park logo because Iouri knew how much I loved dinosaurs. In that letter, Iouri asked me to take care of my mother and Alisa. At some point, I lost the letter with all the moving around I have done in my life. I regret not having it now in the event that could have helped Iouri.

11.    When I was about 20 or 21, I thought about reaching out to Iouri.  I spent a long time looking for Iouri and finally found his prisoner's number and the prison where he

4

AA
Initials

**Exhibit 39 -  663**

is. But I paused back then, thinking it would upset my mom, so I ended up not writing to Iouri.

12.    Iouri is a good man, and I would be really upset if he is executed. I also don't believe in the death penalty.

I declare under penalty of perjury under the laws of the United States of America and of the State of California that the foregoing is true and correct.

DATED: 16/02/2023

_____
ANTON ABRAMKIN

5

<u>AA</u>
Initials

**Exhibit 39 -  664**

# EXHIBIT 40

## DECLARATION OF GARY GENTILE

I, GARY GENTILE, declare as follows:

1.      I was formerly a resident of California, having last lived in Rancho Mirage. I currently reside in Killarney, Ireland.

2.      In 2022, I was interviewed at my home by an investigator named David Park with the Federal Public Defender's Office. He asked me about my recollections of his office's client, Iouri Mikhel.

3.      I have been a golf professional throughout my working life. I first became acquainted with Iouri at a driving range in Calabasas, where I was working at the time. We eventually became friends. I remember playing beach volleyball with him, and participating in a pool team along with my brother. Iouri was very personable, intelligent, and struck me as having traveled the world. He appeared wealthy.

4.      Iouri suggested that we engage in a business venture that ultimately became Babylon Virtual Country Club. The idea materialized after a conversation with a third person, Charlie Kirkpatrick, whom we knew from a pool hall he owned in the desert. The plan was to create a luxurious golf clubhouse with a full range of services and amenities, with the novelty of a set of golf simulators that would allow rounds to be played without a physical course. My role was to develop the golf-related aspects, and Iouri's was to take care of the business side.

5.      To my knowledge, the business did not get off the ground because it was never fully funded. Mr. Park showed me a document indicating a $35,000 wire transfer request into the Babylon account in 1998. I would have been made aware by Iouri of financial transactions concerning this account, but the money side of the venture was his responsibility. Regardless, this would not have gotten us very far as the golf simulators by themselves would have cost $200,000.

1

Initials

**Exhibit 40 - 665**

6.      Iouri appeared to be experiencing serious financial issues, which would have explained the problems getting the venture started. Iouri asked to move into my condo in Rancho Mirage as a way to be closer to where the business would be located, however, it seemed to be a cover for the fact that he was running out of money. I moved in with my girlfriend at the time (now wife), and Iouri stayed in the condo with his girlfriend, Natalia.

7.      I did not know many details about Iouri's work, other than the impression that he traded junk metals. I recall that he took a trip to Turkey, presumably for business, and returned a changed man. I don't remember the exact date, but this must have been before 1999, since that's when he left the Rancho Mirage condo. Previously easy-going, he now appeared to be angry and under immense financial pressure. The evening of his return from the trip, Natalia called us very late at night in a panic and begged us to come over to the condo because Iouri's behavior was worrying her. When I arrived I saw Iouri lying on his bed, sweating profusely and apparently hallucinating. He was gesturing with his arms as though he saw someone or something around him. He said something like, "Don't do that" or "I don't want to do that". He eventually calmed down.

8.      Iouri had always maintained his physical fitness, but after the trip he began working out with such increased intensity that he became huge.

9.      I have never previously been interviewed by anyone about this case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: 2/21/2023                        _____
                                        GARY GENTILE

2

Initials

**Exhibit 40 - 666**

# EXHIBIT 41

DECLARATION OF DR. JOSE FLORES-LOPEZ

I, DR. JOSE FLORES-LOPEZ, declare as follows:

1.    I am a medical doctor licensed to practice in the state of California with a specialty in Psychiatry, retired from working for San Bernardino County, Los Angeles County, Riverside County, and the California Department of Corrections and Rehabilitation

2.    I graduated from the Stanford University School of Medicine in 1981 and over my career I have seen and treated thousands of inmates in both the state and county level.

3.    On December 3, 2022 I spoke with a Federal Investigator named Alejandro Villaseñor who showed me a copy of Interdisciplinary Notes dated 1/30/04 and a typed Memorandum also dated January 30, 2004. I have placed my signature on copies of said documents, which are attached to this declaration as Appendix A. I immediately identified the Interdisciplinary Notes as being in my hand writing with my signature. I also identified the typed memorandum as one I typed. It has been a long time since I wrote these so I had to read them. I do not actually remember Mr. Iouri Mikhel but my notes and memorandum are clear as to how I felt about this inmate.

4.    Based on what I wrote in my memo and notes, Mr. Mikhel was probably having some sort of manic episode. Mr. Mikhel was not suitable for housing at the San Bernardino County Sheriff's Department Central Detention Center ("CDC") and should have been placed in a suicide cell or some other place for his safety. This is especially true since I noted in the memo that Mr. Mikhel was not taking his medication and was uncooperative.

5.    Reading this memo I was clearly concerned about Mr. Mikhel, who should have been forcibly medicated at that time. Mr. Mikhel clearly was not capable of making decisions for himself. As you can see, there is no diagnosis in my memo as I was not asked to give a diagnosis.

1

Initials

**Exhibit 41 -  667**

6.     Under my contract with San Bernardino county at that time, I would go to wherever the San Bernardino County Sheriff needed me but I was mostly at CDC, an old historical jail. CDC was not a nice, new or refined institution. I would show up to CDC once a week and see anywhere from 30 to 40 patients that day. Most were inmates I had been treating for a long time and did not need escorts. From time to time I would be asked to make an assessment of federal inmates at CDC.

7.     The assessments of federal inmates at CDC were not forensic evaluations. In other words, I was not to treat them or diagnose them. I was just to assess if the federal inmate could be housed at CDC. That was all, which is why my memo does not show any diagnosis. In these assessments I was never provided any historical information. There probably was an MFCC or Social Worker who would have had his medical history and would have known him.

8.     These assessments of federal inmates lasted 10 to 15 minutes. I would have a sheriff's deputy escort me to each cell door. From the cell door I would communicate with the inmate. The deputy could hear everything so the conversation between myself and the inmate was not confidential. If the inmate engaged with me, we could have a conversation. Here, based on my memo, I believe I had little to no conversation with the inmate as his memo says that the inmate was uncooperative.

9.     I had no real power with federal inmates. Had Mr. Mikhel been a county inmate I would have made arrangements to transfer him to an acute facility. CDC did not have an adequate facility, like a suicide watch cell, or the ability to safeguard an inmate exhibiting the conditions outlined in my memo. I would have asked the nurse to call Arrowhead Facility or WVDC, where they can provide a higher level of inpatient services. I would have talked to either

2

Initials

**Exhibit 41 -  668**

place and had Mr. Mikhel transferred out to one or the other facility where they could provide services to restore his competency.

10.    I am confident that if Mr. Mikhel were a county inmate, the transfer would have occurred and he would be moved to an acute facility, where at the very least he could be monitored to make sure there were no suicide attempts. However, since I was only asked to assess if Mr. Mikhel, a federal inmate, could stay at CDC, all I could do is type up a memo and pass it on to the administration. Once I did that, I never heard back or was consulted any further on this or any other assessment of a federal inmate at CDC.

11.    My memo is clear, Mr. Mikhel should not be at CDC but at an acute facility. I certainly would not have kept this inmate at CDC. Based on my memo and notes, I believe that Mr. Mikhel was severely depressed, manic and maybe even psychotic. In order to be certain of this I would need to see what medications he was on, what his history was and other information to make that diagnosis. I was never given those things prior to my assessment.

12.    No one from Iouri Mikhel's trial defense team ever contacted me. If I had been contacted, I would have told them what I know and would have testified truthfully.

I declare under penalty of perjury that the foregoing is true and correct.

Executed On:    4/05/2023

DR. JOSE FLORES-LOPEZ

3

Initials

**Exhibit 41 -  669**

# Appendix A

**Exhibit 41 -  670**

FEB 04 04 03:21p          WVDC-medical                    3034033233          p.113

| 1 - D&H SITE | 4 - HOME | 5 - SATELLITE | 6 - SCHOOL | 2 - OTHER FIELD | (ADD CODE 3 IF NON-FACE-TO-FACE) | (LOC IS 1 IF NOT SPECIFIED) |

| DATE | HRS: MIN | LOC | ALL ENTRIES SHALL BE SIGNED WITH NAME AND TITLE HEAD ALL SERVICE ENTRIES WITH SPECIFIC SERVICE |
|------|----------|-----|---------------------------------------------------------------------------------------------|
| 1/21/04 | 14:15 | | O/C call. Inm. referred from Nurse. Inm cut his left ankle yesterday & lost a lot of blood. Meet ī inmate on Unit/16D3. Inm looks tired, clear thinking, coherent, oriented. reports feeling cold & tired, wishing his cut deeper. fair appetite, sleepy. unsure about suicidal ideation. Inm. down AH & unsure how sad he is. Plan. Inm remains s/w watch without blankets. 2) FIU scheduled to monitor mental health status of Inm. (Inm reports & hx of mental health services.) ———————— Monica Hsieh LHTT |
| 1/30/04 09:10 | | | Psy med. Eval. Pt remains a Dnger to self. He is Highly depressed. Has been seen Thou'__ his 4 mee_s ___. Remains a Suicide Risk (+) SI. Pt. needs a Higher level of care. for Suicide w__ 6th of TK (may need involuntary TX) 1) Continue ī Vol. Xmets (w/ ___) 2) Transfer do high level of care 3) Continue Suicide level 1 of CW ___ S Flores - ___ on |

**INTERDISCIPLINARY NOTES**

County of San Bernardino
DEPARTMENT OF BEHAVIORAL HEALTH

Confidential Patient Information
See W&I Code 5328

14-18524-662 Rev. 5/97

| NAME: | |
|-------|---|
| | BOOK# 0304301156 |
| CHART NO.: | MIKHEL. IOURI GHERMAN |
| | DOB 04/09/65 |
| DOB: | MED# 0304301156 |
| PROGRAM: | ——— · ·· |
| BOOKING # | |

008IM

**Exhibit 41 -  671**

## ,e Flores-Lopez, M.D.

09) 386-0912

January 30, 2004

Re: MEKHEL, Iouri Gherman DOB: ███ 65
Med # 0304301156
Book #: 0304301156

To Whom It May Concern:

Mr. Mikhel, presently housed in a single cell at CDC in San Bernardino, requires a higher level of psychiatric care than is currently being provided at the aforementioned location.

