# EXHIBIT

# 49



Gary L. Lage, Ph. D.
glage@comcast.net
609-314-9113 (Mobile)

Counsel in Toxicology and Pharmacology

28 June 2023

Ajay Kusnoor, Esq.
Deputy Federal Public Defender
Federal Public Defender
Central District of California
32 East 2nd St.
Los Angeles, CA 90012-4242

Re: **USA vs. Iouri Mikhel**

Dear Mr. Kusnoor:

I am currently a Principal of **ToxiLogics** in Dover, DE, and have previously served as Senior Program Director and Senior Toxicologist for Environmental Resources Management, Inc. (ERM) in Exton, PA; as Principal and Senior Toxicologist at Environ, Inc.; and as a Vice President at Roy F. Weston, Inc. Before that I was Chairman of the Department of Pharmacology and Toxicology and Professor of Toxicology at the Philadelphia College of Pharmacy and Science. Prior to that I held teaching and research positions in pharmacology and toxicology at the University of Kansas and the University of Wisconsin. I hold a B.S. (1963) in Pharmacy from Drake University, and M.S. (1965) and Ph.D. (1967) in Pharmacology from the University of Iowa. As a toxicologist, from 1980 through 2015, I was one of approximately two thousand diplomates of the American Board of Toxicology, Inc. indicating successful completion of the certification examination in general toxicology. I am a member of the Society of Toxicology, and the American Society for Pharmacology and Experimental Therapeutics. I have served as Chairman of the Toxics Health Effects Committee of the Department of Health of the Commonwealth of Pennsylvania, a Member of the Air Pollution Control Board of the City of Philadelphia, and as a member of the Vietnam Herbicide Information Commission for the Commonwealth of Pennsylvania. In addition, I have served on the Advisory Committee to the National Institutes of Environmental Health Sciences. I have served as a member of the Committee on Review and Evaluation of the Army Chemical Stockpile Disposal Program for the National Research Council. My specific area of research interest includes chemical disposition

within the body in relation to the ultimate toxic effect. Lastly, over the last 40 years I have testified as a Pharmacologist and Toxicologist in several hundred matters involving alcohol, drugs or chemicals. (Curriculum Vitae attached).

**Documents Reviewed**

At your request, I have reviewed the relevant information listed in Appendix A in the above matter.

As a Toxicologist you have requested that I review the available documentation and determine the accuracy and reliability of the reported toxicology results for five decedents recovered from a river and a reservoir in 2001 and 2002. The five decedents were: Mr. Meyer Muscatel, Ms. Rita Peckler, Mr. Alex Umansky, Mr. Nick Kharabadze and Mr. George Safiev. Mr. Iouri Mikhel has been reported to be involved in the deaths of each of these five decedents. I will deal with each of these individuals and their reported toxicological results.

**Mr. Meyer Muscatel**

Mr. Muscatel was reported to have been found floating in a river (actually the New Melones Reservoir), on October 18, 2001. On October 19, 2001, an autopsy was conducted on the body of Mr. Muscatel, and the cause of death was reported to be smothering. The pathologist determined that the time of death was between 4 and 10 days prior to discovery. During the autopsy the only specimen collected for toxicological analysis was liver tissue. The specimen was received in the Central Valley Toxicology Laboratory on October 26, 2001. On November 11, 2001 the Laboratory reported the following results for Mr. Muscatel:

**Liver Tissue**

| | |
|---|---|
| Ethyl Alcohol | 0.20 grams/100 grams (i.e. 0.20 %) |
| Diphenhydramine | 6.54 mg/kg |

Mr. Muscatel was reported to be between 40 and 60 years old (with an estimated age of 48), 6' tall and weighed 220 pounds at the time of his autopsy.

**Ms. Rita Peckler**

Ms. Peckler was reported to have been recovered from the New Melones Reservoir on March 19, 2002 at a depth of 200 – 300 feet. On March 24, 2002, an autopsy was conducted on the body of Ms. Peckler, and the cause of death was reported to be asphyxia. During the autopsy the following specimens were collected for toxicological analysis: chest blood (175 ml) (described

as dark red fluid and foul smelling), heart blood (8 ml), granular substance from stomach lining, kidney tissue, liver tissue, and brain tissue. The Laboratory apparently only analyzed the heart blood and liver tissue. The specimen was received in the Central Valley Toxicology Laboratory on March 27, 2002. On April 7, 2002, the Laboratory reported the following results for Ms. Peckler:

**Blood (Heart)**

| | |
|---|---|
| Ethyl Alcohol | 0.03 grams % (i.e., 0.03 %) |
| Diphenhydramine | 0.91 mg/L (i.e., 910 ng/ml) |

**Liver Tissue**

| | |
|---|---|
| Diphenhydramine | 5.39 mg/kg |

Ms. Peckler was reported to be 39 years old, 5' 6" tall and weighed 155 pounds at the time of her autopsy.

**Mr. Alex Umansky**

Mr. Umansky was reported to have been discovered in the New Melones Reservoir on March 18, 2002. On March 24, 2002, an autopsy was conducted on the body of Mr. Umansky, and the cause of death was reported to be asphyxia. During the autopsy the following specimens were collected for toxicological analysis: chest cavity blood, heart blood, liver tissue, kidney tissue, brain tissue, scrapings from the gastric mucosa and apparently bile. The laboratory apparently only analyzed chest cavity blood and bile. The specimens were received in the Central Valley Toxicology Laboratory on March 27, 2002. On April 7, 2002, the Laboratory reported the following results for Mr. Umansky:

**Blood (Chest cavity)**

| | |
|---|---|
| Ethyl Alcohol | 0.07 grams/100 grams (i.e. 0.07 %) |
| Diphenhydramine | None detected |

**Bile**

| | |
|---|---|
| Ethyl alcohol | 0.03 grams % |

Mr. Umansky was reported to be 36 years old, 6' 2" tall and weighed 215 pounds at the time of his autopsy.

**Mr. Nick Kharabadze**

Mr. Kharabadze was reported to have been discovered in the New Melones Reservoir. On March 19, 2002, an autopsy was conducted on the body of Mr. Kharabadze, and the cause of death was reported to be asphyxia. The FBI estimated that the date of death was February 24, 2002, almost a mouth prior to discovery. During the autopsy the following specimens were collected for toxicological analysis: subclavian blood, liver tissue, kidney tissue and apparently gastric contents. The laboratory apparently only analyzed the subclavian blood and gastric contents. The specimens were received in the Central Valley Toxicology Laboratory on March 26, 2002. On April 7, 2002, the Laboratory reported the following results for Mr. Kharabadze:

**Blood (subclavian)**

| | |
|---|---|
| Ethyl Alcohol | 0.22 grams/100 grams (i.e. 0.22 %) |
| Diphenhydramine | None detected |

**Gastric Contents**

| | |
|---|---|
| Ethyl alcohol | 0.49 grams % |

Mr. Kharabadze was reported to be in his 30's, 6' 4" tall and weighed 215 pounds at the time of his autopsy.

**Mr. George Safiev**

Mr. Safiev was reported to have been discovered in the New Melones Reservoir. On March 19, 2002, an autopsy was conducted on the body of Mr. Safiev, and the cause of death was reported to be asphyxia. The FBI estimated that the date of death was January 24, 2002, about a month prior to discovery. During the autopsy the following specimens were collected for toxicological analysis: subclavian blood, urine, liver tissue, kidney tissue, gastric contents and bile. The laboratory analyzed the subclavian blood, bile and urine. The specimens were received in the Central Valley Toxicology Laboratory on March 26, 2002. On April 7, 2002, the Laboratory reported the following results for Mr. Safiev:

**Blood (subclavian)**

| | |
|---|---|
| Ethyl Alcohol | 0.10 grams/100 grams (i.e., 0.10 %) |
| Diphenhydramine | None detected |

**Bile**

Ethyl alcohol 0.07 grams %

**Urine**

Ethyl Alcohol 0.11 grams %

Mr. Safiev was reported to be in his 40's, 6' tall and weighed 195 pounds at the time of his autopsy.

The following is a discussion of the drugs found in specimens from the five individuals:

**Toxicology of Alcohol**

Alcohol (i.e., ethanol) is absorbed from the stomach and small intestine over a considerable period of time, and has no physiological effect on the body or brain until it is absorbed into the blood stream. This absorption can take anywhere from 30 minutes, in the case of a dilute beverage and an empty stomach, to 2 to 6 hours with some beverages and a full stomach. Food in the stomach markedly delays the absorption of alcohol and the same peak blood level is never reached. Beer itself acts like a food and delays the absorption of the alcohol found in beer. Alcohol is eliminated from the body at anywhere between 0.010 to 0.019 grams/deciliter/hour or 0.010 to 0.019 %/hour. The average individual eliminates alcohol at approximately 0.015 %/hour. Also, in postmortem situations ethyl alcohol can be formed by microbiological action by converting blood glucose to ethyl alcohol (i.e., fermentation).

Typical physiological effects of alcohol on the body are characterized as follows:

| BAC (%) | Area of Brain Affected | Stage of Alcohol Influence | Typical Effects |
|---|---|---|---|
| 0.01-0.05 | frontal lobe | euphoria | decreased inhibition, diminished judgment |
| 0.05-0.10 | frontal lobe | excitement | dulling of attention, sedation, impaired coordination |

| | | | |
|---|---|---|---|
| 0.10-0.20 | Psychomotor | confusion | disorientation, impaired balance, slurred speech |
| 0.20-0.40 | Cerebellum | stupor | ataxia, tremors, disorientation, disturbed equilibrium |
| on over 0.40 | Medulla | coma | unconsciousness, depressed respiration, death |

If the drug and alcohol levels are accurate, the sedative effects of alcohol would be additive to the sedative effects of Diphenhydramine.

**Toxicology of Diphenhydramine**

Diphenhydramine was one of the first effective antihistamine drugs originally sold under the trade name of Benadryl, and is currently available over-the-counter. It is also recognized as a sedative and has been used as a sleep aid. A single 50 mg dose produces a typical blood level of .083 mg/L (i.e., 83 ng/ml) at 3 hours (Baselt, 2020). According to the National Highway Traffic and Safety Administration (NHTSA) Fact Sheet on Diphenhydramine, drowsiness can be observed at 30-40 ng/ml and mental impairment observed with concentrations above 60 ng/ml. Two of the individuals had Diphenhydramine in their specimens. Mr. Muscatel had a level of 6.54 mg/kg in his liver tissue and Ms. Peckler had a level of 910 ng/ml in her heart blood and 5.39 mg/kg in her liver tissue. The other three individuals did not have reported levels of Diphenhydramine in their specimens. Diphenhydramine has an average biological half-life of 5 to 8 hours. According to Baselt (2020), liver concentrations in fatal cases averaged 34 mg/kg with a range of 23 to 47 mg/kg. Obviously, we have no information of liver levels in living individuals. Also, Diphenhydramine is subject to post-mortem redistribution, with heart blood levels 2.4 times the usual peripheral blood level (range 0.4 to 6.0 times). Accordingly, Ms. Peckler's heart blood level of 910 ng/ml would be elevated by a significant amount, even without the effects of decomposition.

**Selection of Postmortem Specimens for Toxicological Analysis**

Forensic Toxicologists know that the ideal location for a biological specimen in postmortem situations is the blood from the peripheral area, usually the femoral artery or vein, since samples from this area are less susceptible to postmortem changes in drug levels (Druid & Holmgren, 1997, Prouty & Anderson, 1990). The least reliable location from which to take a sample is the heart and central area, since these are susceptible to postmortem changes, and elevations of

alcohol and drug levels. Chest fluid is frequently referred to as chest blood, since it looks like blood, but it is actually a mixture of blood and fluid that has leaked from the central area, and is the least reliable source for toxicological analysis. Another logical location for postmortem sampling, particularly for alcohol and some drugs, is the vitreous fluid. The vitreous fluid, from the eye, is less susceptible to postmortem decomposition and alcohol and drug level changes. In this matter, the only autopsy that indicated that the eyes had been destroyed was that of Mr. Umansky. Sampling from tissues, such as liver and brain, can be used, but there is limited information on the relevance of the levels identified. Toxicology laboratories know when they select samples for testing that the most reliable sample locations should be analyzed, but they are limited by the samples provided by the pathologist.

**Evaluation of Post-Mortem Toxicology Drug Levels**

Post-Mortem Redistribution was first reported in 1972 for barbiturates (Gee, et al., 1972) and has been studied extensively since then. Pounder and Jones (1990) reported that postmortem redistribution creates major difficulties in interpretation and undermines the reference values of data bases where the site of origin of post-mortem blood samples is unknown. Obviously, in most death cases there are no results for antemortem blood samples, which would be the most relevant for interpretation of cause of death. The New York State Poison Centers have published an excellent discussion of Post-Mortem Redistribution (2009), and indicate that "[o]nce cells die, their membrane integrity is lost, and the cells leak their contents (drugs, electrolytes, etc.) into the extracellular space. With no circulation occurring, the drugs then passively diffuse by concentration gradients from areas of high concentration to areas of low concentration". Drugs that are mainly contained in the cells and tissues during life (i.e., those with high volumes of distributions), will diffuse out of the tissues and into the blood after cellular death, and therefore will exhibit this post-mortem redistribution (PMR). In these cases, post-mortem levels in central (cardiac) blood can be several times higher than they were antemortem, due to passive diffusion from myocardial cells into blood in the cardiac chambers; or diffusion from adjacent lung tissue into the great vessels in the thorax (aorta, IVC, etc.). Diffusion from the stomach to the heart can also occur from any alcohol that remains in the stomach at the time of death. Also, as discussed above, ethyl alcohol can be formed postmortem by microbiological action, resulting in a false elevation of the antemortem blood alcohol level.

**Post-Mortem Toxicology Testing in Submerged Bodies**

According to Armstrong and Erskine (2018), the selection of matrices will be limited or suboptimal in cases with prolonged submersion and decomposition. These authors also state that interpretation of the degree of ethanol intoxication may be difficult in bodies submerged for prolonged periods due to dilutional effects of water on bodily fluids and/or the confounding effects of postmortem ethanol production. Also the determination of ethyl glucuronide (ETG) in

urine can be used to differentiate between antemortem ingestion and postmortem production of Ethanol, since the formation of ETG requires a living person. Another process that can help differentiate between antemortem Ethanol ingestion and Postmortem Ethanol formation is to analyze for other alcohols (i.e., n-propanol, methanol, etc.), since they would be expected to be formed postmortem and indicate that the level of Ethanol is also elevated by postmortem formation.

**Laboratory Analysis**

In this matter, there are many issuers involving the detection of alcohol and Diphenhydramine in the five decedents. It should be obvious that we have a very limited amount of information on the detection of alcohol and drugs in bodies that have been submerged for a long period of time. The first major issue is the limited number of specimens collected from the bodies, presumably due to decomposition. The second issue is that it is widely recognized that Ethanol can be formed postmortem, and without proper analysis (i.e., ETG detection, and analysis for other alcohols like n-propanol), it is impossible to determine what the antemortem blood levels would have been. All five toxicology results reported various levels of ethyl alcohol in various specimens, but none of the analyses included analyses for other alcohols or for ETG, so it is impossible to know the extent of postmortem formation of the ethyl alcohol levels. The third issue is the detection of Diphenhydramine in two individuals, which would be elevated by postmortem redistribution. The total of all these issues is that it is practically impossible to make any determinations of the possible effects of Ethanol and Diphenhydramine on these individuals prior to their deaths.

In summary, it is my opinion, based on the information I reviewed and on a reasonable degree of scientific certainty, that there are major issues in interpreting the Ethanol and Diphenhydramine levels in the five decedents, and the possible effects of these substances on the decedents prior to their deaths. The major issues involve decomposition, postmortem redistribution, the selection of sample locations and postmortem formation of Ethanol.

I reserve the right to modify this report if additional information becomes available.

Sincerely,

Gary L. Lage, Ph.D.
*Principal*

GLL/ms
Enclosure:

**Selected References**

Armstrong, EJ and KL Erskine, Investigation of Drowning Deaths: A Practical Review, Academic Forensic Pathology, 8(1): 8-43 (2018).

Baselt, R.C., *Disposition of Toxic Drugs and Chemicals in Man,* 12th Ed., Biomedical Pubs, Foster City, CA., 2020.

Druid, H & P Holmgren, A Compilation of Fatal and Control Concentrations of Drugs in Postmortem Femoral Blood, J Forensic Sci, 42(1):79-87 (1997).

Garriott, JC, *Garriott's Medicolegal Aspects of Alcohol, Sixth Ed.,* Lawyers and Judges Pub. Co., 2015.

Gee, DJ, RA Dalley and MA Green, Post Mortem Diagnosis of Barbiturate Poisoning, Forensic Toxicol Page 37-51 (1972).

Gilman, A.G., T.W. Rall, A.S. Nies & P. Taylor, *Goodman & Gilman's The Pharmacological Basis of Therapeutics,* Eighth Ed, McGraw-Hill, New York, 1990.

NY State Poison Center, "Dead Men Tell Tall Tales" the Issue of Post-Mortem Redistribution, January 2009.

Prouty RW, and WH Anderson, The Forensic Science Implications of Site and Temporal Influences on Postmortem Blood-Level Concentrations, J Forensic Sci 35(2):243-70 (1990).

Pounder, DJ and GR Jones, Post-Mortem Drug Redistribution --- A Toxicological Nightmare, Forensic Sci Int., 45(3): 253-63 (1990).

**GARY L. LAGE, Ph.D.**

**ToxiLogics, Inc.**
**103 S. Shore Dr.**
**Dover, DE 19901**
**(302) 387-1211**
**(609) 314-9113 (Cell Phone)**

**E-mail Glage@comcast.net**

**EDUCATION**

1967 Ph.D., Pharmacology, University of Iowa

1965 M.S., Pharmacology, University of Iowa

1963 B.S., Pharmacy, Drake University

**CERTIFICATION**

Diplomate, American Board of Toxicology, 1980 - 2015

**EXPERIENCE**

1996-Present Founder, **ToxiLogics**, Inc., Currently Dover, DE

1995-1996 Senior Program Director, Site Remediation, ERM, Inc., Exton, PA

1991-1995 Principal, Human Health Practice Area, ENVIRON Corp., Princeton, NJ

1987-1991 Project Director, Vice President and Practice Leader for Human Health Practice, Roy F. Weston, West Chester, PA

1984-1987 Philadelphia College of Pharmacy and Science, Chairman of the Department of Pharmacology and Toxicology Programs

1978-1984 Philadelphia College of Pharmacy and Science, Professor of Toxicology, Director of Toxicology Programs

1973-1978 University of Wisconsin-Madison, Associate Professor of Pharmacology and Toxicology

1972-1973 University of Kansas, Associate Professor of Pharmacology and Toxicology

1967-1972 University of Kansas, Assistant Professor of Pharmacology and Toxicology

**GARY L. LAGE, Ph.D.**

Dr. Lage is a founding Principal of **ToxiLogics, Inc.,** responsible for incorporating current toxicology of chemicals and modern risk assessment into scientific decisions. He has over 40 years of experience in toxicology, both in its academic development as a scientific discipline and in consulting activities in risk assessment for industry and government. He has served as an expert in toxicology on numerous issues. He has experience in developing innovative solutions to environmental problems through the use of risk assessments, and is widely recognized for communicating complex issues of toxicology and risk assessment to nonscientific audiences. This activity has included the application of Risk-Based Corrective Action (RBCA) to environmental problems, and he has served as a trainer for ASTM RBCA E-1739-95. His work over the last four decades has included the following:

- Conducted a risk assessment for a unexpected contaminant in an infant product
- Conducted a risk assessment for a air emissions from a sanitary landfill
- Served as an expert and conducted a risk assessment for reoccupation of a building that had been damaged by the September 11, 2001 collapse of the World Trade Center Towers.
- Provided Expert Services in numerous accidental death cases involving drugs and alcohol.
- Provide a detailed summary of the toxicology of MTBE
- Been recognized as an expert in several hundred cases involving the toxicology of alcohol, including absorption, metabolism, and the physiological effects. These cases have included Dram shop cases, and criminal cases, including homicide, rape and vehicular homicide.
- Been recognized as expert in cases involving the pharmacology and toxicology of drugs involving homicide and driving under the influence.
- Served as a toxicology expert in several cases involving potential health effects due to air emissions from various swine facilities.
- Served as a toxicology expert in a case involving prescription drug use and an aircraft accident.
- Conducted a risk assessment for a military installation involving the use of depleted uranium projectiles.
- Provided risk communication services to employees of several clients and potential chemical exposure.
- Developed a toxicology report agency submission for a pharmaceutical company based on an old toxicology study.

GARY L. LAGE, Ph.D.

- Served as a toxicology expert in a case involving esophageal cancer and employment at a petroleum refinery.
- Served as a toxicology expert in a workers compensation case involving leukemia and chemical exposure.
- Served as a toxicology expert in a case involving an automobile accident and the influence of a dietary supplement on the driver.
- Provided risk communication to employees on health effects of asbestos associated with previous activities.
- Provided risk communication to employees on health effects of lead due to previous uses of the building.
- Consult on potential hazard within a day care center due to PCB contamination of an adjacent property.
- Served as a toxicology consultant in a matter involving the cleanup of several apartments that had been painted with paint containing tributyl tin.
- Served as a toxicology consultant in a case involving acute exposure to tetrachloroethylene due to a spill at a dry cleaner.
- Served as a toxicology expert involving death due to a drug overdose in prisoners.
- Assist client in development of guidelines for future development of former agricultural land to which historic pesticides had been applied.
- Served as toxicology expert in a case of alleged salivary gland cancer due to exposure to benzene.
- Provided Expert evaluation of tetrachloroethylene in relation to exposure to residences near dry cleaning establishments.
- Provided Expert evaluation of pancreatic enzyme preparations in response to alleged causation of fibrosing colonopathy
- Provides expert review of alternative cleanup levels for lithium
- Provide expert toxicology, risk assessment and risk communication services in numerous matters of potential indoor air exposure to chemicals (BTEX and Chlorinated hydrocarbons) in groundwater

- Provide expert toxicology and risk assessment assistance in a major sediment remediation project involving BTEX, PAHs and PCBs
- Provided toxicology and risk assessment services on several brownfields development projects (PA Act 2)
- Provided expert assistance in a decision to expand an major shopping mall onto property formally used as a petroleum tank farm
- Served on two Independent Review Teams for the US Army to evaluate environmental conditions on former army bases
- Served as an expert toxicologist in a case involving alleged health effects due to exposure to hair dyes
- Served as an expert toxicologist in a legal malpractice case involving bendectin
- Provided Risk assessment services on the future use of an abandon industrial property for residential development
- Provided expert toxicology and risk assessment services in several cases involving dieldrin
- Consulting on risk assessment activities associated with PCB contamination in the natural gas pipeline industry
- Provided Expert Report in case involving the toxicology testing for a pharmaceutical product
- Provided toxicology expertise and risk communication services in a case involving ground water contamination under homes
- Provided Expert Affidavit on the toxicological differences between hexavalent and trivalent chromium
- Provided Expert Opinion in a Worker's Compensation case involving pancreatic and stomach cancer
- Provided senior oversight to a human health risk assessment on the residual tars and petroleum hydrocarbons resulting from a fire of a petroleum tank farm. Substances included PAHs and BTEX.
- Provided toxicology expertise to determine cost apportionment for remediation of a landfill that contained municipal wastes and hazardous wastes.

- Served as a toxicology expert on a mercury spill within a school.
- Evaluated drug use in an individual, and provided expert opinion on frequency of drug use.
- Expert toxicologist involving case of alleged Reactive Airway Dysfunction Syndrome (RADS) as a result of exposure to surfactants.
- Has evaluated the current cancer slope factor for arsenic and developed an argument for higher soil clean-up levels of arsenic based on current science
- Has directed a risk assessment to determine the risk to construction workers and off-site residents during remediation of dioxin contaminated soil
- Served as toxicologist for a school that was located on a previous industrial site. Helped select sampling locations, analytical methods, and communicated the results of the analysis to the school, parents and regulatory agencies
- Has evaluated the current toxicological status for beryllium
- Has developed a challenge to the provisional Reference Dose for thiocyanate based on the toxicology studies on thiocyanate and it's mechanism of action
- Performing risk assessments associated with RCRA corrective action of an industrial facility
- Serving as an expert in a toxic tort case involving alleged exposure to sulfur dioxide and hydrogen sulfide
- Directing a risk assessment involving a PCB contaminated river and assistance in selection of remedial alternatives based on risk
- Performing a multipathway risk assessment for a cement kiln in support of permitting of hazardous waste derived fuel.
- Conducting a risk assessment for off-site air emissions during dredging and disposal of PCBs, PAHs, pesticides and VOCs of a river in the mid-west.
- Provide litigation support in a case involved alleged leukemia from exposure to non-benzene containing aromatic solvents
- Conduct Risk Assessment for volatilization of VOCs from ground water into government buildings

- Served as an expert in insurance litigation involving the state of knowledge of toxicology in the 1960's and 1970's
- Served as an expert involving alleged occupational asthma from n-hexane exposure
- Served as an expert in determination of physiological effects of alcohol intoxication in several matters
- Conducted a Screening Level Risk Assessment for a Commercial Hazardous Waste Incinerator and presented the results to the state regulatory agency and at a public hearing. The Risk Assessment incorporated emissions estimates of all of the chemicals identified in the USEPA 1994 SLRA guidance and the associated indirect exposure analysis.
- Audited a laboratory/office facility following a chemical spill to determine appropriate chemical storage conditions, and evaluate which chemicals in the laboratories might lead to significant health consequences for the non-laboratory workers if spilled in the future. Recommended appropriate purchasing and storage activities to minimize potential human health effect
- Acted as an expert to evaluate the alleged human health effects of a truck driver exposed to a product while unloading a truck. Evaluation included a thorough review of previous medical records to determine if health effects were pre-existing.
- Acted as an expert in a toxic tort case where workers adjacent to an industrial facility were allegedly exposed to sulfur dioxide.
- Directed a project to conduct a Risk Assessment on an industrial facility as part of a RCRA corrective action. The complex site had numerous SWMUs and multiple potential exposure pathways. Participation included review of a fate and transport model to lead into the Risk Assessment.
- Acted as an expert to evaluate the alleged exposure of a truck driver to material spilled and alleged human health effects due to exposure of the spilled product.
- Conducted a Risk Assessment for a USEPA Region II Superfund site. ENVIRON took over the Risk Assessment after the USEPA contractor had developed an initial draft. USEPA approved the transfer of the Risk Assessment to ENVIRON. Assessment included both Human Health and Ecological components.
- Participated in a project to evaluate human health effects to off-site contaminated ground water from both ingestion and inhalation pathways.

**GARY L. LAGE, Ph.D.**

- Acted as an expert toxicologist to evaluate MSDSs for a company and their warnings to determine if they were appropriate. Made recommendations to improve both the warning labels and the MSDSs.

- Developed sediment remediation goals for an industrial river based on both human health and ecological risk analyses. The site involved PCBs, PAHs and metals.

- Developed assessment of risk to agricultural workers based on exposure to chemicals from nearby Superfund site.

- Developed support for no action alternative for soil remediation at a Superfund site.

- Evaluated the risk to the public from consumption of processed agricultural product grown in area with contaminated ground water and surface water.

- Evaluated the potential health effects to workers allegedly exposed to hydrogen sulfide.

- Directed a project to evaluate the human health impacts of consumption of PCB contaminated fish. Evaluation included conducting a fish survey to determine actual fish consumption and a survey of a local ethnic group to determine their consumption of preparation of fish from the river location.

- Participated in a major toxic tort case involving potential exposures to residents adjacent to a Superfund site.

- Participated as an expert toxicologist in a case involving exposure of residents to substances released from a specialty chemical company.

- Provided expertise in siting and permitting a commercial hazardous waste incinerator with development of a multiple pathway risk assessment and communication of results to regulatory agencies and public interest groups.

- Provided strategic guidance and expert evaluation in litigation involving chlorine and chlorine dioxide exposure to construction workers at a pulp and paper facility.

- Directed a TSCA 8(e) CAP audit for a major chemical manufacturer. In addition to developing a protocol for the audit, developed a database to assist the auditors and to assure retrieval of the over 10,000 studies reviewed.

- Reviewed a risk assessment for development of real estate on the shores of Lake Michigan to assure that the risk assessment would be acceptable to the lending and regulatory agencies.

- Evaluated the potential risks associated with a CFC substitute in foam insulation to workers or to residents of homes insulated with the product.

- Assisted a client in strategic planning for evaluating indoor air concentrations of off-site residences as a result of ground water contamination with volatile chlorinated organic hydrocarbons, and assisted in the protocol development and analysis of indoor air and interpreted the results for the corporation and the residents.

- Evaluated the potential risk to workers due to formaldehyde contamination of an agricultural product.

- Assisted a client in the strategic planning of protocol development and evaluation of potential indoor air contaminants at a former industrial facility due to ground water contamination with freon and chlorinated hydrocarbons, and presented the results to the current employees of the facility.

- Evaluated the potential adverse effects from dioxin contamination of naturally mined materials for both worker exposure and the exposure of consumers of products developed from these materials.

- Assisted a client in the strategic planning and site characterization for a Superfund site to assure that the sampling plan, analytical procedures, and detection limits would meet the needs of the risk assessment to be conducted for the site.

- Assisted four clients in developing protocol for TSCA 8(e) CAP audits.

- Assisted a client in negotiating a protocol for a risk assessment at a Superfund site to be performed by the EPA contractor to reduce the level of antagonism that might develop after the risk assessment was developed.

- Performed an updated risk assessment and evaluation of a Superfund site to incorporate current toxicology information and documented biodegradation into the risk assessment process.

- Assisted a client in designing and performing a risk assessment for a hazardous waste incinerator.

- Evaluated the hazards and potential liabilities for an insurance company due to an inappropriately applied pesticide in an apartment complex.

- Served as an international expert to review hazard assessments developed for 65 chemicals for the Ontario Ministry of the Environment.

- Assisted a client in evaluating potential off-site risks due to an industrial facility using 1,3-butadiene and incorporated current toxicological information on the mechanisms of toxicity of 1,3-butadiene.

- In a product liability case, evaluated the claim that a family was poisoned due to mercury contamination of a commercial juice product.

- Served as an expert toxicologist in litigation concerning trichloroethylene exposure due to contaminated ground water.

- Assisted in determining the necessity for a product recall due to a manufacturing error that caused significant quantities of alkaline material to be found in a consumer juice product. The product was recalled prior to any documented human exposure.

- Evaluated the potential risks due to chlorinated hydrocarbon contamination of ground water subsequently used in a consumer product.

- In a malpractice case, evaluated the potential adverse health affects from an alleged prescription error to the recipient.

- Assisted in performing multipathway risk assessments associated with post-remediation levels of PCBs in gas transmission locations.

- Served as project director and senior scientist for a hazardous waste incinerator project for a major chemical company that included a multipathway risk assessment, a traffic study, and a socioeconomic analysis.

- Performed several risk analyses to support a "no-action" alternative for ground water contaminants at contaminated industrial facilities.

- Served as an expert in support of a "no action" alternative for a site with complex cyanide contamination in soil. Involved differentiation of toxicity of simple cyanide compounds compared to complex cyanides.

- Served as senior scientist for an evaluation of the risk to pulp and paper facilities due to air emissions of chloroform. Developed scientifically sound alternative cancer potency values for chloroform, and presented assessments to numerous state and federal regulatory agencies.

- Directed a series of projects involving the determination of risk associated with PCBs in the gas transmission and distribution industries.

- Assisted a major metal processing facility in determining areas of maximum impact that would result from accidental chemical releases from the facility to surrounding residential

areas. Determined which residential areas would be expected to experience illness or death due to worst-case chemical releases.

- Determined the potential adverse health impact to a sampling team at an NPL site due to unexpected exposure to dioxins, and communicated results to workers.

- Assisted a major company in developing risk-based environmental levels of lithium; helped negotiate with regulatory agencies concerning acceptable levels in ground water.

- Developed a computer model to predict off-site carcinogenic risks associated with on site air emissions; screening model utilized SARA Title III emissions information to predict the carcinogenic risk.

- Evaluated a risk assessment performed on a cement kiln designed to burn fuel derived from hazardous waste. Assisted in presenting results to the regulatory agency and throughout the litigation process.

- Directed the permitting process for a pulp and paper company seeking applicable air permits for a new facility.

- Performed an analysis and evaluation of occupational risks posed to workers in a PCB contaminated facility, and presented results to owners and workers.

- Evaluated potential carcinogenic risk to workers from long-term use of contaminated ground water at a metals manufacturing facility, and presented results to employers.

- Assessed indoor air concentrations and determined potential health risks in residences surrounding a petroleum pipeline leak; monitored indoor air and determined action levels for compounds such as benzene.

- Developed air quality guidelines for 99 toxic chemicals for the city of Philadelphia, one of the first municipalities to develop such guidelines in the early 1980s.

- Developed an educational program entitled "Toxicology for Non-toxicologists," presented widely to attorneys, environmental managers, and other audiences over the last fifteen years.

- For the Pennsylvania Department of Health, participated in a preliminary investigation of potential hazards from chemical waste sites to evaluate the need for a more extensive health assessment.

- Developed a "Chemical Education Hotline" to inform individuals and small businesses about chemical hazards in the workplace, with special emphasis on the OSHA Hazardous Communication Rule.

**GARY L. LAGE, Ph.D.**

**PROFESSIONAL MEMBERSHIPS AND ADVISORY POSITIONS**

Member, Society of Toxicology; treasurer, 1985-1989.

Member, American Society of Pharmacology & Experimental Therapeutics.

Founder and First President, Mid-Atlantic Chapter, Society of Toxicology.

Member, American Chemical Society

Member, Society of Risk Analysis.

Member, International Society of Regulatory Toxicology & Pharmacology.

Member, Drug Metabolism Group.

Member, Section of Toxicology of the International Union of Pharmacology (IUPHAR).

Adjunct Professor of Toxicology, Drexel University, 1985-1991, 1997 - 2001.

Adjunct Professor, Allegheny University of the Health Sciences, 1997 – 2001.

Lecturer, Pennsylvania State University, 1997 – 2004.

Professor, Weston Institute, 1989-1993.

Member of Risk Assessment Subcommittee, and alternate to the Science Advisory Board for Pennsylvania Department of Environmental Protection, 1995- 2001

Member, National Institute of Health, Environmental Health Sciences Review Committee, 1986-1990.

External Advisor, NIEHS Aquatic Biomedical Research Center, Medical College of Wisconsin, 1985-1988.

Member, Advisory Panel on Health, Safety, and Environmental Affairs, Smith Kline & French, 1984-1989.

Member, Advisory Committee on Toxic Air Pollutants for Philadelphia Department of Health, 1981-1987.

Member, Toxics/Health Effects Advisory Committee, Pennsylvania Department of Health, 1984-1988.

**GARY L. LAGE, Ph.D.**

Member, Health Hazard Evaluation Panel, Weston, Inc., 1984-1987.

Member, Air Pollution Control Board, City of Philadelphia, 1983-1987.

Member, Board of Directors, Toxicology Laboratory Accreditation Board, Inc., 1983-1988.

Outside Reviewer, U.S. Navy Toxicology Program, 1983.

Member, Pennsylvania Vietnam Herbicide Information Committee, 1982-1987.

Member of the Committee on Review and Evaluation of the Army Chemical Stockpile Disposal Program for the National Research Council, 2000-2002.

**PUBLICATIONS AND PRESENTATIONS**

Lage, G.L., 2022. Role of Toxicology in Drug-Related Deaths, Presented at PACDL Seminar on Drug Delivery Resulting in Death, Presented April 28, 2022, Harrisburg, PA.

Lage, G.L., 2015. Creating Doubt with the Blood Draw, Presented at PACDL Seminar entitled DUI and Motor Vehicles, 2015, Presented December 4, 2015, King of Prussia, PA.

Lage, G.L., 2015. Interpreting the Pennsylvania Bulletin's Minimum Levels of Controlled Substances, Presented at PACDL Seminar entitled DUI and Motor Vehicles, 2015, Presented December 4, 2015, King of Prussia, PA.

Lage, G.L., 2014, Participant in Continuing Legal education Seminar entitled "The Nuts and Bolts of Defending a Driving While Intoxicated (DI) Charge from the Perspective of a Municipal Prosecutor, Defense attorney and Expert Witness", Sussex county Bar Association, October, 2014.

Lage, G.L., 2012. Can I get an (expert) witness? Drugs, Expert Witnesses and DUI's in the post-Griffith Pennsylvania, Presented at PACDL Seminar entitled Blood, Beers and Gears: The ultimate Motor Vehicle Seminar, Presented February 10, 2012, Lancaster, PA.

Lage, G.L. 2007. General principles of toxicology; Review of toxicological responses; and, Role of toxicology in risk assessment. Papers presented at the ABS Consulting Symposium on Toxicology Made Simple, Aarcher Institute, Atlanta, May, 2007; Phoenix, October 2007; Atlanta, April, 2008; Las Vegas, October 2008; Columbus, April 2009; Annapolis, August 2009; Scottsdale, AZ, October 2009; Annapolis, April 2010, Annapolis, April 2011, San Antonio, September 2011.

Lage, G.L. 2004. General principles of toxicology; Review of toxicological responses; and, Role of toxicology in risk assessment. Papers presented at the ABS Consulting Symposium on Toxicology for Non-Toxicologists, New Orleans, April 2004; Hilton Head Island, August 2004; San Antonio, April, 2005; Hilton Head Island, June, 2005; Williamsburg, December 2005; At S. J. Johnson, WI, May, 2008.

Lage, G.L. 2002. General principles of toxicology; Review of toxicological responses; and, Role of toxicology in risk assessment. Papers presented at the Government Institutes Symposium on Toxicology for Non-Toxicologists, Arlington, VA, April and November, 1993, Marino Del Ray, CA, July 1993 and July 1995; Santa Monica, CA, July 1994; Arlington, VA, April 1994, Hilton Head, S.C., July, 1992; Washington, D.C., April and November, 1992, November 1994, April, 1995; Richland, WA, November, 1991 and December 1992; Washington, D.C., October, 1995; October 1991; April 1991; October 1990; and April 1990; Toronto, Canada, June, 1995, Los Angeles, CA, July 1995, Alexandria, VA, October, 1995, Washington, DC, April 1996, Los Angeles, CA, July 1996, Washington, DC, November 1996, Washington, DC, May 1997, Los Angeles, CA, July, 1997, Washington DC, November 1997, Washington, DC, April, 1998, Redondo Beach, CA, July 1998, Arlington, VA, November 1998, Orlando, FL, February, 1999, Hilton Head, SC, June, 1999, Washington, DC, November, 1999; Hilton Head, SC, June 2000; Colorado Springs, CO, August 2000; Houston, TX, September, 2000; Washington, DC, November, 2000; Washington, DC, March 2001; Hilton Head, SC, July 2001; Washington, DC, November 2001; Orlando, FL, February 2002; San Francisco, CA, July 2002, Washington DC, November 2002, Scottsdale, AZ, March 2003, Hilton Head, SC, August 2003, New Orleans, LA, April 2004, and Hilton Head, SC, August 2004.

Lage, G.L., 2002, Drugs, Chemicals, Blood, Urine, Alcohol: The Toxicologist's Role in Presenting or Attacking Forensic Evidence, Presented at Pennsylvania Bar Institute 19th Annual Criminal law Symposium, Harrisburg, PA, April, 2002 and at Pennsylvania Bar Institute Afternoon of Criminal Law, Philadelphia, PA December 2002.

.Lage, G.L. Toxicology Training Course at Hazmat Conference, Las Vegas, NV, December 2001, November 2003 and November 2005.

Lage, G.L. The Role of a Toxicologist in Criminal Cases, Presented at Pennsylvania Criminal Defense Lawyers Symposium, King of Prussia, PA, October 2001.

Lage, G.L. 1999, Presented two day course on Principles of Risk Assessment to Broward County Florida Environmental Department February 1999.

Lage, GL, 1999, Risk-Based Environmental Decision Making, Program Chairman and Major Speaker, Arlington, VA, September, 1998; Orlando, FL, April, 1999 and Washington, DC, September 2000..

Lage, G.L., 1998, Toxicology for Non-Toxicologists, Presented to Corporation, Cincinnati, OH, May 1998.

Lage, G.L., 1997, Toxicology for Attorneys, Presented to Law Firm, Santa Monica, CA, November 1997.

Lage, G.L., 1997, The Environmental Risk Institute, Program Chairman and Major Speaker, Alexandria, VA, September 1997.

Lage, G.L., 1996, Toxic Chemicals: The Dose makes the Poison, Presented to Trenton Section of American Chemical Society, November 1996.

Lage, G.L., 1996, The Risk Assessment Process, Application of ACT 2 Cleanup Goals, Evaluating Contaminant Transport & Ultimate Fate, Presented at Pennsylvania Council of Professional Geologists meeting on Pennsylvania's Land Recycling Program: Proposed Rulemaking for Risk-Based Corrective Action (RBCA) and the Implementation of Act 2, Philadelphia, October, 1996.

Lage, G.L., 1996, Risk-Based Corrective Action Wilmington, DE, May, 1996

Lage, G.L., 1996, ASTM Risk-Based Corrective Action Training, New York, March, 1996

Lage, G.L., 1996, Program Director and Major Speaker at The Environmental Risk assessment Course, Williamsburg, VA, December, 1995, Orlando, FL, March, 1996, Washington, DC, October 1996, and Annapolis, MD, April, 1997.

Lage, G.L., 1996 Total Cost Control for Remediation with ASTM E-1739-95, Philadelphia, March, 1996, Somerset, NJ, June, 1996.

Lage, G.L., 1996, Understanding Risk Assessments, Philadelphia, PA, December, 1995, and Pittsburgh, March, 1996

Lage, G.L., 1995, Current Applications of Risk Assessment, Presented at Forum on Michigan's New "Brownfields" Legislation, Lansing, MI, November, 1995

Lage, G.L. 1995 Risk Assessment: and Environmental Discussion, Presented to the Technology Council, Frazer, PA, October, 1995.

Lage, G.L. 1995. General principles of toxicology; Review of toxicological responses; and, Role of toxicology in risk assessment. Papers presented at the Governmental Institutes Symposium on Toxicology for Non-Toxicologists for U.S. Army Chemical Research, Development & Engineering Center, Aberdeen Proving Ground, Maryland, May, 1995, also presented in January 1992.

Lage, G.L The Changing Face of Risk Assessment in Environmental Decision making, Ohio Environmental Law Letter, Porter, Wright, Morris & Arthur, November, 1994.

**GARY L. LAGE, Ph.D.**

Lage, G.L. The Changing Face of Risk Assessment as Applied to Environmental Decision making, Published in New Jersey Environmental Law Letter, Pitney, Hardin, Kipp & Szuch, October, 1994.

Lage, G.L. Environmental Risk Assessment Symposium for Government Institutes, Washington, DC, October, 1994.

Lage, G.L. 1994. Risk Assessments: Determining the Impact on Health and Environment, Presented at symposium entitled "Practical Environmental Science"; Government Institute, August 1994, October 1994.

Lage, G.L. 1994. Superfund: What's Needed and Why for the New York State Bar Association and Society for Risk Analysis. New York, New York. June 1994.

Lage, G.L. 1994. Site Remediation Issues in New Jersey After S-1070 for the Environmental Law Section of the New Jersey State Bar Association. Avalon, NJ. June 1994.

Lage, G.L. 1994. Risk Assessment of Incineration Products and Communication to the Public, Society of Toxicology. 6th Annual Meeting, Duquesne University, Pittsburgh, PA. May 1994.

Lage, G.L. 1994. Environmental Risk Assessment, Hoechst Celanese Corporation 1994 Environmental Health and Safety Conference, Charlotte, NC. May 1994.

Lage, G.L. 1994. Communication of Risk to the Public, Presented at Symposium on Incineration of Municipal Waste, Society of Toxicology Annual Meeting, Dallas, TX March, 1994.

Lage, G.L. 1994. Environmental Risk Assessment Symposium for Government Institutes, Orlando, FL March 1994.

Lage, G.L. 1993. Toxicology Update: Plaintiffs Targets in the 1990's, Presented at a symposium entitled Product Liability/Toxic Torts: Trends for the 90's, Philadelphia, PA October 1993.

Lage, G.L. 1993. Basics of Toxicology and Epidemiology, presented at symposium entitle The Science and Law of EMFs, Allentown, PA, June, 1993.

Lage, G.L. 1993. Environmental Risk Assessment Government Institute Symposium at Arlington, VA, 1993.

Lage, G.L. 1993. Symposium entitled Interfacing the Science of Toxicology with the Practice of Law, Presented at Princeton, NJ. February, 1993.

Lage, G.L. 1992. Lead Abatement Update, Presented at Symposium entitled Real Property and Environmental Liability, Alexandria, VA, October 1992.

Lage, G.L. 1992. Role of Risk Assessment in Superfund, presented at symposium entitled Environmental Regulations Houston, TX, September, 1992.

Lage, G.L. 1992. Methods to Conduct Risk Assessment, Presented at ILTA conference, Houston, TX, June, 1992.

Lage, G.L 1992. Environmental Risk Assessment: Techniques and Applications, Presented Government Institute Symposium, Arlington, VA, April, 1992.

Lage, G.L. 1992. Incorporation of Current Science into Risk Assessment, Presented at Mid-Atlantic Chapter of Society of Toxicology, Princeton, NJ April, 1992.

Lage, G.L. 1992. Drug toxicity. *The Merck Manual* 16th ed.

Lage, G.L. 1992. Methods to conduct risk assessments. Paper presented at the 12th Annual ILTA Operating Conference, Houston, Texas, June.

Lage, G.L. 1992. Environmental risk assessments: Techniques and applications. Paper presented at the Governmental Institutes Symposium on Environmental Risk Assessments, Arlington, Virginia, April.

Lage, G.L. 1991. The TSCA Compliance Audit Program: How to determine which studies to report under TSCA Section 8(e). Paper presented at the Government Institutes Symposium on the TSCA Compliance Audit Program, Arlington, Virginia, October.

Lage, G.L. 1991. TSCA 8(e) CAP audits. Paper presented at the 1991 Toxicology Roundtable Symposium, Long Branch, New Jersey, October.

Lage, G.L 1991. Risk assessment and its uses in environmental regulation. Paper presented at the Center for Energy and Environmental Management's Symposium on Risk Assessment, Alexandria, Virginia, October and May.

Lage, G.L. 1991. Risk assessment and how to cope with SARA Title III. Paper presented at the Pennsylvania Chamber of Business and Industry, Harrisburg, Pennsylvania, May.

Lage, G.L. 1990. Introduction to risk assessment -- dispersion modeling/risk assessment. Paper presented at Clean Air Engineering, Chicago, December.

Lage, G.L. 1990. Causation: Chemically induced disease -- the role of toxicology. *The Legal Intelligencer,* Philadelphia, November 15.

Lage, G.L. 1990. PCB management training. Paper presented to the City of Austin Power and Light, Austin, Texas, October.

Lage, G.L. 1990. The role of risk assessment in evaluating human health impacts of site clean-up alternatives. Paper presented at the Institute for International Research Symposium on Environmental Regulations at Federal Facilities, Washington, D.C., September.

Lage, G.L. 1990. Review of chloroform toxicology. Paper presented to the Environmental Committee of the Alabama Pulp and Paper Industry, Montgomery, Ala., September.

Mandelbaum, I., and G.L. Lage. 1989. Cookbook risk assessment: Coping with missing ingredients. Paper presented at Hazardous Waste Management Conference/Central.

Kershaw, W.C., D.A. Barsotti, T.B. Leonard, J. Dent, and G.L. Lage. 1989. Methoxyflurane enhances allyl alcohol hepatotoxicity: Possible involvement of increased acrolein formation. *Drug Metab. Dispos.* 17:117.

Lage, G.L. 1989. Toxicity assessment; and Characterization of risk. Papers presented at the Government Institute Symposium of Environmental Risk Assessment, Washington, D.C., November.

Lage, G.L. 1989. Basic principles of toxicology. Paper presented at the Environmental Engineering Conference, University of Minnesota, Minneapolis, October; and at the Champion International Environmental Forum, Lake Logan, N.C., September.

Lage, G.L. 1989. Risk assessment methodology: Toxicological applications and limitations. Paper presented at the Symposium on Risk Assessment of Solid Wastes at the American Institute of Chemical Engineers, Philadelphia, Pa., August.

Lage, G.L. 1989. Impact of air toxics regulation on industry. Paper presented at Hazmat International, Atlantic City, N.J., June.

Lage, G.L. 1989. How environmental professionals use toxicological data. Paper presented at Hazmat-International, Atlantic City, N.J., June.

Cannon, J.R., P.J. Harvison, and G.L. Lage. 1988. Age related differences in the metabolism of allyl alcohol to acrolein by Sprague-Dawley rats. Abstracted in *Toxicologist* 8:267.

Lage, G.L 1988. Drug testing: Causation implications. Paper presented to the Defense Research Institute Symposium on Workers Compensation, New York, December.

Lage, G.L 1988. Models of immune system testing. Paper presented to Annual Education Seminar of the Dermal Clinical Evaluation Society, Atlantic City, N.J., September.

**GARY L. LAGE, Ph.D.**

Lage, G.L. 1988. Risk assessment and facility siting. Paper presented at the Government Institute Symposium on Incineration and Thermal Destruction of Hazardous Wastes, Philadelphia, Pa., July.

Lage, G.L. 1987. Drug toxicity. *The Merck Manual.* 15th ed.

Abdelhamid, S., V. Valez, D. Smallwood, and G. Lage. 1987. Toxicological risk assessment at hazardous waste sites: An engineer's perspective. Third Annual Hazardous Materials Management Conference West.

Lage, G.L. 1987. The role of toxicology in drug development. Presented to the Philadelphia Forum of the American Association of Pharmaceutical Scientists, Fort Washington, Pa., December.

Lage, G.L., J. Esch, and J.E. Cromwell. 1987. Risk assessment. Paper presented at Third Annual Hazardous Materials Management Conference Symposium on Right to Know: Minimization of Work-Site and Off-Site Health Risks, Long Beach, Calif., December.

Lage, G.L 1987. Pharmacology of drugs of abuse; and Technology of drug testing. Papers presented at the Pennsylvania Bar Institute Symposium of Drug Testing in the Workplace, Philadelphia, Pa. and Princeton, N.J., October.

Lage, G.L. 1987. Air pollutants/air toxics and their interaction with RCRA. Paper presented to the Environmental Forum, Sherman Oaks and Santa Clara, Cali£, August.

Lage, G.L. 1987. Role of toxicology in understanding chemically induced occupational diseases. Paper presented at the Defense Research Institute Academy of Workers Compensation, Boston, June.

Lage, G.L. 1987. Drug testing: The scientific issues. Paper presented at the Federal Publications Symposium on Drugs and Chemicals in the Workplace, Philadelphia and Pittsburgh, May.

Lage, G.L. 1986. Environmental toxicology. Paper presented at the Department of Pharmacology, The Medical College of Pennsylvania, Philadelphia, December.

Lage, G.L. 1986. Drug and alcohol testing in the workplace. Paper presented at the Delaware State Chamber of Commerce Symposium on Drugs, Alcohol, and AIDS in the Workplace, Wilmington, Del., November.

Lage, G.L. 1986. Public health problems associated with solid waste resource recovery and recycling. Sponsored by the League of Women Voters of Berks County, April.

Fancher, R.M., W.C. Kershaw, and G.L. Lage. 1985. Allyl alcohol toxicity in Sprague-Dawley rats: Male vs. female. Paper presented at the Undergraduate Research Symposium, University of West Virginia, September.

Kershaw, W.C., P. Campbell, and G.L Lage. 1985. *In vitro* digitoxin metabolism: Rate-limiting step and alteration following spironolactone pretreatment. *Drug Metab. & Disp.* 13:635-639.

Warwick, R.O., M.P. Smith, M.A. Graffy, and G.L. Lage. 1985. Altered distribution and toxicity of digitoxigenin in fasted mice. *Life Sciences* 37:775.

Lage, G.L. 1985. The air we breathe: Do we need a canary? Paper presented at the Department of Environmental Resources Symposium: Environmental Hazards and Your Health, Commonwealth of Pennsylvania, March.

Lage, G.L. 1985. Mechanisms of chemical hepatotoxicity. Paper presented at the Department of Pharmacology & Toxicology, University of Texas, March. Also presented to the Department of Pharmacology, The Medical College of Pennsylvania, February.

Lage, G.L. 1985. Mechanisms in altered digitalis toxicity. Paper presented to the Department of Pharmacology, Toxicology & Therapeutics, University of Kansas School of Medicine, March.

Lage, G.L. 1984. Expansion and change in the science of toxicology. Paper presented at the OSHA Chemical Hazard Communication Standard Symposium, Manufacturers' Association of Delaware Valley, Valley Forge, Pa., October.

Lage, G.L. 1984. The role of toxicology in determining risk assessment of toxic air pollutants. Paper presented at the American Institute of Chemical Engineers Symposium: Risk Management of Toxic Air Pollutants, Philadelphia, August.

Lage, G.L. 1984. Modern toxicology. Paper presented at the Association of Official Analytical Chemists, Philadelphia, May.

Lage, G.L. 1984. Health effects of dioxin. Paper presented at the Environmental Health Seminar, Harrisburg, Pa., January.

Lage, G.L. 1984. Alcohol intoxication. Paper presented at the Toxicology for Attorneys Symposium, Houston and Chicago, July.

Lage, G.L. 1983. The science of toxicology as it applies to dioxin. Paper presented at the Pennsylvania Medical Science Symposium: Toxic Herbicide Exposure, Pittsburgh and Valley Forge, Pa., October and November.

**GARY L. LAGE, Ph.D.**

Lage, G.L 1983. Extrapolation from animal species to man. Paper presented at the Toxicology for Attorneys Symposium, Valley Forge, Pa., June and December.

Lage, G.L. 1983. The evaluation of the medical aspects of health/risk assessment. ACS Symposium, White Haven, Pa., April.

Lage, G.L. 1982. The role of dose-response relationships in toxicology. ASTM Symposium on Statistics in the Environmental Sciences, Philadelphia, December.

Volp, R.F., and G.L. Lage. 1982. Digitoxin metabolism by rat, mouse and rabbit: NADPH requirement and spironolactone effect. *Research Comm. in Chem. Path and Pharm.* 38:501-504.

Lage, G.L. 1981. Toxicology and laboratory waste. ACS Symposium, King of Prussia, Pa., November.

Lage, G.L. 1980. Dermatotoxicology. Thomas Jefferson University Conference on Toxicology, Philadelphia, March.

Lehman, L., and G.L Lage. 1980. The effect of chronic digitoxin treatment on subsequent digitoxin biliary excretion in the rat. Abstract presented at the West Virginia Symposium for Undergraduate Research, October.

Sweeney, E.F., and G.L. Lage. 1979. Metabolism of digitoxin in the isolated perfused rat liver: Effect of spironolactone pretreatment. *Drug Metab. and Disp.* 7:280-284.

Lage, G.L. 1979. Baccalaureate program in toxicology. *Veterinary and Human Toxicology* 21(3):191.

Lage, G.L. 1979. Role of toxicology in the 1980s. Penjerdel Environmental Improvement Committee, Philadelphia, December.

Lage, G.L. 1979. Opportunities for universities to meet the needs of industrial research and development: The view from academe. Paper presented at the Industrial Research and Development Symposium, University of Mississippi, April.

Volp, R.F., and G.L. Lage. 1978. The fate of a major biliary metabolite of digitoxin in the rat intestine. *Drug Metab. and Disp.* 6:418-424.

Lage, G.L. 1978. Basic pharmacology. Short course for optometrists, Madison, Wisconsin, November and December.

Lage, G.L. 1978. Safety extrapolations based on comparative pharmacokinetic parameters. Paper presented at the Drug Safety Subsection of the Pharmaceutical Manufacturers

Association. Symposium entitled "Practical Pharmacokinetic Considerations in Toxicology," Point Clear, Ala., November.

Lage, G.L. 1974-1978. Toxicology: The study of poisons. Paper presented at Beloit and Ripon Colleges and at the following branches of the University of Wisconsin: Eau Clair, Green Bay, Oshkosh, Platteville, Parkside, Stevens Point and Superior.

Richards, L.G., and G.L. Lage. 1977. Stimulation of the glucuronidation of digitoxigenin monodigitoxoside by liver homogenates from spironolactone-pretreated rats. *Toxicol. & Appl. Pharmacol.* 42:309-318.

Richards, L.G., M.C. Castle, and G.L. Lage. 1977. Glucuronidation of digitoxin and its metabolites by rat and rabbit liver homogenates. *Drug Metab. & Dispos.* 5:469-473.

Volp, R.F., and G.L. Lage. 1977. Studies on the intestinal absorption of bovine xanthine oxidase. *Proc. Soc. Exp. Biol. & Med.* 154:488-492.

Lage, G.L. 1976. Liver tissue as a model to predict final metabolic products in man. Paper presented at the National Industrial Pharmaceutical Research Conference, Lake Delton, Wis.

Lage, G.L 1975. Bioavailability and drug disposition. Paper presented at the Northern Illinois Medical Service Representatives, Rockford, Ill.

Lage, G.L. 1975. Hypertension and risk factors in heart disease. Visiting Lecturer Program at the Wisconsin Heart Association, Milwaukee, Wis.

Lage, G.L. 1975. *Basic Clinical Pharmacology. A* Cassette Presentation for Extension Services in Pharmacy.

Castle, M.C., and G.L. Lage. 1974. Cleavage by the B-glucuronidase of the water-soluble metabolites of digitoxin excreted in the bile of control and spironolactone pretreated rats. *Toxicol. and App. Pharmacology* 27:641-647.

Lage, G.L 1973. Mechanisms of drug interactions. Paper presented at the Wisconsin Pharmaceutical Association Meeting.

Castle, M.C., and G.L. Lage. 1973. Biliary excretion and hepatic concentration of $H^3$ digitoxin and its metabolites following spironolactone pretreatment of rats. *Res. Comm. Chem. Path. and Pharm.* 6:601-612.

Castle, M.C., and G.L. Lage. 1973. Excretion of $H^3$-digitoxin and its metabolites following spironolactone pretreatment in rats. *Drug Metab. and Disp.* 1:590-597.

**GARY L. LAGE, Ph.D.**

Castle, M.C., and G.L. Lage. 1973. Metabolism and distribution of digitoxin in the rat. *Arch Intern. Pharmacodyn. Therap.* 203:323-335.

Castle, M.C., and G.L. Lage. 1973. Enhanced biliary excretion of digitoxin following spironolactone pretreatment as it relates to the prevention of digitoxin toxicity. *Research Comm. in Chem. Path and Pharmacol.* 5:99-108.

Lage, G.L. 1972. The time lag in medical science. *Drug Abuse Resource Manual of Kansas,* vol. 1.

Castle, M.C., and G.L. Lage. 1972. Effect of pretreatment with spironolactone, Phenobarbital or B-diethylaminoethyl diphenylpropylacetate (SKF-525-A) on tritium levels in blood, heart, and liver of rats at various times after administration of H3-digitoxin. *Biochem. Pharmacol.* 21:1449-1455.

Lage, G.L. 1971. Clinical implications of drug interaction information. *Amer. J. Pharm. Educ.* 35:770-775.

Buck, S.H., and G.L. Lage. 1971. Possible mechanisms of the prevention of digitoxin toxicity by spironolactone in the mouse. *Arch Intem Pharmacodyn. Therap.* 189:192-197.

Lage, G.L 1969. Current spot removers: How safe are they? *J. of Kansas Pharmacy* 45:6.

Lage, G.L. 1969. Over-the-counter products. Paper presented at Pharmacy Extension Program, Garden City, Wichita, and Colby, Kansas. January and February.

Lage, G.L. 1968. Prescription drug abuse. Paper presented at Pharmacy Extension Program, Kansas City, Colby, Garden City, Pittsburgh, and Wichita, Kansas. January and February.

Lage, G.L. 1968. Possible therapeutic applications of enzyme induction. *J. of Kansas Pharmacy* 44:6.

Lage, G.L., and J.L. Spratt. 1968. Bilirubin conjugation by hepatic microsomes from adult male guinea pigs. *Arch Biochem. and Biophys.* 236:175-180.

Lage, G.L., and J.L. Spratt. 1968. Species variation and sex differences in the *in vitro* hepatic metabolism of $H^3$-digitoxin. *J. Pharmacol. and Exper. Therap.* 159:182-193.

Spratt, J.L., and G.L. Lage. 1967. Fortran IV program for automatic external standardization in liquid scintillation spectrometry. *Intern. J. Applied Radiation and Isotopes* 18:247-252.

Lage, G.L., and J.L. Spratt. 1967. Effect of chlordane and DDT pretreatment on the metabolism of H3-digitoxin by monkey heart and liver tissues *in vitro*. *Arch. Intern. Pharmacodyn. Therap.* 169:255-261.

Lage, G.L., and J.L Spratt. 1967. Antagonism of intravenous digitoxigenin lethality by reserpine pretreatment in the mouse. *Proc. Soc. Exp. Biol. and Med.* 125:580-583.

Lage, G.L., and J.L Spratt. 1966. Structure-activity correlation of the lethality and central effects of selected cardiac glycosides. *J. Pharmacol. and Exper. Ther.* 152:501-508.

Lage, G.L., and J.L Spratt. 1965. $H^3$-digitoxin metabolism by adult male rat tissues *in vitro. J. Pharmacol. and Exper. Therap.* 149:248-256.

Lage, G.L. How to live with today's toxic chemicals. Paper presented over 100 times to high school and college science groups and to numerous service groups.

# APPENDIX A

Exhibit 49 -  752

# Appendix A - Iouri Mikhel

| Tab | Description | Bates No. |
|---|---|---|
| 1. | Exhibit 11 to Government's Notice of Expert Witnesses: Curriculum Vitae of John T. Cooper, M.D., 05/31/2005 | GLL-001 - 004 |
| 2. | Trial Testimony of John T. Cooper, M.D., 10/25/2006 | GLL-005 - 052 |
| 3. | Trial Exhibit 1259: Autopsy Report of "John Doe" (Meyer Muscatel), 10/19/2001 | GLL-053 - 059 |
| 4. | Trial Exhibit 1260: Skeletal Diagrams Showing the Injuries Suffered by "John Doe" (Meyer Muscatel) | GLL-060 - 61 |
| 5. | Exhibit 10 to Government's Notice of Expert Witnesses: Curriculum Vitae of John W. Eisele, M.D., 05/17/2005 | GLL-062 - 066 |
| 6. | Trial Exhibit 1429: Autopsy Report for Rita Pekler (Jane Doe #1), 04/24/2002 | GLL-067 - 074 |
| 7. | Trial Exhibit 1430: Autopsy Report for Alexander Umansky (John Doe #3), 04/24/2002 | GLL-075 - 081 |
| 8. | Exhibit 9 to Government's Notice of Expert Witnesses: Curriculum Vitae of Robert D. Lawrence, M.D., 05/31/2005 | GLL-082 - 086 |
| 9. | Trial Testimony of Robert Lawrence, M.D., 12/01/2006 | GLL-087 - 147 |
| 10. | Trial Exhibit 1431: Autopsy Report for Nick Kharabadze (John Doe #1) | GLL-148 - 153 |
| 11. | Trial Exhibit 1432: Autopsy Report of Georgy Safiev (John Doe #2), 04/18/2002 | GLL-154 - 159 |

# Appendix A - Iouri Mikhel

| Tab | Description | Bates No. |
|---|---|---|
| 12. | Handwritten Notes by Dr. Robert Lawrence Dated 03/19/2002, Faxed to Kim Myer, 05/23/2005 | GLL-160 - 162 |
| 13. | Exhibit 13 to Government's Notice of Expert Witnesses: Curricula Vitae of Alan D. Barbour, Ph.D., C.L.B, DABFE and Bill L. Posey | GLL-163 - 167 |
| 14. | Trial Testimony of Bill L. Posey, 12/01/2006 | GLL-168 - 195 |
| 15. | Trial Exhibit 1434: Toxicology Report No. CVT 01-7299 for "John Doe," 11/11/2001 | GLL-196 |
| 16. | Trial Exhibit 1435: Toxicology Report No. CVT 02-2750 for "John Doe #1," 04/07/2002 | GLL-197 |
| 17. | Trial Exhibit 1436: Toxicology Report No. CVT 02-2749 for "John Doe #2," 04/07/2002 | GLL-198 |
| 18. | Trial Exhibit 1437: Toxicology Report No. CVT 02-2785 for Alexander Umansky, 04/07/2002 | GLL-199 |
| 19. | Trial Exhibit 1438 Toxicology Report No. CVT 02-2786 for Rita Pekler, 04/07/2002 | GLL-200 |
| 20. | Trial Exhibit 1439: Toxicology Report No. CVT 02-3031 for "Dimedrol," 04/09/2002 | GLL-201 |
| 21. | Follow-up Report by John Crawford, Sr. Investigator, Calaveras Co. District Attorney's Office, re Toxicology Testing, 02/07/2002 | GLL-202 |
| 22. | Autopsy photos of UNSUB #1 (Roll 3), 03/19/2002 *(Envelope labeled: 1A179 Autopsy)* | GLL-203 |

## Appendix A - Iouri Mikhel

| Tab | Description | Bates No. |
|---|---|---|
| 23. | Autopsy photos of UNSUB #1 (Roll 2), 03/19/2002 *(Envelope labeled: 1A180 Autopsy)* | GLL-215 |
| 24. | Autopsy photos of 1st subject recovered from New Melones Lake, (Roll 1), 03/16/2002 *(Envelope labeled: 1A219 Autopsy)* | GLL-236 |
| 25. | Trial Exhibit 507 E: Photo Showing Recovery of John Doe number One (Nick Kharabadze), per testimony of Anthony Tindall. *(45 pound weight attached to his torso with the zip ties)* | GLL-246 |
| 26. | Trial Exhibit 507 F: Photo Showing Recovery of John Number One (Nick Kharabadze), per testimony of Anthony Tindall. *(45pound* weight *attached to his torso with the zip ties from different angle)* | GLL-248 |
| 27. | Trial Exhibit 507 H: Photo Showing Recovery of John Doe Number One (Nick Kharabadze), per testimony of Anthony Tindall. *(Close up of 45 pound weight attached to torso with the zip ties)* | GLL-250 |
| 28. | Trial Exhibit 508 A: Photo of John Doe Number One (Nick Kharabadze), taken on 03/17/2002, at a funeral home in Sonora, CA, by FBI Agent Brian Crews. *(Lying on stomach, flex cuffs around waist)* | GLL-252 |
| 29. | Trial Exhibit 508 B: Photo Showing Recovery of John Doe Number One (Nick Kharabadze), on 03/17/2002, per testimony of Anthony Tindall. *(Flex cuffs around wrists and waist)* | GLL-254 |
| 30. | Trial Exhibit 508 C: Photo of John Doe Number One (Nick Kharabadze), taken at the San Joaquin Sheriff's Office Morgue on 03/19/2002, per testimony of Agent Brian Crews. *(Flex cuffs wrists and waist)* | GLL-256 |

# Appendix A - Iouri Mikhel

| Tab | Description | Bates No. |
|---|---|---|
| 31. | Trial Exhibits 508 C, D, G: Photo of John Doe Number One (Nick Kharabadze), taken at the San Joaquin Sheriff's Office Morgue, on 03/19/2002. (*Close-ups)* | GLL-258 |
| 32. | Trial Exhibit 508 D: Photo of John Doe Number One (Nick Kharabadze), taken at the San Joaquin Sheriff's Office Morgue on 03/19/2002, per testimony of Agent Brian Crews. *(Upper body showing flex ties around wrists and waist)* | GLL-261 |
| 33. | Trial Exhibit 508 E: Photo of John Doe Number One (Nick Kharabadze) taken on 03/17/2002, at a funeral home in Sonora, CA, by FBI Agent Brian Crews. *(Flex cuffs around waist)* | GLL-263 |
| 34. | Trial Exhibit 508 F: Photo of John Doe Number One (Nick Kharabadze) taken on 03/17/2002, at a funeral home in Sonora, CA, by FBI Agent Brian Crews. *(Close-up of flex cuffs around waist)* | GLL-265 |
| 35. | Trial Exhibit 508 G: Photo of John Doe Number One (Nick Kharabadze), taken at the San Joaquin Sheriff's Office Morgue, on 03/19/2002, per testimony of Agent Brian Crews. *(Close-up of neck area showing flex tie as well as a necklace with a cross)* | GLL-267 |
| 36. | Trial Notebook containing Meyer Muscatel Autopsy Photos (272612) | GLL-269 |
| 37. | Trial Notebook containing Meyer Muscatel Autopsy Photos (272613) | GLL-294 |
| 38. | Trial Notebook containing Meyer Muscatel Autopsy Photos | GLL-323 |
| 39. | Trial Notebook containing Meyer Muscatel Autopsy Photos *(Internal autopsy shots)* | GLL-391 |

# Appendix A - Iouri Mikhel

| Tab | Description | Bates No. |
|---|---|---|
| 40. | Trial Notebook containing Meyer Muscatel Autopsy Photos *(Dental)* | GLL-407 |
| 41. | Trial Exhibit 1246: Photo of Meyer Muscatel's recovered body *(Plastic bag over head)* | GLL-413 |
| 42. | Trial Exhibit 1247: Photo of Meyer Muscatel's recovered body *(Plastic bag over head)* | GLL-415 |
| 43. | Trial Exhibit 1248: Photo of Meyer Muscatel's recovered body *(Plastic bag over head, partially removed)* | GLL-417 |
| 44. | Trial Exhibit 1249: Photo of Meyer Muscatel's recovered body *(Plastic bag over head, partially removed)* | GLL-419 |
| 45. | Trial Exhibit 1250: Photo of Meyer Muscatel's recovered body *(Closeup of flex ties binding hands)* | GLL-421 |
| 46. | Trial Exhibit 1251: Photo of Meyer Muscatel's recovered body *(Plastic bag fully removed from head)* | GLL-423 |
| 47. | Trial Exhibit 1252: Photo of Meyer Muscatel's recovered body *(Plastic bag fully removed from head)* | GLL-425 |
| 48. | Trial Exhibit 1253: Photo of Meyer Muscatel's recovered body *(Demonstrating wound to the head)* | GLL-427 |
| 49. | Trial Exhibit 1260: Diagrams Showing The Injuries Suffered By "John Doe" (Meyer Muscatel) | GLL-428 |
| 50. | Trial Exhibit 1998: Photo of Meyer Muscatel's recovered body (Left ront with the tape intact) | GLL-431 |

# Appendix A - Iouri Mikhel

| Tab | Description | Bates No. |
|---|---|---|
| 51. | Autopsy Photos of Jane Doe (un-numbered) (Roll 5), 03/24/2002 *(Envelope labeled: 1A187 Peckler Autopsy)* | GLL-432 |
| 52. | Photographs of body recovered at Parrots Ferry Bridge, New Melones Lake, 03/19/2002. *(Envelope labeled: 1A190, Autopsy)* | GLL-451 |
| 53. | Autopsy photos of Jane Doe #1, (Roll 4), 03/24/2002 (Envelope labeled: 1A183, Autopsy) | GLL-460 |
| 54. | Autopsy photos of John Doe #3 (Roll 7), 03/24/2002 (Envelope labeled: 1A195, Autopsy photos) | GLL-478 |
| 55. | Autopsy photos of Jane Doe #1 (Roll 6), 03/24/2002 (Envelope labeled: 1A188, Autopsy) | GLL-494 |
| 56. | Trial Exhibit 521 E: Photo Showing the Recovery of Jane Doe Number One (Rita Pekler), on 03/19/2002, per testimony of Anthony Tindall. *(Weights attached to legs with ligatures)* | GLL-512 |
| 57. | Trial Exhibit 521 F: Photo Showing the Recovery of Jane Doe Number One (Rita Pekler), on 03/19/2002, per testimony of Anthony Tindall. *(Weights attached to legs with ligatures)* | GLL-514 |
| 58. | Trial Exhibit 521 G: Photo Showing the Recovery of Jane Doe Number One (Rita Pekler), on 03/19/2002, per testimony of Anthony Tindall. *(Ligatures binding ankles)* | GLL-516 |
| 59. | Trial Exhibit 521 H: Photo Showing the Recovery of Jane Doe Number One (Rita Pekler), on 03/19/2002, per testimony of Anthony Tindall. *(Arms and hands bound by ligatures)* | GLL-518 |

## Appendix A - Iouri Mikhel

| Tab | Description | Bates No. |
|---|---|---|
| 60. | Trial Exhibit 522 A: Photo of Rita Pekler's Body at San Joaquin County Coroner's Office per testimony of FBI Agent Anthony Tindall. *(Accurately depicts of victim at the time she was raised from the surface of the New Melones Reservoir)* | GLL-520 |
| 61. | Trial Exhibit 522 C: Photo of Rita Pekler's Body at San Joaquin County Coroner's Office per testimony of FBI Agent Anthony Tindall. *(Close up view of a 6 kilogram weight secured around the waist)* | GLL-522 |
| 62. | Trial Exhibit 522 D: Photo of Rita Pekler's Body at San Joaquin County Coroner's Office per testimony of FBI Agent Anthony Tindall. *(Close up view of a 6 kilogram weight secured around the waist)* | GLL-524 |
| 63. | Trial Exhibit 522 E: Photo of Rita Pekler's Body at San Joaquin County Coroner's Office per testimony of FBI Agent Anthony Tindall. *(Close up view of a 25 pound weight secured around lower legs, and ankles bound)* | GLL-526 |
| 64. | Trial Exhibit 522 F: Photo of Rita Pekler's Body at San Joaquin County Coroner's Office per testimony of FBI Agent Anthony Tindall. *(Close up view of a 25 pound weight secured around lower legs)* | GLL-528 |
| 65. | Autopsy photos of UNSUB #2, (Roll 1), 03/17/2002 *(Envelope labeled: 1A182 Autopsy)* | GLL-530 |
| 66. | Autopsy photos of UNSUB #2 (Roll 5), 03/19/2002 *(Envelope labeled: 1A191, Autopsy)* | GLL-542 |
| 67. | Trial Exhibit 515 G: Photo of John Doe Number Two (Gregory Safiev), taken at the funeral home by FBI Agent Brian Crews, on 03/17/2002 | GLL-561 |

## Appendix A - Iouri Mikhel

| Tab | Description | Bates No. |
|---|---|---|
| 68. | Trial Exhibit 515 H: Photo of John Doe Number Two (Gregory Safiev), taken at the funeral home by FBI Agent Brian Crews, on 03/17/2002. *(Close up of flex tie around his ankles)* | GLL-563 |
| 69. | Trial Exhibit 515 I: Photo of John Doe Number Two (Gregory Safiev), taken at the San Joaquin Sheriff's Office Morgue, on 03/19/2002. (*White rope around arm and flex cuff around ankles*) | GLL-565 |
| 70. | Trial Exhibit 515 J: Photo of John Doe Number Two (Gregory Safiev), taken at the San Joaquin Sheriff's Office Morgue, on 03/19/2002. *(Close up of flex cuff around ankles)* | GLL-567 |
| 71. | Autopsy photos of John Doe (Meyer Muscatel) (Roll 2), 03/24/2002 (Envelope labeled: 1A178 Autopsy Photos 10/09/2002) | GLL-569 |
| 72. | Autopsy photos of 3rd subject recovered from New Melones Lake, (Roll 3), 03/18/2002 (Envelope labeled: 1A218 Autopsy) | GLL-588 |
| 73. | Autopsy photos of John Doe #3, (Roll 1), 03/24/2002 (Envelope labeled: 1A196, Autopsy photos) | GLL-596 |
| 74. | Autopsy photos of John Doe #3 (Roll 3), 03/24/2002*(Envelope labeled: 1A194, Autopsy photos)* | GLL-614 |
| 75. | Trial Exhibit 518 C: Photo of John Doe Number Three (Alexander Umansky), taken at the New Melones Reservoir, Parrot's Ferry Bridge, on 03/18/2002, per testimony of FBI Agent Anthony Tindall. *(At pontoon boat)* | GLL-631 |

# Appendix A - Iouri Mikhel

| Tab | Description | Bates No. |
|---|---|---|
| 76. | Trial Exhibit 518 D: Photo of John Doe Number Three (Alexander Umansky), taken at the New Melones Reservoir, Parrot's Ferry Bridge, on 03/18/2002, per testimony of FBI Agent Anthony Tindall. *(At pontoon boat)* | GLL-633 |
| 77. | Trial Exhibit 518 E: Photo of John Doe Number Three (Alexander Umansky), taken at the New Melones Reservoir, Parrot's Ferry Bridge, on 03/18/2002, per testimony of FBI Agent Anthony Tindall. *(At pontoon boat)* | GLL-635 |
| 78. | Trial Exhibit 518 F: Photo of John Doe Number Three (Alexander Umansky), taken at the New Melones Reservoir, Parrot's Ferry Bridge, on 03/18/2002, per testimony of FBI Agent Anthony Tindall *(At pontoon boat)* | GLL-637 |
| 79. | Trial Exhibit 518 H: taken at the New Melones Reservoir, Parrot's Ferry Bridge, on 03/18/2002, per testimony of FBI Agent Anthony Tindall. *(Zip tie at back of legs)* | GLL-639 |
| 80. | Trial Exhibit 518 J: Photo of John Doe Number Three (Alexander Umansky), per testimony of FBI Agent Anthony Tindall. *(Ligatures binding hands)* | GLL-641 |
| 81. | Trial Exhibit 518 K: Photo of John Doe Number Three (Alexander Umansky), taken at the funeral home on 03/18/2002, per FBI Agent George Fong. *(Close up of wrists)* | GLL-643 |
| 82. | Trial Exhibit 518 L: Photo of John Doe Number Three (Alexander Umansky), taken at the funeral home, per FBI Agent George Fong, on 03/18/2002. *(Showing tie wrap secured around back of legs)* | GLL-645 |

## Appendix A - Iouri Mikhel

| Tab | Description | Bates No. |
|---|---|---|
| 83. | Trial Exhibit 518 M: Photo of John Doe Number Three (Alexander Umansky), taken at the funeral home, by FBI Agent George Fong, on 03/18/2002. *(Close-up shot of his left shoulder and tattoo)* | GLL-647 |
| 84. | Autopsy photos of UNSUB #1 and #2, (Roll 1), 03/19/2002 *(Envelope labeled: 1A181 Autopsy)* | GLL-649 |
| 85. | Autopsy photos of UNSUB #1 and #2, John Doe #1, (Roll 4), 3/19/2002 *(Envelope labeled: 1A192, Autopsy)* | GLL-669 |
| 86. | Testimony of Anthony Tindall (09/06/2006) | GLL-692 |
| 87. | Testimony of Brian Crews; Testimony of George Fong (09/08/2006) | GLL-762 |
| 88. | Declaration of Dr. Stuart J. Hamilton (09/16/2021) | GLL-831 |
| 89. | Data sheets related to toxicology report no. CVT 01-7299 for "John Doe" (10/19/2001 - 11/11/2001) | GLL-868 |
| 90. | Data sheets related to toxicology report no. CVT 02-2785 for Alexander Umansky (03/18/2002 - 04/08/2002) | GLL-872 |
| 91. | Data sheets related to toxicology report no. CVT 02-2786 for Rita Pekler (03/19/2002 - 04/10/2002) | GLL-877 |
| 92. | Data sheets related to toxicology report no. CVT 02-2749 for "John Doe #2" (03/26/2002 - 04/07/2002) | GLL-884 |
| 93. | Data sheets related to toxicology report no. CVT 02-2750 for "John Doe #1" (03/26/2002 - 04/07/2002) | GLL-893 |

# Appendix A - Iouri Mikhel

| Tab | Description | Bates No. |
|---|---|---|
| 94. | Data sheets related to toxicology report no. CVT 02-3031 for Rita Pekler, Nick Kharabadze, Georgy Safiev, Alex Umansky re Dimedrol (04/05/2002 - 04/09/2002) | GLL-898 |
| 95. | Letter from the Calaveras County District Attorney's Office to the Central Valley Toxicology lab with handwritten note stating that no blood sample had been received (11/15/2001) | GLL-904 |
| 96. | FBI laboratory work sheet listing specimens received, with handwritten notes re samples Q59 - Q60 (Dimedrol), Q62 (vial of liquid) and 204.3 (tablets from sample Q204) (11/25/2002) | GLL-905 |
| 97. | FBI lab supporting documentation related to samples Q59, Q60, Q62, Q204:<br>-chain of custody log and examination team record (05/01/2003);<br>-chemistry unit's evidence check-in sheet (01/06/2003);<br>-FBI laboratory files/folders and evidence move logs (02/06/2003);<br>-black and white Xerox images of samples | GLL-920 |
| 98. | Summary of testing results and drug analysis worksheet with handwritten notes, re specimens Q59, Q60, Q62 and 204.3 (01/15/2003 - 04/16/2003) | GLL-933 |
| 99. | Printouts of data related to chemistry examinations of specimens Q60, Q62, Q204 (01/15/2003 - 04/16/2003) and reference material and excerpts from scientific publications regarding the identification of drugs | GLL-938 |
| 100. | FBI report re result of chemistry examination by Eileen Waninger (05/02/2003) | GLL-1032 |

# Appendix A - Iouri Mikhel

| Tab | Description | Bates No. |
|---|---|---|
| 101. | FBI report re improper sealing of 1B-86 (Dimedrol, see worksheet at tab 96 for reference) and 1B-141 (07/14/2004) | GLL-1034 |
| 102. | FBI report re sealing of evidence item 1B-86 (11/03/2004) | GLL-1035 |
| 103. | Fax with handwritten notes mentioning Dimedrol from Dr. Robert Lawrence to Kim Meyer (05/23/2005) | GLL-1036 |
| 104. | Testimony of Eileen Waninger (12/01/2006) | GLL-1039 |

# EXHIBIT

# 50

12 May 2023

Mr. Ajay Kusnoor
Federal Public Defender – Central District of California
321 East 2nd Street
Los Angeles, California 90012

***RE: MT20-0107 –Evaluation of documents and testimony concerning the hair and fiber evidence in the Mikhel case.***

Dear Mr. Kusnoor;

We have completed our review of the documents and testimony concerning the trace evidence in the United States – Iouri Mikhel (18-01733 HAB). This report presents the findings of our review and interpretation.

**Documents reviewed**

- FBI Trace Evidence Unit hair and fiber report 03 June 2004
- FBI Trace Evidence Unit bench notes, FTIR[1] and MSP[2] printouts
- FBI DNA Unit mitochondrial DNA reports dated 18 August 2004 and 22 June 2005
- Transcript of the testimony of Ms. Karen Korsberg

**Task**

- Review and evaluate the collection, analysis, and interpretation of the hair and fiber evidence in the above cited case.

**Summary of the relevant aspects of the case narrative**

This review focuses solely on the trace evidence analysis and interpretation. There are multiple individuals and locations that are part of the case narrative. For context, we provide a brief description of our understanding of each, which is relevant to our interpretation of the trace evidence findings.

***People Involved***

- Five victims: Georgy Safiev, Nick Kharabadze, Alexander Umansky, Meyer Muscatel, and Rita Pekler.

---

[1] Fourier transform infrared spectroscopy (FTIR). This instrument is used to identity materials, particularly organic matter such as textile fibers.
[2] Microspectrophotometry (MSP). This instrument is used to characterize the color of materials such as colored fibers.

- Four Suspects: Iouri Mikhel, Jurijus Kadamovas, Petro Krylov, and Ainar Altmanis

***Locations***

- Kadamovas' location (also referred to as the "Weslin location." [redacted], Sherman Oaks, CA) **SUSPECT**[3]
- Designed Water World, 13605 Ventura Blvd., Sherman Oaks, CA **SUSPECT**
- Parrots Ferry Bridge **SCENE**[4]
- Altmanis vehicle - Lincoln Navigator **SUSPECT**

## Hair evidence

The FBI trace evidence unit reports thirteen potential hair associations between people and locations (or objects) based on light microscopy. However, only two of the results were supported by DNA. The remainder of the hair associations made by light microscopy alone were either not submitted for DNA analysis (six hairs), were refuted by mtDNA[5] analysis (four hairs), or returned a mixture from more than one individual (one hair). A mixture of DNA sources obtained from a hair sample is considered not interpretable by the FBI (CSP-527) since the signal from a hair should arise entirely from a single individual. Ultimately, only two associated questioned hairs (Q448 and Q450) were presented at trial. These head hairs were recovered from the Parrots Ferry Bridge scene and were each associated to the victim, Muscatel (K85), by light microscopy (CSP-061). The relevant hair evidence is summarized in Table 1.

**Table 1. Summary of associated hair evidence.**

| **Hair Evidence** | | | | | |
|---|---|---|---|---|---|
| **Questioned Number** | **Collection Location Details** | **Comparison Sample** | **FBI's Hair Microscopy Observations** | **mtDNA Result** | **Submitted at trial** |
| Q95 Isolated hair labeled Q95.1 for mtDNA analysis | Debris from toilet Kadamovas' location (Weslin location) **SUSPECT** | K17 (Kharabadze) **VICTIM** | Pubic hair | Excluded (labeled Q95.1) | No |
| Q169 | Carpet fragment Kadamovas' location (Weslin location) **SUSPECT** | K17 (Kharabadze) **VICTIM** | Pubic hair | Not submitted (assessed by FBI analyst to be similar to Q95) | No |

[3] The label "SUSPECT" has been added throughout the text to signify the names and locations associated with the suspects in the investigation.
[4] The label "SCENE" has been added throughout the text to signify Parrots Ferry Bridge as one of the potential locations involved in the investigation.
[5] Mitochondrial DNA (mtDNA) is a separate form of DNA compared to nuclear DNA (nDNA). mtDNA is commonly analyzed when the more discriminatory nDNA is not possible, such as when hair samples do not contain root tissue.

| Hair Evidence | | | | | |
|---|---|---|---|---|---|
| **Questioned Number** | **Collection Location Details** | **Comparison Sample** | **FBI's Hair Microscopy Observations** | **mtDNA Result** | **Submitted at trial** |
| Q448 Isolated hair labeled Q448.1 for mtDNA analysis | Debris from Parrott's Ferry Bridge **SCENE** | K85 (Muscatel) **VICTIM** | Head hair | Muscatel Included as potential source (labeled Q448.1) | Yes |
| Q449 | Debris from Parrott's Ferry Bridge **SCENE** | K85 (Muscatel) **VICTIM** | Caucasian origin head hair, blond Similar, not conclusive, limited (CSP 0062) | Not submitted | No |
| Q450 | Debris from Parrotts Ferry Bridge **SCENE** | K85 (Muscatel) **VICTIM** | Caucasian origin head hair | Not submitted (assessed by FBI analyst to be similar to Q448) | Yes |
| Q205 Isolated hair labeled 205.1 for mtDNA analysis | Vacuum Designed Water World **SUSPECT** | K85 (Muscatel) **VICTIM** | Head hair Final report states no decision made about comparison (CSP 0061). | Excluded (labeled Q205.1) | No |
| Q209 Isolated hair labeled Q209.2 for mtDNA analysis | Vacuum Designed Water World **SUSPECT** | K3 (Pekler) **VICTIM** | Caucasian origin head hair | Mixed profile, report states data are not interpretable, no conclusions can be reached (labeled Q209.2) | No |
| Q209 Slide 2 | Vacuum Designed Water World **SUSPECT** | K3 (Pekler) **VICTIM** | Head hair Too limited for microscopical comparison, similar but not necessarily consistent. | Not submitted | No |
| Q209 Slide 4 | Vacuum Designed Water World **SUSPECT** | K38 (Krylov) **SUSPECT** | Caucasian origin head hair light brown | Krylov Excluded (labeled Q209.3)<br><br>Cannot be excluded from Q209.4 | No |

| Hair Evidence | | | | | |
|---|---|---|---|---|---|
| **Questioned Number** | **Collection Location Details** | **Comparison Sample** | **FBI's Hair Microscopy Observations** | **mtDNA Result** | **Submitted at trial** |
| Q209<br>Slide 10 | Designed Water World<br>**SUSPECT** | K44 (Altmanis)<br>**SUSPECT** | Caucasian origin head hair light brown | Altmanis Excluded (labeled Q209.4)<br><br>Cannot be excluded from Q209.3 | No |
| Q209.1<br>Slide 3 | Vacuum Designed Water World<br>**SUSPECT** | K26 (Mikhel)<br>**SUSPECT** | COHH reddish brown* | *One of these three hairs was submitted for mtDNA, the others were assessed by FBI analyst to be similar<br>Mikel included as source<br><br>(labeled Q209.5) | No |
| Q209.1<br>Slide 5 | Vacuum Designed Water World<br>**SUSPECT** | K26 (Mikhel)<br>**SUSPECT** | Head hair* | | No |
| Q209.1<br>Slide 7 | Dirt devil vacuum Designed Water World<br>**SUSPECT** | K26 (Mikhel)<br>**SUSPECT** | Head hair* | | No |

### *Hairs Q448 and Q450*

The Q448 hair was also analyzed by mtDNA and the results supported[6] the conclusion made by light microscopy (CSP-527). The association made with questioned hair Q450 was not followed up with mtDNA analysis. As stated during cross-examination of the FBI analyst (CSP-018), only one of these two hairs was submitted for mtDNA analysis on the premise that the submitted hair is representative of both questioned hairs (Q448 and Q450) recovered at Parrotts Ferry Bridge:

> Question: Was there a reason why some were not sent on to mitochondrial DNA?
>
> Answer: If there are multiple hairs from the same individual or the same location found, generally only one of those would be sent on for further testing
>
> Question: Okay. So in other words, you wouldn't send the same sample twice?
>
> Answer: If there were more than one hairs from the same item associated to the same person, I would only send one.

---

[6] Unlike nuclear DNA (nDNA), mitochondrial DNA (mtDNA) does not provide personal identification; however, it can be used to support or reject the conclusions made by hair comparisons using light microscopy. One of the major limitations of mtDNA is that it is unable to differentiate between members of an individual's maternal line.

This response by the FBI examiner is scientifically incorrect and misleading as it implies that multiple questioned hairs were determined to be from a particular individual. In this case, the source(s) of hairs Q448 and Q450 recovered at Parrots Ferry Bridge is unknown. Therefore, these are questioned hairs, isolated from debris, and as such, there is no assurance that these are from the same person (even if they share similar microscopic characteristics). Scientifically, this is a limitation of hair examination by light microscopy: it is not possible to know that a questioned hair is from a particular individual using microscopy. This is the reason that hair is sent on for DNA analysis to further constrain the potential source. In fact, the FBI examiner, during cross-examination acknowledges the limitations of light microscopy for hair comparisons (CSP-017):

> "For both hairs and fibers, there's always the possibility that there is another source of those items. All I can tell you is that the ones that I concluded that were consistent had all of the same characteristics."

Therefore, only a single microscopical hair association (Q448) was supported by the mtDNA results. This same tenuous logic is relied upon for selecting Q209.5 as representative of the hairs Q209.1 slide 3, slide 5, and slide 7 (CSP-062).

***Hair Q209.2***

This hair was recovered from the Hoover vacuum from Designed Water World (CSP-054). It was reported to have similar microscopic characteristics to the known head hair (K3) of victim Pekler. This questioned hair was further analyzed by mtDNA. There appears to be a discrepancy in the results from this item of evidence. The report dated 18 August 2004 (CSP-527), states:

> "The mtDNA sequence obtained from specimen Q209.2 indicates the presence of a mixture of mtDNA from more than one individual. Because mixtures of mtDNA are not interpretable, no conclusions can be reached."

However, the report dated 22 June 2005 (CSP-846), states:

> "The mtDNA sequences obtained from specimens Q209.2 and Q209.3 are the same. Therefore, Q209.2 and Q209.3 cannot be excluded as arising from a common source."

It is unclear how the data from the 2004 report was interpreted as a mixture, while the same results for Q209.3 was used to form a probative association in the 2005 report. Was the 2004 analysis of Q209.3 determined not to be a mixture or does the 2005 association of Q209.2 and Q209.3 indicate that both of these hairs are composed of a mixture. Regardless, there is a change in interpretation that was not acknowledged in the second report.

**Fiber and cordage evidence**

Four associations were made using fiber and cordage evidence. These associations were detailed in the FBI report dated 03 June 2004 (CSP-052 to CSP-063) and are summarized in Table 2.

**Table 2. Summary of associated fiber evidence.**

| Fiber Evidence | | | | | |
|---|---|---|---|---|---|
| **Questioned Number(s)** | **Collection Location Details** | **Characteristics** | **Analytical Methods Applied**[7] | **Associated Sample(s)** | **Submitted at trial** |
| Q42-Q43 | Mikhel Shoes **SUSPECT** | Nylon "Carpet type" fiber Light brown | LM - Yes FTIR - Yes FM - Yes MSP - No (too lightly colored, CSP-182) | Carpet samples Kadamovas' location (K53, K54) **SUSPECT** | No |
| Q372, 374, 375, 379<br><br>Exhibit 513 A-D | Kharabadze Clothing Q372 (socks) 374 (shoe) 375 (underwear) Q379 (shirt) **VICTIM** | Nylon "Carpet type" fiber Off-white | LM - Yes FTIR - Yes FM - Yes MSP – Only 379 (rest too lightly colored, CSP-182) | Carpet Samples Kadamovas' location, (Weslin Location) (K50-K52) (Exhibits 255-257) **SUSPECT** | Yes |
| Q257 | Vacuum filter Altmanis Vehicle (Lincoln Navigator) **SUSPECT** (CSP-108) | Nylon Green "Carpet type" fiber Described as "Common Fibers"<br><br>Unknown Source | LM - Yes FTIR - Yes FM - Yes MSP - Yes | Fibers adhering to Kharabadze's shirt Q379 CTF (L) Adhering to Kharabadze's shirt (Exhibit 513D) **VICTIM** | Yes |
| Q391 Exhibit 520 | Umansky Cordage **VICTIM** | Cordage Nylon Off-white and light brown fibers | LM - Yes FTIR - Yes FM - Yes MSP – No (too lightly colored, CSP-183) | Cordage from Pekler Q397 Exhibit 529 **VICTIM** | Yes |

***Fiber Associations #1 and #2***

- Association #1. Light brown nylon fibers (Q42 and Q43) from **SUSPECT** Mikhel's shoes **and** carpet (K53 and K54) from the landing and Room L (**SUSPECT** Kadamovas' location/ Weslin Location).

[7] LM: Light microscopy (including comparison microscopy); FTIR: Fourier transform infrared spectrophotometry; FM: Fluorescence microscopy; MSP: Microspectrophotometry. Note during testimony, the FBI analyst states that comparison microscopy was used to examine the hair and fiber evidence (CSP-007). However, no photomicrographs of these comparisons were provided to review these results.

- Association #2. Off-white nylon fibers (Q372, 374, 375, and 379) recovered from **VICTIM** Kharabadze's clothing is associated with carpet from rooms N, Q, and P of **SUSPECT** Kadamovas' location, (Weslin Location) (K50-52).

The analytical methods applied to association #1 and #2 include light microscopy, FTIR, and fluorescence microscopy. A review of the bench notes indicates that the above associated fibers are indistinguishable based on their optical properties, general fiber class (*e.g.*, nylon), and fluorescence characteristics under UV, violet, blue, and green excitation ranges. MSP was not attempted because the fibers were deemed to be too lightly colored (CSP-182).

***Fiber Association #3***

- Association #3. Green trilobal fibers (Q257) from the **SUSPECT**'s Altmanis Vehicle are consistent with originating from the same source as the fibers recovered from **VICTIM** Kharabadze's shirt (Q379).

The analytical methods used for association #3 were the same as previously described but also included MSP spectra (CSP-184). A review of the notes and spectral printouts indicates that the fibers are indistinguishable based on their optical properties, general fiber class (e.g., nylon), and fluorescence characteristics under UV, violet, blue, and green excitation ranges.

However, there appears to be minor differences in the FTIR spectra collected from fibers Q379 and Q257 (CSP 199-200). The significance of these differences is hard to establish without the raw spectrum files to critically compare the data digitally within spectral analysis software; however, Figure 1 shows an overlay produced from the discovery information. There is also no indication that replicate spectra from these fibers were collected. Replicate analyses, a hallmark of the scientific process, provide one means by which the significance of a potential differences can be explored (see discussion on replicate analyses below).

As stated in the FBI report, these fibers are consistent with originating from the same but *unknown* source (CSP-063). These are fibers that were found *on* Altmanis vehicle and Kharabadze's shirt. The evidentiary value of this is significantly lower because of this lack of a potential known source.

***Fiber Association #4***

- Association #4. Cordage consisting of off-white and light brown nylon, from **VICTIM** Umansky (Q391) is consistent with originating from the same source as the cordage from **VICTIM** Pekler (Q397).

The cordage comparison was made using the same methods previously described. The two cordage samples each contain nylon fibers that are colored either light brown or off-white. A review of the bench notes indicates that the K and Q fibers are indistinguishable based on their optical properties, general fiber class (e.g., nylon), and fluorescence characteristics under UV, violet, blue, and green excitation ranges. MSP was not attempted because the fibers were deemed too lightly colored (CSP-183).

***General comments on the technical aspects of the fiber comparisons***

*Documentation.* There are no photographs (micro- or macro-) to document any of these fiber/cordage association(s). Color represents a fundamental and highly discriminating characteristic in the forensic fiber comparison process. Specifically, there are no photomicrographs of the fibers as viewed using a comparison microscope[8] (CSP-007). A hallmark of a scientific study is that it can be peer-reviewed by third parties to assess the validity of the data and its interpretation. Without this documentation, it is not possible to fully review the conclusions in the FBI laboratory reports.

*Limited Analyses.* Microspectrophotometry represents another method for comparing fiber color. In this case, the FBI analyst made the decision not to analyze the fibers involved in Associations 1, 2, and 4 by MSP because the fibers were too lightly colored. In our experience, many lightly colored fibers can provide probative comparative MSP data. The time it takes to collect MSP data (typically less than five minutes per fiber) and the fact that the fibers showed an observable color provides ample reason to attempt MSP data collection.

No attempt was made to identify or compare the fiber dyes. While this is not a common forensic approach, this could be pursued by either Raman microspectroscopy or a form of chromatography such as TLC.[9]

No attempt was made to determine the subtype of nylon (e.g., nylon 6 vs nylon 6,6). This could have been done using technology available in 2004 (*e.g.*, melting point determination using hot stage microscopy). In addition, a detailed analysis of the cross-sections of the K and Q fibers was not performed. The cross-sectional shape was simply inferred from longitudinal features observed using light microscopy, which eliminated another critical point of comparison. For example, with trilobal fibers, the modification ratios of the Q and K fibers could have been compared to each other.

*Replicate Analyses.* Based on the data provided, it appears the FBI used FTIR analysis to identify[10] the general polymer-type used to construct the fibers. There is no indication that the FBI plotted the spectra from the questioned fibers (Q257 and Q379) on the same graph. This is routinely performed to look for subtle differences in the spectra of two samples being compared. Minor differences were noted in a direct comparison of the FTIR spectra provided in support of Association #3. It does not appear that these differences were noted or pursued (Figure 1). Analytical differences, even a minor one, can be significant. There is no indication that the FBI laboratory considered this spectral difference or performed even a single replicate analysis. Without understanding the reason for this difference and without conducting replicate analyses, there is no way to evaluate the potential significance of this difference. In general, there is no

---

[8] A comparison microscope consists of two microscopes that are joined by an optical bridge allowing the analyst to observe microscopic features of two samples (e.g., questioned and known) simultaneously. Comparison microscopy is essential for forensic fiber and hair comparisons.

[9] Forensic Examination of Fibres. Second edition. Edited by James Robertson and Michael Grieve. CRC Press. 1999.

[10] The FBI may have also used FTIR analysis to confirm the identities of the fibers that were made using polarized light microscopy.

indication in the discovery data to suggest replicate analyses, a hallmark of the scientific process, were collected for any of the FTIR or MSP analyses performed in the case.

In summary, the fiber comparisons conducted by the FBI laboratory are cursory in nature. A primary point of comparison, color, was not photographically documented and is thus not reviewable. Points of comparison that were readily accessible at the time of the original work were not evaluated such as MSP data collection (for some fibers), cross section comparison, and subpolymer assignments. Minor differences, such as those observed in the FTIR spectra from Association #3 were not pursued. Each of these criticisms represent accessible analyses in practice at the time the work was performed by the FBI with a relatively high potential for providing additional probative information, that were not performed.

***General comments on the testimony pertaining to the fiber comparisons***

The length and depth of both the direct- and cross-examinations of the FBI hair, fiber, and cordage findings were brief and cursory. The full evidentiary value of the associations was neither fully presented nor adequately challenged. The following discussion provides specific examples of these points.

*"Carpet-Type" Fibers*. The FBI analyst refers to the questioned fibers (Q372, 374, 375, 379) as "carpet-type" fibers (line 11, page CSP-010):

> "There were off-white nylon carpet-type fibers found on the items that I discussed, identified as coming from Mr. Kharabadze…" (CSP – 010)

This statement is presented as fact as opposed to an interpretation. The source of these questioned fibers has not been established. It is misleading to suggest, without further explanation, that that these fibers originate from a carpet because they are trilobal nylon fibers. While it is true that many (not all) carpet fibers are trilobal, trilobal fibers are used in many other applications besides carpets. In support of this inconsistency, one can look to the FBI fiber analyst's own notes which shows that fibers derived from the cordage samples (Q391 and Q397) are also trilobal (CSP-183). This illustrates the misleading nature of such a statement made without context or clarification. This could have been avoided by simply and correctly stating that "white, trilobal nylon fibers" were found.

*Unknown Fiber Source*

The testimony concerning the association between the green trilobal fibers from Q379 (Kharabadze's shirt) and Q257 (vacuum sweeping from Altmanis' vehicle) is misleading in its discussion of the evidentiary significance of this comparison. The entire discussion from the FBI analyst during testimony is:

> "I found green nylon carpet-type fiber that had the same microscopic characteristics and optical properties in a vacuuming that was identified as coming from a vehicle from Mr. Altmanis. Again, these are consistent with coming from the same source." CSP-011

Presenting this comparison in such a brief manner does not provide enough detail for the jury to weigh its significance. In fact, this section of testimony does not discuss the fact that the "green nylon carpet-type fibers" from the vehicle *vacuum sweepings* are not samples of the carpet from

the vehicle, but rather questioned fibers found in the vehicle from an unknown source. Nowhere in the testimony is it stated that the source of these fibers is unknown.[11] Hearing only the presented testimony, the jury could easily draw the inference that the fibers on Kharabadze's shirt were associated with fibers originating from the carpet in Altmanis' vehicle. Fibers of unknown origin are particularly challenging to interpret since the universe of possible sources could include contamination by the scene or laboratory personnel who were in contact with multiple locations.

None of these topics were raised by the defense during their brief cross-examination.

**Limitations of this review**

This review of the collection, analysis, interpretation, and testimony of hair and fiber associations was limited to an evaluation of FBI reports and limited analytical data. We have not reviewed any of the physical evidence; original, full resolution photographs; raw laboratory datafiles; or SOPs in place at the time of the analyses. The photographs that were received were unlabeled (*i.e.*, no sample identifier), low quality, low resolution, black and white scans of what were once color photomicrographs of the hair, fibers, and other physical evidence. Examples of two typical images are shown in Figure 2. A review of Figure 2 shows two entirely unusable images with no identifying information as to the subject of the image. This prevents us from performing a complete review of the data supporting the trace evidence associations made in this case.

To conduct a more thorough review, we request the following items:[12]

1. A full inventory of the evidence collected and sub-evidence items generated by the FBI laboratory.

2. FBI Laboratory trace evidence unit hair and fiber protocols in place over the course of the laboratory analyses (2004).

3. Raw data files for MSP data (CSP-184) and FTIR data (CSP-185 to 203).

4. Original, full resolution images files of:
   a. Hair and fiber photomicrographs (CSP- 204-205, 340-404).
   b. Evidence items (CSP-224, 233, 238, 239).
   **c.** Cordage (CSP-244-245, 251, 253-254).

5. Any other reports, bench notes, images, or analytical data produced by the FBI laboratory including but not limited to replicate analyses.

---

[11] However, disclosure that the source of these fibers is unknown is stated in the FBI trace evidence report.
[12] Note the pages numbers in the provided materials are cited to clarify and aid in the specificity of our requests.

**Summary and Conclusions**

In summary, our review of the trace evidence analyses conducted in this case have identified the following areas of concern:

1. *Lack of documentation*. The documentation of the evidence in this case is limited to the point that certain associations are not scientifically reviewable. For instance, some of the associated light-colored fibers were neither photo-documented nor compared by microspectroscopy, and as such, there is no laboratory data to review. Reviewable data represents a hallmark of the scientific process that is lacking in this case.

2. *Misleading testimony*. The FBI presented the interpretation of fiber evidence as a "carpet-type" fiber as a conclusion that is not supported by analysis. First, "carpet-type" is neither a specific nor scientific term. The term "carpet-type" used by the FBI appears to be used to refer to any trilobal fiber. Trilobal fibers are utilized in more than one application, such as the cordage seen in this case. For this reason, testimony from the FBI laboratory that describes a *questioned* fiber as "carpet type" is scientifically unfounded and potentially misleading.

3. *Overstatement of evidence*. The FBI erroneously assumed that unknown hairs collected in debris from the Parrots Ferry bridge arose from a single source and thus performed mtDNA analysis on only one of these two hairs. As stated above, it is inappropriate to assume that these two unknown hairs originated from the same source.

   Furthermore, this response by the FBI examiner is scientifically incorrect and misleading. It implies that multiple questioned hairs were, in fact, from a particular individual. Scientifically, it is an established limitation of hair comparisons that by light microscopy alone, it is not possible to know if one or more hairs are from a particular individual. If fact, the entire reason that a hair is sent on for DNA analysis is to further limit the potential source. Therefore, the testimony provided by the FBI examiner is misleading.

4. *Limited analyses*. The fibers could have been subjected to a broader range of analyses, using instrumentation that was available at the time. Furthermore, there is no indication that replicate analyses were performed in the case of the instrumental analyses that were conducted. Minor differences in one of the fiber comparisons (FTIR) was neither noted nor pursued. These limited analyses leave open important questions of interpretation.

5. *Limited cross-examination*. The cross-examinations were cursory and did not adequately challenge the various shortcomings of the analytical support or evidentiary significance of the hair, fiber, and cordage associations.

If you have any questions concerning this report, or if we may be of further assistance, please do not hesitate to contact either of us directly. Thank you for consulting Microtrace.

Sincerely,

Jack Hietpas, PhD
Senior Research Microscopist

Christopher Palenik, PhD
Senior Research Microscopist

*This report shall not be reproduced except in full, without written approval of Microtrace.*
*Analyses performed at Microtrace are accredited under ISO/IEC 17025.*
*See certificate #5106.01 issued by the A2LA accrediting body.*

MT20-0107

**Figure 1.** Comparison of FTIR spectra collected from Q275 (black trace) to Q379 (green trace). This figure has been produced by overlaying and aligning discovery items CSP-199 and CSP-200. The blue arrows represent regions where spectral differences are observed.

Microtrace LLC



**Figure 2.** Screen captures showing two of the many photomicrographs provided with discovery information. The photomicrographs provided with the discovery information were submitted as black and white scans that had been degraded to the point that any potential scientific value held in the original image had been degraded and obscured to the point of being scientifically valueless. Furthermore, no information associating an image with a particular sample/exhibit was provided.

# Appendix A

Exhibit 50 - 779

**Curriculum Vitae**

**of**

**Christopher Samuel Palenik, Ph.D.**

**(cpalenik@microtrace.com)**

**Current as of 09/11/2023**

Microtrace

790 Fletcher Drive
Suite 106
Elgin, IL 60123-4755

847.742.9909 (p)
847.742.2160 (f)

www.microtrace.com

C.V. of C.S. Palenik - 2 of 25 - current as of 9/11/2023

**Table of Contents**

Table of Contents .... 2
Educational History .... 3
Employment .... 3
Licenses and Registrations .... 3
Appointments and Committees .... 4
Professional Affiliations .... 4
Honors .... 5
Expert Testimony and Deposition .... 5
Additional Training and Experience .... 6
Analytical Techniques .... 10
Research Grants .... 10
Graduate Committees .... 11
Publications and Teaching .... 11
  Courses and Workshops Taught .... 11
  Book Chapters and Peer Reviewed Reports .... 12
  Journal Articles .... 12
  Conference Proceedings .... 14
  Other Publications .... 15
  Abstracts and Talks .... 15

Exhibit 50 - 781

## Educational History

| | |
|---|---|
| 2002-2004 | University of Michigan, Department of Geological Sciences<br>Ph.D. Geology<br>Dissertation Chair: Prof. Rodney C. Ewing<br>Dissertation Committee: Prof. Eric J. Essene, Prof. Ronald Fleming, Prof. Lumin Wang, Prof. Lynn Walter<br>DOE-OCRWM fellowship recipient<br>Horace H. Rackham 2004 Distinguished Dissertation Award |
| 1999-2001 | University of Michigan, Department of Geological Sciences<br>M.S. Geology<br>Prof. Rodney C. Ewing, Advisor |
| 1995-1999 | University of Chicago<br>B.S. Chemistry, B.S. Geology |
| 1992-1995 | Illinois Mathematics and Science Academy, Aurora, IL |
| 1991-1992 | Saint Edward's Catholic Central High School, Elgin, IL |

## Employment

| | |
|---|---|
| 2005 - Present | Vice President and Senior Research Microscopist, Microtrace, a forensic laboratory specializing in microscopy, microchemistry and microanalysis. |
| 2004-2005 | Federal Bureau of Investigation (ORISE sponsored)<br>Post-Doctoral Fellow in the Counter Terrorism and Forensic Science Research Institute. |
| 1999-2004 | Graduate Student Research Assistant in the Electron Microbeam Analysis Laboratory, University of Michigan. Duties include training and assistance to university scientists in TEM, EMPA, XRD, and SEM/EDS. |
| 1999-2000 | Graduate Student Instructor for Determinative Methods (GS-455). Teaching responsibilities included XRD, SEM, Microprobe, Raman, FTIR. |
| 1993-2004 | Microscopist (consultant) at Microtrace, a forensic laboratory specializing in small particle analysis using microchemistry and microscopy. |

## Licenses and Registrations

- DEA Licensee to purchase, handle, analyze all scheduled controlled substances
- ATF Manufacturer's Explosive License
- Illinois Explosive License
- USDA soil permit
- Illinois Firearms Owners Identification Card (FOID)

## Appointments and Committees

- Chemistry/Instrumental Analysis Scientific Area Committee's (SAC's) Materials (Trace) Subcommittee within the Organization of Scientific Area Committees (OSAC), appointed by Mark Stolorow of the National Institute of Standards (NIST)
    - 2023-present – Affiliate of the questioned documents group
    - 2021-present – Affiliate of the materials group
    - 2014-2021 – Member of the materials group (Charter)

- North Carolina Forensic Science Advisory Board Member, Charter Member, Appointed by the Attorney General of the State of North Carolina. Acting as an advisor to the NC State Crime Laboratory to strengthen the laboratory system. (2012-present)

- ASTM International, Subcommittees: E30 - Forensic Sciences, E30.01 – Criminalistics, E30.11 - Interdisciplinary Forensic Science Standards, Participating Member (2014-present)

- Scientific Working Group for the analysis of Geological Materials (SWGGEO), charter member (2012-2014).

- Independent Review Board for Lawrence Livermore National Laboratory "U and Pu Impurities" Project (2013)

- UNESCO International Union of Geological Sciences (IUGS) Initiative on Forensic Geology Geological (IoFG) Trace Evidence Advisor. (2011-present)

- FermiLab Community Advisory Board Member (2010)

- Board of Directors, RQA Food Forensics LLC (2008-2016)

- Alumni Board Member, University of Michigan Department of Geological Sciences (2005-2015)

## Professional Affiliations

- International Association of Geoanalysts (2016-2017)

- American Society of Trace Evidence Examiners (ASTEE), Charter Member (2009-present)

- American Academy of Forensic Sciences, Fellow (2001-present)

- Midwestern Association of Forensic Scientists, Member (2007–present)

- Mineralogical Society of America (2000-present)

- Geological Society of America (2002-present)

- Sigma Xi – Scientific Research Society, Member (1998-2013)

- American Chemical Society (1998-present)
- State Microscopical Society of Illinois (1998-2000, 2007-2010)
- Materials Research Society (2002-2004)

## Honors

- NIST Long-Term Vision and Strategic Priorities for Forensic Science in the United States: Roundtable Discussion with Thought Leaders. Invited participant (2023).
- Editorial Board Member of the American Academy of Forensic Sciences, appointment to editorial board (2019)
- Certificate of Recognition by the Midwestern Association of Forensic Scientists for appointment to the Materials (Trace) OSAC Committee, Board of Directors (2015)
- Horace H. Rackham Distinguished Dissertation Award (Highest honor given to dissertations produced under the auspices of the University), University of Michigan (2004)
- John Dorr Graduate Academic Achievement Award – Department of Geological Sciences, University of Michigan (2004)
- Geological Society of America, Travel Grant, (2004)
- Graduate Fellowship Recipient, Department of Energy - Office of Civilian Radioactive Waste Management, (2002-2004)
- Best Paper Award, C.S. Palenik and R.C. Ewing, "Microanalysis of Radiation Damage Across a Zoned Zircon Crystal" - Materials Research Society National Meeting (2001)
- Geological Society of America Travel Grant (2004)
- Scott Turner Research Grant in the Earth Sciences (2001, 2002)
- Member, Rackham Graduate Student Forum (2002)
- Co-President, University of Michigan Geology Club (2000-2002)
- Dean's List, University of Chicago (1995-96, 1997-98, 1998-99)

## Expert Testimony and Deposition

- Qualified as expert witness in State, Federal, and Military courts and the International Chamber of Commerce.
- List can be provided upon request.

## Additional Training and Experience

- Practical ID of Environmental Particles Similar to Gunshot Residue & Unusual Elemental Profiles, Taught by Mary Keehan and Nicole Palmer of the Virginia Department of Forensic Science. Full day workshop at the Midwestern Association of Forensic Sciences Annual Meeting, Detroit, MI (August, 2023)
- Explosive Residue Collection, Analysis, and Determinations, Taught by Raleigh W. Parrott II, Technical Leader - Explosives Chemistry, Explosives Training Program Manager, Explosives Unit, FBI Laboratory, half day workshop at the Midwestern Association of Forensic Sciences Annual Meeting, Des Moines, IA (September 2022).
- Hair Root Staining – What Can Hematoxylin Do for Your Laboratory? Taught by Evie Nguyen and Lindsey Admire, North Carolina Forensic Science Laboratory, webinar (2022)
- Raman Spectroscopy of Carbon materials, taught by Tim Smith and Jennifer Ferguson of Renishaw, webinar (2022)
- Examining Documents Requiring a Multi-Faceted Approach A Hands-on, taught by Todd Welch, D-ABFDE, MAFS 2021 Annual Meeting, (2021)
- State of Illinois Explosive License Training Course, taught by Nick Sterling, Illinois Department of Natural Resources, 1 day, Starved Rock State Park (2021)
- Orbitrap training, taught by Dr. Sean McCormick, Thermo, 3 days at Microtrace (2021)
- Orbitrap familiarization training, taught by James Brammeier, Thermo, 5 days at Microtrace (2021).
- DSC Advanced Applications Workshop, taught by Dr, Aniket, Applications Specialist, Perkin Elmer, 1 day workshop at Microtrace LLC (2019)
- Forensic drug analysis seminar, taught by Terry DalCason, Research Chemist, DEA, retired, 1 day seminar at Microtrace LLC (2019)
- Current topics in asbestos analysis seminar, taught by Dr. Eric J. Chatfield at Microtrace LLC, 1 day seminar (2019)
- Electron Backscatter Diffraction and Aztec HKL Training Course taught by Michael Hjelmstad, Oxford Instruments, 3 day workshop, Pleasanton, California (2019)
- Electron Backscatter Diffraction workshop taught by Richard McLaughlin, Oxford Instruments, 2 day workshop (2019)
- ICP-MS Workshop taught by Dr. Peter C. Weiss at the Forensic Science Institute of the Bundeskriminalmt, Wiesbaden, Germany (2018).
- DOJ Grants Financial Management Training. 8 credit hours. Certificate of Completion (2018).
- Fiber, Dye, and Paint Analysis: Approaches of the Netherlands Forensic Institute (NFI). Lectures and discussions by Jaap van der Weerd, reporting officer on fibre and paint investigations. Lecture and Discussions (2017).

- GSR Analysis and Interpretation. Lectures by Robert Berk, Illinois State Police Crime Laboratory, Retired. Lecture and discussions (2017).

- Advanced Trace Evidence Analysis in The Netherlands (MH17 crash investigation). Lecture and Discussions by Dr. Peter Zoon, Nederlands Forensisch Instituut, Divisie Chemische en Fysische Sporen, Microsporen & Materialen (2017).

- Fluorescence Microscopy. Lectures and Workshop taught by Dr. Steve Ruzin, Director, College of Natural Resources Biological Imaging Facility. 1.5 days of laboratory and lecture (2016).

- µ-XRF of glass: A practical explanation of ASTM E2926. Lectures by Troy Ernst, Michigan State Police Forensic Laboratory and Ted Manasian, Ohio Bureau of Criminal Investigation. Presented by NIJ / RTI (2016).

- Forensic Hair Analysis. Lecture by Dick Bisbing, retired from McCrone Associates and Michigan State Police. 3 days of laboratory and lecture (2015).

- Introduction to Basic Human Body Tissues. Taught by Dr. Lynne Herold, retired from the Los Angeles County Sheriff's Department Scientific Services Bureau. 2 day workshop (2015).

- Pistol Training. Taught by Jerry Kau, NRA-IPA-IA-ISV-IVA-Certified instructor (2015).

- Blood Spatter and trace Evidence in the Sam Shepard Case. Lecture and discussion presented by Bart Epstein (retired Assistant Director of from the Minnesota Bureau of Criminal Apprehension) (2014).

- Asbestos Analysis by TEM - Instruction in the Standard Methods for the Analysis of Asbestos. Taught by James R. Millette, Ph.D. and Steven P. Compton, Ph.D. of MVA Scientific Consultants, Duluth, GA. 3 day workshop (2014).

- Thermal Field Emission SEM Operations Training Course. Taught by Natasha Erdman, Ph.D. and Tony Laudate of JEOL at JEOL USA, Peabody, MA. 2 day workshop (2014).

- Forensic Applications of Infrared and Raman Spectroscopy. Taught by Ed Suzuki, Ph.D. of the Washington State Police Forensic Laboratory at Microtrace, Elgin, IL. 4 day workshop (2013).

- Post Mortem Root Banding Hair Workshop. Taught by Stephen Shaw, Sandy Koch, and Karen Korsberg Lowe of the Federal Bureau of Investigation and Amy Michaud (of the Bureau of Alcohol, Tobacco, Firearms, and Explosives) at the Smithsonian Institute. 1 day workshop (2013).

- Nanotechnologies in Textiles Workshop. Taught by Prof. Seshadri Ramkumar (of Technical Textiles in the Department of Environmental Toxicology, Texas Tech University). Webinar (2013).

- Automotive and Industrial Paint Workshop. Taught by Tim Moczulewski and Jon Granberg of PPG Industries at the Oak Creek, WI Coatings Plant in conjunction with the Midwestern Association of Forensic Scientists Annual Meeting. ½ day workshop (2012).

- The Analysis of Low Explosives. Taught by Edward C. Bender, ATF Laboratory, Retired. Held at Midwestern Association of Forensic Scientists Annual Meeting, Milwaukee, IL. 1 day workshop (2012).

- Optical Mineralogy. Taught by Prof. Mickey Gunter of the University of Idaho. 1.5 day workshop held at Microtrace LLC.

- ISO 17025 Without Tears. Taught by Terry Mills of ANSI-ASQ-FQS, Tampa, FL. Three day workshop (2012).
- Geology of Volcano National Park. Taught by Phillip Ong, M.S. at Volcano National Park, Big Island, HI. One day session (2012).
- Natural Fiber Identification. Taught by Skip Palenik at McCrone Research Institute. One day training session (2011).
- Animal Hair Identification. Taught by Bonnie Yates of the U.S. Fish and Wildlife National Forensic Lab at the National Institute of Justice Trace Evidence Symposium. One Day Workshop (2011).
- Quartz Grain Surface Textures. Taught by Prof. Peter Bull of Oxford University at Microtrace LLC. One Day Workshop (2011).
- Forensic Paint Examinations and Comparisons. Taught by Scott Ryland of the Florida Department of Law Enforcement (2010).
- An Introduction to Glass Science and Technology workshop. Taught by J. Terry Fisk of JTF Microscopy Services (formerly of the Corning Glassworks Research Lab, New York) (2010)
- Wood Identification workshop, taught by Dr. Regis Miller of the Center of Wood Anatomy Research, Forest Products Laboratory (2009)
- Microspectrophotometry User Course. Workshop taught by Dr. Jim Throne of CRAIC instruments at Microtrace (2009)
- Airborne Fungus Spores. Workshop taught by Dr. John Haines of the New York State Museum and Science Services, Albany, NY at McCrone Research Institute (2009)
- Energy Dispersive X-ray Spectroscopy- Thermo Noran System 6. Workshop taught by Dr. Dave West, ThermoFisher Scientific at Microtrace (2009)
- Private workshop on SERS sample preparation and analysis with Dr. Marco Leona of the New York Metropolitan Museum of Art (2008)
- Fluorescence Microscopy Workshop, taught by Dr. Steve Ruzin of the University of California at Berkeley at McCrone Research Institute (2008)
- Cement and Concrete Microscopy, taught by Don Campbell of the Campbell Petrographic Services, Inc. Dodgeville, Wisconsin (2007)
- Heavy Mineral Identification, taught by Maria Mange of the University of California at Davis (2007)
- Forensic Paint Examination, taught by Scott Ryland of the Florida Department of Law Enforcement, Lansing, MI (2007)
- Hardwood Identification workshop, taught by Dr. Regis Miller of the Center of Wood Anatomy Research, Forest Products Laboratory (2007)
- Advances and Changes in Forensic Paint Examination Workshop, taught by Scott Ryland of the Florida Department of Law Enforcement at California Associate of Criminalists Semi-annual workshop (2006)

- Forensic Soil Examination Workshop, taught by Dr. Ray Murray, Dr. Robert Graham, Marianne Stam, Dr. Lynne Macdonald, Dr. George Sensabaugh, Skip Palenik and Chris Palenik, at California Associate of Criminalists Semi-annual workshop.
- Paper Fiber Identification Workshop, taught by Dr. Walter Rantanen of the Integrated Paper Service (2006)
- Wood Identification Workshop, taught by Dr. Walter Rantanen of the Integrated Paper Services (2006)
- Softwood Identification workshop, taught by Dr. Regis Miller of the Center of Wood Anatomy Research, Forest Products Laboratory (2006)
- Orientation Imaging Microscopy and Phase Identification EBSD workshop, taught by David Dingley and Matthew Nowell, TSL/EDAX, Draper, Utah, (2005)
- Forensic Analysis of Paint, taught by Ed Suzuki, Ed Bartick, FBI Academy, Quantico, VA (2004)
- FTIR Spectroscopy, taught by Edward Bartick, John Reffner, Edward Suzuki, FBI Academy, Quantico, VA (2004)
- Cathodoluminescence Microscopy Workshop, taught by V. Barbin, M. Schvoerer, K. Ramseyer, Florence, Italy (2004)
- Spent Nuclear Fuel workshop, Chicago, IL (2004)
- Lock and Security workshop, Folger-Adams Security, Lemont, IL (2004)
- Metal Working instruction workshop, taught by Julian Broad, Shop Supervisor, University of Michigan (2004)
- Scientific Glassblowing workshop, taught by Harald Eberhart, Master Glassblower, Ann Arbor, MI (2003)
- Secondary ionization mass spectroscopy (SIMS) of uraninite, under Prof. M. Fayek, Oak Ridge National Laboratory, TN (2003)
- Spindle Stage Methods workshop, Instructors: Prof. D. Bloss, Prof. M. Gunter, Dr. S. Su, McCrone Research Institute, Chicago, IL (July, 2003)
- Actinide Chemistry workshop, Institute for Transuranic Elements, Karlsruhe, Germany (June 2003)
- Micro-Raman spectroscopy research on radiation damage in zircon, under Prof. L. Nasdala, Universität Mainz, Germany (March 2002)
- Micro-XRF experimentation, Advanced Photon Source, Argonne, IL (2002)
- Engineering Mineralogy of Ceramic Materials workshop, University of Siena, Italy (June 2001)
- Forensic Fiber Examination, Instructor: S. Palenik, Department of Public Safety, Austin, TX (June, 2000)
- Synthesis of Hf-borosilicate glasses, under Prof. L.L. Davis, Pacific Northwest National Laboratory, Hanford, WA (February, 2000)
- Design and development of the “Microtrace Forensic Fiber Reference Collection”, with S. Palenik, Microtrace, Elgin, IL (1998-1999)

- Study of automobile paint finish systems, under Dr. W. Stoecklein, Forensic Science Institute of the Bundeskriminalamt, Wiesbaden, Germany (Summer 1998)
- Study of inclusions in the Allende meteorite, Prof. L. Grossman and Dr. S. Simon, Department of Geophysical Sciences, University of Chicago (1996-1998)
- Mentorship study of Gel-based inks, under L. Olson, National Forensic Laboratory, Internal Revenue Service (1994-1995).
- Infrared Spectroscopy Interpretation, Bowdoin College, Maine, (June, 1996)
- Microchemical Methods, Instructor: S. Palenik, McCrone Research Institute, Chicago, IL (1996)
- Scanning Electron Microscopy, Instructor: Stevens, McCrone Research Institute, Chicago, IL (1994)
- NMR Spectroscopy use and interpretation, IMSA, Aurora, IL (1993-1995)
- Polarized Light Microscopy, Instructor: J. Delly, McCrone Research Institute, Chicago, IL (1992)

## Analytical Techniques

Include but are not limited to: Polarized light microscopy, thermal microscopy, scanning electron microscopy, electron microprobe, energy dispersive X-ray spectroscopy, high-resolution transmission electron microscopy, Raman microspectroscopy, infrared microspectroscopy, cathodoluminescence, UV/visible spectroscopy, scanning white light interferometry, UV/visible/near infrared microspectrophotometry, powder x-ray diffraction, micro-X-ray fluorescence, phase contrast microscopy, differential interference contrast microscopy, fluorescence microscopy, gas chromatography-mass spectrometry, ultra-high performance liquid chromatography, high resolution mass spectrometry, electron backscatter diffraction, differential scanning calorimetry, thin layer chromatography, electrostatic detection apparatus, ultra-high performance liquid chromatography with high resolution mass spectroscopy.

## Research Grants

Applied Research in the Characterization, Identification, and Comparison of Pigmented Fiber Evidence (2022, National Institute of Justice, 15PNIJ-21-GG-04185-RESS) – Role: Principal Investigator

The development of objective approach to the characterization and interpretation of paint evidence by SEM/EDS (2017, National Institute of Justice, 2017-IJ-CX-0027) – Role: Principal Investigator

Nanotrace: Applications of subvisible to nanoscale particles in trace evidence (2015, National Institute of Justice, 2015-DN-BX-K0033) – Role: Principal Investigator

Advanced research in Microspectrophotometry of Fibers: Analysis and Interpretation (2012, National Institute of Justice, 2012-DN-BX-K040) – Role: Principal Investigator

Development of a Turnkey Analytical System for the Forensic Comparison and Identification of Fiber Dyes on Casework-sized Fibers (2012, National Institute of Justice, 2012-DN-BX-K42) – Role: Principal Investigator

Raman spectroscopy of automotive and architectural pigments: in situ identification and evidentiary Significance (2011, National Institute of Justice, 2011-DN-BX-K557) – Role: Principal Investigator

Fundamentals of Forensic Pigment Identification by Raman microspectroscopy: A practical identification guide and spectral library (2010, National Institute of Justice, 2010-DN-BX-K236) – Role: Principal Investigator

## Graduate Committees

Samuel Yatzkan (2017) Detection and Persistence of Gunshot Residue (GSR) on Facial Features using SEM/EDX. Master of Science in Forensic and Investigative Science, West Virginia University. Additional committee members: Prof. Keith Morris (chair) and Prof. Susan Bell.

Barbara Fallon (2016) A Tale of two corchorus species: jute and its substitutes in commercial goods. Forensic Science – Master of Science, Michigan State University. Additional committee members: Prof. Ruth Smith (chair) and Prof. Jeremy Wilson.

Katelyn Hargrave (2013) A New Technique for the Identification of Dyes Extracted from Fibers. Master of Science in Forensic Science, University of Illinois at Chicago.

## Publications and Teaching

**Courses and Workshops Taught (invited)**

Palenik, C.S. and Wentling, F.M. (2023) "Ballistics and Gunshot Residue" webinar for the Atlantic Center for Capital Representation / Public Defender Association of Pennsylvania (ACCR/PDAP). CSP presented the GSR section.

Beyond Comparison: An introduction to trace evidence. (2021) Seminar lecture to the Winter 2021 semester "Forensic Science Seminar Series" hosted by Prof. David R. Fisher at the New Jersey Institute of Technology, 5 March 2021.

Development of an objective approach to the characterization and interpretation of paint evidence by SEM/EDS. (2019) Forensic Technology Center of Excellence Webinar Series - Emerging Research: Forensic Chemistry, 4 April 2019.

Applications of Raman Spectroscopy for Trace Evidence Examinations (2018) – workshop taught by Buzzini, P, Suzuki, E.M., Palenik, C.S., Bowen, A.M. at the American Academy of Forensic Sciences Annual Meeting, Seattle, WA.

Advanced Trace Evidence Analysis (2016). Topics included: dye and pigment identification, soil analysis, nanoparticle analysis – workshop taught by Palenik C. at the 8th Annual Asian Network of Forensic Sciences meeting, Bangkok, Thailand.

Petrographic identification of soil minerals (2015) - workshop taught by Palenik, S. and Palenik, C.S. at the National Institute of Justice Impression, Pattern and Trace Evidence Symposium (IPTES), San Antonio, TX.

Applications of Raman Spectroscopy for Trace Evidence Examinations (2014) – workshop taught by Buzzini, P, Suzuki, E.M., Palenik, C.S., Bowen, A.M. at the American Academy of Forensic Sciences Annual Meeting, Seattle, WA.

What did you just step in? (2012) – workshop taught with Mooney, K.E., Flohr, D.B., Bowen, A, Stoney, D, Bisbing, R., Hopen, T., Murray, R., Palenik, C.S., Palenik, S., Schneck, W.M., Stam, M. at the American Academy of Forensic Sciences Annual Meeting, Atlanta, GA.

Classification of Pigments by Raman Spectroscopy (2011) – workshop taught at the Midwestern Association of Forensic Sciences Ruby Jubilee Meeting, Lombard, IL.

Identification of Animal Hairs (2011) – workshop taught with Skip Palenik and Jason Beckert at the American Academy of Forensic Sciences Annual Meeting, Chicago, IL.

Advanced Hair and Fiber Microscopy – synthetic fiber section (2009) taught with Skip Palenik and Jason Beckert at McCrone Research Institute, Chicago, IL.

#Methods in Stereomicroscopy (2009) Customized Class. Rockville, MD.

#Forensic Pigment Analysis (2009) National Institute of Justice (NIJ) Trace Evidence Symposium, Clearwater Beach, FL.

Special topics in Forensic Science (2008) taught with Skip Palenik and Jason Beckert at McCrone Research Institute, Chicago, IL.

#Palenik, C.S (2005-2008) Trace evidence in forensic science. Seminar presented at Northwestern University Forensic Science Series, Chicago, IL (presented annually)

Introductory workshop to Forensic Microscopy (2007) taught with Skip Palenik at the Federal Bureau of Investigation (FBI) / National Institute of Justice (NIJ) Trace Evidence Symposium, Clearwater Beach, FL.

**Book Chapters and Peer Reviewed Reports**

Palenik, C.S. (2015) Forensic Microscopy in Forensic Chemistry (ed. Jay Seigl) American Academy of Forensic Sciences under Wiley Publications.

Palenik, C.S., Beckert, J.C., Palenik, S.J. (2015) Microspectrophotometry of Fibers: Advances in Analysis and Interpretation. Submitted in completion of NIJ grant 2012-DN-BX-K040, 421p.

Palenik, C.S., Palenik, S., Groves, E., Herb, J. (2013) Raman spectroscopy of automotive and architectural paints: in situ pigment identification and evidentiary significance. Submitted in completion of NIJ grant 2011-DN-BX-K557.

Palenik, C.S., Palenik, S., Herb, J., and Groves, E. (2011) Fundamentals of Forensic Pigment Identification by Raman Microspectroscopy: A practical identification guide and spectral library for forensic science laboratories. Submitted in completion of NIJ grant 2010-DN-BX-K236, 572p.

Palenik, C.S. and Buscaglia, J. (2007) Applications of cathodoluminescence in Forensic Science, in Forensic analysis on the Cutting Edge: new methods for trace evidence analysis, ed. R. Blackledge, Wiley.

Palenik, C.S. (2004) Isotopic and Neutronic Composition of the Okelobondo Natural Nuclear Reactor. Ph.D. Thesis, University of Michigan.

Palenik, S.J. and Palenik, C.S. (2004) Microscopy and microchemistry of physical evidence, in Forensic Science Handbook II, 2nd ed. Ed. R. Saferstien, Prentice Hall.

**Journal Articles**

Brinsko-Beckert, K., Palenik, S., Abraham, O.R., Groves, E., Palenik, C.S. (2023 – submitted) A preliminary study of geographic traceability of soil physical evidence: machine learning recognition of elemental fingerprints and morphological features. Journal of Forensic Sciences

Beckert, K. and Palenik, C.S. (2020) The Analysis of 3D Printer Dust for Forensic Applications DOI:10.1111/1556-4029.14486

White, K. and Palenik, C.S. (2020) Toner particles as forensic evidence: Microanalytical characterization of known toner and recognition of toner in environmental samples. 10.1111/1556-4029.14501

Palenik, C.S. (2019) The Role of Collections in Trace Evidence. The Microscope, 67(2).

Palenik, C.S., Groves, E., Insana, J., Palenik, S. (2019) Locating, Identifying and Comparing Sub Visible Paint Particles. Journal of Forensic Sciences. doi: 10.1111/1556-4029.14062.

Palenik, C.S., Brinsko-Beckert, K., Insana, J., and Palenik, S.J. (2018) Analytical and transfer characteristics of a fluorescent detection spray: Implications for subvisible and nanotrace particle transfers. Forensic Science International Volume 286, May 2018, 96-105.

Groves, E.G., Palenik, S.J., and Palenik, C.S. (2018) A Generalized Approach to Forensic Dye Identification: Acquisition and Development and Utility of Reference Libraries. Journal of the American Association of Analytical Chemists (JAOAC) 101(5) 1385-1396.

Groves, E.G., Palenik, S.J., and Palenik, C.S. (2018) Reproducibility of high-performance thin-layer chromatography (HPTLC) in textile dye analysis. Forensic Chemistry, 8, 104–110.

Groves, E.G., Palenik, S.J., and Palenik, C.S. (2016) A Survey of Extraction Solvents in the Forensic Analysis of Textile Dyes. Forensic Science International (268) 139-144.

Groves, E.G. and Palenik, C.S. (2016) Applications of Blue Light Curing Acrylic Resin to Forensic Sample Preparation and Microtomy. Journal of Forensic Science. March 2016, Vol. 61, No. 2 489-493.

Palenik, C.S. and Palenik, S. (2014) Seeing Color: Practical Methods in Pigment Microscopy. The Microscope, v62, 51-61.

Trejos, T., Koons, R., Becker, S., Berman, T., Buscaglia, J., Duecking, M., Eckert-Lumsdon, T., Ernst, T., Hanlon, C., Heydon, A., Mooney, K., Nelson, R., Olsson, K., Palenik, C., Pollock, E.C., Rudell, D., Ryland, S., Tarifa, T., Valadez, M., Weis, P., Almirall, J. (2013) Cross-validation and evaluation of the performance of methods for the elemental analysis of forensic glass by μ-XRF, ICP-MS, and LA-ICP-MS. Anal Bioanalytical Chemistry, 405: 5393-5409 (DOI 10.1007/s00216-013-6978-y).

Jantzi, S.C., Trejos, T., Zdanowicz, V. Dalpe, C., Palenik, C.S., Koons, R. Becker, S., Pollock, E.C., Hanlon, C., Almirall, J.R. (submitted) Inter-laboratory comparison of laser ablation inductively-coupled plasma mass spectrometry (LA-ICP-MS), micro X-ray fluorescence (μXRF) and laser-induced breakdown spectroscopy (LIBS) methods for bulk soil analysis. Forensic Science International.

Palenik, C.S. and Diaczuk P. (2013) Plumbum microraptus: Microscopic indicators of a bullet hole in a synthetic fabric. The Microscope Journal and reprinted in the Journal of the American Society of Trace Evidence Examiners (Volume 4, Issue 2, August 2013).

Ernst, Troy, Berman, Ted, Buscaglia, JoAnn, Eckert-Lumsdon, Tiffany, Hanlon, Christopher, Olsson, E. Kristine, Palenik, Christopher, Ryland, Scott, Trejos, Tatiana, Valadez, Melissa, Almirall, Jose (submitted 2012) Chemistry Signal-to-noise ratios in forensic glass analysis by micro x-ray fluorescence spectrometry. X-ray Spectrometry. DOI 10.1002/xrs.2437

Trejos, T, Koons, R., Becker, S., Berman, T., Buscaglia, J., Dueckingc, M., Eckert-Lumsdon, T., Ernst, T. Hanlonh, C., Heydoni, A., Mooney, K., Nelson, R., Olssonk, K., Palenik, C., Pollock, E.C., Rudelli, D. Ryland, S., Tarifaa, A., Valadez, M., Weisc, P. Almirall, J. (2) Forensic analysis of glass by μ-XRF, SN-ICP-MS, LA-ICP-MS and LAICP-OES: Evaluation of

the performance of different criteria fo comparing elemental composition. Journal of Analytical Atomic Spectrometry, 38, 1270-1282. DOI: 10.1039/c0xx00000x.

Trejos, T, Koons, R., Becker, S., Berman, T., Buscaglia, J., Dueckingc, M., Eckert-Lumsdon, T., Ernst, T. Hanlonh, C., Heydoni, A., Mooney, K., Nelson, R., Olssonk, K., Palenik, C., Pollock, E.C., Rudelli, D. Ryland, S., Tarifaa, A., Valadez, M., Weisc, P. Almirall, J. (accepted) Forensic analysis of glass by μ-XRF, ICP-MS, LA-ICP-MS and LA-ICP-OES - Part I: Method Standardization

Egan, J.M.; Mooney, K.; Palenik, C.S.; Mueller, K.T., and Golombeck, R. (2006) Synthessis, Isolation, and Characterization of Chlorinated Products of Bleached 1-(methylamino)anthraquinone. Journal of Forensic Sciences.

Reich, M., Kesler, S.E., Utsunomiya, S., Palenik, C.S., Chryssoulis, S.L., and Ewing, R.C. (2005) Solubility of gold in arsenian pyrite. Geochimica et Cosmochimica Acta, 69, 2781-2796.

Palenik, C.S. and Palenik, S.J. (2004) Forensic Science and Academic Science, Comment on Forensic Science: Oxymoron? Science, 303, 1136.

Utsunomiya, S., Palenik, C.S., Valley, J.W., Cavosi, A.J., Wilde, S.A. and Ewing, R.C. (2004) Nanoscale behavior of Pb in an Archean zircon. Geochimica et Cosmochimica Acta, 68, 4679-4686.

Ewing, R.C., Palenik, C.S. and Konikow, L. (2004) Comment on: "Probabilistic Risk Analysis for a High-Level Radioactive Waste Repository" by B. L. Cohen in Risk Analysis, vol. 23, 909-915, Risk Analysis, in press.

Palenik, C.S., Utsunomiya, S., Reich, M., Kesler, S.E. and Ewing, R.C. (2004) Invisible Gold Revealed: Direct imaging of gold nanoparticles from a Carlin-type deposit. American Mineralogist, 89, 1359-1366.

Davis, L.L., Darab, J.G., Qian, M., Zhao, D., Palenik, C.S., Li, H., Strachan, D.M. and Li, L. (2003) Hafnium in peralkaline and peraluminous boro-aluminosilicate glass and glass sub-components: a solubility study. Journal of Non-Crystalline Solids, 328, 101-122.

Palenik, C.S., Nasdala, L. and Ewing, R.C. (2003) Radiation damage in a zircon. American Mineralogist, 88, 770-781.

Jensen, K.A., Palenik, C.S. and Ewing, R.C. (2002) $U^{6+}$-phases in the weathering zone of the Bangombe U-deposit: Observed and predicted mineralogy. Radiochimica Acta, 90, 1-9.

Palenik, C.S. (2000) The role of the forensic scientist in the new millennium. Academy News (American Academy of Forensic Sciences), 23-24.

Palenik, C.S. (1989) The microscopical differentiation of dog and cat hairs, The Microscope, 38(4), 415-421.

**Conference Proceedings**

Palenik, C.S., Jensen, K.A. and Ewing, R.C. (2004) The impact of uncertainties in geochemical modeling on performance assessments: Lessons from natural analogues. Materials Research Society Spring Meeting, San Francisco, CA.

Palenik, C.S. and Ewing, R.C. (2002) Microanalysis of radiation damage across a zoned zircon crystal. Proceedings of the Materials Research Society, 713, JJ8.8.1-JJ8.8.6.

Zhao, D., Davis, L.L., Li, L., Palenik, C.S., Wang, L.M, Strachan, D.M. and Ewing, R.C. (2000) Gadolinium and hafnium alumino-borosilicate glasses: Gd and Hf solubilities. Proceedings of the Materials Research Society, vol. 608, 683-689.

**Other Publications**

Palenik, C.S. (2020) Resolving the Source of Foreign Matter in Formulations. In Powder and Bulk Solids. Published online 26 June 2020 (https://www.powderbulksolids.com/screening-separation/resolving-source-foreign-matter-formulations). Print version in September 2020 issue.

Palenik, C. S.; Palenik, S.; Groves, E. (2019). Microscopy | Forensic Microscopy. In Worsfold, P., Poole, C., Townshend, A., Miró, M., (Eds.), Encyclopedia of Analytical Science, (3rd ed.). vol. 7, pp 57–64, Elsevier.

Palenik, C.S. and Jackson, G. (2016) Forensic Myths and Methods. The Analytical Scientist, March 2016 #38, 24-32.

Palenik, C.S., Palenik, S.J., and Groves, E.G. (2014) Forensic Microscopy, In: Reedijk, J. (Ed.) Elsevier Reference Module in Chemistry, Molecular Sciences and Chemical Engineering. Waltham, MA: Elsevier. 07-Aug-14 doi: 10.1016/B978-0-12-409547-2.11426-X.

Palenik, C. and Nytes, B. (2014) Mercury Wings, (ed.) Bethany Halford in Chemical and Engineering News, Newscripts. Volume 92 Issue 22, p40, June 2, 2014.

Palenik, C. (2013) Consumer Complaint Sample Analyses: Considerations for Outsourcing Sample Analysis, Submitted to Society of Consumer Affairs Professionals – Customer Relationship Management CRM Magazine. Summer 2013.

Palenik, C. (2011) A Better Fate For Mercury?, Letter to the Editor, Chemical and Engineering News, 18 April 2011, 89(16), p6.

Palenik, C. (2005) Big "I" in Owens. Letter to the Editor, New York Times, November 13.

Utsunomiya, S., Palenik, C.S., and Ewing, R.C. (2004) Nano- to Atomic Scale Imaging of Heavy Trace Metals Utilizing Advanced Microscopy Techniques in The Dekker Encyclopedia of Nanoscience and Nanotechnology. Marcel Dekker Pub., NY

Palenik, C.S. and Palenik, S.J. (2004) Forensic Microscopy, in Encyclopedia of Analytical Sciences, 2nd Ed., eds. Worsfold, P., Townshend, A and Poole, C. Elsevier, NY.

Palenik, C.S. and Palenik, S.J. (1999) Forensic Fiber Reference Collection Manual. Microtrace: Elgin, IL 46p.

Palenik, S.J. and Palenik, C.S. (1999) Forensic Fiber Identification Course Guide. Microtrace: Elgin, IL, 32p.

**Abstracts and Talks**

*Keynote or Plenary address; #Invited talk; ^Session chair, %Scheduled/Accepted

Mosinski, S., Guse, J., McConnell, J., Ottinger, S., Groves, E., White, K., Palenik, S. and Palenik, C.S. (2023) Characterization and identification of historical writing inks and their colorants. 2024 Meeting of the American Academy of Forensic Sciences, Denver, CO.

Kaur, J. Christensen, J., Groves, E, Palenik, C.S., Palenik, S., De Forest, P, Fikiet, M., Maxwell, V., Kammrath, B.W., (2023) Capabilities and Limitations of Particle Correlated Raman Spectroscopy (PCRS) for the Analysis of Forensic Soil Minerals. 2024 Meeting of the American Academy of Forensic Sciences, Denver, CO.

Beckert, K., Abraham, O., Groves, E., and Palenik, C.S. (2023) Identification of Pigments in Solution Dyed Fibers. 2024 Meeting of the American Academy of Forensic Sciences, Denver, CO.

#Palenik, C.S. (2023) Round table participant at "Long-Term Vision and Strategic Priorities for Forensic Science in the United States: Roundtable Discussion with Thought Leaders" NIST Gaithersburg, MD meeting September 6-7, 2023.

McConnella, J., Ottingera, S. Palenik, C.S., Palenik, S., Groves, E., White, K.M. (2023) Classification and Identification of Historical Ink Deposits Using Non-Destructive and Micro-Invasive Techniques. WiSys SPARK Symposium, August 6-8 2023.

Hietpas, J., Groves, E., O'Callaghan, L., Palenik, C.S., Palenik, S. (2023) Investigating the utility of novel techniques for the forensic characterization and comparison of surficial soils. Inter/Micro 2023, Chicago, IL.

Hietpas, J., Groves, E., Palenik, C.S., Palenik, S. (2023) Developing an Automated Mineral Identification by SEM/EDS for Forensic Laboratories. Inter/Micro 2023, Chicago, IL.

Brinsko Beckert, K., Abraham, O., Groves, E., Nytes, B., Palenik, C.S., Palenik, S. (2023) Microscopy and Microanalysis of Solution Dyed Fibers. Inter/Micro 2023, Chicago, IL.

O'Callaghan, L., Groves, E., Hietpas, J., Palenik, S. Palenik, C.S. (2023) Soil preparation for forensic research and analysis. Inter/Micro 2023, Chicago, IL.

White, K. and Palenik, C.S. (2023) Is it a Van Gogh? Microanalysis of pigments to establish artwork provenance. Inter/Micro 2023, Chicago, IL.

#Palenik, C.S. (2023) Advances in the Microscopical Analysis of Trace Evidence in Advancements in the Analysis of Forensic Trace Evidence at the 6th annual NIJ Forensic Science Symposium at PITTCON 2023, Philadelphia, PA.

#Palenik, C.S. (2022) Forensic Problem Solving through Microanalysis. Midwest Microscopy and Microanalysis Society ($M^3S$), Westmont, IL.

Brinsko Beckert, K., Abraham, O., Groves, E., Palenik, S. Palenik, C.S. (2023) The Microscopical Recognition and Characterization of Pigmented Fibers at the 2023 American Academy of Forensic Sciences meeting, Orlando, FL.

#Palenik, C.S. (2022) Microscopical analysis applied to the detection and sourcing of counterfeit products in the panel session "Challenges of Counterfeit Detection in Pharmaceutical Industry" at the Eastern Analytical Symposium, Princeton, NJ.

Beckert, K., Abraham, O., Groves, E., and Palenik, C.S. (2022) Examination of Pigmented Fibers for Trace Evidence Applications at the Eastern Analytical Symposium, Princeton, NJ.

Beckert, K., Abraham, O., Groves, E., and Palenik, C.S. (2022) Forensic Microscopy of Pigmented Fibers. Joint Midwestern Association of Forensic Scientists / ASTEE Meeting. Des Moines, IA.

Palenik, C.S. (2022) Image Only: Analysis when sampling is not possible. Inter/Micro 2022, Chicago, IL.

McConnell, J., Ottinger, S., Palenik, C.S., and Palenik, S. (2022) Classification and Identification of Historical Inks. Inter/Micro 2022, Chicago, IL.

Beckert, K., Abraham, O., Groves, E., and Palenik, C.S. (2022) Forensic Microscopy of Pigmented Fibers. Inter/Micro 2022, Chicago, IL.

Abraham O., Groves, E., Beckert, K., and Palenik, C.S. (2022) Beyond what the eye can see: application of long exposure fluorescence imaging to the characterization of pigmented fibers. Inter/Micro 2022, Chicago, IL.

Groves, E., Beckert, K., Abraham O., and Palenik, C.S. (2022) Microtomy of Pigmented Fibers – Making the Right Cut Inter/Micro 2022, Chicago, IL.

Brown, S, Messé, G., Notari, C., Garvin, H., Gogola, N., Maxwell, V., Reffner, J.A., De Forest, P.R., Palenik, C.S., Harrington, P., Huck-Jones, D., O'Donnell, B., Whitley, A., Kammrath, B.W. (2021) Soil Mineral Analysis by Particle Correlated Raman Spectroscopy (PCRS): Optimized Dispersion and Double-Pass Raman Analysis. Eastern Analytical Symposium.

Brown, S., Messe, G, Garvin, H, Gogola, N. Notari, C. Maxwell, V. Reffner, J.A., De Forest, P.R., Palenik, C.S., de B. Harrington, P., Huck-Jones, D., O'Donnell, B., Whitley, A., Kammrath, B.W. (2022) Mineral Analysis by Particle Correlated Raman Spectroscopy (PCRS): Optimized Dispersion and Double-Pass Raman Analysis, American Academy of Forensic Sciences 2022 Annual Meeting.

#Palenik, C.S. (2021) Reference Collections and their use in Forensic Fiber Analysis, presented at the virtual 2021 Online Trace Symposium on 29 July 2021.

Gogola, N., Garvin, H., Brown, S. Reffner, J.A., De Forest, P.R., Palenik, C.S., de B. Harrington, P., Huck-Jones, D. O'Donnell, B. Whitley, A. Kammrath, B.W. (2021) Soil Mineral Analysis by Particle Correlated Raman Spectroscopy (PCRS): Sample Preparation and Raman Analysis Optimization. 10th Annual Forensic Science Symposium hosted by the Global Forensic and Justice Center at FIU.

Gogola, N., Garvin, H., Brown, S. Reffner, J.A., De Forest, P.R., Palenik, C.S., de B. Harrington, P., Huck-Jones, D. O'Donnell, B. Whitley, A. Kammrath, B.W. (2021) The Effects of Sample Preparation Optimization on Soil Mineral Analysis by Particle-Correlated Raman Spectroscopy (PCRS) American Academy of Forensic Sciences 2021 National Meeting.

Garvin, H., Gogola, N. , Brown, S. Maxwell, V. Reffner, J.A., De Forest, P.R., Palenik, C.S., de B. Harrington, P., Huck-Jones, D., O'Donnell, B., Whitley, A., Kammrath, B.W., (2021) Soil Mineral Analysis by Particle Correlated Raman Spectroscopy (PCRS): Method Optimization. American Academy of Forensic Sciences 2021 National Meeting.

Kammrath, B.W., Garvin, H., Gogola, N., Brown, S., Reffner, J.A., De Forest, P.R., Palenik, C.S., Harrington, P., Huck-Jones, D., O'Donnell, B., Whitley, A. (2021) Soil Mineral Analysis by Morphologically-Directed Raman Spectroscopy: Method Optimization. Pittcon 2021.

#Palenik, C.S. (2020) Oblique Illuminations. Talk in the Ernst Abbe Award session honoring Brian J. Ford. Eastern Analytical Symposium.

#Palenik, C.S. (2020) Developments in the forensic analysis of automotive paints by SEM/EDS. Pittcon 2020, Chicago, IL.

Palenik, C.S., Groves, E, Michely, L., Lim, Y.C., and Palenik, S.J. (2020) A survey of elements detectable in automotive paint layers by SEM/EDS. American Academy of Forensic Sciences Annual Meeting, Anaheim, CA.

Lewis, A., Palenik, C.S., Palenik, S., Buzzini, P. (2020) Characterization of Nylanthrene Dyes in the Differentiation of Macroscopically Similar Black Fibers using Light Microscopy and Visible Microspectrophotometry. American Academy of Forensic Sciences Annual Meeting, Anaheim, CA.

#Palenik, C.S. (2019) Microanalysis in forensic paint investigations. Midwest Microscopy and Microanalysis Society ($M^3S$), Round Lake, IL.

Brinsko Beckert, K., Palenik, S., Palenik, C.S. (2018) Nanoparticles as Trace Evidence. Joint Meeting of the Southern Association of Forensic Scientists (SAFS) and the American Society of Trace Evidence Examiners in Ashville, NC.

#Palenik, C.S. (2018) Advanced topics in forensic microscopy. Talk given at the Bundeskriminalamt in Wiesbaden, Germany.

Palenik, C.S. and Michely, L. (2018) Analytical considerations for the elemental analysis and forensic comparison of automotive paints. Inter/Micro 2018, Chicago, IL.

White, K.M. and Palenik, C.S. (2018) Product Discoloration: Analysis of an Unknown Red Colorant. Inter/Micro 2018, Chicago, IL

Groves, E.G., Michely, L. and Palenik, C.S. (2018) A Survey of Elements Detected in Multi-layered Automotive Paint Samples by SEM-EDS. Inter/Micro 2018, Chicago, IL.

%White, K.M., Nytes, B.N., and Palenik, C.S. (2018) Applications of Glass Microspheres as Forensic Trace Evidence. Pittcon 2018, Orlando, FL.

%White, K.M. and Palenik, C.S. (2018) Forensic Study of Known Toner Particles. Pittcon 2018, Orlando, FL.

% Brinsko Beckert, K. and Palenik, C.S. (2018) Nanoparticles as trace evidence: Part I. Recognition and collection. Pittcon 2018, Orlando, FL.

% Brinsko Beckert, K. and Palenik, C.S. (2018) The Forensic Analysis of 3D Printer Dust Particles. Pittcon 2018, Orlando, FL.

%Palenik, C.S. (2018) Nanotrace Evidence in Forensic Investigations. National Association of Criminal Defense Laywers. Making Sense of Science XI: Forensic Science and the Law. Las Vegas, NV.

% Palenik, C.S. (2018) High Order Trace Transfers: Considerations for the analysis of subvisible and nanoparticles. American Academy of Forensic Science 70th Annual Scientific Meeting, Seattle, WA.

% Palenik, C.S. (2018) Fulgurites in litigation. American Academy of Forensic Science 70th Annual Scientific Meeting, Seattle, WA.

Palenik, C.S. (2017) Fulgurites and Forensic Science: A Novel Application of Forensic Geology. Inter/Micro-2017, Chicago, IL.

Insana, J. and Palenik, C.S. (2017) Application of Rietveld Refinement to Forensic Samples. Inter/Micro-2017, Chicago, IL.

White, K.M. and Palenik, C.S. (2017) A Forensic Study of Known Toner Nanoparticles, Inter/Micro-2017, Chicago, IL.

Brinsko Beckert, K. and Palenik, C.S. (2017) The forensic analysis of 3-D printer dust particles. Inter/Micro-2017, Chicago, IL.

#Palenik, C.S. (2017) Scientific Foundations Session 1, National Commission on Forensic Science. National Institute of Justice, Washington, DC.

#Palenik, C.S. (2016) Counterfeit materials and their relation to forensic science. Interpol Forensic Science Managers Symposium, Lyon France.

#Palenik, C.S. (2016) The invaluable role of a technician in forensic science. Fall Annual Meeting of the Midland Section of the American Chemical Society, Midland Michigan.

*Palenik, C.S. (2016) Forensic microscopy and the lost art of observation. Fall Annual Meeting of the Midland Section of the American Chemical Society, Midland Michigan.

#Palenik, C.S. (2016) Advanced trace evidence analysis: from micro to nano. Asian Forensic Sciences Network Annual Meeting 2016, Bangkok, Thailand.

#Palenik, S.J. and Palenik, C.S. (2016) The Utilization of Microscopy in Developing Investigative Leads from the Examination of Microscopic Trace Evidence in Forensic Investigations. Microscopy and Microanalysis 2016 Meeting, Dayton, OH.

Hargrave, K.H., Nytes, B.N., Hopen, T., Palenik, C.S. (2016) Applications of Glass Microspheres as Forensic Trace Evidence. Presentation at Inter/Micro 2016, Chicago, IL.

Groves, E.G. and Palenik, C.S. (2016) A practical approach to forensic dye identification: method and validation. Presentation at Inter/Micro 2016, Chicago, IL.

Palenik, C.S., Groves, E.G., and Palenik, C.S. (2016) Dye Identification in Casework: How far can you go? Presentation at Inter/Micro 2016, Chicago, IL.

Scott, K.R., Palenik, C.S., Palenik, S., Morgan, R.M. (2016) A multidisciplinary approach to the collection and analysis of aquatic trace evidence from clothing exhibits. Australian and New Zealand Forensic Science Society International Symposium. Auckland, New Zealand.

Scott, K., Morgan, R., Palenik, C.S. and Palenik, S.J. (2015) Developing the techniques available for the collection and analysis of forensic evidence in freshwater crime scene environments. National Institute of Justice Impression, Pattern and Trace Evidence Symposium (IPTES), San Antonio, TX.

Fallon, B.L., Palenik, C.S. and Palenik, S.J. (2015) Jute and its Substitutes in Common Goods. National Institute of Justice Impression, Pattern and Trace Evidence Symposium (IPTES), San Antonio, TX.

Palenik, C.S. (2015) Decreasing the Scale and Increasing the Scope of Trace Evidence. National Institute of Justice Impression, Pattern and Trace Evidence Symposium (IPTES), San Antonio, TX.

^Palenik, C.S. (2015) Surrounded by Spheres: Microspheres and nanospheres in the world around us. Inter/Micro 2015. Chicago, IL.

Nytes, B.N., Palenik, C.S., Palenik, S.J. (2015) Microchemistry: Not such a small thing. Inter/Micro 2015. Chicago, IL.

Hargrave, K., Palenik, S.J., Beckert, J., Palenik, C.S. (2015) Characterization of Extracted Dyes by Capillary Microspectrophotometry: Proof of Concept. Inter/Micro 2015. Chicago, IL.

Fallon, B.L., Palenik, C.S., and Palenik, S. (2015) A Tale of Two Corchorus Species: Jute and Its Substitutes in Common Goods. Inter/Micro 2015. Chicago, IL.

^#Palenik, C.S. (2015) Keynote Address. Microscopy and the lost art of observation. SCIX 2015, Providence Rhode Island.

#Palenik, C.S. (2015) Microscopy: My Professional Hobby. State Microscopical Society of Illinois monthly speaker series. Chicago, IL.

Palenik, C.S. and Palenik, S.J. (2015) Microtrace to Nanotrace: Extracting information at increasingly smaller length scales. American Academy of Forensic Sciences Annual Meeting, Orlando, FL.

^,#Palenik, C.S. (2014) Identification and Significance of Colorants in Forensic Casework. World Forensic Festival (IAFS 2014, AFSN 2014, APMLA 2014), Seoul, Korea.

Palenik, C.S. and Palenik, S.J. (2014) Seeing Color: Practical Methods in Pigment Microscopy. Inter/Micro 2014, Chicago, IL.

Hargrave, K., Beckert, J., Palenik, C.S., White, K., Sigman, M. (2014) The Comparison of Similarly Colored Fabrics and Yarns Using Comparison Microscopy and Microspectrophotometry. Inter/Micro 2014, Chicago, IL.

Nytes, B., White, K.M., and Palenik, C.S. (2014) You Found WHAT in Your Pizza?: Characterization of a condom allegedly baked into a pizza. Inter/Micro 2014, Chicago, IL.

White, K.M., Palenik, C.S., Beckert, J.B., and Hargrave, K. (2014) Evaluating Different Methods of Comparison for Fibers with Subtle Variations in Dye Concentration. Inter/Micro 2014, Chicago, IL.

#Palenik, C.S. (2014) Food Forensics: Key Considerations for Consumer Complaint Sample Analysis. Food Labs Conference at PittCon, Chicago, IL.

#Palenik, C.S. (2013) Applications of colorant identification in forensic science. SCIX 2013 Annual Meeting, Milwaukee, WI.

Groves, E. and Palenik, C.S. (2013) The use of blue light curing resins in forensic sample preparation, Inter/Micro 2013, Chicago, IL.

Palenik, C. and Beckert, J. (2013) Between the fringes: overlooked topics in microspectrophotometry, Inter/Micro 2013, Chicago, IL. (abstract accepted, talk not given due to illness)

Groves, E. and Palenik, C.S. (2013) Colorant basics: chemical organization of a dye and pigment database, Inter/Micro 2013, Chicago, IL.

Palenik, S. and Palenik, C.S. (2013) Development of a systematic approach to forensic dye identification, Inter/Micro 2013, Chicago, IL.

Nytes, B., Palenik, S.J. and Palenik, C.S. (2013) Fitting the Mold: An Exploration into Sourcing of Glass Fragments, Inter/Micro 2013, Chicago, IL.

Palenik, C.S. (2013) Microanalytical methods of materials characterization in forensic science. International Cement Microscopy Association Annual Meeting, Rosemont IL.

#Palenik, C.S. and Palenik, S.J. (2013) Applications of Forensic Microanalytical Methods to the Identification and Sourcing of Particulate Matter in Pharmaceutical Products, Microscopy & Microanalysis 2013 sponsored by the Microscopy Society of America, Indianapolis, IN.

Palenik, C.S. (2013) Systematic in situ Identification of Pigments in Paint by Raman Microspectroscopy, AAFS, American Academy of Forensic Sciences National Meeting, Washington, DC.

Palenik, C.S. and Beckert, J.B. (2012) The Forensic Analysis of Paint Evidence Using Micro-Raman Spectroscopy, MAFS 2012, Milwaukee, WI.

Groves, E.G., Herb, J., Palenik, C.S. (2012) Benefits of Using Cross-Sectioning in Forensic Analysis of Automotive Paints, Inter/Micro 2012, Chicago, IL.

Palenik, C.S., Buzzini, P., Herb, J., Groves, E. (2012) The Forensic Analysis of Paint Evidence Using Micro-Raman Spectroscopy Part I: Development of Libraries and Application Methods, Inter/Micro 2012, Chicago, IL.

Buzzini, P., Palenik, C.S., and Massonnet, G. (2012) The Forensic Analysis of Paint Evidence Using Micro-Raman Spectroscopy Part II: Case Examples, Inter/Micro 2012, Chicago, IL

Sliwa, S., Groves, E., Palenik, M.C. (2012) Mapping Elemental and Refractive Index Variation in Container Glass, Inter/Micro 2012, Chicago, IL.

Herb, J., Palenik, C.S., and Palenik, S.J. (2012) Four Score and Seven Years Ago" or Was It? : Authenticating President Abraham Lincoln's Signature, Inter/Micro 2012, Chicago, IL.

Palenik, C.S. and Palenik, S. (2012) Development of a Pigment Classification Scheme by Raman Spectroscopy. American Academy of Forensic Sciences National Meeting. Atlanta, GA.

#Palenik, C. (2011) Forensic Soil Examination at the NIJ Sponsored Elemental Analysis Working Group Meeting Miami, Florida – October 12-13, 2011.

Buscaglia, J., Palenik, C.S., Brokus, S.A., Silletti, D.K., Cooper, D.E., Purcell, D.K., Peaslee, G.F. (2011) Applications of Cathodoluminescence (CL) Microscopy and Spectroscopy to Forensic Evidence. Presented at Cathodoluminescence (CL 2011), a topical conference (TC) of the Microbeam Analysis Society (MAS), co-sponsored by the Australian Microbeam Analysis Society (AMAS) held at the National Institute of Standards and Technology (NIST), Gaithersburg, MD, USA on October 24-28, 2011.

#Palenik, CS. Beyond Comparison: Developing Investigative Leads from Trace Evidence. Eastern Analytical Symposium. Somerset, New Jersey.

Palenik, CS, Palenik, S., Herb, J., Beckert, J., Nytes, B. Chemical Classification of Pigments by Raman Spectroscopy for Forensic Applications. NIJ Trace Evidence Symposium, Kansas City, MO (2011).

Palenik, CS, Palenik, S., Beckert, J., Nytes, B., Groves, E. (2011) Improvements in analytical precision in the forensic analysis of glass through the use of metal filters in µ-XRF analysis. NIJ Trace Evidence Symposium, Kansas City, MO.

Jantzi, S.C., Trejos, T., Zdanowicz, V., Dalpe, C., Palenik, C.S., Koons, R., Wong, D., Hanlon, C., Pollock, E., Becker, S., Almirall, J. (2011) Inter-Laboratory Comparison of LA-ICP-MS, µXRF and LIBS methods for Bulk Soil Analysis

Ernst, T., Trejos, T. Valadez, M., Koons, R., Buscaglia, J., Olsson, K., Ryland, S. Berman, T., Eckert-Lumsdon, T. Hanlon, C., Palenik, C., Almirall, J. (2011) When is a peak, a peak? Calculating detection and quantification limits for micro X-ray fluorescence spectrometry of glass samples.

Herb, J.N. and Palenik, C.S. (2011) Use of surface enhanced Raman spectroscopy (SERS) applied to the study of fluorescing pigments and dyes. American Academy of Forensic Sciences National Meeting, Chicago, IL.

Nytes, B.N, Beckert, J., Palenik, C.S., and Palenik, S. (2011) Obtaining investigative forensic information from the analysis of rodents in food products. American Academy of Forensic Sciences National Meeting, Chicago, IL.

Palenik, CS, Wilke, B. (2010) Raman spectroscopy of organic pigments. American Academy of Forensic Sciences National Meeting, Seattle, WA.

Palenik, CS, Nytes, B.N., Beckert, J., Bonta, H, and Palenik, S (2009) Raman spectroscopy of Forensic Evidence. Trace Evidence Symposium (National Institute of Justice (NIJ), Clearwater Beach, FL.

Buscaglia, J., Palenik, C.S., and Peaslee, G. (2009) Trace evidence applications of cathodoluminescence (CL) microspectrophotometry. Trace Evidence Symposium (National Institute of Justice (NIJ), Clearwater Beach, FL.

Wilke, B. and Palenik, C.S. (2009) Organic Pigments: Analytical characterization and classification by Raman spectroscopy. Inter/Micro 09, Chicago, IL.

Palenik, CS, Bonta, H, and Palenik, S (2009) Microanalysis of Architectural Tinting Pigments. American Academy of Forensic Sciences National Meeting. Denver, CO.

#Palenik, CS (2008) Food Forensics: Applications of microscopy and microchemistry to contamination issues in the food industry. Presented to the Griffth Laboratory Global Summit Meeting, Lombard, IL.

#Palenik, CS (2008) Big Picture Clues from Microscopic Particles: Applications of Geology to Forensic Science. Colgate University, NY.

Peaslee, GF, Buscaglia, J, Palenik, CS (2008) Cathodoluminescence as a Forensic Tool. 2008 Joint Meeting of The Geological Society of America, Soil Science Society of America, American Society of Agronomy, Crop Science Society of America, Gulf Coast Association of Geological Societies with the Gulf Coast Section of SEPM. Houston, TX.

Bales, H. and Palenik, CS (2008) Planar Section of Multilayer Paint Chips. Inter/Micro 2008, Chicago, IL.

Palenik, S. and Palenik, CS (2008) A Practical Technique for the Recognition of Modern Sculptures Proffered as Ancient Works of Art. Inter/Micro 2008, Chicago, IL.

Palenik, CS and Bonta, H. (2008) Microanalytical Characterization of Architectural Paint Pigments. Inter/Micro 2008, Chicago, IL.

#Palenik, CS (2008) Workshop on Raman Spectroscopy of Forensic Evidence. International Association of Forensic Sciences Conference Proceedings. New Orleans, LA.

Peaslee, GF, Palenik, CS, and Buscaglia, J (2008) Application of Cathodoluminescence Microspectrophotometry for Forensic Comparison of Concrete Samples. International Association of Forensic Sciences Conference Proceedings.

Palenik, CS, Palenik, S., and Nytes, B. (2008) An introduction to the in situ identification of pigments in automobile and architectural paints by Raman microspectroscopy. Proceedings of the American Academy of Forensic Sciences National Meeting, Washington DC.

Palenik, CS and Nytes B (2007) The *in situ* identification of pigments in CMYK printing inks. Inter/Micro 2007, Chicago, IL.

Palenik, CS and Palenik, SJ (2007) Ensuring the Continued Role of Science in the Forensic Examination of Trace Evidence. Proceedings of the 2007 American Academy of Forensic Sciences National Meeting, San Antonio, TX.

Palenik, SJ and Palenik, CS (2007) Developing Investigative Leads through Trace Evidence. Proceedings of the 2007 American Academy of Forensic Sciences National Meeting, San Antonio, TX.

#Palenik, CS (2007) Forensic Trace Evidence: Big Picture Clues from Microscopic Particles. Saturday Science Fun Lecture Series, Freedom Hall, Park Forest, IL.

#Palenik, CS (2006) Trace Evidence for the Public Defender. Missouri State Public Defender Winter Workshop, St. Louis, MO.

#Palenik, CS (2006) Forensic Microscopy of Fibers. Presentation at Philadelphia University seminar series.

#Palenik, CS (2006) Cathodoluminescence in Forensic Science. Presentation Soil Analysis workshop at California Association of Criminalists Fall Seminar.

Palenik, S.J. and Palenik, C.S. (2006) Developing Forensic Investigative Leads through the Microscopical Examination of Trace Evidence. Geological Society of America National Meeting, Philadelphia, PA. GSA Abstracts with Programs 38 (7).

Palenik, C.S. (2006) Novel applications of cathodluminescence microscopy. Inter/Micro-06, Chicago, IL.

Palenik, C.S. and Buscaglia, J. (2006) Cathodoluminescence in Forensic Science. American Academy of Forensic Sciences National Meeting, Seattle, WA.

Mooney, K.E., Koons, R.D., Buscaglia, J. and Palenik, C.S. (2006) Discrimination of Automobile Side Windows by Micro-XRF. American Academy of Forensic Sciences National Meeting, Seattle, WA.

Palenik, C.S. (2006) From PhD to Professional: Bridging the Gap. 3rd Annual Northwestern University PLU Career Forum.

#Palenik, C.S. (2005) Applications of microscopy and microchemistry in forensic science. Talk given at Chemistry Dept. seminar, University of Wisconsin Platteville.

Egan, J.M., Mooney, K.E., Palenik, C.S., Rickenback, M.P., Golombeck, R.A. and Mueller, K.T. (2005) Synthesis, Isolation, and Characterization of Chlorinated Products of Bank Security Dye Packs Upon Bleaching, Pittcon - 2005, August, 2005.

Palenik, C.S. and Buscaglia, J. (2005) Cathodoluminescence microscopy in forensic science. 2006 Annual meeting of the American Academy of Forensic Sciences. Seattle, WA.

#Palenik, C.S. and Buscaglia, J. (2005) Applications of cathodoluminescence in the forensic analysis of trace evidence. 2005 Annual meeting of SWGMAT (Scientific Working Group for Materials Analysis sponsored by the FBI), Washington, D.C.

*Palenik, C.S. and Buscaglia, J. (2005) Applications of cathodoluminescence in forensic geology. 2005 Goldschmidt Conference, Moscow, Idaho, Geochmica et Cosmochimica Acta.

Fayek, M., Palenik, C.S. and Ewing, R.C. (2005) Characterization of Nd, Te and U isotope ratios in $UO_2$ using SIMS. 2005 Goldschmidt Conference, Moscow, Idaho, Geochmica et Cosmochimica Acta.

Palenik, C.S., Fayek, M., Fleming, R. and Ewing, R.C. (2004) Isotopic composition and neutronics of the Okélobondo natural nuclear reactor. Geological Society of America, Fall National Meeting, Denver, CO.

Palenik, C.S. (2004) Microanalytical Characterization of a Natural Nuclear Reactor. Inter/Micro-04, Chicago, IL, Microscope, 52, 156.

*Ewing, K.A., Palenik, C.S. and Ewing, R.C. (2004) The natural fission reactors at Oklo, Gabon: Lessons for modeling the long-term behavior of a nuclear waste repository. International Geological Congress, Florence, Italy.

Palenik, C.S., Jensen, K.A and Ewing, R.C. (2004) The impact of uncertainties in geochemical modeling on performance assessments. Materials Research Society Spring Meeting, San Francisco, CA.

Jensen, K.A., Palenik, C.S., Fayek, M., Evins, L.Z., Janeczek, J., and Ewing, R.C. (2003) The spent nuclear fuel analogue of the Oklo-Okélobondo and Bangombé natural fission reactors. Nordic Geological Winter Meeting, Sweden.

Palenik, C.A., Fayek, M., Jensen, K.A., and Ewing, R.C. (2003) Analysis of Fission Products and Pu Migration in the Okelobondo Reactor Zone Using SIMS. Geological Society of America, Fall National Meeting, Seattle, WA, 35(6), 237.

Utsunomiya, S., Palenik, C.S., Ewing, R.C., Valley, J.W., Cavosie, A.J., and Wilde, S.A. (2003) Fate of Pb in an Archean Zircon. Geological Society of America, Fall National Meeting, Seattle, WA 35(6), 594.

Reich, M., Palenik, C.S., Utsunomiya, S., Becker, U, Stixrude, L. Kesler, S.E. and Ewing, R.C. (2003) Solubility Limit of Gold in Arsenian Pyrite from Carlin-Type and Epithermal Deposits: EMPA, SIMS, HRTEM and Quantum-Mechanical Constraints. Geological Society of America, Fall National Meeting, Seattle, WA 35(6), 358.

Palenik, C.S. and Stoecklein, W. (2003) Batch to batch differentiation of automobile paints. Inter/Micro-03, Chicago, IL

Jensen K.A., Palenik C.S., and Ewing R.C. (2003) Thermodynamic prediction of observed uranium minerals in the supergene-weathered Bangombé U-deposit: implications for blind prediction modeling. Uranium Geochemistry 2003, Nancy, France.

Palenik, C.S., Utsunomiya, S, Kesler, S.E. and Ewing, R.C. (2002) Gold nanoparticles in aresenian pyrite from a Carlin-type deposit observed by HRTEM. Geological Society of America, Fall National Meeting, Denver, CO.

Palenik, C.S, Jensen, K.A. and Ewing, R.C. (2002) Thermodynamic prediction of observed uranyl phases in the supergene-weatherd Bangombe U-deposit: Implications for Blind Prediction Modeling. International Mineralogical Association, Scotland, England.

Jensen, K.A., Palenik, C.S., Ewing, R.C. and Burns, P.C. (2001) Uranyl Phases in the Bangombe U-Deposit, Migration '01, Bregenz, Austria.

Jensen, K.A., Palenik, C.S., Ewing, R.C. and Burns, P.C. (2001) Oxidative Alteration of the Oklo-Okelobondo and Bangombe U-Deposits in Gabon: Observed and Predicted Mineralogy, American Chemical Society - Fall National Meeting, Chicago, IL.

Palenik, C.S., Lian, J. and Ewing, R.C. (2001) Microanalysis of radiation damage across a zoned zircon crystal. Materials Research Society, Fall National Meeting, Boston, MA.

Palenik, C.S., Lian, J. and Ewing, R.C. (2001) Zircon as a host for the disposal of Plutonium, Workshop on Engineering Mineralogy of Ceramic Materials, ISEPS, Siena, ITALY.

Jensen, K.A., Palenik, C.S., Ewing, R.C., Burns, P. (2000) The role of sulfates during supergene weathering in the Oklo-Okelobondo uranium deposits, Geological Society of America, Reno, NV.

Stoecklein, W. and Palenik, C.S. (1998) Forensic analysis of automotive paints: Evidential value and the batch problem. Presentation – 4th meeting of the European Paint Group. Paris, France, October 5-6.

Palenik, C.S., (1998) Analysis of Chrome-Bearing Spinel from the Allende Meteorite Geophysical Science Exposition '98, University of Chicago.

Simon, S.B., Grossman, L., Ebel, D., Palenik, C. (1998) Large Relict Chromium Spinel from Allende: A link to Murchison?, 29th Lunar and Planetary Science Conference, Houston, TX.

C.V. of C.S. Palenik                    - 25 of 25 -                    current as of 9/11/2023

Palenik, C.S. and Olson, L. (1995) Identification of Gel-Based Inks, INTER/MICRO-95, Chicago, IL.

Palenik, C.S. and Olson, L. (1995) Developing procedures for the identification of gel inks, IMSA Presentation Day, Aurora, IL.

Palenik, C.S. Original Paint Finish Systems on Foreign Automobiles (1994) INTER/MICRO-94, Chicago, IL.

**Exhibit 50 - 804**

# EXHIBIT 51

**WILLIAM VICARY, J.D., M.D.**
FORENSIC PSYCHIATRY
3575 CAHUENGA BOULEVARD WEST
SUITE 300
LOS ANGELES, CA 90068
(323) 876-9133

FAX (323) 876-4716
w.vicary@att.net

January 25, 2007

Dale Rubin
2275 Huntington Dr., Suite 902
San Marino, CA 91108

Re: Iouri Mikhel
Case No: 02-220-(B) DT

Mr. Rubin:

Pursuant to your request the above named defendant was reinterviewed at the MDC on January 18, 2007 for about two hours. In preparing this letter the following were reviewed:

(1) My Prior Letters and Entire File
(2) Psychiatric Report of Dr. Pitt
(3) Psychological report of Dr. Wetzel
(4) Meeting with Defense Counsel

The defendant was also scored on the HARE Psychopathy Checklist-Revised psychological test. This is a twenty item survey of an individual's psychopathic attitudes and antisocial behaviors. Scores at thirty or above are diagnostic of psychopathy and associated with an increased risk of future violent offenses.

The defendant's medical/psychiatric records from the West Valley Detention Center date from February of 2002 to April of 2006. In these records there are repeated notations indicating grandiosity, diminished sleep, pressured speech, racing thoughts, irritability, and agitation. There are repeated references to depressed mood including tearfulness and weight loss. The defendant was described as being guarded. He was noted to be experiencing auditory hallucinations. This data is highly consistent with a diagnosis of Bipolar Disorder.

DEFENDANT'S EXHIBIT
CASE NO. CR-02-220-DT
EXHIBIT NO. 3134

Virtually all the experts in this case have diagnosed the defendant as suffering from a mood disorder. There is no disagreement that he has suffered from symptoms of depression. His manic symptoms are documented in the records from his extended period of confinement and treatment at the West Valley Detention Center. Noworthy is the fact that the staff there had no connection with either the defense or prosecution in this case. The advantage that the staff enjoyed was daily interaction with the defendant and regular professional notations describing his behavior. This contrasts with experts like myself who have interviewed the defendant on a few or only one occasion.

His mental condition appears to recently have deteriorated at the MDC. He has not been offered any mood stabilizing or tranquilizing medication. He was prescribed Prozac which he apparently refused. He has stayed up for days at a time without sleep working on his legal case. He has been consumed with excessive detail. When he testified at his trial he apparently demonstrated some grandiosity. Due to lack of sleep his concentration and memory were impaired as each day went into the afternoon. He believes that he is the victim of an elaborate conspiracy involving the government, the judge, and his own attorneys. His paranoia and frustration led him to refuse to testify further after his attorney ended the direct examination. He subsequently refused to appear in court except for the verdicts. He has indicated that he will not appear during the penalty phase.

On current mental status examination he reported that he felt humiliated, isolated, and hopeless. He denied experiencing any psychiatric symptoms. His speech had a slightly pressured quality at times. There was often moisture in his eyes. He was most comfortable when discussing the conspiracy against him. He denied any suicidal ideas. He did indicate that he might be willing to take tranquilizing and mood stabilizing medications.

His score on the HARE Psychopathy Checklist-Revised test was sixteen. This placed him at the nineteenth percentile of all male prison inmates. His score on factor I for subjective psychopathic character traits was eleven, this placed him at the sixty-eighth percentile of inmates. His score on factor II for objective antisocial behaviors was four, this placed him at the fifth percentile of inmates.

The defendant's paranoia, depression, and agitation has compromised his ability to rationally cooperate with counsel. His self destructive actions such as refusing to stand for cross examination and removing himself from the trial are the product of his illogical thinking. Such actions were taken against the advice of counsel. His behavior antagonized the judge and potentially alienated the jurors.

His guarded demeanor and refusal to disclose his psychiatric symptoms have led the recent government mental health examiners to inferences and conclusions adverse to the defendant. This behavior has also led the mental health staff to underestimate the severity of his mental deterioration and the need for more aggressive medication management. Given the total data available in this case regarding his mental condition there is a question about whether the standard of care is being met with regard to his treatment.

It would be my recommendation that the MDC mental health staff offer the defendant the tranquilizing/mood stabilizing medication Seroquel and the sedating antidepressant Remeron which appeared to have been of therapeutic benefit to him at the West Valley Detention Center. Such medications would reduce his agitation and paranoia. They would improve his depression and sleep disturbance. Such treatment could restore his ability to rationally cooperate with his lawyers during his penalty phase of his trial.

Very Truly Yours,

William Vicary J.D., M.D.
Diplomate, American Board of
Psychiatry and Neurology
Diplomate, American Board of
Forensic Psychiatry

WV: L

01/25/2007 04:57 3238764716 WILLIAM VICARY MD PAGE 05

# THE HARE PSYCHOPATHY CHECKLIST - REVISED (PCL-R)

*Scoring Grid*

Rater: Wm. Vicary, MD Date: 1 / 24 / 07 Name: Iouri Mikhel

| Factor 1 | Factor 2 | Total Score | Item |
|---|---|---|---|
| 1 | | 1 | *1. Glibness/Superficial Charm* |
| 2 | | 2 | *2. Grandiose Sense of Self Worth* |
| | 2 | 2 | *3. Need for Stimulation/Proneness to Boredom* |
| 2 | | 2 | *4. Pathological Lying* |
| 2 | | 2 | *5. Conning/Manipulative* |
| 1 | | 1 | *6. Lack of Remorse or Guilt* |
| 1 | | 1 | *7. Shallow Affect* |
| 1 | | 1 | *8. Callous/Lack of Empathy* |
| | 0 | 0 | *9. Parasitic Lifestyle* |
| | 1 | 1 | *10. Poor Behavioral Controls* |
| | | 0 | *11. Promiscuous Sexual Behavior* |
| | 0 | 0 | *12. Early Behavioral Problems* |
| | 0 | 0 | *13. Lack of Realistic, Long-term Goals* |
| | 1 | 1 | *14. Impulsivity* |
| | 0 | 0 | *15. Irresponsibility* |
| 2 | | 2 | *16. Failure to Accept Responsibility for Own Actions* |
| | | 0 | *17. Many Short-term Marital Relationships* |
| | 0 | 0 | *18. Juvenile Delinquency* |
| | 0 | 0 | *19. Revocation of Conditional Release* |
| | | 0 | *20. Criminal Versatility* |
| 11 | 4 | 16 | Raw Sum |
| 0 | 0 | 0 | *Number of Missing Items* |
| 11 | 4 | 16 | *Adjusted Sum (from Tables 1, 2, and 3)* |
| Factor 1 | Factor 2 | Total Score | |
| 68% | 5% | 19% | |

# EXHIBIT 52



U.S. Department of Justice

*Federal Bureau of Prisons*
*Metropolitan Detention Center*

*535 N. Alameda Street*
*Los Angeles, California 90012-1500*

May 2, 2001

**MEMORANDUM FOR S. WANAMAKER, CAPTAIN**

**FROM : D. BELL, LIEUTENANT**

**SUBJECT: LOST TOOL - SECURITY SCREW DRIVER BIT**

On May 2, 2001 at approximately 2:30 PM, I was informed by SOS T. Freeman, Tool Room Officer, that a class "A" bit to a screw driver was not accounted for when Officer F. Howard returned his tools.

An extensive search of Officer Howard's tool cart and tool box was conducted with negative results.

Inmates assigned to Officer Howard's detail submitted to a visual search and questioned with negative results. All inmates assigned to this detail were placed in Administrative Detention in the Special Housing Unit pending the conclusion of the investigation.

Ares searches conducted by Officer Howard, Officer Zamudio, Officer Cortez and Officer Vo on Unit 6 South, Unit 5 North and 5 South, Unit 7 South and Unit 9 North also met with negative results.

The class "A" screw driver bit remains unaccounted for.

38122

# EXHIBIT 53

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**HONORABLE S. JAMES OTERO, JUDGE PRESIDING**

**UNITED STATES OF AMERICA,** )
)
)
)
**Plaintiff,** )
)
)
)
**Vs.** ) **No. CR 02-220 (B) SJO**
)
)
)
**PETRO KRYLOV,** )
)
)
)
**Defendant.** )
)
___________________________________ )

**REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS**

**LOS ANGELES, CALIFORNIA**

**MONDAY, MAY 21, 2007**

**LEANDRA AMBER, CSR 12070, RPR**
**OFFICIAL U.S. DISTRICT COURT REPORTER**
**312 NORTH SPRING STREET, # 442**
**LOS ANGELES, CALIFORNIA 90012**
**(213) 613-0179**

**A P P E A R A N C E S**

**IN BEHALF OF THE PLAINTIFF, UNITED STATES OF AMERICA:**

U.S. DEPARTMENT OF JUSTICE
U.S. ATTORNEY'S OFFICE
BY: SUSAN J. DeWITT, AUSA
MR. DUGDALE, AUSA
MS. MEYER, AUSA
312 NORTH SPRING STREET
12TH FLOOR
LOS ANGELES, CALIFORNIA 90012
(213) 894-4496
susan.dewitt@usdoj.gov
robert.dugdale@usdoj.gov
kim.meyer@usdoj.gov

**IN BEHALF OF THE DEFENDANT, PETRO KRYLOV:**

LAW OFFICES OF GEORGE W. BUEHLER
BY: GEORGE W. BUEHLER, ESQ.
350 SOUTH GRAND AVENUE
SUITE 3900
LOS ANGELES, CALIFORNIA 90071
(213) 625-1600
buehler@geragos.com

LAW OFFICES OF DAVID R. EVANS
BY: DAVID R. EVANS, ESQ.
600 SOUTH LAKE AVENUE
SUITE 506
PASADENA, CALIFORNIA 91106
(626) 432-5100
dre@drelaw.org

**ALSO APPEARING:**

ALEX LEVOFF, COURT-CERTIFIED RUSSIAN INTERPRETER
VARVARA OLSON, COURT-CERTIFIED RUSSIAN INTERPRETER
JAMES S. DAVIDSON, FBI SPECIAL AGENT
LOUIS PEREZ, FBI SPECIAL AGENT
SCARLET NERAD, MITIGATION SPECIALIST

3

**I N D E X**

| | PAGE |
|---|---|
| JURY INSTRUCTIONS READ BY THE COURT | 15 |
| GOVERNMENT'S CLOSING ARGUMENT BY MS. DeWITT | 63 |
| DEFENSE'S CLOSING ARGUMENT BY MR. BUEHLER | 118 |

UNITED STATES DISTRICT COURT
Exhibit 53 - 812

Factors Number 17 through 20 deal with Mikhel and Kadamovas's involvement in the Russian Mafia. The Government submits that these factors are, frankly, irrelevant and should be given no weight.

First of all, these factors have nothing to do with Krylov's character, and as such aren't true mitigators to begin with. And if anything, these factors weigh in favor of the death penalty. If you believe these factors, they show that this criminal group is really dangerous.

And the Government agrees with that conclusion. But keep in mind, ladies and gentlemen, this group included Petro Krylov. He was a willing participant in this dangerous group, and as such he, himself, was a dangerous person, a really dangerous person. Now the defense wants you to believe that this is a case involving, quote, unquote, the Russian Mafia because it makes Mikhel and Kadamovas seem more scary. It makes this duress defense somehow seem more believable.

Well, ladies and gentlemen, Mikhel and Kadamovas are plenty scary without having to believe they're part of the Russian Mafia. But more importantly, there is simply no evidence that they were a part of the Russian Mafia. Did they have accomplices in Russia? Absolutely. Several of them. Were they organize? Absolutely. Were they sophisticated? Absolutely. But there's not one piece of

evidence showing that they answered to or were connected to what they would call, the defense would call, the true, quote, unquote, Russian Mafia back in Moscow. Instead, what the evidence in this case shows is exactly the opposite. That Iouri Mikhel and Jurijus Kadamovas and this group answered to no one but themselves. Give these factors no weight.

Factors Number 21 through 23 again attempt to address the duress defense. And the only point I want to make here is not to repeat what I've said before, but to remember that you're going to have a lot of mitigation factors here that say exactly the same thing. Different variations in the language, but basically that's what these are about. Don't give them weight more than once, if you think that they even deserve any weight to begin with, because all they are is repetition of the same thing in slightly different forms.

Factor Number 24, Defendant Krylov is 29 years of age at the time of his arrest. Nick Kharabadze was 29, too, at the time that he was killed. He was old enough and bright enough to be starting a significant movie company. What does it matter how old Krylov was when he committed these crimes? I'm not even sure what the defense is trying to say here or why his age would be any excuse whatsoever for any justification that would weigh in favor of leniency. What's

# EXHIBIT 54

JOHN S. GORDON
United States Attorney
RONALD L. CHENG
Assistant United States Attorney
Acting Chief, Criminal Division
KAREN I. MEYER (California Bar Pending)
Assistant United States Attorney
Major Crimes Section
1500 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
(213) 894-8559
Attorneys for Applicant
UNITED STATES OF AMERICA

FILED
CLERK U.S. DISTRICT COURT
FEB 13 2002
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

LODGED
FEB 13 PM 4

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER AUTHORIZING THE INTERCEPTION OF WIRE COMMUNICATIONS | ) | CR MISC. NO. 02-0043 (UNDER SEAL) |
|---|---|---|

ORDER AUTHORIZING THE INTERCEPTION OF WIRE COMMUNICATIONS

Application has been made before the court by Karen I. Meyer, Assistant United States Attorney, Central District of California, United States Department of Justice, an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and an attorney for the government as defined in Rule 54 of the Federal Rules of Criminal Procedure, for orders pursuant to 18 U.S.C. § 2518 authorizing the interception of wire communications to and from:

1. The interception of wire and electronic communications, including facsimile transmissions,

taking place to and from Southwestern Bell (SBC)/Pacific Bell Telephone number (818) 789-8581, subscribed to Iouri G. Mikhel, [REDACTED], Encino, California, a hardline with voice and fax capabilities believed to have been used by Iouri G. Mikhel subsequent to George Safiev's kidnapping in an attempt to purchase photo equipment with George Safiev's American Express Card (hereinafter **Target Telephone #1**);

2. The interception of wire communications taking place to and from AT&T Wireless cellular telephone number (310) 993-6748, with Electronic Serial Number (ESN) 720B7E94, Account Number 29941937, subscribed to Iouri G. Mikhel, [REDACTED], Beverly Hills, California, and believed to be used by Iouri Mikhel to communicate with co-conspirators in the kidnapping of Alexander Umansky (hereinafter **Target Telephone #2**);

3. The interception of wire communications taking place to and from AT&T Wireless cellular telephone number (818) 404-1088, with Electronic Serial Number (ESN) 5EF0D974, Account Number 52005469, subscribed to Iouri Mikhel, [REDACTED], Encino, California, [REDACTED], believed to be used by Iouri Mikhel to communicate with co-conspirators in the kidnapping of Alexander Umansky (hereinafter **Target Telephone #3**); and

4. The interception of wire communications taking place to and from Cingular cellular prepaid telephone number (818) 268-9422, with International Mobile Electronic Identifier (IMEI)[1] 010037303718730, and used by the kidnapper(s) to make ransom demands (hereinafter **Target Telephone #4**).

The court has reviewed the application and finds as follows:

1. There is probable cause to believe that IOURI G. MIKHEL, NATALIA (LNU), RAUL OR RAPHAEL (LNU), PETRO KRYLOV, JURIJUS KADAMOVAS, ALEXANDR AFONIN, and other unknown individuals (herein referred to herein as "the Target Subjects"), have committed, are committing, and will continue to commit the following offenses: 18 U.S.C. § 1201 (kidnapping); 18 U.S.C. § 1202 (ransom money); 18 U.S.C. § 875(b) (making extortionate threats in interstate commerce); 18 U.S.C. § 371 (conspiracy to commit offense against United States); and 18 U.S.C. § 2 (aiding and abetting) (these offenses are collectively referred to below as the "Target Offenses").

2. There is probable cause to believe that **Target Telephone #1**, **Target Telephone #2**, **Target Telephone #3**, and **Target Telephone #4** have been, are being, and will continue to be, used by the Target Subjects in connection with the commission of the above-described offenses;

---

[1] According to Cingular Wireless, the IMEI is a number assigned to each activated telephone, and serves as an identifier of the telephone under global system mobile communications specifications. Thus, its function is similar to an electronic serial number, used by other wireless phone providers.

3. There is probable cause to believe that intercepted wire communications of the Target Subjects will concern, among other things, the following:

(1) the above-described offenses;

(2) the manner, scope, and extent that telephones and cell phones are utilized to facilitate the kidnapping and/or extortion schemes;

(3) the identity of the individuals involved in the kidnapping and/or extortion scheme, conspirators, aiders and abettors, and the roles of each participant in the scheme;

(4) the location of the victims;

(5) the condition of the victims;

(6) the transportation of the victims;

(7) the plans for the victims' release or death;

(8) the payment of ransom;

(9) the disposition of the ransomed monies; and

(10) the precise nature and scope of the illegal activity, including the relationships between the various individuals, who are believed to have connections to Russian Organized Crime. In addition, these communications are expected to constitute admissible evidence of the above-described offenses.

4. Normal investigative procedures have been tried and have failed, reasonably appear unlikely to succeed if tried, or are too dangerous to employ.

5. The applicant has offered specific and articulable facts showing that the FBI is presently conducting an investigation of the Target Subjects in connection with possible violations of 18

U.S.C. § 1201, 18 U.S.C. § 1202, 18 U.S.C. § 875(b), 18 U.S.C. § 371, and 18 U.S.C. § 2, and that the information likely to be obtained from the subscriber information will concern these offenses and will assist in the investigation of the Target Subjects. Additionally, the applicant has offered specific and articulable facts showing that the subscriber records sought pursuant to 18 U.S.C. § 2703 (c) and (d) are relevant and material to the on-going criminal investigation.

WHEREFORE, IT IS HEREBY ORDERED that:

1. Pursuant to 18 U.S.C. § 2518, the FBI and all other law enforcement agencies involved in the investigation are authorized to intercept wire and electronic communications over **Target Telephone #1**, and to intercept wire communications over **Target Telephone #2**, **Target Telephone #3**, and **Target Telephone #4** until all communications are intercepted which reveal fully the manner in which the Target Subjects are committing the above-described offenses; the full extent of the participation of the Target Subjects, the manner, scope, and extent that telephones and cell phones are utilized to facilitate the kidnapping and/or extortion schemes; the identity of the individuals involved in the kidnapping and/or extortion scheme, conspirators, aiders and abettors, and the roles of each participant in the scheme; the location of the victims; the condition of the victims; the transportation of the victims; the plans for the victims' release or death; the payment of ransom; the disposition of the ransomed monies; and the precise nature and scope of the illegal activity, including the relationships between the various individuals, who are believed to

have connections to Russian Organized Crime, or for a period not to exceed 30 days, whichever is earlier.

2. Pursuant to Section 2518(5), it is further requested that the 30-day period commence from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception under this court's order or ten days from the date of the court order, whichever comes first. Authorization is also given for background conversations intercepted in the vicinity of **Target Telephone #1, Target Telephone #2, Target Telephone #3,** and **Target Telephone #4** while they are in use. Pursuant to 18 U.S.C. § 2518(3), interception of communications is authorized while **Target Telephone #2, Target Telephone #3,** and **Target Telephone #4** are "roaming" outside the jurisdiction of the Central District of California.

3. It is requested further that the authorization apply to any changed telephone numbers subsequently assigned to the instruments bearing the same electronic serial numbers (ESN) or international mobile electronic identifiers (IMEI) as **Target Telephone #2, Target Telephone #3, and Target Telephone #4,** or to any changed ESN or IMEI subsequently assigned to the same telephone numbers as **Target Telephone #2, Target Telephone #3, and Target Telephone #4,** or on any changed telephone number for **Target Telephone #1** subsequently listed to the same subscriber and assigned to the same cable, pair and binding post utilized by **Target Telephone #1,** and include any background conversation intercepted while the instrument is off the hook or otherwise in use, within the 30-day period authorized by this order.

4. Pursuant to 18 U.S.C. § 2518(4), Southwestern Bell (SBC)/Pacific Bell Telephone Company, Ameritech, Verizon California Incorporated, AT&T Broadband, Allegiance Telecom, Mpower Communications, AT&T, U.S. Sprint, WorldCom, Cellco Partnership, DBA Verizon Wireless, AT&T Wireless Services, Cingular Wireless, Sprint Spectrum L.P., Nextel Communications and any other affected telephone companies and long-distance carriers who are electronic communications service providers as defined in 18 U.S.C. § 2510(15) ("service providers"), shall:

a. Furnish the FBI and all other law enforcement agencies involved in the investigation, with 24 hour-a-day information, facilities, and technical assistance necessary to accomplish the interception over **Target Telephone #1, Target Telephone #2, Target Telephone #3,** and **Target Telephone #4** with a minimum of interference to the services that the service providers are according to the persons whose communications are to be intercepted. Required information and technical assistance shall include multiple listings and services such as hunting for rotary numbers, call forwarding, speed dialing, call waiting, three-way calling, and all other services. The FBI shall compensate the service providers with reasonable expenses incurred in providing such facilities or technical assistance.

b. Disclose to the FBI and other law enforcement agencies involved in the investigation, all information in their files (except for the contents of communications), including subscriber names and addresses, toll information, drivers' licenses, and social security numbers, applications, account and

billing information, for telephones calling to and from **Target Telephone #1, Target Telephone #2, Target Telephone #3,** and **Target Telephone #4,** whether published or unpublished, upon oral or written demand of the FBI or other law enforcement agencies involved in the investigation.

5. The court's order shall be executed as soon as practicable after it is signed and all monitoring of wire communications shall be in accordance with the minimization requirements of 18 U.S.C. § 2518(5). However, even if a conversation is minimized, "spot" monitoring may be conducted to ascertain whether or not the conversation has become criminal in nature or is no longer privileged. In the event the interceptions are in code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

6. The interception of wire communications must terminate upon attainment of the authorized objectives, or at the end of 30 days measured from the date of this order.

7. To avoid prejudice to the government's criminal investigation, the service providers and their agents and employees shall not disclose or cause a disclosure of the court's order or the request for information, facilities, and assistance by the FBI, and all other law enforcement agencies involved in the investigation, or the existence of the investigation to any person other than those of their agents and employees who require the information to accomplish the requested services. In particular,

the service providers and their agents and employees shall not make such disclosure to lessees, telephone subscribers, or any interceptee or participant in the intercepted communications.

8. An Assistant United States Attorney familiar with the facts of the investigation shall provide the court with a report on or about the tenth day and the twentieth day from the date of the court order showing what progress has been made toward achievement of the objectives and the need for continued interception. If any of the reports should become due on a weekend or holiday, the report shall become due on the next business day.

9. The court's orders, the government's application and the accompanying affidavit and proposed orders, and all reports filed with the court in this matter shall be sealed until further order of this court, except that copies of the order, in full or redacted form, may be served by the FBI upon all other law enforcement agencies involved in the investigation and the service providers as necessary to implement the court's orders.

DATED: 2/13/02

TERRY J. HATTER
UNITED STATES DISTRICT JUDGE

Presented by:

Karen I. Meyer
KAREN I. MEYER
Assistant United States Attorney
Major Crimes Section

JOHN S. GORDON
United States Attorney
RONALD L. CHENG
Assistant United States Attorney
Acting Chief, Criminal Division
KAREN I. MEYER (California Bar Pending)
Assistant United States Attorney
Major Crimes Section
1500 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
(213) 894-8559
Attorneys for Applicant
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER AUTHORIZING THE INTERCEPTION OF WIRE COMMUNICATIONS

CR MISC. NO 02-00431

(UNDER SEAL)

APPLICATION FOR INTERCEPTION
OF WIRE COMMUNICATIONS

I, Karen I. Meyer, an attorney for the United States Department of Justice, state:

A. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an attorney authorized to prosecute or participate in the prosecution of offenses enumerated in 18 U.S.C. § 2516. I am also an attorney for the government as defined in Rule 54 of the Federal Rules of Criminal Procedure, and, therefore, pursuant to 18 U.S.C. § 2516(3), I may apply to a federal judge of competent jurisdiction for an order authorizing and approving the interception of wire and electronic communications and for an order authorizing the

disclosure of subscriber information.

B. Pursuant to 18 U.S.C. § 2516, an appropriate official of the Criminal Division, United States Department of Justice, having been specially designated by the Attorney General pursuant to Order Number 1950-95, has approved this application for an order authorizing the interception of wire communications. Attached to this application is a copy of Order Number 2407-2001, issued on February 13, 2002, specially designating the above official to approve applications for court orders authorizing interception of wire communications. (Exh. "A"). Also attached is a copy of that official's memorandum of authorization approving this application. (Exh. "B").

C. This application seeks authorization to intercept wire communications of IOURI G. MIKHEL, NATALIA (LNU), RAUL OR RAPHAEL (LNU), PETRO KRYLOV, JURIJUS KADAMOVAS, ALEXANDR AFONIN, and other unknown individuals (herein referred to as "the Target Subjects"), concerning offenses enumerated in 18 U.S.C. § 2516, that is, offenses involving violations of:

1. 18 U.S.C. § 1201 (kidnapping);

2. 18 U.S.C. § 1202 (ransom money);

3. 18 U.S.C. § 875(b) (making extortionate threats in interstate commerce);

4. 18 U.S.C. § 371 (conspiracy to commit offense against United States); and

5. 18 U.S.C. § 2 (aiding and abetting) (these offenses are collectively referred to below as the "Target Offenses").

D. This application requests that an order issue pursuant to

18 U.S.C. § 2518, authorizing the following:

1. The interception of wire and electronic communications, including facsimile transmissions, taking place to and from Southwestern Bell (SBC)/Pacific Bell Telephone number (818) 789-8581, subscribed to Iouri G. Mikhel, [REDACTED], Encino, California, a hardline with voice and fax capabilities believed to have been used by Iouri G. Mikhel subsequent to George Safiev's kidnapping in an attempt to purchase photo equipment with George Safiev's American Express Card (hereinafter **Target Telephone #1**);

2. The interception of wire communications taking place to and from AT&T Wireless cellular telephone number (310) 993-6748, with Electronic Serial Number (ESN) 720B7E94, Account Number 29941937, subscribed to Iouri G. Mikhel, [REDACTED], Beverly Hills, California, and believed to be used by Iouri Mikhel to communicate with co-conspirators in the kidnapping of Alexander Umansky (hereinafter **Target Telephone #2**);

3. The interception of wire communications taking place to and from AT&T Wireless cellular telephone number (818) 404-1088, with Electronic Serial Number (ESN) 5EF0D974, Account Number 52005469, subscribed to Iouri Mikhel, [REDACTED] Encino, California, [REDACTED], believed to be used by Iouri

Mikhel to communicate with co-conspirators in the kidnapping of Alexander Umansky (hereinafter **Target Telephone #3**); and

4. The interception of wire communications taking place to and from Cingular cellular prepaid telephone number (818) 268-9422, with International Mobile Electronic Identifier (IMEI)[1] 010037303718730, and used by the kidnapper(s) to make ransom demands (hereinafter **Target Telephone #4**).

Pursuant to 18 U.S.C. 2518(3), this request includes interception of communications while **Target Telephone #2**, **Target Telephone #3**, and **Target Telephone #4** are "roaming" outside the jurisdiction of the Central District of California.

E. Pursuant to Section 2518(5), it is further requested that the 30-day period commence from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception under this court's order or ten days from the date of the court order, whichever comes first.

F. I have discussed all of the circumstances of the above-listed offenses with Federal Bureau of Investigation (FBI) Special Agent (SA) James S. Davidson, an agent assigned to this investigation, and have examined the affidavit of SA Davidson in support of the application for authorization to intercept wire

---

[1] According to Cingular Wireless, the IMEI is a number assigned to each activated telephone, and serves as an identifier of the telephone under global system mobile communications specifications. Thus, its function is similar to an electronic serial number, used by other wireless phone providers.

communications. SA Davidson's affidavit is attached to this application and is incorporated herein. (Exh. "C"). Whereof, I state upon information and belief that:

1. There is probable cause to believe that the Target Subjects, and others unknown, have committed, are committing, and will continue to commit the above-described offenses.

2. There is probable cause to believe that **Target Telephone #1**, **Target Telephone #2**, **Target Telephone #3**, and **Target Telephone #4** are being, and will continue to be, used by the Target Subjects, and others unknown, in connection with the commission of the above-described offenses.

3. There is probable cause to believe that intercepted wire communications of the Target Subjects, and others unknown, will concern, among other things, the following:

a. 18 U.S.C. § 1201 (kidnapping);

b. 18 U.S.C. § 1202 (ransom money);

c. 18 U.S.C. § 875(b) (making extortionate threats in interstate commerce);

d. 18 U.S.C. § 371 (conspiracy to commit offense against United States); and

e. 18 U.S.C. § 2 (aiding and abetting).

In addition, these communications are expected to constitute admissible evidence of the above-described offenses.

G. The individuals authorizing and making this application know of no additional applications to a federal court for authorization to intercept wire, oral, or electronic communications involving the Target Subjects, the facilities, or places specified

in this application, except those set forth in paragraph 14 of Exh. C.

H. Normal investigative procedures have been tried and have failed, reasonably appear unlikely to succeed if tried, or are too dangerous to employ, as described in greater detail in the affidavit of SA Davidson.

I. I certify that FBI and other task force agencies are presently conducting an investigation of the Target Subjects, and others unknown, in connection with possible violations of 18 U.S.C. § 1201, 18 U.S.C. § 1202, 18 U.S.C. § 875(b), 18 U.S.C. § 371, and 18 U.S.C. § 2, and that, based upon the information contained in the affidavit of SA Davidson, specific and articulable facts exist showing that the subscriber records sought pursuant to 18 U.S.C. § 2703 and (d) are relevant and material to the ongoing criminal investigation.

J. On the basis of the allegations contained in this application and on the basis of the affidavit of SA Davidson, I request that this court issue an order that:

1. Pursuant to 18 U.S.C. § 2518, FBI and all other law enforcement agencies involved in the investigation are authorized to intercept wire and electronic communications over **Target Telephone #1**, and to intercept wire communications over **Target Telephone #2**, **Target Telephone #3**, and **Target Telephone #4** until all communications are intercepted which reveal fully the manner in which the Target Subjects, and others unknown, are committing the above-described offenses or for a period not to exceed 30 days, whichever is earlier.

2. Pursuant to Section 2518(5), it is further requested that the 30-day period commence from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception under this court's order or ten days from the date of the court order, whichever comes first. Authorization is also requested for background conversations intercepted in the vicinity of **Target Telephone #1, Target Telephone #2, Target Telephone #3,** and **Target Telephone #4** while they are in use.

3. It is requested further that the authorization apply to any changed telephone numbers subsequently assigned to the instruments bearing the same electronic serial numbers (ESN) or international mobile electronic identifiers (IMEI) as **Target Telephone #2, Target Telephone #3, and Target Telephone #4**, or to any changed ESN or IMEI subsequently assigned to the same telephone numbers as **Target Telephone #2, Target Telephone #3, and Target Telephone #4**, or on any changed telephone number for **Target Telephone #1** subsequently listed to the same subscriber and assigned to the same cable, pair and binding post utilized by **Target Telephone #1**, and include any background conversation intercepted while the instrument is off the hook or otherwise in use, within the 30-day period authorized by this order.

4. Pursuant to 18 U.S.C. § 2518(4), Southwestern Bell Telephone Company (SBC)/Pacific Bell Telephone Company, Ameritech, Verizon California Incorporated, AT&T Broadband, Allegiance Telecom, Mpower Communications, AT&T, U.S. Sprint, WorldCom, Cellco Partnership, DBA Verizon Wireless, AT&T Wireless Services, Cingular Wireless, Sprint Spectrum L.P., Nextel Communications and any other

affected telephone companies and long-distance carriers who are electronic communications service providers as defined in 18 U.S.C. § 2510(15) ("service providers"), shall:

(a) Furnish FBI and all other law enforcement agencies involved in the investigation, with 24 hour-a-day information, facilities, and technical assistance necessary to accomplish the interception over **Target Telephone #1, Target Telephone #2, Target Telephone #3,** and **Target Telephone #4** with a minimum of interference to the services that the service providers are according to the persons whose communications are to be intercepted. Required information and technical assistance shall include multiple listings and services such as hunting for rotary numbers, call forwarding, speed dialing, call waiting, three-way calling, and all other services. FBI shall compensate the service providers with reasonable expenses incurred in providing such facilities or technical assistance.

(b) Disclose to FBI and other law enforcement agencies involved in the investigation, all account information in their files (except for the contents of communications), including subscriber names and addresses, toll information, driver's licenses, social security numbers, applications and billing information, for telephones calling to and from **Target Telephone #1, Target Telephone #2, Target Telephone #3,** and **Target Telephone #4,** whether published or unpublished, upon oral or written demand of FBI or other law enforcement agencies involved in the investigation.

5. The court's order shall be executed as soon as

practicable after it is signed and all monitoring of wire communications shall be in accordance with the minimization requirements pursuant to 18 U.S.C. § 2518(5). (Before any interception over **Target Telephone #1, Target Telephone #2, Target Telephone #3,** and **Target Telephone #4** begins, a meeting will be held for all monitoring agents and the requirements of minimization will be discussed. A memorandum regarding minimization and a copy of the court's order, will be provided to all monitoring officers and posted at the listening site.. Before an officer begins to intercept communications, he or she will sign a form indicating that the agent has read the affidavit, the court's order, and the minimization memorandum, is familiar with the contents of the order, and will intercept communications in compliance with the court's order. If a monitoring agent determines that a conversation is not criminal in nature, is privileged, does not relate to the investigation, or does not involve the Target Subjects, or other co-conspirators identified through the interception process, the interception will be minimized. Wire interceptions will be suspended immediately when it is determined through voice identification or otherwise that none of the aforementioned interceptees nor any co-conspirators is a participant in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. Even if a conversation is minimized, "spot" monitoring will be conducted to ascertain whether or not the conversation has become criminal in nature or is no longer privileged. The monitoring location will be kept secure and access

will be available only to persons authorized to be involved with this investigation). In the event the interceptions are in code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

6. The interception of wire communications authorized by this court's order must terminate upon attainment of the authorized objectives, or, in any event, at the end of 30 days measured from the date of this order.

7. To avoid prejudice to this criminal investigation, the service providers and their agents and employees shall not disclose or cause a disclosure of the court's order or the request for information, facilities, and assistance by FBI and all other law enforcement agencies involved in the investigation, or the existence of the investigation to any person other than those of their agents and employees who require the information to accomplish the requested services. In particular, the service providers and their agents and employees shall not disclose to lessees, telephone subscribers, or any interceptee or participant in the intercepted communications.

8. An Assistant United States Attorney familiar with the facts of the investigation shall provide the court with a report on or about the tenth day and the twentieth day from the day interception commenced, showing what progress has been made toward achievement of the objectives and the need for continued interception. If any of the reports should become due on a weekend

or holiday, the report shall become due on the next business day.

9. The court's orders, this application and the accompanying affidavit and proposed order, and all reports filed with the court in this matter be sealed until further order of this court, except that copies of the order, in full or redacted form, may be served by FBI upon all other law enforcement agencies involved in the investigation and the service providers as necessary to implement the court's orders.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of February, 2002, at Los Angeles, California.

Respectfully submitted,

JOHN S. GORDON
United States Attorney

RONALD L. CHENG
Assistant United States Attorney
Acting Chief, Criminal Division

KAREN I. MEYER
Assistant United States Attorney
Major Crimes Section

Attorneys for Applicant
UNITED STATES OF AMERICA



Office of the Attorney General
Washington, D.C. 20530

ORDER NO. 2407-2001

SPECIAL DESIGNATIONS OF THE ASSISTANT, ACTING ASSISTANT, ANY DEPUTY ASSISTANT, AND ANY ACTING DEPUTY ASSISTANT ATTORNEY GENERAL OF THE CRIMINAL DIVISION TO AUTHORIZE APPLICATIONS FOR COURT ORDERS FOR INTERCEPTION OF WIRE OR ORAL COMMUNICATIONS UNDER CHAPTER 119, TITLE 18, UNITED STATES CODE

By virtue of the authority vested in me by 28 U.S.C. §§ 509 and 510, 5 U.S.C. § 301, and 18 U.S.C. § 2516(1), and in full recognition that 18 U.S.C. § 2516(1) empowers the Attorney General, Deputy Attorney General, and Associate Attorney General to authorize applications to a Federal judge of competent jurisdiction for orders authorizing the interception of wire and oral communications, and in order to preclude any contention that the designations by the prior Attorney General have lapsed, I hereby specially designate the Assistant Attorney General in charge of the Criminal Division, any Acting Assistant Attorney General in charge of the Criminal Division, any Deputy Assistant Attorney General of the Criminal Division, and any Acting Deputy Assistant Attorney General of the Criminal Division to exercise the power conferred by section 2516(1) of title 18, United States Code, to authorize applications to a Federal judge of competent jurisdiction for orders authorizing or approving the interception of wire or oral communications by the Federal Bureau of Investigation or a Federal

EXHIBIT A

agency having responsibility for the investigation of the offense(s) as to which such application is made, when such interception may provide evidence of any of the offenses specified in section 2516 of title 18, United States Code.

Order No. 1950-95 of February 13, 1995, is revoked effective at midnight of the day following the date of this order.

Date: March 8, 2001

JOHN ASHCROFT
Attorney General



**U.S. Department of Justice**

*Criminal Division*
*Office of Enforcement Operations*
*P.O. Box 7600*
*Ben Franklin Station*

*Washington, DC 20044-7600*

FEB 13 2002

**MEMORANDUM**

TO: Maureen H. Killion, Director
Office of Enforcement Operations
Criminal Division

FROM: Michael Chertoff
Assistant Attorney General
Criminal Division

SUBJECT: Authorization for Interception Order Application

This is with regard to your recommendation that I, an appropriately designated official of the Criminal Division, authorize an application to a federal judge of competent jurisdiction for an order under Title 18, United States Code, Section 2518, authorizing for a thirty (30) day period the interception of wire communications to and from the landline telephone bearing the number (818) 789-8581, subscribed to by Iouri G. Mikhel, and located at [REDACTED], Encino, California, and the interception of wire communications to and from the cellular telephones bearing the numbers (310) 993-6748, subscribed to by Iouri G. Mikhel, [REDACTED], Beverly Hills, California, and (818) 404-1088, subscribed to by Iouri Mikhel, [REDACTED], Encino, California, and (818) 268-9422, a prepaid cellular telephone with no subscriber information, in connection with an investigation into possible violations of Title 18, United States Code, Sections 2, 371, 875, 1201, and 1202, by Iouri G. Mikhel, Natalia LNU, Raul or Raphael LNU, Petro Krylov, Jurijus Kadamovas, Alexandr Afcnin, and others as yet unknown.

By virtue of the authority vested in the Attorney General of the United States by Section 2516 of Title 18, United States Code, the Attorney General has by Order Number 2407-2001, dated March 8, 2001, designated specific officials in the Criminal Division to authorize applications for court orders authorizing the interception of wire or oral communications. As a duly designated official in the Criminal Division, this power is

EXHIBIT B

exercisable by me. WHEREFORE, acting under this delegated power, I hereby authorize the above-described application to be made by any investigative or law enforcement officer of the United States as defined in Section 2510(7) of Title 18, United States Code.

The authorization given is intended to apply not only to the target telephone numbers listed above, but to any telephone numbers subsequently assigned to or used by the instruments bearing the same electronic serial numbers or international mobile equipment identifier number as the target cellular telephones within the thirty (30) day period, and to any changed telephone numbers subsequently assigned to the same cable, pair, and binding posts used by the target landline telephone, within the thirty (30) day period. The authorization is also intended to apply to background conversations intercepted in the vicinity of the target telephones while the telephones are off the hook or otherwise in use.

Michael Chertoff
Assistant Attorney General
Criminal Division

FEB 13 2002

Date

BRUCE C. SWARTZ
DEPUTY ASSISTANT ATTORNEY GENERAL

AFFIDAVIT IN SUPPORT OF APPLICATION FOR AUTHORIZATION TO INTERCEPT TARGET TELEPHONES

I.

INTRODUCTION

I, James S. Davidson, having been duly sworn, hereby state:

1. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code (U.S.C.), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, the offenses enumerated in Section 2516(1) of Title 18, United States Code.

2. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), and have been so employed for ten years. I am currently assigned to the violent crime squad in the Los Angeles Division. I am assigned to and responsible for conducting investigations of violations of Federal criminal statutes, including, but not limited to, Title 18, United States Code, § 875(b), Making Extortionate Threats in Interstate Commerce, Title 18, United States Code, § 1201, Kidnapping, and Title 18, United States Code, § 1202, Ransom Money.

3. My experience in the area of investigations related to kidnapping and extortion includes participating in approximately 15 investigations as a case agent or in a subsidiary role. During these investigations, I have debriefed numerous defendants, informants, and witnesses who had personal knowledge regarding kidnapping and/or extortion schemes. I have also participated in surveillance, the execution of search warrants and undercover operations.

EXHIBIT C

4. Based on my training and experience, I have become familiar with the methods of operation used by individuals involved in kidnapping and/or extortion schemes. I know that professional international kidnapping and/or extortion schemes depend on maintaining extensive contacts throughout the country and abroad. This is done to maintain contact with all of the individuals involved in the scheme. It is essential that professionally-organized operations maintain contact with one another and utilize expedient means of communication. To do this, continued access to wire communications is necessary.

II.

**PURPOSE OF AFFIDAVIT**

5. This affidavit is submitted in support of an application which seeks an order authorizing:

a. The interception of wire and electronic communications, including facsimile transmissions, taking place to and from Southwestern Bell (SBC)/Pacific Bell Telephone number (818) 789-8581, subscribed to Iouri G. Mikhel, [redacted] [redacted] Encino, California, a hardline with voice and fax capabilities believed to have been used by Iouri G. Mikhel subsequent to George Safiev's kidnapping in an attempt to purchase photo equipment with George Safiev's American Express Card (hereinafter **Target Telephone #1**);

b. The interception of wire communications taking

place to and from AT&T Wireless cellular telephone number (310) 993-6748, with Electronic Serial Number (ESN) 720B7E94, Account Number 29941937, subscribed to Iouri G. Mikhel, [redacted], Beverly Hills, California, and believed to be used by Iouri Mikhel to communicate with co-conspirators in the kidnapping of Alexander Umansky (hereinafter **Target Telephone #2**);

c. The interception of wire communications taking place to and from AT&T Wireless cellular telephone number (818) 404-1088, with Electronic Serial Number (ESN) 5EF0D974, Account Number 52005469, subscribed to Iouri Mikhel, [redacted], Encino, California [redacted] believed to be used by Iouri Mikhel to communicate with co-conspirators in the kidnapping of Alexander Umansky (hereinafter **Target Telephone #3**); and

d. The interception of wire communications taking place to and from Cingular cellular prepaid telephone number (818) 268-9422, with International Mobile Electronic Identifier (IMEI)[1] 010037303718730, and used by the kidnapper(s) to make ransom demands (hereinafter **Target Telephone #4**).

6. The requested order seeks the interception of wire communications between IOURI G. MIKHEL, NATALIA (LNU), RAUL or

---

[1] According to Cingular Wireless, the IMEI is a number assigned to each activated telephone, and serves as an identifier of the telephone under global system mobile communications specifications. Thus, its function is similar to an electronic serial number, used by other wireless phone providers.

RAPHAEL (LNU), PETRO KRYLOV, JURIJUS KADAMOVAS, ALEXANDR AFONIN, and others yet unknown (hereinafter referred to collectively as "Targets").

7. This affidavit further seeks authorization to intercept any conversations, not only over **Target Telephone #1, Target Telephone #2, Target Telephone #3, and Target Telephone #4**, but also over any changed telephone numbers or any other telephone numbers subsequently assigned to **Target Telephone #1, Target Telephone #2 Target Telephone #3, and Target Telephone #4**, and over any changed electronic serial numbers or international mobile electronic identifiers subsequently assigned to the same telephone numbers as **Target Telephone #1, Target Telephone #2 Target Telephone #3, and Target Telephone #4**. This affidavit further seeks authorization to record background conversations intercepted in the vicinity of **Target Telephone #1, Target Telephone #2, Target Telephone #3, and Target Telephone #4**, while the telephones are off the hook or otherwise in use. Pursuant to 18 U.S.C. 2518(3), this request includes interception of communications while **Target Telephone #2, Target Telephone #3, and Target Telephone #4** are "roaming" outside the jurisdiction of the Central District of California.

8. Based on the facts set forth in this affidavit, I believe that there is probable cause to believe that the Targets have committed, and continue to commit, federal offenses

enumerated in 18 U.S.C. § 2516, namely:

a. 18 U.S.C. § 1201 (kidnapping);

b. 18 U.S.C. § 1202 (ransom money);

c. 18 U.S.C. § 875(b) (making extortionate threats in interstate commerce);

d. 18 U.S.C. § 371 (conspiracy to commit offense against United States); and

e. 18 U.S.C. § 2 (aiding and abetting).

9. Further, I believe there is probable cause to believe that communications in furtherance of these offenses will be intercepted on **Target Telephone #1, Target Telephone #2, Target Telephone #3, and Target Telephone #4.**

III.

**BASIS FOR FACTS CONTAINED IN THIS AFFIDAVIT**

10. Because this affidavit is being submitted for the limited purpose of seeking authorization for the interception of wire communications, I have not set forth each and every fact learned during the course of this investigation. Facts not set forth herein are not being relied upon in reaching my conclusion that an order should be issued.

11. There is probable cause to believe that communications concerning these individuals and these offenses will be obtained through the interception of wire communications at the aforementioned locations, for which authority is herein sought.

In particular, these wire communications will concern:

a. The manner, scope, and extent to which telephones and cell phones are utilized to facilitate the kidnapping and/or extortion schemes;

b. The identity of the individuals involved in the kidnapping and/or extortion scheme, conspirators, aiders and abettors, and the roles of each participant in the scheme;

3. The location of the victims;

4. The condition of the victims;

e. The transportation of the victims;

f. The plans for the victims' release or death;

g. The payment of ransom;

h. The disposition of the ransomed monies; and

1. The precise nature and scope of the illegal activity, including the relationships between the various individuals, who are believed to have connections to Russian Organized Crime.

12. To date, normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or will be too dangerous. These investigative procedures are described below.

IV.

**PRINCIPAL SUBJECTS**

13. I have obtained information concerning the background

of the Targets from the following sources and criminal indices: California Department of Motor Vehicles (DMV); National Law Enforcement Telecommunications System (NLETS); California Law Enforcement Telecommunications System (CLETS); National Crime Information Center (NCIC); Immigration and Naturalization (INS) records, conversations with other agents and officers participating in this investigation, and my own participation in the investigation. To date, the identifying information that I have ascertained regarding the Targets is as follows:

a. IOURI GHERMAN MIKHEL was born on April 9, 1965, in St. Petersburg, Russia. He is a Russian citizen. He has a United States Social Security Account Number of [redacted]2873. His address is [redacted], Encino, California. This assertion is supported by Immigration and Naturalization Records, telephone and property records, and physical surveillance.

b. We have no information concerning NATALIA (LNU); and

c. We have no information concerning RAUL or RAPHAEL (LNU).

d. PETRO KRYLOV was born on August 10, 1972, in Ukraine. He is not a United States citizen. He has a United States Social Security Account Number of [redacted]1616. His address is [redacted] [redacted] [redacted] Los Angeles. This assertion is supported by Immigration and Naturalization records, telephone and property records.

e. JURIJUS KADAMOVAS was born on October 22, 1966, in Lithuania. He is a citizen of Lithuania. He has a United States Social Security Account Number of [redacted]8157. His address is [redacted] Encino, California. This assertion is supported by Immigration and Naturalization records, physical surveillance and California Department of Motor Vehicles (DMV) records.

f. ALEXANDR AFONIN is a Russian National. We have no further information.

V.

**PRIOR APPLICATIONS**

14. On February 11, 2002, the FBI ELSUR Section checked the FBI ELSUR (Electronic Surveillance) index, which revealed that no applications have been made to any court to intercept oral, electronic, or wire communications involving NATALIA (LNU), IOURI GHERMAN MIKHEL, RAUL or RAPHAEL (LNU), **Target Telephone #1, Target Telephone #2, Target Telephone #3, and Target Telephone #4** with the following exceptions:

a. On December 31, 2001, the Honorable Florence-Marie Cooper, United States District Judge for the Central District of California, signed an order authorizing the interception of wire communications over (1) AT&T Wireless Services cellular telephone number (818) 259-1740, with Electronic Serial Number (ESN) 5EDB092C, Account Number 51838142, subscribed to Ian Polack,

[REDACTED], Woodland Hills, California, (2) Nextel Communications cellular telephone number (818) 266-2281, with International Mobile Electronic Identifier (IMEI) 000800111308800, International Mobile Subscriber Identity (IMSI) 316010005122277, Account Number 0000023916-0, subscribed to the kidnap victim, Alex Umansky at Hard Wired, 12547 Sherman Way, Unit E, North Hollywood, California, and (3) AT&T Wireless Services cellular telephone number (818) 516-3198, with Electronic Serial Number (ESN) 5E2AA51C, Account Number 50799220, subscribed to Victor Polake, [REDACTED], Woodland Hills, California.

b. On January 31, 2002, the Honorable Victor B. Kenton, United States Magistrate Judge for the Central District of California, signed an order authorizing the installation of a federal pen register on **Target Telephone #4** for a period of sixty days.

c. On February 8, 2002, the Honorable Patrick J. Walsh, United States Magistrate Judge for the Central District of California, signed an order authorizing the installation of a federal pen register on **Target Telephones #1, #2,** and **#3** for a period of sixty days.

**VI.**

**RELIABILITY OF INFORMATION**

15. This affidavit is based on personal knowledge I have

gained from my participation in this investigation, conclusions I have reached based on my training and experience in the investigation of offenses involving kidnapping and/or extortion schemes, and information from the following sources:

a. Oral and written reports about this investigation and other investigations that I have received from federal agents, and agents and officers from other law enforcement agencies;

b. Physical surveillance conducted by federal and local law enforcement agents, the details of which have been reported to me either directly or indirectly; and

c. Telephone records.

16. Unless otherwise noted, when I assert that a statement was made, I received the information from a law enforcement officer who provided the information to me, either verbally or in a written report. The officer(s) providing me with the information may have received the information by way of personal knowledge or from another source. Likewise, information resulting from surveillance, except where otherwise indicated, does not necessarily set forth my observations, but rather has been provided directly or indirectly by FBI Agents or other law enforcement officers who conducted such surveillance. Likewise, any information pertaining to vehicles and/or registrations, personal data on individuals, and record checks have been obtained through California law enforcement database systems or

National Crime Information Center (NCIC) computers by members herein described.

VII.

**FACTS ESTABLISHING PROBABLE CAUSE**

**Background Re: Kidnapping of Alexander Umansky**

17. On December 13, 2001, at approximately 7:00 p.m., Alexander Umansky was last seen leaving his business, Hard Wired Auto Accessories (Hard Wired), 12547 Sherman Way, Unit E, North Hollywood, California, en route to meet a client to show him the electronic equipment Umansky had installed on his GMC Yukon Sport Utility Vehicle (SUV).

18. According to employees at Hard Wired, Umansky was previously unfamiliar with this client. The client spoke with Umansky at least once the day before he disappeared, during which Umansky wrote the name "Victor" on a piece of paper as a reminder, and at least twice during the day Umansky disappeared. The client requested to meet Umansky at an unknown location rather than at the Hard Wired business.

19. Umansky left the Hard Wired office at approximately 6:00 p.m in his GMC Yukon to show the vehicle to an unidentified client.

20. On December 14, 2001, at approximately 2:00 a.m. PST, Umansky's fiancee', Irina Prishedko, received a telephone call from Umansky. The caller identification feature on her cell

phone indicated that this call came from (818) 259-1740.

21. On December 14, 2001, at approximately 9:00 a.m., Umansky called Prishedko on her cell phone. During this call, Prishedko gave Umansky a cellular telephone number for Michael Umansky, (214) 673-1297. Telephone Activity Records indicate that this call came from (818) 259-1740.

22. On December 14, 2001, at approximately 10:00 a.m., Ruven Umansky, Umansky's father, unaware of his son's disappearance, went to Alex Umansky's Hard Wired business and noticed three identical facsimiles demanding that a ransom of $234,628.00 U.S. Dollars be sent to Standard Chartered Bank, New York, for further credit to the bank's branch in Dubai, United Arab Emirates.

23. On December 14, 2001, between approximately 9:15 a.m. PST and 4:30 p.m., Michael Umansky, who was in New York City on personal business, received five calls from Alex to his cell phone, (214) 673-1297. The calls concerned Michael Umansky's need to arrange for payment of the ransom. In the first call, Alex told Michael not to call the police or the FBI and that Michael will receive a facsimile at his home with instructions on where to send the money.

24. Telephone subscriber and activity records for (818) 259-1740 revealed the following:

a. (818) 259-1740 is an AT&T Wireless phone,

subscribed to Ian Polack, [REDACTED], Woodland Hills, California.

b. Investigation revealed that [REDACTED] Woodland Hills, California, is a non-existent address.

c. An investigation was conducted in an effort to identify Ian Polack at any Los Angeles county address, but none was located. The only other Ian Polack located in California lives near San Francisco and does not appear to be associated with this investigation.

d. The telephone was purchased on December 12, 2001, the day before Umansky disappeared.

e. On December 13, 2001, at 1:46 p.m. E.S.T., the first of 11 calls that day was made from (818) 259-1740 to victim Alexander Umansky's cellular phone, (818) 266-2281. Telephone records reveal that these 11 calls were made both before and after Umansky was last seen on December 13, 2001.

f. On December 14, 2001, a pen register/trap and trace was activated on (818) 259-1740.

g. An examination of call activity records and pen register/trap and trace records for (818) 259-1740 reveals that all identifiable calls made by (818) 259-1740 from December 12, 2001, to the present were made to the victim and by the victim to family members of the victim, including Michael Umansky, Irina Prishedko, and Umansky's parents. The telephone calls from the victim related to the payment of the ransom.

h. Based on the above information, I believe that (818) 259-1740 was purchased and was used for the sole purpose of negotiating the kidnapping and communicating with those persons involved in the kidnapping.

25. On December 17, 2001, the Umansky family wired a total of $89,598 in three separate wire transfers to Standard Chartered Bank in New York. On this same date the money was wired to the Standard Chartered Bank in Dubai. The last proof of life from Umansky occurred on this date, at approximately 8 p.m.

26. On December 27, 2001, the wire transfer of the remaining ransom amount, approximately $145,000.00, was wired to Standard Chartered Bank in New York, for further credit to the account in Dubai, United Arab Emirates. All of these wire transfers were placed in the business account of Al-Shaza Sanitary and Building Materials TRD., pursuant to the faxed instructions.

27. According to bank officials in Dubai, the account holder for the Al-Shaza Sanitary and Building Materials TRD business account is Andrei Agueev. Andrei Agueev, along with his wife, Irina Agueev, have a personal account at the bank as well.

28. According to bank officials in Dubai, out of a total of $234,628.00 wired to Agueev's business account, Agueev transferred $27,322 to his personal account and then withdrew it. All but $22,000 of the remaining wired funds Agueev transferred to his personal account, which was subsequently withdrawn by

Andrei Liapine, with Agueev's permission.

29. On January 29, 2002, SA Louis Perez interviewed Agueev. Agueev said that between December 1, 2001, and December 7, 2001, he was approached by his business associate, Alexandr Afonin, while in Dubai, UAE, and asked if he would use his bank account to receive $234,000.00, which was to be wired from a New York bank. Agueev agreed and provided Afonin his bank account information at Standard Chartered Bank in Sharjah, UAE. Afonin told Agueev that he was to provide the funds to Andrei Liapine, a mutual business associate of Agueev and Afonin. Agueev subsequently provided the funds to Liapine, except for one instance in which he provided funds directly to Afonin.

30. On January 29, 2001, I interviewed Liapine, who told me that in November 2001 he met with Afonin while Afonin was visiting Dubai, UAE, from Russia. Afonin owns a company called Tekniks, which is located in Barnaul, Russia. During this meeting, Afonin asked Liapine to receive money from Agueev and then wire it to an account in Riga, Latvia. On approximately January 8, 2002, in addition to the instructions to wire the money to Riga, Latvia, Afonin provided Liapine a copy of a document instructing that $32,000 be wired to an account in the name of Designed Water World, Inc., account no. [redacted]6613, at Bank of America in Studio City, California. Shortly thereafter, Afonin told Liapine to disregard these instructions and to instead send the money to the account in Riga, Latvia, that

Afonin had previously mentioned.

31. I reviewed bank documents received from Bank of America concerning account no. ██████6613. This account is in the name of Designed Water World, Inc., 13605 Ventura Boulevard, Sherman Oaks, California. There are two signatories for this account: Jurijus Kadamovas, (323) 469-0441, and Iouri G. Mikhel, (310) 993-6748. The account statement for the period from December 28, 2001, through January 29, 2002, reveals that on January 3, 2002, $6,280.00 was received from the account in Latvia to which Liapine had previously wired the proceeds, and that on January 15, 2002, $32,000.00 was received from the same account. Both Mikhel's and Jurijus' signatures appear on drafts written against this account.

**Background Re: Kidnapping of Rita Pekler**

32. I reviewed a Los Angeles Sheriff's Department (LASD) Missing Person's police report concerning Rita Pekler, which related the following:

a. On December 3, 2001, a male, who spoke only Russian, came to Rita Pekler's office and identified himself as Volodia to employee Nellie Faktorovich. Volodia told Faktorovich he wanted to speak to Pekler, and that she was the only one who could help him. Faktorovich scheduled an appointment for Volodia for December 4, 2001, at 2:00 p.m.

b. On December 4, 2001, about 10:30 a.m., Volodia called Pekler's office and cancelled his appointment for 2:00

p.m. Volodia left a message for Pekler to contact him at (818) 516-3198.

c. On December 5, 2001, at about 10:00 a.m., Volodia telephoned Pekler at her office concerning a location where the two could meet. This conversation was overheard by employee Greta Blyumkin. Blyumkin believes Volodia told Pekler he could not come to the office and would prefer to meet at the Jamba Juice store on Ventura Boulevard in Studio City, California. Pekler subsequently left for Studio City.

d. According to Pekler's husband, Roman Khayumov, he last spoke to Pekler when she telephoned him from her cell phone on December 5, 2001, at about 7:15 p.m. Pekler told Khayumov she was going to be home late and would explain everything when she returned home. On December 6, 2001, Khayumov notified police that Pekler had failed to come home the previous evening.

33. I reviewed the subscriber information on (818) 516-3198, the cellphone Volodia indicated as being his, and noted it was a pre-paid AT&T cell phone. The purchaser of the phone indicated his name as Victor Polake, [REDACTED], Woodland Hills, California. The telephone was purchased on October 17, 2001, and was used, with one exception, for the sole purpose of negotiating the kidnapping of Pekler.

**Background Re: Kidnapping of Nick Kharabadze and George Safiev**

34. On January 24, 2002, Nellie Facktorivich told Detective

Shawn Cohen, LASD, Major Crimes Bureau, that two associates of Pekler's, George Safiev and Nick Kharabadze, may be missing. Faktorovich put Detective Cohen in touch with Olga Preiss of Matador Media, Safiev=s production company. Preiss told Detective Cohen that no one had seen either Kharabadze or Safiev since Sunday evening, January 20, 2002. However, Preiss had received several phone calls from Kharabadze during the week, and Safiev's son's nanny had received several calls from Safiev. Preiss spoke with the nanny and told Detective Cohen that the content of both the calls with Safiev and the calls with Kharabadze were similar. During each of these calls, Kharabadze and Safiev said that they were in Las Vegas and that everything was fine. However, neither would provide contact information, which Preiss found highly unusual.

35. I read a report of a January 28, 2002 interview of Gary Paronyan conducted by SA Ingerd Sotelo. During this interview, Paronyan said that on January 24, 2002, he called Kharadbadze at Kharabadze's cellphone. Paronyan told Kharabadze that he knew something was wrong but Kharabadze insisted that nothing was wrong and that he would be there at Paronyan's house for a birthday party that evening at 8:00 p.m. After Paronyan got off the phone, he went to Matador Media and met with Olga Preiss, Matvey Shatz (Nick Kharabadze's stepfather), and George Petrishvili (a friend of Kharabadze who works at Bank of America) in order to discuss the situation. During this meeting, Preiss

received a call from Safiev on her cellphone. During the call, Petrishvili took the phone from Preiss and asked in Georgian if he had been kidnapped. Safiev replied, "Yes."

Paronyan recalled that on December 5, 2001, he was at the Aeroflot Terminal at LAX with Safiev and Kharabadze when Safiev received a telephone call from Pekler, who said she wanted to meet with him. When he mentioned this to Paronyan and Kharabadze, Kharabadze said that he received a similar call from Pekler earlier that day. Neither could meet with her as they were headed to Moscow.

36. On the evening of January 24, 2002, Matvey Schatz, Kharabadze's stepfather, reported both Kharabadze's and Safiev's disappearance to the Santa Monica Police Department. The matter was subsequently transferred to the Los Angeles Police Department (LAPD), who are now working with both the Los Angeles Sheriff's Department (LASD) and the FBI to investigate this matter.

37. SA Martha Sipos told me that on February 8, 2002, a federal search warrant was executed at George Safiev's residence. During the ensuing search, a business card with the name "Designed Water World, Inc." was found.

**Use of Target Telephone #1**

38. Detective Cohen told me that on January 24, 2002, (four days after Safiev's kidnapping) Olga Preiss at Matador Media was contacted by a representative of B&H Photo-Video, Inc. (B&H) in

New York, who wanted to confirm an $8,600 credit card purchase of video equipment on George Safiev's American Express credit card. In conjunction with this purchase, B&H had previously requested the purchaser to provide a copy of the credit card, which was faxed to B&H at (800) 947-2215. Because of the amount of the transaction, B&H thought it prudent to confirm the purchase directly with Safiev's office.

39. An analysis of subscriber and toll information for (800) 947-2215 (B&H) revealed that on January 24, 2002, at approximately 5:21 p.m. EST, (800) 947-2215 was dialed by **Target Telephone #1**, a hardline telephone subscribed to by Iouri Mikhel at [redacted], Encino, California.

40. An analysis of subscriber information for **Target Telephone #1**, (a line capable of both voice and facsimile transmissions), revealed a previous address for Iouri G. Mikhel of [redacted], Woodland Hills, California. (This address is a real address, and is one and two digits off from the fictitious Calvert Street addresses associated with the cellphones used in the Pekler and Umansky kidnappings.)

41. On February 8, 2002, an FBI surveillance team conducted a surveillance of Iouri Mikhel. During this surveillance, Mikhel was observed departing [redacted], Encino, California, in a 1992 BMW, California license plate number 3NTH917, registered to him at this address. At approximately 10:21 a.m.,

Mikhel was observed picking up Jurijus Kadamovas in front of an apartment building located at [redacted] [redacted], Encino, California. Surveillance agents identified both Mikhel and Kadamovas by their California driver's license photographs, which were obtained as a result of information received in conjunction with Bank of America account no. [redacted]6613 (the account to which some of the Umansky ransom money was wired from Latvia).

42. SA Louis Perez told me that in early February 2002, Irina Agueeva, Andrei Agueev's wife, provided him with 007-385-2320644 as a telephone number for Alexandr Afonin in Russia.

43. Toll and subscriber records for **Target Telephone #1** for the period October 1, 2001, through December 27, 2001, revealed the following:

a. **Target Telephone #1** makes a large number of overseas calls to which subscriber information cannot be obtained in a timely manner. However, based on my knowledge of the case, I believe that the following foreign telephone numbers are significant:

| Date Range | Tel. No. | City, Country |
|---|---|---|
| 10/08/01-12/12/01 | 371-7-015601 | Olaine, Latvia |
| 12/02/01-12/23/01 | 7-3852-383124 | Barnaul, Russia |

b. I believe that the Olaine, Latvia calls (8 calls) are significant because Andrei Liapine told me that he wired the proceeds from the Umansky kidnapping primarily to an account in

Riga, Latvia. Olaine is less than 20 miles from Riga.

c. I believe that the Barnaul, Russia calls (16 calls) are significant because, according to Andrei Liapine, Alexandr Afonin (the individual who gave Liapine instructions to wire money to the Bank of America account in the name of Designed Water World, Inc., for which Iouri Mikhel and Jurijus Kadamovas are signatories), owns and works at a company called Tekniks, which is based in Barnaul, Russia.

d. With few exceptions,[2] the normal daily pattern of **Target Telephone #1** from October 1, 2001, through December 27, 2001, is that it makes between one and ten overseas calls, an occasional state to state call, and an occasional local call. On December 5, 2001, the day Rita Pekler was abducted, between approximately 10:35 a.m. and 9:24 p.m., there were no overseas or domestic calls. However, during this same time period, **Target Telephone #2** (a cellphone which I believe is used primarily by Iouri Mikhel) called **Target Telephone #1** six times.

e. Similarly, between 6:09 a.m. PST on December 14, 2001, and 5:20 a.m. on December 16, 2001, (dates during which Umansky was making ransom calls), there is no other activity other then six (6) calls from **Target Telephone #2** to **Target Telephone #1**.

---

[2]On November 24, 2001, three calls were placed from **Target Telephone #2** to **Target Telephone #1** within a five-minute period.

f. **Target Telephone #1** called 007-385-2320644 (Afonin's number in Russia) on December 17, 2001, at 10:05 p.m. (After Kharabadze's last proof of life at 8 p.m.), December 20, 2001, and December 22, 2001.

44. Overseas calls are consistently made except during the periods of the kidnappings, as set forth in paragraphs 43(d) and (e). I believe this indicates that Mikhel was out of his residence during these time periods, and involved in the kidnappings of Pekler and Umansky.

I also believe that Mikhel is the primary user of **Target Telephone #1** and **Target Telephone #2.** To further establish this, I analyzed a surveillance report of Mikhel's activities on February 10, 2002, in conjunction with telephone activity records for **Target Telephone #1** for this date. This analysis revealed the following:

a. On February 10, 2002, Mikhel was at his residence until approximately 1:20 p.m. Pacific Standard Time (PST). Prior to Mikhel's departure, nine (9) outgoing calls were made from **Target Telephone #1**. Six (6) of these calls are to overseas telephone numbers.

b. Mikhel departed his residence at 1:20 p.m. PST, returned at 2:16 p.m. PST, left at 2:24 p.m., then returned again at 3:55 p.m. for the rest of the day. While he was out, two calls were placed to **Target Telephone #1** (located at his

residence) from (310) 993-6748, (**Target Telephone #2**, which is subscribed to and I believe used by Mikhel).

c. Three more calls were made after Mikhel returned to his residence at 3:55 p.m. Two calls were to Olaine, Latvia.

45. On February 7, 2002, I called a sample of the overseas telephone numbers that I obtained from the toll records for **Target Telephone #1**. I determined that some of these numbers received fax transmissions, and some received voice transmissions.

46. Based on my training and experience, I know that there is often substantial planning prior to the execution of a kidnapping, and that kidnappings often involve co-conspirators in foreign countries, the international transfer of funds, and the international conveyance of ransom demands. I also know that facsimile machines are among the communication devices used in kidnappings. Particularly in this instance, since there is an international connection (there is a partially identified co-conspirator in Baurnal, Russia; the initial ransom demand was sent by facsimile from Russia; ransom was sent to a bank in Dubai, UAE; then to Riga, Latvia; and then back to the United States) it is probable that numerous months of planning went into the preparation of the kidnappings, and that in these months communications were sent internationally by voice and facsimile in order to finalize these plans.

In addition, I noted that **Target Telephone #1** was used to send a copy of George Safiev's credit card in order to obtain $8,600 of computer equipment after he had been kidnapped, and that on February 10, 2002, there were two calls to Olaine, Latvia.

To date, none of the victims have been recovered. With respect to Safiev there is still an unsatisfied ransom demand of $4,000,000 outstanding. Therefore, I believe that Mikhel used **Target Telephone #1** and will continue to use it to further this criminal conspiracy.

**Use of Target Telephone #2**

47. SA Louis Perez told me that, according to Ruven Umansky (Umansky's father), Petro Krylov worked for Hard Wired as an Installer from approximately mid-1999 until February 2001, when he was fired. Although he was fired, Alex maintained a relationship with Krylov, who periodically stopped by Alex's office in order to purchase equipment at wholesale prices and to receive advice from Alex. According to Ruven, Alex once expressed to Ruven that he had concerns about Krylov stealing proprietary information such as client names and addresses, and that he had observed him going through some papers in Alex's office.

48. I have reviewed subscriber records for (323) 270-5115 and determined that it is subscribed to Petro Krylov.

49. SA Louis Perez told me that on February 8, 2002, he interviewed Elizabeth Umansky, Alex's mother, who said that on two consecutive days just prior to Alex's kidnapping on December 13, 2001, she observed Krylov in Alex's office at the shop with an unidentified male of Russian descent.

50. Telephone subscriber and activity records between October 1, 2001, and February 4, 2002, for **Target Telephone #2** revealed the following:

a. Between November 8, 2001, and December 1, 2001, **Target Telephone #2** is in contact with (323) 270-5115 (Petro Krylov's cellphone), 5 times.

b. Between December 15, 2001, and December 17, 2001, **Target Telephone #2** is in contact with (323) 270-5115, 9 times. (Alex Umansky was abducted on the evening of December 13, 2001, and placed calls to his family members until approximately 8 p.m. on the evening of December 17, 2001, the last proof of life from Umansky).

c. Thereafter, (323) 270-5115 is not in contact with **Target Telephone #2** until January 5, 2002.

d. **Target Telephone #2** is in contact with (323) 428-1630 and (818) 996-3147, numbers subscribed to Jurijus Kadamovas (one of the two signatories - Iouri Mikhel being the other - of the Bank of America account that was wired a portion of the Umansky ransom proceeds from Latvia), 150 times between October

7, 2001, and February 4, 2002.

51. Pen register data from its inception on February 9, 2002, through February 11, 2002, at approximately 11:15 a.m., revealed that **Target Telephone #2** continues to call Designed Water World, Inc. and Jurijus Kadamovas. On February 10, 2002, **Target Telephone #2** called Kadamovas' cellphone (323) 428-1630. The level of activity has not changed.

52. On January 16, 2002, a confidential informant of untested reliability told SA Perez that he/she knows the user of (818) 516-3198 (the phone used in the Pekler kidnapping) as Victor, that he/she met Victor through the brother of Oleg Spector, and that Oleg Spector uses cellphone number (818) 645-7555. This confidential informant was approached by Victor and asked to participate in an illegitimate business venture.

53. Telephone subscriber and activity records for (818) 645-7555 revealed that it is subscribed to Oleg Spector. (323) 270-5115 (Krylov's cellphone) called (818) 645-7555 on November 23, 2001, November 27, 2001, and November 28, 2001.

54. Based on my training and experience, I know that there is often substantial planning prior to the execution of a kidnapping, including becoming familiar and making contact with the victim. Based on my familiarity with this investigation, I believe that Alex Umansky did not know the user of (818) 259-1740, the telephone used by the kidnapper(s) to effect his

abduction. I therefore think it is likely that the user of (818) 259-1740 was also not familiar with Alex Umansky. Therefore, as part of the planning process, the abductors may have sought a person already familiar with Umansky; someone with an understanding of his personality, inclinations, and patterns. Petro Krylov was familiar with Umansky, and would have had an understanding of how best to lure Umansky to a location at which his abduction could be discreetly effected. I believe that this is substantiated by the cellphone contact between Mikhel and Krylov during the time period of Umansky's abduction.

Further, I believe that Krylov's contact with Oleg Spector, whom I believe is connected to "Victor," the user of the cellphones that lured both Umansky and Pekler to the locations at which they were abducted, further substantiates Krylov's involvement, and thus Mikhel's involvement and use of **Target Telephone #2** to further this conspiracy.

Finally, the frequency of calls between Mikhel (using **Target Telephone #2**) and Kadamovas, the co-signatory of the Bank of America account that received a portion of the Umansky ransom proceeds, also indicates Mikhel's use of **Target Telephone #2** to further this conspiracy.

**Use of Target Telephone #3**

55. On December 19, 2001, (818) 404-1088, **Target Telephone #3**, was activated in the name of Iouri Mikhel. Toll information

reveals that activity on this phone is significantly less than on **Target Telephone #2.** Between December 19, 2001, and February 4, 2002, **Target Telephone #3** makes 23 calls, including to telephone numbers associated with Jurijus Kadamovas, Designed Water World, Inc., and to Petro Krylov. **Target Telephone #3** called the number associated with Jurijus Kadamovas on February 2, 2002, the number associated with Designed Water World, Inc. on January 16, 2002, and placed two calls to the number associated with Petro Krylov, one on January 5, 2002, and the other on January 18, 2002. There has been no activity on **Target Telephone #3** since February 8, 2002. However, I know that sophisticated criminals often use several cellphones interchangeably in order to communicate with their co-conspirators. I believe that Mikhel is the user of **Target Telephone #3** and will continue to use **Target Telephone #3** because ransom negotiations for Safiev are still ongoing.

**Use of Target Telephone #4**

56. I read a summary of a January 29, 2002 interview with Paronyan conducted by SA Sally A. Brown and Detective David A. Jones, Long Beach Police Department. During this interview, Paronyan said that he was able to gain access to the voice mail feature of Kharabadze's cellular phone, which he did after Kharabadze disappeared. Paronyan said that he discovered twenty-six messages. The majority of the messages, which were left after Kharabadze's disappearance, were from his friends and

family inquiring about his whereabouts. However, there was one call on January 20, 2002 (the date Kharabadze disappeared), at approximately 11:15 a.m., that was from a female speaking in Russian who said, "This is Natalia from Moscow. I would like to meet with you. Call me at (818) 268-9422 [**(Target Telephone #4)**] and maybe we can have a late dinner."

57. SA Sipos told me that she interviewed Olga Preiss of Matador Media on February 9, 2002. According to Preiss, on January 17, 2002, a female (whose name she cannot accurately recall), called Matador Media three or four times and asked for "Nicky" (Kharabadze). Kharabadze spoke to this female two or three times and Preiss overheard Kharabadze tell her that he would try to get together with her over the weekend. This female left her telephone number. It did not appear to Preiss that Kharabadze was very interested in talking with her. Preiss believes that Kharabadze gave the female his cellphone number. Preiss recalled that Safiev teased Kharabadze about the phone calls.

58. Telephone Activity Records for **Target Telephone #4** revealed that it made three telephone calls to Matador Media on January 17, 2002.

59. Subsequent investigation revealed that **Target Telephone #4** is a prepaid Cingular Wireless telephone that was purchased at Affordable Portables, 14513 Ventura Boulevard, Sherman Oaks,

California.

60. Detective Jones told me that on January 31, 2002, he and SA Brown contacted Veronica Castellanos, a sales representative at Affordable Portables, and determined that **Target Telephone #4** had been activated there on January 12, 2002. A copy of the account receipt for activation was obtained from Castellanos. It indicated that a new SIM card had been purchased for a charge of $25.00 with a $25.00 installation fee and $50.00 worth of prepaid service for the account. The charges had been paid for in cash and the signature provided by the purchaser consisted of several "x's."

61. Detective Jones told me that on February 1, 2002, he contacted Corporate Security for Affordable Portables at 3065 Edinger Avenue, Tustin, California, and spoke with Security Manager Joe Moran. Moran provided a VHS videotape containing footage of the store interior taken by surveillance cameras at the Affordable Portable store located at 14513 Ventura Boulevard, Sherman Oaks. A review of the tape revealed a female with long dark hair making the purchase referred to above, as indicated by a comparison of the time stamp in the video and the time noted on the account receipt. A photograph of the female was made from the videotape.

62. Detective Jones told me that on February 3, 2002, he spoke with Alexander Gutenmakher, a close friend of Nick

Kharabadze. Gutenmakher said that Kharabadze was scheduled to meet with him on January 20, 2002, at 4:30 p.m., but Kharabadze had called him at home to cancel their meeting, explaining that he was en route to Las Vegas and would contact him in a few days. Gutenmakher recalled not being familiar with the number displayed on his caller identification feature prior to answering the call and was surprised that it was Kharabadze on the line.

Gutenmakher said that Kharabadze spoke to him in Russian, which he remarked was unusual as they normally conversed in English. Gutenmakher said that the call had been placed at approximately 3:00 p.m.

63. Telephone Activity Records for **Target Telephone #4** revealed that it placed a call to (323) 654-7869 (Gutenmakher's cellphone) on January 20, 2002, at 4:44 p.m., that lasted approximately one minute.

64. Detective Jones told me that on February 4, 2002, he and SA Brown returned to Affordable Portables, 14513 Ventura Boulevard, Sherman Oaks, and interviewed store manager Darren Trenier. Trenier was shown the photograph of the female subject that had been in the store on January 12, 2002, as well as the account activation receipt. Trenier recalled replacing the SIM card in the telephone with a new one that would allow the telephone to work in the United States. The SIM card that was removed was a German card intended for use only in Germany.

Trenier did not recall any further specifics regarding the female from the photograph.

65. Between January 23, 2002, and February 4, 2002, there were 89 transactions in Germany involving four ATM cards belonging to either George Safiev or Nick Kharabadze.

66. Telephone activity records for the period January 12, 2002 (the day of activation) through January 30, 2002, for **Telephone Number #4** and Kharabadze's cellphone, (818) 731-4324, reveal the following:

a. With the exception of three calls to Pacific Bell Customer Care, all calls (five) made by **Target Telephone #4** between January 12, 2002, and January 19, 2002, were to Matador Media.

b. On January 20, 2002, **Target Telephone #4** called Matador Media, (310) 264-6655, at 11:23 a.m., and Nick Kharabadze's cellular telephone, (818) 731-4324, at 11:51 p.m., at 12:21 p.m., at 12:24 p.m., 12:29 p.m., and at 12:56 p.m. (Kharabadze's cellular telephone was used to call **Target Telephone #4** at 2:52 p.m.) The call to Gutenmakher from Kharabadze (on **Target Telephone #4**) took place at 4:44 p.m.

c. All calls since January 20, 2002, placed by **Target Telephone #4**, have been placed through an AT&T pre-paid calling card account associated with access number (800) 648-9326 and Personal Identification Numbers (PIN) 5714261755, 7511011953,

7045221719, and 0731471175.

67. Telephone records pertaining to AT&T Calling Card PINs 5714261755, 7511011953, 7045221719, and 0731471175 reveal that these PINs were utilized in conjunction with **Target Telephone #4** 14 times between January 30, 2002, and February 2, 2002, to call Konstantinos Tezhik overseas at 377607935688.

68. Tezhik will not travel to the United States because he fears that this will place his life in jeopardy. Consequently, SA David Cloney interviewed Tezhik by telephone, who told him that he is a business associate of George Safiev, who works at Matador Media in the United Kingdom. On January 21 or 22, 2002, Tezhik was in the United Kingdom when he received a telephone call from Safiev. Safiev told him that he wanted Tezhik to make a money transfer for him, but that he did not yet have the specific details. Approximately four hours later, Safiev called Tezhik back. During this call, Safiev instructed Tezhik to transfer $969,000 from a Matador Media account in Singapore to Capital Solution, Ltd. Tezhik was under the impression at the time that this money was for business purposes and was unaware that Safiev had been kidnapped.

On January 22, 2002, Tezhik received a call from an individual who identified himself as either Raul or Raphael. Raul said "I'm calling on behalf of George" and that he (Raul) was here to fix the situation. Raul said that he was going to

fax a letter and that he would call back in ten hours. On January 31, 2002, at approximately 10:00 p.m. (Moscow time), Raul called Tezhik. Raul said that he was sending the letter. Raul told Tezhik to read the letter to understand what he (Tezhik) must do. The note said that whoever presented the original of the letter to Tezhik should receive $4,000,000. George Safiev's signature appeared to be on the letter.

Within seven minutes on the morning of Wednesday, February 2, 2002, Tezhik received approximately ten telephone calls with Safiev's voice on the line. Usually, Safiev would say, "Hello, are you alone?" Tezhik heard beeping in the background and each message appeared to be the same words that Safiev had used when he spoke to Tezhik on January 21, 2002. The calls repeatedly disconnected and Tezhik believes that Safiev's voice may have been previously recorded and replayed during each of the calls.

Raul subsequently called Tezhik on February 5, 2002, and asked him about the $4,000,000. Tezhik told Raul that he needed to hear Safiev's voice before he would agree to pay the ransom. He never did.

On February 7, 2002, Tezhik received additional calls from the kidnappers, although he cannot recall how many. These calls were similar to the calls he received on February 4, 2002, in which Safiev's voice seemed to have been pre-recorded. Again, these calls lasted only seconds and repeatedly disconnected.

69. Since Tezhik did not receive calls regarding Safiev

between January 23, 2002, and January 31, 2002, the calling card calls placed with **Target Telephone #4** (8 calls) were to other parties. I have thus far been unable to determine to which parties these calls were made. However, based on the fact that **Target Telephone #4** was prepaid and purchased in the name of a fictitious subscriber, and based upon the similarity in the pattern of calls among **Target Telephone #4**, the previous use of (818) 259-1740 (the phone used in the kidnapping of Umansky), and (818) 516-3198 (the phone used in the kidnapping of Pekler), I believe that **Target Telephone #4** calls only to numbers associated with the kidnapping. I, therefore, believe that **Target Telephone #4** was purchased and is being used for the sole purpose of negotiating the kidnapping of Safiev and Kharabadze. As of February 7, 2002, there was approximately $9.00 left of service, but additional time can be purchased at any time. Pen register information reveals that there were three outgoing calls on **Target Telephone #4** on February 11, 2002, using a combination of the PIN numbers identified in paragraph 66(c). As of the date of this affidavit, it has not yet been determined what numbers **Target Telephone #4** called.

70. There is still an outstanding ransom demand of $4,000,000 for Safiev that has not been satisfied. Based on our inability to monitor the incoming calls to Kostantinos Tezhik, due to his unwillingness to travel to the United States, I

believe it necessary to intercept **Target Telephone #4** in order to ascertain the contents of the ransom negotiations, the status of the victim, and the evidence necessary to prosecute the co-conspirators.

**Summary of Criminal Conspiracy and Connection Among Victims**

71. I compared the purchaser's information on the prepaid cellphone (818) 516-3198, (Volodia's cellphone), with that of the prepaid cellphone (818) 259-1740 (the Umansky kidnappers' cellphone). I noted that the name of the purchaser of (818) 259-1740 is Ian Polack at [redacted], Woodland Hills, California, and that the name of the purchaser of (818) 516-3198 is Victor Polake at [redacted], Woodland Hills, California. In addition, I noted the two addresses located on Calvert Street, differing only in one digit, do not exist.

72. Based on my training and experience, I know that individuals who commit kidnappings often times use pre-paid calling cards and/or cellular telephones because they do not require correct billing information. This allows the purchaser to be anonymous. I also know that it is not uncommon for the purchaser of a phone or other item to be used in the commission of a crime to use fictitious information (such as a fictitious address) that appears to be legitimate. A common way to make such information appear legitimate is to use a physical address that does not exist, but can exist if the postal numbering system

were set up differently. In order to achieve this appearance of legitimacy, one must be familiar with the postal numbering system in a specific geographical area. I believe that Iouri Mikhel was familiar with Calvert Street based on his prior subscription to a telephone located on this street, and chose the fictitious addresses for the Umansky and Pekler phones based on his knowledge of the postal numbering system for this street.

73. I noted that Iouri Mikhel, who is a signator on the Bank of America account that received ransom proceeds originating from the Umansky family, is the same Iouri Mikhel who resides at [REDACTED], Encino, California, (the location of **Target Telephone #1**), and the same Iouri Mikhel who once subscribed to a telephone located at [REDACTED], Woodland Hills, California, (a real address off by one digit from the fictitious addresses described in the previous paragraph), and the same Iouri Mikhel who subscribes to a telephone that faxed a copy of Safiev's American Express card after he was kidnapped.

74. I believe that due to both Pekler's and Umansky's disappearance being within eight days of each other, the similarities in the method of operation in the kidnappings, the pre-paid phones' purchaser information, Pekler's business links with Safiev and Kharabadze (her business relationship and the fact that she called Safiev and Kharabadze after her abduction on December 5, 2001, which I believe was an attempt to satisfy the

kidnappers' request for her to lure them for the purpose of their abduction), Iouri Mikhel's link to all four kidnappings, and Jurijus Kadamovas' and Mikhel's links to the account which received ransom proceeds, the kidnappings were perpetrated by either the same individual or individuals within the same Russian Organized Crime group.

**VIII.**

**NEED FOR ELECTRONIC INTERCEPTION**

75. I believe the interception of wire communication to and from **Target Telephones #1, #2, #3, and #4** will enable the government to fully achieve the objectives of this investigation, namely, to obtain direct evidence that will convince a jury beyond a reasonable doubt of the following:

a. The full scope, extent, methods of operation, and personnel of the kidnapping and/or extortion scheme in the areas of Southern California, Russia, Latvia, and other locations as yet unknown; and,

b. The dates, times, and places for planning and commission of the kidnapping and/or extortion scheme; and,

c. The location, receipt, administration, control, management, and disposition of the ransomed monies.

76. Based upon my training and experience and conversations with other experienced Special Agents of the FBI and other law

enforcement officers, I am aware that there are certain standard investigative techniques normally employed in kidnapping and extortion investigations. The techniques most commonly employed include: (1) the use of undercover agents and/or informants to infiltrate the criminal conspiracy; (2) the development of credible witnesses who can testify regarding the criminal offenses; (3) physical surveillance; (4) the analysis of telephone toll records and pen register information; (5) the execution of search warrants; (6) Grand Jury investigation; (7) scientific investigation, including the analysis of fingerprints, handwriting, firearms and ballistics; and (8) the analysis of computer indices containing criminal records and Department of Motor Vehicle information.

77. I believe the interception of wire communications to and from **Target Telephones #1, #2, #3, and #4** are necessary in this matter because normal investigative techniques have either (1) been attempted and failed to reveal the identities of the participants in the criminal enterprise and the full nature and extent of their criminal activities, or (2) have not been attempted because they would either fail to accomplish the objectives of the investigation, are too dangerous to employ, or would otherwise compromise the investigation.

78. Based on my training and experience, and upon the facts and circumstances presented in this affidavit, I believe that

**Target Telephones #1, #2, #3, and #4** will again be utilized by Safiev's captors to advise Safiev's associates of his release or to re-negotiate an additional ransom demand.

79. Based on my training and experience, and the circumstances presented in this affidavit, it is my opinion that **Target Telephones #1, #2, #3, and #4** are, and will continue to be used to communicate between and among the individuals involved in the kidnapping. The telephone conversations between and among these individuals, if monitored, will allow Special Agents to identify the individuals involved. Moreover, the evidence gained through monitoring the target telephone conversations will serve to further connect the kidnapping of Alexander Umansky, Rita Pekler, Nick Kharabadze, and George Safiev.

80. Based upon my training and experience, and based upon all the facts set forth herein, it is my belief that the interception of wire communications is the only available investigative technique with a reasonable likelihood of securing the evidence necessary to identify the perpetrators and the kidnapping and/or extortion plan, and is the only available technique that will allow for the prosecution of the individuals identified.

81. Although successful prosecution of the subjects is the ultimate goal of this investigation, the more immediate and pressing objective of this investigation is the safe recovery of

the victims. Based upon my training and experience, and upon my conversations with other experienced Special Agents of the FBI and law enforcement officers, I believe that the interception of wire communications in the manner requested herein is the only available technique by which the victims can be successfully located and safely recovered.

IX.

UNDERCOVER AGENTS

82. No attempts have been made to introduce undercover agents (UCAs) to the subjects of this investigation. This is due to the following: (1) the use of UCAs would be extremely difficult, given the close-knit group involved in Russian Organized Crime and the rapid pace of the investigation; (2) the use of UCAs would, at best, be successful in gathering evidence against only a few members of this criminal conspiracy; and (3) there are dangers to the UCAs and to the victims inherent in dealing with the members of this conspiracy, as evidenced by the kidnapper's threats mentioned above.

a. Based upon the above acts and information and through my experience investigating violent crimes, I believe that any UCA introduced to the subjects of this investigation would be put in an extremely dangerous situation. Based upon the past statements made by the subjects, I believe that a UCA could easily be harmed by these subjects if the UCA were compromised. This, in turn, would seriously jeopardize the safety of the

victims.

b. I believe that it would be extremely difficult to introduce a UCA to the subjects of this investigation. A kidnapping or abduction is a rapidly moving investigation. To properly ensure that a UCA will have success in penetrating any criminal organization, he or she must gain the confidence of the members of that organization. To do this requires that proper bona fides be developed supporting the past history of the UCA. Any person introduced to the subjects would be most likely be viewed with a great deal of suspicion, and the subjects would probably not be willing to discuss their criminal activities around the UCA. In view of the possibility that the subjects are aware of this investigation, any attempts to introduce a UCA to these subjects would most likely fail and could result in harm to the victims or retaliation against the UCA and/or anyone associated with the UCA.

X.

CONFIDENTIAL SOURCES

83. Based upon my training and experience, I am aware that the development of confidential informants (CIs) who are willing to testify and who are in a position to infiltrate the criminal organization in investigations of this sort is difficult. CIs usually refuse to testify against members of the conspiracy out of fear of retaliation against the CIs or their families. The FBI has not identified any sources that it currently believes can

infiltrate the organization and/or is willing to testify against members of this criminal conspiracy.

XI.

**INTERVIEWS**

84. Based upon my experience and the experience of other Special Agents of the FBI, it is believed interviews would not normally be successful regarding this type of criminal activity because the only persons knowledgeable about the content of the conversations or transactions are the parties who are the direct participants and who are also themselves the subjects. It is for this same reason that I believe a grand jury investigation would not be fruitful.

XII.

**PHYSICAL SURVEILLANCE**

85. On February 8, 2002, an FBI surveillance team conducted a surveillance of Iouri Mikhel. During this surveillance, Mikhel was observed departing [REDACTED], Encino, California, in a 1992 BMW, California license plate number 3NTH917, registered to him. At approximately 10:21 a.m., he was observed picking up Jurijus Kadamovas in front of an apartment building located at [REDACTED] [REDACTED] [REDACTED], California. On the morning of February 9, 2002, a surveillance was initiated on Jurijus Kadamovas. However, as of the date of this affidavit, neither Mikhel nor Kadamovas have lead investigators to the location of the victims or to the identification of other co-

conspirators, nor has the surveillance of these individuals been sufficient by itself to allow the government to gather the evidence necessary to establish the purpose or meaning of their activities.

86. Physical surveillance has been used and will continue to be used during the investigation. However, I believe surveillance will not enable the government to achieve fully its objectives in this investigation. Generally speaking, surveillance is an investigative technique that can be used to confirm suspected activities between alleged participants, but often leaves the investigators with insufficient evidence to prove the purpose of the meetings and activities. This investigation has yet to uncover the identity of every participant.

87. Over the course of this investigation, physical surveillance has been conducted in conjunction with information received via pen registers. While surveillance has thus far provided some valuable information that has helped advance the investigation, surveillance has been unsuccessful in revealing the identity of all the subjects or the means employed by the subjects, so as to meet the stated objectives of this investigation. When physical surveillance is combined with the intercept of wire communications, the purpose of surveilled actions can be revealed and may constitute admissible evidence if the actions related to an intercepted conversation of criminal

behavior.

88. Based on the aforementioned facts and on my training and experience, I do not believe that continued surveillance of the individuals and locations referenced above, absent a wire tap on **Target Telephones #1, #2, #3, and #4** will enable the government to achieve the objectives of this investigation.

**XIII.**

**TOLL RECORDS**

89. Although it has been possible to obtain the long distance toll records of **Target Telephones #1, #2, #3, and #4,** this has not achieved the goals of the investigation. **Target Telephone #4** was purchased eight days prior to Safiev's and Kharabadze's kidnappings and has made telephone calls to their place of business and/or to their associates for the suspected purpose of luring Kharabadze to enable his abduction. **Target Telephone #4** also makes calls to negotiate the ransom.

**Target Telephone #1** is used to make or send a large number of overseas telephone calls and/or facsimiles, in many cases to individuals in areas of the world believed related to the kidnapping. It is difficult, if not impossible, to identify the subscribers to these telephones, either at all, or in a sufficiently timely fashion to aid in making investigative decisions.

Regardless, toll records only provide circumstantial

evidence that the telephone was used and that contact was made between two telephones. In conjunction with physical surveillance, toll records (as they existed on February 10, 2002 for **Target Telephone #1**) can help identify those individuals actually making and receiving telephonic communications. However, even with the combination of these two investigative techniques (analyis of toll records and physical surveillance), these techniques cannot ascertain the nature of these communications. Moreover, toll records do not show local calls.

**XIV.**

**PEN REGISTERS**

90. Pen registers on **Target Telephones #1,#2, #3, and #4** are also being utilized. Although this device provides identifying information regarding calls made to and from the target telephone, like toll records, it does not identify those individuals actually making and receiving telephonic communications. It also does not provide information relating to the substance of those conversations. It is the content of these conversations about the criminal activity and the victims of the kidnapping that are necessary to the safe recovery of the victims and successful prosecution of the subjects.

**XV.**

**SEARCH WARRANTS**

91. Based on my experience and on the experience of other

Special Agents of the FBI, I believe that the execution of search warrants at this time would jeopardize the life of the victims because co-conspirators may then know that law enforcement is involved in the investigation, contrary to the express instruction of the subjects.

On January 16, 2002, search warrants were executed on several addresses associated with subscribers to telephones that communicated with the prepaid telephones used in the kidnapping of Umansky and Pekler. In retrospect, there was only one instance in which an address at which a warrant was executed was directly relevant to the investigation. In this instance, insufficient evidence was recovered or developed that could substantiate an indictment of any adult resident at this address or completely eliminate any adult resident from consideration as a suspect. However, it appears that the adult residents may have information which could be useful in the investigation, even though they are likely not directly involved with the co-conspirators. Because of the narrow exposure caused by the execution of these search warrants (only one address was pertinent and no one at this address is believed directly involved), it is not believed that the co-conspirators have learned of the involvement of law enforcement.

Warrants were also executed for the victims' recovered automobiles, which were recovered from the parking lot of Los

Angeles International Airport on December 26, 2001, from Glendale, California, on January 28, 2002, from Burbank, California. These warrants were able to be executed because it was determined that there was a low probability that law enforcement involvement would become known to the subjects. The FBI is awaiting results of forensic analysis such as DNA, latent fingerprint, and hair and fiber examinations.

On February 8, 2002, a search warrant was conducted on George Safiev's residence. Again, it was determined that there was a low probability that law enforcement involvement would become known to the subjects. During the ensuing search, a business card with the name "Designed Water World, Inc." was found, connecting Safiev to a suspected co-conspirator. Although this suggests that this victim (Safiev) may have had contact with his captors some time prior to his abduction, without evidence collected using other investigative methods such as telephone intercepts, this evidence will not alone be sufficient to achieve the government=s objectives.

**XVI.**

**DURATION OF INTERCEPTION**

92. I believe that the facts alleged herein establish that certain individuals are engaged in a violation of Title 18, United States Code, Section 1201, Kidnapping, Title 18, United States Code, Section 1202, Ransom Money, and Title 18, United

States Code, Section 875(b), Making Extortionate Threats in Interstate Commerce, and that the evidence sought will be intercepted on a continuing basis following the first receipt of the particular communications that are the object of this request. Therefore, it is requested that the court order that the interception need not terminate when the communications described herein are first intercepted but may continue until the victim is recovered and the full scope of this investigation is developed, including the identities of all participants, their places and methods of operation, the various activities in which they are engaged in furtherance of their criminal activity as it relates to the kidnapping previously described, or for a period of 30 days, whichever is earlier. Your affiant requests that the time set forth in the order run from the earlier of the day on which the investigative or law enforcement officer first begins to conduct the interception or ten days from the date of this order.

XVII.

SCOPE OF INTERCEPTION

93. It is further requested that the order authorize the interception of wire and electronic communications, including facsimile transmissions, to and from **Target Telephones #2, #3, and #4** and to and from any changed telephone number subsequently assigned to an instrument bearing the same ESN or IMEI with the

same subscriber information as **Target Telephones #2, #3, and #4**, or any changed ESN or IMEI assigned to the same telephone number with the same subscriber information as **Target Telephones #2, #3, and #4**, or on any changed telephone number for **Target Telephone #1** subsequently listed to the same subscriber and assigned to the same cable, pair and binding post utilized by the **Target Telephone #1**, including any background conversation intercepted while the instrument is off the hook or otherwise in use. Monitoring of **Target Telephone #1** will occur in the Central District of California.

**XIII.**

**MINIMIZATION**

94. All interceptions will be minimized in accordance with Title 18, United States Code, Section 2518(5). Interception will be suspended when it is determined through voice identification, physical surveillance, or otherwise that none of the individuals involved in the offenses, when identified, are participants in the conversation already overheard or that the conversation is not criminal in nature.

95. If one or more of the individuals involved in the offenses are identified as a participant in a conversation, monitoring will be suspended if the conversation is not criminal in nature or otherwise related to the offenses under investigation. However, minimized conversations will be spot-

monitored to determine if they have subsequently become criminal in nature.

96. Based on my conversations with other agents who are familiar with monitoring court-authorized wire interceptions, I know that during the interception of telephone conversations, the **Target Telephone** will sometimes be left off the hook, allowing for the monitoring of non-telephonic background conversations. Because these conversations may involve criminal activity, I request the authority to intercept any/all such conversations which might be transmitted over the intercepted telephone line in accordance with minimization standards set forth in the preceding paragraphs.

James S. Davidson
Special Agent
FBI, Los Angeles

Subscribed to and sworn to before me, this 13TH day of FEBRUARY, 2002.

TERRY J. HATTER
United States District Judge

# EXHIBIT 55

**DECLARATION OF KEVIN McNALLY REGARDING ANONYMOUS JURIES IN FEDERAL CAPITAL CASES**

1. I currently serve with the Federal Death Penalty Resource Counsel Project, assisting court-appointed and defender attorneys charged with the defense of capital cases in the federal courts. I have served as Resource Counsel since the inception of the Resource Counsel Project (RCP) in January, 1992. I was the Director of the Project between 2007 and 2018. The Project is funded and administered under the Criminal Justice Act by the Defender Services Office of the Administrative Office of the United States Courts.

2. My responsibilities as federal resource counsel include the monitoring of all federal capital prosecutions throughout the United States in order to assist in the delivery of adequate defense services to indigent capital defendants in such cases. This effort includes the collection of data on the initiation and prosecution of federal capital cases.[1]

[1]The work of the Federal Death Penalty Resource Counsel Project is described in a report prepared by the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998), at 28-30. http://www.uscourts.gov/sites/default/files/original_spencer_report.pdf. The Subcommittee report "urges the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project ..., which has become essential to the delivery of high quality, cost-effective representation in death penalty cases ...." *Id.* at 50.

3. In order to carry out the duties entrusted to me, I maintain a comprehensive list of federal death penalty prosecutions and information about these cases. I accomplish this by internet news searches, by reviewing dockets and by downloading and obtaining indictments, pleadings of substance, notices of intent to seek or not seek the death penalty, instructions and by telephonic or in-person interviews with defense counsel or consultation with chambers. This information is regularly updated and is checked for accuracy by consulting with defense counsel. The Project's information regarding federal capital prosecutions has been relied upon by the Administrative Office of the United States Courts, by the Federal Judicial Center and by various federal district courts.

4. There have been 240 federal capital trials commenced to date. Of these, affiant is aware of an anonymous jury being utilized in 27 (or 11%) trials.[2]

---

An update to the Report states: "Many judges and defense counsel spoke with appreciation and admiration about the work of Resource Counsel. Judges emphasized their assistance in recruiting and recommending counsel for appointments and their availability to consult on matters relating to the defense, including case budgeting. Defense counsel found their knowledge, national perspective, and case-specific assistance invaluable." http://www.uscourts.gov/services-forms/defender-services/publications/update-cost-and-quality-defense-representation-federal

[2] 1) *United States v. Anthony Jones* (D. MD No. 1:96-CR-00458-GLR); 2) *United States v. Mohamed Rashed Al'Owhali and Khalfan Khamis Mohamed* (S.D. NY No. 1:98-CR-01023-LAK); 3) *United States v. Gray, et al.* (D. DC No. 1:00-CR-00157-RCL); 4) *United States v. Alan Quinones and Diego Rodriguez* (S.D. NY No. 1:00-CR-00761-JSR); 5) *United States v. Martin Aguilar* (E.D. NY No.

5. In some cases jurors were referred to by number in public, ostensibly to protect individual jurors from media scrutiny. However, counsel were made aware of the jurors' name and address. These cases include *United States v. Timothy McVeigh and Terry Nichols* on change of venue to (D. CO No. 1:96-CR-00068-RPM); *United States v. Jason DelaTorree, et al.* (D. NM No. 1:95-CR-00538-MV)*; United States v. Dean Beckford, et al.* (E.D. VA No. 3:95-CR-00066-REP); *United States v. Chevy Kehoe and Daniel Louis Lee* (E.D. AR No. 4:97-CR-00243-KGB); *United States v. Gurmeet Singh Dhinsa* (E.D. NY No. 1:97-CR-00672-ERK); *United States v. Bobby*

---

1:01-CR-01367-RJD); 6) *United States v. Dustin Honken and* 7) *Angela Johnson* (N.D. IA No. 3:01-CR-03047-MWB) (separate trials); 8) *United States v. Andre Cooper and Jamain Williams* (E.D. PA No. 2:01-CR-00512-JCJ); 9) *United States v. Zacarias Moussaoui* (E.D. VA No. 1:01-CR-00455-LMB); 10) *United States v. Alfred Bourgeois* (S.D. TX No. 2:02-CR-00216); 11) *United States v. Jurijus Kadamovas and Iouri Mikhel and* 12) *Petro Krylov* (C.D. CA No. 2:02-CR-00220-SJO) (Krylov tried separately); 13) *United States v. Barry Byron Mills, Tyler Bingham,* 14) *Wayne Bridgewater, Michael Houston* (C.D. CA No. 2:02-CR-00938-RGK) (two trials); 15) *United States v. William Baskerville* (D. NJ No.3: 03-CR-00836-JAP); 16) *United States v. Kenneth McGriff* (E.D. NY No. 1:04-CR-00966-ERK); 17) & 18) *United States v. Ronell Wilson* (E.D. NY No. 1:04-CR-01016-NGG) (at trial and retrial); 19) *United States v. James McTier* (E.D. NY No. 1:05-CR-00401-ILG); 20) *United States v. Vincent Basciano* (E.D. NY No.1: 05-CR-00060-NGG); 21) *United States v. Dennis Cyrus* (N.D. CA No. 3:05-CR-00324-MMC); 22) *United States v. Kaboni Savage and Steven Northington* (E.D. PA No. 2:07-CR-00550-RBS); 23) *United States v. Maurice Phillips* (E.D. PA No. 2:07-CR-00549-JCJ); 24) *United States v. Alexis Candelario-Santana* (D. PR No. 3:09-CR-00427-JAF); 25) *United States v. Thomas Steven Sanders* (W.D. LA No. 1:10-CR-00351-DDD); 26) *United States v. Xavier Jiminez-Bencevi* (D. PR No. 3:12-CR-00221-JAF) and 27) *United States v. Dylann Storm Roof* (D. SC No. 2:15-CR-00472-RMG).

On September 30, 2014, an anonymous jury was denied in *United States v. Juan Briseno* (N.D. IN No. 2:11-CR-00077-PPS) (unpublished opinion).

*and Elijah Williams* (S.D. NY No. 1:00-CR-01008-NRB); *United States v. Brendt Christensen* (C.D. IL No. 2:17-CR-20037-CSB-EIL); *United States v. Brandon Council* (D. SC No. 4:17-CR-00866-CRI) and *United States v. Sayfullo Saipov* (S.D. NY No. 1:17-CR-00722-VSB).[3]

6. In *United States v. Darryl Alamont Johnson* (N.D. IL No. 1:96-CR-00379), the government suggested the use of anonymous jury and this request was quickly rebuffed by Judge Conlon during a pretrial conference. In *United States v. Cornelius Peoples* (W.D. MO No. 4:98-CR-00149-FJG), the district court denied the government's request for an anonymous jury in a prosecution involving the murder of a federal witness. In *United States v. Clarence Heatley and John Cuff* (S.D. NY No. 1:96-CR-00515-MBM), the government withdrew its request for an anonymous jury after the Court scheduled an evidentiary hearing to determine the support for the government's request.

I declare under the penalty of perjury under the laws of the United States of American, 28 U.S.C. §1746, that the foregoing is true and correct.

Executed this 26th day of January, 2023.

/s/ Kevin McNally

[3] In *Dhinsa*, Judge Korman allowed the lawyers access to the names and addresses of jurors but not Mr. Dhinsa, the defendant.

# EXHIBIT 56

281H-LA-229714-ELENA — 8
GHB:ghb
05-09-2004

1

The following investigation was conducted by SA Gary H. Bennett, Jr. of the Federal Bureau of Investigation (FBI), Los Angeles.

Elena Krivohatchenko signed a contract with the FBI on 3/31/2004. Present was SA Bennett and SA Paul Bonder, who provided Russian translation of the document (note: Krivohatchenko reads and speaks both Russian and English). In the contract, Krivohatchenko acknowledged her independence and was given a list of admonishments. The signed contact, which was approved by FBI Headquarters and signed by the ADIC, is attached.

AGREEMENT

Whereas the Federal Bureau of Investigation, hereinafter referred to as the FBI, is conducting a lawful investigation regarding activities on the part of individuals engaged in the violation of various United States criminal statutes.

Whereas Elena Krivohatchenko wife of Ainar Altmanis (who is in a position to and has a agreed to furnish assistance in the form of testimony on behalf of the FBI in its investigation and prosecution) has received financial aid and security from the FBI for her and her three children Maria Krivohatchenko, Alexandra Altmanis and Arthur Altmanis (also the children of Ainar Altmanis);

Now, therefore, the parties hereto agree as follows:

ACKNOWLEDGMENTS OF PARTIES
(initial each paragraph)

E.K. 1. Since February 2001, the FBI has provided Elena Krivohatchenko with a monthly stipend and rented an apartment for her family's residence. The FBI has also facilitated obtaining a new identity, social security number and legal residency for Elena Krivohatchenko through the U.S. Citizenship and Immigràtion Services. This assistance was provided to Elena Krivohatchenko due to her husband's cooperation in a federal prosecution and the threats to the safety of Krivohatchenko family.

E.K. 2. This Agreement confirms that Elena Krivohatchenko desires and understands that the FBI will no longer provide her with assistance and that she acknowledges the following:

E.K. a. Elena Krivohatchenko agreed, prior to accepting a stipend and safe haven by the FBI, that this assistance would cease once a new identity, social security number and legal status for her had been established.

E.K. b. Elena Krivohatchenko's name, and the names of her three children have been successfully changed. Elena Krivohatchenko and her three children have all received social security numbers under their new names.

E.K. c. Elena Krivohatchenko's has been advised by the FBI that, in the interest of personal safety, she should not reside in Los Angeles County even with her name change.

47842

E.K. d. Although Elena Krivohatchenko was advised that she should enter the U.S. Marshall's WitSec program, as did her husband, she refused.

E.K. e. The final amount of $12,700.00 cash is being provided to Elena Krivohatchenko with this Agreement. This amount is in addition to the $7,300 Elena Krivohatchenko received on or about February __, 2004 to rent a new apartment for six months. This amount is final payment and Elena Krivohatchenko will not request, nor will she receive, additional money from the FBI.

E.K. f. Elena Krivohatchenko acknowledges, that her new identity and social security number (and those of her children) cannot be used for fraudulent purposes or as a way of escaping any debts she may have incurred under her previous identities. She acknowledges that she successfully filed for bankruptcy on her previous debts under her prior identity.

E.K. g. Elena Krivohatchenko acknowledges that she may no longer use her previous identities.

E.K. 3. You and your beneficiaries, accept the within-stated offer of financial assistance as final and conclusive from the FBI and agree that said acceptance constitutes a complete release by you and your heirs, executors, administrators or assigns of any and all claims, demands, rights, and causes of action of whatsoever kind and nature, arising now or in the future from, and by reason of any and all known and unknown, foreseen and unforeseen, bodily and personal injuries (including wrongful death), damages to property, breaches of contract or law, and any other acts or omissions, and the consequences thereof resulting, and to result, from the same subject matter that gave rise to this agreement.

E.K. 4. Elena Krivohatchenko was not an employee, partner, member of a joint venture, an associate, or Agent of the FBI, nor will she identify herself or hold herself out to be such.

E.K. 5. Elena Krivohatchenko shall have no authority, actual or implied, to obligate and/or bind the FBI to any contractual duty and/or obligation.

CONFIDENTIALITY

E.K. 6. Elena Krivohatchenko will in no way reveal the confidentiality and sensitive nature of this investigation or disclose her previous identities or any FBI Agents to any unauthorized person or persons; and, further will not undertake any publication or dissemination of any information or material that result from this investigation without the prior express written authorization of the FBI.

By subscription of their signatures below, the parties herewith acknowledge that they have read, understand, and will abide by the foregoing statements.

Elena Krivohatchenko — Date 03/31/04
AKA Isabel Joanne Moore

WITNESSES: SA 3/31/04
03/31/04

Name: — Date
CONTRACTING OFFICER FOR THE FEDERAL BUREAU OF INVESTIGATION

RICHARD T. GARCIA — Date
ASSISTANT DIRECTOR IN CHARGE
LOS ANGELES, FBI

CONFIDENTIALITY

_____6. Elena Krivohatchenko will in no way reveal the confidentiality and sensitive nature of this investigation or disclose her previous identities or any FBI Agents to any unauthorized person or persons; and, further will not undertake any publication or dissemination of any information or material that result from this investigation without the prior express written authorization of the FBI.

By subscription of their signatures below, the parties herewith acknowledge that they have read, understand, and will abide by the foregoing statements.

Elena Krivohatchenko
AKA Isabel Joanne Moore

Date

WITNESSES:

Name:
CONTRACTING OFFICER FOR THE FEDERAL BUREAU OF INVESTIGATION

3-31-04
Date

RICHARD T. GARCIA
ASSISTANT DIRECTOR IN CHARGE
LOS ANGELES, FBI

5/2/2004
Date

# EXHIBIT

# 57

**DECLARATION OF JOHN R. WEEKS, Ph.D.**

**In the Case of:**

**UNITED STATES OF AMERICA v. IOURI MIKHEL AND JURIJUS KADAMOVAS**

**Case No. 02-CR-00220-SJO**

I, John R. Weeks, Ph.D., declare as follows:

1. I am Distinguished Professor Emeritus of Geography and Director of the International Population Center at San Diego State University.

2. My qualifications are detailed in the accompanying Curriculum Vitae (Appendix A to this declaration). In brief, I received my A.B. in Sociology from the University of California, Berkeley, in 1966; my M.A. in Demography from the University of California, Berkeley, in 1969; and my Ph.D. in Demography from the University of California, Berkeley, in 1972. I taught at Michigan State University for three years (1971-1974) prior to accepting an appointment at San Diego State University, where I have been since 1974, initially in the Department of Sociology. I was granted tenure, promoted to Associate Professor, and elected Chair of the Department of Sociology in 1978; and was promoted to Full Professor in 1981. I served as Chair until 1985, when I was appointed Director of the International Population Center (a position I still hold). In 1992, I requested and was granted a move to the Department of Geography, where I am now Distinguished Professor Emeritus of Geography. I am also a Senior Fellow of the California Council on Science and Technology, and a Research Associate of the Broom Center for Demography at the University of California, Santa Barbara. In 2011, I was awarded the Albert W. Johnson Research Award and Distinguished Professorship by San Diego State University.

Initials

3. I have taught undergraduate and graduate-level courses in demography and statistics since 1971, and I have published more than 200 professional articles, chapters, and books in the field of population studies. In addition, I have presented papers at professional meetings and published reports of professional research. My textbook *Population: An Introduction to Concepts and Issues* is now in its thirteenth edition and is the best-selling text in the field of population studies. Over the past 25 years, I have received several million dollars in research grants from the National Institutes of Health, the National Aeronautics and Space Administration, the National Science Foundation, and the Andrew Mellon Foundation to fund research focused on incorporating remotely sensed images and geographic information system technology into statistically oriented demographic research. Much of this work is summarized in my book, *Spatial Inequalities: Health, Poverty, and Place in Accra, Ghana* (Dordrecht: Springer Publishing Company, 2013). I have also authored papers more closely related to criminal justice issues, such as "Does Night-Time Lighting Deter Crime? An Analysis of Remotely-Sensed Imagery and Crime Data," in Victor Mesev (ed.), *Remotely-Sensed Cities* (London: Taylor & Francis, 2003), and "Remote Sensing and Spatial Statistics as Tools in Crime Analysis," in Fahui Wang (ed.), *Geographic Information Systems and Crime Analysis* (Hershey, PA: Idea Group Publishers, 2005). Another of my relevant publications is "Jury Representativeness: Challenging the Array," Chapter 7 in Walter F. Abbott and John Batt (eds.), *Handbook of Jury Research*, Revision 5 (Philadelphia, PA: American Law Institute - American Bar Association, 1999). My most recent publication is John R. Weeks, "The Future is a Foreign Country: We'll Do Things Differently There," Chapter 7 in Alex Aleinikoff and Alexandra Delano (editors), *New Narratives on the Peopling of America* (Baltimore: Johns Hopkins University Press, 2024).

Initials

4. I have been involved in work regarding the demographic composition of juries and other population-based/statistical legal issues since 1980, and I have served as a consultant and/or expert witness in nearly 250 legal cases (criminal and civil) as of this date (a complete list is provided in my CV in Appendix A), not including post-sentencing habeas cases such as this (a separate list of which is available upon request). The vast majority of criminal cases have been capital punishment cases and most of them have involved challenges to the composition of petit and/or grand juries. Although I have usually been designated as an expert by the defense, I have typically worked closely with jury management personnel in each case, and I have been gratified over the years to see that many of my recommendations for change in jury management procedures have been implemented by the respective courts in order to improve jury representativeness. That process first began in Los Angeles County Superior Court in 1987 in People v. Ramirez (the so-called "Nightstalker Case."), and it has continued since then in both state and federal courts. I have served as an expert witness on the demographics of federal juries in several United States District Courts, including the Central, Eastern, Northern, and Southern Districts of California; the Eastern District of Washington; the District of New Mexico; the District of Vermont; and the Western District of Pennsylvania. All of the cases (both criminal and civil) in which I have been involved required the utilization of my expertise in sampling and statistical/demographic analysis. In civil cases, I have been designated as a witness for both plaintiffs and defendants, depending upon individual needs for demographic and/or statistical expertise.

**QUESTIONS PRESENTED, METHODOLOGY, AND CONCLUSIONS**

5. I have been asked by habeas counsel for Mr. Mikhel and Mr. Kadamovas to evaluate the representativeness of the jury pool assembled for Mr. Mikhel and Mr. Kadamovas'

Initials

trial in 2006 at the Los Angeles Courthouse of the Western Division of the Central District of California, which includes the counties of Los Angeles, Ventura, Santa Barbara, and San Luis Obispo.

6. I incorporate calculations into my analysis that address not just the size of disparities with respect to cognizable groups, but also the level of statistical significance of those disparities, as expressed by what is often called "standard deviation analysis." I have been employing this approach to my analyses of jury representativeness for many years, and in my overview of these methods more than two decades ago, I indicated that "[T]he fact that a disparity is statistically significant does not, in and of itself, command judicial attention. However, a large relative disparity that is statistically significant should command judicial notice, regardless of the size of the absolute disparity." [1]

7. I was also asked to determine whether the jury selection system in the Western Division of the Central District of California was operating in a random fashion as required by the Jury Selection and Services Act (JSSA) and whether there was compliance with the requirement of section 1863(b)(3) of the Act that the system:

> "shall ensure that names of persons residing in each of the counties, parishes, or similar political subdivisions within the judicial district or division are placed in a master jury wheel; and shall ensure that each county, parish, or similar political subdivision within the district or division is substantially proportionally represented in the master jury wheel for that judicial district, division, or combination of divisions. For the purposes of

[1] John R. Weeks, 1999, "Jury Representativeness," Chapter 7 in Walter F. Abbott and John Batt, editors, A Handbook of Jury Research, Philadelphia: American Law Institute-American Bar Association: page 7-23; emphasis added.

Initials

determining proportional representation in the master jury wheel, either the number of actual voters at the last general election in each county, parish, or similar political subdivision, or the number of registered voters if registration of voters is uniformly required throughout the district or division, may be used."

8. In this declaration I compare the demographics of the population in the Western Division of the Central District of California with data from 287 prospective jurors who were summoned to the court for this trial. Data have been provided to me by habeas counsel.

9. My analysis in the following paragraphs reveals a large and statistically significant underrepresentation of Hispanics in the jury pool, along with a large and statistically significant overrepresentation of non-Hispanic Blacks relative to the Division's population. I conclude that these very large disparities are likely caused by systematic problems in the way the court operated to draw jurors to the courthouse.

**JURY DEMOGRAPHICS**

10. I have reviewed the demographic data currently available about each member of the 287-person jury pool. The information provided to me includes the race, gender, and city (but not zip code) of those who were summoned to appear as petit jurors and responded to the Juror Qualification Questionnaire.

11. Data on race were self-reported for 275 of the 287 prospective jurors. There were 123 persons who indicated they were non-Hispanic White (44.7%), 53 who were non-Hispanic Black (19.3%), 52 who were Hispanic (18.9%), 30 who were non-Hispanic Asian (10.9%), and 17 who were non-Hispanic "other" race (6.2%). Data on gender were available for 272 of the 287 persons, and 130 (47.8%) reported that they were female.

Initials

**JURY DEMOGRAPHICS COMPARED TO COMMUNITY DEMOGRAPHICS**

12. Table 1 compares the jury pool demographics with the population aged 18 and older in the Western Division of the Central District in 2006, using data that I interpolated between the 2000 and 2010 decennial censuses of population. If the jury pool is representative, its distribution by race-ethnicity and gender should be very similar to the demographics of the Western Division. However, Table 1 shows this is not the case. In particular, it can be seen that there are large absolute and relative disparities with respect to Hispanics and non-Hispanic Blacks. Hispanics are 53% underrepresented, non-Hispanic Blacks are 145% overrepresented and the residual race-ethnic category is 152% overrepresented, although its absolute disparity is fairly small.

13. A variety of approaches have been advanced over the years to help the court decide whether or not a significant underrepresentation of a cognizable group exists in a particular district. A review of case law related to these issues, as well as new literature that has emerged since my own summary of methods to be used in these kinds of cases was published[2], suggests that courts have become increasingly open to a variety of methodological approaches. For example, the United States Supreme Court declined in Berghuis v. Smith (2010)[3] to impose a particular method or measure to address representativeness claims in that ruling, and expressly observed that "neither *Duren* nor any other decision of this Court specifies the method or test courts must use to measure the representation of distinctive groups in jury pools."[4]

[2] Weeks, 1999, ibid.
[3] 559 U.S. 314 (2010).
[4] *Id.* at 329.

Initials

**Table 1. Comparison of Jury Pool Demographics with Western Division Demographics Based on 2006 Interpolation of the 2000 and 2010 Decennial Censuses for People Aged 18 or Older**

| | Non-Hispanic White | Hispanic | Non-Hispanic Black | Non-Hispanic Asian | All Others | Female |
|---|---|---|---|---|---|---|
| Jurors in Pool in 2006 | 275 | 275 | 275 | 275 | 275 | 272 |
| Jurors of this Group | 123 | 52 | 53 | 30 | 17 | 130 |
| Percent of Group in the Jury Pool | 44.7% | 18.9% | 19.3% | 10.9% | 6.2% | 47.8% |
| Percent of 18+ population in the Western District of the Central Division of California of this Group in 2006 (*source=interpolation between 2000 and 2010 decennial censuses*) | 36.5% | 40.1% | 7.9% | 13.1% | 2.5% | 50.9% |
| Absolute Disparity | 8.2 | -21.2 | 11.4 | -2.2 | 3.7 | -3.1 |
| Relative Disparity | 23% | -53% | 145% | -16% | 152% | -6% |
| Z-score Associated with Disparity | 2.83 | -7.16 | 7.02 | -1.06 | 4.00 | -1.02 |
| Probability of the Disparity Occurring by Chance | 0.002 | 0.000 | 0.000 | 0.144 | 0.000 | 0.154 |
| Statistically Significant? | YES | YES | YES | NO | YES | NO |

14. I am aware that there continues to be scholarly discussion of the appropriate approach to representativeness calculations and analyses.[5] I have taken into account all relevant current and historical information of which I am aware in providing the analysis in this declaration.

15. Disparity is typically measured by absolute disparity, relative (or comparative) disparity, and by the statistical significance of the disparity (sometimes called the "standard

[5] See e.g., Joseph L. Gastwirth and Qing Pan, 2011, "Statistical measures and methods for assessing the representativeness of juries: a reanalysis of the data in *Berghuis v. Smith*," 10 Law, *Probability and Risk*: 17–57.

Initials

deviation test")[6]. These methods have the advantage of being readily interpretable, although each is in turn more complex to calculate than the preceding one. Other methods of measuring disparity have also been advanced over time, including "disparity of risk"[7], "absolute impact"[8], and temporal trends,[9] but they are not widely used and I am not employing them in this analysis. Let me discuss the main approaches aimed at improving our understanding of the extent of disparity. To illustrate the methods, I will discuss the disparity with respect to Hispanics, calculated for the comparison between the population in the Western Division and the jury pool data for Mr. Mikhel and Mr. Kadamovas' trial. These calculations are summarized above in Table 1.

16. Absolute disparity measures the simple absolute difference between the percentage of that group as represented in the jury pool, as shown in Table 1, which I will label $v$ (for venire) and the percentage of people in the community who are in the cognizable group (i.e., "Hispanics," as shown in Table 1), which I will label $P$ (for population):

Absolute disparity (AD) = $v - P$ = 18.9% – 40.11% = -21.2 percentage points.

17. Relative or comparative disparity is measured by relating (comparing) the absolute disparity to the cognizable group's percentage in the entire jury-eligible community. By showing how big the absolute disparity is in relation to what would be expected based on the community demographics, the relative disparity indicates how substantive the absolute disparity is, even if it may seem relatively small on its own:

[6] For a detailed discussion of these methods see Rose et al., (2018), ibid., and Weeks (1999), ibid.
[7] Peter A. Detre, 1994, "A Proposal for Measuring Underrepresentation in the Composition of the Jury Wheel," 103 *Yale Law Review:* 1913.
[8] Gatswirth and Pan, ibid.
[9] Rose et al., ibid.

Initials

$$\text{Relative disparity (RD or CD)} = \frac{v-P}{P} * 100 = \frac{18.9-40.1}{40.1} * 100 = \text{-53\%}.$$

The usefulness of this calculation is that it is readily interpretable: Hispanics were 53% underrepresented in the jury pool in the Western Division in 2006. Put another way, we expected 110 Hispanics in the jury pool, but observed only 52.

18. If the absolute disparity is large, as it is in this case, then there is rarely an issue as to whether that could have happened just by chance, unless the jury venire is small (e.g., less than 100 persons). However, in any situation it is useful to ask whether the disparity is large enough in relation to the number of people in the jury venire that this result is unlikely to have occurred by chance alone. We do this with a standard deviation test (also called a test of statistical significance) in which we test the null hypothesis that there is no real difference between $v$ and $P$—the observed difference is due simply to chance.

19. Statistical significance answers the question: What is the probability that we could have randomly drawn a sample of 275 prospective jurors from the list of Jury Master Wheel in the Western Division and have generated an absolute disparity of -21.2 percentage points with respect to Hispanics in the community? To answer the question, we first calculate what is called a z-score, which is the number of standard deviation units that our sample value is away from the population value. As can be seen above in Table 1, this value is -7.16:

$$\text{z-score} = \frac{v-P}{\sqrt{\frac{P*(1-P)}{(n-1)}}} = \frac{.189-.401}{\sqrt{\frac{.401*(1-.401)}{(275-1)}}} = -7.16.$$

20. The value of -7.16 indicates that the disparity is 7.16 standard deviation units below the population value in a normal distribution.[10] The z-score is then converted into the

[10] We use the normal distribution because regardless of the distribution of the variable itself, random samples from that distribution (the qualified jury wheel in this case) will approximate the normal distribution. This is known as the Central Limit Theorem, formulated in the early 19th century by the French mathematician Pierre-Simon Laplace (1814), and it is the mathematical centerpiece of the ability to generalize from a sample to the population from which a sample is drawn.

Initials

more intuitively apparent answer, which is the p-value, or the probability that a result this far below the population value could have occurred just by chance. This value can be found in published tables in the appendices of most statistics textbooks or calculated online at websites such as: http://www.socscistatistics.com/pvalues/normaldistribution.aspx. The p-value in this case is .000. In other words, there is essentially no chance that this was a random finding. Put another way, this is highly statistically significant.

21. There is no single standard by which statistical significance is judged to exist. In scientific research there are several decision rules that are typically applied to determine whether or not a p-value is statistically significant. In critical research such as medical tests, a level of statistical significance of $p < .01$ (less than one chance in a hundred) may be required before the decision is reached that, for example, a health benefit is derived from using a particular drug. A more standard measure is $p < .05$ (less than five chances in a hundred), but in exploratory research and in situations in which samples are smaller in size, a value of $p < .10$ (less than 10 chances in 100) is often employed. Those are the three common options. On the other hand, if we followed the standard legal requirement of "more likely than not" used in many civil cases and other legal applications, we would assume that a probability of 49% or less would indicate that the result did not occur by chance (e.g., $p < .50$).

22. Since the p-value for the underrepresentation of Hispanics in the jury pool is .000 (0 chances in 1,000), this indicates that the underrepresentation is statistically significant at any of the common cutoffs that would be used by scientists, including even the rigorous $p < .01$ cutoff typically used for medical trials. Thus, the 53% underrepresentation is not only a large disparity, but it is also statistically significant—it almost certainly did not occur by chance.

Initials

23. The same conclusion can be drawn with respect to the overrepresentation of Blacks, in which case the absolute disparity is 11.4 percentage points (see Table 1), producing a relative disparity of 145%, which is associated with a z-score of 7.02, and a p-value of .000. This is a large and highly statistically significant difference from the community population.

## Why Do the Disparities Exist?

24. Given the very limited data provided to me, it is not easy to hypothesize why these disparities exist. I first examined the jury data by city, coding each city according to the county in which it is located, to see if the draw had not been proportional by county. I found that 86% of the jurors came from Los Angeles County, exactly matching the proportion of the Western Division population living in that county. Ventura County accounted for 8% of jurors, which was also exactly the percentage of its population in the Western Division. Santa Barbara County accounted for 4% of jurors and also that same percent of the Western Division population. San Luis Obispo includes 3% of the Western Division population, but less than 1% of the jurors, and there was one juror whose address was in San Bernardino County, which is not in the Western Division. Overall, however, there is no evidence that proportionality of the draw by county was likely to have been an issue.

25. The problem almost certainly arises from issues associated with drawing jurors from Los Angeles County. This could be due to the way in which the master list is created, or drawn from that county, or to issues dealing with spatially differential response rates. Until I am provided with the additional data requested by habeas counsel I will be unable to answer the question of why the disparities exist.

Initials

I declare under penalty of perjury that the foregoing is true and correct.

DATED: 6 September 2023

JOHN R. WEEKS, Ph.D.

Initials

*APPENDIX A*

**CURRICULUM VITAE OF DR. JOHN R. WEEKS**

Initials

**JOHN R. WEEKS, Ph.D.**
Distinguished Professor Emeritus of Geography
Director, International Population Center
San Diego State University
San Diego, CA 92182-4493 USA

*email*: john.weeks@sdsu.edu

***CURRICULUM VITAE***
**2023**

---

## EDUCATION

Ph.D. (Demography) University of California, Berkeley, 1972
M.A. (Demography) University of California, Berkeley, 1969
A.B. (Sociology) University of California, Berkeley, 1966

## ACADEMIC POSITIONS

| | |
|---|---|
| 2013 - present | Distinguished Professor Emeritus of Geography, and Director, International Population Center, San Diego State University: https://ipc.sdsu.edu |
| 2012 - present | Research Associate, Broom Center for Demography, University of California, Santa Barbara |
| 2008 -present | Senior Fellow, California Council on Science and Technology |
| 1998 - 2019 | Clinical Professor of Global Public Health, School of Medicine, University of California, San Diego |
| 2010 - 2013 | Distinguished Professor of Geography and Director, International Population Center, San Diego State University |
| 1992 – 2010 | Professor of Geography and Director, International Population Center, San Diego State University |
| 1985 - 1992 | Professor of Sociology and Director, International Population Center, San Diego State University |
| 1981 - 1985 | Professor and Chair, Department of Sociology, San Diego State University |
| 1978 - 1981 | Associate Professor and Chair, Department of Sociology, San Diego State University |
| 1974 - 1978 | Assistant Professor, Department of Sociology, San Diego State University |
| 1971 - 1974 | Assistant Professor of Sociology and Director of Social Science Methods Laboratory, James Madison College, and Assistant Professor of Anthropology (joint appointment), Michigan State University, East Lansing, Michigan |
| 1970 - 1971 | Teaching Assistant, Department of Demography, University of California, Berkeley |

## OTHER PERTINENT PROFESSIONAL EXPERIENCE

Visiting Assistant Research Demographer, International Population and Urban Research, University of California, Berkeley, Summer, 1972
Public Health Statistician, California Department of Public Health, Berkeley, California, 1971
Undergraduate Research Assistant, International Population and Urban Research, University of California, Berkeley, 1964-1966

## RELEVANT HONORS

Recipient of *Lifetime Achievement Award*, American Association of Geographers Population Specialty Group, March 2016
*Commencement Speaker*, College of Arts and Letters, San Diego State University, May 2013.
Recipient of the *Albert W. Johnson Research Award and Distinguished Professorship*, San Diego State University, 2010
Recipient of *Most Influential Professor* Award, Department of Geography (named by Outstanding Graduating Student in Geography), San Diego State University, 2003, 2007
Recipient of San Diego State University Alumni Association *Distinguished Faculty Award in the College of Arts and Letters*, 2003

*Phi Beta Kappa Lecturer*, Nu of California Chapter of Phi Beta Kappa, San Diego State University, 2000
Recipient of *Most Influential Professor* Award, Undergraduate Studies (named by Outstanding Graduating Student in Liberal Studies), San Diego State University, 1996
*Ford Foundation Fellowship in Demography*, Department of Demography, University of California, Berkeley, 1970-1971
*NIH Traineeship in Demography*, Department of Demography, University of California, Berkeley, 1967-1970
*NIMH Traineeship in the Demography of Social Disorganization*, Department of Sociology, University of Southern California, Los Angeles, California, 1966-1967
*California State Scholarship*, University of California, Berkeley, 1962-1966

**PUBLICATIONS**

**Books**

John R. Weeks, ***Population: Introduction to Concepts and Issues, Thirteenth Edition*** (Boston, MA: Cengage Learning, 2020. [Best-selling textbook in the field of population studies; used in Departments of Demography, Sociology, Geography, Ecology, and related Social and Behavioral Sciences in the United States, Canada, Mexico, the United Kingdom, and elsewhere; earlier editions have been translated into Spanish and Arabic.] The 8th, 9th, and 10th editions are available on audio through http://www.learningally.org. The iPhone app for the 13th edition can be downloaded from the App Store.
John R. Weeks, ***Population: Introduction to Concepts and Issues, Twelfth Edition*** (Boston, MA: Cengage Learning), 2016.
John R. Weeks, Allan G. Hill, and Justin Stoler, Editors, ***Spatial Inequalities: Health, Poverty and Place in Accra, Ghana*** (Dordrecht, The Netherlands: Springer), 2013.
John R. Weeks and Debbie L. Fugate, Editors, ***The Youth Bulge: Challenge or Opportunity?*** (New York: IDEBATE Press), 2012.
John R. Weeks, ***Population: Introduction to Concepts and Issues, Eleventh Edition*** (Belmont, CA: Wadsworth Cengage Learning), 2012.
Gregory B. Weeks and John R. Weeks, ***Irresistible Forces: Explaining Latin American Migration to the United States and Its Effects on the South*** (Albuquerque, NM: The University of New Mexico Press), 2010. (see reviews in *Contemporary Sociology: A Journal of Reviews*, 41:1(110-111), 2012; and *Choice*, September 2011).
John R. Weeks, ***Population: Introduction to Concepts and Issues, Tenth Edition*** (Belmont, CA: Wadsworth Publishing Co.), 2008.
Susan L. Cutter, Margaret Arnold, Deborah Balk, Bela Hovy, Mei-Po Kwan, Jonathan D. Mayer, David R. Rain, Havidan Rodriguez, Barbara Boyle Torrey, Billie L. Turner II, John R. Weeks, and Tukufu Zuberi, ***Tools and Methods for Estimating Populations at Risk From Natural Disasters and Complex Humanitarian Crises*** (Washington, DC: The National Academies Press), 2007.
John R. Weeks, ***Population: Introduction to Concepts and Issues, Ninth Edition*** (Belmont, CA: Wadsworth Publishing Co.), 2005.
John R. Weeks, ***Population: Introduction to Concepts and Issues, Eighth Edition*** (Belmont, CA: Wadsworth Publishing Co.), 2002.
John R. Weeks, ***Population: An Introduction to Concepts and Issues, Seventh Edition*** (Belmont, CA: Wadsworth Publishing Co.), 1999.
John R. Weeks, ***Population: An Introduction to Concepts and Issues, Sixth Edition*** (Belmont, CA: Wadsworth), 1996.
John R. Weeks, ***Population: An Introduction to Concepts and Issues, Updated Fifth Edition*** (Belmont, CA: Wadsworth), 1994.
John R. Weeks, ***Population: An Introduction to Concepts and Issues, Fifth Edition*** (Belmont, CA: Wadsworth), 1992.
John R. Weeks and Roberto Ham-Chande (eds.), ***Demographic Dynamics of the U.S.-Mexico Border*** (University of Texas at El Paso: Texas Western Press), 1992. [Reviewed in *Contemporary Sociology* 22(4) July, 1993; *Foreign Affairs* 73(2) March/April, 1994]
John R. Weeks, ***Population: An Introduction to Concepts and Issues, Fourth Edition*** (Belmont, CA: Wadsworth Publishing Co.), 1989.
John R. Weeks, ***Population: An Introduction to Concepts and Issues, Third Edition*** (Belmont, CA: Wadsworth Publishing Co.), 1986.
John R. Weeks, ***Sociología de la Población*** (Madrid: Alianza Universidad Textos), 1984.
John R. Weeks, ***Aging: Concepts and Social Issues*** (Belmont, CA: Wadsworth Publishing Co.), 1984.

John R. Weeks, ***Population: An Introduction to Concepts and Issues, Second Edition*** (Belmont, CA: Wadsworth Publishing Co.), 1981.

John R. Weeks, ***Population: An Introduction to Concepts and Issues*** (Belmont, CA: Wadsworth Publishing Co.), 1978. [Reviewed in *Contemporary Sociology* 8(1):86, 1979].

John R. Weeks, ***Teenage Marriages: A Demographic Analysis***, Studies in Population and Urban Demography, Number 2 (Westport, CT: Greenwood Press), 1976. [Also made available on tape by Recording for the Blind, Inc., 1979]; [Reviewed in *Population (French Edition)*, Vol. 32, No. 6 (Nov. - Dec., 1977), p. 1316]

John R. Weeks, ***Social Statistics: A Competency-Based Workbook*** (San Diego: San Diego State University Press), 1975.

## Journal Articles

John R. Weeks, "The Importance of Arthur Getis to Spatial Demography." ***Journal of Geographical Systems***, in press.

Shih, H.-C.; Stow, D.A.; Weeks, J.R.; Goulias, K.G.; Carvalho, L.M.V. "The Relative Timing of Population Growth and Land Use Change—A Case Study of North Taiwan from 1990 to 2015." ***Land,*** 11:2204., 2022.

Holly Shakya, John R. Weeks, Sneha Challa, Paul Fleming, Beniamino Cislaghi, Lotus McDougal, Sabrina Boyce, Anita Raj, and Jay Silverman, "Spatial analysis of individual and village level sociodemographic characteristics associated with age at first marriage among married adolescents in rural Niger," ***BMC Public Health***, 20:279, 2020.

Sory I. Touré, John R. Weeks, David López-Carr, and Douglas Stow, "Evaluating links between dynamic urban landscapes and under-five child mortality in Accra, Ghana." ***Demographic Research***, Volume 42, Article 20, Pages 589-614, 2020.

Holly Shakya, G. L. Darmstadt, K.M. Barker, John R. Weeks, and Nicholas Christakis, "Social normative and social network factors associated with adolescent pregnancy: a cross-sectional study of 176 villages in rural Honduras." ***Journal of Global Health***, 10(1), 2020.

Holly Shakya, John R. Weeks, and Nicholas Christakis, " Do Village-Level Normative and Network Factors Help Explain Spatial Variability in Adolescent Childbearing in Rural Honduras?" ***SSM - Population Health*** 9 (100371), 2019.

Yu Hsin Tsai, Douglas A. Stow, David López-Carr, John R. Weeks, Keith C. Clarke, and Foster Mensah, "Monitoring Forest Cover Change Within Different Reserve Types in Southern Ghana," ***Environmental Monitoring and Assessment***, https://doi.org/10.1007/s10661-019-7450-z, May 2019.

Sory I. Touré, Douglas A. Stow, Keith C. Clarke, and John R. Weeks, "Patterns of Land Cover and Land Use Change within the Two Major Metropolitan Areas of Ghana," ***Geocarto International***, https://doi.org/10.1080/10106049.2018.1516244, 2018.

Sory I. Touré, Douglas A. Stow, Hsiao-chien Shih, John R. Weeks, and David López-Carr, "Land Cover and Land Use Change Analysis Using Multi-Spectral Resolution Data and Object-Based Image Analysis," ***Remote Sensing of Environment***, 210:259-268, 2018.

Magdalena Benza, John R. Weeks, Douglas A. Stow, David López-Carr, and Keith C. Clarke, "Fertility and Urban Context: A Case Study from Ghana, West Africa, Using Remotely Sensed Imagery and GIS," ***Population, Space and Place***, 23(8), 2017.

Lloyd Coulter, Douglas A Stow, Yu-Hsin Tsai, Nicholas Ibanez, Hsiao-chien Shih, Andrew Kerr, Magdalena Benza, John R. Weeks, and Foster Mensah, "Classification and assessment of land cover and land use change in southern Ghana using dense stacks of Landsat 7 ETM+ imagery," ***Remote Sensing of Environment***, 184:396-409, 2016.

Magdalena Benza, John R. Weeks, Douglas A. Stow, David López-Carr, and Keith C. Clarke, "A Pattern-Based Definition of Urban Context Using Remote Sensing and GIS," ***Remote Sensing of Environment***, 183(15):250-264, 2016.

David López-Carr, Kevin M. Mwenda, Narcisa G. Pricope, Phaedon C. Kyriakidis, Marta M. Jankowska, John Weeks, Chris Funk, Gregory Husak, and Joel Michaelsen, "Climate-Related Child Undernutrition: An Integrated Spatial Analysis Of Health Surveys, NDVI, And Precipitation Data In The Lake Victoria Basin," ***IEEE Journal of Selected Topics in Applied Earth Observations and Remote Sensing***, 9(6):2830-2835, 2016.

Steven Crook, Li An, John R. Weeks, and Douglas A. Stow, "Latent Trajectory Modeling of Spatiotemporal Relationships between Land Cover and Land Use, Socioeconomics, and Obesity in Ghana", ***Spatial Demography***, 4(3):221-244, 2016.

Douglas Stow, John R. Weeks, Hsiao-chien Shih, Lloyd Coulter, Yu-Hsin Tsai, Andrew Kerr, and Foster Mensah, "Inter-regional pattern of urbanization in southern Ghana in the first decade of the new millennium," ***Journal of Applied Geography***, 71:32-43, 2016.

Sory Touré, Douglas Stow, Hsiang-chien Shih, Lloyd Coulter, John Weeks, Ryan Engstrom and Avery Sandborn, " An object-based temporal inversion approach to urban land use change analysis," ***Remote Sensing Letters*** 7(5): 503-512, 2016.

Erin E. Conners, Joseph M. Vinetz, John R. Weeks, and Kimberly C. Brouwer, "A global systematic review of Chagas disease prevalence among migrants," ***Acta Tropica*** 156:68-78, 2016.

Hsiao-chien Shih, Douglas A. Stow, John R. Weeks, and Lloyd Coulter, "Determining the Type and Starting Time of Land Cover and Land Use Change in Ghana Based on Discrete Analysis of Dense Landsat Image Time Series," ***IEEE Journal of Selected Topics in Applied Earth Observations and Remote Sensing (JSTARS***), 9(5):2064-2073, 2015.

Ryan Engstrom, Avery Sandborn, Yu Qin, Jason Burgdorfer, Douglas Stow, John Weeks, and Jordan Graesser, "Mapping slums using spatial features in Accra, Ghana," ***Joint Urban Remote Sensing Event (JURSE),*** https://doi.org/10.1109/JURSE.2015.7120494, 2015.

Gregory B. Weeks and John R. Weeks, "Immigration and Transnationalism: Rethinking the Role of the State in Latin America," ***International Migration***, 53(5):122-134, 2015.

Anna Carla López-Carr, Marta M. Jankowska, Justin Stoler, Caetlin Ofiesh, David Rain, and John R. Weeks, "Agency, Access, and Anopheles: Neighborhood health perceptions and the implications for community health interventions in Accra, Ghana," ***Global Health Action***, 8(http://dx.doi.org/10.3402/gha.v8.26492), 2015.

Justin Stoler, John R. Weeks, and Richard Appiah Otoo, "Drinking Water in Transition: A Multilevel Cross-sectional Analysis of Sachet Water Consumption in Accra," ***PLOS ONE***, 8(6): e67257. doi:10.1371/journal.pone.0067257, 2013.

Sory Touré, Douglas Stow, John R. Weeks, and Sanil Kumar, "Histogram Curve Matching Approaches for Object-Based Image Classification of Land Cover and Land Use," ***Photogrammetric Engineering and Remote Sensing***, 79(5): 433-440, 2013.

Ryan Engstrom, David Rain, Caetlin Ofiesh, Henry Jewell, and John R. Weeks, "Defining Neighborhood Boundaries for Urban Health Research in Developing Countries: A Case Study of Accra, Ghana," ***Journal of Maps*** (9)1:36-42. 2013.

Stow, Douglas A., John R. Weeks, S. Toure, Christopher Lippitt, Lloyd Coulter, and Eric Ashcroft, "Urban vegetation cover and vegetation change in Accra, Ghana: Connection to housing quality," ***Professional Geographer***, Vol. 65 Issue 3, p451-465, 2013.

Marta Jankowska, Magdalena Benza-Fiocco, and John R. Weeks, "Estimating Spatial Inequalities of Urban Child Mortality," ***Demographic Research***, 28(2):33-62, 2013.

Günther Fink, John R. Weeks, and Allan G. Hill, "Income and Health in Accra, Ghana: Results from the Time Use and Health Study, ***American Journal of Tropical Medicine and Hygiene***, 87(4):608-615, 2012.

Stoler, Justin, John R. Weeks, and Günther Fink, "Sachet drinking water in Ghana's Accra-Tema Metropolitan Area: Past, present, and future," ***Journal of Water, Sanitation and Hygiene for Development***, 2(4): 223-240, 2012.

Gregg Verutes, Magdalena Benza-Fiocco, John R. Weeks, and Lloyd L. Coulter, "Health, Poverty, and Place in Accra, Ghana: Mapping Neighborhoods," ***Journal of Maps***, Special Issue on Innovative Mapping in Spatial Demography, 8(4):369-373, 2012.

Kimberly C. Brouwer, Melanie L. Rusch, John R. Weeks, Remedios Lozada, Alicia Vera, Carlos Magis-Rodríguez, and Steffanie A. Strathdee, "Spatial Epidemiology of HIV. Among Injection Drug Users in Tijuana, Mexico," ***Annals of the Association of American Geographers***, 102(5):1190-1199, 2012.

John R. Weeks, Arthur Getis, Douglas A. Stow, Allan G. Hill, David Rain, Ryan Engstrom, Justin Stoler, Christopher Lippitt, Marta Jankowska, Anna Carla López, Lloyd Coulter, and Caetlin Ofiesh, "Connecting the Dots Between Health, Poverty and Place in Accra, Ghana," ***Annals of the Association of American Geographers***, 102(5):932-941, 2012.

Kimberly C. Brouwer, Remedios Lozada, John R. Weeks, Carlos Magis-Rodríguez, Michelle Firestone-Cruz, and Steffanie A. Strathdee, "Intra-Urban Mobility and its Potential Impact on the Spread of Blood-Borne Infections among Drug Injectors in Tijuana, Mexico," ***Substance Use and Misuse***, 47(3):244-253, 2012.

Justin Stoler, Dean Daniels, John R. Weeks, Douglas A. Stow, Lloyd L. Coulter, and Brian K. Finch, "Assessing the Utility of Satellite Imagery with Differing Spatial Resolutions for Deriving Proxy Measures of Slum Presence in Accra, Ghana," ***GIScience & Remote Sensing***, 49(1):31-52, 2012.

Justin Stoler, Günther Fink, John R. Weeks, Richard Appiah Otoo, Joseph Ampofo, and Allan G. Hill, "When Urban Taps Run Dry: Sachet Water Consumption and Health Effects in Low Income Neighborhoods of Accra, Ghana," ***Health & Place***, 18:250-262, 2012.

Marta M. Jankowska, John R. Weeks, and Ryan Engstrom, "Do the Most Vulnerable People Live in the Worst Slums? A Spatial Analysis of Accra, Ghana," ***Annals of GIS***, 17(4):221-235, 2011.

Gregory B. Weeks and John R. Weeks, "Latin American Migration to the United States: A Multidisciplinary View," ***The Latin Americanist***, 55(4):5-8, 2011.

Tsai, Yu Hsin, Douglas Stow, and John R. Weeks, "Comparison of Object-Based Image Analysis Approaches to Mapping New Buildings in Accra, Ghana Using Multi-Temporal QuickBird Satellite Imagery," ***Remote Sensing***, 3:2707-2726, 2011.

Justin Stoler, Stephanie K. Brodine, Simeon Bromfield, John R. Weeks, and Henry P. Scarlett, "Exploring the relationships between dengue fever knowledge and Aedes aegypti breeding in St. Catherine Parish, Jamaica: A pilot of enhanced low-cost surveillance, ***Research Reports in Tropical Medicine***, 2011(2):1-11, 2011.

John R. Weeks, Justin Stoler, and Piotr Jankowski, "Who's Crossing the Border: New Data on Undocumented Immigrants to the United States," ***Population, Space and Place***, 17(1):1-26, 2011.

Joni A. Mayer, Susan I. Woodruff, Donald J. Slymen, James F. Sallis, Jean L. Forster, Elizabeth J. Clapp, Katherine D. Hoerster, Latrice C. Pichon, John R. Weeks, George E. Belch, Martin A. Weinstock, and Todd Gilmer, "Why do teens use indoor tanning? A large-scale evaluation of psychosocial, environmental, and policy level correlates," ***American Journal of Public Health***, 101:930-938, 2011. PMID: 21421947

Lola Duque and John R. Weeks, "Towards a Model and Methodology for Assessing Student Learning Outcomes and Satisfaction," ***Quality Assurance in Education***, 18(2):84-105, 2010.

Douglas Stow, Chris Lippitt, and John R. Weeks, "Delineation of Neighborhoods of Accra, Ghana Based on QuickBird Satellite Data," ***Photogrammetric Engineering and Remote Sensing***, 76(8):907-914, August 2010. PMID: 20689664.

John R. Weeks, Arthur Getis, Allan G. Hill, Samuel Agyei-Mensah, and David Rain, "Neighborhoods and Fertility in Accra, Ghana: An AMOEBA-based Approach," ***Annals of the Association of American Geographers***, 100(3):558-578, July 2010. PMCID: PMC3093308.

Justin Stoler, John R. Weeks, Arthur Getis, and Allan G. Hill, "Distance Threshold for the Effect of Urban Agriculture on Elevated Self-reported Malaria Prevalence in Accra, Ghana," ***American Journal of Tropical Medicine and Hygiene*** 80(4): 547-554, 2009. PMID: 19346373.

Hoerster, K.D., R. L. Garrow, J. A. Mayer, E. J. Clapp, J. R. Weeks, S. I. Woodruff, J. F. Sallis, D. J. Slymen, M. R. Patel, and S. A. Sybert, "Density of indoor tanning facilities in 116 large U.S. cities," ***American Journal of Preventive Medicine***, 36(3):243-246, 2009. PMID: 19215849.

Marta Jankowska, Jared Aldstadt, Arthur Getis, John R. Weeks, and Grant Fraley, "An amoeba procedure for visualizing clusters," ***Proceedings of GIScience***, 2008.

Douglas A. Stow, Anna Carla López, Christopher Lippitt, Sarah Hinton, and John R. Weeks, "Object-based classification of residential land use within Accra, Ghana based on QuickBird satellite data," ***International Journal of Remote Sensing***, 28(22):5167-5173, 2007. PMID: 19424445.

Chris D. Elvidge, P. Cinzano, D. R. Pettit, J. Arvesen, Paul Sutton, Christopher Small, R. Nemani, T. Longcore, C. Rich, J. Safran, John R. Weeks, and S. Ebener, "The Nightsat Mission Concept," ***International Journal of Remote Sensing*** 28(12):2645-70, 2007.

John R. Weeks, Allan G. Hill, Douglas A. Stow, Arthur Getis, and Debbie Fugate, "Can You Spot a Neighborhood From the Air? Defining Neighborhood Structure in Accra, Ghana," ***GeoJournal*** 69:9-22, 2007. PMID: 19478993.

Minal R. Patel, Joni A. Mayer, Donald J. Slymen, John R. Weeks, and Ami L. Hurd, "Correlates of Tanning Facility Prevalence within San Diego County, California Census Tracts," ***Journal of Community Health*** 32:391-400, 2007. PMID: 17940870.

Gregory B. Weeks, John R. Weeks, and Amy J. Weeks, "Latino Immigration to the U.S. South: 'Carolatinos' and Public Policy in Charlotte, North Carolina," ***Latino(a) Research Review***, 6:1-2:50-72, 2007.

John R. Weeks, Allan G. Hill, Arthur Getis, and Douglas Stow, 2006, "Ethnic Residential Patterns as Predictors of Intra-Urban Child Mortality Inequality in Accra, Ghana," ***Urban Geography*** 27(6):526-548. PMCID: PMC2758568.

Tarek Rashed, John R. Weeks, Douglas A. Stow, and Debbie Fugate, "Measuring Temporal Compositions of Urban Morphology through Spectral Mixture Analysis: Toward a Soft Approach to Change Analysis in Crowded Cities," ***International Journal of Remote Sensing***, 26(4):699-718, 2005.

John R. Weeks, "What Did He Know, and When Did He Know It? Putting Glenn Trewartha's Call for Population Geography into Historical Perspective." ***Population, Space and Place*** 10:279-283, 2004.

John R. Weeks, Arthur Getis, Allan G. Hill, Tarek Rashed, and M. Saad Gadalla, "The Fertility Transition in Egypt: Intra-Urban Patterns in Cairo," ***Annals of the Association of American Geographers***, 94 (1):74-93, 2004.

Tarek Rashed, John R. Weeks, Dar Roberts, John Rogan, and Rebecca Powell, "Measuring the Physical Composition of Urban Morphology Using Multiple Endmember Spectral Mixture Models," ***Photogrammetric Engineering and Remote Sensing*** 69(9): 1111-1120, 2003.

Tarek Rashed and John R. Weeks, "Assessing Vulnerability to Earthquake Hazards Through Spatial Multicriteria Analysis of Urban Areas," International Journal of Geographical Information Science, 17(6):549-578, 2003.

John R. Weeks, "Estimating the Muslim Population in the United States Using Census 2000 Data," ***Espaces-Populations-Sociétés***, 2003-1:89-101, 2003.
David L. McIntyre and John R. Weeks, "Environmental Impacts of Illegal Immigration on the Cleveland National Forest in California," ***Professional Geographer***, 54(3):392-405, 2002.
Christopher Peak and John R. Weeks, "Does Community Context Influence Reproductive Outcomes of Mexican Origin Women in San Diego, California?", ***The Journal of Immigrant Health***, 4(3):125-136, 2002. PMID: 16228756.
Tarek Rashed, John R. Weeks, M. Saad Gadalla, and Allan G. Hill, "Revealing the Anatomy of Cities through Spectral Mixture Analysis of Multispectral Imagery: A Case Study of the Greater Cairo Region, Egypt," ***Geocarto International***, 16(4):5-16, 2001.
John R. Weeks, M. Saad Gadalla, Tarek Rashed, James Stanforth, and Allan G. Hill, "Spatial Variability in Fertility in Menoufia, Egypt, Assessed Through the Application of Remote Sensing and GIS Technologies," ***Environment and Planning A***, (32):695-714, 2000.
John R. Weeks, Rubén G. Rumbaut, and Norma Ojeda, "Reproductive Outcomes Among Mexico-Born Women in San Diego and Tijuana: Testing the Migration Selectivity Hypothesis," ***The Journal of Immigrant Health*** 1(2):77-90, 1999. PMID: 16228706.
John R. Weeks, "The Early Years of the PAA," a compilation of Weeks (1996) and Weeks (1997): The Population Association of America--https://www.populationassociation.org/about/our-history
John R. Weeks, "Vignettes of PAA History - Demographics of the Early PAA Board Members," ***PAA Affairs*** 30(2 - Summer):4, 1997.
John R. Weeks, "Vignettes of PAA History - The Beginnings," ***PAA Affairs*** 29 (4 - Winter): 3-5, 1996.
Rubén G. Rumbaut and John R. Weeks, "Unraveling a Public Health Enigma: Why do Immigrants Experience Superior Perinatal Health Outcomes?" ***Research in the Sociology of Health Care***, 13(B): 337-391, 1996.
Paul Ganster, John R. Weeks, and Roberto Ham-Chande, "Demographic Dynamics of the U.S.-Mexico Border," ***International Journal of the Sociology of Language*** 114:124-129, 1995
John R. Weeks and Rubén G. Rumbaut, "Infant Mortality Among Ethnic Immigrant Groups," ***Social Science and Medicine***, 33(3): 327-334, 1991. PMID: 1925697.
John R. Weeks, "The Binational Survey in San Diego and Tijuana," ***Frontera Norte*** 2(4): 234-236, 1990.
Rubén G. Rumbaut and John R. Weeks, "Infant Health Among Indochinese Refugees: Patterns of Infant Mortality, Birthweight and Prenatal Care in Comparative Perspective," ***Research in the Sociology of Health Care***, Volume 8: 137-196, 1989.
John R. Weeks, Rubén G. Rumbaut, Claire Brindis, Carol Korenbrot, and Donald Minkler, "An Analysis of High Fertility Among Indochinese Refugees," ***Public Health Reports***, 104(2): 143-150, 1989. [Abstracted in The Atlantic Monthly, April 1994, pp. 89-90] PMID: 2495548.
John R. Weeks, "The Demography of Islamic Nations," ***Population Bulletin*** (Population Reference Bureau), 43(4), December, 1988. [Abstracted in International Family Planning Perspectives, 15(2):108-109, 1989; and American Demographics (September, 1989):66; Executive Summary prepared by the Population Reference Bureau in April, 1989, and distributed by the Population Resource Center, Washington, D.C.] PMID: 12281990.
Rubén G. Rumbaut and John R. Weeks, "Fertility and Adaptation Among Indochinese Refugees in the United States," ***International Migration Review*** 20(2): 428-465, 1986. PMID: 12267858.
John R. Weeks, "Teaching International Demography," ***Teaching Sociology*** 14: (2):92-101, 1986. PMID: 12268304.
John R. Weeks, "Introduction to Three Papers on Teaching Demography,", ***Teaching Sociology*** 14(2), 1986.
Sally Koblinsky, John R. Weeks, and Gwen C. Cooke, "Preparation and Practice of Secondary Family Life Education Teachers in Home Economics and Other Disciplines," ***Home Economics Research Journal*** 13(3):334-344, 1985.
Helen M. Wallace, John R. Weeks, and Earl D. Hollander, "Effects of Proposition 13 on Health Care Services for Mothers and Children in California." ***Journal of Public Health Policy*** 5(4):458-470, 1984. PMID: 6526934.
Sally A. Koblinsky and John R. Weeks, "Family Life Education in California Secondary Schools," ***Journal of School Health*** 54(4): 181-184, 1984. PMID: 6564301.
John R. Weeks and Jose B. Cuellar, "Isolation of Older Persons: The Influence of Immigration and Length of Residence," ***Research on Aging*** 5(4):369- 388, 1983.
Helen M. Wallace, John R. Weeks, and Antonio Medina, "Services for and Needs of Pregnant Teenagers in Large Cities of the United States, 1979-1980," ***Public Health Reports*** 97(6): 583-588, 1982. PMID: 6890697.
Helen M. Wallace, John R. Weeks, and Antonio Medina, "Changes in the Services and the Needs of Pregnant Teenagers in the Large Cities of the United States: A Follow-up Analysis," ***Journal of the American Medical Association*** 248(18): 2270-2273, 1982. PMID: 7188595.
John R. Weeks, "An Evaluation of the Use-Effectiveness of Fertility Awareness Methods of Family Planning," ***Journal of Biosocial Science*** 14(1):32-38, 1982. PMID: 7061541.

John R. Weeks and José B. Cuellar, "The Role of Family Members in the Helping Networks of Older People," ***The Gerontologist*** 21(4): 388-394, 1981. PMID: 7262568.

José B. Cuellar and John R. Weeks, "Hispanic Elders' Needs, Problems, and Access to Public Benefits and Services," ***La Red/the Net*** no. 28, University of Michigan, Institute for Social Research, November, 1980.

John R. Weeks, "Record Linkage in Demography: History and Application," ***Preliminary Papers, Results of Current Research in Demography,*** No. 9, Vol. I, International Population and Urban Research, University of California, Berkeley, February, 1977.

John R. Weeks, "Infant Mortality and Premarital Pregnancy," ***Social Science and Medicine*** 10(2):165-169, 1976. PMID: 968502.

John R. Weeks, "Urban and Rural Natural Increase in Chile," ***Milbank Memorial Fund Quarterly*** 48(1):71-89, 1970.

**Chapters in Books**

John R. Weeks, "The Future is a Foreign Country: We'll Do Things Differently There," Chapter 7 in Alex Aleinikoff and Alexandra Delano (editors), ***New Narratives on the Peopling of America*** (Baltimore: Johns Hopkins University Press), 2024.

John R. Weeks, Douglas A. Stow, and Li An, "Demographics, Health Drivers and Impacts on Land-Cover and Land-Use Change in Ghana," in Steven J. Walsh, editor, ***Comprehensive Remote Sensing, Volume 9,*** pp. 76-89 (Oxford: Elsevier), 2018.

John R. Weeks, "Demographic Transition Theory" in Bryan S. Turner, ed., ***The Wiley Blackwell Encyclopedia of Social Theory*** (Oxford, UK: Wiley Blackwell Publishing Co.), 2017.

John R. Weeks, "Demography is an Inherently Spatial Science," in Frank M. Howell, Jeremy R. Porter, and Stephen A. Matthews, Editors, ***Recapturing Space: New Middle-Range Theory in Spatial Demography*** (Dordrecht, The Netherlands: Springer), 2015.

John R. Weeks, "Demographic Transition Theory," and "Malthus, Thomas," in George Ritzer, ed., ***The Wiley Blackwell Encyclopedia of Sociology (Updated)*** (Oxford, UK: Wiley Blackwell Publishing Co.), 2015.

Gregory B. Weeks and John R. Weeks, "The Train Has Left the Station: Latino Aging in the New South," Chapter 4 in W.A. Vega, K.S. Markides, J.L. Angel, and F.M. Torres-Gil, editors, ***Challenges of Latino Aging in the Americas*** (Dordrecht: Springer), 2015.

John R. Weeks, "Population Theories and Dynamics," Chapter 5 in Deborah McFarlane, Editor, ***Global Population and Reproductive Health*** (Burlington, MA: Jones & Bartlett Learning), 2015.

John R. Weeks, "History and Future of World Population," Chapter 2 in Deborah McFarlane, Editor, ***Global Population and Reproductive Health*** (Burlington, MA: Jones & Bartlett Learning), 2015.

John R. Weeks, "The World Can't Support Its Current Population Without Inequality and Poverty." In ***World Geography: Understanding a Changing World*** (http://worldgeography2.abc-clio.com/), 2014.

John R. Weeks, Justin Stoler, Allan G. Hill, Alex Zvoleff, "Fertility in Context: Exploring Egocentric Neighborhoods in Accra," Chapter 11 in John R. Weeks, Allan G. Hill, and Justin Stoler, Editors, ***Spatial Inequalities: Health Poverty and Place in Accra, Ghana*** (Dordrecht, The Netherlands: Springer), 2013.

Alex Zvoleff, Li An, Justin Stoler, John R. Weeks, "What if Neighbors' Neighborhoods Differ: The Influence of Neighborhood Definitions on Health Outcomes in Accra, Chapter 9 in John R. Weeks, Allan G. Hill, and Justin Stoler, Editors, ***Spatial Inequalities: Health Poverty and Place in Accra, Ghana*** (Dordrecht, The Netherlands: Springer), 2013.

Ryan Engstrom, Caetlin Ofiesh, David Rain, Henry Jewell, and John Weeks, "Defining Neighborhood Boundaries for Urban Health Research: A Case Study of Accra, Ghana," Chapter 4 in John R. Weeks, Allan G. Hill, and Justin Stoler, Editors, ***Spatial Inequalities: Health Poverty and Place in Accra, Ghana*** (Dordrecht, The Netherlands: Springer), 2013.

John R. Weeks, Allan G. Hill, and Justin Stoler, "Introduction to the Accra School: An Overview of Health, Poverty, and Place in Accra," Chapter 1 in John R. Weeks, Allan G. Hill, and Justin Stoler, Editors, ***Spatial Inequalities: Health Poverty and Place in Accra, Ghana*** (Dordrecht, The Netherlands: Springer), 2013.

Gregory B. Weeks and John R. Weeks, "The Demographic Fit Between the US and Latin America" Chapter 11 in John R. Weeks and Debbie L. Fugate, Editors, ***The Youth Bulge: Challenge or Opportunity?*** (New York: IDEBATE Press), 2012.

John R. Weeks, "Why Do Some Countries Have a Demographic Dividend and Others Do Not?" Chapter 10 in John R. Weeks and Debbie L. Fugate, Editors, ***The Youth Bulge: Challenge or Opportunity?*** (New York: IDEBATE Press), 2012.

John R. Weeks and Debbie L. Fugate, "Introduction: What is the youth bulge and why does it matter?," Chapter 1 in John R. Weeks and Debbie L. Fugate, Editors, ***The Youth Bulge: Challenge or Opportunity?*** (New York: IDEBATE Press), 2012.

John R. Weeks, "Demographic Transition Theory," and "Malthus, Thomas," in George Ritzer and J. Michael Ryan, eds., ***The Concise Encyclopedia of Sociology*** (Oxford, UK: Blackwell Publishing Co.), 2011.

John R. Weeks, "Fertility Rate," in Barney Warf, editor, ***Encyclopedia of Geography*** (Thousand Oaks, CA: Sage Publications), 2010.

John R. Weeks, "Spatial Patterns of Fertility Change in Rural Egypt," Chapter 17 in Luc Anselin and Serge Rey, editors, ***Perspectives on Spatial Data Analysis*** (New York: Springer Publishing Co.), 2010.

John R. Weeks, "Defining Urban Areas," Chapter 3 in Tarek Rashed and Carsten Juergens (eds.), ***Remote Sensing of Urban and Suburban Areas*** (New York: Kluwer Press), 2010.

Kimberly Brouwer, John R. Weeks, Remedios Lozada and Steffanie A. Strathdee, "Integrating GIS into the Study of Contextual Factors Affecting Injection Drug Use Along the Mexico/US Border." Chapter 3 (pp. 27-42) in Yonette F. Thomas, Douglas Richardson, and Ivan Cheung, editors, ***Geography and Drug Addiction*** (New York: Springer Publishing Co.), 2008.

Tarek Rashed, John R. Weeks, Helen Couclelis, and Martin Herold, "An Integrative GIS and Remote Sensing Model for Place-Based Urban Vulnerability Analysis," Chapter 9 in Victor Mesev, editor, ***The Integration of RS and GIS*** (New York: John Wiley & Son), 2007.

John Anarfi, George Botchie, Samuel Agyei-Mensah, Nii Ayite Coleman, Raymond Atuguba, Julius Najah Fobil, Allan G. Hill, John R. Weeks, and Jacob Songsore, "Population, Development and Environment in Metropolitan Accra: A Two-Phase Study," in ***CICRED Programme International de Rescherche sur les Interactions entre la Population, le Developpement et l'Environnement (PRIPODE)*** (Paris: UNESCO), 2007.

John R. Weeks, "Demographic Transition Theory," and "Malthus, Thomas," in George Ritzer, ed., ***The Blackwell Encyclopedia of Sociology*** (Oxford, UK: Blackwell Publishing Co.), 2006.

John R. Weeks, Dennis Larson, and Debbie Fugate, "Patterns of Urban Land Use as Assessed by Satellite Imagery: An Application to Cairo, Egypt," Chapter 11 in Barbara Entwisle and Paul Stern, editors, ***Population, Land Use, and Environment: Research Directions*** (Washington, DC: National Academies Press), 2005.

DongMei Chen, John R. Weeks, and John V. Kaiser, "Remote Sensing and Spatial Statistics as Tools in Crime Analysis," Chapter XVI in Fahui Wang, ed., ***Geographic Information Systems and Crime Analysis*** (Hershey, PA: Idea Group Publishers), 2005.

Ernst C. Griffin and John R. Weeks, "Peopling the Region: San Diego's Population Patterns," in Philip R. Pryde, Editor, ***San Diego: An Introduction to the Region, Fourth Edition*** (Boston: Pearson Custom Publishing), 2004.

Yuying Li and John R. Weeks, "Marital Status," in Sana Loue and Martha Sajatovic, Editors, ***Encyclopedia of Women's Health*** (New York: Kluwer Academic/Plenum Publishers), 2004.

Elizabeth Christensen and John R. Weeks, "Maternal Mortality," in Sana Loue and Martha Sajatovic, Editors, ***Encyclopedia of Women's Health*** (New York: Kluwer Academic/Plenum Publishers), 2004.

James Craine and John R. Weeks, "Life Expectancy," in Sana Loue and Martha Sajatovic, Editors, ***Encyclopedia of Women's Health*** (New York: Kluwer Academic/Plenum Publishers), 2004.

John R. Weeks and Manuel Miranda, "Mortality," in Sana Loue and Martha Sajatovic, Editors, ***Encyclopedia of Women's Health*** (New York: Kluwer Academic/Plenum Publishers), 2004.

John R. Weeks, "Morbidity," in Sana Loue and Martha Sajatovic, Editors, ***Encyclopedia of Women's Health*** (New York: Kluwer Academic/Plenum Publishers), 2004.

John R. Weeks, "Demography" in Kimberly Kempf-Leonard, Editor-in-Chief, ***Encyclopedia of Social Measurement*** (San Diego: Academic Press), 2004.

John R. Weeks, "The Role of Spatial Analysis in Demographic Research," in Michael F. Goodchild and Donald G. Janelle (eds.), ***Spatially Integrated Social Science: Examples in Best Practice*** (New York: Oxford University Press), 2004.

John R. Weeks, "Using Remote Sensing and Geographic Information Systems to Identify the Underlying Properties of Urban Environments," Chapter 17 in Tony Champion and Graeme Hugo, eds., ***New Forms of Urbanization: Conceptualizing and Measuring Human Settlement in the Twenty-first Century*** (London: Ashgate Publishing Limited), 2004, eBook issued in 2017: https://doi.org/10.4324/9781315248073.

John R. Weeks, "Does Night-Time Lighting Deter Crime? An Analysis of Remotely-Sensed Imagery and Crime Data," in Victor Mesev. (ed.), ***Remotely-Sensed Cities*** (London: Taylor & Francis), 2003.

Tarek Rashed and John R. Weeks, "Exploring the Spatial Association Between Measures from Satellite Imagery and Patterns of Urban Vulnerability to Earthquake Hazards," in ***International Archives of the Photogrammetry Remote Sensing and Spatial Information Sciences*** (CD-ROM), Regensburg, Germany, June 27-29, 2003, Vol. XXXIV-7/W9:114-152.

John R. Weeks, "Remote Sensing," in Paul Demeny and Geoffrey McNicoll, eds., ***Encyclopedia of Population, Revised Edition*** (New York: Macmillan Reference USA), 2003.

John R. Weeks, “Population Aging,” in David J. Ekerdt, Robert A. Applebaum, Karen C. Holden, Stephen G. Post, Kenneth Rockwood, Richard Schulz, Richard L. Sprott, and Peter Uhlenberg, editors, ***Encyclopedia of Aging*** (New York: Macmillan Reference USA), 2003.

Rashed, T., J. Weeks, D. Stow, and D. Fugate, “Measuring Temporal Compositions of Urban Morphology through Spectral Mixture Analysis: Toward a Soft Approach to Change Analysis in Crowded Cities,” ***Proceedings of the Third International Symposium on Remote Sensing of Urban Areas,*** Istanbul, Turkey, June 11-13, 2002.

John R. Weeks and Imre E. Quastler, “Population Geographies of Canada and the United States Since 1950,” Chapter 4 in Arthur Getis, Judith Getis, and I.E. Quastler, ***The United States and Canada: The Land and the People, Second Edition*** (New York: McGraw-Hill), 2001.

John R. Weeks, "Jury Representativeness: Challenging the Array," Chapter 7 in Walter F. Abbott and John Batt, eds., ***Handbook of Jury Research, Revision 5*** (Philadelphia, PA: American Law Institute - American Bar Association), 1999.

Rubén G. Rumbaut and John R. Weeks, "Children of Immigrants: Is Americanization Hazardous to Infant Health?" in Hiram E. Fitzgerald, Barry M. Lester, and Barry Zuckerman, editors, ***Children of Color: Research, Health, and Policy Issues*** (New York: Garland Publishing), 1999.

John R. Weeks, “Demographic Dynamics of the San Diego-Tijuana Region,” Chapter 2 (pp 17-34) in Mark Spalding, editor, ***Sustainable Development in San Diego-Tijuana: Environmental, Social and Economic Implications of Interdependence*** (La Jolla: Center for US-Mexican Studies, University of California, San Diego), 1999.

John R. Weeks and Karyl Fuller, "Population Distribution and Migration: Components of Housing Demand and Supply," pp. 60-79 in D. Wozniak, T. Shuman, A. Roet, and M. Garrett, editors, ***Human Settlements Habitat: Proceedings and Recommendations of the International Symposium on Human Settlements*** (San Diego State University: International Institute for Human Resources Development), 1996.

John R. Weeks, "Population Trends Since 1950," Chapter 5 in Arthur Getis and Judith Getis, Editors, ***North America: The Land and the People*** (Dubuque, IA: W.C. Brown Publishers), 1995.

John R. Weeks, "The Six Pillars of Global Population and Social Change," ***Population Research Group Research Paper 95-01*** (East Lansing, MI: Michigan State University, Institute for Public Policy and Social Research), 1995.

John R. Weeks, "Population," Chapter 3 in Anthony DeSouza and Frederick Stutz, ***A Geography of World Economy*** (New York: Macmillan), 1994.

John R. Weeks, "The Changing Demographic Structure of the San Diego Region," in Norris Clement, editor, ***San Diego and Tijuana in Transition*** (San Diego State University: Institute for Regional Studies of the Californias), 1993.

John R. Weeks, "The Economic and Social Implications of Population Aging in the Context of Internal and International Migration," pp. 143-162 in T. Shuman et al., ***Population Aging: International Perspectives: Proceedings and Recommendations of the International Conference of Population Aging*** (San Diego State University: University Center on Aging), 1993

John R. Weeks, "Service Provider Attitudes Toward Natural Family Planning," Chapter 6 in L.A. Severy (Editor), ***Advances in Population: Psychosocial Perspectives, Volume 1*** (London, England: Jessica Kingsley Publishers, Ltd), 1993. PMID: 12159241.

John R. Weeks and Roberto Ham-Chande, "Demographic Dynamics in the Context of the U.S.-Mexico Border," Chapter 15 in John R. Weeks and Roberto Ham-Chande (eds.), ***Demographic Dynamics of the U.S.-Mexico Border*** (University of Texas at El Paso: Texas Western Press), 1992.

Roberto Ham-Chande and John R. Weeks, "A Demographic Perspective of the U.S.-Mexico Border," Chapter 1 in John R. Weeks and Roberto Ham-Chande (eds.), ***Demographic Dynamics of the U.S.-Mexico Border*** (University of Texas at El Paso: Texas Western Press), 1992.

John R. Weeks, "Introduction," in Fareed H. Nu'man, ***The Muslim Population in the United States: A Brief Statement*** (Washington, D.C.: American Muslim Council), 1992.

Manual García y Griego, John R. Weeks, and Roberto Ham-Chande, "Migration to Mexico," in C. Nam, R. Weller, and W. Serow (eds.), ***Comparative Handbook of International Migration*** (Westport, CT: Greenwood Press), 1990.

John R. Weeks, "Factors Affecting the Choice of Natural Family Planning," pp. 77-84 in ***Proceedings of the Fifth National and International Symposium on NFP*** (Los Angeles: Los Angeles Regional Family Planning Council), 1990.

John R. Weeks, "How to Influence Fertility: The Experience So Far." Chapter 15 in Lindsey Grant (ed.), ***Elephants in the Volkswagen: Facing the Tough Questions about Our Overcrowded Country*** (New York: W.H. Freeman Company), 1992. PMID: 12178971.

John R. Weeks, "Asian-American Aged," pp. 49-50 in G. Maddox (ed.), ***Encyclopedia of Aging*** (New York: Springer Publishing Co.), 1986.
John R. Weeks and Joseph Spielberg Benitez, "The Cultural Demography of Midwestern Chicano Communities," in S.A. West and J. Macklin (eds.), ***The Chicano Experience*** (Boulder, CO: Westview Press), pp. 229-251, 1979, reissued as an eBook in 2019: https://doi.org/10.4324/9780429051197.
John R. Weeks, "Retirement Homes: Economic Realities and Implications for Ethnic Minority Elders," in E.P. Stanford (ed.), ***Retirement: Concepts and Realities*** (San Diego State University: University Center on Aging) pp. 151-159, 1978.

**Reviews and Other Publications**

John R. Weeks, 'The Great Demographic Illusion: Majority, Minority, and the Expanding American Mainstream," ***Contemporary Sociology***, November 2023.
Gregory Weeks and John R. Weeks, "The political demography of U.S.-Cuba relations," http://www.washingtonpost.com/blogs/monkey-cage/wp/2014/12/18/the-political-demography-of-u-s-cuba-relations/, 2014.
John R. Weeks, "Review of Mark Baldassare, 'California in the New Millennium: The Changing Social and Political Landscape,' Berkeley, CA: University of California Press, 2000." ***Professional Geographer***, 53, 2001.
John R. Weeks, "Review of Charles Hirschman, Philip Kasinitz, and Josh DeWind, editors, 'Handbook of International Aging: The American Experience.' ***Journal of Immigrant Health***, 3(3):165-167, 2001.
John R. Weeks, "Review of Donald J. Hernandez and Evan Charney, editors, 'From Generation to Generation: The Health and Well-Being of Children in Immigrant Families,' Washington, DC, National Academy of Sciences Press, 1998," ***Contemporary Sociology*** 29(2): 399-400, 2000.
John R. Weeks, "Review of 'Fertility in the United States: New Patterns, New Theories,' by Casterline, Lee, and Foote," ***Population and Environment*** 19(6): 577-580, 1998.
John R. Weeks, "Review of 'Aging and Ethnicity: Knowledge and Services' by Donald Gelfand," ***Ageing and Society***, 15(2): 138-139, 1995.
John R. Weeks, "Review of 'Immigration and Ethnicity: The Integration of America's Newest Arrivals' by Barry Edmonston and Jeffrey S. Passel," ***Population Research and Policy Review***, 14(2):274-276,1995.
John R. Weeks, "Review of 'Painful Inheritance: Health and the New Generation of Fatherless Families' by Ronald J. Angel and Jacqueline L. Angel," ***American Journal of Sociology***, (November): 841-843, 1994.
John R. Weeks, "Review of 'The Fourth Wave' and 'Opening and Closing the Doors'," ***Population and Environment***, 15(1): 71-72, 1993.
John R. Weeks, "Review of 'The Fear of Population Decline' by Michael Teitelbaum and Jay M. Winter.'" ***Canadian Studies in Population*** 15(2): 234-236, 1988.
John R. Weeks, "Review of 'Population and Technological Change: A Study of Long-Term Trends' by Ester Boserup," ***The Journal of Developing Areas*** 17(4):544-546, 1983.
John R. Weeks, "Review of 'Age and Sex Population Projections of Utah Counties', by Therel Black and James Tarver," ***Sociology and Social Research*** 51(2):386-388, 1967.

**SELECTED OTHER RESEARCH REPORTS**

John R. Weeks, "The Use and Abuse of Sampling and Statistical Methods in Construction Defect Lawsuits," last revised 2023.
John R. Weeks and David M. Eisenberg, "Estimating the Cost to the County of San Diego, California, of Services Delivered to Undocumented Immigrants During FY 2006-07," Final Report to the County of San Diego, 2007.
Tanis Salant, John R. Weeks, Efrat Feferman, Jenna Berman, and David Eisenberg, "Undocumented Immigrants in U.S.-Mexico Border Counties: The Costs of Law Enforcement and Criminal Justice Services," Final Report to the United States/Mexico Border Counties Coalition, 2008, https://www.ncjrs.gov/pdffiles1/nij/grants/223285.pdf
Tanis Salant, Christine Brenner, Nadia Rubaii-Barrett, and John R. Weeks, "Illegal Immigrants in U.S./Mexico Border Counties: The Costs of Law Enforcement, Criminal Justice, and Emergency Medical Services." Final Report to the United States/Mexico Border Counties Coalition, 2001, earthops.org/immigration/bordercounties/frontdocs.pdf
John R. Weeks, John V. Kaiser, Dongmei Chen, and Michael T. Dolan, "Identification of Urban Areas at High Risk for Criminal Activity Through Image Analysis: What are the Possibilities?" Final Report to NASA Earth Science Enterprise Commercial Remote Sensing Program, Affiliated Research Center, San Diego State University, 2000.

John R. Weeks, "An Analysis of the Sampling and Extrapolation Methods Utilized by Curtis Guy Odom of The Diehl Group Architects, Inc.," prepared in the case of Canyon Rim Townhomes Association v. The Baldwin Company et al., Orange County Superior Court, 1997.

John R. Weeks, "An Analysis of the Sampling and Extrapolation Methods Utilized by Bruck Allen Architects, Inc.," prepared in the case of The Lakes at Carmel Del Mar Condominium Association v. The Baldwin Company et al., San Diego Superior Court, 1996.

John R. Weeks, "The Muslim Population of San Diego County: An Assessment of Pilot Project Methods and Results," Final Report Submitted to the American Muslim Council and Dar al Islam, July 1996.

John R. Weeks, "The Economic Adjustment of Small to Medium Sized Defense Related Firms in San Diego County: With Comparisons of the East, Central, North and South Regions of the County," Prepared for the East County Economic Development Council under contract with the City of San Diego, Economic Development Services, as part of Grant No. CR 9223-94-02 from the Office of Economic Adjustment of the U.S. Department of Defense, December 1995.

John R. Weeks, "The Economic Adjustment of Small to Medium Sized Defense Related Firms in the City of San Diego," Prepared for the East County Economic Development Council under contract with the City of San Diego, Economic Development Services, as part of Grant No. CR 9223-94-02 from the Office of Economic Adjustment of the U.S. Department of Defense, November 1995.

John R. Weeks, "An Evaluation of The Termination of San Diego County's Family Planning Program: Final Report," Prepared for the California Family Planning Council, January, 1995.

John R. Weeks, "The Economic Adjustment of Small Defense Related Firms in the East County Region of San Diego County: Analysis and a Prototype," Prepared for the East County Economic Development Council under contract with the City of San Diego, Economic Development Services, as part of Grant No. CR 9223-94-02 from the Office of Economic Adjustment of the U.S. Department of Defense, December 1994.

John R. Weeks, "Perceptions of Health Care in the East County." La Mesa, CA: East County Economic Development Council, 1994.

John R. Weeks, "Health Status of American Muslims: A Report of Findings from a Set of Preliminary Questionnaires Administered by the American Muslim Council," Prepared for the American Muslim Council, Washington, D.C., 1994.

John R. Weeks, Editor, "The Demographics of East County" (La Mesa, CA: East County Economic Development Council), 1993.

John R. Weeks, "The Nascent Awareness of Muslims in America," Prepared at the request of the American Muslim Council, Washington, D.C., 1993.

Rubén G. Rumbaut and John R. Weeks, "Perinatal Risks & Outcomes Among Low-Income Immigrants," Final Report for Grant MCJ-060595-01 from the U.S. Bureau of Maternal and Child Health and Resources Development, 1992.

David Feldman and John R. Weeks, "Perceptions of East County: The View from Outside," Report for the East County Economic Development Council, 1991.

John R. Weeks, "The Impact of Jobs on Business: Results of a Study Conducted by the East County Economic Development Council." Final Report submitted to the East County Economic Development Council, La Mesa, California, 1991.

John R. Weeks, "The Demographics of the East County Judicial District of the San Diego Superior Court," prepared for the case of People v. Vera, San Diego Superior Court, 1989.

John R. Weeks and Roberto Ham-Chande, with Norma Ojeda, "Demographic Interrelatedness of the U.S.-Mexico Border," Final Report submitted to the U.S. Bureau of the Census, Joint Statistical Agreement Project No. 01-70-20-5900-00-258, May 1989.

John R. Weeks, "Factors Affecting the Choice of Natural Family Planning," Final Report submitted to the U.S. Office of Population Affairs, Research Grant No. FPR 000052-01-0, January 1989.

John R. Weeks, "Population Projection Analysis for the Wastewater Program Management Project", prepared for James M. Montgomery, Consulting Engineers, Inc., San Francisco, California, on behalf of the County of San Diego, September 1988.

John R. Weeks and Rubén G. Rumbaut, "Infant Health and Mortality Among Indochinese Refugees in San Diego County: Final Report," Final Report submitted to the Division of Maternal and Child Health, Bureau of Health Care Delivery and Assistance, Research Grant No. MCJ-060551, August 1988.

John R. Weeks, "Report on an Analysis of the Procedures Used to Develop the Master Juror Qualification List in Los Angeles County," prepared for the case of People v. Richard Ramirez, Los Angeles Superior Court, May 1988.

John R. Weeks, "A Comparison of the Demographics of the Pool of Eligible Jurors in the Community with the Demographics of a Sample of Jurors in the Courthouse: Los Angeles Superior Court, Central Judicial District:

August-December 1987," prepared for the case of People v. Richard Ramirez, Los Angeles Superior Court, March 1988.
John R. Weeks, "A Comparison of the Demographics of the Pool of Eligible Jurors in the Community with the Demographics of a Sample of Jurors in the Jury Lounge, San Diego Courthouse, January-February 1988," prepared for the case of People v. Mayer, San Diego Superior Court, 1988.
John R. Weeks, "A Comparison of the Demographics of the Pool of Eligible Jurors in the Community with the Demographics of a Sample of Jurors in the Courthouse: Los Angeles Superior Court, Western (Santa Monica) Judicial District: August 1987-February 1988," prepared for the case of People v. Ware, Los Angeles Superior Court, 1988.
John R. Weeks, "An Analysis of the Demographics of Jury Composition in the Riverside Superior Court, March-April 1987," prepared for the case of People v. Neidiffer and Cruz, Riverside Superior Court, 1987.
John R. Weeks and Roberto Ham-Chande, "Binational Symposium on Population Issues Along the U.S.-Mexico Border," Summary Report of Conference held in Tijuana, Mexico, June 1987.
John R. Weeks, "A Comparison of the Demographics of the Pool of Eligible Jurors with the Demographics of a Sample of Jurors in the Jury Lounge, San Diego Courthouse, March-April 1987," prepared for the case of People v. Lucas, San Diego Superior Court, 1987
John R. Weeks, "The Development of Information Related to U.S. and Mexican Populations," Report to the William and Flora Hewlett Foundation, 1987.
John R. Weeks, "The Disparity Between the Proportion of Blacks in the Population and Proportion of Blacks Surveyed in the Jury Lounges: Vista and San Diego," prepared for the case of People v. Troiani, San Diego Superior Court, 1986.
John R. Weeks, "Teenage Male Attitudes Toward Adolescent Pregnancy," Final Report to the San Diego Community Foundation, 1984.
Helen M. Wallace and John R. Weeks, "Effects of Proposition 13 on Health Care Services for Mothers and Children in California: Reports of Periodic Monitoring, 1978-1984," Final Report to the Division of Maternal and Child Health, U.S. Department of Health and Human Services, 1984.
John R. Weeks, "The Availability of Members of Potentially Cognizable Groups in the Pool of Prospective Jurors," prepared for the case of People v. Ivory, San Diego Superior Court, 1984.
John R. Weeks, "SDSU Demographics in the Year 2000," Report prepared for the Directions 2000 Committee of the California State University Board of Trustees, 1982
John R. Weeks and Sally A. Koblinsky, "An Assessment of Family Life Education in the 9th and 10th Grades in California," Final Report to the Office of Family Planning, California Department of Human Services, 1982.
José B. Cuellar and John R. Weeks, "Minority Elderly Americans: A Prototype for Area Agencies on Aging," Final Report for Grant No. 90-A-1667 (01) from the Administration on Aging to the San Diego Area Agency on Aging and Allied Home Health Association, 1980.
John R. Weeks, "The Need for In-Home Services in San Diego, Part II, "Final Report for Contract No. 00290l from the San Diego Regional Employment and Training Consortium to Allied Community Services, 1978.
John R. Weeks, "The Need for In-Home Services in San Diego, Part I," Final Report for Contract No. 002401 from the San Diego Regional Employment and Training Consortium to Allied Community Services, 1978.

**RESEARCH SUPPORT**

John R. Weeks, Mentor to Holly Shakya, "Adolescent pregnancy and social networks in rural Honduras," K01HD087551 Grant from the National Institute of Child Health and Human Development, 2016-2023.
John R. Weeks, Co-Principal Investigator, "The Urban Transition in Ghana and Its Relation to Land Cover and Land Use Change Through Analysis of Multi-Scale and Multi-Temporal Satellite Image Data," National Aeronautics and Space Administration (Douglas Stow, PI), 2012-2016 ($900,000).
John R. Weeks, Mentor to Peter Davidson, "A Mixed-Method Study of Injection Drug Use Settings among FSWs in Tijuana", K01DA032443 grant from the National Institute of Drug Abuse, 2012-2017.
John R. Weeks, Mentor to Abby Randolph, "HIV and Substance Abuse Epidemiology among IDUs: Structural and Network Risk Factors", K01DA033879 grant from the National Institute of Drug Abuse, 2012-2017.
John R. Weeks, Principal Investigator, "Doctoral Dissertation Research: Integrating Space and Place into Children's Perceptions of Environmental Health Hazards," Marta Jankowska, Doctoral Student. Grant from the National Science Foundation, 2011-2013 ($11,585).
John R. Weeks, Principal Investigator/Project Director (Allan G. Hill, Arthur Getis, Douglas Stow, David Rain, and Ryan Engstrom, Co-Investigators), "Health, Poverty, and Place: Modeling Inequalities in Accra Using RS and GIS," R01 Grant from the National Institute of Child Health and Human Development, 2007-2012 ($3,000,000); Diversity Post-Doctoral Supplement, 2009-2011 ($167,000); ARRA Administrative Supplement, 2009 ($72,000).

John R. Weeks, Principal Investigator, "Determining the Costs of Emergency Medical Services Provided to Undocumented Immigrants in San Diego County," Contract with the County of San Diego, 2007 ($40,000).
John R. Weeks, Principal Investigator, "Determining the Costs of Illegal Immigrant Criminal Activity in San Diego Imperial, and Yuma Counties in 2006," Grant from the U.S. Department of Justice, through the United States/Mexico Border Counties Coalition, 2007 ($17,500).
John R. Weeks, Arthur Getis, and Douglas Stow, "Summer Award for External Funding Proposal Development," Grant from the SDSU College of Arts and Letters, 2005 ($5,000).
John R. Weeks, Principal Investigator (Allan G. Hill, Arthur Getis, and Douglas Stow, Co-Investigators), "Intraurban Health Assessed by Remote Sensing and GIS," R21 Grant from the National Institute of Child Health and Human Development, 2004-2007 ($320,000).
John R. Weeks, Co-Principal Investigator (with Arthur Getis), "SPACE Workshop," Grant from the University Consortium on Geographic Information Science, 2004 ($26,000).
John R. Weeks, Co-Investigator (Douglas Stow, PI), "Spatial Decision Support for Border Security," Grant from the National Aeronautics and Space Administration (NASA), 2003-2007 ($900,000).
John R. Weeks, Co-Investigator (Joni Mayer, PI), "Multi-Level Assessment of Indoor Tanning Practices," Grant from the National Cancer Institute, 2003-2007 ($1.2 million).
John R. Weeks, Principal Investigator, "Doctoral Dissertation Research: Measuring the Environmental Context of Social Vulnerability to Urban Earthquake Hazards: An Integrative Remote Sensing and GIS Approach," Tarek Rashed, Doctoral Student. Grant from the National Science Foundation, 2001-2003 ($6,400).
John R. Weeks, Principal Investigator (Allan G. Hill, Arthur Getis, Douglas Stow, and Saad Gadalla, Co-Investigators), "Applying Remote Sensing and Geographic Information System Techniques to the Arab Fertility Transition," Grant from the National Science Foundation, 2001-2004 ($360,000).
John R. Weeks, Principal Investigator, "Determining the Costs of Illegal Immigrant Criminal Activity and Use of Emergency Medical Services in San Diego and Imperial Counties," Grant from the U.S. Department of Justice, through the United States/Mexico Border Counties Coalition, 2000-2001 ($45,000).
John R. Weeks, Co-Principal Investigator, "Identification of Urban Areas at High Risk for Criminal Activity Through Image Analysis: What are the Possibilities?" Grant from the National Aeronautics and Space Administration, Commercial Remote Sensing Program to the San Diego State University Department of Geography Affiliated Research Center (Douglas A Stow, Principal Investigator), 1999 ($50,000).
John R. Weeks, Project Director, "Urban Growth and Socio-Spatial Change in Latin America," San Diego State University Faculty Grant-in-Aid, 1998-99 ($7,500).
John R. Weeks, Principal Investigator (with Allan G. Hill, Harvard University, and M. Saad Gadalla, San Diego State University), "Applications of GIS/Remote Sensing to an Analysis of the Arab Fertility Transition," Grant from the Andrew Mellon Foundation, 1998-2000 ($100,000).
John R. Weeks, Project Director, "Enumerating the Muslim Population of Los Angeles," Grant from the American Muslim Council, 1997($50,000).
John R. Weeks, Project Director, "A Census of the Muslim Population in the United States: Pilot Project in San Diego County," Grant from Dar al Islam (private foundation in New Mexico), 1995 ($40,000).
John R. Weeks, Project Director, "A Study of the Needs of Small Defense-Related Firms in San Diego County," Grant from the U.S. Department of Defense, Office of Economic Adjustment to the City of San Diego Economic Development Services and the East County Economic Development Council, 1994-95.
John R. Weeks, Project Director, "Evaluation of the Closing of San Diego County's Family Planning Program," California Family Planning Council, 1994.
John R. Weeks, Project Director, "Outcomes Measures of Perinatal Risks Among Low Income Immigrant Women," San Diego State University Faculty Grant-in-Aid. 1993.
John R. Weeks, Project Director, "Expert Group Meeting on the Enumeration and Sociodemographic Characterization of the American Muslim Population," American Muslim Council, 1992.
John R. Weeks, Project Director, "Coding of Data on Perinatal Risks and Outcomes," SDSU College of Arts and Letters Mini-Grant, 1992.
John R. Weeks, Co-Principal Investigator (with Rubén G. Rumbaut), "Perinatal Risks and Outcomes Among Low-Income Immigrants," grant from the U.S. Public Health Service, Bureau of Maternal and Child Health and Resource Development, 1990-91.
John R. Weeks, Project Director, "Publication of Proceedings of Population Issues Along the U.S.-Mexico Border," grants from the S.H. Cowell Foundation, and the William and Flora Hewlett Foundation, 1990.
John R. Weeks, Project Director, Research, Scholarship, and Creative Activity mini-grant from San Diego State University, Spring, 1990.
John R. Weeks, Project Director, Research, Scholarship, and Creative Activity mini-grant from San Diego State University, Spring, 1989.

John R. Weeks, Principal Investigator, "Demographic Interrelatedness of the U.S. Mexico Border Region," Grant from the S.H. Cowell Foundation, and a Joint Statistical Agreement (JSA) with the U.S. Bureau of the Census, 1988-1989.

John R. Weeks, Principal Investigator, "Factors Affecting the Choice of Natural Family Planning," Grant from the U.S. Office of Population Affairs to the San Diego State University Foundation, 1987-1988.

John R. Weeks, Co-Principal Investigator (with Rubén G. Rumbaut), "An Analysis of Infant Mortality Among Indochinese Refugees," Grant from the U. S. Office of Maternal and Child Health to the San Diego State University Foundation, 1987-1988.

John R. Weeks, Project Director, "Border Issues in Population/Family Planning," Grants from the William and Flora Hewlett Foundation, the Bergstrom Foundation, the S. H. Cowell Foundation, and the Rockefeller Foundation to the San Diego State University Foundation, 1986-1987.

John R. Weeks, Principal Investigator, "Further Analysis of Live Birth Data for San Diego County," Grant for Support of Faculty Research for the Summer of 1985, San Diego State University, 1985.

John R. Weeks, Principal Investigator, "Analysis of Live Birth Data for San Diego County, 1983-1984," Grant from San Diego Urban League to San Diego State University Foundation, 1985.

John R. Weeks, Principal Investigator, Analysis of Survey Data on Male Attitudes Toward Teenage Pregnancy," Grant from San Diego Community Foundation to San Diego State University Foundation, 1984.

John R. Weeks, Co-Principal Investigator (with Helen M. Wallace), "Effects of Proposition 13 on Health Services in California," Grant from the U.S. Office of Maternal and Child Health Services in California," Grant from the U.S. Office of Maternal and Child Health to the San Diego State University Foundation, 1983-1984.

John R. Weeks, Co-Investigator (with Helen M. Wallace), "Maternal and Child Health Project," Grant from the U.S. Office of Maternal and Child Health to the San Diego State University Foundation, 1982-1983.

John R. Weeks, Co-Principal Investigator (with Helen M. Wallace, Gwen C. Cooke, and Sally A. Koblinsky), "The Family Health Education and Training Project," Contract No. 49800365 from the California Office of Family Planning to the San Diego State University Foundation, 1981-1982.

John R. Weeks, Co-Principal Investigator (with José B. Cuellar), "Minority Elderly Americans: Development of a Prototype for Area Agencies on Aging in the Assessment of Equitability of Receipt of Public Benefits in Housing, Employment, Retirement, Income, Health, and Services," Grant No. 90-A-1667 (01) from the U. S. Administration on Aging to the San Diego Area Agency on Aging and Allied Home Health Association, 1979-1980.

John R. Weeks, Principal Investigator, "Client and Population Based Information System for Managing and Evaluating In-Home Services," Contract No. 002901 from the San Diego Regional Employment and Training Consortium to Allied Community Services, 1978.

John R. Weeks, Principal Investigator, "Management Information System for In-Home Service," Contract No. 002401 from the San Diego Regional Employment and Training Consortium to Allied Community Services, 1978.

**PAPERS PRESENTED AT PROFESSIONAL MEETINGS**

John R. Weeks, "How Has Teaching Demography Evolved Over Time," presented at the (virtual) annual meeting of the Population Association of America," May 2021.

John R. Weeks, "Educational Level as a Key Predictor of Human Wellbeing," presented at the Wittgenstein Centre Conference, Demographic Aspects of Human Wellbeing, Vienna, Austria, November 2019.

Holly Shakya, John R. Weeks, and Nicholas Christakis, "Individual Social Network Factors Across Disparate Relationships: Social Norms and Their Association with Adolescent Pregnancy in Rural Honduras," presented at the annual meeting of the Population Association of America, Austin, TX, April 2019.

Holly Shakya, John R. Weeks, and Nicholas Christakis, "Village Level Normative: Spatial and Social Network Predictors of Adolescent Pregnancy in Rural Honduras," presented at the annual meeting of the Population Association of America, Denver, April 2018.

Holly Shakya, John R. Weeks, Paul J. Fleming, Lotus McDougal, Anne Scobel, Benjamin Cislaghi, Sabrina Boyce, Anita Raj, and Jay Silverman, "The Association Between Individual and Village-Level Demographic Characteristics and Age at First Marriage Among Married Adolescents in Rural Niger: A Spatial Analysis," presented at the annual meeting of the Population Association of America, Denver, April 2018.

Holly Shakya, John R. Weeks, and Nicholas A. Christakis, "Distribution of adolescent fertility in the Copán region of rural Honduras: Results from a complete census of 176 villages," presented at the annual meeting of the Population Association of America, Chicago, April 2017.

John R. Weeks, "Child mortality along the urban gradient in Ghana," presented at the annual meeting of the American Association of Geographers, Boston, April, 2017.

John R. Weeks and Gregory B. Weeks, "Too Big to Succeed? Demography and Socialist Experiments in Chile and Venezuela," presented at the annual meeting of the Southeastern Council of Latin American Studies (SECOLAS), Charleston, SC, March 2015.

Magdalena Benza, John R. Weeks, Douglas A. Stow, Keith C. Clarke, and David López-Carr, "Fertility and Urban Context: A Case Study from West Africa Using Remotely Sensed Imagery and GIS," presented at the Annual Meeting of the Population Association of America, San Diego, April 2015.

John R. Weeks and Allan G. Hill, "Inequalities in health, morbidity and mortality in Accra, Ghana," presented at the European Health, Morbidity and Mortality Working Group, and British Society for Population Studies Workshop on "The continuing Importance of Inequality in Health and Mortality Analyses," London School of Economics, London, England, September 2014.

John R. Weeks, Douglas A. Stow, David López-Carr, Ryan Engstrom, Lloyd Coulter, Sory Toure, Nicholas Ibanez, Foster Mensah, and Sean Taugher, "Environmental Drivers of Internal Migration in Ghana," presented at the Annual Meeting of the Association of American Geographers, Miami, April, 2014.

Douglas Stow, Lloyd Coulter, John R. Weeks, Magdalena Benza-Fiocco, Sory Toure, and Nicholas Ibanez, "The Urban Transition in Ghana and Its Relation to Land Cover and Land Use Change Through Analysis of Multi-scale and Multi-temporal Satellite Image Data," presented at the Annual Meeting of the American Society of Photogrammery and Remote Sensing, Louisville, March, 2014.

Anna Carla Lopéz, David Lopéz-Carr, Laura Grant, and John R. Weeks, "The Spaces and Places of Food Security: Learning from Spatial, Hierarchical, and Econometric Models in Urban Data-poor Areas," presented at the General Meeting of the International Union for the Scientific Study of Population (IUSSP), Busan, Korea, August, 2013.

Allan G. Hill, John R. Weeks, and Magdalena Benza Fiocco, "Towards The Demography Of Ill-Health: Comparing the Geographical Distributions Of Mortality and Health in Ghana," presented at the Annual Meeting of the British Society for Population Studies, Nottingham, UK, September, 2012.

John R. Weeks, Justin Stoler, Allan G. Hill, and Alex Zvoleff, "Fertility in Context: Exploring Egocentric Neighborhoods in Accra, Ghana," Presented at the Annual Meeting of the Association of American Geographers, New York, NY, February 2012; and at the Annual Meeting of the Population Association of America, San Francisco, May, 2012.

John R. Weeks, "Connecting the Dots Between Health, Poverty and Place in Accra, Ghana," Presented at the Annual Meeting of the Association of American Geographers, Seattle, WA, April, 2011.

John R. Weeks, Samuel Agyei-Mensah, George Owusu, Allan G. Hill, and Magdalena Benza-Fiocca, "Ethnic Assimilation in Accra, Ghana," Presented at the Annual Meeting of the Population Association of America, Washington, DC, April, 2011.

Charles F. Westoff and John R. Weeks, "Religiousness and Reproduction in Muslim Countries," Presented at the Annual Meeting of the Population Association of America, Dallas, April, 2010.

John R. Weeks, Allan G. Hill, Arthur Getis, David Rain, Ryan Engstrom, Douglas A. Stow, Livia Montana, Kenneth Hill, and Mark Montgomery, "Modeling Spatial Inequalities in Health in Cities of Developing Countries: The Case of Accra, Ghana," Presented at the Annual Meeting of the Association of American Geographers, Las Vegas, March 2009; and revised versions presented at the Annual Meeting of the Population Association of America, Detroit, May 2009, and the General Meeting of the International Union for the Scientific Study of Population (IUSSP), Marrakech, Morocco, October, 2009.

Gregory B. Weeks and John R. Weeks, "Immigration and Transnationalism: Rethinking the Role of the State in Latin America," Presented at the Annual Meeting of the Southeastern Council of Latin American Studies, New Orleans, LA, April, 2009.

John R. Weeks, Allan G. Hill, Arthur Getis, and Sarah Hinton, "Do Slums Promote High Urban Fertility? Neighborhood Differences in Fertility in Accra, Ghana," Presented at the Annual Meeting of the Population Association of America, New York, March, 2007, and at the Annual Meeting of the Association of American Geographers, San Francisco, April, 2007.

John R. Weeks, Allan G. Hill, Arthur Getis, Douglas Stow, and Debbie Fugate, "The Impact of Neighborhood Structure on Health Inequalities in Accra, Ghana," Presented at the Annual Meeting of the Population Association of America, Los Angeles, March, 2006.

John R. Weeks, Allan G. Hill, Douglas Stow, and Arthur Getis, "Can We Spot a Neighborhood From the Air?," Presented at the Annual Meeting of the Association of American Geographers, Chicago, March, 2006.

Gregory B. Weeks and John R. Weeks, "The Political Demography of Latin American Migration," Presented at the LASA2006 Congress, San Juan, Puerto Rico, March 2006.

Chase-Dunn, Christopher, Alexis Alvarez, Andrew Jorgenson, Richard Niemeyer, Daniel Pasciuti and John Weeks, "Global City Networks in World Historical Perspective." Presented at the annual meeting of the American Sociological Association, Montreal, August 2006.

John R. Weeks, Allan G. Hill, Arthur Getis, Douglas Stow, Sam Agyei-Mensah, and John K. Anarfi, "Intra-urban Differentials in Poverty and Health in Accra, Ghana," Presented at the General Meeting of the International Union for the Scientific Study of Population, Tours, France, July 2005.

John R. Weeks, Allan G. Hill, Arthur Getis, and Douglas Stow, "Residential Segregation as a Predictor of Intra-Urban Health Inequality in Accra, Ghana." Presented at the Annual Meeting of the Association of American Geographers, Denver, April 2005.

John R. Weeks, "Family Demographic Histories," Presented at the Workshop on Teaching Undergraduate Demography, Annual Meeting of the American Sociological Association, San Francisco, August 2004.

Stow, D., D. Fugate, T., Rashed, J., Weeks, and A. Getis, "Validation of Satellite Derived End-Member Fraction Maps of Cairo, Egypt Using Quickbird Imagery," presented at the Annual Meeting of the Association of American Geographers, Philadelphia, March 2004.

John R. Weeks, Arthur Getis, Douglas Stow, Debbie Fugate, and Anna Carla López, "Neighborhood Predictors of Fertility Levels in Amman, Jordan, Combining RS and Census Data into a GIS," presented at the Annual Meeting of the Association of American Geographers, Philadelphia, March 2004.

John R. Weeks, "Pace and Space: The Geography of Fertility Change in Egypt," Harvard Center for Population and Development Studies Working Group on Health Healing and Ritual Practice, Cambridge, MA, March 2004.

Christopher Chase-Dunn and John R. Weeks, "Global Cities and Suburban Sprawl: An Analysis using GIS and Remote Sensing," Specialist Meeting on Globalization in the World System: Mapping Change over Time, University of California, Riverside, February 2004.

John R. Weeks, "Patterns of Urban Land Use as Assessed by Satellite Imagery: Applications in Egypt and Jordan," presented at the Workshop on Research on Population, Land Use, and Environment, Panel on New Research in Population and Environment, Committee on the Human Dimensions of Global Change, National Research Council, Irvine, California, January 2004.

John R. Weeks and Debbie Fugate, "Neighborhood Context as a Determinant of Child Health in Cairo, Egypt: The Application of GIS and Remote Sensing to a Study of Intra-Urban Variability in Health," presented at Second International Conference on Urban Health, New York City, October 2003 (abstract published in ***Journal of Urban Health*** 80: Supplement 2, p. 13, 2003).

John R. Weeks, "The Creation and Application of an Urban Gradient Index," presented at the Conference on Migration, Urbanization and Health, Princeton University, September 2003.

Tarek Rashed and John R. Weeks, "Exploring the Spatial Association Between Measures from Satellite Imagery and Patterns of Urban Vulnerability to Earthquake Hazards," presented at the 4th International Symposium on Remote Sensing of Urban Areas, Regensburg, Germany, 2003.

John R. Weeks, Dennis Larson, and Tarek Rashed, "Contrast or Continuum? The Creation and Application of an Urban Gradient Index," presented at the Annual Meeting of the Association of American Geographers, New Orleans, March 2003; also presented at the Annual Meeting of the Population Association of America, Minneapolis, May 2003.

John R. Weeks, "What did he know, and when did he know it? Putting Glenn Trewartha's call for population geography into historical perspective," presented at the Plenary Session of the Population Specialty Group, Annual Meeting of the Association of American Geographers, New Orleans, March 2003.

John R. Weeks, "Is Americanization Bad for Your Health? Lessons Learned From Studying Reproductive Outcomes of Immigrant Women," Opening Plenary Address at the U.S. Centers for Disease Control Eighth Annual Maternal and Child Health Epidemiology Conference, Clearwater Beach, Florida, December 2002.

John R. Weeks, Dennis Larson, Douglas A. Stow, and Tarek Rashed, "Conceptualizing the Urban-Rural Continuum: The Potential Contribution of Remotely-Sensed Imagery," presented at the International Conference on Population Geographies, University of St. Andrews, St. Andrews, Scotland, July 2002.

Tarek Rashed, John R. Weeks, Douglas Stow, and Debbie Fugate, "Measuring Temporal Compositions of Urban Morphology Through Spectral Mixture Analysis: Toward a Soft Approach to Change Analysis in Crowded Cities," presented at the Third International Symposium on Remote Sensing of Urban Areas, Istanbul, Turkey, June 2002.

John R. Weeks, Arthur Getis, Douglas Stow, Tarek Rashed, Xiaoling Yang, and M. Saad Gadalla, "Spatial Patterns as Predictors of Fertility in Cairo, Egypt," presented at the Annual Meeting of the Population Association of America, Atlanta, GA, May 2002

John R. Weeks, Xiaoling Yang, Arthur Getis, M. Saad Gadalla, and Allan G. Hill, "Spatial Patterns as Predictors of Fertility Change in Rural Egypt," presented at the Annual Meeting of the Population Association of America, Atlanta, GA, May 2002

John R. Weeks, "Using Remote Sensing and Geographic Information Systems to Identify the Underlying Properties of Urban Environments," presented at the conference on "New Forms of Urbanization: Conceptualizing and Measuring Human Settlement in the Twenty-first Century," organized by the IUSSP Working Group on

Urbanization and held at the Rockefeller Foundation's Study and Conference Center, Bellagio, Italy, March 2002.

John R. Weeks, Arthur Getis, Douglas Stow, Tarek Rashed, Xiaoling Yang, Saad Gadalla, and Allan Hill, "Spatial Patterns as Predictors of Fertility in Cairo, Egypt," presented at the Annual Meetings of the Association of American Geographers, Los Angeles, March 2002.

Mark McGinnis, Richard Wright, and John R. Weeks, "Predicting the Spatial Pattern of Urban Growth in San Diego County: An Application of the Clarke Urban Growth Model," presented at the Annual Meetings of the Association of American Geographers, Los Angeles, March 2002.

Christine Thurlow Brenner, Nadia Rubaii-Barrett, Tanis Salant, and John R. Weeks, "Criminal Undocumented Immigrants: The Cost to U.S. Counties on the Mexican Border for Law Enforcement, Criminal Justice and Emergency Health Care Services," presented at the Annual Meeting of the Association for Borderlands Studies, Reno, NV, April 2001.

Christopher Peak and John R. Weeks, "Does Community Context Influence Reproductive Outcomes of Mexican Origin Women in San Diego, California? Presented at the Annual Meeting of the Population Association of America, Washington, DC, March 2001.

John R. Weeks, M. Saad Gadalla, and Allan G. Hill, "The Environmental Context of Fertility in Egypt: Evidence from Demographic and Health Surveys," presented at the Annual Meeting of the Association of American Geographers, New York City, March 2001 (also presented at the Annual Meeting of the Population Association of America, Washington, DC, March 2001).

John R. Weeks, John V. Kaiser, Dongmei Chen, Milan Mueller, and Michael T. Dolan, "Exploring the Role of Remote Sensing and Crime," Presented at Wheredunit? Investigating the Role of Crime and Criminality: The Fourth Annual International Crime Mapping Research Conference, San Diego, CA, December 2000.

John R. Weeks, John V. Kaiser, Dongmei Chen, Milan Mueller, and Michael T. Dolan, "Identification of Urban Areas at High Risk for Criminal Activity Through Image Analysis: What are the Possibilities?" Presented at the ESRI Users Conference, San Diego, CA, June 2000.

John R. Weeks, Tarek Rashed, M. Saad Gadalla, and Allan G. Hill, "The Environmental Context of Reproduction in Rural Menoufia, Egypt," presented at the Annual Meeting of the Association of American Geographers, Pittsburgh, April 2000.

John R. Weeks, Tarek Rashed, M. Saad Gadalla, and Allan G. Hill, "Measuring the Environmental Context of Urban Fertility in Arab Countries: A 'Top-Down' Approach to Fertility in Cairo, Egypt," presented at the Annual Meeting of the Population Association of America, Los Angeles, March 2000.

John R. Weeks, "GIS for the Demography of the Border," presented at the Taller Demográfica de la Frontera México - Estados Unidos, El Colegio de la Frontera Norte, Tijuana, Mexico, October, 1999.

John R. Weeks, M. Saad Gadalla, Tarek Rashed, James Stanforth, and Allan G. Hill, "Spatial Variability in Fertility in Menoufia, Egypt, Assessed Through the Application of Remote-Sensing and GIS Technologies," presented at the Annual Meeting of the Population Association of America, New York, March 1999.

John R. Weeks, Allan G. Hill, and M. Saad Gadalla, "Applications of Remote-Sensing and GIS to the Fertility Transition in Rural Egypt," presented at the 1998 Annual North American Meeting of the Regional Science Association International, Santa Fe, New Mexico, November 1998.

John R. Weeks, "Demographic Dynamics of the San Diego-Tijuana Region," presented at the Conference on "Sustainable Development in San Diego-Tijuana: Environmental and Social Consequences of Economic Integration," UCSD Center for US-Mexican Studies, San Diego, May, 1997.

John R. Weeks and Laura M. Makey, "Fertility Along and Across the US-Mexico Border," presented at the 1997 Annual Meeting of the Population Association of American (Washington, DC, March 1997); and at the 1997 Annual Meeting of the Association of American Geographers (Forth Worth, Texas, April 1997).

John R. Weeks, "New Methods of Estimating the Muslim Population in the United States," presented at the annual meeting of the Population Association of America, New Orleans, 1996.

John R. Weeks, "The Census of Muslims in the United States," presented at the annual meeting of the Association of American Geographers, Charlotte, NC, 1996.

John R. Weeks and Karyl Fuller, "Population Distribution and Migration: Components of Housing Demand and Supply," presented at the International Symposium on Human Settlements, Habitat II, "From Cairo to Istanbul," San Diego, CA 1996.

John R. Weeks, Rubén G. Rumbaut, and Norma Ojeda, "Are Mexico-Born Women Giving Birth in San Diego Healthier Than Women Giving Birth in Tijuana?" presented at the 123rd Annual Meeting of the American Public Health Association, San Diego, CA, 1995.

Rubén G. Rumbaut and John R. Weeks, "Unraveling a Public Health Enigma: Why do Immigrants Experience Superior Perinatal Health Outcomes?" presented at the 122nd Annual Meeting of the American Public Health Association, Washington, DC, 1994. [Abstracted in the ***Journal of the American Medical Association***, the ***New York Times***, and the ***Wall Street Journal***].

John R. Weeks and Rubén G. Rumbaut, "How Important is Migration Selectivity as a Factor in the Perinatal Health of Hispanics?" presented at the annual meeting of the Population Association of America, Miami, FL, 1994.

I. Douglas Sheres and John R. Weeks, "The Geodemographics of Major League Baseball," presented at the annual meeting of the Association of American Geographers, San Francisco, 1994. [Abstracted in ***American Demographics***, October 1994, pp 9-11].

John R. Weeks and Robert Schlesinger, "Fertility Along the Two Sides of the U.S.-Mexico Border," presented at the annual meeting of the Association of American Geographers, San Francisco, 1994.

Rubén G. Rumbaut and John R. Weeks, "Ethnicity, Nativity, and the Paradox of Perinatal Health and Morbidity: An Analysis of Sociocultural and Biomedical Causal Factors," presented at the annual meeting of the American Sociological Association, Miami, FL, 1993.

John R. Weeks and Rubén G. Rumbaut, "Why do Immigrant Asian and Hispanic Women Experience Superior Perinatal Health Outcomes?," presented at the annual meeting of the Population Association of American, Cincinnati, OH, 1993. [also presented at the Eighth Annual San Diego Biostatistics and Epidemiology Applications Conference, University of California, San Diego, April, 1993].

John R. Weeks, "The Demographic Dynamics of the U.S.-Mexico Border and the Implications for NAFTA," presented to the Congressional Sunbelt Caucus, the Congressional Border Caucus, and the National Governor's Association, Washington, D.C., sponsored by the Population Resource Center, 1993. [Repeated for members of the Texas State Legislature, Austin, Texas, 1993].

John R. Weeks, "The Economic and Social Implications of Population Aging in the Context of Internal and International Migration," Presented at the International Conference of Population Aging, San Diego, CA, 1992.

John R. Weeks, "The Role of Incentives and Disincentives in Stabilizing Population Growth," presented at the National Carrying Capacity Issues Conference, Washington, D.C., 1992.

John R. Weeks, "Demographic Trends in the Middle East," presented at a Congressional Briefing and a private U.S. State Department Briefing, sponsored by the Population Resource Center and the Population Association of America, Washington, D.C., 1991.

John R. Weeks and Rubén G. Rumbaut, "Ethnicity, Maternal Risk Factors, and Pregnancy Outcomes," presented at the annual meeting of the Population Association of America, Washington, D.C., 1991.

John R. Weeks, "The Demographic Distinctiveness of the U.S.-Mexico Border Region," presented at the IV. Reunión Nacional de la Sociedad Mexicana de Demografía (SOMEDE), El Colegio de México, México, D.F., April, 1990.

John R. Weeks, "Household Structure and Fertility at the U.S.-Mexico Border," presented at the Annual Meeting of the Association of Borderland Scholars, Tijuana, Mexico, 1990.

John R. Weeks and Rubén G. Rumbaut, "Infant Mortality Among Indochinese Refugees," presented at the Second Annual Regional Conference on Maternal and Child Health Research, Rockville, Maryland, 1989.

Rubén G. Rumbaut and John R. Weeks, "Infant Health Among Indochinese Refugees: Patterns of Infant Mortality, Birthweight and Prenatal Care in Comparative Perspective," presented at the annual meeting of the American Sociological Association, San Francisco, 1989.

John R. Weeks and Rubén G. Rumbaut, "Infant Mortality Among Indochinese Refugees in San Diego County," presented at the annual meeting of the Population Association of America, Baltimore, 1989.

John R. Weeks and Tam Trinh, "Factors Affecting the Choice of Natural Family Planning: A Research Progress Report," Fifth National and International Symposium on Natural Family Planning, Los Angeles, 1988.

John R. Weeks, "Factors Affecting the Choice of Natural Family Planning," 16th Annual Psychosocial Workshop, New Orleans, 1988.

Rubén G. Rumbaut and John R. Weeks, "Indochinese Refugees: Infant Health and Cultural Adaptation," National Association of Social Workers, San Diego Health Council, 1988.

John R. Weeks, "Business Demography: Sociological Approaches," Expert Panel on Business Demography, Midwest Sociological Society, Minneapolis, 1988.

John R. Weeks, "Population and Contemporary Issues," Teaching Workshop at the Annual Meeting of the American Sociological Association, Chicago, 1987.

John R. Weeks, "Un Resumen Sobre Niveles de Fecundidad y Planificación Familiar a lo Largo de la Frontera Norte de México," presented at the Third Meeting of Sociedad Mexicana de Demografía, Mexico City, 1986.

John R. Weeks, Rubén G. Rumbaut, Claire Brindis, Carol Korenbrot, and Donald Minkler, "An Analysis of High Fertility Among Indochinese Refugees," presented at the Annual Meetings of the Population Association of America, San Francisco, California, 1986.

John R. Weeks, "Life Satisfaction and Support Networks Among Elder Immigrants," presented at the National Institute of Mental Health Workshop on Immigration and Mental Health, San Diego State University, 1985.

Rubén G. Rumbaut and John R. Weeks, "Fertility and Adaptation Among Indochinese Refugees," presented at the Psychosocial Workshop of the Annual Meetings of the Population Association of America, Boston, Massachusetts, 1985.

John R. Weeks, and Mohamed El-Assal, "Implications of Current Fertility Trends for the Future Development of Egypt," presented at the Egypt in the Year 2000 Conference, Cairo, Egypt, 1982.
Helen M. Wallace, John R. Weeks, Charlotte S. Jones, and Nelaufa Perera-Merrill, "Effects of Proposition 13 on Health Care of Mothers in California," presented at the Annual Meetings of the American Public Health Association, Los Angeles, California, 1982.
José B. Cuellar, John R. Weeks, Solomon Jacobson, Jesse McClure, Rudy Arrieta, and David Guttman, "Distribution of Public Benefits Among the Minority Elderly," presented at the Annual Meetings of the Gerontological Society of America, San Diego, California, 1980.
John R. Weeks and José B. Cuellar, "The Role of Family Members in the Helping Networks of Older People," presented at the Annual Meetings of the California Council on Family Relations, Santa Barbara, California, 1980.
John R. Weeks and José B. Cuellar, "The Influence of Immigration and Length of Residence on the Isolation of Older Persons," presented at the Annual Meetings of the Population Association of America, Denver, 1980.
José B. Cuellar and John R. Weeks, "A Strategy and Tool for the Assessment of Needs and Barriers to Benefits for Minority Elderly," presented at the Annual Meetings of the Western Gerontological Society, Anaheim, California, 1980.
John R. Weeks, "Critique of Research on Psychosocial Aspects of Natural Family Planning," presented at the Research Workshop on NFP: Reality and Potential, sponsored by the National Institute of Child Health and Human Development, Bethesda, Maryland, 1979.
John R. Weeks, "Income Distribution as a Factor in Coale's Preconditions for a Fertility Decline: Evidence from Mexico," presented at the Annual Meetings of the Population Association of America, Atlanta, Georgia, 1978.
John R. Weeks, "Retirement Homes: Economic Realities and Implications for Ethnic Minority Elders, presented at the Annual Institute on Minority Aging, San Diego, California, 1978.
John R. Weeks, "Social Psychological Correlates of Fertility Expectations," Presented at the Annual Meetings of the Pacific Sociological Association, Victoria, British Columbia, 1975.
John R. Weeks and Joseph Spielberg Benitez, "The Ethnodemography of Midwestern Chicano Communities," presented at the Annual Meetings of the Population Association of America, New Orleans, 1973.
John R. Weeks, "Fertility and Family Structure in Chile," presented at the Annual Meetings of the Pacific Sociological Association, Long Beach, California, 1967.

**OTHER RELATED PROFESSIONAL ACTIVITIES**

Organizer and Chair, "PAA Presidential Address Topics: Where are they Now? Volume III" Webinar of the Population Association of America, January 2022; available at: https://www.youtube.com/watch?v=0GzTE5OWBkE&list=PLNFXEhCaegwYi6Uz36cYy_Vc5d7hX3Nl9&index=14
Invited Presenter, "Global and Regional Demographic Trends," Webinar of the GEOINT Tradecraft Speaker Series, National Geospatial-Intelligence Agency, November 2021.
Organizer and Chair, "PAA Presidential Address Topics: Where are they Now? Volume II" Webinar of the Population Association of America, April 2021; available at: https://www.youtube.com/watch?v=7k9Y-LJwkWU&t=204s
Organizer and Chair, "PAA Presidential Address Topics: Where are they Now?" Webinar of the Population Association of America, December 2020; available at: https://www.youtube.com/watch?v=JZ9s1OfMMug&t=208s
Invited Speaker, "The Future is a Foreign Country: We'll Do Things Differently There," New Narratives on the Peopling of America, University of California, Berkeley, December 2019.
Discussant, Session on "Spatial Effects on Reproductive Health and Fertility," Annual Meeting of the Population Association of America, Austin, April, 2019.
Organizer and Chair, Sessions on "Health, Poverty, and Place in Ghana," Annual Meeting of the American Association of Geographers, Boston, April, 2017.
Panelist, Session on "Population Geography and the Environment: Special Session in Honor of Clark Gray and David López-Carr," Annual Meeting of the American Association of Geographers, Boston, April, 2017.
Participant, Session on "Population Specialty Group: Lifetime Achievement Award for John Weeks," Annual Meeting of the Association of American Geographers, San Francisco, CA, March 2016.
Panelist, Session on "Mapping Secondary Cities for Resiliency and Emergency Preparedness," Annual Meeting of the Association of American Geographers, San Francisco, CA, March 2016.
Chair, Session on "International Migration," Annual Meeting of the Association of American Geographers, San Francisco, CA, March 2016.

Panelist, Session on "Global health and the environment I: Research," Annual Meeting of the Association of American Geographers, San Francisco, CA, March 2016.
Invited Presenter, "The Power of Pixels: Using Imagery to Understand Spatial Inequalities in Health," University of North Carolina, Charlotte Departments of Geography and Political Science, March 2016.
Organizer and Chair, Session on "Spatial Analysis of Population and the Environment," Annual Meeting of Population Association of America, San Diego, CA, May 2015.
Invited Presenter, "The Power of Pixels: Using Imagery to Understand Spatial Inequalities in Health," University of Miami Departments of Geography, Sociology, and the Center for Latin American Studies, Miami, FL, February 2015.
Invited Presenter, "Too Big to Succeed? Demography and Socialist Experiments in Chile and Venezuela," University of Miami Departments of Geography, Sociology, and the Center for Latin American Studies, Miami, FL, February 2015.
Keynote Speaker, "North of the Border: The Changing Demographics of San Diego," Annual Meeting of the Western Regional Science Association, San Diego, CA, February 2014.
Panelist, Session on "The Use and Abuse of Sampling and Extrapolation in Construction Defect Lawsuits," West Coast Casualty's Construction Defect Seminar, Anaheim, CA, May 2013.
Organizer and Chair, Sessions on "Economic Change and Migration," Annual Meeting of the Population Association of America, San Francisco, May 2012.
Organizer and Chair, Sessions on "Health, Poverty, and Place in Ghana I, II, and III," Annual Meeting of the Association of American Geographers, New York, NY, February 2012.
Keynote Address, "Why Should You Care About the Census, and How Will it Affect Education Planning?" 35th Annual Conference of the California Association for Institutional Research, San Diego, November 2010.
Organizer and Instructor, "Advanced Spatial Analysis," GIS in Population Science Workshop, Center for Spatially Integrated Social Science, University of California, Santa Barbara, July 2010.
Invited Presenter, "Why Should You Care About the Census?," Distinguished Lecture Series, Osher Lifelong Learning Institute, University of California, San Diego, June 2010.
Organizer and Instructor, "Advanced Spatial Analysis," GIS in Population Science Workshop, Center for Spatially Integrated Social Science, University of California, Santa Barbara, July 2008.
Organizer and Chair, "Panel Discussion: PAA: How Did We Get Here and Where Are We Going?" and Discussant, Session on "Spatial Demography," Annual Meeting of the Population Association of America, New Orleans, April 2008.
Invited Presenter, "Do Slums Promote High Urban Fertility: Neighborhood Differences in Accra, Ghana," Social Science in Place (SSIP): GIS and Spatial Concepts Seminar Series, Survey Research Center, University of California, Berkeley, November 2007; and in the Winter 2008 Seminar Series of the Initiative in Population Research at The Ohio State University, February, 2008; and at the Graduate Student Seminar Series, Office of Population Research, Princeton University, March, 2008.
Invited Keynote Speaker, "Putting Place and Space into Demographic Analysis," GIS and Population Science Workshop, Center for Spatially Integrated Social Science, University of California, Santa Barbara, July 2006.
Panelist, "Democracy in the Middle East: Prospects, Problems and Promises," Annual Meeting of the Association of American Geographers, Chicago, March 2006.
Invited presenter, "It Takes Money to Make Money: Educating South County," presented to the South County 15th Annual Economic Summit, San Diego, October 2005.
Invited Keynote Speaker, "Putting Place and Space into Demographic Analysis," GIS and Population Science Workshop, Center for Spatially Integrated Social Science, University of California, Santa Barbara, June 2005.
Invited Keynote Speaker, "The Silent Storm: Or, How Population Growth Impacts Everything We Do," Colloquium on Populations Growing: Public Health Responses to Global Impacts, SDSU Graduate School of Public Health, April 2005.
Invited Presenter, "Patterns of Intra-Urban Fertility in Cairo, Egypt and Amman, Jordan," presented to the Department of Geography, University of Ghana, Accra, Ghana, January 2005.
Invited Presenter, "Patterns of Intra-Urban Fertility in Cairo, Egypt and Amman, Jordan," presented to the Rostock Demographic Colloquium, Max Planck Institute for Demographic Research, Rostock, Germany, November 2004.
Invited Presenter, "Changing Hispanic Demographics," presented to the Council of State Governments-West, San Diego, October 2004.
Participant, "Workshop on Systematic Population Estimation," Sponsored by the Office of External Research, Bureau of Intelligence and Research, U.S. Department of State, Arlington, Virginia, May 2004.
Panelist, PSG Session in Honor of the AAG Centennial: Overlaying GIS and Population Geography, Annual Meeting of the Association of American Geographers, Philadelphia, March 2004.

Organizer and Chair, Session on "Spatial Models," Annual Meeting of the Population Association of America, Boston, March 2004.
Presenter, "Demographics of East County," Board of Directors of the East County Economic Development Council, September 2003.
Chair and Discussant, "Population Processes," Regular Session of the Annual Meeting of the American Sociological Association, Atlanta, August 2003.
Instructor, "An Introduction to Spatial Pattern Analysis in a GIS Environment," Center for Spatially Integrated Social Science Summer Workshop Series, University of California, Santa Barbara, July 2003.
Presenter, "Can You Spot a City From the Air? Using Remote Sensing and GIS to Improve our Understanding of Urban Places," Program on Global Studies, 2003 Colloquium Series, Institute for Research on World-Systems, University of California, Riverside, April 2003.
Presenter, "Measuring the Ecological Context of Urban Vulnerability to Earthquake Hazards Through an Integrative Remote Sensing and GIS Approach," Congressional Briefing organized by the University Consortium for Geographic Information Science (UCGIS), Washington, DC, February 2003.
Panelist, "Is Population Growth Good or Bad for San Diego's Economy?" presented at the 2003 San Diego Economic Roundtable (County of San Diego), San Diego, January 2003 (available on video).
Organizer and Chair, "Fertility: Individual Level Concepts" and Organizer and Discussant, "Fertility: Policy Level Contexts," Regular Sessions of the Annual Meeting of the American Sociological Association, Chicago, August 2002.
Instructor, "An Introduction to Spatial Pattern Analysis in a GIS Environment," Center for Spatially Integrated Social Science Summer Workshop Series, University of California, Santa Barbara, July 2002.
Presenter, "2010 Roundtable," City of San Diego Year 2000 Redistricting Commission, San Diego, CA, December 2001.
Presenter, "Workshop on Finding Statistically Significant Crime Hot Spots," US Department of Justice, Fifth Annual International Crime Mapping Research Conference, Dallas, TX, December 2001.
Instructor, "An Introduction to Spatial Pattern Analysis in a GIS Environment," Center for Spatially Integrated Social Science Summer Workshop Series, University of California, Santa Barbara, August 2001.
Invited Lecturer, "Population Growth as a Ponzi Scheme," Thirty-Sixth Phi Beta Kappa Lecture, San Diego State University, November, 2000.
Instructor, "An Introduction to Spatial Pattern Analysis in a GIS Environment," Center for Spatially Integrated Social Science Summer Workshop Series, University of California, Santa Barbara, August 2000.
Invited Discussant, "Census 2000 Users' Conference on Public Use Microdata Sample (PUMS) Files," U.S. Bureau of the Census, Washington, DC, May 2000.
Organizer and Chair, Session on "Demographic Applications of GIS and Remote Sensing," Annual Meeting of the Association of American Geographers, Pittsburgh, April 2000.
Presenter, "External Demographics," Districtwide Strategic Planning Committee of the Grossmont-Cuyamaca Community College District, El Cajon, CA, October 1999.
Co-Organizer, Taller Demográfica de la Frontera México-Estados Unidos, El Colegio de la Frontera Norte, Tijuana, Mexico, October, 1999.
Speaker, "The Changing Demographics of San Diego County," Turning Point 2000 Summit of the Grossmont Union High School District, San Diego, March 1999.
Panelist, "Changing Demographics," 1999 San Diego Economic Roundtable (County of San Diego), San Diego, January 1999 (available on video).
Presenter, Seminario de Temas Selectos sobre Salud Reproductiva, "Reproductive Outcomes Among Mexico-Born Women in San Diego and Tijuana: Testing the Migration Selectivity Hypothesis," El Colegio de la Frontera Norte, Tijuana, Mexico, June 1998.
Panelist, Session on "Making Census Data Accessible for College Classes: the SSDAN Network," Annual Meeting of the Association of American Geographers, Fort Worth, April, 1997.
Chair, AAG Presidential Special Topic Session on "The Demography of Texas and the Southwest," Annual Meeting of the Association of American Geographers, Fort Worth, April, 1997.
Discussant, Session on "Major Directions in Population Geography," Annual Meeting of the Association of American Geographers, Fort Worth, April, 1997.
Presenter, "Demo-Facts for the US-Mexico Border Region," Summit Foundation, Washington, DC, March, 1997.
Contributor/Interviewee, "Populations and Communities," Part 24 of Biology Telecourse, "Cycles of Life," Produced by KOCE-TV, Huntington Beach, CA, 1996.
Invited Presenter, "Major Trends in Population Growth in San Diego County," Presented to the Board of Trustees of the Grossmont-Cuyamaca Community College District, 21 November 1995.
Consultant to the East County Economic Development Council on its subcontract from the San Diego Economic Development Corporation to provide data on defense related firms in San Diego County, 1995.

Invited Presenter, "San Diego Town Meeting on Defense Conversion," Co-sponsored by the San Diego Economic Development Corporation, the East County Economic Development Council, and the San Diego Economic Conversion Council; San Diego County Administration Center, November 1995.
Keynote Speaker, "The Six Pillars of Global Population and Social Change." Conference on Global Population and Social Change, Michigan State University, April 1995.
Invited Presenter, "The Defense Conversion and Adjustment Needs of East County Firms," Semi-Annual Meeting of the East County Economic Development Council, Santee, CA, January, 1995.
Consultant, "The Impact of Medicaid Managed Care on STD/HIV. Clinical and Preventive Services in San Diego County," San Diego State University Graduate School of Public Health (Rob Seidman, Project Director), November 1994-October 1995.
Invited Presenter, "Up, Down, and Sideways: Fertility Along the US-Mexico Border." Graduate Colloquium Series of the Department of Geography, University of California at Santa Barbara, November, 1994.
Consultant, "Maquiladora Family Planning and Child Care Survey," San Diego State University Institute for Regional Studies of the Californias (Paul Ganster, Project Director), September-December, 1993.
Keynote Speaker, "East County in Transition," Annual Meeting of the East County Economic Development Council, El Cajon, CA, June 1993.
Invited Presenter, "The Changing Demographic Structure of the San Diego Region," SDSU-COLEF Binational Symposium of San Diego and Tijuana in Transition, Tijuana, Mexico, April 1993.
Invited Participant, "California Population Studies," Meeting convened by the California Policy Seminar (a Joint Program of the University of California and State Government), Sacramento, California, January, 1992.
Moderator, Session on "Dollars and Pesos: Funding Joint Ventures," Joint Ventures in Family Planning: A U.S./Mexico Perspective, Binational Conference on Family Planning Along the Border, Co-sponsored by Planned Parenthood of San Diego and Riverside Counties and MexFam, Tijuana, Mexico, September 1991.
Chair, "Demografía Historica: Siglo XVIII-XIX," VIII Conference of Mexican and North American Historians, San Diego, October 1990.
Invited Guest Lecturer, "The Demography of Paradise," I & R Network Conference, Harbor Island, San Diego, January, 1990.
Invited Participant, "II Simposio Binacional Sobre la Población de la Frontera México-Estados Unidos," El Paso, Texas, November, 1989.
Invited Guest Lecturer, "The Demography of the U.S.-Mexico Border," Population Research Laboratory, University of Southern California, Los Angeles, November, 1989.
Invited Guest Lecturer, "The Demographic Interrelatedness of the U.S.-Mexico Border," Population Research Center, University of Texas, Austin, November, 1989.
Invited Guest Lecturer, "The Demographics of San Diego," International Studies Education Project of San Diego Retreat, Mission San Luis Rey, Oceanside, CA, November 1989
Member of Review Panel for "America in the 21st Century: A Global Perspective," Population Reference Bureau, Washington, D.C., August, 1989.
Invited Lecturer, "Demography and Destiny: The Case of Islamic Nations," presented to the Northern California World Affairs Council, San Francisco, April, 1989.
Organizer, Session on "The United States and Mexico: Demographic and Economic Relationships at the Border," Annual Meetings of the Population Association of America, New Orleans, 1988.
Invited Witness, California Legislature's Joint Committee on Refugee Resettlement, International Migration and Cooperative Development, Hearing on the Impact of the Immigration Reform and Control Act of 1986 on the border region of California, San Diego, December, 1987.
Invited Participant, "Southwest Symposium on U.S. Population Policy,"The Woodlands Center for Growth Studies, Houston, Texas, October 1987.
Invited Participant, "Simposio Binacional Sobre la Politica de Poblacion," Universidad Autonoma de Chihuahua, Ciudad Juarez, Mexico, September, 1987.
Member, General Planning Committee, "Bridging the Pacific." Conference sponsored by the United Nations Association of Southern California, University of San Diego, April, 1987.
Director, "Intensive Training Program for Family Planning and Related Health Professionals," International Population Center, San Diego State University, April-May, 1987.
Invited Participant, "Seminar on Southeast Asian Issues," University of California, Irvine, March, 1987.
Discussant, Session on "Later Phases of the Family Life Cycle," Annual Meetings of the Population Association of America, San Francisco, April, 1986.
Consultant re computerizing data for Zimbabwe National Family Planning Council, Harare, Zimbabwe, September, 1984.
Invited Speaker, "Who Lit the Fuse on the Population Bomb?" Earth Day Celebration [the inaugural one], Fresno State College, Fresno, CA, April 1970.

**COURSES TAUGHT AT SAN DIEGO STATE UNIVERSITY**

Population and the Environment
Seminar in GeoDemographics
Seminar in Spatial Demography
Spatial Data Analysis
Advanced Quantitative Analysis in Geography
Seminar in Geographic Research Design
People, Places & Environment
Population and Contemporary Issues
Seminar in Demographic Analysis
Seminar in Population Geography
Seminar in Population and Demography
Demography of Latin America
Elementary Social Statistics
Principles of Cultural Geography
Seminar in Human Geography
Sociology of Aging
Social Psychology
Contemporary Social Problems
Introductory Sociology

**GRADUATE ADVISEES**

PhD Committees: Chair (10); Second member (8); Outside member (4)
MA/MS Committees: Chair (32); Second member (17); Outside member (8)
MPH Committees: Outside member (11)

**CONSULTING EXPERIENCE**

***Demographic and Statistical Expert Witnessing and Research in the following legal cases:***

State of Arizona v. Frank C. Garcia, Jr. (2023); Maricopa County Superior Court, Arizona
Smart Efficient Solutions, LLC v . Heritage Property & Casualty Insurance Company (2023): Circuit Court of the 20th Judicial District in and for Collier County, Florida (*)
Mayes v. La Sierra University, et al. (2023): Riverside County Superior Court
Ernesto Herrera v. General Atomics et al. (2022): U.S. District Court, Southern District of California (+)
American/BCEGZV v. Shores LLC (2021): Los Angeles County Superior Court (*)
United States v. Robert Bowers (2020): U.S. District Court, Western District of Pennsylvania
De Navarro et al. v. City of South Pasadena et al. (2020): Los Angeles County Superior Court
Tsang v. Candlewood Country Club, et al. (2020): Los Angeles County Superior Court
Zimmerer v. Capistrano Unified School District; YMCA of Orange County (2020): Orange County Superior Court
Aboukhalil v. U.S. Home (2020): Clark County, Nevada Superior Court
People v. E.M. Alfaro (2019): Marin County Superior Court (*)
Victoria Brown v. Parking Concepts, etc., et al. (2019): Orange County Superior Court
Solair v. Starline Windows (2019): Los Angeles County Superior Court
People v. Vincent Martinez et al. (2018): Maricopa County Superior Court, Arizona
The Vue re Starline Windows (2018): Los Angeles County Superior Court
Pepper Lane Owners Association v. Pulte Home Company, LLC (2018): San Francisco Superior Court
Grande South Owners v. Starline Windows Inc. (2018); San Diego County Superior Court
United States v. Alfonzo Williams et al. (2018); U.S. District Court, Northern District of California
Bayside v. Bosa (2017); San Diego County Superior Court
Sapphire Tower Owners Association v. Swinerton (2017); San Diego County Superior Court
People v. Dmitry Shubov. (2017); Stanislaus County Superior Court
United States v. Donald Fell (2017); U.S. District Court, District of Vermont (*)
People v. Anthony Lemar Jones (2016); Solano County Superior Court (*)
2999 California St. HOA v. Axis Services, Inc. (2016); San Francisco County Superior Court
Antelope v. Greystone and US Home (2015); Las Vegas, Nevada

Town Green Village Association v. Orrin Thiessen, Terri Thiessen & Town Green Village LP (2015); Sonoma County Superior Court
People v. Kiyon Twyman (2015); San Diego County Superior Court
Gerald Atkins, et al. v. Del Webb Communities (2015); Las Vegas, Nevada
Campaña v. D.R. Horton (2015); San Diego County Superior Court (+)
The Mark Condominiums Owners Association v. The Mark Condominiums LLC (2014); San Diego County Superior Court (*)
La Posada Homeowners Association v. Brussel Consulting & Construction Mgmt (2014); Las Vegas, Nevada
Solana Del Mar v. Centex Homes (2014); Las Vegas, Nevada
Tomlinson v. U.S. Home (2014); Las Vegas, Nevada
350 W. Ash Association v. 350 W. Ash Urban Homes et al. (2014); San Diego County Superior Court (*)
Mills at Cortez Hill HOA v. Cortez Hill (2014); San Diego County Superior Court
Newport Bluffs v. Western National Construction (2014); Orange County Superior Court
Miller v. Embassy Suites Management, LLC et al. (2014); Orange County Superior Court
Montefaro Owners Associations v. Centex Homes (2014); San Diego County Superior Court
Grand Canyon Village HOA v. Grand Canyon Condominiums, LLC (2014); Las Vegas, Nevada (*)
The Verandas at Escala Assoc. v. Shea Homes (2013); San Diego County Superior Court (*)
Aragon Townhomes v. Hill Contracting (2013): San Diego County Superior Court
Ochoa (Desert Canyon) v. US Home Corporation (2013); Las Vegas, Nevada
Courts at Aliante v. D.R. Horton (2013): Las Vegas, Nevada (*)
Dorrell Square v. D.R. Horton (2013): Las Vegas, Nevada (*)
Slaughter et al. v. Uponor (2013); Las Vegas, Nevada
Serene v. Desert Plastering (2013); Las Vegas, Nevada
Borges v. McMillin et al. (2013); County of Imperial—El Centro Superior Court (*)
1100 Wilshire Property Owners Association v. 1100 Wilshire Associates LLC et al. (2013); Los Angeles County Superior Court
Hass et al. v. Bivins Construction (Eagle View) (2012); Las Vegas, Nevada (*)
Acqua Vista HOA v. K Hovnanian at Acqua Vista LLC (2012); San Diego County Superior Court (*)
Horsley v. Skyhawk (2012); Las Vegas, Nevada (*)
People v. Charfarous, Luangrath, and Ortiz (2012); San Diego County Superior Court (*)
People v. Padilla (2012); San Diego County Superior Court (*)
Desert Plastering v. Copper Creek LLC (2012); Las Vegas, Nevada
People v. Scott Evans (2012); Orange County Superior Court
United States v. McCluskey (2012); U.S. District Court, District of New Mexico
Cosio et al. v. McMillin et al. (2012); County of Imperial—El Centro Superior Court (*)
Desert Princess HOA v. Kennedy-Wilson, Inc., et al. (2012); Riverside County Superior Court
Shelton et al. v. Banning 144 LLC et al. (2011); Riverside County Superior Court
Aztech Plastering, Inc. adv. Environment for Living (Serenity HOA) (2010); Las Vegas, Nevada
People v. Marc Jernigan (2010); San Diego County Superior Court (*)
People v. Eddie Montañez (2010); San Diego County Superior Court
Rancho Lake (re Desert Plastering) (2010); Las Vegas, Nevada
Rock Springs Vista III v. Zuraff Construction (2009); Las Vegas, Nevada (*)
People v. Johannes Mehserle (2009); Alameda County Superior Court
Bahhur et al. v. Pardee Homes et al. (2009); Ventura County Superior Court
People v. Derlyn Ray Threats (2009); San Diego County Superior Court
Pacific Windows v. ADCO (2008); Riverside County Superior Court (*)
First Light HOA v. D.R. Horton (2008); Las Vegas, Nevada (*)
IPEX Fitting Litigation (2008); Las Vegas, Nevada
Bobier v. McMillin (2008); San Diego County Superior Court
John Allen et al. v. Pacific Coast Communities, Inc. et al. (2008); San Diego County Superior Court
People v. Jean Pierre Rices (2008); San Diego County Superior Court
Del Webb v. IPEX USA LLC (2008); Las Vegas, Nevada (*)
People v. Columbus Allen (2007); Stanislaus County Superior Court
People v. Randolph Kling (2007); Ventura County Superior Court (*)
Adapon v. McMillin (2007); San Diego County Superior Court
Allstate Insurance Company et al. v. IPEX (2007); Las Vegas, Nevada
Simpson v. Wexford et al. v. Atrium Door & Window et al. (2007); Las Vegas, Nevada
People v. Richard Garcia (2007); San Diego County Superior Court
Serena, David et al. v. Yolo County Grand Jury et al. (2006); U.S. District Court, Eastern District of California (*)

People v. Paris and Alberran (2006); San Diego County Superior Court (*)
People v. Edward Thomas (2006); San Diego County Superior Court
Kendall Creek HOA v. Saxton, Inc. (2006); Las Vegas, Nevada
People v. Reggie Cole (2006); Imperial County Superior Court
People v. Mark Jeffrey Brown (2006); San Diego County Superior Court (*)
Dakota Condominium v. Covington Crossing (2006); Las Vegas, Nevada
Galleria Villas COA v. Gray Castle Land, Inc. (2006); Las Vegas, Nevada (*)
People v. DeShawn Campbell (2006); Santa Clara County Superior Court
Centex Rodgers v. Catholic Healthcare West (2005); Arbitration, Los Angeles County Superior Court
Wayne R. & Leah J. Carlson et al. v. Syncon Homes et al. (2005); Ninth Judicial District Court of State of Nevada
People v. Frank Daniels (2004); Santa Barbara County Superior Court
People v. Michael Jackson (2004); Santa Barbara County Superior Court
Onyegbule v. Shapell (2004); San Diego County Superior Court
United States v. Raimundo (2004); United States District Court for the Southern District of California
People v. Noriega (2003); Santa Barbara County Superior Court
United States v. Soewin Chan (2003); United States District Court for the Northern District of California
Erickson et al. v. Brehm Homes et al. (2003); San Diego County Superior Court
People v. Ballesteros et al. (2003); Santa Barbara County Superior Court (*)
Spectrum Community Association v. Bristol House Partnership, Ltd et al. (2003); Orange County Superior Court
People v. Stuart Alexander (2002); Alameda County Superior Court (*)
17161 Alva Road , etc., v. Zanderson, Inc. et al. (2002); San Diego County Superior Court
United States v. John That Luong (2002); United States District Court for the Eastern District of California
United States v. Rubalcaba et al (re Cervantes) (2002); United States District Court for the Northern District of California
People v. David Ziesmer (2002); Ventura County Superior Court (*)
Allen et al. v. Bramalea California, Inc. et al. (2002); Orange County Superior Court
People v. Michael Schultz (2001); Ventura County Superior Court (*)
Duncan v. Vasquez (2001); United States District Court for the Central District of California
Farshchian v. Ahmanson Development (2001); Los Angeles County Superior Court
People v. Ranjel (2001); San Francisco County Superior Court (*)
Altman v. Cayman Developers (2000); Orange County Superior Court
People v. Wayne Adam Ford (2000); San Bernardino County Superior Court (*)
Monarch Hills v. Bowers Construction, Inc. (2000); San Diego County Superior Court
Sheila A. Delancy et al. v. Ranchland Portola Development et al. (2000); Orange County Superior Court
People v. John Ter Zakarian et al. (2000); Los Angeles County Superior Court
PGA West II Residential Association v. Sunrise Desert Partners et al. (2000); Riverside County Superior Court
Marshall et al. v. Baldwin Builders et al. (2000); San Diego County Superior Court (*)
Abraham et al v. Baldwin Builders et al. (2000); Orange County Superior Court
Village at Majorca HOA v. Leisure Technology, Inc. (2000); San Diego County Superior Court
Bateman el al. v. The William Lyon Company et al. (2000); Orange County Superior Court (*)
People v. Mares (2000); Los Angeles County Superior Court
Lomas de Oro HOA v. Robin Hood Homes, Inc. et al. (1999); San Diego County Superior Court
Corte Melina Maintenance Corporation v. Corte Melina Partners et al (1999); Orange County Superior Court
Costa Brava HOA v. Domain Developers (1999); Orange County Superior Court
Deborah Jo Berg et al. v. The Baldwin Company et al. (1999); San Diego County Superior Court (*)
People v. Iman Kennedy et al. (1999); Marin County Superior Court
People v. James Ary (1999); Contra Costa County Superior Court (*)
Reece et al. v. Premier Group (1999); Riverside County Superior Court
Summit Renaissance HOA v. Anaheim Summit et al. (1999); Orange County Superior Court
Spitz et al v. Brighton et al (1999); Orange County Superior Court (*)
People v. Mark Chin (1999); U.S. District Court, Northern District of California (San Francisco)
Casafina v. William Lyon Company et al. (1999); Orange County Superior Court
Fisher et al., v. Glendale Federal Bank et al. (1999); Orange County Superior Court (*)
People v. Boswell (1999); Monterey County Superior Court
Renaissance Capri HOA v. California Pacific Homes et al. (1999); San Diego County Superior Court
Bishop et al. v. Marblehead and the Lusk Company (1999); Orange County Superior Court (+)
The Masters Series of Seacliff on the Greens Homeowners Association et al. v. Cayman Development Company et al. (1998); Orange County Superior Court
Sausalito Maintenance v. Barratt American Incorporated et al. (1998); Orange County Superior Court (*)

Summit Court Homeowners Association v. Baldwin Building Contractors et al. (1998); Orange County Superior Court (*)
Barkdull v. Fargo Industries et al. (1998); San Diego County Superior Court
Oxford Court HOA v. J.M. Peters Company (1998); Orange County Superior Court
Mission Greens I Maintenance Assoc v. The William Lyon Company (1998); Orange County Superior Court (+)
Spinazolla v. Tierrasanta ("Bella Vista") (1998); San Diego County Superior Court
Kate v. Osborne Development ("Vista Estrella") (1998); Los Angeles County Superior Court
State Farm, etc., v. Newhall Land and Farming et al. ("The Stratford Collection") (1998); Los Angeles County Superior Court
The Glen at Hillsborough Assoc v. The William Lyon Company (1998); Orange County Superior Court
Belflora v. William Lyon Company et al. (1998); Orange County Superior Court
Seacove Place Homeowners Association v. Laguna Audubon II et al. (1998); Orange County Superior Court (*)(+)
Kerner v. Rancho Cielo Association (1998); Orange County Superior Court (*)
Rancho Villas v. Showcase Homes et al. (1998); San Diego County Superior Court
Monarch Villas v. Shapell Industries et al. (1998); San Diego County Superior Court
Villa Point Homeowners Association v. The Irvine Company (1998); Orange County Superior Court
PGA West v. Sunrise Development (1998); Riverside Superior Court (*)
Provence d'Aliso Community Association v. Jess L. Frost et al. (1998); Orange County Superior Court (+)
Cabo Vista Maintenance Corporation v. Fieldstone Trabuco Partners et al. (1998); Orange County Superior Court
Windsong Community Association v. Windsong Partners (1998); Orange County Superior Court
Montecido at Portola Hills Association v. Baldwin Building Contractors (1998); Orange County Superior Court
Mission Del Oro v. Robinhood Homes et al. (1998); San Diego County Superior Court
Schmidt v. Skandia Scene, Inc et al. (1998): San Diego County Superior Court
Angulo et al v. Broadmoor et al. (1998); San Diego County Superior Court
Jacqueline Ames et al. v. Rancon Development Fund VI et al. (Promenade) (1998); San Diego County Superior Court (+)
Cueto v. Pardee Construction (1998); San Diego County Superior Court
Palm Valley v. Sunrise Development (1997); Riverside County Superior Court
Sharpe v. Carmel Mountain (1997); San Diego County Superior Court
Gillis v. Fonelo Construction (1997); Los Angeles County Superior Court
Scripps Townhomes COA v. California Pacific Homes (1997); San Diego County Superior Court
Canyon Rim Townhomes Assn v. The Baldwin Company et al. (1997); Orange County Superior Court (*)
Desert Horizons Owners Assn v. Desert Horizons et al. (1997); San Diego County Superior Court (*)
Edward and Helen Law et al. v. Signal Landmark et al. (Port Royale) (1997); San Diego County Superior Court (+)
Corarito v. Donald F. Sammis (1997); San Diego County Superior Court
United States v. Sigifredo Robles et al. (1996); U.S. District Court, Northern District of California
Elysian Community Association v. RGC-M Associates (1996); San Diego County Superior Court
Brown et al., v. F & M Associates (1996); San Diego County Superior Court
Fairway Villas at Eastlake Green Assoc v. Century American Corporation et al. (1996); San Diego County Superior Court
Belsera v. Tierrasanta (1996); San Diego County Superior Court
Alexander v. J.M. Peters (1996); San Diego County Superior Court
Cimarron HOA v. Home Capital Corp (1996); San Diego County Superior Court
People v. Mendes Stanley Brown (1996); San Francisco County Superior Court (*)
Ocean Hills Country Club HOA v. Leisure Technology Inc. (1996); San Diego County Superior Court
Scripps Nob Hill v. The Presley Companies (1996); San Diego County Superior Court
Arborlake v. Baldwin et al. (1996); San Diego County Superior Court (*)
Kennedy v. Santa Fe Ridge (1996); San Diego County Superior Court (*)
Mesquite Country Club Condominium HOA v. Mesquite Country Club (1996); Riverside County Superior Court
United States v. Reese (1996 retrial); U.S. District Court, Southern District of California
The Lakes at Carmel Del Mar v. Baldwin Company et al. (1995); San Diego County Superior Court
United States v. Rubio (1995); U.S. District Court, Southern District of California
Cape la Jolla OA v. Brehm Communities et al. (1995); San Diego County Superior Court
Zaslow v. The Baldwin Company (1995); San Diego County Superior Court
Fisher et al., Pacific Sun/West (1995); San Diego County Superior Court
Halcyon Community Assoc. v. Del Mar Associates et al. (1995); San Diego County Superior Court
Arnold v. Baldwin et al. (1995); San Diego County Superior Court (*)
United States v. Elizarra (1995); U.S. District Court, Southern District of California
People v. Cunningham (1995); San Bernardino County Superior Court (*)

Pardee Construction v. Astra Flooring (1995); San Diego County Superior Court (*)
La Costa Alta v. Newport Pacific (1994); San Diego County Superior Court (*)
People v. Ramirez (1994); San Francisco County Superior Court
Vintage Townhomes HOA v. Northwoods-Rancho Cucamonga, Ltd et al. (1994); Riverside County Superior Court
Terraces at Scripps West v. Foote Development (1994); San Diego County Superior Court
City Scene v. Brehm Communities (1994); San Diego County Superior Court (*)
People v. Chan et al. (1993); Orange County Superior Court (*)
People v. Burney (1993); Orange County Superior Court (*)
United States v. Reese et al. (1993); U.S. District Court, Southern District of California
United States v. Roaches (1993); U.S. District Court, Central District of California
Casa de Las Companas v. The Law Company et al. (1993); San Diego County Superior Court
United States v. Valera-Calderon (1993); U.S. District Court, Southern District of California
Ranchwood Park Property Owners Assoc v. Ranchwood Community (1993); San Diego County Superior Court
People v. Strother (1993); Los Angeles County Superior Court (*)
People v. Weaver (1993); San Diego County Superior Court
Courtyards v. Shapell (1992); San Diego County Superior Court
Creekwood Condominium Association v. Douglas Allred Co. (1992); San Diego County Superior Court
North Rim Homeowners Association v. Douglas Allred Co. et al. (1992); San Diego County Superior Court
People v. Hines (1992); San Diego County Superior Court
People v. Chaidez (1992); Santa Barbara County Superior Court (*)
People v. Cabrera et al. (1991); San Diego County Superior Court (*)
United States v. Sainz (1991); U.S. District Court, Southern District of California (*)
People v. Bell (1991); San Diego County Superior Court
County of San Diego, et al., v. Jesse M. Unruh, et al. (1990); San Diego County Superior Court (*)(+)
People v. Isaquirre (1990); San Diego County Superior court
People v. Roberts (1990); San Diego County Superior Court
People v. Butler (1990); San Diego County Superior Court
People v. Pearce (1990); San Diego County Superior Court
People v. Sixto (1989); Kern County Superior Court
People v. Moffett (1989); San Diego County Superior Court
People v. Vera (1989); San Diego County Superior Court (*)
People v. Agrio (1989); San Diego County Superior Court
People v. Bustamonte (1988); Imperial County Superior Court
United States v. Valencia-Garcia (1988); U.S. District Court, Southern District of California
United States v. Martinez-Gonzalez (1988); U.S. District Court, Southern District of California
Ramos v. Ragu Foods (1988); San Francisco County Superior Court
People v. Miller (1988); Riverside County Superior Court
People v. Maier (1988); San Diego County Superior Court
People v. Ware (1987); Los Angeles County Superior Court [Crim Case No. A-739-760 (1988)] (*)
People v. Ramirez (1987); Los Angeles County Superior Court (*)
People v. Samayoa (1987); San Diego County Superior Court (*)
People v. Cosby (1987); San Diego County Superior Court
People v. Carpenter (1987); San Diego County Superior Court
People v. Ayala (1987); San Diego County Superior Court
People v. Moreno (1987); San Diego County Superior Court
People v. Neidiffer and Cruz (1986); Riverside County Superior Court (*)
People v. Lucas (1986); San Diego County Superior Court (*)
People v. Troiani (1986); San Diego County Superior Court (*)
People v. Herrera (1985); San Diego County Superior Court (*)
People v. Dier (1985); San Diego County Superior Court
People v. Dumas (1985); San Diego County Superior Court (*)
People v. O'Hare (1985); San Diego County Superior Court
People v. Ivory (1984); San Diego County Superior Court (*)
People v. Washington (1984); San Diego County Superior Court (*)
People v. Alexander (1983); San Diego County Superior Court (*)
People v. Silva (1982); San Diego County Superior Court (*)
People v. Marshall (1980); San Diego County Superior Court (*)

(*) *Includes Court Testimony and/or Deposition*

*(+) Indicates work for Plaintiff*

***Other Professional Consulting:***

Federal Public Defender, Central District of California, Los Angeles, CA (2013 - present)
Habeas Corpus Resource Center, San Francisco, CA (2007-present)
Capital Post-Conviction Project of Louisiana (2021-2022)
East County Economic Development Council (1986-2010)
United Nations Food and Agriculture Organization (FAO-CGIAR Centers) (2002-2005)
Center for Behavioral Epidemiology and Child Health, San Diego State University (2000-2005)
Center for Research on Child and Adolescent Mental Health Services, Children's Hospital, San Diego (1998-2000)
Pacific Biometrics, Inc. (1998 - 1999)
Dick & Patel Associates, Inc. (1998)
Quidel Corporation (1997)
Federal Defenders of San Diego, Inc. (1997)
Sullivan/Luallin Healthcare Consulting (1996-98)
Grossmont-Cuyamaca Community College District (1996)
City of San Diego Economic Development Services (1996)
San Diego Economic Development Corporation (1995)
Calgaro Insurance Services, Inc. (1993)
Cuyamaca Bank (1992)
Los Angeles Regional Family Planning Council (1985-1990)
James M. Montgomery, Consulting Engineers, Inc. (1988)
Encyclopedia Britannica Educational Corporation (1982)
Council on Pilipino-American Organizations (1978-81)
Allied Community Services/Allied Community Health (1978-80)

**PROFESSIONAL MEMBERSHIPS AND RELATED RECOGNITION**

Population Association of America (PAA)
PAA Historian and Chair, PAA History Committee, 1994-present (https://www.populationassociation.org/about/our-history)
Member, Memorial Service Committee, 2009-2011 (Chair in 2011)
Chair of Local Arrangements Committee, 1982
Member, ***World Commission on Forced Displacement Project Steering Committee***, Chumir Foundation for Ethics in Leadership, 2016 to 2019.
American Association of Geographers (AAG)
Member of Board of Directors of Population Geography Specialty Group (1996-2000), President (2000-2001), Immediate Past President (2001-2002)
Reviewer for *The Annals of the Association of American Geographers,* and the *Professional Geographer*
Editorial Board, ***Annals of the Association of American Geographers*** (2010-2014).
American Sociological Association (ASA)
Member of Section on Population;
Member of Section on International Migration;
Guest Editor of Special Issue of *Teaching Sociology,* 1986
Reviewer for the *American Sociological Review*
International Union for the Scientific Study of Population (IUSSP)
Southern Demographic Association
Association of Borderland Scholars
Sociedad Mexicana de Demografía
The Society for the Study of Social Biology
Editorial Board, ***Journal of Immigrant Health*** (1996-present).
Editorial Board, ***GeoJournal*** (2007-2017).
External reviewer for the European Research Council, 2014-2015.
Permanent Member, Social Sciences and Population B (SSPB) Study Section, Center for Scientific Review, National Institutes of Health, 2012-2013.
Member, SaniPath International Advisory Board, Rollins School of Public Health, Emory University (2012-2014)

Member, Advisory Committee, "GIS Training in Population Sciences," Awarded to Stephen Matthews (PI) by the National Institute of Child Health and Human Development, 2004-2013.
External Member, Study Section for Social Science and Population Studies, *Eunice Kennedy Shriver* National Institute of Child Health and Human Development, 2005-2011.
International Institute for Applied Systems Analysis (IIASA), Population and Society Site Evaluation Team Member, Vienna, Austria, January 2007.
National Research Council, Committee on the Effective Use of Data, Methodologies and Technologies to Estimate Sub-National Populations at Risk, Member 2005-2007
Panelist, National Science Foundation Review Panel for Biocomplexity in the Environment: Dynamics of Coupled Natural and Human Systems, Washington, DC, March 2004.
*Ad hoc* reviewer for the National Science Foundation
Member, Educators Who Care Executive Committee, Population Institute (Washington, DC), 1999-2008)

**UNIVERSITY SERVICE**

Member, Review Panel for Gerontology Program, SDSU, 2013
Chair, Student Outcomes Assessment Committee, Department of Geography, 2000-2013
Member, University Student Learning Outcomes Assessment Committee, 2011-2013
Member, University Research Council, 2010-2013
Academic Advisor, Certificate in Environmental Studies, 1997-2013
Faculty Advisor, SDSU Over 60 Program, 1994 - 2013
Member, Personnel Committee, Department of Geography, 1996-2013 (chair 1993-94, 2001-02)
Member, Ph.D. Advising Committee, Department of Geography, 1998-2005, 2007-2010
Member, Research Committee of the College of Arts and Letters, 2008-2009.
Member, Policy Advisory Committee, Department of Geography, 1993-1995, 1997-98 (Chair), 1999-2001, 2008-2009 (Chair).
Member, Global Health Joint Doctoral Program (SDSU-UCSD) Steering Committee, 2007
Member, Curriculum Committee, Department of Geography, 2005-2006
Member, Search Committee for the Dean of the College of Health and Human Services, 2004-2005
Member, Hiring Committee, Department of Geography, 2000-2005
Member, College of Arts and Letters Budget and Resource Planning Committee, 2003-2004
Member, University Faculty Honors and Awards Committee, 2003
Member, Building Advisory Committee, College of Arts and Letter, 2002-03
Member, Search Committee for the Director of the University Center on Aging, SDSU, 2002-2003
Member, Search Committee for the Harold Simon Endowed Chair in International Health and Cross-Cultural Medicine, UCSD School of Medicine, 2000-2003
Member, University Center on Aging, Steering Committee for BA Program, 1995-2003
Member, Search Committee for Tenure-Track Assistant Professor in Gerontology, SDSU, 2000-2001
Member, M.A. Advising Committee, Department of Geography, 1993-99
Member, Search Committee for Dean of the College of Health and Human Services, 1993-94
Member, College of Arts and Letters Research and Professional Leaves Committee, 1989-1990; 1992-1994.
Founding Member of San Diego State University Chapter of Phi Beta Delta Honor Society for International Scholars, 1989.
Member, Department of Sociology Graduate Committee, 1986-1987, 1990-1992.
Member, Department of Sociology Personnel/Recruitment Committee, 1990-1992 (Chair, 1990-1991).
External Member, College of Business Administration Peer Review Committee, 1990-1991.
Member, Advisory Committee of the Program in Cross-Cultural Nursing, College of Health and Human Services, 1987-91.
Member, Planning Committee of the University Center on Aging, 1978 to 1990 (Chair of Committee from 1980-1985).
Member, Ad Hoc Committee on Development of a Joint Doctorate in Applied Social Science Research, 1986-89.
Member, College of Arts and Letters Personnel Committee, 1987-1988.
Member, Department of Sociology Curriculum Committee, 1986-1987.
Chair, Department of Sociology Promotion, Tenure, and Retention Committee, 1986-1987
Member, San Diego State University Senate (Senator from the College of Arts and Letters), 1980-1986.

**RELEVANT COMMUNITY SERVICE**

San Diego Association of Governments (SANDAG) - Member of Regional Growth Forecast Expert Review Panel, 1990 - 2012, 2017 – 2018, 2022.

Southern California Association of Governments (SCAG) - Member of Forecast Expert Panel, 2021.
Member, UCSD Center for US-Mexican Studies Fellowship Selection Committee, 1997.
Member, East County Regional Prosperity Strategy Task Force, 1994.
Member, Economic Advisory Board Task Force, County of San Diego, 1993-94.
Planned Parenthood of San Diego and Riverside Counties - Member of Binational Affairs Committee, 1988 to 1992; Member of Board of Directors, 1991-92.

**MEDIA INTERVIEWS:**

05/28/2023, "Homeownership in San Diego loses ground in last decade, especially for minorities and younger, middle-aged households." San Diego Union-Tribune: https://www.sandiegouniontribune.com/business/story/2023-05-28/homeownership-in-san-diego-loses-ground-in-last-decade-especially-for-minorities-and-younger-middle-aged-households?utm_id=99221&sfmc_id=2407999
01/20/2019, "Declining birth rates in the U.S." KUSI-TV: https://www.kusi.com/san-diego-people-us-cancer-rate-drops-for-25th-straight-year/
07/23/2018, "Pushed out by high prices, these San Diegans left for greener pastures," San Diego Union-Tribune: http://www.sandiegouniontribune.com/business/real-estate/sd-fi-leaving-san-diego-20180723-story.html.
01/15/2018, "By the Numbers: San Diego County's Most Diverse Neighborhoods," KPBS Midday Edition: http://www.kpbs.org/news/2018/jan/15/numbers-san-diego-countys-most-diverse-neighborhoo/
09/18/2015, "Median Income Climbs; Poverty Persists," San Diego Union-Tribune (Page A1): http://sandiegouniontribune.ca.newsmemory.com/?token=df352adb229611da5c5a1c3e1a268f54_55fc468f_4eb59fe&selDate=20150918
05/01/2015, "San Diego growing at healthy pace," San Diego Union-Tribune: http://www.utsandiego.com/news/2015/may/01/san-diego-population-growths-healthy-pace/
01/08/2015, live interview re low fertility in Japan on KPCC (Southern California Public Radio) on AirTalk with Larry Mantle: http://www.scpr.org/programs/airtalk/2015/01/07/41011/japan-s-shrinking-population-highlights-greater-gl/
12/17/2014, live interview re California demographics on KOGO radio (San Diego, CA) on "News with Cliff Albert."
12/15/2014, live interview re California demographics on KABC radio (Los Angeles, CA) on "McIntyre in the Morning."
12/12/2014, "Improving Economy Boosts Calif. Population," San Diego Union-Tribune (Page A1): http://www.utsandiego.com/news/2014/dec/11/california-demographics-population-state-births/
10/16/2014, "By the Numbers: How diverse is your neighborhood?" Inewsource.org: https://inewsource.org/2014/10/16/diversity-in-san-diego/
6/15/2014, "Ethnic Mosaic a Stroll in Normal Heights," San Diego Union-Tribune (Page SD1): http://www.utsandiego.com/news/2014/Jun/15/tp-ethnic-mosaic-a-stroll-in-normal-heights/?#article-copy
12/13/2013, "Immigrants Drive CA's Higher Growth Rate," San Diego Union-Tribune (Page A2): http://www.utsandiego.com/news/2013/dec/12/california-population-growth-immigrant-immigration/
12/01/2013, "Hardships Still Keep Young Adults at Home," San Diego Union-Tribune: (Page A2) http://www.utsandiego.com/news/2013/Dec/01/tp-hardships-still-keep-young-adults-at-home/?#article-copy
11/7/2013, "Including Cost of Living, State Tops Poverty List," San Diego Union-Tribune (Page A1): http://www.utsandiego.com/news/2013/nov/06/california-census-supplemental-poverty-measure/
9/24/2013, "Report: Migration Numbers Set to Rise Again," San Diego Union-Tribune (Page A1): http://www.utsandiego.com/news/2013/sep/24/tp-report-migration-numbers-set-to-rise-again/
9/1//2013, "No Big Changes for Region's Poverty, Income Rates," San Diego Union-Tribune: http://www.utsandiego.com/news/2013/sep/19/poverty-sandiego-income-census-food/
5/01/2013, "Little Baghdad, California," The Progressive (May 2013 issue): http://progressive.org/little-baghdad-california
1/31/2013, "State Becoming Equal Parts Hispanic and White," San Diego Union-Tribune (Page A1): http://www.utsandiego.com/news/2013/jan/31/california-population-hispanic-white/
1/05/2013, "Population expected to slow to rate unseen since depression," San Diego Union-Tribune (Page A1): http://www.utsandiego.com/news/2013/jan/05/population-expected-to-slow-to-rate-unseen-since/
9/29/2012, "Census may change race, ethnicity terms," San Diego Union-Tribune: http://www.utsandiego.com/news/2012/sep/29/census-looking-to-the-future/?page=1#article

6/25/2012, "Interstate 8 Divide May Lead To San Diego Political Gridlock," KPBS (and played on NPR): http://www.kpbs.org/news/2012/jun/25/interstate-8-divide-may-lead-san-diego-political-g/
5/17/2012, "State, county long ahead of national non-white birth trend, San Diego Union-Tribune: http://www.utsandiego.com/news/2012/may/17/a-first-births-of-babies-of-color-tops-50-percent/?page=1#article
12/08/2011, "Snapshot of How We Live," San Diego Union-Tribune (page A3)
11/30/2011, "Senior Population Grows," San Diego Union-Tribune (page A1): http://www.signonsandiego.com/news/2011/nov/30/number-of-seniors-65-at-record-high-in-2010/?page=1#article
11/15/2011, "Census: Fewer on the Move in America," San Diego Union-Tribune (page A1): http://www.signonsandiego.com/news/2011/nov/15/record-number-americans-staying-put/
10/28/2011, "Are we facing a crisis of overpopulation?" Aljazeera: http://english.aljazeera.net/indepth/features/2011/10/20111071617442944439.html
9/13/2011, "U.S. Census - More Americans Living In Poverty," Midday Edition, KPBS Radio: http://www.kpbs.org/news/2011/sep/13/us-census-more-americans-living-poverty/
8/09/2011, "Envision San Diego: Changing Face of America," KPBS-TV: http://www.kpbs.org/news/2011/aug/09/envision-san-diego-changing-face-america/
7/29/2011, "Young and Restless can be a Volatile Mix," Science, Vol. 333:552-554, http://www.sciencemag.org/content/333/6042/552
7/15/2011, "Births Fuel Hispanic Growth," Wall Street Journal (page A3), http://online.wsj.com/article/SB10001424052702304521304576446232406979972.html?mod=WSJ_hps_sections_news
6/27/2011, "Hispanic Population Growth Has Big Effect," San Diego Union-Tribune (page A1), http://www.signonsandiego.com/news/2011/jun/27/hispanic-population-growth-has-big-effect/
6/23/2011, "Census Chronicles Housing's Downturn," San Diego Union-Tribune (Page A1), http://www.signonsandiego.com/news/2011/jun/22/homeownership-fell-in-fast-growing-suburbs-census/
4/20/2011, "Cutting Services to Illegal Immigrants Isn't Easy," San Diego Union-Tribune, http://www.signonsandiego.com/news/2011/apr/19/cutting-services-to-illegal-immigrants-isnt-easy/
3/25/2011, KUSI-TV, "2010 Census: San Diego population now a minority-majority," http://www.kusi.com/story/14324842/lenderman-pkg
3/25/2011, "Census shows dynamic populations in San Diego, U.S," San Diego Union-Tribune, http://www.signonsandiego.com/news/2011/mar/25/census-shows-dynamic-populations-in-san-diego-us/
3/18/2011, Guest on "San Diego Week," KPBS-TV, http://www.kpbs.org/news/san-diego-week/
3/09/2011, "Region's Growth Eases," San Diego Union-Tribune.
3/08/2011, "U.S. Census: More Minorities Than Whites In San Diego County," KPBS, http://www.kpbs.org/news/2011/mar/08/census-more-minorities-whites-san-diego-county/
2/18/2011, "Census decennial roll-out ongoing, not yet California," San Diego Union-Tribune
2/16/2011, "Connecting the Dots: What Happens Halfway Around the World Affects Americans, Too," SDSU 360 Magazine, http://newscenter.sdsu.edu/360/news.aspx?s=72772
12/21/2010, Guest interview on CNN International "Connect the World," http://www.cnn.com/CNNI/Programs/connect.the.world/
12/21/2010, "As U.S. becomes more diverse, Hispanics flourish," Reuters News Agency, http://www.reuters.com/article/idUSTRE6BK2UC20101221?pageNumber=1
12/15/2010, "Census Confirms Growth of Minority Groups," San Diego Union-Tribune.
6/13/2010, "Iraqi Refugees, Desperately Seeking English," Chronicle of Higher Education.
4/12/2010, "English classes can't meet demand," San Diego Union-Tribune.
9/20/2009, "Immigrant population declines in California," San Diego Union-Tribune.
7/01/2009, "New federal population estimates differ sharply from state's," North County Times.
5/14/2009, "County not go-to spot for Latinos in region," San Diego Union-Tribune.
12/19/2008, "County bucks trend with 1.5% population gain," San Diego Union-Tribune.
6/25/2008, "Who are the Lucky Few?," USA Today.
3/24/2008, "D.A. says jury pool falls short of Latinos; Office offers plan to boost numbers," San Diego Union-Tribune.
3/20/2008, "County residents are staying put: Housing slump puts brakes on migration," San Diego Union-Tribune.
2/12/2008, "Immigration projected to drive America's population growth," San Diego Union-Tribune.
1/28/2008, "Analysis: Downtown Juries Lack Hispanics," San Diego Union-Tribune.

9/17/2007, KPBS-Radio, These Days with Tom Fudge, "Birth Rates Shape the Future of San Diego County," http://www.kpbs.org/radio/these_days;id=9638.
9/08/2007, "Official Defends Study on Immigrants," San Diego Union-Tribune.
9/08/2007, "Report estimates county's illegal immigrant cost at $256 million in 2006," North County Times.
6/28/2007, "Growth robust in outlying suburbs," San Diego Union-Tribune.
9/14/2006, "Ruling Lets Lawyers Study Jury Recruitment," San Diego Union-Tribune.
8/17/2006, Panel on Voice of America, Talk to America, "China, Inc."
8/15/2006, "Kids' English Fluency Flourishes," San Diego Union-Tribune.
8/04/2006, "County's diversity up; Growth levels off," San Diego Union-Tribune.
7/11/2006, Panelist on Voice of America, Talk to America, "World Population Day."
3/25/2006, "Numbers Down at Schools," San Diego Union-Tribune.
1/08/2006, "Santa Barbara changes a system one judge said was flawed," Ventura County Star.
1/23/2005, "Where Latinos live," San Diego Union-Tribune.
5/20/2004, "County's whites to lose their majority," San Diego Union-Tribune.
4/09/2004, "Thousands in S.D. get a move on," San Diego Union-Tribune.
11/13/2003, "County jury pools ruled unconstitutional," Santa Barbara News-Press.
9/27/2003, "Latino jury controversy may delay second trial," Santa Barbara News-Press.
9/22/2003, "Report says county short on Latinos in jury pools," Santa Barbara News-Press.
5/15/2002, "County's immigration surge outstrips region," San Diego Union-Tribune.
4/29/2002, "Babies and immigrants fuel growth of county," San Diego Union-Tribune.
4/7/2002, "Slow progress: More Latinos joining the ranks of homeowners," San Diego Union-Tribune.
5/23/2001, "North County aging, growing more diverse," North County Times.
4/8/2001, "Region grows slower than nation, state for first time in 100 years," North County Times.
3/30/2001, "Despite gains, county slips to No. 3 in state," San Diego Union.
2/14/2001, "Repayment sought for processing of migrants," San Diego Union, http://www.signonsandiego.com/news/metro/20010214-9999_6m14illegal.html.
2/9/2001, "Study tallies cost of illegal immigration," Los Angeles Times/
2/6/2001, "County spent $50 million on immigrants in '99, study finds," San Diego Union.
2/3/2001, "Imperial County Spent $5.4 million in 1999 to provide services to illegal immigrants," Imperial Valley Press.
10/2000, Victor Sherman and Janet Sherman, "Institutional Racism in the Los Angeles County Grand Jury System," Verdict, Vol. 6, No. 4, pp.3-10.
6/12/2000, San Diego Union-Tribune, "Changing Demographics Challenge Public Schools to Give More Tutoring and Bilingual Support; Hispanic Student Population Soared in the Past 10 Years"
4/25/2000, National Public Radio, Morning Edition, "L.A. Grand Jury"
4/25/2000, Los Angeles Times, "Choices for County Grand Jury Again Include Few Latinos"
4/17/2000, Los Angeles Times, "Gap in Census Leaves Need for Religious Data"
3/26/2000, Los Angeles Times, "Special Report: They're Gaining Clout Everywhere in the Region, But a Legal Challenge Contends That Because of a Flawed Selection Process Latinos are Underrepresented on County Grand Jury"
2/27/2000, San Diego Union-Tribute, "Brake Lights Ahead: Housing Prices Driving Force Behind Slowing Growth and Slowing Traffic"
1/2/2000, San Diego Union-Tribune, "Future of Growth"
9/15/1999, San Diego Union-Tribune, "'90s growth is attributed to minorities"
1/18/1999, San Diego Business Journal, "Economists: 1999 looks healthy for San Diego"
1/9/1999, San Diego Union-Tribune, "Experts foresee San Diego's growth moderating a bit"
9/27/1998, San Diego Union-Tribune, "County's growth measured in millions"
8/31/1998, KGTV. Channel 10 News, interview re U.S. illegitimacy rates
1/30/1998, San Diego Union-Tribune, "S.D. County population growth amazes experts"
5/18/1997, San Diego Union-Tribune, "Experts warn of a leveling-off in decline in Mexico's birth rate"
5/15/1997, KNSD Channel 7/39 News. interview re Nutrition, population growth, and size of humans
4/20/1997, San Diego Union-Tribune, "S.D. County grows, but not by much"
8/11/1996, San Diego Union-Tribune, "Who we are: migration is putting new face on San Diego County"
5/4/1996, San Diego Union-Tribune, "San Diego is No. 1 in growth in the state"
4/14/1996, San Diego Union-Tribune, "Growth up smallest amount in two decades"
2/9/1996, San Diego Union-Tribune, "Fear may keep exact Muslim population a mystery"
11/21/1995, KUSI Channel 9/51 News, interview re defense conversion study
4/20/1995, The Daily Californian, "Military downsizing a bane to small businesses"
2/9/1995, Houston Chronicle, "Infant mortality linked more to morality than to socio-economic status"

2/1/1995, Wall Street Journal, "Infant mortality, mother's morality"
1/31/1995, The Daily Californian, "Pundit: all not lost with peso fall"
11/21/1994, American Medical News, "Poor immigrants have healthier infants than U.S.-born"
11/9/1994, New York Times, "Health Watch: Study finds healthier pregnancy for refugees"
9/4/1994, The Daily California, "East County spins its wheels when it comes to mass transit"
8/30/1994, San Diego Union-Tribune, "Millions in motion: driven by population growth, volume of migration is unprecedented"
6/6/1994, San Diego Union-Tribune, "Not all show decline in bacterial disease passed during sex"
5/29/1994, San Diego Union-Tribune, "San Diego leads state in growth"
2/27/1994, San Diego Union-Tribune, "Economy's slowdown means more people leave than move here in '93"
9/23/1993, San Diego Union-Tribune, "Study shows strengths of immigrants"
9/21/1993, The Daily Californian, "Development council pitches itself"
6/27/1993, San Diego Union-Tribune, "Linked Destiny: border cities in transition as old engines of growth stall"
6/27/1993, San Diego Union-Tribune, "Demographics take West out of East County"
6/25/1993, The Daily Californian, "Data reveals upward trend"
5/6/1993, San Diego Union-Tribune, "Population increase at 22-year low"
5/1/1993, San Diego Union-Tribune, "Analysts paint bleak picture for S.D., Tijuana"
4/28/1993, The Daily Californian, "NAFTA would aid San Diego economy"
4/22/1993, The Daily Californian, "Days of plenty fading for many local residents"
9/1/1992, Los Angeles Times, San Diego Edition, "Glee and gloom as University classes begin"
7/18/1992, The Daily Californian, "Lifestyle trends mean change in lunch program"
5/25/1992, Los Angeles Time, San Diego Edition, "SDSU: Narrow, deep cuts cause anguish at University"
5/19/1992, San Diego Union, "San Diego Census: 1990, National City hit hardest by poverty"
5/12/1992, The Daily Californian, "Figures show growing gap between rich, poor"
5/11/1992, San Diego Union, "County census portrait alarming"
11/21/1991, San Diego Evening Tribune, "In courts here, death deals a dark hand: Capital punishment shows distinct racial patterns"
11/18/1991, San Diego Evening Tribune, "Shadow of segregation haunts city"
8/27/1991, New York Times, "Hmong refugees resist adopting birth control"
3/15/1991, Boston Globe, "Population explosion heightens pressures"
2/23/1991, San Diego Union, "Kuwaiti waits anxiously for chance to return home"
5/28/1990, San Diego Union, "Punishment for women who kill said more severe"
2/11/1990, San Diego Union, "Hidden San Diego: Experts focus on special groups to study how society is changing"
5/2/1989, San Diego Daily Transcript, "ECEDC study indicates new East County employees continue living elsewhere"
3/1/1989, San Diego Tribune, "Does Islam "bomb' have sizzling fuse"
2/17/1989, San Diego Tribune, "San Diego population experts say Islam is the world's fastest growing religion"
11/20/1988, Los Angeles Times, "Lack of young jurors spurs legal tussle"
9/3/1988, The Daily Californian, "Staying ahead of the trends is his job: Weeks' services are sought all over the world"
7/7/1987, Riverside Press-Enterprise, "Riverside judge rules jury pool an uneven mix"
6/15/1987, Excelsior (Mexico City), "Frontera Norte: Estudios de Población"
1/29/1987, The Reader, "Borderline figures: just how many people live in Tijuana today?"
12/8/1986, San Diego Union, "Divorces outnumbered marriages in county last year"
10/14/1986, Los Angeles Times, "Defense Challenges D.A.'s Standard for Seeking Death Penalty"
9/4/1986, San Diego Union, "Statistics don't match the charge against Troiani"
8/28/1986, San Diego Union, "Study says race not a factor in seeking death penalty"
10/24/1985, USA Today, "Elder boom: strange mix of problems"
11/9/1979, San Diego Tribune, "Motivation called natural birth control key"
10/25/1973, Michigan State News, "Two professors give new theory of population, social relationships"

***Rev: 09/06/2023***

# APPENDIX B

Exhibit 57 -   946

## APPENDIX B - Iouri Mikhel

| DESCRIPTION | BATES NO. |
|---|---|
| First Report on Goals and Recommendations of the Ninth Circuit Jury Trial Improvement Committee, Adopted by the Judicial Council of the Ninth Circuit (May 2004) | JW-001 - 015 |
| General Order No. 03-12,<br>Plan for the Random Selection of Grand and Petit Jurors,<br>U.S. District Court for the Central District of California, 12/16/2003 | JW-016 - 025 |
| General Order No. 07-10,<br>Plan for the Random Selection of Grand and Petit Jurors,<br>U.S. District Court for the Central District of California, 11/28/2007 | JW-026 - 034 |
| Excerpts from Appellant's Sealed Joint Excerpt of Record, pp. 222-227, *U.S. v. Iouri Mikhel*, U.S. Court of Appeals for the Ninth Circuit, Case No. 07-99008 (05/06/2013)<br>(UNDER SEAL PURSUANT TO COURT ORDER) | JW-035 - 041 |
| Juror questionnaires 1 through 50<br>(UNDER SEAL PURSUANT TO COURT ORDER) | JW-042 - 641 |
| Juror questionnaires 51 through 99<br>(UNDER SEAL PURSUANT TO COURT ORDER) | JW-642 - 1229 |
| Juror questionnaires 100 through 150<br>(UNDER SEAL PURSUANT TO COURT ORDER) | JW-1230 - 1853 |
| Juror questionnaires 151 through 200<br>(UNDER SEAL PURSUANT TO COURT ORDER) | JW-1854 - 2453 |
| Juror questionnaires 201 through 229<br>(UNDER SEAL PURSUANT TO COURT ORDER) | JW-2454 - 2801 |
| Juror questionnaires 230 through 287<br>(UNDER SEAL PURSUANT TO COURT ORDER) | JW-2802 - 3497 |
| Chart by FPD re demographic data of jurors (01/19/2023) | JW-3498 - 3507 |