# EXHIBIT

# 150



U.S. Department of Justice

Federal Bureau of Investigation
*Washington, D.C. 20535*

July 7, 2020

MR. ALEJANDRO VILLASENOR
FEDERAL PUBLIC DEFENDER
CENTRAL DISTRICT OF CALIFORNIA
321 EAST 2ND STREET
LOS ANGELES, CA 90012-4202

FOIPA Request No.: 1461950-000
Subject: SAFIEV, GEORGY

Dear Mr. Villasenor:

This responds to your Freedom of Information/Privacy Acts (FOIPA) request. Please see the paragraphs below for relevant information specific to your request as well as the enclosed FBI FOIPA Addendum for standard responses applicable to all requests.

The FBI has completed its search for records responsive to your request. The material you requested is located in an investigative file which is exempt from disclosure pursuant to 5 U.S.C. § 552(b)(7)(A).   5 U.S.C. § 552(b)(7)(A) exempts from disclosure:

> records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ... could reasonably be expected to interfere with enforcement proceedings...

The records responsive to your request are law enforcement records; there is a pending or prospective law enforcement proceeding relevant to these responsive records, and release of the information could reasonably be expected to interfere with enforcement proceedings.   Therefore, your request is being administratively closed.   For a further explanation of this exemption, see the enclosed Explanation of Exemptions.

Please refer to the enclosed FBI FOIPA Addendum for additional standard responses applicable to your request.   "Part 1" of the Addendum includes standard responses that apply to all requests.   "Part 2" includes additional standard responses that apply to all requests for records about yourself or any third party individuals.   "Part 3" includes general information about FBI records that you may find useful.   Also enclosed is our Explanation of Exemptions .

For questions regarding our determinations, visit the www.fbi.gov/foia website under "Contact Us."   The FOIPA Request Number listed above has been assigned to your request.   Please use this number in all correspondence concerning your request.

If you are not satisfied with the Federal Bureau of Investigation's determination in response to this request, you may administratively appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, 441 G Street, NW, 6th Floor, Washington, D.C. 20530, or you may submit an appeal through OIP's FOIA STAR portal by creating an account following the instructions on OIP's website: https://www.justice.gov/oip/subm it-and-track-request-or-appeal.   Your appeal must be postmarked or electronically transmitted within ninety (90) days of the date of my response to your request.   If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."   Please cite the FOIPA Request Number assigned to your request so it may be easily identified.

**Exhibit 150 - 2463**

You may seek dispute resolution services by contacting the Office of Government Information Services (OGIS). The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769. Alternatively, you may contact the FBI's FOIA Public Liaison by emailing foipaquestions@fbi.gov. If you submit your dispute resolution correspondence by email, the subject heading should clearly state "Dispute Resolution Services." Please also cite the FOIPA Request Number assigned to your request so it may be easily identified.

Sincerely,

Michael G. Seidel
Acting Section Chief,
Record/Information
   Dissemination Section
Information Management Division

Enclosure(s)

Exhibit 150 - 2464

FBI FOIPA Addendum

As referenced in our letter responding to your Freedom of Information/Privacy Acts (FOIPA) request, the FBI FOIPA Addendum provides information applicable to your request. Part 1 of the Addendum includes standard responses that apply to all requests. Part 2 includes standard responses that apply to requests for records about individuals to the extent your request seeks the listed information. Part 3 includes general information about FBI records, searches, and programs.

Part 1: The standard responses below apply to all requests:

(i)    5 U.S.C. § 552(c). Congress excluded three categories of law enforcement and national security records from the requirements of the FOIPA [5 U.S.C. § 552(c)]. FBI responses are limited to those records subject to the requirements of the FOIPA. Additional information about the FBI and the FOIPA can be found on the www.fbi.gov/foia website.

(ii)   Intelligence Records. To the extent your request seeks records of intelligence sources, methods, or activities, the FBI can neither confirm nor deny the existence of records pursuant to FOIA exemptions (b)(1), (b)(3), and as applicable to requests for records about individuals, PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(1), (b)(3), and (j)(2)]. The mere acknowledgment of the existence or nonexistence of such records is itself a classified fact protected by FOIA exemption (b)(1) and/or would reveal intelligence sources, methods, or activities protected by exemption (b)(3) [50 USC § 3024(i)(1)]. This is a standard response and should not be read to indicate that any such records do or do not exist.

Part 2: The standard responses below apply to all requests for records on individuals:

(i)    Requests for Records about any Individual—Watch Lists. The FBI can neither confirm nor deny the existence of any individual's name on a watch list pursuant to FOIA exemption (b)(7)(E) and PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(7)(E), (j)(2)]. This is a standard response and should not be read to indicate that watch list records do or do not exist.

(ii)   Requests for Records about any Individual—Witness Security Program Records. The FBI can neither confirm nor deny the existence of records which could identify any participant in the Witness Security Program pursuant to FOIA exemption (b)(3) and PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(3), 18 U.S.C. 3521, and (j)(2)]. This is a standard response and should not be read to indicate that such records do or do not exist.

(iii)  Requests for Records for Incarcerated Individuals. The FBI can neither confirm nor deny the existence of records which could reasonably be expected to endanger the life or physical safety of any incarcerated individual pursuant to FOIA exemptions (b)(7)(E), (b)(7)(F), and PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(7)(E), (b)(7)(F), and (j)(2)]. This is a standard response and should not be read to indicate that such records do or do not exist.

Part 3: General Information:

(i)    Record Searches. The Record/Information Dissemination Section (RIDS) searches for reasonably described records by searching systems or locations where responsive records would reasonably be found. A standard search normally consists of a search for main files in the Central Records System (CRS), an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled by the FBI per its law enforcement, intelligence, and administrative functions. The CRS spans the entire FBI organization, comprising records of FBI Headquarters, FBI Field Offices, and FBI Legal Attaché Offices (Legats) worldwide; Electronic Surveillance (ELSUR) records are included in the CRS. Unless specifically requested, a standard search does not include references, administrative records of previous FOIPA requests, or civil litigation files. For additional information about our record searches, visit www.fbi.gov/services/information-management/foipa/requesting-fbi-records.

(ii)   FBI Records. Founded in 1908, the FBI carries out a dual law enforcement and national security mission. As part of this dual mission, the FBI creates and maintains records on various subjects; however, the FBI does not maintain records on every person, subject, or entity.

(iii)  Requests for Criminal History Records or Rap Sheets. The Criminal Justice Information Services (CJIS) Division provides Identity History Summary Checks – often referred to as a criminal history record or rap sheet. These criminal history records are not the same as material in an investigative "FBI file." An Identity History Summary Check is a listing of information taken from fingerprint cards and documents submitted to the FBI in connection with arrests, federal employment, naturalization, or military service. For a fee, individuals can request a copy of their Identity History Summary Check. Forms and directions can be accessed at www.fbi.gov/about-us/cjis/identity-history-summary-checks. Additionally, requests can be submitted electronically at www.edo.cjis.gov. For additional information, please contact CJIS directly at (304) 625-5590.

(iv)   National Name Check Program (NNCP). The mission of NNCP is to analyze and report information in response to name check requests received from federal agencies, for the purpose of protecting the United States from foreign and domestic threats to national security. Please be advised that this is a service provided to other federal agencies. Private Citizens cannot request a name check.

**Exhibit 150 - 2465**

## EXPLANATION OF EXEMPTIONS

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552

(b)(1)    (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified to such Executive order;

(b)(2)    related solely to the internal personnel rules and practices of an agency;

(b)(3)    specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

(b)(4)    trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(b)(5)    inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

(b)(6)    personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(b)(7)    records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ( A ) could reasonably be expected to interfere with enforcement proceedings, ( B ) would deprive a person of a right to a fair trial or an impartial adjudication, ( C ) could reasonably be expected to constitute an unwarranted invasion of personal privacy, ( D ) could reasonably be expected to disclose the identity of confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of record or information compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, ( E ) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or ( F ) could reasonably be expected to endanger the life or physical safety of any individual;

(b)(8)    contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(b)(9)    geological and geophysical information and data, including maps, concerning wells.

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552a

(d)(5)    information compiled in reasonable anticipation of a civil action proceeding;

(j)(2)    material reporting investigative efforts pertaining to the enforcement of criminal law including efforts to prevent, control, or reduce crime or apprehend criminals;

(k)(1)    information which is currently and properly classified pursuant to an Executive order in the interest of the national defense or foreign policy, for example, information involving intelligence sources or methods;

(k)(2)    investigatory material compiled for law enforcement purposes, other than criminal, which did not result in loss of a right, benefit or privilege under Federal programs, or which would identify a source who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(3)    material maintained in connection with providing protective services to the President of the United States or any other individual pursuant to the authority of Title 18, United States Code, Section 3056;

(k)(4)    required by statute to be maintained and used solely as statistical records;

(k)(5)    investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment or for access to classified information, the disclosure of which would reveal the identity of the person who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(6)    testing or examination material used to determine individual qualifications for appointment or promotion in Federal Government service the release of which would compromise the testing or examination process;

(k)(7)    material used to determine potential for promotion in the armed services, the disclosure of which would reveal the identity of the person who furnished the material pursuant to a promise that his/her identity would be held in confidence.

FBI/DOJ

Exhibit 150 - 2466

# EXHIBIT

# 151



**U.S. Department of Justice**

**Federal Bureau of Investigation**
*Washington, D.C. 20535*

June 25, 2020

MR. ALEJANDRO VILLASENOR
FEDERAL PUBLIC DEFENDER
CENTRAL DISTRICT OF CALIFORNIA
321 EAST SECOND STREET
LOS ANGELES, CA 90012-4202

FOIPA Request No.: 1461595-000
Subject: KHARABADZE, KHAREBA

Dear Mr. Villasenor:

This responds to your Freedom of Information/Privacy Acts (FOIPA) request. Please see the paragraphs below for relevant information specific to your request as well as the enclosed FBI FOIPA Addendum for standard responses applicable to all requests.

The FBI has completed its search for records responsive to your request. The material you requested is located in an investigative file which is exempt from disclosure pursuant to 5 U.S.C. § 552(b)(7)(A). 5 U.S.C. § 552(b)(7)(A) exempts from disclosure:

> records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ... could reasonably be expected to interfere with enforcement proceedings...

The records responsive to your request are law enforcement records; there is a pending or prospective law enforcement proceeding relevant to these responsive records, and release of the information could reasonably be expected to interfere with enforcement proceedings. Therefore, your request is being administratively closed. For a further explanation of this exemption, see the enclosed Explanation of Exemptions.

Please refer to the enclosed FBI FOIPA Addendum for additional standard responses applicable to your request. **"Part 1"** of the Addendum includes standard responses that apply to all requests. **"Part 2"** includes additional standard responses that apply to all requests for records about yourself or any third party individuals. **"Part 3"** includes general information about FBI records that you may find useful. Also enclosed is our Explanation of Exemptions.

For questions regarding our determinations, visit the www.fbi.gov/foia website under "Contact Us." The FOIPA Request Number listed above has been assigned to your request. Please use this number in all correspondence concerning your request.

If you are not satisfied with the Federal Bureau of Investigation's determination in response to this request, you may administratively appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, 441 G Street, NW, 6th Floor, Washington, D.C. 20530, or you may submit an appeal through OIP's FOIA STAR portal by creating an account following the instructions on OIP's website: https://www.justice.gov/oip/submit-and-track-request-or-appeal. Your appeal must be postmarked or electronically transmitted within ninety (90) days of the date of my response to your request. If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal." Please cite the FOIPA Request Number assigned to your request so it may be easily identified.

Exhibit 151 - 2467

You may seek dispute resolution services by contacting the Office of Government Information Services (OGIS).   The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.   Alternatively, you may contact the FBI's FOIA Public Liaison by emailing foipaquestions@fbi.gov.   If you submit your dispute resolution correspondence by email, the subject heading should clearly state "Dispute Resolution Services."   Please also cite the FOIPA Request Number assigned to your request so it may be easily identified.

Sincerely,

Michael G. Seidel
Acting Section Chief,
Record/Information
    Dissemination Section
Information Management Division

Enclosure(s)

Exhibit 151 - 2468

## FBI FOIPA Addendum

As referenced in our letter responding to your Freedom of Information/Privacy Acts (FOIPA) request, the FBI FOIPA Addendum provides information applicable to your request.  Part 1 of the Addendum includes standard responses that apply to all requests.  Part 2 includes standard responses that apply to requests for records about individuals to the extent your request seeks the listed information.  Part 3 includes general information about FBI records, searches, and programs.

**Part 1: The standard responses below apply to all requests:**

(i)    **5 U.S.C. § 552(c).**  Congress excluded three categories of law enforcement and national security records from the requirements of the FOIPA [5 U.S.C. § 552(c)].  FBI responses are limited to those records subject to the requirements of the FOIPA.  Additional information about the FBI and the FOIPA can be found on the www.fbi.gov/foia website.

(ii)   **Intelligence Records.**  To the extent your request seeks records of intelligence sources, methods, or activities, the FBI can neither confirm nor deny the existence of records pursuant to FOIA exemptions (b)(1), (b)(3), and as applicable to requests for records about individuals, PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(1), (b)(3), and (j)(2)].  The mere acknowledgment of the existence or nonexistence of such records is itself a classified fact protected by FOIA exemption (b)(1) and/or would reveal intelligence sources, methods, or activities protected by exemption (b)(3) [50 USC § 3024(i)(1)].  This is a standard response and should not be read to indicate that any such records do or do not exist.

**Part 2: The standard responses below apply to all requests for records on individuals:**

(i)    **Requests for Records about any Individual—Watch Lists.**  The FBI can neither confirm nor deny the existence of any individual's name on a watch list pursuant to FOIA exemption (b)(7)(E) and PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(7)(E), (j)(2)].  This is a standard response and should not be read to indicate that watch list records do or do not exist.

(ii)   **Requests for Records about any Individual—Witness Security Program Records.**  The FBI can neither confirm nor deny the existence of records which could identify any participant in the Witness Security Program pursuant to FOIA exemption (b)(3) and PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(3), 18 U.S.C. 3521, and (j)(2)].  This is a standard response and should not be read to indicate that such records do or do not exist.

(iii)  **Requests for Records for Incarcerated Individuals.**  The FBI can neither confirm nor deny the existence of records which could reasonably be expected to endanger the life or physical safety of any incarcerated individual pursuant to FOIA exemptions (b)(7)(E), (b)(7)(F), and PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(7)(E), (b)(7)(F), and (j)(2)].  This is a standard response and should not be read to indicate that such records do or do not exist.

**Part 3: General Information:**

(i)    **Record Searches.**  The Record/Information Dissemination Section (RIDS) searches for reasonably described records by searching systems or locations where responsive records would reasonably be found.  A standard search normally consists of a search for main files in the Central Records System (CRS), an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled by the FBI per its law enforcement, intelligence, and administrative functions.  The CRS spans the entire FBI organization, comprising records of FBI Headquarters, FBI Field Offices, and FBI Legal Attaché Offices (Legats) worldwide; Electronic Surveillance (ELSUR) records are included in the CRS.  Unless specifically requested, a standard search does not include references, administrative records of previous FOIPA requests, or civil litigation files.  For additional information about our record searches, visit www.fbi.gov/services/information-management/foipa/requesting-fbi-records.

(ii)   **FBI Records.**  Founded in 1908, the FBI carries out a dual law enforcement and national security mission.  As part of this dual mission, the FBI creates and maintains records on various subjects; however, the FBI does not maintain records on every person, subject, or entity.

(iii)  **Requests for Criminal History Records or Rap Sheets.**  The Criminal Justice Information Services (CJIS) Division provides Identity History Summary Checks – often referred to as a criminal history record or rap sheet.  These criminal history records are not the same as material in an investigative "FBI file."  An Identity History Summary Check is a listing of information taken from fingerprint cards and documents submitted to the FBI in connection with arrests, federal employment, naturalization, or military service.  For a fee, individuals can request a copy of their Identity History Summary Check.  Forms and directions can be accessed at www.fbi.gov/about-us/cjis/identity-history-summary-checks.  Additionally, requests can be submitted electronically at www.edo.cjis.gov.  For additional information, please contact CJIS directly at (304) 625-5590.

(iv)   **National Name Check Program (NNCP).**  The mission of NNCP is to analyze and report information in response to name check requests received from federal agencies, for the purpose of protecting the United States from foreign and domestic threats to national security.  Please be advised that this is a service provided to other federal agencies.  Private Citizens cannot request a name check.

**Exhibit 151 - 2469**

**EXPLANATION OF EXEMPTIONS**

**SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552**

(b)(1)     (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified to such Executive order;

(b)(2)     related solely to the internal personnel rules and practices of an agency;

(b)(3)     specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

(b)(4)     trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(b)(5)     inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

(b)(6)     personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(b)(7)     records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ( A ) could reasonably be expected to interfere with enforcement proceedings, ( B ) would deprive a person of a right to a fair trial or an impartial adjudication, ( C ) could reasonably be expected to constitute an unwarranted invasion of personal privacy, ( D ) could reasonably be expected to disclose the identity of confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of record or information compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, ( E ) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or ( F ) could reasonably be expected to endanger the life or physical safety of any individual;

(b)(8)     contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(b)(9)     geological and geophysical information and data, including maps, concerning wells.

**SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552a**

(d)(5)     information compiled in reasonable anticipation of a civil action proceeding;

(j)(2)     material reporting investigative efforts pertaining to the enforcement of criminal law including efforts to prevent, control, or reduce crime or apprehend criminals;

(k)(1)     information which is currently and properly classified pursuant to an Executive order in the interest of the national defense or foreign policy, for example, information involving intelligence sources or methods;

(k)(2)     investigatory material compiled for law enforcement purposes, other than criminal, which did not result in loss of a right, benefit or privilege under Federal programs, or which would identify a source who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(3)     material maintained in connection with providing protective services to the President of the United States or any other individual pursuant to the authority of Title 18, United States Code, Section 3056;

(k)(4)     required by statute to be maintained and used solely as statistical records;

(k)(5)     investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment or for access to classified information, the disclosure of which would reveal the identity of the person who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(6)     testing or examination material used to determine individual qualifications for appointment or promotion in Federal Government service the release of which would compromise the testing or examination process;

(k)(7)     material used to determine potential for promotion in the armed services, the disclosure of which would reveal the identity of the person who furnished the material pursuant to a promise that his/her identity would be held in confidence.

FBI/DOJ

Exhibit 151 - 2470

# EXHIBIT

# 152

| | |
|---|---|
| **From:** | FOIA Status |
| **To:** | Pamela Gomez |
| **Subject:** | Fw: Requestor seeks an update to F-2022-03077 |
| **Date:** | Monday, March 21, 2022 11:05:20 AM |
| **Attachments:** | F-2022-04840.pdf |

---

Ms. Gomez,

We refer to your letter regarding the status of FOIA case control number F-2021-03077.

In response to your inquiry, the FOIA Requester Service Center contacted the Bureau of Diplomatic Security and was advised that your request is in process. The searches have been completed and the case is currently in review. The estimated date of completion (EDC) is April 1, 2022. EDCs are estimates and are subject to change.

If you have any concerns or questions regarding a FOIA-related matter, please contact the FOIA Requester Service Center at 202-261-8484 or send an e-mail to foiastatus@state.gov.

Sincerely,

U.S. Department of State
FOIA Requester Service Center

SENSITIVE BUT UNCLASSIFIED

**Exhibit 152 - 2471**

# EXHIBIT

# 153



*Office of Information Governance and Privacy*

**U.S. Department of Homeland Security**
500 12th St., SW
Washington, D.C. 20536

**U.S. Immigration
and Customs
Enforcement**

August 21, 2020

C. Gomez
Federal Public Defender
Central District of California
321 East 2nd Street
Los Angeles, CA 90012-4202

**RE:    ICE FOIA Case Number 2020-ICFO-63800**

Dear Ms. Gomez:

This letter is the final response to your Freedom of Information Act (FOIA) request to U.S. Immigration and Customs Enforcement (ICE), dated July 09, 2020.  You have requested records pertaining to Rita Pekler aka Margaret Kaspler, DOB: ▉/62, COB: Russia. ICE has considered your request under the FOIA, 5 U.S.C. § 552.

A search of the ICE Office of Homeland Investigation (HSI) for records responsive to your request produced 11 pages that are responsive to your request.  After review of those documents, I have determined that portions of 11 pages will be withheld pursuant to Exemptions of the FOIA as described below.

ICE has applied FOIA Exemptions 6 and 7(C) to protect from disclosure the names and identification numbers of DHS employees and other third party information within the documents.

**FOIA Exemption 6** exempts from disclosure personnel or medical files and similar files the release of which would cause a clearly unwarranted invasion of personal privacy.  This requires a balancing of the public's right to disclosure against the individual's right to privacy.  The privacy interests of the individuals in the records you have requested outweigh any minimal public interest in disclosure of the information.  Any private interest you may have in that information does not factor into the aforementioned balancing test.

**FOIA Exemption 7(C)** protects records or information compiled for law enforcement purposes that could reasonably be expected to constitute an unwarranted invasion of personal privacy. This exemption takes particular note of the strong interests of individuals, whether they are suspects, witnesses, or investigators, in not being unwarrantably associated with alleged criminal activity.  That interest extends to persons who are not only the subjects of the investigation, but

**www.ice.gov**

**Exhibit 153 - 2472**

Page 2 of 3

those who may have their privacy invaded by having their identities and information about them revealed in connection with an investigation. Based upon the traditional recognition of strong privacy interest in law enforcement records, categorical withholding of information that identifies third parties in law enforcement records is ordinarily appropriate. As such, ICE has determined that the privacy interest in the identities of individuals in the records you have requested clearly outweigh any minimal public interest in disclosure of the information. Please note that any private interest you may have in that information does not factor into this determination.

ICE has applied FOIA Exemption 7(E) to protect from disclosure internal agency URLs and case numbers contained within the document.

FOIA Exemption 7(E) protects records compiled for law enforcement purposes, the release of which would disclose techniques and/or procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law. I have determined that disclosure of certain law enforcement sensitive information contained within the responsive records could reasonably be expected to risk circumvention of the law. Additionally, the techniques and procedures at issue are not well known to the public.

You have a right to appeal the above withholding determination. Should you wish to do so, you must send your appeal and a copy of this letter, within 90 days of the date of this letter following the procedures outlined in the DHS FOIA regulations at 6 C.F.R. Part 5 § 5.8. You may submit your appeal electronically at GILDFOIAAppeals@ice.dhs.gov or via regular mail to:

> U.S. Immigration and Customs Enforcement
> Office of the Principal Legal Advisor
> U.S. Department of Homeland Security
> 500 12th Street, S.W., Mail Stop 5900
> Washington, D.C. 20536-5900

Your envelope and letter should be marked "FOIA Appeal." Copies of the FOIA and DHS regulations are available at www.dhs.gov/foia.

Provisions of FOIA allow DHS to charge for processing fees, up to $25, unless you seek a waiver of fees. In this instance, because the cost is below the $25 minimum, there is no charge.

If you need any further assistance or would like to discuss any aspect of your request, please contact the FOIA office and refer to FOIA case number 2020-ICFO-63800. You may send an e-mail to ice-foia@ice.dhs.gov, call toll free (866) 633-1182, or you may contact our FOIA Public Liaison, Fernando Pineiro, in the same manner. Additionally, you have a right to right to seek dispute resolution services from the Office of Government Information Services (OGIS) which mediates disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation. If you are requesting access to your own records (which is considered a Privacy Act request), you should know that OGIS does not have the authority to handle requests made under the Privacy Act of 1974. You may contact OGIS as follows: Office of Government Information

**Exhibit 153 - 2473**

Page **3** of **3**

Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

Sincerely,

Catrina M. Pavlik-Keenan
FOIA Officer

Enclosure(s): 11 pages

Exhibit 153 - 2474



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS



~~OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE~~

07/17/2020 08:08 EDT                                                                 Page 1 of 4

# PECKLER, RITA MARGARET

## Biographics

| Name | |
|---|---|
| Last | PECKLER |
| First | RITA |
| Middle | MARGARET |
| Name Flip | No |
| **Alias** | |
| Last | BITAR |
| First | MARGARET |
| Middle | RITA |
| **Alias** | |
| Last | KASPLER |
| First | MARGARET |
| **Date of Birth** | ██/1962 |
| **Gender** | |
| Gender | F - FEMALE |
| **Race** | W - WHITE |
| **Hair Color** | BR - BROWN |
| **Eye Color** | HA - HAZEL |

## Addresses

| Address | |
|---|---|
| Address | ██████████ |
| Apt./Suite | ██ |
| City | W. HOLLYWOOD |
| State | CA - CALIFORNIA |
| Postal Code | ███ |
| Country | US - UNITED STATES |

~~OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE~~

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

**Exhibit 153 - 2475**



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS



OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

07/17/2020 08:08 EDT

Page 2 of 4

## Subject Record Information

| ICM Record ID | (b)(7)(E) |
|---|---|
| CBP Record ID | (b)(7)(E) |
| **Subject Record Status** | |
| Status | SO - SUSPECT, OTHER |
| **Subject Record Category** | |
| Category | OT - OTHER |
| **Primary Action Code** | |
| Primary Action Code | (b)(7)(E) |
| Start Date | October 21, 1997 |
| End Date | October 21, 1998 |
| **Criminal Affiliation** | |
| Notes | (b)(7)(E) |

## Driver's License

| **License Number** | ▉ |
|---|---|
| **State** | CA - CALIFORNIA |
| **Country** | US - UNITED STATES |
| **License Type** | |
| Type | 4 - OTHER |
| Other | C |
| **License Status** | VALID |
| **Issue and Expiration Date** | |
| Issue Date | August 15, 1995 |
| Expiration Date | August 5, 1999 |

## Remarks

| **Remarks** | SUBJECT IS A KNOWN PAWN SHOP BROKER AND (b)(7)(E) |
|---|---|
| | (b)(7)(E) |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

**Exhibit 153 - 2476**



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS



OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

07/17/2020 08:08 EDT

Page 3 of 4

## Routing Information

| | |
|---|---|
| **Subject Record Owner** | (b)(6); (b)(7)(C) |
| **Subject Record Supervisor** | (b)(7)(E) |
| **Office Code** | IL - Los Angeles (b)(7)(E) |
| **Query Notification Level** | 1 - TO RECORD OWNER |

## Restrict Visibility

| | |
|---|---|
| **Groups Visible To** | DHS |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

**Exhibit 153 - 2477**



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS



~~OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE~~

07/17/2020 08:08 EDT                                                          Page 4 of 4

## Metadata

| Document Number | (b)(7)(E) |
|---|---|
| Document Status | Published |
| Opened | 10/21/1997 |
| Last Updated | 7/14/1998 |
| Author | (b)(6); (b)(7)(C) |
| Owner(s) | (b)(6); (b)(7)(C) |
| Supervisor | (b)(7)(E) |

## Case Metadata

| Case Title | (b)(7)(E) |
|---|---|
| Case Number | (b)(7)(E) |
| Case Opened | 10/15/1997 |
| Case Last Updated | 5/14/1999 |
| Approved | 4/16/2016 |

~~OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE~~

This document is leaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

**Exhibit 153 - 2478**



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

~~OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE~~



07/21/2020 19:21 EDT

Page 1 of 7

**CASE NUMBER**
(b)(7)(E)

**CASE OPENED**
10/14/1997

**CURRENT CASE TITLE**
(b)(7)(E)

**REPORT TITLE**
(b)(7)(E)

**SYNOPSIS**

The October meeting for the (b)(7)(E) (b)(7)(E) was held on 07 October 1997, at the California Department of Justice Office, in Commerce, CA. (b)(7)(E)

(b)(7)(E)

the October meeting.

