# EXHIBIT 165

<u>DECLARATION OF RICHARD CALLAHAN</u>

I, Richard Callahan, declare as follows:

1.      I represented Iouri Mikhel at his capital trial in federal district court. Shortly after my appointment, Dale Rubin was appointed as my co-counsel. I had never previously worked with Mr. Rubin. This was also my first capital trial.

2.      It has been over 16 years since Mr. Mikhel was sentenced to death. Because of the passage of time, my memory of this case is very limited.

3.      Before I opened my current criminal defense practice, I worked at the U.S. Attorney's Office in Los Angeles. While I was there, I worked with Nora Manella before she was appointed to be a federal district judge. I did not work with any of the prosecutors who tried the Mikhel case (Bob Dugdale, Kim Meyer or Susan DeWitt).

4.      Mr. Rubin brought Chris Filipiak on board as a fact investigator for the Mikhel team. Later on, Holly Jackson was added to the team as a mitigation specialist. I had never previously worked with Mr. Filipiak or Ms. Jackson.

5.      Mr. Mikhel's current counsel have informed me that Judge Manella refused to authorize funding for the services of a mitigation specialist before the DOJ's authorization decision. I have no recollection of Judge Manella's refusal to fund the services of a mitigation specialist while the authorization decision was still pending.

6.      Mr. Rubin took primary responsibility for preparing our authorization pitch to the DOJ. I have no real recollection of the correspondence we sent to the DOJ regarding the authorization decision. I do not recall doing a moot court or a dry run to prepare for these presentations.

7.      We had two meetings with DOJ regarding the authorization decision, one with the local U.S. Attorney's Office, and a second meeting with DOJ lawyers in Washington, D.C. I do

1

* Initials*

**Exhibit 165 - 2604**

not recall a change in strategy between the two meetings, but I have no firm recollection of our meeting with the local U.S. Attorney's Office. Going into the meeting with the DOJ in Washington, D.C., we were hopeful. I remember thinking that Mr. Rubin did a good job at the second meeting. But we got an icy reception from the attorneys in D.C. I was not surprised when they authorized this case.

8.       Before I was appointed, attorney Victor Sherman briefly represented Mr. Mikhel. He conflicted off this case because he was representing a co-defendant, Andrei Agueev. I recall that Mr. Mikhel continued to have a very high opinion of Mr. Sherman, even after he conflicted off the case. Mr. Mikhel's current counsel have informed me that Mr. Sherman continued to have regular meetings with Mr. Mikhel in jail after he was removed as his counsel. I have no specific recollection of this. However, I recall that Mr. Sherman told the court that he continued to represent Mr. Mikhel as his legal counsel in non-criminal matters after he was conflicted off the criminal case. I do not know anything about the scope of that representation. In a declaration filed with the district court, Mr. Sherman also represented to the court that he had obtained consent from me and Mr. Rubin to continue meeting with Mr. Mikhel. To my recollection, that was not true. I don't believe Mr. Sherman talked to me or Mr. Rubin about this.

9.       In preparation for trial, I took primary responsibility for the preparation of Mr. Mikhel's guilt-phase defense, and Mr. Rubin took primary responsibility for the penalty phase. However, Mr. Rubin had tried many capital cases in state court before this case. I relied on Mr. Rubin's expertise in forensics for the guilt-phase preparation as well. Our team retained a DNA expert, Norah Rudin, to evaluate the government's DNA evidence. I had never previously worked on a case that was so heavy with forensic science. For that reason, I really depended on Mr. Rubin's expertise; Mr. Rubin had more experience with forensics from his previous capital

2

Initials

Exhibit 165 - 2605

trials. Ms. Rudin was the only forensic expert that our team retained. We decided not to challenge much of this evidence, including the fingerprint evidence. I recall that Richard Lasting (counsel for Mr. Kadamovas) retained an expert to evaluate the cell site location data. I am not sure who he hired.

10. Working with Mr. Mikhel was remarkably interesting. Mr. Mikhel felt very comfortable talking about non-legal things, but he did not typically want to talk about the case. Mr. Mikhel often waxed poetic about "wine, women, and song." More than anything else, Mr. Mikhel liked to regale me with his history of connoisseurship and travels, even in the darkest moments of his existence. My preliminary approach was to get Mr. Mikhel comfortable so that he would be trusting enough to talk about the case later down the road. Despite this effort, most times I tried to talk about the case, Mr. Mikhel would steer our conversation away from it.

11. Mr. Mikhel tried to keep an even keel; he did not yell or lash out at his team. In my opinion, even though Mr. Mikhel appeared reserved, it was clear that his brain was going a million miles an hour. Mr. Mikhel got along well with the investigators, but he periodically was at odds with the attorneys.

12. I recall that the government alleged that Mr. Mikhel had attempted to escape from the MDC in Los Angeles. I do not recall suspecting MDC staff involvement in this attempt. I do not recall what we did to investigate this incident, and I have no memory of interviewing any of the alleged co-conspirators. The government additionally alleged that Mr. Mikhel also attempted to escape from the Central Detention Center in San Bernardino County. I have no recollection of what efforts we took to investigate this incident.

13. I recall that DOJ placed Mr. Mikhel under Special Administrative Measures ("SAMs") after an attempt to escape from MDC. SAMs resulted in Mr. Mikhel's complete

3


Initials

**Exhibit 165 - 2606**

isolation from all but his jailers and his legal team. These measures severely impacted Mr. Mikhel's mental health and impeded our efforts as his legal representatives. Mr. Mikhel's current counsel have informed me that DOJ justified its SAMs order by alleging that Mr. Mikhel had ties to the Russian mafia. I have no recollection of this. I did not follow the trial of Mr. Mikhel's co-defendant, Petro Krylov, which took place after Mr. Mikhel was sentenced to death. Mr. Mikhel's current counsel have informed me that at the Krylov trial, the government denied that Mr. Mikhel had any ties to the Russian mafia. Before discussing this case with Mr. Mikhel's current counsel, I was not aware that the government had taken inconsistent positions in his case and the Krylov trial.

14.     Working with Mr. Mikhel was like preparing a case with a client *in absentia.* SAMs conditions did not help. The jail treated Mr. Mikhel like he was Hannibal Lecter, wheeling him out to visits in a wheelchair with a sack over his head. The impact on Mr. Mikhel was obvious to me, even though Mr. Mikhel did not like to complain. I could tell Mr. Mikhel wasn't handling it well at all. I believe it impeded our ability to prepare for trial.

15.     I thought the isolation that SAMs imposed affected Mr. Mikhel's mental state and humiliated him. He decompensated more as time passed. Under SAMs, Mr. Mikhel was forced to write using a golf pencil and wide-lined paper. I recall that this embarrassed him. It was clearly infantilizing.

16.     I have no recollection of Mr. Mikhel complaining about any medication he was taking while he was in jail. I don't recall having concerns that Mr. Mikhel was hoarding or not taking his medication. I don't recall whether his medication affected my relationship with him.

17.     Mr. Mikhel attempted suicide three times during my representation of him. Before the first attempt, I have no recollection of any signs or "red flags" that he might be suicidal. After

4

*Initials*

**Exhibit 165 - 2607**

the first attempt, I had a moment where I wondered if Mr. Mikhel was just attempting to get transferred to a less secure prison or if he was just trying to get attention. Although I still had some doubts, I took his attempts at self-harm seriously.

18.    Before meeting with Mr. Mikhel's current counsel, I had only a vague recollection of his second suicide attempt, which involved pills. His current counsel reminded me that Mr. Mikhel took a massive overdose of psychiatric medication that he had hoarded over a long period of time. I am shocked that Mr. Mikhel managed to hoard pills while under SAMs restrictions, which entailed frequent cell searches.

19.    I recall Mr. Mikhel's third suicide attempt, which happened at the start of his guilt-phase trial. Mr. Mikhel attempted to hang himself. I understand he came to court with an obvious ligature mark on his neck, which could not be covered up by his clothing.

20.    Mr. Mikhel current counsel have informed me that a jail psychiatrist, Dr. Ralph Ihle, evaluated Mr. Mikhel after his third suicide attempt. I remember Dr. Ihle doing an examination, but I do not recall the outcome, and I have not recently reviewed his report.

21.    Other than Mr. Mikhel's case, I have had one other client attempt suicide. This was about one to two years after Mr. Mikhel's trial. I was pretty shaken up after that experience.

22.    My guilt phase strategy was to portray Mr. Mikhel as a sophisticated money launderer and to convince the jury that he was not responsible for the hands-on violence in this case. Carl Knudson, our forensic accountant, prepared charts of the financial transactions in this case. I thought Mr. Knudson's charts could have been useful to show the jury that the financial transactions in this case were relatively complex. But ultimately, both Mr. Knudson's testimony and the charts were excluded because they were not timely disclosed to the government.

5

*aue*
Initials

**Exhibit 165 - 2608**

23.     At the beginning of the guilt phase, I fell down a flight of stairs and suffered a serious head injury. I was hospitalized and treated for my injuries. Because of this injury, I continue to suffer near-total hearing loss in my left ear. Mr. Rubin moved for a continuance of the trial. Judge Tevrizian was angry at this request. He implied that I was faking my injuries to force another continuance of the trial. Judge Tevrizian examined my doctor in court about my condition to verify that I was actually injured.

24.     Before the Mikhel trial, I had previously appeared before Judge Tevrizian as defense counsel in other matters. After my injury, Judge Tevrizian treated me differently in court. I recall that Judge Tevrizian would interject during my examinations of witnesses, essentially "objecting" when the government had failed to do so. This was unnerving and frustrating for me. It also implied to the jury that I was doing something incorrect. I do not recall Judge Tevrizian interrupting the government's attorneys in the same manner.

25.     After my injury, I felt that Judge Tevrizian treated me so poorly in part because of what happened on the Krylov team. Mr. Mikhel's case was originally joined with the prosecution of his co-defendants Jurijus Kadamovas and Petro Krylov. Before trial, Mr. Krylov's counsel, David Evans, fell ill and had issues with his hearing. He requested a continuance and severance from Mr. Mikhel and Mr. Kadamovas because of his illness. I believe that Judge Tevrizian thought I was malingering because Mr. Evans had succeeded in using his illness to get a continuance in the Krylov trial.

26.     Near the end of the guilt phase of Mr. Mikhel's trial, we learned that Judge Tevrizian had applied to be the new U.S. Attorney for the Central District of California. Mr. Rubin and I moved to recuse Judge Tevrizian because of his application, which gave rise to an appearance of bias. Mr. Mikhel's current counsel have informed me that we filed this motion

6

Initials

Exhibit 165 - 2609

over a month after Judge Tevrizian's application to be the U.S. Attorney was publicized. I do not recall why we waited so long to file this motion.

27.     Mr. Mikhel decided to testify at the 11th hour. I attempted to dissuade him from testifying. So did other team members. I wrote a letter to Mr. Mikhel on the topic of his testimony. It included a laundry list of reasons why testifying was a bad idea. I wanted to impress on Mr. Mikhel that the prosecutor had spent years preparing for a potential cross-examination, and his testimony would be devastating for his credibility. Mr. Mikhel refused to budge on this. Ultimately, his testimony was disastrous. Being in court during Mr. Mikhel's testimony was like an out of body experience. I believe Mr. Mikhel came across as arrogant, and that his testimony probably alienated the jury.

28.     Mr. Mikhel was despondent after his testimony. He was even more depressed than he had been after he attempted suicide. Afterward, I remember seeing him in the lockup, and he seemed to be at his lowest point.

29.     The trial took place in Courtroom 890 of the Roybal building. Facing the bench from the well of the court, the government sat to the right (in front of the jury box) and the defense sat to the left. The Mikhel and Kadamovas teams had 2 separate tables, one in front of the other. Throughout the trial, the Kadamovas team sat behind the Mikhel team. At the Mikhel table, we were seated as follows (from left to right, facing the table from the well): Mr. Rubin / myself / Ms. Jackson / Mr. Mikhel.

30.     In addition to the entrance security at the courthouse, another metal detector was set up at the courtroom door, manned by four or five Marshals. I am not certain, but I seem to recall that this second metal detector was in place during voir dire. I believe Mr. Mikhel wore ankle chains throughout all phases of the trial.

7

Initials

Exhibit 165 - 2610

31.    We were never provided any jurors' names or identifying information. At all phases of jury selection and trial, the jury was fully anonymous. This means we had no way to investigate the prospective jurors' backgrounds. I do not believe this ever happened in any of my other trials. Mr. Mikhel's current counsel have informed me that Mr. Rubin and I did not object to the anonymous jury. I have no recollection of the factors behind that decision.

32.    The presence of the victims' families in the courtroom made this trial difficult. Mr. Umansky's father attended every day of the trial. Our team did not retain anyone to do victim outreach in this case.

I declare under penalty of perjury under the laws of the United States of America and of the State of California that the foregoing is true and correct.

DATED: 9/28/23

RICHARD CALLAHAN

8

Initials

**Exhibit 165 - 2611**

# EXHIBIT

# 166

N2M8SAI1                                                      2752

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

                v.                    17 Cr. 722 (VSB)

SAYFULLO HABIBULLAEVIC SAIPOV,

                Defendant.
                                      Trial
------------------------------x
                                      New York, N.Y.
                                      February 22, 2023
                                      12:10 p.m.

Before:

                    HON. VERNON S. BRODERICK,

                                      District Judge
                                      -and a Jury-

                        APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  AMANDA L. HOULE
     JASON A. RICHMAN
     ALEXANDER N. LI
     ANDREW S. DEMBER
     Assistant United States Attorneys

DAVID E. PATTON
     Federal Defenders of New York, Inc.
     Attorney for Defendant
BY:  DAVID E. PATTON
     SYLVIE J. LEVINE
     ANDREW J. DALACK
     ANNALISA MIRON
     -and-
ROTHMAN, SCHNEIDER, SOLOWAY & STERN, LLP
BY:  DAVID M. STERN
     -and-
RUHNKE & BARRETT
BY:  DAVID A. RUHNKE

                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

**Exhibit 166 -  2612**

N2M8SAI3                                                                2815

(Jury present)

THE COURT:  Welcome back, ladies and gentlemen.  I apologize for the delay.  I was dealing with some issues with the lawyers, and you know me, once I start jibber-jabbering, I don't stop.  So I apologize again for the delay.

Let's now proceed.

The government.

MS. HOULE:  Thank you, your Honor.

The government rests.

THE COURT:  Thank you very much.

The defense's first witness.

MR. STERN:  The defense calls Chris Synsvoll.

MS. HOULE:  Just one moment, your Honor.

(Continued on next page)

Exhibit 166 -  2613

N2M8SAI3                    Synsvoll - Direct                    2817

(In open court)

THE COURT:  Mr. Synsvoll, if I could ask you to remain standing.  My deputy clerk will administer the oath.

CHRIS SYNSVOLL,

     called as a witness by the defendant,

     having been duly sworn, testified as follows:

THE COURT:  You may be seated.

You can remove your mask.  I just ask that you state your name and spell it for the record.

THE WITNESS:  My name is Chris Synsvoll.  First name is spelled C-h-r-i-s, last name is spelled S-y-n-s-v-o-l-l.

THE COURT:  You may inquire.

DIRECT EXAMINATION

BY MR. STERN:

Q.  Good afternoon, Mr. Synsvoll.

A.  Good afternoon.

Q.  Mr. Synsvoll, where are you employed?

A.  I am employed by the Federal Bureau of Prisons, and I am physically assigned to the federal correctional complex in Florence, Colorado.

Q.  Tell me about your undergraduate education.

A.  I attended Augustana University, in Sioux Falls, South Dakota, graduating with a degree in business administration and philosophy.

Q.  After completing undergraduate school, did you go to any

**Exhibit 166 -  2614**

N2M8SAI3                     Synsvoll - Direct                2819

Q.   How did you like Philadelphia?

A.   It was definitely a culture shock having grown up and never left the state of South Dakota or the midwest before.  So I knew coming in, when they hired me on, they made it clear that you are going to be spending at least 10 to 12 months in a regional or central office; we are going to get you acclimated to practicing law within the Federal Bureau of Prisons.  And then we are going to ask that you go out to the field and work in an institution, to be the in-house counsel essentially for the staff and the warden at a specific institution.

Q.   Did you go out and try to get work at somewhere more like home?

A.   Yes.

Q.   Where did you go?

A.   So, not that I didn't enjoy my time in Philadelphia, but being from the midwest, there was an opportunity in Colorado. There was a position that was open for a staff attorney out there.  So I applied for that and was selected to be an attorney advisor at the federal correctional complex in Florence, Colorado in June of '99.

Q.   Do you still work there today?

A.   Yes, I do.

Q.   Other than your normal salary, are you getting paid to testify here?

A.   No, I am not.

**Exhibit 166 -  2615**

# EXHIBIT

# 167

<u>DECLARATION OF GEORGE M. BIRNBAUM</u>

I, GEORGE M. BIRNBAUM, declare as follows:

1.     I am a 74 year old owner of the building at 13605 Ventura Blvd., Los Angeles, California. I am also the owner of other buildings in the same general area of Los Angeles.

2.     Around June 2000 Dean Cutler, with the Piken Company, introduced me to Iouri Mikhel and Jurijus Kadamovas. They were interested in renting a place in one of my buildings. I had some issues with their address being a P.O. Box, which I brought up to Dean. Dean told me he believed there was a lot of upside in renting to them because he had looked at their financials. I ultimately ended up renting the above location to them for their business Designed Water World.

3.     I dealt almost exclusively with Iouri. I did not even know if Kadamovas spoke English. One time I walked down to the locksmith with Kadamovas and pointed out a fish store as possible competition. I wanted to see if Kadamovas spoke English. When he responded then I knew Kadamovas indeed did speak English.

4.     I was pleased with Iouri as a tenant. If a lawyer would have come to me and told me to start eviction proceedings on Iouri I would have said no way. In fact I wanted more tenants like him. The rent was paid on time, and they didn't complain. I had breakfast and lunch with Iouri, played pool at Designed Water World, and spoke to Iouri. Generally we talked about the nature of his business since it was a unique business. I never had any issues or bad feelings about Iouri.

5.     For example, there was an issue between a neighboring tenant of mine, Ian Reed, and Designed Water World. Ian Reed had some fear about the people who came to Designed Water World. The issue was not about Iouri or Kadamovas but other clients or friends and their cars parked in a way that blocked Ian's business. Ian was clear, no one ever did or said anything

<div align="center">1</div>

Initials

**Exhibit 167 -  2616**

to him. He simply said the clients or friends looked right through him. I ended up contacting Iouri about the parked cars blocking Ian Reed's spots. Iouri apologized and the cars were moved. Iouri even asked that I tell Ian that it would never happen again. That was the end of it.

6.    In 2006, the FBI interviewed me about my interactions with Iouri Mikhel and Jurijus Kadamovas. I provided the FBI with their lease and all related documents. I have talked with Alejandro Villaseñor, a Federal Investigator who showed me the FBI 302 which has the lease and all the attachments for a total of 49 pages, attached here as Appendix A.

7.    No one from Iouri Mikhel's trial defense team ever contacted me. If I had been contacted, I would have told them what I know and would have testified truthfully.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: 09/29/23

GEORGE V. BIRNBAUM

2

Initials

**Exhibit 167 - 2617**

# Appendix A

**Exhibit 167 -  2618**

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription     01/12/2006

George Birnbaum, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, owner of Designed Water World (DWW) building, 13605 Ventura Blvd., Los Angeles, California, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ was interviewed by Special Agent Cristy Taltavull with the Federal Bureau of Investigation and Special Agent Jose Gonzalez with the Internal Revenue Service. After being advised of the identities of the interviewing agents and the purpose of the interview, Birnbaum, provided the following information:

Birnbaum first met IOURI MIKHEL and JURIJUS KADAMOVAS through a broker, Dean Cutler with Piken Company. Birnbaum did not know how Cutler knew MIKHEL and KADAMOVAS. Cutler brought MIKHEL and KADAMOVAS to Birnbaum as potential tenants of 13605 Ventura Blvd., in approximately June 2000. Birnbaum, MIKHEL, and KADAMOVAS, had lunch together on a few occasions. Birnbaum played pool at Designed Water World on one occasion with MIKHEL.

Ian Reed rents the location neighboring DWW, 13607 and 13609 Ventura Blvd., ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. On several occasions, Reed had contacted Birnbaum with complaints about DWW. Reed told Birnbaum that he was scared of the occupants of DWW and Reed was concerned because DWW did not have any customers. On one occasion, Reed called Birnbaum and asked him to ask the tenants of DWW to move their car because it was blocking Reeds spot. Birnbaum wanted Reed to contact DWW himself, however, Reed said he was scared of them. Reed told Birnbaum that DWW had parties on Friday nights.

Birnbaum advised that MIKHEL and KADAMOVAS lived a very high life style. Birnbaum advised that MIKHEL and KADAMOVAS had gone on ski trips in a helicopter and traveled to Europe.

MIKHEL and KADAMOVAS generally paid rent on time. On one occasion rent was late, because they were out of the country, in England. (This trip to England was the second trip to England Birnbaum was aware of). When MIKHEL and KADAMOVAS returned from their trip they contacted Birnbaum regarding the late rent. They advised that they did not want this to happen again and requested to pay the entire years rent up-front. Birnbaum prepared a statement of this total amount of remaining rent, property taxes, utilities, and insurance, which totaled approximately $28,000.00.

Investigation on     1/11/2006     at  Los Angeles

File #  281H-LA-229714-302

Date dictated

by     SA Cristy Taltavull

**76155**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to

**Exhibit 167 -  2619**

FD-302a (Rev. 10-6-95)

281H-LA-229714-302

Continuation of FD-302 of ___George Birnbaum_____ , On _1/11/2006___ , Page __2__

This request to pay rent early was normal, however, Birnbaum thought it was unusual that MIKHEL and KADAMOVAS did not request a discount because the payment was in advance. Shortly after this payment was made by wire transfer, MIKHEL and KADAMOVAS were arrested. Birnbaum did not recall where the wire transfer originated from. Birmbaum received the wire transfer into his personal/business account with Bank of America.

After MIKHEL and KADAMOVAS were arrested, Birnbaum was contacted by Gitte Lellan, representing MIKHEL and KADAMOVAS to rent out DWW and to sell their homes. Later Lellan was replaced by Michael Chernykh to represent them for the lease of DWW. Chernykh was involved in the lease to the current tenant of 13605 Ventura Blvd. The current tenants signed a new lease with Birnbaum. The current lessee's of this location are Russian and Birnbaum does not know if they knew MIKHEL and KADAMOVAS.

On one occasion, Birnbaum walked with MIKHEL to a nearby locksmith to copy a key. In walking to the locksmith, they walked past a fish store and Birnbaum commented that the fish store may be competition for DWW, MIKHEL advised that he was not worried about competition because he has a unique product.

Birnbaum asked MIKHEL why they do not have many customers at DWW. MIKHEL advised that they designed the interior of DWW to entertain their customers and that their sales were primarily done on the internet.

In compliance with trial subpoena served on January 11, 2006, for all documents associated with Designed Water World, 13605 Ventura Blvd., Sherman Oaks, CA, IOURI MIKHEL, and JURIJUS KADAMOVAS, Birnbaum provided original documents which are enclosed in a 1A 666. In addition, a copy of these documents have been attached and made part of this report.

76156

**Exhibit 167 - 2620**

## DECLARATION

I,  GEORGE BIRNBAUM, declare as follows:

1. I am over 18 years of age and not a party to this action. I am familiar with the facts set forth herein, and could and would competently testify thereto if called as a witness.

2. My business address is  14359  ADDISON  ST,  SHERMAN  OAKS,  CA  91423

3. I am the duly authorized custodian of records of  PREMISES  LEASED  BY 13605 RIVERSIDE VENTURA, BL. DESIGN WORLD'  (hereinafter "the Company") and am the custodian of those records described in the subpoena or court order dated  DECEMBER  28, 2005 , from the United States of America, which are in the possession, custody or control of the Company.

4. The records produced with this declaration are try and correct copies of documents contained in the business records of personnel working for the Company, were prepared at or near the time of the acts, conditions or events recorded therein by, or from information transmitted by, a person with knowledge, were kept in the course of the Company's regularly conducted business activities, ant it was the regular practice of the Company to make the records.

5. I am making this declaration and producing the records in response to a subpoena which has been served upon me by the United States. I have delivered all of the records produced to an agent of the United States.

76157

**Exhibit 167 - 2621**

I declare under penalty or perjury under the laws of the United States of America that the foregoing is true and correct and that this Declaration was executed on ____1 | 1 8_____, 2006 at

__L.A._____,  __cA_____.
(city)                    (state)

_George Birnbaum_
Signature of Custodian

_GEORGE  BIRNBAUM_
Printed Name

76158

**Exhibit 167 -  2622**

Case 2:02-cr-00220-MCS    Document 2475-10    Filed 10/05/23    ID #:22282    Page 23 of 145    Page



76159

Exhibit 167 - 2623

## STANDARD INDUSTRIAL/COMMERCIAL MULTI-TENANT LEASE - NET
## AMERICAN INDUSTRIAL REAL ESTATE ASSOCIATION

1.  **Basic Provisions ("Basic Provisions").**
    1.1  Parties: This Lease ("Lease"), dated for reference purposes only _____ July 5 _____, 2000, is made by and between George Birnbaum _____

    _____ ("Lessor")

    and Designed Water World, Inc. / Mr. Jurijus Kadamovas / Mr. Iouri Mikhel _____

    _____

    _____ ("Lessee"), (collectively the "Parties", or individually a "Party").

    1.2(a)  Premises: That certain portion of the Project (as defined below), including all improvements therein or to be provided by Lessor under the terms of this Lease, commonly known by the street address of _____ 13605 Ventura Boulevard _____, located in the City of _____ Sherman Oaks _____, County of _____ Los Angeles _____, State of _____ California _____, with zip code ____ 91423 ____, as outlined on Exhibit ____ attached hereto ("Premises") and generally described as (describe briefly the nature of the Premises): Approximately 1,150 square feet of commercial space

    In addition to Lessee's rights to use and occupy the Premises as hereinafter specified, Lessee shall have non-exclusive rights to the Common Areas (as defined in Paragraph 2.7 below) as hereinafter specified, but shall not have any rights to the roof, exterior walls or utility raceways of the building containing the Premises ("Building") or to any other buildings in the Project. The Premises, the Building, the Common Areas, the land upon which they are located, along with all other buildings and improvements thereon, are herein collectively referred to as the "Project." (See also Paragraph 2)

    1.2(b)  Parking:  See Paragraph # 52  unreserved vehicle parking spaces ("Unreserved Parking Spaces"); and  See Paragraph # 52  reserved vehicle parking spaces ("Reserved Parking Spaces"). (See also Paragraph 2.6)

    1.3  Term:  Three (3)  years and  Two (2)  months ("Original Term") commencing  Upon substantial completion of Lessor's Tenant Improvement work  ("Commencement Date") and ending  Three (3) years and Two (2) months from Lessee's possession of Premises  ("Expiration Date"). (See also Paragraph 3)

    1.4  Early Possession: _____ None. _____ ("Early Possession Date"). (See also Paragraphs 3.2 and 3.3)

    1.5  Base Rent: $ 1,900.00  per month ("Base Rent"), payable on the _____ 1st _____ day of each month commencing on the commencement date. See Paragraph # 51 . (See also Paragraph 4)

    ☑ If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted.

    1.6  Lessee's Share of Common Area Operating Expenses: Twenty-Three and no/100 percent (23.00%) ("Lessee's Share").

    1.7  Base Rent and Other Monies Paid Upon Execution:
      (a)  Base Rent: $ 1,900.00  for the period  1st Month's Rent
      (b)  Common Area Operating Expenses: $ 345.00  for the period  of the first month
      (c)  Security Deposit: $ 1,900.00  ("Security Deposit"). (See also Paragraph 5)
      (d)  Other: $ _____ for _____

      (e)  Total Due Upon Execution of this Lease: $ 3,800.00 .

    1.8  Agreed Use: Retail sale of fish aquariums and related supplies to the general public

    _____ . (See also Paragraph 6)

    1.9  Insuring Party. Lessor is the "Insuring Party". (See also Paragraph 8)

    1.10  Real Estate Brokers: (See also Paragraph 15)
      (a)  Representation: The following real estate brokers (the "Brokers") and brokerage relationships exist in this transaction (check applicable boxes):
      ☐ _____ represents Lessor exclusively ("Lessor's Broker");
      ☐ _____ represents Lessee exclusively ("Lessee's Broker"); or
      ☑ _____ The Piken Company _____ represents both Lessor and Lessee ("Dual Agency").
      (b)  Payment to Brokers: Upon execution and delivery of this Lease by both Parties, Lessor shall pay to the Brokers the brokerage fee agreed to in a separate written agreement (or if there is no such agreement, the sum of _____ or _____ % of the total Base Rent for the brokerage services rendered by the Brokers).

    1.11  Guarantor. The obligations of the Lessee under this Lease are to be guaranteed by Mr. Jurijus Kadamovas and Mr. Iouri Mikhel ("Guarantor"). (See also Paragraph 37)

    1.12  Addenda and Exhibits. Attached hereto is an Addendum or Addenda consisting of Paragraphs  50  through  54  and Exhibits  A  through  B , all of which constitute a part of this Lease.

2.  **Premises.**
    2.1  Letting. Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Premises, for the term, at the rental, and upon all of the terms, covenants and conditions set forth in this Lease. Unless otherwise provided herein, any statement of size set forth in this Lease, or that may have been used in calculating Rent, is an approximation which the Parties agree is reasonable and any payments based thereon are not subject to revision whether or not the actual size is more or less.

    2.2  Condition. Lessor shall deliver that portion of the Premises contained within the Building ("Unit") to Lessee broom clean and free of debris on the Commencement Date or the Early Possession Date, whichever first occurs ("Start Date"), and, so long as the required service contracts described in Paragraph 7.1(b) below are obtained by Lessee and in effect within thirty days following the Start Date, warrants that the existing electrical, plumbing, fire sprinkler, lighting, heating, ventilating and air conditioning systems ("HVAC"), loading doors, if any, and all other such elements in the Unit, other than those constructed by Lessee, shall be in good operating condition on said date and that the structural elements of the roof, bearing walls and foundation of the Unit shall be free of material defects. If a non-compliance with such warranty exists as of the Start Date, or if one of such systems or elements should malfunction or fail within the appropriate warranty period, Lessor shall, as Lessor's sole obligation with respect to such matter, except as

Initials

Initials

otherwise provided in this Lease, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, malfunction or failure, rectify same at Lessor's expense. The warranty periods shall be as follows: (i) 6 months as to the HVAC systems, and (ii) 30 days as to the remaining systems and other elements of the Unit. If Lessee does not give Lessor the required notice within the appropriate warranty period, correction of any such non-compliance, malfunction or failure shall be the obligation of Lessee at Lessee's sole cost and expense (except for the repairs to the fire sprinkler systems, roof, foundations, and/or bearing walls - see Paragraph 7).

2.3 Compliance. Lessor warrants that the improvements on the Premises and the Common Areas comply with the building codes that were in effect at the time that each such improvement, or portion thereof, was constructed, and also with all applicable laws, covenants or restrictions of record, regulations, and ordinances in effect on the Start Date ("Applicable Requirements"). Said warranty does not apply to the use to which Lessee will put the Premises or to any Alterations or Utility Installations (as defined in Paragraph 7.3(a)) made or to be made by Lessee. NOTE: Lessee is responsible for determining whether or not the Applicable Requirements, and especially the zoning, are appropriate for Lessee's intended use, and acknowledges that past uses of the Premises may no longer be allowed. If the Premises do not comply with said warranty, Lessor shall, except as otherwise provided, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, rectify the same at Lessor's expense. If Lessee does not give Lessor written notice of a non-compliance with this warranty within 6 months following the Start Date, correction of that non-compliance shall be the obligation of Lessee at Lessee's sole cost and expense. If the Applicable Requirements are hereafter changed so as to require during the term of this Lease the construction of an addition to or an alteration of the Unit, Premises and/or Building, the remediation of any Hazardous Substance, or the reinforcement or other physical modification of the Unit, Premises and/or Building ("Capital Expenditure"), Lessor and Lessee shall allocate the cost of such work as follows:

(a) Subject to Paragraph 2.3(c) below, if such Capital Expenditures are required as a result of the specific and unique use of the Premises by Lessee as compared with uses by tenants in general, Lessee shall be fully responsible for the cost thereof, provided, however that if such Capital Expenditure is required during the last 2 years of this Lease and the cost thereof exceeds 6 months' Base Rent, Lessee may instead terminate this Lease unless Lessor notifies Lessee, in writing, within 10 days after receipt of Lessee's termination notice that Lessor has elected to pay the difference between the actual cost thereof and the amount equal to 6 months' Base Rent. If Lessee elects termination, Lessee shall immediately cease the use of the Premises which requires such Capital Expenditure and deliver to Lessor written notice specifying a termination date at least 90 days thereafter. Such termination date shall, however, in no event be earlier than the last day that Lessee could legally utilize the Premises without commencing such Capital Expenditure.

(b) If such Capital Expenditure is not the result of the specific and unique use of the Premises by Lessee (such as, governmentally mandated seismic modifications), then Lessor and Lessee shall allocate the obligation to pay for the portion of such costs reasonably attributable to the Premises pursuant to the formula set out in Paragraph 7.1(d); provided, however, that if such Capital Expenditure is required during the last 2 years of this Lease or if Lessor reasonably determines that it is not economically feasible to pay its share thereof, Lessor shall have the option to terminate this Lease upon 90 days prior written notice to Lessee unless Lessee notifies Lessor, in writing, within 10 days after receipt of Lessor's termination notice that Lessee will pay for such Capital Expenditure. If Lessor does not elect to terminate, and fails to tender its share of any such Capital Expenditure, Lessee may advance such funds and deduct same, with Interest, from Rent until Lessor's share of such costs have been fully paid. If Lessee is unable to finance Lessor's share, or if the balance of the Rent due and payable for the remainder of this Lease is not sufficient to fully reimburse Lessee on an offset basis, Lessee shall have the right to terminate this Lease upon 30 days written notice to Lessor.

(c) Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to non-voluntary, unexpected, and new Applicable Requirements. If the Capital Expenditures are instead triggered by Lessee as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises then, and in that event, Lessee shall be fully responsible for the cost thereof, and Lessee shall not have any right to terminate this Lease.

2.4 Acknowledgements. Lessee acknowledges that: (a) it has been advised by Lessor and/or Brokers to satisfy itself with respect to the condition of the Premises (including but not limited to the electrical, HVAC and fire sprinkler systems, security, environmental aspects, and compliance with Applicable Requirements and the Americans with Disabilities Act), and their suitability for Lessee's intended use, (b) Lessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to its occupancy of the Premises, and (c) neither Lessor, Lessor's agents, nor Brokers have made any oral or written representations or warranties with respect to said matters other than as set forth in this Lease. In addition, Lessor acknowledges that: (i) Brokers have made no representations, promises or warranties concerning Lessee's ability to honor the Lease or suitability to occupy the Premises, and (ii) it is Lessor's sole responsibility to investigate the financial capability and/or suitability of all proposed tenants.

2.5 Lessee as Prior Owner/Occupant. The warranties made by Lessor in Paragraph 2 shall be of no force or effect if immediately prior to the Start Date Lessee was the owner or occupant of the Premises. In such event, Lessee shall be responsible for any necessary corrective work.

2.6 Vehicle Parking. Lessee shall be entitled to use the number of Unreserved Parking Spaces and Reserved Parking Spaces specified in Paragraph 1.2(b) on those portions of the Common Areas designated from time to time by Lessor for parking. Lessee shall not use more parking spaces than said number. Said parking spaces shall be used for parking by vehicles no larger than full-size passenger automobiles or pick-up trucks, herein called "Permitted Size Vehicles." Lessor may regulate the loading and unloading of vehicles by adopting Rules and Regulations as provided in Paragraph 2.9. No vehicles other than Permitted Size Vehicles may be parked in the Common Area without the prior written permission of Lessor.

(a) Lessee shall not permit or allow any vehicles that belong to or are controlled by Lessee or Lessee's employees, suppliers, shippers, customers, contractors or invitees to be loaded, unloaded, or parked in areas other than those designated by Lessor for such activities.

(b) Lessee shall not service or store any vehicles in the Common Areas.