Mr. Mikhel remains acutely suicidal and depressed. He requires 24-hour suicide watch, as well as daily psychiatric consultations. He is uncooperative, unpredictable and exhibits severe mood swings, as well as severe depression.

Mr. Mikhel has been observed to discard his voluntary psychiatric medications. As a result, Mr. Mikhel is a strong candidate for involuntary medication.

At CDC. San Bernardino, we are unable to accommodate patients requiring involuntary psychiatric medication. We cannot accommodate this high level of psychiatric need.

It is crucial that Mr. Mikhel be transported to a facility where all of his psychiatric needs can be addressed.

Should you have any questions, or require further clarification, please do not hesitate to contact the undersigned.

Respectfully Submitted,

Jose Flores-Lopez, M.D. Psychiatrist

JFL:nf

001IM

PCF - 026154

**Exhibit 41 -  672**

# EXHIBIT

# 42

DECLARATION OF CHRISTIAN FILIPIAK

I, CHRISTIAN FILIPIAK, declare as follows:

1.      I am currently an investigator with the trial unit of the Federal Public Defender's Office in the District of Nevada.

2.      My training in investigations began as a Special Agent in the Air Force, which I left in August of 1991. I worked at a firm contracted with San Bernardino County, then went into private practice. I have experience investigating numerous State death penalty cases.

3.      On June 19, 2020, and in March 2023, I was interviewed remotely by members of the Federal Public Defender's Office in Los Angeles, including investigators Alejandro Villaseñor and David Park. They inquired about my recollections of working on the federal capital trial of Iouri Mikhel.

4.      In 2002, I was brought in by attorney Dale Rubin as an investigator on the Mikhel trial team. Dale and I knew each other since we had worked together on other cases before. To my recollection, this was not my first federal death penalty case. I had worked on many international investigations previously, including a non-death case with a Russian defendant, but I did not have any background in Russian language or culture.

5.      I was initially the only investigator on the case, assigned to guilt phase preparation. Mitigation investigation was different during that time, with the ABA guidelines having just come out. Everything needed to be justified in order to be approved by the Court. The trip Dale and I took to England to interview and videotape Marina Karagodina was intended to get Iouri involved in the case. We thought it would be good for him to see his children. Once the case was death-authorized, Holly Jackson was hired to focus on mitigation. That work was continuous as the Government constantly dumped discovery on us, including after the case had ended. Looking back, it was a mistake to wait so long to bring Ms. Jackson on board.

1

*CSF*
Initials

**Exhibit 42 -  673**

6.      I was not involved in the presentation to the local United States Attorney's Office and the Department of Justice so the case would not be authorized as a death case. I do not recall any planning meetings or the substance of the presentations. This was probably a mistake as well.

7.      The team did not hold many formal meetings. I spoke frequently with Dale as we are friends and were working on other cases together at the time, including the Richard Terflinger case. I probably talked to Dale every day regarding one case or another since we were working together on so many cases. I was basically Dale's investigator since early 2000. In Iouri's case, we may have held meetings at the courthouse and at attorney Richard Callahan's house. I had not previously worked with Ms. Jackson, except for our work in the Terflinger case. I do not recall working with resource counsel.

8.      Regarding experts, I would prepare documents to review, including discovery or relevant reports upon request, and then clear the documents I thought pertinent with Dale before sending them out. I don't think we kept a list of materials given to experts like we do now. That wasn't the practice back then. Once Holly came on board, we talked about what documents were pertinent together. The team hired a paralegal but I do not recall the extent of her involvement. I do remember performing a large part of what would traditionally be considered paralegal responsibilities myself.

9.      I remember Iouri wanting to testify at trial. I do not recall if any preparation was done for his testimony. He told me that he did not intend to answer any questions posed to him by the Government. Iouri was adamant that he just wanted to tell his side of the story. I couldn't see how, but I think Iouri believed he was charming and eloquent enough that he could persuade the jury despite all the evidence the Government had presented. I think Iouri understood our

2

*CSF*
Initials

**Exhibit 42 -  674**

explanation that the American Justice system required him to answer questions posed by the Government if he testified, but somehow, he thought he could game the system because of his experiences growing up under the corruption of the Soviet regime. That was my takeaway when I told him I had received a federal summons for a trial during his case. Given the timing, it was clear I was being summoned for his trial. I jokingly told Iouri that I would be on his jury, and knew exactly how to get the jury to go his way. Iouri took it seriously. He really thought I could and would do that to game the system to his advantage.

10.    Iouri and Dale did not have a good relationship. The Special Administrative Measures (SAMs) imposed on Iouri were just 100% horrible and made things worse. It really impeded our ability to communicate with him. The conditions for our meetings were not conducive at all to having proper communications with a client, either to continue developing a trusting relationship or for the client to participate and assist counsel in his defense. Before SAMs, we met Iouri in nice rooms with computers, and Iouri was unshackled for our visits. After SAMs, we had to meet in what can be best described as a hallway with telephones, separated by glass. I could literally touch both sides of the room if I stood upright and extended my arms. Iouri and I communicated through the phone from either side of the glass. There was a row of cells behind him. There was no privacy. This is the same section that was housing members of the Aryan Brotherhood, Mexican Mafia, all the heavy hitters. I think Iouri had to be handcuffed during those meetings. He was strip-searched even though it was not a contact visit. Iouri became so paranoid about talking over the phone in the visiting room when we met that he would not talk at all about the case in any meaningful way. The only way to share a document was by putting it in front of the glass; and if I wanted to play a recording for Iouri, I would have had to place the recorder on the phone receiver.

3

*CSF*
Initials

**Exhibit 42 -  675**

11.     I can't emphasize how bad SAMs was for Iouri, us and the case. Iouri shut down after SAMs. Whatever rapport and trusting relationship we had managed to build until then went out the window when the Government put Iouri under SAMs restrictions. I felt that the attorneys should never have agreed to the terrible conditions. I told them that they should litigate the issue because it would prevent us from meeting and continuing to develop a relationship with Iouri. I told the attorneys SAMs wasn't going to go well for us, and that the Government was just going to shut down our defense. I had other clients with custodial misconduct problems -- some of the top guys from the Mexican Mafia, for example -- who were not placed on the same restrictions. Iouri held it against us that we agreed to SAMs and then did not fight to take him off SAMs. Iouri would complain about Dale being a "shit" lawyer because he couldn't take him off SAMs.

12.     The SAMs restrictions continued after trial. I learned this because after trial, I wanted to keep in touch with Iouri, as I do with some of my other clients. I was told by AUSA Susan DeWitt I could not send him letters because I was no longer the investigator assigned to the case. It was infuriating.

13.     My recollection of Judge Tevrizian is that he was upset at the trial team for some reason. He just treated the defense side very differently. I was surprised by some of the actions he took given how I had seen him preside over other cases. Judge Tevrizian's tone with the defense in this case was more curt, more abrupt, and less willing to entertain the possibility that some of our arguments had any merit. He had that demeanor throughout, before and during the trial in front of the jury. There were particular incidents that stand out in my memory: one, his reaction when Rick Callahan fell down, and we asked for a continuance. It was outrageous how Tevrizian questioned Rick, his credibility and integrity. There was no reason for Tevrizian to think Rick was a drunk, especially after he questioned Rick's doctor about his very serious head


Initials

**Exhibit 42 -  676**

injury. Tevrizian would not have questioned a prosecutor the same way he did Rick. The second instance was the way Judge Tevrizian gutted the videos we were offering -- he made a point to cut down all the videotapes for the penalty phase. Third, he was really upset when we raised in court his application for the United States Attorney position in Los Angeles; he did not like that at all. Finally, I think he was really upset when the issue of his potential investment in some property linked to one of the victims was raised.

14.     My belief regarding Victor Sherman's involvement in Iouri's case is that it was improper for Sherman to have Iouri sign over his house to Sherman. Sherman did a lot of Medicare/MediCal fraud cases, some of which I worked on after he was removed by the presiding courts. I recall those clients complained that Sherman played on their expectations with promises of positive results. I feel that Sherman did the same with Iouri. I remember Iouri telling me Sherman had promised him that if Iouri gave him money, Sherman could make the case go away.

15.     I am told I wrote a memo about how one of the witnesses I was interviewing called Special Agent Louis Perez to seek his permission to talk to me. I don't have an independent recollection of this, but if it is in my memo, I stand by it. Contemporaneous memos are very important. Memories fade, so I consider contemporaneous writings more accurate than one's memory years later.

16.     For investigative work in Russia, I procured assistance through contacts I had developed while in the military, along with referrals from international investigator associations. Records collection in Russia was like the Wild West. We would hire a local fixer and then just show up to see what would happen.

*CSF*
Initials

**Exhibit 42 -   677**

17. My billing records are essentially the investigation plan as each request for funding would have been accompanied by a memorandum justifying the need for investigation. All of my work, including interview memos and client visits, should be reflected in the billing records. My practice for the case was to go through and organize the discovery, create a bates stamp log, and discuss next steps with Dale.

18. When I was asked my impressions about Iouri's suicide attempts, I frankly was at a loss. I did not remember how many times he had made attempts to commit suicide, or the circumstances surrounding them. I really do not know why I no longer remember the incidents.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: _4/21/23_

_____
CHRISTIAN FILIPIAK

6

_CsF_
Initials

**Exhibit 42 -  678**

# EXHIBIT 43

## DECLARATION OF HOLLY JACKSON

I, Holly Jackson, declare as follows:

1. I am an attorney and mitigation specialist. I was the mitigation specialist for Iouri Mikhel at his capital trial in federal district court. Although I have been licensed to practice law since 2000, and I have provided direct legal representation in a limited number of non-capital direct appeal cases, I work primarily as a mitigation specialist.

2. I was new to the field of capital mitigation when I joined Mr. Mikhel's trial team. At that point, most of my experience was in state death-penalty proceedings. Before Mr. Mikhel's case, I had some, but not a lot, of experience in federal death-penalty cases. I had previously worked on Charles Woody's federal case, and at the time of Mr. Mikhel trial, I was also working on Richard Terflinger's defense team, also a federal case.