**REPORTED BY**
(b)(6); (b)(7)(C)

INTELLIGENCE SPEC

**APPROVED BY**
(b)(6); (b)(7)(C)

SUP RESEARCH SPEC

**DATE APPROVED**
10/20/1997

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| (b)(7)(E) | (b)(7)(E) | 10/20/1997 |

~~OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE~~

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

**Exhibit 153 - 2479**



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION



~~OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE~~

07/21/2020 19:21 EDT

Page 2 of 7

## DETAILS OF INVESTIGATION

Detective (b)(6); (b)(7)(C) , requested information
(b)(6); (b)(7)(C); (b)(7)(E)

Detective (b)(6); (b)(7)(C) Los Angeles Sheriffs Office (LASO), (b)(7)(E)
(b)(7)(E)

Detective (b)(6); (b)(7)(C) Los Angeles Police Department (b)(7)(E)
(b)(7)(E)
(b)(7)(E) for pawn shop applicants in the Los Angeles area.
Many of these applicants are Russian emigres living on welfare. Yet in spite
of this fact these individuals have been found to have large amounts of
currency (in the hundreds of thousands) available to them to open up the pawn
shops. Rita PECKLER, a known pawn shop broker, represents many of the
applicants.

(b)(7)(E) that Rita PECKLER (dob ███ 62; CDL # ████████
was listed as the owner on three CTR transactions (total transactions
$177,000.00) (b)(6); (b)(7)(C)
(b)(7)(E); (b)(6); (b)(7)(C)

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| (b)(7)(E) | (b)(7)(E) | 10/20/1997 |

~~OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE~~

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of
this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

**Exhibit 153 - 2480**



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



07/21/2020 19:21 EDT

Page 3 of 7

Angeles, CA. (b)(7)(E)

(b)(7)(E); (b)(6); (b)(7)(C)

(b)(7)(E); (b)(6); (b)(7)(C)

(b)(7)(E); (b)(6); (b)(7)(C)

(b)(7)(E); (b)(6); (b)(7)(C)

(b)(7)(E); (b)(6); (b)(7)(C)

(b)(7)(E); (b)(6); (b)(7)(C)

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| (b)(7)(E) | (b)(7)(E) | 10/20/1997 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

**Exhibit 153 - 2481**



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION



~~OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE~~

07/21/2020 19:21 EDT

Page 4 of 7

(b)(7)(E); (b)(6); (b)(7)(C)

(b)(7)(E); (b)(6); (b)(7)(C)

(b)(7)(E): (b)(6): (b)(7)(C)

(b)(7)(E); (b)(6); (b)(7)(C)

(b)(7)(E); (b)(6); (b)(7)(C)

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| (b)(7)(E) | (b)(7)(E) | 10/20/1997 |

~~OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE~~

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

**Exhibit 153 - 2482**



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



07/21/2020 19:21 EDT                                               Page 5 of 7

(b)(7)(E); (b)(6); (b)(7)(C)

(b)(7)(E); (b)(6); (b)(7)(C)

(b)(7)(E); (b)(6); (b)(7)(C)

(b)(6); (b)(7)(C)

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| (b)(7)(E) | (b)(7)(E) | 10/20/1997 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

**Exhibit 153 - 2483**



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

~~OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE~~



07/21/2020 19:21 EDT

Page 6 of 7

(b)(7)(E); (b)(6); (b)(7)(C)

(b)(7)(E)

(b)(7)(E); (b)(6); (b)(7)(C)

(b)(7)(E)

(b)(7)(E)

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| (b)(7)(E) | (b)(7)(E) | 10/20/1997 |

~~OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE~~

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

**Exhibit 153 - 2484**



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

~~OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE~~



07/21/2020 19:21 EDT                                                                    Page 7 of 7

(b)(7)(E); (b)(6); (b)(7)(C)

The aforementioned information was conveyed to SA (b)(6); (b)(7)(C)  SAC/SD.
(b)(7)(E)

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| (b)(7)(E) | (b)(7)(E) | 10/20/1997 |

~~OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE~~

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

**Exhibit 153 - 2485**

# EXHIBIT

# 154

JANUARY 2, 2002                    - 7 -                    001-08490-0973-400

## INTERVIEW OF NINEL FAKTOROVICH (NELLIE)

The interview began at approximately 1055 hours. Nellie provided Investigators with her personal information; DOB: ▮▮▮ 59, address ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Playa Del Rey, ▮▮▮ home phone (310 578-0372).

Nellie related that she has worked for Rita since 1992. One and a half years ago their working relationship became a partnership. Rita owns 80 percent of the business Nellie owns 20 percent. The name of the business is "The Pekler Group." Nellie described Rita as being very responsible. She said Rita would never do anything bad to you, and she would never leave Sam. Rita did everything for Sam. When asked about Roman, Nellie said that he would be a failure without Rita. Nellie was aware that Rita wanted to return to the doctor for in vitro fertilization again. She said this was very important to Rita and she would never have missed Friday's doctor's appointment.

She did mention that Rita was having mood swings, which started some time last year. She believed Rita was on some sort of antidepressants that she got from a holistic doctor by the name of Khalsa. It was later found that the antidepressants were homeopathic in nature and not prescription medication.

Nellie said that on Monday, December 3rd, a man who called himself Voloday, came into the office at about 2 PM. He asked for Rita, and was told she was not in. Nellie escorted him into her office. He said that someone had recommended Rita to him and that he wanted to open a corporation and purchase property. He never said who recommended Rita. Voloday seemed to know that Rita was the only one in the office who could help him purchase real estate. He told Nellie he wanted to look at property in Beverly Hills or the Bel Air area. Nellie asked him where his money was and he replied, " It's in Europe." He told Nellie he was from Moscow. Nellie made an appointment for he and Rita to meet at the office at 2:00 PM on Tuesday. Nellie asked him to leave a phone number. Voloday said he had a pre-paid cellular telephone and didn't know the phone number. He told her he would wait until someone called him and he would obtain the number at that time. He would then provide her with the phone number. The next day he called and spoke with an employee, Svetlana Korogodsky, leaving his phone number. He also canceled the 2:00 PM appointment with Rita and made another appointment to meet with Rita at 10:30 on Wednesday morning, at the office.

At approximately 0950 hours on Wednesday morning, Voloday called Rita and changed their meeting place to " the place where they make juices" (Jamba Juice) on Ventura Boulevard. He told Rita he wanted to look at property in the valley. Rita asked Nellie if she could borrow her car. Rita said she had spilled juice in her car and did not want to meet a

32113

**Exhibit 154 - 2486**

JANUARY 2, 2002                        - 8 -                        001-08490-0973-400

client with a dirty car. It was not unusual for Rita to borrow Nellie's car and Nellie gave her the keys. Rita left the office at about 10:40 AM to meet Voloday. She was running late.

At approximately 4:30 PM Rita called Nellie from her cell phone. Rita said she was sorry, but she left Nellie's car parked at 12345 Ventura Boulevard, Studio City. She said it was in front of the Coldwell Banker real estate office. It should be noted that this is next to the Jamba Juice, where Rita met Voloday. Rita told her she left the car unlocked with the keys under the floor mat. Nellie was angry because the car was unlocked and her son's paycheck was inside. She went to pick up the car and arrived at approximately 5:30 PM. The key was under the floor mat and her son's paycheck was still there. Nellie did notice that when she got in she had to adjust the driver's seat and the side and rear view mirrors. She found this unusual because when Rita borrows her car, she does not have to adjust the seat or the mirrors. She and Rita are the same height. She said the seat had been moved back a few inches and assumed someone else had been driving her car. She also found a Coldwell Banker Real Estate, 12345 Ventura Boulevard, business card in the center console. She wasn't sure if the business card had been in her car before she let Rita borrow it.

Investigator Harris asked Nellie who Nick Kharabadze and George Safiev were. She related that Nick is a manager for George's Corporation and George is a client of Rita's. She vindicated George was in the office speaking with Rita the week before she went missing.

She described what Rita was wearing when she left the office; a dark blue pinstripe business suit which included pants and a jacket. The jacket had lapels, was fitted and medium length. When she left the office, Rita was carrying her cell phone, Nellie's car keys and some notes.

Nellie described Voloday as being a Russian national, 40-45 years of age, medium height, medium weight. He spoke only Russian and it appeared as if he had a Russian national accent. She said he was dressed nicely and was very polite. She never saw him in a vehicle. She said that Voloday is a nickname for Vladimir.

Investigators made arrangements to meet Nellie at Rita's office in order to look through Rita's business papers. The interview was concluded. At Rita's office, Investigators were given full access to her desk, her files, and her phone books. Nellie allowed Investigators to take Rita's message pad, and her phone books. The phone books were copied and returned to Nellie. The message pad will be maintained in the investigative file.

On 12/24/01 at approximately 0930 hours, Investigator Harris spoke with the U.S. Attorney Dan Saunders by phone. Mr. Saunders related that there was nothing happening in the

32114

**Exhibit 154 - 2487**

JANUARY 2, 2002                    - 9 -                    001-08490-0973-400

Grand Jury investigation that should have caused Rita any concern. It was a pre-indictment investigation that Rita was aware of. The investigation did include contacts and informants in the Russian Organized Crime arena. The only other name involved in the investigation is a ▅▅▅▅ by the name of ▅▅▅▅▅▅▅▅. Mr. Saunders indicated that he was not aware of an insurance fraud investigation involving Rita. He said it would be best to speak with IRS Agent Tom Paramo for further information regarding the investigation.

Mr. Saunders related there was an aspect of the investigation having to do with Bank of America accounts belonging to Rita. Bank of America indicated there was some questionable activity in Rita's accounts and asked the U.S. Attorney if it would hamper their investigation to close those accounts. Approximately 1 month prior, Bank of America was given the go-ahead by the U.S. Attorney's Office. Bank of America's attorney is Steve Madison (213 533-8621).

On 12/26/01 Investigator Harris spoke with Mr. Scott Shaw of the National Insurance Crime Bureau, NICB. Mr. Shaw related that the FBI was working a kidnap case, which occurred on 12/13/01 in which Alex Umansky was kidnapped. Mr. Shaw believes there is a connection between Rita and Alex Umansky. Alex owns an auto body shop and is involved in insurance fraud. Rita is also involved in insurance fraud. The Friday before Rita went missing, she was deposed in regards to an insurance fraud case, People of the State of California/All State Insurance vs. Fair Care Medical, et al. During the deposition she invoked her fifth amendment right against self-incrimination. This insurance fraud case deals with a conspiracy between attorneys, doctors and auto body repair shops. All proceeds from this insurance fraud conspiracy are said to have gone through a Corporation belonging to Rita, Professional Business Development. Arrangements were made to meet Mr. Shaw at 1400 hours.

On 12/26/01 at 1230 hours, Investigator Harris received a phone call from agent Mark Wilson, FBI L.A. office (310) 587-3934. Agent Wilson called to asked questions about the disappearance of Rita Pekler. He was advised there would be a meeting at 1400 hours between Investigators and Mr. Shaw from NICB. He was invited to attend. He indicated agent Louis Perez from his office would participate in the meeting.

At 1400 hours Investigator Harris, Sergeant Delores Scott, and Lieutenant Hartshorne met with Scott Shaw (NICB), Louis Perez (FBI), and Vicki Madrano (FBI). During this meeting it was discovered that the suspect involved in the kidnaping of Alex Umansky used a pre-paid cellular phone (818 259-1740). That pre-paid cellular phone was registered by Ian Polak, ▅▅▅▅▅▅▅. Woodland Hills, home phone (818 348-8551).

32115

**Exhibit 154 - 2488**

# EXHIBIT

# 155

1

**Internal Revenue Service**
Appeals Office
P.O .Box 24018
Fresno, CA 93779-4018

Date:
DEC 0 9 2020

ALEJANDRO VILLASENOR
321 EAST 2ND STREET
LOS ANGELES, CA 90012

**Department of the Treasury**

**Person to Contact:**
Alexis Lindauer
Employee ID
Number: 1000157545
Tel:  (559) 454-6328
Fax: (877) 818-6361
**Refer Reply to:**
AP:EX:FRC:AGL
**In Re:**
Freedom of Information Act
**Disclosure Case Number(s):**
F20073-0030
Rita Pekler

Dear xxx,

This letter is in response to your appeals request dated 5/29/2020 for Freedom of Information Act (FOIA) information.  According to your letter you are appealing the response of 3/25/2020 from the Disclosure Office of your request for information dated 2/25/2020.

You requested for copies for any and all records/files/documents relating to Rita Pekler, and release of the following:

1. Any and all records/information/documents on Rita Pekler that relate to any Internal Revenue Service criminal investigation.
2. Any and all records/information/documents on Rita Pekler including any notes and narrative memoranda prepared by an Internal Revenue Service agent.
3. And public records maintained in files, such as court records and news clipping without the express authorization of a third party.

The Disclosure Specialist contacted you via phone on 3/17/2020 and explained that you did not provide any authorization to receive any document/information concerning Rita Pekler, therefore no documents/information could be released to you.

The Disclosure Specialist also responded to you in writing explaining that your request was being denied because the scope of your request, consist or contain the return information of a third party, and the request would be denied under FOIA exemption (b)(3).

**Exhibit 155 - 2489**

2

Your appeal states that you are appealing the documents withheld in full, because the stated reason justifying the denial shows your request was read in an overly narrow manner focused on "third party return information."

We have reviewed the response of the Disclosure Specialist, and the Disclosure database, have determined that it is appropriate under the circumstances. Appeals responsibility concerning the appeal of FOIA cases is limited to a de novo review to ensure the documents withheld or redacted for the specific requester and documents requested fall within the FOIA exemption(s) cited. Appeals only has jurisdiction over the denial of documents in response to a FOIA request. We address the adequacy of the search, the appropriateness of the redactions and documents withheld through determined FOIA exemptions. Our written notice is your determination that the information was properly withheld through the FOIA exemptions cited. Our sole responsibility is to determine if the documents were properly withheld under the FOIA.

The information you are seeking is the return information of a third party taxpayer. You requested for copies for any and all records/files/documents relating to Rita Pekler, which is return information. "Return information" is defined in I.R.C. Section 6103(b)(2)(A) as

> a taxpayer's identity ... or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability [under the Internal Revenue Code]....

To the extent that such information exists, the Service is prohibited under I.R.C. Section 6103(a) from providing you with a copy of that information without authorization. Section 6103(a) provides that returns and return information are confidential. FOIA exemption 3 provides that the disclosure provisions of the FOIA do not apply to matters that are

> specifically exempted from disclosure by statute ... provided that such statute (A) requires that the matters be withheld ... in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld.

Exemption 3 is being asserted in conjunction with I.R.C. Section 6103(a) to withhold any third party return information. Section 6103 of the Internal Revenue Code has been determined to be an exemption 3 statute. Church of Scientology v. IRS, 484 U.S. 9 (1987).

**Exhibit 155 - 2490**

3

As part of the 2007 FOIA amendments, the Office of Government Information Services (OGIS) was created to offer mediation services to resolve disputes between FOIA requesters and the Office of Disclosure as a non-exclusive alternative to litigation.  The Office of Appeals is not a part of this mediation process.  Using OGIS services does not affect your right to pursue litigation.  If you are requesting access to your own records (which is considered a Privacy Act request), you should know that OGIS does not have the authority to handle requests made under the Privacy Act of 1974.  If you disagree with the Appeals determination and wish to pursue mediation, you may contact OGIS in any of the following ways:

Office of Government Information Services
National Archives and Records Administration
8601 Adelphi Road - OGIS
College Park, MD 20740
E-mail: ogis@nara.gov
Web: https://ogis.archives.gov
Telephone: 202-741-5770
Facsimile: 202-741-5769
Toll-free: 1-877-684-6448

The FOIA requires us to advise you of the judicial remedies granted in the Act. You may file a complaint in the United States District Court for the District in which you reside, or have your principal place of business, or in which the agency records are located, or in the District of Columbia.

Sincerely,

P. Perez
Appeals Team Manager

**Exhibit 155 - 2491**

# EXHIBIT

# 156

# Internal Revenue Service
## Criminal Investigation Division



# Memorandum of Interview

| | | | |
|---|---|---|---|
| **In Re:** | RITA PEKLER | **Location:** | █████████ Las Vegas, NV █████ |
| **Investigation #:** | 339930366 | | |
| **Date:** | February 15, 2001 | | |
| **Time:** | Approx.: 7:08PM to 7:17PM | | |
| **Participant(s):** | Humayun Bashir, Interviewee | | |
| | Richard Goss, Special Agent | | |
| | Thomas Paramo, Special Agent | | |

On the above date and approximate time, special agents Goss and Paramo met with Bashir to discuss the circumstances surrounding his dealings with RITA PEKLER. Special agents Goss and Paramo identified themselves as Special Agents of the Internal Revenue Service, Criminal Investigation and presented their credentials to Bashir for inspection. Additionally, special agents Goss and Paramo explained to Bashir that they were assisting a federal grand jury with this investigation. In response to questions asked, Bashir stated, in substance, the following:

1. His date of birth is █████ 1951.

2. He is a U.S. Citizen.

3. He began his employment at the Bank of America (BOFA) in May of 1989. He was hired as a teller and worked many positions until he became a branch manager in 1996 at the Walnut, CA BOFA branch.

4. When he met RITA PEKLER, he was a Branch Specialist at the North Toluca Lake branch of BOFA. His job was as an assistant to several individuals at the bank.

5. He didn't feel comfortable with PEKLER and her banking practices but he did what his supervisors told him to do.

6. He stated that he was running late for work and would meet with agents Goss and Paramo after his shift.

Memorandum   Page 1 of 2

U.S. Treasury Criminal Investigation Division

0436RP

**Exhibit 156 - 2492**

7.  His cell phone number is (702) 232-9555.

<i>[signature]</i> E/

Special Agent

<i>[signature]</i> Thomas J. Pavone E/

Special Agent

I prepared this memorandum on February 16, 2001 after refreshing my memory from notes made during and immediately after the interview with Bashir.

<i>[signature]</i> E/

Special Agent

Memorandum  Page 2 of 2                                    U.S. Treasury Criminal Investigation Division

0437RP

**Exhibit 156 - 2493**

Humayun Bashir

███████████████████████

2-1501          19:08    Las Vegas.

Humayun Bashir

███ -51

U.S. Citizen

Started E&F May 1989.
hired as teller   and worked various Positions
Became Branch Manage in 1096
Walnut E&F Branch.

Was a Employee Specialist at V. Tijuan Lake
Didn't feel very comfortable
w/ Teklie        did what Managers
told him.

702-252-9555      Wants Us to meet
around 12:00AM after his shift.
19:17

0438RP

**Exhibit 156 - 2494**

**Internal Revenue Service**
**Criminal Investigation Division**

**Memorandum of Interview**



---

| | | |
|---|---|---|
| **In Re:** | RITA PEKLER | **Location:** ▮▮▮▮▮▮▮▮ |
| **Investigation #:** | 339930366 | Las Vegas, NV |
| **Date:** | February 16, 2001 | |
| **Time:** | Approx.: 3:33PM to 5:11PM | |
| **Participant(s):** | Humayun Bashir, Interviewee | |
| | Richard Goss, Special Agent | |
| | Thomas Paramo, Special Agent | |

On the above date and approximate time, special agents Goss and Paramo met with Bashir to discuss the circumstances surrounding his dealings with RITA PEKLER. Special agents Goss and Paramo identified themselves as Special Agents of the Internal Revenue Service, Criminal Investigation and presented their credentials to Bashir for inspection. Additionally, special agents Goss and Paramo explained to Bashir that they were assisting a federal grand jury with this investigation. In response to questions asked, Bashir stated, in substance, the following:

1. He met RITA PEKLER in 1994 or 1995. She was introduced to him about six months after he came to the Bank of America (BOFA) North Toluca Lake Branch (NTLB).

2. PEKLER was a customer of the NTLB prior to his arrival at the branch.

3. The following individuals comprised the management of the NTLB:
   a) Alex (LNU) was the branch manager.
   b) Terri (LNU) was the customer service manager.
   c) Roland (LNU) was the assistant customer service manager.
   d) Rose Mary (LNU) was the new account representative.

4. Bashir was fourth from the top in the NTLB chain of command. He assisted in management maters when those above him were busy.

5. PEKLER had the PEKLER GROUP ACCOUNT. The name PROFESSIONAL BUSINESS DEVELOPMENT (PBD) sounds familiar.

6. He was told by someone on the management platform (perhaps Teri) that PEKLER was an accountant. She manages trips for people who come from the former Soviet Union. She also helped Russian businesses get established by opening bank accounts for them.

U.S. Treasury Criminal Investigation Division

0439RP

**Exhibit 156 - 2495**

7. PEKLER always received the "VIP treatment" when she came into the branch.

8. Both Terri and Alex told him that PEKLER was a good account for the branch.

9. PEKLER came to the NTLB nearly everyday for one and a half years. When she came to the branch she would typically come in with her fiancé, ROMAN (LNU). ROMAN would make deposits while PEKLER would schmooze the people at the bank. He remembers PEKLER coming in and sitting at Alex's desk on several occasions.

10. PEKLER would conduct multiple transactions when she came in. Each time she came to the branch, she was there for 20 to 30 minutes.

11. PEKLER was introduced to the BOFA district manager Craig (LNU) (Perhaps Moore) and his assistant Patty (LNU). He thinks that the district manager had influence on how PEKLER was treated at the branch.

12. No other customer received the same treatment as PEKLER. The typical banking rules were changed just for her. For instance, PEKLER was allowed to overdraw her account and make up the difference on a later date.

13. PEKLER was very arrogant.

14. Members of the management platform told him not to question PEKLER. He was specifically told that she was exempt from Currency Transaction Reports and that the Internal Revenue Service had issued her an exemption to the forms.

15. He was specifically told not to scrutinize the payees of third party checks. All three of the people above him told him it was OK to accept her deposits without question. One of the management platform told him to authorize all of her transactions.

16. Special agent Paramo showed Basir checks numbered 1170, 1236, 1237 and 1425 drawn from the PBD checking account. Upon review of the checks he stated in substance the following regarding the checks:
   a) His initials appear on check number 1170. He initialed checks when he was acting branch manager. The initials indicate that the transaction is approved.
   b) Alex's initials appear on check number 1237. He thinks the notations on check 1237 appear to be indications that a cashier's check was issued. The notations are not particularly are not within the bank policy but they are not particularly suspicious.
   c) Roland's initials appear on check number 1425.
   d) Terri Dietrich's (spelling unknown) initials appear on check number 1236.

17. PEKLER would seek him out because he was efficient at conducting transaction and could complete them quickly.

18. Roland ordered cash for the branch weekly. PEKLER would call Roland so he could order an appropriate amount of cash.

0440RP

Exhibit 156 - 2496

19. Some time in 1997 he was promoted to Assistant Customer Service Manager at the Studio City Branch.

20. Terri, Roland and Alex also left the NTLB. After they left, PEKLER approached him at the SCB. PEKLER told him that she wanted to mover her accounts to the SCB. He approached the Customer Service Manager with PEKLER'S proposition and she approved the transfer. He believes that PEKLER and the Customer Service Manager knew each other prior to PEKLER coming the SCB.

21. The Branch Manager at SCB initially was a woman named Phyllis (LNU). Phyllis left the SCB about one month after Bashir arrived.

22. The SCB Branch Manager ultimately authorized PEKLER to conduct transactions in the same fashion as she did at the NTLB.

23. PEKLER continued to come the SCB everyday with ROMAN. ROMAN had come the SCB by him self occasionally. When PEKLER came in to the SCB the Customer Service Manager made it a point to talk with her.

24. On numerous occasions, the Customer Service Manager and the Branch Manager would leave the branch with out telling him, leaving him as the ranking person at the branch.

25. He believes that the Customer Service Manager and the Branch Manager of the SCB conspired to get him investigated by the bank's internal security.

26. One day he was interviewed by the bank's internal security and was asked questions about PEKLER. The investigators did not tell him specifically why he was under investigation. But the investigators believed that he was helping PEKLER circumvent bank policy in exchange for money. The investigator scrutinized a $60,000 inheritance that he received.

27. He does not know anything about PEKLER opening accounts with cut and past signatures. Opening accounts in such a manner would never be allowed under the banks rules.

28. He remembered that Dotty Lawson was an employee of the bank, but he does not have a specific recollection of her.

29. After he left the SCB, he became a relief manager for all of the branches in the district. This sometimes required him to drive as much as 200 miles.

30. Eventually, he was promoted to manager of a brand new branch in Walnut, CA. His new branch was number one for a long time.

U.S. Treasury Criminal Investigation Division

0441RP

**Exhibit 156 - 2497**

31. After his move to Walnut, PEKLER again contacted him and asked him to take her accounts at his new branch. He refused her accounts. He told her that he did not feel comfortable with her accounts and he would not take them. She replied by telling him that he would be better taking her business.

32. After being at the Walnut branch for three months, he was fired. The reason given for his termination was for writing a check $200 against an account that was closed. He transferred his checking account that he held at the NTLB to the Walnut branch. He accidentally wrote the check from the wrong check book.

33. After he was fired he was unable to get a job at another financial institution.

34. He has 22 year old son, a 17 year old daughter and an 11 year old daughter.

Special Agent

Special Agent

I prepared this memorandum on May 7, 2001, after refreshing my memory from notes made during and immediately after the interview with Bashir.

Special Agent

U.S. Treasury Criminal Investigation Division

0442RP

Exhibit 156 - 2498

2-16-01                    15:33

█████████████████████████████        L.V. N.V.

Humayun Bashir

Met Rita in about Mar 95.

Rita came to N. Tolyca LakeBranch
    Alex was Branch Manager
    Terr. was Customer Service Manager
                Assistant
Robert ~~██████~~ was wither either hawaiian or Philipian
        Rose ~~Manny~~    the New Account Rep
R.P. always - V.I.P. ~~Restaurant~~ treatment

R.P. Would go and sit at Alexes Desk.

R.P. Was At Branch prior to his arrival.

R.P. was introduced to her to her about 6 months.

H.B. Was incharge. Can 4th in line.

He only helped

Terr. + Alex + other, told him to
        that R.P. was a good Account for the
    Branch.

one of the things that the branch
    did was allow her to overdraw ①

0443RP

**Exhibit 156 - 2499**

and make of the difference

H.B. thinks that District level help on how R.F. was treated

He remembers that R.F. had the Tekla Group account.

FBD rings a bell.

H. Backal managrnt what R.F. did for a living establish he was told that. She managed for Russians who come from the U.S.R.

R.F. opened Bank accounts for Russian Business to get Established.

Customer service Manager told him.

He was told R.F. was an accountant

R.F. was in bank everyday. She came w/ on the person she was engaged to. he would make the deposits. She would schmooze the bank employees

She came to branch. everyday for 1½ years. Went Was always with

Which Name was Romkin,

0444RP

**Exhibit 156 - 2500**

She conducted multiple transactions each day. Each time she was there about 20-30 mins

Check # 1170 is his initial — always.

H.B. initialed checks when he was acting Manager. Registrations — initials were to OK the check.

H.B. was told not to question R. to Fokker.

R.T. was very arrogant.

R.P. looked for her, because he was fast.
He was told that R.P. was exempt from — specifically
CRS. one of the management told him

He was told that the IRS issued her an exemption.
# 1237 is Alex's initials

Thinks refunds are because Cashiers check was issued. Not a particularly suspicious transaction, is because
#1425 is Refund
1236 is Terri Refunda.

0445RP

**Exhibit 156 - 2501**

R.F. called typically called Roland was the person who ordered cash Ordered cash every week for Branch.

He was told specifically not to scrutinize the payee's ie. if a third party V, it was o.k. w/o question. All three had standing order one of three told him to ok all other transactions

No other customer got the same treatment. The rules were changed specifically for her.

She was introduced to District Manager Craig Ross (< N and Fatty (LNU) Assistant to D.M.

After N.T.L.B. was promoted to Assistant Customer Service Mgr. in Studio City Branch.

Terry + Rosemary + Alex Left. R.F. came to H.B. in Studio City.

Customer Service Mg. in Studio City Knew Rita

④

R.P. approached him at the branch and said
she wanted to move her account to
BT SCB.

C.S.M. told him it was ok to
~~take R.P. account~~ take the R.P. acent.

@ R.P. Studio City Frank ~~of Murga~~
also ~~Approved~~ some activity. W/R.P.

F.P. Still came in everyday W/ Romans,
CSM made it a point to talk to him.

Phyliss was Branch Manager. and left after one
month.

Romans came in by him self once or
twice.

H.J. at Studio City Branch around 1997.

Remembers ~~Poppy~~ Lawson, was an employee
of BofA but he does not have a specific
recollection.

He believes
CSM. + Branch manager conspired to get him
investigated by bank internal security.

one day. bank investigators came when

Many times CSM + B.M. many times would
discipline. + honks running to head.