(c) If Lessee permits or allows any of the prohibited activities described in this Paragraph 2.6, then Lessor shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove or tow away the vehicle involved and charge the cost to Lessee, which cost shall be immediately payable upon demand by Lessor.

2.7 Common Areas - Definition. The term "Common Areas" is defined as all areas and facilities outside the Premises and within the exterior boundary line of the Project and interior utility raceways and installations within the Unit that are provided and designated by the Lessor from time to time for the general non-exclusive use of Lessor, Lessee and other tenants of the Project and their respective employees, suppliers, shippers, customers, contractors and invitees, including parking areas, loading and unloading areas, trash areas, roadways, walkways, driveways and landscaped areas.

2.8 Common Areas - Lessee's Rights. Lessor grants to Lessee, for the benefit of Lessee and its employees, suppliers, shippers, contractors, customers and invitees, during the term of this Lease, the non-exclusive right to use, in common with others entitled to such use, the Common Areas as they exist from time to time, subject to any rights, powers, and privileges reserved by Lessor under the terms hereof or under the terms of any rules and regulations or restrictions governing the use of the Project. Under no circumstances shall the right herein granted to use the Common Areas be deemed to include the right to store any property, temporarily or permanently, in the Common Areas. Any such storage shall be permitted only by the prior written consent of Lessor or Lessor's designated agent, which consent may be revoked at any time. In the event that any unauthorized storage shall occur then Lessor shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove the property and charge the cost to Lessee, which cost shall be immediately payable upon demand by Lessor.

2.9 Common Areas - Rules and Regulations. Lessor or such other person(s) as Lessor may appoint shall have the exclusive control and management of the Common Areas and shall have the right, from time to time, to establish, modify, amend and enforce reasonable rules and regulations ("Rules and Regulations") for the management, safety, care, and cleanliness of the grounds, the parking and unloading of vehicles and the preservation of good order, as well as for the convenience of other occupants or tenants of the Building and the Project and their invitees. Lessee agrees to abide by and conform to all such Rules and Regulations, and to cause its employees, suppliers, shippers, customers, contractors and invitees to so abide and conform. Lessor shall not be responsible to Lessee for the non-compliance with said Rules and Regulations by other tenants of the Project.

2.10 Common Areas - Changes. Lessor shall have the right, in Lessor's sole discretion, from time to time:

(a) To make changes to the Common Areas, including, without limitation, changes in the location, size, shape and number of driveways, entrances, parking spaces, parking areas, loading and unloading areas, ingress, egress, direction of traffic, landscaped areas, walkways and utility raceways;

(b) To close temporarily any of the Common Areas for maintenance purposes so long as reasonable access to the Premises remains available;

(c) To designate other land outside the boundaries of the Project to be a part of the Common Areas;

(d) To add additional buildings and improvements to the Common Areas;

(e) To use the Common Areas while engaged in making additional improvements, repairs or alterations to the Project, or any portion thereof; and

(f) To do and perform such other acts and make such other changes in, to or with respect to the Common Areas and Project as Lessor may, in the exercise of sound business judgment, deem to be appropriate.

3. Term.

3.1 Term. The Commencement Date, Expiration Date and Original Term of this Lease are as specified in Paragraph 1.3.

3.2 Early Possession. If Lessee totally or partially occupies the Premises prior to the Commencement Date, the obligation to pay Base Rent shall be abated for the period of such early possession. All other terms of this Lease (including but not limited to the obligations to pay Lessee's Share of Common Area Operating Expenses, Real Property Taxes and insurance premiums and to maintain the Premises) shall, however, be in effect during such

Initials Initials

76160

Exhibit 167 - 2625

76161

period. Any such early possession shall not affect the Expiration Date.

3.3    Delay in Possession. Lessor agrees to use its best commercially reasonable efforts to deliver possession of the Premises to Lessee by the Commencement Date. If, despite said efforts, Lessor is unable to deliver possession as agreed, Lessor shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease. Lessee shall not, however, be obligated to pay Rent or perform its other obligations until it receives possession of the Premises. If possession is not delivered within 60 days after the Commencement Date, Lessee may, at its option, by notice in writing within 10 days after the end of such 60 day period, cancel this Lease, in which event the Parties shall be discharged from all obligations hereunder. If such written notice is not received by Lessor within said 10 day period, Lessee's right to cancel shall terminate. Except as otherwise provided, if possession is not tendered to Lessee by the Start Date and Lessee does not terminate this Lease, as aforesaid, any period of rent abatement that Lessee would otherwise have enjoyed shall run from the date of delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed under the terms hereof, but minus any days of delay caused by the acts or omissions of Lessee. If possession of the Premises is not delivered within 4 months after the Commencement Date, this Lease shall terminate unless other agreements are reached between Lessor and Lessee, in writing.

3.4    Lessee Compliance. Lessor shall not be required to tender possession of the Premises to Lessee until Lessee complies with its obligation to provide evidence of insurance (Paragraph 8.5). Pending delivery of such evidence, Lessee shall be required to perform all of its obligations under this Lease from and after the Start Date, including the payment of Rent, notwithstanding Lessor's election to withhold possession pending receipt of such evidence of insurance. Further, if Lessee is required to perform any other conditions prior to or concurrent with the Start Date, the Start Date shall occur but Lessor may elect to withhold possession until such conditions are satisfied.

4.    Rent.

4.1    Rent Defined. All monetary obligations of Lessee to Lessor under the terms of this Lease (except for the Security Deposit) are deemed to be rent ("Rent").

4.2    Common Area Operating Expenses. Lessee shall pay to Lessor during the term hereof, in addition to the Base Rent, Lessee's Share (as specified in Paragraph 1.6) of all Common Area Operating Expenses, as hereinafter defined, during each calendar year of the term of this Lease, in accordance with the following provisions:

(a)    "Common Area Operating Expenses" are defined, for purposes of this Lease, as all costs incurred by Lessor relating to the ownership and operation of the Project, including, but not limited to, the following:

(i)    The operation, repair and maintenance, in neat, clean, good order and condition of the following:

(aa)    The Common Areas and Common Area Improvements, including parking areas, loading and unloading areas, trash areas, roadways, parkways, walkways, driveways, landscaped areas, bumpers, irrigation systems, Common Area lighting facilities, fences and gates, elevators, roofs, and roof drainage systems.

(bb)    Exterior signs and any tenant directories.

(cc)    Any fire detection and/or sprinkler systems.

(ii)    The cost of water, gas, electricity and telephone to service the Common Areas and any utilities not separately metered.

(iii)    Trash disposal, pest control services, property management, security services, and the costs of any environmental inspections.

(iv)    Reserves set aside for maintenance and repair of Common Areas.

(v)    Real Property Taxes (as defined in Paragraph 10).

(vi)    The cost of the premiums for the insurance maintained by Lessor pursuant to Paragraph 8.

(vii)    Any deductible portion of an insured loss concerning the Building or the Common Areas.

(viii)    The cost of any Capital Expenditure to the Building or the Project not covered under the provisions of Paragraph 2.3 provided; however, that Lessor shall allocate the cost of any such Capital Expenditure over a 12 year period and Lessee shall not be required to pay more than Lessee's Share of 1/144th of the cost of such Capital Expenditure in any given month.

(ix)    Any other services to be provided by Lessor that are stated elsewhere in this Lease to be a Common Area Operating Expense.

(b)    Any Common Area Operating Expenses and Real Property Taxes that are specifically attributable to the Unit, the Building or to any other building in the Project or to the operation, repair and maintenance thereof, shall be allocated entirely to such Unit, Building, or other building. However, any Common Area Operating Expenses and Real Property Taxes that are not specifically attributable to the Building or to any other building or to the operation, repair and maintenance thereof, shall be equitably allocated by Lessor to all buildings in the Project.

(c)    The inclusion of the improvements, facilities and services set forth in Subparagraph 4.2(a) shall not be deemed to impose an obligation upon Lessor to either have said improvements or facilities or to provide those services unless the Project already has the same, Lessor already provides the services, or Lessor has agreed elsewhere in this Lease to provide the same or some of them.

(d)    Lessee's Share of Common Area Operating Expenses shall be payable by Lessee within 10 days after a reasonably detailed statement of actual expenses is presented to Lessee. At Lessor's option, however, an amount may be estimated by Lessor from time to time of Lessee's Share of annual Common Area Operating Expenses and the same shall be payable monthly or quarterly, as Lessor shall designate, during each 12 month period of the Lease term, on the same day as the Base Rent is due hereunder. Lessor shall deliver to Lessee within 60 days after the expiration of each calendar year a reasonably detailed statement showing Lessee's Share of the actual Common Area Operating Expenses incurred during the preceding year. If Lessee's payments under this Paragraph 4.2(d) during the preceding year exceed Lessee's Share as indicated on such statement, Lessor shall credit the amount of such over-payment against Lessee's Share of Common Area Operating Expenses next becoming due. If Lessee's payments under this Paragraph 4.2(d) during the preceding year were less than Lessee's Share as indicated on such statement, Lessee shall pay to Lessor the amount of the deficiency within 10 days after delivery by Lessor to Lessee of the statement.

4.3    Payment. Lessee shall cause payment of Rent to be received by Lessor in lawful money of the United States, without offset or deduction (except as specifically permitted in this Lease), on or before the day on which it is due. Rent for any period during the term hereof which is for less than one full calendar month shall be prorated based upon the actual number of days of said month. Payment of Rent shall be made to Lessor at its address stated herein or to such other persons or place as Lessor may from time to time designate in writing. Acceptance of a payment which is less than the amount then due shall not be a waiver of Lessor's rights to the balance of such Rent, regardless of Lessor's endorsement of any check so stating. In the event that any check, draft, or other instrument of payment given by Lessee to Lessor is dishonored for any reason, Lessee agrees to pay to Lessor the sum of $25 in addition to any late charges which may be due.

5.    Security Deposit. Lessee shall deposit with Lessor upon execution hereof the Security Deposit as security for Lessee's faithful performance of its obligations under this Lease. If Lessee fails to pay Rent, or otherwise Defaults under this Lease, Lessor may use, apply or retain all or any portion of said Security Deposit for the payment of any amount due Lessor or to reimburse or compensate Lessor for any liability, expense, loss or damage which Lessor may suffer or incur by reason thereof. If Lessor uses or applies all or any portion of the Security Deposit, Lessee shall within 10 days after written request therefor deposit monies with Lessor sufficient to restore said Security Deposit to the full amount required by this Lease. If the Base Rent increases during the term of this Lease, Lessee shall, upon written request from Lessor, deposit additional monies with Lessor so that the total amount of the Security Deposit shall at all times bear the same proportion to the increased Base Rent as the initial Security Deposit bore to the initial Base Rent. Should the Agreed Use be amended to accommodate a material change in the business of Lessee or to accommodate a sublessee or assignee, Lessor shall have the right to increase the Security Deposit to the extent necessary, in Lessor's reasonable judgment, to account for any increased wear and tear that the Premises may suffer as a result thereof. If a change in control of Lessee occurs during this Lease and following such change the financial condition of Lessee is, in Lessor's reasonable judgment, significantly reduced, Lessee shall deposit such additional monies with Lessor as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on such change in financial condition. Lessor shall not be required to keep the Security Deposit separate from its general accounts. Within 14 days after the expiration or termination of this Lease, if Lessor elects to apply the Security Deposit only to unpaid Rent, and otherwise within 30 days after the Premises have been vacated pursuant to Paragraph 7.4(c) below, Lessor shall return that portion of the Security Deposit not used or applied by Lessor. No part of the Security Deposit shall be considered to be held in trust, to bear interest or to be prepayment for any monies to be paid by Lessee under this Lease.

6.    Use.

6.1    Use. Lessee shall use and occupy the Premises only for the Agreed Use, or any other legal use which is reasonably comparable thereto, and for no other purpose. Lessee shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste or a nuisance, or that disturbs occupants of or causes damage to neighboring premises or properties. Lessor shall not unreasonably withhold or delay its consent to any written request for a modification of the Agreed Use, so long as the same will not impair the structural integrity of the improvements on the Premises or the mechanical or electrical systems therein, and/or is not significantly more burdensome to the Premises. If Lessor elects to withhold consent, Lessor shall within 7 days after such request give written notification of same, which notice shall include an explanation of Lessor's objections to the change in the Agreed Use.

6.2    Hazardous Substances.

(a)    Reportable Uses Require Consent. The term "Hazardous Substance" as used in this Lease shall mean any product, substance, or waste whose presence, use, manufacture, disposal, transportation, or release, either by itself or in combination with other materials expected to





Initials

Initials

76162

Exhibit 167 - 2626

be on the Premises, is either: (i) potentially injurious to the public health, safety or welfare, the environment or the Premises, (ii) regulated or monitored by any governmental authority, or (iii) a basis for potential liability of Lessor to any governmental agency or third party under any applicable statute or common law theory. Hazardous Substances shall include, but not be limited to, hydrocarbons, petroleum, gasoline, and/or crude oil or any products, by-products or fractions thereof. Lessee shall not engage in any activity in or on the Premises which constitutes a Reportable Use of Hazardous Substances without the express prior written consent of Lessor and timely compliance (at Lessee's expense) with all Applicable Requirements. "Reportable Use" shall mean (i) the installation or use of any above or below ground storage tank, (ii) the generation, possession, storage, use, transportation, or disposal of a Hazardous Substance that requires a permit from, or with respect to which a report, notice, registration or business plan is required to be filed with, any governmental authority, and/or (iii) the presence at the Premises of a Hazardous Substance with respect to which any Applicable Requirements requires that a notice be given to persons entering or occupying the Premises or neighboring properties. Notwithstanding the foregoing, Lessee may use any ordinary and customary materials reasonably required to be used in the normal course of the Agreed Use, so long as such use is in compliance with all Applicable Requirements, is not a Reportable Use, and does not expose the Premises or neighboring property to any meaningful risk of contamination or damage or expose Lessor to any liability therefor. In addition, Lessor may condition its consent to any Reportable Use upon receiving such additional assurances as Lessor reasonably deems necessary to protect itself, the public, the Premises and/or the environment against damage, contamination, injury and/or liability, including, but not limited to, the installation (and removal on or before Lease expiration or termination) of protective modifications (such as concrete encasements) and/or increasing the Security Deposit.

(b)       Duty to Inform Lessor. If Lessee knows, or has reasonable cause to believe, that a Hazardous Substance has come to be located in, on, under or about the Premises, other than as previously consented to by Lessor, Lessee shall immediately give written notice of such fact to Lessor, and provide Lessor with a copy of any report, notice, claim or other documentation which it has concerning the presence of such Hazardous Substance.

(c)       Lessee Remediation. Lessee shall not cause or permit any Hazardous Substance to be spilled or released in, on, under, or about the Premises (including through the plumbing or sanitary sewer system) and shall promptly, at Lessee's expense, take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the cleanup of any contamination of, and for the maintenance, security and/or monitoring of the Premises or neighboring properties, that was caused or materially contributed to by Lessee, or pertaining to or involving any Hazardous Substance brought onto the Premises during the term of this Lease, by or for Lessee, or any third party.

(d)       Lessee Indemnification. Lessee shall indemnify, defend and hold Lessor, its agents, employees, lenders and ground lessor, if any, harmless from and against any and all loss of rents and/or damages, liabilities, judgments, claims, expenses, penalties, and attorneys' and consultants' fees arising out of or involving any Hazardous Substance brought onto the Premises by or for Lessee, or any third party (provided, however, that Lessee shall have no liability under this Lease with respect to underground migration of any Hazardous Substance under the Premises from areas outside of the Project). Lessee's obligations shall include, but not be limited to, the effects of any contamination or injury to person, property or the environment created or suffered by Lessee, and the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease. No termination, cancellation or release agreement entered into by Lessor and Lessee shall release Lessee from its obligations under this Lease with respect to Hazardous Substances, unless specifically so agreed by Lessor in writing at the time of such agreement.

(e)       Lessor Indemnification. Lessor and its successors and assigns shall indemnify, defend, reimburse and hold Lessee, its employees and lenders, harmless from and against any and all environmental damages, including the cost of remediation, which existed as a result of Hazardous Substances on the Premises prior to the Start Date or which are caused by the gross negligence or willful misconduct of Lessor, its agents or employees. Lessor's obligations, as and when required by the Applicable Requirements, shall include, but not be limited to, the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.

(f)       Investigations and Remediations. Lessor shall retain the responsibility and pay for any investigations or remediation measures required by governmental entities having jurisdiction with respect to the existence of Hazardous Substances on the Premises prior to the Start Date, unless such remediation measure is required as a result of Lessee's use (including "Alterations", as defined in paragraph 7.3(a) below) of the Premises, in which event Lessee shall be responsible for such payment. Lessee shall cooperate fully in any such activities at the request of Lessor, including allowing Lessor and Lessor's agents to have reasonable access to the Premises at reasonable times in order to carry out Lessor's investigative and remedial responsibilities.

(g) Lessor Termination Option. If a Hazardous Substance Condition (see Paragraph 9.1(e)) occurs during the term of this Lease, unless Lessee is legally responsible therefor (in which case Lessee shall make the investigation and remediation thereof required by the Applicable Requirements and this Lease shall continue in full force and effect, but subject to Lessor's rights under Paragraph 6.2(d) and Paragraph 13), Lessor may, at Lessor's option, either (i) investigate and remediate such Hazardous Substance Condition, if required, as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) if the estimated cost to remediate such condition exceeds 12 times the then monthly Base Rent or $100,000, whichever is greater, give written notice to Lessee, within 30 days after receipt by Lessor of knowledge of the occurrence of such Hazardous Substance Condition, of Lessor's desire to terminate this Lease as of the date 60 days following the date of such notice. In the event Lessor elects to give a termination notice, Lessee may, within 10 days thereafter, give written notice to Lessor of Lessee's commitment to pay the amount by which the cost of the remediation of such Hazardous Substance Condition exceeds an amount equal to 12 times the then monthly Base Rent or $100,000, whichever is greater. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days following such commitment. In such event, this Lease shall continue in full force and effect, and Lessor shall proceed to make such remediation as soon as reasonably possible after the required funds are available. If Lessee does not give such notice and provide the required funds or assurance thereof within the time provided, this Lease shall terminate as of the date specified in Lessor's notice of termination.

6.3       Lessee's Compliance with Applicable Requirements. Except as otherwise provided in this Lease, Lessee shall, at Lessee's sole expense, fully, diligently and in a timely manner, materially comply with all Applicable Requirements, the requirements of any applicable fire insurance underwriter or rating bureau, and the recommendations of Lessor's engineers and/or consultants which relate in any manner to the Premises, without regard to whether said requirements are now in effect or become effective after the Start Date. Lessee shall, within 10 days after receipt of Lessor's written request, provide Lessor with copies of all permits and other documents, and other information evidencing Lessee's compliance with any Applicable Requirements specified by Lessor, and shall immediately upon receipt, notify Lessor in writing (with copies of any documents involved) of any threatened or actual claim, notice, citation, warning, complaint or report pertaining to or involving the failure of Lessee or the Premises to comply with any Applicable Requirements.

6.4       Inspection; Compliance. Lessor and Lessor's "Lender" (as defined in Paragraph 30) and consultants shall have the right to enter into Premises at any time, in the case of an emergency, and otherwise at reasonable times, for the purpose of inspecting the condition of the Premises and for verifying compliance by Lessee with this Lease. The cost of any such inspections shall be paid by Lessor, unless a violation of Applicable Requirements, or a contamination is found to exist or be imminent, or the inspection is requested or ordered by a governmental authority. In such case, Lessee shall upon request reimburse Lessor for the cost of such inspection, so long as such inspection is reasonably related to the violation or contamination.

7.       Maintenance; Repairs, Utility Installations; Trade Fixtures and Alterations.

7.1       Lessee's Obligations.

(a)       In General. Subject to the provisions of Paragraph 2.2 (Condition), 2.3 (Compliance), 6.3 (Lessee's Compliance with Applicable Requirements), 7.2 (Lessor's Obligations), 9 (Damage or Destruction), and 14 (Condemnation), Lessee shall, at Lessee's sole expense, keep the Premises, Utility Installations (intended for Lessee's exclusive use, no matter where located), and Alterations in good order, condition and repair (whether or not the portion of the Premises requiring repairs, or the means of repairing the same, are reasonably or readily accessible to Lessee, and whether or not the need for such repairs occurs as a result of Lessee's use, any prior use, the elements or the age of such portion of the Premises), including, but not limited to, all equipment or facilities, such as plumbing, HVAC equipment, electrical, lighting facilities, boilers, pressure vessels, fixtures, interior walls, interior surfaces of exterior walls, ceilings, floors, windows, doors, plate glass, and skylights but excluding any items which are the responsibility of Lessor pursuant to Paragraph 7.2. Lessee, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices, specifically including the procurement and maintenance of the service contracts required by Paragraph 7.1(b) below. Lessee's obligations shall include restorations, replacements or renewals when necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition and state of repair.

(b)       Service Contracts. Lessee shall, at Lessee's sole expense, procure and maintain contracts, with copies to Lessor, in customary form and substance for, and with contractors specializing and experienced in the maintenance of the following equipment and improvements, if any, if and when installed on the Premises: (i) HVAC equipment, (ii) boiler and pressure vessels, (iii) clarifiers, and (iv) any other equipment, if reasonably required by Lessor. However, Lessor reserves the right, upon notice to Lessee, to procure and maintain any or all of such service contracts, and if Lessor so elects, Lessee shall reimburse Lessor, upon demand, for the cost thereof.

(c)       Failure to Perform. If Lessee fails to perform Lessee's obligations under this Paragraph 7.1, Lessor may enter upon the Premises after 10 days' prior written notice to Lessee (except in the case of an emergency, in which case no notice shall be required), perform such obligations on Lessee's behalf, and put the Premises in good order, condition and repair, and Lessee shall promptly reimburse Lessor for the cost thereof.

(d)       Replacement. Subject to Lessee's indemnification of Lessor as set forth in Paragraph 8.7 below, and without relieving Lessee of liability resulting from Lessee's failure to exercise and perform good maintenance practices, if an item described in Paragraph 7.1(b) cannot be repaired other than at a cost which is in excess of 50% of the cost of replacing such item, then such item shall be replaced by Lessor, and the cost thereof shall be prorated between the Parties and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease, on the date on which Base Rent is due, an amount equal to the product of multiplying the cost of such replacement by a fraction, the numerator of which is one, and the denominator of which is 144 (ie. 1/144th of the cost per month). Lessee shall pay interest on the unamortized balance at a rate that is commercially

Initials

Initials

76163

Exhibit 167 - 2627

reasonable in the judgment of Lessor's accountants. Lessee may, however, prepay its obligation at any time.

7.2 **Lessor's Obligations.** Subject to the provisions of Paragraphs 2.2 (Condition), 2.3 (Compliance), 4.2 (Common Area Operating Expenses), 6 (Use), 7.1 (Lessee's Obligations), 9 (Damage or Destruction) and 14 (Condemnation), Lessor, subject to reimbursement pursuant to Paragraph 4.2, shall keep in good order, condition and repair the foundations, exterior walls, structural condition of interior bearing walls, exterior roof, fire sprinkler system, Common Area fire alarm and/or smoke detection systems, fire hydrants, parking lots, walkways, parkways, driveways, landscaping, fences, signs and utility systems serving the Common Areas and all parts thereof, as well as providing the services for which there is a Common Area Operating Expense pursuant to Paragraph 4.2. Lessor shall not be obligated to paint the exterior or interior surfaces of exterior walls nor shall Lessor be obligated to maintain, repair or replace windows, doors or plate glass of the Premises. Lessee expressly waives the benefit of any statute now or hereafter in effect to the extent it is inconsistent with the terms of this Lease.

7.3 **Utility Installations; Trade Fixtures; Alterations.**

(a) Definitions. The term "Utility Installations" refers to all floor and window coverings, air lines, power panels, electrical distribution, security and fire protection systems, communication systems, lighting fixtures, HVAC equipment, plumbing, and fencing in or on the Premises. The term "Trade Fixtures" shall mean Lessee's machinery and equipment that can be removed without doing material damage to the Premises. The term "Alterations" shall mean any modification of the improvements, other than Utility Installations or Trade Fixtures, whether by addition or deletion. "Lessee Owned Alterations and/or Utility Installations" are defined as Alterations and/or Utility Installations made by Lessee that are not yet owned by Lessor pursuant to Paragraph 7.4(a).

(b) Consent. Lessee shall not make any Alterations or Utility Installations to the Premises without Lessor's prior written consent. Lessee may, however, make non-structural Utility Installations to the interior of the Premises (excluding the roof) without such consent but upon notice to Lessor, as long as they are not visible from the outside, do not involve puncturing, relocating or removing the roof or any existing walls, and the cumulative cost thereof during this Lease as extended does not exceed a sum equal to 3 month's Base Rent in the aggregate or a sum equal to one month's Base Rent in any one year. Notwithstanding the foregoing, Lessee shall not make or permit any roof penetrations and/or install anything on the roof without the prior written approval of Lessor. Lessor may, as a precondition to granting such approval, require Lessee to utilize a contractor chosen and/or approved by Lessor. Any Alterations or Utility Installations that Lessee shall desire to make and which require the consent of the Lessor shall be presented to Lessor in written form with detailed plans. Consent shall be deemed conditioned upon Lessee's: (i) acquiring all applicable governmental permits, (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (iii) compliance with all conditions of said permits and other Applicable Requirements in a prompt and expeditious manner. Any Alterations or Utility Installations shall be performed in a workmanlike manner with good and sufficient materials. Lessee shall promptly upon completion furnish Lessor with as-built plans and specifications. For work which costs an amount in excess of one month's Base Rent, Lessor may condition its consent upon Lessee providing a lien and completion bond in an amount equal to 150% of the estimated cost of such Alteration and/or upon Lessee's posting an additional Security Deposit with Lessor.

(c) Indemnification. Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use on the Premises, which claims are or may be secured by any mechanic's or materialman's lien against the Premises or any interest therein. Lessee shall give Lessor not less than 10 days notice prior to the commencement of any work in, on or about the Premises, and Lessor shall have the right to post notices of non-responsibility. If Lessee shall contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend and protect itself, Lessor and the Premises against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof. If Lessor shall require, Lessee shall furnish a surety bond in an amount equal to 150% of the amount of such contested lien, claim or demand, indemnifying Lessor against liability for the same. If Lessor elects to participate in any such action, Lessee shall pay Lessor's attorneys' fees and costs.

7.4 **Ownership; Removal; Surrender; and Restoration.**

(a) Ownership. Subject to Lessor's right to require removal or elect ownership as hereinafter provided, all Alterations and Utility Installations made by Lessee shall be the property of Lessee, but considered a part of the Premises. Lessor may, at any time, elect in writing to be the owner of all or any specified part of the Lessee Owned Alterations and Utility Installations. Unless otherwise instructed per paragraph 7.4(b) hereof, all Lessee Owned Alterations and Utility Installations shall, at the expiration or termination of this Lease, become the property of Lessor and be surrendered by Lessee with the Premises.

(b) Removal. By delivery to Lessee of written notice from Lessor not earlier than 90 and not later than 30 days prior to the end of the term of this Lease, Lessor may require that any or all Lessee Owned Alterations or Utility Installations be removed by the expiration or termination of this Lease. Lessor may require the removal at any time of all or any part of any Lessee Owned Alterations or Utility Installations made without the required consent.

(c) Surrender; Restoration. Lessee shall surrender the Premises by the Expiration Date or any earlier termination date, with all of the improvements, parts and surfaces thereof broom clean and free of debris, and in good operating order, condition and state of repair, ordinary wear and tear excepted. "Ordinary wear and tear" shall not include any damage or deterioration that would have been prevented by good maintenance practice. Notwithstanding the foregoing, if this Lease is for 12 months or less, then Lessee shall surrender the Premises in the same condition as delivered to Lessee on the Start Date with NO allowance for ordinary wear and tear. Lessee shall repair any damage occasioned by the installation, maintenance or removal of Trade Fixtures, Lessee owned Alterations and/or Utility Installations, furnishings, and equipment as well as the removal of any storage tank installed by or for Lessee. Lessee shall also completely remove from the Premises any and all Hazardous Substances brought onto the Premises by or for Lessee, or any third party (except Hazardous Substances which were deposited via underground migration from areas outside of the Project) even if such removal would require Lessee to perform or pay for work that exceeds statutory requirements. Trade Fixtures shall remain the property of Lessee and shall be removed by Lessee. The failure by Lessee to timely vacate the Premises pursuant to this Paragraph 7.4(c) without the express written consent of Lessor shall constitute a holdover under the provisions of Paragraph 26 below.

8. **Insurance; Indemnity.**

8.1 Payment of Premiums. The cost of the premiums for the insurance policies required to be carried by Lessor, pursuant to Paragraphs 8.2(b), 8.3(a) and 8.3(b), shall be a Common Area Operating Expense. Premiums for policy periods commencing prior to, or extending beyond, the term of this Lease shall be prorated to coincide with the corresponding Start Date or Expiration Date.

8.2 **Liability Insurance.**

(a) Carried by Lessee. Lessee shall obtain and keep in force a Commercial General Liability policy of insurance protecting Lessee and Lessor as an additional insured against claims for bodily injury, personal injury and property damage based upon or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto. Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $1,000,000 per occurrence with an annual aggregate of not less than $2,000,000, an "Additional Insured-Managers or Lessors of Premises Endorsement" and contain the "Amendment of the Pollution Exclusion Endorsement" for damage caused by heat, smoke or fumes from a hostile fire. The policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an "insured contract" for the performance of Lessee's indemnity obligations under this Lease. The limits of said insurance shall not, however, limit the liability of Lessee nor relieve Lessee of any obligation hereunder. All insurance carried by Lessee shall be primary to and not contributory with any similar insurance carried by Lessor, whose insurance shall be considered excess insurance only.

(b) Carried by Lessor. Lessor shall maintain liability insurance as described in Paragraph 8.2(a), in addition to, and not in lieu of, the insurance required to be maintained by Lessee. Lessee shall not be named as an additional insured therein.

8.3 **Property Insurance - Building, Improvements and Rental Value.**

(a) Building and Improvements. Lessor shall obtain and keep in force a policy or policies of insurance in the name of Lessor, with loss payable to Lessor, any ground-lessor, and to any Lender insuring loss or damage to the Premises. The amount of such insurance shall be equal to the full replacement cost of the Premises, as the same shall exist from time to time, or the amount required by any Lender, but in no event more than the commercially reasonable and available insurable value thereof. Lessee Owned Alterations and Utility Installations, Trade Fixtures, and Lessee's personal property shall be insured by Lessee under Paragraph 8.4. If the coverage is available and commercially appropriate, such policy or policies shall insure against all risks of direct physical loss or damage (except the perils of flood and/or earthquake unless required by a Lender), including coverage for debris removal and the enforcement of any Applicable Requirements requiring the upgrading, demolition, reconstruction or replacement of any portion of the Premises as the result of a covered loss. Said policy or policies shall also contain an agreed valuation provision in lieu of any coinsurance clause, waiver of subrogation, and inflation guard protection causing an increase in the annual property insurance coverage amount by a factor of not less than the adjusted U.S. Department of Labor Consumer Price Index for All Urban Consumers for the city nearest to where the Premises are located. If such insurance coverage has a deductible clause, the deductible amount shall not exceed $1,000 per occurrence.

(b) Rental Value. Lessor shall also obtain and keep in force a policy or policies in the name of Lessor with loss payable to Lessor and any Lender, insuring the loss of the full Rent for one year with an extended period of indemnity for an additional 180 days ("Rental Value insurance"). Said insurance shall contain an agreed valuation provision in lieu of any coinsurance clause, and the amount of coverage shall be adjusted annually to reflect the projected Rent otherwise payable by Lessee, for the next 12 month period.

(c) Adjacent Premises. Lessee shall pay for any increase in the premiums for the property insurance of the Building and for the Common Areas or other buildings in the Project if said increase is caused by Lessee's acts, omissions, use or occupancy of the Premises.

(d) Lessee's Improvements. Since Lessor is the insuring Party, Lessor shall not be required to insure Lessee Owned Alterations and Utility Installations unless the item in question has become the property of Lessor under the terms of this Lease.

Initials

Initials

Case 2:02-cr-00220-MCS   Document 2475-10   Filed 10/05/23   Page 28 of 145   Page ID #:22287

76164

Exhibit 167 – 2628

8.4     Lessee's Property; Business Interruption Insurance.

(a)     Property Damage. Lessee shall obtain and maintain insurance coverage on all of Lessee's personal property, Trade Fixtures, and Lessee Owned Alterations and Utility Installations. Such insurance shall be full replacement cost coverage with a deductible of not to exceed $1,000 per occurrence. The proceeds from any such insurance shall be used by Lessee for the replacement of personal property, Trade Fixtures and Lessee Owned Alterations and Utility Installations. Lessee shall provide Lessor with written evidence that such insurance is in force.

(b)     Business Interruption. Lessee shall obtain and maintain loss of income and extra expense insurance in amounts as will reimburse Lessee for direct or indirect loss of earnings attributable to all perils commonly insured against by prudent lessees in the business of Lessee or attributable to prevention of access to the Premises as a result of such perils.

(c)     No Representation of Adequate Coverage. Lessor makes no representation that the limits or forms of coverage of insurance specified herein are adequate to cover Lessee's property, business operations or obligations under this Lease.

8.5     Insurance Policies. Insurance required herein shall be by companies duly licensed or admitted to transact business in the state where the Premises are located, and maintaining during the policy term a "General Policyholders Rating" of at least B+, V, as set forth in the most current issue of "Best's Insurance Guide", or such other rating as may be required by a Lender. Lessee shall not do or permit to be done anything which invalidates the required insurance policies. Lessee shall, prior to the Start Date, deliver to Lessor certified copies of policies of such insurance or certificates evidencing the existence and amounts of the required insurance. No such policy shall be cancelable or subject to modification except after 30 days prior written notice to Lessor. Lessee shall, at least 30 days prior to the expiration of such policies, furnish Lessor with evidence of renewals or "insurance binders" evidencing renewal thereof, or Lessor may order such insurance and charge the cost thereof to Lessee, which amount shall be payable by Lessee to Lessor upon demand. Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less. If either Party shall fail to procure and maintain the insurance required to be carried by it, the other Party may, but shall not be required to, procure and maintain the same.

8.6     Waiver of Subrogation. Without affecting any other rights or remedies, Lessee and Lessor each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss of or damage to its property arising out of or incident to the perils required to be insured against herein. The effect of such releases and waivers is not limited by the amount of insurance carried or required, or by any deductibles applicable hereto. The Parties agree to have their respective property damage insurance carriers waive any right to subrogation that such companies may have against Lessor or Lessee, as the case may be, so long as the insurance is not invalidated thereby.

8.7     Indemnity. Except for Lessor's gross negligence or willful misconduct, Lessee shall indemnify, protect, defend and hold harmless the Premises, Lessor and its agents, Lessor's master or ground lessor, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Lessee. If any action or proceeding is brought against Lessor by reason of any of the foregoing matters, Lessee shall upon notice defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor and Lessor shall cooperate with Lessee in such defense. Lessor need not have first paid any such claim in order to be defended or indemnified.

8.8     Exemption of Lessor from Liability. Lessor shall not be liable for injury or damage to the person or goods, wares, merchandise or other property of Lessee, Lessee's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising upon the Premises or upon other portions of the Building, or from other sources or places. Lessor shall not be liable for any damages arising from any act or neglect of any other tenant of Lessor nor from the failure of Lessor to enforce the provisions of any other lease in the Project. Notwithstanding Lessor's negligence or breach of this Lease, Lessor shall under no circumstances be liable for injury to Lessee's business or for any loss of income or profit therefrom.

9.     Damage or Destruction.

9.1     Definitions.

(a)     "Premises Partial Damage" shall mean damage or destruction to the improvements on the Premises, other than Lessee Owned Alterations and Utility Installations, which can reasonably be repaired in 3 months or less from the date of the damage or destruction, and the cost thereof does not exceed a sum equal to 6 month's Base Rent. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

(b)     "Premises Total Destruction" shall mean damage or destruction to the improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which cannot reasonably be repaired in 3 months or less from the date of the damage or destruction and/or the cost thereof exceeds a sum equal to 6 month's Base Rent. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

(c)     "Insured Loss" shall mean damage or destruction to improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which was caused by an event required to be covered by the insurance described in Paragraph 8.3(a), irrespective of any deductible amounts or coverage limits involved.