3. I now prefer working on federal, rather than state, capital cases. One of the aspects of federal work that I appreciate is the access to federal resource counsel. In my experience, they are clever, caring minds who want to help.

4. Before Mr. Mikhel's case, I had no specialized knowledge in Russian language, culture, or history. I had never previously represented a foreign national.

5. Dale Rubin, one of Mr. Mikhel's court-appointed lawyers, asked me to join the team as a mitigation specialist. Mr. Rubin's co-lead counsel was Richard Callahan. I had never previously worked with Mr. Callahan. Between the two attorneys on this case, Dale Rubin took primary responsibility for preparation of the penalty-phase defense. I worked more closely with Mr. Rubin than I did with Mr. Callahan.

6. The fact investigator on the Mikhel defense team was Chris Filipiak. Mr. Filipiak and I were already working together on the Terflinger case at the time I joined the Mikhel team. Mr. Rubin was defense counsel for Mr. Terflinger. Based on my experiences with Mr. Filipiak in

1

Initials

**Exhibit 43 - 679**

the Mikhel and Terflinger cases, I think he is uniquely suited to guilt-phase investigation rather than penalty-phase mitigation investigation. I learned that during the Terflinger investigation, Mr. Filipiak wore a gun during witness interviews to protect himself.

7.      I did not join the Mikhel defense team until September 2004, over two years after Mr. Mikhel was arrested. My appointment was delayed because the district court would not fund penalty-phase experts until the Department of Justice authorized this case as a capital proceeding. Because I joined the team so late, I felt like I had to play catch up.

8.      In my experience, collaboration, open communication, and regular team meetings are critical to successful teamwork in capital litigation. This team did not work together well. I was not given much direction from the attorneys; instead, I was expected to figure things out on my own. The team rarely met in person to assign tasks and keep each other apprised of what we were doing on the case. I do not recall the attorneys consulting me regarding the defense strategy for pre-trial motions or for the guilt phase. I was never instructed to review the discovery, but I took it upon myself to review it.

9.      My role as the mitigation specialist on this team did not encompass investigation of rebuttal evidence for the government's case-in-aggravation. I assumed that Chris Filipiak was responsible for this aspect of the penalty-phase investigation.

10.      Michael Burt and Judy Clarke were the federal resource counsel assigned to this case. When I joined this team, Ms. Clarke told me that she could tell this was going to be a really tough case. She was concerned for us and she offered me her assistance. Despite the availability of this assistance, our team made little use of resource counsel.

11.      No one on the team produced an investigation plan.

2


Initials

**Exhibit 43 -  680**

12. When I first met Mr. Mikhel, it was clear to me that he was very depressed. His presentation was very monotone. At that time, he did not have wild mood swings; later on, I observed wild swings in his mood. Mr. Mikhel was housed at West Valley Detention Center when I first joined the team. I had trouble scheduling visits at West Valley. I recall instances where jail staff would triple book the visiting room. Sometimes I would show up for a scheduled visit, and they would tell me to go home.

13. Mr. Mikhel was already under a Special Administrative Measures order at the time I joined his legal team. Long-term solitary confinement had a devastating effect on Mr. Mikhel. It hastened the deterioration of his mental health. It also posed huge barriers to our work as his legal representatives—it made visitation more challenging, particularly for Chris Filipiak.

14. Because I knew that investigating Mr. Mikhel's mental health was going to be an important part of our work, I produced a form for team members to use during legal visits in order to document Mr. Mikhel's appearance and symptoms. I thought this would be a useful tool for us to identify indications of mental illness. No one on the team used the form I created. I gathered that no one else on the team thought it was worthwhile monitoring the client's symptoms. I suspect that Mr. Callahan and Mr. Rubin both thought Mr. Mikhel was faking mental illness. Mr. Filipiak did too, initially. But over time he came to realize that Mr. Mikhel was actually very sick.

15. From the beginning of my work on this case, it was clear that there was a rift between the attorneys and Mr. Mikhel.

16. I wanted to locate and interview witnesses who knew Mr. Mikhel in the Southern California area. I assumed that Chris Filipiak would identify witnesses for me to interview based on his review of the discovery. Chris had access to investigative databases to locate witnesses. I

3


Initials

**Exhibit 43 - 681**

did not, so I relied on him to provide contact information for witnesses. I eventually just gave up on the investigation of mitigation witnesses in the area. Mr. Mikhel's current counsel have shown me declarations executed by witnesses who knew him after he moved to Southern California, including Gary Gentile, Linda Morrow, and Anton Abramkin. The information contained in these declarations is the type of information I sought in preparation for the penalty phase. I was looking for witnesses who could humanize Mr. Mikhel with the jury.

17. After I joined the team, I learned that in 2002, Mr. Filipiak and Mr. Rubin traveled to Russia and to the United Kingdom to interview defense witnesses. On these trips, Mr. Filipiak and Mr. Rubin attempted to conduct mitigation investigation to prepare for their presentation to the Department of Justice. Mr. Filipiak videotaped several witness interviews on these trips, including interviews with Mr. Mikhel's ex-girlfriend, Marina Karagodina, and his former attorney in St. Petersburg, Benjamin Bril. The team later attempted to introduce these videos into evidence at the penalty phase. The court refused to admit the videos because Mr. Filipiak had asked the witnesses leading questions.

18. In the years between Mr. Filipiak and Mr. Rubin's trip to Russia and my appointment as mitigation specialist, no one maintained contact with Mr. Mikhel's friends and family in Russia or the UK. My first investigative trip to Russia was in October 2005, a year after I was appointed. The second trip was in October 2006, during the guilt phase of the trial. I should not have waited so long to travel to Russia. I knew that many important mitigation witnesses were in Russia. The time we spent there was inadequate. I wish we had stayed in Russia for several weeks to exhaust record collection and to build rapport with witnesses.

19. We asked Mr. Mikhel to sign releases for records before we traveled to Russia. He did so, and was always willing to cooperate in this regard.

4


Initials

**Exhibit 43 -  682**

20.     I have recently reviewed an email dated October 11, 2006, discussing our effort to collect Mr. Mikhel's prison records from Russia. This email says the team will need a power of attorney executed in the presence of a consular official to obtain Mr. Mikhel's prison records. I have no memory of ever asking Mr. Mikhel to prepare a power of attorney authorizing me or anyone else on his team to seek records on his behalf. Nor do I have any memory of ever asking the Russian government to supply Mr. Mikhel with valid identity documents to facilitate our requests for records on his behalf.

21.     I did not have assistance from the Russian embassy or government in conducting the mitigation investigation. I think other team members may have had contact with the consulate.

22.     I used the same interpreter on both trips--Masha Smirnova, a Russian-based interpreter. Ms. Smirnova was born in St. Petersburg and was familiar with the local bureaucracy. Her role in the case was broad. She helped locate witnesses, request records, translate from Russian to English, and interpret during witness interviews. I ended up relying on Ms. Smirnova, rather than a court-certified translator, for much of the written translation work in this case. Despite Ms. Smirnova's assistance, overcoming cultural barriers was a huge challenge throughout my investigation in Russia. I often struggled to connect with witnesses because of cultural and language barriers to building rapport.

23.     Prior to my first trip to Russia in 2005, I had almost no communication with Mr. Filipiak or Mr. Rubin about what they did on their prior trip to Russia. I never got the impression that they had uncovered anything meaningful that would have helped me. No one informed me that Mr. Rubin and Mr. Filipiak had videotaped interviews with mitigation witnesses in 2002. As

5

Initials

**Exhibit 43 - 683**

a result, I did not review these videos until much later, after I had already interviewed several of the same witnesses and recorded their statements on video.

24.     Right before my first trip to Russia, I learned that Mr. Filipiak had previously worked with an investigator based in Russia, Vladimir Solomanidin. Mr. Filipiak hyped him up as someone who would be able to help our investigation, but ultimately, I had limited contact with Mr. Solomanidin. In retrospect, I wish we had consulted Mr. Solomanidin regarding Mr. Mikhel's criminal history in Russia. He could have provided important context about this aspect of the case.

25.     Mr. Filipiak and Mr. Rubin were in Russia conducting investigation at the same time that I was there in the fall of 2005. But they stayed at a different hotel from me, and we worked independently. I recall that at some point we had a joint meeting with Dr. Elena Zdravomyslova, a Russian sociologist whom we had hired as a penalty-phase expert. They may also have joined me in a meeting with Natasha Alifanova, Mr. Mikhel's ex-girlfriend. Mr. Filipiak and Mr. Rubin conducted investigation regarding Mr. Mikhel's criminal history and incarceration in Russia, but they did not seem invested in the life history investigation that I was conducting with Masha Smirnova's assistance.

26.     On this trip, Mr. Mikhel's ex-girlfriend, Natasha Alifanova, gave me a copy of the autobiography of Mr. Mikhel's mother, Margarita.

27.     Ms. Smirnova and I also obtained Mr. Mikhel's childhood medical records. We got them directly from a clinic where Mr. Mikhel had been treated. I will never forget Ms. Smirnova just walking out of the clinic carrying a whole set of original records. I believe we attempted to obtain medical records for Mr. Mikhel's parents, but we were unsuccessful in these efforts.

6


Initials

**Exhibit 43 -  684**

28.    Mr. Mikhel's childhood medical records were lengthy, and they needed to be translated. I recall asking Ms. Smirnova to produce a translation. The translation she produced was short, maybe about 7 pages long. This translation could not be used as evidence in court; it needed to come from a certified interpreter. I believe I used Ms. Smirnova's translation to identify what portions of the records were relevant, then hired a certified translator to produce a final translation. By that point, it was so close to trial that I only had a small portion of the records translated.

29.    I have recently reviewed an email I wrote early in this trip, indicating that I wanted to locate and interview 3 of Mr. Mikhel's childhood friends: Alexandr Onustschenko, Vladimir Udaltsov, and Vasily Rhoo. I recall attempting to locate these witnesses. However, Mr. Mikhel's current counsel recently showed me translations of Mr. Mikhel's school records from 1975 through 1978. I obtained these original school records in Russian. However, I do not think I realized that these records included lists of all of Mr. Mikhel's classmates. We did not attempt to identify and interview the classmates identified in these records.

30.    I have recently reviewed my billing records from this trial. This made me realize that our team failed to do some important tasks in the run-up to trial. One of the biggest areas where we failed was in understanding Mr. Mikhel's mental health. We never retained a consulting mental health expert to guide our investigation. While we worked with mental health experts at various points in our preparation, each of them served a pretty limited role on the team.