(S)

0447RP

**Exhibit 156 - 2503**

Bank investigators did not tell him why specifically he was under investigation

Investigators thought he was helping Rita Cheat the Bank.

They scrutinized a $60,000 inheritance.

The Allegations was that he waived the rules for Rita her money.

Does not know if anything about accounts being opened w/ out signature Sig. reveal could be allowed under counter rules.

After SCS he became a relief for, all Managers in the district list some times down to 200 miles

Then he became Branch Manager of Walnut Branch of 2005 and New Branch His Branch was #1 for a long time

R.F. Called him in Walnut and wanted to move her account Walnut

He refused to take her account.

Technically he was fired because he wrote a $700 check from his N. TLB account that he transfered to his Walnut Branch   ⑥

0448RP

**Exhibit 156 - 2504**

he simply had the wrong check book.

He wrote that check to get $16.15 for his daughter.

- Rita wanted him to take accounts
- He told her he didn't feel comfortable with her accounts.
- She tells him that he would be better off with her business

Was at Walnut Creek for 3 months was fired

He tried to get a Job w/ Well Fargo but they refused to hire him.

The banks told him that the wanted to hire him. Even they told him they really one day. They then refuse to hire him.

He has 22 year old Son who his a tennis director
17 year old daughter
11 year " daughter

17:11

0449RP

**Exhibit 156 - 2505**



# EXHIBIT

# 157

JUN-21-2006  12:11        DOJ BMFEA                                        8185562939    P.02

# U.S. Department of State
# Diplomatic Security Service
# Russian Business Investigations
# Initiative Program Intelligence Repor



LIMITED OFFICIAL USE

LAW ENFORCEMENT SENSITIVE

*Washington, DC*

## BORIS NIKOLAYEVICH MISHIN

81218

**Exhibit 157 - 2506**

JUN-21-2006  12:11     DOJ BMFEA                                8185562939    P.03



# Russian Business
# Investigations Initiative
# Criminal Intelligence Report



| SUBJECT(S): | FAKTOROVICH, NINEL [AKA. NELLIE | DPOB: ?/?/59; SS# ███-1433 |
| | PEFLEY, JOHN J. | N/A; SS# ███-0673 |
| | PEKLER, RITA | ██/62; SS# ███-5772 |
| | MISHIN, BORIS NIKOLAYEVICH | ██/57; RUSSIA SS# ███-1366 |

| COMPANY: | CMM INTERNATIONAL TRADE, INC. | 8155 SANTA MONICA BLVD. STE. 200 WEST HOLLYWOOD, CA 90026 TEL. 213-650-6777 |
| | KORK HOLDING COMPANY | N/A |
| | THE PEKLER GROUP | 8155 SANTA MONICA BLVD. LOS ANGELES, CA 90046 TEL. 213-650-6777 |
| | PROFESSIONAL BUSINESS DEVELOPMENT SERVICES | 6130 PALM DRIVE CARMICHAEL, CA 95608 TEL. 916-488-4851 |

**SYNOPSIS:**

POST-VLADIVOSTOK            RECEIVED INFORMATION FROM LOCAL POLICE SOURCES WHICH INDICATED THAT SUBJECT, **MISHIN, BORIS** IS A MEMBER OF AN ORGANIZED CRIME GROUP ORIGINATING FROM THE VLADIVOSTOK CONSULAR DISTRICT. DS/CR/VF HAS ALSO LEARNED THAT **MISHIN** IS CONNECTED WITH SUBJECT, **PEKLER, RITA** AND **THE PEKLER GROUP**, A PREVIOUS MALAFIDE SPONSOR AND INCORPORATOR OF OVER 40 QUESTIONABLE COMPANIES ACROSS CALIFORNIA.

This report is loaned to you for official use only and remains the property of the U.S. Department of State. Diplomatic Security Service. Neither it nor any of its contents may be disseminated outside the agency to which it is loaned. Any further information, requests for disclosure, or comments may be directed to the Department of State. Diplomatic Security Service. Criminal Investigations Division. Washington, DC, telephone (202) 663-0342, fax (202) 663-0656.

81219

**Exhibit 157 - 2507**

JUN-21-2006  12:12          DOJ BMFEA                                        8185562939    P.04

# BORIS NIKOLAYEVICH MISHIN

**INTRODUCTION**: POST-VLAD recently received information assembled toward the end of August, 1997 from the local police that identified the subject, BORIS MISHIN, along with others, as a reputed member of a Vladivostok organized crime group, originating in the Vladivostok Consular District. Upon further examination, it has been learned that MISHIN's original invitation to the United States was sponsored by subject RITA PEKLER, a malafide sponsor and registering agent for no fewer than 40 companies throughout California which apparently act as visa petitioning firms for NIV applicants and/or money laundering operations for Russian OC figures in the United States.

**FINDINGS:** Preliminary inquiries on MISHIN recovered multiple California addresses dating back to December, 1993. This includes the current address listed on his driver's license; [13067 Caminito Del Rocio, Del Mar California 92014]. Subsequent TECS address searches on this residence revealed six individuals who have used it as their intended stay address including:

| NAME | DOB | DOA | DOD | POD |
|------|-----|-----|-----|-----|
| MICHINA, Elena | 60 | 07/11/93 | 09/19/93 | SFR |
| MICHINA, Evguenia | 82 | 07/11/93 | 09/19/93 | SFR |
| MIRONOV, Serguei | 85 | 07/16/95 | N/A | N/A |
| MIRONOV, Serguei | 85 | 07/11/93 | 09/19/93 | SFR |
| MOSKALENKO, Andrei | 60 | 07/19/93 | 07/25/93 | SFR |
| RODIONOVA, Julia | 86 | 06/27/93 | N/A | N/A |

As for the subject MISHIN, TECS queries indicate he was entered into CLASS on 01/01/96 [updated 10/23/96] as an S-7 status and "EXCLUDABLE" for, "UNLAWFUL ACTIVITY RELATED TO NATIONAL SECURITY". Checks with CA/DOJ indicate that MISHIN is involved with subject company, **CMM INTERNATIONAL TRADE, INCORPORATED.** MISHIN's U.S. based contacts allegedly further include; **KORK HOLDING COMPANY; PROFESSIONAL BUSINESS DEVELOPMENT SERVICES;** and **THE PEKLER GROUP.**

Information on RITA PEKLER also indicates multiple California addresses dating back to December, 1989. Among these is the current listing for **THE PEKLER GROUP** [8155 Santa Monica Boulevard Suite 200 Los Angeles, CA 90046]. Corporations queries on this address yielded over 70 companies, apparently with RITA PEKLER listed as one of, or the sole officer and/or registering agent on file. These companies include:

| | |
|---|---|
| BERNET JEWELRY & LOAN | AQUATREND INC. |
| AVON MEDICAL | CMM INTERNATIONAL |
| X.L.E.L. CORP. | NORTH VALLEY ST.ASSOC. |
| GUNTZ INC. | PAWN SHOP CITY LOAN |
| VIGOR CORP | YELENA'S CORP. |
| ABX SECURED DELIVERY | RSVS SERVICES |
| VS &AG ENTERPRISES INC. | W. HOLLYWOOD HEALTH & REHAB |
| RESEDA DISCOUNT | MILAG INC. |
| AIDA GREY ENCINO INC. | FAMILY HOUSING ASSISTANCE GROUP |
| INTERSERVICE INC. | ISABELLA'S LIFE MEDICAL SUPPLY |
| MONTEBELLO INC. | ROXBURGH MANAGEMENT INC. |

| | |
|---|---|
| RTCA INC. | S.I. ENTERPRISES INC. |
| A.R.T. PAWN SHOPS INC. | AARON TAVDI & ASSOCIATES |
| ALICA INTERNATIONAL | DISCOVERY INTERNATIONAL TRADE |
| MATRYOSHKA INC. | MGN PAWN SHOP |
| PATTCO MACHINING | RATMANSKY INC. |
| VEHA INTERNATIONAL CORP. | W/C CONSULTING GROUP |
| M.V.P. SERVICES | A.S.K.S. INTERNATIONAL |
| GROWTH FINANCIAL INVEST. | VAP & AP INTERNATIONAL CORP. |
| LAST CALL OUTLETS | MERXLINE CORP. |
| DALIMPEX IMPORT & EXPORT | INTERNATIONAL TRADE ANDRE CORP. |
| L.A. CENTRAL PAWN SHOP | INTERSERVICE INC. |
| A &C GROUP INC. | AMBLER COMPANY, INC. |
| AMP JSC INTERNATIONAL | U.S. EAST EUROPEAN DEVELOPMENT CO. |
| VAP & AP | AARON TAVDI & ASSOCIATES |

Further inquiries into several of these firms indicate their status as; "DISSOLVED", while the majority remained "ACTIVE". TECS travel queries on PEKLER revealed recent travel, dated 12/22/97 aboard Virgin Atlantic Airways flight #7, departing from Heathrow Airport in London and arriving at LAX. Additional TECS searches indicate that PEKLER's status was listed as a; "SUSPECT" and; "ASSOCIATE OF PIKOULINE. PEKLER IS UNDER INVESTIGATION BY LAPD, INS, AND OTHER FEDERAL AGENCIES AT THIS TIME FOR MONEY LAUNDERING AND INS FRAUD."

As for CMM INTERNATIONAL TRADE, INCORPORATED, said company was allegedly headed by MISHIN, with PEKLER as the registering agent. It is currently led by NELLIE FAKTOROVICH with the title of "CHAIRMAN". Preliminary searches brought back a hit for a Ninel FAKTOROVICH. DS/CR/VF has yet to ascertain if this is indeed, the same subject. No other hits were available for this subject.

Checks on PROFESSIONAL BUSINESS DEVELOPMENT SERVICES/GROUP turned up only one such company operating in California with subject JOHN PEFLEY listed as the owner. The firm's status remains "ACTIVE", operating as a "MANAGEMENT CONSULTING SERVICE" started in 1995. Checks on subject PEFLEY indicate a current address of 2801 California Avenue, Carmichael California. TECS queries on this address were negative. TECS travel searches turned up only one hit indicating travel on 12/03/96 aboard United Airlines flight #941 departing from Frankfurt Germany arriving at O'Hare Airport in Chicago.

**ASSESSMENT:** INFORMATION PENDING. MISHIN has been identified as a known OC figure. His association with PEKLER fits the current profile of OC activity and lends credence to the argument that PEKLER is a known associate of OC figures and malafide sponsor.

LAW ENFORCEMENT SENSITIVE

81220

**Exhibit 157 - 2508**

JUN-21-2006  12:12      DOJ BMFEA                                    8185562939    P.05



## US Department of State
## Diplomatic Security Service
## RBII: SUBJECT: BIO SHEET



| DSS CASE NUMBER: V-98-00001 | RSO NUMBER: VLADIVOSTOK {N/A} |
|---|---|
| ARREST DATE: | JABS #: |



### BIOGRAPHICAL INFORMATION:

| NAME: MISHIN, BORIS NIKOLAYEVICH | |
|---|---|
| DATE OF BIRTH: ███/57 | PLACE OF BIRTH: RUSSIA |
| HEIGHT: 5' 7" | WEIGHT: 190 (LBS) |
| GENDER: MALE | RACE: WHITE |
| HAIR: BROWN | EYES: BLUE |
| SCARS, MARKS, TATTOOS: N/A | MARITAL STATUS: N/A |

**COMMENTS:**
ADDRESS: ██████ ████, DEL MAR, CA; AND ████ ████ SAN DIEGO, CA ██; AND ██ ████████. LOS ANGELES, CA ██
DRIVER'S LICENSE #: ████; ISSUED 04/20/93
SSN: ███-1366
POST-VLADIVOSTOK RECEIVED INFORMATION FROM LOCAL POLICE SOURCES THAT IDENTIFIED MISHIN AS A MEMBER OF AN OC GROUP FROM THE VLADIVOSTOK CONSULAR DISTRICT

This report is loaned to you for official use only and remains the property of the U.S. Department of State, Diplomatic Security Service. Neither it nor any of its contents may be disseminated outside the agency to which it is loaned. Any further information, requests for disclosure, or comments may be directed to the Department of State, Diplomatic Security Service, Criminal Investigations Division, Washington, DC, telephone (202) 663–0342, fax (202) 663–0656.

81221

**Exhibit 157 - 2509**



Law Enforcement Sensitive

Exhibit 157 - 2510

# EXHIBIT

# 158

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

UNITED STATES

Plaintiff,

Case No: CR-02-00220

v.

IOURI MIKHEL

Defendant.

I, Maureen Patricia Baird, declare that the following statements are true:

**BACKGROUND OF DECLARANT**

1.    From March 1989 through September 2016, I was employed by the Department of Justice, Federal Bureau of Prisons (BOP), and served in many capacities. My last three positions held were Warden, Federal Correctional Institution, (FCI) Danbury; Connecticut (2009-2014); Senior Executive Service (SES) Warden; Metropolitan Correctional Center (MCC); New York (2014-2016), and SES Warden United States Penitentiary, (USP), Marion, Illinois (2016-Retired).

2.    In my capacity as Warden at these institutions, I was responsible for the overall operations and all components of each prison. I am fully knowledgeable of the operations, procedures, and policies of the BOP and very specifically familiar with the operations of the Communication Management Unit at USP Marion and the management of inmates assigned Special Administrative Measures (SAMs) during my time as Warden at MCC New York. My professional experience of working in federal

1

**Exhibit 158 - 2511**

corrections included many areas. In two of the BOP Regional Offices I worked, one of my duties included the classification and designation of newly committed inmates, as well as reviewing and approving inmate transfers to other federal prisons. Initial designations and subsequent transfers required a thorough review of the inmate's complete pre and post commitment record, to ensure accurate placement at an appropriate security level prison. One of my other duties when I was assigned to the Regional Offices, was to conduct and at times, chair, after action investigations/reviews and prepare reports for the Regional Director concerning significant incidents, including homicides and suicides which occurred within federal prisons. I was also responsible for inmate grievances regarding topics pertaining to correctional programs, including appeals related to the discipline policy. Throughout the course of my career, in many of my positions, I was required to assess an inmate's risk formally and informally. This risk assessment was especially critical when an inmate was being considered for a lesser security prison transfer or a community program.

3. Since my retirement from the Bureau of Prisons, I have maintained contact with many former colleagues. Since early 2017, I have worked as an independent prison consultant and have provided expert witness testimony. I have kept abreast of new policies and laws that directly impact the BOP.

4. Most recently, I have been preparing reports for filing in various United States District Courts throughout the country. These reports are prepared for the purpose of Compassionate Release consideration or for inmates who are being considered for release under the Incarceration Reduction Amendment Act (IRAA). In preparation for

2

**Exhibit 158 - 2512**

these reports, I am required to review prison records of each inmate so I can provide a concise and thorough report for the Court.

5.    I have previously been qualified as an expert witness in federal courts in the areas of prison management, prison practices, and prison adjustment. I have never been found not qualified to testify as an expert witness.

6.    A copy of my resume which includes my relevant work experience is attached to this report as Exhibit A.

**STATEMENT OF WORK**

7.    I was contacted by Pamela Gomez, Deputy Federal Public Defender at the Office of the Federal Public Defender, Central District of California, who is representing Iouri Mikhel, a federal inmate who is currently housed at USP Terre Haute. The Judgment and Probation Commitment Order dated March 12, 2007, from the United States District Court, Central District of California, documents Mikhel's conviction for the offenses of: Conspiracy to Take Hostages Resulting in Death, and Hostage-Taking Resulting in Death, Conspiracy to Launder Monetary Instruments, Conspiracy to Escape from Custody, and Criminal Forfeiture. Following his conviction of these charges a Death sentence was imposed.

8.    In preparation of my report, Ms. Gomez requested I review the trial transcripts of various government and defense witnesses, as well as records from the prisons where Mikhel was housed during pre-trial detention and opine on the information as it relates to Mikhel, with emphasis on what the jury did not hear regarding Special Administrative Measures.

9.    I understand the legal team who represented Mikhel at trial did not offer a prison expert

3

Exhibit 158 - 2513

who had knowledge about Special Administrative Measures (SAMs) procedures and more specifically, how these SAMs procedures would apply to Mikhel following a conviction. As part of my review, I was asked to evaluate how a federal prison expert, with direct and intimate knowledge of SAMs may have assisted in Mikhel's defense at trial had one been engaged. Further, I was asked to opine on the BOP's ability to safely and securely house Mikhel had a sentence of life imprisonment been imposed in his case.

10. I reviewed hundreds of documents provided by counsel. In developing an approach to review the volume of documents, I relied on my years of federal corrections experience, which enabled me to focus primarily on the records needed to formulate an opinion on the issues Mikhel's Counsel requested. In developing my opinion on whether a prison expert, who more fully understood SAMs, would have contributed to Mikhel's defense and, if so, how. An extensive part of my review focused on:

- Trial transcript of Dr. Mark Cunningham.
- Mikhel's actions during pretrial detention as provided in prison records from the Metropolitan Detention Center (MDC) Los Angeles, California, and San Bernardino Central Detention Center (SB-CDC) in San Bernardino, California with particular attention to activity after Special Administrative Measures (SAMs) were in place (June 6, 2003).
- Summarizing how a prison expert, had one been retained, may have contributed to Mikhel's defense.

In my analysis I primarily attempted to answer the questions,

- Was the jury at Mikhel's trial provided the necessary information about SAMs to make an informed sentencing decision?
- How might a BOP expert, with intimate knowledge of SAMs procedures have assisted Mikhel's defense at trial?
- Can Mikhel be safely managed by the BOP?

4

**Exhibit 158 - 2514**

**EXECUTIVE SUMMARY**

11. As a result of my review of the documents provided by Counsel, it is my opinion that Mikhel can safely be managed by the BOP for the remainder of his life in prison. Because of the escape attempts during his pretrial detention, Mikhel is now classified and viewed by the BOP as someone who poses a serious risk for escape. The BOP applies enhanced security measures to offenders, like Mikhel, who present significant management concerns. These measures are taken to provide a safe environment for both staff and inmates. Enhanced security protocols were applied by the BOP to Mikhel forthwith, during his time in federal detention, following his serious escape attempt from MDC Los Angeles in April 2003 and will remain in place throughout his time in federal prison. These enhanced security protocols are not solely dependent on Mikhel having a death sentence as the BOP regularly assesses security needs of all inmates and bases the security requirements on an individual's security needs. The BOP's security measures have proven effective and, from the documents I reviewed, Mikhel has no discipline infractions related to any acts of violence or escape attempts noted in the record since his conviction for the instant offense.

12. Many years have passed since the serious escape attempt at MDC Los Angeles, involving Mikhel, and the Agency's security procedures have improved not only because of lessons learned from that incident, but from other similar incidents which have occurred in all federal prisons. The BOP is now better equipped to effectively manage inmates who pose significant security concerns and risks. Because of the Agency's ever evolving security processes, I am confident they will continue to safely house and manage Mikhel, for the remainder of his life, as they have already

5

**Exhibit 158 - 2515**

demonstrated over the last more than 20 years since April 2003, when the escape plot was uncovered.

13. At trial, Mikhel did not have the benefit of a prison expert who was intimately familiar with BOP operations. This would have been important to explain how the Agency would manage inmates like him into the future. The BOP is a complex organization which incorporates and utilizes hundreds of policies which guide the operations of all its federal prisons. Additionally, there are an enormous number of documents and forms utilized by the Agency in its day-to-day operations. Because these policies are complex and detailed, they can be easily misinterpreted and confusing to a lay person or anyone else who is unfamiliar with specific BOP corrections' processes.

14. The BOP policies, applicable to Mikhel would have been explained by a federal prison expert at trial. The expert would have described how enhanced security measures, like those initiated and applied to Mikhel following the escape attempt from MDC Los Angeles, would remain in place throughout his life in prison.

15. Perhaps more important, was the absence of any detailed information presented at trial of how Special Administrative Measures (SAMs), measures would apply to Mikhel, post-sentencing. Even more concerning was the misleading and inaccurate information regarding alleged SAMs order violations which was offered and expounded upon by the Assistant United States Attorney during her cross examination of Dr. Cunningham, expert defense witness for Mikhel's co-defendant, Jurijus Kadamovas.

16. It was clear during my review of prison records for the time Mikhel was in pretrial detention at SB-CDC, that this U.S. Marshals' contract prison was not equipped or designed to properly manage inmates, like Mikhel, who were under the provisions of

6

**Exhibit 158 - 2516**

SAMs. Much to the contrary, the BOP is designed to fully comply with SAMs Orders to manage inmates safely and securely with SAMs restrictions.

17. Notably, the mission of the H Unit, located at the Administrative Maximum Security United States Penitentiary, (ADX), Florence, Colorado is designed to house sentenced offenders who are assigned SAMs and the housing unit is solely comprised of inmates under SAMs orders. H Unit at ADX has been available and functioning since 2002, at least four years before Mikhel's trial. ADX staff, especially those assigned to H Unit, receive extensive training on SAMs procedures as well as managing inmates under SAMs provisions.

18. During direct testimony, Dr. Mark Cunningham, defense witness, briefly discussed Special Administrative Measures. When asked whether he had experience with SAMs, Dr. Cunningham replied that he had "some knowledge". During his testimony Dr. Cunningham provided a general overview regarding SAMs but did not address how these measures specifically applied to Mikhel, during pretrial or post-conviction incarceration, nor was he asked to expound on this topic. Dr. Cunningham testified about how the SAMs' periodic review process works, yet he does not know how many inmates in the federal system are under a SAMs order, nor does he explain the average length of time an inmate remains under SAMs, both important pieces of information. Also omitted from Dr. Cunningham's testimony, is how extraordinarily difficult and rare it is for SAMs inmates to successfully appeal SAMs restrictive measures or have SAMs removed altogether. Following this brief and general overview of SAMs, Mikhel's Counsel redirects Dr. Cunningham's attention to another topic, stating "Now,

7

**Exhibit 158 - 2517**

just to get away from the SAMS for a moment…" implying at some point there would be a return to the SAMs topic, yet that never happened by any of Mikhel's legal team.

19. During cross-examination of Dr. Cunningham by the prosecutor the line of questioning pertaining to SAMs was briefly discussed. Still, there remains no detailed explanation of SAMs procedures; however, **there was a blatantly false statement made by the prosecutor regarding multiple violations of SAMs orders by inmates at ADX Florence (bold emphasis added).** While questioning Dr. Cunningham, AUSA DeWitt asks "And you're aware of the fact that even at ADX, the most secure facility in the Bureau of Prisons, there have been instances where people have been able to violate SAMs orders?" Dr. Cunningham responds that he does not have "specific information about whether SAMs have been violated or not." AUSA DeWitt goes on to cite a recent Office of Inspector General (OIG) Report regarding how terrorists housed at the ADX had been able to get messages to the outside world by circumventing mail procedures. AUSA DeWitt very clearly implied that these "messages" had been sent by inmates under a SAMs order.

20. Because of my corrections experience, having been the former Warden at MCC New York, responsible for a SAMs unit within the prison and the strict requirements associated with SAMs, as well as my knowledge of ADX operations, I could not reconcile in my mind how AUSA DeWitt's statement could possibly be true. Immediately, I searched and located the OIG report AUSA DeWitt was referencing.[1]

21. After reviewing that OIG report, I learned that the statement of AUSA DeWitt regarding egregious violations of SAMs orders related to inmates at ADX was inaccurate and

---

[1] U.S. Department of Justice Office of the Inspector General Evaluation and Inspections Division, "The Federal Bureau of Prisons' Monitoring of Mail for High-Risk Inmates," September 2006

8

Exhibit 158 - 2518

untrue. Instead, the OIG report she references identifies three convicted terrorists who were incarcerated at the ADX between the years of 2002 and 2004, who had mailed approximately 90 letters to Islamic extremists. These inmates who mailed the nefarious letters were **not under SAMs provisions** when those incidents occurred; therefore, no SAMs orders had been violated as AUSA DeWitt implies in her comments. Such a blatant misrepresentation, which was never challenged by Mikhel's legal team, likely left the jurors to believe these types of SAMs order violations exist at the ADX or at a minimum, left them confused as to how such violations could occur.

22. Because SAMs requirements are so specific, they can be very confusing to those not familiar with its processes and procedures. I believe a BOP prison expert who was experienced with SAMs would have played a vital role at trial in helping jurors understand the program. The expert would have opined on the various ways Mikhel would be managed by the BOP going forward, and the stringent security protocols applicable to him under a SAMs order. At trial an expert would have provided an assurance that Mikhel, regardless of a life-or-death sentence, could be effectively controlled and managed by the BOP. The expert would have also been able to articulate how inmates under SAMs orders are managed in the BOP, in stark contrast to the haphazard implementation of SAMs procedures which occurred while Mikhel was in pretrial detention at a local U.S. Marshals contract jail, which was not intended or designed for defendants under SAMs orders.

23. The expert would have explained in detail, how SAMs is strictly enforced and administered within H Unit at the ADX and how Mikhel, if a life sentence were imposed, would have been transferred to H Unit forthwith, following sentencing. Having been

9

**Exhibit 158 - 2519**

equipped with this knowledge, the jury in his case would have been able to make a fully informed decision regarding the fate of Mikhel.

24. My conclusions are based on a thorough review of relevant documents, my many years of federal corrections experience, my firm understanding of the mechanics of SAMs, and my knowledge of the inner workings of the BOP.

25. Had a prison expert, knowledgeable of SAMs been retained for Mikhel's defense, in addition to testimony, the expert could have assisted counsel with matters related to the BOP. Assistance in the form of clarifying specific BOP policies and SAMs procedures, nuances related to the Agency, identifying prison records, and other matters, could have proven useful in aiding defense counsel.

26. I would not have been available as an expert during the time of Mikhel's trial; however, there were other experts, similar to experts offered in other defendants' defense, including retired BOP personnel, who likely would have been available and able to provide invaluable assistance during Mikhel's trial.

**COMPLEXITIES OF THE FEDERAL BUREAU OF PRISONS; POLICIES AND PROCEDURES**

27. During my lengthy career with the BOP, I was fortunate to hold many positions with varying and increasing levels of responsibility as I moved through the ranks. With each new assignment, I was surprised, yet educated, with the many facets and complexities of the BOP. The Agency has a mission statement, vision statement, and a multitude of policies and procedures, some of which specifically address the mission of a particular prison. As a result of changes in the law, new initiatives established by Congress, or for the purpose of a creating safer prison environments, the BOP was continuously

10

Exhibit 158 - 2520

modifying policies or introducing new ones. Since leaving the BOP I have conducted training classes for many stakeholders of the BOP ranging from federal defenders, prosecutors, probation officers, and criminal defendants. During many of these training sessions, the lack of understanding the complexities of the BOP is apparent, which is understandable since these individuals have limited direct involvement with federal corrections. Even for those individuals outside of the Agency who have been involved to some degree with BOP cases in their professional capacities, comprehending and fully understanding the complexities of policies and inner workings of the BOP is still a struggle. Absent years of direct involvement in the federal prison system, it is highly unlikely an individual, including a corrections expert, could grasp specific concepts related to federal inmates, federal prisons, and the policies applicable to the BOP.

28. Most individuals, especially those with no knowledge of SAMs, or those with limited knowledge of corrections, would likely understand that security and safety are the core principles; however, the mechanics of how those principles are practiced and established within the BOP may be confusing and overwhelming. Even more confusing are the principles applicable to SAMs and because there are so few inmates in the BOP, less than 60 at the present time, with SAMs orders, the processes and procedures are also typically not even fully understood by most federal prisons employees, unless those employees directly supervise that small contingent of SAMs inmates. Learning and understanding the bevy of BOP policies was an ongoing process for me and my colleagues, who were entrenched daily during our lengthy service to the BOP. For a layperson, unfamiliar with corrections, attempting to comprehend how these policies are put into practice, would require some explanation by a federal prison expert who has

11

Exhibit 158 - 2521

several years of experience working in federal corrections, especially one with knowledge of SAMs.

29. At Mikhel's trial, the benefit of a federal prison expert would have provided the jury with a clearer understanding of how BOP policies and security procedures would affect Mikhel, had a sentence of life imprisonment been imposed. Regardless of whether a death sentence was imposed, the security measures and SAMs restrictions enacted for Mikhel, as they were, immediately following the escape attempt, would remain, at least, in part, for the remainder of his time in custody. Having been equipped with this knowledge, the jury in his case would have been able to make a fully informed decision regarding the fate of Mikhel.