(d)     "Replacement Cost" shall mean the cost to repair or rebuild the improvements owned by Lessor at the time of the occurrence to their condition existing immediately prior thereto, including demolition, debris removal and upgrading required by the operation of Applicable Requirements, and without deduction for depreciation.

(e)     "Hazardous Substance Condition" shall mean the occurrence or discovery of a condition involving the presence of, or a contamination by, a Hazardous Substance as defined in Paragraph 6.2(a), in, on, or under the Premises.

9.2     Partial Damage - Insured Loss. If a Premises Partial Damage that is an Insured Loss occurs, then Lessor shall, at Lessor's expense, repair such damage (but not Lessee's Trade Fixtures or Lessee Owned Alterations and Utility Installations) as soon as reasonably possible and this Lease shall continue in full force and effect; provided, however, that Lessee shall, at Lessor's election, make the repair of any damage or destruction the total cost to repair of which is $5,000 or less, and, in such event, Lessor shall make any applicable insurance proceeds available to Lessee on a reasonable basis for that purpose. Notwithstanding the foregoing, if the required insurance was not in force or the insurance proceeds are not sufficient to effect such repair, the insuring Party shall promptly contribute the shortage in proceeds as and when required to complete said repairs. In the event, however, such shortage was due to the fact that, by reason of the unique nature of the improvements, full replacement cost insurance coverage was not commercially reasonable and available, Lessor shall have no obligation to pay for the shortage in insurance proceeds or to fully restore the unique aspects of the Premises unless Lessee provides Lessor with the funds to cover same, or adequate assurance thereof, within 10 days following receipt of written notice of such shortage and request therefor. If Lessor receives said funds or adequate assurance thereof within said 10 day period, the party responsible for making the repairs shall complete them as soon as reasonably possible and this Lease shall remain in full force and effect. If such funds or assurance are not received, Lessor may nevertheless elect by written notice to Lessee within 10 days thereafter to: (i) make such restoration and repair as is commercially reasonable with Lessor paying any shortage in proceeds, in which case this Lease shall remain in full force and effect, or (ii) have this Lease terminate 30 days thereafter. Lessee shall not be entitled to reimbursement of any funds contributed by Lessee to repair any such damage or destruction. Premises Partial Damage due to flood or earthquake shall be subject to Paragraph 9.3, notwithstanding that there may be some insurance coverage, but the net proceeds of any such insurance shall be made available for the repairs if made by either Party.

9.3     Partial Damage - Uninsured Loss. If a Premises Partial Damage that is not an Insured Loss occurs, unless caused by a negligent or willful act of Lessee (in which event Lessee shall make the repairs at Lessee's expense), Lessor may either: (i) repair such damage as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) terminate this Lease by giving written notice to Lessee within 30 days after receipt by Lessor of knowledge of the occurrence of such damage. Such termination shall be effective 60 days following the date of such notice. In the event Lessor elects to terminate this Lease, Lessee shall have the right within 10 days after receipt of the termination notice to give written notice to Lessor of Lessee's commitment to pay for the repair of such damage without reimbursement from Lessor. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days after making such commitment. In such event this Lease shall continue in full force and effect, and Lessor shall proceed to make such repairs as soon as reasonably possible after the required funds are available. If Lessee does not make the required commitment, this Lease shall terminate as of the date specified in the termination notice.

9.4     Total Destruction. Notwithstanding any other provision hereof, if a Premises Total Destruction occurs, this Lease shall terminate 60 days following such Destruction. If the damage or destruction was caused by the gross negligence or willful misconduct of Lessee, Lessor shall have the right to recover Lessor's damages from Lessee, except as provided in Paragraph 8.6.

9.5     Damage Near End of Term. If at any time during the last 6 months of this Lease there is damage for which the cost to repair exceeds one month's Base Rent, whether or not an Insured Loss, Lessor may terminate this Lease effective 60 days following the date of occurrence of such damage by giving a written termination notice to Lessee within 30 days after the date of occurrence of such damage. Notwithstanding the foregoing, if Lessee at that time has an exercisable option to extend this Lease or to purchase the Premises, then Lessee may preserve this Lease by, (a) exercising such option and (b) providing Lessor with any shortage in insurance proceeds (or adequate assurance thereof) needed to make the repairs on or before the earlier of (i) the date which is 10 days after Lessee's receipt of Lessor's written notice purporting to terminate this Lease, or (ii) the day prior to the date upon which such option expires. If Lessee duly exercises such option during such period and provides Lessor with funds (or adequate assurance thereof) to cover any shortage in insurance proceeds, Lessor shall, at Lessor's commercially reasonable expense, repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect. If Lessee fails to exercise such option and provide such funds or assurance during such period, then this Lease shall terminate on the date specified in the termination notice and Lessee's option shall be extinguished.

9.6     Abatement of Rent; Lessee's Remedies.

_Initials_

_Initials_

Case 2:02-cr-00220-MCS   Document 2475-10   Filed 10/05/23   Page 29 of 145   Page ID #:22288

(a)    Abatement.  In the event of Premises Partial Damage or Premises Total Destruction or a Hazardous Substance Condition for which Lessee is not responsible under this Lease, the Rent payable by Lessee for the period required for the repair, remediation or restoration of such damage shall be abated in proportion to the degree to which Lessee's use of the Premises is impaired, but not to exceed the proceeds received from the Rental Value Insurance.  All other obligations of Lessee hereunder shall be performed by Lessee, and Lessor shall have no liability for any such damage, destruction, remediation, repair or restoration except as provided herein.

(b)    Remedies.  If Lessor shall be obligated to repair or restore the Premises and does not commence, in a substantial and meaningful way, such repair or restoration within 90 days after such obligation shall accrue, Lessee may, at any time prior to the commencement of such repair or restoration, give written notice to Lessor and to any Lenders of which Lessee has actual notice, of Lessee's election to terminate this Lease on a date not less than 60 days following the giving of such notice.  If Lessee gives such notice and such repair or restoration is not commenced within 30 days thereafter, this Lease shall terminate as of the date specified in said notice.  If the repair or restoration is commenced within such 30 days, this Lease shall continue in full force and effect.  "Commence" shall mean either the unconditional authorization of the preparation of the required plans, or the beginning of the actual work on the Premises, whichever first occurs.

9.7    Termination; Advance Payments.  Upon termination of this Lease pursuant to Paragraph 6.2(g) or Paragraph 9, an equitable adjustment shall be made concerning advance Base Rent and any other advance payments made by Lessee to Lessor.  Lessor shall, in addition, return to Lessee so much of Lessee's Security Deposit as has not been, or is not then required to be, used by Lessor.

9.8    Waive Statutes.  Lessor and Lessee agree that the terms of this Lease shall govern the effect of any damage to or destruction of the Premises with respect to the termination of this Lease and hereby waive the provisions of any present or future statute to the extent inconsistent herewith.

10.    Real Property Taxes.

10.1    Definition.  As used herein, the term "Real Property Taxes" shall include any form of assessment; real estate, general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or license fee imposed upon or levied against any legal or equitable interest of Lessor in the Project, Lessor's right to other income therefrom, and/or Lessor's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Project address and where the proceeds so generated are to be applied by the city, county or other local taxing authority of a jurisdiction within which the Project is located.  The term "Real Property Taxes" shall also include any tax, fee, levy, assessment or charge, or any increase therein, imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership of the Project or any portion thereof or a change in the improvements thereon.  In calculating Real Property Taxes for any calendar year, the Real Property Taxes for any real estate tax year shall be included in the calculation of Real Property Taxes for such calendar year based upon the number of days which such calendar year and tax year have in common.

10.2    Payment of Taxes.  Lessor shall pay the Real Property Taxes applicable to the Project, and except as otherwise provided in Paragraph 10.3, any such amounts shall be included in the calculation of Common Area Operating Expenses in accordance with the provisions of Paragraph 4.2.

10.3    Additional Improvements.  Common Area Operating Expenses shall not include Real Property Taxes specified in the tax assessor's records and work sheets as being caused by additional improvements placed upon the Project by other lessees or by Lessor for the exclusive enjoyment of such other lessees.  Notwithstanding Paragraph 10.2 hereof, Lessee shall, however, pay to Lessor at the time Common Area Operating Expenses are payable under Paragraph 4.2, the entirety of any increase in Real Property Taxes if assessed solely by reason of Alterations, Trade Fixtures or Utility Installations placed upon the Premises by Lessee or at Lessee's request.

10.4    Joint Assessment.  If the Building is not separately assessed, Real Property Taxes allocated to the Building shall be an equitable proportion of the Real Property Taxes for all of the land and improvements included within the tax parcel assessed, such proportion to be determined by Lessor from the respective valuations assigned in the assessor's work sheets or such other information as may be reasonably available.  Lessor's reasonable determination thereof, in good faith, shall be conclusive.

10.5    Personal Property Taxes.  Lessee shall pay prior to delinquency all taxes assessed against and levied upon Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all personal property of Lessee contained in the Premises.  When possible, Lessee shall cause its Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all other personal property to be assessed and billed separately from the real property of Lessor.  If any of Lessee's said property shall be assessed with Lessor's real property, Lessee shall pay Lessor the taxes attributable to Lessee's property within 10 days after receipt of a written statement setting forth the taxes applicable to Lessee's property.

11.    Utilities.  Lessee shall pay for all water, gas, heat, light, power, telephone, trash disposal and other utilities and services supplied to the Premises, together with any taxes thereon.  Notwithstanding the provisions of Paragraph 4.2, if at any time in Lessor's sole judgment, Lessor determines that Lessee is using a disproportionate amount of water, electricity or other commonly metered utilities, or that Lessee is generating such a large volume of trash as to require an increase in the size of the dumpster and/or an increase in the number of times per month that the dumpster is emptied, then Lessor may increase Lessee's Base Rent by an amount equal to such increased costs.

12.    Assignment and Subletting.

12.1    Lessor's Consent Required.

(a)    Lessee shall not voluntarily or by operation of law assign, transfer, mortgage or encumber (collectively, "assign or assignment") or sublet all or any part of Lessee's interest in this Lease or in the Premises without Lessor's prior written consent.

(b)    A change in the control of Lessee shall constitute an assignment requiring consent.  The transfer, on a cumulative basis, of 25% or more of the voting control of Lessee shall constitute a change in control for this purpose.

(c)    The involvement of Lessee or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, transfer, leveraged buy-out or otherwise), whether or not a formal assignment or hypothecation of this Lease or Lessee's assets occurs, which results or will result in a reduction of the Net Worth of Lessee by an amount greater than 25% of such Net Worth as it was represented at the time of the execution of this Lease or at the time of the most recent assignment to which Lessor has consented, or as it exists immediately prior to said transaction or transactions constituting such reduction, whichever was or is greater, shall be considered an assignment of this Lease to which Lessor may withhold its consent.  "Net Worth of Lessee" shall mean the net worth of Lessee (excluding any guarantors) established under generally accepted accounting principles.

(d)    An assignment or subletting without consent shall, at Lessor's option, be a Default curable after notice per Paragraph 13.1(c), or a noncurable Breach without the necessity of any notice and grace period.  If Lessor elects to treat such unapproved assignment or subletting as a noncurable Breach, Lessor may either: (i) terminate this Lease, or (ii) upon 30 days written notice, increase the monthly Base Rent to 110% of the Base Rent then in effect.  Further, in the event of such Breach and rental adjustment, (i) the purchase price of any option to purchase the Premises held by Lessee shall be subject to similar adjustment to 110% of the price previously in effect, and (ii) all fixed and non-fixed rental adjustments scheduled during the remainder of the Lease term shall be increased to 110% of the scheduled adjusted rent.

(e)    Lessee's remedy for any breach of Paragraph 12.1 by Lessor shall be limited to compensatory damages and/or injunctive relief.

12.2    Terms and Conditions Applicable to Assignment and Subletting.

(a)    Regardless of Lessor's consent, no assignment or subletting shall:  (i) be effective without the express written assumption by such assignee or sublessee of the obligations of Lessee under this Lease, (ii) release Lessee of any obligations hereunder, or (iii) alter the primary liability of Lessee for the payment of Rent or for the performance of any other obligations to be performed by Lessee.

(b)    Lessor may accept Rent or performance of Lessee's obligations from any person other than Lessee pending approval or disapproval of an assignment.  Neither a delay in the approval or disapproval of such assignment nor the acceptance of Rent or performance shall constitute a waiver or estoppel of Lessor's right to exercise its remedies for Lessee's Default or Breach.

(c)    Lessor's consent to any assignment or subletting shall not constitute a consent to any subsequent assignment or subletting.

(d)    In the event of any Default or Breach by Lessee, Lessor may proceed directly against Lessee, any Guarantors or anyone else responsible for the performance of Lessee's obligations under this Lease, including any assignee or sublessee, without first exhausting Lessor's remedies against any other person or entity responsible therefore to Lessor, or any security held by Lessor.

(e)    Each request for consent to an assignment or subletting shall be in writing, accompanied by information relevant to Lessor's determination as to the financial and operational responsibility and appropriateness of the proposed assignee or sublessee, including but not limited to the intended use and/or required modification of the Premises, if any, together with a fee of $1,000 or 10% of the current monthly Base Rent applicable to the portion of the Premises which is the subject of the proposed assignment or sublease, whichever is greater, as consideration for Lessor's considering and processing said request.  Lessee agrees to provide Lessor with such other or additional information and/or documentation as may be reasonably requested.

(f)    Any assignee of, or sublessee under, this Lease shall, by reason of accepting such assignment or entering into such sublease, be deemed to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Lessee during the term of said assignment or sublease, other than such obligations as are contrary to or inconsistent with provisions of an assignment or sublease to which Lessor has specifically consented to in writing.

(g)    Lessor's consent to any assignment or subletting shall not transfer to the assignee or sublessee any Option granted to the original Lessee by this Lease unless such transfer is specifically consented to by Lessor in writing.  (See Paragraph 39.2)

12.3    Additional Terms and Conditions Applicable to Subletting.  The following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

(a)    Lessee hereby assigns and transfers to Lessor all of Lessee's interest in all Rent payable on any sublease, and Lessor may collect such Rent and apply same toward Lessee's obligations under this Lease; provided, however, that until a Breach shall occur in the performance of Lessee's obligations, Lessee may collect said Rent.  Lessor shall not, by reason of the foregoing or any assignment of such sublease, nor by reason of the

Initials _____              Page 7 of 12            Initials _____

76166

Exhibit 167 - 2630

collection of Rent, be deemed liable to the sublessee for any failure of Lessee to perform and comply with any of Lessee's obligations to such sublessee. Lessee hereby irrevocably authorizes and directs any such sublessee, upon receipt of a written notice from Lessor stating that a Breach exists in the performance of Lessee's obligations under this Lease, to pay to Lessor all Rent due and to become due under the sublease. Sublessee shall rely upon any such notice from Lessor and shall pay all Rents to Lessor without any obligation or right to inquire as to whether such Breach exists, notwithstanding any claim from Lessee to the contrary.

(b)     In the event of a Breach by Lessee, Lessor may, at its option, require sublessee to attorn to Lessor, in which event Lessor shall undertake the obligations of the sublessor under such sublease from the time of the exercise of said option to the expiration of such sublease; provided, however, Lessor shall not be liable for any prepaid rents or security deposit paid by such sublessee to such sublessor or for any prior Defaults or Breaches of such sublessor.

(c)     Any matter requiring the consent of the sublessor under a sublease shall also require the consent of Lessor.

(d)     No sublessee shall further assign or sublet all or any part of the Premises without Lessor's prior written consent.

(e)     Lessor shall deliver a copy of any notice of Default or Breach by Lessee to the sublessee, who shall have the right to cure the Default of Lessee within the grace period, if any, specified in such notice. The sublessee shall have a right of reimbursement and offset from and against Lessee for any such Defaults cured by the sublessee.

13.     Default; Breach; Remedies.

13.1     Default; Breach. A "Default" is defined as a failure by the Lessee to comply with or perform any of the terms, covenants, conditions or Rules and Regulations under this Lease. A "Breach" is defined as the occurrence of one or more of the following Defaults, and the failure of Lessee to cure such Default within any applicable grace period:

(a)     The abandonment of the Premises; or the vacating of the Premises without providing a commercially reasonable level of security, or where the coverage of the property insurance described in Paragraph 8.3 is jeopardized as a result thereof, or without providing reasonable assurances to minimize potential vandalism.

(b)     The failure of Lessee to make any payment of Rent or any Security Deposit required to be made by Lessee hereunder, whether to Lessor or to a third party, when due, to provide reasonable evidence of insurance or surety bond, or to fulfill any obligation under this Lease which endangers or threatens life or property, where such failure continues for a period of 3 business days following written notice to Lessee.

(c)     The failure by Lessee to provide (i) reasonable written evidence of compliance with Applicable Requirements, (ii) the service contracts, (iii) the rescission of an unauthorized assignment or subletting, (iv) an Estoppel Certificate, (v) a requested subordination, (vi) evidence concerning any guaranty and/or Guarantor, (vii) any document requested under Paragraph 41 (easements), or (viii) any other documentation or information which Lessor may reasonably require of Lessee under the terms of this Lease, where any such failure continues for a period of 10 days following written notice to Lessee.

(d)     A Default by Lessee as to the terms, covenants, conditions or provisions of this Lease, or of the rules adopted under Paragraph 2.9 hereof, other than those described in subparagraphs 13.1(a), (b) or (c), above, where such Default continues for a period of 30 days after written notice; provided, however, that if the nature of Lessee's Default is such that more than 30 days are reasonably required for its cure, then it shall not be deemed to be a Breach if Lessee commences such cure within said 30 day period and thereafter diligently prosecutes such cure to completion.

(e)     The occurrence of any of the following events: (i) the making of any general arrangement or assignment for the benefit of creditors; (ii) becoming a "debtor" as defined in 11 U.S.C. § 101 or any successor statute thereto (unless, in the case of a petition filed against Lessee, the same is dismissed within 60 days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within 30 days; or (iv) the attachment, execution or other judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within 30 days; provided, however, in the event that any provision of this subparagraph (e) is contrary to any applicable law, such provision shall be of no force or effect, and not affect the validity of the remaining provisions.

(f)     The discovery that any financial statement of Lessee or of any Guarantor given to Lessor was materially false.

(g)     If the performance of Lessee's obligations under this Lease is guaranteed: (i) the death of a Guarantor, (ii) the termination of a Guarantor's liability with respect to this Lease other than in accordance with the terms of such guaranty, (iii) a Guarantor's becoming insolvent or the subject of a bankruptcy filing, (iv) a Guarantor's refusal to honor the guaranty, or (v) a Guarantor's breach of its guaranty obligation on an anticipatory basis, and Lessee's failure, within 60 days following written notice of any such event, to provide written alternative assurance or security, which, when coupled with the then existing resources of Lessee, equals or exceeds the combined financial resources of Lessee and the Guarantors that existed at the time of execution of this Lease.

13.2     Remedies. If Lessee fails to perform any of its affirmative duties or obligations, within 10 days after written notice (or in case of an emergency, without notice), Lessor may, at its option, perform such duty or obligation on Lessee's behalf, including but not limited to the obtaining of reasonably required bonds, insurance policies, or governmental licenses, permits or approvals. The costs and expenses of any such performance by Lessor shall be due and payable by Lessee upon receipt of invoice therefor. If any check given to Lessor by Lessee shall not be honored by the bank upon which it is drawn, Lessor, at its option, may require all future payments to be made by Lessee to be by cashier's check. In the event of a Breach, Lessor may, with or without further notice or demand, and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such Breach:

(a)     Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession to Lessor. In such event Lessor shall be entitled to recover from Lessee: (i) the unpaid Rent which had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Lessee proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Lessee proves could be reasonably avoided; and (iv) any other amount necessary to compensate Lessor for all the detriment proximately caused by the Lessee's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including but not limited to the cost of recovering possession of the Premises, expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, and that portion of any leasing commission paid by Lessor in connection with this Lease applicable to the unexpired term of this Lease. The worth at the time of award of the amount referred to in provision (iii) of the immediately preceding sentence shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of the District within which the Premises are located at the time of award plus one percent. Efforts by Lessor to mitigate damages caused by Lessee's Breach of this Lease shall not waive Lessor's right to recover damages under Paragraph 12. If termination of this Lease is obtained through the provisional remedy of unlawful detainer, Lessor shall have the right to recover in such proceeding any unpaid Rent and damages as are recoverable therein, or Lessor may reserve the right to recover all or any part thereof in a separate suit. If a notice and grace period required under Paragraph 13.1 was not previously given, a notice to pay rent or quit, or to perform or quit given to Lessee under the unlawful detainer statute shall also constitute the notice required by Paragraph 13.1. In such case, the applicable grace period required by Paragraph 13.1 and the unlawful detainer statute shall run concurrently, and the failure of Lessee to cure the Default within the greater of the two such grace periods shall constitute both an unlawful detainer and a Breach of this Lease entitling Lessor to the remedies provided for in this Lease and/or by said statute.

(b)     Continue the Lease and Lessee's right to possession and recover the Rent as it becomes due, in which event Lessee may sublet or assign, subject only to reasonable limitations. Acts of maintenance, efforts to relet, and/or the appointment of a receiver to protect the Lessor's interests, shall not constitute a termination of the Lessee's right to possession.

(c)     Pursue any other remedy now or hereafter available under the laws or judicial decisions of the state wherein the Premises are located. The expiration or termination of this Lease and/or the termination of Lessee's right to possession shall not relieve Lessee from liability under any indemnity provisions of this Lease as to matters occurring or accruing during the term hereof or by reason of Lessee's occupancy of the Premises.

13.3     Inducement Recapture. Any agreement for free or abated rent or other charges, or for the giving or paying by Lessor to or for Lessee of any cash or other bonus, inducement or consideration for Lessee's entering into this Lease, all of which concessions are hereinafter referred to as "Inducement Provisions", shall be deemed conditioned upon Lessee's full and faithful performance of all of the terms, covenants and conditions of this Lease. Upon Breach of this Lease by Lessee, any such Inducement Provision shall automatically be deemed deleted from this Lease and of no further force or effect, and any rent, other charge, bonus, inducement or consideration theretofore abated, given or paid by Lessor under such an Inducement Provision shall be immediately due and payable by Lessee to Lessor, notwithstanding any subsequent cure of said Breach by Lessee. The acceptance by Lessor of rent or the cure of the Breach which initiated the operation of this paragraph shall not be deemed a waiver by Lessor of the provisions of this paragraph unless specifically so stated in writing by Lessor at the time of such acceptance.

13.4     Late Charges. Lessee hereby acknowledges that late payment by Lessee of Rent will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Lessor by any Lender. Accordingly, if any Rent shall not be received by Lessor within 5 days after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall pay to Lessor a one-time late charge equal to 10% of each such overdue amount or $100, whichever is greater. The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of such late payment. Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's Default or Breach with respect to such overdue amount, nor prevent the exercise of any of the other rights and remedies granted hereunder. In the event that a late charge is payable hereunder, whether or not collected, for 3 consecutive installments of Base Rent, then notwithstanding any provision of this Lease to the contrary, Base Rent shall, at Lessor's option, become due and payable quarterly in advance.

13.5     Interest. Any monetary payment due Lessor hereunder, other than late charges, not received by Lessor, when due as to scheduled

Initials                                                                                                                    Initials

Case 2:02-cr-00220-MCS   Document 2475-10   Filed 10/05/23   Page 31 of 145   Page ID #:22290

76167

Exhibit 167 - 2631

payments (such as Base Rent) or within 30 days following the date on which it was due for non-scheduled payment, shall bear interest from the date when due, as to scheduled payments, or the 31st day after it was due as to non-scheduled payments. The interest ("interest") charged shall be equal to the prime rate reported in the Wall Street Journal as published closest prior to the date when due plus 4%, but shall not exceed the maximum rate allowed by law. Interest is payable in addition to the potential late charge provided for in Paragraph 13.4.

13.6     Breach by Lessor.

(a)     Notice of Breach.  Lessor shall not be deemed in breach of this Lease unless Lessor fails within a reasonable time to perform an obligation required to be performed by Lessor.  For purposes of this Paragraph, a reasonable time shall in no event be less than 30 days after receipt by Lessor, and any Lender whose name and address shall have been furnished Lessee in writing for such purpose, of written notice specifying wherein such obligation of Lessor has not been performed; provided, however, that if the nature of Lessor's obligation is such that more than 30 days are reasonably required for its performance, then Lessor shall not be in breach if performance is commenced within such 30 day period and thereafter diligently pursued to completion.

(b)     Performance by Lessee on Behalf of Lessor.  In the event that neither Lessor nor Lender cures said breach within 30 days after receipt of said notice, or if having commenced said cure they do not diligently pursue it to completion, then Lessee may elect to cure said breach at Lessee's expense and offset from Rent an amount equal to the greater of one month's Base Rent or the Security Deposit, and to pay an excess of such expense under protest, reserving Lessee's right to reimbursement from Lessor.  Lessee shall document the cost of said cure and supply said documentation to Lessor.

14.     Condemnation.  If the Premises or any portion thereof are taken under the power of eminent domain or sold under the threat of the exercise of said power (collectively "Condemnation"), this Lease shall terminate as to the part taken as of the date the condemning authority takes title or possession, whichever first occurs.  If more than 10% of the floor area of the Unit, or more than 25% of Lessee's Reserved Parking Spaces, is taken by Condemnation, Lessee may, at Lessee's option, to be exercised in writing within 10 days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within 10 days after the condemning authority shall have taken possession) terminate the Lease as of the date the condemning authority takes such possession.  If Lessee does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent shall be reduced in proportion to the reduction in utility of the Premises caused by such Condemnation.  Condemnation awards and/or payments shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold, the value of the part taken, or for severance damages; provided, however, that Lessee shall be entitled to any compensation for Lessee's relocation expenses, loss of business goodwill and/or Trade Fixtures, without regard to whether or not this Lease is terminated pursuant to the provisions of this Paragraph.  All Alterations and Utility Installations made to the Premises by Lessee, for purposes of Condemnation only, shall be considered the property of the Lessee and Lessee shall be entitled to any and all compensation which is payable therefor.  In the event that this Lease is not terminated by reason of the Condemnation, Lessor shall repair any damage to the Premises caused by such Condemnation.

15.     Brokerage Fees.

15.1     Additional Commission.  In addition to the payments owed pursuant to Paragraph 1.10 above, and unless Lessor and the Brokers otherwise agree in writing, Lessor agrees that:  (a) if Lessee exercises any Option, (b) if Lessee acquires from Lessor any rights to the Premises or other premises owned by Lessor and located within the Project, (c) if Lessee remains in possession of the Premises, with the consent of Lessor, after the expiration of this Lease, or (d) if Base Rent is increased, whether by agreement or operation of an escalation clause herein, then, Lessor shall pay Brokers a fee in accordance with the schedule of the Brokers in effect at the time of the execution of this Lease.

15.2     Assumption of Obligations.  Any buyer or transferee of Lessor's interest in this Lease shall be deemed to have assumed Lessor's obligation hereunder.  Brokers shall be third party beneficiaries of the provisions of Paragraphs 1.10, 15, 22 and 31.  If Lessor fails to pay to Brokers any amounts due as and for brokerage fees pertaining to this Lease when due, then such amounts shall accrue interest.  In addition, if Lessor fails to pay any amounts to Lessee's Broker when due, Lessee's Broker may send written notice to Lessor and Lessee of such failure and if Lessor fails to pay such amounts within 10 days after said notice, Lessee shall pay said monies to its Broker and offset such amounts against Rent.  In addition, Lessee's Broker shall be deemed to be a third party beneficiary of any commission agreement entered into by and/or between Lessor and Lessor's Broker for the limited purpose of collecting any brokerage fee owed.

15.3     Representations and Indemnities of Broker Relationships.  Lessee and Lessor each represent and warrant to the other that it has had no dealings with any person, firm, broker or finder (other than the Brokers, if any) in connection with this Lease, and that no one other than said named Brokers is entitled to any commission or finder's fee in connection herewith.  Lessee and Lessor do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying Party, including any costs, expenses, attorneys' fees reasonably incurred with respect thereto.

16.     Estoppel Certificates.

(a)     Each Party (as "Responding Party") shall within 10 days after written notice from the other Party (the "Requesting Party") execute, acknowledge and deliver to the Requesting Party a statement in writing in form similar to the then most current "Estoppel Certificate" form published by the American Industrial Real Estate Association, plus such additional information, confirmation and/or statements as may be reasonably requested by the Requesting Party.

(b)     If the Responding Party shall fail to execute or deliver the Estoppel Certificate within such 10 day period, the Requesting Party may execute an Estoppel Certificate stating that: (i) the Lease is in full force and effect without modification except as may be represented by the Requesting Party, (ii) there are no uncured defaults in the Requesting Party's performance, and (iii) if Lessor is the Requesting Party, not more than one month's rent has been paid in advance.  Prospective purchasers and encumbrancers may rely upon the Requesting Party's Estoppel Certificate, and the Responding Party shall be estopped from denying the truth of the facts contained in said Certificate.

(c)     If Lessor desires to finance, refinance, or sell the Premises, or any part thereof, Lessee and all Guarantors shall deliver to any potential lender or purchaser designated by Lessor such financial statements as may be reasonably required by such lender or purchaser, including but not limited to Lessee's financial statements for the past 3 years.  All such financial statements shall be received by Lessor and such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

17.     Definition of Lessor.  The term "Lessor" as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a sublease, of the Lessee's interest in the prior lease.  In the event of a transfer of Lessor's title or interest in the Premises or this Lease, Lessor shall deliver to the transferee or assignee (in cash or by credit) any unused Security Deposit held by Lessor.  Except as provided in Paragraph 15, upon such transfer or assignment and delivery of the Security Deposit, as aforesaid, the prior Lessor shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Lessor.  Subject to the foregoing, the obligations and/or covenants in this Lease to be performed by the Lessor shall be binding only upon the Lessor as hereinabove defined.  Notwithstanding the above, and subject to the provisions of Paragraph 20 below, the original Lessor under this Lease, and all subsequent holders of the Lessor's interest in this Lease shall remain liable and responsible with regard to the potential duties and liabilities of Lessor pertaining to Hazardous Substances as outlined in Paragraph 6.2 above.

18.     Severability.  The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

19.     Days.  Unless otherwise specifically indicated to the contrary, the word "days" as used in this Lease shall mean and refer to calendar days.

20.     Limitation on Liability.  Subject to the provisions of Paragraph 17 above, the obligations of Lessor under this Lease shall not constitute personal obligations of Lessor, the individual partners of Lessor or its or their individual partners, directors, officers or shareholders, and Lessee shall look to the Premises, and to no other assets of Lessor, for the satisfaction of any liability of Lessor with respect to this Lease, and shall not seek recourse against the individual partners of Lessor, or its or their individual partners, directors, officers or shareholders, or any of their personal assets for such satisfaction.

21.     Time of Essence.  Time is of the essence with respect to the performance of all obligations to be performed or observed by the Parties under this Lease.

22.     No Prior or Other Agreements; Broker Disclaimer.  This Lease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective.  Lessor and Lessee each represents and warrants to the Brokers that it has made, and is relying solely upon, its own investigation as to the nature, quality, character and financial responsibility of the other Party to this Lease and as to the use, nature, quality and character of the Premises.  Brokers have no responsibility with respect thereto or with respect to any default or breach hereof by either Party.  The liability (including court costs and attorneys' fees), of any Broker with respect to negotiation, execution, delivery or performance by either Lessor or Lessee under this Lease or any amendment or modification hereto shall be limited to an amount up to the fee received by such Broker pursuant to this Lease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

23.     Notices.

23.1 Notice Requirements.  All notices required or permitted by this Lease or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by facsimile transmission, and shall be deemed sufficiently given if served in a manner specified in this Paragraph 23.  The addresses noted adjacent to a Party's signature on this Lease shall be that Party's address for delivery or mailing of notices.  Either Party may by written notice to the other specify a different address for notice, except that upon Lessee's taking possession of the Premises, the Premises shall constitute Lessee's address for notice.  A copy of all notices to Lessor shall be concurrently transmitted to such party or parties at such addresses as Lessor may from time to time hereafter designate in writing.

23.2 Date of Notice.  Any notice sent by registered or certified mail, return receipt requested, shall be deemed given on the date of delivery shown

Initials                              Page 9 of 11                              Initials

Case 2:02-cr-00220-MCS   Document 2475-10   Filed 10/05/23   Page 32 of 145   Page ID #:22291

76168

Exhibit 167 - 2632

on the receipt card, or if no delivery date is shown, the postmark thereon. If sent by regular mail the notice shall be deemed given 48 hours after the same is addressed as required herein and mailed with postage prepaid. Notices delivered by United States Express Mail or overnight courier that guarantee next day delivery shall be deemed given 24 hours after delivery of the same to the Postal Service or courier. Notices transmitted by facsimile transmission or similar means shall be deemed delivered upon telephone confirmation of receipt (confirmation report from fax machine is sufficient), provided a copy is also delivered via delivery or mail. If notice is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

24.     Waivers.  No waiver by Lessor of the Default or Breach of any term, covenant or condition hereof by Lessee, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Default or Breach by Lessee of the same or of any other term, covenant or condition hereof. Lessor's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessor's consent to, or approval of, any subsequent or similar act by Lessee, or be construed as the basis of an estoppel to enforce the provision or provisions of this Lease requiring such consent. The acceptance of Rent by Lessor shall not be a waiver of any Default or Breach by Lessee. Any payment by Lessee may be accepted by Lessor on account of moneys or damages due Lessor, notwithstanding any qualifying statements or conditions made by Lessee in connection therewith, which such statements and/or conditions shall be of no force or effect whatsoever unless specifically agreed to in writing by Lessor at or before the time of deposit of such payment.

25.     Disclosures Regarding The Nature of a Real Estate Agency Relationship.

(a)     When entering into a discussion with a real estate agent regarding a real estate transaction, a Lessor or Lessee should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction.  Lessor and Lessee acknowledge being advised by the Brokers in this transaction, as follows:

(i)     Lessor's Agent.  A Lessor's agent under a listing agreement with the Lessor acts as the agent for the Lessor only.  A Lessor's agent or subagent has the following affirmative obligations:  To the Lessor: A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessor.  To the Lessee and the Lessor: (a) Diligent exercise of reasonable skills and care in performance of the agent's duties.  (b) A duty of honest and fair dealing and good faith.  (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties.  An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(ii)     Lessee's Agent.  An agent can agree to act as agent for the Lessee only.  In these situations, the agent is not the Lessor's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Lessor. An agent acting only for a Lessee has the following affirmative obligations.  To the Lessee: A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessee.  To the Lessee and the Lessor: (a) Diligent exercise of reasonable skills and care in performance of the agent's duties. (b) A duty of honest and fair dealing and good faith.  (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties.  An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(iii)     Agent Representing Both Lessor and Lessee.  A real estate agent, either acting directly or through one or more associate licensees, can legally be the agent of both the Lessor and the Lessee in a transaction, but only with the knowledge and consent of both the Lessor and the Lessee. In a dual agency situation, the agent has the following affirmative obligations to both the Lessor and the Lessee: (a) A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either Lessor or the Lessee.  (b) Other duties to the Lessor and the Lessee as stated above in subparagraphs (i) or (ii).  In representing both Lessor and Lessee, the agent may not without the express permission of the respective Party, disclose to the other Party that the Lessor will accept rent in an amount less than that indicated in the listing or that the Lessee is willing to pay a higher rent than that offered.  The above duties of the agent in a real estate transaction do not relieve a Lessor or Lessee from the responsibility to protect their own interests. Lessor and Lessee should carefully read all agreements to assure that they adequately express their understanding of the transaction.  A real estate agent is a person qualified to advise about real estate.  If legal or tax advice is desired, consult a competent professional.

(b)     Brokers have no responsibility with respect to any default or breach hereof by either Party.  The liability (including court costs and attorneys' fees), of any Broker with respect to any breach of duty, error or omission relating to this Lease shall not exceed the fee received by such Broker pursuant to this Lease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

(c)     Buyer and Seller agree to identify to Brokers as "Confidential" any communication or information given Brokers that is considered by such Party to be confidential.