31.    Mr. Rubin liked using Dr. Sam Miles as an expert. I believe he worked on a lot of juvenile cases. Dr. Miles was Rubin's go-to guy. Dr. Miles was a "one and done" type of guy,

7

Initials

**Exhibit 43 - 685**

meaning Dr Miles was someone you went to for a quick forensic evaluation. I now think this was the wrong type of case for a quick evaluation.

32. Dr. Cynthia Stout was a forensic trauma psychologist. I do not recall why we didn't make more use of her in this case.

33. Investigation of multi-generational family history is a critical part of a mental health investigation. Such investigation can shed light on an individual's genetic predisposition for mental illness. I wish that our team had done more to investigate this aspect of the case. I have also recently reviewed an email that I sent to the team near the start of the trip, indicating that I wanted to get confirmation that Vladimir Mikhel, Iouri's brother, was dead. But I have no memory of ever attempting to obtain his death certificate. This was a mistake. Mr. Mikhel's current counsel have shown me a copy of Vladimir Mikhel's death certificate, which shows that he died by suicide in 1996. He asphyxiated himself by hanging. This is important information that should have been presented to the jury—a suicide at such a young age indicates that Vladimir was experiencing a severe mental health crisis. It also indicates that Mr. Mikhel was predisposed to mental illness.

34. Mr. Mikhel's current attorneys have shown me a copy of a disability certificate for Mr. Mikhel's maternal grandmother, Anna Fot. This document shows that Ms. Fot was diagnosed with psychiatric disorders in 1946. I did not obtain this document. Once again, this is the type of information that I wish we had obtained—it would have helped us show that Mr. Mikhel had a genetic predisposition to mental illness.

35. Mr. Mikhel's attorneys have shown me a disability certificate for Iouri Mikhel's grand-aunt, Evdokia Kurmanov. This shows that she was diagnosed with age-related depression

8


Initials

**Exhibit 43 - 686**

in 1947. Our team did not obtain this document, which also would have shed light on Mikhel's genetic predisposition to mental illness.

36.    During pre-trial, Mr. Filipiak and I both spent a lot of time visiting Mr. Mikhel. Mr. Filipiak reviewed discovery with him. Mr. Callahan also made an effort to visit Mr. Mikhel. Out of all team members, Mr. Rubin made the least effort to visit Mr. Mikhel.

37.    I recall a tense meeting with resource counsel, after which Mr. Rubin and Mr. Callahan berated me for what I had told resource counsel. In my recollection, this meeting happened right before the start of the guilt-phase trial. By the time trial started, Mr. Rubin and Mr. Callahan were no longer speaking to me. I sat next to Mr. Mikhel at counsel table, even though Mr. Rubin and Mr. Callahan did not want me there. Mr. Mikhel's mental health was extremely poor at that time. I could tell he was in a fog. He would say things to me along the lines of, "I feel like you are saving my life just by sitting here." I felt like my only ally was Chrissy Gits, the paralegal assigned to Jurijus Kadamovas's defense team.

38.    Shortly after trial began, Mr. Mikhel attempted suicide. This was his third suicide attempt while he was incarcerated. I reached out to his treating psychiatrist at West Valley Detention Center, Dr. Inderpal Dhillon, who was extremely compassionate and concerned about Mr. Mikhel's wellbeing.

39.    It was and is my opinion that Mr. Mikhel was not competent to stand trial. I recall telling Dale Rubin and Rick Callahan that I did not think Mr. Mikhel was competent and that he could not rationally assist counsel. To this day, I cannot explain why the attorneys never formally declared a doubt about Mr. Mikhel's competency or requested a competency hearing.

40.    I took a second trip to Russia in October 2006. Dr. Craig Haney, our social historian, joined me on this second trip. This investigative trip coincided with the guilt phase of

9


Initials

**Exhibit 43 -  687**

Mr. Mikhel's trial. This was terrible timing. Because I was in Russia, I missed the guilt-phase testimony of one of the most important prosecution witnesses, Ainar Altmanis. The ongoing trial was a distraction from my investigation. I wanted to get back to Los Angeles as soon as possible so I wouldn't miss it. The second trip was delayed because the attorneys were convinced that they would get a continuance of the trial date. This did not pan out, which is why Dr. Haney and I ended up traveling to Russia during the trial.

41.    I had worked with Dr. Haney previously, and he has a reputation for being extremely thorough in his preparation. Dr. Haney did not get to spend enough time in Russia to really dig into this case. Looking back, I think I expected Dr. Haney to do the full mitigation work that he typically does, but on a compressed time frame. Dr. Haney's schedule was really packed. He wanted to re-interview everyone that the defense team had previously interviewed, but we did not have time to do this.

42.    I wish we had more time to track down Iouri's former teachers in St. Petersburg. We were starting to make progress in this area, but we did not have enough time to complete the task on either of my trips.

43.    The only witnesses on the paternal side of Mr. Mikhel's family that we were able to interview were Edward and Musa Mikhel. Edward was Mr. Mikhel's cousin, and Musa was Edward's wife. This interview was videotaped, and the recording was introduced at the penalty phase of trial. Edward shared much helpful information with me. He told me that when Mr. Mikhel's mother Margarita learned she was pregnant with him, she consulted a friend who was a gynecologist about terminating the pregnancy. This friend told Margarita that it was too late to terminate the pregnancy. I do not recall attempting to locate or interview this particular friend. Nor do I recall attempting to locate or interview any of Margarita's friends.


Initials

**Exhibit 43 - 688**

44.     I recently reviewed an email exchange dated October 25 and 26, 2006; this was an exchange of emails between me and Dr. Haney. According to these emails, on the first day of the trip, letters were delivered to two members of the paternal family, seeking interviews. At this point, I do not remember who these witnesses are. I wanted to locate and interview any blood relatives who were still alive, and I know that we had names for many of Mr. Mikhel's relatives, but many had passed away. If witnesses were alive that we wanted to interview, that was a missed opportunity and a mistake.

45.     When I returned to LA, Mr. Mikhel was not doing well at all. He was perseverating on all that had gone wrong. He was stuck, almost to the point of dissociating from reality. I tried to help him. My approach was to let him talk out what he was feeling.

46.     Our team wanted to have three of Mr. Mikhel's friends from Russia travel to the United States to testify at the penalty phase, but I did not understand how much time it takes to get a visa to travel from Russia to the United States. We did not make any efforts to help our witnesses obtain visas until mid-January 2007. Ultimately, the only witness who was able to travel to the United States to testify was our expert sociologist, Dr. Elena Zdravomyslova.

47.     Instead of presenting live witness testimony from Mr. Mikhel's friends, we presented videotaped statements. Based on my experience as a mitigation specialist, I know that this was an insufficient substitute for live testimony. You cannot achieve the same emotional connection with jurors using videotaped statements. I wish that Mr. Mikhel's jurors had the opportunity to hear directly from friends and family who knew him and loved him, and I believe that would have made a difference in their penalty-phase deliberations.

48.     I played a key role in preparing Dr. Inderpal Dhillon for her testimony. Dr. Dhillon mistakenly testified that Mr. Mikhel had bipolar I disorder. In fact, he had symptoms

11


Initials

**Exhibit 43 -  689**

consistent with bipolar II. The prosecution harped on this error in cross-examination. I could have prepared Dr. Dhillon better for this line of questioning, which was very effective because it made Dr. Dhillon look biased in Mr. Mikhel's favor.

I declare under penalty of perjury under the laws of the United States of America and of the State of California that the foregoing is true and correct.

DATED: 8/12/2023            _____
                           HOLLY JACKSON

12

Initials

**Exhibit 43 - 690**

# EXHIBIT

# 44

<u>DECLARATION OF ARMEN HARUTIUNIAN</u>

I, ARMEN HARUTIUNIAN, declare as follows:

1.      I am a 40-year-old former federal inmate whose BOP register number was 21179-112. I am half Armenian on my mother's side and half Russian on my father's side. I currently live in Chicago.

2.      I first met Iouri Mikhel when I was 17. I met Iouri at a Hookah lounge in Encino. My older brother Aram introduced us. I did not know Iouri well and would only see him around Encino from time to time.

3.      When my brother and I arrived at the Metropolitan Detention Center in Los Angeles (MDC LA) Iouri Mikhel was already there. The moment I got there Iouri reached out to me and my brother. Iouri would put money on my books, help me out at commissary and cook for all of us. A group of us all ate together and shared our food. It did not matter that my brother and I were only half Russian. Iouri never asked for anything in return. Iouri was just a nice guy.

4.      The day I was to be released, Iouri was brought to the showers. My cell was near the showers, so Iouri and I spoke. That is how I knew Iouri had trial that day. I was released early in the day, maybe around 9 am. May have been earlier. I called my sister, ~~Naomi~~ Sonia, and asked her to bring me a suit so I could go to court. My sister came by MDC LA with a suit. I changed and walked to the courthouse.

5.      On the first floor of the courthouse, I asked where Iouri's trial was and headed up. In front of the courtroom there was a table with two Marshals. I gave them my Federal ID from MDC LA. The Marshals wrote down my name and asked why I was there. I told the Marshal that this was a public courtroom and I was there to show support to my friend. The Marshal then let me in.

1

*AH*
Initials

**Exhibit 44 -  691**

6.      I remember opening the door and everyone turned around and looked at me. I did not realize the trial had started when I opened the door. I simply walked in and sat down around the back on Iouri's side. I do not remember if that was the left or right side. My only reason for being there was to show support to Iouri who was really nice to me. I sat down for seconds, less than a minute, when 4 Marshals came to me and walked me out.

7.      Outside, the Marshal at the table asked what was going on and told the other Marshals that he had let me in. One of the Marshals that escorted me out said no. He said I should not be let in because I was an associate of Iouri and was there to scope out or pick out the jury. I cannot remember which. That is a lie. They even contacted my PO and he told me never to go back to the courtroom.

8.      I do have a tattoo of the Armenian flag on the back of my head but it also says 1915 on it, which is the year of the Armenian Genocide. That is why I got the tattoo.

9.      I am not in any gang. Armenian power as a gang is bullshit. Six or seven months after I got out, I violated and because of what happened in the courtroom the Bureau of Prisons (BOP) labeled me as Russian Mob. I have never been part of that. In fact, that label was removed by the BOP when I got to Victorville. I have no idea why anyone would say that I am in any gang.