## FOUR FACTORS DICTATE HOW MIKHEL WILL BE MANAGED BY THE BOP: ESCAPE INCIDENT, CONVICTION, AND SENTENCE

30. The primary factors which determine Mikhel's institution security measures include the escape attempt, conviction, and sentence imposed. The fourth, and most defining factor is Mikhel's SAMs classification. The BOP classifies Hostage Taking Resulting in Death and Conspiracy to Escape from Custody convictions as a Greatest Severity Offense. A conviction itself requires enhanced security measures by the BOP. Additional security protocols and procedures are applied because the serious escape attempt occurred within a BOP institution. A sentence greater than 30 years requires housing within a United States Penitentiary (USP) or depending on other factors in the case, at the Administrative Maximum Facility, Florence, Colorado, also known as ADX Florence.

12

Exhibit 158 - 2522

31. Following trial, absent a death sentence, which usually results in placement in the Special Confinement Unit (SCU) at USP Terre Haute, Indiana, Mikhel would undoubtedly have been incarcerated within H Unit at ADX Florence. This decision is based solely on the SAMs order which was in place at the time of trial and for many years after. Unless there are extenuating and extraordinary medical reasons which preclude placement at the ADX, all federally convicted inmates who have SAMs imposed by the Attorney General, are designated to serve their sentence within this specialized unit at the ADX.

32. The ADX is one of the most secure prisons in the world and is designed to house dangerous and violent offenders, based on their criminal histories, backgrounds, and conduct in prison. **No inmate has ever escaped from the ADX.** The ADX has several missions and housing units within its institution. The Special Security Unit, otherwise known as H Unit, within the ADX, is one of the most restrictive units and is solely comprised of inmates under a SAMs order. The main purpose of assigning SAMs is to restrict the inmate's communication, not only with the outside world, but also with other inmates. The primary means for which SAMs procedures are accomplished is through total isolation of the inmate.

33. Inmates in H Unit are single-celled and there is no physical contact between inmates. The cells are comprised of solid walls and steel doors, with a small slot in the door which allows food trays to be delivered and restraints to be applied. Some cells at the ADX comprise an additional security enhancement of a sallyport, which provides greater security for corrections officers. Each cell is configured with a concrete bed, desk, and stool and includes a thin mattress and blanket. Sinks, toilets, and showers are typically

13

Exhibit 158 - 2523

contained within each cell, further lessening the risk to staff by limiting contact with inmates. Small, narrow windows provide limited natural light in the cells. A small television and radio are provided in most of these cells, with limited programming options which have been approved by prison officials.

34. Inmates in H Unit in Phase One are authorized two telephone calls to approved family members twice per month, Phase Two receive three calls, and Phase Three receive four calls all of which are in 15-minute intervals. The calls must be scheduled in advance and coordinated through BOP staff and agents from the Federal Bureau of Investigation (FBI). All telephone calls must be live monitored by an FBI agent and a translator must be available when the inmate communicates in a language other than English. It should be noted, not all SAMs inmates are approved for Phase Two or Three and some remain in Phase One for the duration of their time in H Unit. Like telephone calls, the inmate's limited social visits with immediate family members also require live audio monitoring by the FBI. When I was Warden at MCC New York, most inmates under SAMs were not United States citizens, nor did their families reside in this Country. This made it very difficult for their families to visit and the time differences made it difficult to arrange for telephone calls.

35. SAMs inmates are locked alone in their cells for up to 24 hours each day. Meals are delivered through the food slot three times a day. The only out-of-cell time is for scheduled legal and social visits with approved visitors, certain medical procedures, and limited hours each week of indoor or outdoor recreation. All visits which occur at the ADX are non-contact visits. Inmates and visitors at the ADX are assigned to visiting booths. These visiting booths are equipped with a phone and designed with plexiglass

14

Exhibit 158 - 2524

to restrict any physical contact. All visits are monitored by corrections officers. For inmates assigned SAMs, there is also an agent from the FBI who will be listening in on the audio portion of the visiting conversation. If for instance, Mikhel was speaking to a visitor in a language other than English, an agent who is fluent in that language must be available to monitor before the visit can occur. If anything is discussed during the visit which is not authorized under Mikhel's SAMs provision, the visit would be immediately terminated.

36. SAMs are imposed in "up to one year" increments, with the time-requirements the same for any extension beyond one year. During my term as Warden at MCC New York, I had never witnessed an inmate who had SAMs removed but saw extensions. Periodic reviews of SAMs inmates' cases are conducted by Department of Justice officials to determine if SAMs will be renewed. The application of SAMs, in a legal sense, affords the opportunity for inmates to challenge its implementation, but it is likely more of a circular argument. SAMs are typically extended and not removed until the government decides they should be removed and input from an inmate is given little weight. Inmates are required to receive notification of the restrictions and the basis for SAMs at the time of initial implementation and then again when restrictions are being renewed. One avenue for inmates to object to a SAMs renewal is through meeting with his institution unit team and the supervising law enforcement agency case agent, where they are afforded the opportunity to present evidence and/or discuss issues and provide information indicating there is no need to extend SAMs, or why a modification to the restrictions is justified. The information is compiled by the case manager and forwarded to the Warden through the institution's legal department. All of this, in most cases, is

15

**Exhibit 158 - 2525**

an exercise in futility where a recommendation for continued SAMs is involved. As a former senior executive of the BOP, I do not know of any warden who would recommend discontinuing SAMs at the possible risk of serious harm to others resulting or the potential for threats to national security. It is not realistic, and I can say with near certainty, it is not going to happen.

37. Other avenues of appealing SAMs are also futile. An inmate can object to his SAMs during his twice-yearly unit team reviews, initial classification review, and when his progress report is being prepared by his case manager. Having been a case manager for several years, early on in my BOP career, it is unrealistic to think these avenues would provide anything more than an outlet for an inmate under SAMs to vent frustration. A case manager may listen to concerns a SAMs inmate presents; however, even if the case manager believed a change in status was warranted, there is no possible way they would initiate a recommendation for removal of the restricted measures. This type of recommendation is far above their authority as a case manager.

38. An inmate may also challenge the SAMs through the BOP's Administrative Remedy Program. Throughout my 27 years with the BOP, I was responsible for responding to Administrative Remedies. With certainty, I declare, for the purpose of challenging a SAMs placement through Administrative Remedy would not be successful. The BOP exercises no control or jurisdiction over SAMs imposed by the Attorney General. Wardens are bound to abide by the SAMs imposed on an inmate. An inmate's only possibility of having his SAMs reconsidered or modified would be for him to exhaust the Administrative Remedy process, so he could file a motion with the Court.

16

**Exhibit 158 - 2526**

39. During my time at MCC New York as Warden, there were instances when I wanted to make concessions or modifications to SAMs to make living conditions more humane for the inmate. However, I was restricted from doing so. Small concessions, such as adding items to the commissary list for certain holidays, were within my purview, however; the things that were substantial and mattered, those things which could make a real difference, or make conditions more humane, were not within my authority.

40. For as long as a SAMs order is in effect and absent significant medical conditions, Mr. Mikhel would have remained within the H Unit at ADX. Typically, the restrictive measures placed on SAMs inmates are identical and remain in effect for years. Had this information been available or provided at Mikhel's trial, it may have altered the outcome of the sentence imposed.

## MIKHEL HAS BEEN SUCCESSFULLY MANAGED SINCE THE CONVICTION AND SENTENCE IMPOSED

41. In April 2007, almost immediately following conviction and sentencing, the BOP designated Mikhel to the United States Medical Center for Federal Prisoners (USMCFP) Springfield, Missouri, in order that he undergo a psychological diagnostic and observation evaluation. Because of his SAMs status, Mikhel was housed in Administrative Detention, in isolation, for the short time he was incarcerated at the Springfield facility. Following completion of the psychiatric evaluation, also in April 2007, he was redesignated and transferred to the USP Terre Haute, Special Confinement Unit (SCU), which houses inmates on death row.

17

**Exhibit 158 - 2527**

42. Since his arrival to the SCU at Terre Haute, Mikhel has received two incident reports for drug related infractions. On December 31, 2008, and March 5, 2009, he was found guilty of Code 110 violations, Refusing Drug/Alcohol Test. The last chronological discipline log available for my review is dated July 23, 2019; therefore, I am unaware of any disciplinary infractions since that date.

43. The enhanced security measures and SAMs restrictive measures remained in place through June 9, 2017. Following the removal of SAMs in 2017, alternate security measures have been in place for Mikhel, and they will remain in place regardless of the institution where he is located. The foremost concern at any federal prison where Mikhel is located will be safety of staff and inmates, especially related to his serious prior escape attempt. As a result, security procedures for Mikhel will remain rigid and unwavering for many years and/or until he can demonstrate a lessening of security protocols is warranted.

44. During his time in federal custody, under the restrictive security measures imposed since the planned escapes during his pretrial detention, Mikhel has not incurred any discipline infractions related to any acts of escape.

**WHAT THE JURY DID AND DID NOT HEAR DURING TRIAL TESTIMONY**

45. The jury in the Mikhel trial heard testimony from experts, primarily focused on a general description of SAMs, but they were not provided an account of how SAMs would specifically apply to Mikhel.

46. The erroneous information regarding SAMs order violations, by inmates at the ADX, as presented and implied by the government at trial, may have significantly altered the jurors' understanding of how the BOP implements SAMs measures and procedures.

18

**Exhibit 158 - 2528**

47. Separate and apart from SAMs, the BOP has numerous policies to manage the lives of inmates and to protect them from violence. There are also policies in place which protect the Agency and the community from inmate escapes. Information regarding how policies are applied and an understanding of the mechanics of living in a correctional environment would have been important to explain to jurors during trial, by an expert with firsthand knowledge. Although a significant portion of trial testimony by Dr. Cunningham focused on the ADX, there was very little regarding SAMs and limited information on the details of SAMs procedures. Nothing in the testimony of any of the experts at trial provided an outline for the jury of how Mikhel's SAMs status, coupled with his escape risk, would affect his prison assignment following sentencing. A prison expert's knowledge of these policies and the context of how policies are implemented would have been extremely important for Mikhel's defense.

48. In reading through trial transcripts, paying careful attention to the testimonies offered by government and defense prison experts, it clearly reveals how the jury members may have been confused when considering the fate of Mikhel. Had a federal prison expert also been retained to assist and explain the prison process moving forward, as it pertained to Mikhel, at a minimum, the jury would have been able to make a more informed decision in his case.

**CONCLUSION**

49. Mikhel did not have the benefit of a BOP expert to offer information which may have assisted in his defense. It would not be prudent for me to speculate whether a prison expert, with specific knowledge of SAMs, would have made a difference in the jury's sentencing decision, although having this information would have allowed the jury to

19

**Exhibit 158 - 2529**

be more fully informed when making their decision affecting Mikhel.

50. Had an expert been retained; however, the jury would have understood, without question, that an opportunity for Mikhel to breach the provisions of SAMs while housed within the ADX H Unit would not have been possible, as it was while he was housed at SB-CDC. The jury would have understood that while under a SAMs order, Mikhel would remain within H Unit and would not have been eligible to serve his sentence in an open mainstream penitentiary for the duration of the SAMs regime. A federal prison expert would have opined on how a person with his characteristics, with a conviction for escape, regardless of a SAMs order, would result in the BOP ensuring Mikhel was in a prison, where he would not be in a position, in the future, to escape.

51. A prison expert would have opined on the foremost philosophy of the BOP, safety, and security, and how a transfer for Mikhel, to an alternate location from the ADX, which would result in lessening his security constraints and protocols would very much contradict the Agency's mission.

52. The BOP is a conservative agency, and its decisions are made with careful consideration of staff safety and the orderly running of its institutions. I was assigned to positions during my career with the Agency, where I was responsible for making decisions on where an inmate would serve his sentence. I am confident the BOP would take extra precautions with inmate Mikhel, as they have already demonstrated for the last 20 years since the escape attempt from MDC Los Angeles occurred. These precautions are in effect, and will remain in place, because of the escape incident, regardless of his conviction, SAMs order, and subsequent death sentence. In looking at Mikhel's records since the incident, I noted that he has no incidents related to escape attempts or violence

20

**Exhibit 158 - 2530**

and I view this as evidence that he can be safely housed in a BOP facility for the remainder of his life. The jury was not apprised of these specifics during the trial, because Mikhel did not have the benefit of a prison expert who would have provided these details.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Date: Sep 25, 2023

_Maureen P Baird_
Maureen P Baird (Sep 25, 2023 15:36 EDT)
Maureen Patricia Baird

## EXHIBIT A

### *Maureen Patricia Baird*

*617-858-5008  |  Info@Prisonology.com*

*Professional Profile*
I currently work as a corrections consultant, specializing in Federal Corrections. I have provided Expert Witness testimony in United States District Courts, at Sentencing Hearings for defendants who are facing a sentence of incarceration in the Federal System. I work as an independent Consultant and provide consulting services on all aspects of the Federal Prison System for private attorneys, Federal Defenders Offices and individuals and family members of those facing a possible federal prison sentence or those who have already been sentenced/incarcerated. I have prepared numerous Declarations for Attorneys within the U.S., and for Barristers/Solicitors in the United Kingdom, working on extradition cases. I have also provided Expert Testimony at Extradition Hearings in the Westminster Magistrates' Court in the UK regarding conditions of confinement in the Bureau of Prisons. My career in Adult Male/Female Corrections spanned 28 years with the Bureau of Prisons in various capacities, with my final positions as Warden and Senior Executive Service Warden at three Federal Prisons that encompassed a variety of missions and programs. I am an experienced Executive in Correctional Management with a demonstrated history of working in the law enforcement industry.

My experience in Federal Corrections began in 1989 as a case manager with the Department of Justice, Federal Bureau of Prisons. Throughout my 28 years with the Agency, I continued to acquire positions of increasing responsibility. In 2009, I was appointed to the position of Warden at the Federal Correctional Institution, Danbury, Connecticut, and was later promoted to Warden

21

Exhibit 158 - 2531

at the Metropolitan Correctional Center in New York City. There, I was appointed to Senior Executive Staff by the United States Attorney General and within two years, I was transferred to a position of greater responsibility as the Warden of the United States Penitentiary in Marion, Illinois. As warden, I was responsible for the leadership and direction of 300 to 350 staff members and approximately 1200 to 1500 inmates. During my tenure as warden for seven years, I was responsible for staff development and various specialized inmate housing units, including a high security management unit which mainly housed international terrorists who were assigned maximum custody. I led staff through a mission change at the Federal Prison in Danbury, where we had housed female offenders for several years and then transitioned to male offenders in 2013. I was also a member of the Joint Terrorist Task Force, and a member of various other federal, state, and local groups. I was very active with joint training that involved local, state, and federal law enforcement entities. For the last several years I have held Top Secret Clearance, only issued to a small percentage of Wardens and Executive Staff.

## *Professional Experience*

*Warden*                                          *Dec 2015 - Oct 2016*

**United States Penitentiary - Marion, IL**
- CEO of an institution which housed 1500 medium/high security male offenders
- Supervised 350 staff members and a 40-million-dollar budget
- Oversaw the institution and staffing, inmate programs, institution security, staff training, staff and inmate investigations and discipline, policy and procedural changes, community relations, regular training on emergency preparedness
- Provided training to all institution staff during an annual refresher training for six to eight weeks
- Provided training to new hires regarding procedures, rules, and regulations, ethics, and code of conduct requirements and both basic and advanced correctional duties

*Warden*                                          *Jun 2014 - Dec 2015*

**Metropolitan Correctional Center - New York City, NY**
- CEO of a pre-trial federal prison which employed 350 staff and housed 700 all security level, pre-trial inmates and 150 low security sentenced offenders
- Performed all duties indicated above as warden at USP Marion, Illinois

**Warden**                                        *Oct 2009 - Jun 2014*
Federal Correctional Institution - Danbury, CT
- CEO of an institution which employed 250 staff and housed 1200 female offenders

22

**Exhibit 158 - 2532**

- Performed all duties indicated above as warden at USP Marion, Illinois, with an added emphasis on training geared toward female offenders

**Correctional Institution Administrator/Associate Warden**     *Aug 2007 - Oct 2009*
Metropolitan Detention Center - San Diego, CA
- Provided direction and leadership to 230 employees
- Assisted in the management of a multi-million-dollar budget
- Oversaw high security/maximum custody pre-trial inmates and 200 low security sentenced inmates
- Ensured all mandatory internal and external security requirements were maintained and properly implemented
- Served on a forward-thinking workgroup focusing solely on future training trends
- Provided training on a regular basis to institution staff as well as other government agency staff
- Implemented several new proactive security measures which resulted in a more open form of communication between staff and inmates, thus allowing staff to find more contraband and providing a safer environment for staff and inmates
- Worked with union representatives to assist in resolving employee concerns as the Chairperson of the Labor Management Relations Board

**Regional Correctional Programs Administrator**     *Feb 2005 - Aug 2007*
Bureau of Prisons, Western Regional Office - Dublin, CA
- Oversaw 22 federal prisons located in the Western Region of the United States
- Primarily focused on the development and training of correctional programs staff who were employed by the individual facilities
- Orchestrated on-site training at the institutions, ensured the staff were familiar with policy, provided guidance, and compiled a report following each training
- Assembled a training manual for all new case managers to assist them in their duties
- Conducted regional training with all case management coordinators from the 22 institutions on an annual basis
- Was appointed to various after-action committees to investigate serious incidents that occurred at the prisons within the region
- Acted in the position of Regional Director and Deputy Regional Director multiple times
- Participated in and coordinated several Institution Character Profiles to evaluate programs and review security procedures at various institutions Recommendations were made with regards to enhancing security or reorganizing programs.
- Was involved in the activation of all aspects of newly constructed federal prisons within the Western Region
- Coordinated a four-week online training session for case management coordinators to provide information/training on their new responsibilities through the merging of the Inmate Systems Department falling under their purview
- Received the Supervisor of the Year award from the Regional Director in June 2006

**Correctional Institution Administrator/Executive Assistant**     *Aug 2000 - Feb 2005*
Federal Correctional Institution - Schuylkill, PA

**Exhibit 158 - 2533**

- Planned, supervised, and evaluated programs, training of new staff, and quarterly training of correctional officers
- Was the Chairperson for inmate's initial classifications and program reviews
- Conducted ongoing training and guidance for mentors and proteges as the Mentoring Coordinator

**Assistant Correctional Programs Administrator**         *Apr 1997 - Aug 2000*
Bureau of Prisons, Northeast Regional Office - Philadelphia, PA
- Committee Member
- Assisted in designing the current Security and Classification System utilized for classifying sentenced female offenders
  - Performed extensive research which suggested a need for a separate classification system for male and female offenders
  - The Bureau of Prisons compiled our findings and in a short time implemented the Committees' suggestions and created a separate Classification System for female offenders, which is still being utilized to date
- Coordinated and conducted annual training programs for all case management coordinators throughout the 23 institutions that comprised the Northeast Region
- Submitted recommendations for policy changes which were adopted and implemented
- Conducted on-site staff assistance visits at various institutions to provide training to staff
- Participated in after-action reviews following significant incidents at institutions within the region

**Case Management Coordinator**                 *Dec 1992 - Apr 1997*
Federal Correctional Complex - Allenwood, PA
- Served as Victim Witness Coordinator, Central Inmate Monitoring Coordinator, Inmate Performance Pay Coordinator and Public Information Spokesperson for the institution
- Oversaw security with regards to review and approval of inmates designated to the institution
- Wrote lesson plans and provided on-the-job training for new case managers and new counselors
- Provided ongoing training to all case managers, counselors, unit secretaries, and correctional officers regarding correctional programs, procedures, and responsibilities
- Was responsible for quality control of all case management paperwork prior to submission to the warden for signature

**Assistant Parole Liaison Administrator**           *Oct 1991-Dec 1992*
Mid-Atlantic Regional Office – Annapolis Junction, MD
Duty Station – U.S. Parole Commission – Chevy Chase, MD
- Was responsible for Security Classifications and Designations of parole violators returning to federal prisons

**Case Manager**                      *Mar 1989 – Oct 1991*
Federal Correctional Institution - Danbury, CT
Federal Prison Camp – Nellis Air Force Base - Las Vegas, NV
- Oversaw programs related to the 150-200 inmates assigned to my caseload

24

**Exhibit 158 - 2534**

- Provided training to new case managers
- Conducted inmate classification and program reviews
- Assisted inmates with their release planning
- Provided guidance to inmates
- Conducted security and shakedowns within the institution
- Regularly filled in for correctional officer posts
- Wrote all reports pertaining to inmates on my caseload
- Regulated institution security and housing

*Education*
*Western Connecticut State University - Danbury, CT*
*Bachelor of Science in Justice and Law Administration, May 1988*
- Recipient of Justice and Law Administration Award of 1988

25

**Exhibit 158 - 2535**

## EXHIBIT B - IOURI MIKHEL

| TAB | DESCRIPTION | BATES NO. |
|---|---|---|
| 1. | Metropolitan Detention Center (Los Angeles), Memorandum for Captain S. Wanamaker with subject "Lost Tool - Security Screw Driver Bit," 05/02/2001 | DC-0001 |
| 2. | Metropolitan Detention Center (Los Angeles), Inmate Investigative Report re 03/07/2003 escape attempt, 04/29/2003 | DC-0002 |
| 3. | Letter from AUSA D. Wang to San Bernardino Central Detention Center, United States Marshals Service and Metropolitan Detention Center (Los Angeles) re Special Administrative Measures (SAMs), 11/10/2003 | DC-0017 |
| 4. | Sheriff's Department, County of San Bernardino, report by officer P. Casas re possible escape incident, 01/21/2004 | DC-0019 |
| 5. | Sheriff's Department, County of San Bernardino, supplemental report by officer J. Payne, 01/22/2004[i] | DC-0024 |
| 6. | Sheriff's Department, County of San Bernardino, report by officer D. Lupear re escape attempt, 01/26/2004 | DC-0026 |
| 7. | Sheriff's Department, County of San Bernardino, supplemental report by officer D. Lupear re escape attempt, 01/26/2004 | DC-0036 |
| 8. | Sheriff's Department, County of San Bernardino, report by officer D. Lupear re interview of J. Stivers, 01/27/2004 | DC-0038 |
| 9. | Sheriff's Department, County of San Bernardino, report by officer D. Lupear re attempted escape, 03/29/2004 | DC-0045 |
| 10. | Transcript of trial testimony of Marvin Battley, 12/06/2006 | DC-0051 |
| 11. | Transcript of trial testimony of Billy Parker, 12/06/2006 | DC-0159 |
| 12. | Transcript of trial testimony of Ingerd Sotelo, 12/06/2006 | DC-0210 |
| 13. | Transcript of trial testimony of Tomas Delamora, 12/07/2006 | DC-0232 |
| 14. | Transcript of trial testimony of Mark Harlien, 12/07/2006 | DC-0291 |
| 15. | Transcript of trial testimony of Ingerd Sotelo (continued), 12/07/2006 | DC-0343 |

**Exhibit 158 – 2536**

**EXHIBIT B - IOURI MIKHEL**

| TAB | DESCRIPTION | BATES NO. |
|---|---|---|
| 16. | Transcript of trial testimony of Joseph Trujillo, 12/07/2006 | DC-0382 |
| 17. | Transcript of trial testimony of Jose Avila, 12/08/2006 | DC-0428 |
| 18. | Transcript of trial testimony of Lorenzo Cervantes, 12/08/2006 | DC-0512 |
| 19. | Transcript of trial testimony of Jordan Hollett, 12/08/2006 | DC-0522 |
| 20. | Transcript of trial testimony of Jose Avila (continued), 12/12/2006 | DC-0538 |
| 21. | Transcript of closing arguments at trial, 01/10/2007 | DC-0547 |
| 22. | Transcript of closing arguments at trial, 01/11/2007 | DC-0716 |
| 23. | Transcript of closing arguments at trial, 01/12/2007 | DC-0886 |
| 24. | Transcript of trial testimony of Paul Cases, 01/24/2007 | DC-1050 |
| 25. | Transcript of trial testimony of Joshua Payne, 01/24/2007 | DC-1110 |
| 26. | Transcript of trial testimony of Paul Cases (continued), 01/25/2007 | DC-1143 |
| 27. | Transcript of trial testimony of Jack Trotter, 01/31/2007 | DC-1159 |
| 28. | Transcript of trial testimony of Mark Cunningham, 02/06/2007 | DC-1194 |
| 29. | Transcript of trial testimony of Mark Cunningham (continued), 02/07/2007 | DC-1275 |
| 30. | Transcript of closing arguments (penalty) at trial, 02/09/2007 | DC-1332 |

**Exhibit 158 - 2537**

**EXHIBIT B - IOURI MIKHEL**

| TAB | DESCRIPTION | BATES NO. |
|---|---|---|
| | **Sent August 25, 2023** | |
| 31. | Opinion Affirming USDC Judgment, 05/09/2018 | DC-1490 |
| 32. | Transcript of trial testimony of Craig Haney, 02/01/2007 | DC-1616 |
| 33. | Transcript of trial testimony of Craig Haney, 02/02/2007 | DC-1660 |
| 34. | Transcript of trial testimony of Craig Haney, 02/06/2007 | DC-1743 |
| 35. | Bureau of Prisons Documents re Iouri Mikhel, (2003-2007) | DC-1843 |
| 36. | Bureau of Prisons Documents re Iouri Mikhel, (2007-2009) | DC-2247 |
| 37. | Bureau of Prisons Documents, Terre Haute C-file re Iouri Mikhel, (2006-2019) | DC-2497 |
| 38. | Judgment and Probation /Commitment Order, 03/13/2007 | DC-3324 |
| 39. | Letter from Assistant United States Attorney, attaching Special Administrative Measures Memorandum and Affirmation Form, 06/09/2003 | DC-3326 |
| 40. | 40.Criminal Records for Iouri Mikhel related to 1985 Conviction (Russian with English Translation) | DC-3343 |
| 41. | 41.Criminal Records for Iouri Mikhel related to 1993 Conviction (Russian with English Translation) | DC-3352 |

---

i Incident report erroneously indicates year as 2003, instead of 2004.

**Exhibit 158 - 2538**

# EXHIBIT

# 159

## DECLARATION OF SANDRA GRUCE

I, SANDRA GRUCE, declare as follows:

1.    I am the mother of Jason Stivers. I currently live in San Bernardino County, California.

2.    On July 26, 2021 I spoke to a Federal Investigator named Alejandro Villaseñor who asked me about an incident in 2004 involving my son Jason while he was incarcerated at the Central Detention Center (CDC) in San Bernardino, California. Mr. Villaseñor informed me that Jason was accused of assisting another inmate, Iouri Mikhel, in an attempt to escape from the CDC.

3.    Mr. Villaseñor showed me the report attached here as Appendix A, which I have initialed. I deny engaging in any of the activity detailed in this report. I do not know anyone named Iouri Mikhel. I do not know anyone named Hector Lopez. I never received any letter, box or package containing money. Jason never told me about an escape attempt, and I would never be involved in something like that.

4.    I remember that many years ago the authorities told me something about a box of money or the like being sent to me. I believe the authorities even had the local post office under surveillance.

5.    A Sheriff questioned me about these events. The Sheriff gave me a lie detector test. I was asked about a box or bag or envelope of money being sent to

1



Initials

**Exhibit 159 - 2539**

me. I told the Sheriff I knew nothing of this. The Sheriff never told me if I passed or failed the lie detector test.

6.    No one from Iouri Mikhel's trial defense team ever contacted me. If I had been contacted, I would have told them what I know, and if asked would have testified truthfully.