26.     No Right To Holdover.  Lessee has no right to retain possession of the Premises or any part thereof beyond the expiration or termination of this Lease.  In the event that Lessee holds over, then the Base Rent shall be increased to 150% of the Base Rent applicable immediately preceding the expiration or termination.  Nothing contained herein shall be construed as consent by Lessor to any holding over by Lessee.

27.     Cumulative Remedies.  No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

28.     Covenants and Conditions; Construction of Agreement.  All provisions of this Lease to be observed or performed by Lessee are both covenants and conditions.  In construing this Lease, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Lease.  Whenever required by the context, the singular shall include the plural and vice versa.  This Lease shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

29.     Binding Effect; Choice of Law.  This Lease shall be binding upon the parties, their personal representatives, successors and assigns and be governed by the laws of the State in which the Premises are located.  Any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.

30.     Subordination; Attornment; Non-Disturbance.

30.1     Subordination.  This Lease and any Option granted hereby shall be subject and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device (collectively, "Security Device"), now or hereafter placed upon the Premises, to any and all advances made on the security thereof, and to all renewals, modifications, and extensions thereof.  Lessee agrees that the holders of any such Security Devices (in this Lease together referred to as "Lender") shall have no liability or obligation to perform any of the obligations of Lessor under this Lease.  Any Lender may elect to have this Lease and/or any Option granted hereby superior to the lien of its Security Device by giving written notice thereof to Lessee, whereupon this Lease and such Options shall be deemed prior to such Security Device, notwithstanding the relative dates of the documentation or recordation thereof.

30.2     Attornment.  In the event that Lessor transfers title to the Premises, or the Premises are acquired by another upon the foreclosure or termination of a Security Device to which this Lease is subordinated (i) Lessee shall, subject to the non-disturbance provisions of Paragraph 30.3, attorn to such new owner, and upon request, enter into a new lease, containing all of the terms and provisions of this Lease, with such new owner for the remainder of the term hereof, or, at the election of such new owner, this Lease shall automatically become a new Lease between Lessee and such new owner, upon all of the terms and conditions hereof, for the remainder of the term hereof, and (ii) Lessor shall thereafter be relieved of any further obligations hereunder and such new owner shall assume all of Lessor's obligations hereunder, except that such new owner shall not:  (a) be liable for any act or omission of any prior lessor or with respect to events occurring prior to acquisition of ownership; (b) be subject to any offsets or defenses which Lessee might have against any prior lessor, (c) be bound by prepayment of more than one month's rent, or (d) be liable for the return of any security deposit paid to any prior lessor.

30.3     Non-Disturbance.  With respect to Security Devices entered into by Lessor after the execution of this Lease, Lessee's subordination of this Lease shall be subject to receiving a commercially reasonable non-disturbance agreement (a "Non-Disturbance Agreement") from the Lender which Non-Disturbance Agreement provides that Lessee's possession of the Premises, and this Lease, including any options to extend the term hereof, will not be disturbed so long as Lessee is not in Breach hereof and attorns to the record owner of the Premises.  Further, within 60 days after the execution of this Lease, Lessor shall use its commercially reasonable efforts to obtain a Non-Disturbance Agreement from the holder of any pre-existing Security Device which is secured by the Premises.  In the event that Lessor is unable to provide the Non-Disturbance Agreement within 60 days, then Lessee may, at Lessee's option, directly contact Lender and attempt to negotiate for the execution and delivery of a Non-Disturbance Agreement.

30.4     Self-Executing.  The agreements contained in this Paragraph 30 shall be effective without the execution of any further documents; provided, however, that, upon written request from Lessor or a Lender in connection with a sale, financing or refinancing of the Premises, Lessee and Lessor shall execute such further writings as may be reasonably required to separately document any subordination, attornment and/or Non-Disturbance Agreement provided for herein.

31.     Attorneys' Fees.  If any Party or Broker brings an action or proceeding involving the Premises whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees.  Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment.  The term, "Prevailing Party" shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense.  The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred.  In addition, Lessor shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Default or resulting Breach ($200 is a reasonable minimum per occurrence for such services and consultation).

32.     Lessor's Access; Showing Premises; Repairs.  Lessor and Lessor's agents shall have the right to enter the Premises at any time, in the case of an emergency, and otherwise at reasonable times for the purpose of showing the same to prospective purchasers, lenders, or tenants, and making such alterations, repairs, improvements or additions to the Premises as Lessor may deem necessary.  All such activities shall be without abatement of rent or

Initials                                                                                                                                         Initials

Case 2:02-cr-00220-MCS   Document 2475-10   Filed 10/05/23   Page 33 of 145   Page ID #:22292

liability to Lessee. Lessor may at any time place on the Premises any ordinary "For Sale" signs and Lessor may during the last 6 months of the term hereof place on the Premises any ordinary "For Lease" signs. Lessee may at any time place on the Premises any ordinary "For Sublease" sign.

33. **Auctions.** Lessee shall not conduct, nor permit to be conducted, any auction upon the Premises without Lessor's prior written consent. Lessor shall not be obligated to exercise any standard of reasonableness in determining whether to permit an auction.

34. **Signs.** Except for ordinary "For Sublease" signs which may be placed only on the Premises, Lessee shall not place any sign upon the Project without Lessor's prior written consent. All signs must comply with all Applicable Requirements.

35. **Termination; Merger.** Unless specifically stated otherwise in writing by Lessor, the voluntary or other surrender of this Lease by Lessee, the mutual termination or cancellation hereof, or a termination hereof by Lessor for Breach by Lessee, shall automatically terminate any sublease or lesser estate in the Premises; provided, however, that Lessor may elect to continue any one or all existing subtenancies. Lessor's failure within 10 days following any such event to elect to the contrary by written notice to the holder of any such lesser interest, shall constitute Lessor's election to have such event constitute the termination of such interest.

36. **Consents.** Except as otherwise provided herein, wherever in this Lease the consent of a Party is required to an act by or for the other Party, such consent shall not be unreasonably withheld or delayed. Lessor's actual reasonable costs and expenses (including but not limited to architects', attorneys', engineers' and other consultants' fees) incurred in the consideration of, or response to, a request by Lessee for any Lessor consent, including but not limited to consents to an assignment, a subletting or the presence or use of a Hazardous Substance, shall be paid by Lessee upon receipt of an invoice and supporting documentation therefor. Lessor's consent to any act, assignment or subletting shall not constitute an acknowledgment that no Default or Breach by Lessee of this Lease exists, nor shall such consent be deemed a waiver of any then existing Default or Breach, except as may be otherwise specifically stated in writing by Lessor at the time of such consent. The failure to specify herein any particular condition to Lessor's consent shall not preclude the imposition by Lessor at the time of consent of such further or other conditions as are then reasonable with reference to the particular matter for which consent is being given. In the event that either Party disagrees with any determination made by the other hereunder and reasonably requests the reasons for such determination, the determining party shall furnish its reasons in writing and in reasonable detail within 10 business days following such request.

37. **Guarantor.**

37.1 **Execution.** The Guarantors, if any, shall each execute a guaranty in the form most recently published by the American Industrial Real Estate Association, and each such Guarantor shall have the same obligations as Lessee under this Lease.

37.2 **Default.** It shall constitute a Default of the Lessee if any Guarantor fails or refuses, upon request to provide: (a) evidence of the execution of the guaranty, including the authority of the party signing on Guarantor's behalf to obligate Guarantor, and in the case of a corporate Guarantor, a certified copy of a resolution of its board of directors authorizing the making of such guaranty, (b) current financial statements, (c) an Estoppel Certificate, or (d) written confirmation that the guaranty is still in effect.

38. **Quiet Possession.** Subject to payment by Lessee of the Rent and performance of all of the covenants, conditions and provisions on Lessee's part to be observed and performed under this Lease, Lessee shall have quiet possession and quiet enjoyment of the Premises during the term hereof.

39. **Options.** If Lessee is granted an option, as defined below, then the following provisions shall apply.

39.1 **Definition.** "Option" shall mean: (a) the right to extend the term of or renew this Lease or to extend or renew any lease that Lessee has on other property of Lessor; (b) the right of first refusal or first offer to lease either the Premises or other property of Lessor; (c) the right to purchase or the right of first refusal to purchase the Premises or other property of Lessor.

39.2 **Options Personal To Original Lessee.** Any Option granted to Lessee in this Lease is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and, if requested by Lessor, with Lessee certifying that Lessee has no intention of thereafter assigning or subletting.

39.3 **Multiple Options.** In the event that Lessee has any multiple Options to extend or renew this Lease, a later Option cannot be exercised unless the prior Options have been validly exercised.

39.4 **Effect of Default on Options.**

(a) Lessee shall have no right to exercise an Option: (i) during the period commencing with the giving of any notice of Default and continuing until said Default is cured, (ii) during the period of time any Rent is unpaid (without regard to whether notice thereof is given Lessee), (iii) during the time Lessee is in Breach of this Lease, or (iv) in the event that Lessee has been given 3 or more notices of separate Default, whether or not the Defaults are cured, during the 12 month period immediately preceding the exercise of the Option.

(b) The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Lessee's inability to exercise an Option because of the provisions of Paragraph 39.4(a).

(c) An Option shall terminate and be of no further force or effect, notwithstanding Lessee's due and timely exercise of the Option, if, after such exercise and prior to the commencement of the extended term, (i) Lessee fails to pay Rent for a period of 30 days after such Rent becomes due (without any necessity of Lessor to give notice thereof), (ii) Lessor gives to Lessee 3 or more notices of separate Default during any 12 month period, whether or not the Defaults are cured, or (iii) if Lessee commits a Breach of this Lease.

40. **Security Measures.** Lessee hereby acknowledges that the Rent payable to Lessor hereunder does not include the cost of guard service or other security measures, and that Lessor shall have no obligation whatsoever to provide same. Lessee assumes all responsibility for the protection of the Premises, Lessee, its agents and invitees and their property from the acts of third parties.

41. **Reservations.** Lessor reserves the right: (i) to grant, without the consent or joinder of Lessee, such easements, rights and dedications that Lessor deems necessary, (ii) to cause the recordation of parcel maps and restrictions, and (iii) to create and/or install new utility raceways, so long as such easements, rights, dedications, maps, restrictions, and utility raceways do not unreasonably interfere with the use of the Premises by Lessee. Lessee agrees to sign any documents reasonably requested by Lessor to effectuate such rights.

42. **Performance Under Protest.** If at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum. If it shall be adjudged that there was no legal obligation on the part of said Party to pay such sum or any part thereof, said Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay.

43. **Authority.** If either Party hereto is a corporation, trust, limited liability company, partnership, or similar entity, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf. Each party shall, within 30 days after request, deliver to the other party satisfactory evidence of such authority.

44. **Conflict.** Any conflict between the printed provisions of this Lease and the typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

45. **Offer.** Preparation of this Lease by either party or their agent and submission of same to the other Party shall not be deemed an offer to lease to the other Party. This Lease is not intended to be binding until executed and delivered by all Parties hereto.

46. **Amendments.** This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification. As long as they do not materially change Lessee's obligations hereunder, Lessee agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.

47. **Multiple Parties.** If more than one person or entity is named herein as either Lessor or Lessee, such multiple Parties shall have joint and several responsibility to comply with the terms of this Lease.

48. **Waiver of Jury Trial.** The Parties hereby waive their respective rights to trial by jury in any action or proceeding involving the Property or arising out of this Agreement.

49. **Mediation and Arbitration of Disputes.** An Addendum requiring the Mediation and/or the Arbitration of all disputes between the Parties and/or Brokers arising out of this Lease ☐ is ☒ is not attached to this Lease.

50. *Tenant Improvements. Lessor shall provide Lessee with premises in a vanilla shell condition including the removal of all existing flooring, the removal of the existing counter, the repair and replacement of the existing T-Bar ceiling tiles as necessary and the installation of a new door in the existing partition wall.*

51. *Rent Commencement. Notwithstanding anything to the contrary, the Base Rent and other charges shall commence upon the sooner of sixty (60) days from delivery of Premises from Lessor or Lessee's open for business date. At such time, Lessor and Lessee shall execute an official commencement letter which sets forth the commencement and termination date of the lease.*

52. *Parking. Subject to the Parking Rules in the attached Rules and Regulations, Lessee's customers shall have the right to park in the rear of the Premises in common with the other customers of the Premises. Lessee shall not have the right to any reserved spaces. Additionally, notwithstanding anything to the contrary, Lessee shall not park more than one (1) employee vehicle in the parking lot*

LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN, AND BY THE EXECUTION OF THIS LEASE SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO. THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND

Initials _____    Initials _____

Exhibit 167 - 2634

76170

PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.
ATTENTION: NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE AMERICAN INDUSTRIAL REAL ESTATE ASSOCIATION OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION TO WHICH IT RELATES.  THE PARTIES ARE URGED TO:
1.      SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.
2.      RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES.  SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PREMISES, THE STRUCTURAL INTEGRITY, THE CONDITION OF THE ROOF AND OPERATING SYSTEMS, COMPLIANCE WITH THE AMERICANS WITH DISABILITIES ACT AND THE SUITABILITY OF THE PREMISES FOR LESSEE'S INTENDED USE.
WARNING:  IF THE PREMISES ARE LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE LEASE MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PREMISES ARE LOCATED.

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

| | |
|---|---|
| Executed at: _____ | Executed at: _Encino, CA_ |
| on: _____ | on: _June 13, 00_ |
| By LESSOR: | By LESSEE: |
| George Birnbaum | Designed Water World, Inc. / Mr. Jurijus |
| | Kadamovas / Mr. Iouri Mikhel |
| By: _[signature]_ | By: _[signature]_ |
| Name Printed: George Birnbaum | Name Printed: Mr. Jurijus Kadamovas |
| Title: _____ | Title: _____ |
| By: _____ | By: _[signature]_ |
| Name Printed: _____ | Name Printed: Mr. Iouri Mikhel |
| Title: _____ | Title: _____ |
| Address: 2900 South Main Street | Address: 9461 Charleville Blvd., #578 |
| Los Angeles, CA 90007 | Beverly Hills, CA 90212-3017 |
| Telephone: (213) 747-6172 | Telephone: (__) _____ |
| Facsimile: (213) 747-6177 | Facsimile: (__) _____ |
| Federal ID No. _____ | Federal ID No. _____ |

These forms are often modified to meet changing requirements of law and needs of the industry. Always write or call to make sure you are utilizing the most current form: American Industrial Real Estate Association, 700 South Flower Street, Suite 600, Los Angeles, CA 90017. (213) 687-8777.

©Copyright 1989 By American Industrial Real Estate Association.
All rights reserved.
No part of these works may be reproduced in any form without permission in writing.

Initials _[initials]_     Initials _[initials]_

Exhibit 167 - 2635

76171

# RENT ADJUSTMENT(S)
## STANDARD LEASE ADDENDUM

Dated _____ July 5, 2000 _____

By and Between (Lessor) George Birnbaum _____

_____

(Lessee) Mr. Jurijus Kadamovas and Mr. Iouri
Mikhel DBA Designed Water World

Address of Premises: 13605 Ventura Boulevard, Sherman Oaks, CA _____

Paragraph _53_

A. RENT ADJUSTMENTS:
The monthly rent for each month of the adjustment period(s) specified below shall be increased using the method(s) indicated below:

(Check Method(s) to be Used and Fill in Appropriately)

☑ I. Cost of Living Adjustment(s) (COLA)

   a. On (Fill in COLA Dates): each lease year anniversary _____

the Base Rent shall be adjusted by the change, if any, from the Base Month specified below, in the Consumer Price Index of the Bureau of Labor Statistics of the U.S. Department of Labor for (select one): ☐ CPI W (Urban Wage Earners and Clerical Workers) or ☑ CPI U (All Urban Consumers), for (Fill in Urban Area): _____ Los Angeles, Anaheim and Riverside _____,
All Items (1982-1984 = 100), herein referred to as "CPI".

   b. The monthly rent payable in accordance with paragraph A.I.a. of this Addendum shall be calculated as follows: the Base Rent set forth in paragraph 1.5 of the attached Lease, shall be multiplied by a fraction the numerator of which shall be the CPI of the calendar month two months prior to the month(s) specified in paragraph A.I.a. above during which the adjustment is to take effect, and the denominator of which shall be the CPI of the calendar month which is two months prior to (select one): ☑ the first month of the term of this Lease as set forth in paragraph 1.3 ("Base Month") or ☐ (Fill in Other "Base Month"): _____ . The sum so calculated shall constitute the new monthly rent hereunder, but in no event, shall any such new monthly rent increase be less than three percent (3%) and no greater than six percent (6%). ~~the rent payable for the month immediately proceeding the rent adjustment.~~

   c. In the event the compilation and/or publication of the CPI shall be transferred to any other governmental department or bureau or agency or shall be discontinued, then the index most nearly the same as the CPI shall be used to make such calculation. In the event that the Parties cannot agree on such alternative index, then the matter shall be submitted for decision to the American Arbitration Association in accordance with the then rules of said Association and the decision of the arbitrators shall be binding upon the parties. The cost of said Arbitration shall be paid equally by the Parties.

☐ II. Market Rental Value Adjustment(s) (MRV)

   a. On (Fill in MRV Adjustment Date(s): _____

the Base Rent shall be adjusted to the "Market Rental Value" of the property as follows:

   1) Four months prior to each Market Rental Value Adjustment Date described above, the Parties shall attempt to agree upon what the new MRV will be on the adjustment date. If agreement cannot be reached within thirty days, then:

      (a) Lessor and Lessee shall immediately appoint a mutually acceptable appraiser or broker to establish the new MRV within the next thirty days. Any associated costs will be split equally between the Parties, or

      (b) Both Lessor and Lessee shall each immediately make a reasonable determination of the MRV and submit such determination, in writing, to arbitration in accordance with the following provisions:

         (i) Within fifteen days thereafter, Lessor and Lessee shall each select an ☐ appraiser or ☐ broker ("Consultant" - check one) of their choice to act as an arbitrator. The two arbitrators so appointed shall immediately select a third mutually acceptable Consultant to act as a third arbitrator.

         (ii) The Three arbitrators shall within thirty days of the appointment of the third arbitrator reach a decision as to what the actual MRV for the Premises is, and whether Lessor's or Lessee's submitted MRV is the closest thereto. The decision of a majority of the arbitrators shall be binding on the Parties. The submitted MRV which is determined to be the closest to the actual MRV shall thereafter be used by the Parties.

         (iii) If either of the Parties fails to appoint an arbitrator within the specified fifteen days, the arbitrator timely appointed by one of them shall reach a decision on his or her own, and said decision shall be binding on the Parties.

         (iv) The entire cost of such arbitration shall be paid by the party whose submitted MRV is not selected, ie. the one that is NOT the closest to the actual MRV.

   2) Notwithstanding the foregoing, the new MRV shall not be less than the rent payable for the month immediately preceding the rent adjustment.

Initials: _____                                         Initials: _____

For this form, write: American Industrial Real Estate Association, 700 S. Flower Street, Suite 600, Los Angeles, Calif. 90017
©1997 - American Industrial Real Estate Association          REVISED          FORM RA-2-9/97E



b. Upon the establishment of each New Market Rental Value:
    1) the new MRV will become the new "Base Rent" for the purpose of calculating any further Adjustments, and
    2) the first month of each Market Rental Value term shall become the new 'Base Month' for the purpose of calculating any further Adjustments.

☐  iii.  Fixed Rental Adjustment(s) (FRA)

The Base Rent shall be increased to the following amounts on the dates set forth below:

| On (Fill in FRA Adjustment Date(s)): | The New Base Rent shall be: |
|---|---|
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |

B.  NOTICE:
    Unless specified otherwise herein, notice of any such adjustments, other than Fixed Rental Adjustments, shall be made as specified in paragraph 23 of the Lease.

C.  BROKER'S FEE:
    The Brokers specified in paragraph 1.10 shall be paid a Brokerage Fee for each adjustment specified above in accordance with paragraph 15 of the Lease.

Initials: _____    Initials: _____

NT ADJUSTMENTS
Page 2 of 2

For this form, write: American Industrial Rea...      ...ociation, 700 S. Flower Street, Suite 600, Los Angeles, Calif. 90017

76172

*Exhibit 167 - 2636*

Exhibit 167 - 2637

76173

## OPTION(S) TO EXTEND
### STANDARD LEASE ADDENDUM

Dated _____ July 5, 2000 _____

By and Between (Lessor) George Birnbaum _____

(Lessee) Mr. Jurijus Kadamovas and Mr. Iouri Mikhel DBA Designed Water World

Address of Premises: 13605 Ventura Boulevard, Sherman Oaks, CA

Paragraph __54__

A. OPTION(S) TO EXTEND:
Lessor hereby grants to Lessee the option to extend the term of this Lease for __One (1)__ additional Thirty-Six (36) month period(s) commencing when the prior term expires upon each and all of the following terms and conditions:

(i) In order to exercise an option to extend, Lessee must give written notice of such election to Lessor and Lessor must receive the same at least __6__ but not more than __9__ months prior to the date that the option period would commence, time being of the essence. If proper notification of the exercise of an option is not given and/or received, such option shall automatically expire. Options (if there are more than one) may only be exercised consecutively.

(ii) The provisions of paragraph 39, including those relating to Lessee's Default set forth in paragraph 39.4 of this Lease, are conditions of this Option.

(iii) Except for the provisions of this Lease granting an option or options to extend the term, all of the terms and conditions of this Lease except where specifically modified by this option shall apply.

(iv) This Option is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and without the intention of thereafter assigning or subletting.

(v) The monthly rent for each month of the option period shall be calculated as follows, using the method(s) indicated below: (Check Method(s) to be Used and Fill in Appropriately)

☑ I. Cost of Living Adjustment(s) (COLA)
a. On (Fill in COLA Dates): each lease year anniversary _____

the Base Rent shall be adjusted by the change, if any, from the Base Month specified below, in the Consumer Price Index of the Bureau of Labor Statistics of the U.S. Department of Labor for (select one): ☐ CPI W (Urban Wage Earners and Clerical Workers) or ☑ CPI U (All Urban Consumers), for (Fill in Urban Area):
Los Angeles, Anaheim and Riverside ._____
All Items (1982-1984 = 100), herein referred to as "CPI".

b. The monthly rent payable in accordance with paragraph A.I.a. of this Addendum shall be calculated as follows: the Base Rent set forth in paragraph 1.5 of the attached Lease, shall be multiplied by a fraction the numerator of which shall be the CPI of the calendar month two months prior to the month(s) specified in paragraph A.I.a. above during which the adjustment is to take effect, and the denominator of which shall be the CPI of the calendar month which is two months prior to (select one): ☑ the first month of the term of this Lease as set forth in paragraph 1.3 ("Base Month") or ☐ (Fill in Other "Base Month"): _____. The sum so calculated shall constitute the new monthly rent hereunder,

~~but in no event, shall any such new monthly rent increase be less than three percent (3%) and no greater than six percent (6%) the rent payable for the month immediately preceding the rent adjustment.~~

c. In the event the compilation and/or publication of the CPI shall be transferred to any other governmental department or bureau or agency or shall be discontinued, then the index most nearly the same as the CPI shall be used to make such calculation. In the event that the Parties cannot agree on such alternative index, then the matter shall be submitted for decision to the American Arbitration Association in accordance with the then rules of said Association and the decision of the arbitrators shall be binding upon the parties. The cost of said Arbitration shall be paid equally by the Parties.

☐ II. Market Rental Value Adjustment(s) (MRV)
a. On (Fill in MRV Adjustment Date(s)) _____

the Base Rent shall be adjusted to the "Market Rental Value" of the property as follows:

1) Four months prior to each Market Rental Value Adjustment Date described above, the Parties shall attempt to agree upon what the new MRV will be on the adjustment date. If agreement cannot be reached, within thirty days, then:

(a) Lessor and Lessee shall immediately appoint a mutually acceptable appraiser or broker to establish the new MRV within the next thirty days. Any associated costs will be split equally between the Parties, or

Initials: _____    Initials: _____

©1997 - American Industrial Real Estate Association

Page 1 of 2
REVISED

FORM OE-2-3/97E

(b) Both Lessor and Lessee shall each immediately make a reasonable determination of the MRV and submit such determination, in writing, to arbitration in accordance with the following provisions:

(i) Within fifteen days thereafter, Lessor and Lessee shall each select an ☐ appraiser or ☐ broker ("Consultant" - check one) of their choice to act as an arbitrator. The two arbitrators so appointed shall immediately select a third mutually acceptable Consultant to act as a third arbitrator.

(ii) The three arbitrators shall within thirty days of the appointment of the third arbitrator reach a decision as to what the actual MRV for the Premises is, and whether Lessor's or Lessee's submitted MRV is the closest thereto. The decision of a majority of the arbitrators shall be binding on the Parties. The submitted MRV which is determined to be the closest to the actual MRV shall thereafter be used by the Parties.

(iii) If either of the Parties fails to appoint an arbitrator within the specified fifteen days, the arbitrator timely appointed by one of them shall reach a decision on his or her own, and said decision shall be binding on the Parties.

(iv) The entire cost of such arbitration shall be paid by the party whose submitted MRV is not selected, ie. the one that is NOT the closest to the actual MRV.

2) Notwithstanding the foregoing, the new MRV shall not be less than the rent payable for the month immediately preceding the rent adjustment.

b. Upon the establishment of each New Market Rental Value:

1) the new MRV will become the new "Base Rent" for the purpose of calculating any further Adjustments, and
2) the first month of each Market Rental Value term shall become the new "Base Month" for the purpose of calculating any further Adjustments.

☐ III. Fixed Rental Adjustment(s) (FRA)
The Base Rent shall be increased to the following amounts on the dates set forth below:

| On (Fill in FRA Adjustment Date(s)): | The New Base Rent shall be: |
|---|---|
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |
| _____ | $_____ |

B. NOTICE:
Unless specified otherwise herein, notice of any rental adjustments, other than Fixed Rental Adjustments, shall be made as specified in paragraph 23 of the Lease.

C. BROKER'S FEE:
The Brokers specified in paragraph 1.10 shall be paid a Brokerage Fee for each adjustment specified above in accordance with paragraph 15 of the Lease.

Initials: _____

Initials: _____

©1997 - American Industrial Real Estate Association

Page 2 of 2
REVISED

FORM OE-2-3/97E

76174

Exhibit 167 - 2638



Exhibit 167 - 2639

76175

# RULES AND REGULATIONS FOR
# STANDARD OFFICE LEASE

Dated: _____ July 5, 2000 _____

By and Between George Birnbaum ("Lessor") and Jurijus Kadamovas and Iouri Mikhel DBA Designed Water World ("Lessee")

## GENERAL RULES

1. Lessee shall not suffer or permit the obstruction of any Common Areas, including driveways, walkways and stairways.
2. Lessor reserves the right to refuse access to any persons Lessor in good faith judges to be a threat to the safety and reputation of the Project and its occupants.
3. Lessee shall not make or permit any noise or odors that annoy or interfere with other lessees or persons having business within the Project.
4. Lessee shall not keep animals or birds within the Project, and shall not bring bicycles, motorcycles or other vehicles into areas not designated as authorized for same.
5. Lessee shall not make, suffer or permit litter except in appropriate receptacles for that purpose.
6. Lessee shall not alter any lock or install new or additional locks or bolts.
7. Lessee shall be responsible for the inappropriate use of any toilet rooms, plumbing or other utilities. No foreign substances of any kind are to be inserted therein.
8. Lessee shall not deface the walls, partitions or other surfaces of the Premises or Project.
9. Lessee shall not suffer or permit anything in or around the Premises or Building that causes excessive vibration or floor loading in any part of the Project.
10. Furniture, significant freight and equipment shall be moved into or out of the building only with the Lessor's knowledge and consent, and subject to such reasonable limitations, techniques and timing, as may be designated by Lessor. Lessee shall be responsible for any damage to the Office Building Project arising from any such activity.
11. Lessee shall not employ any service or contractor for services or work to be performed in the Building, except as approved by Lessor.
12. Lessor reserves the right to close and lock the Building on Saturdays, Sundays and Building Holidays, and on other days between the hours of _____ P.M. and _____ A.M. of the following day. If Lessee uses the Premises during such periods, Lessee shall be responsible for securely locking any doors it may have opened for entry.
13. Lessee shall return all keys at the termination of its tenancy and shall be responsible for the cost of replacing any keys that are lost.
14. No window coverings, shades or awnings shall be installed or used by Lessee.
15. No Lessee, employee or invitee shall go upon the roof of the Building.
16. Lessee shall not suffer or permit smoking or carrying of lighted cigars or cigarettes in areas reasonably designated by Lessor or by applicable governmental agencies as non-smoking areas.
17. Lessee shall not use any method of heating or air conditioning other than as provided by Lessor.
18. Lessee shall not install, maintain or operate any vending machines upon the Premises without Lessor's written consent.
19. The Premises shall not be used for lodging or manufacturing, cooking or food preparation.
20. Lessee shall comply with all safety, fire protection and evacuation regulations established by Lessor or any applicable governmental agency.
21. Lessor reserves the right to waive any one of these rules or regulations, and/or as to any particular Lessee, and any such waiver shall not constitute a waiver of any other rule or regulation or any subsequent application thereof to such Lessee.
22. Lessee assumes all risks from theft or vandalism and agrees to keep its Premises locked as may be required.
23. Lessor reserves the right to make such other reasonable rules and regulations as it may from time to time deem necessary for the appropriate operation and safety of the Project and its occupants. Lessee agrees to abide by these and such rules and regulations.

## PARKING RULES

1. Parking areas shall be used only for parking by vehicles no longer than full size, passenger automobiles herein called "Permitted Size Vehicles." Vehicles other than Permitted Size Vehicles are herein referred to as "Oversized Vehicles."
2. Lessee shall not permit or allow any vehicles that belong to or are controlled by Lessee or Lessee's employees, suppliers, shippers, customers, or invitees to be loaded, unloaded, or parked in areas other than those designated by Lessor for such activities.
3. Parking stickers or identification devices shall be the property of Lessor and be returned to Lessor by the holder thereof upon termination of the holder's parking privileges. Lessee will pay such replacement charge as is reasonably established by Lessor for the loss of such devices.
4. Lessor reserves the right to refuse the sale of monthly identification devices to any person or entity that willfully refuses to comply with the applicable rules, regulations, laws and/or agreements.
5. Lessor reserves the right to relocate all or a part of parking spaces from floor to floor, within one floor, and/or to reasonably adjacent offsite location(s), and to reasonably allocate them between compact and standard size spaces, as long as the same complies with applicable laws, ordinances and regulations.
6. Users of the parking area will obey all posted signs and park only in the areas designated for vehicle parking.
7. Unless otherwise instructed, every person using the parking area is required to park and lock his own vehicle. Lessor will not be responsible for any damage to vehicles, injury to persons or loss of property, all of which risks are assumed by the party using the parking area.
8. Validation, if established, will be permissible only by such method or methods as Lessor and/or its licensee may establish at rates generally applicable to visitor parking.
9. The maintenance, washing, waxing or cleaning of vehicles in the parking structure or Common Areas is prohibited.
10. Lessee shall be responsible for seeing that all of its employees, agents and invitees comply with the applicable parking rules, regulations, laws and agreements.
11. Lessor reserves the right to modify these rules and/or adopt such other reasonable and non-discriminatory rules and regulations as it may deem necessary for the proper operation of the parking area.
12. Such parking use as is herein provided is intended merely as a license only and no bailment is intended or shall be created hereby.

Initials                          Page 1 of 1                          Initials



76176

Exhibit 167 -  2640

Case 2:02-cr-00220-MCS   Document 2475-10   Filed 10/05/23   Page 41 of 145   Page
ID #:22300

76177

Exhibit 167 - 2641



## AMERICAN INDUSTRIAL REAL ESTATE ASSOCIATION
## GUARANTY OF LEASE

WHEREAS, _____ **George Birnbaum** _____, hereinafter "Lessor", and _____ **Designed Water World, Inc.** _____, hereinafter "Lessee", are about to execute a document entitled "Lease" dated _____ **July 5, 2000** _____ concerning the premises commonly known as _____ **13605 Ventura Boulevard, Sherman Oaks, CA** _____ wherein Lessor will lease the premises to Lessee, and

WHEREAS, _____ **Mr. Jurijus Kadamovas and Mr. Iouri Mikhel** _____ hereinafter "Guarantors" have a financial interest in Lessee, and

WHEREAS, Lessor would not execute the Lease if Guarantors did not execute and deliver to Lessor this Guarantee of Lease.

NOW THEREFORE, in consideration of the execution of the foregoing Lease by Lessor and as a material inducement to Lessor to execute said Lease, Guarantors hereby jointly, severally, unconditionally and irrevocably guarantee the prompt payment by Lessee of all rents and all other sums payable by Lessee under said Lease and the faithful and prompt performance by Lessee of each and every one of the terms, conditions and covenants of said Lease to be kept and performed by Lessee.

It is specifically agreed that the terms of the foregoing Lease may be modified by agreement between Lessor and Lessee, or by a course of conduct, and said Lease may be assigned by Lessor or any assignee of Lessor without consent or notice to Guarantors and that this Guaranty shall guarantee the performance of said Lease as so modified.

This Guaranty shall not be released, modified or affected by the failure or delay on the part of Lessor to enforce any of the rights or remedies of the Lessor under said Lease, whether pursuant to the terms thereof or at law or in equity.

No notice of default need be given to Guarantors, it being specifically agreed that the guarantee of the undersigned is a continuing guarantee under which Lessor may proceed immediately against Lessee and/or against Guarantors following any breach or default by Lessee or for the enforcement of any rights which Lessor may have as against Lessee under the terms of the Lease or at law or in equity.

Lessor shall have the right to proceed against Guarantors hereunder following any breach or default by Lessee without first proceeding against Lessee and without previous notice to or demand upon either Lessee or Guarantors.

Guarantors hereby waive (a) notice of acceptance of this Guaranty, (b) demand of payment, presentation and protest, (c) all right to assert or plead any statute of limitations relating to this Guaranty or the Lease, (d) any right to require the Lessor to proceed against the Lessee or any other Guarantor or any other person or entity liable to Lessor, (e) any right to require Lessor to apply to any default any security deposit or other security it may hold under the Lease, (f) any right to require Lessor to proceed under any other remedy Lessor may have before proceeding against Guarantors, (g) any right of subrogation.

Guarantors do hereby subrogate all existing or future indebtedness of Lessee to Guarantors to the obligations owed to Lessor under the Lease and this Guaranty.

If a Guarantor is married, such Guarantor expressly agrees that recourse may be had against his or her separate property for all of the obligations hereunder.

The obligations of Lessee under the Lease to execute and deliver estoppel statements and financial statements, as therein provided, shall be deemed to also require the Guarantors hereunder to do and provide the same.

The term "Lessor" refers to and means the Lessor named in the Lease and also Lessor's successors and assigns. So long as Lessor's interest in the Lease, the leased premises or the rents, issues and profits therefrom, are subject to any mortgage or deed of trust or assignment for security, no acquisition by Guarantors of the Lessor's interest shall affect the continuing obligation of Guarantors under this Guaranty which shall nevertheless continue in full force and effect for the benefit of the mortgagee, beneficiary, trustee or assignee under such mortgage, deed of trust or assignment and their successors and assigns.

The term "Lessee" refers to and means the Lessee named in the Lease and also Lessee's successors and assigns.

In the event any action be brought by said Lessor against Guarantors hereunder to enforce the obligation of Guarantors hereunder, the unsuccessful party in such action shall pay to the prevailing party therein a reasonable attorney's fee which shall be fixed by the court.

If this Form has been filled in, it has been prepared for submission to your attorney for his approval. No representation or recommendation is made by the American Industrial Real Estate Association, the real estate broker or its agents or employees as to the legal sufficiency, legal effect, or tax consequences of this Form or the transaction relating thereto.

Executed at _Encino_ _CA_  
on _June 18 00_  
Address _17337 Ventura Blvd_  
_#200 Encino CA 91316_

Jurijus Kadamovas _____

Iouri Mikhel _____

"GUARANTORS"

© 1986   American Industrial Real Estate Association   FORM 02-4-12/91D

FROM : FIRST AMERICAN RES          FAX NO. : 7147013692          NOV. 19 2002 01:02PM P1

November 7, 2002

George Birnbaum
Attorney at Law
2900 South Main Street
Los Angeles, California 90007

Dear Mr. Birnbaum:

Whereas we have a lease on the above premises dated July 5, 2000 which is scheduled to expire November 15, 2003 and are no longer operating our business there - we hereby authorize you to lease the same expeditiously at the best rates and terms.