10.     After I was kicked out of the courtroom, no one from Iouri's defense team ever talked to me. If I had been contacted, I would have told them what I know and would have testified truthfully.

I declare under penalty of perjury that the foregoing is true and correct.

Executed On:

5/8/23

ARMEN HARUTIUNIAN

2

_____
Initials

**Exhibit 44 -  692**

# EXHIBIT

# 45

<u>DECLARATION OF LINDA MORROW</u>

I, LINDA MORROW, declare as follows:

1. I currently reside in Beverly Hills, CA, under the supervision of a residential reentry office of the Federal Bureau of Prisons, having pleaded to charges related to health care insurance fraud and contempt of court.

2. I formerly helped my husband, Dr. David Morrow, in his practice of medicine in Rancho Mirage, CA, by helping with marketing and public relations, teaching staff manners on how to properly speak with patients and maintaining the decor of the physical office.

3. On July 25, 2022, I was interviewed at the Metropolitan Detention Center in Los Angeles, California, by an investigator named David Park with the Federal Public Defender's Office. He asked me about my recollections of his office's client, Iouri Mikhel, whom I knew as Alex Pavlov.

4. I got to know Alex when he became my husband's patient. As a fully observant Orthodox Jew with the tradition of opening my home to Jews and non-Jews alike for meals and especially for Sabbath meals, I invited Alex to join our family for these special meals where we would say the traditional prayers, sing, and discuss topics such as philosophy, religion, history, art and music. Alex did not divulge much about himself but he was always an interesting and knowledgeable conversationalist. I came to like Alex and at one point even tried to play matchmaker for him.

5. At some point, recognizing that my husband was attracting patients from around the world, Alex suggested that it would be a good idea for my husband to expand his practice to Europe, in the South of France. Alex said that his role in the project would be as a funder. The practical efforts to establish the clinic were the responsibility of a woman named Natasha Strawbridge, whom I assumed had been brought in by Alex to take care of the details as neither my husband nor I knew anything about such a venture. As my husband was practicing medicine, I remember going to southern France on a number of occasions to review potential sites. I spent considerable time with Ms. Strawbridge in Europe and on the phone trying to put together deals and navigating through red tape, only to have everything apart. I began to suspect that the failure of these efforts was intentional and that Ms. Strawbridge was acting solely for her own benefit. Ultimately, my husband terminated the project.

Initials

**Exhibit 45 -  693**

6. I became aware of Alex having been arrested for murder when FBI agents came to our clinic to interview me and my husband. The FBI agent who interviewed me told me that he was surprised I was still alive. This statement contradicted my experiences and impressions of Alex, who was always kind to me.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: March 8, 2023

LINDA MORROW

_____
Initials

**Exhibit 45 - 694**

# EXHIBIT 46

## <u>DECLARATION OF CYNTHIA HAMILTON (RE: ELIZABETH TADDY)</u>

I, Cynthia Hamilton, declare as follows:

1. I am an investigator with the Office of the Federal Public Defender for the Central District of California. My office represents Iouri Mikhel in his post-conviction proceedings. On March 5, 2020, I interviewed Elizabeth Taddy, Mikhel's ex-wife.

2. Before our meeting, I made arrangements to meet Ms. Taddy at a Starbucks in Sherman Oaks, California. I introduced myself to Ms. Taddy, gave her my business card and showed her my federal identification. I explained again that I worked on behalf of Mr. Mikhel and for his attorneys. I told her that our office was appointed by the court to represent Mr. Mikhel.

3. Ms. Taddy said she met Mr. Mikhel through Walter Brill, her former employer. Mr. Brill owned an auto parts and cell phone store. Ms. Taddy was twenty-four or twenty-five years old at the time she met Mr. Mikhel. She could not recall if she was pregnant when she first met Mr. Mikhel. She remembered that they dated approximately six months before getting married in Las Vegas. Mr. Mikhel did not mind that Ms. Taddy had a son.

4. Ms. Taddy described Mr. Mikhel as being kind and smart. She said he had a good sense of humor and was mature. She said Mr. Mikhel did not mind that she had a son from a previous relationship, and she said that he was good with her son, Devlin. He was attentive to Devlin. She trusted Mr. Mikhel to watch him when she was not home. Devlin never expressed any concerns, never appeared cautious or hesitant being around Mr. Mikhel or being left alone with him.

<div align="center">1</div>

Initials

**Exhibit 46 - 695**

5.      The only negative comment that Ms. Taddy said she could make about Mr. Mikhel was that he was not "forthright." When asked to explain, Ms. Taddy said he was not open about his life or business.

6.      Ms. Taddy said that Mr. Mikhel did not talk about his life in Russia. She could not recall if his parents were alive. She was unsure if he had a brother but thought he might have. She recalled nothing about his brother. She did not know if he was older or younger than Mr. Mikhel or if he was alive or not. Ms. Taddy said that Mr. Mikhel did not discuss his parents or anyone in his family. Ms. Taddy could not recall Mr. Mikhel ever talking about growing up in Russia, his teachers, being placed in boarding schools, sanatoriums, or any other institutions in Russia.

7.      In terms of friends, Ms. Taddy said that the only friend she knew that Mr. Mikhel had was Walter Brill. She said he had other friends. She did not know them. Ms. Taddy said the two of them traveled in different circles. The witness said she had her friends and Mr. Mikhel had his friends.

8.      Regarding Mr. Mikhel's employment, Ms. Taddy said that he sold raw metals. When she was living with Mr. Mikhel, she saw some type of document about metals. She thought it might have been an invoice but was not sure.

9.      During their marriage, Ms. Taddy said she worked but never had any financial worries. She said that Mr. Mikhel was generous.

10.      At this point in the interview, Ms. Taddy said she did not want to be involved and that was what she told someone representing Mr. Mikhel years ago. She received a phone call from someone on Mr. Mikhel's team and told them she would not meet with them and did not want to be involved in his case. She added that she could not have any interference in her life,

2

Initials

**Exhibit 46 -  696**

that she was concerned about herself and her family. She stated that Mr. Mikhel was involved with some dangerous people. She said she did not want to be contacted again and that she had nothing more to say.

I declare under penalty of perjury under the laws of the United States of America and of the State of California that the foregoing is true and correct.

DATED: *August 4, 2023*   _Cynthia Hamilton_
CYNTHIA HAMILTON

3

Initials

**Exhibit 46 - 697**

# EXHIBIT

# 47

## DECLARATION OF INDERPAL DHILLON, M.D.

I, INDERPAL DHILLON, declare as follows:

1.    I am a licensed psychiatrist in the State of California. I currently work four days a week providing telehealth services for the California Department of Corrections & Rehabilitation ("CDCR"). I also work one day a week at West Valley Detention Center ("WVDC"). I began working for WVDC around 1994.

2.    On August 15, 2023, I was interviewed at my home by David Park, an investigator with the Federal Public Defender's Office for the Central District of California, located in Los Angeles, California. He asked me about Iouri Mikhel, who is represented by his office in capital federal habeas proceedings. I testified at Mikhel's trial.

3.    I was employed at WVDC during a period when Mikhel was incarcerated there. I recall hearing about a massive show of police force when he arrived at the jail, with roads blocked off and SWAT teams on the rooftop. These actions made it seem as though someone particularly dangerous was arriving. I was given no advance notice. Mikhel informed me that custody personnel put him in a restraint chair with a bag over his head and spun in circles before he was brought to Unit 16. I believe the U.S. Government arranged to pay to keep Mikhel isolated in a wing by himself, with no other inmates. In my time at WVDC, none of my other patients were treated this way. I remember being asked by a short female prosecutor if I could take care of Mikhel despite his not being a state prisoner.

4.    I treated Mikhel at WVDC for mental health issues over a span of about two and a half years from 2004 to 2006. During that period he attempted suicide with pills; prior to his arrival at WVDC, Mikhel had attempted suicide at another institution via a serious laceration to an artery in his ankle. He was observed or reported many troubling behaviors and symptoms, including racing thoughts, sleeplessness, auditory hallucinations, and banging his head against

1

Initials

**Exhibit 47 - 698**

the wall. Consequently, I was subpoenaed by Mikhel's trial counsel to testify at the penalty phase of his trial.

5.    My initial diagnosis of Mikhel was that he suffered from Bipolar Disorder I. By the time I testified at trial, I had changed my mind and felt Bipolar Disorder II was a more fitting diagnosis. I included this change in a declaration I drafted myself, which I signed and sent to the trial team. I do not remember having any discussions with the trial team about the change in diagnosis.

6.    I do not recall if I was prepared for my testimony by anyone on the trial team. If I interacted with anyone, it would have been a brunette woman named Holly. I do not remember ever interacting with either of Mikhel's trial attorneys.

7.    My experience on the stand was very negative. I was scared because I had never been involved in such a serious case before. My previous court appearances had been mostly in county court for matters like involuntary medication. I believe that if I had been prepared by the trial team for my testimony, I would have had a better presentation of the change in diagnosis, especially on cross-examination.

8.    Having information about Mikhel's family history would also have allowed for a better presentation. Information about the mental health issues suffered by his grandmother and great-aunt would have enabled me to speak specifically about genetic predisposition in relation to Mikhel's own issues, rather than in generalities. Similarly, the suicide of Mikhel's brother would have placed Mikhel's suicide attempts in a much different light. I do not recall reviewing any records of family members. Family history of mental illness makes clear that Mikhel was suffering from genuine mental illness, not just a one-time episode brought on by his incarceration.

2


Initials

**Exhibit 47 - 699**

9.      Mikhel's current counsel have shared witness statements from two individuals who knew Mikhel before he was incarcerated: Gary Gentile and Larry Prasol. This is the type of information I wish I had been provided prior to my testimony, especially regarding Mikhel's moods and changes in behavior. Gentile observed Mikhel experiencing hallucinations. This information would have bolstered my diagnosis and subsequent treatment of Mikhel. I now feel strongly that Mikhel should have been treated not with anti-depressants, but with mood stabilizers and anti-psychotics. Larry Prasol's account of dramatic changes in Mikhel's mood also would have bolstered my diagnosis; he recounted that Mikhel's mood vacillated from being pleasant and energetic to being irritable, with no extraneous factor explaining the change in mood. This is indicative of bipolar disorder.

I declare under penalty of perjury under the laws of the United States of America and of the State of California that the foregoing is true and correct.