I declare under penalty of perjury the foregoing is true and correct

Executed On:    9-21-23

_____
SANDRA GRUCE

2

SKB
_____
Initials

**Exhibit 159 - 2540**

# Appendix A

**Exhibit 159 -  2541**

| | | | CASE NO. |
|---|---|---|---|
| | SHERIFF'S DEPARTMENT | | 300400093 |
| | COUNTY OF SAN BERNARDINO | | H# |
| | CALIFORNIA | | REPORT AREA |
| | CA 03600 | Page 4 | |

| CODE SECTION | CRIME | | CLASSIFICATION | |
|---|---|---|---|---|
| | ATTM ESCAPE | | FEL | |
| VICTIM'S NAME - LAST NAME | FIRST NAME | MIDDLE NAME | (FIRM NAME IF BUSINESS) | |
| STATE | | | | |
| ADDRESS | RESIDENCE | | | PHONE |

### INVOLVED PARTY INTERVIEW:

GRUSE, SANDRA – DOB 9-14-59
4442 ½ Poza Road
Phelan, CA
(760) 619-2669

I interviewed Gruse inside the Homicide Detail interview room #2. The interview was video and audio taped. The following is a summary of that interview.

I began the interview with Gruse at 1454 hours on 1-22-2004. Gruse told me that she is the mother of Jason Stivers and that Stivers had got out of prison on 1-5-2004 and was using her address as a federal probation address. She said that Stivers stays at her house sometimes and sometimes at his sister's house on the other side of town in Hesperia.

I asked Gruse if in her house she ever heard anybody including her son mention anything about a Russian or the Russian Mafia or some kind of plan or dealings with them. Gruse told me no, she never heard that. She told me that the only Russian that is ever mentioned in her house is her step-daughter's husband, Vanermeer or Vladimir, she's not sure which one but they live in San Bernardino and they've been married several years but she does not see them much. She told me that her daughter is studying to be a nurse and Vladimir is a janitor at Redlands Community Hospital. She said that neither one of them has been in trouble before and are both going to medical school.

| REPORTING OFFICER | | DATE | REVIEWED BY | TYPED BY | ROUTED BY | DATE |
|---|---|---|---|---|---|---|
| D. LUPEAR, L1788 | | Jan. 27, 2004 | | Happy J0748 | | |
| FURTHER ACTION: | COPIES TO: | ☐ Other | ☐ SD/PD | REMARKS | | |
| ☐ YES   ☐ NO | ☐ Detective | ☐ CII | ☐ Other | | | |
| 15-15184-401 Rev. 1/83 | ☐ Dist. Atty. | ☐ Patrol | | | | |

SKG
39762

**Exhibit 159 - 2542**

| SHERIFF'S DEPARTMENT<br>COUNTY OF SAN BERNARDINO<br>CALIFORNIA<br>CA 03600 | | | CASE NO.<br>300400093 |
|---|---|---|---|
| | | Page 5 | H# |
| | | | REPORT AREA |

| CODE SECTION | CRIME<br>ATTM ESCAPE | | CLASSIFICATION<br>FEL |
|---|---|---|---|
| VICTIM'S NAME - LAST NAME | FIRST NAME | MIDDLE NAME | (FIRM NAME IF BUSINESS) |
| STATE | | | |
| ADDRESS | RESIDENCE | | PHONE |

**INVOLVED PARTY INTERVIEW GRUSE:     CONTINUED**

I asked Gruse if her son had ever said anything about receiving a letter from jail addressed to him to make sure that he got it.   She told me no.  I showed Gruse the letter that had been received from Central Detention Center.  I showed Gruse where her son's name was on top of the letter and where her address was and phone number inside the letter.  Gruse told me that was her address and phone number.  I had Gruse read the same part of the letter that I had her son read.  I asked her if it sounds to her like whoever wrote the letter had prior contact with her son.  Gruce said yes it did sound like the letter was written to her son with his prior knowledge of a "plan".

I asked her if she thought that was something that her son would do.  Gruse sat quietly for a second and then answered yes, it does sound like something that he might do.  I again asked Gruse if she had any part in the planning of or any knowledge of the escape attempt and she told me no.  I asked Gruse if she was willing to take a polygraph test and she told me yes that she would.

**ADDITIONAL INFORMATION DETECTIVE:**

At that time I went next door to the Sheriff's Polygraph unit and advised polygrapher Michelle Gamboa that Sandra Gruse was willing to take a polygraph test and told her the areas that I wanted to have her question her about.  Immediately after talking to Gamboa I went back and escorted Gruse over to the polygraph office where she was taken into polygraph room #2 with Michelle Gamboa.

After the polygraph was completed, Gamboa told me that she did have some reaction to the questions about the escape that she was leaning towards the

| REPORTING OFFICER<br>D. LUPEAR, L1788 | DATE<br>Jan. 27, 2004 | REVIEWED BY | TYPED BY<br>Happy J0748 | ROUTED BY | DATE |
|---|---|---|---|---|---|
| FURTHER ACTION:<br>☐ YES  ☐ NO<br>15-15184-401 Rev. 1/83 | COPIES TO:<br>☐ Detective<br>☐ Dist. Atty. | ☐ Other<br>☐ CI<br>☐ Patrol | ☐ SDPD<br>☐ Other | REMARKS | |


39763

**Exhibit 159 - 2543**

| | | | CASE NO. 300400093 |
|---|---|---|---|
| **SHERIFF'S DEPARTMENT COUNTY OF SAN BERNARDINO CALIFORNIA CA 03600** | | Page 6 | H# |
| | | | REPORT AREA |

| CODE SECTION | CRIME ATTM ESCAPE | | CLASSIFICATION FEL | |
|---|---|---|---|---|
| VICTIM'S NAME - LAST NAME | FIRST NAME | MIDDLE NAME | (FIRM NAME IF BUSINESS) | |
| STATE | | | | |
| ADDRESS | RESIDENCE | | | PHONE |

## ADDITIONAL INFORMATION DETECTIVE:    CONTINUED

deceitful side. At that time I decided to try and re-interview Sandra Gruse.

## REINTERVIEW GRUSE, SANDRA:

I escorted Gruse into interview room #2 from the polygraph office. I told Gruse that her polygraph test was showing that she was being deceitful on the questions about having knowledge of the planning of the escape. Gruse immediately told me that the test was wrong that she had no idea that anything like this was being planned and had nothing to do with it. I directly accused Gruse several times of being involved, each time she denied it strongly saying that she would never have anything to do with it and she did not have anything to do with any escape of a Russian.

When I showed Gruse the address in the letter written by Mikhel she became very upset and began to cry. She told me that her son had turned into a very bad person and she could not believe that he would actually give out her address to somebody that belonged to the Russian Mafia. She said that she is raising her daughter's young child and that could possibly put her and her young child in danger.

I questioned Gruse for several more minutes with the same answer that she did not know anything about the escape attempt. I asked Gruse if she would be willing to call me or contact the Sheriff's Department if she was ever contacted, called or written to from the Russian Mafia or any other person about an

| REPORTING OFFICER D. LUPEAR, L1788 | | DATE Jan. 27, 2004 | REVIEWED BY | TYPED BY Happy J0748 | ROUTED BY | DATE |
|---|---|---|---|---|---|---|
| FURTHER ACTION: ☐ YES  ☐ NO 15-15184-401 Rev. 1/83 | COPIES TO: ☐ Detective ☐ Dist. Atty. | ☐ Other ☐ CII ☐ Patrol | ☐ SDPD ☐ Other | REMARKS | | |

SkC
39764

**Exhibit 159 - 2544**

| SHERIFF'S DEPARTMENT<br>COUNTY OF SAN BERNARDINO<br>CALIFORNIA<br>CA 03600 | | | | CASE NO.<br>300400093 |
|---|---|---|---|---|
| | | | Page 7 | H# |
| | | | | REPORT AREA |

| CODE SECTION | CRIME<br>ATTM ESCAPE | | CLASSIFICATION<br>FEL | |
|---|---|---|---|---|
| VICTIM'S NAME - LAST NAME | FIRST NAME | MIDDLE NAME | (FIRM NAME IF BUSINESS) | |
| STATE | | | | |
| ADDRESS | RESIDENCE | | | PHONE |

**REINTERVIEW SANDRA GRUSE:**          **CONTINUED**

escape attempt.  She immediately told me that she would be happy to call and asked for my card.

No additional questions were asked of Gruse.  I escorted Gruse out of the interview room where Det. Ferber escorted her from the building to give her a ride home.

| REPORTING OFFICER<br>D. LUPEAR, L1788 | | DATE<br>Jan. 27, 2004 | REVIEWED BY | TYPED BY<br>Happy J0748 | ROUTED BY | DATE |
|---|---|---|---|---|---|---|
| FURTHER ACTION:<br><br>☐ YES   ☐ NO<br><br>15-15184-401 Rev. 1/83 | COPIES TO:<br>☐ Detective<br>☐ Dist. Atty. | ☐ Other<br>☐ CII<br>☐ Patrol | ☐ SDPD<br>☐ Other | REMARKS | | |

SKG

39765

**Exhibit 159 - 2545**

# EXHIBIT

# 160

# Ninth Circuit Jury Trial Improvement Committee

## First Report on Goals and Recommendations

**Adopted by the
Judicial Council of the Ninth Circuit
May 2004**

1

**Exhibit 160 - 2546**

**A Message from the Chair**

---

August 10, 2004

The Jury Trial Improvement Committee's first series of recommendations addresses ways to reduce the hardship jury service imposes on prospective jurors and to increase citizen participation in the jury process.  The Committee hopes that the District Courts will look favorably on these recommendations.  The Committee also believes that the implementation of the recommendations are interdependent. Expansion of the pool of prospective jurors, restrictions on excuse categories and liberal deferral policies must be coupled with the use of updated technology to improve juror qualification and scheduling for these recommendations to be cost effective for the districts.

In the coming months, the Committee will be focusing on suggestions for improving the voir dire process and juror comprehension.  We will be drawing on the experience of the district and magistrate judges from our 2003 survey as well as asking both prospective and trial jurors about their experiences to frame the recommendations of our second report.

In the near future we also hope to provide information about implementation of the recommendations in this first report that will be affordable for the districts and that will decrease the burden of jury administration on our already overextended Clerk's office personnel.

The Committee encourages comments and suggestions from the judges of the Ninth Circuit about the work of the Committee and any ideas the judges have about improving jurors' experiences serving in the District Courts.

**Exhibit 160 – 2547**

**Ninth Circuit Jury Trial Improvement Committee Members**

---

**Hon. Richard C. Tallman**
*U.S. Circuit Judge*
**U.S. Ninth Circuit Court of Appeals**

**Ms. Franny Forsman**
*Federal Public Defender*
**District of Nevada**

**Hon. Virginia Phillips**
*U.S. District Judge*
**Central District of California**

**Hon. Judith McConnell**
*Presiding Justice*
**California Court of Appeal**

**Hon. Anthony Ishii**
*U.S. District Judge*
**Eastern District of California**

**Hon. Michael Brown**
*Retired Presiding Judge*
**Pima County, Arizona Superior Court**

**Hon. William Alsup**
*U.S. District Judge*
**Northern District of California**

**Ms. Cynthia Jensen**
*Deputy Clerk of Court*
**District of Nevada**

**Hon. Elizabeth Laporte**
*U.S. Magistrate Judge*
**Northern District of California**

**Mr. Brian Rekofke**
*Lawyer Representative*
**Eastern District of Washington**

**Hon. Debra Yang**
*U.S. Attorney*
**Central District of California**

**Mr. John Hannah**
*Lawyer Representative*
**District of Arizona**

**Dr. Gregory B. Walters**
*Circuit Executive*
**Office of the Circuit Executive**

**Ms. Joanne Cook**
*Jury Administrator*
**District of Idaho**

**Committee Staff:**

**Dr. Robert E. Rucker**
*Assistant Circuit Executive*
**Office of the Circuit Executive**

**Ms. Kathleen Mantila**
*Policy and Research Analyst*
**Office of the Circuit Executive**

**Exhibit 160 - 2548**

# Contents

---

**Goal I:  Reduce the Hardships of Jury Service**

**Recommendation 1.**  Term of Jury Service Should Be One Appearance or One Trial............................1

**Recommendation 2.**  Use Technology to Improve Juror Qualification and Scheduling..........................2


**Goal II:  Broaden Citizen Participation in the Jury System**

**Recommendation 3**.  Improve Source Lists, Use Drivers License & State Identification, Voter Registration & the National Change of Address System to Expand Inclusiveness...................................3

**Recommendation 4**.  Abolish Most Excuse Categories & Develop Objective Criteria for Hardships....5

**Recommendation 5.**  Grant Deferrals to Jurors Upon Request................................................................ 6

**Recommendation 6.**  Consider Ways to Address Non-Responders......................................................... 7

**Recommendation 7.**  Increase Awareness about Jury Service through Public Outreach........................ 7

**Conclusions**………………………………………………...…………………………….........8

**Exhibit 160 – 2549**

**Goal I:  Reduce the Hardships of Jury Service**

**Recommendation 1:  Term of Jury Service Should be One Appearance or One Trial**

There is no standard term for jury service in the Ninth Circuit's district courts.  The typical term is one month, though some courts have three-month terms and two have terms of up to one year.  Thus, prospective jurors may be "on call" anywhere from one month to an entire year in order to fulfill their jury duty.  This can be a significant disruption to the potential jurors' lives.  As evidenced by the high number of requests to be excused, such disruptions can lead to negative attitudes about the courts and jury service, and adverse affect on their performance as jurors.

Even for those people who are willing to serve, the extended "on call" status may complicate their schedules for work, family, schools, vacations, etc.  Potential jurors may find it difficult to take time off from work at the time of the summons.  Some cannot afford the loss of income; some cannot afford the costs associated with childcare, and there are other legitimate reasons for finding it difficult to serve at a particular time.  As a result there are large numbers of failures to appear that place hardships on the court as well, forcing the courts' jury administration staff to process thousands of requests to be excused.[1]

The Jury Trial Improvement Committee believes that the current terms of service place undue hardship on both jurors and courts.  Therefore, the Committee recommends that district courts implement a five-day or one week "on call" term for jury service.  Jurors should normally have to make only one appearance in court for jury selection or serve for one trial.

> **One Appearance / One Trial**
>
> In 1984 the District of Nevada transitioned from a six-month term of jury service to the first one appearance / one trial term of jury service in the federal court system.  The shorter term of service resulted in the jurors feeling more positive about their service, more willing to serve again and a feeling that the length of jury service was either "about right" or "too short."  While there was a substantial increase in the number of jurors qualified, it was offset by a 10% to15% decrease in the number of requests for excuse and a savings of four hours a week in processing excuses.  There was also a sense that as more people were able to serve, the jury panels would be more representative of the population.

State courts that have implemented a jury plan that called for one appearance or serving as a juror on one trial have reported positive results.  The Committee found that one

---

[1] Jensen, Cynthia, "One Appearance / One Trial Term of Jury: U.S. District Court, District of Nevada." Presentation to the Jury Trial Improvement Committee, Pasadena, CA June 5, 2003.

1

**Exhibit 160 - 2550**

appearance/one trial policies produced increased participation by members of the public in the jury systems.  Additional benefits include fewer requests to be excused, reduced financial losses for prospective jurors, and reduced waiting times for jurors.  Revised policies can help assure administrators of increased juror availability and allow the courts to reduce the resources allocated for monitoring that availability.

In 1984, the District of Nevada led the federal courts by being the first to reduce its term for jury service from six months to one appearance or one trial.  Jurors are dismissed from jury duty after making one appearance for jury duty or after completing the trial for which they are impaneled.  Two other Ninth Circuit districts operate "in practice" on a one appearance or one trial policy.

Prior to implementation of the one appearance/one trial policy, some judges in Nevada expressed concern about the potential negative impacts such as increased deliberation times and the possibility of more hung juries.  These concerns were unrealized.  The court found no discernable change in deliberation time or in the number of hung juries.  In fact, following implementation of one appearance/one trial, the court found that the jurors' attitudes about their service, and about the courts in general, improved and requests for excuses dropped significantly.

The change to one appearance/one trial will likely necessitate an increase in the number of persons summoned for jury duty, which in turn, can result in some additional work for the jury administration division of the clerks' offices.  Some mitigation strategies that have been successfully used by the courts when they have implemented this procedure include pooling jurors, further automating the jury management process (see recommendation 2), streamlining the summonsing process, and improving juror utilization to minimize the number of jurors that go unused.

**Recommendation 2:  Use Technology to Improve Juror Qualification and Scheduling**

The committee found that interactive voice response systems (IVR) and other automated systems will improve the scheduling and qualifying process.  Potential jurors can use IVRs from their telephones (or even their computers via the Internet).  They can confirm citizenship, age, residence, and other qualifying information using IVRs and they can easily request a limited number of postponements to available alternate dates when the court will need jurors.

2

**Exhibit 160 – 2551**

All of this can be accomplished without using the time of court staff.  The courts benefit by saving printing and postage costs and reducing the staff time previously devoted to reviewing thousands of deferral requests or responding to telephone calls.

IVR systems have additional benefits.  Rather than having one general message for all prospective jurors, IVRs allow for messages tailored to individual jurors.  These messages not only provide general information, such as directions to the courts, they can tell prospective jurors when to appear.  The messages can also be in multiple languages.

> **A personal example from the committee chair:**  After receiving a jury summons to Maricopa County Superior Court for an inconvenient date, I accessed the court's website and took advantage of the one-postponement policy.  I chose my own new summons date.  That date, May 27, 2004, conflicted with the Judicial Council meeting and the court website would not permit a second postponement.  Undeterred, I called the IVR system which allowed me a second postponement but gave me a six week window within which I could choose my new summons date.  After completing the call I looked at the court's website which I  had not closed before making my call.  It had updated my file with the new summons date.  A confirming postcard was later received.  All of this occurred without any contact with court staff.

The Committee visited two state trial courts with IVRs in operation.  The Los Angeles County Superior Court and Clark County District Court in Nevada have operations that federal district courts may choose to emulate.  Clark County, in particular, has software supporting their IVR-telephone system that is nearly identical to the Jury Management System (JMS) currently used by the federal courts.  The same company makes both software packages.

A sophisticated interactive voice response system can alleviate many of the administrative burdens associated with qualifying questionnaires, excuse requests, and deferrals.  Courts that are using IVRs have shown that they can actually reduce staff time even when they are using a one appearance/one trial procedure and calling in more potential jurors.

**Goal II:  Increase Citizen Participation in the Jury System**

**Recommendation 3:  Improve Source Lists, Use Drivers License and State Identification, Voter Registration, and the National Change of Address System to Expand Inclusiveness**

Nearly all state courts now use more than one source list (the most commonly used supplemental sources are department of motor vehicle drivers licenses and state identification card lists) when creating master jury wheels.  Most of the district courts in the Ninth Circuit still

**Exhibit 160 - 2552**

use only voter registration lists. The Committee believes that voter registration lists should be supplemented in order to increase inclusiveness and to provide better representation of the adult citizen population who are qualified to serve as jurors.

According to the 2000 national census statistics, voter registration lists tend to disproportionately represent persons when compared to the total U.S. citizen population in certain age, income, employment classification, and education categories.[2] In addition, in California and Arizona, voter registration lists under-represent Hispanic citizen populations and over-represent Caucasian populations. [3]

Moreover, according to census statistics, a substantial portion of the population is not registered to vote -- voter registration lists contain only about 66 percent of the adult citizen population in the states of the Ninth Circuit. This percentage falls far below the American Bar Association's standard of at least 80 percent[4] for source list coverage and even further below the National Center for State Courts' standard of at least 85 percent coverage.[5] Drivers license lists include more than 90 percent of the adult citizen population in the Ninth Circuit states.[6]

Combining department of motor vehicles drivers license/identification lists and voter lists would provide superior coverage. Duplication of names can be addressed with computer software that is currently utilized by some courts.

One state achieved an increase in coverage of more than 75% after it combined voter and driver lists and purged the duplicates.[7] The Committee anticipates the district courts that combine voter registration along with the department of motor vehicle drivers license/ identification data will be able to achieve levels that meet or exceed the 80 percent ABA standard. The Committee believes the adoption and implementation of this recommendation will lead to more representative and inclusive master wheels and pools of prospective jurors.

Two other related factors have a negative impact on the extent to which the juror source lists accurately represent populations in the districts. The first factor is transitory populations

---

[2] U.S. Census Bureau; "Voting and Registration in the Election of November 2000: Detailed Tables for Current Population Report, P20-542," Published 27 February 2002; http://www.census.gov/population/www/socdemo/voting/p20-542.html
[3] U.S. Census Bureau; "Reported Voting and Registration of the Total Voting-Age Population, by Sex, Race, and Hispanic Origin, for States: November 2000;" Table 4a.
[4] American Bar Association. *Standards Relating to Juror Use and Management*. National Center for State Courts, 1993.
[5] Munsterman, G. Thomas. *Jury System Management*. National Center for State Courts, 1996.
[6] Federal Highway Administration, "Highway Statistics 2001, Section III: Driver Licensing," Published October 2002; <http://www.fhwa.dot.gov/ohim/hs01/dl.htm>
[7] Munsterman, G. Thomas and Paula L. Hannaford-Agor. *The Promise and Challenges of Jury System Technology*. National Center for State Courts, 2003. Calculations conducted using source list data for Connecticut divided by 18 years and older population estimates.

Exhibit 160 - 2553

due to migration.  Between 1995 and 2000, 120 million people (46%) of the U.S. population changed addresses.  According to the 2000 Census data, people in the western states move even more frequently than people living elsewhere.[8]

A second factor, which is related to the first one, is the high number of undeliverable questionnaires sent out by the district courts.  In a survey conducted by the Committee, the jury administrators in ten districts reported that about 33,000 recently mailed potential juror questionnaires were returned as undeliverable.

In light of these findings, the Committee recommends that courts have the people constructing the master jury wheel run the names through the National Change of Address System (NCOA), a program that private companies use to identify changes of address.  These companies are licensed by the U.S. Postal Service to use the NCOA program.

For example, the District of Idaho's vendor builds a master wheel and then runs the names and addresses through the NCOA.  They follow this process every two years at a cost of approximately $2,000 for the entire process.  There are several vendors that can provide just the NCOA services for those courts that build their own master wheels or whose vendors currently do not combine these services.  The cost of using NCOA is usually only a few hundred dollars, a cost that can quickly be recouped by reducing the number of undeliverable questionnaires.

### Recommendation 4:  Abolish Most Excuse Categories and Develop Objective Criteria for Hardships

The larger the jury pool the more likely it is to be representative of the population.  However, very lenient excuse policies create a danger that the jury pools will be smaller, and therefore, less representative.  The Committee believes that some excuse categories are valid, but most are unnecessary.

Some district courts routinely excuse entire categories of occupations, including attorneys, physicians, pharmacists, dentists, registered nurses, teachers, and members of the clergy.  In addition, some district courts routinely excuse students, persons more than 70 years of age, caretakers of children or aged persons, individuals who must travel long distances to court, individuals with previous jury service in the past two years, and essential business personnel.

Lenient excuse policies mean that thousands of prospective jurors are routinely excused each year, causing others to carry the burden of service.  Based on a survey of jury administrators, the Committee found that district courts recently excused almost forty thousand

---

[8]U.S. Census Bureau; "Migration and Geographic Mobility in Metropolitan and Nonmetropolitan America:  1995 to 2000." Published August 2003, <http://www.census.gov/prod/2003pubs/censr-9.pdf>

**Exhibit 160 –  2554**

prospective jurors.[9]  Since lenient excuse policies result in less representative jury pools -- especially with regard to occupations and social class -- the Committee believes that most of the excuse categories should be eliminated.  As a result, jury service would then be spread more evenly across occupations, allowing for a more equitable distribution of the benefits and burdens of jury service.

The Committee also discovered that limited, but fair excuse policies result in more first time jurors.  Bringing more new potential jurors into the courts is an important additional benefit of eliminating excuses.  When combined with shorter terms of service, more people can serve and many hardships associated with jury service are eliminated or significantly reduced because service is spread across a larger population.

In addition to broad excuse categories, some district courts have a general hardship excuse category that permits some flexibility in granting excuses that do not fall into the specific categories addressed in their jury plans.  The Committee found problems can arise when court staff lack clear guidelines on which prospective jurors should be granted excuses under this general hardship category.  When more than one person is authorized to grant excuses different standards may be employed by different people.

The Committee therefore recommends that if district courts have a general hardship category, clear written standards for granting hardship excuses should be developed.  Such uniform standards will help the courts enforce a fair and equitable application of the excuse policy.

**Recommendation 5:  Grant Deferrals to Jurors Upon Request**

To help citizens meet their duty to serve as jurors, the Committee recommends that in place of lenient excuse policies, the district courts should accommodate requests for postponements of jury service to dates more convenient for prospective jurors.

Although strict excuse policies spread the burdens and benefits of jury service more evenly and lead to a more representative jury pool, the district courts may find a significant number of citizens dissatisfied with the court's refusal to dismiss them solely for reasons of inconvenience.  The Committee believes that deferrals for unexcused persons will alleviate much of this dissatisfaction while still allowing jurors to fulfill their duties to serve as jurors.

Courts that implement the IVR system suggested in Recommendation 2 will find that granting deferrals can be done with almost no burden to the court staff.  IVR software permits

---

[9]Jury Trial Improvement Committee; "Survey Results: Jury Systems Management in the Ninth Circuit." San Francisco. February 27, 2003.

6

**Exhibit 160 - 2555**

potential jurors to select future jury service dates that are convenient for them while still ensuring that the courts have sufficient jurors for the upcoming trials.

The Los Angeles County Superior Court has implemented a system with features similar to the one the committee is recommending with highly satisfactory results.  Potential jurors can use their telephones to call the IVR and defer jury service up to three times, without directly contacting court staff.  This computer-based system permits the potential juror to choose from a range of dates when the court needs jurors.

The Los Angeles County Superior Court's IVR system has improved juror satisfaction by accommodating jurors' personal schedules while still fulfilling the jury needs of the court.  This has been accomplished with reduced staffing levels because of the system's automated capabilities.

**Recommendation 6:  Consider Ways to Address Non-Responders**

The Committee's survey of Ninth Circuit jury administrators found that of 27,676 persons recently summoned, 13 percent did not respond.  In addition, only a few of the courts routinely send a follow-up summons to non-respondents.  Research has found that the most effective way to increase response rates is to send a follow up mailing to non-respondents.[10] The Ninth Circuit's jury administrators agreed that following up on non-respondents is one of the most important things a court can do to increase response rates.  The Committee therefore recommends that district courts issue a second summons to non-responding citizens.

Currently, the district courts in the Ninth Circuit rarely or never require the person to appear in court to show cause for not responding to the summons, impose fines on persons, or imprison persons for not responding.  The Committee recommends that district courts consider enforcing summons by holding show cause hearings on a limited basis.  Such hearings can be made known to media outlets for coverage in newspapers and on television.  This technique is reported to have been very effective in improving response rates in the California state courts.  It was anecdotally reported that the federal district courts also noted improved response rates as a result of the state courts' use of show cause hearings.

**Recommendation 7:  Increase Awareness about Jury Service through Public Outreach**

The courts have previously focused public outreach efforts on jury service as an important civic duty.  The Committee found that most citizens agreed that jury service is an important civic duty and they are willing to serve, but they frequently fail to respond to

---

[10]Boatright, Robert G*. Improving Citizen Response to Jury Summonses: A Report with Recommendations.*  American Judicature Society, 1998.

**Exhibit 160 - 2556**

summons because they believe jury service means long waits, dull trials, too much time away from work, or very low probability of being selected to actually serve on a jury.[11]

Public outreach efforts, therefore, should strive to dispel these concerns.  In order to assist the districts with outreach to citizens and to employers, the Committee will be working with the Ninth Circuit's existing committees, such as the Public Information and Community Outreach (PICO) Committee, LRCC, and the Advisory Board, to develop materials and dissemination plans.  The Committee recommends that the district courts distribute the materials that will be developed from the joint efforts of the Jury Trial Improvement and Public Information and Community Outreach committees.

Additionally, the Committee believes that efforts should be made to contact employers and educate them about jury duty and the normal terms of jury service in the Ninth Circuit's courts.  Research has demonstrated that some employers have informal, and sometimes, formal policies that discourage people from participating on juries.  Policies that limit or eliminate salaries discourage the public from willingly participating when they are summoned for jury duty.

Research has shown that contacting and educating the largest employers in a community may significantly improve response rates to juror summons.  The PICO Committee and others can provide substantial assistance to the Jury Trial Improvement Committee in this area.