Regards,

Iouri Mikhel

Dated: **11.15.02**

**76178**

**Exhibit 167 - 2642**

# GEORGE BIRNBAUM
### ATTORNEY AT LAW
### 2900 S. MAIN STREET
### LOS ANGELES, CA 90007
Tel: (213)747-6172, Wats (800)421-8857, Fax (213)747-6177

February 6, 2002

Mr. Jurius Kadamovas, Mr. Iouri Mikhel
Designed Water World
13605 Ventura Boulevard
Sherman Oaks, CA 91423

Re: Advance Rental

Dear Jurius and Iouri,

I hope this letter finds you enjoying yourself on a pleasant skiing vacation.

In our conversation last week you requested I calculate the rental for the coming year and you would determine whether to pay the rent in advance. This is the calculation:

| | |
|---|---:|
| 1. Currently outstanding rent per my letter of 1/24/02 - | 2805.01 |
| 2. Rent (Feb. 15 through Dec. 15) (1973.03 x 11) | 21703.33 |
| 3. Estimated monthly expenses for utilities (100.00), cleaning (60.00), clean awning (35.00), air condition maintenance (20.00) – ($215.00 x 13, Dec. 2001 through Dec. 2002, = $2795.00) Your 23% share - | 642.85 |
| 4. Property tax (2nd part due April) (your 23% share) - | 1360.72 |
| 5. Property tax (1st part for 2002-3 due Dec. 10) – (estimate) - | 1390.00 |
| 6. Rent adjustment for Nov. 15 & Dec. 15 rents (estimate) - | 150.00 |
| 7. Insurance for Nov. 2002 to Nov. 2003 (estimate) – see my letter of 12/3/01 - | 425.00 |
| TOTAL | $28,476.91 |

You should be aware that I am trying to give you as complete a list as possible and that the figure need not include all items listed above – especially those due towards the end of the year. You may not want to pay now for expenses due in November and December and covering the year 2003. Your accountant can give you tax advice on these matters. We can also make any advance payment subject to verification and adjustment at the end of the year. In any event please feel free to call me to discuss this.

Best regards,

George Birnbaum

**76179**

**Exhibit 167 - 2643**

February 12, 2002

**ATT: JURIUS KADAMOVAS AND IOURI MIKHEL**
**FROM: GEORGE BIRNBAUM**
**RE: WIRING INSTRUCTIONS FOR RENT PAYMENT**

DEAR JURIUS AND IOURI

PURSUANT TO YOUR REQUEST THE FOLLOWING IS THE WIRING INSTRUCTION:

1. BANK NAME: BANK OF AMERICA
2. BANK ADDRESS: 1127 S. HILL ST., LOS ANGELES, CA 90015
3. NAME OF ACCOUNT: GEORGE BIRNBAUM
4. ACCOUNT NUMBER: 0306831037
5. ROUTING NUMBER: 121000358

PLEASE CALL ME RIGHT AFTER YOU HAVE WIRED THE FUNDS SO I CAN CONFIRM WITH BANK.

REGARDS,

GEORGE BIRNBAUM

**76180**

**Exhibit 167 - 2644**

# GEORGE BIRNBAUM

**ATTORNEY AT LAW**
**2900 S. MAIN STREET**
**LOS ANGELES, CA   90007**
Tel: (213)747-6172, Wats (800)421-8857, Fax (213)747-6177

November 6, 2002

**ATT: MR. VICTOR SHERMAN**
**FROM: GEORGE BIRNBAUM**
**RE: DESIGNED WATER WORLD, IOURI MIKHEL & JURIJUS KADAMOVAS**

Dear Mr. Sherman

Pursuant to our discussion yesterday I request that you provide me and the leasing agent authorization to lease the premises at 13605 Ventura Blvd known as 'Designed Water World' so we can begin marketing the property.  Presently the premises are sitting empty and I have been approached by Gitte Lelan, a representative of Mr. Mikhel, and by 'Michael' representing Mr. Kadamovas with potential replacement tenants.  None of those prospects followed through and it is the opinion of all concerned that have contacted me that the premises now need to be marketed professionally and leased.

I request from Mr. Mikhel and Mr. Kadamovas – or their representatives with power of attorney - to provide me with written authorization to proceed with the leasing.  A simple statement with the appropriate signature stating along the lines:

Re: Designed Water World @ 13605 Ventura Blvd.

Dear Mr. Birnbaum

Whereas we have a lease on the above premises dated July 5, 2000 which is scheduled to expire November 15, 2003 and are no longer operating our business there – we hereby authorize you to lease the same expeditiously at the best rates and terms.

Signed and dated.

It should be brought to your attention that the rental has been paid through the end of this year and slightly into next.  I can provide you with calculations and copy of the lease if you wish.

Regards,

George Birnbaum

CC: MICHAEL

76181

**Exhibit 167 -  2645**



**CALIFORNIA ASSOCIATION OF REALTORS®**

**ADDENDUM**

(C.A.R. Form ADM, Revised 10/01)

**No. 1** _____

The following terms and conditions are hereby incorporated in and made a part of the: ☐ Residential Purchase Agreement, ☐ Manufactured Home Purchase Agreement, ☐ Business Purchase Agreement, ☐ Residential Lease or Month-to-Month Rental Agreement, ☐ Vacant Land Purchase Agreement, ☐ Residential Income Property Purchase Agreement, ☐ Commercial Property Purchase Agreement, ☒ other **Standard Industrial/Commercial Multi-Tenant Lease "Net"**

dated **July 5, 2000** , on property known as **13605 Ventura Boulevard, Sherman Oaks**

in which **Jurijus Kadamovas, Iouri Mikhel** is referred to as ("Buyer/Tenant")
and **George Birnbaum** is referred to as ("Seller/Landlord").

1) This lease-addendum terminates Iouri Mikhel and Jurijus Kadamovas' liabilities as tenants; and re-assigns Lubomir Gueorguiev and Plamen Guergov as tenants on the existing lease of the premises 13605 Ventura Boulevard, Sherman Oaks.

2) Prior to taking possession of the premises, Lubomir Gueorguiev and Plamen Guergov agree to pay to Iouri Mikhel and Jurijus Kadamovas the lump sum of $15,000 as reimbursement of security deposit, prepaid rent and other improvements. The payment is to be made as follows:

    Certified check in the amount of $ _____ , payable to Marina Karagodina
    Certified check in the amount of $ _____ , payable to Michael Chernykh
OR  Certified check in the amount of $15,000, payable to Attorney Victor Sherman,
    2115 Main Street, Santa Monica, CA 90405

3) Pool-table, high table and two matching chairs and the green lamp above the pool have been sold to a third party, therefore, these items are not included in the transfer.

4) Copy of existing commercial lease, dated July 5, 2000, has been received by the new tenants who agree to obey by its terms and conditions.

Signed and accepted by Lubomir Gueorguiev _____

Signed and accepted by Plamen Guergov _____

The foregoing terms and conditions are hereby agreed to, and the undersigned acknowledge receipt of a copy of this document.

Date _____    Date _____

Buyer/Tenant _____
    **Jurijus Kadamovas**
      Seller/Landlord _____
      **George Birnbaum**

Buyer/Tenant _____
    **Iouri Mikhel**
      Seller/Landlord _____

The copyright laws of the United States (Title 17 U.S. Code) forbid the unauthorized reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. Copyright© 1986-2001, CALIFORNIA ASSOCIATION OF REALTORS®, INC. ALL RIGHTS RESERVED.

THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ADEQUACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.

This form is available for use by the entire real estate industry. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020
ADM-11 REVISED 10/01 (PAGE 1 OF 1)

Reviewed by _____
Broker or Designee _____ Date _____



**ADDENDUM (ADM-11 PAGE 1 OF 1)**

Default 539 N. Glenoaks Blvd. Burbank CA 91502
Phone: (818)8482288    Fax: (818)5667085    Gitte Lellan    14717375.ZFX

**Exhibit 167 - 2646**

# GEORGE BIRNBAUM

**ATTORNEY AT LAW**
**2900 S. MAIN STREET**
**LOS ANGELES, CA. 90007**
Tel (213)747-6172, Fax (213)747-6177

December 3, 2001

Mr. Jurius Kadamovas, Mr. Iouri Mikhel
Designed Water World
13605 Ventura Blvd.
Sherman Oaks, Ca. 91423

Re: Property Tax, Insurance, Utility

Dear Jurius and Iouri,

Please note that the following obligations have accrued since my last statement to you:

1. Property tax (1ˢᵗ Part) 2001/02      5916.16 x 23% =   1360.72
2. Utility                              607.37 x 23% =    139.70
3. Insurance                           1772.00 x 23% =    407.56

                                    **TOTAL      $1907.98**

Best Regards,

*George Birnbaum*
George Birnbaum

**76183**

**Exhibit 167 - 2647**

# ADDENDUM

This Addendum to the Lease Agreement by and between George Birnbaum (Lessor) and Ester Kanimyan and Tamerlan Mourtouzaev (Lessee) for the premises commonly known as 13605 Ventura Boulevard in Los Angeles has been drawn for the purpose of adding, modifying or clarifying the Lease Agreement as follows:

1. **Tenant Improvements and Fixtures** – It has been represented by Lessee to Lessor that Lessee paid the tenants currently occupying the premises a certain sum for improvements made to the premises. These improvements include work done to the floor, ceiling and walls as well as fish tanks built into the walls and certain equipment remaining on the premises. Lessor does not claim ownership to the fish tanks or equipment left by the current tenants and will not object to their removal by Lessee.

2. **Rental Adjustment** – The rental rate throughout the term of the lease and option period shall be adjusted annually by the Consumer Price Index All Urban Consumers for Los Angeles (CPI), however in no event shall the adjustment be less than an increase of 3% or more than an increase of 6% from the previous year. October of each year shall be used as the base month for measuring the CPI.

3. **Option to Extend** – Lessee shall have one five (5) year option to extend this Lease as per clause 21 of the Agreement except the rental for the first year of the option period shall be the same as the original rental stated in the Agreement as adjusted to that date by clause 4 of this Addendum.

4. **Other expenses** – Lessee shall not be responsible to reimburse Lessor for any expenses for maintaining the building and shall be liable to pay Lessor only the base rent.

This Addendum is signed together with the Lease on the date hereinbelow indicated.

_____  11/27/02
George Birnbaum         (date)

_____  11-27-02
Ester Kanimyan          (date)

_____  11/27/2002
Tamerlan Mourtouzaev    (date)

**76184**

**Exhibit 167 - 2648**

## AGREEMENT

WHEREAS George Birnbaum (hereinafter "Lesser") on the one part and Jurijus Kadamovas and Iouri Mikhel (hereinafter "Lessee") on the other part have a lease agreement dated July 5, 2000 (hereinafter "the Lease Agreement") pertaining to the premises commonly known as 13605 Ventura Blvd, in Sherman Oaks, CA (hereinafter "the Premises"), and,

WHEREAS Lessee is no longer operating a business on the Premises,

NOW THEREFORE, Lessor and Lessee hereby agree to terminate the Lease Agreement subject to the following terms and conditions:

1. DATE – The Lease Agreement is terminated effective December 31, 2002.
2. MUTUAL RELEASE – Neither party has any claims against the other for losses or any form of damages relating to this lease termination.
3. TENANT IMPROVEMENTS AND CONTENTS – Lessee shall make no claim of ownership to anything remaining in, on or about the Premises from Lessor. This includes any and all fixtures, improvements, equipment as well as fish and fish tanks.
4. REIMBURSMENT – Lessor agrees to reimburse Michael Chernykh on behalf of Lessee upon termination of this lease the sum total of $3755.00 which comprises the following:
   a. Security deposit – 1900.00
   b. Advance property tax payment - $1390.00
   c. Advance rental adjustment - $40.00
   d. Advance insurance payment - $425.00

The parties hereby affix their signatures to this Agreement on the dates hereinbelow indicated.

George Birnbaum _____ Date 11/27/02

Jurijus Kadamovas/Michael Chernykh _____ Date 1/27/02 Copy of Power of Attorney attached

Iouri Mikhel _____ Date 11.27.02

**76185**

**Exhibit 167 - 2649**

06/10/2002  15:02    8185667085                                          PAGE  02/03

*Iouri Mikhel*

*Jurijus Kadamovas*

May 20, 2002

We, Iouri Mikhel and Jurijus Kadamovas hereby give Gitte Lellan, and her designated representative(s), authorization to enter and use the facilities in the business, located at 13605 Ventura Boulevard in Sherman Oaks.

Sincerely

*Iouri Mikhel*                    *Jurijus Kadamovas*

76186

**Exhibit 167 -  2650**

06/10/2002  15:02    8185667085                                    PAGE  01/03

P.O. Box 1098
Glendale, CA 91209-1098
glellan@cs.com
Phone     (818) 238-0011
Fax       (818) 566-7085

## Gitte Lellan

June 10, 2002

**Mr. George Birnbaum
TRIUMP OF CALIFORNIA INC.
VIA FACSIMILE**

Re:    13605 Ventura Boulevard, Sherman Oaks CA
       Designed Water World, Inc. - Iouri Mikhel & Jurijus Kadamovas

Dear Mr. Birnbaum;

Please see enclosed authorization by Iouri Mikhel and Jurijus Kadamovas, which was given to me with the expressed purpose of entering and maintaining the facilities at 13605 Ventura Boulevard in Sherman Oaks.

At this time, they have been approached by an interested party, who may be interested in taking over the premises, as it stands with inventory, fish-tanks etc. This person would like to use the facilities for a little café. Further, he would like to extend the existing lease with an additional five (5) years. Please advise if you would be willing to consider this potential tenant to take over the premises, subject to customary credit-approval by you.

Also, I have been informed that the base-rent for the premises is paid current until December 2002. Please advise if any additional charges are owed at this time.

Sincerely,

GITTE LELLAN

cc:  Iouri Mikhel - Jurijus Kadamovas

76187

**Exhibit 167 -  2651**

06/10/2002  15:02    8185667085                                    PAGE  03/03



RE/MAX
Town Center Realty
Independently Owned and Operated
**Gitte Lellan**
REALTOR* • Notary Public
3% of REALTORS* Nationwide
539 N. Glenoaks Blvd. #101
Burbank, California 91502
Car: (661) 250-4000, (818) 238-0011
Fax: (818) 568-7085
Cellular: (818) 203-7379
E-mail: glellan@cs.com

*NOTARY PUBLIC*

ANYWHERE
Office • Home • Hospital • Court • Prison

Real Estate Documents
Legal Documents
Jurats
Acknowledgements
Paralegal Services
Fingerprinting
Project Research
Wedding Services

*Gitte Lellan*

P.O. Box 1098
Glendale, CA 91209-1098
Glellan@cs.com

*(818) 203-7379*

76188

**Exhibit 167 -  2652**

# GEORGE BIRNBAUM

### ATTORNEY AT LAW
### 2900 S. MAIN STREET
### LOS ANGELES, CA   90007
Tel: (213)747-6172, Wats (800)421-8857, Fax (213)747-6177

January 24, 2002

Mr. Jurius Kadamovas, Mr. Iouri Mikhel
Designed Water World
13605 Ventura Boulevard
Sherman Oaks, CA  91423

Re: Outstanding Rental

Dear Jurius and Iouri

My records indicate that your latest payment was for $1076.00. If that is in fact the case then I am confused as to why you paid that amount. Your regular rental is $1973.03 as per my letter of November 19 (see copy) and your triple net expenses amounted to $1907.98 which remains outstanding (see my letters of December 3 and January 17).

Is it possible that you paid $1076.00 by accident but intended to pay $1976.00?

Perhaps you in fact paid $1976.00 and I copied it incorrectly?

In any event, if my records are correct then you owe $3881.01 (comprising of $1973.03 as January rental and $1907.98 as triple net expenses) less the $1076.00 you sent earlier this month for a total of **$2805.01.**

Please call me to clarify this.

Best regards,

George Birnbaum

76189

**Exhibit 167 - 2653**

# GEORGE BIRNBAUM
### ATTORNEY AT LAW
### C/o TRIUMPH OF CALIFORNIA INC.
### 2900 S. MAIN STREET
### LOS ANGELES, CA 90007
#### Tel (310)552-3243

November 19, 2001

Mr. Jurius Kadamovas, Mr. Iouri Mikhel
Designed Water World
13605 Ventura Blvd.
Sherman Oaks, CA 91423

Re: Rental Adjustment

Dear Jurius and Iouri

Pursuant to paragraph 54 of our lease a rental adjustment is currently due based on the Consumer Price Index (CPI) going back 4 months prior to the date it becomes effective. Since the adjustment becomes effective with your November 15 rental, the base month for measuring the CPI is July and is calculated as follows:

$$178.3 / 171.7 \times 1900 = \$1973.03$$

Your monthly base rental commencing November 15 is $1973.03.

As we have done previously I will be mailing to you copies of the expenses pertaining to the triple net charges shortly.

Best regards,

George Birnbaum

76190

**Exhibit 167 - 2654**

# GEORGE BIRNBAUM
### ATTORNEY AT LAW
### 2900 S. MAIN STREET
### LOS ANGELES, CA  90007
Tel: (213)747-6172, Wats (800)421-8857, Fax (213)747-6177

April 18, 2001

Mr. Jurius Kadamovas, Mr. Iouri Mikhel
Designed Water World
13605 Ventura Blvd.
Sherman Oaks, CA 91423

Re: Rental Adjustment

Dear Jurius and Iouri

Pursuant to the terms of our lease the tenant is responsible for its share of the triple net expenses relating to maintenance, utilities, taxes, insurance and general upkeep of the building.  As I mentioned in my letter of February 12 the total expenses to that point amounted to $11283.50 of which your 23% amounts to $2595.20.  The property tax bill is annual (December 10, 2000 to December 10, 2001) as is the insurance (November 12, 2000 to November 12, 2001).  Utility and maintenance bills are more frequent.

You may pay the $2595.20 which is due now or pay monthly rent of $2115.00 effective this past March to cover those expenses.  Please let me know how you decide (my understanding from our previous telephone conversation was that you preferred the latter).

Regards,

George Birnbaum

**76191**

**Exhibit 167 -  2655**

# GEORGE BIRNBAUM

### ATTORNEY AT LAW
## 2900 S. MAIN STREET
## LOS ANGELES, CA   90007
#### Tel: (213)747-6172, Wats (800)421-8857, Fax (213)747-6177

January 12, 2001

Mr. Jurius Kadamovas, Mr. Iouri Mikhel
Designed Water World
13605 Ventura Blvd.
Los Angeles, CA 91423

Re: 13605 Ventura Blvd.

Dear Jurius and Iouri

Please note that by the terms of your lease the monthly base rental is $1900.00. In addition there are triple net expenses for your share of the property tax, insurance and general common area maintenance. In the lease agreement this was calculated to be $345.00 per month in addition to your base rent and which you did indeed pay the first month of your lease. Since that time you have paid only the base rent of $1900.00 for one month and then another monthly rental erroneously made out for $1800.00.

The $345.00 monthly fee meant to cover the extra expenses amounts to about $.30 per ft. and is probably high. I can discuss with you about lowering it and will cal you soon. I am merely writing this letter to give you a chance to look into your lease prior to our discussion.

I have also noticed that the work in your store is proceeding and I am curious to see what it will look like upon completion. It appears that it will be a very attractive place of business. Please keep me informed of developments.

Best regards,

George Birnbaum

76192

**Exhibit 167 -  2656**

# GEORGE BIRNBAUM

**ATTORNEY AT LAW**
**2900 S. MAIN STREET**
**LOS ANGELES, CA   90007**
Tel: (213)747-6172, Wats (800)421-8857, Fax (213)747-6177

February 12, 2001

Mr. Jurijus Kadamovas
Mr. Iouri Mikhel
13605 Ventura Blvd.
Los Angeles, CA m 91423

Re: Common Area Maintenance Expenses

Dear Mr. Kadamovas and Mr. Mikhel

By the terms of your lease your base monthly rent is $1900.00. In addition you are also responsible for 23% of the common area maintenance which represents your share of the total amount of the building you occupy. In the lease this is calculated to be $345.00 per month at the start of your term which you paid with your first month's rent. In other words, your total monthly rent by the terms of the lease is $2245.00.

I indicated to you a few weeks ago that the $345.00 figure seemed high and I can now give you a calculation of what the actual cost is. Last year we had the following extra expenses in property tax, insurance and utilities (I am not including other expenses under the heading of repair and maintenance):

1. Property tax - $9539.71
2. Insurance -   $1275.00
3. Utilities -      $468.79 (backup documents available)
         TOTAL              $11283.50

The monthly bill on these items (11283.50 divided by 12) without counting anything in the maintenance and repair category comes to $940.29 of which your share is 23%, or $216.26. Rather than having me calculate and send you a monthly statement which would include the utility rates that are expected to rise significantly and items of repair and maintenance, please just send a monthly rental of **$2115.00** for the remainder of the year. At that time we will recalculate to determine what changes, if any, are necessary.

Best regards,

George Birnbaum

76193

**Exhibit 167 -  2657**

# GEORGE BIRNBAUM

### ATTORNEY AT LAW
### 2900 S. MAIN STREET
### LOS ANGELES, CA   90007
Tel: (213)747-6172, Wats-(800)421-8857, Fax (213)747-6177

March 5, 2001

Messrs. Jurijus Kadamovas, Iouri Mikhel
Designed Water World.
13605 Ventura Blvd.
Los Angeles, CA 91423

Re: Monthly Rental

Dear Jurijus and Mikhel

Thank you for sending me last month's rental check. Apparently you sent it out before receiving my letter on the calculation for the total monthly rental with backup documents which includes all the expenses. I am sending you a copy of that letter enclosed with this mailing.

If the enclosed letter is clear to you than please make out future monthly rental checks for **$2115.00.** If for any reason it is not clear and you need further backup or explanation than please do not hesitate to call me.

Regards,

George Birnbaum

76194

**Exhibit 167 -  2658**

# GEORGE BIRNBAUM

**ATTORNEY AT LAW**
**C/o TRIUMPH OF CALIFORNIA INC.**
**2900 S. MAIN STREET**
**LOS ANGELES, CA 90007**
TEL. (213)747-6172 ext. 16, WATS (800)421-8857 ext. 16, FAX (213)747-6177

September 29, 2000

Mr. Jurijus Kadamovas
Mr. Iouri Mikhel
WaterWorld
13605 Ventura Blvd.
Sherman Oaks, CA 91423

Re: Construction on Premises

Dear Tenants

It has been several weeks since I last met with you. Since that time I have been looking into the premises and have noticed that there is not much activity in terms of construction or improvements. I am concerned because we completed our share of the tenant improvements in early July. If we count from August 15 as the time from which you were to take over the premises, then by the terms of the lease you have at most 60 days from which to commence rental payment. That date would fall in the middle of October and so far I see no signs that you are anywhere near to being ready to open for business. I tried contacting you by phone but I was merely transferred to a message center.

Also, we need to be in contact because the awning company needs information from you as to the precise wording you want on the bottom of the canvas.

Please contact me for an update as to your progress in opening the premises for business and information regarding the awning.

Best regards,

George Birnbaum

Cc: Brandon Weinstock and Dean Cutler of Piken Real Estate

76195

**Exhibit 167 - 2659**

6-26-00;10:45AM;THE PIKEN COMPANY                    ;8189817480              # 2/  6



**FOR SALE OR LEASE**
**THE PIKEN COMPANY**
**EXCLUSIVE AGENT**    Real Estate Brokerage • Property Management • Shopping Center Development • Since 1960

June 26, 2000

Mr. George Birnbaum
Triumph of California
2900 South Main Street
Los Angeles, CA 90007

RE:    PROPOSAL TO LEASE RETAIL SPACE
       13605 VENTURA BOULEVARD
       SHERMAN OAKS, CA

Dear George,

We have been authorized by our client to submit the following terms and conditions with respect to leasing the above referenced property. They are as follows:

| | |
|---|---|
| PREMISES: | 13605 Ventura Boulevard<br>Sherman Oaks, CA |
| SIZE: | Approximately 1,150 usable square feet, subject to Tenant's verification. |
| TENANT: | Designed Water World, Inc. DBA WaterWorld / Mr. Iouri Mikhel |
| USE: | Retail sales of aquariums and related supplies and equipment to the general public. |
| LEASE COMMENCEMENT: | Upon completion of Landlord's vanilla shell work. |
| LEASE TERM: | Three (3) years. |
| RENT COMMENCEMENT: | The sooner of sixty (60) days from delivery of premises from Landlord or Tenant's open for business. |
| RENT: | Year 1:    $1.65 per square foot, Triple Net. |
| RENTAL INCREASE: | The Rental Rate as stated above shall be adjusted annually in accordance with the local Consumer Price Index (CPI). Said CPI increases shall begin Year 2, and be subject to a minimum of three percent (3%) and a maximum of six percent (6%). |
| OPTION TO RENEW: | Tenant shall have the option to renew the lease for one (1) additional three (3) year period provided Tenant is not in default of the Lease and gives Landlord one hundred eighty (180) day advance written notice of its intent to exercise such option.<br><br>The rental rate for the 1st option period shall be at the same terms and conditions in the initial term, but in no event less than the rate at the end of the initial term. |

13251 Ventura Boulevard, Suite 2 • Studio City, CA 91604-1886 • Tel: (818) 981-7440 • Tel: (310) 247-1001 • Fax (818) 981-7480

76196

Exhibit 167 - 2660

6-26-00;10:45AM;THE PIKEN COMPANY                              ;8169817480                    #  3/  6

Mr. George Birnbaum
June 26, 2000
Page 2

PARKING:                     Tenant's customers shall have the right to use the parking areas in common with other tenant's of the premises.

TENANT
IMPROVEMENTS:                Landlord at Landlord's expense shall deliver the premises in a Standard "Vanilla Shell" condition, including but not limited to, the removal of all existing flooring, the removal of the existing counter, the repair and replacement of ceiling tiles as necessary, install a new door in the partition wall, and a 200-amp panel and all ADA requirements

UTILITIES:                   Tenant to pay their own utilities. Landlord to provide Tenant with separate utilities.

SIGNAGE:                     Landlord shall allow Tenant, at Tenant's expense, the right to install Tenant's standard sign package in the front and rear of the premises. All signage shall be subject to local governmental approval.

CONDITION OF
PREMISES:                    All operating, electrical, plumbing and HVAC systems will be fully operational when Tenant takes delivery of the Premises. In addition, external walls and windows shall be in good repair.

SECURITY DEPOSIT
AND FIRST MONTH'S
RENT:                        Upon execution of the lease documents, Tenant shall pay Landlord the first month's rent and a security deposit equal to one (1) month's rent.

SUBLEASING/
ASSIGNMENT:                  As long as Tenant is not in default with any of the terms or conditions of the lease, Tenant shall have the right to sublease / assign all or any portion of said space during the term of the lease to any subtenants subject to Landlord's reasonable approval.

HAZARDOUS
MATERIALS:                   Landlord represents to Tenant that to the best of Landlord's knowledge, the Building or Premises currently complies with any governmental laws, ordinances, regulations or orders relating to asbestos and other hazardous, toxic or contaminating materials.

BROKER
REPRESENTATION:              Both Landlord and Tenant acknowledge that The Piken Company represents the Landlord exclusively. Additionally, The Piken Company represents the Tenant. Landlord shall pay brokerage fees in accordance with the Listing Agreement.

FINANCIAL REVIEW:            This proposal is contingent upon the Landlord's review and approval of Tenant's financial statements and information. Tenant hereby authorizes Broker to submit said information to Landlord, and Landlord agrees to keep this information confidential.

76197

**Exhibit 167 -  2661**

Mr. George Birnbaum
June 26, 2000
Page 3

Landlord and Tenant acknowledge that this proposal is not a lease and that, it is intended as the basis for the preparation of a lease by the Landlord. The lease shall be subject to Landlords and Tenant's approval and only a fully executed lease shall constitute a lease for the Premises. Broker makes no warranty or representations to Landlord or Tenant that acceptance of this proposal will guarantee the execution of the lease for the Premises.

Kind Regards,

THE PIKEN COMPANY                    ACCEPTED AND AGREED: "LANDLORD"

J Brandon Weinstock                  Authorized Signature            Date

76198

**Exhibit 167 -  2662**

FROM : PROFFESIONAL SERVICES    PHONE NO. : 818 990 6785    Jun. 23 2000 07:14PM P2

FINANCIAL STATEMENT

ALL BLANKS. WRITING "NO" OR "NONE" WH. NECESSARY TO COMPLETE INFORMATION

| | | | |
|---|---|---|---|
| First Name: **Iouri** | Driver's License **B 6548632** | Social Security **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** | Date of Statement **06/23/2000** |
| | | | Telephone Number **Bus. (310) 333-6798** |

Name: Trustees (UK) LTD    Address: 45 Belford Hill London SW2 9E    State CA

## ASSETS

| (ENTER "P" IF ASSET IS PLEDGED) | | AMOUNT |
|---|---|---|
| CASH IN BANKS (SCHEDULE 1) | P | $ 94,600.00 |
| STOCKS AND BONDS LISTED ON EXCHANGES (DETAIL ON SCHEDULE 3 ON BACK) | | |
| STOCKS AND BONDS NOT LISTED ON EXCHANGE (DETAIL ON SCHEDULE 3) | | |
| ACCOUNTS RECEIVABLE — CURRENT | | |
| NOTES RECEIVABLE — CURRENT | | 850,000.00 |
| CASH VALUE LIFE INSURANCE | | |
| IRA-KEOGH PROFIT SHARING | | |
| REAL ESTATE (SCHEDULE 4) | | |
| TRUST DEEDS (SCHEDULE 6) | | |
| Consulting S/E Business | | 150,000.00 |
| | | |
| AUTO MAKE BMW 750 YEAR 99 | P | $ 45,000.00 |
| AUTO MAKE Jeep YEAR 97 | | $ 11,000.00 |
| PERSONAL PROPERTY (SCHEDULE) | | |
| OTHER ASSETS: Describe | | |
| **TOTAL ASSETS** | | $ 1,250,600.00 |

## LIABILITIES

| | AMOUNT |
|---|---|
| BANK NOTES PAYABLE (SCHEDULE 2) | |
| MARGIN ACCOUNT | |
| OTHER LIABILITIES | |
| LOAN ON LIFE INSURANCE | |
| OTHER ACCOUNT PAYABLE | |
| REAL ESTATE LOANS (SCHEDULE 4) | |
| CREDIT CARDS | 1,750. |
| UNPAID INCOME TAXES | |
| **TOTAL LIABILITIES** | $ 1,750.0 |
| NET WORTH (ASSETS LESS LIABILITIES) | |
| TOTAL LIABILITIES & NET WORTH | $ 1,750 |

SCHEDULE 1: CASH

| BANK WHERE CARRIED | CASH IN BANKS |
|---|---|
| Bridge | $ 77,500.00 |
| Fed | $ 7,800.00 |
| City Bank | $ 9,300.00 |
| **TOTAL** | $ 94,600.00 |

SCHEDULE 2: BANK NOTES PAYABLE

| BANK WHERE CARRIED | AMOUNT OWED ON ABOVE DATE | INT RATE | MATURITY DATE | TYPE OF COLLATE HOW PAY |
|---|---|---|---|---|
| | | | | |
| | | | | |
| **TOTAL** | $ | | | |

PLEASE GIVE DETAILS ON ANY ASSETS, OTHER THAN REAL ESTATE, PLEDGED TO SECURE LOANS: _____

ANNUAL INCOME AND EXPENSE FOR PERIOD FROM **01/01/1599** TO **12/31/59**

| INCOME | | | EXPENSE | |
|---|---|---|---|---|
| SALARY | $ 32,540.00 | | INTEREST | $ — |
| RENTALS | $ — | | TAXES AND ASSESSMENTS | $ 6,052 |
| DIVIDENDS | $ — | | UPKEEP ON REAL ESTATE | $ — |
| INTEREST | $ — | | PAYMENTS ON MORTGAGES, CONTRACTS, ETC. | $ — |
| OTHER INCOME (DESCRIBE) | | | RENT | $ 13,200 |
| Business Consulting | $ 27,604.00 | | PERSONAL LIVING EXPENSE | $ 7,800.0 |
| | | | OTHER EXPENSE (DESCRIBE) | $ — |
| **TOTAL INCOME** | $ 60,144.00 | | **TOTAL EXPENSE** | $ 27,052 |

TOTAL INCOME REPORTED TO IRS LAST YEAR $ 60,144.00

Applicant Signature _____    Date _____    Co-owner Signature If Applicable _____    Date _____

*(handwritten, right margin)* 1243 MANSFIELD AVE

76199

Exhibit 167 - 2663

FROM : PROFFESSIONAL SERVICES    PHONE NO. : 818 990 6785    Jun. 23 2000 07:14PM P3

STOCKS AND BONDS (ATTACH SCHEDULE IF MORE SPACE REQUIRED)

| NUMBER OF SHARES OR PAR VALUE BONDS LISTED | MKT | DESCRIPTION OF ISSUE | ISUND IN NAME OF | YES | COST PER SHARE | TOTAL COST | MKT PER SHARE | TOTAL MARKET VALUE |
|---|---|---|---|---|---|---|---|---|
| | | | N/A | | | $ | $ | |
| | | | | | | | | |
| | | | | | | | | |

| UNLISTED | | | | | | TOTAL LISTED | $ |
|---|---|---|---|---|---|---|---|
| | | | | | | $ | |
| | | | | | | | |
| | | | | | | TOTAL UNLISTED | $ |

**SCHEDULE 4: REAL ESTATE & REAL ESTATE LOANS** (ATTACH SCHEDULE IF MORE SPACE REQUIRED)

| PROPERTY ADDRESS | TYPE OF BLDG. | MARKET VALUE | PRESENT ANNUAL INCOME | PRESENT ANNUAL EXPENSE | MORTGAGES & MATURITY | MORTGAGE HELD BY | PRESENT ANNUAL PMTS. | INT. RATE |
|---|---|---|---|---|---|---|---|---|
| 1 | | $ | $ | $ | $ | | $ | |
| AGE    YR PURCHASED | | | | | DATE | | | |
| COST $ | | | | | | | | |
| 2 | | $ | N/A | | $ | | $ | |
| AGE    YR PURCHASED | | | | | DATE | | | |
| COST $ | | | | | | | | |
| 3 | | $ | $ | $ | $ | | $ | |
| AGE    YR PURCHASED | | | | | DATE | | | |
| COST $ | | | | | | | | |
| 4 | | $ | $ | $ | $ | | $ | |
| AGE    YR PURCHASED | | | | | DATE | | | |
| COST $ | | | | | | | | |
| TOTALS | | $ | $ | $ | $ | | $ | |

**SCHEDULE 5: TRUST DEEDS AND MORTGAGES OWNED** (ATTACH SCHEDULE IF MORE SPACE REQUIRED)

| NAME OF PAYER | STREET ADDRESS AND TYPE OF IMPROVEMENTS | UNPAID BALANCE | JOINT TENANCY? | TERMS | 1ST or 2ND LIEN | VALUE OF PROPERTY |
|---|---|---|---|---|---|---|
| | N/A | $ | | | | $ |
| | | $ | | | | $ |
| | | $ | | | | $ |
| | | $ | | | | $ |
| | | $ | | | | $ |
| | | $ | | | | $ |
| | TOTAL | $ | | | | $ |

**PAST AND PRESENT BUSINESS CONNECTIONS**

| NAME OF EMPLOYERS OR ASSOCIATES | LOCATION | DATE OF CONNECTION | DATE CONNECTION TERMINATED |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

**GENERAL INFORMATION**

☐ MARRIED    ☐ UNMARRIED    ☐ SEPARATED    DO YOU HAVE A WILL? ☐ YES  ☐ NO    EXECUTOR OF YOUR WILL

Have you ever failed in business or compromised debts with your creditors?    ☐ Yes ☒ No    If yes, give details

Are any of your assets pledged, or in any other manner unavailable for paying debts? ☐ Yes ☒ No    If yes, give details

Are there any suits, judgments, executions of attachments against you pending?    ☐ Yes ☒ No    If yes, give details

If this is a statement of you & your spouse are any assets spouse's separate property?    ☐ Yes ☒ No    If yes, give details

Are you contingently liable for any endorsement or guarantees?    ☐ Yes ☒ No    If yes, give details

THE FEDERAL EQUAL OPPORTUNITY ACT PROHIBITS CREDITORS FROM DISCRIMINATING AGAINST CREDIT APPLICANTS ON THE BASIS OF SEX OR MARITAL STATUS. THE FEDERAL AGENCY WHICH ADMINISTERS COMPLIANCE WITH THIS LAW CONCERNING THIS BANK IS THE FEDERAL DEPOSIT INSURANCE CORPORATION, 44 MONTGOMERY STREET, SAN FRANCISCO, CALIFORNIA 94104.