DATED: _8-31-23_          _____
                         INDERPAL DHILLON

3

<u>Initials</u>

**Exhibit 47 - 700**

# EXHIBIT

# 48

<u>DECLARATION OF CRAIG HANEY</u>

I, Craig Haney, declare as follows:

1.      I am a Professor of Psychology at the University of California, Santa Cruz. I am trained as a social psychologist. I have specialized training in the assessment of the social histories of persons accused of, and convicted of, serious violent crimes. I testified as a defense expert for Mr. Iouri Mikhel at the penalty phase of his capital trial in federal district court.

2.      By the time I testified in the Mikhel case in 2007, I had published extensively about the way in which social history and background experiences can profoundly shape a person's life trajectory and influence their likelihood of engaging in criminal behavior, as well the effects of institutionalization and the factors that predict a person's adjustment to incarceration. I also had served by then as a consultant and/or testifying expert witness on these issues in over 100 capital cases, had lectured in numerous law schools and professional meetings and legal training programs about the nature of capital mitigation, and had published a number of articles about capital mitigation per se.

3.      I joined Mr. Mikhel's defense team much later in the process than I normally do in capital trial cases. I was appointed months before the guilt phase began. Holly Jackson, the mitigation specialist on the Mikhel team, brought me on board. If I had not already known and respected Ms. Jackson, from having worked with her on prior cases, I would not have gotten involved in the case. Ms. Jackson was the only team member that I knew before I joined the Mikhel team. I had never previously worked with Dale Rubin or Rick Callahan, his trial lawyers. I have never worked with either one of them again.

4.      When I agree to work on a capital case, I usually insist on a year of preparation, at a minimum. By my standards, my work on this case was lightning fast. Typically, I try to interview all of the important mitigation witnesses myself, rather than relying on the accounts of

1

*CH*
Initials

**Exhibit 48 -  701**

others and, in the case of key mitigation witnesses, I prefer to conduct multiple interviews. There are several reasons for this. One is because mitigation evidence often touches on very sensitive issues that people are not always comfortable discussing. Conducting more than one interview allows me to build rapport. It also allows time for witnesses to recall things that might not have come to mind in an initial interview. A second (and sometimes a third) interview with key mitigation witnesses also allows me to ask about additional information that may have been uncovered as the investigation is proceeding. I also feel that establishing a good relationship with our key mitigation witnesses is reassuring to them, before they have to testify (which, for most of them, is an unfamiliar, intimidating experience).

5.      My initial impression in this case was that the team was not prepared for the penalty phase. I got the sense that the trial lawyers had spent a lot of time on issues that were not critical to the penalty-phase defense.

6.      I also had the perception that the team communicated poorly. For example, I recall having very few team meetings, which I think are essential to effective preparation. Having everyone together in a room from time to time to discuss the case is essential to developing an overall approach. It also allows for the exchange of important information. I had very little contact with the attorneys in the Mikhel case; so little that I think I would have a difficult time recognizing them if I encountered them now.

7.      I recently reviewed a copy of an email that I wrote to the team, dated August 29, 2006. According to this e-mail, I had not participated in a substantive team meeting as of August 29, 2006, on the brink of the guilt phase. That's consistent with my memory.

8.      Michael Burt and Judy Clarke were the resource counsel assigned to this case. In my view, they are two of the most experienced, knowledgeable trial attorneys in the country.

2

*CH*
Initials

**Exhibit 48 -  702**

However, they did not appear to me to have much of a role in this case. In my experience on federal capital cases, resource counsel are typically included in team meetings. It was my impression that the Mikhel team did little to include Ms. Clarke and Mr. Burt in our preparation. For example, they did not attend any of the few team meetings that I attended.

9.      I generally believe that, whenever possible, the defense should have a unitary strategy for the guilt- and penalty-phase presentation. This typically includes frontloading at least some of the mitigation into the guilt phase, so that the jury begins to better understand the defendant, and see him as a person. Similarly, the penalty-phase defense strategy should be informed by what happened during the guilt phase. I do not believe there was a unified strategy going into Mr. Mikhel's trial; if there was, it was not shared with me.

10.      I first met Mr. Mikhel when he was incarcerated at a county jail facility. The jail treated Mr. Mikhel as if he were Hannibal Lecter. He was brought to the interview room strapped in a chair, and he was spun around before being placed in the room. I am very experienced at conducting in-custody interviews in high-profile cases with persons who are accused of very serious crimes. I do not believe I have ever seen anyone brought to me the way Mr. Mikhel was.

11.      Whenever I came to the jail for visits, the staff joked that I was there to see "MacGyver," because of his alleged attempt to escape from MDC. My impression was that the jail staff, both at the county jail and at MDC, assumed the worst about Mr. Mikhel and regarded him as manipulative. That was not my experience with Mr. Mikhel.

12.      At my first meeting with Mr. Mikhel, he expressed concern about his attorneys. He did not think they were prepared for the trial, and he did not think they cared to have his input. He seemed to doubt that his attorneys were committed to him, and voiced concerns about whether they were preparing for the penalty phase, which he knew I was brought on board to

3

<span style="font-style: italic;">CH</span>
Initials

**Exhibit 48 -  703**

assist with. He openly talked about getting rid of them. I perceived this as his way to exercise some agency in what he thought was a hopeless situation. I got the sense that Mr. Mikhel had become resigned to the fact that he would receive the death penalty and that his lawyers were not working hard enough to prevent it.

13.     Over the course of my preparation in the case, I thought I developed a reasonably good relationship with Mr. Mikhel. He never refused a visit with me. Our visits were lengthy. Mr. Mikhel would talk for hours, and he impressed me as honest and forthcoming. I found him to be a reliable reporter about his social history, which was the focus of my interviews with him. He did not exaggerate things; if anything, he was stoic, and understated the hardships and traumas to which he had been exposed.

14.     I had two referral questions in this case. I was asked to analyze Mr. Mikhel's background and social history, with particular attention to potential mitigating factors in his life. I was also asked to form an opinion about Mr. Mikhel's potential for making a positive adjustment to prison in the future.

15.     I am not a clinical psychologist and so was not retained to conduct a mental health evaluation of Mr. Mikhel. However, Mr. Mikhel's depression was unmistakable. I learned he was periodically suicidal. I was aware that Mr. Mikhel had at times refused to take his medication and I recall from time to time encouraging him to take it (because he was so clearly depressed). I believe that the isolated, solitary confinement conditions to which Mr. Mikhel was subjected contributed to his depression and sense of hopelessness.

16.     I have conducted extensive research on the impact of solitary confinement. It is extremely harmful to a prisoner's psyche. Persons housed in solitary lose agency or control over nearly all aspects of their life, and are deprived of meaningful social contact. This not only

4

CH
Initials

**Exhibit 48 -  704**

contributes to depression but also can create social anxiety. Many people who are deprived meaningful social contact with others come to see other people as aversive; that is, they become uncomfortable around them. Mr. Mikhel manifested this pattern. He often needed time at the start of my interviews with him to "warm up" and feel comfortable and communicative. But, as I said, once he felt comfortable, he could talk for hours, and was thoughtful and informative.

17.    Despite my expertise in solitary confinement, Mr. Mikhel's team never explicitly instructed me to evaluate Mr. Mikhel to discern the impact of long-term solitary confinement on his mental health. I attribute this to the failure of communication on the team. I am confident this would have come up, had we met regularly to discuss the case.

18.    I recall that Mr. Mikhel attempted to take his own life at the start of the guilt phase. This did not come as a total shock to me. I knew that Mr. Mikhel had twice attempted suicide while he was in jail awaiting trial. I viewed these efforts as legitimate attempts at self-harm. They were consistent with his depression and his overall feelings of hopelessness. They were also a response to his feeling that he was not being well-represented.

19.    In October 2006, I traveled to Russia with Ms. Jackson. The trip was poorly timed, as it coincided with the guilt phase of Mr. Mikhel's trial. The attorneys were preoccupied with the guilt phase and did not communicate with us while we were in Russia. At one point, Ms. Jackson told me that she did not think the attorneys were invested in developing penalty-phase witness testimony.

20.    I was aware that Dale Rubin, Chris Filipiak, and Holly Jackson had previously traveled to Russia to interview witnesses. But, in order to prepare for my testimony, it was important that I personally interview the witnesses that had been previously contacted. Even though Ms. Jackson had conducted initial interviews, I wanted an opportunity to personally ask

5

CH
Initials

**Exhibit 48 -  705**

follow-up questions of each witness. As I noted earlier, multiple interviews with mitigation witnesses are especially important because of the sensitive subject matter that is being discussed. There were also cultural barriers that needed to be overcome. The legal system in the United States is very different from the one operating in Russia, so potential witnesses needed to understand why they were being asked questions about this sensitive subject matter. I also knew that "telling Iouri's story" would require the participation of lay witnesses, in addition to experts, and wanted to develop a sense of whether they would make informative witnesses for the possible penalty phase trial.

21.     On this trip, Ms. Jackson and I interviewed Edward and Musa Mikhel, Benjamin Bril, Natasha Alifanova, Olga Startseva, Yanina Startseva, Svetlana Koginova, and Margarita Vaseilevna (Iouri's teacher). We had multiple meetings with Dr. Elena Zdravomyslova, the Russian sociologist that the defense team hired. We also drove around St. Petersburg attempting to view all of the places where Mr. Mikhel resided, went to school, or received treatment. We made in-person requests for Mr. Mikhel's records.

22.     Our work was rushed because we did not have much time in Russia. Because the guilt phase of the trial was already underway, I realized that we would very likely not have an opportunity to return to Russia, so we needed to accomplish everything essential on that one trip. As a result, there were many leads that we were unable to follow up on, and I wished that I had had an opportunity to return to Russia to follow up on the leads from my first trip. If we had done so, I am confident that we would have found additional witnesses who could have testified at the penalty phase.

23.     Cultural barriers were significant obstacles to our investigation. In addition to the differences in the legal system, and the wariness that Russians had about government

6

QH
Initials

**Exhibit 48 -  706**

officials (whom some of them perceived us to be), many of them seemed wary of people from the United States in general, and defensive about the former Soviet Union. It took time and effort to get Mr. Mikhel's friends to warm up to us.