**Conclusion**

The Jury Trial Improvement Committee is keenly aware that the courts are experiencing a period of unprecedented budget constraints.  The Committee recognizes that implementing an IVR system or some of the recommendations made above will necessitate both a significant financial commitment and a commitment to training staff.  However, the Committee is convinced that the financial costs can be quickly recouped by the courts and the courts will ultimately need to allocate fewer staff hours to jury-related activities such as answering phone calls for deferrals and excuses.

The Committee also believes that if the recommendations are implemented a number of other positive benefits will be achieved, including broader citizen participation in our jury process and increased juror satisfaction.

---

[11] Ibid, p. 71.

**Exhibit 160 - 2557**

# References

American Bar Association, Standards Relating to Juror Use and Management (1993).

Anderson, David, Let Jurors Talk: Authorizing Pre-Deliberation Discussion of the Evidence During Trial, 174 Mil. L. Rev. 92 (2002).

Bradley Saxton, How Well Do Jurors Understand Jury Instructions? A Field Test Using Real Juries and Real Trials in Wyoming, 33 Land & Water L. Rev. 59 (1998).

Colorado Supreme Court Committee on the Effective and Efficient Use of Juries, *With Respect to the Jury: A Proposal for Jury Reform* (1997).

David Bordy and John Neiswender, *Judicial Attitudes Toward Jury Reform*, 83 Judicature 298 (2000).

Frank A. Maiocco and Jr., Lore A. Joplin and Peter C. Kiefer, *An Evaluation of the Marion County Court One-Day/One-Trial Jury Term,* Trial Court Programs Division, Office of the State Court Administrator, Oregon Judicial Department (February 27, 1997).

G. Thomas Munsterman and Linda Walker, Study and Implementation Plan: One-Day/One-Trial Term of Jury Service, King County Superior Court, Seattle, Washington, National Center for State Courts (August 24, 1993).

G. Thomas Munsterman, *Jury System Management,* National Center for State Courts (2001-2002).

G. Thomas Munsterman, *Jury Trial Innovations*, prepared for the Jury Trial Improvement Committee, San Francisco, CA, February 27-28, 2003.

G. Thomas Munsterman, research on second mailing effects in Eau Claire County, Wisconsin (1997).

G. Thomas Musterman, *A Brief History of State Jury Reform Efforts*, 79 Judicature 216 (1996).

G.P. Kramer and D. Koening, *Do Jurors Understand Criminal Jury Instructions? Analyzing the Results of the Michigan Juror Comprehension Project*, 23 U. Mich.J.L.Reform 401 (1990).

Hope Viner Samborn, *The Vanishing Trial*, 88-OCT A.B.A. J. 25 (2002).

James Carroll, *The Many Roads to One-Day/One-Trial*, Judicial Council of California Court News (March-April 1999).

Joanne Cook, *Report on Operation of the Jury Selection Plan*, Idaho statistics on jury demographics (2002).Stephanie Domitrovich, Jury Source Lists and the Community's Need to Achieve Racial Balance on the Jury, 33 Duq. L. Rev. 39 (1994).

Joel D. Lieberman, *What Social Science Teaches Us about the Jury Instruction Process*, 3 Psychol. Pub. Pol'y & Law. 589 (1997).

**Exhibit 160 - 2558**

John Fallahay, *A Survey of Jury Reforms: Initiatives, Innovations Abound*, 36 NO. 4 Judges' J. 34 (1997).

John P. Cronan, *Is Any of This Making Sense? Reflecting on Guilty Pleas to Aid Criminal Juror Comprehension*, 39 Am. Crim. L. Rev. 1187 (2002).

John Shapard and Molly Johnson, *Federal Judicial Center Survey Concerning Voir Dire*, October 4, 1994.

Judge Jacqueline A .Connor, *Jury Reform: Notes on the Arizona Seminar*, 1 J. Legal Advoc. & Prac. 25 (1999).

Judicial Counsel of California, *Final Report of the Task Force on Jury System Improvements* (2003).

K.B. Battaglini and Mark A. Behrens, Cary Silverman, *Jury Patriotism: The Jury System Should Be Improved for Texans Called to Serve*, 35 St. Mary's L. J. 117 (2003).

Leslie Miller-Stover, *Employing Common Sense in West Virginia Trial Courts: Encouraging Juror Note-Taking and the Questioning of Witnesses by Jurors*, 102 W. Va. L. Rev. 869 (2000).

Lore A. Joplin and Frank A. Maiocco and Peter C. Kiefer, An Evaluation of the Marion County Court One-Trial/One-Day Jury Term, Oregon Judicial Department (1997).

Mark A. Behrens and Edward O. Gramling, *Improving the Jury System in Kansas: A Call for Jury Patriotism Legislation,* 13 Kan. J. L. & Pub. Pol'y 1 (2003/2004).

Nancy S. Marder, *Juries, Justice and Multiculturalism,* 75 S. Cal. L. Rev. 659 (2002).

New York State Unified Court System, *Continuing Jury Reform in New York State* (2001) <<http://nysl.nysed.gov>>.

Ninth Circuit Jury Trial Improvement Committee, Results of Judges' Survey (2003).

Ninth Circuit Office of the Circuit Executive, *A Surprising Look at Jury Trials in the Ninth Circuit*, presentation prepared for the Conference of Chief District Judges, Sacramento, CA, February 18, 2003.

Ninth Circuit Office of the Circuit Executive, *Jury Systems Management in the Ninth Circuit*, prepared for the Jury Trial Improvement Committee, San Francisco, CA, February 27, 2003.

Paula L. Hannaford and G. Thomas Munsterman, *Beyond Note-Taking: Innovations in Jury Reform*, 1997 WL 9957730 (1997).

Paula L. Hannaford-Agor and Valerie P Hans and G. Thomas Munsterman, *"Speaking Rights": Evaluating Juror Discussions During Civil Trials*, 85 Judicature 237 (2002).

Robert G. Boatright, *Improving Citizen Response to Jury Summonses*, American Judicature Society (1998).

Shari Diamond et al, *Juror Discussions During Civil Trials: Studying An Arizona Innovation*, 45 Ariz. L. Rev. 1(2003).

**Exhibit 160 – 2559**

Shari Seidman Diamond and Neil Vidmar and Mary Rose and Leslie Ellis and Beth Murphy, *Juror Discussions During Civil Trials: Studying an Arizona Innovation*, 45 Ariz. L. Rev. 1 (2003).

State of Massachusetts Office of Jury Commissioner, *Failure to Appear for Juror Service*, <<http://www.state.ma.us/courts/jury/public.htm>>

State of Massachusetts Office of Jury Commissioner, *The Public Outreach Program* <<http://www.state.ma.us/courts/jury/public.htm>>

Supreme Court of Florida Jury Innovations Committee, Final Report (2001).

Supreme Court of Nevada, Report of the Supreme Court of Nevada Jury Improvement Committee (2002).

Susan Jennen and Lois McBride and Wayne Minske, *Defending Your Jury Source List*, prepared at the Direction of the Minnesota Jury Rule 803 Committee (1997).

Susan L. Coleman and Peter C. Kiefer, *Marion County Juror Satisfaction Analysis*, Oregon Judicial Department (1999).

The Administrative Office of the Courts of Maryland, Council of Jury Use and Management Report and Recommendations (2000).

The Arizona Supreme Court Committee on More Effective Use of Juries, *Jurors: The Power of 12* (1994).

*Through the Eyes of the Juror: A Manual for Addressing Juror Stress*, National Center for State Courts (1998).

U.S. v. Faron Wade Jones 353 F.3d 816 (2003).

USPS, Description of the National Change of Address System (NCOA) <<http://wwwusps.com/ncsc/products/ncoa.htm>>.

Valerie Hans and Paula Hannaford and G. Thomas Munsterman, *The Arizona Jury Reform Permitting Civil Jury Trial Discussions: The Views of Trial Participants*, Judges and Jurors, 32 U. Mich.J.L.Reform 349 (1999).

Washington State Jury Commission, Report to the Board for Judicial Administration (2000).

**Exhibit 160 – 2560**

# EXHIBIT

# 161

DECLARATION OF ALEJANDRO VILLASEÑOR (RE: SABRINA CANNON)

I, ALEJANDRO VILLASEÑOR, declare as follows:

1.      I am an investigator with the Office of the Federal Public Defender in Los Angeles, California, and am assigned to the case of Iouri Mikhel.

2.      On August 17, 2021, in preparation for the filing of a motion for collateral relief in the Iouri Mikhel case, I interviewed, Sabrina Tynan, the ex-wife of Thomas Tynan, who now goes by Sabrina Cannon. I interviewed Sabrina at her home.

3.      Sabrina told me she pled guilty to one count of Aiding or Assisting Attempted Escape for being part of an escape attempt from the Metropolitan Detention Center Los Angeles (MDC) which involved her ex-husband Thomas Tynan, his brother Michael Tynan, Iouri Mikhel, and Petro Krylov. Sabrina was sentenced to 16 months in custody and 3 years under supervised release.

4.      Sabrina's then husband, Thomas, was already in federal detention when he told Sabrina about the escape attempt. Sabrina told me she tried to shut him down. Sabrina was hoping Thomas would bail out because she wanted him to help her financially. Sabrina said she was out of money and alone with a baby. Thomas did not bail out and instead came up with this plan.

5.      Sabrina said that as part of this plan, she was only to do a few things: get weed, cell phones, tools, a video camera and a hydraulic jack. Sabrina received all of her instructions from Thomas, who would call her, sometimes using other inmates' codes. Sabrina did not know the names of the other inmates whose codes Thomas used. Sabrina said she only made one significant contribution to formulating the escape plan. The one thing she suggested was that they rappel down the side of the building. Thomas told Petro Krylov who agreed this was a good

1


Initials

**Exhibit 161 - 2561**

idea and asked that Sabrina get equipment for this. Prior to her suggestion, Iouri had no plan for getting down from the 6th floor.

6.    According to Sabrina, Thomas told her that Iouri had correctional officers in his pocket who helped Iouri with these drawings.

7.    Sabrina told me that she became skeptical of these plans when she found out Thomas's brother, Michael Tynan (Mike), was involved. Sabrina said that Mike is Thomas' flunky. Thomas uses him for all kinds of scams. Thomas watches out for Mike and pays for all his needs.

8.    Sabrina said that Thomas told her to pay Mike to buy the necessary tools for the escape. In Sabrina's view, Mike is a skinny loser who can barely tie his own shoelaces. Mike was absolutely the worst person to ask to complete this job. Sabrina said she feared Mike would get them all killed. Mike has been to rehab 9 to 10 times and has a weird knack for almost literally falling into the authorities' hands while doing illegal things. Sabrina said she does not think Mike knows how many times he has been arrested.

9.    Sabrina told me she understood that her job was to make sure Mike did not fall into a crack pipe while he was here in Los Angeles. Sabrina was not present at the time, but she believes Mike left his car keys locked in the car and had to get AAA to open the car up for him while he was supposed to be delivering the tools to MDC. Sabrina said that knowing Mike, this is very plausible. There is a 50/50 chance that Mike was that dumb and left the keys accidently or Mike did so to either go score drugs or just got scared and figured that leaving the keys in the car was a way to get out of doing the tool delivery.

10.    Sabrina said she was skeptical about the escape plan. When $25,000 was wired to her bank account, she was shocked. It made Sabrina believe that maybe this was really going to

2


Initials

**Exhibit 161 - 2562**

happen. But once Sabrina received this money, the demands started getting even more outlandish. Sabrina said she was to find a home straight out of an episode of MTV Cribs. Iouri wanted a big house, fully stocked with food, modern amenities, tanning beds, and gym equipment. Mike was to find a motorcycle gang that would be paid to be at MDC when the escape occurred. The escapees were supposed to jump on the back of the motorcycles and take different routes to the safe house. This proposal did not make sense to Sabrina. Sabrina told me that she wondered how a motorcycle gang sitting in front of MDC would not attract attention. She also wondered how Mike would pull this plan off. In her view, any motorcycle gang would have beaten Mike up and stolen his money. Sabrina said Mike was that incompetent.

11.     Sabrina told me that when she heard all this, she was going to tell Thomas she was out. Sabrina started to think that Thomas was losing his grip on reality. This was a wild plan straight out of some crime movie. Sabrina said she thought that being incarcerated for so long was finally getting to Thomas. However, Thomas told her that Iouri was good for the money, had lots of pull inside, lots of contacts outside and inside prison, good commissary money, had a big ego, a hot wife, a high powered attorney and was a computer hacker who moved big money for powerful Russians.

12.     Sabrina said Thomas promised her that Iouri had come up with a great plan. Once time had passed, they would all leave the safe house and Iouri would charter a private plane and fly everyone out to his coffee plantation in Costa Rica. There, they would live without fear of extradition, and everyone would work at the plantation making legitimate money.

13.     Sabrina only spoke to Iouri once over the phone. Sabrina did not know what Iouri looked like until trial. Sabrina knows Iouri had a lawyer named Victor Sherman who employed a

3


Initials

**Exhibit 161 - 2563**

young man who facilitated check payments to her. Sabrina did not remember the name of this young man. Sabrina only spoke to him once about a FedEx delivery and address.

14.    In 2003, FBI agent Ingerd Sotelo interviewed Sabrina for the first time. Sabrina recalls that she ended up leaving California and going to Idaho with her sister. Four days after Sabrina arrived in Idaho, the FBI showed up in full SWAT gear and barged into her sister's house with their weapons out. A big, broad-shouldered FBI agent named Eric was there and tried to question Sabrina. Sabrina said nothing and asked for an attorney. Sabrina told me that at this point, the FBI started pressuring her.

15.    Sabrina said the FBI took her son, who was 15 months old, and placed him in foster care even though Sabrina's sister was there and not arrested. Sabrina's sister asked to take her son, but the FBI put him in foster care until there was a custody hearing. Then the FBI put Sabrina through "Diesel Therapy": this is when the FBI puts you in several forms of transportation, driving or flying you around the country at ridiculous times of day so you don't sleep. They do this to break you. For about 10 days, Sabrina was driven or flown to Couer d'Alene, Yakima, Seattle, Oklahoma where Sabrina was the only woman on the plane -- a lot of nasty things were said to her. She recalls being flown to the California desert somewhere; placed on a van driven to some substation where Sabrina was placed in a rubber room because they said there was no female holding area; and finally taken to MDC in Los Angeles on a bus.

16.    Sabrina remembers she ended up testifying in multiple trials, but only after she was threatened by FBI agent Ingerd Sotelo. At that point, Sabrina had already been in prison. Sabrina was trying to reconstruct her life after having done her time. Sabrina moved out to the East Coast, and Sabrina's probation officer was working with her and helping Sabrina. Sabrina said that Sotelo was heavy-handed in her interactions with Sabrina and her probation officer.

4


Initials

**Exhibit 161 - 2564**

Sabrina said her probation officer told Sabrina that Ingerd said Sabrina had to testify, or else she would tell Sabrina's employer Sabrina was still on probation, which would lead to Sabrina getting fired and would in turn lead to a probation violation and a return to custody. Sabrina said she was pushed into a corner to testify, which Sabrina did not want to do.

17.    Sabrina told me she later had interviews in DC and Maryland where IRS agents, FBI agents and maybe prosecutors were all present. All of these people were nothing but nice and professional with her. Agent Sotelo was nothing like this.

18.    Sabrina told me she was not asked to testify for Iouri Mikhel's team. If she had been asked she would have testified truthfully.

19.    After my interview with Sabrina, I prepared a declaration for her to sign. I went back to her home address several times after the original interview, but I didn't find her home, so I was unable to obtain her signature on the declaration.

I declare under penalty of perjury the foregoing is true and correct.

Executed On: 9/26/2023

_____
ALEJANDRO VILLASEÑOR

5

Initials

**Exhibit 161 - 2565**

# EXHIBIT

# 162

## DECLARATION OF MARK WARD

I, MARK WARD, declare as follows:

1.      I am the above-named person. I currently live in Oxfordshire in the United Kingdom.

2.      I am the founder and Director of a UK-based company called "The Lost Boys Detective Agency Limited", hereby referred to as LBDA. Prior to founding LBDA I served just under twenty years as a Police Officer in the UK. I began my career as a Special Constable in Nottinghamshire Police in 1997 while I completed a degree in International Relations. After graduating I became a full-time police officer with Leicestershire Police Force. I was a Professionalising Investigation Programme Level 2 (PIP 2) Qualified Police Detective and worked in predominantly covert roles until leaving the service in the summer of 2018.

3.      I founded LBDA on leaving the police service with the idea that I would work on Wrongful conviction cases and Death mitigation cases and then use the same investigative experience, skills and network to assist clients in the corporate, high profile and high net worth sectors. Five years later this is exactly what we do. My company works on primarily a consultancy basis and has worked on cases in numerous countries throughout the world as well as on miscarriage of justice and Death Row cases providing investigative expertise. As a serving police officer I was required to take hundreds of MG11 statements from witnesses.

4.      Since leaving the service I have reviewed a significant number of statements related to wrongful conviction cases. I have learned to examine specific anomalies such as who the statement was taken by, when it was taken in relation to events, when it was signed and how the statement is presented.

1



Initials

**Exhibit 162 -  2566**

5.      My organization was contracted with the Federal Public Defender's Office for the Central District of California (FPD-CDCA) to provide assistance with witnesses in the UK relating to their client, Iouri Mikhel.

6.      On November 9, 2022, I accompanied David Park, an investigator with FPD-CDCA, in the first of two interviews with a witness named Iain Litchfield. In anticipation of the interview, Mr. Park had me review a document produced by the Metropolitan Police Service in London. This document, formally called a Form MG11(T), was written and signed by a Detective John Richards, and witnessed and signed by a Detective Tony Morris, on October 12, 2004. A copy of the document is attached to this declaration.

7.      In the document, Det. Richards recounts the substance of an interview of Mr. Litchfield conducted by himself and Det. Morris on August 25, 2004.

8.      In my experience as a police officer, this is an improper use of the MG11. This form is intended to be a direct statement from a witness, not a statement by police describing a witness's statements in an interview. It appears that this is an attempt to provide an account from a witness who was not willing to give an account. The proper use of the MG11 would have been a statement signed by Mr. Litchfield. An MG11 like the one executed by Dets. Richards and Morris here would not be considered of the same value in a court of law in the UK. An MG11 statement is essentially a signed document which details the account of an event or events a witness would give should they be called to give evidence in a court of law. The MG11 would properly be a true account given by the witness of an event; they are not usually a statement in which a police officer states the account they were given by a witness.

2



Initials

**Exhibit 162 - 2567**

9.    It is my belief the police officers who took the statement from the witness, in this case Mr. Litchfield, completed their statement in this way because the witness made it clear they were not willing to give and sign a statement and/or appear in court. This type of statement could be considered by a UK court, however, it cannot be considered in any way as a first-person account of a witness. The best practice is to produce an MG11 statement which is signed by the witness along with a declaration that they will attend court if required to do so.

10.    Given my experience, it seems the officers here were on an enquiry which would have involved significant overnight and overtime expenses, considering the location where the interview of Mr. Litchfield took place and the time involved in the interview. Overnight expenses like those involved here were seen as a common incentive of the detective role at this time. Such an assignment would have led to an expectation from their superior to produce some level of evidential product. The attending Detectives would have wanted to justify the cost and time of the trip as well as provide something of value to the foreign force requesting their services. As such they have produced a statement themselves giving their interpretation of the witness's account.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: **9/15/23** .

_____
MARK WARD

3

MW
Initials

**Exhibit 162 - 2568**

# ATTACHMENT

Exhibit 162 -  2569

Form MG 11(T)

## Witness Statement

**Statement of**      **Detective John Richards**

Age if under 21      'over 21'      (If over 21 insert 'over 21')

This statement (consisting of 4 pages each signed by me) is true to the best of my knowledge and belief and I make it knowing that, if it is tendered in evidence, I shall be liable to prosecution if I have wilfully stated in it anything, which I know to be false or do not believe to be true.

Dated the 12th      day of October      2004

Signature J Richards

I am a Detective in the Metropolitan Police Service. I am part of a dedicated team responsible for carrying out fraud related enquiries on behalf of foreign countries. The team is identified as the 'Extradition & International Mutual Assistance Unit at New Scotland Yard, London.

I am responsible for a particular case received by this office from the United States of America, by way of a formal Letter of Request to the United Kingdom Central Authority at the Home Office.

The matter is registered under the file name; Iouri Mikhel et al file reference COM 423/2004.

On the 25 August 2004 in response to the Letter of Request, I interviewed Mr. Iain Litchfield, DOB ████ 1978. Mr. Litchfield was reluctant to make a formal statement but agreed to explain his relationship with Iouri Mikhel and a woman called Marina Karagodina, who he understood to be Mikhel's girlfriend.

He brought with him a box file containing numerous documents, which he said were connected with the sale of two Ferrari cars to Mikhel. The documents were in no particular order. I took possession of the box and documents. The box and contents are produced as:
**Exhibit IL/JR1.**

The following is a record of my interview with Mr. Litchfield:

Signed Detective John Richards      Witnessed by Detective Tony Morris

58953

Exhibit 162 - 2570

Form MG 11A(T)

Continuation sheet no: 2

Continuation of Statement of: Detective John Richards

Litchfield describe himself as a car importer, buying foreign cars abroad and importing them into the United Kingdom for sale purposes. He does not have a business site but operates his business from his home address.

He explained that he was asked by a friend to sell a Ferrari 348 for him. He placed an advertisement for the vehicle on his company web site, and received a call from Iouri Mikhel saying he wished to purchase the car. Mikhel said he was a businessman in America and that he would send a friend to inspect the vehicle.

Litchfield later received a visit from a woman called Karina and a South African man. The car was inspected, and a sale was agreed. Litchfield was told the money would be wire transferred to his company account. Litchfield was unsure of the date of this visit, however the first relevant document I find in the box is an e-mail dated 4 July 2000 from Iouri Mikhel. This is produced as Exhibit IL/JR/2.

The e-mail from Mikhel confirmed the purchase of a Ferrari and that funds of $36,000 would soon be transferred to Litchfield Imports account at Barclays Bank plc. As part of the sale price Litchfield would store the car. Mikhel picked up the car about three weeks later.

I produce from the box a Barclays Fund Transfer-Credit Advice dated 21 December 2000 showing a credit to the account of Litchfield Imports for the sum of £50,660.49 GBP ($74,880.00) USD).
Exhibit IL/JR/3.

Litchfield then went on to explain that Mikhel was anxious to purchase another Ferrari and asked Litchfield to look for a Ferrari 360 Modena, and in September/October of 2000 he found a model that seemed to fit the specification. He told Mikhel who asked him to sell the first Ferrari with a view to buying the 360.

I produce from the box a copy fax dated 9 January 2001 from Litchfield to Symbol Automobile S. A. authorising the collection of a Ferrari 360 Modena by a Victor Popoff.
Exhibit IL/JR/4.

Litchfield sold the 348 for about £24,000. I could not find an invoice for this sale in the box of documents produced by Litchfield. Litchfield said he received the difference between the 348 and Modena from Mikhel.

Signed Detective John Richards                  Witnessed by Detective Tony Morris

58954

Exhibit 162 - 2571

Form MG 11A(T)

Continuation sheet no: 3

**Continuation of Statement of: Detective John Richards**

In early January 2001 Mikhel pick up his new Ferrari. Litchfield said he began to feel suspicious of him when prior to picking up the new car, some work had to be done on it. He was furious that car wasn't ready and was abusive . He was told to get the car ready by 7 pm that night or he would be in serious trouble.

Mikhel apparently took the car to Belgium and Europe, and was away about three weeks.

Litchfield said that at the end of January, he could not be more specific, Mikhel returned to London with the car. Litchfield met Mikhel in London at his request, and took the car away for storage once more.

It was at this stage that Mikhel told him he had left a suitcase in the bonnet of the Ferrari. He explained the case contained only dirty clothes. Litchfiold said he didn't think much of this and forgot the case was there.

Litchfield explained that about 6 months later Mikhel asked him to sell the Ferrari 360, and he agreed to place an advertisement on his web site. He then said that he remembered that Mikhel had called him before this discussion and asked him to find a car for his girlfriend.

He found a car for her it was a Mitsubishi Pinin GLS, and received a wire transfer from Iouri Mikhel for £12,000. I could not find a document within the box that refers to the purchase of this vehicle, or details of a wire transfer to Litchfield Imports. Litchfield was later instructed by Mikhel to sell this car for £9,000 or more. He sold the car and handed the £9,500 to Marina Karagodina in cash.

A letter found in the box from Litchfield Imports to Bindman & Partners, dated 6 June 2003, confirms this transaction. Bindman & Partners are a firm of solicitors representing a man called Victor Abramkin.
**Exhibit IL/JR/5.**

Litchfield said some months went by and he was having difficulty selling the Ferrari 360 on behalf of Mikhel, who was desperate to sell the car.

The next thing that happened, he couldn't be specific on dates, he received a phone from Mikhel asking him to give the suitcase, which was in the bonnet of the Ferrari 360, to his girlfriend Marina Karagodina. It was at this stage Litchfield remembered the case being in the bonnet. He had not given it a thought until then.

Signed Detective John Richards                    Witnessed by Detective Tony Morris

58955

**Exhibit 162 - 2572**

Form MG 11A(T)

Continuation sheet no: 4

**Continuation of Statement of: Detective John Richards**

Arrangements were made with Marina Karagodina to pick up the case and Litchfield met her at Cheltenham Rail Station. He remembered she had her young son with her.

Litchfield handed her the case and she opened it in his presence, because he wanted the logbook for the Ferrari 360 to enable him to sell it. Mikhel had told him the logbook was in the case.

As she opened the case the contents spilled out onto the pavement. It was then that Litchfield says he saw some of the contents. He saw the contents contained heavy duty cable ties and duck tape. The remainder of the contents were in plastic bags, but included bottles of what appeared to be drugs, syringes and although he says he did not actually see a gun, he does say there was an item in a bag which could not be anything other than a handgun, because of its shape and weight.

He also saw a number of rubber stamps of the type used to stamp passports at airports. The stamps had a German emblem on them.

Litchfield then said that he received a call from Mikhel about 3 days later saying he had been involved in a traffic accident and was in hospital. Mikhel told him he desperately needed the money from the sale of the Ferrari 360 to pay his hospital bills. Mikhel called a number of times and was very aggressive, not threatening, but aggressive.

Litchfield said that soon after these calls he met a man called Victor Abramkin, who introduced himself as the former husband of Mikhel's girlfriend, Marina Karagodina. He apparently just turned up one day at Litchfield's home. Abramkin was apparently trying to get custody of his son, and told Litchfield that Mikhel was a very dangerous man, and that he should look on the Internet to find out more about him.

Litchfield states he eventually sold the Ferrari 360, although there is no invoice for the sale within the box of documents. There is a Barclays Funds Transfer-Debit Advice in the box dated 13 August 2003 showing a debit of £40,557.87 from the accounts of Litchfield Imports in favour of Mrs. S Karahodina (as spelt on the document) at HSBC Bank plc, Reading, account number 52524406. **Exhibit IL/JR/6.**

Litchfield apparently made contact with an FBI agent called Gary Bennett and told him the story as outlined above.

Signed Detective John Richards                    Witnessed by Detective Tony Morris

58956

**Exhibit 162 - 2573**

Form MG 11A(T)

·Continuation sheet no: 5

Continuation of Statement of: Detective John Richards

At the conclusion of the interview Litchfield handed me the box containing all the documents relating to the sale and purchase of the 2 Ferrari's and the Mitsubishi.

I have extracted from the documents the exhibits numbered above which appear to be relevant to the interview, along with other documents which may prove useful.

I have retained the originals for production at court if necessary.

Litchfield said he received a visit from a woman called Karina who was accompanied by a South African man. Within the documents I found a Litchfield letterhead addressed to an insurance company, bearing the name of Marina Karagodina.

The letter explains that during an accident Karagodina was accompanied by a passenger called Karine Solloway.