76200

**Exhibit 167 - 2664**

and deed of the undersigned, to sign, seal, execute, deliver, and acknowledge such deeds, covenants, leases, indentures, agreements, mortgages, deeds of trust, hypothecations, assignments, bottomries, charter parties, bills of lading, bills, bonds, notes, receipts, evidences of debts, releases, and satisfactions of mortgage, judgment and other debts, and such other instruments in writing, of whatever kind or nature, as may be reasonable, advisable, necessary, or proper in the premises.

Each and all of the powers herein granted shall be exercised by said Attorney as to the following described property only:  [See item 1 and 2 listed below]

1) Any and all transactions related to Designed Water World Inc., located at 13605 Ventura Boulevard in Sherman Oaks.

2) Any and all transactions related to my business dealings with Calabasas Motorcars Inc., in Calabasas

Giving and granting unto my said Attorney full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done in and about the premises, as fully to all intents and purposes as the undersigned might or could do if personally present, the undersigned hereby expressly ratifying and confirming all that said Attorney shall lawfully do or cause to be done by virtue of these presents.

Dated: April 13, 2002

_____
JURIJUS KADAMOVAS

_____

STATE OF CALIFORNIA
County of Los Angeles                   } ss.

On April 13, 2002 _____ before me, the undersigned, a Notary Public in and for said State, personally appeared JURIJUS KADAMOVAS _____ personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
Notary Public in and for said County and State

GITTE LELLAN
(Notary's name must be typed or legibly printed)

GITTE LELLAN
Commission # 1333150
Notary Public - California
Los Angeles County
My Comm. Expires Dec 3, 2005

(NOTARY STAMP OR SEAL)

- Power of Attorney - Special, Page 2 of 2

76201

**Exhibit 167 - 2665**

# GEORGE BIRNBAUM
### ATTORNEY AT LAW
### 2900 S. MAIN STREET
### LOS ANGELES, CA  90007
Tel: (213)747-6172, Wats (800)421-8857, Fax (213)747-6177

January 17, 2002

Mr. Jurius Kadamovas, Mr. Iouri Mikhel
Designed Water World
13605 Ventura Blvd.
Sherman Oaks, CA  91423

Re: Outstanding Invoice

Dear Jurius and Iouri

I have been receiving your regular monthly rental payments however it seems you have forgotten to pay the triple net expenses I sent you last month. Please check your records and if in fact you have not paid it send out your check for $1907.98 as per attached letter.

Best regards,

George Birnbaum

76202

**Exhibit 167 -  2666**

Recorded at the request of:

Jurijus Kadamovas/Michael Chernykh

When recorded, mail to:

MICHAEL CHERNYKH
5940 Carlos Ave #807
Los Angeles,
CA 90028

# Power of Attorney - Special

KNOW ALL MEN BY THESE PRESENTS:

that  I, JURIJUS KADAMOVAS of Los Angeles, California
has/have made, constituted and appointed, and by these presents do/does hereby make, constitute and appoint MICHAEL CHERNYKH, 5940 Carlos Ave #807, L.A.90028 my/our true and lawful Attorney for me/us and in my/our name(s), place and stead to ask, demand, sue for, recover, collect and receive all such sums of money, debts, dues, accounts, legacies, bequests, interests, dividends, annuities, and demands whatsoever as are now or shall hereafter become due, owing, payable, or belonging to the undersigned; and have, use, and take all lawful ways and means in the name of the undersigned, or otherwise, for the recovery thereof, by legal process, and to compromise and agree for the same, and grant acquittances or other sufficient discharges for the same, for the undersigned, and in the name of the undersigned to make, seal, and deliver the same; to compromise any and all debts owing by the undersigned, and to convey, transfer, and/or assign any property of any kind or character belonging to the undersigned in satisfaction of any debt owing by us or either of us; and to bargain, contract, agree for, purchase, receive, and take lands, tenements, hereditaments, and accept the seizin and possession of all lands, and all deeds, and other assurances in the law therefor; and to lease, let, demise, bargain, sell; remise, release, convey, mortgage, convey in trust, and hypothecate lands, tenements, and hereditaments, upon such terms and conditions, and under such covenants as said Attorney shall think fit; to exchange real or personal property for other real or personal property, and to execute and deliver the necessary instruments of transfer or conveyance to consummate such exchange; to execute and deliver subordination agreements subordinating any lien, encumbrance or other right in real or personal property to any other lien, encumbrance, or other right therein; also to bargain and agree for, buy, sell, mortgage, hypothecate, convey in trust or otherwise, and in any and every way and manner deal in and with goods, wares and merchandise, choses in action, and other property in possession or in action, including authority to utilize my eligibility for VA Guaranty; also to transfer, assign, and deliver stock and the certificate or certificates evidencing the ownership of the same; and to make, do, and transact all and every kind of business of what nature and kind whatsoever; and, also, for the undersigned and in the name(s) and as the act

Power of Attorney - Special, Page 1 of 2

76203

**Exhibit 167 -  2667**

# EXHIBIT

# 168

## DECLARATION OF DAVID PARK (RE: IAIN LITCHFIELD)

I, DAVID PARK, declare as follows:

1.    I am an investigator for the Federal Public Defender's Office in Los Angeles, CA. On November 9, 2022 and November 18, 2022, I interviewed Iain Litchfield at his home in Gloucestershire, England. On both occasions I was accompanied by Mark Ward, a private investigator.

2.    I asked Mr. Litchfield to recall his interactions with Iouri Mikhel, who is a client of the Federal Public Defender's Office. Mr. Litchfield said that his interactions with Mr. Mikhel occurred in 2000 and 2001.

3.    Mr. Litchfield stated that he was previously interviewed by the FBI in 2004 about his interactions with Mr. Mikhel. This interview took place at the Queen's Hotel in Cheltenham, England, in the presence of two detectives from the Metropolitan Police Service whose names he could not recall. Mr. Litchfield recalled that an FBI agent was put on speakerphone and conducted the interview, asking all of the questions, while the British detectives took some notes. Prior to my interviews with Mr. Litchfield, he had never seen any documents or statements relating to this FBI interview. Mr. Litchfield said he was not aware of any recordings made of the interview. Until my interviews with him in November 2022, Mr. Litchfield was unaware that a police witness statement of the substance of this interview had been prepared.

4.    I provided Mr. Litchfield with the 2004 witness statement, written and signed by Detective John Richards of the Metropolitan Police Service in London, England, purporting to describe the responses Mr. Litchfield had given during his 2004 interview with the FBI. Mr. Litchfield stated that Det. Richards' witness statement contained inaccuracies, as explained below. A copy of Det. Richards' witness statement that I provided Mr. Litchfield is attached to this declaration.

1

Initials

**Exhibit 168 -  2668**

5.    In the early 2000's, Mr. Litchfield said he had a car sales business; in the summer of 2000, he advertised in a UK auto magazine that he had a Ferrari 348 for sale. Late one night Mr. Litchfield said he received a telephone call from an interested buyer. This caller turned out to be Mr. Mikhel, who proceeded to purchase the Ferrari and wired Mr. Litchfield the money. In the fall of 2000, Mr. Litchfield said that Mr. Mikhel became interested in purchasing a Ferrari 360 Modena. Mr. Mikhel asked that Mr. Litchfield sell the Ferrari 348 and acquire the Ferrari 360 Modena, which he did.

6.    Mr. Litchfield said that he met Mr. Mikhel on two occasions in London at a bar in a Knightsbridge hotel, to deliver the vehicles. On one occasion Mr. Mikhel was accompanied by two men, one fat and bald, the other thin. During the prior 2004 FBI interview Mr. Litchfield was told that the FBI had videotaped his meetings with Mr. Mikhel in London. As he had explained at the time, he repeated that his only purpose for these trips was to hand over the cars and the keys to Mr. Mikhel. He conducted no other business with Mr. Mikhel. The exchanges were brief.

7.    Mr. Litchfield remembered that in 2001, he received several telephone calls from Mr. Mikhel urging him to sell the second Ferrari. Mr. Mikhel later asked Mr. Litchfield to give a bag left in the boot of this vehicle to Mr. Mikhel's then-girlfriend, Marina, which he did. Mr. Litchfield stated that it was not unusual for people to leave personal belongings in the vehicles they left for him to keep in storage, and then ask him to safeguard or retrieve these items. Mr. Litchfield asserted that he never saw the contents of the bag he gave to Marina, as it was locked. Mr. Litchfield stated that the witness statement Det. Richards prepared is incorrect about this exchange. Marina did not open the bag for Mr. Litchfield, and he never saw what was inside it.

2


Initials

**Exhibit 168 - 2669**

8.    Mr. Litchfield said that his only involvement with Mr. Mikhel was for the purchase and sale of automobiles. They did not spend time together in any other sense. Mr. Litchfield's impression of Mr. Mikhel was that he was a wealthy businessman, but he did not know anything about Mr. Mikhel beyond that impression. Mr. Litchfield did not know what business Mr. Mikhel was in.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: 8.29.2023

DAVID PARK

3

Initials

**Exhibit 168 -  2670**

# ATTACHMENT

Exhibit 168 -  2671

Form MG 11(T)

## Witness Statement

**Statement of    Detective John Richards**

Age if under 21    'over 21'    (If over 21 insert 'over 21')

This statement (consisting of 4 pages each signed by me) is true to the best of my knowledge and belief and I make it knowing that, if it is tendered in evidence, I shall be liable to prosecution if I have wilfully stated in it anything, which I know to be false or do not believe to be true.

Dated the 12th    day of October    2004

Signature J Richards

---

I am a Detective in the Metropolitan Police Service. I am part of a dedicated team responsible for carrying out fraud related enquiries on behalf of foreign countries. The team is identified as the 'Extradition & International Mutual Assistance Unit at New Scotland Yard, London.

I am responsible for a particular case received by this office from the United States of America, by way of a formal Letter of Request to the United Kingdom Central Authority at the Home Office.

The matter is registered under the file name; Iouri Mikhel et al file reference COM 423/2004.

On the 25 August 2004 in response to the Letter of Request, I interviewed Mr. Iain Litchfield, DOB █████ 1978. Mr. Litchfield was reluctant to make a formal statement but agreed to explain his relationship with Iouri Mikhel and a woman called Marina Karagodina, who he understood to be Mikhel's girlfriend.

He brought with him a box file containing numerous documents, which he said were connected with the sale of two Ferrari cars to Mikhel. The documents were in no particular order. I took possession of the box and documents. The box and contents are produced as:
**Exhibit IL/JR1.**

The following is a record of my interview with Mr. Litchfield:

Signed Detective John Richards

Witnessed by Detective Tony Morris

58953

Exhibit 168 - 2672

Form MG 11A(T)

Continuation sheet no: 2

Continuation of Statement of: Detective John Richards

Litchfield describe himself as a car importer, buying foreign cars abroad and importing them into the United Kingdom for sale purposes. He does not have a business site but operates his business from his home address.

He explained that he was asked by a friend to sell a Ferrari 348 for him. He placed an advertisement for the vehicle on his company web site, and received a call from Iouri Mikhel saying he wished to purchase the car. Mikhel said he was a businessman in America and that he would send a friend to inspect the vehicle.

Litchfield later received a visit from a woman called Karina and a South African man. The car was inspected, and a sale was agreed. Litchfield was told the money would be wire transferred to his company account. Litchfield was unsure of the date of this visit, however the first relevant document I find in the box is an e-mail dated 4 July 2000 from Iouri Mikhel. This is produced as Exhibit **IL/JR/2.**

The e-mail from Mikhel confirmed the purchase of a Ferrari and that funds of $36,000 would soon be transferred to Litchfield Imports account at Barclays Bank plc. As part of the sale price Litchfield would store the car. Mikhel picked up the car about three weeks later.

I produce from the box a Barclays Fund Transfer-Credit Advice dated 21 December 2000 showing a credit to the account of Litchfield Imports for the sum of £50,660.49 GBP ($74,880.00 USD).
**Exhibit IL/JR/3.**

Litchfield then went on to explain that Mikhel was anxious to purchase another Ferrari and asked Litchfield to look for a Ferrari 360 Modena, and in September/October of 2000 he found a model that seemed to fit the specification. He told Mikhel who asked him to sell the first Ferrari with a view to buying the 360.

I produce from the box a copy fax dated 9 January 2001 from Litchfield to Symbol Automobile S. A. authorising the collection of a Ferrari 360 Modena by a Victor Popoff.
**Exhibit IL/JR/4.**

Litchfield sold the 348 for about £24,000. I could not find an invoice for this sale in the box of documents produced by Litchfield. Litchfield said he received the difference between the 348 and Modena from Mikhel.

Signed Detective John Richards          Witnessed by Detective Tony Morris

58954

**Exhibit 168 - 2673**

Form MG 11A(T)

Continuation sheet no: 3

**Continuation of Statement of: Detective John Richards**

In early January 2001 Mikhel pick up his new Ferrari. Litchfield said he began to feel suspicious of him when prior to picking up the new car, some work had to be done on it. He was furious that car wasn't ready and was abusive . He was told to get the car ready by 7 pm that night or he would be in serious trouble.

Mikhel apparently took the car to Belgium and Europe, and was away about three weeks.

Litchfield said that at the end of January, he could not be more specific, Mikhel returned to London with the car. Litchfield met Mikhel in London at his request, and took the car away for storage once more.

It was at this stage that Mikhel told him he had left a suitcase in the bonnet of the Ferrari. He explained the case contained only dirty clothes. Litchfield said he didn't think much of this and forgot the case was there.

Litchfield explained that about 6 months later Mikhel asked him to sell the Ferrari 360, and he agreed to place an advertisement on his web site. He then said that he remembered that Mikhel had called him before this discussion and asked him to find a car for his girlfriend.

He found a car for her it was a Mitsubishi Pinin GLS, and received a wire transfer from Iouri Mikhel for £12,000. I could not find a document within the box that refers to the purchase of this vehicle, or details of a wire transfer to Litchfield Imports. Litchfield was later instructed by Mikhel to sell this car for £9,000 or more. He sold the car and handed the £9,500 to Marina Karagodina in cash.

A letter found in the box from Litchfield Imports to Bindman & Partners, dated 6 June 2003, confirms this transaction. Bindman & Partners are a firm of solicitors representing a man called Victor Abramkin.
**Exhibit IL/JR/5.**

Litchfield said some months went by and he was having difficulty selling the Ferrari 360 on behalf of Mikhel, who was desperate to sell the car.

The next thing that happened, he couldn't be specific on dates, he received a phone from Mikhel asking him to give the suitcase, which was in the bonnet of the Ferrari 360, to his girlfriend Marina Karagodina. It was at this stage Litchfield remembered the case being in the bonnet. He had not given it a thought until then.

Signed Detective John Richards                    Witnessed by Detective Tony Morris

58955

Exhibit 168 - 2674

Form MG 11A(T)

Continuation sheet no: 4

Continuation of Statement of: Detective John Richards

Arrangements were made with Marina Karagodina to pick up the case and Litchfield met her at Cheltenham Rail Station. He remembered she had her young son with her.

Litchfield handed her the case and she opened it in his presence, because he wanted the logbook for the Ferrari 360 to enable him to sell it. Mikhel had told him the logbook was in the case.

As she opened the case the contents spilled out onto the pavement. It was then that Litchfield says he saw some of the contents. He saw the contents contained heavy duty cable ties and duck tape. The remainder of the contents were in plastic bags, but included bottles of what appeared to be drugs, syringes and although he says he did not actually see a gun, he does say there was an item in a bag which could not be anything other than a handgun, because of its shape and weight.

He also saw a number of rubber stamps of the type used to stamp passports at airports. The stamps had a German emblem on them.

Litchfield then said that he received a call from Mikhel about 3 days later saying he had been involved in a traffic accident and was in hospital. Mikhel told him he desperately needed the money from the sale of the Ferrari 360 to pay his hospital bills. Mikhel called a number of times and was very aggressive, not threatening, but aggressive.

Litchfield said that soon after these calls he met a man called Victor Abramkin, who introduced himself as the former husband of Mikhel's girlfriend, Marina Karagodina. He apparently just turned up one day at Litchfield's home. Abramkin was apparently trying to get custody of his son, and told Litchfield that Mikhel was a very dangerous man, and that he should look on the Internet to find out more about him.

Litchfield states he eventually sold the Ferrari 360, although there is no invoice for the sale within the box of documents. There is a Barclays Funds Transfer-Debit Advice in the box dated 13 August 2003 showing a debit of £40,557.87 from the accounts of Litchfield Imports in favour of Mrs. S Karahodina (as spelt on the document) at HSBC Bank plc, Reading, account number 52524406. **Exhibit IL/JR/6.**

Litchfield apparently made contact with an FBI agent called Gary Bennett and told him the story as outlined above.

Signed Detective John Richards          Witnessed by Detective Tony Morris

58956

Exhibit 168 - 2675

Form MG 11A(T)

·Continuation sheet no: 5

Continuation of Statement of: Detective John Richards

At the conclusion of the interview Litchfield handed me the box containing all the documents relating to the sale and purchase of the 2 Ferrari's and the Mitsubishi.

I have extracted from the documents the exhibits numbered above which appear to be relevant to the interview, along with other documents which may prove useful.

I have retained the originals for production at court if necessary.

Litchfield said he received a visit from a woman called Karina who was accompanied by a South African man. Within the documents I found a Litchfield letterhead addressed to an insurance company, bearing the name of Marina Karagodina.

The letter explains that during an accident Karagodina was accompanied by a passenger called Karine Solloway.

Signed Detective John Richards

Witnessed by Detective Tony Morris

58957

Exhibit 168 - 2676

# EXHIBIT

# 169

# DECLARATION OF LYDIA BRYANS

I, Lydia Bryans, declare as follows:

1.      I am a professional translator, certified by the American Translators Association (ATA) to translate from Russian to English. The Federal Public Defender (FPD) for the Central District of California has retained me as a translator in *United States v. Mikhel*, Case No. 02-cr-00220. The FPD sent me the documents listed in Addendum A, hereto attached, to translate from Russian to English.

2.      With this declaration, I declare under penalty of perjury under the laws of the United States of America and of the State of California that that my translation from Russian to English of the documents listed in Addendum A is true and accurate to the best of my knowledge and abilities.


DATED: 9/27/23                           _____
                                         Lydia Bryans


1

<u>Initials</u>

**Exhibit 169 - 2677**

# Addendum A

Exhibit 169 -  2678

# Addendum A
### (Iouri Mikhel)

| DOCUMENT DESCRIPTION | NO. OF PAGES | LB BATES REF. |
| --- | --- | --- |
| Iouri Mikhel's Birth Certificate | 1 | LB-001 |
| Training Course Certificate for Iouri Mikhel, 06/15/1991 | 1 | LB-457 |
| Driving Exam Certificate for Iouri Mikhel, 09/10/1992 | 2 | LB-458 |
| Disability Certificate for Iouri Mikhel, 1993 | 2 | LB-578 |
| Russian Criminal Records for Iouri Mikhel | 10 | LB-583 |
| Marriage Certificate of Margarita Fot and Gherman Mikhel | 2 | LB-532 |
| Autobiography of Margarita Fot (Trial Exhibit 3135) | 2 | LB-534 |
| Death Certificate of Margarita Mikhel | 1 | LB-461 |
| Death Certificate of Anna Fot | 1 | LB-460 |
| Death Certificate of Gherman Mikhel | 1 | LB-1089 |
| Death Certificate of Sofia Petrova | 1 | LB-572 |
| Video Interview of Edward Mikhel by Holly Jackson, Date Unknown | 9 | LB-606 |
| Video Interviews by Chris Filipiak of:<br>- Benjamin Bril, 10/24/2002; and<br>- Natalia Alifanova, 10/29/2002 (Part 1) | 7 | LB-582 |
| Video Interview by Chris Filipiak of Natalia Alifanova, 10/29/2002 (Part 2) | 12 | LB-582 (part 2) |
| Video Interviews by Holly Jackson of:<br>- Svetlana Koginova, 10/18/2005;<br>- Galina Koginova, 10/18/2005; and<br>- Olga Startseva (part 1), 10/18/2005 | 10 | LB-605 |
| Video Interviews by Holly Jackson of:<br>- Olga Startseva (part 2), 10/18/2005;<br>- Yana Startseva, 10/18/2005; and<br>- Margarita Dorchenko (part 1), 10/27/2005 | 8 | LB-605 (part 2) |

Initials *LB*

**Exhibit 169 - 2679**

# Addendum A
### (Iouri Mikhel)

| DOCUMENT DESCRIPTION | NO. OF PAGES | LB BATES REF. |
|---|---|---|
| Video Interview by Holly Jackson of Margarita Dorchenko (part 2), 10/27/2005 | 3 | LB-605 (part 3) |
| Video Interview by Holly Jackson of Natalia Alifanova, 10/19/2005 | 21 | LB-832 |
| School Records and Class Photo for Iouri Mikhel , 1975-1978 | 4[1] | LB-453 |
| Case File of Margarita Mikhel, 1945-1947 | 7 | LB-683 |
| Employment Records of Margarita Mikhel, 1947-1973 | 1 | LB-824 |
| Pension Fund of the Russian Federation, File of Margarita Mikhel | 3 | LB-821 |
| Central Archive of the Ministry of Defense of the Russian Federation, Personal File of Anna Fot | 23 | LB-797 |
| Military Records for Anna Fot, with Attachment re Red Star Award | 10 | LB-536 |
| Military Records for Gherman Mikhel with Attachment, 03/28/1945 | 3 | LB-556 |
| List of Military Awards for Gherman Mikhel with Award Dates | 1 | LB-548 |
| Medal for the Capture of Berlin, Commemorative Record for Gherman Mikhel with attachment | 3 | LB-549 |
| Medal for Military Merit Commemorative Record for Gherman Mikhel | 3 | LB-553 |
| Order of the Red Star, Commemorative Record for Gherman Mikhel with Attachment | 5 | LB-565 |
| Order of the Red Star Commemorative Record for Gherman Mikhel, 1944-1945 | 2 | LB-570 |
| Order of the Red Star Award Certificate for Gherman Mikhel with Attachment, 04/27/1945 | 3 | LB-562 |

---

[1] The original photo and school records in Russian language consist of a four-page document. The translation is eleven pages.

Addendum A - 2

Initials 𝐼𝐵

**Exhibit 169 -  2680**

# Addendum A
### (Iouri Mikhel)

| Document description | No. of Pages | LB Bates Ref. |
|---|---|---|
| Military Records for Gherman Mikhel with Attachment, 03/17/1945 | 3 | LB-559 |
| Registry Entry re Gherman Mikhel, 1911 | 1 | LB-627 |
| Letter from the FSB to Irina Zdorotsova re Summary of Criminal Charges Against Gherman Mikhel, 01/20/2021 | 2 | LB-825 |
| Leningrad Prosecutor's Office Records re Gherman Mikhel, 1944-1965 | 11 | LB-1028 |
| State Archives of the Tver Region, Records re Mikhel Family Members, 1929 | 3 | LB-709 |
| Saint Petersburg's Central State Archive, Personal File of Boris Ivanovich Mikhel | 17 | LB-712 |
| Military Records for Andrei Ivanovich Mikhel with Attachment | 2 | LB-574 |
| State Archives of the Russian Federation, Personal Files of Ivan Kasperovich Mikhel and Andrei Ivanovich Mikhel | 52 | LB-732 |
| Vital Records for Vladimir Ghermanovich Mikhel | 5 | LB-981 |
| USSR Communist Party Records re Edward Mikhel, 1966-1967 | 13 | LB-1039 |
| Registry Entries re Marriage of Kaspar Mikhel with Identifier "173", 1865 | 6 | LB-620 |
| Registry Entry for Aleksey Kasparovich Mikhel, 1879 | 1 | LB-610 |
| Record of Admission for Medical Care for Aleksey Kasparovich Mikhel, with Identifier "Mikhel - 57", 1917 | 1 | LB-609 |
| Description of Evdokia Kurmanov with Handwritten Notes | 2 | LB-648 |
| Certificate of Illness and Disability of Evdokia Kurmanov | 1 | LB-645 |
| Handwritten Autobiography of Evdokia Kurmanov, 1923 | 5 | LB-665 |
| Reply to Evdokia Kurmanov's Letter to Stalin, 05/17/1950 | 1 | LB-650 |

Initials _LB_

**Exhibit 169 - 2681**

## Addendum A
(Iouri Mikhel)

| DOCUMENT DESCRIPTION | NO. OF PAGES | LB BATES REF. |
|---|---|---|
| Description of Yulia Kurmanov with Handwritten Notes, 08/19/1947 | 1 | LB-651 |
| Communist Party Mandate for Aleksey Kurmanov, 08/16/1921 | 1 | LB-654 |
| Certificate re Sending Aleksey Kurmanov to the Western Region to check the Progress of the Collectivization, 02/11/1931 | 1 | LB-658 |
| Certificate for Aleksey Kurmanov re Authorization to Execute on the Spot, 12/05/1918 | 1 | LB-652 |
| Certificate for Aleksey Kurmanov re Military Commander of the Rifle Division, 03/08/1920 | 1 | LB-653 |
| Extract from Records about Aleksey Kurmanov's Service in the Red Army and Outside of It | 2 | LB-655 |
| Description of Aleksey Kurmanov's Service in the Red Army with Handwritten Notes | 2 | LB-646 |
| Document re Aleksey Kurmanov's Position as Prosecutor | 1 | LB-657 |
| Photos of Aleksey Kurmanov's Funeral with Handwritten Notes | 4 | LB-679 |

Addendum A - 4

Initials _LB_

**Exhibit 169 - 2682**

# EXHIBIT

# 170

<u>DECLARATION OF AJAY KUSNOOR</u>

I, Ajay Kusnoor, declare as follows:

1. I am an attorney with the Office of the Federal Public Defender for the Central District of California ("FPD"). I am licensed to practice law in the State of California and admitted to practice in this Court. I represent Iouri Mikhel in his post-conviction proceedings. Mr. Mikhel is serving a death sentence for his 2007 conviction in Case No. 02-cr-00220. I make this declaration in support of his motion for collateral relief under 28 U.S.C. § 2255.

1. Mr. Mikhel's motion alleges claims for relief premised on trial counsel's responsibility to thoroughly investigate his social history, including but not limited to Claim 5. See *Wiggins v. Smith*, 539 U.S. 510 (2003) (trial counsel ineffective for failing to investigate client's social history). Social history investigation in this case requires travel to Russia. Mr. Mikhel was born in St. Petersburg (then Leningrad) in 1965 and resided there until he emigrated in 1992. The majority of his relatives and childhood friends reside in the St. Petersburg area. Medical, school, housing, court, and criminal records reflecting Mr. Mikhel's formative experiences as a child and young adult are only available in Russia.

2. The standard of care for post-conviction counsel in a death-penalty proceeding requires our office to conduct a comprehensive investigation of Mr. Mikhel's social history. Interviewing Mr. Mikhel's family members, childhood friends, and other acquaintances is essential to preparing his social history. This cannot be done remotely, via telephone or e-mail. Rather, counsel must conduct "face-to-face, one-on-one interviews with . . . the client's family, and other witnesses who are familiar with the client's life, history or family history or who would support a sentence less than death." Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases, Guideline 10.11-C, *reprinted in* 36 Hofstra L. Rev. 677, 689 (2008).

1

AK
Initials

**Exhibit 170 - 2683**

3.     The FPD's investigation in support of Mr. Mikhel's motion for collateral relief is incomplete due to a number of extraordinary circumstances beyond our control, including Russia's invasion of Ukraine.

4.     On July 29, 2020, the Chief of the Legal and Policy Division from the Defender Services Office ("DSO"), Administrative Office of the United States Courts, denied counsel's request for authorization to travel outside the conterminous United States. DSO policy requires that Federal Defenders request permission for staff to travel internationally when such travel is required in a given case. Our request to travel to Russia was denied because of the public health emergency during the COVID-19 global pandemic and associated travel concerns.

5.     On January 23, 2022, the U.S. State Department issued the strictest travel warning, a "Level 4: Do Not Travel" advisory for Russia and noted the possibility of wrongful detention by non-state actors. Subsequently, the State Department reissued this warning and added a "D" indicator to alert American travelers of the risk of wrongful detention by the Russian government itself. U.S. Dep't of State, Bureau of Consular Affairs, Russia Travel Advisory (Jul. 19, 2022).

6.     On February 21, 2022, President Biden signed Executive Order 14065— "Blocking Property of Certain Persons and Prohibiting Certain Transactions With Respect to Continued Russian Efforts To Undermine the Sovereignty and Territorial Integrity of Ukraine" —which expanded the scope of the 2014 economic sanctions on Russia.

7.     Russia invaded Ukraine on February 24, 2022.

8.     By May 2022, the United States imposed sanctions in Russia as a consequence of its attack on Ukraine; monetary transactions have been restricted and major credit card firms have suspended services in Russia.

2



Initials

**Exhibit 170 - 2684**

9.    Russia has enacted strict laws that make it difficult to hire and pay for assistance in Russia to conduct investigation, without those individuals risking grave repercussions. On June 7, 2022, the Russian parliament voted to tighten restrictions on "foreign agents" to include any person who receives financial or any other kind of support from abroad. *Russian Parliament Votes to Tighten "Foreign Agents" Law*, Reuters (June 7, 2022). The law is implemented so arbitrarily that the European Court of Human Rights held that Russia's legislation of "foreign agents" violated the freedom of assembly and association, and that judicial review "failed to provide adequate and effective safeguards against the arbitrary and discriminatory exercise of the wide discretion left to the executive" under such provisions. Case of Ecodefense and Others v. Russia, Eur. Ct. H.R. (June 14, 2022).

10.    Pursuant to his authority under the International Emergency Powers Act ("IEEPA"), codified at Title 50, United States Code, Sections 1701-1708, President Biden issued Executive Order ("E.O.") 14024, which imposed sanctions against individuals and entities furthering specified harmful foreign activities of the Russian Federation. E.O. 14068, issued on March 11, 2022, expanded the scope of E.O. 14024 by implementing a prohibition on "the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of U.S. dollar–denominated banknotes to the Government of the Russian Federation or any person located in the Russian Federation." Section 1(a)(iv) of E.O. 14068. This section, also referred to as the "U.S. dollar-denominated banknote export ban," has been construed broadly. According to the U.S. Treasury, the E.O. prohibits the "[E]xportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, of U.S. dollar-denominated banknotes to . . . any person located in the Russian Federation." U.S. Treasury, FAQ 1028.

3


Initials

**Exhibit 170 - 2685**

11.     Russian Secret Services are jailing an increasing number of private American citizens, making it unreasonable to travel to Russia or Ukraine at this time. For example, W.N.B.A. star and two-time Olympic gold medalist Brittney Griner was detained for nearly 10 months after she was accused of carrying hashish oil in her luggage. Evan Gershkovich remains incarcerated in Russia for allegations of espionage, the first western journalist arrested and accused of espionage by Moscow since the Cold War.

12.     The State Department's Level 4 designation remains in effect today.

13.     The ongoing impediments detailed above make it impossible for our team to fulfill our obligation to investigate Mr. Mikhel's social history. As noted above, medical, school, housing, court, and criminal records reflecting Mr. Mikhel's formative experiences as a child and young adult are only available in St. Petersburg. While counsel were able to obtain some of those records before the invasion of Ukraine, that is no longer the case under the Executive Orders prohibiting a broad range of activity in the Russian Federation and the Russian Federation's draconian "foreign agent" laws.

14.     We have identified mitigation witnesses that we intend to interview in Russia, including 16 of Mr. Mikhel's relatives who were not interviewed by prior counsel. Additionally, we anticipate conducting interviews with at least 9 of Mr. Mikhel's friends and acquaintances once it is safe to travel to Russia.

15.     Our office has obtained Mr. Mikhel's school records from his prior counsel. Through these records, we have identified 36 former classmates that we would like to locate and interview, in addition to the witnesses noted above.

16.     Investigators, experts, and consultants—including an interpreter, a penalty-phase expert, and a fact investigator who interviewed several critical guilt- and penalty-phase

4

*AK*
Initials

**Exhibit 170 - 2686**

witnesses—retained by trial counsel reside in Russia, and it is imperative that we interview them as well.

17.    Mr. Mikhel's maternal grandfather and his mother were born on Mennonite land in southeastern Ukraine, territory that is now under Russian occupation. We must conduct archival research in southeastern Ukraine as part of our investigation into Mr. Mikhel's social history. This investigation was underway prior to the war but has since been hampered by the conflict. Outstanding investigative tasks in Ukraine include collecting records from the Zaporizhzhia Archives, which is located in a zone of active conflict.

I declare under penalty of perjury under the laws of the United States of America and of the State of California that the foregoing is true and correct.

DATED: 10|1|23

AJAY KUSNOOR

5



Initials

**Exhibit 170 - 2687**

# EXHIBIT

# 171

Note-Altering May Cost Menendez Psychiatrist - Los Angeles Times        https://www.latimes.com/archives/la-xpm-1996-04-11-mn-57375-story.html



Los Angeles Times

**CALIFORNIA**

# Note-Altering May Cost Menendez Psychiatrist

BY STEPHANIE SIMON AND DOUGLAS P. SHUIT

APRIL 11, 1996 12 AM PT

TIMES STAFF WRITERS

Not one to seek refuge in clunky medical jargon, psychiatrist William Vicary has always talked of his patients in the most evocative way.

He called a convicted killer "a very sick lady with one foot on a banana peel and the other in the gas chamber." He described a teenage murder suspect as "an accident waiting to happen." He deemed Erik Menendez "so sick it was almost time to take him upstairs and put him in the rubber room."

Wrapped in language jurors can understand, Vicary's psychiatric evaluations help determine peoples' fates: whether a convict deserves the death penalty or life behind bars; whether a teenager should be judged as a juvenile or an adult; whether a killer is insane or competent to stand trial.

Vicary has made a living making these kinds of judgments--most recently in the Menendez brothers' murder trial, where he caused an uproar this week by admitting that he altered notes of sessions with Erik. The Menendez trial was just one of hundreds of Los Angeles County murder cases he has testified in, either for the defense, the prosecution, or as a psychiatric evaluator for the court itself.

It's a profitable job. He earned $136,000 last year just from taxpayer-funded assignments in Los Angeles County Superior Court, and has received $31,000 for his work on the Menendez case over the past six years.

**Exhibit 171 -  2688**

While he was at it, he earned considerable respect.

But both the money and the respect are now in jeopardy.

Vicary's bombshell statement last week that he doctored notes about counseling sessions with Erik Menendez under pressure from defense lawyer Leslie Abramson stunned court watchers, horrified ethics experts and embarrassed other forensic psychiatrists.

Vicary could face discipline ranging from a reprimand to loss of his professional license. He could also find himself expelled from the panel of psychiatrists eligible to work as court evaluators. Even if he escapes disciplinary action, he could be shut out of work for the court because of the scandal.

Dr. Daniel Borenstein, a Brentwood psychiatrist and member of the American Psychiatric Assn.'s ethics board, said he expects his agency to take action against Vicary. "Any time we feel a doctor has violated the canons of ethics, as I believe will be the case here, we don't wait for some outside agency to initiate a complaint," he said.

Vicary has admitted under oath that he erred.

He has testified that he now regrets deleting two dozen segments of his notes at Abramson's request. In an interview with The Times on Wednesday, however, he insisted that his solid reputation would carry him through this ethical lapse. "I'll be just fine," he said. "I honestly believe that once this furor has died down, people will take a hard look at it and realize they have made a mountain out of a molehill. "

For all his confidence, though, Vicary knows how bad his behavior looks. After all, he has written volumes on ethical courtroom testimony.