24.    In general, the witnesses we interviewed in Russia were sensitive about socioeconomic status, reluctant to complain about what they did not have, and inclined to portray themselves as better-off than they actually were. I attribute this to their prior lives lived under communism and the central role of the state in ordinary people's lives. When the state has a primary role in every aspect of daily life, to complain is to be disloyal. Mr. Mikhel's cousin Edward and Edward's wife Musa were a prime example of this phenomenon. When Ms. Jackson and I visited them, they were living in a tiny unit in a run-down, slum apartment building. I remember seeing rats running around at the bottom of the stairwell. To me, these conditions were particularly appalling, considering Edward Mikhel's long service in the Soviet army. Edward had every reason to feel slighted by the Soviet Union, but he did not complain about his circumstances.

25.    The time spent with Edward and his wife illustrates why the opportunity to conduct multiple visits and interviews is important. Edward Mikhel was engaging and talkative, but Musa, his wife, was quiet and withdrawn. Despite my efforts, she said very little, appearing reluctant to talk in front of her husband. She was a witness that I wish I had another opportunity to interview. Had I returned to Russia, I would have attempted a one-on-one interview with her in the hope of getting her to open up.

26.    It is my understanding that the prosecution attempted to portray Mr. Mikhel's family as relatively well-off. But I knew that was not accurate. Mr. Mikhel's parents had not been active, high-ranking Communist party members. As a result, they were not afforded special

7

CH
Initials

**Exhibit 48 -  707**

government protections or economic advantages that others who rose through the ranks to leadership positions might have enjoyed.

27. Ms. Jackson and I took a tour of the Kresti jail, the facility where Mr. Mikhel was incarcerated in the 1980s. It was still operational when we went. The Kresti was an incredibly harsh environment—a very old, stark, and barren facility. There was a palpable tension in the air. In the interactions I observed, both in the treatment Ms. Jackson and I received and in watching how they behaved with prisoners, it appeared to me that the guards at the Kresti facility were harsh and authoritarian. Ideally, I would have interviewed people who were incarcerated with Mr. Mikhel in Russia. We did not have time for this. If I had had an opportunity to return to Russia, this would have been a priority.

28. I suspected that Mr. Mikhel's time in jail and prison was traumatic for him. It is for most people who enter prison environments for the first time. But this was the one thing that he was somewhat guarded in talking about (as many people are). I also knew that his time in jail and prison in Russia had exposed him to more sophisticated criminals, which led to his later involvement in the criminal underworld after his release. I would like to have learned more about the early days of Mr. Mikhel's incarceration and the likely brutality that he endured before he had established himself. While Mr. Mikhel was generally cooperative, he never opened up to me about his experiences in prison in Russia. This is why collateral sources are so important to this part of an investigation in a death penalty case, as it is not uncommon that defendants minimize the brutality to which they have been exposed.

29. With more time, we could have found people who could explain Mr. Mikhel's time in prison, the institutional trauma he likely experienced, and the survival skills that he was forced to develop there. I also could have consulted an expert on prison conditions in Russia. Dr.

8


Initials

**Exhibit 48 - 708**

Zdravomyslova did not have expertise in this area. She was hired to flesh out the Mikhel family dynamics. Had I worked on the case longer, and been able to share some of what I learned in earlier trips, I think Mr. Mikhel would have eventually opened up to me about this aspect of his experience.

30.     Ms. Jackson and I interviewed Benjamin Bril, who represented Mr. Mikhel in criminal proceedings in Russia. I also wish we had additional opportunities to interview Mr. Bril. On a second interview, I would have liked to question Mr. Bril about the economic circumstances that Mr. Mikhel faced when he was "growing" his business. He seemed to be more insightful than other witnesses about what Mr. Mikhel was going through, about the economic and other pressures that persons like Mikhel were experiencing at that time in Russia. I also wish we had asked Mr. Bril's help in locating witnesses who could testify about the Kresti.

31.     In Russia, Ms. Jackson and I got the sense that someone was following us because of the work we were doing and the questions we were asking. We had a hard time getting records and locating witnesses. I remember being on the trail of witnesses, but struggling to locate them. We drove around St. Petersburg and spent a fair amount of time requesting records, trying to get an audience with the right person. Records that would be available as a matter of course in the U.S. were inaccessible to us in Russia.

32.     We had a translator (Masha Smirnova) and a driver for the trip, plus Dr. Elena Zdravomyslova. But we lacked a records specialist—someone on the ground in Russia who had particular expertise with the Russian bureaucracy and how best to gather records and find archival material.

33.     On my way home from Russia, I stopped in London to attempt two more witness interviews. I wanted to meet Mr. Mikhel's ex-girlfriend, Marina Karagodina, who was

9

*CH*
Initials

**Exhibit 48 - 709**

the mother of his child. I had only a phone number and an address. I tried calling her repeatedly to arrange an interview, but no one picked up. I decided to take a train to a town outside London, where she supposedly lived. I hired a taxi to take me from the train station to her house. She lived in an ordinary, middle-class neighborhood, with modest homes. The taxi driver was a little uncertain about the address, but, as we drove down the street, I was immediately able to identify her house: it had a Ferrari parked in the driveway, exactly the car Iouri had told me she had. Needless to say, the Ferrari was out of place in her neighborhood. No one answered the door when I rang, so I waited with the cab for some time. But she never answered and I never got to meet or interview Marina or any of her family members.

34.     I was able to interview only one witness in the United Kingdom: Yelena Gray, who was Natasha Alifanova's friend. I recall that she generally corroborated what Natasha told the defense team and did not add much to the picture. But I still thought it would be a good idea to have her testify in court despite her presentation. Gray was pretty down and out. She was emotionally fragile and quite frazzled in the interview. I had to pay for her train fare to meet me. I do not think I was aware of any other witnesses in the UK at the time, and so did not attempt anyone else there.

35.     I found out about Elizabeth Taddy, Mr. Mikhel's ex-wife who was living in Los Angeles, fairly late into my work on this case. No one on the team had attempted to interview her. I recently reviewed notes dated January 25, 2007, that appear to be Holly Jackson's handwritten notes, from a conversation she had with me in which I reported on my interview of Ms. Taddy. Ms. Jackson did not participate in the interview with Ms. Taddy--I spoke to her alone. I was surprised to learn of Ms. Taddy and even more surprised when I was able to make contact with her, because no mention had been made of her in developing the mitigation in the

10

*CH*
Initials

**Exhibit 48 -  710**

case. I assumed that either she could not be found or that she was uncooperative. She shared positive memories about Mr. Mikhel and said he had been helpful to her in a variety of ways. I expected to interview her again, and thought it might even be possible for her to appear as a witness in the trial. But I recall being told that for some reason she was not going to be used.

36.     Mr. Mikhel told me about Michelle Lancaster, his ex-girlfriend in Jamaica who, according to him, was the daughter of a very prominent, wealthy Jamaican family. Ms. Lancaster had had a serious relationship with Mr. Mikhel. I was surprised to hear about her and asked if she had been interviewed. Mr. Mikhel told me that his lawyers dismissed his stories about her and said he thought they were skeptical of her existence and/or the nature of his relationship with her. At the next interview, to convince me of her existence, Mr. Mikhel brought a number of photographs of himself with Ms. Lancaster and her family to show me. She very clearly existed and, from the photos, it seemed that they did, indeed, have a close relationship and that he had been welcomed into the family. He said Ms. Lancaster's father, who was depicted in a number of the photos, was a high-level political figure in Jamaica  Mr. Mikhel said that they had ended their relationship on good terms. I believed that, like Ms. Taddy, she might have been a compelling penalty phase witness who could portray another side of Mr. Mikhel. I conveyed this information to the attorneys, but they seemed skeptical and uninterested. I persisted that it was important to try to find her and see if she would agree to an interview. They delayed acting on this. This is why Mr. Filipiak and I did not travel to Jamaica or attempt to interview Ms. Lancaster or her family members until January 2007 (right before the penalty phase trial).

37.     I remember going to Jamaica with Mr. Filipiak on a hastily arranged trip. We had not been able to do the advance planning we ordinarily would have, or make repeated efforts to contact persons close to Ms. Lancaster to explain why we needed to speak with her. Once in

11

*CH*
Initials

**Exhibit 48 -  711**

Jamaica, we learned where Ms. Lancaster and her family lived, and approached it, finding a compound with armed security guards. We returned from Jamaica empty-handed, and it is my understanding that no further efforts were made to contact Ms. Lancaster after this trip. This is another instance of mitigation that could have been developed, perhaps to great effect, but was not.

38. I did not attend the guilt-phase trial. I was not in court during Mr. Mikhel's testimony. But I reviewed transcripts of Mr. Mikhel's testimony before I took the stand. In my view, Mr. Mikhel's testimony was intended to be self-destructive. In my opinion, every effort should have been made to talk him out of testifying. Despite my relationship with him, no one asked me to attempt talking to Mr. Mikhel about the dangers of testifying. Because Mr. Mikhel insisted on taking the stand, it was imperative that the attorneys make him likeable for the jury. Given Mr. Mikhel's relationship with his lawyers, that would likely have been difficult if not impossible for them to do.

39. In capital cases, live testimony from lay witnesses is essential to the mitigation case. A client's story cannot be effectively or persuasively told exclusively through expert witnesses. Lay witnesses—people who knew the client personally, at key periods in his life—are needed to humanize capital defendants. Competent capital defense attorneys understand the critically important differences between the nature of guilt- and penalty-phases. They know that the real purpose of a penalty-phase defense is much broader than the narrow questions that are often at issue in guilt phases (such as the defendant's mental state or whether actions were taken in self-defense). The goal of a capital penalty phase is to provide the jury with as much information as possible about the course of the client's life, the struggles and obstacles that helped to shape them, and to have them understand all of their human dimensions (ones that go

12


Initials

**Exhibit 48 - 712**

far beyond the acts for which they have, by definitions, been convicted). We failed to do this in Mr. Mikhel's case. There are parts of his life story we were never able to uncover, or to uncover fully, or to adequately portray. And there were many aspects or dimensions of him, as a person, that we were never able to convey. For example, his jury never got to know Iouri as a partner, as a husband, as a substitute father, and as a caring man. They never got a feel for all of his human dimensions and qualities.

40.     Even the mitigation we were able to gather was not effectively conveyed to the jury. For various reasons that I was not consulted about, the team decided to present videotaped statements from Mr. Mikhel's friends and family in lieu of live testimony. I was present when some of the videotapes were made in Russia and know that they conveyed only a small portion of the information the witnesses had. Moreover, I saw how awkward the videotaping was for witnesses who were not used to it. They became terse and often suppressed their emotions. The videotaped testimony conveyed less mitigation than we actually had, and it insufficiently humanized Mr. Mikhel.