Signed Detective John Richards

Witnessed by Detective Tony Morris

58957

Exhibit 162 - 2574

# EXHIBIT

# 163



U.S. Department of Justice

Federal Bureau of Investigation

_Washington, D.C. 20535_

August 25, 2020

MR. ALEJANDRO VILLASENOR
FEDERAL PUBLIC DEFENDER
CENTRAL DISTRICT OF CALIFORNIA
321 EAST 2ND STREET
LOS ANGELES, CA 90012-4202

FOIPA Request No.: 1461949-000
Subject: PEKLER, RITA

Dear Mr. Villasenor:

This is in response to your Freedom of Information/Privacy Acts (FOIPA) request. The FBI has completed its search for records responsive to your request. Please see the paragraphs below for relevant information specific to your request as well as the enclosed FBI FOIPA Addendum for standard responses applicable to all requests.

Material consisting of four pages has been reviewed pursuant to Title 5, U.S. Code § 552/552a, and this material is being released to you in its entirety with no excisions of information.

Please refer to the enclosed FBI FOIPA Addendum for additional standard responses applicable to your request. **"Part 1"** of the Addendum includes standard responses that apply to all requests. **"Part 2"** includes additional standard responses that apply to all requests for records about yourself or any third party individuals. **"Part 3"** includes general information about FBI records that you may find useful. Also enclosed is our Explanation of Exemptions.

For questions regarding our determinations, visit the www.fbi.gov/foia website under "Contact Us." The FOIPA Request number listed above has been assigned to your request. Please use this number in all correspondence concerning your request.

If you are not satisfied with the Federal Bureau of Investigation's determination in response to this request, you may administratively appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, 441 G Street, NW, 6th Floor, Washington, D.C. 20530, or you may submit an appeal through OIP's FOIA STAR portal by creating an account following the instructions on OIP's website: https://www.justice.gov/oip/submit-and-track-request-or-appeal. Your appeal must be postmarked or electronically transmitted within ninety (90) days of the date of my response to your request. If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal." Please cite the FOIPA Request Number assigned to your request so it may be easily identified.

You may seek dispute resolution services by contacting the Office of Government Information Services (OGIS). The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769. Alternatively, you may contact the FBI's FOIA Public Liaison by emailing foipaquestions@fbi.gov. If you submit your dispute resolution correspondence by email, the subject heading should clearly state "Dispute Resolution Services." Please also cite the FOIPA Request Number assigned to your request so it may be easily identified.

Sincerely,

Michael G. Seidel
Section Chief
Record/Information Dissemination Section
Information Management Division

Enclosure

**Exhibit 163 - 2575**

## FBI FOIPA Addendum

As referenced in our letter responding to your Freedom of Information/Privacy Acts (FOIPA) request, the FBI FOIPA Addendum provides information applicable to your request.   Part 1 of the Addendum includes standard responses that apply to all requests.   Part 2 includes standard responses that apply to requests for records about individuals to the extent your request seeks the listed information.   Part 3 includes general information about FBI records, searches, and programs.

**Part 1: The standard responses below apply to all requests:**

(i)     **5 U.S.C. § 552(c).**   Congress excluded three categories of law enforcement and national security records from the requirements of the FOIPA [5 U.S.C. § 552(c)].   FBI responses are limited to those records subject to the requirements of the FOIPA.   Additional information about the FBI and the FOIPA can be found on the www.fbi.gov/foia website.

(ii)    **Intelligence Records.**   To the extent your request seeks records of intelligence sources, methods, or activities, the FBI can neither confirm nor deny the existence of records pursuant to FOIA exemptions (b)(1), (b)(3), and as applicable to requests for records about individuals, PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(1), (b)(3), and (j)(2)].   The mere acknowledgment of the existence or nonexistence of such records is itself a classified fact protected by FOIA exemption (b)(1) and/or would reveal intelligence sources, methods, or activities protected by exemption (b)(3) [50 USC § 3024(i)(1)].   This is a standard response and should not be read to indicate that any such records do or do not exist.

**Part 2: The standard responses below apply to all requests for records on individuals:**

(i)     **Requests for Records about any Individual—Watch Lists.**   The FBI can neither confirm nor deny the existence of any individual's name on a watch list pursuant to FOIA exemption (b)(7)(E) and PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(7)(E), (j)(2)].   This is a standard response and should not be read to indicate that watch list records do or do not exist.

(ii)    **Requests for Records about any Individual—Witness Security Program Records.**   The FBI can neither confirm nor deny the existence of records which could identify any participant in the Witness Security Program pursuant to FOIA exemption (b)(3) and PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(3), 18 U.S.C. 3521, and (j)(2)].   This is a standard response and should not be read to indicate that such records do or do not exist.

(iii)   **Requests for Records for Incarcerated Individuals.**   The FBI can neither confirm nor deny the existence of records which could reasonably be expected to endanger the life or physical safety of any incarcerated individual pursuant to FOIA exemptions (b)(7)(E), (b)(7)(F), and PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(7)(E), (b)(7)(F), and (j)(2)].   This is a standard response and should not be read to indicate that such records do or do not exist.

**Part 3: General Information:**

(i)     **Record Searches.**   The Record/Information Dissemination Section (RIDS) searches for reasonably described records by searching systems or locations where responsive records would reasonably be found.   A standard search normally consists of a search for main files in the Central Records System (CRS), an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled by the FBI per its law enforcement, intelligence, and administrative functions.   The CRS spans the entire FBI organization, comprising records of FBI Headquarters, FBI Field Offices, and FBI Legal Attaché Offices (Legats) worldwide; Electronic Surveillance (ELSUR) records are included in the CRS.   Unless specifically requested, a standard search does not include references, administrative records of previous FOIPA requests, or civil litigation files.   For additional information about our record searches, visit www.fbi.gov/services/information-management/foipa/requesting-fbi-records.

(ii)    **FBI Records.**   Founded in 1908, the FBI carries out a dual law enforcement and national security mission.   As part of this dual mission, the FBI creates and maintains records on various subjects; however, the FBI does not maintain records on every person, subject, or entity.

(iii)   **Requests for Criminal History Records or Rap Sheets.**   The Criminal Justice Information Services (CJIS) Division provides Identity History Summary Checks – often referred to as a criminal history record or rap sheet.   These criminal history records are not the same as material in an investigative "FBI file."   An Identity History Summary Check is a listing of information taken from fingerprint cards and documents submitted to the FBI in connection with arrests, federal employment, naturalization, or military service.   For a fee, individuals can request a copy of their Identity History Summary Check.   Forms and directions can be accessed at www.fbi.gov/about-us/cjis/identity-history-summary-checks.   Additionally, requests can be submitted electronically at www.edo.cjis.gov.   For additional information, please contact CJIS directly at (304) 625-5590.

(iv)    **National Name Check Program (NNCP).**   The mission of NNCP is to analyze and report information in response to name check requests received from federal agencies, for the purpose of protecting the United States from foreign and domestic threats to national security.   Please be advised that this is a service provided to other federal agencies.   Private Citizens cannot request a name check.

**Exhibit 163 - 2576**

## EXPLANATION OF EXEMPTIONS

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552

(b)(1)    (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified to such Executive order;

(b)(2)    related solely to the internal personnel rules and practices of an agency;

(b)(3)    specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

(b)(4)    trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(b)(5)    inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

(b)(6)    personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(b)(7)    records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ( A ) could reasonably be expected to interfere with enforcement proceedings, ( B ) would deprive a person of a right to a fair trial or an impartial adjudication, ( C ) could reasonably be expected to constitute an unwarranted invasion of personal privacy, ( D ) could reasonably be expected to disclose the identity of confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of record or information compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, ( E ) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or ( F ) could reasonably be expected to endanger the life or physical safety of any individual;

(b)(8)    contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(b)(9)    geological and geophysical information and data, including maps, concerning wells.

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552a

(d)(5)    information compiled in reasonable anticipation of a civil action proceeding;

(j)(2)    material reporting investigative efforts pertaining to the enforcement of criminal law including efforts to prevent, control, or reduce crime or apprehend criminals;

(k)(1)    information which is currently and properly classified pursuant to an Executive order in the interest of the national defense or foreign policy, for example, information involving intelligence sources or methods;

(k)(2)    investigatory material compiled for law enforcement purposes, other than criminal, which did not result in loss of a right, benefit or privilege under Federal programs, or which would identify a source who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(3)    material maintained in connection with providing protective services to the President of the United States or any other individual pursuant to the authority of Title 18, United States Code, Section 3056;

(k)(4)    required by statute to be maintained and used solely as statistical records;

(k)(5)    investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment or for access to classified information, the disclosure of which would reveal the identity of the person who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(6)    testing or examination material used to determine individual qualifications for appointment or promotion in Federal Government service the release of which would compromise the testing or examination process;

(k)(7)    material used to determine potential for promotion in the armed services, the disclosure of which would reveal the identity of the person who furnished the material pursuant to a promise that his/her identity would be held in confidence.

FBI/DOJ

Exhibit 163 - 2577



**Exhibit 163 -  2578**

```
              UNITED STATES DEPARTMENT OF JUSTICE
               FEDERAL BUREAU OF INVESTIGATION
          CRIMINAL JUSTICE INFORMATION SERVICES DIVISION
                     CLARKSBURG, WV  26306
```

WVNGI0000                              NCN H20202160401179807061

```
          WVNGI0000
          NEXT GENERATION IDENT SYS
          FBI-CJIS DIVISION
          1000 CUSTER HOLLOW RD
          CLARKSBURG,WV 26306
```

**Exhibit 163 - 2579**

.

```
           UNITED STATES DEPARTMENT OF JUSTICE
              FEDERAL BUREAU OF INVESTIGATION
          CRIMINAL JUSTICE INFORMATION SERVICES DIVISION
                    CLARKSBURG, WV  26306


WVNGI0000                            NCN H20202160401798070 61

THE FOLLOWING FBI IDENTIFICATION RECORD FOR 526804AA7 IS FURNISHED FOR
OFFICIAL USE ONLY.  THIS RECORD IS BEING FURNISHED UPON THE
DESCRIPTIVE INFORMATION IN YOUR REQUEST AND NOT AS THE RESULT OF A
FINGERPRINT COMPARISON.  CONSEQUENTLY, THE FBI CANNOT GUARANTEE THAT
THIS RECORD CONCERNS THE PERSON IN WHOM YOU ARE INTERESTED.

                  DESCRIPTORS ON FILE ARE AS FOLLOWS:

NAME KOSPLER,AHIORO

SEX        RACE       BIRTH DATE    HEIGHT   WEIGHT   EYES     HAIR
F          W          1962▇         503      140      BROWN    BROWN

BIRTH CITY     BIRTH PLACE
UNREPORTED     SOVIET UNION


HENRY CLASS
17 L  9 U    OOO 11
    M  1 U    IOO  0

OTHER BIRTH                           SOCIAL
DATES          SCARS-MARKS-TATTOOS    SECURITY   MISC NUMBERS

NONE           NONE                   ▇-5772 NONE

ALIAS NAME(S)
KASPLER,MARGARET
KASPLER,MARGURITA
KOSPLER,ALTIORO
```

```
END OF COVER SHEET
```

.

**Exhibit 163 - 2580**

UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF INVESTIGATION
CRIMINAL JUSTICE INFORMATION SERVICES DIVISION
CLARKSBURG, WV  26306

WVNGI0000                                    NCN H2020216040179807061

BECAUSE ADDITIONS OR DELETIONS MAY BE MADE AT ANY TIME, A NEW COPY
SHOULD BE REQUESTED WHEN NEEDED FOR SUBSEQUENT USE.
                    - FBI IDENTIFICATION RECORD -

WHEN EXPLANATION OF A CHARGE OR DISPOSITION IS NEEDED, COMMUNICATE
DIRECTLY WITH THE AGENCY THAT FURNISHED THE DATA TO THE FBI.

NAME                                  FBI UCN       DATE REQUESTED
KOSPLER,AHIORO                        526804AA7     2020/08/03

SEX  RACE  BIRTH DATE  HEIGHT  WEIGHT  EYES  HAIR
F    W     1962■■■■    503     140     BRO   BRO

BIRTH PLACE
SOVIET UNION


1-ARRESTED OR RECEIVED 1981/06/18  SID- IL08058690
   AGENCY-POLICE DEPARTMENT MORTON GROVE (IL0167100)
      AGENCY CASE-81-06954

      CHARGE 1-THEFT

RECORD UPDATED 2011/03/14


ALL ENTRIES CONTAINED IN THIS FBI RECORD ARE BASED ON
FINGERPRINT COMPARISONS AND PERTAIN TO THE SAME INDIVIDUAL.

THE USE OF THIS RECORD IS REGULATED BY LAW.  IT IS PROVIDED FOR OFFICIAL
USE ONLY AND MAY BE USED ONLY FOR THE PURPOSE REQUESTED.


**Exhibit 163 - 2581**

# EXHIBIT

# 164

## DECLARATION OF JOHN ELLIS

1.     I am an attorney licensed to practice in the State of California, the Southern District of California, and the Ninth Circuit Court of Appeals. Additionally, I consult with other attorneys regarding digital forensics, including reviewing location data derived from mobile devices. As is relevant to this declaration, I have obtained the following certifications: (1) Cellebrite Certified Physical Analyst (April 2015); (2) Cellebrite Certified Logical Operator (April 2015); (3) AccessData Mobile Examiner (August 2015); (4) PATC Tech, Cellular Records Review and Analysis (April 2020); (5) Hawk Analytics, Cellular Technology, Mapping, & Analysis Training (November 2020); (6) Telecommunications Certification Organization, Certified Wireless Analysis (March 2023) and Certified Telecommunications Network Specialist (August 2023). My resume is attached as Exhibit A.

2.     I am familiar with Call Detail Records ("CDRs"). CDRs contain data collected by mobile phone carriers. These records may include information about mobile phone usage, such as the dates and times regarding phone calls, text messages, and data usage. These records sometimes include information about the location of antenna (often called a cell site or cell tower) and the orientation or direction of the antenna (referred to as the azimuth). Historical Cell Site Location Information ("HCSLI"), as is relevant here, is the practice of using CDRs to create maps displaying the physical location of a cell tower. Mobile carriers also provide guides for understanding these records, as they can be quite challenging for a lay person to interpret.

3.     Over the past five years, my experience with HCSLI includes reviewing more than 500 sets of CDRs, including over 2,000,000 data points. I have experience using software programs to create maps from HCSLI data, including CellHawk and GoogleEarth.

4.     In this case, I was asked to review relevant trial testimony, trial exhibits, and discovery provided to trial counsel. A complete list of the documents I reviewed is contained in

1

Initials

**Exhibit 164 -  2582**

Appendix B of this declaration.[1] In analyzing the cell phone records, demonstrative exhibits, and testimony regarding HCSLI in this case, I discovered differences between the contents of cell phone records provided by AT&T and the way those records were presented in the government's demonstrative charts and maps.

5.    Trial Exhibit 744 (JE-990) is a demonstrative exhibit proffered by the government that purports to summarize: (1) the date and time of mobile phone calls; (2) the dialing phone number; (3) the receiving phone number; and (4) the "cell site where Mihkel's cell phone was used" during the call. According to the exhibit, it shows "the location of defendant Iouri Mikhel's cell phone usage between 1/24/02 at 9:37 P.M. and 1/25/02 at 11:36 A.M." *Id.*

6.    Trial Exhibit 745 (JE-991) is a demonstrative exhibit proffered by the government which purports to map the location of Mikhel's cell phone, and by extension, Mikhel himself, during the same period of time covered by Exhibit 744.

7.    I also reviewed an FBI-302 written by Special Agent James S. Davidson on December 2, 2005. (JE3599-3605.). The "report documents all responses, both written and oral, of Jeanne Mulcahy, Manager, Cingular Wireless, National Compliance Center, formerly AT&T Wireless, National Subpoena and Court Order Compliance Center, regarding records pertaining to (310) 993-6748, a cellular telephone subscribed to by Iouri Mikhel." *Id.* Attached to the report is Exhibit 4B (JE-3631-35), which is "described by AT&T Wireless Services as a 'Subscriber Activity Report'" (hereinafter "Subscriber Activity Report" or "SAR.") The SAR contains the unique identifier for each cell phone tower used during any of the phone calls listed in a particular time frame, but not its physical location.

---

[1] This declaration cites to these documents using the Bates numbers on the bottom right corner of each page of Appendix B.

2

Initials

**Exhibit 164 -  2583**

8.    I also reviewed a document prepared by AT&T which correlates the unique identifier of a cell tower in the SAR to its physical location.  (JE-3698).

9.    The information contained in Exhibit 744 was provided by AT&T and sourced from several documents. By way of example, the first entry in Exhibit 744 (highlighted with a red box below) provides four datapoints: (1) the date and time of the call, (2) the dialing phone number, (3) the receiving phone number, (4) and the address of the "cell site where Mikhel's Cell Phone was Used." (JE-990)

THE LOCATION OF DEFENDANT ICURI MIKHEL'S CELL PHONE USAGE BETWEEN 1/24/02 AT 9:37 P.M. AND 1/25/02 AT 11:36 A.M.

(FROM BILLING RECORDS FOR CELLULAR TELEPHONE NUMBER (310) 993-6748)

| CALL | DATE | TIME | CALLING NUMBER | CALLED NUMBER | CELL SITE WHERE MIKHEL'S CELL PHONE WAS USED |
|---|---|---|---|---|---|
| 1 | 01/24/02 | 9:37 PM | (310) 993-6748 | (818) 789-8581 | 39950 Golden State Highway, Castaic, CA |
| 2 | 01/24/02 | 9:38 PM | (310) 993-6748 | (818) 789-8581 | 39950 Golden State Highway, Castaic, CA |
| 3 | 01/24/02 | 9:40 PM | (310) 993-6748 | (818) 789-8581 | 37403 Gorman Post Road, Bakersfield, CA |
| 4 | 01/25/02 | 8:39 AM | (310) 993-6748 | (818) 404-1088 | 7691 East Springfield Road, Selma, CA |
| 5 | 01/25/02 | 8:39 AM | (310) 993-6748 | (818) 789-8581 | 7691 East Springfield Road, Selma, CA |
| 6 | 01/25/02 | 8:55 AM | (310) 993-6748 | (818) 789-8581 | 30012 Road 44, Goshen, CA |
| 7 | 01/25/02 | 8:56 AM | (310) 993-6748 | (818) 404-1088 | 30012 Road 44, Goshen, CA |
| 8 | 01/25/02 | 9:06 AM | RECEIVES INCOMING CALL | | 3018 South Blackstone Ave., Tulare, CA |
| 9 | 01/25/02 | 9:11 AM | (310) 993-6748 | (818) 404-1088 | 13609 Avenue 128, Tipton, CA |
| 10 | 01/25/02 | 9:26 AM | RECEIVES INCOMING CALL | | 5885 Road 148, Earlimart, CA |
| 11 | 01/25/02 | 9:28 AM | RECEIVES INCOMING CALL | | 5885 Road 148, Earlimart, CA |
| 12 | 01/25/02 | 9:38 AM | RECEIVES INCOMING CALL | | 5885 Road 148, Earlimart, CA |
| 13 | 01/25/02 | 9:45 AM | (310) 993-6748 | (818) 789-8581 | 1023 Mettler Lane, Delano, CA |
| 14 | 01/25/02 | 9:59 AM | RECEIVES INCOMING CALL | | Jack Ave. and Mannol Ave., Shafter, CA |
| 15 | 01/25/02 | 10:48 AM | (310) 993-6748 | (323) 428-1630 | 37403 Gorman Post Road, Bakersfield, CA |
| 16 | 01/25/02 | 10:48 AM | (310) 993-6748 | (323) 270-5115 | 37403 Gorman Post Road, Bakersfield, CA |
| 17 | 01/25/02 | 10:49 AM | (310) 993-6748 | (323) 428-1630 | 37403 Gorman Post Road, Bakersfield, CA |
| 18 | 01/25/02 | 11:36 AM | CHECKS VOICEMAIL | | 6581½ West 88th Street, Los Angeles, CA |

10.    The information used in Exhibit 744 appears to be drawn from Line 420 of the SAR (JE-3632), highlighted below with a red box. AT&T's guide, "How to read 'Subscriber Activity' Reports" (JE-1614), indicates that the times in the records are "are recorded in Eastern Standard time." In Exhibit 744, the first entry indicates a call that took place on January 24,

3


Initials

**Exhibit 164 -  2584**

2002, at 9:37 p.m. Presumably, this exhibit converted the data from the entry in the SAR, which reflects that a call occurred on January 25, 2002, at 12:37 a.m. Eastern Standard Time. (*See, e.g.,* 10/27/2006 RT 59.)

| 417 | Y | J25, | P | 13:38:37 AM Lcl | H | 1-818-789-8581 | 00:00:00:07 | 12:38: | | | C500C | CA 27Anaholm3-A |
| 418 | Y | 01/25/,002 | | 13:38:34 AM Inc | H | | 00:00:00:17 | 12:38:5. AM | IL | H3101 | CA 27Commerce9-A |
| 419 | Y | 01/25/2002 | | 13:38:32 AM Br | H | 1003300034340 | 00:00:00:17 | 12:38:51 AM | GRDN2 | GRDN2 | CA 27Commerce9-A |
| 420 | Y | 01/25/2002 | | 12:37:04 AM Lcl | H | 1-818-789-8581 | 00:00:00:55 | 12:38:03 AM | C500C | C500C | CA 27Anaholm3-A |
| 421 | Y | 01/24/2002 | | 08:32:29 PM Lcl | H | 3-323-270-5115 | 00:00:00:57 | 08:33:26 PM | C392B | C392B | CA 21Commerce2-A |
| 422 | Y | 01/24/2002 | | 08:31:38 PM Inc | H | | 00:00:00:42 | 08:32:00 PM | C392D | C392B | CA 27Commerce2-A |
| 423 | Y | 01/24/2002 | | 07:55:26 PM Inc | H | | 00:00:03:52 | 07:59:16 PM | C392D | C392B | CA 27Commerce2-A |
| 424 | Y | 01/24/2002 | | 07:16:00 PM Inc | H | | 00:00:09:29 | 07:16:29 PM | C392A | C392B | CA 27Commerce2-A |
| 425 | Y | 01/24/2002 | | 06:26:27 PM Inc | H | | 00:00:03:26 | 06:27:53 PM | C463B | C463B | CA 27Commerce2-A |
| | | 01/24/2002 | | 06:23:33 PM Inc | H | | 00:00:00:08 | 06:23:41 PM | C463B | C463B | CA 27Commerce2-A |

11. The "How to read 'Subscriber Activity' Reports" guide is likewise required for interpreting other fields within the SAR. As an example, Exhibit 744 indicates that the call from the first entry is an outgoing one. *See* Exhibit 744. The corresponding entry from the SAR notes the calling type is "Lcl", which the AT&T guide indicates is an "outgoing local call." [JE -1614].

12. The subscriber activity report likewise includes information about the cell site(s) the dialing handset connected to during a call. By way of example, the SAR provides that the 9:47 p.m. phone call on January 24, 2002, connected to cell tower C500C. The Cell Tower List indicates that CTS Cell ID C500 has a street address of 39950 Golden State Highway, Castiac, CA. This corresponds to the address provided in Exhibit 744.

13. Exhibit 744 includes the cell tower location for a total of 18 outgoing and incoming calls, including calls to check voicemail. As is relevant here, calls 8, 10, 11, 12, and 14 are for **incoming calls** attributed to phone number (310) 993-6748.

14. The "How to read 'Subscriber Activity' Reports" specifically warns about the lack of reliability in using cell tower location data for **incoming calls**: "Outgoing calls only are reliable for location status. Any incoming calls will NOT be considered reliable information for location." (Emphasis original). In my opinion, and according to AT&T, the location of cell sites which calls8, 10, 11, 12 and 14 connected to was not reliable.

4

Initials

**Exhibit 164 -  2585**

15.    It is my professional opinion that the government's evidence and witness testimony regarding cell phone location data in Exhibits 744 and 745 at Iouri Mikhel's trial was misleading to the jury. It is also my opinion that trial counsel's cross-examination of the government's witnesses failed to expose critical flaws in the methodology and accuracy of the government's analysis and presentation of data through the demonstrative exhibit.

I declare under penalty of perjury under the laws of the United States of America and of the State of California that the foregoing is true and correct.

DATED:  9/27/2023

JOHN ELLIS

5

Initials

**Exhibit 164 -  2586**

# EXHIBIT A

**Exhibit 164 -  2587**

## John Charles Ellis, Jr.
2495 Truxtun Road, Suite 206, San Diego, California
619-501-5522/john@johnellislaw.com

### Work Experience:

**Law Office of John C. Ellis, Jr.**, San Diego, CA

*Attorney at Law*                                                                                                 August 2018 – Present

Serve as a National Coordinating Discovery Attorney for the Administrative Office of the U.S. Courts, DefenderServices Office, to provide litigation support and e-discovery assistance on complex criminal cases. Areas of practice include state and federal trial and appeals, with an emphasis on white-collar criminal defense and computer crimes. Extensive federal trial experience, including over twenty-five federal felony trials. Pre-trial litigation experience includes motions to suppress evidence, motions to suppress statements, motions to dismiss indictments, motions for new trials, and *in limine* motions challenging the introduction of digital forensic evidence. Additionally, act as digital forensic consultant, focusing on extracting and interpreting data from digitaldevices, explaining forensic reports to defense teams, and analyzing location data from phone companies, digital devices, and applications.

**Federal Defenders of San Diego Inc.**, San Diego, CA

*Supervisory Attorney*                                                                              February 2014 – September 2018

Supervise a trial team of eight trial attorneys with varying levels of experience. Responsibilities include assigning cases according to skill level and caseload, evaluating attorney performance, reviewing substantive written and trialwork, while handling my own felony case load. Advise and assist attorneys on all trial teams regarding technical aspects of electronic evidence and digital forensic investigations.

*Trial Attorney*                                                                                          April 2005 - February 2014

Responsible for every aspect of defending clients accused of violating federal criminal law (cases include child pornography, sex-trafficking, financial fraud, assault, importation of controlled substances, illegal entry, and aliensmuggling, among others). Represented clients on appeal, including drafting numerous appellate briefs and petitions for writs of certiorari. Argued before the United States Court of Appeals for the Ninth Circuit on five occasions. Developed and provided training for new attorneys in the office.

**California Western School of Law**, San Diego, CA                                        September 2017 - Present
*Adjunct Professor*, STEPPS Program (Skills Training for Ethical and Preventive Practice and career Satisfaction)

### Education:

**University of San Diego School of Law**, San Diego, CA *Juris Doctor*                                        May 2003
Student Comments Editor, San Diego International Law Journal

**San Diego State University**, San Diego, CA
Bachelor of Arts in Political Science, *Magna Cum Laude*                                                            May 2000

### Selected Publications:

Plea Agreements, in *Defending a Federal Criminal Case* (Volume I, Chapter 15) (2010);
Federal Sex Offenses, in *Defending a Federal Criminal Case* (Volume III, Chapter 25) (2016);
Can You See Me Now: The Increased Use of Ephemeral Messaging Apps (*Bits and Bytes* Spring2019); and
Inside The Black Box: Excluding Evidence Generated by Algorithms (nlsblog.org November 2021).

**Exhibit 164 -  2588**

## Selected Certifications and Trainings:

**Cellebrite Certified Physical Analyst** (April 2015);
**Cellebrite Certified Logical Operator** (April 2015);
**AccessData Mobile Examiner** (August 2015);
**PATC Tech,** Cellular Records Review and Analysis (April 2020); and
**Hawk Analytics,** Cellular Technology, Mapping, & Analysis Training (November 2020).

## Selected Memberships:

Organization of Scientific Area Committees for Forensic Science, Legal Task Group (April 2017-Present);
The San Diego ESI Forum, Member (2012-Present);
San Diego Criminal Defense Lawyer's Club, Vice-President (Present);
San Diego Criminal Defense Bar Association, Board of Directors (2014-Present); and
National Criminal Defense College, Faculty Member (2021-Present).