**Exhibit 171 -  2689**

In articles and videos, and in classrooms at USC, Vicary teaches other psychiatrists how to testify in court. He emphasizes two lessons above all: Be objective. And be honest. As he wrote in a pamphlet on courtroom testimony, speaking from the witness stand "in some regards . . . is the acid test of the competency of a forensic expert." As he said in the interview, "Your credibility is crucial. Without your credibility, you have no value."

Pondering his own value after the Menendez disclosures, Vicary paused, then answered lightly: "That remans to be seen."

"That's kind of the irony of this situation," he added. "I teach doctors always to be honest and ethical, and here I am in this tremendously big case, involved in a conflict."

Both the California Medical Board, which licenses psychiatrists, and the American Psychiatric Assn., which Vicary belongs to, could discipline him for his admitted error.

David Thornton, a supervising investigator with the California Medical Board, said it is a misdemeanor criminal offense in California to fraudulently alter medical records--including notes from a psychiatric session. The misdemeanor is punishable by a $1,000 fine. But the board can also take far more serious action, from putting a doctor on probation to revoking his license.

The psychiatric association, a trade group, could expel or suspend Vicary. It could also add his name to a national database of physicians who have been disciplined by regulatory agencies or lost malpractice cases. Once listed in the database, a physician can have trouble not only getting clients, but also signing up for malpractice insurance or government contracts under Medicare or Medicaid.

Vicary said he is ready to take whatever punishment comes his way. He also repeated

**Exhibit 171 -  2690**

his willingness to answer any questions about his action as soon as the judge lifts a gag order that applies to all participants in the Menendez case.

But no explanation can satisfy some of his colleagues.

"The honesty of the profession requires that you do not alter notes," said Dr. Richard D. Milone, who serves on the New York State Board for Professional Medical Conduct. "It's a character defect to change or alter notes. It is a deception."

In admitting to that deception, Vicary has testified with the same firm, straight-arrow tone that makes him so winning as an expert witness. He did not squirm. He did not fidget. He did remove his glasses to mop his brow--once. But mostly, he sat still and straight, looking firmly into the eyes of his questioner and answering with his trademark bluntness.

"Do you concede today that your actions were wrong?" prosecutor David Conn asked.

"Yes," Vicary responded.

A longtime member of the court's panel of psychiatric evaluators, Vicary has won praise for his frank, direct demeanor. He once testified that Erik Menendez was "a basket case" and another time described him as "a pathetic, wimpy, hopeless mess." In fact, he says he refuses to shade his testimony to make one side or the other look good. Several people who have worked with Vicary commend him for such honesty.

"Some of these psychiatrists are just the most obscene whores you can imagine. He's just the opposite --refreshing, professionally candid," one Superior Court judge said. "I consider him top flight. . . . He's always been very reliable and as evenhanded as you can get."

Los Angeles judges who need a physician to determine a defendant's mental state can

**Exhibit 171 -  2691**

draw whomever they want from a list of about 70 eligible psychiatrists and psychologists.

Because Vicary would be vulnerable to a blistering cross-examination from any attorney who disagreed with his conclusions, judges may now be reluctant to hire him.

"An individual judge might say, 'This is just going to be opening up a can of worms every time he comes into the courtroom. . . . I want to appoint a psychiatrist whose report will stand on its own merit,' " said Superior Court Judge Michael A. Cowell.

Cowell, who heads the committee of judges that evaluates court-hired psychiatrists twice a year, emphasized that he was speaking in general about doctors with spotty records, not specifically about Vicary.

A graduate of Harvard Law School as well as USC Medical School, Vicary said he has always wanted to do court-related psychiatry, relishing the challenge of working with some of society's most wretched and ill patients. He estimated that his court fees-- which have tallied at least $42,650 so far this year--account for one-third to one-half of his income.

As a court-appointed psychiatrist, he earns $250 for the initial evaluation of a defendant, plus $400 for each day of testimony. In death penalty cases, he can request more money for additional sessions but doesn't always receive it. For the past two years, he has not earned a penny from the Menendez case, Vicary said. The court simply does not have enough money to pay witnesses, even in death penalty cases, for every hour they spend with defendants. And the Menendez estate has run out of money, shifting the burden of the brothers' defense to taxpayers.

In his private work for defense attorneys and prosecutors, Vicary says, he earns much more than he can in court: up to $300 an hour.

**Exhibit 171 - 2692**

But he insists that money "has really not ever been an issue for me." If he wanted riches, Vicary said, "it would be much easier for me to sit in Beverly Hills and treat neurotic housewives for $350 an hour."

He points out that he has volunteered every Friday night for the last 25 years at the Hollywood-Sunset Free Clinic, where he treats everything from runny noses to sexually transmitted diseases.

Vicary contends that the passages he deleted, while extensive, did not affect either his clinical evaluation of Erik Menendez or the facts presented to jurors. Even Erik's statements that he "couldn't wait" to kill his parents a week before the murders and that Lyle's incestuous relationship with their mother was all "in his head" were not relevant, Vicary said.

Regardless of how Vicary assessed the notes' importance, however, fellow psychiatrists said he absolutely should not have deleted them. One said she would resign from a case rather than give in to a lawyer's pressure.

"The medical societies tell people, the malpractice insurance companies tell people, the lawyers tell people: The worst thing you can do is change the records," said Dr. Benjamin Shwachman, a Covina anesthesiologist who also has a law degree. "You are dead in the water if the record is altered."

Times staff writers Alan Abrahamson and Ann W. O'Neill contributed to this story.

* THE OTHER SIDE: The brothers of Kitty Menendez testify for prosecution. B1

**Exhibit 171 -  2693**

Copyright © 2023, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell or Share My Personal Information

**Exhibit 171 - 2694**

# EXHIBIT 172

Case: 02-56108   05/02/2013   ID: 8613206   DktEntry: 103-2   Page: 323 of 3436 (of 3617)



United States Marshals Service
*Central District of California*



*Edward Roybal Building*
*255 E. Temple Street/Room 167*
*Los Angeles, CA. 90012*
*Office: (213) 894-2488  Facsimile: (213) 894-3817*

To: Susan de Witt

From: Larry O'Connor

Date: 2/2/04

NUMBER OF PAGES: ___/___ (EXCLUDING COVER SHEET)

Comments: Mikhel is presently at West Valley, not CDC. SBSO states they can't meet his needs - He must leave. Please call me with questions 213-894-2496 ASAP 888-305-5472 (pgr)

Larry

002IM

**Exhibit 172 - 2695**

# EXHIBIT

# 173

# FAX COVER SHEET

| TO | Ph.D. Ralph Ihle |
|---|---|
| COMPANY | Chief, Psychology Services MDC |
| FAX NUMBER | 12132539582 |
| FROM | Dale Rubin |
| DATE | 2006-09-12 14:03:58 GMT |
| RE | Iouri Mikhel |

## COVER MESSAGE

Dr. Ihle:

I am sorry but it took me time to locate this report in my computer.  I hope it is some help to you.  If important, Iouri was being medicated at WVDC at the time of this testing.

I thought you should be aware that Iouri is now unable to assist us in the preparation/presentation of this trial. He sits and stares blankly ahead, does not respond to our inquiries, and when he does speak makes comments that are inappropriate to the proceedings at hand.  He claims that he is not sleeping but is very tired all the time.

I hope this provides some insight into Mr. Mikhel.  Dale Rubin

www.efax.com

**Exhibit 173 - 2696**

# EXHIBIT

# 174

| Case | District | NOI status | Description | Status, if available[2] |
|---|---|---|---|---|
| U.S. v. Alex Castro | EDMI, 19-20498 | Government declined to seek death after a Capital Case Review Committee ("CCRC") meeting.<br><br>02/19/2021 Gov't files notice not to seek death. Dkt. No. 114. | A 2019 beating death and inmate murder at the Milan Detention Center, captured on video, of the suspected head of an international child exploitation ring. The defendants are charged with the attempted murder of two other inmates, an apparent melee. All involved are white, except Kechego who is Native American and Castro who is Hispanic. | Trial resulting (among others) in: Guilty for assault resulting in serious bodily injury (2 counts).<br><br>Mistrial as to murder in fist degree and lesser included ; conspiracy to commit murder; assault with intent to commit murder of Figura. Mistrial declared on 8/5/2022. Dkt. No. 278.<br><br>Retrial on remaining counts set for 2/1/2023. Dkt. No. 287. |
| U.S. v. Jason Kechego | EDMI, 19-20498 | Government declined to seek death after a CCRC meeting.<br><br>02/19/2021 Gov't files notice not to seek death. Dkt. No. 113. | Same as above | 8/05/22<br>Trial resulting (among others) in: Not guilty of murder in the first degree; guilty as to murder in second degree; not guilty on assault to commit murder of Figura. |
| U.S. v. Adam Wright | EDMI, 19-20498 | Government declined to seek death after a CCRC meeting.<br><br>2021-02-202 Gov't filed notice not to seek death. Dkt. No. 112 | Same as above | Plea agreement entered on 2/10/22 to 18 U.S.C. § 1111(b), Second Degree Murder; Aiding and Abetting.<br><br>Government recommends sentence of imprisonment does not exceed 328 months. Dkt. No. 167. |

[1] Dkt. No. refers to docket entries in each case mentioned.
[2] Status of cases updated as of February 16, 2023.

Exhibit 174 - 2698

| Case | District | NOI status | Description | Status, if available[2] |
|---|---|---|---|---|
| | | | | 10/12/22 Sentenced to 292 months. Dkt. No. 294. |
| U.S. v. Romeo Lopez-Hernandez | MDFL, 22-00031 | Government decline to seek death without CCRC meeting | 2021 BOP homicide at FCC Coleman Medium, by a defendant who was scheduled for release on June 8, 2022.  The defendant claims he was practicing Santeria and was told to kill his cellmate. Indictment filed  6/21/22,  alleging willful, deliberate, malicious, and with premeditation and malice aforethought, unlawful killing by strangulation.  Dkt. No. 18. | Competency evaluation pending. |
| U.S. v. Lorenzo Scott | MDPA, 20-00065 | Government declined to seek death without CCRC meeting | a 2015 BOP inmate beating murder at USP Lewisburg.\n\nIndictment filed on 3/03/2020 alleging that Scott, with malice aforethought, did unlawfully kill victim, by repeatedly striking, stomping and inflicting blunt force trauma to victim's head, neck and torse, which resulted in death, pursuant to 18 U.S.C. § 111 and 7(3). Dkt. No. 1. | Trial  continued to the January 2023, trial list. Dkt. No. 95. |
| U.S. v. Lawrence Taylor | SDIN, 22-00006 | Government declined to seek death without CCRC meeting | 2019 inmate murder at USP Terre Haute. All involved are African-American.\n\nIndictment filed alleging Taylor unlawfully, willfully, deliberately, and maliciously killed another human being with malice aforethought and with premeditation, by stabbing victim multiple times in the neck, | Penalty sheet noting maximum penalty is Life. DKt. No. 35.\n\nTrial rescheduled to 4/10/2023. Dkt. No. 65 |

Page 3 of 14

| Case | District | NOI status | Description | Status, if available[2] |
|---|---|---|---|---|
| | | | face, chest, and elsewhere with a metal weapon pursuant to 18 U.S.C. § 111 | |
| U.S. v. Ruben Laurel | NDWV, 17-00039 | Notice of Intent to seek death filed on 5/2/2018. Dkt. No. 43. | a 2012 stabbing death of a BOP inmate at USP Hazelton who stabbed someone else in a separate incident shortly before. | Entered plea agreement in May 2021 for 25 years. Dkt. No. 231. Sentenced to 25 years on 7/19/2022. Dkt. No. 242. |
| U.S. v. Michael Owle | NDWV, 17-00039 | Notice of Intent to seek death filed on 5/2/2018. Dkt. No. 42. | Same as above | Entered plea agreement in May 2021 for 25 years. Dkt. No. 235. Sentenced to 25 years on 7/19/2022. Dkt. No. 238. |
| U.S. v. Morgan Siler | DAZ | No charges yet filed, no NOI filed, but AUSA notified withdrawn. | Two inmates investigated for the murder of an inmate at USP Tucson. All involved are white. The homicide was in Dec. 2015. Still pending without charges filed. | |
| U.S. v. Samuel Silva | WDVA 20-00017 | NOI filed in Dec. 2020. Dkt. No. 11. Gov't Motion to Withdraw Notice of Intent to Seek Death filed on 5/24/22. Dkt. No. 149. | a 2018 BOP inmate murder at USP Lee by a member of the prison gang Syndicato De Nuevo Mexico. The victim was a member of a rival gang, Puente 13. Silva was serving a 47-year sentence for carjacking and use of a gun. He was involved in a gang-related state prison murder in 2000. All involved are Hispanic | Jury trial reset for 6/12/2023. Dkt. No. 173. |

**Exhibit 174 -  2699**

# BIDEN ADMINISTRATION DEAUTHORIZATIONS

Exhibit 174 - 2700

| Case | District | NOI status | Description | Status, if available[3] |
|---|---|---|---|---|
| U.S. v. Nicholas Tartaglione | SDNY 16-00832 | Notice of Intent to seek death filed on 04/19/19. Dkt. No. 121.<br>Notice to deauthorize filed on 12/13/22. Dkt. No. 383. | Four 2016 drug-related murders by a former police officer and another who allegedly buried the bodies on his property. Tartaglione is white and the victims are Latino. Dkt. No. 120. | No plea agreement, and case is pending. |
| U.S. v. Ronald Donell Brown | SDTX 17-567 | Authorized by AG Sessions in a letter dated October 23, 2018, though no Notice of Intent filed.<br>Notice to deauthorize by AG Garland on 11/28/2022, entered 12/14/2022. Dkt. No. 261, Exhibit A.<br>Memo regarding deauthorization is granted. Dkt. No. 263. | A 2014 drug-related gun murder-for-hire in which the shooting occurred in the parking lot of a parole office. All involved are African American. Dkt. No. 130. | David Roberts entered into a plea agreement 04/05/2018. Dkt. No. 72.<br>Clyde Williams entered into a plea agreement 11/21/2019. Dkt. No. 164.<br>No plea agreement for Ronald Donell Brown, and case is pending. |
| U.S. v. Daniel Nantz | EDKY 19-16 | Notice of Intent to seek death entered 05/07/20. Dkt. No. 121.<br>Withdrawal of intent to seek death entered on 12/01/22. Dkt. No. 399. | A 2019 drug-related gun murder of a federal witness, the defendant's pregnant girlfriend. She was dropped off at a hospital, but died. Multiple killings are alleged, due to the death of the baby girl three days later. All involved are white. Dkt. No. 32. | No plea agreement, and case still pending. |
| U.S. v. Anthony Jordan | EDMO 15-404 | Notice of Intent to seek death entered 12/20/18. Dkt. No. 1988.<br>Withdrawal of intent to seek death entered on 11/28/22. Dkt. No. 3725. | Twelve drug-related gun murders, three in 2008, two in 2010, four in 2013, including a double murder, two in 2014 and one in 2015. Jordan is charged in eleven; Ward in four; Terry, Woodson, Thompson and | No plea agreement for Anthony, and case still pending. |

---

[3] Status of cases updated as of February 6, 2023.

Exhibit 174 - 2701

| Case | District | NOI status | Description | Status, if available[3] |
|------|----------|------------|-------------|------------------------|
| | | | Washington in three; Lemons in two; and Sims, Furnace and Williams in one. Dkt. No. 1990. | |
| U.S. v. Joshua Nesbitt and Shawn Burkhalter | WDMO 18-36 | Notice of Intent to seek death entered 7/30/19. Dkt. No. 240. Notice of Intent to seek death amended on 12/29/21. Dkt. No. 918. Withdrawal of intent to seek death entered on 8/30/22. Dkt. No. 1217. | Two drug-related gun murders in 2015, one a robbery, the other a witness retaliation murder. Dkt. No. 1226. | No plea agreement, and case still pending. |
| U.S. v. Ryan Phillip Schlesinger | D. AZ 18-02719 | Notice of Intent to seek death filed 9/8/2020. Dkt. No. 187. Amended Notice of intent to seek death filed 10/02/2020. Dkt. No. 194. Motion to withdraw amended notice of intent to seek death entered on 8/29/22. Dkt. No. 449. Motion to withdraw intent to seek death granted on 08/30/2022. Dkt. No. 450. | The 2018 gun murder of a Deputy U.S. Marshal who was serving an arrest warrant for stalking a police sergeant. Dkt. No. 192. | No plea agreement, and case still pending. |
| U.S. v. Michael Rebolledo | NDCA 18-119 | Notice of Intent to seek death filed 10/2/19. Dkt. No. 209. Deauthorized on 7/12/22. Dkt. No. 457. | Seven RICO gun murders by the 19th Street Surenos gang: three in 2006 including a double murder, another double murder in 2008 and a murder in 2009. Rebolledo is charged in three killings, thirteen years earlier when he was 18. Rebolledo is also charged in four attempted murders between 2007 and 2011. Aguilar, Cid-Salinas, Gonzalez, Rojas and Urbina are | No plea agreement, and case still pending. |

Exhibit 174 - 2702

| Case | District | NOI status | Description | Status, if available[3] |
|---|---|---|---|---|
| | | | charged in two and the others in one. The defendants are Hispanic, the victims are African-American and Hispanic. Dkt. No. 1. | |
| U.S. v. Samuel Silva | WDVA 20-17 | Notice of Intent to seek death filed 12/4/20. Dkt. No. 11. Motion to withdraw intent to seek death filed 5/24/22. Dkt. No. 149. Motion to withdraw intent to seek death granted 05/26/2022. Dkt. No. 151. Jury trial reset for 6/12/2023. Dkt. No. 173. | A 2018 Bureau of Prison inmate murder at United States Penitentiary, Lee County, Virginia by a member of the prison gang Syndicato De Nuevo Mexico. The victim was a member of a rival gang, Puente 13. Silva was serving a 47 year sentence for carjacking and use of a gun. He was involved in a state prison murder in 2000. All involved are Hispanic. Dkt. No. 1. | No plea agreement, and case still pending. |
| U.S. v. Victor Silvers | WDKY 18-50 | Notice of Intent to seek death filed 2/25/21. Dkt. No. 75. This document was stricken from the record. Motion to withdraw intent to seek death filed on 04/14/2022. Dkt. No. 113. Withdrawal of intent to seek death. Dkt. No. 116. | A 2018 murder by shooting of the defendant's spouse, and a 2018 attempted murder. Dkt. No. 239. | No plea agreement, and case still pending. |
| U.S. v. Steven Wiggins | MDTN 19-194 | Notice of Intent to seek death filed 8/8/19. Dkt. No. 20. Motion to withdraw death is granted on 04/27/22. Dkt. No. 127. | The May 30, 2018 carjacking/gun murder of a law enforcement officer, a Sergeant with the Sheriff's Office. The murder is on videotape from Sergeant Baker's body cam. Wiggins confessed on video that he executed the officer "like a dog … [to end] it's suffering …" Wiggins took the police car and the officer's body and attempted to burn them. Wiggins was previously convicted of aggravated assault. Dkt. No. 18. | Mr. Wiggins plead guilty to counts 1, 2, 3, and 4. Sentencing date set for 04/20/22. Dkt. No. 115. The plea hearing was reset for 04/26/22. Dkt. No. 124. Judgment: life imprisonment on Counts 1; a consecutive sentence of 120 months imprisonment on Count 2; and 120 months imprisonment on Counts 3 and 4, to run concurrent with the life sentence on Count 1. Remanded to custody. $400 special assessment. Dkt. No. 129. |

Page 6 of 14

Page 7 of 14

| Case | District | NOI status | Description | Status, if available[3] |
|---|---|---|---|---|
| U.S. v. Michael Owle and Ruben Laurel | NDWV 17-00039 | Michael Owle Notice of Intent to seek death filed on 5/2/2018. Dkt. No. 42.<br><br>Ruben laurel Notice of Intent to seek death filed on 5/2/2018. Dkt. No. 43.<br><br>Deauthorization for Michael Owle and Ruben Laurel entered on 02/18/22. Dkt. No. 223. | A 2012 stabbing death of a BOP inmate at USP Hazelton who stabbed someone else in a separate incident shortly before. Dkt. No. 40. | Michael Owle entered plea agreement on 07/18/22 for 300 months (25 years) He plead guilty to aiding and abetting second degree murder. Dkt. No. 235. Sentenced to 25 years on 7/19/2022. Dkt. No. 238.<br><br>Ruben Laurel entered plea agreement on 07/11/22 for 300 months (25 years). He plead guilty to aiding and abetting second degree murder. Dkt. No. 231. Sentenced to 25 years on 7/19/2022. Dkt. No. 242. |
| U.S. v. Morgan Siler | D. Arizona | 9/18/17 DOJ meeting, thereafter counsel advised by AUSA of authorization by AG Session, but no notice of intent or indictment filed. Counsel advised of deauthorization on 2/8/22. | A BOP homicide at USP Tucson allegedly by Siler and David Hammer (who is now deceased). Siler is a seriously mentally ill inmate, now housed at USP Allenwood. Two inmates investigated for the murder of an inmate at USP Tucson. All involved are white. The homicide was in Dec. 2015. Still pending without charges filed. | |
| U.S. v. James Wayne Ham | SDTX 13-00363 | Notice of Intent to seek death entered 10/06/14. Dkt. No. 36.<br><br>Amended Notice of Intent to seek death entered 11/15/16. Dkt. No. 94.<br><br>Second amended Notice of Intent to seek death entered on 03/19/18. Dkt. No. 102. | A 2013 gun murder of a U.S. postal worker (a letter carrier) because the white defendant thought the black female carrier was diverting his mail to his estranged wife. After the shooting, the victim's car, with her body still inside, was set on fire by the defendant and the victim's body was reduced to ashes and a few bones. Dkt. No. 69. | Plea agreement entered on 12/06/21 for life imprisonment. He plead guilty to first-degree murder Dkt. No. 208. |

**Exhibit 174 - 2703**

Exhibit 174 - 2704

| Case | District | NOI status | Description | Status, if available[3] |
|------|----------|-----------|-------------|------------------------|
| | | Motion to withdraw intent to seek death entered on 12/02/21. Dkt. No. 206. | | |
| U.S. v. Edwin Mills and Carlo Wilson | EDMI 16-20460 | Notice of Intent to seek death entered 03/01/18. Dkt. No. 293. Notice of withdrawal of intent to seek death entered on 10/28/21. Dkt. No. 1515. | Four RICO gun murders in 2015, including a double RICO gun murder, by the 6 Mile Chedda Grove gang. Mills and Wilson, who were authorized, are charged in the double murder, in which the intended target and an innocent bystander, a 13 year old girl, were killed. Two other children, sitting on the hood of the victim's car, were injured but not shot. Dkt. No. 292. | Edwin Mills plea agreement entered 10/20/22. He plead guilty to racketeering conspiracy and will serve life imprisonment. Dkt. No. 1685. Carlo Wilson plea agreement entered 08/24/22. He plead guilty to racketeering conspiracy and will serve life imprisonment. Dkt. No. 1670. |
| U.S. v. Elmer Zelaya-Martinez | EDVA 18-123 | Notice of Intent to seek death entered 01/06/20. Dkt. No. 425. Notice of withdrawal of intent to seek death entered 10/28/21. Dkt. No. 1033. | 2016 kidnapping-murders of a 17-year old and a 14-year-old victim. MS-13 gang members suspected the 17 year old of working for a rival gang. The 14 year old potential witness had lured the 17 year old to be killed but then was suspected of cooperating. Elmer Zelaya Martinez, Ruiz, Contreras, Henry Martinez, Velasco, Avalos, Ferrera and Alfaro are charged in both murders, the rest in one. Elmer Zelaya Martinez is the only MS-13 defendant authorized, the first such case under the Trump administration. He allegedly ordered the two killings, grabbed the 17 year old around the neck as he was being stabbed and was present and filming the killing of the 14 year old. The 17 year old was from Guatemala, the 14 year old was from Honduras. Dkt. No. 162. | Judgement was entered on 12/21/22. No plea agreement. Elmer was sentenced to life imprisonment. Dkt. No. 1324. Notice of Appeal entered on 01/10/23. Dkt. No. 1354. |

Exhibit 174 - 2705

| Case | District | NOI status | Description | Status, if available[3] |
|---|---|---|---|---|
| U.S. v. Billy Arnold | EDMI 15-20652 | Notice of Intent to seek death entered 01/08/18. Dkt. No. 817.<br>Deauthorized 09/13/21. Dkt. No. 1760. | Three RICO gun murders, one in 2006, one in 2014, one in 2015, by the Seven Mile Bloods. Arnold is charged in two, the rest in one. Arnold is also charged in nine attempted murders. Only Arnold was authorized. Dkt. No. 1665. | No plea agreement as to Billy, case still pending. |
| U.S. v. John Smith | D. ALASKA 16-86 | Notice of Intent to seek death entered 06/19/18. Dkt. No. 168.<br>Deauthorized 06/17/21. Dkt. No. 1086. | A 2016 double gun murder. Smith allegedly committed three separate drug-related robberies. The last resulted in the shooting deaths of two individuals. A third person was wounded. All involved are white. Dkt. No. 102. | No plea agreement. Found guilty by jury on 08/23/22. Dkt. No. 1259. |
| U.S. v. Juan R. Pedro Vidal | DPR 16-778 | Notice of Intent to seek death entered 06/28/18. Dkt. No. 484.<br>Notice of request to withdraw intent to seek death entered 06/02/21. Dkt. No 791.<br>Withdrawal of intent to seek death granted on 06/02/21. Dkt. No. 792. | A 2016 carjacking, kidnapping, gun murder. Dkt. No. 481. | No plea agreement, and case still pending. |
| U.S. v. William Wood Jr. | NDNY 19-058 | Notice of Intent to seek death entered 04/12/19. Dkt. No. 15.<br>Request to withdraw intent to seek death entered 06/02/21. Dkt. 76.<br>Motion to withdraw intent to seek death entered 06/03/21. Dkt. No. 77.<br>Motion to withdraw intent to seek death granted on 06/07/21. Dkt. No. 79. | A 2018 double gun murder of employees during a robbery of a Chili's Restaurant near Syracuse, New York, by a former employee who had been fired a few months earlier. Dkt. No. 1. | Plea agreement entered on 08/23/21. He plead guilty to interference with commerce by robbery, and use of a firearm in furtherance of a crime of violence and murder. He is sentenced to life imprisonment. Dkt. No. 80. |

Exhibit 174 - 2706

| Case | District | NOI status | Description | Status, if available[3] |
|---|---|---|---|---|
| U.S. v. Lilbear George, Curtis Johnson, Chukwudi Ofomata | EDLA 17-201 | Lilbear George - notice of intent to seek death entered 08/31/18. Dkt. No. 147.<br>Lilbear George - amended notice of intent to seek death entered on 06/19/19. Dkt. No. 393.<br>Lilbear George - second amended notice of intent to seek death entered 07/01/2019. Dkt. No. 409.<br>Curtis Johnson - notice of intent to seek death entered 08/31/18. Dkt. No. 148.<br>Chukwudi Ofomata - notice of intent to seek death entered 08/31/18. Dkt. No. 149.<br>Lilbear George - motion to withdraw second amended intent to seek death entered on 05/05/21. Dkt. No. 1377.<br>Curtis Johnson - motion to withdraw intent to seek death entered on 05/05/21. Dkt. No. 1379.<br>Chukwudi Ofomata - motion to withdraw intent to seek death entered on 05/05/21. Dkt. No. 1378.<br>Lilbear George - motion to withdraw second amended intent to seek death granted on 05/10/21. Dkt. No. 1383. | A 2013 New Orleans gun murder of an armored truck driver at a bank. Ofomata is charged in state court with a separate 2008 double murder. Dkt. No. 237. | Lilbear George – plea agreement on 05/25/21. He plead guilty to use, carrying, brandishing, and discharging of a firearm in furtherance of a crime of violence which resulted in death. He is to be sentenced to between 360 months and 480 months. Dkt. No. 1390.<br>Lilbear George - order granting application for immunity on 03/23/22. Dkt. No. 1639.<br><br>Curtis Johnson – no plea agreement. Sentenced to 600 months on 07/13/22. Dkt. No. 1733.<br>Curtis Johnson – notice of appeal entered 07/13/22. Dkt. No. 1735<br><br>Chukwudi Ofomata – plea agreement on 05/25/21. He plead guilty to use, carrying, brandishing, and discharging of a firearm in furtherance of a crime of violence which resulted in death. He is to be sentenced to no more than 480 months. Dkt. No. 1392.<br>Chukwudi Ofomata – order granting application for immunity on 03/23/22. Dkt. No. 1641 |

Page 10 of 14

Exhibit 174 - 2707

| Case | District | NOI status | Description | Status, if available[3] |
|------|----------|-----------|-------------|------------------------|
|  |  | Curtis Johnson - motion to withdraw intent to seek death granted on 05/10/21. Dkt. No. 1382.<br>Chukwudi Ofomata - motion to withdraw intent to seek death granted on 05/10/21. Dkt. No. 1381. |  |  |

Exhibit 174 - 2708

# POTENTIAL FEDERAL CAPITAL DEFENDANTS NOT AUTHORIZED
# FOR A CAPITAL PROSECUTION UNDER BIDEN ADMINISTRATION

| Case | District | NOI status | Description | Status, if available |
|---|---|---|---|---|
| U.S. v. Antoine Thompson | EDKY 19-22 | | A 2014 inmate stabbing murder at USP McCreary. Dkt. No. 1. | Jury found Antoine guilty of second-degree murder. Dkt. No. 448. |
| U.S. v. Adam Wright | EDMI 19-20498 | | A 2019 beating and stabbing inmate-murder at the Milan Detention Center, captured on video, of the suspected head of an international child exploitation ring. The defendants are charged with the attempted murder of two other inmates, an apparent melee. Adam also assaulted a nurse in order to prevent him from stopping the defendants' assaults upon the two inmates. Dkt. No. 123. | Adam entered a plea agreement on 02/10/22. He plead guilty to second-degree murder. Dkt. No. 167.<br>He is sentenced to 292 months. Dkt. No. 294. |
| U.S. v. James Dean Cloud | EDWA 19-2032 | | The 2019 gun murders of five on the grounds of the Yakama Nation. When the car they had broke down, they held a child hostage and carjacked another car. Dkt. No. 285. | James was found guilty and sentenced to life imprisonment. Dkt. No. 913. |
| U.S. Romeo Blackman | NDIL 18-728 | | Ten murders by the Goonie Boss/Goonie street gang, four in 2013, one in 2015 and five in 2016. Romeo Blackman is charged in seven murders. Of the ten murders, four are charged as overt acts. The others are charged as RICO murders. Dkt. No. 56. | No plea agreement, and case still pending. |

| Case | District | NOI status | Description | Status, if available |
|---|---|---|---|---|
| U.S. v. Darius Murphy | NDIL 19-641 | | Nineteen murders by the Traveling Vice Lords street gang, between 2000 and 2020, including two double murders, one in 2016 and a 2018 double gun murder, Murphy is alleged to have been hired. The victims, a male and a female, were shot multiple times in the back of the head. Murphy is charged in six murders, eight attempted murders, and one robbery. Most of Murphy's homicides were committed when he was a juvenile. Dkt. No. 284. | Darius entered into a plea agreement on 08/05/2022. He plead guilty to racketeering conspiracy. Dkt. No. 572. Amended judgment entered on 12/21/2022, whereby Darius was sentenced to 600 months' imprisonment. Dkt. No. 842. |
| U.S. v. Derek Michael Chauvin | DMN 21-108 | | The 2020 murder of George Floyd on videotape. Four police officers were involved. Former police officer Derek Chauvin knelt on Floyd's neck for 9 minutes and he died. The defendant is white. The victim is African American. Dkt. No. 1. | Chauvin entered a plea agreement on 12/15/2021. He plead guilty to deprivation of rights. Dkt. No. 142. He was sentenced to 245 months on 07/07/2022 to account for his time spent on prior confinement. Dkt. No. 391. |
| U.S. v. Steven Carrillo | NDCA 20-265 | | The 2020 murder of one protective security officer and attempted murder of another protective security officer. Dkt. No. 12. | Steven entered into a plea agreement on 02/11/2022. Dkt. No. 128. He was sentenced to 41 years imprisonment. Dkt. No. 166. |
| U.S. v. Felix Verdejo-Sanchez | DPR 21-161 | | The 2021 carjacking and kidnapping resulting in death of Verdejo-Sanchez's pregnant girlfriend. Dkt. No. 130. | No plea agreement for Felix, and case still pending. |
| U.S. v. Patrick Devone Stallworth | NDAL 20-206 | | A 2019 intrastate kidnapping from a birthday party, sexual assault and suffocation murder of a three year old child. Dkt. No. 108. | Jury found him guilty of kidnapping and conspiracy to commit kidnapping. Dkt. No. 123. |

**Exhibit 174 - 2709**

| Case | District | NOI status | Description | Status, if available |
|---|---|---|---|---|
| U.S. v. Victor Kingsley | EDNY 18-128 | | A 2017 bombing that killed a 73-year-old man in Queens and an attempted bombing in 2018. Dkt. No. 24. | No plea agreement, and case still pending. |
| U.S. v. Patrick Wood Crusius | W.D. Tex 20-CR-00389 | | After driving for hours to El Paso, defendant killed 22 people and wounded two dozen more at a Walmart, which the government charged as hate crimes since he targeted his victims because of their actual and perceived national origin | https://www.justice.gov/opa/pr/texas-man-sentenced-90-consecutive-life-sentences-2019-mass-shooting-walmart-el-paso-texas  Dkt. No. 254, Notice. |

**Exhibit 174 -  2710**

# EXHIBIT

# 175

MAY-18-2005  10:57        DOJ CRIM DIV                          202 514 5143    P.02/04

## Memorandum

To    :    **Assistant Attorney General**                    Date  05/12/2005
           **Criminal Division** .

                           (b)(6); (b)(7)(C)
From  : .   **Section Chi**
           **Integrity in Government/Civil Rights Section**

           (b)(6); (b)(7)(C)
Subject :                  b)(6); (b)(7)(C)        (b)(6);
           **LOS ANGELES MDC FACILITY;**
           **194C-LA-241540**

### ACTION MEMORANDUM

The Los Angeles Division of the Federal Bureau of Investigation (FBI) has requested Department of Justice (DOJ), Office of Enforcement Operations (OEO), authorization for Los Angeles Division Cooperating Witness,  (b)(6)  (b)(6)  (*protect identity*), a federal prisoner currently incarcerated at the Los Angeles Metropolitan Detention Center (MDC), to introduce an undercover employee (UCE) to subject  (b)(6)  (b)(6);

By way of background, this investigation involves allegations that individuals employed as Correctional Officers at the Los Angeles MDC are receiving payments from inmates in return for smuggling contraband into the MDC.  Specifically, it has been alleged that these officers have brought cigarettes, alcoholic beverages, tattoo ink, and cellular telephones into the MDC and provided them to inmates in exchange for money.

The following information is furnished in accordance with an OEO memorandum regarding the use of federal prisoners in investigations:

1)    Name:
      Sex:
      Race:
      DOB:
      POB:
      Citizenship:       (b)(6); (b)(7)(C)
      SSN:
      FBI#:
      BOP#:

2)    The prisoner to be utilized is currently incarcerated at the Los Angeles MDC, 535 North Alameda Street, Los Angeles, California.