41.     I believe Mr. Mikhel's decision not to attend his penalty-phase trial had a terrible impact on his case. It made it difficult if not impossible for the jury to get a sense of Mr. Mikhel as a person if he was not present in court. In my experience, when mitigating evidence is being presented at the penalty phase, jurors will often look over at the client, connecting the dots that the trauma history they are hearing about actually happened to the defendant sitting in front of them. This builds an empathic bond between the juror and the defendant. I remember trying to convince Mr. Mikhel to attend the trial. Unfortunately, by that point, the breakdown in the relationship between Mr. Mikhel and his lawyers was too great, and he would not reconsider his decision.

13

CH
Initials

**Exhibit 48 -  713**

42.     Much of my research on and writing about capital mitigation directly and indirectly addresses the issue of the "empathic divide" that exists between jurors and capital defendants. It refers to the extent to which the typical juror lacks insight into or understanding about—thus cannot empathize with—the typical capital defendant's life experiences and potentially life-altering traumas. Competent defense counsel know that they cannot save their client's life if the jury does not see and "feel" him as a full-fledged human being and appreciate the social historical forces that helped to shape him. In this case, the defense team did not succeed in bridging that divide. In addition to the rushed and incomplete mitigation preparation that prevented us from achieving this task, we faced an additional hurdle: the "foreignness" of Russian culture, with which most jurors have little familiarity. This made it even more important that we try in every possible way to provide the jury with the full picture—by conducting a comprehensive mitigation investigation, that included repeat interviews with key witnesses, multiple trips to track down potential witnesses who could provide more context to the client's story and add more human dimensions to his character, as well as presenting that evidence in the most compelling possible way, with as many live, lay witnesses as possible.

43.     Jail medical records were integral to my analysis of Mr. Mikhel's adjustment to incarceration. I was recently shown a batch of Mr. Mikhel's medical records that we subpoenaed from the Metropolitan Detention Center-LA (MDC). These records were turned over too late for me to make any use of them. Because I did not have a complete set of records at the time I was prepared to testify, I believe I was more tentative in my findings regarding Mr. Mikhel's institutional adjustment than I would have been, had I had time to review these records.

44.     I also believe that the Mikhel team failed to conduct adequate witness preparation to ensure that all of the information a witness had (as shared in prior interviews with

14


Initials

**Exhibit 48 -  714**

investigators and experts) was included in their testimony. For example, because I have extensive experience in capital trials, and have typically interviewed many of the persons who will be called to testify, the defense team usually involves me in preparing other mitigation witnesses for their testimony, or at least discussing the full scope of what they have to offer. That did not happen here.

45. With respect to my own testimony, I do not recall Mr. Rubin and I engaging in very extensive preparation. I know that I shared a copy of my PowerPoint presentation with Mr. Rubin before I testified and I believe we reviewed it together, before I testified. But my testimony was hampered by the fact that Mr. Rubin did not follow the sequence of topics in the PowerPoint itself. Since the PowerPoint slides are arranged in order, it is not possible to skip ahead to topics without throwing off the sequencing to the slides. I felt Mr. Rubin and I were out-of-synch in this regard throughout my testimony.

46. I testified over the course of 3 court days. I have no memory of meeting the attorneys at night or on the weekend to prepare, or at any intervening point after my testimony began.

47. My testimony was rooted in a "risk factor" model. I have used this model in many of my cases. It is an extremely useful framework for understanding how adverse experiences impact a person's development, and it helps capital jurors understand the long-term impact of events that occurred in childhood and adolescence. I have recently reviewed my testimony from Mr. Mikhel's trial, and I think it would have been valuable to conduct much more redirect testimony, giving me a chance to address the incomplete and misleading picture the prosecutor was able to paint in her cross examination. I believe that, had Mr. Rubin and I had more opportunities to discuss these issues beforehand, he would have understood the fact that

15


Initials

**Exhibit 48 - 715**

there were answers to many of these questions that would have been provided in redirect examination. For instance, the critique about the supposed limits of the risk factor model for individuals raised in the Soviet Union could have been addressed more clearly during the redirect. In addition, the issue of the ways in which behavior is shaped and affected in institutional settings can and should have been addressed. Similarly, the jury would have benefitted from an explanation that I could have provided in redirect, discussing the ways in which, despite having been adversely affected by criminogenic risk factors, people's character can and often does change for the better over time.

48.      I believe that part of the reason the attorneys presented a narrow and incomplete penalty trial was because they were fearful of the escape evidence. They went out of their way to avoid addressing it in court. I believe this is why they directed my testimony away from the issue of Mr. Mikhel's adjustment to incarceration. Yet, there were many reasons why Mr. Mikhel would adjust well to prison. Yet the goal seemed to be to minimize any discussion of this potentially helpful mitigating theme.

49.      I acknowledge that some of my expert opinions (i.e., that Mikhel had attachment disorder) could be perceived as "double-edged." In fact, this is true of most, if not all, mitigation. Unless it is presented effectively, every mitigating theme can be turned on its head to appear to be aggravating. A person who has suffered a terrible life history, which is mitigating, can be made to appear to be damaged beyond repair, which is aggravating. A defendant with good qualities who has done good things in the past, which is mitigating, can be made to appear as if they knew how to and could act better but chose not to, which is aggravating. The difference is that effective trial counsel know how to present the explanation in such a way that jurors understand why the aggravating implication is not the one that applies to the current case.

16

*CH*
Initials

**Exhibit 48 -  716**

50.     In Mr. Mikhel's case, for example, the "attachment disorder" label risked painting him as irretrievably damaged by his upbringing and incapable of attaching to others. But this implication was incorrect in his case, and the jury would have understood it as such if the attorneys had properly contextualized the testimony. Thus, had the defense brought in Mr. Mikhel's loved ones, like his ex-girlfriends, that would have illustrated how he attempted to and did form secure, loving attachments to others over the course of his life. He struggled to overcome the legacy of his past and, in many respects, was successful in doing so. He could not have been credibly portrayed as a "monster."

51.     My testimony also failed to capture what Mr. Mikhel experienced during perestroika. I knew this firsthand from my trip to St. Petersburg, that the fall of communism had unleashed chaos in Russia, a kind of "capitalism gone wild." Conspicuous consumption was the order of the day when I visited, and opulent displays of wealth were ubiquitous. Everything and, it seemed, everyone was for sale. There were sex workers in the nice hotel where we stayed who were unabashed about propositioning guests. Everyone wanted to make as much money as possible. And no one wanted to talk about poverty. I recall visiting a shopping district in St. Petersburg that put Rodeo Drive to shame. This district sits just a few blocks away from a block of derelict tenement buildings from the USSR era. Despite the obvious and widespread social inequality, no one complained. But at trial, because I was not an expert on Russian society, I struggled to testify confidently about these social dynamics. Yet I believe these social, political, and economic forces had an impact in shaping Mr. Mikhel's perspectives and behaviors.

52.     In most other cases on which I have worked on, it is common for the defense team to gather all of the experts to share their information and conclusions. That did not happen here. I had no contact with Drs. William Vicary, Inderpal Dhillon or Marshall Goldman before

17


Initials

**Exhibit 48 -  717**

they testified. The only expert I worked with was Dr. Elena Zdravomyslova. I was never asked to convey my findings to any of the other experts. This is unusual in capital defense work-- typically, you want your mental health experts to have all of the social history evidence that is available to the defense team.

53.     I was in court for Dr. Zdravomyslova's testimony. From my perspective— because I had talked with her extensively beforehand, in Russia, and knew what she had to offer—she was forced to rush through her testimony. Poor planning meant that she was put on the witness stand with a flight to catch back to Russia later that day. She was an engaging witness, but the jury did not get to hear all of what she had to say.

54.     Throughout my testimony, I felt that Judge Tevrizian was hostile to the defense, including before the jury. I do not think the transcript does justice to the extent of Judge Tevrizian's hostility, which he largely conveyed through his demeanor and body language. The defense was already struggling to connect with the jurors, and Judge Tevrizian just made it worse. For example, I remember that there were some technical problems, getting my PowerPoint up and running and then, as I described earlier, coordinating with Mr. Rubin about sequencing the slides. Judge Tevrizian seemed impatient about all of this.

55.     Years after my testimony in this case, I traveled to the United States Penitentiary at Terre Haute as part of an investigation into conditions at that facility, including the section where death row inmates are housed after conviction. I was allowed to walk through the prison and speak with the condemned prisoners, all of whom had been convicted of very serious crimes. But when I attempted to enter the tier where Mr. Mikhel was housed, I was told I could not walk down it, to the cell where Mr. Mikhel was living. I learned that Mr. Mikhel was housed by himself at the end of hallway, separated by 7 or 8 cells from his nearest neighbor. I

18

*CH*

Initials

**Exhibit 48 -  718**

was shocked to find that Mr. Mikhel continued to be housed in near-total isolation, isolation more profound than other death row prisoners, so long after the trial.

56.     I also believe our team failed to properly investigate intergenerational trauma in Mr. Mikhel's family. I base this on the fact that I recently have been informed that Mr. Mikhel's post-conviction counsel obtained records showing that Mikhel's brother took his own life in 1996, and his death certificate shows that his death was ruled a suicide by hanging. I was unaware of this fact. This is the type of evidence that the defense should have uncovered and presented to the jury. Had I known about it, I would have considered it and taken it into account in my testimony, and explained its mitigating significance to the jury.

57.     Post-conviction counsel has also informed me that Mr. Mikhel's grandmother and maternal grand-aunt were certified by the state as disabled due to mental illness. This, too, is exactly the type of mitigating evidence that the defense should have uncovered and presented to the jury. Had I known about it, I would have considered it and taken it into account in my testimony, and explained its mitigating significance to the jury.

58.     I do not recall learning anything about potential staff involvement in Mr. Mikhel's alleged attempt to escape from MDC. This evidence would have been very helpful to me, if it was available. Had I known that staff were suspected of abetting Mr. Mikhel's alleged attempt to escape, it would have taken the sting out of the prosecution's argument that he posed a "future danger" in prison.

I declare under penalty of perjury under the laws of the United States of America and of the State of California that the foregoing is true and correct.

DATED: September 8, 2023          _Craig Haney_
                                  CRAIG HANEY

19

OH
Initials

**Exhibit 48 - 719**