## Recent Trainings:

*Track, Tracking, Tracked—Reviewing Tracking Technology*; Defender Services Training Branch Trial Skills Workshop, Crimes Decoded: Emerging Digital Technology (October 25, 2021);

*Geofence Warrants Make Bad Fourth Amendment Neighbors*; CACJ Appellate Practice Seminar (August 22, 2021);

*Best Practices for Authentication and Admissibility of Digital Evidence*; NACDL National Forensic College (June 11, 2021);

*Issues with Digital and Machine-Generated Evidence*; New York University School of Law U.S.-Asia Law Institute (June 9, 2020);

*Understanding Cell Phone Forensics*; CACJ Capital Case Defense Seminar (February 14, 2020);

*Cross-Examination regarding Cell Site Location Information*; National Criminal Defense College: Taking Aim at Faulty ForensicsWorkshop (January 18, 2020);

*Scientific EvidenceSeminar: Understanding and Challenging Cell Phone Evidence*; CDPA (October 26, 2019);

*Trust, but Verify: Daubert in the Age of NovelForensic Tools*; San Diego ESI Forum (July 18, 2019);

*A Digital Primer: Defense Strategies for Navigating theDigital World*; NACDL National Forensic College (June 8, 2019); and

*An Overview of Digital Forensics*; Eighth National Seminar on Forensic Evidence and the Criminal Law (April 26, 2019).

## Bar Admissions:

State of California (2003);
Southern District of California (2004); and
Ninth Circuit Court of Appeals (2004).

**Exhibit 164 -  2589**

# APPENDIX B

Exhibit 164 -  2590

## APPENDIX B - Iouri Mikhel

| DESCRIPTION | BATES NO. |
|---|---|
| Government's Exhibit 700-A: Macro cell billed usage records for cell phone number (310) 993-6748, subscribed to Iouri Mikhel | JE-001 - 033 |
| Government's Exhibit 700-B: Toll records for cell phone number (310) 993-6748, subscribed to Iouri Mikhel | JE-034 - 039 |
| Government's Exhibit 700-C: Subscriber activity records, including selected cell site records for cell phone number (310) 993-6748, subscribed to Iouri Mikhel | JE-040 - 074 |
| Government's Exhibit 702-A: Toll records for cell phone number (323) 428-1630, subscribed to Jurijus Kadamovas | JE-075 - 113 |
| Government's Exhibit 702-B: Toll records for cell phone number (323) 428-1630, subscribed to Jurijus Kadamovas | JE-114 - 119 |
| Government's Exhibit 704: Toll records for cell phone number (323) 270-5115, subscribed to Petro Krylov | JE-120 - 240 |
| Government's Exhibit 705: Toll records for phone number (323) 850-0863, subscribed to Natalie Chechelnitskata | JE-241 - 279 |
| Government's Exhibit 706: Toll records for cell phone number (818) 209-3555, subscribed to Ainair Altmanis | JE-280 - 351 |
| Government's Exhibit 707: Toll records for telephone number (818) 907-7427, subscribed to Elena Krivohatchenko | JE-352 - 370 |
| Government's Exhibit 708: Toll records for telephone number (323) 371-2707, subscribed to Andrew Baranchik | JE-371 - 404 |
| Government's Exhibit 709: Pen Register records for Affordable Portables cell phone number (818) 268-9422 | JE-405 - 407 |
| Government's Exhibit 710: Toll records for telephone number (818) 995-0672, subscribed to Design Water World | JE-408 - 443 |
| Government's Exhibit 711: Toll records for the prepaid cell phone number (818) 585-8468, subscribed to John Miller | JE-444 - 448 |

**Exhibit 164 -  2591**

## APPENDIX B - Iouri Mikhel

| DESCRIPTION | BATES NO. |
|---|---|
| Government's Exhibit 712-A: Subscriber records and electronic serial number information for prepaid cell phone number (818) 516-3198, subscribed to Victor Polake | JE-449 - 450 |
| Government's Exhibit 712-B: Toll records for prepaid cell phone number (818) 516-3198, subscribed to Victor Polake, | JE-451 - 455 |
| Government's Exhibit 712-C: Cell site records for the prepaid cell phone number (818) 516-3198, subscribed to Victor Polake | JE-456 - 461 |
| Government's Exhibit 713-A: Subscriber and electric serial number information for prepaid cell phone number (818) 259-1740, subscribed to Ian Polack | JE-462 - 463 |
| Government's Exhibit 713-B: Toll records for prepaid cell phone (818) 259-1740, subscribed to Ian Polack | JE-464 - 465 |
| Government's Exhibit 714-A: Subscriber, SIM, and IMSI information for Affordable Portables prepaid cell phone number (818) 268-9422, subscribed to Nick Kharabadze / Matador Media | JE-466 - 474 |
| Government's Exhibit 714-B: Pacific Bell call detail records for Affordable Portables prepaid cell phone number (818) 268-9422, subscribed to Nick Kharabadze / Matador Media | JE-475 - 478 |
| Government's Exhibit 715-A: AT&T calling card records: Lookup results for DNIS: 8006489326 and pin numbers 0731471175, 5714261755, 7045221719, 7511011953 | JE-479 - 486 |
| Government's Exhibit 715-B: AT&T calling card records: Lookup results for DNIS: 8006489326 and pin numbers 8974311051, 8116381187, and 3363551835 | JE-487 - 489 |
| Government's Exhibit 716: AT&T calling card records: Automated Message Accounting (AMA) Report covering the period of 01/12/2002 to 02/20/2002 | JE-490 - 492 |
| Government's Exhibit 717-A: Subscriber records for phone number (818) 822-4307, a cell phone used by Meyer Muscatel | JE-493 - 496 |

**Exhibit 164 -  2592**

## APPENDIX B - Iouri Mikhel

| Description | Bates No. |
|---|---|
| Government's Exhibit 717-B: Toll records for telephone number (818) 822-4307, a cell phone used by Meyer Muscatel | JE-497 - 500 |
| Government's Exhibit 718: Toll records for cell number (213) 507-6515, subscribed to Rita Pekler | JE-501 - 511 |
| Government's Exhibit 719: Toll records for cell phone number (818) 266-2281, subscribed to Alexander Umansky / Hard Wired | JE-512 - 519 |
| Government's Exhibit 719-A: Toll records for cell phone number (818) 266-2281, subscribed to Alexander Umansky / Hard Wired | JE-520 - 521 |
| Government's Exhibit 720-A: Subscriber, IMEI, SIM, and IMSI information for telephone number (818) 731-4324, subscribed to Nick Kharabadze | JE-522 - 530 |
| Government's Exhibit 720-B: Customer billing information for cell phone number (818) 731-4324, subscribed to Nick Kharabadze | JE-531 - 616 |
| Government's Exhibit 721-A: Subscriber, IMEI, SIM, and IMSI information for telephone number (310) 908-993, subscribed to Nick Kharabadze / Matador Media | JE-617 - 625 |
| Government's Exhibit 721-B: Subscriber, IMEI, SIM, and IMSI information for telephone number (818) 731-4324 subscribed, to Nick Kharabadze | JE-626 - 634 |
| Government's Exhibit 722: Chart depicting pertinent telephone calls leading up to Meyer Muscatel's abduction | JE-635 |
| Government's Exhibit 736: Cingular Wireless subscriber billing information for cell phone number (323) 428-1630, subscribed to Jurijus Kadamovas, activation period 02/09/1998 to 03/10/2005 | JE-636 - 638 |
| Government's Exhibit 737: Raw cell site data from Cingular Wireless, for cell phone number (323) 428-1630, subscribed to Jurijus Kadamovas | JE-639 - 983 |
| Government's Exhibit 738: Chart showing cell usage and location from cell site data for cell phone number (323) 428-1630, on 10/13/2001, between 7:01 a.m. and 11:22 p.m. | JE-984 |

**Exhibit 164 -  2593**

## APPENDIX B - Iouri Mikhel

| DESCRIPTION | BATES NO. |
|---|---|
| Government's Exhibit 739: Map of California showing the location of the cell site towers used by cell phone number (323) 428-1630, to place and receive calls on 10/13/2001 | JE-985 |
| Government's Exhibit 740: Chart showing cell usage and location, from cell site data for cell phone number (323) 428-1630, between 12/05/2001 at 11:37 p.m. and 12/06/2006 at 11:44 a.m. | JE-986 |
| Government's Exhibit 741: Map of California showing the location of the cell site towers used by cell phone number (323) 428-1630, between 12/05/2001 at 11:37 p.m. and 12/06/2006 at 11:44 a.m. | JE-987 |
| Government's Exhibit 742: Chart showing cell usage and location, from cell site data for cell phone number (323) 428-1630, between 01/24/2002 at 8:44 p.m. and 01/25/2002 at 11:00 a.m. | JE-988 |
| Government's Exhibit 743: Map of California showing the location of the cell site towers used by cell phone number (323) 428-1630, between 01/24/2002 at 8:44 p.m. and 01/25/2002 at 11:00 a.m. | JE-989 |
| Government's Exhibit 744: Chart showing cell usage and location, from billing records for cell phone number (310) 993-6748, between 01/24/2002 at 9:37 p.m. and 01/25/2002 at 11:36 a.m. | JE-990 |
| Government's Exhibit 745: Map of California showing the location of the cell site towers used by cell phone number (310) 993-6748, between 01/24/2002 at 9:37 p.m. and 01/25/2002 at 12:27p.m. | JE-991 |
| Government's Exhibit 746: AT&T Wireless subscriber information for cell phone number (310) 993-6748, subscribed to Iouri Mikhel | JE-992 |
| Government's Exhibit 747-A: AT&T Wireless bill for cell phone number (310) 993-6748, including coverage period 10/13/2001 and 10/14/2001 | JE-993 - 994 |
| Government's Exhibit 747-B: AT&T Wireless bill for cell phone number (310) 993-6748, including coverage period 12/05/2001 and 12/06/2001 | JE-995 - 997 |

**Exhibit 164 -  2594**

## APPENDIX B - Iouri Mikhel

| DESCRIPTION | BATES NO. |
| --- | --- |
| Government's Exhibit 747-C: AT&T Wireless bill for cell phone number (310) 993-6748, including coverage period 12/17/2001 and 12/18/2001 | JE-998 - 1000 |
| Government's Exhibit 747-D: AT&T Wireless bill for cell phone number (310) 993-6748 including coverage date 01/22/2002 | JE-1001 - 1003 |
| Government's Exhibit 748-A: AT&T Wireless macro cell billed usage records for phone number (310) 993-6748, regarding coverage period 10/13/2001 and 10/14/2001 | JE-1004 - 1005 |
| Government's Exhibit 748-B: AT&T Wireless macro cell billed usage records, for cell phone number (310) 993-6748, regarding coverage period 12/05/2001 and 12/06/2001 | JE-1006 - 1007 |
| Government's Exhibit 748-C: AT&T Wireless macro cell billed usage records, for cell phone number (310) 993-6748, regarding coverage period 12/17/2001 and 12/18/2001 | JE-1008 - 1010 |
| Government's Exhibit 749: AT&T Wireless subscriber activity records for cell phone number (310) 993-6748, regarding coverage period 01/01/2002 to 02/08/2002 | JE-1011 - 1023 |
| Government's Exhibit 750: Chart showing cell usage and location, from billing records for cell phone number (310) 993-6748, between 10/13/2001 at 7:58 a.m. and 10/14/2001 7:46 p.m. | JE-1024 |
| Government's Exhibit 751: Map of California showing the general location of the calls from cell phone (310) 993-6748 between 10/13/2001 at 7:58 p.m. and 10/14/2001 at 7:46 p.m. | JE-1025 |
| Government's Exhibit 752: Chart showing cell usage and location from billing records for cell phone number (310) 993-6748, between 12/5/2001 at 10:39 p.m. and 12/06/2001 at 8:01 p.m. | JE-1026 |
| Government's Exhibit 753: Map of California showing the general location of the calls from cell phone (310) 993-6748 between 12/05/2001 at 10:39 p.m. and 12/06/2001 at 8:01 p.m. | JE-1027 |
| Government's Exhibit 754: Chart showing cell usage and location, from billing records for cell phone number (310) 993-6748, between 12/17/2001 at 10:39 p.m. and 12/18/2001 at 10:52 a.m. | JE-1028 |

**Exhibit 164 -  2595**

**APPENDIX B - Iouri Mikhel**

| DESCRIPTION | BATES NO. |
|---|---|
| Government's Exhibit 755: Map of California showing the general location of the calls from cell phone (310) 993-6748 between 12/17/2001 at 09:28 p.m. and 12/18/2001 at 10:52 a.m. | JE-1029 |
| Government's Exhibit 756: Map of California showing the cell phone locations of Mikhel Iouri and Jurijus Kadmovas between 10/13/2001 and 10/14/2001, coinciding with the time of Meyer Muscatel's disappearance. Map also indicates usage of Mikhel's credit card at a Mobil gas station | JE-1030 |
| Government's Exhibit 757: Map of California showing the cell phone locations of Mikhel Iouri and Jurijus Kadmovas between 12/05/2001 and 12/06/2001, coinciding with the time of Rita Pekler's abduction | JE-1031 |
| Government's Exhibit 758: Map of California showing Mikhel Iouri's cell phone locations on 12/17/2001 and 12/182001, coinciding with the time of Alexander Umansky's disappearance | JE-1032 |
| Government's Exhibit 759:Map of California showing Mikhel Iouri's and Jurijus Kadmovas' cell phone locations on 01/24/2002 and 01/25/2002, coinciding with the time George Safiev and Nick Kharabadze disappeared | JE-1033 |
| Government's Exhibit 763: Subscriber information and call detail for telephone number (214) 673-1297, the phone Michael Umansky used to speak with his brother Alexander Umansky during ransom calls | JE-1034 – 1065 |
| Government's Exhibit 764: Subscriber information, toll records for telephone number (818) 262-3235, subscribed to Michael Umansky / Hard Wired. Phone was used by Irina Prishedko during recorded calls between her and Alexander Umansky | JE-1066 - 1080 |
| Government's Exhibit 765: Toll records for telephone number (818) 497-4337, covering the period of 12/01/2001 to 12/24/2001 | JE-1081 - 1085 |
| Government's Exhibit 766: AT&T prepaid calling card record relating to calling card access number (800) 648-9326 and pin 5552331384 | JE-1086 |
| Government's Exhibit 767: Chart depicting calls from calling card data: Calls from Snowmass Village, Colorado between 02/04/2002 at 10:51 p.m. and 02/05/2002 at 11:00 p.m. | JE-1087 |

**Exhibit 164 -  2596**

## APPENDIX B - Iouri Mikhel

| DESCRIPTION | BATES NO. |
|---|---|
| Government's Exhibit 770-C: Chart showing telephone contacts between the Iouri Mikhel and Vladimir Sobolev, emails and phone calls to Konstantinos Tezhik, and calls between Iouri Mikhel and Jurijus Kadamovas | JE-1088 - 1089 |
| Defendant's Exhibit 2068:Chart containing a summary of phone calls on 12/05/2001, to/from cell phone number (323) 428-1630, subscribed to Jurijus Kadamovas | JE-1090 - 1091 |
| Defendant's Exhibit 2069:Summary chart for cell phone number (323) 428-1630, subscribed to Jurijus Kadamovas, regarding telephone calls on 12/17/2001 and 12/18/2001 | JE-1092 - 1093 |
| Defendant's Exhibit 2070: Map of the San Fernando Valley | JE-1094 - 1096 |
| Reporter's Transcript Volume 33, 10/27/2006, (Testimony of James Davidson) | JE-1097 - 1152 |
| Reporter's Transcript Volume 43, 11/16/2006, (Testimony of Gary Bennett, Matthew Steele and Timothy Tomasello) | JE-1153 - 1287 |
| Reporter's Transcript, Volume 47, 12/01/2006, (Testimony of James Davidson) | JE-1288 - 1350 |
| Reporters Transcript Volume 48, 12/05/2006, (Testimony of James Davidson) | JE-1351 - 1522 |
| Reporters Transcript Volume 49, 12/06/2006, (Testimony of James Davidson) | JE-1523 - 1533 |
| Reporters Transcript Volume 54, 12/14/2006, (Testimony of James Davidson and Chris Nicely) | JE-1534 - 1578 |
| Record for telephone number (818) 268-9422, 02/13/2002, with page of handwritten notes re cell site info retrieval | JE-1579 - 1580 |
| Records of activity for telephone numbers (818) 404-1088, 01/02/2002 through 12/04/2002; (818) 599-9173, 01/02/2002 through 01/28/2002 | JE-1581 - 1585 |

**Exhibit 164 -  2597**

## APPENDIX B - Iouri Mikhel

| DESCRIPTION | BATES NO. |
|---|---|
| Discovery excerpt labeled "Muscatel materials[1]" containing telephone records and warrant to AT&T Wireless, including "Ping" locations and directory of cell sites in relation to telephone number (818) 585-8468 | JE-1586 - 1612 |
| FBI report attaching records from AT&T Wireless for telephone numbers (818) 599-9173; (818) 404-1088; (310) 993-6748, 02/11/2002 | JE-1613 - 1649 |
| FBI report attaching records provided in response to subpoena by AT&T Wireless for telephone number (323) 440-5756, 02/15/2002 | JE-1650 - 1654 |
| FBI report attaching records from AT&T Wireless for telephone number (818) 599-5305, 12/01/2001 through 01/28/2002 | JE-1655 - 1698 |
| FBI report attaching records from Cingular Wireless, in response to court order request, for telephone numbers (310) 384-9993; (310)748-4947; (310) 908-5467, 01/01/2002 to 02/05/2002. | JE-1699 - 1708 |
| FBI report attaching call to destination search records from Cingular Wireless in response to court order request, for telephone numbers (310) 908-9993; (818) 731-4324, with handwritten notes, 01/29/2002 | JE-1709 - 1711 |
| FBI reports attaching Sprint destination search records for telephone number (323) 845-9663; (818) 370-4536, 01/03/2002 | JE-1712 - 1723 |
| FBI report attaching records from Verizon Wireless for telephone number (323) 829-4484, 01/04/2002 | JE-1724 - 1744 |
| FBI report attaching Verizon toll records for telephone number (213) 507-6515 (Rita Pekler's cellphone), 11/01/2001 through 01/04/2002 | JE-1745 - 1771 |
| FBI report attaching records provided in response to subpoena by Cingular Wireless for telephone numbers (310) 908-9333; (818) 731-4324, 01/01/2002 through 01/25/2002 | JE-1772 - 1796 |

---

[1] Actually spelled "Muskatel Materials" in the document.

**Exhibit 164 - 2598**

## APPENDIX B - Iouri Mikhel

| DESCRIPTION | BATES NO. |
|---|---|
| FBI report attaching records provided in response to subpoena by AT&T Wireless for telephone number (323) 440-5756, 10/01/2001 through 02/18/2002 | JE-1797 - 1815 |
| FBI report attaching records provided in response to subpoena by Verizon California, Inc.'s for telephone numbers (818) 832-8087; (818) 360-6620; (818) 360-6691; (818) 834-2488; (818) 834-4208, (818) 897-8301, 12/10/2001 through 12/26/2001 | JE-1816 - 2004 |
| FBI report attaching records provided in response to subpoena by Sprint PCS for telephone number (818) 516-3198, 12/01/2001 through 01/03/2002 | JE-2005 - 2007 |
| FBI report attaching records provided in response to subpoena by Nextel Communications for telephone numbers (818) 262-6622; (818) 535-6100, 12/01/2001 through 01/10/2002 | JE-2008 - 2045 |
| FBI report attaching records from Nextel Communications, provided in response to subpoena, for telephone number (818) 262-3235; 12/10/2001 through 12/31/2001 | JE-2046 - 2062 |
| FBI report attaching records from Verizon Wireless, provided in response to subpoena, for telephone numbers (323) 654-7869; (310) 415-9630; (818) 631-1208; (213) 503-3235; (818) 521-7926, 02/05/2002 | JE-2063 - 2076 |
| FBI report attaching records from Pacific Bell, provided in response to subpoena, for telephone number (323) 931-3326, the main billing number for (323) 935-9222, 01/30/2002 | JE-2077 - 2177 |
| FBI report attaching records from Verizon Wireless, provided in response to subpoena, for telephone number (323) 829-2255, 01/07/2002 | JE-2178 - 2212 |
| FBI report attaching records from Pacific Bell, provided in response to subpoena, regarding telephone number (310) 247-1701, 01/01/2002 through 01/30/2002 | JE-2213 - 2255 |
| FBI report attaching records from Sprint Spectrum LP for telephone numbers (323) 252-6444; (818) 209-5204; (323) 252-6444; (818) 209-5204, 10/26/2001 through 01/24/2002 | JE-2256 - 2357 |

**Exhibit 164 -  2599**

## APPENDIX B - Iouri Mikhel

| DESCRIPTION | BATES NO. |
|---|---|
| FBI report attaching records from AT&T Wireless, provided in response to subpoena, for telephone number (214) 673-1297, 12/10/2001 through 01/31/2002 | JE-2358 - 2391 |
| FBI report attaching records from AT&T Wireless, provided in response to subpoena, for telephone number (818) 259-1740, 12/01/2001 through 12/19/2001 | JE-2392 - 2396 |
| FBI report attaching records from Sprint Spectrum LP, provided in response to subpoena, for telephone numbers (323) 270-5115; (818)209-3555, 10/01/2001 through 02/13/2002 | JE-2397 - 2652 |
| FBI report attaching records from Verizon Wireless for telephone number (213) 507-6515; (818) 370-4536; (323) 845-9663, 11/01/2001 through 01/03/2002 | JE-2653 - 2719 |
| FBI report attaching records from Cellco Partnership dba Verizon Wireless for telephone number (818) 903-0100, 11/01/2001 through 01/15/2002 | JE-2720 - 2732 |
| FBI report attaching records from Cellco Partnership dba Verizon Wireless for telephone number (818) 497-4337, 11/01/2001 through 01/11/2002 | JE-2733 - 2745 |
| FBI report attaching records from Pacific Bell/SBC for telephone numbers (818) 501-8148; (818) 996-3147, 11/01/2001 through 02/09/2002 | JE-2746 - 2827 |
| FBI report attaching records from Cingular Wireless for telephone numbers (818) 667-7420; (818) 667-7102, 02/25/2002 | JE-2828 - 2849 |
| FBI report attaching records from Cingular Wireless records for telephone number (213) 422-7468, 12/01/2001 | JE-2850 - 2856 |
| FBI report attaching records from Verizon Wireless for telephone number (818) 497-4337, 12/01/2001 through 12/20/2001 | JE-2857 - 2866 |
| FBI report attaching records from Cingular Wireless of search results re any Cingular Wireless telephones calling telephone numbers (818) 764-7855; (818) 764-6886; (415) 336-7876; (818) 226-2281; (818) 497-7337, 12/19/2002 | JE-2867 - 2870 |

**Exhibit 164 -  2600**

## APPENDIX B - Iouri Mikhel

| DESCRIPTION | BATES NO. |
|---|---|
| FBI report attaching records from Sprint of search results re any Sprint PCS telephone calling telephone numbers (818) 764-7855; (818) 764-6886;  (415) 336-7876; (818) 226-2281; (818) 497-7337, 12/26/2001 | JE-2871 - 2879 |
| FBI report attaching records from Nextel Communications of search results re any Nextel telephone calling telephone numbers (818) 764-7855; (818) 764-6886; (415) 336-7876; (818) 226-2281; (818) 497-7337, 12/19/2001 | JE-2880 - 2893 |
| FBI report attaching records from AT&T Wireless of search results re any AT&T Wireless telephone calling telephone numbers (818) 764-7855;  (818) 764-6886; (415) 336-7876; (818) 226-2281; (818) 497-7337, 12/19/2001 | JE-2894 - 2902 |
| FBI report attaching records from AT&T Wireless for telephone numbers (310) 993-6748; (818) 404-1088; (818) 599-9173 (Iouri Mikhel), 10/01/2001 through 02/04/2002 | JE-2903 - 2945 |
| FBI report attaching records from SBC/Pacific Bell for telephone numbers (818) 764-8550; (818) 764-7855; (818) 765-6886, 12/01/2001 through 12/19/2001 | JE-2946 - 3025 |
| FBI report attaching records from Verizon Wireless of search results re any Verizon  Wireless telephone calling telephone numbers (818) 764-7855;  (818) 764-6886; (415) 336-7876; (818) 226-2281; (818) 497-7337, 12/20/2001 | JE-3026 - 3036 |
| FBI report attaching records from AT&T Wireless for telephone number (818) 512-6724, 01/25/2002 | JE-3037 - 3063 |
| FBI report attaching records provided in response to subpoena by Verizon Wireless records regarding telephone numbers (213) 507-6515;  (818) 370-4536; (323) 845-9663, 01/04/2002 | JE-3064 - 3081 |
| FBI report attaching records provided in response to a court order by Verizon Wireless, regarding cell site information for telephone number (213) 507-6515 (Rita Pekler's cellphone), with handwritten notes, 01/07/2002 | JE-3082 - 3094 |

**Exhibit 164 -  2601**

## APPENDIX B - Iouri Mikhel

| DESCRIPTION | BATES NO. |
|---|---|
| FBI report attaching records provided in response to a court order by AT&T regarding cell site information for telephone number (818) 259-1740, 12/19/2001 | JE-3095 - 3098 |
| FBI report attaching records provided in response to subpoena by AT&T Wireless for telephone number (310) 993-6748, 01/01/1999 through  12/01/2001 | JE-3099 - 3354 |
| FBI report attaching records provided in response to subpoena by Cingular Wireless for telephone numbers (949) 370-4833; (760) 583-7518 from the time of activation through 03/12/2003 | JE-3355 - 3374 |
| FBI report regarding results of investigation on cell site information for telephone numbers (310) 993-6748; (818) 404-1088; (818) 599-9173, with attached records from Nextel, 06/10/2002 | JE-3375 - 3381 |
| FBI report attaching records received from Verizon Wireless for telephone number (323) 371-2707, 10/01/2001 through 02/21/2002 | JE-3382 - 3416 |
| FBI report of investigation attaching records provided in response to subpoena by Cingular Wireless for telephone numbers (310) 908-9993; (310) 731-4324, as well as subscriber information and cell site sector records for (310) 428-1630 | JE-3417 - 3555 |
| FBI report regarding receipt of raw switch data from Cingular Wireless, 05/13/2005 | JE-3556 - 3559 |
| FBI report of investigation with attached records received in response to subpoena from SBC Pacific Bell Telephone Company for telephone number (818) 884-1850, 01/29/2002 through 01/31/2002 | JE-3560 - 3598 |
| FBI report re information obtained from Jeanne Mulcahy, Manager at Cingular Wireless, National Compliance Center, formerly AT&T Wireless, regarding telephone number (310) 993-6748 (Iouri Mikhel' s cellphone) with attachments, 12/02/2005 | JE-3599 - 3641 |
| FBI report attaching records received in response to subpoena from Nextel for telephone number (818) 266-2281, 11/19/2001 through 12/19/2001 | JE-3642 - 3685 |

**Exhibit 164 -  2602**

## APPENDIX B - Iouri Mikhel

| DESCRIPTION | BATES NO. |
|---|---|
| FBI report of interview of Matt Steele, Manager of Message Processing at Cingular Wireless, 03/13/2006 | JE-3686 - 3693 |
| FBI report of investigation with attached cell site information provided by Jeanne Mulchahy (Cingular Wireless) for telephone numbers (310) 993-6748; (818) 585-8468; (818) 259-1740; (818) 519-3198, 04/20/2006 | JE-3694 - 3698 |
| FBI report of investigation attaching records from Cingular Wireless for phone numbers (310) 993-6748 (subscribed to Iouri Mikhel), from 02/09/2002 through 02/21/2002 and (323) 428-1630 (subscribed to Jurijus Kadamovas), 02/11/2002 through 02/18/2002 | JE-3699 - 3715 |
| FBI report regarding use of Cingular Wireless telephone (818) 268-9422, with exhibits, 07/26/2006 | JE-3716 - 3772 |
| Pen register data marked as "1D-57" for telephone numbers (214) 673-1297; (310) 908-9993; (818) 259-1740; (818) 268-9422; (818) 370-4536; (818) 516-3198; (818) 731-4324; (818) 262-3235; (818) 262-3251; (818) 266-2281 | JE-3773 - 3743 |
| Second Superseding Indictment, 07/29/2004 | JE-3744 - 3783 |
| Reporter's Transcript Volume 61 (Closing Arguments), 01/10/2007 | JE-3784 - 3995 |
| Reporter's Transcript Volume 62 (Closing Arguments), 01/11/2007 | JE-3996 - 4168 |
| Reporter's Transcript Volume 63 (Closing Arguments), 01/12/2007 | JE-4169 - 4338 |

**Exhibit 164 -  2603**