3)    The prisoner is currently in the supervisory custody of the United States Marshal's Service, and is being held at MDC Los Angeles.  The utilization of this prisoner has been fully

bop foia 2021-04847 17 of 21

**Exhibit 175 -  2711**

# EXHIBIT 176

**RESTRICTED (when completed)**

MG 15(T)

Page 10 of 16

Person Interviewed    Miss Marina KARAGODINA

| Tape counter times(♦) | Person speaking | Text |
|---|---|---|
| | MISS KARAGODINA | Hours, yeah. |
| | DC MORRIS | OK. |
| | DC RICHARDS | OK. We are going to talk about the bag again Marina. |
| | MISS KARAGODINA | Yeah. |
| | DC RICHARDS | You remember the bag that we discussed in the previous interviews and one that was supposed to have contained a gun, syringes and tape and all that sort of thing. |
| | MISS KARAGODINA | Yeah. |
| | DC RICHARDS | Later today we intend interviewing Mr. LITCHFIELD again, and an additional witness that we have found in relation to the bag and its contents. It is important that before we do that we get from you again the story of this bag, it is very important that we know that what you told us both in the last time in interview and the discussions that you and I have had, is absolutely true, because you know what LITCHFIELD said, you are aware of what Mr. LITCHFIELD was saying when he handed you that bag at Cheltenham Railway Station, it opened up, the contents spilled out on the floor for all to see, and part of that contents was a gun, including the syringes and the tape and whatever. Now he maintains that there was a gun in that bag and he handed it to you. It is most important we find out (1) that if there was a gun in that bag and (2) where is it now, if it has been thrown away, if it has been sold or if it has been thrown in a lake, whatever, I mean he doesn't know where that is. Now he is insisting the bag contained a gun, insisting. Now are you still insisting that it didn't? |

Signature(s)...................................................................................
(Contemporaneous notes only)
2004/05(1): MG 15(T)

♦Not relevant for contemporaneous notes

**70863**

**Exhibit 176 -  2712**

MG 15(T)

**RESTRICTED (when completed)**

Person Interviewed    Miss Marina KARAGODINA

| Tape counter times(♦) | Person speaking | Text |
|---|---|---|
| | MISS KARAGODINA | Yes, we do, and my son he is of course still young, and you think I would take it with me, well my, I am not insane, they may say whatever they want, I have my boy with me and he was only eight months old, years old and I was seven months pregnant, and he is saying that I picked up a gun and I took it with me. |
| | DC MORRIS | But can I just say that you were sufficiently frightened not to spend £80,000 when you really could do with spending quite a bit of that money, so it could be, could it not that if you had been told to pick that up and dispose of the contents or whatever, you would be sufficiently frightened to do that. |
| | MISS KARAGODINA | (pause) No. |
| | DC MORRIS | You understand what I am saying now? |
| | MISS KARAGODINA | Yes, I do understand, it is all very scary. |
| | DC MORRIS | And if that is the case then we need to know. |
| | MISS KARAGODINA | (pause) It has never happened. |
| | DC MORRIS | OK. |
| | DC RICHARDS | Why would, perhaps you can't answer this, why would a man like LITCHFIELD, how many times did you meet him? |
| | MISS KARAGODINA | A few. |
| | DC RICHARDS | A few, because you had the car, and the other ///////////// |
| | MISS KARAGODINA | Yes. |

Signature(s)..................................................................................
(Contemporaneous notes only)
2004/05(1): MG 15(T)

♦Not relevant for contemporaneous notes

**70864**

**Exhibit 176 - 2713**

Person Interviewed    Miss Marina KARAGODINA

| Tape counter times(♦) | Person speaking | Text |
|---|---|---|
| | DC RICHARDS | Why would he, why would he tell a story like that if it isn't true? Why would he tell a story about a gun in the bag if it wasn't true? |
| | MISS KARAGODINA | (pause)    Because I wouldn't be responsible for what Mr. LITCHFIELD is saying. |
| | DC RICHARDS | I understand that, I understand that. |
| | MISS KARAGODINA | And I don't know his relation with Iouri beforehand, what was it, I don't know, but definitely it has never, the bag was in a trunk, it was in the boot and he opened, I opened it and I gave him the, ////////////////////////// in February the book for the bag, for the car. |
| | DC RICHARDS | Yes, the Log Book, yes, the registration book. |
| | MISS KARAGODINA | Yes, and that was it, so that the, and as a result of the witness who was saying that I took the gun. |
| | DC RICHARDS | Well what we are saying is, we are interviewing a second witness, we don't know what he is going to say yet because we haven't interviewed him, but we are seeing another witness, now if he says the same thing, you know, it is going to be very strange, and I don't understand why anybody would say that a bag contained something that it did not, it just doesn't make sense. I mean if, look, the bottom line is Marina, let me just say this to you, and I know it is on tape. If you, if there was a gun in that bag and you have thrown it away for goodness sake tell us, you are not going to get into any more trouble, you can't, it is impossible, you are frightened, you are pregnant for goodness sake, and you have an eight year old boy with you, if you have got rid of this because you are frightened, you must tell us, and then we will stop hounding you, we will stop |

Signature(s)................................................................................................................
(Contemporaneous notes only)
2004/05(1): MG 15(T)

♦Not relevant for contemporaneous notes

RESTRICTED (when completed)

MG 15(T)

Person Interviewed    Miss Marina KARAGODINA

| Tape counter times(♦) | Person speaking | Text |
|---|---|---|
| | | interviewing you. |
| | MISS KARAGODINA | (pause) I don't know about that, I don't know, there are strange people around and I don't know, I don't know, I don't want to do anything with that, because I never, I never had any connection with that. |
| | DC RICHARDS | We understand that, it is a fact of life that somebody has, you have got a bag that has been handed to you by somebody and it has something in it. Whether you have given it to somebody else, we know that you are not going to use a gun, we are quite aware of that, we can see what sort of a person you are, there was a gun in there. |
| | MISS KARAGODINA | May be Mr. LITCHFIELD took it back like he said. |
| | DC RICHARDS | I have thought of that, there was a gun in there though. |
| | MISS KARAGODINA | How do you know? |
| | DC RICHARDS | Well no, I am asking you? |
| | MISS KARAGODINA | Oh you are asking me is there a gun in there, if Mr. LITCHFIELD took it. |
| | DC RICHARDS | No, I am asking you if there was a gun in there. |
| | MISS KARAGODINA | (long pause) The bag never spilled out of the car, and I never pick up anything from the floor, and as I said my boy was with me. |
| | DC RICHARDS | OK. |
| | MISS KARAGODINA | Well I don't know what to say. |

Signature(s)..............................................................................................
(Contemporaneous notes only)
2004/05(1): MG 15(T)

♦Not relevant for contemporaneous notes

**70866**

**Exhibit 176 - 2715**

RESTRICTED (when completed)   MG 15(T)

Page 14 of 16

Person Interviewed     Miss Marina KARAGODINA

| Tape counter times(♦) | Person speaking | Text |
|---|---|---|
| | DC RICHARDS | Well you must tell us if the... |
| | DC MORRIS | Just tell us, that's all we want to know. |
| | DC RICHARDS | If it did contain a gun and you have disposed of it, you must tell us, because we either believe you or we believe Mr. LITCHFIELD and now another man, and it doesn't look very good does it. I understand you are saying the bag did not open up and fall on the floor or the contents on the floor, that's what you are saying, so LITCHFIELD has lied. |
| | MISS KARAGODINA | Yes, he is lying to you. |
| | DC RICHARDS | On that point. |
| | MISS KARAGODINA | On that point, it has never, it has never. |
| | DC RICHARDS | So the bag was opened in the boot or the bonnet of the car, is that what you are saying? |
| | MISS KARAGODINA | It was, yes, it was lying in the trunk. |
| | DC RICHARDS | The trunk, yes. The Ferrari's engines are at the back, so the trunk would be in the front, yes? |
| | MISS KARAGODINA | Yes. |
| | DC RICHARDS | And when the bag was opened... |
| | MISS KARAGODINA | No it wasn't a Ferrari, he came... |
| | DC RICHARDS | He came in a different car, oh ok, I understand. |
| | MISS KARAGODINA | He came in a different car. |

Signature(s)........................................................................
(Contemporaneous notes only)
2004/05(1): MG 15(T)

♦Not relevant for contemporaneous notes

**70867**

**Exhibit 176 - 2716**

RESTRICTED (when completed)

MG 15(T)

Page 15 of 16

Person Interviewed    Miss Marina KARAGODINA

| Tape counter times(♦) | Person speaking | Text |
|---|---|---|
| | DC RICHARDS | So when the bag was opened to get the log book out, the registration book, the contents of the bag, what did it contain? |
| | MISS KARAGODINA | (pause) Lots of rubbish was in the way. |
| | DC RICHARDS | Right, I will give you another opportunity, and one last opportunity to tell me if there was a gun in that bag? |
| | MISS KARAGODINA | (pause) I suppose it was. |
| | DC RICHARDS | I know there was, I can see by your face. |
| | MISS KARAGODINA | And I threw it away the next morning. |
| | DC RICHARDS | I can see by your face. Where did you throw it away? |
| | MISS KARAGODINA | In the rubbish bin. |
| | DC RICHARDS | Can we get it back? |
| | MISS KARAGODINA | (pause) What do you mean? |
| | DC RICHARDS | Sorry. |
| | MISS KARAGODINA | What do you mean? |
| | DC RICHARDS | In the rubbish bin you say. So it has gone to the Tip, is that what you are saying, the bin men have picked it up? |
| | MISS KARAGODINA | I lived in Hammersmith Place, I took it early morning when the rubbish men were picking up and I put it in a bin. |
| | DC RICHARDS | What about the rest of the contents of the bag? |
| | MISS KARAGODINA | Well everything I put in the bin, but the bag in the back never spilt out. |

Signature(s)............................................................................................
(Contemporaneous notes only)
2004/05(1): MG 15(T)

♦Not relevant for contemporaneous notes

**70868**

**Exhibit 176 - 2717**

**RESTRICTED (when completed)**

MG 15(T)

Page 16 of 16

Person Interviewed      Miss Marina KARAGODINA

| Tape counter times(♦) | Person speaking | Text |
|---|---|---|
| | | out. |
| | DC RICHARDS | OK.  We need to stop this interview here for a moment.  We are going to stop for a moment Marina and come back to you.  It is 11.59am. |

Signature(s)...................................................................................
(Contemporaneous notes only)
2004/05(1): MG 15(T)

♦Not relevant for contemporaneous notes

**70869**

**Exhibit 176 - 2718**

**RESTRICTED (when completed)**

MG 15(T)

# RECORD OF INTERVIEW

URN

**ROTI**

| | |
|---|---|
| Person interviewed | Miss Marina KARAGODINA |
| Place of interview | Ground Floor Interview Room at Lodden Valley Police Station |

Police Exhibit No.    JR/4A

Number of Pages 4

Signature of interviewing officer producing exhibit

| | |
|---|---|
| Date of interview | Monday 16th May 2005 |
| Time commenced | 12.19pm    Time concluded    12.24pm |
| Duration of interview | 5 minutes |
| Audio tape reference nos.(•) | Visual image reference nos.(•) |
| Interviewer(s) | Detective John RICHARDS |
| Other persons present | Detective Tony Morris |

| Tape counter times(•) | Person speaking | Text |
|---|---|---|
| | DC RICHARDS | Continuing the interview with Marina KARAGODINA at 12.19pm. Marina, in relation to what you said at the end of the last tape, in relation to the contents of that bag including the gun, my colleague Tony and I have taken some advice on the latter and it would appear that you may have committed some offence, particularly one of possessing and the disposing of a firearm. I don't propose arresting you today but I will caution you again because I think it proper that you should be re-cautioned, and after that we just want to ask you a few more questions and then you will be free to leave. So you do not have to say anything, but it may harm your defence if you do not mention when questioned something, which you will later rely on in Court, anything you do say may be given in evidence. Do you understand that? |
| | MISS KARAGODINA | Yes. |
| | DC RICHARDS | And I will have to ask you again, do you want a lawyer present? |

Signature(s)...................................................................................
(Contemporaneous notes only)
2004/05(1): MG 15(T)

•Not relevant for contemporaneous notes

**70870**

**Exhibit 176 - 2719**

| | RESTRICTED (when completed) | MG 15(T) |

Person Interviewed    Miss Marina KARAGODINA

| Tape counter times(•) | Person speaking | Text |
|---|---|---|
| | MISS KARAGODINA | What do you think, do I need? |
| | DC RICHARDS | No, I can't give advice on that. |
| | MISS KARAGODINA | Well ok I will answer the questions; I don't think so because I am telling the truth. |
| | DC RICHARDS | All right. I just want to clear up just a couple of points in relation to that gun and I want you to tell me exactly what else was in that bag beside the gun that you threw away? |
| | MISS KARAGODINA | Well first of all the bag never spilled, when I took the bag I new knew what was in it. |
| | DC RICHARDS | Right. So you picked the bag up from LITCHFIELD. |
| | MISS KARAGODINA | Yes. |
| | DC RICHARDS | You gave him the Log Book from the bag. |
| | MISS KARAGODINA | Yes. |
| | DC RICHARDS | And then what happened after that? |
| | MISS KARAGODINA | So then I went home with my son. |
| | DC RICHARDS | You went home with your son. |
| | MISS KARAGODINA | Yes. |
| | DC RICHARDS | And the bag. |
| | MISS KARAGODINA | And the bag, yes. |
| | DC RICHARDS | Did you at that stage know what was in the bag? |

Signature(s).........................................................................................
(Contemporaneous notes only)
2004/05(1): MG 15(T)

•Not relevant for contemporaneous notes

**70871**

**Exhibit 176 - 2720**

**RESTRICTED (when completed)**

MG 15(T)

# RECORD OF INTERVIEW

URN

**ROTI**

| | |
|---|---|
| Person interviewed | Miss Marina KARAGODINA |
| Place of interview | Ground Floor Interview Room at Lodden Valley Police Station |

Police Exhibit No.    JR/4A

Number of Pages 4

Signature of interviewing officer producing exhibit

| | |
|---|---|
| Date of interview | Monday 16th May 2005 |
| Time commenced | 12.19pm    Time concluded    12.24pm |
| Duration of interview | 5 minutes |
| Audio tape reference nos.(•) | Visual image reference nos.(•) |
| Interviewer(s) | Detective John RICHARDS |
| Other persons present | Detective Tony Morris |

| Tape counter times(•) | Person speaking | Text |
|---|---|---|
| | DC RICHARDS | Continuing the interview with Marina KARAGODINA at 12.19pm. Marina, in relation to what you said at the end of the last tape, in relation to the contents of that bag including the gun, my colleague Tony and I have taken some advice on the latter and it would appear that you may have committed some offence, particularly one of possessing and the disposing of a firearm.  I don't propose arresting you today but I will caution you again because I think it proper that you should be re-cautioned, and after that we just want to ask you a few more questions and then you will be free to leave. So you do not have to say anything, but it may harm your defence if you do not mention when questioned something, which you will later rely on in Court, anything you do say may be given in evidence.  Do you understand that? |
| | MISS KARAGODINA | Yes. |
| | DC RICHARDS | And I will have to ask you again, do you want a lawyer present? |

Signature(s)..............................................................................................
(Contemporaneous notes only)
2004/05(1): MG 15(T)

•Not relevant for contemporaneous notes

**70872**

**Exhibit 176 - 2721**

RESTRICTED (when completed)

MG 15(T)

Page 2 of 4

Person Interviewed    Miss Marina KARAGODINA

| Tape counter times(♦) | Person speaking | Text |
|---|---|---|
| | MISS KARAGODINA | What do you think, do I need? |
| | DC RICHARDS | No, I can't give advice on that. |
| | MISS KARAGODINA | Well ok I will answer the questions; I don't think so because I am telling the truth. |
| | DC RICHARDS | All right. I just want to clear up just a couple of points in relation to that gun and I want you to tell me exactly what else was in that bag beside the gun that you threw away? |
| | MISS KARAGODINA | Well first of all the bag never spilled, when I took the bag I new knew what was in it. |
| | DC RICHARDS | Right. So you picked the bag up from LITCHFIELD. |
| | MISS KARAGODINA | Yes. |
| | DC RICHARDS | You gave him the Log Book from the bag. |
| | MISS KARAGODINA | Yes. |
| | DC RICHARDS | And then what happened after that? |
| | MISS KARAGODINA | So then I went home with my son. |
| | DC RICHARDS | You went home with your son. |
| | MISS KARAGODINA | Yes. |
| | DC RICHARDS | And the bag. |
| | MISS KARAGODINA | And the bag, yes. |
| | DC RICHARDS | Did you at that stage know what was in the bag? |

Signature(s)..................................................................................................
(Contemporaneous notes only)
2004/05(1): MG 15(T)

♦Not relevant for contemporaneous notes

**70873**

**Exhibit 176 - 2722**

RESTRICTED (when completed)

MG 15(T)

Page 3 of 4

Person Interviewed    Miss Marina KARAGODINA

| Tape counter times(*) | Person speaking | Text |
|---|---|---|
| | MISS KARAGODINA | No I didn't. |
| | DC RICHARDS | All right. So you get home and then what happens? |
| | MISS KARAGODINA | Well then when I get home I remember at that time I went, because I was heavily pregnant I went to my doctor because I had an appointment with and then I came home. I feed my son and I put him to bed and then I open the bag, I cried when I saw what I saw in it, so I put all the contents in the bag, and in the morning, so I didn't sleep all night, and in the morning, the next morning when the rubbish bin came, but I knew it was coming at 7 o'clock, so when I heard the noise because it is a big vehicle in a small street, so I came downstairs and I just put this bag in the rubbish bin, and so the rubbish cart took it away. |
| | DC RICHARDS | And what was in the bag? |
| | MISS KARAGODINA | (pause) There was a gun. |
| | DC RICHARDS | And? |
| | MISS KARAGODINA | (pause) There were some stamps, there was sellotapes, but Mr. LITCHFIELD said about drugs, there were no drugs, there was a gun, and there were some shirts, I mean shirts. |
| | DC RICHARDS | Do you know what sort of gun it was? |
| | MISS KARAGODINA | No, I don't know anything about that, and I didn't look at it and I didn't touch it, I just, I just put it all in the bag, and then I put it in the bin. |
| | DC RICHARDS | And where were you living then, the address you were at? |

Signature(s).................................................................................................
(Contemporaneous notes only)
2004/05(1): MG 15(T)

*Not relevant for contemporaneous notes

**70874**

**Exhibit 176 - 2723**

# EXHIBIT

# 177

BP-S243.013  APPLICATION TO ENTER INSTITUTION AS REPRESENTATIVE  CDFRM
MAY 94
U.S. DEPARTMENT OF JUSTIC.'                                    FEDERAL BUREAU OF PRISONS

## GENERAL

This information is provided pursuant to Public Law 93 - 579, the Privacy Act of December 31, 1974.

## PURPOSES AND USES

The information you supply may be used as a basis for an investigation regarding your correspondence with __Iouri Mikhel  # 23675-112__ and admission to visit this person at __Metropolitan Detention Center__ . In the process of conducting the investigation, the Bureau of Prisons may disclose the information to federal, state, or local law enforcement agencies.

## EFFECTS OF NONDISCLOSURE

You are not required to supply the information requested on the attached form. If you do not furnish the information requested, the processing of your request will be suspended, and you will receive no further consideration. If you furnish only part of the information required, the processing of your request will be attempted; however, it may be significantly delayed. If the information withheld is found to be essential to processing your request properly, you will be so informed, and your request will receive no further consideration unless you supply the missing information. Although no penalties are authorized for failure to supply the requested information, failure to supply the information could result in your not being considered for or allowed admittance to the institution or correspondence privileges with the inmate in question.

**APPLICATION TO ENTER INSTITUTION AS THE REPRESENTATIVE OF A LICENSED ATTORNEY OR TO CORRESPOND WITH A FEDERAL PRISONER AS THE REPRESENTATIVE OF A LICENSED ATTORNEY**

This form has three parts:

1. Questionnaire : The questionnaire is to be completed by each paralegal employee, legal assistant, clerk or student who seeks to enter an institution of Federal Bureau of Prisons as the representative of a licensed attorney to visit a federal prisoner or to correspond with a federal prisoner as the attorney's representative.

2. Certification : The person seeking to enter a federal institution or to visit or correspond with a federal prisoner must sign the certification which follows the questionnaire.

3. Attorney's Statement : The licensed attorney must sign this statement.

]

59311

**Exhibit 177 - 2724**

<u>QUESTIONNAIRE</u>

(NOTE: Answer all questions. If a question does not apply to you, write "Not Applicable" in the space provided for the answer.)

1. Name: _____ LELLAN, Gitte _____

1. a. Any alias or other name ever used:

Name: _____ N/A _____    When used: _____

Name: _____    When used: _____

b. Date of Birth: ███/61

3.

a. Present Address: ██-████████, Burbank CA 91504

b. How long at this address? Since July 2001

c. List all previous addresses (Including Street and Number, City and State) for the last five years and dates you resided at each address:

████████-██, Valencia CA 91354

████████-██, Santa Clarita CA 91321

4.

a. Present place of employment: _____ Attorney Victor Sherman (work assignments only)

b. Name of immediate supervisor: _____ Mr. Victor Sherman

c. Employer's business address: _____ 2115 Main Street, Santa Monica 90405

d. Employer's business phone: _____ (310) 399-3259

e. List all previous employers for the past five years, including employer's addresses and dates of your employment with each employer:

| Employer | Address | Dates of Employment |
|---|---|---|
| Please see attached Resume | | |

5. List all schools, universities, or other educational institutions attended from grade 10 to present (This should include any and all legal training that you have received):

| School | Address | Degree and date received |
|---|---|---|
| Please see attached Resume | | |

6. Have you ever been convicted of ANY criminal offense? If so, complete the following. You may exclude any convictions for minor traffic violations (fine of $50 or less).

| Offense | Date of Conviction | Name, Location of Court |
|---|---|---|
| N/A | | |

7. Have you ever been confined in any jail, prison or penal institution? If so, complete the following:

| Type of Institution (State, Federal, Municipal, County) | Location | Dates of Confinement |
|---|---|---|
| Please see attached letter of explanation | | |

2

59312

**Exhibit 177 - 2725**

8. Have you ever been denied permission to visit or correspond with any inmate by an institution within the Federal Bureau of Prisons? __No__ If so, which institutions, with which inmate, and when?

_____

9. Are you a citizen of the United States? __No__ If not, give the name of the country of which you are a citizen or subject. __Denmark - Legal Resident of US__ (#A071649594)

**STATEMENT OF APPLICANT SEEKING TO ENTER AN INSTITUTION TO VISIT OR TO CORRESPOND WITH A FEDERAL AS THE REPRESENTATIVE OF A LICENSED ATTORNEY**

I certify that I am authorized to act as the legal representative of __Attorney Victor Sherman__ , who is a licensed member of the bar of the State of __California__. I request that I be allowed to interview and correspond with __Iouri Mikhel # 23675-112__ ,who is confined at __Metropolitan Detention C.__ I am aware of my responsibility as a representative of the above-named attorney and certify that I am able to meet this responsibility. I am also aware of the Bureau of Prison's Policy on Inmate Legal Activities and certify that I am able to and will adhere to the requirements of this policy. I pledge to abide by Bureau of Prisons regulations and Institution guidelines.

I hereby certify that all of the information contained in this questionnaire is true and correct to the best of my knowledge. Furthermore, I understand that all information contained in this questionnaire may be investigated and verified through the use of federal, state, and local authorities.

Applicant's printed name: ___GITTE LELLAN___

Applicant's signature: _____

Date completed: ___July 10, 2002___

**STATEMENT OF SPONSORING ATTORNEY**

I hereby certify that I am a licensed member of the bar of the State of __CA__ and that I employ or supervise __Gitte Lellan__. I authorize __Gitte Lellan__ to represent me and request that as my representative he/she be allowed to interview and correspond with __Iouri Mikhel__ who is currently confined at __M.D.C.__. I further certify that __Gitte Lellan__ is aware of the responsibility of his/her role as my representative and is able to meet this responsibility. I pledge that I will supervise my representative's activities. I accept personal and professional responsibility for all acts of my representative which affect the institution, its inmates or staff.

Attorney's printed name: __Victor Sherman, 2115 Main Street, Santa Monica 90405__

Attorney's signature: _____

Date completed: ___July 11, 2002___

(This form may be replicated via WP)              Replaces BP-243(13) of JUL 90

3

59313

**Exhibit 177 - 2726**

BP-S660.012 **NCIC CHECK** CDFRM
MAR 99

**U.S. DEPARTMENT OF JUSTICE**                                    F.DERAL BUREAU OF PRISONS

AUTHORIZATION FOR RELEASE OF INFORMATIO.
NCIC (National Crime Information Center) CHECK

I hereby authorize a representative of the Federal Bureau of Prisons to obtain any information on my criminal history background. I understand that this check must be done before I am allowed to enter/serve at any Bureau facility. I also understand that refusal to provide all necessary information may result in 1) denial of entry into a Bureau facility and 2) denial of volunteer/contract status.

1. Name (Last, First, Middle)

LELLAN, Gitte

2. Address (Street address) (City, State, County, Zip Code)

Burbank, CA 91504

3. Home Telephone Number (Area Code, Number):     (818) 238-0011

4. Aliases/Nickname:     N/A

5. Citizenship (List the country you are a citizen of): Denmark (legal resident of U.S.)

6. Social Security Number:     5026

7. Date of Birth (Month, day, year):     , 1961

| 8a. Sex:  Female | 8b. Race:  White |
| 8c. Height:  5'5" | 8d. Weight:  155 |
| 8e. Color of Eyes:  Brown | 9f. Color of Hair:  Brown |

9. Place of Birth (City, State, County), (List city, county and country if outside the U.S.A)
    Copenhagen, Denmark

| 10. The above listed information is true and correct. Applicant's Signature | 10a. Date |
| --- | --- |
| *[signature]* | July 10, 2002 |

*PRIVACY ACT NOTICE*

**Authority for Collecting Information:** E.O. 10450; 5 USC 1303-1305; 42 USC 2165 and 2455; 22 USC 2585 and 2519; and 5 USC 3301

**Purposes and Uses:** Information provided on this form will be furnished to individuals in order to obtain information regarding activities in connection with an investigation to determine (1) fitness for Federal employment, (2) clearance to perform contractual service for the Federal Government, (3) security clearance or access. The information obtained may be furnished to third parties as necessary in the fulfillment of official responsibilities.

.ects of **Non-disclosures**: Furnishing the requested information is voluntary, but failure provide all or of part the information may result in lack of further consideration for employment, clearance or access, or in the termination of your employment.

59314

**Exhibit 177 - 2727**

# EXHIBIT 178

Subj:     RE: June 26, 2002
Date:     6/26/2002 9:46:47 PM Pacific Standard Time
From:   AGiline@lasd.org (Gilinets, Alex)
To:     GLellan@cs.com ('GLellan@cs.com ')

thank you gitta,,,this should be very help ful,,,i will let you know,,,,,i
have to go to court all day tomorrow,,if u are available in the after
noon,,,i would like to meet with u ,,,,call me and leave me a message
,,either way,,,please......if not, send me an email,.,,,,,thanks
again,,,,alex
—----Original Message—---
From: GLellan@cs.com
To: AGiline@lasd.org
Sent: 6/26/02 8:28 PM
Subject: June 26, 2002

Please confirm receipt of this email;

I met with Iouri Mikhel today for about two hours. I had a document for
him to notarize etc. He was not in a very good mood, kind of grouchy so
I spent a lot of time with him, just making him relax and talk.

I asked him questions regarding the "guys coming over." I said that I
might have a girlfriend who would volunteer to marry one of them. He was
limited with information, however, he did end up telling that it was
three guys from Russia and they were all his own age, in their late
thirties. He pointed out that these three guys were from Russia, not
from Ukraine or any other part. He said that he would send a letter to
them and let them know that there were two possibilities. I reminded
him that "I still was an interview away from obtaining my US citizen
status" but my girlfriend was an unmarried US Citizen. He did say that
the three guys needed to enter on a tourist visa first and then enter
marriages here in the US.

Iouri asked me to assist him in transferring funds from Sierra
Technologies and Stenmark Ventures through my account and then on to
Marina's account. I got the exact info from Marina regarding her bank
account which is:

    HSBC Bank PLC
    26 Broad Street
    Reading, RG1 2BU
    United Kingdom
    Account Number ▇▇▇3817
    Branch Sort Code ▇▇3804.

Iouri stated that if the transfer of these funds take place immediately,
"then we can move on to bigger and better amount, kind of like Safiev's
transactions" (I always get the impression that he and Safiev were
business associates). Iouri offered to pay me at least $25K if I will
help him with transferring the balance from these two accounts to
Marina. He has offered to pay me at least $100K if I will help him with
something "big" in Europe. As for the "bigger and better", he has
repeatedly suggested me to travel to United Kingdom and do the
following:

1)   First meet with Marina and offer her some personal comfort.
2)   Then go to Mail Boxes ETC. at 28 Old Brompton Road, South

Thursday, June 27, 2002 CompuServe: GLellan

60154

**Exhibit 178 - 2728**

Kensington, London, SW7 3SS and establish a personal mailbox.
3)    Then he wants me to go to a place on "Bond Street in London" which deals with shelf-corporations. He wants me to buy a shelf-corporation and then add the name of the corp. to the personal mailbox in South Kensington.
4)    He wants me to meet with "two boys" in London
5)    Then he wants me to take the train from UK to France and continue straight to Antwerpen in Belgium where he wants me "to take care of some big business for him".
6)    From Antwerpen he wants me to go back to London to get the final paperwork "from the place on Bond Street". The final paperwork should include a bank account in some foreign bank, where big sums of money from Latvia and Antwerpen should be transferred through.
7)    Then spend another few days with Marina before returning to the US

We talked briefly about Jeff Dabbs and his partner Ladan, who should have sent a reassuring message through attorney Victor Sherman that "they would remain neutral" and that Mikhel shouldn't worry about Dabbs or Ladan talking! Iouri did (again) confirm that Jeff Dabbs was paid $25K and this time he pinpointed the time as being in the beginning of 2002.

That's pretty much it for now, as far as I recall right now!


—————————— Headers ——————————
Return-Path: <AGiline@lasd.org>
Received: from rly-ye01.mx.aol.com (rly-ye01.mail.aol.com [172.18.151.198]) by air-ye03.mail.aol.com (v86_r1.15) with ESMTP id MAILINYE33-0627004646; Thu, 27 Jun 2002 00:46:46 -0400
Received: from eocfw-ex4.lasd.org (66-120-226-1.ded.pacbell.net [66.120.226.1]) by rly-ye01.mx.aol.com (v86_r1.15) with ESMTP id MAILRELAYINYE14-0627004627; Thu, 27 Jun 2002 00:46:27 -0400
Received: from mail.lasd.org by eocfw-ex4.lasd.org
        via smtpd (for ye.mx.aol.com [205.188.158.25]) with SMTP; 27 Jun 2002 04:43:06 UT
Received: by mail.lasd.org with Internet Mail Service (5.5.2653.19)
    id <N4CZRTL3>; Wed, 26 Jun 2002 21:47:04 -0700
Message-ID: <6EE3E6BC2C6AD4119FE000805FC762BCB39626@1-SHQ-LASDMAIL>
From: "Gilinets, Alex" <AGiline@lasd.org>
To: "'GLellan@cs.com '" <GLellan@cs.com>
Subject: RE: June 26, 2002
Date: Wed, 26 Jun 2002 21:47:36 -0700
MIME-Version: 1.0
X-Mailer: Internet Mail Service (5.5.2653.19)
Content-Type: text/plain;
    charset="iso-8859-1"


Thursday, June 27, 2002 CompuServe: GLellan

60155

**Exhibit 178 - 2729**

# EXHIBIT

# 179



## Internal Revenue Service
## Criminal Investigation Division

## Memorandum of Activity

REVISION 01/16/2003



| | | | |
|---|---|---|---|
| **In Re:** | GITTE LELLAN | **Location:** | U.S. Attorney's Office |
| **Investigation #:** | 950430329 | | 312 North Spring Street, 15th Fl |
| **Date:** | September 23, 2004 | | Los Angeles, CA. 90012 |
| **Time:** | Approx.: 2:09PM to 3:23PM | | |

**Participant(s):** Alex Gilinets, Los Angeles Sheriffs Office (LASO)
Susan Dewitt, Assistant United States Attorney
Kim Meyer, Assistant United States Attorney
Robert Dugdale, Assistant United States Attorney
Alka Sagar, Assistant United States Attorney
Aaron Gogley, IRS-CI
Lynn Antolin, IRS-CI
Thomas Paramo, IRS-CI

On the above date and approximate time, Alex Gilinets and the aforementioned participants met to discuss Gilinets interactions with GITTE LELLAN. At the outset of the meeting, Gilinets was instructed to be careful concerning his knowledge, if any, of information that might be attorney client privileged pursuant to conversations between LELLAN and IOURI MIKHEL that may have been conveyed to him by LELLAN. Gilinets stated, in substance, the following:

1. He has met with LELLAN in person approximately six to ten times. He primarily used e-mail to communicate with LELLAN.

2. He was introduced to LELLAN through an informant approximately two and a half years ago. The informant told him (Gilinets) that there was someone who may have knowledge concerning the "kidnappings" and he (Gilinets) should speak with that person. The person the informant was referring to was LELLAN. Gilinets explained that the informant and LELLAN had a social/personal relationship.

3. Another Los Angeles Sheriffs Office (LASO) deputy, who was handling the informant referred to in paragraph two above, was present with him during the initial contact with LELLAN. The context of this first meeting was "What do you know?" and "Why are you doing this?"

4. Although he may have directed LELLAN to do a couple of things such as to pass on information as she obtained it, he never gave LELLAN specific instructions to do anything on behalf of the LASO. He considered LELLAN to be an "intel informant" and used her as a "listening post". He explained that he was concerned from the onset about the attorney-client privilege issue, and because of this did not provide

60268

**Exhibit 179 - 2730**

her with specific instructions and was very vague. He told her basically to "pass on information to him". This was also the reason he used e-mail to communicate with LELLAN.

5. He does recall Jennifer Shram (FBI) trying to get LELLAN to call "Dabbs".

6. LELLAN told him that she sometimes acted in the capacity of a paralegal for attorneys. One of the attorneys she did this for was Victor Sherman and pursuant to this she would visit inmates and solicit business for Sherman. This allowed her to make some money in the capacity of a paralegal and also provided her with the opportunity to obtain real estate listings through the inmates.

7. LELLAN was in a position to obtain good information pursuant to her having contact with the main suspect, but he was never interested in obtaining admissions from MIKHEL and never directed LELLAN to ask MIKHEL for any specific information. He was aware that the FBI was tracing ransom monies paid pursuant to the kidnappings, and his purpose in talking with LELLAN was to obtain bank account information to further trace the ransom money and/or identify other individuals possibly involved in the kidnappings. He did this with the intention of providing this information to FBI Special Agent Louie Perez.

8. The fact that LELLAN was a paralegal was always a consideration. His logic was that he was just obtaining information and the information he obtained would be evaluated. He told LELLAN he was concerned about the attorney client privilege issue. LELLAN told him that she was not acting in the capacity of a paralegal pursuant to her contacts with MIKHEL, and affirmatively told him that she was acting in the capacity of a real estate agent pursuant to her dealings with MIKHEL.

9. Although it is not LASO standard procedure to tell informants they are not to conduct or engage in illegal activity, he regularly instructs informants not to conduct or engage in illegal activity. He specifically recalls telling LELLAN not to conduct or engage in any illegal activity. Furthermore, it is LASO department policy to formally document an informant only when the informant is being paid by the LASO, or the informant is working time off of a jail/prison sentence. LELLAN was always considered an "intel informant" and therefore it was not necessary to document LELLAN pursuant to department policy. LELLAN was never paid any monies by the LASO. LELLAN may now be documented by the LASO pursuant to her providing information to the Joint Terrorism Task Force.

10. The LASO deputy who dealt with LELLAN pursuant to her providing information to the Joint Terrorism Task Force is Mike Young. He requested a copy of e-mails sent to Mike Young.

11. The only benefit from the LASO that LELLAN was told she would receive was a letter of consideration for her son who is incarcerated pursuant to a vehicular manslaughter violation. LELLAN, from the beginning, told him (Gilinets) her motivation for providing information was to obtain help for her son and keep her son from being deported.

Memorandum  Page 2 of 5                                         U.S. Treasury Criminal Investigation Division

60269

**Exhibit 179 - 2731**

# EXHIBIT

# 180

10/8/2019                                California student gets 8-year term for fatal crash - Deseret News

Deseret News | Church News                                                                    Print Subscriptions

 **DeseretNews**

U.S. & WORLD

# California student gets 8-year term for fatal crash

By Deseret News | Jun 23, 2000, 8:41am MDT

SAN FERNANDO, Calif. (AP) — A high school student who sped repeatedly on the same stretch of road until he crashed and killed three classmates and another man was sentenced to eight years in prison.

Marcus Christian Lellan, 19, pleaded guilty in April to reckless driving and four counts of vehicular manslaughter with gross negligence. He was sentenced Wednesday.

Authorities said his Acura was traveling at more than 100 mph on Feb. 17 when it flipped over and landed on top of an oncoming car on Soledad Canyon Road. He had previously been ticketed for speeding on that road in October and January.

**Exhibit 180 – 2732**